**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**LEE SCHMIDT and CRYSTAL ARRINGTON,**

> **Plaintiff,**

**v.**                                          **Civil Action No.: 2:24-cv-621**

**CITY OF NORFOLK, NORFOLK POLICE**
**DEPARTMENT, and MARK TALBOT, in his**
**Official capacity as the Norfolk Chief of Police,**

> **Defendants.**

**<u>DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION</u>**
**<u>TO DISMISS THE COMPLAINT</u>**

**NOW COME** the Defendants, the City of Norfolk (the "City"), Norfolk Police Department, and Mark Talbot, Norfolk Chief of Police, by counsel, and, pursuant to Rules 12(b)(6), 12(b)(1), and 12(b)(2) of the Federal Rules of Civil Procedure, hereby file their Memorandum in Support of their Motion to Dismiss the Plaintiffs' Complaint with prejudice for failure to state a claim upon which relief can be granted, lack of subject matter jurisdiction, and lack of personal jurisdiction as to Defendant the Norfolk Police Department.

**<u>INTRODUCTION</u>**

In bringing this action, Plaintiffs attempt to extend the boundaries of Fourth Amendment protection beyond any place it has reached before. Plaintiffs are <u>not</u> asking this Court to consider police intrusions into the curtilage of their homes, their private offices, their hotel rooms, or the contents of their personal property. Instead, Plaintiffs want this Court to restrict the use of cameras on public land to capture static images of what any passerby would have been able to observe on the exterior of a vehicle.

1

Federal courts across the nation have repeatedly rejected such an extension of Fourth Amendment protections, finding the analysis hinges on the reasonableness of the privacy right claimed in information gathered in public spaces.  Indeed, the Fourth Circuit has been clear: where an individual has "no legitimate expectation of privacy," such as on public land, police are free "to use video surveillance to capture what any passerby would have been able to observe."  *United States v. Vankesteren*, 553 F.3d 286, 291 (4th Cir. 2009).[1]  Plaintiffs' subjective expectations of privacy are not relevant to any analysis of the Fourth Amendment unless they are consistent with what society generally accepts as an objectively reasonable expectation of privacy.  *See California v. Greenwood*, 486 U.S. 35, 39-40 (1988) (refusing to extend Fourth Amendment protection over garbage left curbside, outside the curtilage of a home).

Even taking all allegations within the Complaint as true, Plaintiffs simply cannot establish a reasonable expectation of privacy in the appearance of the exterior of their vehicles as they drive on public roads.  As a matter of law, their claims fail to set forth a basis on which relief can be granted, and this Court should dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6).

Assuming this Court would entertain stretching the established boundaries of the Fourth Amendment to claims such as those raised by Plaintiffs, these particular Plaintiffs lack the standing necessary to bring suit against Defendants, and this Court should dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(1).

---

[1] This Court has found the analysis in *Vankesteren* controlling when considering a challenge similar to that presented here. *Rutledge v. City of Norfolk*, Virginia, No. 2:09CVL57, 2009 WL 10706608, at *1 (E.D. Va. Apr. 28, 2009) (dismissing a civil action alleging police violated the Fourth Amendment through the warrantless use of video surveillance in "public places where law enforcement officers could have physically conducted surveillance").

Finally, the Court should dismiss the Norfolk Police Department as a Defendant in this action because the Norfolk Police Department is established as part of the City of Norfolk and lacks the capacity to be sued. Therefore, the Court should dismiss the Complaint as to the Norfolk Police Department for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).

## **FACTUAL BACKGROUND**

This lawsuit arises out of the City's operation of automatic license plate reader ("ALPR") cameras purchased from Flock Safety ("Flock"), a private technology contractor. ECF No.1, ¶ 2. Plaintiffs allege that the City and its police department operate 172 ALPR cameras purchased from Flock. *Id.* ¶ 2. These ALPR cameras photograph passing cars, and Flock's proprietary machine learning programs analyze the cars' license plate and other vehicle features. *Id.* ¶¶ 2, 21, 33, 41. The type of ALPR camera purchased by the City from Flock capture images of vehicles traveling up to 100 miles per hour from up to 150 feet away.[2] *Id.* ¶ 32.

When Flock's cameras capture an image of a car, Flock's software uses machine learning to create a "Vehicle Fingerprint" which catalogs the color, make, and distinctive features of the car, like the presence of a bumper sticker or roof rack. *Id.* ¶ 33. This information is uploaded to Flock's database, and Flock then stores such information on its database for 30 days. *Id.* ¶ 41, 43. With the permission of the Norfolk Police Department ("NPD"), Flock pools data across the jurisdictions of its customers, including Norfolk and its surrounding cities (Chesapeake, Suffolk, Hampton, Newport News, Isle of Wight, Franklin, Virginia Beach, and Portsmouth) to enable law enforcement monitoring against law enforcement hotlists as well as provide search access to law enforcement for investigative purposes only. *Id.* ¶ 42. Pursuant to NPD policy, officers of the

---

[2] Plaintiffs do not allege, as they cannot, that Flock cameras photograph anything but the rear of a passing vehicle.

City's police department can access the historical data collected from the Flock cameras for law enforcement purposes.[3]  *Id.* ¶ 47.

Plaintiff Lee Schmidt lives in Norfolk and alleges that there are four Flock cameras just outside his neighborhood.  *Id.* ¶ 53.  The Complaint alleges that each time Schmidt leaves his neighborhood, the Flock cameras take a picture of his car and store it, along with associated data, for at least 30 days.  *Id.* ¶ 55.  Schmidt alleges he has noticed cameras other than the ones outside his neighborhood during his daily travels in Norfolk and that Flock cameras have taken pictures of his car as it passed by and stored those pictures for at least 30 days.  *Id.* ¶ 56.

Plaintiff Crystal Arrington lives in Portsmouth, Virginia.  *Id.* ¶ 61.  She alleges that for personal and professional reasons, she goes through the Downtown Tunnel and drives in and around Norfolk nearly every day.  *Id.* ¶ 64.  "Upon information and belief," based on Chief Talbot's alleged statement that "[i]t would be difficult to drive anywhere of any distance without running into a camera," Arrington alleges that some of the 172 Flock cameras posted at undisclosed locations throughout the City have photographed her car on a near-daily basis since their installation.  *Id.* ¶ 65.  Arrington alleges she frequently drives her elderly client to doctors' offices and medical facilities, so she has passed some of the Flock cameras posted at undisclosed locations throughout the City on those trips.  *Id.*  ¶ 67.

Plaintiffs allege that the City's use of the Flock ALPR cameras violates the Fourth Amendment as "[t]racking the whole of a person's public movements over (at least) 30 days is a search."  *Id.* ¶ 9.  Because the City does this without a warrant, Plaintiffs allege that this constitutes an unreasonable search.  *Id.*  Plaintiffs request that the Court issue injunctive relief against

---

[3] Plaintiffs do not allege, as they cannot, that the technology provides a live stream or passive monitoring function.

Defendants, to include permanently enjoining Defendants from operating Flock cameras and ordering Defendants to delete all images and other data generated by the Flock cameras. *Id.* at 22-23.

## ARGUMENT

### I.   Standard for Motion to Dismiss

#### A. Standard for Motion to Dismiss Under Rule 12(b)(6)

Rule 12(b)(6) permits dismissal when a complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A complaint fails to state a claim if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Though a complaint need not be detailed, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A motion to dismiss tests the sufficiency of a complaint without resolving factual disputes, and a district court "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" *Kensington Volunteer Fire Dep't v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, Inc., 637 F.3d 435, 440 (4th Cir. 2011)). Although the truth of the facts alleged is presumed, district courts are not bound by the "legal conclusions drawn from the facts" and "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc. v. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000); *see also Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

**B.  Standard for Motion to Dismiss Under Rule 12(b)(1)**

Standing "is generally associated with Civil Procedure Rule 12(b)(1) pertaining to subject matter jurisdiction . . . because 'Article III gives federal courts jurisdiction only over cases and controversies,' and standing is 'an integral component of the case or controversy requirement.'" *CGM, LLC v. BellSouth Telecommunications, Inc.*, 664 F.3d 46, 52 (4th Cir. 2011) (quoting *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006)). "The burden of proving subject matter jurisdiction on a motion to dismiss is on the plaintiff, the party asserting jurisdiction." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). "[W]hen a defendant asserts that the complaint fails to allege sufficient facts to support subject matter jurisdiction, the trial court must apply a standard patterned on Rule 12(b)(6) and assume the truthfulness of the facts alleged." *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009).  "In order to satisfy the standing requirements of Article III of the Constitution, a plaintiff must demonstrate that: (1) it has suffered an injury in fact; (2) the asserted injury in fact is fairly traceable to, or caused by, the challenged action of the defendant; and (3) it is likely rather than just conjectural that the asserted injury in fact will be redressed by a decision in the plaintiff's favor." *Taubman Realty Group Ltd. Partnership v. Mineta*, 320 F.3d 475, 480 (4th Cir. 2003).

**C.  Standard for Motion to Dismiss Under Rule 12(b)(2)**

When a court's personal jurisdiction is properly challenged by a Rule 12(b)(2) motion, the jurisdictional question thus raised is one for the judge, with the burden on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence. *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).

**II.**   **Plaintiffs' claims must be dismissed because they have not plausibly alleged a search occurred under the Fourth Amendment**

The Court should dismiss Plaintiffs' claims because they have not plausibly alleged a search occurred under the Fourth Amendment.  The Fourth Amendment provides that the "right

of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The application of the Fourth Amendment depends on whether the person invoking its protection can claim a "justifiable," a "reasonable," or a "legitimate expectation of privacy" that has been invaded by government action. *Smith v. Maryland*, 442 U.S. 735, 740 (1979). The inquiry as to whether a Fourth Amendment search occurred involves a two-part test articulated by the Supreme Court in *Katz v. United States*, 389 U.S. 347 (1967). *See id.* The *Katz* test requires courts to analyze, first, whether the person "exhibit[s] an actual (subjective) expectation of privacy" and, second, whether the expectation is "one that society is prepared to recognize as 'reasonable.'" *Katz*, 389 U.S. at 361 (Harlan, J., concurring).

### A. Plaintiffs do not have a reasonable expectation of privacy in the exterior of their vehicles while driving on public thoroughfares

Plaintiffs attempt to satisfy the *Katz* test by alleging they have a "subjective expectation of privacy in the whole of their long-term physical movements" and that "[s]ociety's expectation has been that law enforcement officers would not and could not monitor and catalogue the whole of a person's movement over 30 days." ECF No. 1, ¶ 99. In light of how Plaintiffs describe the Flock cameras and how they work, this recital of the two lines of inquiry under *Katz* fails to allege that their operation constitutes a Fourth Amendment search. Longstanding precedent holds that, (1) persons do not have an expectation of privacy in the exterior of their automobile exposed to public view (*see New York v. Class*, 475 U.S. 106, 114, (1986)) and (2) "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *United States v. Knotts*, 460 U.S. 276, 281 (1983).

Both of these well-established tenets dictate that Plaintiffs have not alleged – because they cannot allege – a legitimate expectation of privacy that has been invaded by the City's operation

of the Flock cameras.  Turning first to the type of information the Flock cameras capture, Plaintiffs allege they "capture vehicles traveling up to 100 miles per hour from up to 150 feet away" (ECF No. 1 ¶ 32), a car's license plate (ECF No. 1 ¶ 41), and the "make, model color, timestamp, type of plate, damage or alterations and whether the vehicle is registered to a resident or non-resident."[4] (*Id.*).  There is simply no expectation of privacy in these external features or information about a vehicle.  *See Class*, 475 U.S. at 114 (finding it is unreasonable to have an expectation of privacy in a VIN number which is required by law to be located in a place ordinarily in plain view from the exterior of the automobile); *United States v. George*, 971 F.2d 1113, 1120 (4th Cir. 1992), *as amended* (Aug. 12, 1992) (finding "one does not have a reasonable expectation of privacy in the visible exterior parts of an automobile that travels the public roads and highways."); *see also Neal v. Fairfax Cnty. Police Dep't*, 295 Va. 334, 346 (2018) (finding that there is nothing about a license plate number stored in an ALPR database that inherently "describes, locates or indexes anything about an individual").

Other courts considering the issue have reached similar conclusions regarding an individual's reasonable expectation of privacy in the information captured by taking an image of a vehicle's exterior from a position open to the public. *See United States v. Salcido-Gonzalez*, No. 4:23-CR-00049-DN, 2024 WL 2305478, at *12 (D. Utah May 21, 2024) (finding no search because license plate reader technology "did not operate at the granular level of detail that would expose the intimate details of an individual's life."); *United States v. Jiles*, No. 8:23-CR-98, 2024

---

[4] Despite having access to the City's contract with Flock Safety, *see* ECF No. 1 ¶ 37, and the Flock website, *see id*. at 8 n.5, Plaintiffs do not cite any documentation to support their contention that the Flock camera captures a vehicle's "model", "damage", or the content of a vehicle registration record. The last contention is particularly absurd, since such information is housed in the state's motor vehicle records, *see* Va. Code § 46.2-600, and cannot be gleaned from photographing the exterior of a vehicle.

WL 891956, at *19 (D. Neb. Feb. 29, 2024) (finding no search occurred when police accessed an automated license plate reader database as such technology "reveals when, where, and in which direction a certain vehicle was driving—information of limited value…."); *United States v. Toombs*, 671 F. Supp. 3d 1329, 1333 (N.D. Ala. 2023); *United States v. Graham*, No. CR 21-645, 2022 WL 4132488, at *5 (D.N.J. Sept. 12, 2022); *United States v. Rubin*, 556 F. Supp. 3d 1123, 1130 (N.D. Cal. 2021); *United States v. Brown*, No. 19CR0000949, 2021 WL 4963602, at *3 (N.D. Ill. Oct. 26, 2021) (finding "two dozen snapshots of a car on the streets over ten weeks" does not constitute a search under the Fourth Amendment).

Next, to the extent Plantiffs' claims rest on their allegation that the City's Flock cameras photograph their cars when they drive in or around Norfolk, Plaintiffs have failed to allege a reasonable expectation of privacy that has been violated. "A person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another," since he "voluntarily convey[s] [them] to anyone who want[s] to look." *Knotts*, 460 U.S. at 281. In *Knotts,* the Supreme Court held that the government did not conduct a search when it placed a monitoring beeper, a type of tracking device, in a container purchased by one of Knotts's co-conspirators and used it to monitor his trip all the way to a secluded cabin owned by Knotts. *Id*. at 278–80. The Supreme Court reasoned that the use of the tracker merely "augment[ed]" existing police capabilities and "amounted principally to the following of an automobile on public streets and highways." *Id.* at 281–82. The Supreme Court concluded that:

> The governmental surveillance conducted by means of the beeper in this case amounted principally to the following of an automobile on public streets and highways. We have commented more than once on the diminished expectation of privacy in an automobile: "One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view."

*Id*. at 281 (quoting *Cardwell v. Lewis,* 417 U.S. 583, 590 (1974)).

As in *Knotts*, the technology at issue here – the Flock ALPR cameras – functions to capture details about a car that is travelling in plain view on a public thoroughfare.  Accordingly, Plaintiffs cannot allege a reasonable expectation of privacy has been violated by the City's operation of the Flock cameras.  Less than two months ago, this Court reached that exact conclusion in the context of a criminal defendant moving to suppress ALPR evidence from the Flock database as the product of a warrantless search in violation of the Fourth Amendment.  *See United States v. Martin,* No. 3:23-CR-150, 2024 WL 4476560 (E.D. Va. Oct. 11, 2024).  In that case, a Richmond police officer had accessed the Flock database to identify the license plate number of a suspect vehicle involved in a Richmond robbery, and, later, a Chesterfield County detective searched the Flock database for images of the same vehicle in relation to an attempted robbery in Chesterfield County.  *Id*. at *3-4. The type of Flock camera involved in that case was the very same type at issue here, the "Falcon," described as "a stationary camera affixed to a pole without zoom, tilt, pan, audio, or video capabilities."  *Id.* at *2.  At the time of the Richmond robbery, Flock cameras, owned by both public and private entities, covered an area that includes Richmond City, Chesterfield County, Hanover County, Henrico County, and Colonial Heights.  *Id.*

In considering the motion to suppress, Judge Payne engaged in a detailed analysis of precedent regarding searches under the Fourth Amendment.  Applying the *Katz* test, the Court found that the defendant did not have a subjective expectation of privacy while driving his vehicle. *Id.* at *11.  The Court reasoned that "well-established precedent forecloses such a possibility" as "[t]here is simply no expectation of privacy in the exterior of one's vehicle," "or while driving it on public thoroughfares."  *Id.* (citing *Class*, 475 U.S. at 106; *Knotts*, 460 U.S. at 281-282). Consistent with this Court's holding in *Martin*, plaintiffs Schmidt and Arrington have not plausibly

alleged that the City's operation of Flock cameras violates a reasonable expectation of privacy where such cameras capture images of vehicles travelling in plain view on public thoroughfares.

The Fourth Circuit has observed in considering the boundaries of an individual's reasonable expectation of privacy, "'[v]ideo surveillance does not in itself violate a reasonable expectation of privacy. Videotaping of suspects in public places, such as banks, does not violate the fourth amendment; the police may record what they normally may view with the naked eye.'" *Vankesteren*, 553 F.3d at 290 (quoting *United States v. Taketa*, 923 F.2d 665, 677 (9th Cir. 1991)).

The sophistication of the technology used to capture and record those images does not alter the conclusion here. "That the agents chose to use a more resource-efficient surveillance method does not change our Fourth Amendment analysis." *Vankesteren*, 553 F.3d at 291. Where, as here, "the camera did little more than the agents themselves could have physically done [] its use was therefore not unconstitutional." *Id.*; *accord United States v. Houston,* 813 F.3d 282, 287-88 (6th Cir. 2016) (finding no Fourth Amendment violation in continuous surveillance for 10 weeks because the defendant "had no reasonable expectation of privacy in video footage recorded by a camera that was located on top of a public utility pole and that captured the same views enjoyed by passersby on public roads.").

This Court's reasoning in *Martin* and the Fourth Circuit's analysis in *Vankesteren* apply to the facts of this case such that Plaintiffs have failed to allege that the City's operation of Flock cameras violates a reasonable expectation of privacy.

### B. Flock cameras do not violate the reasonable expectation of privacy in the whole of a person's physical movements

Presumably aware that their allegations regarding the City's operation of Flock cameras would not pass the reasonable expectation of privacy test under *Katz* and a straightforward application of the reasoning in *Knotts*, Plaintiffs allege that the City's operation of Flock cameras

violates a reasonable expectation of privacy in the "whole of their long-term physical movements." ECF No. 1, ¶ 99.  Plaintiffs rely on cases which examine the Fourth Amendment as it applies to location-tracking technology, without regard to the obvious differences between the technology examined in those cases and the Flock camera technology at issue here.  *See* ECF No. 1, p. 4 n. 1 and ¶ 100.

In *United States v. Jones*, 565 U.S. 400 (2012), the Supreme Court examined police use of a GPS-tracking device to remotely monitor and record a vehicle's movements over 28 days. *Id.* at 402–04. Applying a property-based approach to determine whether a search had occurred, the Court ultimately decided that the government's physical trespass on Jones's vehicle amounted to a search.  *Id.* at 404-405.  In separate opinions, five Justices agreed that "longer term GPS monitoring ... impinges on expectations of privacy."  *See id.* at 430 (Alito, J., concurring); *id.* at 415 (Sotomayor, J., concurring).  The concurring Justices reasoned that "society's expectation" was that police would not "secretly monitor and catalogue every single movement of an individual's car for a very long period." *See id.* at 430 (Alito, J., concurring); *see also id.* at 415 (Sotomayor, J., concurring).  Nothing in the Supreme Court's jurisprudence post-*Jones* has impacted the way federal courts have analyzed the reasonable expectation of privacy either in the object being examined here – the exterior of the car – or the technology being used here – surveillance cameras. The Court in *Jones* acknowledged the holding did not disturb its prior rulings where police information-gathering amounted to only a visual inspection of a vehicle. *Jones*, 565 U.S. at 410 (distinguishing its prior ruling in *New York v. Class,* 475 U.S. 106 (1986), that examining the exterior of a car, "thrust into the public eye," "does not constitute a 'search'").

Several years later, the Supreme Court revisited the principles that informed several opinions reported in *Jones* when it decided *Carpenter v. United States*, 585 U.S. 296 (2018).  In

*Carpenter*, the Court examined government access to historical cell-site location information ("CSLI") – a time-stamped record that is automatically generated every time any cell phone connects to a cell site. *Id.* at 300-301. The Court found that CSLI shared many of the same qualities of the GPS monitoring the Court considered in *Jones*. *Id.* at 309-13. The Court observed that, unlike the bugged container in *Knotts*, a cell phone is almost a "feature of human anatomy" and "tracks nearly exactly the movements of its owner." *Id.* at 311 (internal citation omitted). "A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales." *Id.* (internal citation omitted). The Court took care to contrast a cell phone with a car, as "a car has little capacity for escaping public scrutiny." *Id.* citing *Cardwell v. Lewis,* 417 U.S. 583 (1974) (plurality opinion). The Supreme Court concluded that, "[a]ccordingly, when the Government tracks the location of a cell phone it achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user." *Id.* at 312. On these facts, *Carpenter* held "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI," and that the government's acquisition of CSLI was a search within the meaning of the Fourth Amendment. *Id.* at 310, 315. The Court declared that "Our decision today is a narrow one. We do not express a view on matters not before us… We do not…call into question conventional surveillance techniques and tools, such as security cameras." *Id.* at 316.

Plaintiffs seize upon *Carpenter*'s identification of a "reasonable expectation of privacy in the whole of [a person's] physical movements", (*id.* at 310), as analyzed by the Fourth Circuit in *Leaders of a Beautiful Struggle v. Baltimore Police Dep't,* 2 F.4th 330 (4th Cir. 2021). *Beautiful Struggle* involved a Fourth Amendment challenge to an aerial-surveillance program that the City of Baltimore experimented with using. *Id.* at 333. While it was in operation, the program used

13

aerial photography to track movements related to serious crimes.  *Id.* at 333-334.  Multiple planes flew distinct orbits above Baltimore, equipped with camera technology that captured aerial photos of 32 square city miles every second for at least 40 hours a week, obtaining an estimated twelve hours of coverage of around 90% of the city each day.  *Id.* at 334.  Any single aerial image – captured once per second – included around 32 square miles of Baltimore and could be magnified to a point where people and cars are individually visible, but only as blurred dots or blobs.  *Id.* Based on the nature of the surveillance program at issue, the Fourth Circuit concluded that, because the program opened "an intimate window" into a person's associations and activities, it violated the reasonable expectation of privacy individuals have in the whole of their movements.  *Id.* at 342 (quoting *Carpenter,* 515 U.S. at 311).  Therefore, the warrantless operation of the program violated the Fourth Amendment.  *Id.* at 346.

Here, Plaintiffs strain to liken the City's use of Flock cameras to the aerial surveillance program at issue in *Beautiful Struggle* in an effort to demonstrate that the use of Flock cameras violates Plaintiffs' expectation of privacy in the whole of their physical movements. *See* ECF No. 1, ¶ 100.  This failed analogy is telling, and only serves to highlight relevant distinctions between the City's use of Flock cameras and the use of technology that *Carpenter* and *Beautiful Struggle* found to violate a reasonable expectation of privacy in the whole of a person's physical movements.

Unlike the CSLI in *Carpenter* or the aerial surveillance program in *Beautiful Struggle*, the City's Flock ALPR cameras do not capture data about *people*.  They capture data about *vehicles* from a fixed position and a public vantage point.  *See* ECF No. 1, ¶¶ 19, 21, 32, 41.  Any identifying vehicle information that may be captured by a Flock camera – such as the make and color (*see* ECF No. 1, ¶ 41) – are only those characteristics that are plainly visible to the naked eye.

14

Images in the Flock database reveal nothing about the vehicle's driver because the Flock cameras capture vehicles, not people.  *See* ECF No. 1, ¶¶ 19, 21, 32, 41.  The Flock system does not reveal who is driving a vehicle or even who the registered owner of a vehicle is.  That the "Vehicle Fingerprint" created by the Flock cameras includes a license plate (*see* ECF No. 1, ¶ 100) does not violate anyone's reasonable expectation of privacy under *Carpenter* or *Beautiful Struggle* because it is unreasonable to have an expectation of privacy in either information that is required by law to be located in plain view, such as a license plate, or the characteristics of a vehicle traveling along public thoroughfares.  *See Class*, 475 U.S. at 114; *Knotts* 460 U.S. at 28.  In *Martin*, this Court held:

> Moreover, the Court agrees with the Government that, to the extent Martin claims a reasonable expectation of privacy in his vehicle and license plate, *Knotts* disposes of that contention. *Knotts* specifically held that individuals do not have a reasonable expectation of privacy in their vehicle's movements when driving that vehicle on public streets, highways, and thoroughfares. Just as in *Knotts*, Martin drove his vehicle on the public streets of Richmond City and Chesterfield County so that "anyone who wanted to look" could see his location at the times that the Flock cameras took photographs of his vehicle.

*Martin¸* 2024 WL 4476560, at *15 (internal citations omitted).

Unlike the CSLI at issue in *Carpenter* or the aerial surveillance in *Beautiful Struggle*, there is no way for Flock cameras to track all of an individual person's movements long-term.  First, the cameras operate from a fixed position, with a limited range of capture (up to 150 feet).  *See* ECF ¶ 21, 32.  They do not function as a "feature of human anatomy" or as a "cell phone [that] faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales."  *See Carpenter*, 585 U.S. at 311.  Further, as the Court reasoned in *Carpenter*, while individuals "compulsively carry cell phones with them all the time," "individuals regularly leave their vehicles."  *Carpenter*, 585 U.S. at 311.  For these factual, technical reasons, the Flock cameras do not photograph a vehicle once it leaves

15

the range of the camera, do not photograph vehicles that leave the public thoroughfare, and do not photograph people.  The Flock cameras cannot follow an individual at all.  They can only document the location of a *vehicle* and, even then, only when it is on a public street and within 150 feet.  Accordingly, due to their fixed positions and limited range of capture, Flock cameras cannot track a whole of an individual's movements.

Second, any record or image created by the fixed, ground positioning of Flock cameras with a limited capture range of 150 feet is dissimilar to the "map of movements" created by the aerial surveillance at issue in *Beautiful Struggle*, which utilized aerial cameras to capture *32 square miles per image per second.  See Beautiful Struggle*, 2 F.4th 330 at 334, 344.  Moreover, the aerial surveillance in *Beautiful Struggle* was capable of capturing *individuals* within each 32 square mile image, i.e., each image could show, simultaneously and concurrently, 32 square miles' worth of people walking outside of their vehicles.  *See Beautiful Struggle*, 2 F.4th 330 at 334.  The way the technology was used in that case could "track[] every movement" of every person outside in Baltimore for significant periods of time. *Id.* at 341-342.  The court in *Beautiful Struggle* was clear: the Fourth Amendment challenge in that case was "the creation of a retrospective database of everyone's movements across the city." *Id.* at 345.  The *Beautiful Struggle* opinion thus centers on the reasonable expectation of privacy in the whole or sum of an individual's activities over an extended period of time.

Accordingly, Plaintiffs' reliance on *Beautiful Struggle* is misplaced. Plaintiffs' allegation that Flock cameras can be used to "map nearly all of [their] movements" (*see* ECF ¶ 57, 69) is a conclusory statement that is inconsistent with the facts alleged and ignores the obvious distinctions between the capability of grounded, fixed positioned Flock cameras at discrete locations and the capability of aerial surveillance technology in *Beautiful Struggle* that can capture 32 square miles

per image per second.[5]  Nothing about the technology employed here captures the whole of an individual's movements or the privacies of life, and nothing in photographs of Plaintiffs' vehicles is "so revealing of intimate details as to raise constitutional concerns." *Dow Chem. Co. v. United States*, 476 U.S. 227, 238 (1986) (approving the warrantless use of sophisticated surveillance equipment to take aerial pictures of a chemical manufacturing facility). Indeed, Plaintiffs do not even allege *any* individual identifying information is recorded by Flock cameras.  Plaintiffs acknowledge, as they must, that Flock technology captures information about the outside of a vehicle – which provides no information about the operator or occupants of that vehicle.  Plainly, there is nothing intimate about the exterior features of a vehicle and a license plate exposed to public view traversing a public road.  The collection of that data by the police using the Flock technology is equivalent to the kind of "traditional, short-term surveillance" the Fourth Circuit excluded from the ambit of its holding in *Beautiful Struggle*.  *See Beautiful Struggle*, 2 F.4th 330 at 343.

This Court has already had an opportunity to examine the technological distinctions between Flock cameras and the location-monitoring technology discussed in *Carpenter* and *Beautiful Struggle*.  In *Martin*, Judge Payne undertook such an analysis and concluded that the use of Flock cameras did not violate a reasonable of expectation of privacy in the whole of a person's movements within the reasonings of *Carpenter* or *Beautiful Struggle*.  *Martin*, 2024 WL 4476560 at *14.  There, in considering a motion to suppress ALPR evidence from Flock cameras, the Court examined a configuration of cameras in the City of Richmond and surrounding areas nearly

---

[5] Notably, the record in *Beautiful Struggle* established that the City of Baltimore used its "CitiWatch camera network" and license plate readers concurrently with the air surveillance program, but the use of such camera network and license plate readers was neither challenged nor disturbed by the that decision.  *Beautiful Struggle*, 2 F.4th 330 at 344.

identical to the system alleged by Plaintiffs to exist in Norfolk.  The same stationary "Falcon" fixed pole camera was at issue, and it was alleged that there were almost 200 such Flock cameras in the area of the defendants' alleged crimes.  *See id.* at \*2, \*14.

The Court considered both *Carpenter* and *Beautiful Struggle* and concluded that "[n]o such dragnet type law enforcement practice of the kind before the courts in *Carpenter* and *Beautiful Struggle* has occurred in this case."  *Id.*  at \*14 (internal citation omitted).  The Court based this conclusion on an analysis of the technological distinctions between the Flock system and those surveillance technologies at issue in *Carpenter* and *Beautiful Struggle*:

> When reviewing the Flock database, police officers could not see the route Martin allegedly took to and from the robberies *because the Flock system does not record the totality of one's movements*. None of the almost 200 other Flock cameras in the area photographed Martin's vehicle. That, of course, is part of the system's design, not a defect. *The Flock system is not meant to "track" or "monitor" the entirety of an individual's movements during a particular car trip, much less through the activities of their daily life.* The Flock cameras are "strategically" placed to capture images of <u>locations</u>, not <u>individuals</u>, that are known as historically high-traffic or high-crime areas. ECF No. 65, at 12-14, 25-28. The three individual snapshots of Martin's brief location at specific times hardly rise to the level of persistent, unceasing public surveillance that the courts found troublesome in <u>Carpenter</u> and <u>Beautiful Struggle</u>…*In no sense does the technology, at present, rise to the level of all-encompassing surveillance threatened by GPS tracking, CSLI, or the AIR program.*

*Id.* at \*14 (italicized emphasis supplied; underlined emphasis in original).

The Court further concluded that "while Flock cameras do *operate* twenty-four hours a day, seven days a week, they do not actually *surveil* individual citizens for that duration.  As has been stated, they do not track or monitor the whole of an individual's movements akin to the aerial monitoring in *Beautiful Struggle* or provide constant location information of individuals as in *Carpenter*."  *Id.* at \*15 (emphasis in original).[6]

---

[6] *Martin* also endorsed the Norfolk Circuit Court opinion in *Commonwealth v. Robinson*, 2024 Va. Cir. LEXIS 104 (June 26, 2024).  *Martin*, 2024 WL 4476560 at \*14 n.16.  *Robinson* found that

The Court's reasoning in *Martin* distinguishing the Flock system from the technology at issue in *Carpenter* and *Beautiful Struggle* applies equally here.  It follows that the Court should conclude that the City's use of Flock cameras does not violate a reasonable expectation of privacy in the whole of a person's movements.  Plaintiffs have made no allegations to distinguish the facts of this case from those that were at issue and carefully analyzed in *Martin*.

Plaintiffs have not plausibly alleged that the City's operation of Flock cameras violates a reasonable expectation of privacy and have therefore failed to allege that any of the Defendants have engaged in a search subject to the protections of the Fourth Amendment.  Accordingly, their claims should be dismissed.

## III.   Plaintiffs lack standing to bring a claim under the Fourth Amendment

The Court should dismiss the Complaint because plaintiffs Schmidt and Arrington lack standing to challenge the City's use of the Flock ALPR cameras.  Standing under Article III of the Constitution requires Plaintiffs to show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) the likelihood that a favorable decision will redress the injury.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  To establish injury in fact, a plaintiff must show that he or she

---

each of the 172 Flock cameras in Norfolk target only "a single lane of traffic [and] capture only a very tiny fraction of the city's roadways." *Robinson*, 2024 Va. Cir. LEXIS 104, at *16-21. The court noted those cameras are targeted at vehicles—not individuals—and photograph them at "discrete dates and times," rather than tracking their travels throughout the city, and concluded that the "system does not provide anything close to continuous tracking and relies on a vehicle passing by the relatively few camera locations dispersed throughout the city," which rendered the "FLOCK system ... not analogous to long-term GPS positioning, ongoing CSLI geolocation, or constant aerial surveillance." *Id.*  Likewise, *Martin* criticizes another Norfolk Circuit Court opinion that reached an opposite result, stating reasoning based on "fears about the many ways in which [Flock's system] could be abused in the future…[i]s not the constitutional standard that *Katz* or *Carpenter* or *Beautiful Struggle* require."  *Martin*, 2024 WL 4476560 at *14 n.16 (internal quotations omitted).

suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. 555, 560 (internal quotation omitted). The party invoking federal jurisdiction bears the burden of establishing these elements. *Id. at* 504 U.S. 555, 561 (internal citation omitted).

To establish standing, the "threatened injury must be *certainly* impending to constitute injury in fact," and "[a]llegations of possible future injury" are not sufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal citation omitted; emphasis in original) (finding that plaintiffs lacked standing to challenge a federal surveillance statute where plaintiffs merely alleged an "objectively reasonable likelihood" that their communications with their foreign contacts would be intercepted under said statute). Here, Plaintiffs fail to establish an injury in fact and therefore lack standing to bring their Fourth Amendment claims.

Plaintiffs allege that the search subject to scrutiny under the Fourth Amendment is the "Defendants' operation of the Flock Cameras." ECF No. 1, ¶ 97. They define such search as "[t]racking the whole of a person's public movements over (at least) 30 days." *Id.* ¶ 9. Plaintiffs claim that the installation and operation of the Flock Cameras create a running 30-day record of the whole of Lee's and Crystal's movements throughout Norfolk and other jurisdictions that allow Flock to share their data. *Id.*, ¶ 74.

Accepting Plaintiffs' definition of a search, a review of the allegations in the Complaint reveals that Plaintiffs have merely alleged harm that is conjectural or hypothetical, rather than harm that is actual or imminent to them. Plaintiff Schmidt has alleged there are four Flock cameras outside his neighborhood and that the Flock cameras capture the start of nearly every trip Schmidt makes in his car, so "he effectively cannot leave his neighborhood without the NPD knowing it." ECF No. 1, ¶ 53, 55. Under these facts, Schmidt has not alleged any actual or imminent harm of

being subject to a search as the Complaint defines a search, i.e. the tracking of the whole of Schmidt's public movements over 30 days. *See* ECF No. 1, ¶ 9, 34. At most, Schmidt has alleged that the four Flock cameras he has identified capture when his car leaves his neighborhood. ECF No. 1, ¶ 53, 55. Nothing about Schmidt's allegation that a camera captures his vehicle leaving a neighborhood can possibly rise to level of tracking the "whole" of his movements. It is pure speculation to infer from the discrete observation of Schmidt's car leaving his neighborhood that the Defendants track the whole of Schmidt's public movements throughout the municipal boundaries of the City of Norfolk or beyond.[7] Accordingly, Schmidt has failed to allege that he is actually or imminently subject to the harm he complains of, a search that tracks the whole of his public movements.

That Schmidt alleges he "routinely passes some of the many other cameras posted at undisclosed locations throughout the City" does not save his alleged harm from the hypothetical realm. *See* ECF No. 1, ¶ 56. Schmidt does not identify where such cameras are placed. He does not allege how stationary Flock cameras with a capture range of 150 feet (*see* ECF No. 1, ¶ 32) are able track his "every movement" (*see* ECF No. 1, ¶ 60). To conclude from these allegations

---

[7] Plaintiff Schmidt suggests that information collected from Flock cameras "just outside his neighborhood" provide information that allows NPD to "infer that he is going to his daughter's school" based on "recording [him] going straight through the intersection. ECF No. 1 ¶ 54. As is plain from the allegations, the Flock cameras do not record vehicle movements, (*see id.* ¶ 33 ("Flock's cameras capture an image of a car…")), making the allegation about a possible recording of passing through an intersection unwarranted and unreasonable. Similarly, Schmidt alleges that NPD can make inferences about his destinations if the Flock cameras capture him turning right or left. *Id.* ¶ 54. Again, there are no allegations of fact to support Plaintiffs' inference that the Flock cameras are capable of identifying vehicle movements or are positioned in a way to enable law enforcement to identify turning maneuvers. The suggestion that privacies of Schmidt's life and activities can be inferred from video recordings or information in specific photographs that theoretically *could* be snapped by Flock cameras if they were perhaps positioned just so does not surpass the "speculative level" which is considered insufficient to support an actionable claim under *Twombly*, 550 U.S. at 570.

that Schmidt has actually or imminently suffered the alleged harm of a search – defined as having his every movement tracked – requires a conjectural leap contrary to the requirement that a plaintiff allege an injury in fact.

If Schmidt's alleged harm is merely conjectural, then plaintiff Arrington's allegations amount to a complete shot in the dark as far as alleging an injury in fact.   Based on an alleged statement by defendant Talbot that "[i]t would be difficult to drive anywhere of any distance without running into a camera," Arrington alleges that "some of the 172 Flock Cameras posted at undisclosed locations throughout the City have photographed [her] car on a near daily basis since their installation in February 2023."  ECF No. 1, ¶ 65.  Arrington does not identify the locations of any Flock cameras, nor has she specified where in Norfolk she travels.  Rather, Arrington alleges that "because of Defendants' installation and operation of the Flock Cameras, Flock Cameras have photographed and tracked Crystal's car in and around Norfolk…".  *Id*., ¶ 78. In other words, Arrington asks the Court to presume that because Arrington drives in Norfolk and heard or read that Flock Cameras are located somewhere in the City, Flock cameras have necessarily captured images of Arrington's car, and done so on a nearly daily basis.[8]  This is an unwarranted inference that the Court need not accept as true.  *See Shore Mkts., Inc. v. Assocs. Ltd. P' ship*, 213 F.3d 175,

---

[8] Plaintiffs allege that there are 172 Flock cameras located within the Norfolk city limits.  ECF No. 1 ¶.  They characterize the coverage provide by them as a "blanket," despite not providing any evidence of how many linear miles of public streets exists in Norfolk or even basic information about the area of land involved.  Had the Plaintiffs reviewed publicly available U.S. Census data, they would have seen that the City of Norfolk consists of more than 53 square miles of land.  *See* https://www.census.gov/quickfacts/fact/table/norfolkcityvirginia/LND110220 (last visited Nov. 25, 2024).  Thus, there are, on average, three cameras per square mile.  If there are four cameras just outside Plaintiff Schmidt's neighborhood, (ECF No. 1 ¶ 53), it is possible he would drive over a mile before passing another camera, if he passes any at all.  Plaintiffs' description of the City's Flock inventory as a "blanket" is mere puffery, likely offered to make it sound like the comprehensive aerial photography program that Baltimore experimented  with and was the subject of *Beautiful Struggle*, when it is nothing of the sort.

180.  Further, even if the Court were to accept this inference, such inference would only amount to a *likelihood* that Flock cameras have captured images of Arrington's car, which likelihood does not establish an injury in fact.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410.

Accordingly, Arrington has failed to allege that her "every movement" (*see* ECF No. 1, ¶ 72) was actually or imminently tracked by Defendants since she has not even plausibly alleged that Flock cameras captured an image of her vehicle at any place or time.  It follows that Arrington has failed to allege an injury of fact, as the notion that she was subject to a search of "tracking her every movement" (*see id.*) is purely hypothetical.  Because Arrington has failed to allege an injury in fact necessary for standing to bring her Fourth Amendment claim, her claim should be dismissed.

Both Schmidt and Arrington have failed to allege an injury in fact entitling them to standing for purposes of challenging the City's use of Flock cameras.  Accordingly, the Court should dismiss their claims.

## IV.     The Court lacks personal jurisdiction over the Norfolk Police Department

This action should be dismissed in its entirety as against the Norfolk Police Department for lack of personal jurisdiction because the Norfolk Police Department is not a separate legal entity under City or State Code.  This Court has consistently held that a police department, including the Norfolk Police Department, is not a proper defendant to a § 1983 action because it is not an entity that can be sued in its own right.  *See Revene v. Charles County Comm'rs.*, 882 F.2d 870, 874 (4th Cir. 1989)*; see also Garrett v. Norfolk Police Dep't*, E.D. Va. No. 2:12CV295, 2013 WL 12109483, at *2 (E.D. Va. Jan. 9, 2013); *Muniz v. Fairfax County Police Dep't*, No. 1:05cv466, 2005 WL 1838326, at *2 (E.D. Va. Aug. 2, 2005); *Young v. City of Norfolk*, 62 Va.Cir. 307 (Norfolk Cir. 2003).  Under Rule 17(b) of Federal Rules of Civil Procedure, the capacity to be

sued, where the party is not an individual or a corporation, must be determined by the law of the state.   Under Virginia law, a police department does not have the capacity to be sued if it is established as part of the City and not as a separate legal entity. The Norfolk Police Department therefore is not a proper party to Plaintiffs' suit because it is established as part of the City of Norfolk (*see* City of Norfolk Charter §§ 2(25), 52, 60) and lacks the capacity to be sued. This Court lacks personal jurisdiction over the Norfolk Police Department and the Plaintiffs cannot state a claim against it for relief which can be granted. Accordingly, the Court should dismiss the suit against the Norfolk Police Department pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, the City of Norfolk, the Norfolk Police Department, and Mark Talbot by counsel, respectfully request that this Honorable Court dismiss Plaintiffs' Complaint, with prejudice, and for all such other relief this Court deems just and proper.

**CITY OF NORFOLK,**
**NORFOLK POLICE DEPARTMENT, and**
**MARK TALBOT**


                 /s/
Karla J. Soloria (VSB 82674)
Assistant City Attorney
Adam D. Melita (VSB 41716)
Chief Deputy City Attorney
karla.soloria@norfolk.gov
adam.melita@norfolk.gov
City of Norfolk Department of Law
810 Union Street, Suite 900
Norfolk, VA 23510
Telephone: (757) 664-4529
Facsimile: (757) 664-4201

*Counsel for Defendants*

24

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this <u>25th</u> day of November, 2024 I will electronically file the

foregoing *Memorandum in Support of Motion to Dismiss* with the Clerk of Court using the

CM/ECF system, which will send a copy of the foregoing to the following,

Robert Frommer
Joshua Windham
Michael B. Soyfer
Institute for Justice
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
rfrommer@ij.org
jwindham@ij.org
msoyfer@ij.org
Telephone: (703) 682-9320
Fax: (703) 682-9321

*Counsel for Plaintiffs*


_____/s/_____
Karla J. Soloria (VSB 82674)
Assistant City Attorney
karla.soloria@norfolk.gov
City of Norfolk Department of Law
810 Union Street, Suite 900
Norfolk, VA 23510
Telephone: (757) 664-4529
Facsimile: (757) 664-4201

*Counsel for Defendants*