**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

LEE SCHMIDT and CRYSTAL
ARRINGTON,

       *Plaintiffs*,

v.

CITY OF NORFOLK, the NORFOLK
POLICE DEPARTMENT, and MARK
TALBOT, in his official capacity as the
Norfolk Chief of Police,

       *Defendants*.

Civil Case No. 2:24-cv-00621-MSD-LRL

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ......................................................3

LEGAL STANDARDS ......................................................................................................6

ARGUMENT ......................................................................................................................7

I.  Lee and Crystal plausibly alleged that Defendants' dragnet surveillance violates
their Fourth Amendment rights ............................................................................7

    a.  The Flock Cameras effect a Fourth Amendment search under the privacy test ...8

        i.  The Flock Cameras violate Lee's and Crystal's reasonable expectation
of privacy in the whole of their physical movements .............................8

        ii.  Defendants' strawman arguments ignore binding precedent and
improperly dispute the complaint's well-pleaded allegations................14

    b.  Alternatively, the Flock Cameras effect a Fourth Amendment "search"
under the text and original understanding of the Fourth Amendment ...............21

II.  Lee and Crystal have standing because their complaint plausibly alleges that the
Flock Cameras have compiled a detailed record of their movements in Norfolk .......23

III.  Defendants' request to dismiss the NPD is moot ........................................................27

CONCLUSION....................................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)............................................................................................6

*Barbour v. Garland,*
   105 F.4th 579 (4th Cir. 2024) ...........................................................................6

*Beck v. McDonald,*
   848 F.3d 262 (4th Cir. 2017) .............................................................................7

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)............................................................................................6

*California v. Acevedo,*
   500 U.S. 565 (1991)..........................................................................................22

*Carpenter v. United States,*
   585 U.S. 296 (2018).................................................................................. *passim*

*Clapper v. Amnesty International USA,*
   568 U.S. 398 (2013)..........................................................................................24

*Cnty. of Riverside v. McLaughlin,*
   500 U.S. 44 (1991)............................................................................................23

*Deal v. Mercer Cnty. Bd. of Educ.,*
   911 F.3d 183 (4th Cir. 2018) .............................................................................7

*Delaware v. Prouse,*
   440 U.S. 648 (1979)..........................................................................................14

*DiCocco v. Garland,*
   52 F.4th 588 (4th Cir. 2022) ...........................................................................23

*Hately v. Watts,*
   917 F.3d 770 (4th Cir. 2019) .............................................................................7

*Kansas v. Glover,*
   589 U.S. 376 (2020)..........................................................................................20

*Katz v. United States,*
   389 U.S. 347 (1967)......................................................................................8, 11

*King v. Rubenstein*,
    825 F.3d 206 (4th Cir. 2016) ..................................................................18

*Kyllo v. United States*,
    533 U.S. 27 (2001) ................................................................8, 21, 22

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
    979 F.3d 219 (4th Cir. 2020) ..............................................................24, 25

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
    2 F.4th 330 (2021) ................................................................ *passim*

*Morgan v. Fairfield Cnty.*,
    903 F.3d 553 (6th Cir. 2018) ..........................................................21, 22, 23

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1 (2022) ................................................................................21

*Nat'l Fed'n of the Blind of Va. v. Va. Dep't of Corr.*, 2024 WL 1291502
    (E.D. Va. Mar. 26, 2024) ..................................................................27

*Neal v. Fairfax Cnty. Police Dep't*,
    812 S.E.2d 444 (2018) ......................................................................20

*Rakas v. Illinois*,
    439 U.S. 128 (1978) ..........................................................................26

*Ray v. Roane*,
    948 F.3d 222 (4th Cir. 2020) ............................................................17

*Riley v. California*,
    573 U.S. 373 (2014) ..........................................................................23

*Rutledge v. City of Norfolk*,
    2009 WL 10706608 (E.D. Va. Apr. 28, 2009) ..................................20

*Smith v. Maryland*,
    442 U.S. 735 (1979) ............................................................................8

*Tobey v. Jones*,
    706 F.3d 379 (4th Cir. 2013) ............................................................18

*United States v. Brown*,
    2021 WL 4963602 (N.D. Ill. Oct. 26, 2021) ....................................20

*United States v. Di Re*,
    332 U.S. 581 (1948) ............................................................................8

*United States v. Graham*,
   2022 WL 4132488 (D.N.J. Sept. 12, 2022) ...............................................................20

*United States v. Houston*,
   813 F.3d 282 (6th Cir. 2016) ...................................................................................20

*United States v. Jiles*,
   2024 WL 891956 (D. Neb. Feb. 29, 2024) ...............................................................20

*United States v. Jones*,
   565 U.S. 400 (2012)...................................................................................... *passim*

*United States v. Knotts*,
   460 U.S. 276 (1983).......................................................................................14, 15, 19

*United States v. Martin*,
   2024 WL 4476560 (E.D. Va. Oct. 11, 2024).......................................................18, 19

*United States v. Maynard*,
   615 F.3d 544 (D.C. Cir. 2010) ...............................................................1, 10, 11, 12

*United States v. Rubin*,
   556 F. Supp. 3d 1123 (N.D. Cal. 2021) ...................................................................20

*United States v. Salcido-Gonzalez*,
   2024 WL 2305478 (D. Utah May 21, 2024)...........................................................20

*United States v. Toombs*,
   671 F. Supp. 3d 1329 (N.D. Ala. 2023) ...................................................................20

*United States v. Vankesteren*,
   553 F.3d 286 (4th Cir. 2009) ...................................................................................20

*Wikimedia Found. v. NSA*,
   857 F.3d 193 (4th Cir. 2017) ........................................................................ *passim*

*Williams v. Kincaid*,
   45 F.4th 759 (4th Cir. 2022) ......................................................................................7

**Constitutional Provisions**

U.S. Const. Article III ...............................................................................................23

U.S. Const. amend. IV ..................................................................................... *passim*

**Rules**

Rule 12(b)(1)................................................................................................................6

Rule 12(b)(2)............................................................................................................................6

Rule 12(b)(6)............................................................................................................................6

**Other Authorities**

https://www.norfolk.gov/5967/Cameras ................................................................................11

Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L.
    Rev. 547 (1999) ............................................................................................................13

## INTRODUCTION

In *Leaders of a Beautiful Struggle v. Baltimore Police Department*, the en banc Fourth Circuit held that daytime aerial surveillance of Baltimore violated the Fourth Amendment rights of those below. 2 F.4th 330, 333 (2021). At best, the drones captured "blurred dots or blobs." *Id.* at 334. But that did not matter because, despite their shortcomings, the aircraft still collected enough information to figure out people's habits and identities. *See id.* at 342–44 & n.9. And although they only captured people's *public* movements, their observations transcended ordinary law enforcement surveillance capabilities. *Id.* at 345. Put differently, there is a difference between an officer "follow[ing] someone during a single journey" and "dogging his prey until he has identified all the places, people, amusements, and chores that make up that person's hitherto private routine." *Id.* at 345 (quoting *United States v. Maynard*, 615 F.3d 544, 560 (D.C. Cir. 2010), *aff'd sub nom. United States v. Jones*, 565 U.S. 400 (2012)).

Now, Defendants are trying to accomplish by ground what Baltimore tried to do by air. They installed a network of 172 automatic license plate reader cameras (the "**Flock Cameras**") that collates the movements of everyone who drives through the city over 30 days in an organized database. Any officer can log in whenever they please and make software-assisted "deductions about 'what a person does repeatedly, what he does not do, and what he does ensemble.'" *Beautiful Struggle*, 2 F.4th at 342 (quoting *Maynard*, 615 F.3d at 562–63). That means *Beautiful Struggle* controls this case. If anything, the Flock Cameras are even *more* invasive than the aircraft in *Beautiful Struggle*. They operate around the clock, effortlessly stitch together people's movements across 30 days, and provide deft data-mining tools to discern drivers' routines and associations. No such feat would have been possible in the analog age; it would have required positioning hundreds of officers working long shifts to try to copy down every passing license plate. And that

means the Flock Cameras upend the long-settled societal expectations of privacy that the Fourth Circuit reinforced in *Beautiful Struggle*.

Still, Defendants move to dismiss, latching onto immaterial technological differences to distinguish *Beautiful Struggle* and otherwise disputing the complaint's well-pleaded allegations. The Court should reject those efforts. They encourage the Court to miss the forest for the trees by focusing on individual cameras, rather than the entire surveillance system. And by overplaying minor gaps in the Flock Cameras' coverage, Defendants invite the Court to "do[] exactly what the Supreme Court has admonished against" and "allow[] inference to insulate a search." *Id.* at 345. Their remaining arguments merely dispute the facts alleged in the complaint and the reasonable conclusions drawn from them. At this stage, that will not fly.

Defendants then repackage the same points as standing arguments. That effort, too, fails because it ignores binding Fourth Circuit precedent distinguishing what little case law Defendants cite. *See Wikimedia Found. v. NSA*, 857 F.3d 193, 211 (4th Cir. 2017). Under that precedent, Plaintiffs alleged the "three key facts" that establish an "actual and ongoing" injury: (i) their driving patterns make it likely they have "travel[ed]" the "roads" under surveillance; (ii) the Flock Cameras collect the information of everyone that drives by them; and (iii) Chief Talbot's public statement that "[i]t would be difficult to drive anywhere of any distance without running into a camera" makes it plausible that the Flock Cameras have catalogued Plaintiffs' movements. *Cf. id.* at 210–11. The rest of Defendants' arguments conflate standing with the merits and raise premature factual disputes.

For these reasons and those that follow, the Court should deny Defendants' motion.

### FACTUAL AND PROCEDURAL BACKGROUND

The City of Norfolk lives under the watch of a flock of unblinking eyes—the eyes of 172 Flock Cameras that the NPD has posted all over the city. Doc. 1, PageID# 9 (¶¶ 37, 40).

It rents the Flock Cameras from a technology company called Flock Safety. *Id.*, PageID# 8–10 (¶¶ 31, 37–38, 41). These are no ordinary license plate readers, like the ones that might catch traffic violations. *Id.*, PageID# 7–8 (¶¶ 30–31). The Flock Cameras "operate around the clock, power themselves with solar energy, and capture vehicles traveling up to 100 miles per hour from up to 150 feet away." *Id.*, PageID# 8, 10 (¶¶ 32, 41). "When Flock's cameras capture an image of a car, Flock's software uses machine learning to create what Flock calls a 'Vehicle Fingerprint.'" *Id.*, PageID# 8 (¶ 33). According to the NPD's own website, the Vehicle Fingerprint contains "more information than just the license plate, including: make, model, color, timestamp, type of plate, damage or alterations and whether the vehicle is registered to a resident or non-resident." *Id.*, PageID# 10 (¶ 41). Collecting that information allows Flock to "link[] together different photos of the same car and creat[e] a detailed record of its movements." *Id.*

The Flock Cameras then upload that to a centralized database, where Flock pools data nationally. *Id.*, PageID# 8–10 (¶¶ 33, 35, 42). Flock retains data for at least 30 days, and both Flock and its customers can download and save the data for even longer. *Id.*, PageID# 9–11 (¶¶ 36, 43, 48). Any Flock user with access can then mine that data for insights using Flock's software features. "These features create real-time alerts against hotlists, analyze patterns of movement, flag repeat visitors to the area, provide a streamlined advanced search, project information onto maps, analyze vehicles frequently seen in proximity to one another, generate lists of vehicles that have visited multiple locations of interest, and more." *Id.*, PageID# 8 (¶ 34). Flock even offers a

"Convoy Analysis" feature that "lets users identify vehicles that are often seen together." *Id.*, PageID# 13, 15 (¶¶ 58, 70).

The NPD and Flock entered into a five-year contract in February 2023, with a total cost of over $2 million. *Id.*, PageID# 9 (¶¶ 37–38). The contract's defined "Purpose" is "the awareness, prevention, and prosecution of crime, bona fide investigations by police departments, and archiving for evidence gathering." *Id.*, PageID# 9 (¶ 39). The NPD and Flock worked together to decide where to put the cameras, so that, in Police Chief Mark Talbot's words, "It would be difficult to drive anywhere of any distance without running into a camera." *Id.*, PageID# 9–10 (¶ 40). The NPD also opted into Flock's national database[1] so that, per Chief Talbot, it could create "a nice curtain of technology" around the region. *Id.*, PageID# 10 (¶ 42). In September 2024, Chief Talbot revealed plans to add 65 more cameras in the future. *Id.*, PageID# 9–10 (¶ 40).

"Months after the Flock Cameras started operating, in May 2023, the NPD admitted that it had no policy governing the cameras' use and video retention." *Id.*, PageID# 11 (¶ 45). The policy it adopted months later "provided virtually no privacy protections." *Id.*, PageID# 11 (¶ 46). Any officer who completes "'standardized training' and creates login credentials can access data from the Flock Cameras." *Id.* Once in, every patrol officer must "utilize the technology throughout their entire shift." *Id.* The policy limits use to "law enforcement purposes." *Id.*, PageID# 11 (¶ 47). But it never says what those are, instead leaving that judgment "entirely [in] the discretion of each individual officer." *Id.* No advance approval—from a judge or even a superior officer—is needed to search the system. *Id.*, PageID# 11 (¶ 49). "Nothing in the Flock Agreement or the NPD's policy

---

[1] Although Plaintiffs could not allege that the NPD opted into Flock's national database when they filed the complaint, Defendants' brief confirms that it has. *See* Doc. 19, PageID# 76.

requires officers to establish probable cause or obtain a warrant to access the data. And, in practice, officers commonly do access the data without probable cause or a warrant." *Id.*, PageID# 12 (¶ 50).

Plaintiffs are ordinary people who live and conduct business inside Defendants' "curtain of technology." *Id.*, PageID# 12, 14 (¶¶ 51–52, 61–62).

Lee Schmidt recently retired from the Navy with an honorable discharge after 21 years of service. *Id.*, PageID# 12 (¶ 51). Just outside his neighborhood, four Flock Cameras record the comings-and-goings of every driver. *Id.*, PageID# 12 (¶ 53). "[H]e effectively cannot leave his neighborhood without the NPD knowing about it." *Id.*, PageID# 12 (¶ 55). In fact, depending on which way he turns, the NPD (or any other Flock user) can deduce where he is going. *Id.* And he has noticed cameras elsewhere along his daily travels through Norfolk. *Id.*, PageID# 12–13 (¶ 56). Because they capture every passing car, Lee reasonably believes the Flock Cameras have repeatedly photographed his car, created a "Vehicle Fingerprint," and stored organized, 30-day records of his movements. *Id.*, PageID# 12–13 (¶¶ 55–59).

Crystal Arrington is a home healthcare worker who lives in Portsmouth. *Id.*, PageID# 14 (¶¶ 61, 63). She grew up in Norfolk, and visits her family and friends there often. *Id.*, PageID# 14 (¶ 62). She also makes near-daily trips to and around Norfolk to drive her elderly clients to doctors' offices and other appointments. *Id.*, PageID# 14 (¶ 63). Based on what she knows about the Flock Cameras' capabilities *and* what Chief Talbot has said about their strategic placement, she reasonably believes the Flock Cameras have repeatedly photographed her car, created a "Vehicle Fingerprint," and stored organized, 30-day records of her movements. *Id.*, PageID# 14–15 (¶¶ 65–67, 69). And because Crystal lives within Defendants' "curtain of technology," they can even follow her home at night after she leaves Norfolk. *Id.*, PageID# 15–16 (¶ 71).

Lee and Crystal both find this unsettling—"creepy," even. *Id.*, PageID# 3–4, 13–14, 16 (¶¶ 8, 60, 72). As a healthcare worker, Crystal also worries for her clients' privacy—after all, she got into the home healthcare "business because she wanted to treat elderly people with dignity and compassion." *Id.*, PageID# 15–16 (¶¶ 68, 73). Both Lee and Crystal have expected that no one would be able to "track[ their] every movement over 30 days or more and analyze[] that data the way the Flock Cameras allow the NPD and other Flock users to do." *Id.*, PageID# 13, 16, 20 (¶¶ 60, 72–73, 99(a)). The Flock Cameras' systematic collection and synthesis of people's movements has the potential to reveal "where [they] go[], what [they] do[], and who [they] associate[] with in a way that would have been impossible in the past." *Id.*, PageID# 13–14, 16 (¶¶ 60, 72–73). "If anyone but the government created such a record of [their] movements, [Lee and Crystal] would consider it stalking and probably call the police." *Id.*, PageID# 14, 16 (¶¶ 60, 72). Society at large has long had the same expectation. *Id.*, PageID# 21 (¶ 99(b)).

Plaintiffs filed this lawsuit in October 2024, alleging that this dragnet surveillance violates the Fourth Amendment. *See* Doc. 1. On November 25, 2024, Defendants moved to dismiss for lack of standing under Rule 12(b)(1), lack of personal jurisdiction over the NPD under Rule 12(b)(2), and failure to state a claim under Rule 12(b)(6). Doc. 18.

## LEGAL STANDARDS

***Failure to State a Claim.*** "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court must "accept the complaint's factual allegations as true" and "draw all reasonable inferences in the [Plaintiffs'] favor." *Barbour v. Garland*, 105 F.4th 579, 589 (4th Cir. 2024). That means it "cannot favor its perception of the relevant events over the narrative offered

by the complaint, thereby recasting 'plausibility' into 'probability.'" *Wikimedia Found. v. NSA*, 857 F.3d 193, 208 (4th Cir. 2017) (cleaned up) (citation omitted). "The recitation of facts need not be particularly detailed, and the chance of success need not be particularly high." *Williams v. Kincaid*, 45 F.4th 759, 765 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 2414 (2023). Instead, plausibility requires just "enough to raise a right to relief above the speculative level" and "nudg[e] the[] claims across the line from conceivable to plausible." *Hately v. Watts*, 917 F.3d 770, 781 (4th Cir. 2019).

**Lack of Standing.** "A defendant may challenge subject-matter jurisdiction in one of two ways: facially or factually." *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017). Because Defendants mount a facial challenge, Plaintiffs are "'afforded the same procedural protection' that exists on a motion to dismiss." *Wikimedia*, 857 F.3d at 208 (citation omitted). So, the Court must "accept as true all material allegations of the complaint and construe the complaint in favor of" Plaintiffs. *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018). And, at this stage of the case, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the court will] presume that general allegations embrace those specific facts that are necessary to support the claim." *Beck*, 848 F.3d at 270.

ARGUMENT

## I.   Lee and Crystal plausibly alleged that Defendants' dragnet surveillance violates their Fourth Amendment rights.

Lee and Crystal plausibly alleged that Norfolk's installation and operation of the Flock Cameras is a Fourth Amendment "search." Using the Flock Cameras to systematically track their movements is a search because it violates a reasonable expectation of privacy in the whole of their movements. Alternatively, it is the type of purposeful, investigative conduct that would have been a search at the founding. In arguing otherwise, Defendants distort the relevant case law, set up

strawman legal theories Plaintiffs did not plead, and dispute the well-pleaded allegations of the complaint. The Court should reject their arguments.

### a.   The Flock Cameras effect a Fourth Amendment search under the privacy test.

#### i.   The Flock Cameras violate Lee's and Crystal's reasonable expectation of privacy in the whole of their physical movements.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. That command, the Supreme Court has held, "protects people, not places." *Katz v. United States*, 389 U.S. 347, 351 (1967). Thus, "[w]hen an individual 'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable,' [the Supreme Court] ha[s] held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *Carpenter v. United States*, 585 U.S. 296, 304 (2018) (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). Those protections extend beyond the home to protect "what [a person] seeks to preserve as private, even in an area accessible to the public." *Katz*, 389 U.S. at 351. That extension fulfills the "central aim of the Framers . . . 'to place obstacles in the way of a too permeating police surveillance.'" *Carpenter*, 585 U.S. at 305 (quoting *United States v. Di Re*, 332 U.S. 581, 595 (1948)). Consistent with their intent, the Fourth Amendment protects not only against the types of searches that existed at the founding, but more broadly against the use of technology to diminish the "degree of privacy against government that existed when the Fourth Amendment was adopted." *Id.* (quoting *Kyllo v. United States*, 533 U.S. 27, 34 (2001)).

That has led the Supreme Court to "recognize[] that individuals have a reasonable expectation of privacy in the whole of their physical movements." *Id.* at 310.

In *United States v. Jones*, a unanimous Court held that attaching a GPS device to a car to track its movements for 28 days was a search. *See* 565 U.S. 400, 401, 403–04 (2012). The majority opinion so held because attaching the device was a trespass to chattels that would undoubtedly have been a search at the founding. *See id.* at 404–05. But across two concurrences, five justices also endorsed a privacy-based approach to long-term location tracking. *See Carpenter*, 585 U.S. at 307, 310. Four justices feared that, under the majority's approach, the Fourth Amendment would have nothing to say about non-trespassory location tracking. *See Jones*, 565 U.S. at 425–26 (Alito, J., concurring). Instead of focusing on the technical trespass, these justices homed in on the way electronic location tracking upset traditional expectations of privacy. *See id.* at 430–31. "[S]ociety's expectation has been that law enforcement agents and others would not—and, indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period." *Id.* at 430. Although she joined the majority opinion, Justice Sotomayor explained that in a different case she would consider how "even short-term monitoring" allowed the government to "record[] and aggregate[]" "the sum of [people's] public movements" in a way "that enables the government to ascertain more or less at will, their political and religious beliefs, sexual habits, and so on." *Id.* at 415–16 (Sotomayor, J, concurring).

The upshot of the *Jones* concurrences, the Court later explained, is that "individuals have a reasonable expectation of privacy in the whole of their physical movements." *Carpenter*, 585 U.S. at 310. In *Carpenter*, prosecutors subpoenaed suspects' cell-site location information. *Id.* at 302. Even over as little as seven days, *id.* at 310 n.3, those "time-stamped data provide[] an intimate window into a person's life," *id.* at 311. "Prior to the digital age," people reasonably expected that such tracking was effectively impossible for more than "a brief stretch." *Id.* at 310. But technology has made long-term tracking possible "[w]ith just the click of a button . . . at practically no

expense." *Id.* at 311. "[T]he retrospective quality of the data" made that capability all the more alarming because it meant that "this newfound tracking capacity runs against everyone," not just those suspected of crimes. *Id.* at 312. Accordingly, such location tracking "invaded [the defendant's] reasonable expectation of privacy in the whole of his movements." *Id.* at 313.

The en banc Fourth Circuit applied *Jones* and *Carpenter* in *Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330 (2021). The plaintiffs there sought a preliminary injunction against Baltimore's AIR program, which used aircraft to capture second-by-second images of broad swaths of the city during the day and then stored those images for 45 days. *See id.* at 333–34. At best, the aircraft could capture "people and cars . . . as blurred dots or blobs." *Id.* at 334. Police often lost people in buildings or at night, turning to other surveillance tools—like "license plate readers"—to pick up the trail. *See id.* at 344. Even so, the Fourth Circuit explained, the AIR program created "a 'detailed, encyclopedic[]' record of where everyone came and went within the city during daylight hours over the prior month-and-a-half." *Id.* at 341. Just as in *Carpenter*, that upset society's traditional expectations about the government's surveillance capabilities. *See id.* at 341–43, 345. And, just as in *Carpenter*, the AIR data allowed police to travel back in time and track "the entire population." *See id.* at 341–42, 347.

*Beautiful Struggle*, like *Jones* and *Carpenter*, applied what is sometimes called "mosaic theory." *See id.* at 342 & n.8, 345–46 (citing *United States v. Maynard*, 615 F.3d 544, 560, 562–63, 565–66 (D.C. Cir. 2010)). Rather than focus on isolated images or movements, the Fourth Circuit considered what police could glean from the totality of people's movements over 45 days. *See id.* at 342 & n.8; *see also id.* at 344 ("[W]e consider not only the raw data, but what that data can reveal."). That mosaic "reveal[ed] more about a person than does any individual trip"—or "tile"—"viewed in isolation," allowing police to make "deductions about 'what a person does

repeatedly, what he does not do, and what he does ensemble." *Id.* at 342 (quoting *Maynard*, 615 F.3d at 562–63). Whether or not they actually invested the time and effort to make those deductions did not matter. The "search" was "capturing everyone's movements outside during the daytime for 45 days" because traditional surveillance could never catalogue Baltimoreans' public movements like that. *See id.* at 345–46. At best, traditional surveillance could pick up isolated public movements (a few "tiles"), but not all of them (the "mosaic"). *See id.*

No less than an aircraft capturing "blurred dots or blobs," *id.* at 334, the Flock Cameras violate Lee's and Crystal's reasonable expectation of privacy in the whole of their movements.[2] Like those aircraft, they are pervasive, stationed strategically throughout the City so that "[i]t would be difficult to drive anywhere of any distance without running into a camera." Doc. 1, PageID# 9–10 (¶ 40). In other ways, though, they are even *more* invasive. *Id.*, PageID# 21 (¶ 100). Unlike the aircraft, the Flock Cameras "operate around the clock." *Id.*, PageID# 8 (¶ 32). And unlike the aircraft, they make it easy to identify drivers and track them "over the course of multiple days." *See Beautiful Struggle*, 2 F.4th at 342–43. Each time a driver passes one of the 172 Flock Cameras, they create a "Vehicle Fingerprint" that links together information about the same car to create a record of its movements. Doc. 1, PageID# 10 (¶ 41).[3] That time- and location-stamped record then goes into Flock's national database for at least 30 days, where anyone with access can bring up a record of Lee's, Crystal's, or anyone else's movements with just a few mouse clicks.

---

[2] Defendants do not dispute the subjective prong of the *Katz* test, but Plaintiffs adequately alleged their subjective expectation of privacy, in any event. *See* Doc. 1, PageID# 13–14, 16, 20 (¶¶ 60, 72–73, ¶ 99(a)).

[3] Defendants claim that "Plaintiffs do not cite any documentation to support their" allegations about what information the Flock Cameras collect and deride these allegations as "absurd." Doc. 19, Page ID# 81 n.4. But the allegation is a direct quote from the "Flock Safety Cameras" section of the NPD's own website. *See* Doc. 1, PageID# 10 (¶ 41 & n.6) (linking to https://www.norfolk.gov/5967/Cameras (click "Flock Safety Cameras" to see relevant text)).

*See* Doc. 1, PageID# 2–3, 8, 10–11 (¶¶ 4, 33, 43, 44–49).[4] From there, they can use Flock's integrated software capabilities to "analyze patterns of movements, flag repeat visitors to the area . . . , project information onto maps, analyze vehicles frequently seen in proximity to one another, generate lists of vehicles that have visited multiple locations of interest, and more." Doc. 1, PageID# 8 (¶ 34). The "labor-intensive process" of tracking and figuring out the identities of "blurred dots and blobs" from the sky pales in comparison. *See* 2 F.4th at 334, 345; Doc. 1, PageID# 21 (¶ 100).

Given the number of cameras, Chief Talbot's statement about their placement, and the information they collect, "[t]hat is enough to yield a 'wealth of detail,' greater than the sum of the individual trips." *Beautiful Struggle*, 2 F.4th at 342. The quartet of cameras just outside Lee's neighborhood can record when he leaves the house most mornings. Doc. 1, PageID# 12 (¶¶ 53–55). Depending on which way he turns, someone can piece together whether he is going to his daughter's school, the grocery store, or the shooting range. Doc. 1, PageID# 12 (¶¶ 53–55). Crystal drives extensively around Norfolk, so anyone with access to Norfolk's Flock data can follow her daily travels. Doc. 1, PageID# 14–15 (¶¶ 64–67). And because she lives inside the "curtain of technology," Defendants can tell when she leaves Norfolk to go home—or if she spends the night. Doc. 1, PageID# 10, 15 (¶¶ 42, 71–72). With a little work, that information can "reveal[] the habits and patterns that mark the distinction between a day in the life and a way of life," as well as any "departure from a routine." *Beautiful Struggle*, 2 F.4th at 342 n.8 (quoting *Maynard*, 615 F.3d at 562). All of that "opens 'an intimate window' into" Lee's and Crystal's "associations and activities." *Id.* at 342 (quoting *Carpenter*, 585 U.S. at 311). And that is the point: Flock offers a

---

[4] *Cf. Carpenter*, 585 U.S. at 311 ("With just the click of a button, the Government can access each carrier's deep repository of historical location information at practically no expense.")

"Convoy Analysis" feature, for instance, that lets users identify cars that are often seen together so they can discover those associations. Doc. 1, PageID# 13, 15 (¶ 58, 70).

"Moreover, the retrospective quality of the data here gives police access to a category of information otherwise unknowable." *Carpenter*, 585 U.S. at 312. All the data go into a national database that police can use to "travel back in time to retrace a person's whereabouts, subject only to the retention policies of" Flock and the NPD. *See id.* Unlike with traditional surveillance, police need not have a particular suspect in mind because "this newfound tracking capacity runs against everyone." *Id.*; *see Beautiful Struggle*, 2 F.4th at 323, 347. In other words, every person who drives through Norfolk is now subject to the type of surveillance once reserved for "extraordinary offenses." *Cf. Jones*, 565 U.S. at 431 (Alito, J., concurring).

Tracking people's movements like this would have been unheard of at the founding. *Cf. Carpenter*, 585 U.S. at 305, 320; *Beautiful Struggle*, 2 F.4th at 340. There were few law enforcement officers then, and they mostly worked part time. *See* Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 620–21 (1999). No late eighteenth-century resident of any American city would have expected that officers would log all of their comings-and-goings in so many places. *Cf. Jones*, 565 U.S. at 420 (Alito, J., concurring) ("[I]t is almost impossible to think of late-18th-century situations that are analogous to what took place in this case."). Today, that would require 344 officers working twelve-hour shifts, seven days per week, indefinitely. And, even then, none of them could match the Flock Cameras, which record and remember every license plate that passes within 150 feet at speeds up to 100 miles per hour. Doc. 1, PageID# 8 (¶ 32). No reasonable person in 1791 or today would expect that the government could track the whole of people's physical movements like the Flock Cameras do.

In short, the Flock Cameras "record[] the movements of a city" and, "[w]ith analysis, can reveal where individuals come and go over an extended period." *Beautiful Struggle*, 2 F.4th at 346. Because that upends a long-settled expectation of privacy in the whole of one's movements, the installation and operation of the Flock cameras is a search, and their "warrantless operation violates the Fourth Amendment." *Id.*

> ii.   **Defendants' strawman arguments ignore binding precedent and improperly dispute the complaint's well-pleaded allegations.**

Defendants try to distinguish *Beautiful Struggle*. *See* Doc. 19, PageID# 80–92. But their efforts fall short. Their counterarguments are all either strawmen, veiled factual disputes, or efforts to repackage positions *Jones*, *Carpenter*, and *Beautiful Struggle* rejected. Plaintiffs address each of them in turn:

> ***The aggregation of 30 days' travel is more than the sum of its parts.*** Defendants mistakenly rely on *United States v. Knotts*, 460 U.S. 276 (1983), to argue that Lee and Crystal have no expectation of privacy in their movements on public roads. *See* Doc. 19, PageID# 82–83. In doing so, they ignore how *Jones* and *Carpenter* limited that case.

In *Knotts*, officers used a "beeper" to intermittently track a container inside a car that moved it "from one place to another." *Id.* at 278–79, 281. That violated no expectation of privacy because police could have accomplished the same thing just by tailing the suspect. *See id.* at 285. Still, the Court reserved how it would rule on "dragnet type law enforcement practices" like "twenty-four hour surveillance of any citizen of this country . . . without judicial knowledge or supervision." *Id.* at 283–84. After all, "people are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks" and then "from the sidewalks into their automobiles." *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). So, *Knotts* left open the question of how the Fourth Amendment limits surveillance of people's movements in their cars.

14

The Court took up that question "[t]hree decades later" in *Jones*. *See Carpenter*, 585 U.S. at 307. Between the two concurrences, a majority of justices "concluded that 'longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy'—regardless of whether those movements were disclosed to the public at large." *Id.* (quoting *Jones*, 565 U.S. at 430 (Alito, J., concurring)). *Jones* and *Carpenter* thus "solidified the line between short-term tracking of public movements—akin to what law enforcement could do '[p]rior to the digital age'—and prolonged tracking that can reveal intimate details through habits and patterns." *Beautiful Struggle*, 2 F.4th at 341.

*Knotts* fell on the "short-term" end of the spectrum because police could always track someone on a single trip. *See* 460 U.S. at 285. *Jones*, *Carpenter*, and *Beautiful Struggle* fell on the "prolonged" end because tracking the whole of someone's movements before the digital age was pure fantasy. *Cf. Jones*, 565 U.S. at 420 (Alito, J., concurring) ("Is it possible to imagine a case in which a constable secreted himself somewhere in a coach and remained there for a period of time in order to monitor the movements of the coach's owner?"). So too here. Perhaps a few officers could have monitored intersections for short stretches and jotted down the license plates they managed to see. But the Flock Cameras are akin to posting officers round-the-clock at 172 locations to diligently copy down every license plate. *See* Section I(a)(i) above. In other words, the need to resort to that type of fanciful analogy signals that this case involves the sort of "dragnet" surveillance that *Knotts* expressly reserved and that *Jones*, *Carpenter*, and *Beautiful Struggle* have since held to be a search.

**Defendants' efforts to distinguish Jones, Carpenter, and Beautiful Struggle *miss the mosaic for the tiles.*** Defendants latch onto picayune technological differences to try to pass off the Flock Cameras as less invasive than the technologies in *Jones*, *Carpenter*, and *Beautiful Struggle*.

Doc. 19, PageID# 84–92. But their arguments are either repackaged versions of positions *Beautiful Struggle* rejected or premature factual disputes best resolved on the merits.

Most of Defendants' arguments focus on what individual Flock cameras see. *See id.* at PageID# 88–90. Much like the *Beautiful Struggle* plaintiffs, though, "Plaintiffs do not object to what any one [Flock] image reveals." *See* 2 F.4th at 345. Rather, they are challenging what the integrated system of hardware and software reveals, Doc. 1, PageID# 9–10 (¶ 40), by "creati[ng] . . . a retrospective database of everyone's movements across the city," *Beautiful Struggle*, 2 F.4th at 345. That any *one* Flock camera can only photograph cars within 150 feet of a fixed location is irrelevant because there are 172 of them, strategically placed so that "[i]t would be difficult to drive anywhere of any distance without running into a camera." Doc. 1, PageID# 9–10 (¶ 40).

Next, in an attempt to limit *Jones*, *Carpenter*, and *Beautiful Struggle* to their specific facts, Defendants play up minor "technological distinctions" and gaps in the Flock Cameras' coverage. Doc. 19, PageID# 88–91. As the Fourth Circuit explained, however, the technology "is only incidental." *Beautiful Struggle*, 2 F.4th at 345. Like the Flock Cameras, the surveillance tools in *Jones*, *Carpenter*, and *Beautiful Struggle* "had gaps in their coverage, too." *Id.* at 342. And just like the Flock Cameras, *see* Doc. 19, PageID# 88, neither the GPS device in *Jones* nor the aircraft in *Beautiful Struggle* followed people indoors, *see Jones*, 565 U.S. at 402; *Beautiful Struggle*, 2 F.4th at 334. For whatever gaps they might have, though, the Flock Cameras can place cars more precisely than the technology in *Carpenter*. *See* 585 U.S. at 312 ("one-eighth to four square miles"). They let police more easily identify and follow specific drivers across multiple days than the aircraft in *Beautiful Struggle*. *See* 2 F.4th at 343–45 & n.9. And, unlike those aircraft, they operate round-the-clock and in inclement weather. *See id.* at 340. Indeed, Baltimore police used *license plate readers* to pick up trails and identify suspects. *See id.* at 344. Defendants' nitpicking

16

loses sight of what matters: the overall system's ability to track long-term movements in a way that enables deductions about drivers' identities, activities, and associations. *See id.* at 342.

At bottom, Defendants are just fighting Plaintiffs' factual allegations. They repeatedly make factual assertions that contradict the complaint, for instance:

- "The Flock system does not reveal who is driving a vehicle or even who the registered owner of a vehicle is." Doc. 19, PageID# 88.

- "The Flock cameras cannot follow an individual at all." *Id.*, PageID# 89.

- "[D]ue to their fixed positions and limited range of capture, Flock cameras cannot track a whole of an individual's movements." *Id.*

- "[A]ny record or image created by the fixed, ground positioning of Flock cameras with a limited capture range of 150 feet is dissimilar to the 'map of movements' created by the aerial surveillance at issue in *Beautiful Struggle*, which utilized aerial cameras to capture *32 square miles per image per second*." *Id.*

- "Nothing about the technology employed here captures the whole of an individual's movements or the privacies of life . . . ." *Id.*, PageID# 90.

At this stage, however, Defendants are stuck with Plaintiffs' allegations. *See, e.g.*, *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020). Their allegation that Defendants blanketed Norfolk with 172 Flock cameras. Doc. 1, PageID# 9–10 (¶¶ 37–38, 40). Their allegation that Chief Talbot said, "It would be difficult to drive anywhere of any distance without running into a camera." *Id.*, PageID# 20 (¶ 40). Their allegations that each camera photographs every passing car, converts each photograph into a "Vehicle Fingerprint" connecting the movements of individual cars, and stores that information in an easy-to-mine database for at least 30 days. *Id.*, PageID# 8, 10–11 (¶¶ 32–33, 41, 43). That allows Defendants to make deductions about where Lee and Crystal travel and who they see in Norfolk and beyond, across multiple trips and days. *Id.*, PageID# 12–16 (¶¶ 53–59, 64, 69, 71). Plaintiffs confirmed as much by alleging that two officers in Kansas were able to use Flock cameras to effectively stalk their ex-partners. *Id.*, PageID# 7 (¶ 29(a)).

Defendants largely ignore those facts. Indeed, this section of their brief barely mentions the number of cameras, Chief Talbot's public statements, and the number of days of data the Flock Cameras collect. *See* Doc. 19, PageID# 84–92. That is fatal because those facts, taken as true, make it plausible that the Flock Cameras create a long-term record of the whole of Plaintiffs' movements. Doc. 1, PageID# 16, 19–21 (¶¶ 74, 90, 99); *cf. Wikimedia*, 857 F.3d at 211 (allegations about the extent of surveillance, including government's own public statements, made it plausible that government intercepted plaintiff's communications). And Plaintiffs are entitled to that reasonable inference at this stage of the case. *See King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). To be sure, Defendants contest these facts and inferences, but the motion-to-dismiss stage is not the time to "resolve contests surrounding facts." *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013) (citation omitted). Those are for the merits.

**Martin *is distinguishable, and, if anything, supports Plaintiffs' arguments.*** Defendants claim that "[t]his Court" already resolved the issue in *United States v. Martin*, 2024 WL 4476560 (E.D. Va. Oct. 11, 2024). *See* Doc. 19, PageID# 83–84, 90–92. But that opinion followed an evidentiary hearing on a motion to suppress, where the defendant had the burden of proving his case by a preponderance of the evidence. *See* 2024 WL 4476560, at *1, *10.

Even so, Defendants liken the number of cameras in *Martin* (188, *id.* at *2) to this case (172) and say the outcome should be the same. *See* Doc. 19, PageID# 91–92. In *Martin*, though, the cameras were spread across three counties and two cities, and they "captured only three photographs of [the defendant's] vehicle during the relevant 30-day period." *See* 2024 WL 4476560, at *2, *16. Here, by contrast, Defendants compressed about the same number of cameras into a single city. *See* Doc. 1, PageID# 9 (¶ 40). In visual terms, roughly equal numbers of cameras cover the areas shaded in blue (*Martin*) and red (this case):



Given how far the cameras were spread and how little information they collected, it made sense for the *Martin* court to analogize to *Knotts* and consider them in isolation. *See* 2024 WL 4476560, at *13–16. At the same time, *Martin* makes it plausible that the same number of cameras compressed into a fraction of the land could cross the threshold into tracking or monitoring the whole of people's movements. *See id.* at *16. And that is what Plaintiffs alleged: a surveillance program that is actively collecting more information, more frequently than was even possible in *Martin*. *See* Doc. 1, PageID# 12–17 (¶¶ 53–59, 62–67, 69–71, 74–80).

**The Flock Cameras collect information about people, not cars.** Defendants argue throughout their brief that the Flock Cameras photograph only the exteriors of cars, in which there is no reasonable expectation of privacy. *See* Doc. 19, PageID# 81–82, 87–88, 90.

Their first iteration of this argument is a strawman. Plaintiffs alleged an expectation of privacy in the whole of their movements, not isolated observations of their cars. *See* Doc. 1, PageID# 17–21 (¶¶ 77, 79, 87, 90, 99). That means non-binding cases Defendants cite denying motions to suppress, *see* Doc. 19, PageID# 81–82, are irrelevant because they only involved

19

isolated observations that did not sum up to the whole of the defendant's movements.[5] The pre-*Beautiful Struggle* cases Defendants cite about recording people at a single location are even further off-base.[6]

The second iteration of this argument rests on the false premise that the Flock Cameras collect no information about the *people* inside the cars. *See* Doc. 19, PageID# 87–88, 90.[7] The Flock Cameras' sole purpose is the "investigation[]" and "prosecution of crime." Doc. 1, PageID# 9 (¶ 39). But cars don't commit crimes, people do. So, if the Flock Cameras collected no information about people, they would be useless. *Cf. Beautiful Struggle*, 2 F.4th at 343 ("After all, the AIR program's express goal is to identify suspects and witnesses to help BPD solve crimes."). To be sure, identifying drivers might require a few extra investigative steps. Not many, though. A Virginia "license plate number . . . is an agency-issued number that identifies the owner of the vehicle," *Neal v. Fairfax Cnty. Police Dep't*, 812 S.E.2d 444, 449 (Va. 2018), and common sense dictates that the owner is "likely the driver," *Kansas v. Glover*, 589 U.S. 376, 381 (2020).

---

[5] *See United States v. Salcido-Gonzalez*, 2024 WL 2305478, at *12 (D. Utah May 21, 2024) (two license plate reads that only pointed generally to metropolitan area); *United States v. Jiles*, 2024 WL 891956, at *18–19 (D. Neb. Feb. 29, 2024) ("'only five or six' hits" over "six months"); *United States v. Toombs*, 671 F. Supp. 3d 1329, 1340 (N.D. Ala. 2023) (officer "made one query . . . and received one data point"); *United States v. Graham*, 2022 WL 4132488, at *5 (D.N.J. Sept. 12, 2022) ("[L]aw enforcement's use of ALPR database limited to a single occurrence on a single day did not reveal private details of Defendant's life."); *United States v. Rubin*, 556 F. Supp. 3d 1123, 1130 (N.D. Cal. 2021) ("the precise volume of information is unknown" but, at worst, established presence in a city); *United States v. Brown*, 2021 WL 4963602, at *3 (N.D. Ill. Oct. 26, 2021) ("about two dozen snapshots of a car on the streets over ten weeks").

[6] *See United States v. Vankesteren*, 553 F.3d 286, 290–91 (4th Cir. 2009) (single camera in unprotected "open field"); *United States v. Houston*, 813 F.3d 282, 287–90 (6th Cir. 2016) (single camera recording farm from atop public utility pole); *cf. Rutledge v. City of Norfolk*, 2009 WL 10706608, at *1 (E.D. Va. Apr. 28, 2009) (dismissing pro se complaint alleging "video surveillance . . . in unspecified public places," where plaintiff "d[id] not allege that he was videotaped").

[7] Defendants wrongly claim that "Plaintiffs acknowledge" that the Flock Cameras "provide[] no information about the operator or occupants of [a] vehicle." Doc. 19, PageID# 90.

Perhaps in some cases, figuring out the driver's identity might require a bit more work. But that was true in *Jones*, where the suspect's wife owned the car, *see* 565 U.S. at 403, 404 n.2, 425–26, and in *Beautiful Struggle*, where the aircraft captured only dots or blobs, *see* 2 F.4th at 334, 343–44. Just because information requires further "analysis (*i.e.*, the making of inferences)" does not mean its collection is not a search. *See Kyllo v. United States*, 533 U.S. 27, 36 (2001); *Beautiful Struggle*, 2 F.4th at 345. And the complaint explains how easy it is for Defendants to make those inferences using "a 'Vehicle Fingerprint' that includes identifying information, like a license plate[,] . . . to identify drivers and then dig even deeper into their travel, habits, and associations using Flock's advanced software capabilities." Doc. 1, PageID# 21 (¶ 100). Those allegations more than clear the plausibility threshold because "identity is easy to deduce from just a few random points of an individual's movements," "[w]hether . . . obtained from a cell phone," "an airplane," or a license plate reader. *See Beautiful Struggle*, 2 F.4th at 344 & n.11.

### b. Alternatively, the Flock Cameras effect a Fourth Amendment "search" under the text and original understanding of the Fourth Amendment.

Even absent the on-point precedent in *Jones*, *Carter*, and *Beautiful Struggle*, the complaint would still plausibly allege a "search" under the Fourth Amendment's original meaning. Text and history are central guideposts for constitutional interpretation. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 25 (2022). So, to figure out if the Flock Cameras effect a "search," the Court should simply ask what that word meant at the founding. *See, e.g.*, *Kyllo*, 533 U.S. at 32 n.1; *Morgan v. Fairfield Cnty.*, 903 F.3d 553, 568 (6th Cir. 2018) (Thapar, J., concurring).

At the founding, "search" was not a legal term of art. *See Carpenter*, 585 U.S. at 347 (Thomas, J., dissenting); *Morgan*, 903 F.3d at 568 (Thapar, J., concurring). To understand what the Framers had in mind, then, the Court should look to the word's ordinary meaning in 1791. *See Morgan*, 903 F.3d at 568 (Thapar, J., concurring). Then, as now, a "search" was just an effort to

find or discern something. *See Kyllo*, 533 U.S. at 33; *Carpenter*, 585 U.S. at 347 (Thomas, J., dissenting) (collecting Founding-era dictionary definitions). In other words, a "search" is "a purposeful, investigative act (and nothing more)." *Morgan*, 903 F.3d at 568 (Thapar, J., concurring).

Under that definition, Plaintiffs plausibly allege that Norfolk's dragnet surveillance is a search. The Flock Agreement's defined "Purpose" is "the awareness, prevention, and prosecution of crime, bona fide *investigations* by police departments, and archiving for evidence gathering." Doc. 1, PageID# 9 (¶ 39) (emphasis added). To accomplish that purpose, the Flock Cameras photograph every passing car and then collate the images in a connected database that police can easily search for investigative and law enforcement purposes. Doc. 1, PageID# 8, 10 (¶¶ 33–35, 41); *see also id.* PageID# 17, 20 (¶¶ 76–81, 98). Because Defendants' *purpose* in doing all of this is *investigating* crime, their installation and operation of the cameras clears the "purposeful, investigative act" hurdle. *Cf. Morgan*, 903 F.3d at 572 (Thapar, J., concurring) (arguing that using technology to enhance naked-eye surveillance is logically a "search" under the original meaning). And that brings their conduct within the ambit of the Fourth Amendment.

From there, the Court would ask whether such searches are "unreasonable." In the Fourth Amendment, "unreasonable" is shorthand for "against the reason of the common law." *Carpenter*, 585 U.S. at 355 (Thomas, J., dissenting); *California v. Acevedo*, 500 U.S. 565, 583 (1991) (Scalia, J., concurring). As the Supreme Court has repeatedly said, courts "must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *Jones*, 565 U.S. at 406. And when it was adopted, the Amendment was understood to secure Americans against arbitrary invasions of their persons and property by limiting searches and seizures to at least within the bounds of the common law of 1791. *See Carpenter*, 585 U.S. at 355–

56 (Thomas, J., dissenting) (collecting authorities). So, if a common law rule exists, that sets the *minimum* level of protection. *See Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 60 (1991) (Scalia, J., dissenting); *cf. Riley v. California*, 573 U.S. 373, 382, 385–86 (2014) (adopting greater protections than afforded by common-law exception for searches incident to arrest in light of differences between cellphones and property historically subject to search upon arrest). And if not, reasonableness turns on whether letting government agents conduct the type of search at issue without judicial oversight would undermine the people's "right to be secure." *See Morgan*, 903 F.3d at 573–75 (Thapar, J., concurring).

Here, the answer is straightforward. By allowing anyone with login credentials to monitor the ongoing and historical movements of Norfolk's entire driving population, Defendants created an atmosphere where no one can move freely without fear of being tracked. That allows for arbitrary and unfettered invasions into the security of a driver's person and effects, and, as such, is unreasonable absent judicial oversight.

*     *     *

The Court should hold that, like the long-term aerial surveillance in *Beautiful Struggle*, Defendants' long-term ground surveillance is a search.

## II. Lee and Crystal have standing because their complaint plausibly alleges that the Flock Cameras have compiled a detailed record of their movements in Norfolk.

"A plaintiff has Article III standing if she (1) suffers an injury in fact that is (2) fairly traceable to the challenged conduct and (3) likely to be redressed if the court rules in her favor." *DiCocco v. Garland*, 52 F.4th 588, 591 (4th Cir. 2022). Defendants challenge only injury, contending that Plaintiffs' injuries are too speculative. *See* Doc. 19, PageID# 93. This argument misunderstands how the injury requirement applies in the surveillance context and ignores binding precedent distinguishing what little case law Defendants cite.

23

In *Clapper v. Amnesty International USA*, the plaintiffs had "no actual knowledge" of the government's surveillance practices. 568 U.S. 398, 411 (2013). Instead, they speculated that the government *might* someday intercept their communications based on "a highly attenuated chain of possibilities" involving officials across two branches of government. *See id.* at 410–11. But Lee and Crystal are not alleging that the Flock Cameras *might* track their movements in the future; their claim is that the Flock Cameras have already done and will continue to do so, if not enjoined. *See* Doc. 1, PageID# 12–16 (¶¶ 53–59, 65–67, 69–71). That "actual and ongoing [surveillance] injury . . . renders *Clapper*'s certainly-impending analysis inapposite here." *Wikimedia*, 857 F.3d at 211.

*Wikimedia*, not *Clapper*, governs this case. Although the plaintiff could not "precisely describe" all the details of the surveillance, it "allege[d] three key facts" supporting the inference that its communications had been intercepted. *See* 857 F.3d at 210. First, the "volume" and "geographical diversity" of its communications meant that they "almost certainly traverse[d] every [internet] backbone link." *Id.* Second, "for technical reasons," the government "must [have] be[en] copying and reviewing all the . . . communications that travel across a given link." *Id.* And third, the government's own public statements "confirmed that it conduct[ed] . . . surveillance at more than one point along the [I]nternet backbone." *Id.* at 211 (third alteration in original). In sum, the plaintiff "plausibly alleged that its communications travel all of the roads that a communication can take, and that the [government] seizes all of the communications along at least one of those roads." *Id.*; *accord Leaders of a Beautiful Struggle v. Balt. Police Dep't* ("*Beautiful Struggle I*"), 979 F.3d 219, 225 (4th Cir. 2020) (plaintiffs had standing where surveillance "can capture around ninety percent of Baltimore in a given moment"), *rev'd on other grounds*, 2 F.4th 330.

So too here. Plaintiffs' allegations follow the path laid out in *Wikimedia* and cross the plausibility threshold for the same reasons.

First, each Plaintiff alleges that, given where they live and their pattern of movements, they "almost certainly" pass several cameras. *Cf. Wikimedia*, 857 F.3d at 210; *Beautiful Struggle I*, 979 F.3d at 225. Start with Lee. There are four Flock Cameras just outside his neighborhood, "so he effectively cannot leave his neighborhood without" being tracked. Doc. 1, PageID# 12 (¶ 55). He has seen cameras elsewhere in Norfolk, too, so he can allege with some certainty that he has been photographed elsewhere along his daily travels in the city. *Id.*, PageID# 12 (¶ 56). Like Lee, Crystal drives extensively throughout Norfolk. *Id.*, PageID# 14 (¶¶ 63–64). Norfolk is where her friends and family live, and she visits them often. *Id.*, PageID# 14 (¶ 62). She also drives around Norfolk for business reasons, taking her elderly home healthcare clients to doctors' offices and other appointments. *Id.*, PageID# 14 (¶¶ 63).

Second, Plaintiffs "spell[] out" how the cameras work and gather data. *Wikimedia*, 857 F.3d at 210–11. They allege that the Flock Cameras "photograph every car" and "store the information of every driver that passes them." Doc. 1, PageID# 2–3, 6, 8 (¶¶ 2, 6, 21, 33). They also allege that the Flock Cameras "operate around the clock . . . and capture vehicles traveling up to 100 miles per hour from up to 150 feet away." *Id.*, PageID# 8 (¶ 32). Given those allegations, their conclusion that the Flock Cameras photographed them and harvested their information each time they drove past, *id.*, PageID# 12–17 (¶¶ 55–56, 65, 67, 75–79), is "reasonable and entitled to the presumption of truth," *Wikimedia*, 857 F.3d at 211.

Third, Plaintiffs use Defendants' own public statements to plausibly allege that the Flock Cameras are systematically tracking their movements. *Cf. id.* Per Chief Talbot, "It would be difficult to drive anywhere of any distance without running into a camera." Doc. 1, PageID# 10–

11 (¶ 40). This public statement supports the reasonable conclusion that Defendants are pervasively tracking their movements given the "roads" Plaintiffs "travel" and the "technical rules" of how the Flock Cameras work. *Wikimedia*, 857 F.3d at 210–11 "Together, these allegations are sufficient to make plausible the conclusion," *id.* at 211, that the Flock Cameras are capturing and cataloguing Plaintiffs' movements, *see* Doc. 1, PageID# 14 (¶ 65).

Defendants' standing arguments largely rehash their arguments that the Flock Cameras do not capture the whole of Lee's and Crystal's public movements. *See* Doc. 19, PageID# 93–96. But those arguments conflate the merits with standing. *See Wikimedia*, 857 F.3d at 212 (citing *Rakas v. Illinois*, 439 U.S. 128, 140 (1978)). Arguments about the "definition of Fourth Amendment rights [are] more properly placed within the purview of substantive Fourth Amendment law than within that of standing." *Compare id.* (quoting *Rakas*, 439 U.S. at 140), *with* Doc. 19, PageID# 93 (framing arguments around "Plaintiffs' definition of a search").

In any event, like their merits arguments, these arguments simply dispute the facts alleged in the complaint and the conclusions that can be drawn from them. At this stage, Defendants must concede that Plaintiffs drive extensively throughout Norfolk, that the cameras photograph every passing car, and that the cameras are strategically placed so that "[i]t would be difficult to drive anywhere of any distance without running into a camera somewhere." From there, as explained above, it reasonably follows that the Flock Cameras have repeatedly photographed Lee's and Crystal's cars and created a detailed record of their movements. That is more than enough to give them standing. After all, the Fourth Circuit expressed concern about how the AIR program managed to track one car at "eleven locations" across "three days." *Beautiful Struggle*, 2 F.4th at 343 n.9. Plaintiffs' allegations, at the very least, make it plausible that they have been tracked that

much, if not more. To be sure, Defendants dispute those facts and conclusions, but, again, factual disputes are for the merits. *See Wikimedia*, 857 F.3d at 212.

The Court should hold that Plaintiffs plausibly alleged standing.

## III. Defendants' request to dismiss the NPD is moot.

The Court entered a consent order dismissing the NPD without prejudice, subject to conditions agreed upon by the parties. *See* Doc. 21. The Court should therefore deny as moot the portion of Defendants' motion seeking dismissal of the NPD for lack of personal jurisdiction. *See, e.g.*, *Nat'l Fed'n of the Blind of Va. v. Va. Dep't of Corr.*, 2024 WL 1291502, at *3 (E.D. Va. Mar. 26, 2024).

### CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion.

Respectfully submitted,

Dated: December 16, 2024          */s/ Robert Frommer*

Robert Frommer
  (VA Bar No. 70086)
Joshua Windham
  (NC Bar No. 51071)*
Michael B. Soyfer
  (NY Bar No. 5488580; DC Bar No. 230366)*
Institute for Justice
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
Tel: (703) 682-9320
Fax: (703) 682-9321
rfrommer@ij.org
jwindham@ij.org
msoyfer@ij.org

*Attorneys for Plaintiffs*
*pro hac vice