**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**LEE SCHMIDT and CRYSTAL ARRINGTON,**

      **Plaintiff,**

**v.**                                                                 **Civil Action No.: 2:24-cv-621**

**CITY OF NORFOLK,**
**and MARK TALBOT, in his**
**Official capacity as the Norfolk Chief of Police,**

      **Defendants.**

**DEFENDANTS' REPLY MEMORANDUM**
**IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT**

      **NOW COME** the Defendants, the City of Norfolk (the "City") and Mark Talbot, Norfolk Chief of Police, by counsel, and hereby file their Reply Memorandum in Support of their Motion to Dismiss the Plaintiffs' Complaint and in support thereof state as follows:

**INTRODUCTION**

      Fourth Amendment cases must be decided on the facts of each case, not by extravagant generalizations. *Dow Chem. Co. v. United States*, 476 U.S. 227, 239 n.5 (1986). Plaintiffs' brief in opposition to Defendants' Motion to Dismiss aggrandizes and blatantly mischaracterizes the Complaint's factual allegations in a bald attempt to have this Court accept their legal conclusions as true. In doing so, Plaintiffs urge this Court to forgo a thorough analysis of Fourth Amendment jurisprudence as it applies specifically to the City's use of Flock technology. Plaintiffs pursue this sleight of hand because rigorous application of the relevant case law to the facts Plaintiffs have actually pleaded plainly shows that the Flock technology at issue does not constitute a search under *Katz, Jones, Carpenter, Beautiful Struggle* or any relevant authority. Accordingly, the Complaint should be dismissed.

**FACTUAL BACKGROUND**

Rather than refer to the factual allegations pleaded in the Complaint, Plaintiffs' opposition attempts to augment their case with overstated claims and assertions that have no basis in the facts alleged.  Plaintiffs introduce their arguments with the naked declaration that Flock cameras "collate the movements of *everyone who drives through the city* over 30 days in an organized database." ECF No. 22, Page ID #113 (emphasis supplied).  There are no factual allegations in the Complaint to support this conclusion.  First, the Complaint does not and cannot allege Flock cameras capture a *person's* movement, because stationary Flock cameras capture static images of passing *vehicles* (ECF No. 1, ¶¶ 2, 21, 33).  Second, while the Complaint declares "[a]ll of that surveillance creates a detailed record of where every driver in Norfolk has gone" (ECF No. 1, ¶¶ 3) there are simply no factual allegations which reasonably support the inference that the City's 172 stationary Flock cameras capture *any* driver in Norfolk, and certainly not *every* driver.  Accepting as true that Flock cameras "photograph every car that passes them" (ECF No. 1 ¶ 2), Plaintiffs cannot reasonably conclude that Flock cameras collate or otherwise record the movement of "everyone who drives through the city over 30 days" unless they allege that everyone who drives through the city over a period of 30 days passes a Flock camera and every Flock camera photographs the driver while it is photographing the vehicle.  Plaintiffs have not—and cannot— allege such facts.

Likewise, no factual allegations in the Complaint support Plaintiffs' declaration that Flock cameras "effortlessly stitch together people's movements across 30 days" and "provide deft data-mining tools to discern drivers' routines and associations."  ECF No. 22 PageID # 113.  These are puffed up conclusions not reasonably drawn from the facts alleged.  Even accepting as true that Flock cameras "photograph every car that passes them" (ECF No. 1 ¶ 2), how do Flock cameras

"discern" anything, let alone a drivers' "routines and associations"?  The only way to reach those conclusions is to presume facts not pleaded:  that Flock cameras capture images of all drivers with sufficient resolution to be able to identify them, track where vehicles go after passing one camera and before passing another, and photograph where drivers stop and get out of their vehicles to associate, assemble, or effect any other routine.  As further discussed in this Reply, Plaintiffs ask the Court to make these unwarranted and unsupported presumptions because they fit Plaintiffs' bungled analysis of *Jones*, *Carpenter*, and *Beautiful Struggle* – all decisions that turned on the specific characteristics of the surveillance technology at issue.

Plaintiffs' misdirection does not end there. The opposition brief attempts to attach significance to aspects of Flock technology that do not substantiate Plaintiffs' conclusion that the City's use of Flock cameras constitutes a "search" as defined by the Complaint – "[t]racking the *whole* of a *person's* public movements over (at least) 30 days."  ECF No.1 ¶ 9 (emphasis supplied). Plaintiffs refer to Flock software creating a "Vehicle Fingerprint" that includes the vehicle's license plate and "make model, color timestamp, type of plate, damage or alterations and whether the vehicle is registered to a resident or non-resident[1]." ECF No. 1 ¶ 33; ECF No. 22 PageID# 115. There is not a single allegation that the "Vehicle Fingerprint" indexes anything about a person, driver, or individual, as opposed to merely identifying external vehicle characteristics which are in plain view to the public on public roads.  There is no allegation to suggest that Flock technology identifies who is driving the vehicle, or whether the driver is the owner of the vehicle.

---

[1] Whether the vehicle is registered to a resident or non-resident has no relevant significance as far as revealing information about a person, where Plaintiffs have not even alleged the Vehicle Fingerprint identifies the resident or non-resident's name, or whether the resident or non-resident is driving the vehicle that is photographed by a Flock camera.

Next, Plaintiffs lean heavily on Chief Talbot's statement that, "It would be difficult to drive anywhere of any distance without running into a camera," ECF No. 1 ¶ 40; ECF No. 22 PageID# 116 (emphasis supplied), as support for their legal conclusions. However, this statement amounts to nothing more than an allegation that it is likely a vehicle driven in Norfolk will pass one Flock camera. Plaintiffs do not and cannot allege how the possibility a driver may pass a single camera reasonably justifies their conclusion that Flock cameras track the whole of a person's public movements over 30 days. Against the backdrop of *Jones*, *Carpenter*, and *Beautiful Struggle* the facts actually pleaded do not allege a "systematic collection and synthesis of people's movements," as Plaintiffs argue in their opposition. ECF No. 22 PageID# 118.

The City's use of Flock technology does not offend the Fourth Amendment as Flock cameras capture only information in which Plaintiffs' cannot have a reasonable expectation of privacy – vehicles traveling on public streets and their license plates. *See New York v. Class*, 475 U.S. 106 (1986); *United States v. Knotts*, 460 U.S. 276 (1983). The City's use of Flock technology does not track the whole of a person's movements and therefore does not amount to a Fourth Amendment search. *See Carpenter v. United States*, 585 U.S. 296 (2018).

## ARGUMENT

### I.    Standard for Motion to Dismiss

The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation omitted). Where a complaint pleads facts that are merely consistent with a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (cleaned up). For the purposes of a motion to dismiss the Court "must take all of the factual allegations in the complaint as true, but [is] not bound to accept as true a legal

conclusion couched as a factual allegation. *Id.* (cleaned up). Legal conclusions pleaded as factual allegations, "unwarranted inferences," "unreasonable conclusions," and "naked assertions devoid of further factual enhancement" are not entitled to the presumption of truth. *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (internal citation omitted).

II.   **Flock cameras do not effect a Fourth Amendment search**

A.   **Plaintiffs' Fourth Amendment claim relies on the false premise that Flock technology collects information about individuals**

The claim that the City's use of Flock technology constitutes a Fourth Amendment search rests upon the false premise that Flock cameras capture or record information about individuals. To have this Court infer a search where none has occurred, the Complaint props up a false equivalency between features observable on the exterior of a vehicle and information about a person. Once this presumption is unmasked for what it is, Plaintiffs' claim that the NPD's operation of Flock cameras constitutes a search fails.

Plaintiffs' factual allegations conflate observations as to vehicles and information about people. A particularly telling example is Plaintiff Schmidt's allegation that the Flock cameras "capture the start of nearly every trip Lee makes in his car, so he effectively cannot leave his neighborhood without NPD knowing about it. Each time Lee leaves his neighborhood, the Flock cameras take a picture of his car…" ECF NO. 1 ¶ 55. Here is where the unreasonable presumption that Flock cameras capture any information about an individual is laid bare. As alleged, "the Flock *cameras take a picture of his car*." *Id.* (emphasis supplied). There are no allegations that Flock technology is capable of capturing or identifying who is driving a car (such as Lee), so there are no allegations which reasonably support the claim that NPD knows if Lee (or anyone else) leaves his neighborhood. There are no allegations to support the claim that when Lee's vehicle leaves his neighborhood, Flock cameras could identify it is the start of *Lee's* trip. These claims presume,

without ever alleging, that Flock technology identifies the person driving the car that is photographed, and also presume that the only person to ever drive Lee's car is Lee himself. Because Flock cameras do not collect or capture any information about individual persons, the notion that "Plaintiff Schmidt effectively cannot leave his neighborhood without NPD knowing about it" is an empty declaration, devoid of any factual support.

That Flock technology only captures images about vehicles and is incapable of tracking people is consistent with the purposes for which it is deployed, as alleged in the Complaint. *See* ECF No. 1 ¶ 24 ( "Police departments commonly compare the license plate images to 'hot lists' [which] include vehicles reported stolen and those [vehicles] suspected of involvement in a crime."); ¶ 34 ("These features create real-time alerts against hotlists…analyze *vehicles* frequently seen in proximity to one another, generate lists of *vehicles* that have visited multiple locations of interest…") (emphasis supplied).

If an owner reports their vehicle stolen, if police dispatch issues a "be on the lookout" for that vehicle, and if a patrolling officer spots the vehicle driving by, is it reasonable to assume that the *owner* is the person behind the wheel?  At any point has the officer tracked an identifiable *person*? Clearly the answer to both inquiries is no, as all that was observed is a vehicle and its license plate, the very information the officer was "on the lookout" for.  The fact that a Flock camera did the looking out or the spotting does not change the reality that observing the exterior of a vehicle is not the same as observing anything about an individual.  This straightforward and commonplace example completely undermines Plaintiffs' dismissive comment that "if the Flock Cameras collected no information about people, they would be useless." ECF No. 22 Page ID# 133.  Flock cameras are excellent at spotting license plates, as alleged by the Complaint, making

them an invaluable resource when police are looking for a stolen car and have a plate number to work with.

Plaintiffs rely heavily on the false premise that information regarding vehicles equates to information about persons because they cannot otherwise sidestep the well-established precedent that "[t]here is simply no expectation of privacy in the exterior of one's vehicle," "or while driving it on public thoroughfares." *United States v. Martin*, No. 3:23-CR-150, 2024 WL 4476560, at \*11 (E.D. Va. Oct. 11, 2024) (citing *Class*, 475 U.S. at 106; *Knotts*, 460 U.S. at 281-282). Once the Court disregards, as it should, Plaintiffs' unreasonable and unsupported fiction that information about a vehicle and information about a person are one and the same, this case can be dismissed on that authority alone. Plaintiffs have failed to allege Flock cameras capture anything about a person. As alleged, the cameras capture snapshots of vehicles travelling on public roads in plain view and catalog information about them – information in which Plaintiffs do not have a reasonable expectation of privacy. *Id.*

**B. Plaintiffs have failed to allege Flock cameras track the whole of their physical movements under *Jones* and *Carpenter***

Plaintiffs' legal conclusion that Flock cameras violate their reasonable expectation of privacy is derived entirely from their unsubstantiated theory that Flock cameras track the whole of their physical movements. The Defendants agree with Plaintiffs that *Carpenter v. United States*, 585 U.S. 296 (2018), building on the concurrences of Justices Alito and Sotomayor in *United States v. Jones*, 565 U.S. 400 (2012), acknowledged the reasonableness of an "expectation of privacy in the whole of [a person's] physical movements." 585 U.S. 296 at 310. *See* discussion at ECF No. 19 PageID # 85-86. Defendants disagree, however, with Plaintiffs' proposition that the Court is permitted to disengage from the factual analysis undertaken in *Jones* and *Carpenter*, and rather simply accept that Flock cameras track the whole of a person's physical movements

because Plaintiffs say so.  This is not the standard of review applicable to Defendants' Motion to Dismiss.  Legal conclusions pleaded as factual allegations are entitled to no presumption of truth. *See Ashcroft*, 556 U.S. 662, 678.

Rather, the analytical construct that applies at this juncture is for the Court to examine the technological system at issue and assess the extent of the surveillance effected by that technological system.  *United States v. Martin*, No. 3:23-CR-150, 2024 WL 4476560, at *7).  *Jones* and *Carpenter* provide the framework for this Court to analyze whether the City's use of Flock cameras tracks the whole of a person's physical movements.  In *Jones*, the Court examined police use of a GPS-tracking device to monitor and record a vehicle's movements over 28 days.  *Jones*, 565 U.S. at 402-404.  The GPS-tracking device was attached to the vehicle and could establish the vehicle's location within 50 to 100 feet.  *Id.*  It is untenable to think that Justice Alito's concurrence, expressing that "[s]ociety's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue *every single movement* of an individual's car for a very long period," was not informed by the specific, GPS-tracking technology at issue in that case.  *See Jones,* 565 U.S. 400, 430 (emphasis supplied).  Similarly, Justice Sotomayor relied on the "unique attributes of GPS surveillance" in her concurrence, which attributes included that "GPS monitoring generates a *precise, comprehensive record* of a person's public movements" which in turn "reflects a wealth of detail about her familial, political, professional, religious, and sexual associations."  *Id.* at 415 (J. Sotomayor, concurring) (emphasis supplied).

Plaintiffs have not, and cannot, allege that Flock cameras operate with a capability anything akin to that of GPS-tracking – that they "catalogue every single movement of an individual's car" or generate a "precise, comprehensive record of a person's public movements," which concerned

Justice Alito and Justice Sotomayor.  There is no allegation that Flock cameras attach to cars, videorecord them, or follow them.  All Plaintiffs have, and can, plead is that Norfolk has installed 172 Flock cameras which photograph passing vehicles on public streets and store information about the location, date, time, and some exterior characteristics in a database.  Plaintiffs have not alleged how Flock cameras capturing vehicles by happenstance are similar to GPS-tracking devices, amount to tracking every single movement of an individual's car, or track the whole of a person's physical movements.

Similarly, Plaintiffs have not alleged the City's use of Flock cameras amounts to tracking the whole of a person's movements under *Carpenter*.  There, in finding that the Government accessing historical cell-site location information ("CSLI") amounted to a search, the Court again analyzed the specific technological attributes of CSLI, reasoning that a cell phone is almost a "feature of human anatomy" and "tracks nearly exactly the movements of its owner."  *Carpenter v. United States*, 585 U.S. 296, 311 (2018).   "A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales."  *Id.* (internal citation omitted).  No allegations in the Complaint suggest that Flock cameras operate like an "ankle monitor to a [vehicle's] user."  *Id.* at 312.  Flock cameras do not attach to or follow a person (or vehicle) anywhere.  Accordingly, Plaintiffs have not alleged the City's use of Flock cameras tracks the whole of their physical movements.

### C. Plaintiffs fail to allege Flock cameras track the whole of their physical movements under *Beautiful Struggle*

In their opposition brief, Plaintiffs brush off the obvious distinctions between the City's Flock technology and the technologies at issue in *Jones*, *Carpenter,* and *Beautiful Struggle*, demeaning them as "picayune," "minor," or "immaterial" because they know that even a cursory acknowledgement of these differences is fatal to the sufficiency of their Complaint.

9

This is especially true in comparing Baltimore's aerial surveillance technology (the "AIR program") to Norfolk's use of Flock cameras.   In *Beautiful Struggle*, Baltimore's aerial surveillance technology generated "AIR data [that was] a photographic record of movements, surpassing the precision even of GPS data and CSLI." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 343 (4th Cir. 2021).   Any single aerial image – captured once per second – included around 32 square miles of Baltimore and could be magnified to a point where people and cars are individually visible, but only as blurred dots or blobs.   *Id.* at 334.   Approximately twelve hours a day, Baltimore's aerial cameras captured *32 square miles (or around 90% of the city) per image per second.   See Beautiful Struggle*, 2 F.4th at 334, 344 (emphasis supplied).

It is only because Baltimore's AIR program created a "highly precise map of movements" of people in Baltimore that the Court was able to conclude the technology's operation was a search. *See Beautiful Struggle*, 2 F.4th at 344.   And it is not difficult to understand how Baltimore's aerial program created such a "precise map of movements" analogous to the GPS-tracking in *Jones* or the CSLI in *Carpenter*.   Crudely simplified, the AIR program cameras functioned like a videorecorder high above the city – snapping an image of 32 square miles at a framerate of one photo per second.   Review each photo in the context of the one before and the one after, and one could see precisely where every outdoor vehicle or person visible from the air inside 32 square miles of the city moves.   Over the course of twelve hours, one could keep tracking the path of vehicles or persons, albeit as dots or blurbs, across 90% of the city each day.   *See Beautiful Struggle*, 2 F.4th at 344.

Compare this to what is alleged about Norfolk's Flock cameras.   Plaintiffs allege there are 172 Flock cameras placed within the Norfolk city limits.   ECF No. 1 ¶.   They characterize the coverage provided by them as a "blanket," (ECF No. 22 PageID# 129), despite not providing any

allegations of how many linear miles of public streets exists in Norfolk or even basic information about the area of land involved. Moreover, there are no allegations as to how close one Flock camera is positioned in relation to the other 171[2]. In sum, despite Plaintiffs' conclusory statement that the City "is trying to accomplish by ground what Baltimore tried to do by air," (ECF No. 22 PageID# 113), there are no allegations to explain how the Flock cameras create a precise map of movements akin to that produced by the technology in *Beautiful Struggle*. Flock cameras only capture an image of a vehicle that happens to pass a location where a camera is placed, and once a vehicle leaves the 150-foot capture range, Flock only captures an image of that same vehicle if it happens to pass another location where a camera is placed. The stationary cameras cannot capture any information about where a vehicle stops or goes between cameras, and Plaintiffs have not pleaded otherwise. Analogizing to the technology in *Beautiful Struggle*, for the Flock system to "track" one minute's worth of movement of any vehicle, a vehicle would have to move from one Flock camera location to another Flock camera once a second for 60 seconds. There are no allegations to support that the City's Flock cameras are capable of tracing a vehicle's path in such a way. Under the facts alleged, it is wholly unreasonable to assert that the City's Flock cameras create a precise map of movements of any vehicle or track the whole of any person's physical movements.

Plaintiffs argue that gaps in Flock cameras' coverage, or any technological distinction from the unblinking coverage of 90% of the entire land area of the City of Baltimore that was at issue in *Beautiful Struggle*, is only "incidental" to the Court's analysis of whether the City's use of Flock

---

[2] Plaintiff Schmidt alleges there are four Flock cameras just outside his neighborhood, so there are only 168 cameras left to be placed at other locations other than just outside Plaintiff Schmidt's neighborhood. If the Court assumes that Flock cameras are grouped by location, consistent with Plaintiff Schmidt's allegation, then Flock cameras would be stationed at just 42 other intersections around the City, (168 ÷ 4 = 42).

violates a reasonable expectation of privacy in the whole of a person's physical movements. *See* ECF No. 22 PageID# 128. However, Defendants misuse an out of context quotation from *Beautiful Struggle* – "that the technology 'is only incidental'" (ECF No. 22 PageID# 128) – to discourage the Court from analyzing the differences between Flock technology and the air surveillance program for the purpose of evaluating Plaintiffs' legal conclusions. Read in context, the court in *Beautiful Struggle* merely affirmed that the "aerial" nature of Baltimore's AIR program was only incidental to the Plaintiffs' claim, just as cell phone technology is ultimately incidental to the outcome in *Carpenter*, insofar as the core holding in those cases turns on the interpretation and application of precedents concerning a person's right to privacy in physical location and movements. *See Beautiful Struggle,* 2 F.4th at 345. In other words, *Beautiful Struggle* did not jettison the analysis conducted in *Carpenter*, as Plaintiffs would have this Court do, which undertook an examination of specific technology to closely assess what it revealed about a person's physical location and movement. As applied in this case, that Flock cameras operate from the ground may be "incidental" to the Court's analysis, because other characteristics of the Flock system (for example, that the cameras do not follow vehicles and have a static field of view from a static location), considered together, substantiate that the City's use of Flock does not track the whole of a person's movements.

Finally, in light of the gaping distinctions between the City's Flock technology and Baltimore's AIR program, in order to have the Court misapply *Beautiful Struggle* and find that a search occurred in this case, Plaintiffs fall back on an argument that "Defendants are just fighting Plaintiffs' factual allegations." ECF No. 22 PageID #129. Oddly, they then go on to list facts

directly inferred from the Complaint,[3] followed by a set of Defendants' legal conclusions that counter the Plaintiffs' own legal conclusions.  While it is true that "Defendants are stuck" with Plaintiffs' *factual* allegations, neither the Defendants nor the Court are stuck with Plaintiffs legal conclusions, in particular their conclusory assertion that Norfolk's use of Flock technology tracks the whole of a person's movements just like the AIR program in *Beautiful Struggle*.

### D.  Plaintiffs misapply the "mosaic theory" in this case

Plaintiffs weave into their opposition a haphazard discussion of the "mosaic theory" and misinterpret that theory's application in *Beautiful Struggle, Jones*, and *Carter*.  To the extent the mosaic theory was discussed in any of those cases, the theory in itself was not adopted as the basis for the courts' decisions in those matters.  Neither the Supreme Court nor the Fourth Circuit has adopted the mosaic theory as an acceptable test for deciding whether the government has violated a reasonable expectation of privacy in the whole of a person's physical movements.  *See Martin*, *Martin¸* 2024 WL 4476560, at \*12 (declining to apply the mosaic theory in analyzing motion to suppress evidence obtained from Flock cameras where it has not been adopted by the Supreme Court or the Fourth Circuit).  Moreover, Plaintiffs do not point to any precedent wherein the mosaic theory has been applied to purported surveillance technology that gathers information solely related to vehicles (as here), as opposed to individuals.  Assuming, without conceding, that *Beautiful Struggle* or *Carpenter* engaged with the mosaic theory, those cases involved technology that tracked individual *persons*, and as such are inapposite to suggest the mosaic theory should

---

[3] Plaintiffs recite that Defendants assert: (1) "The Flock system does not reveal who is driving a vehicle or even who the registered owner of a vehicle is" (the Complaint contains no allegation that the Flock system identifies who is driving a vehicle or even who the registered owner of a vehicle is); (2) "The Flock cameras cannot follow an individual at all" (the Complaint contains no allegation that Flock cameras can follow vehicles); (3) "[D]ue to their fixed positions and limited range of capture, Flock cameras cannot track a whole of an individual's movements" (The Complaint describes stationary (fixed) cameras with a capture range of only 150 feet).

apply here, where there is no allegation that all of the Plaintiffs' movements are synonymous and coincident with all of the movements of their cars.  *See Carpenter*, 585 U.S. at 311 (reasoning a cell phone is almost a "feature of human anatomy" and "tracks nearly exactly the movements of its owner"); *Beautiful Struggle* 2 F.4th at 334 ("any single AIR image – captured once per second – includes around 32 square miles of Baltimore that can be magnified to a point where people and cars are individually visible…").

Even if the Court were to engage with the mosaic theory for this case, it should recognize that Plaintiffs have muddled the theory's application.  The mosaic theory asks whether the government has observed enough of a person's physical movements to deduce intimate details about his private life that could not be learned from simply observing his isolated trips or activities.  *See United States v. Chatrie*, 107 F.4th 319, 334 (4th Cir. 2024, reh'g en banc granted, No. 22-4489, 2024 WL 4648102 (4th Cir. Nov. 1, 2024); *see* Orin S. Kerr, *The Mosaic Theory of the Fourth Amendment*, 111 Mich. L. Rev. 311 (2012).  Under this theory, access to a person's short-term movements does not invade any reasonable expectation of privacy.  Such information reveals only the locations a person visits and nothing more, which is something that law enforcement could learn from traditional means of surveillance.  *Chatrie*, 107 F.4th at 334 (citing *Beautiful Struggle*, 2 F.4th at 341; *Jones*, 565 U.S. at 429 (opinion of Alito, J.)).

Thus, under the mosaic theory the relevant "tiles" are discrete bits of surveillance information that observe a person's physical movements and reveal the location such person visits, i.e. "short trips."  Should enough of these tiles be aggregated, the theory posits, they could create a "mosaic," or larger picture, of someone's life.  The discrete tiles "enable deductions about 'what a person does repeatedly, what he does not do, and what he does ensemble,' which 'reveal[s] more about a person than does any individual trip viewed in isolation.'"  *Chatrie*, 107 F.4th at 329 (citing

14

*Beautiful Struggle*, 2 F.4th at 342 (quoting *United States v. Maynard*, 615 F.3d at 562–63 (2012))) (alteration in original).

Accordingly, in this case the mosaic theory is inapposite to find that the City's use of Flock technology is a search.  This is because the allegations do not even substantiate a "tile" to consider inserting into the mosaic, since Flock cameras do not reveal the location any person visits and do not collect information about trips, even short ones.  Plaintiffs have not (and cannot) plead that Flock cameras collect images of persons, that they capture where a person stops and steps out of a vehicle, or that they capture any information about destinations, including schools, grocery stores, or shooting ranges (*see* ECF 1 ¶ 54; ECF No. 22; PageID# 124).  Accordingly, the mosaic theory is inapposite to this case to suggest the City's use of Flock technology is a Fourth Amendment search.

### E. *Martin* applies to the facts of this case

This Court's analysis in *Martin* squarely governs this case such that the Court should similarly find Norfolk's use of Flock technology does not amount to a Fourth Amendment search. Plaintiffs argue the Court should not adopt the analysis in *Martin* because the Fourth Amendment question arose during a motion to suppress hearing, where the defendant had the burden of proving his case by a preponderance of the evidence.  ECF No. 22 PageID# 130.  If anything, the procedural posture of *Martin* makes its reasoning even more apropos, because the facts of the fully developed record in that case regarding how the Flock cameras work align with the allegations of the Complaint here.   In *Martin*, the criminal defendant's liberty was at stake, an arguably more serious civil right than the one the Plaintiffs claim has been injured in the instant case.  There is no reason to believe that the protections of the Fourth Amendment can be analyzed more casually in a criminal case like *Martin* than in a civil case such as this.

Presumably recognizing the weakness of their position, Plaintiffs argue *Martin* is somehow inapposite based on an irrelevant size comparison between the City of Norfolk and the localities in which Flock cameras were located in the *Martin* case. ECF No. 22 PageID# 131. Since Plaintiffs' resort to citing facts extraneous to their Complaint, in the form of a map, (ECF No. 22 PageID# 131), Defendants provide the Court with clarifying, publicly available facts in response.

Norfolk has "over 2,186 lane miles of City roadways" that are maintained by its Public Works Department. *See* https://www.norfolk.gov/1655/Streets-Bridges (last visited Dec. 19, 2024). Each flock camera has a photographic range of 150 feet. ECF No. 1 at ¶ 32. There are 172 Flock cameras in the City of Norfolk. ECF No. 1 at ¶ 2. At most, these cameras can capture photographs of vehicles that travel along 4.9 miles of the City's roadways (172 x 150 ft. = 25,800 ft. ÷ 5,280 ft./mi. = 4.89 mi.). Thus, the Flock cameras in Norfolk are alleged to only have the capacity to photograph vehicular activity along 0.2% of the lane miles that exist in the City of Norfolk. (4.89 mi. ÷ 2,186 mi. = 0.002 = 0.2%).

To provide a meaningful metric to compare the Flock camera network in *Martin* to the network in Norfolk, Plaintiffs would have to provide facts about the total length of roadways involved in *Martin*, not the total land mass. This is the necessary factual basis to consider whether Norfolk has "compressed" its Flock cameras such that, as Plaintiffs argue, the Court should ignore the holdings in *Knotts*. ECF No. 22 PageID# 131. Because the Complaint does not allege these facts, the gross land mass comparison between Norfolk and other localities is a meaningless attempt to distinguish this case from *Martin*.

Plaintiffs' further attempt to distinguish *Martin* also fails. They state that the subject vehicle in *Martin* was only photographed three times and that the cameras collected "little information." *Id.* at PageID# 130-131. Norfolk, they argue, is using its Flock cameras to operate

a "surveillance program that is actively collecting more information…." *Id*. at PageID# 131. However, the factual allegation pleaded is that a person driving in Norfolk is only expected to encounter one camera. ECF No. 1 at ¶ 40 (quoting Police Chief Talbot as saying, "It would be difficult to drive anywhere of any distance without running into <u>a</u> camera.") (emphasis added). Chief Talbot's statement only serves to demonstrate that this case falls squarely within the reasoning of *Martin*, and this Court should find that "the Flock system does not record the totality of one's movements." *See Martin, 2024 WL 4476560, at *14*.

     **F.  *Katz* and its progeny, establishing a test for detecting whether a search violates a reasonable expectation of privacy, govern this case**

Plaintiffs proffer a textual and originalist theory as an alternative basis for the Court to find that the City's use of Flock technology constitutes a search. ECF 22 PageID # 133-135. This appears designed to convince the Court to avoid using the reasonable expectation of privacy test established in *Katz v. United States*, 389 U.S. 347 (1967) and refined by cases such as *Knotts* and *Carpenter* as technology has evolved. There is no basis for the Court to depart from applying these well-established precedents to the facts of this case and indeed it is bound to do so. *See Masterson v. Commonwealth Bankshares, Inc.*, 2 F. Supp. 3d 824, 830 (E.D. Va. 2014) ("Notwithstanding … various arguments suggesting the contrary, this Court is obligated to follow such published on-point precedent."); *Selke v. Germanwings GmbH*, 261 F. Supp. 3d 645, 660 (E.D. Va. 2017) ("This Court must also follow binding precedent from the Supreme Court of the United States…." ). Accordingly, the Court should analyze the City's use of Flock technology under the apposite jurisprudence regarding a person's reasonable expectation of privacy, and find that such use does not constitute an unlawful search under the Fourth Amendment.

**III.   <u>Plaintiffs lack standing</u>**

The Complaint fails to allege an injury in fact entitling Plaintiffs to standing for purposes of challenging the City's use of Flock cameras. The allegations fail the standard set forth in *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193 (4th Cir. 2017) that Plaintiffs argue should apply. In *Wikimedia*, plaintiffs challenged an electronic surveillance program called "Upstream," operated by the National Security Agency ("NSA"). *Id*. at 200. The specific allegation that the court evaluated for purposes of determining a plausible injury in fact was that the "the NSA is intercepting, copying, and reviewing at least some of [plaintiff's] communications in the course of Upstream surveillance, even if the NSA conducts Upstream surveillance on only a single [I]nternet backbone link." *Id.* at 209 (internal quotations omitted).

To analyze the plausibility of this allegation, the court focused on three facts alleged by the plaintiff. These facts related to the structure of the internet and how the plaintiff's data moved through the internet. First, the plaintiff alleged that "[g]iven the relatively small number of international chokepoints, the volume of plaintiff's communications, and the geographical diversity of the people with whom it communicates, [plaintiff's] communications almost certainly traverse every international backbone link connecting the United States with the rest of the world." *Id.* at 210–11 (internal quotations omitted). Second, plaintiff alleged that, due to technical reasons that it described, the NSA "must be copying and reviewing all the international text-based communications that travel across a given link" upon which surveillance equipment had been installed. *Id.* Third, "the NSA ha[d] confirmed that it conducts Upstream surveillance at more than one point along the [I]internet backbone." *Id.* The court found that altogether, these allegations were sufficient to make plausible the conclusion that the NSA is intercepting, copying, and reviewing at least some of plaintiff's communications. The court noted, "[t]o put it simply, [plaintiff] has plausibly alleged that its communications travel all of the roads that a

18

communication can take, and that the NSA seizes all of the communications along at least one of those roads." *Id.* at 211. Accordingly, it was plausible that the NSA had seized some of plaintiff's communications. *Id.*

So, in *Wikimedia*, the court found a plausible injury in fact because the plaintiff alleged: (1) there were a limited number of internet roads for its data to travel, (2) plaintiff's data travelled all of those roads, and (3) since the government had admitted to surveilling at least one road, some of plaintiff's data was plausibly seized. *See id.* To fit into the court's analysis in *Wikimedia*, both Plaintiff Schmidt and Plaintiff Arrington would have to allege they travel all the roads in Norfolk, and that since Flock cameras take photographs of vehicles on at least one or some of those roads, Flock cameras have taken photographs of Plaintiffs' vehicles. There is no allegation in the Complaint that Plaintiffs travel all the roads in Norfolk such that the reasoning in *Wikimedia* would apply to grant them standing in this case. And, even if the Plaintiffs amended their Complaint to allege that the Flock cameras have the sort of comprehensive coverage that the NSA's Upstream program had, they still would come up short of showing sufficient standing, since the Flock cameras do not photograph people. The plaintiff in *Wikimedia* asserted that the NSA was "seizing and searching the [I]nternet communications of U.S. citizens." *Id.* at 202. All that is alleged in this case is that the City of Norfolk and the NPD have photographed the Plaintiffs' vehicles. To equate personal, protected speech—which was being collected in *Wikimedia*—to the public, unprotected appearance of the exterior of a vehicle and its license plate—as alleged in this case— is an unwarranted legal leap, ignorant of and inconsistent with the holdings in *Class* and *Knotts* that explain why no reasonable expectation of privacy exists for cars operating on public streets.

Accordingly, the Court should dismiss the Complaint as Plaintiffs have not cleared the standing hurdle discussed and applied in *Wikimedia*. Rather, Plaintiffs' theory of standing is based

on a highly attenuated chain of possibilities, which does not satisfy the Supreme Court's requirement that a "threatened injury must be certainly impending."  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

## CONCLUSION

WHEREFORE, for the foregoing reasons, the City of Norfolk and Mark Talbot by counsel, respectfully request that this Honorable Court dismiss Plaintiffs' Complaint, with prejudice, and for all such other relief this Court deems just and proper.

**CITY OF NORFOLK,**
**and**
**MARK TALBOT**

                /s/
Karla J. Soloria (VSB 82674)
Assistant City Attorney
Adam D. Melita (VSB 41716)
Chief Deputy City Attorney
karla.soloria@norfolk.gov
adam.melita@norfolk.gov
City of Norfolk Department of Law
810 Union Street, Suite 900
Norfolk, VA 23510
Telephone: (757) 664-4529
Facsimile: (757) 664-4201

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of December, 2024 I will electronically file the foregoing *Reply Memorandum in Support of Motion to Dismiss* with the Clerk of Court using the CM/ECF system, which will send a copy of the foregoing to the following,

Robert Frommer
Joshua Windham
Michael B. Soyfer
Institute for Justice
901 N. Glebe Rd., Suite 900

Arlington, VA 22203
rfrommer@ij.org
jwindham@ij.org
msoyfer@ij.org
Telephone: (703) 682-9320
Fax: (703) 682-9321

*Counsel for Plaintiffs*


_____/s/_____
Karla J. Soloria (VSB 82674)
Assistant City Attorney
karla.soloria@norfolk.gov
City of Norfolk Department of Law
810 Union Street, Suite 900
Norfolk, VA 23510
Telephone: (757) 664-4529
Facsimile: (757) 664-4201

*Counsel for Defendants*