# EXHIBIT 10

*Redacted*



**Planet Depos**
**We Make It *Happen*™**

## CONTAINS CONFIDENTIAL INFORMATION
## SUBJECT TO PROTECTIVE ORDER

# Transcript of Josh Thomas, Corporate Designee

**Date:** July 29, 2025
**Case:** Schmidt and Arrington -v- City of Norfolk, et al.

**Planet Depos**
**Phone:** 888.433.3767 **| Email:** transcripts@planetdepos.com
**www.planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

**1**

```
        IN THE UNITED STATES DISTRICT COURT

        FOR THE EASTERN DISTRICT OF VIRGINIA

- - - - - - - - - - - - -x

LEE SCHMIDT and CRYSTAL    :

ARRINGTON,                 :

          Plaintiffs, :

   v.         :  Civil Action No.

CITY OF NORFOLK and MARK  : 2:24-cv-00621-MSD-LRL

TALBOT, in his official   :

capacity as Norfolk       :

Chief of Police,          :

          Defendants. :

- - - - - - - - - - - - -X

    CONTAINS CONFIDENTIAL INFORMATION

        SUBJECT TO PROTECTIVE ORDER

 Videotaped Deposition of FLOCK GROUP INC. d/b/a

 FLOCK SAFETY, by and through its Designated

      Representative JOSH THOMAS

        Conducted Virtually

    Tuesday, July 29, 2025, 1:18 p.m. EDT

Job No.:  589834
Pages 1 - 119
Reported by:  Debra A. Whitehead
```

**2**

Videotaped Deposition of JOSH THOMAS, conducted virtually.

        Pursuant to notice, before Debra Ann Whitehead, E-Notary Public in and for the Commonwealth of Virginia.

**3**

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS:

    MICHAEL SOYFER, ESQUIRE

    JOSHUA WINDHAM, ESQUIRE

    ROBERT FROMMER, ESQUIRE

    TAMINEH DEHBOZORGI, ESQUIRE

    JESSICA BIGBIE, ESQUIRE

    THE INSTITUTE FOR JUSTICE

    901 North Glebe Road, Suite 900

    Arlington, Virginia 22203

    (703) 682-9320

ON BEHALF OF DEFENDANTS:

    KARLA J. SOLORIA, ESQUIRE

    ADAM D. MELITA, ESQUIRE

    NORFOLK CITY ATTORNEY

    900 City Hall Building

    810 Union Street

    Norfolk, Virginia 23510

    (757) 664-4529

**4**

A P P E A R A N C E S   C O N T I N U E D

ON BEHALF OF FLOCK SAFETY AND THE WITNESS:

    E. MARTIN ESTRADA, ESQUIRE

    JOSEPH MANTEGANI, ESQUIRE

    MUNGER TOLLES & OLSON

    350 South Grand Avenue

    50th Floor

    Los Angeles, California 90071

    (213) 683-9100

ALSO PRESENT:

    JACK DUNN, Video Specialist

    MICHAEL GOLDSTICKER, ESQUIRE

    Inhouse Counsel, Flock Safety

**Page 5**

C O N T E N T S

EXAMINATION OF JOSH THOMAS                    PAGE

By Mr. Soyfer                    7
By Mr. Estrada                   115

EXHIBITS MARKED IN TODAY'S SESSION
(Attached to the Transcript)

PLAINTIFFS' DEPOSITION EXHIBIT          PAGE

Exhibit 61   Agreement By and Between the City   38
             of Norfolk and Flock Safety, Inc.,
             Bates FLOCK 0000007 - 00000031
Exhibit 62   Printout from Flock Safety          50
             Website, Data at the Curb:  How
             Traffic Analytics is Transforming
             Safety and Success for Commercial
             Businesses

EXHIBITS MARKED IN PRIOR SESSIONS
(Not attached)

PLAINTIFFS' DEPOSITION EXHIBIT              PAGE

Exhibit 54   Subpoena to Testify at a            10
             Deposition in a Civil Action

Confidential - Subject to Protective Order: 16:13-18:17;
19:14-20:18; 21:1-21:4; 36:4-36:11; 38:7-49:19;
54:6-57:18; 58:20-63:19; 65:7-67:2; 68:8-86:10;
88:2-88:10; 88:17-89:16; 104:1-106:4; 109:9-113:16

**Page 6**

P R O C E E D I N G S

VIDEO SPECIALIST:  Here begins Media Number 1 in the videotaped deposition of Josh Thomas in the matter of Lee Schmidt and Crystal Arrington V City of Norfolk, and Mark Talbot, in his official capacity as Norfolk chief of staff -- chief of police, excuse me; in the United States District Court for the Eastern District of Virginia; Case Number 2:24-CV-00621-MSD-LRL.

Today's date is July 29, 2025.  The time on the video monitor is 13:18 eastern time.  The videographer today is Jack Dunn, representing Planet Depos.  All parties of this video deposition are attending remotely.

Would counsel please voice-identify themselves and state whom they represent.

MR. SOYFER:  Michael Soyfer from the Institute For Justice, on behalf of plaintiffs in this case.  I am joined today by my colleagues Robert Frommer, Joshua Windham, Jessica Bigbie, and Tahmineh Dehbozorgi.

MR. ESTRADA:  Good afternoon. Martin

**Page 7**

Estrada.  I'm joined by Joe Mantegani, on behalf of Flock Safety, from the law firm of Munger, Tolles & Olson.  Also with us is Michael Goldsticker, in-house counsel for Flock Safety. We are here representing the witness, Josh Thomas.

MS. SOLORIA:  Good afternoon.  I'm Karla Soloria, with the Norfolk City Attorney's Office, representing the defendants.  And I'm joined by my colleague Adam Melita.

VIDEO SPECIALIST:  The court reporter today is Debbie Whitehead, representing Planet Depos.

The witness will now be sworn.

JOSH THOMAS,
having been duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MR. SOYFER:

Q    Could you please state your name, for the record.

A    **My name is Josh Thomas.**

Q    And, Mr. Thomas, you and I have never met before today.  Correct?

**Page 8**

A    **Correct.**

Q    Are you employed?

A    **Yes.**

Q    Where are you employed?

A    **Flock Safety.**

Q    What do you do at Flock Safety?

A    **Communications.**

Q    What is your title?

A    **Chief communications officer.**

Q    Great.  And have you been deposed before?

A    **No.**

Q    Have you ever given testimony at trial or in a court?

A    **No.**

Q    So I just want to run through some of the ground rules for today.  This is to make sure things go smoothly and we get a clean record.

The first thing -- which you've been doing a great job of so far -- is always remember to give verbal responses, not shaking your head or saying uh-huh or unh-unh.  That just makes sure that our record is clear.

**9**

1     Is that fair?
2     A     Yes.
3     Q     The other thing is not to speak over one
4  another.  I will always try to let you finish your
5  answer before I ask my next question.  And I ask
6  that you let me finish my questions before you
7  start to answer.
8     Is that fair?
9     A     Yes.
10    Q     If at any time you don't understand my
11 questions for any reason, please just let me know.
12 I'm happy to clarify or try to rephrase.  By
13 extension, if you answer my questions I'll assume
14 that you understood them.
15    Is that fair?
16    A     Yes.
17    Q     Is there any reason you can't give
18 truthful and accurate testimony today?
19    A     No.
20    Q     I'll preface this by saying sometimes
21 witnesses have a bad reaction to this question,
22 but it's asked in virtually every deposition.

**10**

1     Are you on any drugs or other substances
2  that would interfere with your ability to testify
3  truthfully and accurately today?
4     A     No.
5     Q     Are you receiving any compensation to
6  testify today?
7     A     No.
8     Q     Has anyone made any promises to you in
9  exchange for giving certain testimony today?
10    A     No.
11    Q     Is your continued employment contingent
12 on your testimony today?
13    A     No.
14    Q     Do you understand you're here today to
15 testify as a representative of Flock?
16    A     Yes.
17    Q     And this was previously introduced in
18 Mr. Lukens' deposition.
19    MR. SOYFER:  But hopefully, Martin, if
20 you still have it handy, you can pull it up.  I'd
21 like to go to Plaintiff's Exhibit 54.
22    (Plaintiffs' Exhibit 54, previously

**11**

1  marked, not attached.)
2     MR. ESTRADA:  So we do have Exhibit 54 up
3  on the side screen.
4     MR. SOYFER:  Great.
5     Q     And again for the record, this is the
6  subpoena to Flock for today's deposition.
7     When I refer to "Flock," you'll
8  understand that that's the entity identified here
9  as Flock Group, Inc., doing business as Flock
10 Safety.  Correct?
11    A     Yes.
12    Q     Sometimes today I'll ask you some obvious
13 questions just to make sure things are clear for
14 the record, like that one.  So just bear with me
15 for those.
16    So just looking back, if you go a few
17 pages in to Page 4 of this exhibit, of Exhibit 54,
18 you'll see a section entitled Deposition Topics.
19    Correct?
20    A     Yes.
21    Q     And feel free to look through those, but
22 do you understand you have been designated to

**12**

1  testify on behalf of Flock on Topic 1, Topics 6 to
2  9, and Topics 13 to 15?
3     A     Yes.
4     Q     Okay.  Great.
5     What did you do to prepare for your
6  testimony today?
7     A     Reviewed the documentation here and
8  talked with our counsel.
9     Q     And when you say "our counsel," can you
10 just tell me which specific people you mean?
11    A     I mean Martin Estrada, Joe, and Michael.
12    Q     How many times did you speak to them?
13    A     Three times.
14    Q     And for roughly how long each time?
15    A     Roughly four hours each time.
16    Q     Did you review -- and I'm just looking
17 for a yes or no for right now.  Did you review any
18 documents during the times that you met with them?
19    A     Yes.
20    Q     Roughly how many documents would you say
21 you reviewed?
22    A     Four.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025

4 (13 to 16)

---

**13**

1    Q    Did any of those documents refresh your
2  recollection of certain matters or events?
3         MR. ESTRADA:  And I would just instruct
4  the witness not to provide any specific documents
5  unless they refreshed your recollection.
6    A    No.
7    Q    Did you speak to any other Flock
8  employees, current or past, to prepare for your
9  deposition today?
10   A    No.
11   Q    I just want to ask a few background
12 questions about you.
13        Where did you attend college?
14   A    UC Santa Barbara.
15   Q    What did you study?
16   A    English literature.
17   Q    And have you gone to grad school?
18   A    No.
19   Q    How long have you worked at Flock?
20   A    Seven years.
21   Q    So starting around 2018?
22   A    Yes.

---

**14**

1    Q    What was your first job at Flock?
2    A    Marketing.
3    Q    And were you employed before you started
4  working at Flock?
5    A    Yes.
6    Q    What were you doing before Flock?
7    A    Would you like immediately preceding or
8  my whole --
9    Q    Yeah, let's start with immediately
10 preceding.
11   A    I worked for a company called Experience.
12   Q    And what did Experience do?
13   A    Sports and live entertainment ticketing,
14 and upgrades for live events.
15   Q    Got it.  And what was your role there,
16 just briefly?
17   A    Marketing.
18   Q    And so then you came into Flock and
19 started in marketing, correct --
20   A    That's correct.
21   Q    -- in 2018?
22        Sorry, that was a yes?

---

**15**

1    A    Yes.
2    Q    What was your -- I guess what was your
3  actual title at that point?
4    A    It was the literal single word
5  "marketing."
6    Q    Okay.  Got it.  Thank you for that.
7         Just tell me again briefly what your
8  day-to-day role in marketing entailed.
9    A    At the very beginning when I first
10 started?
11   Q    Yes.
12   A    It entailed communications and PR,
13 setting up digital marketing channels like Google
14 and Facebook, building a website.  Kind of your
15 traditional getting a company started in early
16 marketing activities.
17   Q    Got it.  So that was very early in
18 Flock's existence, if I understand correctly.
19        Right?
20   A    Yes.
21   Q    Flock was founded in 2017, I believe?
22   A    Yes.

---

**16**

1    Q    And so you started marketing.  Did your
2  job responsibilities change at some point in time
3  after that?
4    A    Yes.
5    Q    And when was that?
6    A    Well, they changed all the time.  Every
7  three to six months my responsibilities would
8  change pretty dramatically until eventually my
9  focus got pretty narrowed into just doing
10 communications.  And that was in roughly 2020.
11   Q    Okay.
12   A    2021, something like that.
13
14
15
16
17
18
19
20
21
22

---

Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025

17

1 ████████████████████████████████
2 ████████████████████████████████
3 ████████████████████████████████
4 ████████████████████████████████
5 █████████████████████
6 ██ ██ ████████████████████████
7 ████████████████████████████
8 █████████████████████████████
9 ███████████████████
10 ████████████████████████████
11 █████████████████████████████████
12 ████████████████████████████████
13 ███████████████████████████████
14 ██████████████████
15 ████ ████████████████
16 █████████████████████████████
17 ████ ███████████████████
18 ████████████████████████████
19 ███████████████
20 ██████████████████████████
21 ████████████████
22 ███████████████████

19

1 **affairs.**
2    Q    Has that -- that title obviously changed
3 at some point between then and now.  Right?
4    **A    Yes.**
5    Q    And now can you just kind of go through
6 what your titles were from that point until the
7 present?
8       MR. ESTRADA:  You're talking about 2020
9 or 2021 to the present?
10      MR. SOYFER:  Yes.
11   **A    At some point in time I was the SVP of**
12 **policy and communications, and then I have my**
13 **current title.**
14 ████████████████████████████████
15 ███████████████████████████
16 █████████████████████████████████
17 █████████████████████████████
18 ████████████████████████████
19 ████████████████████████████████
20 ████████████████████████████████
21 █████████████████████████████████
22 █████████████████████████████████

18

1 ████████████████████████████████████
2 ████████████████████████████████████
3 ██████████████████████████████████
4 ███████████████████████
5 ████████████████████████
6 ████████████████████████████
7 ██████████████████████████████
8 ██ ██████████████████████
9 ████████████████████████████
10 ██ ████████████████████████████
11 ███████████████████████████████████
12 ████████████████████████████████
13 ████████████████████████████████
14 ████████████████████████████████
15 ████████████████████████████████
16 ██ ████████████████████████
17 ███████████████████████
18    Q    Okay.  Understood.
19       And so what was your title when you
20 shifted to that communications role in 2020 or
21 2021?
22    **A    I believe I was the VP of external**

20

1 █████████████████████████████████████
2 ███████████████████████████████████
3 ███████████████████████████████████
4 ████████████████████████████████
5 ████████████████████████████████
6 ████████████████████████████
7 ███████████████████████████
8 ███████████████████████████████
9 ███████████████████████████
10 █████████████████████████████████
11 █████████████████████████████████
12 ███████████████████████████████████
13 █████████████████████████████████
14 ██████████████████████████████
15 ████████████████████████████████
16 ████████████████████████████████
17 ██████████████████████ █
18 ████████████████████████
19    Q    Do you -- okay.  Got it.
20       And do you still supervise that team
21 today?
22    **A    No.**

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025

---

21

1 [REDACTED]
2 [REDACTED]
3 [REDACTED]
4 [REDACTED]
5    Q    Okay.  If you turn to the deposition
6 notice for today, you'll see that Topic 1 is the
7 intended purpose and use of Flock cameras.
8        Correct?
9    A    Yes.
10    Q    Great.
11        What types of -- just like as background,
12 can you tell us what types of cameras Flock offers
13 to its customers?
14    A    Yeah.  Flock offers LPR devices, video
15 cameras, and drones and trailers.
16    Q    Got it.  What are trailers?  Just cameras
17 mounted on trailers?
18    A    Yeah, a trailer can be mounted with a
19 camera, it could be mounted with a speaker to
20 provide a talk-down kind of a voice-over coming
21 out of the -- it can have flashing lights on it as
22 well.  But it does contain a camera.

---

22

1    Q    Got it.  When I talk about Flock cameras
2 today, just so we have a clean record, I'm mostly,
3 unless I say otherwise, going to be talking about
4 Flock license plate reader cameras.
5        Does that track?
6    A    Yes.
7    Q    Okay.  Great.  Does Flock offer, again
8 just as background, multiple different types of
9 LPR cameras?
10    A    So Flock has different models of LPRs,
11 yes.
12    Q    Okay.
13    A    They all perform generally the same
14 function, just a kind of different -- different
15 angles and different focal lengths.
16    Q    Can you tell me what those models are?
17    A    So it's the Flock LPR device is just our
18 standard LPR.  There's a long-range version, a
19 short-range version, and a flex version are kind
20 of the primary models.
21    Q    Let me ask you about those.  I guess the
22 difference between the long-range version and the

---

23

1 short-range version is how far it could see,
2 essentially.  Right?
3    A    Has to do with, yeah, the focal distance.
4 That's right.
5    Q    Got it.  And what about flex, tell me a
6 bit about what that does.
7    A    I don't know all the technical specs of
8 the flex.  But the idea of the flex is that
9 it's -- as opposed to a fixed location that's
10 installed in the ground in one point in time, it
11 is a temporary solution that can be used mounted
12 and taken down and the battery stays charged for a
13 limited amount of time, but it is not meant to be
14 a permanent installation.
15    Q    Got it.  Can it be mounted on a car?
16    A    No.
17        MR. ESTRADA:  I missed the question.  Can
18 it be mounted on what?
19        MR. SOYFER:  A car.
20        MR. ESTRADA:  Oh, okay.
21    A    No.
22    Q    Does Flock manufacture any

---

24

1 vehicle-mounted license plate readers?
2    A    No.
3    Q    And I should ask you, does Flock itself
4 manufacture all of those cameras?
5    A    Yes.
6    Q    So I want to focus today -- or scratch
7 that.  Let me ask you, are you aware of which
8 Flock cameras the defendants in this case, the
9 City of Norfolk and the chief of police, have
10 acquired?
11    A    My understanding is it's all the standard
12 LPR.
13    Q    Okay.  What's the intended use of those
14 standard LPR cameras?
15    A    To provide objective evidence, to
16 increase public safety in a transparent and
17 accountable way.
18    Q    Is one intended use to investigate crime?
19    A    Yes.
20    Q    How are the Flock LPR cameras used to
21 investigate crime?
22    A    A Flock LPR device can take a picture of

---

25

1 the back of a car and provide the objective, you
2 know, sort of plain-view information that may be
3 helpful to give another clue to an investigator as
4 she's developing her case.
5     Q    So they take pictures of the backs of
6 cars.  Right?  That's one thing that they do?
7     A    Yes.
8     Q    Can they take pictures of the fronts of
9 cars as well?
10    A    A Flock LPR device can inadvertently take
11 a picture of the front of the car, but it's
12 designed to take the picture of the back of a car.
13    Q    And those pictures, they include a time
14 stamp.  Right?
15    A    Yes.
16    Q    They include a location.  Correct?
17    A    It includes the location of the device,
18 yes.
19    Q    And so that information provides a clue
20 to investigators as they develop their cases.
21        Is that fair?
22    A    Yes.

26

1     Q    Do they store any other information about
2 cars, other than what we've just gone through?
3     A    It can essentially, in the picture of the
4 back of the car, it can read the license plate
5 characters, ABC123, the state of the license
6 plate, as well as the color of the vehicle, the
7 type of vehicle, often the make of the vehicle,
8 and a few other sort, of like, distinguishing
9 characteristics about the vehicle itself.
10    Q    And how is that information used?
11    A    Could you be more specific in what you
12 mean by that?
13    Q    I guess I'm just asking why would that
14 information be useful to Flock's customers?
15    A    Well, an investigator might be given an
16 eyewitness statement about a vehicle saying it was
17 a blue car, and so they could go into the Flock
18 system and filter on blue cars in the time frame
19 and the designated location, might give them a
20 license plate, which could give that investigator
21 another clue in their investigation.
22    Q    So you mentioned the time frame.  Is part

27

1 of the purpose of the Flock cameras to store
2 information that investigators can look up later?
3     A    That's one of the benefits of using
4 Flock, yes.
5     Q    You have this record, you can go in,
6 search for a vehicle, and pull up images for
7 what -- whatever time frame you're searching for
8 within the retention period.
9        Is that right?
10        MR. ESTRADA:  Objection.  Asked and
11 answered.
12    A    An investigator can go into the Flock
13 system and narrow the time frame to see if a
14 particular vehicle or license plate drove by a
15 Flock device to further an investigation in the
16 event of a crime.
17    Q    And Flock cameras don't just take
18 pictures of cars that are suspected of involvement
19 in crime.  Correct?
20    A    Correct.
21    Q    Flock cameras take pictures of every car
22 that passes them.  Correct?

28

1        MR. ESTRADA:  Objection.  Misstates the
2 prior testimony.
3     A    A Flock camera can take a picture of a
4 car that drives past that particular camera.
5     Q    Yeah.  So I guess I'm trying to
6 understand the answer.
7        You're saying they don't take pictures of
8 every car that passes them?
9        MR. ESTRADA:  Let me just object.  This
10 is a witness designated on Topic Number 1.  You
11 already had a witness who testified extensively on
12 technical capabilities of the Flock cameras.  It
13 seems like we're covering the same territory here.
14        MR. SOYFER:  Okay.
15        MR. ESTRADA:  And that information you
16 could have talked about with Mr. Lukens.
17        MR. SOYFER:  It falls within the intended
18 use.  I mean, thanks for the speaking objection,
19 but we disagree.
20    Q    If you know, you can answer, Mr. Thomas.
21        MR. ESTRADA:  Objection.  Beyond the
22 scope.

29

1     A    Do you mind restating what you asked?
2     Q    Yes.  Sure.  You're saying they don't
3  take pictures of every car that passes them.
4         MR. ESTRADA:  Objection.  Beyond the
5  scope.
6     A    I did not say that, no.
7     Q    Okay.  Do the Flock cameras take pictures
8  of every car that passes them?
9         MR. ESTRADA:  Objection.  Beyond the
10 scope.
11    A    They're intended to do that, yes.
12    Q    They are intended to take pictures of
13 every car that passes them.  Correct?
14    A    Yes.
15    Q    So if I understand correctly, Flock
16 has -- well, let me ask you this:  Who are Flock's
17 customers, just kind of in broad strokes?
18        MR. ESTRADA:  Objection.  Beyond the
19 scope.
20        You can answer.
21    A    Really anybody that cares about public
22 safety.  So law enforcement, businesses, private

30

1  individuals, HOAs, churches.  Really anybody that
2  has a desire to increase their public safety in a
3  transparent and accountable way.
4     Q    Got it.  I asked you that because I want
5  to ask about some of those private-sector
6  customers that you just listed.
7         What -- how do Flock's private-sector
8  customers use Flock cameras?
9         MR. ESTRADA:  I'm going to object.
10 Beyond the scope.  Unless you can give me a
11 representation on how this touches upon the
12 noticed topics that you gave, I'm going to
13 instruct him not to answer.
14        MR. SOYFER:  You're going to instruct him
15 not to answer?  I mean, the intended use and
16 purpose of Flock cameras is the topic.  It doesn't
17 say for the specific type of customer.  I mean, I
18 don't have three hours of questions on this, but I
19 do have some questions on this, and it's well
20 within the scope of the topic.
21        MR. ESTRADA:  Okay.
22        You can answer that question.

31

1         We'll see how far it goes.
2     A    Do you mind restating the question?
3     Q    Yes.  How do Flock's private-sector
4  customers use Flock cameras?
5     A    In the event of a crime, they can provide
6  objective vehicular evidence to their local law
7  enforcement.
8     Q    So kind of similar to public sector
9  customers, to assist in investigations.
10        Is that fair?
11    A    It's pretty different in the way that a
12 private-sector customer uses Flock versus a
13 public-sector customer.
14    Q    Tell me a little bit about that.
15        MR. ESTRADA:  Object.  Beyond the scope.
16        You can answer.
17    A    Well, a private-sector customer isn't law
18 enforcement, and so they don't have to follow very
19 similar rules as law enforcement with having
20 public-usage policies.  They can't act on this
21 information as law enforcement can with developing
22 reasonable suspicion.  They're merely providing a

32

1  piece of evidence to law enforcement to let law
2  enforcement go continue their investigation, and
3  therefore severely limited, what private-sector
4  customer can actually view or do within Flock.
5     Q    I think I understand.  So their intended
6  use is to assist law enforcement in
7  investigations.
8         Is that a fair characterization of your
9  answer there?
10    A    Yes.
11    Q    And a private-sector customer can share
12 information with law enforcement.  Correct?
13        MR. ESTRADA:  Objection.  Assumes facts.
14 Lack of foundation.
15        You can answer if you understand.
16    A    Will you clarify what you mean by
17 "information"?
18    Q    They can share images or data from their
19 Flock cameras with law enforcement.  Correct?
20    A    Yes.
21        MR. ESTRADA:  Objection.  Beyond the
22 scope.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025

9 (33 to 36)

33

1   Q   Okay.  Let's move on to Topic 6.
2       So this topic is your ability and
3   authority to make defendants' Flock cameras or
4   Flock data available to third parties.
5       Correct?
6   **A   Yes.**
7   Q   What ability, if any, does Flock have to
8   make the defendants' Flock cameras or data
9   available to third parties?
10  **A   So we build a system and tools that**
11  **allows the customer who owns the data to decide**
12  **with whom they share and lets their system**
13  **administrator of that information share that**
14  **information at their will, as long as it's within**
15  **the confines of the law.**
16  Q   So the customer makes the choice of who
17  to share their data with.
18      Is that right?
19      MR. ESTRADA:  Objection.  Misstates
20  testimony.
21  **A   The system administrator of the -- like**
22  **who is -- of the customer is the one who can**

34

1   **decide with whom they share their data.  Flock**
2   **does not decide who they share their data with.**
3   Q   Let me ask you, does Flock have a
4   national database of all customers?
5       MR. ESTRADA:  Objection.  Vague and
6   ambiguous.
7   **A   Can you clarify what you mean by "a**
8   **database"?**
9   Q   Yeah.  So does Flock have a database that
10  its customers -- strike that.
11      Let me ask you this a little bit
12  differently.  Does every customer have to
13  decide -- strike that.
14      Does each customer have to choose
15  individually each other customer that they want to
16  share their data with?
17  **A   If a customer wants to share data with**
18  **another customer, they must explicitly choose to**
19  **do so.**
20  Q   And do they have to do that on a
21  customer-by-customer basis?
22  **A   They must share individually with another**

35

1   customer on a customer-by-customer basis.
2   Q   So are you saying they can't choose to
3   just, say, share with every other customer in the
4   state?
5       MR. ESTRADA:  Objection.  Lack of
6   foundation.  Calls for legal conclusion.
7   **A   The customer can additionally decide if**
8   **they want to share with anybody within the state,**
9   **or they can decide to share with people nationally**
10  **if they choose.**
11  Q   And how do they do that?  Like, is there
12  a button they can click within Flock, essentially,
13  to do that?
14  **A   The system administrator sets the**
15  **parameters for sharing, and they decide if they**
16  **want to share one-to-one with another agency**
17  **within the state or with anybody else who would**
18  **choose to reciprocate within the nation.**
19  Q   Got it.  And so that latter option, is
20  that an opt-in option; that is to say, if they
21  want to share nationally, do they have to opt into
22  that?

36

1   **A   The system administrator must choose,**
2   **yes, to explicitly opt in to share nationally if**
3   **they want to do so.**



12  Q   Can Flock share defendants' data with
13  private-sector customers?
14  **A   Sharing never goes from a law enforcement**
15  **agency to a private-sector customer.**
16  Q   In any form?
17  **A   Correct.**
18  Q   If Flock receives a subpoena for
19  Norfolk's data, what happens?  What's your
20  understanding of what happens?
21  **A   What happens is we send it to our legal**
22  **team, and they work with city and state attorneys**

Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025

37

1  or whoever is important, and they figure out what
2  to do next.  I'm not a lawyer.  I don't actually
3  know the exact process.
4        But we send it to our legal team, and
5  they make an interpretation on how to proceed.
6     Q    Is it your understanding that Flock has
7  the ability or authority to make defendants' Flock
8  data available to third parties if it receives a
9  subpoena?
10    A    My understanding is that we would follow
11 the legal process.
12    Q    And would you give the same answer if I
13 asked you about a warrant?
14    A    We would follow the legal process.
15    Q    So your answers, just to be clear, would
16 be the same if I asked you about warrants?
17    A    I think you would need to be more
18 specific about what you're asking about warrants.
19    Q    Yeah.  If you received a warrant from a
20 court signed by a judge for defendants' Flock
21 data, what would be the process then?
22       MR. ESTRADA:  Objection.  Calls for legal

38

1  conclusion.
2     A    My understanding is we would send it to
3  our legal team, and they would go interpret what
4  is the legal responsibility of Flock, and it would
5  work with the court or the judge, the attorneys at
6  play, and follow the legal process.



CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025



CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025

12 (45 to 48)



49



20    Q    You can set that aside for the moment.  I
21 have a few questions on that last issue, and I'm
22 going to put another exhibit in the chat to try to

50

1 ask some of those.
2        (Plaintiffs' Deposition Exhibit 62 marked
3 for identification and is attached to the
4 transcript.)
5        MR. ESTRADA:  Okay, we have Exhibit 62 on
6 the screen.
7        MR. SOYFER:  Okay.  Great.
8    Q    What is this document?
9    A    It looks like a blog post from our
10 website.
11    Q    Does the Flock Safety blog fall under
12 your purview as chief communications officer?
13    A    No, but on an interim basis I'm helping
14 to oversee some of these people.
15    Q    Got it.  How long have you been
16 overseeing them on an interim basis?
17    A    A couple of months.
18    Q    And if you'll look at the blog post, you
19 can see it's dated July 2nd, 2025.  Correct?
20    A    Yes.
21    Q    Great.  And the title of the blog post is
22 Data At the Curb:  How Traffic Analytics is

51

1 Transforming Safety and Success For Commercial
2 Businesses.
3        Do you see that?
4    A    Yes.
5    Q    Do you know who wrote this blog post?
6    A    I don't.
7    Q    I just want to ask you about a specific
8 part of this.  So could you go to Page 3 of the
9 PDF.  You'll see it's Page 3 out of 7 in the
10 bottom right corner.
11    A    Yes.
12    Q    Okay.  So you can see that the section is
13 talking about Flock's traffic analytics for
14 businesses.  Right?
15        MR. ESTRADA:  So we have Benefit, Safety,
16 and Wealth of Consumer Intelligence, and then no
17 bullet.  Then this says, Visitor Origin, Repeat
18 Visit Patterns.
19        Which one are you talking about?
20        MR. SOYFER:  Okay.  Why don't we go back
21 to the previous page.  I'll take this piece by
22 piece.

52

1    Q    You'll see at the very bottom of the page
2 there's a section entitled Beyond Safety:  A
3 Wealth of Consumer Intelligence.  Correct?
4    A    Yes.
5    Q    And on the first sentence of this section
6 states, "Where traffic analytics really shines for
7 businesses is in what it reveals about the
8 noncriminal visitors, the everyday customers who
9 drive in, park, and make purchases."
10        Did I read that correctly?
11    A    I believe so.
12    Q    Are you generally familiar with Flock's
13 Traffic Analytics for businesses?
14    A    At a high level, yes.
15    Q    Got it.  And Flock does, in fact, offer
16 traffic analytics to businesses?
17    A    Yes.
18    Q    Okay.  So the next sentence states, With
19 Flock's platform, commercial operators can
20 identify patterns that inform operational
21 decisions and strategic growth, followed by a
22 colon, and then four bullet points.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025

14 (53 to 56)



53

1      Do you see that?
2    A   I do.
3    Q    And the first bullet point, it has a
4  label in bold text, Visitor Origin, colon, By
5  seeing where vehicles are coming from, open paren,
6  based on anonymized vehicle movement data, close
7  paren, businesses can understand geographic draw
8  zones.  Are customers coming from local
9  neighborhoods or across town.  Are campaigns
10 working to attract out-of-area customers.
11     Do you see that?
12    A   I do.
13    Q    And what is the anonymized vehicle
14 movement data that's referenced here, if you know?
15     MR. ESTRADA:  Objection.
16     Let me just object.
17     Beyond the scope of the notice topics.
18     You can answer, if you understand.
19    A   This is the first time I've seen this.
20     I'm not sure.
21    Q    So let me just ask you, for private
22 business customers like, say, a store, they're

54

1  going to have cameras around their business or on
2  their parking lot.  Right?
3    A   A private business customer, yeah, would
4  deploy Flock devices around their parking lot or
5  around their store.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025

15 (57 to 60)



Page 57

19    Q    Okay.  You can close that document out.
20 We will move on to Topic 8 now.  If you have the
21 deposition notice handy, Topic 8 is, "Whether and
22 how Flock monitors defendants' use of Flock's

Page 58

1  products and services."
2        Correct?
3     A   Yes.
4     Q   Does Flock monitor defendants' use of
5  Flock's products and services in any way?
6     A   No.  We created tools so that the City of
7  Norfolk can monitor their own use of the products
8  and services.
9     Q   What are those tools?
10    A   We call them our, like, auditing tools.
11    Q   And just explain to me what those tools
12 do?
13    A   Sure.  They essentially record the
14 keystrokes of the users of the Flock Safety system
15 when they're performing a search, so it
16 understands what the officer typed into the Flock
17 Safety system, their search reason, and then some
18 of the filters by which they search for a specific
19 vehicle.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025

16 (61 to 64)



Page 61 / Page 62 (redacted)

Page 63
20    Q    Does Flock collect success stories from
21  the City of Norfolk?
22    A    We would love to.

Page 64
1    Q    Okay.  Does Flock monitor legal cases
2  where the City of Norfolk relies on Flock data?
3    A    Could you clarify what you mean by
4  "monitors"?
5    Q    Yeah.  Does Flock, you know, keep tabs on
6  them, watch them, you know, try to get updates on
7  cases where the City of Norfolk is relying on
8  Flock data in court?
9        MR. ESTRADA:  Objection.  Vague and
10 ambiguous.
11   A    I don't know if there's anybody who's
12 directly checking the status of court cases in the
13 City of Norfolk.
14   Q    Okay.  Is there anyone at Flock who looks
15 for success stories in the City of Norfolk use
16 Flock data?
17       MR. ESTRADA:  Objection.  Asked and
18 answered.
19   A    We have a team of people at Flock who
20 are -- would love to have success stories from any
21 of our customers.
22   Q    Do they actively reach out to the City of

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025

17 (65 to 68)

65

1  Norfolk to try to get them, or are they sort of
2  just passively hoping customers will contact
3  Flock?
**4      A    I don't know if anyone has ever reached**
**5  out to somebody at Norfolk or not asking for**
**6  success stories.**



66

67

3      Q    Okay.  So to your knowledge, can
4  defendants download data from their Flock system?
**5      A    Yes.**
6      Q    Does Flock create records of when police
7  officers in Norfolk download data?
**8      A    I'm not sure of that.  I would refer you**
**9  to my colleague, Mr. Lukens.**
10      Q    So to your knowledge, it doesn't monitor
11  data downloads in that way?
12      MR. ESTRADA:  Objection.
13  Mischaracterizes testimony.  Asked and answered.
**14      A    I'm not sure.**
15      Q    Let's move on to Topic 9.
16      MR. ESTRADA:  Okay.  Let's take a break
17  then.
18      MR. SOYFER:  Oh, gotcha.  Yeah, happy to
19  take a break.
20      VIDEO SPECIALIST:  Stand by.
21      We are going off the record at 14:29.
22      (A recess was taken.)

68

1      VIDEO SPECIALIST:  And we're back on the
2  record.  The time is 14:41.
3  BY MR. SOYFER:
4      Q    Mr. Thomas, we're just back from a break,
5  but you understand you're still under oath.
6      Correct?
**7      A    Yes.**

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025

18 (69 to 72)



CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025

19 (73 to 76)



CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025

20 (77 to 80)



CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025



CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025

22 (85 to 88)



85

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

87

1    A    Correct.
2    Q    And for the Norfolk Police Department as
3 of July 1st, 2025, officers also have to provide a
4 case or call-for-service number.
5       Is that correct?
6    A    As well as some other things, yes, that's
7 correct.
8    Q    What are the other things?
9    A    Well, the new statute requires a lot of
10 new things, including a shorter date of retention
11 period, some auditing requirements.  They have to
12 put in like, you mentioned a case number,
13 call-for-service number.  I think there's also
14 like -- I forget the exact words, but it's like an
15 offence type, maybe is what it's called.  So
16 there's a -- there's a few things that are new
17 requirements under the law that an officer has to
18 do.
19    Q    Got it.  Let me break that down.
20       So the offense type, does that go in The
21 Reason field?
22    A    I believe it's an either/or offense type

86

1
2
3
4
5
6
7
8
9
10
11    Q    Okay.  Let me go back.  I actually wanted
12 to ask a question that relates more to Topic 8,
13 which is whether and how Flock monitors
14 defendants' use of Flock's products and services.
15       Just as background, let me ask, when an
16 officer goes in to search within Flock's OS, they
17 have to enter a reason for the search.  Correct?
18    A    When somebody performs a search for
19 Flock's -- when they're using the Flock system,
20 they need to input a reason.  Yes, that's correct.
21    Q    They can't -- they can't do the search
22 without putting in a reason.  Right?

88

1 or the search reason.
2
3
4
5
6
7
8
9
10
11    Q    So I want to ask about the case or
12 call-for-service number.
13       So is it your understanding that that
14 field has to be completed before a search is
15 performed?
16    A    Yes.
17
18
19
20
21
22

Case 2:24-cv-00621-MSD-RJK    Document 108-11    Filed 09/15/25    Page 25 of 32
PageID# 1890

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025

23 (89 to 92)

89



17    Q    So I want to move on to Topic 13, if you
18 have the notice handy.  You'll see the Topic 13 is
19 the retention period for defendants' Flock data,
20 as well as how and why that retention period was
21 chosen or applies to defendants' Flock data.
22        Correct?

90

1    A    Yes.
2    Q    And so here's where I'll try to be very
3 specific about the time periods I'm talking about.
4        So from the time defendants first
5 acquired their Flock cameras to June 30th, 2025,
6 the retention period was 30 days.  Correct?
7    A    Yes.
8    Q    And from July 1st, 2025, to the present
9 and going into the future, the retention period is
10 21 days.  Correct?
11    A    Yes.
12    Q    Okay.  So I wanted to talk first about
13 the 30-day retention period.
14        Why was the retention period initially 30
15 days?
16    A    Because we wanted to ensure that the
17 public information that was collected by Flock
18 devices was actually useful for law enforcement as
19 they're looking to solve and investigate crime.
20        And given the volume of crime that takes
21 place in America, and given what we heard from a
22 lot of our customers early on, they wouldn't even

91

1 be assigned cases sometimes for several weeks.
2 And so having access to data that would help them
3 potentially solve crime for around 30 days was an
4 area where our customers would tell us they would
5 want to have that much data.
6        But we also spoke to professors, privacy
7 advocates, the public around what we were doing in
8 building these tools.  And a lot of people, like
9 the NYU Policing Project, for example, said a
10 shorter retention period would better allay
11 concerns of privacy advocates.  And so our
12 perspective was, Look, let's try to find the right
13 balance between providing enough evidence for law
14 enforcement to solve crime, while at the same time
15 addressing concerns of privacy advocates.  So 30
16 days felt like a really reasonable compromise to
17 give law enforcement enough time to do what they
18 needed to do to ensure they had the evidence for
19 their ability to solve crime.
20    Q    Got it.  I appreciate the thorough
21 answer.  I want to unpack it a little bit.  But
22 the first question I want to ask is just, was 30

92

1 days Flock's default retention period?
2    A    It still is to this day.
3    Q    So let me ask for background.  How long
4 has that been Flock's default retention period?
5    A    Since we were founded.
6    Q    Got it.  Back in 2017?
7    A    Yes.
8    Q    And is that when the conversations with,
9 you know, professors, privacy advocates, and the
10 public, happened?
11    A    That's when they began.
12    Q    Do you recall any specific professors
13 that Flock has consulted?
14    A    Yeah.
15    Q    And who are they?
16    A    There is one professor named Farhang
17 Heydari.  He's I believe at University of
18 Tennessee now, but he used to be the executive
19 director of the NYU Policing Project.
20    Q    Okay.
21    A    Barry Friedman was involved, he's at NYU.
22 These are all folks that we had -- another guy

93

1  named Max Issacs.  These are all people that we
2  have spoken to at the NYU Policing Project.
3      Q    And when did those conversations with the
4  NYU Policing Project happen?
5      A    I don't remember the exact dates, but I
6  would guess they were probably between 2019 and
7  2021 was the bulk of those conversations.
8      Q    At any point in time during discussions
9  with Norfolk prior to passage of the new Virginia
10 legislation requiring the 21-day retention period,
11 did Norfolk ever request a different retention
12 period?
13     A    Not to my knowledge.
14     Q    Do Flock customers ever depart from the
15 30-day default?
16     A    Yes.
17     Q    Do some customers have lower -- strike
18 that.
19         Do some customers have shorter retention
20 periods?
21         MR. ESTRADA: Objection.  Beyond the
22 scope.

94

1          You can answer.
2      A    Some customers have a longer retention
3  period, and some customers have a shorter
4  retention period.
5      Q    And in those cases Flock defers to
6  whatever the customer wants?
7      A    Our general policy is that we defer to
8  whatever the law is in that jurisdiction or that
9  locality, or ordinance or whatever it may be.
10         So if a -- there's a legal standing in
11 some capacity that says it needs to be longer or
12 shorter, we defer to the law.
13     Q    Got it.  So why did Flock decide upon 30
14 days specifically for its default?
15         MR. ESTRADA: Objection.  Asked and
16 answered.
17     Q    I guess my question is, why not ten days,
18 why not 20 days, something like that?
19         MR. ESTRADA: Objection.  Asked and
20 answered.
21     A    We try to strike the right balance
22 between what law enforcement told us that they

95

1  needed for the opportunity to even have the clues
2  for their investigations, and oftentimes a city
3  may not even be -- like an officer, a detective,
4  may not even be assigned a case for several weeks.
5  And so we wanted to ensure that the data was there
6  and useful for law enforcement to be able to solve
7  crime.
8          But storing and maintaining data for
9  significantly longer periods of time creates the
10 opportunity for more noise than signal.  And
11 therefore we want to ensure that the data is
12 actually useful for law enforcement to investigate
13 and solve crime.
14         And then we also wanted to ensure that as
15 we were talking to more -- you know, people in the
16 public, that we were allaying their concerns that
17 the data is only going to be used for those
18 purposes, and not -- not for anything else.
19         So 30 days felt like a really great
20 compromise.
21     Q    Yeah.  How does a 30-day retention period
22 allay those concerns?

96

1          MR. ESTRADA: Objection.  Lack of
2  foundation.
3      A    It provides the opportunity for law
4  enforcement to do their job and investigate crime.
5  And if it's not used for those purposes, it's
6  permanently and irrevocably deleted.
7          And so what we've heard from privacy
8  advocates is that's a helpful -- a helpful feature
9  of the Flock system, is that the data is only
10 collected for a temporary time period for law
11 enforcement to do their job and nothing more.
12     Q    In that answer you referenced privacy
13 advocates a lot.  I'm wondering, does Flock have
14 any position on whether the 30-day retention
15 period protects personal privacy?
16     A    Flock's position is that 30 days is a
17 helpful in allaying the concerns of privacy
18 advocates by ensuring that the data is around for
19 a long enough time period for law enforcement to
20 do their job and nothing more.  And therefore, it
21 is permanently and irrevocably deleted every 30
22 days on a rolling basis.

97

1    Q   Got it. So Flock's position is just, we
2 want to do what we need to do to allay the
3 concerns of privacy advocates.
4       Is that fair?
5       MR. ESTRADA: Objection.
6 Mischaracterizes testimony.
7    A   No. I would say that what Flock is
8 trying to do is ensure that we provide the
9 evidence necessary for law enforcement to do their
10 jobs, and nothing more. And therefore, we
11 instituted a limited data retention so that we
12 could tell the public that that is exactly what
13 this is being used for. It's for law enforcement
14 to do their job and nothing more. And therefore
15 at some period in the future we are going to
16 permanently and irrevocably delete this data. And
17 30 days felt like a really great compromise for
18 our default position.
19    Q   So what I'm trying to understand is, does
20 Flock have its own position on why data should not
21 be kept more than 30 days, or is that just an
22 effort to kind of compromise with privacy

98

1 advocates and reassure the public?
2       MR. ESTRADA: Objection. Asked and
3 answered. Beyond the scope.
4    A   I mean, our position is what I stated,
5 which is, we want to ensure that law enforcement
6 have the opportunity to leverage the objective
7 plain-view evidence necessary to do their jobs,
8 and help stop and solve crime, and nothing more.
9 And therefore, we instituted a limited data
10 retention period for the purposes of ensuring that
11 it can be used, it can be helpful, and then it's
12 not used for anything else.
13    Q   Okay. Would it cost Flock more money to
14 store more than 30 days of data?
15       MR. ESTRADA: Objection. Lack of
16 foundation.
17    A   The longer you store data, the more it
18 costs.
19    Q   And the current retention period since
20 July 1st of this year is now 21 days. Correct?
21    A   Correct.
22    Q   Does Flock have any position on that?

99

1       Is it too short, in Flock's view?
2       MR. ESTRADA: Objection. Beyond the
3 scope.
4    A   I think it depends on every circumstance.
5 So it's hard to say if 21 days is too short in
6 every circumstance.
7    Q   Why is it 21 days now?
8       MR. ESTRADA: Objection. Calls for legal
9 conclusion.
10    A   Legislators in the State of Virginia
11 voted on that and followed the democratic process,
12 followed the law, and instituted that new law.
13    Q   That wasn't Flock's choice. Correct?
14    A   Legislators passed a law. Yeah, Flock
15 did not pass a law.
16    Q   And Flock implemented that for all of its
17 customers in Virginia. Correct?
18    A   Yeah, Flock did that. We follow the law.
19    Q   Outside of Virginia, does Flock still
20 apply a 30-day default?
21       MR. ESTRADA: Objection. Vague and
22 ambiguous.

100

1    A   That's our default position. But if
2 there's a law that is in existence that supercedes
3 that longer or shorter, we will follow the law
4 that's shorter or longer on data retention.
5    Q   And when defendants go in to search data,
6 if they search the data of out-of-state agencies,
7 can they see data that are older than 21 days,
8 depending on the out-of-state agency's retention
9 periods?
10       MR. ESTRADA: Objection. Assumes facts.
11    A   You're saying if the City of Norfolk has
12 a sharing relationship with somebody outside of
13 Norfolk, outside of the State of Virginia?
14    Q   Yes.
15    A   Can they see data that's longer than the
16 21 days?
17    Q   That's right.
18    A   My understanding is they can have access
19 to whatever the data-retention period is on the
20 locality in which they're searching.
21    Q   Got it. And so if they're searching a
22 locality that has a 30-day retention period, for

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025

26 (101 to 104)

---

101

1 that locality they can see 30 days of data when
2 they go in and search.  Right?
3         MR. ESTRADA:  Objection.  Lack of
4 foundation.  Calls for legal conclusion.
5     A   I'm not certain, but I believe that that
6 is right.  I think that that's more of a question
7 I would actually have you defer to Davis Lukens
8 on.  But I think that -- I think what you
9 described is accurate.
10    Q   Okay.  Flock doesn't prevent defendants
11 from downloading and storing data for longer than
12 21 days.  Right?
13        MR. ESTRADA:  Objection.  Vague and
14 ambiguous.
15    A   You -- would you rephrase that?  Sorry.
16 That sounded like a couple of negatives.  I got
17 confused.
18    Q   Okay.  Sure.
19        Flock does not prevent defendants from
20 downloading and storing data for longer than 21
21 days.  Correct?
22    A   Correct.  Yeah.  If a customer downloads

---

102

1 the footage, they would store it as part of their
2 evidence-management system.  So yeah, they can
3 store it as long as their internal policies allow
4 them to store it.
5     Q   Flock doesn't interfere with that.
6         Correct?
7     A   Flock does not interfere.
8     Q   Okay.  Let's move on to Topic 14.  And
9 this topic is Flock's ability to use, access, or
10 retrieve defendants' Flock data that have been
11 deleted.
12        Do you see that?
13    A   Yes.
14    Q   So again, as we've been discussing, the
15 retention period before July 1st used to be 30
16 days, now it's 21 days.  Right?
17    A   Yes.
18    Q   Okay.  And whenever that deadline hits,
19 Flock automatically deletes data.
20        Is that right?
21    A   Yes.
22    Q   And that process is automatic.  Correct?

---

103

1     A   Correct.
2     Q   Once the data are deleted, are they just
3 permanently unavailable in any form?
4     A   Correct.
5     Q   There is absolutely no way to recover any
6 portion of the data?
7     A   Once data has been deleted, there is no
8 opportunity to recover data.
9     Q   How is the -- let me just ask you, to
10 follow up on that.  How is the data deletion
11 handled?  Does Flock accomplish it, or is it
12 something Amazon Web Services accomplishes for
13 Flock?
14    A   My understanding is it is a setting in
15 Amazon Web Services that is where the data is
16 actually purged.
17    Q   And to your understanding, Amazon Web
18 Services has zero ability to recover any deleted
19 data.  Correct?
20        MR. ESTRADA:  Objection.  Beyond the
21 scope.
22    A   That's my understanding.

---

104



---

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025

27 (105 to 108)

105



106

5      Q    Got it.  I'd like to move on now to our
6  last topic, which is Topic 15.  "Flock's role in
7  determining the placement, location, and/or
8  positioning of defendants' Flock cameras, as well
9  as, at a general level, the methodology for
10 deciding where to place, locate, and/or position
11 defendants' Flock cameras."
12      Do you see that?
13      A    I do.
14      Q    What role, if any, did Flock have in
15 determining the placement, location, or
16 positioning of defendants' Flock cameras?
17      A    Really just the final call to ensure that
18 the locations would actually work where the city
19 wanted them.  The police department told us where
20 they wanted to put these devices based on
21 historical crime patterns is my understanding.
22 And then Flock would determine the final location

107

1  to ensure that, you know, these are solar-powered
2  devices, there actually was enough sun in those
3  locations.  Maybe there was a tree in the way and
4  the canopy might block it.
5      And so Flock's role is just to ensure
6  that the location that's picked actually works to
7  achieve the outcomes of the police department.
8      Q    And so your understanding is that the
9  specific locations were all decided upon by the
10 Norfolk Police Department.
11      Is that right?
12      A    Yes.
13      Q    And what's Flock's understanding of
14 how -- of what methodology was used to decide
15 where to place those?
16      A    My understanding was that the City of
17 Norfolk used historical crime data that they had
18 access to, and therefore wanted to put devices
19 near those historical crime areas to ensure that
20 if there was a crime committed in the future, they
21 had the evidence necessary to go, you know,
22 further their investigation.

108

1      Q    Did Norfolk have a set number of cameras
2  it wanted to buy at the outset -- or strike that.
3      Did Norfolk have a set number of cameras
4  it wanted to acquire at the outset of this
5  process?
6      MR. ESTRADA:  Objection.  Beyond the
7  scope.  Lack of foundation.
8      You can answer, if you understand.
9      A    I'm not sure if they had a specific
10 number in mind.
11      Q    Okay.  When Norfolk identified the
12 cameras, did Flock provide any assistance with
13 identifying where to locate those cameras within
14 the areas that Norfolk wanted them?
15      MR. ESTRADA:  Did you say identify the
16 cameras?  Shouldn't it be identify the locations?
17      MR. SOYFER:  Right.  Let me reask that.
18      Q    When Norfolk identified the locations
19 where it wanted cameras, did Flock provide any
20 assistance with identifying where to locate those
21 cameras within the areas that Norfolk wanted them?
22      A    I'm sure we helped decide some of those



Case 2:24-cv-00621-MSD-RJK    Document 108-11    Filed 09/15/25    Page 30 of 32
PageID# 1895
CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025
28 (109 to 112)

**109**
1 locations based on what we talked about earlier.
2 Is there enough sunlight. You know, Flock calls
3 811 to ensure that there's no underground sewage
4 or wires. So I'm sure that we helped find the
5 precise location in those areas.
6   Q   Does Flock provide any general guidelines
7 for customers on how to location Flock cameras?
8   A   Yes.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025

29 (113 to 116)

113



17    Q    So do you have an understanding of how
18 many Flock cameras Norfolk has?
19    A    Yes.
20    Q    And how many do they have?
21    A    My understanding is 172.
22    Q    Has that number stayed the same since

114

1 they initially acquired cameras, as far as you
2 know?
3    A    I think they wanted to get 176.  I'm not
4 sure if those last four were ever installed.
5    Q    How do you know they wanted to get 176?
6    A    I saw a document, I think that you
7 provided maybe, going back and forth between
8 somebody at the City of Norfolk and one of our
9 sales reps, inquiring about four more cameras.
10    Q    To your knowledge, did Flock have any
11 involvement in deciding where to place those
12 cameras?
13        MR. ESTRADA:  Objection.  Vague and
14 ambiguous.  Asked and answered.
15    A    From what I saw, the City of Norfolk sent
16 over specific, like, coordinates of where they
17 wanted those devices.  So I believe the City of
18 Norfolk chose those locations, like they did with
19 all the rest of their devices.
20        MR. SOYFER:  Could we take a ten-minute
21 break.
22        MR. ESTRADA:  Sure.

115

1        MR. SOYFER:  Great.
2        VIDEO SPECIALIST:  We are going off the
3 record.  The time is 15:34.
4        (A recess was taken.)
5        VIDEO SPECIALIST:  We are back on the
6 record.  The time is 15:51.
7        MR. SOYFER:  Okay.  I have good news,
8 which is that subject to any questions I might
9 have after redirect, those are all of my questions
10 for you today, Mr. Thomas.
11        THE WITNESS:  Thank you.
12    EXAMINATION BY COUNSEL FOR FLOCK SAFETY
13    AND THE WITNESS:
14 BY MR. ESTRADA:
15    Q    So I have a few questions.
16        Good afternoon, Mr. Thomas.
17    A    Hello.
18    Q    I just have one clarification.
19        You were shown a document which discussed
20 Flock's work with private entities and their data.
21 I believe it's Exhibit 62.
22        Do you recall that?

116

1    A    Yes.
2    Q    I want to be very clear.  Does Flock
3 share any of defendants' data, Norfolk Police
4 Department Flock data, with any private entities?
5    A    No.
6        MR. SOYFER:  Object to form.  Foundation.
7    Q    Are you aware of Flock ever sharing any
8 of defendants' data with any private entities?
9        MR. SOYFER:  Objection.  Form.
10 Foundation.
11    A    No.
12    Q    Are you aware of Flock sharing any of
13 defendants' data with any private businesses
14 within the City of Norfolk?
15        MR. SOYFER:  Form.  Foundation.
16    A    No.
17    Q    Does Flock share defendants' data,
18 whether in any form, anonymized data, with any
19 private entities?
20        MR. SOYFER:  Form.  Foundation.
21    A    No.
22    Q    Does Flock share Norfolk data,

117

1  defendants' data, in any form, including
2  aggregated data, with any private entities?
3        MR. SOYFER:  Form.  Foundation.
4     A  No.
5        MR. ESTRADA:  No further questions.
6        MR. SOYFER:  And just to clarify, those
7  questions were in your capacity as counsel for
8  Flock.  Correct?
9        MR. ESTRADA:  You're talking to me,
10 Michael?
11       MR. SOYFER:  Yes, I am.
12       MR. ESTRADA:  Yes.
13       MR. SOYFER:  Okay.
14       VIDEO SPECIALIST:  Any other questions
15 from counsel?
16       MS. SOLORIA:  The city has nothing
17 further.
18       VIDEO SPECIALIST:  Okay.  Then if no one
19 objects, I'll read us off the record.
20       This ends the deposition of Josh Thomas.
21 We are going off the record at 15:53.
22       MR. ESTRADA:  We are designating the

118

1  transcript as confidential.
2        MR. SOYFER:  I will just say we are fine
3  treating the transcript as confidential until we
4  receive more specific designations.  But the
5  Protective Order requires that a specific portion
6  or portions be designated confidential on the
7  record.
8        So I'm not sure if you want to go on the
9  record and say what those portions are, or if
10 you're just fine with our agreement that until we
11 get a letter from you with specific designations,
12 we'll treat it as confidential.
13       MR. ESTRADA:  The agreement would be
14 we'll keep the whole thing confidential until we
15 send you a letter designating specific portions.
16       MR. SOYFER:  That's right.
17       MR. ESTRADA:  That's fine with us.
18       MR. SOYFER:  Okay.
19       (Off the record at 3:54 p.m. EDT.)
20
21
22

119

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2    I, Debra Ann Whitehead, E-Notary Public in and
3  for the Commonwealth of Virginia, the officer
4  before whom the foregoing proceedings were taken,
5  do hereby certify that the foregoing transcript is
6  a true and correct record of the proceedings; that
7  said proceedings were taken by me stenographically
8  and thereafter reduced to typewriting under my
9  supervision; that reading and signing was not
10 requested; and that I am neither counsel for,
11 related to, nor employed by any of the parties to
12 this case and have no interest, financial or
13 otherwise, in its outcome.
14   IN WITNESS WHEREOF, I have hereunto set my hand
15 and affixed my notarial seal this 8th day of
   August, 2025.
16 My commission expires:
   October 31, 2027
17
18
19
20 ----------------------------
21 E-NOTARY PUBLIC IN AND FOR THE
22 COMMONWEALTH OF VIRGINIA