## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**

LEE SCHMIDT and CRYSTAL ARRINGTON,

      Plaintiffs,

v.

CITY OF NORFOLK and MARK TALBOT,
in his Official capacity as the Norfolk Chief of
Police,

      Defendants.

Civil Action No. 2:24-cv-00621-MSD-LRL

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## THEIR MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................ 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................... 4

STANDARD ................................................................................................................... 13

ARGUMENT .................................................................................................................. 13

I.      PLAINTIFFS LACK ARTICLE III STANDING TO CHALLENGE QUERIES OF THEIR VEHICLES' LICENSE PLATES ............................................. 14

II.     PLAINTIFFS' CLAIM FAILS ON THE MERITS BECAUSE UNDISPUTED FACTS SHOW THAT NPD'S USE OF THE FLOCK CAMERAS IS NOT A SEARCH ....................................................................... 17

        A.    To Show a Fourth Amendment Search, Plaintiffs Must Prove that NPD's Flock System Reveals the Whole of their Physical Movements. ..................... 17

        B.    Federal Courts Have Uniformly Held that LPRs Do Not Track the Whole of Individuals' Movements .................................................................. 21

        C.    The Undisputed Facts Establish that NPD's Flock Cameras Do Not Track the Whole of Plaintiffs' Physical Movements ....................................... 23

        D.    Plaintiffs' Experts Have Not Shown that NPD Can Use Flock Cameras to Learn Private Information About Plaintiffs .................................................. 26

CONCLUSION ............................................................................................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Anderson v. Liberty Lobby Inc.*,
477 U.S. 242 (1986) ............................................................................................. 13

*Babbitt v. United Farm Workers Nat'l Union*,
442 U.S. 289 (1979) ............................................................................................. 15

*Boroian v. Mueller*,
616 F.3d 60 (1st Cir. 2010) ................................................................................. 17

*Carpenter v. United States*,
585 U.S. 296 (2018) ..................................................................................... *passim*

*Clapper v. Amnesty Int'l, USA*,
568 U.S. 398 (2013) ............................................................................................. 14

*Food & Drug Admin. v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ............................................................................. 14, 16, 17

*Leaders of a Beautiful Struggle v. Baltimore Police Department*,
2 F.4th 330 (4th Cir. 2021) ......................................................................... *passim*

*McGregor v. United States*,
2025 WL 2550533 (E.D. Va. Sept. 4, 2025) ...................................................... 21

*New York v. Class*,
475 U.S. 106 (1986) ....................................................................................... 18, 30

*Scholl v. Ill. State Police*,
776 F. Supp. 3d 701 (N.D. Ill. 2025) ........................................................... *passim*

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ............................................................................................. 14

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ............................................................................................. 15

*United States v. Bowers*,
2021 WL 4775977 (W.D. Pa. Oct. 11, 2021) .................................................... 21

*United States v. Brown*,
2021 WL 4963602 (N.D. Ill. Oct. 26, 2021) ..................................................... 21

*United States v. Brown*,
2025 WL 2444596 (W.D. Okla. Aug. 25, 2025) ............................................... 21

*United States v. Cooper*,
  2025 WL 35035 (E.D. La. Jan. 6, 2025) ...................................................................... 21, 22, 26

*United States v. Curry*,
  965 F.3d 313 (4th Cir. 2020) ................................................................................... 16

*United States v. Ellison*,
  462 F.3d 557 (6th Cir. 2006) ................................................................................... 18

*United States v. George*,
  971 F.2d 1113 (4th Cir. 1992) ............................................................................ 1, 18

*United States v. Graham*,
  2022 WL 4132488 (D.N.J. Sept. 12, 2022) .............................................................. 21

*United States v. Gregory*,
  128 F.4th 1228 (11th Cir. 2025) ............................................................................. 19

*United States v. Griffin*,
  2025 WL 1474679 (S.D. Ind. May 22, 2025) ........................................................... 21

*United States v. Harry*,
  130 F.4th 342 (2d Cir. 2025) .................................................................................. 19

*United States v. Hay*,
  95 F.4th 1304 (10th Cir. 2024) .............................................................................. 19

*United States v. Houston*,
  813 F.3d 282 (6th Cir. 2016) ................................................................................. 19

*United States v. Jackson*,
  2025 WL 1530574 (D. Kan. May 29, 2025) ....................................................... *passim*

*United States v. Jacobsen*,
  466 U.S. 109 (1984) ............................................................................................. 18

*United States v. James*,
  2023 WL 3370421 (W.D. La. Jan. 30, 2023) ............................................................ 21

*United States v. Jiles*,
  2024 WL 891956 (D. Neb. Feb. 29, 2024) .................................................... 15, 21, 22

*United States v. Jones*,
  565 U.S. 400 (2012) ................................................................................. 17, 20, 23

*United States v. Karo*,
  468 U.S. 705 (1984) ............................................................................................. 17

*United States v. Knotts*,
  460 U.S. 276 (1983) .................................................................................. 1, 19, 28

*United States v. Martin,*
    753 F. Supp. 3d 454 (E.D. Va. 2024) ................................................................ *passim*

*United States v. Porter,*
    2022 WL 124563 (N.D. Ill. Jan. 13, 2022) ................................................................ 21

*United States v. Ramirez Acosta,*
    2025 WL 2427700 (N.D. Okla. Aug. 22, 2025) ........................................................ 21

*United States v. Rubin,*
    556 F. Supp. 3d 1123 (N.D. Cal. 2021) ..................................................................... 21

*United States v. Salcido-Gonzalez,*
    2024 WL 2305478 (D. Utah May 21, 2024) .............................................................. 21

*United States v. Slaybaugh,*
    2025 WL 2123781 (M.D. Ala. July 29, 2025) ...................................................... 21, 22

*United States v. Toombs,*
    671 F. Supp. 3d 1329 (N.D. Ala. 2023) ............................................................... 21, 23

*United States v. Vankesteren,*
    553 F.3d 286 (4th Cir. 2009) ..................................................................................... 18

*United States v. Walraven,*
    892 F.2d 972 (10th Cir. 1989) ................................................................................... 18

*United States v. Yang,*
    958 F.3d 851 (9th Cir. 2020) ..................................................................................... 21

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) ................................................................................................... 14

**STATE CASES**

*Commonwealth v. Adams,*
    113 Va. Cir. 505 (2024) ............................................................................................. 22

*Commonwealth v. Bell,*
    113 Va. Cir. 316 (May 10, 2024) ............................................................................... 22

*Commonwealth v. Roberson,*
    113 Va. Cir. 565 (2024) ............................................................................................. 22

*Commonwealth v. Robinson,*
    113 Va. Cir. 494 (2024) ................................................................................. 22, 24, 26

*Commonwealth v. Watkins,*
    304 A.3d 364 (Pa. Super. Ct. 2023) .......................................................................... 22

iii

*State v. Sidor*,
    558 P.3d 621 (Ariz. Ct. App. 2024)........................................................................ 22

*Uhunmwangho v. State*,
    2020 WL 1442640 (Tex. App. Mar. 25, 2020) .................................................... 22

**STATE STATUTES**

Ark. Code Ann. § 12-12-1804(a)................................................................................ 11

Cal. Veh. Code § 2413(b) ........................................................................................... 11

Ga. Code Ann. § 35-1-22(b)....................................................................................... 11

Minn. Stat. Ann. § 13.824(3)(a) ................................................................................. 11

Mont. Code Ann. § 46-5-118(1).................................................................................. 11

N.C. Gen. Stat. § 20-183.32(a)................................................................................... 11

Neb. Rev. Stat. § 60-3204........................................................................................... 11

Tenn. Code Ann. § 55-10-302(4b) ............................................................................. 11

Va. Code Ann. § 46.2-715 .......................................................................................... 18

Va. Acts of Assembly, Chap. 720 (2025).......................................................... 11, 12, 15

Vt. Stat. Ann. Title 23, § 1607(c)(2) .......................................................................... 11

**FEDERAL RULES**

Fed. R. Civ. Pro. 56(a)................................................................................................ 13

## INTRODUCTION

Thousands of cities and towns across the country, including many in Virginia, have turned to license plate reader ("LPR") cameras to keep their communities safe while protecting individuals' privacy. In Virginia, LPRs are regulated by Code of Virginia § 2.2-5517, which limits when LPR data can be accessed, how long it can be stored, and with whom it can be shared. Plaintiffs claim that the Norfolk Police Department ("NPD") also must obtain a warrant to use Flock Safety LPRs because such use is a search for purposes of the Fourth Amendment. Invoking the Supreme Court's decision in *Carpenter v. United States*, 585 U.S. 296 (2018), that "individuals have a reasonable expectation of privacy in the whole of their physical movements," *id.* at 310, Plaintiffs allege that **"The Flock Cameras Trace the Whole of [Their] Movements in Norfolk."**

On the pleadings, this Court was required to credit Plaintiffs' allegations. But discovery has shown that Plaintiffs lack standing to make those allegations and that they aren't true. The undisputed facts show what every federal court to have decided the issue has held: accessing LPR data cannot be used to track the whole of Plaintiffs' physical movements. Accordingly, there is no longer any daylight between this case and the nearly two dozen others that have distinguished LPRs from the technology at issue in *Carpenter* and held that using LPRs is not a search. Defendants therefore are entitled to summary judgment.

Accessing information about activities in *public* generally does not invade any expectation of *privacy*. There is no "reasonable expectation of privacy in the visible exterior parts of an automobile that travels the public roads." *United States v. George*, 971 F.2d 1113, 1120 (4th Cir. 1992). A "person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *United States v. Knotts*, 460 U.S. 276, 281–82 (1983).

The Supreme Court in *Carpenter* did not disturb this precedent. The Court described its decision as a "narrow one," which did not "call into question conventional surveillance techniques and

1

tools, such as security cameras." 585 U.S. at 316. Rather, the Court recognized that "individuals have a reasonable expectation of privacy in the whole of their physical movements," *id.* at 310, even if some of those movements were in public, because "an all-encompassing record" of an individual's whereabouts can also reveal "the privacies of life," *id.* at 311. When the government accesses data on individuals' movements "as if it had attached an ankle monitor," the data "provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations." *Id.* at 311–12 (citation modified). The Fourth Circuit in *Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330 (4th Cir. 2021), held that *Carpenter*'s standard was met where police accessed data from unmanned planes that surveilled "around 90% of the city" to "track every movement of every person outside in Baltimore," *id.* at 334, 341 (citation modified).

Plaintiffs' Complaint promised to meet the *Carpenter* standard, repeatedly alleging that "Defendants have captured the whole of [their] public movements." *See, e.g.*, ECF 1 ("Compl.") ¶¶ 90, 92. But the discovery record shows that this claim fails.

*First*, Plaintiffs lack standing because any claim about what NPD *could* learn about Plaintiffs' movements is entirely hypothetical. NPD could access information about Plaintiffs' movements only by querying the Flock database for their vehicles' license plates. But NPD has never done that, and there is no evidence that it will. *See Scholl v. Ill. State Police*, 776 F. Supp. 3d 701, 710 (N.D. Ill. 2025) (no standing to challenge use of LPR database where no "substantial risk" exists that police would "soon retrieve plaintiffs' license plate information from the database"). That is especially true since Virginia has enacted strict and comprehensive regulations governing the use of LPR data.

*Second*¸ Plaintiffs have no evidence that NPD could use the Flock data to track the whole of their physical movements or learn detailed information about their lives—not from testimony at 12 depositions, not among the thousands of pages of documents that NPD and Flock produced, and not in

data reflecting every time that Flock cameras photographed any vehicle in Norfolk over a period of several months. To the contrary, the undisputed facts establish that NPD *could not* use the Flock camera data to track the whole of Plaintiffs' physical movements or learn private details of their lives. Plaintiffs themselves *testified* that they engage in repeated travel in Norfolk that is not photographed by the Flock cameras, and often could not say where they went when the Flock cameras did photograph their vehicles. Plaintiffs' experts have not opined that Flock cameras can track the whole of Plaintiffs' movements or reveal any information about their private lives. Their experts could not use the Flock data to identify any place or person that Plaintiffs visited that the experts did not already know about beforehand, let alone identify Plaintiffs' political activities or religious practices. *See* Compl. ¶¶ 25–26 (alleging Flock data would reveal such information).

Plaintiffs' experts could not do so because the undisputed facts make clear that Flock cameras are "not meant to 'track' or 'monitor' the entirety of an individual's movements during a particular car trip, much less through the activities of their daily life." *United States v. Martin*, 753 F. Supp. 3d 454, 472–73 (E.D. Va. 2024). Flock LPR cameras are not akin to an "ankle monitor," or a cell phone, because they do not "follow" anyone "beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales." *Carpenter*, 585 U.S. at 311 (citation modified). Flock LPR cameras do not collect information about people at all. They take photographs of vehicles if—and only if—the vehicles pass by roadside cameras clustered at 75 public locations in Norfolk that cover only 0.1138% of the more than 9 million feet of road in the City.

Those photographs do not reflect "a detailed, encyclopedic, record of where everyone came and went within the city during daylight hours." *Beautiful Struggle*, 2 F.4th at 341 (citation modified). The cameras photograph Plaintiffs' vehicles on average only two to three times per day—and on many days do not photograph Plaintiffs' vehicles at all. On average, a car that is detected by one of NPD's Flock cameras is photographed only once every two days. And when Flock cameras do photograph a passing

vehicle, they do not collect any information about who was driving the car, where the vehicle started its trip, where the trip ended, or what a driver did in between the snapshots of their vehicle. Without information about where a person was coming from or going to, NPD cannot use LPRs to "discern an individual's familial, political, professional, religious, and sexual associations." *United States v. Jackson*, 2025 WL 1530574, at *8 (D. Kan. May 29, 2025).

In sum, the undisputed facts confirm what the courts have uniformly held: LPRs do not enable "the pervasive and continuous gathering of information with which the Supreme Court was concerned in *Carpenter*." *Id.* at *8. Accordingly, NPD's use of Flock cameras is not a search, and Plaintiffs' Fourth Amendment claims must be dismissed.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### Flock Cameras

1.     As in many communities, Norfolk's crime rate spiked during the COVID-19 pandemic with a surge in vehicle-related crimes—including car thefts and drive-by shootings. Ex. 1[1] [Capt. Thomas Decl.] ¶ 4; Ex. 2 [Capt. Thomas Dep.] at 24:10–29:21; Ex. 3 [Chief Naughton Dep.] 77:10–80:16; Ex. 4 [Jan. 24, 2023 Minutes] at 2–3; Ex. 5 [May 23, 2023 Minutes] at 7.

2.     To help stem this vehicle-related crime and assist with vital public safety functions, like locating missing people, NPD acquired Flock cameras in 2023. Ex. 1 [Capt. Thomas Decl.] ¶¶ 5–6; Ex. 2 [Capt. Thomas Dep.] at 24:10–29:21.

3.     Flock's flagship LPRs (previously called "Falcon" cameras, and hereinafter "Flock cameras") are fixed cameras typically mounted on the top of poles and installed next to public roadways. They are designed to photograph the backs of passing vehicles, including license plates, and photograph external vehicle characteristics that are visible to the naked eye, such as the vehicle's color and make. Ex. 6 [Josh Thomas Dep.] at 24:20–25:7; Ex. 7 [Lukens Decl.] ¶¶ 2, 6, 8, 12, 22; Ex. 8

---

[1] Unless otherwise specified, all exhibit numbers are to the Declaration of Lauren E. Ross.

[Josh Thomas Decl.] ¶ 5.

4.    The optimal range of a Flock camera is between 40 to 70 feet from the camera, across two lanes of roadway in a single direction.  Ex. 7 [Lukens Decl.] ¶¶ 6–8.

5.    Flock cameras do not provide information to users about the location of individuals beyond public roadways or outside of vehicles and, unlike cell phones, do not follow individuals inside buildings, such as homes, businesses, doctors' offices, and so on.  Ex. 7 [Lukens Decl.] ¶¶ 9–10.

6.    As fixed cameras that cannot pan, tilt, or zoom, Flock cameras are designed to photograph vehicles traveling in only one direction.  Ex. 2 [Capt. Thomas Dep.] at 41:7–15; Ex. 7 [Lukens Decl.] ¶¶ 6, 9; Ex. 9 [Estevez Report] ¶ 19.

7.    Flock cameras do not collect data regarding who is driving or riding in any car at any given time.  Ex. 7 [Lukens Decl.] ¶¶ 8, 17.

8.    Flock cameras do not collect any information on where a car went or what a person did in between the moments when a car was photographed by two separate cameras.  Ex. 2 [Capt. Thomas Dep.] at 328:16–329:22; Ex. 7 [Lukens Decl.] ¶¶ 9–10; Ex. 10 [Sgt. Gauthier Dep.] at 123:23–124:12.

9.    Flock cameras do not collect information regarding where any vehicle's trip began or ended.  Flock cameras collect only information showing that a vehicle passed by the camera at a particular time.  Ex. 2 [Capt. Thomas Dep.] at 328:16–329:22; Ex. 7 [Lukens Decl.] ¶ 10.

**The Flock System**

10.    After a Flock camera photographs a passing vehicle, the image is uploaded to encrypted Amazon Web Services servers.  Ex. 11 [Lukens Dep.] at 130:8–10, 131:1–5; Ex. 7 [Lukens Decl.] ¶ 11.

11.    Data from Flock cameras is securely stored on the servers for a retention period based on the customer's policies and applicable laws, after which it is permanently deleted and inaccessible to anyone, including Flock.  Ex. 6 [Josh Thomas Dep.] at 102:8–103:22; Ex. 7 [Lukens Decl.] ¶ 30.

12.    Once data from Flock cameras is uploaded to the servers, Flock applies machine

learning to images to identify license plate characters and certain *external* vehicle features, which authorized NPD personnel can use to filter photographs through Flock's customer-facing interface ("the Flock System").  Ex. 7 [Lukens Decl.] ¶¶ 12, 22–25; Ex. 11 [Lukens Dep.] 38:6–21.

13.     "Vehicle Fingerprint" is a marketing term that Flock uses to describe a feature that enables authorized users to filter photos of vehicles based on certain external vehicle characteristics, specifically, the vehicle's make, color, and body type; the presence of other identifying features, such as roof racks, back racks, and toolboxes; or the presence (but not content) of bumper stickers.  Ex. 7 [Lukens Decl.] ¶ 22; Ex. 11 [Lukens Dep.] at 31:10–19, 63:3–5.  But Flock does not create or maintain an aggregated profile for a particular vehicle.  Specific license plate numbers are linked to vehicle characteristics only in individual query results or hotlist alerts.  Ex. 7 [Lukens Decl.] ¶ 16.

14.     Law enforcement agencies determine which personnel can become authorized users of the Flock System.  Once a username is assigned, the authorized user creates their own password.  Without a username and password, a person cannot access the Flock System.  Ex. 7 [Lukens Decl.] ¶¶ 4–5; Ex. 18 [2025 General Order] pp. 3–4 § III.C.

15.     Authorized users access data from Flock cameras by logging into a web-based interface or mobile application.  In the Flock System, authorized users can run queries for a full or partial license plate number, a set of Vehicle Fingerprint characteristics, or both.  Alternatively, an authorized user can look up all of the photographs by a particular Flock camera within its network during a given time period.  But an authorized user cannot query the Flock System by filtering for a person or by using an individual's name, address, appearance, or other human characteristics.  Ex. 7 [Lukens Decl.] ¶¶ 4, 8, 20–25; Ex. 11 [Lukens Dep.] at 69:13–70:8.

16.     Authorized users also can receive real-time alerts when a vehicle on a "hotlist" is detected by a Flock camera to which the user has access.  NPD receives hotlist alerts from the FBI's National Crime Information Center database and the National Center for Missing & Exploited

Children's "AMBER Alerts."  Authorized users also can create "custom hotlists," for example to help locate a stolen vehicle or missing person.  Ex. 1 [Capt. Thomas Decl.] ¶¶ 15–18; Ex. 2 [Capt. Thomas Dep.] at 26:8–27:3, 36:9–16; Ex. 7 [Lukens Decl.] ¶¶ 13–15.

17.     When a Flock camera accessible to an authorized user registers a vehicle on a hotlist, the authorized user (or their agency) receives an alert informing them of the date, time, and location of the hit.  Ex. 7 [Lukens Decl.] ¶¶ 13–15.

**NPD's Flock System**

18.     NPD operates 176 Flock cameras.[2]  Ex. 1 [Capt. Thomas Decl.] ¶ 6.

19.     Flock cameras are not located at 176 different places in Norfolk.  Rather, NPD has clustered its 176 Flock cameras in 75 locations.  Ex. 9 [Estevez Report] ¶ 21.  One reason for these "clusters" is that a single Flock camera is designed to photograph cars traveling in only one direction.  Ex. 7 [Lukens Decl.] ¶¶ 8–9.  Accordingly, photographing traffic at a major four-way intersection requires four cameras at that same intersection.  Ex. 1 [Capt. Thomas Decl.] ¶ 12; Ex. 2 [Charles Thomas Dep.] at 41:7–15; Ex. 9 [Estevez Report] ¶ 19.

20.     NPD's Flock cameras are generally located at busy intersections, in commercial areas, and near freeway onramps and offramps.  Ex. 1 [Capt. Thomas Decl.] ¶ 13.  They are rarely located in residential neighborhoods:  only 16 cameras are in areas exclusively zoned as residential, and less than 1% of license plate photographs occur in clusters of cameras that cover an area zoned entirely as residential.  Ex. 9 [Estevez Report] ¶¶ 23–24 & App'x C, Exs. 6A–C.

21.     NPD determined the placement and total number of cameras based on data showing areas of Norfolk with high rates of violent crime and high-priority calls for service.  In addition, NPD placed Flock cameras at major points of ingress to and egress from Norfolk.  Ex. 1 [Capt. Thomas

---

[2]  NPD initially obtained 172 LPR cameras from Flock.  In 2024, NPD obtained four additional LPR cameras from Flock.

Decl.] ¶ 10; Ex. 2 [Capt. Thomas Dep.] at 122:7–17.

22.    As explained in the declaration of Captain Thomas, NPD has successfully used Flock cameras to locate stolen cars, missing persons, and vehicles seen leaving the scene of violent crimes. Ex. 1 [Capt. Thomas Decl.] ¶¶ 16–17, 30–34.

23.    NPD has never purchased any Flock products other than Flock cameras.  Ex. 1 [Capt. Thomas Decl.] ¶ 7; Ex. 6 [Josh Thomas Dep.] at 24:6–12.

24.    NPD has Flock's basic software package, meaning that it lacks access to any advanced features.  Ex. 7 [Lukens Decl.] ¶ 3; Ex. 11 [Lukens Dep.] at 86:4–87:4, 99:22–100:11.

25.    In addition to the 176 Flock cameras it operates, NPD also has access to data from approximately 40 Flock cameras operated by third parties in Norfolk who have chosen to share their Flock data with NPD.  Ex. 9 [Estevez Report] App'x C, tabl. 2. Plaintiffs' vehicles are rarely photographed by these other Flock cameras in Norfolk.  NPD-operated cameras account for more than 99% of photographs of Plaintiffs' vehicles within Norfolk.  *Id.* ¶ 34.

26.    Pursuant to Virginia law, *see infra* para. 38, NPD shares its Flock camera data only with other law enforcement agencies in the Commonwealth of Virginia.  Ex. 1 [Capt. Thomas Decl.] ¶¶ 25–29; Ex. 7 [Lukens Decl.] ¶ 18; Ex. 8 [Josh Thomas Decl.] ¶ 11.  Those data sharing arrangements allow NPD and other Virginia law enforcement agencies to access each other's Flock camera data.  Ex. 1 [Capt. Thomas Decl.] ¶ 26.  NPD does *not* share data from its Flock cameras with any private parties. Ex. 1 [Capt. Thomas Decl.] ¶ 27; Ex. 8 [Josh Thomas Decl.] ¶ 11 & n.1.

**Flock Cameras in Norfolk Cover Sparsely and Capture Rarely**

27.    Flock cameras do not track "the whole" of Plaintiffs' movements.  They collect only a tiny fraction of the data points generated by cell-site location information, GPS tracking, or aerial surveillance.  Ex. 12 [Horan Report] at pp. 3–8.

28.    Norfolk spans 66 square miles and contains over nine million feet of road.  Ex. 9

[Estevez Report] ¶ 26 & n.22.  Based on the Flock cameras' specified range, the Flock cameras operated by NPD cover just 0.1138% of Norfolk's roadways and 0.0069% of square mileage in the city limits. *Id.* ¶ 26 & nn.26–27.[3]

29.     Consistent with this sparse coverage, a vehicle that was photographed by one of NPD's Flock cameras was photographed an average of only once every two days over a four-month period. Ex. 9 [Estevez Report] ¶ 40.  Including any cameras in Norfolk accessible to NPD does not change that rate.  *Id.*  During this period, on days when a vehicle was photographed by an NPD Flock camera, 90% of the time the car was photographed no more than twice in the same day.  *Id.*

30.     Even the 5% of vehicles photographed most often during this period—a category that includes both of Plaintiffs' primary vehicles—were on average not photographed on more than half of days and photographed no more than once on about two-thirds of days.  Ex. 9 [Estevez Report] ¶ 41.

### Photographs of Plaintiffs' Vehicles

31.     In an average period of 21 days—NPD's time limit on retaining LPR data under Virginia law— ███████████████████████████ vehicles were photographed by an NPD Flock camera an average of about 2 and 3 times per day, respectively.  Ex. 9 [Estevez Report] ¶¶ 35–36.[4]

████████████████████████████████████████████████████

███████████████  Ex. 9 [Estevez Report] ¶ 47.

32.     In an average 21-day retention period, ████████████████████ was not photographed by any NPD Flock camera on nearly two-third of days, and ██████████████ was not photographed by any NPD Flock camera on nearly three in ten days.  Ex. 9 [Estevez Report] ¶¶ 35–36.

---

[3] These figures reflect that all 176 cameras are operational.

[4] Data includes all possible 21-day periods starting with the period February 15 to March 8, 2025 and ending with the period June 13 to July 3, 2025.

33.    On average, when Plaintiffs' vehicles were photographed more than once on the same day, ███████████████████ were photographed 3.5 miles and more than 45 minutes apart while ███████████████████████████ were photographed 2.5 miles and nearly 50 minutes apart. For each Plaintiff, the overwhelming majority of their time between 7:00 am and 9:00 pm consisted of time without two Flock camera photographs of their vehicle in Norfolk within 30 minutes.  Ex. 9 [Estevez Report] ¶¶ 43–46 & App'x C, Exs. 8a–8d.

34.    Because the Flock cameras are scattered and there are often many establishments in the immediate vicinity of a given Flock camera, *see, e.g.*, Ex. 9 [Estevez Report] ¶ 58, ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████    *See* Ex. 14 [Schmidt Dep.] at 98:3–16, 130:9–144:15, 178:20– 186:7-21, 226:21–241:7; Ex. 15 [Arrington Dep.] at 134:21–151:19.

35.    Plaintiffs also testified that they engage in regular travel within Norfolk that is not reflected in Flock camera data, and which Plaintiffs' experts were not able to infer from the Flock data:

a.    Ms. Arrington testified that she visits ████████████████████

████████████████████████████████████████████    Ex. 15 [Arrington Dep.] at 33:5–43:18.  The Flock data does not show this.  Ms. Arrington was not photographed by a single Flock camera in Norfolk on two thirds of days, ██████████████

████████    Ex. 9 [Estevez Report] ¶ 36 & App'x C, tbl. 4.[5]

b.    Mr. Schmidt testified that he has three regular driving "routines" within Norfolk:

████████████████████████████████████████████████

---

[5] ██████████████████████████████████████████████

████████████████████████████████████████████████

████████████    Ex. 9 [Estevez Report] ¶ 112 & App'x C, Ex. 20.

████████████████████████████████████████ Ex. 14 [Schmidt Dep.] at 36:10–46:5, 118:3–15.  NPD's Flock cameras did not photograph Mr. Schmidt's vehicles in the vicinity of these locations each week when Mr. Schmidt says he generally visited them.  *E.g.*, *id.* at 226:21–231:20.  ███████████████████████████████████████

███████████████████████, *id.* at 170:19–173:21, 184:14–186:21, ███████████████

█████████████████████████████████████████████████████████

██████, Ex. 9 [Estevez Report] ¶ 67.

### NPD Policies for Flock Cameras

36.    NPD's use of Flock cameras is regulated by Virginia law and City regulations.  Ex. 1 [Capt. Thomas Decl.] ¶¶ 19–24.

37.    After acquiring the Flock cameras, NPD promulgated "Operational Special Order – 23:002: Flock Safety."  The Special Order provided, among other things, that "Flock Safety will automatically delete data after a 30 day period" and that the Flock System "is to be utilized by personnel for law enforcement purposes only."  Ex. 16 [2023 Special Order].

38.    On May 2, 2025, Governor Youngkin signed into law an Act amending the Code of Virginia, including by adding Section 2.2-5517 (the "LPR Law").  Ex. 17 [LPR Law].  The LPR Law imposes some of the most restrictive conditions on the use of LPR data in the entire country, including the following:

a.    LPR data must be purged 21 days from the date of the photograph unless the data is "part of an ongoing investigation, prosecution, or civil action," *id.* at p. 2, § 2.2-5517(E);[6]

b.    Law enforcement can access LPR data in only three circumstances:  (1) as part

---

[6] This 21-day retention period is shorter than in many other jurisdictions that have enacted LPR regulations.  *See, e.g.*, Cal. Veh. Code § 2413(b) (60 days); Minn. Stat. Ann. § 13.824(3)(a) (60 days); Mont. Code Ann. § 46-5-118(1) (90 days); N.C. Gen. Stat. § 20-183.32(a) (90 days); Tenn. Code Ann. § 55-10-302(4b) (90 days); Ark. Code Ann. § 12-12-1804(a) (150 days); Neb. Rev. Stat. § 60-3204 (180 days); Vt. Stat. Ann. tit. 23, § 1607(c)(2) (18 months); Ga. Code Ann. § 35-1-22(b) (30 months).

of a criminal investigation into an alleged violation of the Code of Virginia or any ordinance of any county, city, or town where there is reasonable suspicion that a crime was committed; (2) as part of an active investigation related to a missing or endangered person or a person associated with human trafficking; or (3) to receive notifications related to a missing or endangered person, a person with an outstanding warrant, a person associated with human trafficking, a stolen vehicle, or a stolen license plate, *id.* § 2.2-5517(D);

      c.     Out-of-state and federal data sharing is generally prohibited. Law enforcement agencies can share LPR data only with other law enforcement agencies in Virginia, in response to valid legal process, with a vendor for maintenance or quality-assurance purposes, or to alert the public in emergency and other situations, *id.* § 2.2-5517(F); and

      d.     Agencies must audit the use of an LPR database every 30 days, *id.* at p. 3, § 2.2-5517(H)(6).[7]

39.     In June 2025, the City promulgated "Operational General Order – 493: Flock Safety ALPR System" ("General Order"), which implements the LPR Law and supersedes NPD's Special Order. *See* Ex. 18 [2025 General Order].

40.     The General Order requires any authorized user to enter all of the following information in order to query a Flock database: (1) a case or call-for-service number; (2) an offense type; and (3) the basis for reasonable suspicion. *Id.* p. 4, § III.D. An audit log of these entries must be reviewed at least once per month by an NPD official to monitor compliance. *Id.* In practice, NPD reviews the audit logs to ensure compliance bi-weekly. Ex. 1 [Capt. Thomas Decl.] ¶ 24.

41.     The General Order also requires that, in order to create a custom hotlist alert, an NPD

---

[7] Plaintiffs' counsel, the Institute for Justice, opposed the LPR Law before the Virginia legislature and unsuccessfully advocated for more stringent restrictions on the use of LPRs. *See* Courts of Justice, *Virginia Senate*, Senate Room A (305), Feb. 10, 2025 (video at 2:25:20), available at https://virginia-senate.granicus.com/MediaPlayer.php?view_id=3&clip_id=7363.

user must submit a Form PD-643 to a Detective Division supervisor for approval. The Form PD-643 must state the "Permitted Purpose" (as defined in Section III.A of the General Order) for the hotlist alert. If the Form PD-643 is approved, then the license plate is added to the hotlist for a period of only 21 days unless an NPD user obtains approval of a new Form PD-643 requesting an extension for an additional 21 days. At the conclusion of the authorized period, the hotlist entry is automatically purged from the Flock System. *See* Ex. 18 ["General Order"] pp. 4–5, § III.E.

42.    NPD has never queried any license plate number associated with a vehicle registered to either Plaintiff outside of this litigation. Ex. 1 [Capt. Thomas Decl.] ¶¶ 41–42.

43.    Plaintiffs do not intend to engage in conduct that could result in their vehicles being queried or subject to a hotlist alert for one of the Permitted Purposes specified in the General Order. Ex. 14 [Schmidt Dep.] at 155:10–158:22, 268:18–269:8; Ex. 15 [Arrington Dep.] at 76:9–79:6.

## STANDARD

A district court shall grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). The mere existence of some alleged factual dispute between the parties "will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48 (1986).

## ARGUMENT

Plaintiffs' claim is that NPD's use of the Flock cameras is a search because they "have captured the whole of [their] public movements." Compl. ¶ 90. This claim fails for two reasons.

*First*, the undisputed facts show that Plaintiffs lack standing to pursue a claim that NPD's Flock cameras reveal the whole of their movements. NPD could access information about Plaintiffs' movements only by querying the Flock System for their vehicles, but NPD has never done so outside of this litigation and no evidence exists that NPD will.

13

*Second*, Plaintiffs have no evidence that Flock cameras enable NPD to track the whole of their physical movements or learn information about their private lives.  Plaintiffs' experts have not offered any opinion that NPD's network of Flock cameras has that capability.  In fact, the record evidence affirmatively makes clear that NPD *cannot* use the Flock cameras to track the whole of Plaintiffs' physical movements or learn information about their private lives.  Accordingly, the use of the Flock system is not a search, and Plaintiffs' claim fails on the merits.

## I. PLAINTIFFS LACK ARTICLE III STANDING TO CHALLENGE QUERIES OF THEIR VEHICLES' LICENSE PLATES

In their Complaint, Plaintiffs claimed that they were injured because NPD's Flock cameras "invaded their privacy by exposing a record of their movements throughout the City to every person the NPD allows to access its data." *Id.* ¶ 87.  They claimed to "worr[y]" about "how the NPD, an individual officer, or another Flock user might use or misuse the records of his movements" or that "third-party hackers might one day gain access to Flock's database." *Id.* ¶ 85.  After discovery, Plaintiffs' alleged injury remains entirely hypothetical and thus insufficient for Article III standing.

Standing requires proof that (among other elements) the plaintiff "has suffered or likely will suffer an injury in fact." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).  In order to show an injury in fact, Plaintiffs must have suffered or will suffer "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016).  While the "threatened injury" need not be "literally certain," it must be "certainly impending." *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 410, 414 n.5 (2013) (citation modified).

"Allegations of possible future injury do not satisfy the requirements of Art. III." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990); *see also Clapper*, 568 U.S. at 412 (plaintiffs lacked standing to challenge surveillance where they "set forth no specific facts demonstrating that" their communications "will be targeted").  For that reason, the Northern District of Illinois recently held that plaintiffs lacked

14

standing to challenge the Illinois State Police's use of an LPR database because there was no "substantial risk" that the police would "soon retrieve plaintiffs' license plate information from the database." *See Scholl*, 776 F. Supp. 3d at 710 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).[8]

There is no dispute that the same risk is missing here. Plaintiffs' alleged injury is that NPD has invaded their privacy because the Flock cameras allow NPD to track "the whole" of their physical movements. Compl. ¶ 90. No single photograph could reveal the whole of Plaintiffs' physical movements. Plaintiffs' injury therefore depends on what NPD *could* learn from querying the Flock system for the photographs of their vehicles in the aggregate. Yet NPD has never queried Plaintiffs' vehicles outside of this litigation, and there is no evidence that NPD will do so.[9] The Virginia LPR Law and NPD's General Order limit when an NPD officer can access data from the Flock System. *See supra* SUMF ¶¶ 36–41. And Plaintiffs have acknowledged that they have no "intention to engage in a course of conduct" that would justify querying the Flock System for their data consistent with the LPR Law and the General Order. *Scholl*, 776 F. Supp. 3d at 710 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). *See supra* SUMF ¶ 43.

The lack of queries and Virginia's LPR Law distinguish this case from *Beautiful Struggle*. In

---

[8] *Scholl* observed that both *Carpenter* and *Beautiful Struggle* framed the Fourth Amendment search in terms of *accessing* data. 776 F. Supp. 3d at 719; *see Carpenter*, 585 U.S. at 300 (asking "whether the Government conducts a search under the Fourth Amendment when it *accesses* historical cell phone records that provide a comprehensive chronicle of the user's past movements" (emphasis added)); *Beautiful Struggle*, 2 F.4th 330 at 344 ("[W]hen BPD 'accesses' AIR data, it invades the recorded individuals' reasonable expectation of privacy, conducting a search."). Consistent with that approach, courts have focused on queries of an LPR database as the relevant Fourth Amendment moment because then—and only then—is the aggregate data accessed. *See, e.g.*, *United States v. Jiles*, 2024 WL 891956, at *19 (D. Neb. Feb. 29, 2024) ("Deputy Parmer did not perform a 'search' within the meaning of the Fourth Amendment when he accessed the ALPR database.").

[9] Plaintiffs alleged that this aggregation occurs automatically after the Flock camera photographs a vehicle. Compl. ¶¶ 77, 79. That is not true. Vehicle information is aggregated only if an authorized user queries the Flock System or creates a hotlist. Ex. 7 [Lukens Decl.] ¶ 16.

that case, the plaintiffs were "grassroots community advocates" whose work "necessarily involve[d] traveling through and being present outdoors in areas with high rates of violent crime," including "visit[ing] scenes of gun violence as soon as possible after a crime takes place." 2 F.4th at 335. It was "more likely" that the advocates would "be captured in AIR data than most because they work in high crime areas, sometimes soon after serious crimes take place." *Id.* at 337. Accordingly, in "access[ing] AIR program materials" during investigations, police "would access images . . . in which Plaintiffs may be depicted." *Id.* Here, by contrast, Plaintiffs have made no similar showing that there is any likelihood that Flock camera data regarding their vehicles will be accessed by NPD for one of the limited purposes authorized by the Virginia LPR law. Their own testimony shows they have no reason to believe that their vehicles will be queried. *Supra* SUMF ¶ 43. Thus, Plaintiffs' alleged injury is hypothetical, and they lack Article III standing.

That result advances the principle that Fourth Amendment challenges "must be grounded on an accurate understanding of the facts." *United States v. Curry*, 965 F.3d 313, 316 (4th Cir. 2020). In cases where criminal defendants seek suppression of LPR data, courts have concrete records about how the data was, in fact, used. Federal courts considering that evidence have uniformly rejected arguments that the use of LPRs is a search. Part II.B *infra*. Plaintiffs here ask this Court to reach a different conclusion based on an abstract, hypothetical inquiry into how NPD *could* use the Flock System to track their movements. Indeed, Plaintiffs' expert Dr. Higdon-Topaz, a former math professor, analyzes a set of "simulated" routes between locations in Norfolk rather than actual LPR data from the Flock System. Ex. 19 [Higdon-Topaz Dep.] at 135:1–22. Article III's standing requirement forecloses such claims so that "legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *All. for Hippocratic Med.*, 602 U.S. at 379–80.

The standing requirement also ensures that "federal courts" do not "operate as an open forum

for citizens to press general complaints about the way in which government goes about its business." *Id.* at 379 (citation modified). This allows issues to "be resolved by the political branches in the democratic process," *id.* at 380, which is essential in the Fourth Amendment context because a "legislative body is well situated to gauge changing public attitudes, to draw detailed lines, and to balance privacy and public safety in a comprehensive way," *United States v. Jones*, 565 U.S. 400, 429–30 (2012) (Alito, J. concurring). The Virginia General Assembly did just that earlier this year by passing a statute that regulates the use of LPRs. Plaintiffs cannot use the Courts to subject LPRs to further restrictions under the Fourth Amendment when they have no evidence that their vehicles have been or will be queried. The Supreme Court has "never held that potential, as opposed to actual, invasions of privacy constitute searches for purposes of the Fourth Amendment." *United States v. Karo*, 468 U.S. 705, 712 (1984); *see also Boroian v. Mueller*, 616 F.3d 60, 69–70 (1st Cir. 2010) (Fourth Amendment claim was "purely speculative" because Plaintiff had "not alleged any present or imminent use of" a database "to check his DNA profile").

## II. PLAINTIFFS' CLAIM FAILS ON THE MERITS BECAUSE UNDISPUTED FACTS SHOW THAT NPD'S USE OF THE FLOCK CAMERAS IS NOT A SEARCH

Even if Plaintiffs had standing to assert that NPD's Flock cameras reveal the whole of their physical movements, that claim fails—as it has in every other federal court. Federal courts have uniformly held that using LPRs is not a search because LPRs do not track the whole of individuals' physical movements or reveal private information. Plaintiffs have no evidence to support their allegations that NPD's LPR cameras have capabilities that LPR cameras in these other cases did not. To the contrary, the undisputed facts show that NPD's Flock cameras do not and cannot enable NPD to track the whole of Plaintiffs' physical movements or learn private information about their lives.

### A. To Show a Fourth Amendment Search, Plaintiffs Must Prove that NPD's Flock System Reveals the Whole of their Physical Movements.

A "search" for Fourth Amendment purposes occurs only "when an expectation of privacy that

17

society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Plaintiffs' counsel have argued that a "search" occurs the moment "[w]hen the camera snaps a picture of the license plate," Ex. 20 [Aug. 6, 2025 Hrg. Tr.] at 57, and Plaintiffs testified that even one Flock camera would invade their privacy, Ex. 15 [Arrington Dep.] at 57:13–59:13; Ex. 14 [Schmidt Dep.] at 187:13–189:14. These positions contradict settled law. No search occurs when a Flock camera takes a photograph of a vehicle traveling on a public street past a camera placed at a discrete location.

There is no "reasonable expectation of privacy in the visible exterior parts of an automobile that travels the public roads and highways." *George*, 971 F.2d at 1120. Because the "exterior of a car . . . is thrust into the public eye" whenever it turns onto a public road, "to examine it does not constitute a 'search'" under the Fourth Amendment. *New York v. Class*, 475 U.S. 106, 114 (1986); *see also Martin*, 753 F. Supp. 3d at 475 ("[W]e have come to expect the public surveillance of our vehicle as we travel on public roads[.]").

Likewise, the Supreme Court has held that "it is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile." *Class*, 475 U.S. at 114. The law requires that license plates be publicly displayed, Va. Code Ann. § 46.2-715, so a "motorist has no reasonable expectation of privacy in the information contained on his license plate," *United States v. Ellison*, 462 F.3d 557, 561, 563 (6th Cir. 2006); *accord United States v. Walraven*, 892 F.2d 972, 974 (10th Cir. 1989) (same).

The general rule that there is no expectation of privacy in public activity goes beyond a single snapshot. "People understand that they may be filmed by security cameras on city streets, or a police officer could stake out their house and tail them for a time." *Beautiful Struggle*, 2 F.4th at 345. Accordingly, courts routinely uphold the use of surveillance cameras to take images of a location over time. *See United States v. Vankesteren*, 553 F.3d 286, 291 (4th Cir. 2009) (law enforcement agents were free "to use" a motion-activated camera for "video surveillance" that would "capture what any

passerby would have been able to observe").[10]

Similarly, the Supreme Court has held that using a device to collect information regarding a car's location at multiple points in time was not a search.  In *United States v. Knotts*, 460 U.S. 276 (1983), the defendant bought a container of methamphetamine precursors that had been outfitted with a hidden beeper and drove the chemicals to a co-defendant's cabin.  *Id.* at 278.  The Supreme Court explained that a "person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another."  *Id.* at 281.  It reasoned that the defendant "voluntarily conveyed to anyone who wanted to look the fact that he was travelling over particular roads in a particular direction, the fact of whatever stops he made, and the fact of his final destination when he exited from public roads onto private property."  *Id.* at 281–82.

*Carpenter* did not disturb these settled precedents that there generally is no expectation of privacy in public activity.  *Carpenter* was a "narrow" decision that did not "call into question conventional surveillance techniques and tools, such as security cameras."  585 U.S. at 316.  The Court expressly distinguished technology that captures "a person's movement at a particular time."  *Id.* at 315.  Rather, *Carpenter* held that technology that "provides an all-encompassing record" of a person's "whereabouts," 585 U.S. at 311, can invade an expectation of privacy "in the whole of their physical movements" even if some of those movements are in public, *id.* at 310.

The Supreme Court traced the principle "that individuals have a reasonable expectation of privacy in the whole of their physical movements" to concurring opinions signed by a majority of the

---

[10] *See also United States v. Harry*, 130 F.4th 342, 351 (2d Cir. 2025) ("collection of footage of activities in public view at Harry's business, for a period of 50 days," was not a search); *United States v. Houston*, 813 F.3d 282, 287–88 (6th Cir. 2016) ("[Defendant had] no reasonable expectation of privacy in video footage recorded by a camera that was located on top of a public utility pole and that captured the same views enjoyed by passersby on public roads."); *United States v. Hay*, 95 F.4th 1304, 1314 (10th Cir. 2024) ("The use of video equipment and cameras to record activity visible to the naked eye does not ordinarily violate the Fourth Amendment." (cleaned up)); *United States v. Gregory*, 128 F.4th 1228, 1242 (11th Cir. 2025) ("Pole cameras are a conventional surveillance technique very similar to security cameras—and the government has used them for surveillance across the country for decades.").

Court in *United States v. Jones*, 565 U.S. 400 (2012). *See Carpenter*, 585 U.S. at 310. The Court held in *Jones* "that the Government's installation of a GPS device on a target's vehicle . . . to monitor the vehicle's movements[]" constituted a search under the Fourth Amendment based on the physical trespass. 565 U.S. at 412–13. Concurring Justices opined that using a GPS device to "monitor and catalogue every single movement of an individual's car" could violate a reasonable expectation of privacy, *id.* at 426–30 (Alito, J., concurring), and that "GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations," *id.* at 415 (Sotomayor, J., concurring).

In *Carpenter*, the Supreme Court recognized that the government's access to historical cell site location information ("CSLI") presents similar privacy concerns as GPS tracking in *Jones* because a "cell phone—almost a feature of human anatomy—tracks nearly exactly the movements of its owner." 585 U.S. at 311. This tracking occurs not only in public but also in private: "A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales." *Id.* (citations modified). Cell phone tracking that generated 101 data points per day, *id.* at 302, "achieves near perfect surveillance, as if [the government] had attached an ankle monitor to the phone's user," *id.* at 311–12. Thus, like GPS tracking, CSLI data "provides an all-encompassing record of the holder's whereabouts." *Id.* And that data was stored "for up to five years," *id.* at 312, creating a "detailed chronicle of a person's physical presence compiled every day, every moment, over several years," *id.* at 315.

The Fourth Circuit applied *Carpenter* to Baltimore's Aerial Investigative Research ("AIR") program in *Beautiful Struggle*. In the AIR program, unmanned planes photographed "around 90% of the city" for twelve hours each day, generating data stored for 45 days. 2 F.4th at 334. The Fourth Circuit held that accessing AIR data was an unlawful search under *Carpenter* because it "track[ed] every movement of every person outside in Baltimore," whether in a car or by foot, creating "a detailed,

encyclopedic, record of where everyone came and went within the city during daylight hours over the prior month-and-a-half." *Id.* at 341 (citation modified). Like CSLI, the aerial surveillance was akin to "attaching an ankle monitor" to everyone in the city. *Id.* (quoting *Carpenter*, 585 U.S. at 311–12).

Thus, under *Carpenter*, accessing information regarding public activity can be a search if it "is the equivalent of tracking 'the whole of their physical movements,'" *McGregor v. United States*, 2025 WL 2550533, at *10 (E.D. Va. Sept. 4, 2025) (citation modified), because that whole can expose "privacies of life" and "provides an intimate window" into "familial, political, professional, religious, and sexual associations," *Carpenter*, 585 U.S. at 311 (citation modified).

### B.  Federal Courts Have Uniformly Held that LPRs Do Not Track the Whole of Individuals' Movements

Nearly two dozen federal courts have addressed whether the use of LPRs is a search for purposes of the Fourth Amendment under the standard recognized in *Carpenter*. All of them have rejected the argument. *See, e.g.*, *Scholl*, 776 F. Supp. 3d at 710 (use of approximately 300 LPR cameras did not violate the Fourth Amendment); *Jackson*, 2025 WL 1530574, at *3–10 (Wichita's use of around 190 Flock cameras was not a search); *United States v. Griffin*, 2025 WL 1474679, at *8 (S.D. Ind. May 22, 2025) (alleged use of 600 LPR cameras in Marion County was not a search).[11]  That judicial consensus includes *United States v. Martin*, 753 F. Supp. 3d 454 (E.D. Va. 2024), where Judge Payne

---

[11]  *See also United States v. Brown*, 2025 WL 2444596, at *3–5 (W.D. Okla. Aug. 25, 2025); *United States v. Ramirez Acosta*, 2025 WL 2427700, at *5 (N.D. Okla. Aug. 22, 2025); *United States v. Slaybaugh*, 2025 WL 2123781, at *1–2 (M.D. Ala. July 29, 2025); *United States v. Jackson*, 2025 WL 1530574, at *3–10 (D. Kan. May 29, 2025); *United States v. Rubin*, 556 F. Supp. 3d 1123, 1130 (N.D. Cal. 2021); *United States v. Yang*, 958 F.3d 851, 862 (9th Cir. 2020) (Bea, J., concurring); *United States v. Salcido-Gonzalez*, 2024 WL 2305478, at *12 (D. Utah May 21, 2024); *United States v. Porter*, 2022 WL 124563 (N.D. Ill. Jan. 13, 2022); *United States v. Slaybaugh*, 2025 WL 2123781, at *1–2 (M.D. Ala. July 29, 2025) *United States v. Jiles*, 2024 WL 891956, *15–19 (D. Neb. Feb. 29, 2024); *United States v. James*, 2023 WL 3370421, at *4–6 (W.D. La. Jan. 30, 2023); *United States v. Graham*, 2022 WL 4132488, at *5 (D.N.J. Sept. 12, 2022), *aff'd*, 2025 WL 342190 (3d Cir. Jan. 30, 2025); *United States v. Cooper*, 2025 WL 35035, at *7 (E.D. La. Jan. 6, 2025); *United States v. Brown*, 2021 WL 4963602 (N.D. Ill. Oct. 26, 2021); *United States v. Bowers*, 2021 WL 4775977, at *3 (W.D. Pa. Oct. 11, 2021); *United States v. Toombs*, 671 F. Supp. 3d 1329, 1340–41 (N.D. Ala. 2023).

held that the use of Flock cameras in Richmond was not a search.  And courts in Norfolk, in other jurisdictions in Virginia, and in other states have reached the same conclusion.[12]

The only decision holding that the use of LPRs is a search is *Commonwealth v. Bell*, 113 Va. Cir. 316 (May 10, 2024).  Courts have described *Bell* as an "outlier[]," *Jackson*, 2025 WL 1530574, at *7 n.10, and found that its "reasoning [is not] persuasive," *Slaybaugh*, 2025 WL 2123781, at *2. According to Judge Payne, *Bell* did not apply the standard that "*Carpenter* and *Beautiful Struggle* require."  *Martin*, 753 F. Supp. 3d at 473 n.16.

The courts that have applied the *Carpenter* standard have uniformly rejected Fourth Amendment challenges to the use of LPRs because they have identified "fundamental differences" between LPRs and "the nature of surveillance" held unconstitutional in *Carpenter* and *Beautiful Struggle*.  *Jackson*, 2025 WL 1530574 at *9.

As Judge Payne held after reviewing the record in *Martin*, as "part of the system's design," the Flock System "is not meant to 'track' or 'monitor' the entirety of an individual's movements during a particular car trip, much less through the activities of their daily life."  *Martin*, 753 F. Supp. 3d at 472–73.  Rather, Flock cameras only photograph vehicles as they pass cameras on public streets at discrete moments.  *See Cooper*, 2025 WL 35035, at *6 (noting that "the ALPR technology at issue captures only the public movements of vehicles that happen to pass by locations on a public street in view of an ALPR camera"); *accord Jiles*, 2024 WL 891956, at *19 ("[L]icense plates are not akin to 'feature[s] of human anatomy,' such that tracking a license plate 'achieves near perfect surveillance, as if [the Government] had attached an ankle monitor' to the suspect.").  The Supreme Court in *Carpenter* expressly distinguished CSLI from technology that captures "a person's movement at a particular

---

[12] *See, e.g.*, *Commonwealth v. Roberson*, 113 Va. Cir. 565 (2024) (Norfolk); *Commonwealth v. Robinson*, 113 Va. Cir. 494 (2024) (Norfolk); *Commonwealth v. Adams*, 113 Va. Cir. 505 (2024) (Chesterfield); *Uhunmwangho v. State*, 2020 WL 1442640, at *8 (Tex. App. Mar. 25, 2020); *State v. Sidor*, 558 P.3d 621, 631 (Ariz. Ct. App. 2024); *Commonwealth v. Watkins*, 304 A.3d 364, 372 (Pa. Super. Ct. 2023).

time."  585 U.S. at 515.  Consistent with that distinction, courts have emphasized that LPRs do not enable "the pervasive and continuous gathering of information with which the Supreme Court was concerned in *Carpenter* and *Jones*," *Jackson*, 2025 WL 1530574, at *8, but only "provide a snapshot of the suspect's location at a discrete time while traveling in an automobile on a public road," *United States v. Toombs*, 671 F. Supp. 3d 1329, 1340–41 (N.D. Ala. 2023).

Indeed, unlike the cell phones in *Carpenter* or the aerial surveillance in *Beautiful Struggle*, no Flock camera "follows" the driver "beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales."  *Carpenter*, 585 U.S. at 311 (citation modified).  If a person is at home, inside a building, walking, biking or taking public transit, then their cell phone or a GPS device will collect data on where they are, but Flock cameras will not. *See* Ex. 12 [Horan Report] at 6.  This "means that the amount of data collected is incomplete and does not track the totality of an individual's movements."  *Jackson*, 2025 WL 1530574, at *8.  Courts have therefore concluded that LPR data is far "less comprehensive" and "lacks the same 'deeply revealing nature' as the information recorded by the surveillance technologies discussed in *Carpenter*, *Jones*, and *Leaders of a Beautiful Struggle*."  *Scholl*, 776 F. Supp. 3d at 720 (quoting *Carpenter*, 585 U.S. at 320).

## C.    The Undisputed Facts Establish that NPD's Flock Cameras Do Not Track the Whole of Plaintiffs' Physical Movements

The undisputed facts about NPD's Flock cameras establish the same conclusion beyond genuine dispute.  At the pleading stage, this Court was required to credit Plaintiffs' allegations that NPD is using the Flock System for "secretly monitoring and cataloguing the whole of tens of thousands of individual[s'] movements of an extended period."  ECF 29 at 19.  Plaintiffs alleged that Flock cameras "enable the warrantless surveillance of their every move," Compl. ¶ 1, "create a running 30-day record of the whole of [their] movements," *id.* ¶ 74, and can be used to "map nearly all" of their movements, *id.* ¶¶ 57, 69.  Plaintiffs have no evidence to support these allegations because they are wrong.  Now, all that Plaintiffs' experts can claim is that NPD can draw some limited inferences from Flock data.

23

That is not—and cannot be—the standard for a search under the Fourth Amendment.

Plaintiffs have no evidence to support their allegations that NPD could use the Flock System "to figure out which places [Plaintiffs] frequently visit[] in Norfolk and deduce who [their] relatives and closest friends are," including "who [Mr. Schmidt] goes to church with, and who he meets at the shooting range," and "who [Ms. Arrington's] clients are and where she usually takes them." *Id.* ¶¶ 58, 66, 73. In written discovery, Plaintiffs admitted that Defendants cannot use the Flock System alone to identify any of their clients or personal friends. Ex. 21 [Schmidt RFAs] at pp. 3–5 (RFAs 1–2); Ex. 22 [Arrington RFAs] at pp. 3–4 (RFAs 1–2).[13] ███████████████████████████

████████████████████████████████████████████████████████████

████████████████ *See supra* SUMF ¶ 34. ████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████ *See supra* SUMF ¶ 35.

Not only do Plaintiffs lack evidence that NPD's Flock cameras track the whole of their movements, but the evidence affirmatively shows that the Flock cameras do not and cannot do so.

*First*, NPD's Flock cameras cover only a small fraction of Norfolk and its roads. The AIR program in *Beautiful Struggle* surveilled 90% of Baltimore. 2 F.4th at 335. CSLI covers every square inch of Norfolk. Ex. 12 [Horan Report] at 4; Ex. 23 [Horan Dep.] at 162:20–163:3. But NPD's LPRs cover just 0.1138% of the street mileage in Norfolk and 0.0069% of the area in the city limits, much like in *Martin* where, at the time of the decision, Flock cameras covered just 0.06% of street mileage and less than 0.00413% of area in Richmond. Ex. 9 [Estevez Report] ¶ 28. *See Martin* 753 F. Supp. 3d at 472–73 (Flock cameras "are 'strategically' placed to capture images of <u>locations</u>, not <u>individuals</u>, that are known as historically high-traffic or high-crime areas"); *Robinson*, 113 Va. Cir. 494, 2024 WL

---

[13] Plaintiffs refused to produce information that would enable Defendants to test their allegations because it would reveal "confidential" information, *see* ECF 82, Ex. F (ROG No. 15), but they did not explain how that could be so if NPD can already deduce the same information from the Flock data.

5454692, at * 7 ("[NPD's Flock cameras] capture only a very tiny fraction of the city's roadways.").

*Second*, data regarding Plaintiffs' vehicles shows that NPD's Flock cameras do not generate "an all-encompassing record" of their vehicles' whereabouts, let alone of everywhere they go outside of a car. *Carpenter*, 585 U.S. at 311. NPD's Flock cameras photograph ▇▇▇▇▇▇▇▇▇ an average of only about 3 times per day and ▇▇▇▇▇▇▇▇▇▇▇ about 2 times per day. *Supra* SUMF ¶ 31. Thus, the Flock System collects far less data than the 101 location data points collected per day in *Carpenter*, 585 U.S. at 302, which created "a detailed chronicle of a person's physical presence," *id.* at 315.

In fact, for each Plaintiff, only roughly 1% of the time between 7:00 am and 9:00 pm involved two photographs of their vehicle within 30 minutes. *Supra* SUMF ¶ 33. Because Plaintiffs' experts have not opined that NPD can use only one Flock photograph to do any tracking, Ex. 19 [Higdon-Topaz Dep.] at 173:22–174:4, this means that Flock data would not support any inference about their movements during roughly 99% of their time between 7:00 am and 9:00 pm. That is the polar opposite of an "ankle monitor." *Beautiful Struggle*, 2 F.4th at 334.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇ For an entire four month period, more than half of all license plates photographed in Norfolk were photographed only once, 70% were photographed twice or less, and three-quarters were photographed three times or less. Ex. 9 [Estevez Report] ¶ 39. ▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *Supra* SUMF ¶ 30. Even for this group of the most photographed cars, on two-thirds of days, the cars were on average detected once or less. *Id.* Thus, on the average day, even the most photographed vehicles in Norfolk cannot be tracked using Flock data at all. That is far from "a detailed, encyclopedic, record of where everyone came and went within the city during daylight hours." *Beautiful Struggle*, 2 F.4th at 341 (citation modified).

*Third*, even when Plaintiffs' vehicles are photographed, the data does not reveal the whole of their movements. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

██████████████████████ *Supra* SUMF ¶ 34.  As Plaintiffs' experts conceded, Flock cameras do not provide NPD with any information on where Plaintiffs began or ended a trip before their vehicle was photographed.  Ex. 19 [Higdon-Topaz Dep.] at 116:9–117:12.  Without that information, NPD cannot identify whether Plaintiffs were leaving a doctor's office, headed to a church, or driving to a political rally, and thus NPD cannot use Flock data to "discern [Plaintiffs'] familial, political, professional, religious, and sexual associations.'"  *Jackson*, 2025 WL 1530574, at *8.

The Flock System also generally "offers no insight" about a "vehicle's movements or location when between cameras."  *Robinson*, 113 Va. Cir. 494, 2024 WL 5454692, at *7.  On average, photos of Plaintiffs' vehicles taken on the same day were over 2 miles and nearly an hour apart.  *Supra* SUMF ¶ 33.  There are hundreds of places Plaintiffs could have gone in those intervals.  *Supra* SUMF ¶ 34.  Plaintiffs' experts offered no opinion that Flock data could be used to determine where a person visited between moments when their vehicle was photographed during such intervals.

These undisputed facts establish beyond dispute that NPD's use of the Flock System "does not infringe upon an individual's reasonable expectation of privacy because it does not reveal intimate details of an individual's daily life[.]"  *Cooper*, 2025 WL 35035 at *6.

### D.    Plaintiffs' Experts Have Not Shown that NPD Can Use Flock Cameras to Learn Private Information About Plaintiffs

Plaintiffs' experts do not create any genuine dispute of material fact.  Neither Plaintiffs' experts opines that NPD can use the Flock System to track the whole of Plaintiffs' physical movements.  Ex. 19 [Higdon-Topaz Dep.] at 9:18–11:1; Ex. 13 [Wheeler Dep.] at 145:19–146:7.  Nor does either expert opine that NPD can use the Flock System to determine Plaintiffs' "familial, political, professional, religious, and sexual associations," *Carpenter*, 585 U.S. at 311 (citation modified).  Ex. 13 [Wheeler Dep.] at 142:21-143:21; Ex. 19 [Higdon-Topaz Dep.] at 9:18-11:19.  Plaintiffs identified numerous locations that they claim to visit frequently.  If the Flock data enabled NPD to track the whole of Plaintiffs' movements, then Plaintiffs' experts should have been able to show that the Flock data

would reveal these locations. But Plaintiffs' experts did not even try to do so.

**Dr. Chad Higdon-Topaz** did not analyze any Flock data regarding any vehicle primarily driven by either Plaintiff, and he did not "try to put" himself "in the shoes of a Norfolk police officer in determining what they could deduce or infer from looking at Flock data." Ex. 19 [Higdon-Topaz Dep.] at 97:11–98:5; *id.* at 107:3–108:9. Instead, Dr. Higdon-Topaz used a computer model to create a set of "simulated" trips between locations in Norfolk. *Id.* at 135:4–136:10, 142:10–12. After *creating* these simulated trips, Dr. Higdon-Topaz attempted to determine whether the NPD's Flock cameras could be used to "reconstruct" those routes. Critically, when Dr. Higdon-Topaz says he can "reconstruct" a route, he does not mean that Flock cameras can be used to determine the route that any vehicle actually took. *Id.* at 175:16–176:1. He testified that this analysis would be "speculation." *Id.* at 165:22–168:10, 189:8–14. Rather, Dr. Higdon-Topaz has merely opined that if a vehicle passes two Flock cameras on one of his theoretical routes, then navigation software like Google Maps can find the fastest driving route between the two cameras under ideal conditions. *Id.* at 128:15–20.

Dr. Higdon-Topaz's analysis fails to create a genuine issue of material fact for multiple reasons.

*First*, Dr. Higdon-Topaz approached the fundamental issue backwards. Rather than analyze whether NPD could use Flock data to track where Plaintiffs or others went, Dr. Higdon-Topaz *created* data on where people could have gone. This backwards approach only confirms that Plaintiffs' claims are flawed. The reason why Dr. Higdon-Topaz had to create a set of hypothetical routes to attempt to discern where individuals in Norfolk *might* have gone is because the Flock camera data does not show everywhere that people *actually* go in Norfolk. Dr. Higdon-Topaz testified that he had "no idea" about everywhere Plaintiffs went based on Flock data "without speculating." *Id.* at 179:4–184:1. Dr. Higdon-Topaz thus acknowledged that he has "not presented any opinion" that "Flock camera data can be used to construct a realistic model of how people travel by car within Norfolk." *Id.* at 139:13–19.

*Second*, navigation software's estimate of the fastest route between two points is not private

information about anyone; it is available to anyone with an app. *Id.* at 161:20–162:2. ████████
██████████████████████████████████████, Ex. 14 [Schmidt Dep.] at 174:17–
176:8; Ex. 15 [Arrington Dep.] at 22:12–23:6, ████████████████████████████████
████████████████████████. Ex. 19 [Higdon-Topaz Dep.] 162:22–163:5.

Regardless, even if navigation software could show how Plaintiffs' vehicles actually went from A to B on a public street, Plaintiffs have no expectation of privacy in that route. *See Knotts*, 460 U.S. at 281–82 (an "automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another"); *cf. Scholl*, 776 F. Supp. 3d at 720 ("Knowing what portions of an expressway someone passes tells the government far less about the privacies of life, than data that tracks nearly exactly the movements of [a cell phone's] owner[.]" (citation modified)).

*Third*, if Dr. Higdon-Topaz's analysis of hypothetical routes is relevant, then it affirmatively illustrates that Flock cameras cannot be used to track Plaintiffs' whole movements. Dr. Higdon-Topaz acknowledges that his own analysis shows that nearly half of simulated routes would not pass two Flock cameras, and thus could not be reconstructed using Flock data. Ex. 19 [Higdon-Topaz Dep.] at 204:16–205:3. He further admitted that more than 50% of simulated routes could not be reconstructed even one quarter of the way and more than 70% of simulated routes could not be reconstructed half of the way. *Id.* at 214:19–217:19. That is nothing close to a dragnet.

**Dr. Andrew Wheeler.** Plaintiffs retained Dr. Wheeler to try to identify the ways in which Defendants can use data from the Flock cameras to draw inferences about their locations, movements, and private lives. But Plaintiffs' counsel told Dr. Wheeler the locations that Plaintiffs frequent *before* he drew any of the purported inferences he now offers—██████████████████████████████
████████████████████████████. Ex. 13 [Wheeler Dep.] at 130:14–131:5, 133:3–17, 254:20–255:5, 278:5–279:3. Thus, Dr. Wheeler already knew the location information that he claimed to be testing whether NPD could discover from the LPR data. His analysis therefore is

completely uninformative about what the NPD could use Flock cameras to learn because, unlike Dr. Wheeler, the NPD does *not* know where Plaintiffs (or other Norfolk residents) frequently visit.

Even *with* Plaintiffs' "key locations" in hand, Dr. Wheeler was willing to offer an opinion that Plaintiffs actually visited only one place: ███████████████████████████.  Dr. Wheeler did not use Flock data to identify or infer any visit to any of the other locations that Plaintiffs disclosed in discovery or highlighted in their Complaint, including Mr. Schmidt's home, ████████ ██████, his gun range, his church, ████████████████████████, Ms. Arrington's home, her clients' medical appointments, ████████████████████.  Ex. 13 [Wheeler Dep.] at 164:4–174:11, 202:5–203:8.  That is not surprising.  Even with computer code, Dr. Higdon-Topaz could not draw the inferences that Dr. Wheeler sought to draw by looking at the data.  Ex. 19 [Higdon-Topaz Dep.] 249:18-22, 257:3-12.

Dr. Wheeler identified only one day when Mr. Schmidt was ███████████████████████ ██████████, Ex. 13 [Wheeler Dep.] at 217:6–219:1; Ex. 9 [Estevez Report] ¶ 67, even though ███ ███████████████████████████████████████████, Ex. 14 [Schmidt Dep.] at 36:10–46:5.  ██████████████████████████████████████████████████ ███████████████████████████████ Ex. 13 [Wheeler Dep.] at 217:6– 219:1.  Dr. Wheeler also acknowledged that NPD could not use Flock data to know "whether or not [Ms. Arrington] traveled into the [City of Norfolk]" on nearly *two-thirds* of days because her vehicle was not photographed in Norfolk on those days, *id.* at 190:14-18, even ████████████████████ ████████████████████████████████ Ex. 15 [Arrington Dep.] at 35:11–43:18.  The most specific he could get about Ms. Arrington based on the Flock data is that she lived in and visited areas of an undefined size, only one of which was in Norfolk.  Ex. 13 [Wheeler Dep.] at 197:17– 198:11, 201:6–17, 202:17–203:8, 176:8–177:11.

Ultimately, all that Plaintiffs' experts can say is that Flock camera data enable inferences or

deductions to "narrow down" a list of places where Plaintiffs "might have been"—or rule out where they did not go.  Ex. 19 [Higdon-Topaz Dep.] at 183:2–5.  Even if that were true, it would be immaterial to the relevant legal issue.  Although it is not the law that "inference insulates a search," *Carpenter*, 585 U.S. at 312, it also is not the law that any inference *creates* a Fourth Amendment search.  The law does not require police to obtain a warrant for any tool that enables them to make inferences that could advance an investigation.  Observing a vehicle or its license plate on a public street with the naked eye also supports an inference that the driver was in a general area, but the Supreme Court has held that such observations are not searches.  *Class*, 475 U.S. at 114.

Rather, the Fourth Amendment standard that governs this case is the one that Plaintiffs invoked in their Complaint:  whether using LPRs enables NPD to track the "whole of [a person's] physical movements," *Carpenter*, 585 U.S. at 313, such that it "provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations," *id.* at 311 (citation modified).  Plaintiffs have no evidence that NPD's use of the Flock System supports any inference about any such intimate information.  To the contrary, as in the many other cases rejecting the argument that the use of LPRs is a search, the undisputed facts establish that "the Flock cameras exposed no details about where [Plaintiffs] traveled, what businesses [they] frequented, with whom [they] interacted in public, or whose homes [they] visited, among many other intimate details of [their] life." *Jackson*, 2025 WL 1530574, at *8 (citation modified).

## CONCLUSION

Like every other federal court that has decided the issue, this Court should reject Plaintiffs' Fourth Amendment challenge to the use of LPRs, which help law enforcement agencies across the country to respond to emergencies in real time and solve and prevent crime.  NPD does not need a warrant to use information about vehicles on public streets to protect people in Norfolk.

THE CITY OF NORFOLK and
MARK TALBOT


/s/
Karla J. Soloria (VSB 82674)
Assistant City Attorney
Adam D. Melita (VSB 41716)
Chief Deputy City Attorney
karla.soloria@norfolk.gov
adam.melita@norfolk.gov
City of Norfolk Department of Law
810 Union Street, Suite 900
Norfolk, VA 23510
Telephone:  (757) 664-4529
Facsimile:  (757) 664-4201

*Attorneys for Defendants the City of Norfolk
and Mark Talbot*

E. Martin Estrada (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
(213) 683-9100
Martin.Estrada@mto.com

Jonathan I. Kravis (*pro hac vice*)
Lauren E. Ross (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue, NW, Suite 500E
Washington, D.C. 20001
(202) 220-1100
Jonathan.Kravis@mto.com
Lauren.Ross@mto.com

Justin P. Raphael (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105
(415) 512-4000
Justin.Raphael@mto.com

*Attorneys for Defendant the City of Norfolk*

31

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of September, 2025, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a copy of the foregoing to the following:

Michael B. Soyfer, Esq. (NY Bar # 5488580; DC Bar # 230366)
Robert Frommer, Esq. (VA Bar #70086)
Joshua Windham, Esq. (NC Bar #51071)
Tahmineh Dehbozorgi, Esq. (DC Bar #90030252)
Jessica Bigbie, Esq. (TX Bar #24134429)
James T. Knight, II (DC Bar #1671382)
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203-1854
703-682-9320 phone
703-682-9321 fax
rfrommer@ij.org
jwindham@ij.org
msoyfer@ij.org
tdehbozorgi@ij.org
jbigbie@ij.org
jknight@ij.org

*Counsel for Plaintiffs*

/s/
Karla J. Soloria (VSB 82674)
Assistant City Attorney
karla.soloria@norfolk.gov
City of Norfolk Department of Law
810 Union Street, Suite 900
Norfolk, VA 23510
Telephone:  (757) 664-4529
Facsimile:  (757) 664-4201

*Attorney for Defendants the City of Norfolk and Mark Talbot*