# EXHIBIT 2



# HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

# Transcript of Captain Charles Thomas, Corporate Designee

**Date:** July 22, 2025
**Case:** Schmidt and Arrington -v- City of Norfolk, et al.

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
www.planetdepos.com
Michigan #8598 | Nevada #089F | New Mexico #566

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

HIGHLY CONFIDENTIAL

Transcript of Captain Charles Thomas, Corporate Designee
Conducted on July 22, 2025

1 (1 to 4)

**Page 1**

```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
                       NORFOLK DIVISION
---------------------------------X
LEE SCHMIDT and CRYSTAL ARRINGTON    :
           Plaintiffs                :
       V                             : Civil Case No.
CITY OF NORFOLK and                  : 2:24-CV-00621-MSD-LRL
and MARK TALBOT, in his official     :
Capacity as the Norfolk Chief of     :
Police,                              :
           Defendants                :
---------------------------------X
       HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

       Videotaped 30(b)(6) deposition of the
                    CITY OF NORFOLK
         By and through its Corporate Designee
                CAPTAIN CHARLES THOMAS
             And in his personal capacity
                    Conducted virtually
                   Tuesday, July 22, 2025
                         9:34 a.m.

Job No.: 589830
Pages 1 - 333
Reported by: Dianna C. Kilgalen
Videotaped by: Isaac Weaver
```

**Page 2**

```
         Videotaped deposition of CAPTAIN
CHARLES THOMAS, conducted virtually with all
parties attending remotely.




         Pursuant to Notice, before Dianna C.
Kilgalen, Notary Public for the State of
Maryland.
```

**Page 3**

```
                    A P P E A R A N C E S
ON BEHALF OF THE PLAINTIFFS:
         ROBERT FROMMER, ESQUIRE
         MICHAEL B. SOYFER, ESQUIRE
         TAHMINEH DEHBOZORGI, ESQUIRE
         INSTITUTE FOR JUSTICE
         901 North Glebe Road
         Suite 900
         Arlington, Virginia 22203
         703.682.9320

         JESSICA BIGBIE, ESQUIRE
         INSTITUTE FOR JUSTICE
         816 Congress Avenue
         Suite 970
         Austin, Texas 78701
         512.480.5936
```

**Page 4**

```
         A P P E A R A N C E S   C O N T I N U E D
ON BEHALF OF THE DEFENDANTS:
         JONATHAN KRAVIS, ESQUIRE
         MUNGER, TOLLES & OLSON, LLP
         601 Massachusetts Avenue, Northwest
         Washington, DC 20001
         202.220.1100
         E. MARTIN ESTRADA, ESQUIRE
         LIAM GENNARI, ESQUIRE
         MUNGER, TOLLES & OLSON, LLP
         350 South Grand Avenue
         50th floor
         Los Angeles, California 90071
         213.683.9100
         CARLA SOLORIA, ESQUIRE
         ADAM MELITA, ESQUIRE
         City of Norfolk
         City Attorney's Office
         810 Union Street, Suite 900
         Norfolk, Virginia 23510
```

Page 5

```
           C O N T E N T S
EXAMINATION OF CAPTAIN CHARLES THOMAS         PAGE
By MR. SOYFER:                                   8
MR. KRAVIS:                                    327

              E X H I B I T S
       (Exhibits attached to the transcript.)
THOMAS DEPOSITION EXHIBIT                     PAGE
   12    Amended Notice of Deposition         332
   13    NORF004032-004035                    332
   14    NORF014661-014670                    332
   15    NORF007695-007702                    332
   16    NORF009761-009767                    332
   17    NORF004715-004723                    332
   18     NORF014089-014091                   332
   19     NORF018093 and NORF018094           332
   20    NORF008166-008168                    332
   21    NORF006895-06901                     332
   22    NORF006843-006846                    332
   23    NORF009843-009851                    332
   24    NORF009665-009670                    332
   25    NORF017584-017589                    332
```

Page 6

```
         E X H I B I T S   C O N T I N U E D
THOMAS DEPOSITION EXHIBIT                     PAGE
   26    NORF017593                           332
   27    Excel spreadsheet                    332
   28    Excel spreadsheet                    332
   29    Excel spreadsheet                    332
```

Page 7

THE VIDEOGRAPHER: Here begins media Number 1 in the videotaped deposition of Captain Charles Thomas in the matter of Lee Schmidt and Crystal Arrington versus the City of Norfolk and Mark Talbot in his official capacity as the Norfolk chief of police, in the United States District Court for the Eastern District of Virginia, Norfolk Division. Case number 2:24-CV-00621-MSD-LRL.

Today's date is July 22nd, 2025. The time on the video monitor is 9:34.

The remote videographer today is Isaac Weaver representing Planet Depos.

All parties of this video deposition are attending remotely.

Would counsel please voice identify themselves and state whom they represent?

MR. SOYFER: Michael Soyfer from the Institute for Justice on behalf of plaintiffs. I'm joined by my colleagues Robert Frommer, Jessica Bigbie and Tahmineh Dehbozorgi.

MR. KRAVIS: Jonathan Kravis on behalf

Page 8

of the defendants and the witness. I'm joined today by my colleagues from MTO, Martin Estrada and Liam Gennari. I'm also joined by my co-counsel, the city attorneys from the City Attorney's Office, Adam Melita and Carla Soloria.

THE VIDEOGRAPHER: All right. The court reporter today is Dianna Kilgalen representing Planet Depos. The witness will now be sworn.

P R O C E E D I N G S

CAPTAIN CHARLES THOMAS, having been duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
BY MR. SOYFER:

Q. Good morning. Would you please state your name for the record?

A. Good morning. Charles Michael Thomas.

Q. Okay. And as you just heard, my name is Michael Soyfer. I represent the plaintiffs in this case.

We haven't met before today, correct?

A. Correct.

Q. Are you presently employed, Captain

HIGHLY CONFIDENTIAL
Transcript of Captain Charles Thomas, Corporate Designee
Conducted on July 22, 2025

6 (21 to 24)

**21**

1 lieutenant in charge of special projects.
2         What is special projects?
3     A.   Special projects was really unspecified
4 for that particular reason.
5         I could tell you that when I was
6 assigned there, Chief Boone's directive to me was
7 I want you working on anything that you feel like
8 is going to make the Norfolk Police Department
9 better.
10    Q.   Okay. And during what time frame were
11 you in that role?
12    A.   From -- I believe it was the fall of
13 2021 until August of '23. Yes.
14    Q.   What role did you move into after that?
15    A.   I moved into the role of Captain of the
16 training division.
17    Q.   Okay. Are you still in that role?
18    A.   No, I'm not.
19    Q.   Okay. What role did you move into after
20 becoming Captain of the training division?
21    A.   In April of this year I was transferred
22 to the Strategic Intelligence Division.

**22**

1     Q.   What is the Strategic Intelligence
2 Division?
3     A.   It is the division that houses the Real
4 Time Crime Center as well as the criminal
5 intelligence unit.
6     Q.   Okay. And what is the criminal
7 intelligence unit?
8     A.   The criminal intelligence unit has
9 investigators. They monitor things such as
10 threats against dignitaries, providing safety and
11 security during council meetings. It also houses
12 crime analysts.
13    Q.   What do you mean by threats against
14 dignitaries?
15    A.   So if there was a threat against say a
16 city council member or a judge here in Norfolk or
17 the mayor, they would monitor that, they would
18 investigate that to determine the credibility of
19 such threats.
20    Q.   Well, what are some ways they might
21 investigate that?
22    A.   They would speak to the individuals who

**23**

1 make those threats, go interview them, determine
2 if probable cause exists to effect an arrest.
3         If it's not a criminal threat, then they
4 would -- you know, they would advise the chief of
5 police as well as the dignitary involved. They
6 might set up a security plan for them such as,
7 you know, do they need -- do they need somebody
8 with them for a given amount of time to provide
9 safety and security.
10    Q.   So going back to the Flock cameras, what
11 made Assistant Chief Naughton interested in the
12 Flock cameras?
13    A.   So at the time, we had experienced a
14 significant increase in stolen vehicles here in
15 the City of Norfolk.
16        Also, with that, it was noticed that in
17 stolen vehicles there were stolen guns that were
18 being used for shootings here in the City of
19 Norfolk, shootings into occupied dwellings,
20 shootings into occupied vehicles, shootings of
21 people.
22        So the police department was looking for

**24**

1 a tool to help reduce those crimes in effect to
2 reduce gun violence in the City of Norfolk.
3     Q.   How did the Flock cameras help achieve
4 that goal?
5     A.   The Flock cameras at that time, it was
6 our belief that would help us solve stolen autos
7 by being able to arrest offenders more quickly,
8 thus reducing their opportunity to commit
9 shootings here in the City of Norfolk.
10    Q.   How does it help you arrest offenders
11 more quickly?
12    A.   So if a stolen vehicle passes by a Flock
13 camera, officers are alerted to that. Officers
14 are then going to the location where it was last
15 seen going through a camera and they search for
16 that vehicle. If they are able to locate that
17 vehicle, they will then verify that the vehicle
18 is in fact stolen and then they would stop that
19 vehicle and make an arrest, or further their
20 investigation into that to determine if the
21 person driving was a suspect and continue on in
22 their investigation. If it required for an

25

1 arrest, that's what they would do.
2   Q.   And could they continue on their
3 investigation using information from the Flock
4 cameras?
5   A.   I'm not sure I understand the question.
6   Q.   Yeah. I guess you said that, you know,
7 if they didn't make an arrest at that moment,
8 they could then continue on their investigation.
9 How would they continue on their investigation?
10   A.   I'm not sure that I said if they don't
11 make an arrest they could continue.
12         MR. SOYFER: Okay.
13   A.   So if -- if the person -- let me start
14 over.
15         The Flock camera provides information
16 that a stolen vehicle passed through a Flock
17 camera at any -- at any given -- at any given
18 time, at a time and location. So it tells an
19 officer that a vehicle that has been reported
20 stolen through the NCIC/VCIN system has -- was
21 seen in that area.
22         Officers will respond to that area and

26

1 then search for the vehicle because the Flock
2 camera is not going to tell them where it went
3 after it passed through that location.
4         So if they were able to locate that
5 vehicle, they would attempt a traffic stop. And
6 if the investigation showed that that person was
7 a suspect, they would make the arrest on that.
8   Q.   Okay. And so would -- so I guess -- you
9 mentioned alerts. If I call those hot list
10 alerts, is that -- is that a reasonable
11 terminology to use, or what would you call it?
12   A.   No. They may be separate.
13         MR. SOYFER: Okay.
14   A.   So the reason why they might be separate
15 is a hot list alert requires an officer or
16 investigator to enter the vehicle into the Flock
17 system to create an alert.
18         A stolen auto automatically goes into
19 the system through NCIC/VCIN and will alert
20 officers when it passes through. So those are
21 two separate ways.
22         They are alerts either way, but a hot

27

1 list alert specifically pertains to officers and
2 investigators who have manually input a vehicle
3 into the hot list.
4   Q.   Okay. And other than receiving alerts,
5 was there any other reason or purpose for which
6 Norfolk was interested in acquiring the Flock
7 cameras? And this is thinking back to 2022.
8   A.   Well, I kind of want to clear that up.
9         We didn't get it for the purpose of
10 getting alerts. We got it for the purpose of
11 helping solve crime and diminish violent crime in
12 Norfolk.
13         So the idea wasn't to just get alerts.
14 I mean, the Flock system assists us in other ways
15 as well. It can assist in finding missing
16 people. It can assist us in locating vehicles
17 who have been involved with Amber alerts.
18         So it wasn't just to get an alert. But
19 what we used -- the plan was to use the system in
20 that manner, was to assist us in those ways as
21 well.
22   Q.   Okay. One of the purposes for which you

28

1 wanted to use the Flock system back in 2022 was
2 to investigate crime. Is that right?
3   A.   Yes.
4   Q.   How would you use the Flock cameras to
5 assist in finding missing people?
6   A.   So when a family member reports an
7 individual as missing, one of the questions we
8 would ask is are they driving a vehicle, are they
9 associated with any vehicles.
10         If they are, we can put that vehicle
11 license plate into a hot list, or it will come up
12 as a missing person alert because of NCIC/VCIN.
13         So if the missing person is associated
14 with a vehicle and that vehicle has a license
15 plate, it would provide us an alert that that
16 vehicle has passed through a particular location
17 at a specific time.
18         Officers would then be able to go to
19 that area, search for the vehicle. In the event
20 that it was located, the hope is that they would
21 be able to locate the missing person as well.
22   Q.   Could you also look up where that

29
1  vehicle has been in -- has been seen in the past?
2    A.   Yes, you could.
3    Q.   Okay.  Is that helpful?
4    A.   It would be helpful, yes.
5    Q.   Why is it helpful to look up where the
6  vehicle has been seen in the past?
7    A.   It would be helpful because if that
8  person was traveling in a -- in an area multiple
9  times a day and that person is either associated
10 with a crime or is a missing person, it may give
11 the officer a clue as to what area of the city
12 that person might be staying for that particular
13 moment, for that time frame.
14   Q.   Okay.  So the officer could look for
15 patterns, right?
16   A.   They could, yes.
17   Q.   And that would provide a clue that might
18 help the officer find where that person is.  Is
19 that your testimony?
20   A.   It could assist with that, yes.
21   Q.   Okay.  So you mentioned Assistant Chief
22 Naughton.  Who else was involved in the decision

30
1  to acquire Flock cameras?
2    A.   Deputy Chief Maslow.
3    Q.   And what are Deputy Chief Maslow's
4  responsibilities?
5    A.   His current responsibilities?
6    Q.   Let's think back to 2022 when this
7  decision was being made.
8    A.   His -- his day-to-day job was to run the
9  operations of the police department on a daily
10 basis.
11   Q.   Okay.  So he kind of had overall
12 responsibility --
13   A.   Yes.
14   Q.   -- for the police department?
15        Okay.  Anyone else other than Deputy
16 Chief Maslow?
17   A.   I'm sure there are others, but at the
18 time that's who I was interacting with on a
19 regular basis.
20   Q.   Okay.  And so after Assistant Chief
21 Naughton sort of expressed this interest
22 following the conference she attended in Texas,

31
1  what steps did the City of Norfolk take to
2  investigate the Flock cameras?
3    A.   We invited Flock Safety in to provide us
4  with a presentation on the capabilities of the
5  Flock cameras.
6    Q.   And when was that?
7    A.   I don't know the exact date.  If you --
8  if you had a document that showed that, I
9  would -- it would refresh my memory.
10        MR. SOYFER:  Okay.
11   A.   But off the top of my head, I don't have
12 a specific date.
13   Q.   Did the City of Norfolk consider any
14 other companies that make license plate reader
15 cameras during that process?
16   A.   No, not at that time.
17   Q.   Why not?
18   A.   Because Flock Safety was going to
19 provide us with what we were trying to do.
20        Additionally, Flock was already in our
21 area.  They were in Hampton.  They were in
22 Chesapeake and Suffolk.  And so as a

32
1  regionalization, it would be helpful to be able
2  to share information regionally to help with the
3  same problems that I have already -- I have
4  already described.
5         So because of that, we thought it was in
6  the best interest of the City of Norfolk and the
7  citizens to purchase the Flock Safety product
8  because it provided us with what we wanted and
9  needed as well as the ability to work with and
10 communicate with our neighboring cities.
11   Q.   And why is that helpful?
12   A.   Because people driving vehicles don't
13 typically stay in one city.  So they traverse to
14 and from cities around here.  The Hampton Roads
15 area is pretty tightly connected.  And so those
16 who are either missing or stolen vehicles or
17 those who commit crimes tend to pass through the
18 neighboring cities on a regular basis.  So that's
19 why it would be helpful.
20   Q.   So you can -- if someone commits a crime
21 in Norfolk, you can continue to follow them into
22 the neighboring jurisdictions.  Is that right?

33

1  A.  So --
2      MR. KRAVIS:  Objection.
3  Mischaracterizes prior testimony.  Go ahead.
4  A.  So I would say that you could follow
5  them.  The word follow would not be accurate.
6      Again, the system allows us to place
7  somebody at a particular location at a particular
8  time.
9      MR. SOYFER:  Okay.
10 A.  It simply tells us that they passed
11 through that location.  And if we deem necessary,
12 we could send officers or investigators to that
13 area to try to locate that person.
14 Q.  Okay.  But you can't send -- well, tell
15 me, can you send officers or investigators into
16 other jurisdictions to locate a person?
17 A.  Yes, we can.
18 Q.  Okay.  So you can send them into, say,
19 Chesapeake or Portsmouth?
20 A.  Yes, we can.
21 Q.  Okay.  Does that require any
22 coordination with those jurisdictions to be able

34

1  to do that?
2  A.  Not typically, no.  I mean, if -- if we
3  need to, we can -- we can simply call over there
4  and let them know we are in their city looking
5  for a vehicle.
6  Q.  Did you reach out to any other Hampton
7  Roads jurisdictions during the process of
8  deciding to buy the Flock cameras?
9  A.  I did.  I reached out to Newport News.
10 I reached out to Chesapeake.  And I believe I
11 spoke with Suffolk as well.
12 Q.  And why did you reach out to them?
13 A.  I reached out to them to ask if they
14 thought the Flock Safety system was a worthwhile
15 system, to ask them if it had actually assisted
16 in solving crimes that we were interested in
17 solving, if it actually did assist them in
18 locating stolen vehicles and then subsequently
19 arresting individuals involved in stolen
20 vehicles.
21 Q.  Did you discuss sharing information with
22 those jurisdictions?

35

1  A.  We did at some point.  I can't tell you
2  if it was before we purchased the product or
3  after, but we did eventually discuss sharing
4  data, yes.
5  Q.  Okay.  When Norfolk made the decision to
6  purchase the Flock cameras, was the assumption
7  that data would be shared across these
8  jurisdictions?
9  A.  Yes.
10 Q.  And so you mentioned that Flock
11 presented to you about the capabilities of the
12 Flock cameras during the -- during your
13 decision-making process.  Is that right?
14 A.  Yes.
15 Q.  Okay.  Do you know who from Flock made
16 that presentation?
17 A.  It was Dan Mento.
18 Q.  Okay.  And who from the Norfolk Police
19 Department attended?
20 A.  I was there.  The deputy chief was
21 there.  We had some IT folks there.
22     Anything technology related, we always

36

1  invite IT just to ensure we cover that -- that
2  basis.
3  Q.  Was Assistant Chief Naughton there?
4  A.  I don't recall if she was there or not.
5  Q.  Okay.  And so you mentioned the
6  presentation was about the capabilities of the
7  Flock system.  Is that right?
8  A.  Yes.
9  Q.  What capabilities of the Flock system
10 stood out to you?
11 A.  Its ability to send the alert when a
12 stolen vehicle had passed through it.  Its
13 ability to send us an alert when a vehicle
14 associated with a missing person had passed
15 through it.  Those were the -- those were the key
16 aspects for us.
17 Q.  Do you know what vehicle fingerprint is?
18 A.  No.  That's not a term that I recall
19 hearing.
20 Q.  Okay.  Do any of the -- did the ability
21 to search within the Flock system -- sorry.
22 Scratch that.

Page 37

1  Was the ability to search within the
2  Flock system a feature that you thought would be
3  useful during that presentation?
4     A.   Yes.
5     Q.   And why?
6     A.   Because if we had an incident that
7  occurred involving a vehicle, it would give us
8  the ability to locate that vehicle. And with the
9  hope of associating an individual with a vehicle
10 who may have committed a crime, to get that
11 person arrested and off the streets as quickly as
12 possible.
13    Q.   Why does it help you associate an
14 individual with a vehicle?
15    A.   I don't think I said it helps us
16 associate a person.
17         If we can identify the vehicle, that
18 identification would associate that person with a
19 vehicle.
20    Q.   Did the ability of the system to store
21 data for up to 30 days at a time appeal to the
22 City of Norfolk?

Page 38

1     A.   It did. I don't -- I don't think the
2  amount of days itself specifically was an appeal.
3  The fact that it could provide us with some
4  historical data was -- was good in my opinion.
5     Q.   Why is it good that the system could
6  provide you with some historical data?
7     A.   Because oftentimes people report late
8  crimes that have occurred. They report multiple
9  days after somebody has gone missing. And the
10 ability to go back, at the time 30 days, was --
11 would be useful to us for that purpose.
12    Q.   Is that the only reason it was useful?
13    A.   I can't think of any other reason it
14 would be useful other than trying to investigate
15 a crime that occurred within that 30-day time
16 frame.
17    Q.   Did any -- have you heard the term
18 machine learning in connection with Flock?
19    A.   Yes.
20    Q.   Are you aware of any machine learning
21 features in the Flock system?
22    A.   I couldn't speak specifically to the

Page 39

1  machine learning itself, but I have heard the
2  phrase, yes.
3     Q.   Was that something that appealed to the
4  City of Norfolk when making the decision to
5  acquire the Flock cameras?
6     A.   It was not a deciding factor, no.
7     Q.   How many cameras did the City of Norfolk
8  decide to acquire from Flock?
9     A.   Initially we acquired 172.
10    Q.   Has that number changed since then?
11    A.   Yes. We added four at some point in the
12 last several months. So the total is 176.
13    Q.   Okay. We will come back to that.
14         But just thinking about 2022, and over
15 the course of making this decision to acquire
16 Flock cameras, did the number of Flock cameras
17 the City of Norfolk planned to acquire change
18 over time?
19    A.   During the purchase process?
20         MR. SOYFER: Yes.
21    A.   Not in particular.
22         I mean, the initial idea from the deputy

Page 40

1  chief was let's see what 20 cameras looks like.
2         We had no idea what -- what the system
3  was, what it looked like.
4         But that was not a directive that was
5  given that we had to stay within or anything like
6  that. It was let's just see what 20 looks like
7  and let's go from there.
8         So yeah, to some degree, I mean, it
9  changed, but we didn't go into it with a
10 predetermined amount of cameras that we were
11 going to get.
12    Q.   What guided your decision on the number
13 of cameras to buy?
14    A.   So throughout the process of identifying
15 the locations, we did not have a number of
16 cameras in mind.
17         I met with Flock multiple times to go
18 over locations in the City of Norfolk that had
19 high propensity for violence. So we looked at
20 heat maps that were created to show that and we
21 went through those maps location by location to
22 determine where we would put cameras that would

HIGHLY CONFIDENTIAL
Transcript of Captain Charles Thomas, Corporate Designee
Conducted on July 22, 2025

11 (41 to 44)

---

**41**

1  assist us in those investigations.
2         And at the end, they advised us that it
3  would take 172 cameras to do that.
4    Q.   When you say they advised us, you meant
5  Flock advised you that it would take 172 cameras?
6    A.   Yes.
7    Q.   And did they explain specifically why
8  that would take 172 cameras?
9    A.   Yes. I mean, that's -- we plotted 172
10 locations.
11        And when I say locations, one
12 intersection itself takes four cameras to -- to
13 get a visual on that intersection because of
14 vehicles traveling in all four directions. So
15 that's -- that's why.
16   Q.   Okay. And are the hot spots always
17 right at intersections?
18        MR. KRAVIS: Objection. Vague.
19   A.   So they're -- no, not necessarily.
20 They could be on a street. They could be at an
21 intersection. They could be at a neighborhood.
22 So . . .

**42**

1    Q.   And so is the idea to place cameras at
2  the intersections around hot spots?
3    A.   Yes.
4    Q.   And why -- why is that useful to place
5  them at the intersections?
6    A.   So if a vehicle has been associated with
7  somebody who committed a crime, if that vehicle
8  passes through that intersection, there would be
9  evidence of that that we could follow up on.
10   Q.   Okay. And do you have to place cameras
11 at multiple intersections around hot spots, in
12 general?
13        MR. KRAVIS: Objection. Vague.
14   A.   In order to -- yes, you would have to
15 place cameras at multiple intersections.
16        Let's just say a neighborhood is a hot
17 spot. You would look to place cameras in the
18 most likely intersection a vehicle would pass
19 through to leave that neighborhood or to come
20 into that neighborhood.
21   Q.   Was one of your goals in mapping out the
22 Flock cameras to prevent people who committed

**43**

1  crimes from being able to find routes around the
2  Flock cameras to get out of those hot spots?
3    A.   Yes.
4    Q.   How did Norfolk decide on the -- well,
5  let me ask you.
6         The contract with Flock is a five-year
7  contract. Is that right?
8    A.   Yes. That sounds right. Yes. Without
9  seeing the contract in front of me, that sounds
10 right.
11   Q.   How was the decision made to enter into
12 a multi-year contract like that?
13   A.   I don't know that there was discussion
14 about it. That was just what they -- they
15 presented with us, a five-year contract, to
16 maintain the pricing for that five years.
17        So in order to maintain the pricing,
18 that seemed like the best -- the best course of
19 action for us.
20   Q.   Are you familiar with Falcon Flex
21 cameras from Flock?
22   A.   I am, yes.

**44**

1    Q.   What are those?
2    A.   They are mobile Falcons that you could
3  place at different locations. So they are not
4  affixed to the ground.
5    Q.   Has -- has the City of Norfolk ever
6  looked into acquiring Falcon Flex cameras?
7    A.   We asked them if we could test one and
8  they would not allow us to test one. So the
9  discussion ended with that.
10   Q.   Okay. Are there any other Flock
11 products that you are aware of other than the
12 Falcon and Falcon Flex cameras?
13   A.   They have the Raven which is a gunshot
14 detection camera. The camera is not going to --
15 it has a gunshot detection device. Also a camera
16 system with it is my understanding.
17        They also have a Real Time Crime Center
18 platform with live view type of cameras.
19        I'm not familiar with anything else
20 other than those.
21   Q.   Have you ever heard that Flock has the
22 ability to turn live view cameras into license

Case 2:24-cv-00621-MSD-LRL    Document 114-2    Filed 09/15/25    Page 11 of 14
PageID# 2424

HIGHLY CONFIDENTIAL
Transcript of Captain Charles Thomas, Corporate Designee
Conducted on July 22, 2025

31 (121 to 124)

**121**

1  what Councilman Smigiel means when he writes
2  about trying to follow a pattern of a car that
3  gets picked up on Flock?
4  　　　MR. KRAVIS: Objection. Calls for
5  speculation.
6  　A.　Yeah. I don't know. I think it's his
7  misunderstanding of what the Flock system does.
8  　Q.　Okay. If you go up to the next e-mail,
9  you will see there is an e-mail from Chief Talbot
10 to Councilman Smigiel basically saying that he is
11 going to ask his team to weigh in. Do you see
12 that?
13 　A.　Yes.
14 　Q.　Okay. And then the very top e-mail,
15 it's from Deputy Chief Maslow to Amanda Deloatch
16 and cc'ing Chief Talbot. Do you see that?
17 　A.　Yes.
18 　Q.　And Deputy Maslow writes: Amanda,
19 please send once you have reviewed. Thanks, MCM.
20 　　　So this is a message that he's written
21 for Ms. Deloatch to send to the councilman,
22 correct?

**122**

1  　A.　Correct.
2  　Q.　So I'm going to go -- skip from the
3  beginning of this paragraph and go one, two,
4  three, four sentences in to the sentence starting
5  with as such. Let me know when you are there.
6  　A.　I'm there.
7  　Q.　So he writes: As such, while working
8  with a limited number of cameras, we prioritized
9  locations of the Flock Safety cameras by
10 examining high priority calls for service,
11 concentrated violent crime data and city ingress
12 and egress routes.
13 　　　Did I read that correctly?
14 　A.　Yes.
15 　Q.　And is that a true and accurate
16 description of how the cameras were placed?
17 　A.　It is.
18 　Q.　He then goes on: We believe the current
19 placement of the cameras allows us to identify
20 and arrest the most violent offenders within our
21 community while also limiting unnecessary contact
22 with law enforcement for most citizens.

**123**

1  　　　Do you see that?
2  　A.　Yes.
3  　Q.　And does that truly and accurately
4  capture the belief of the NPD about the current
5  placement of the cameras?
6  　A.　Yes.
7  　Q.　What does he mean when he writes that it
8  allows limiting unnecessary contact with law
9  enforcement for most citizens?
10 　A.　I don't know what exactly he means by
11 that.
12 　Q.　Okay. I mean, what would qualify as
13 unnecessary contact with law enforcement?
14 　　　MR. KRAVIS: Objection. Vague. Calls
15 for speculation.
16 　A.　Yeah. I'm just not sure what exactly he
17 meant by that. I don't -- I don't know.
18 　Q.　Okay. Is a car being captured by a
19 Flock camera -- well, scratch that. Let me start
20 that over.
21 　　　If a car is photographed by one of the
22 Norfolk Police Department's Flock cameras, is

**124**

1  that contact with law enforcement?
2  　A.　It is not.
3  　Q.　Okay. So he goes on: Working with a
4  limited number of cameras, it was impossible to
5  cover all the areas in the city that would
6  benefit from coverage.
7  　　　Did I read that correctly?
8  　A.　Yes.
9  　Q.　And is he correct that with the number
10 of cameras it was impossible to cover all the
11 areas in the city that would benefit from
12 coverage?
13 　A.　Yes.
14 　Q.　And so there are areas in the city that
15 would benefit from coverage that as of this
16 e-mail did not have cameras, correct?
17 　A.　Correct. Yeah.
18 　Q.　Is that also correct today?
19 　A.　It is.
20 　Q.　He writes: In some instances we
21 installed cameras at the primary gateways leading
22 into and out of some areas in an effort to

HIGHLY CONFIDENTIAL
Transcript of Captain Charles Thomas, Corporate Designee
Conducted on July 22, 2025

82 (325 to 328)

---

325

1  Q.  Okay. Just personally day to day, how
2  do you use Flock in your day-to-day job at if at
3  all?
4  A.  I do not.
5  Q.  Okay. You don't personally access the
6  system to go search anything like that?
7  A.  I don't.
8  Q.  Okay. Do you still -- I should ask
9  today, do you still approve and remove users from
10 the system, or is that primarily Sergeant
11 Gauthier and Lieutenant Vernon?
12 A.  Yes, it's primary -- it's primarily the
13 sergeant and lieutenant, yes.
14 Q.  Okay. Do you still meet with Flock on
15 occasion, thinking -- let's mostly say this year?
16 A.  No, I have not.
17 Q.  Okay. Have you ever attended any Flock
18 conferences?
19 A.  No, I haven't.
20 Q.  Okay. Have you attended any webinars
21 with Flock?
22 A.  Not that I can think of.

326

1  Q.  Have you ever been employed by Flock?
2  A.  So when they did the installation of the
3  cameras, they wanted police officers there with
4  the installer. So I, along with several other
5  police officers, worked for them as, I guess you
6  would say, a private contractor just to provide,
7  you know, security for them to close a lane of
8  traffic or something like that.
9  Q.  Okay. And that was something Flock paid
10 for?
11 A.  Yes.
12 Q.  Did you have to get that approved by a
13 supervisor or someone else in the city?
14 A.  Yes.
15 Q.  Okay. And what -- just briefly what is
16 that process?
17 A.  Yeah, I submitted a form to my
18 supervisor who at the time was Deputy Chief
19 Maslow indicating what kind of work it was.
20 Once he approves it, then I'm able to
21 work it.
22 Q.  Do you recall how much Flock paid you

327

1  for that?
2  A.  I don't.
3      MR. SOYFER:  Okay. So subject to any
4  redirect, those are all of my questions.
5      MR. KRAVIS:  Great. Captain, I just
6  want to follow up on a couple of topics real
7  quick.
8      Madam Court Reporter, you can hear me
9  okay?
10     THE REPORTER:  Yes, sir.
11     MR. KRAVIS:  Great. Just making sure
12 because of where I am sitting.
13     EXAMINATION BY COUNSEL FOR THE DEFENDANTS
14 BY MR. KRAVIS:
15 Q.  First, you testified a little bit
16 earlier about an incident that involved a photo
17 taken by a Flock camera that happened to show in
18 the background an individual that was holding a
19 gun. Do you remember that?
20 A.  Yes.
21 Q.  I just want to clarify one thing about
22 this.

328

1      I think I heard you testify that that
2  photograph was disseminated.
3      Do you remember that?
4  A.  Yes.
5  Q.  Just to be clear, the photo was
6  disseminated within the Norfolk Police
7  Department, right?
8  A.  Correct.
9      MR. SOYFER:  Object to form.
10 Q.  Okay. So when you said disseminated,
11 you meant disseminated within the police
12 department, not disseminated to like the general
13 public. Do I have that right?
14     MR. SOYFER:  Object to form.
15 A.  Yes.
16 Q.  One other thing, a little bit earlier
17 today, my colleague was asking you about uses of
18 the Flock system and you gave an answer in which
19 you were talking about how the Flock cameras do
20 not tell you where the car stopped. Do you
21 remember that?
22 A.  Yes.

Case 2:24-cv-00621-MSD-LRL    Document 114-2    Filed 09/15/25    Page 13 of 14
PageID# 2426

HIGHLY CONFIDENTIAL
Transcript of Captain Charles Thomas, Corporate Designee
Conducted on July 22, 2025

83 (329 to 332)

**329**

1  Q.  And I think my colleague at that point
2  objected and moved to strike the response.
3      So I'm just going to ask you now to get
4  on the record here, what did you mean when you
5  were saying, you know, in the context of how the
6  police department uses the Flock cameras, that
7  the Flock cameras do not show you where the
8  vehicle stops?  What exactly do you mean by that?
9      MR. SOYFER:  Object to form.
10  A.  So what I mean by that is if a vehicle
11  is traveling to and from a business or a house or
12  anywhere, for that matter, it's not going to tell
13  us that.  I don't know where they came from and I
14  don't know where they are going.
15      The Flock camera only tells us that a
16  person passed a camera at a particular location
17  at a particular time and that's it.
18      So I don't know if they have gone to a
19  house or a residence or a business or anywhere
20  else for that matter.
21      So I don't know when or where they
22  stopped at all.  So that's it.

**330**

1  Q.  And so just as a general matter, in
2  light of that limitation that you've described,
3  that the Flock camera doesn't tell you where the
4  person is going, it just tells you whether the
5  vehicle has passed a particular camera at a
6  particular time, in light of that limitation, how
7  does the police department use Flock cameras?
8      MR. SOYFER:  Object to form.
9  A.  It utilizes it by giving us an
10  investigative tool to send officers to the
11  location to complete an additional search.
12      So if a vehicle passes by and that
13  vehicle is of interest, I will just use that as a
14  blanket term, because it applies to one of those
15  things we talked about all day long, an officer
16  will go to the location where it last passed and
17  search for that vehicle.
18      If they find that vehicle, they will
19  use, you know, investigative means to identify
20  the occupants or driver or what have you,
21  depending on the situation, to try to identify
22  those who are in the vehicle to help further the

**331**

1  investigation they are working on, whatever that
2  may be.
3      So they use that information to send
4  them to an area of the city to continue a search.
5      MR. KRAVIS:  Thank you.  That was all I
6  had.
7      MR. SOYFER:  I have no further
8  questions.
9      THE VIDEOGRAPHER:  All right.  I will
10  take us off.
11      This concludes today's deposition.  The
12  time on the monitor is 1714.
13      (Thereupon, there was a discussion off
14  the record.)
15      THE REPORTER:  Counsel, can I get
16  transcript orders, please?
17      MR. SOYFER:  I think we have a standing
18  order.  Ours is normal turnaround time and we
19  order the video same normal turnaround time.
20      MR. KRAVIS:  Yeah, I think for MTO we
21  have a standing order as well.
22      (Thereupon, there was a discussion off

**332**

1  the record.)
2      THE VIDEOGRAPHER:  We are back on the
3  record.  The time on the monitor is 1716.
4      MR. KRAVIS:  Sorry.  Just one last
5  thing.
6      Noting for the record that the City is
7  designating as highly confidential under the
8  protective order the portions of the testimony
9  that concern the attorney's eyes only documents.
10  And we will follow up with specific page and line
11  numbers for those designations.
12      THE REPORTER:  Thank you.
13      THE VIDEOGRAPHER:  This concludes
14  today's deposition.  We are going off the record.
15  The time on the monitor is 1716.
16      (Off the record at 4:16 p.m.)
17      (Whereupon, Thomas Deposition Exhibits
18  7, 8, 12-29 were marked for identification and
19  attached to the transcript.)
20
21
22

HIGHLY CONFIDENTIAL
Transcript of Captain Charles Thomas, Corporate Designee
Conducted on July 22, 2025

84 (333 to 336)

```
                                          333
1       CERTIFICATE OF SHORTHAND REPORTER
2              NOTARY PUBLIC
3          I, Dianna C. Kilgalen, the officer
4   before whom the foregoing deposition was taken,
5   do hereby certify that the foregoing transcript
6   is a true and correct record of the testimony
7   given; that said testimony was taken by me
8   stenographically and thereafter reduced to
9   typewriting under my direction; that reading and
10  signing was not requested; and that I am neither
11  counsel for, related to, nor employed by any of
12  the parties to this case and have no interest,
13  financial or otherwise, in its outcome.
14         IN WITNESS WHEREOF, I have hereunto set
15  my hand and affixed my notarial seal this 31st
16  day of July, 2025.
17  My commission expires June 28th, 2029.
18     [signature: Dianna C. Kilgalen]
19  _____
20  NOTARY PUBLIC
21  IN AND FOR THE STATE OF MARYLAND
22  COUNTY OF HARFORD
```