# EXHIBIT 10



# Transcript of Jason Gauthier

**Date:** July 16, 2025
**Case:** Schmidt and Arrington -v- City of Norfolk, et al.

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
www.planetdepos.com
Michigan #8598 | Nevada #089F | New Mexico #566

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

### Page 1

```
1        IN THE UNITED STATES DISTRICT COURT
2         FOR THE EASTERN DISTRICT OF VIRGINIA
3                   NORFOLK DIVISION
4  --------------------------------X
5  LEE SCHMIDT and CRYSTAL          :
6  ARRINGTON,                       :
7               Plaintiffs,         :
8        v.                         : Civil Action No:
9                                   : 2:24-cv-00621-MSD-LRL
10 CITY OF NORFOLK and MARK TALBOT, :
11 in his official capacity as the  :
12 Norfolk Chief of Police,         :
13              Defendants.         :
14 --------------------------------X
15
16          DEPOSITION OF JASON GAUTHIER
17     APPEARING REMOTELY FROM NORFOLK, VIRGINIA
18             WEDNESDAY, JULY 16, 2025
19                   9:30 A.M.
20
21
22
23 Job No.: 589828
24 Pages 1 - 199
25 Reported by: Adrienne Mignano, RPR
```

### Page 2

```
1        Deposition of JASON GAUTHIER, held via Zoom
2  videoconferencing, Pursuant to Notice, before
3  Adrienne M. Mignano, a Registered Professional
4  Stenographic Reporter and Notary Public
```

### Page 3

```
1                    A P P E A R A N C E S
2
3  ON BEHALF OF PLAINTIFFS:
4      TAHMINEH DEHBOZORGI, ESQUIRE
5      ROBERT FROMMER, ESQUIRE
6      JESSICA BIGBIE, ESQUIRE
7      MICHAEL SOYFER, ESQUIRE
8      JOSH WINDHAM, ESQUIRE
9      INSTITUTE FOR JUSTICE
10     901 North Glebe Road
11     Suite 900
12     Arlington, Virginia 22203
13     703.682.9320
14
15
16 ON BEHALF OF DEFENDANTS - CITY OF NORFOLK AND
17 THE WITNESS
18     JONATHAN KRAVIS, ESQUIRE
19     LAUREN ROSS, ESQUIRE
20     MUNGER TOLLES & OLSON LLP
21     601 Massachusetts Avenue NW
22     Suite 500 E
23     Washington, D.C. 20001
24     202.220.1100
25
```

### Page 4

```
1  APPEARANCES (Continued)
2
3     ON BEHALF OF DEFENDANTS
4         ADAM MELITA, ESQUIRE
5         NORFOLK COMMONWEALTH ATTORNEY
6         800 E. City Hall Avenue
7         Suite 600
8         Norfolk, Virginia 23510
9         757.664.4444
10
11     ALSO PRESENT:
12         Jon Thompson - Videographer
13         Josetta Edwards - Court Reporter Trainee
```

Page 5

```
        C O N T E N T S

EXAMINATION OF JASON GAUTHIER            PAGE
        By Ms. Dehbozorgi                7
        By Mr. Kravis                    193

        E X H I B I T S
        (Attached to the transcript)
GAUTHIER DEPOSITION EXHIBITS             PAGE
Exhibit 1  E-mail chain, top e-mail from  84
           Derrick Vernon to Jason Gauthier
           dated 1-17-25
Exhibit 2  E-mail chain, top e-mail from  91
           Greg Sheehan to Jason Gauthier
           dated 11-1-24
Exhibit 3  E-mail from Mike Thomas to    138
           Derrick Vernon dated 4-9-25 plus
           attachments
Exhibit 4  Memorandum to All Commands from 172
           Chief of Police dated 6-30-25
```

Page 6

THE VIDEOGRAPHER: Here begins Media Number 1 in the videotaped deposition of Sergeant Jason Gauthier in the matter of Lee Schmidt and Crystal Arrington versus the City of Norfolk and Mark Talbot, in his official capacity as the Norfolk Chief of Police, in the United States District Court for the Eastern District of Virginia, Norfolk Division; Case Number 2:24-cv-00621-MSD-LRL.

Today's date is July 16, 2025. The time on the video monitor is 9:33 a.m. The remote videographer today is Jon Thompson, representing Planet Depos. All parties of this video deposition are attending remotely.

Would counsel please voice identify themselves and state whom they represent.

MS. DEHBOZORGI: My name is Tahmineh Dehbozorgi with Institute for Justice, and I represent the plaintiffs.

MR. KRAVIS: My name is Jonathan Kravis, from the law firm Munger, Tolles & Olson, representing the defendants and the witness. I'm joined today by Adam Melita from the city attorney's office and my colleague Lauren Ross, who is remote.

Page 7

MR. FROMMER: This is Robert Frommer. I'm representing plaintiffs, with the Institute for Justice.

MR. SOYFER: Michael Soyfer, from the Institute for Justice, on behalf of plaintiffs.

MR. WINDHAM: Josh Windham, Institute for Justice, on behalf of plaintiffs.

MS. BIGBIE: Jessica Bigbie, Institute for Justice, on behalf of the plaintiffs.

THE VIDEOGRAPHER: The court reporter today is Adrienne Mignano, representing Planet Depos. The witness will now be sworn.

Whereupon,
        JASON GAUTHIER,
being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:
        EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
BY MS. DEHBOZORGI:
Q  Good morning, Sergeant.
A  Good morning.
Q  Please state your name and address for the record, please.
A  Jason Gauthier, sergeant.

Page 8

Q  Are you currently employed?
A  Yes, I am.
Q  Where?
A  The City of Norfolk.
Q  And what do you do?
A  I am a sergeant in the Real Time Crime Center.
Q  Sergeant, have you been deposed in the past?
A  No.
Q  Have you ever given a testimony at trial?
A  Yes.
Q  When? How many times?
A  Oh, I have no idea. I have been with the department for 25 years.
Q  More than 10 times?
A  Yes.
Q  More than 20 times?
A  Yes.
Q  More than 30 times?
A  Yes.
Q  And have those testimonies been live in court?
A  Been what?

**121**

1  no longer be integrated into Fusus?
2      A   I'm not currently aware of any.  I
3  just -- again, they talked about that a couple
4  months ago.  It hasn't happened as of yet.  So I
5  don't know -- I'm not in the know on when and if
6  that's going to happen.  I just know it was
7  talked about.
8      Q   Okay.  Who would know?
9      A   Probably whoever owns Flock and
10 whoever owns Fusus.
11     Q   Who in the Norfolk Police Department
12 makes decisions about what types of technologies
13 to use at the Real Time Crime Center?
14     A   I guess I would have to ultimately
15 say it comes down to the Chief of Police.
16     Q   Is that Chief Talbot?
17     A   Yes.
18     Q   So I'm curious about, like, your
19 day-to-day use of these technologies.  Let's
20 start from Flock.  How do you use Flock,
21 particularly in your Real Time Crime Center?
22     A   I guess, basically, you would -- so
23 we would use that if a suspect vehicle was given
24 enough of a description in detail to see if we
25 could try to find it with Flock.  It's not like

**122**

1  something that is, like, constantly being run
2  all the time.  It is when we need to try to see
3  if a vehicle was in a certain area at a certain
4  time, we kind of use it then to help with
5  investigations.
6      Q   Do you know when the decision was
7  made to use Flock at the Real Time Crime Center?
8      A   I was not a part of the initial onset
9  of that, so I don't know.
10     Q   Do you know who was?
11     A   I believe Captain Thomas would have
12 been involved at that time and the Chief of
13 Police.
14     Q   How does Flock help with
15 investigations?
16     A   Well, it only helps in investigations
17 where there is a vehicle involved.  It doesn't
18 really help outside of that, I guess I would
19 say.
20     Q   So in the investigations where there
21 is a vehicle involved, how is the Flock camera
22 system helpful?
23     A   It gives you a snapshot of where the
24 vehicle was at, at a certain time in the past, I
25 guess you could say.

**123**

1      Q   So could you please just, like, walk
2  me through, like, how would an officer use that
3  information to investigate a crime that does
4  actually include a vehicle.
5      A   So I guess if -- I guess a
6  hypothetical example would be say some type of
7  violent crime occurred on B Street, and we know
8  it occurred on B Street, and we were told, hey,
9  there is a -- we'll go with a black vehicle
10 involved.  Let's say we happen to know that at
11 the end of B Street, the direction the vehicle
12 would have had to have gone, there is a Flock
13 camera.
14         If we know what time the incident
15 occurred, then we could check the Flock camera
16 around the time the incident occurred to see if
17 indeed a black vehicle went by a Flock camera.
18 And if it did and a photograph was taken of the
19 license plate, then we would possibly -- we
20 would have a possible suspect vehicle in regard
21 to whatever violent crime happened, if that
22 makes sense.
23     Q   Okay.  Let's say one of the cameras
24 captured the car, but the car is not stopping.
25 How would you figure out where the car went

**124**

1  after you find it on one Flock camera?
2      A   So that's the problem, I would say.
3  If it passed the Flock camera, we know where it
4  was.  If it doesn't pass another one, I don't
5  know where it is.  The only way we would find it
6  again is if, A, it hit on another Flock camera,
7  or, B, responding officers happened to find the
8  car driving around or if we run the vehicle and
9  get an address, we could have the units go to
10 the address the vehicle is also registered to.
11 But once it goes past that Flock camera, I don't
12 know where it is, if that makes sense.
13     Q   Yeah.
14         So if it passes through one Flock
15 camera, you just get one snapshot at the time
16 that where it was, and then what do you do when
17 you get only one snapshot?
18     A   I'm not really sure --
19     Q   Let's say the car doesn't go --
20 doesn't hit another Flock camera, just one.
21 Could you walk me through what you do to keep
22 investigating.
23     A   To keep investigating?
24     Q   Or to look for the car.
25     A   So if it doesn't pass another one, we

125

1 have -- we have the vehicle tag information, so
2 we'll run that. And then, if we need to, we'll
3 send a unit to the location of -- wherever the
4 car -- if the car is registered somewhere in
5 Norfolk, we'll probably have a unit go by and
6 see if the car is there.
7     If it's not there, then it is just a
8 matter of it's a broadcast to all the cars in
9 that -- probably that precinct, that is, the
10 First or the Second, hey, be on the lookout for
11 this car with this tag involved in this
12 incident.
13   Q   Okay.
14   A   And then --
15   Q   Sorry, go ahead and finish.
16   A   And then that's it. We just -- if we
17 come across it, great. If we don't, we just
18 don't.
19   Q   So assume that the vehicle passes
20 multiple Flock cameras.
21   A   Uh-huh.
22   Q   And so how do you -- what are the
23 next steps that you would take?
24   A   So I guess the best example of that
25 would be, let's say there's a stolen vehicle in

126

1 the city of Norfolk. What happens when it
2 passes the Flock camera, it notifies -- it sends
3 an alert to Flock -- or through Flock, but
4 dispatch gets the alert too. So dispatch will a
5 lot of times put out a broadcast, hey, be
6 advised, stolen vehicle, license plate ABC 123,
7 last seen at the intersection of Ballantine and
8 the Boulevard. And then if it passes another
9 one somewhere in the First Precinct, dispatch
10 would put out another broadcast, hey, here it is
11 again.
12     So if we don't get any more of those,
13 what units will usually do is go to where it was
14 last seen and then maybe drive through the
15 neighborhood and see if it is parked somewhere
16 and whatnot. But once it passes that point, I'm
17 not saying the car disappears, but for lack of
18 better purpose, we only know where it was five
19 minutes ago. After that, we couldn't tell you
20 where it went, how fast it was going, who was in
21 it, nothing else about it other than at five
22 minutes ago, it was at that intersection. If it
23 doesn't pass another one, then it's essentially
24 disappeared.
25   Q   Could you try to look at a video from

127

1 a LiveView camera in the area?
2   A   So that would be a possibility, but
3 you would have to have -- but, again, I would
4 say it is possible but probably not as probable
5 as you would like to think.
6   Q   What do you mean?
7   A   Due to the limited number of Flock
8 cameras and LiveView cameras in the city, they
9 don't -- again, it is possible but maybe not
10 probable. I don't know how else to really give
11 you a specific -- I mean, there could be
12 specific instances where -- well, the problem
13 you're going to have is if it goes past the
14 Flock camera and you still have a live camera,
15 even if they are right next to each other, it
16 still has a limited range. It's not going to --
17 it's not like it is going to follow that car.
18 It's going to go into the frame of the live
19 camera and then go out of it, and now it's gone
20 again.
21     The camera doesn't track the car. It
22 just -- the camera would literally be looking at
23 the road. Well, for whatever reason, as it goes
24 past the Flock, it would go through the video of
25 the camera, and then that's it. Okay. There it

128

1 was. Still don't know where it went. We know
2 it was on Church Street now, but we don't know
3 where it went after it passed that camera.
4   Q   Well, what if there are other
5 LiveView cameras along the way? Are you still
6 able to keep tracking the car?
7     MR. KRAVIS: Objection. Incomplete
8 hypothetical. Calls for speculation.
9   A   In a perfect hypothetical world
10 scenario, you probably could; however, due to
11 just the infrastructure, technology available in
12 the city right now, I honestly can't think of a
13 spot in the city where you're going to get that
14 lucky, if that --
15   Q   Do you think --
16   A   -- makes sense.
17   Q   Yeah.
18   A   It is just not -- it is just very,
19 very unprobable.
20   Q   Do you think it would be helpful if
21 the City of Norfolk added more Flock cameras?
22   A   That's really not up for me to
23 decide.
24   Q   Well, you testified earlier that you
25 are at the Real Time Crime Center; is that

197

1 what constitutes a law enforcement purpose.  Do
2 you remember those questions?
3      A   Yes, I do.
4      Q   And am I correct that Section III.A.1
5 of the June 30th, 2025 order, in fact, lists
6 three specific circumstances when the Flock ALPR
7 system --
8          MS. DEHBOZORGI:  Objection.  Leading
9 question.
10     Q   -- may be used by the City of
11 Norfolk?  Am I right about that?
12     A   Correct.
13         MS. DEHBOZORGI:  Objection.  Leading.
14         MR. KRAVIS:  Okay, thanks.  Those are
15 all the questions that I have.
16         THE VIDEOGRAPHER:  Here marks the end
17 of the deposition of Sergeant Jason Gauthier.
18 The time is 3:23 p.m.
19         (Off the record at 3:23 p.m.)

198

1          ACKNOWLEDGMENT OF DEPONENT
2
3          I, JASON GAUTHIER, do hereby
4 acknowledge that I have read and examined the
5 foregoing testimony, and the same is a true,
6 correct and complete transcription of the
7 testimony given by me and any corrections appear
8 on the attached Errata sheet signed by me.
9
10 _____   _____
11     (Date)              (Signature)

199

1          CERTIFICATE OF REPORTER - NOTARY PUBLIC
2          I, ADRIENNE MIGNANO, the officer before
3 whom the foregoing deposition was taken, do hereby
4 certify that the foregoing transcript is a true
5 and correct record of the testimony given; that
6 said testimony was taken by me and thereafter
7 reduced to typewriting under my direction; that
8 reading and signing was requested; and that I am
9 neither counsel for, related to, nor employed by
10 any of the parties to this case and have no
11 interest, financial or otherwise, in its outcome.
12         IN WITNESS WHEREOF, I have hereunto set
13 my hand and affixed my notarial seal this 28th day
14 of July, 2025.
15 My Commission Expires: June 2026.
16
17
18
19 *Adrienne M. Mignano*
20 _____
21 ADRIENNE MIGNANO, RPR