# EXHIBIT 13

Unredacted Exhibit Filed Under
Seal Per Protective Order



**CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**

# Transcript of Andrew P. Wheeler, Ph.D.

**Date:** September 4, 2025
**Case:** Schmidt and Arrington -v- City of Norfolk, et al.

**Planet Depos**
**Phone:** 888.433.3767 **| Email:** transcripts@planetdepos.com
**www.planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Andrew P. Wheeler, Ph.D.
Conducted on September 4, 2025

1 (1 to 4)

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF VIRGINIA
 3              NORFOLK DIVISION
 4   - - - - - - - - - - - - - x
 5   LEE SCHMIDT and CRYSTAL
 6   ARRINGTON,            :
 7          Plaintiffs,    :
 8     v.                  : Civil Action No.
 9   CITY OF NORFOLK and MARK  : 2:24-cv-00621-MSD-LRL
10   TALBOT, in his official   :
11   capacity as Norfolk Chief :
12   of Police,            :
13          Defendants.    :
14   - - - - - - - - - - - - - X
15       CONFIDENTIAL - ATTORNEYS' EYES ONLY
16        Videotaped Deposition of
17        ANDREW P. WHEELER, Ph.D.
18           Washington, D.C.
19      Thursday, September 4, 2025
20              9:17 a.m.
21   Job No. 597262
     Pages: 1 - 302
22   Reported by:  Janet A. Hamilton, RDR
```

**Page 2**

```
 1        Videotaped Deposition of ANDREW P.
 2   WHEELER, Ph.D., held at the office of:
 3
 4
 5        Munger, Tolles & Olson LLP
 6        601 Massachusetts Avenue, NW
 7        Suite 500 E
 8        Washington, DC  20001
 9        202.220-1100
10
11
12
13
14        Pursuant to Notice, before Janet A.
15   Hamilton, Registered Diplomate Reporter and Notary
16   Public in and for the District of Columbia.
17
18
19
20
21
22
```

**Page 3**

```
 1        A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFFS:
 3        ROBERT FROMMER, ESQUIRE
 4        TAMINEH DEHBOZORGI, ESQUIRE
 5        THE INSTITUTE FOR JUSTICE
 6        901 North Glebe Road
 7        Suite 900
 8        Arlington, Virginia  22203
 9        703.682.9320
10
11   ON BEHALF OF DEFENDANT CITY OF NORFOLK and
12   MARK TALBOT, in his official capacity:
13        KARLA J. SOLORIA, ESQUIRE
14        Assistant City Attorney
15        City of Norfolk
16        Office of the City Attorney
17        810 Union Street
18        Suite 900
19        Norfolk, Virginia 23510
20        757.664.4529
21   -And-
22
```

**Page 4**

```
 1      A P P E A R A N C E S  C O N T I N U E D
 2   ON BEHALF OF DEFENDANTS:
 3        LAUREN E. ROSS, ESQUIRE
 4        JONATHAN KRAVIS, ESQUIRE
 5        E. MARTIN ESTRADA, ESQUIRE
 6        DEVANSH JOTSINGHANI, ESQUIRE
 7        MUNGER, TOLLES & OLSON LLP
 8        601 Massachusetts Avenue, NW
 9        Suite 500 E
10        Washington, DC  20001
11        202.220.1100
12
13
14
15   ALSO PRESENT:
16        KONLY HARDING, Videographer
17
18
19
20
21
22
```

Case 2:24-cv-00621-MSD-LRL    Document 114-13    Filed 09/15/25    Page 4 of 28
PageID# 2673

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Andrew P. Wheeler, Ph.D.
Conducted on September 4, 2025

2 (5 to 8)



**Page 5**

CONTENTS

EXAMINATION OF ANDREW P. WHEELER, Ph.D.    PAGE

By Ms. Ross                    9

EXHIBITS

(Attached to the transcript)

WHEELER DEPOSITION

Exhibit 40  LinkedIn Profile              21
Exhibit 41  Expert Report of             49
    Andrew P. Wheeler on Behalf of Plaintiffs
Exhibit 42  Rebuttal Expert Report on        67
    Behalf of Plaintiffs
Exhibit 43  Video clip              95
    *Retained by Counsel*
Exhibit 44  Video clip              98
    *Retained by Counsel*
Exhibit 45  Spreadsheet of capture        119
    information
Exhibit 46  Plaintiff Lee Schmidt's        125
    Responses to Defendants' First Set of
    Interrogatories

**Page 7**

EXHIBITS CONTINUED
PAGE

Exhibit 55  Appendix A - Resume of            289
    Valentin Estevez, Ph.D.
Exhibit 56  Article: "The Journey-to-Crime    295
    Buffer Zone:  Measurement Issues and
    Methodological Challenges"
    D. Kim Rossmo and Andrew Wheeler

**Page 6**

EXHIBITS CONTINUED
PAGE

Exhibit 47  Expert Report of              161
    Valentin Estevez, Ph.D.
Exhibit 53  Blog post by Nick Selby          260
    "Los Angeles Just Proposed the Worst Use
    of License Plate Reader Data in History"

**Page 8**

THE VIDEOGRAPHER:  Here begins media number one in the videotape deposition of Andrew Wheeler in the matter of Lee Schmidt and Crystal Arrington versus City of Norfolk and Mark Talbot in his official capacity as Norfolk Chief of Police, in the United States District Court for the Eastern District of Virginia, Norfolk Division, case number 2:24-cv-00621-MSD-LRL.  Today's date is September 4th, 2025.  The time on the video monitor is 9:17 a.m. Eastern time.  The videographer today is Konly Harding, representing Planet Depos.  This video deposition is taking place at 601 Massachusetts Avenue, Northwest, Suite 500 E, Washington, DC 20001.

Will counsel please voice identify themselves and state whom they represent.

MS. ROSS:  My name is Lauren Ross from Munger, Tolles & Olson.  I represent the City of Norfolk.  I'm joined by my colleagues Jonathan Kravis and Devansh Jotsinghani, also from Munger, Tolles & Olson, and Karla Soloria from the City Attorney's Office of Norfolk.

Case 2:24-cv-00621-MSD-LRL    Document 114-13    Filed 09/15/25    Page 5 of 28
PageID# 2674

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Andrew P. Wheeler, Ph.D.
Conducted on September 4, 2025

31 (121 to 124)

121

1 two separate captures given how short in time, the
2 short time between those captures?
3    **A I -- you can just -- the only thing --**
4 **they're basically like redundant data. So the**
5 **camera just took the picture at the same time. So**
6 **you can just tell that this particular license**
7 **plate passed by this location at that particular**
8 **time.**
9    Q Okay. You can set that aside. Thank you.
10 I think you mentioned this earlier. Did you do
11 any analysis of how many hits a day there were on
12 plaintiffs' vehicles analysis?
13    **A I don't -- sorry. I don't recall if I did**
14 **-- I don't recall doing that in my initial report.**
15 **I could be wrong but...**
16    Q I didn't see it in there, for what it's
17 worth.
18    **A Yeah.**
19    Q Did you analyze how many hits there were
20 for a particular 21-day window or 30-day window?
21    **A No.**
22    Q Why not?

122

1    **A To me, I basically just did -- the**
2 **analysis that I did was replicating pretty much**
3 **what a crime analyst would do. So I basically**
4 **built -- if I was a working crime analyst and**
5 **somebody was, like, hey Andy, build me a profile**
6 **for Lee, I wouldn't have gone and counted up the**
7 **average number of hits for other people or even**
8 **for Lee. I would just build those maps and**
9 **basically go do a report and be, like, look, I**
10 **think he's doing this at this location.**
11    Q Do you think the number of hits on a
12 particular day could be indicative of the number
13 of inferences that you would likely be able to
14 draw?
15       MR. FROMMER: Objection. Am- -- vague.
16    **A I mean, it's hard for me to put inferences**
17 **in a discrete sort of number, but, so it's**
18 **definitely the case if people didn't drive in the**
19 **city at all, you wouldn't be able to make any**
20 **inference.**
21    Q Did you analyze how many days in the data
22 there were no Flock camera captures for

123

1 Mr. Schmidt or Miss Arrington?
2    **A No, I did not.**
3    Q Okay. In your view is the number of -- do
4 you think it's possible to infer where someone was
5 on a particular day if there are no Flock camera
6 captures on that day?
7    **A No.**
8    Q Do you think it's impossible to -- do you
9 think it is possible to infer where someone is on
10 a particular day if there's only one Flock camera
11 capture on that day?
12       MR. FROMMER: Objection. Incomplete
13 hypothetical.
14    **A So if there's -- if there's one capture,**
15 **well, you definitely know that the person was at**
16 **that particular time and place for that**
17 **particular, the snapshot.**
18    Q Okay. Do you know if you could draw any
19 inferences from that fact, just one capture on a
20 particular day?
21    **A So the term "inferences" is a little**
22 **vague. Like, you can draw the inference that they**

124

1 were at that specific location at that time that
2 the camera was -- that that camera capture
3 happened.
4    Q I think you mentioned that kind of the
5 three data sources you were using when analyze the
6 NPD Flock data was the CSVs where the cameras were
7 located and key locations for the plaintiffs in
8 this case; is that right?
9    **A Yes.**
10    Q Okay. How did you -- how did you learn
11 about those key locations?
12    **A I was provided those.**
13    Q Were you provided those in the form of
14 plaintiffs' discovery responses in this case?
15    **A I'm not familiar, sorry, with -- I was**
16 **provided the materials at -- sorry. What's --the**
17 **question is, like, when -- like, how I was**
18 **provided these materials or when?**
19    Q The question is first how were you
20 provided with these materials?
21    **A Yeah. The same way as the other**
22 **materials. I was just -- I was just sent those**

Case 2:24-cv-00621-MSD-LRL    Document 114-13    Filed 09/15/25    Page 6 of 28
PageID# 2679

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Andrew P. Wheeler, Ph.D.
Conducted on September 4, 2025

32 (125 to 128)

125

1  via, whatever, electronic system that the
2  Institute produced.
3      Q  Were you given just a list of plaintiffs'
4  locations?
5      A  Yes, I believe so.
6      Q  Okay.  I'll try and make this a bit more
7  concrete.  Can we take a look at tab 10?  This
8  will be Exhibit No. 46.
9          (Wheeler Exhibit 46 was marked for
10 identification.)
11     A  Oh, could I actually amend one of my
12 statements I made earlier?
13     Q  Sure.
14     A  So you said for the Flock, like, if you
15 don't have -- if you don't have any hits per day,
16 can you make inferences about somebody?  You can
17 make inferences that they weren't, like, in the
18 city.  So, like, if you -- if you know that you
19 have coverage -- if you know you have coverage of
20 these -- like, you know that they're not -- they
21 didn't pass by the camera on that particular day.
22     Q  Okay.  So this is Exhibit 46.  This is

126

1  Mr. Schmidt's Responses to Defendants' First Set
2  of Interrogatories.
3          Is this the document that you reviewed to
4  determine Mr. Schmidt's frequently visited
5  locations in the city?
6      A  No.
7      Q  Okay.  So you were provided a separate
8  list of Mr. Schmidt's locations that he visits in
9  the city?
10     A  Yes.
11     Q  Okay.  Do you know who generated that
12 list?
13     A  No, I do not.
14     Q  Okay.  When did you receive that list of
15 locations that Mr. Schmidt and Miss Arrington
16 visit in the city?
17     A  Oh, I do not know an exact date for that.
18     Q  Was it at the same time that you received
19 the CSVs and the camera location information?
20     A  I believe so but I'm not a hundred percent
21 sure.
22     Q  Okay.  Do you recall receiving the CSVs

127

1  and the Flock camera data before receiving the
2  list of frequently visited locations?
3      A  No.
4      Q  Did you review the list of frequently
5  visited locations when you received it?
6      A  Did I -- did I look at the data?  Yes.
7      Q  Okay.  And had you reviewed the list of
8  frequently visited locations before you began to
9  review the map of the various Flock camera
10 captures for the plaintiffs?
11     A  Yeah.  I'm not a hundred percent sure the
12 order that I did things.
13     Q  How long did it take you to generate the
14 map of plaintiffs' -- of plaintiffs' Flock
15 captures?
16     A  How -- how long?
17     Q  Mm-hmm.
18     A  I'm not sure.  I can give you the total
19 time that I spent going back and forth with the
20 different reports, but, like, the times of me
21 making a first map, it would have been fairly
22 short.

128

1      Q  I guess my question is, it presumably took
2  you some amount of time to generate this map?  You
3  had to take a look at the CSVs, clean the CSVs,
4  create the program and then eventually upload
5  them; is that right?
6      A  Yes.
7      Q  During that time would you have had the
8  opportunity to review the list of key locations
9  that you were provided?
10     A  I -- I don't -- I understand your
11 question.  You're asking me if I reviewed the
12 case -- if I reviewed the key locations before I
13 made the particular maps.  I -- I don't -- I don't
14 know if I reviewed the key locations first because
15 basically my approach is what I looked at the
16 ALPRs first, and then later on I added in the key
17 locations into those particular maps.  I can't
18 recall if I looked at -- the exact order that I
19 looked at those materials though.
20     Q  Do you recall if you had reviewed the key
21 locations before you made any inferences about the
22 Flock camera data that you were reviewing?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Andrew P. Wheeler, Ph.D.
Conducted on September 4, 2025

33 (129 to 132)

---

129

1    A  I'm not -- so I did -- I did some
2  **preliminary analysis, but ultimately I can't**
3  **remember if I made specific inferences with the**
4  **data or not beforehand or after.**
5    Q  Is the list of key locations that you
6  relied on in your list of materials considered?
7    **A  Oh, it should be if it's not.**
8    Q  Can we take a look together?  Do you see
9  it in the list of materials --
10   **A  I do not.**
11   Q  I'd ask that you provide that to us after
12 this deposition is over.
13   **A  Okay.  That is my mistake.  I do**
14 **apologize.  The key locations are in the maps.  So**
15 **it was -- it was definitely used.**
16   Q  I appreciate that.  And I have been
17 reminded that, in fact, if you could get that to
18 us over the lunch break, we would appreciate it.
19   **A  Okay.**
20   Q  Thank you.  So just to close this out.
21 Before you inferred that Mr. Schmidt visits the
22 area around the Norfolk Naval Station Commissary

---

130

1  from the NPD Flock camera data, did you already
2  know from this list of frequently visited
3  locations that Mr. Schmidt visits the Norfolk
4  Naval Station Commissary?
5    **A  I think I knew that he worked there.  I**
6  **don't remember if it was a regular -- I knew**
7  **that -- I knew that Mr. Schmidt worked at -- was**
8  **in the Navy, so...**
9    Q  But did you know that he visits the
10 Norfolk Naval Station Commissary before drawing an
11 inference that he visits the area around that
12 location?
13   **A  No.  I didn't know that specifically.**
14   Q  Had you reviewed the list of key locations
15 before drawing an inference that Mr. Schmidt
16 visits the area around the Norfolk Station
17 Commissary?
18   **A  Yeah, I'm sorry.  Let me -- let me revise.**
19 **There was -- the final report is the final**
20 **inferences that I made, and that was with**
21 **knowledge of the locations, the key locations.**
22   Q  Okay.  Before you inferred that Miss

---

131

1  Arrington lives in a particular area in Portsmouth
2  from the NPD Flock camera data, did you already
3  know from a list of key locations Miss Arrington's
4  home address?
5    **A  Yes.**
6    Q  Before you inferred that Miss Arrington
7  visited the residential neighborhood in which her
8  father lives on a particular day, did you already
9  know from a list of key locations that Miss
10 Arrington visits her father in Norfolk and her
11 father's home address?
12   **A  I didn't know that it was her father.  It**
13 **was one of those areas, I would have to actually**
14 **go back, go back and look to the data.  I don't**
15 **remember the exact -- I was given a list of key**
16 **locations.  I don't think I knew that it was her**
17 **father or not.  So I would have to go back and**
18 **review the materials.**
19   Q  Okay.  But you knew that the address in
20 that area was one that she visited frequently;
21 right?
22   **A  I would have to go back to my particular**

---

132

1  **materials.  I -- is it okay if I refer to my**
2  **report?**
3    Q  Yeah, of course.  And if you're looking, I
4  can direct you to the page.  If you look at page
5  16, the third paragraph from the bottom, I believe
6  that's where you discuss this particular
7  inference.
8    **A  All right.  I'm going to try to refer to a**
9  **different --**
10   Q  Of course, yes.  Sorry.  I'm not directing
11 where you have to go.
12   **A  Yeah.  I honestly have to go back -- I**
13 **would have to go back to the CSV and look to see**
14 **if -- I don't -- I don't have it in my mind all**
15 **the different key places.  So I don't remember if**
16 **it -- what page did I discuss it on?  16?**
17   Q  I have it on page 16.
18   **A  Yeah, I'm sorry.  I would have to go back**
19 **and refer to the data to know if that was -- I**
20 **don't even remember if that was one of the key**
21 **places or not in that particular list.  It might**
22 **have -- I just don't -- I'm sorry.  I don't**

---

Case 2:24-cv-00621-MSD-LRL    Document 114-13    Filed 09/15/25    Page 8 of 28
PageID# 2677

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Andrew P. Wheeler, Ph.D.
Conducted on September 4, 2025

34 (133 to 136)

133

1 recall.

2    Q  That's okay.

3        Is it your understanding that there is any
4 point in your report where you inferred that
5 Mr. Schmidt or Miss Arrington visited a particular
6 location when you did not already know from a list
7 of key locations that plaintiffs, in fact, visit
8 that location?

9    A  The -- the inference -- so if I'm
10 understanding the question correctly, you're
11 asking if I -- so I make inferences about places
12 that they visit, and you're asking did I make any
13 inferences but, like, before I knew --

14    Q  Yes.



21    A  I just remember it was one of the first
22 pieces of analysis I did, and I went back to

134

1 the -- I went back to the folks at Institute For
2 Justice and be, like, like, here's an example of
3 the type of analysis that's possible.

4    Q  And you think that you had not already
5 been provided a list of key locations before you
6 did that analysis?

7    A  I honestly -- I would have to go back and
8 look to see, like, the time period that everything
9 was given.

10    Q  So you just don't recall?

11    A  Yeah.  I'm sorry.  It came up and -- yeah,
12 I don't recall.

13    Q  In your reports you have not offered an
14 opinion about the inference that could be drawn by
15 pairing Flock camera data with data from other
16 cameras owned by the City of Norfolk; is that
17 right?

18    A  Yeah.  It was specifically focused on the
19 ALPR data.

20    Q  Okay.  And you have not offered any
21 opinions in your reports about whether or not
22 Flock data will commit the NPD to make inferences

135

1 about plaintiffs' movements when they are in a
2 vehicle that is not registered to them; right?

3    A  Can you repeat that question again?
4 Sorry.

5    Q  Sure.  You have not offered an opinion in
6 your reports about whether Flock data would permit
7 the NPD to make inferences about plaintiffs'
8 movements when they are in a vehicle that's not
9 registered to them; right?

10    A  So I didn't speak about that specifically
11 in the report, but often, like, as thinking about
12 in terms of an analyst, you often have additional
13 intelligence that you can know if somebody, like,
14 if -- you can know, like, Lee's wife's vehicle, so
15 could look up both of those vehicles in that
16 scenario.

17    Q  You've not offered that opinion in this
18 report though; right?

19    A  No, I have not.

20    Q  If you turn to page 8 of your opening
21 report, and at the Flock report -- I'm in the,
22 kind of the middle, the second paragraph after the

136

1 heading Analysis of Lee's Movements.

2        You wrote that "Flock records the make,
3 model and other distinctive features of cars and
4 its proprietary vehicle fingerprint to enable
5 police to identify pictures of the same vehicle
6 that may not include the license plate"; right?

7    A  Yes.

8    Q  What is your understanding of the vehicle
9 fingerprint technology?

10    A  My understanding of the technology is that
11 when they, they take a picture of the vehicle when
12 it drives by using similar machine learning
13 technology to do the scan of the license plate.
14 They can use similar types of models to identify
15 the color of the car, the -- I forget -- I forget
16 the exact fields that are in there, but, like, you
17 could look for a blue -- you could look for a blue
18 vehicle or I think it does have the make of the
19 vehicle in there as well.  So, like, you can do
20 searches of a specific vehicle even if it doesn't
21 have the license plate attached to it.

22    Q  Okay.  If you look at -- and I'm sorry.

Case 2:24-cv-00621-MSD-LRL    Document 114-13    Filed 09/15/25    Page 9 of 28
PageID# 2678

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Andrew P. Wheeler, Ph.D.
Conducted on September 4, 2025

36 (141 to 144)



141

1  just, like, how a crime analyst would do it.  So
2  you go and you get the queries for the particular
3  data.
4        If -- if there was a case where somebody
5  had -- like, I talked about the fake plates, the
6  fake tags before.  Like, if you knew that the
7  person had those fake tags, and a crime analyst,
8  if it was a person of interest that they wanted to
9  spend the time to do that, they could go do the
10 analysis that I'm talking about here.
11    Q  But, again, you have no reason to believe
12 that anywhere in the Flock Safety system there is
13 a picture of Lee and Crystal's car that doesn't
14 have an associated license plate; correct?
15        MR. FROMMER: Objection.  Mischaracterizes
16 prior testimony.  Please wait.
17    A  So I don't have -- let me -- let's go
18 back.  You said it was a guess and I said yes, and
19 I'd like to amend my statement a little bit there.
20
21
22

142

1
2
3
4
5
6
7
8
9
10
11
12    Q  But you have not checked the data to
13 determine whether or not that's accurate; correct?
14    A  I have not done specific analysis to
15 identify a specific image, no.
16    Q  You have not offered an opinion in your
17 reports saying you were able to identify any
18 individuals with whom Mr. Schmidt associates by
19 analyzing the Flock data; is that right?
20    A  Can you -- can you repeat that question?
21    Q  Sure.  You have not offered an opinion in
22 your reports that you are able to identify any of

143

1  the individuals with whom Mr. Schmidt associates
2  using the Flock data; is that right?
3     A  No.
4     Q  Okay.  You have not offered an opinion in
5  your reports saying you are able to identify any
6  individuals with whom Ms. Arrington associates by
7  analyzing the Flock data; is that right?
8     A  No.
9     Q  You have not offered an opinion in your
10 reports saying that you are able to infer
11 Mr. Schmidt or Miss Arrington's political
12 affiliations based on the Flock data; correct?
13    A  Correct.
14    Q  You have not offered an opinion in your
15 reports stating that you are able to infer
16 Mr. Schmidt or Miss Arrington's religious
17 associations based on the Flock data; correct?
18    A  Correct.
19    Q  You don't know if they belong to an
20 organized religious group at all; is that correct?
21    A  Correct.
22    Q  I think we'll do this later once we have

144

1  the list of addresses you relied on.
2        You take a look at page 7 of your report.
3  You state that "While the cameras are focused on
4  major thoroughfares, it is possible to reconstruct
5  the daily routines of individuals based on this
6  coverage"; is that right?
7     A  Yes.
8     Q  Okay.  And what do you mean by "daily
9  routine" here?
10    A  A daily routine, it -- I'll just give an
11 example.  Like, imagine somebody just goes to work
12 or goes to their regular location.  So that's --
13 that's what I mean by daily routine.
14    Q  What daily routines have you reconstructed
15 with Mr. Schmidt's Flock camera data in your
16 reports?
17
18
19
20    Q  Does Mr. Schmidt go to those locations --
21 did you infer that Mr. Schmidt visits those
22 locations daily?

Case 2:24-cv-00621-MSD-LRL    Document 114-13    Filed 09/15/25    Page 10 of 28
PageID# 2679

CONFIDENTIAL — ATTORNEYS' EYES ONLY
Transcript of Andrew P. Wheeler, Ph.D.
Conducted on September 4, 2025                    37 (145 to 148)

145

1    A  No.
2    Q  Okay.  So when you're referring to a daily
3  routine, what are you referring to?
4    A  It's just a regular routine for an
5  individual, and so the -- it's any basic -- it's
6  any repeated pattern that a person would, would
7  do.
8  ████████████████████████████
9  ████████████████████████████████████
10 ████████████████████████████████████████
11 ████████████████████
12   A  Is it okay if I refer to my report?
13   Q  Yes.
14   A  I only discussed -- I only discussed one
15 particular time stamp in the report.  There
16 were -- there were likely additional time stamps
17 around it, but I only -- the only one that I
18 discussed in the report is in Figure 6.
19   Q  Are you offering any opinion in this case
20 as to whether Flock cameras can track the whole of
21 an individual's movements?
22     MR. FROMMER: Objection.  Calls for a

146

1  legal opinion.
2    A  Yeah, I know -- I know a whole of a
3  person's movements is a legal term, and so I'm not
4  -- I'm not a lawyer.
5    Q  Okay.  You're not offering an opinion on
6  that question?
7    A  Yes.
8    Q  In your report you state that you analyzed
9  the Flock camera data to arrive at certain
10 inferences about plaintiffs; right?
11     (The reporter requested clarification.)
12   Q  Certain inferences about plaintiffs; is
13 that right?
14   A  Yes.
15   Q  How do you define an inference?
16   A  Inferences here would just be -- like,
17 it's how I would do it as a crime analyst, and you
18 would just be looking at key locations that they
19 repeatedly visit to try to further, like, identify
20 what they're doing at those places, and so there
21 isn't, like, a formal methodology that I used
22 here.  I looked at the data in the same way that I

147

1  would have as a crime analyst to try to just
2  identify those particular patterns.
3    Q  Do you think that the inferences that
4  someone could draw from the Flock data might vary
5  depending on who's drawing the inference?
6    A  Sure.
7    Q  Okay.  Is another way of defining
8  inference an educated guess?
9     MR. FROMMER: Objection.  Mischaracterizes
10 prior testimony.
11   A  Yeah, I don't know the definition of an
12 educated guess, but I -- inferences here it's --
13 it's essentially the patterns that I think are
14 likely based on the data that I see from the
15 Flock.
16   Q  It's possible that these inferences could
17 be incorrect; right?
18   A  Yes.
19   Q  Okay.  They're not a hundred percent
20 certain?
21   A  Yes.
22   Q  Alternative inferences are possible?

148

1    A  Essentially pretty much all the work I do
2  as a, as a crime analyst, it's, like,
3  probabilistic.  It's never a hundred percent
4  certain.  So, yeah, it's true of this as well as,
5  like, the majority of work I've done as an
6  analyst, so...
7    Q  And in your experience is the kind of
8  inference you can draw only as good as the
9  surrounding facts or evidence that you have
10 available to you?
11     MR. FROMMER: Objection.  Vague and
12 ambiguous.
13   A  Yeah.  Can you be more specific?
14   Q  Sure.  Is the -- if you're trying to draw
15 an inference about someone's movements if you have
16 reliable sources of information or additional
17 context beyond the Flock data, can that help you
18 to draw a better inference?
19   A  I mean it's hard for me to answer because
20 it's -- it's -- the question's pretty vague.  So,
21 like, you have scenarios where, where you have a
22 suspect associated with, say, like, a robbery and

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Andrew P. Wheeler, Ph.D.

Conducted on September 4, 2025          41 (161 to 164)

---

161

1      MS. ROSS:  Just Dr. Estevez's report, tab
2  13.  Also there's no magic to these questions.  We
3  can stop now if you need a break.
4      THE WITNESS:  That's fine.
5      MS. ROSS:  So this will be Exhibit 47.
6      (Wheeler Exhibit 47 was marked for
7  identification.)
8  BY MS. ROSS:
9      Q  And we're going to take a look at page 23,
10 paragraph 67.  And you see that Dr. Estevez's
11 analysis show that all four of these hits were on
12 a single day?
13     **A  Yes.  I see that.**
14     Q  Okay.  If you added that piece of
15 information, that all of these Flock camera
16 captures occurred on only one day over a two-month
17 period, would you infer from this map you have
18 here that Mr. Schmidt travels to the Norfolk Naval
19 Station Commissary frequently or infrequently?
20     MR. FROMMER:  Objection.  Incomplete
21 hypothetical.
22     **A  Yeah, just based on this the data is what**

---

162

1  **it is.  So it would be he's traveled there for a**
2  **single day over the two months.**
3      Q  Okay.  That would be the inference you
4  would draw from the Flock camera data here?
5      **A  Yes.**
6      MS. ROSS:  Okay.  That's all I have.  We
7  can go to lunch.
8      Over lunch would you mind e-mailing us the
9  additional document?
10     MR. FROMMER:  Yeah.  We'll --
11     MS. ROSS:  Thank you.
12     MR. FROMMER:  We're taking care of that.
13 How long do you want to take?
14     MS. ROSS:  I defer to you.
15     MR. FROMMER:  What?
16     MS. ROSS:  I defer to you.
17     MR. FROMMER:  Oh, like 40 minutes.
18     MS. ROSS:  Great.
19     THE VIDEOGRAPHER:  We are going off the
20 record.  The time is 12:30.
21     (A lunch recess was taken.)
22     THE VIDEOGRAPHER:  We are back on the

---

163

1  record.  The time is 13:16.
2  BY MS. ROSS:
3      Q  Dr. Wheeler, I think we were discussing
4  earlier the list of key locations that you
5  reviewed in drawing the inferences in your report,
6  and I think you mentioned that you want to clarify
7  your answers earlier.
8      **A  Yes.  Thank you very much.  So I had**
9  **initially mistaken the interrogatories report.  I**
10 **mistakenly thought that that did not include the**
11 **key locations.  It does -- upon reviewing it, it**
12 **does include the key locations, and the key**
13 **locations that I use in my report are the same**
14 **ones that are in those interrogatory reports, both**
15 **for Mr. Schmidt and Mrs. Arrington.**
16     Q  Okay.  And just to make sure I understand
17 your response, are you saying that you received a
18 copy of these interrogatory responses, and that is
19 the source of the key locations you use in drawing
20 your inferences?
21     **A  Yes, it is, and these are cited in, for**
22 **Lee Schmidt, citation 14 in my initial reports,**

---

164

1  **and let's see if I --**
2      MR. FROMMER:  18.
3      **A  -- and citation 18 for Crystal Arrington.**
4      Q  So let's take a look at Exhibit 46, which
5  is Mr. Schmidt's interrogatory responses,
6  together.  We can turn to page 6.
7      So this is the list of frequently visited
8  locations that you reviewed when drawing the
9  inferences in your report; is that right?
10     **A  This is the -- the list of locations I was**
11 **given for Mr. Schmidt, or not given, but in this**
12 **particular report.  The frequent locations that I**
13 **inferred were based on the actual distribution of**
14 **the Flock, the Flock camera hits.**
15     Q  And so I see -- so in his response to
16 interrogatory No. 4 Mr. Schmidt identified the
17 locations in the City of Norfolk that he recalls
18 visiting often from February 19th to present.
19     Do you see that?
20     **A  Which page is that?**
21     Q  I'm on page 6.
22     **A  Okay.**

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Andrew P. Wheeler, Ph.D.
Conducted on September 4, 2025

42 (165 to 168)

---

165

1    Q  It's the final line of text before the
2  response in bold with a colon after that.
3    **A  Okay.**
4    Q  Okay.  And so you see that Mr. Schmidt
5  identified these as locations in the City of
6  Norfolk he recalls visiting often from February
7  19th to present; is that right?
8    **A  Yes.**
9    Q  He lists seven locations here; is that
10 right?
11   **A  Yes.**
12   
13
14
15   Q  Your report does not state that you were
16 able to infer that Mr. Schmidt visits this
17 address; is that right?
18   **A  My report, the way I did my report is I**
19 **just pulled out a few examples.  I didn't go**
20 **exhaustively through the list and identify**
21 **particular examples associated with each of these,**
22 **so I can't speak if that's sufficient.**

---

166

1    Q  Okay.  So your report does not include all
2  of the inferences that you drew from the Flock
3  data that you reviewed?
4        MR. FROMMER:  Objection.  Mischaracterizes
5  prior testimony.
6    Q  I can withdraw and ask it again.
7        Do your expert reports in this case
8  contain all of the inferences that you drew
9  regarding the locations that Mr. Schmidt visits in
10 the City of Norfolk?
11   **A  The inferences I provide in the report are**
12 **based on the samples of data that I show and so —**
13 **yeah.  It's just — it's limited to those.**
14   Q  Are there any other inferences that you
15 drew while preparing your report from the Flock
16 data that you reviewed that are not included?
17   **A  Any — any — can you give an example of**
18 **another inference?**
19   Q  Was there an inference that you drew from
20 the Flock data that you reviewed that you chose
21 not to include in your expert reports?
22   **A  Oh.  No.**

---

167

1    Q  Okay.  So you did not draw any inferences
2  from the Flock data you reviewed other than what
3  is contained in your expert reports; correct?
4    **A  Yes.**
5
6
7
8
9    Q  Your expert reports do not contain
10 inference that Mr. Schmidt visits Costco
11 Wholesale; correct?
12   **A  My report is just limited to, like, a few**
13 **examples of the particular data.  So it's — so**
14 **it's not exhaustive of this list.**
15   Q  Okay.  But I think you told me earlier you
16 did not draw any inferences that are not contained
17 in your report; correct?
18   **A  Correct.**
19   Q  Okay.  There are, I think we counted
20 earlier, seven locations here; is that right?
21   **A  Yes.**
22   Q  Your report contains examples -- your

---

168

1  report states that you can draw inferences that
2  Mr. Schmidt visited only two of these locations;
3  is that right?
4    **A  No, that's not — that's not what I said**
5  **or it's not what I meant in my report.**
6    Q  How -- how is that not accurate?
7    **A  It's not accurate because I didn't make**
8  **any claims in my report that it's — that it's —**
9  **is — encompasses all of his regular places that**
10 **Mr. Schmidt visits.**
11   Q  Okay.  But you did not attempt to
12 determine whether or not it's possible to draw an
13 inference that Mr. Schmidt visits five of these
14 seven locations; is that correct?
15   **A  Can you repeat that question?  Sorry.**
16   Q  You did not determine whether or not it's
17 possible to draw an inference that Mr. Schmidt
18 visits five of these seven locations; is that
19 correct?
20   **A  Sorry.  Can we — can you say that**
21 **question one more time?**
22

---

Case 2:24-cv-00621-MSD-LRL    Document 114-13    Filed 09/15/25    Page 13 of 28
PageID# 2682

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Andrew P. Wheeler, Ph.D.
Conducted on September 4, 2025

43 (169 to 172)



Case 2:24-cv-00621-MSD-LRL    Document 114-13    Filed 09/15/25    Page 14 of 28
PageID# 2685

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Andrew P. Wheeler, Ph.D.
Conducted on September 4, 2025

44 (173 to 176)



173

174

12   Q  Can we look together at Figure 6 on page
13 15 of your opening report?  Is this map generated
14 in the same way as the map we are looking for --
15 looking at for Mr. Schmidt's movements earlier?
16   A  Yes.
17   Q  Okay.  So this map contains two months
18 worth of Flock camera data for Miss Arrington; is
19 that correct?
20   A  Yes.
21   Q  And you didn't kind of remove any
22 duplicate hits from this map; is that correct?

175

1   A  That's correct.
2   Q  Okay.  What is the inference that you were
3 able to draw from this map in your report?
4   A  Inferences aren't just based on this map.
5 It's based on, like, the totality of the data that
6 I had available to me.
7   Q  Okay.  Can we take a look at page 14 of
8 your report together?  And take a look at the
9 first two sentences under Analysis of Crystal's
10 Movements.  You write: "Figure 6 shows the
11 distribution of captures for the license plate on
12 the car that I understand Crystal primarily drives
13 from February 19th through April 10th.  Given the
14 density of events in Portsmouth, rule of 100 one
15 can reasonably infer that she lives there."
16   Do you see that?
17   A  Yes.
18   Q  Going on, you say, "Figure 7 shows where
19 Crystal lives and how commonly she was captured by
20 cameras positioned near her home.  Indeed, given
21 the number of captures both northbound and
22 southbound on Towne Point between Pines Road, both

176

1 just north of an exit from Route 164, comparing
2 the lower number of captures on the cameras east
3 and west one can infer that Crystal likely lives
4 in development just north of this exit and likely
5 to the west of Twin Pines Road."
6   Do you see that?
7   A  Yes.
8   Q  So I want to just make sure I understand
9 what you're stating here.  Is it your opinion that
10 you can infer from Flock camera data alone that
11 Crystal likely lives in the development north of
12 the Route 164 exit and west of Twin Pines Road?
13   A  Yes.
14   Q  Okay.  Is that fact depicted in Figure 7
15 of your report on page 15?
16   A  Yes.  I think that that's reasonable.  The
17 105 number of events, number of captures.
18   Q  Do you know how large the area you've
19 identified here is?
20   A  I do not know the total size in terms of
21 geographic area, no.
22   Q  Do you know the distance between



177

1 Ms. Arrington's home and the nearest Flock camera?
2    A No, I don't. I can't tell exactly from
3 this map the distance.
4    Q You don't have any understanding of
5 whether or not it's over a mile between Miss
6 Arrington's home and the nearest Flock camera?
7    A No. I don't have a scale on my map, so I
8 cannot tell the total distance.
9    Q Do you know how many people live in this
10 area that you've identified?
11    A No, I do not.
12    Q Can you ballpark it for us?
13    MR. FROMMER: Objection. Calls for
14 speculation. Don't guess.
15    A It's possible to figure out, but I
16 wouldn't know offhand just from looking at it.
17    Q Okay. If we take a look at Figure 7,
18 you've identified -- you have a stickie here that
19 says "home"; is that right?
20    A I'm sorry. What are we referring to?
21    Q We're still on Figure 7. We're looking at
22 the bottom of the map there, the Flock camera

178

1 captures; right?
2    A Yes.
3    Q And then at the top there's a label that
4 says "home"; is that right?
5    MR. FROMMER: He's on the wrong page.
6    Q He's on the wrong page? I'm on page 15.
7    A I thought you said Figure 7. I'm sorry.
8    Q The figures -- there are two Figure 7s in
9 the report. I'm sorry. I can do a better job of
10 identifying the page numbers.
11    A Oh, okay.
12    Q So Figure 7 on page 15.
13    A Okay.
14    Q So if you take a look at the top of this
15 map you've generated for Figure 7, there's a label
16 that says "home"; is that right?
17    A Yes.
18    Q Is this a particular -- is this Miss
19 Arrington's home address?
20    A Yes.
21    Q How did you identify that home address?
22    A From the interrogatory report information,

179

1 I believe.
2    Q Okay. So you can take a look. I don't
3 believe that Miss Arrington's home address is
4 identified in those interrogatories. I'm going
5 to -- while you take a look I'm going to introduce
6 Exhibit 49 which is tab 26, and we're going to do
7 Exhibit 50 along with it which is tab 18.
8    So this is 49. This is 50.
9    (Wheeler Exhibit 49 and Exhibit 50 were
10 marked for identification.)
11
12
13 
14
15
16
17
18    Q Okay. So can we take a look at what is
19 now Exhibit 49? This is Miss Arrington's
20 Responses to the Request For Production, and we're
21 going to be looking at page 9, RFP 7. And you see
22 the Request For Production is for documents

180

1 sufficient to show every address at which you
2 resided since May 1st of 2022; is that right?
3    A Sorry. Where is that again?
4    Q It's Request For Production number 7 on
5 page 9.
6    A Okay.
7    Q And the Request For Production was for
8 documents sufficient to show every address at
9 which you have resided since May 1st; is that
10 correct?
11    A Yes.
12    Q And the response is: "Consistent with
13 plaintiffs' objections, see Arrington 00001"; is
14 that right?
15    A Yes.
16
17
18 
19
20
21    Q Did you rely on this document when
22 determining where Miss Arrington lives?

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Andrew P. Wheeler, Ph.D.
Conducted on September 4, 2025

47 (185 to 188)

185

1  hypothetical.  Calls for speculation.
2      A  It just wasn't the analysis that I
3  conducted.  So you could do that, but I just
4  didn't do it here for this report.
5      Q  Why didn't you try to infer how frequently
6  Miss Arrington visits the City of Norfolk?
7      A  The process that I did here was basically
8  synonymous with how I would have done it as a
9  crime analyst, and so I wouldn't have gone into a
10 detective and been, like, this person visits the
11 city X number of days a month.  I would have gone
12 in and just described the key locations that they
13 have captures on the cameras.
14     Q  You wouldn't have said, This person visits
15 the City of Norfolk frequently or infrequently?
16     A  You would have been able to infer that
17 context from, like, the key locations, but
18 otherwise, no, it wouldn't have been -- it
19 wouldn't have been something that would come up
20 in, like, a geographic profile of an individual
21 based on this data, in my experience.
22     Q  In reviewing Miss Arrington's key

186

1  locations were you able to infer how frequently
2  she visits the City of Norfolk?
3      A  I didn't conduct that analysis here.
4      Q  If you take a look at Exhibit 47 again,
5  this is Dr. Estevez's report.  If we can take a
6  look together at paragraph 36.
7      A  Which page is that on?
8      Q  It should be --
9          MR. FROMMER:  14.
10     Q  Thank you very much, page 14.  Do you see
11 that Dr. Estevez found that Miss Arrington was not
12 captured by a Flock camera located in the City of
13 Norfolk on 65 percent of the days that he
14 reviewed?
15     A  Sorry.  Which bullet point is the -- it's
16 in No. 36 then; right?
17     Q  Yes.
18     A  It's hard for me -- so can you repeat your
19 question?
20     Q  Sure.  Are you aware that Dr. Estevez
21 found that Miss Arrington was not captured by a
22 Flock camera located in the City of Norfolk on 65

187

1  percent of the days that he reviewed?
2      A  I mean I'm honestly a little bit confused
3  about this because it lists -- so okay.  So it's
4  65 percent not captured at all and 5 percent only
5  once.  Okay.  Yes.
6      Q  Mm-hmm.  Is that consistent with your own
7  analysis of Miss Arrington's Flock data?
8      A  I didn't conduct this same analysis.
9      Q  You have no reason to believe this figure
10 is inaccurate; is that right?
11         MR. FROMMER:  Objection.  Calls for
12 speculation.  Incomplete hypothetical.
13     A  Yeah, I can't speak to the, the veracity
14 of this.
15     Q  If Miss Arrington's vehicle was not
16 captured by any Flock camera in the City of
17 Norfolk on 65 percent of, of days, would that be
18 consistent with Miss Arrington visiting the City
19 of Norfolk frequently or infrequently in your
20 view?
21         MR. FROMMER:  Objection.  Calls for --
22 well, objection.  Form.

188

1      A  Yeah, you would need additional,
2  additional information to, to make the
3  determination of frequent or infrequent, which
4  honestly it's not -- it's just not something that
5  I think would honestly come up for a crime
6  analyst.
7      Q  What additional information would you need
8  to determine whether or not Miss Arrington was
9  visiting the City of Norfolk?
10         MR. FROMMER:  Objection.  Mischaracterizes
11 prior testimony.
12     A  So we're talking about a singular plate
13 here.  You could have information that a person
14 drives multiple vehicles or goes with other
15 people.
16     Q  Okay.  If we assume that Miss Arrington
17 only uses one vehicle to drive, if you knew that
18 she was not captured by a Flock camera in the City
19 of Norfolk on 65 percent of days -- withdrawn.
20         Beyond whether or not someone uses a car
21 with a different license plate, what other
22 information would you need to determine whether or

Case 2:24-cv-00621-MSD-LRL    Document 114-13    Filed 09/15/25    Page 17 of 28
PageID# 2680

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Andrew P. Wheeler, Ph.D.
Conducted on September 4, 2025

48 (189 to 192)

189

1  not Miss Arrington visits the City of Norfolk
2  frequently or infrequently beyond the Flock camera
3  data provided in this case?
4      MR. FROMMER: Objection. Vague and
5  incomplete hypothetical. You can answer.
6      A Yeah, I mean I can give examples of other
7  data that you could use. I don't have, like, an
8  exhaustive list. Like, you could know that she
9  works in the city, so, like, know that her
10 employer's address.
11     Q Got it. How would that be used to
12 determine whether or not Miss Arrington visits the
13 city frequently or infrequently?
14     MR. FROMMER: Same objection.
15     A So based on -- if you know somebody works
16 at a particular location, you can -- I think
17 it's -- you can make a pretty reasonable inference
18 that they -- like, if you know that they have to
19 physically come into their place of work, that
20 they visit the city frequently.
21     Q If you learned that on 65 percent of days
22 Miss Arrington's car was not captured by any Flock

190

1  Safety camera in the City of Norfolk, would you
2  infer that on 65 percent of days she did not visit
3  the City of Norfolk?
4      MR. FROMMER: Objection. Calls for
5  speculation. Incomplete hypothetical.
6      A No, not necessarily.
7      Q Why not?
8      A Like, I gave examples of other scenarios
9  in which Ms. Arrington could travel to the city.
10     Q What are those scenarios?
11     A The examples I gave previously, like, she
12 traveled with a friend into the city. So you
13 wouldn't know.
14     Q Okay. So based just on captures of Miss
15 Arrington's vehicle you wouldn't know whether or
16 not she traveled into the city on those 65 percent
17 of days?
18     A No.
19     Q So your report walks through an example
20 day for Miss Arrington on March 20th at page 15;
21 correct?
22     A My analysis starts on page 14, but yes.

191

1      Q Thank you. Yes. But your analysis --
2  well, doesn't matter. But your analysis of the
3  March 20th trip begins on page 15; is that right?
4      A That appears correct, yes.
5      Q Okay. It's comprised of a series of
6  captures from 7:50 a.m. to 2:20 p.m.; correct?
7      A 7:50 -- yes. What I write about here is
8  that time span.
9      Q Why did you decide to analyze this
10 particular day?
11     A I can't say as I had a specific
12 methodology. I essentially just looked at the map
13 and then pulled up, pulled up an example day and
14 walked through it.
15     Q When you say you looked at the map, what
16 were you looking for when you were looking at the
17 map?
18     A I was looking at both the, the license
19 plate reader hits as well as the time in between
20 the hits.
21     Q So you had a map depicting license plate
22 hits and the time in between hits?

192

1      A Yes. I don't -- yes.
2      Q And just to make sure we're not talking
3  past each other, are you referring here to the
4  figures that you produced at Figures 8 through 12
5  at pages 17 through 19 of your report or are you
6  talking about kind of the map you're using to look
7  at the Flock camera data in aggregate when you
8  were initially providing -- were analyzing it?
9      A I'm sorry. I'm having a hard time
10 distinguishing between the question. So the --
11 the -- so I put, like, example figures in the
12 report, but it includes, like, a bigger map that I
13 look at broader stuff in, yes.
14     Q All right. Let me try the question again.
15     How did you select this day to analyze?
16     A I, like -- I -- just looking at the data I
17 could see that there was many captures nearby one
18 another, and so I just picked a particular day
19 where you could trace the movements through.
20     Q Okay. So you picked a day where there
21 were a lot of captures; is that right?
22     MR. FROMMER: Objection. Mischaracterizes

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Andrew P. Wheeler, Ph.D.
Conducted on September 4, 2025

50 (197 to 200)

197

1  distribution around that particular location, but
2  you could basically make inferences like she
3  didn't continue on down the street because she
4  wasn't captured by a subsequent camera. So it's
5  likely based on those two points as well as, like,
6  not being captured on nearby cameras as well.
7      Q  Do you know the location of other Flock
8  cameras in the area depicted in Figure 8?
9      A  No.  I do not have it memorized the
10 location of the Flock cameras.
11     Q  When you were drawing this inference about
12 what Miss Arrington did between 7:50 and 8:38, did
13 you know the location of other Flock cameras in
14 this area?
15     A  Yes.  I would have in the maps and the
16 other analysis that I did.
17     Q  Okay.  You state that you can infer that
18 Crystal conducted some other activity in this
19 location.  What do you mean by "this location"?
20     A  This location, like, again, it would be
21 based on where the other subsequent cameras were
22 to basically box it in where the approximate area

198

1  of doing something here would be.
2      Q  Okay.  Is it the area depicted in the
3  outer bounds of Figure 8?  Is that the outer
4  bounds of the location that you're identifying
5  here?
6      A  No.  The map does not annotate
7  specifically the area.
8      Q  Okay.  Do you know how large that area is?
9      A  I -- I did not -- I did not make -- I did
10 not estimate the total area for it in this
11 scenario, no.
12     Q  Okay.  So you didn't estimate the location
13 in which Crystal potentially conducted this other
14 activity in Figure 8.  Is that accurate?
15     A  To just, like, reiterate my inference,
16 based on the particular captures of the locations,
17 my inference is that she likely conducted some
18 business in this particular area.  So that isn't
19 to say it's at a specific address, and it isn't --
20 there's a --the way that the cameras are set up
21 it's basically difficult to not be boxed into a
22 particular area.  So I don't -- so that's why I

199

1  make that inference she's likely doing something
2  at this particular location.
3      Q  My question though is how large is the
4  location or area that you think that she was in
5  while she was doing that activity?
6      A  Yeah, I'm sorry.  I didn't do the analysis
7  here to do that.
8      Q  And what do you mean by "some other
9  activity"?
10     A  I'm basically -- so we know that she's not
11 driving and being captured on the cameras, and so
12 that basically leaves one to conclude that she's
13 not driving at that particular time.
14     Q  Do you know anything about the other
15 activity that she is doing other than that she is
16 not driving?
17     A  For this particular example, no.
18     Q  Can we take a look at Figure 9 on page 17?
19 And sorry.  We're going to flip back and forth
20 again.
21        So this is back to page 16 which is
22 describing Figure 9.  You write: "In Figure 9

200

1  Crystal is then captured at the camera on Twin
2  Pines and Towne Point Road on the southbound
3  camera two times: Once at 9:47 and another at
4  11:37.  Again, one can subsequently infer some
5  time spent in the local area to generate the two
6  different captures given their time apart"; is
7  that right?
8      A  Yes.
9      Q  Okay.  And again, what is the basis for
10 this opinion?
11     A  It's based on those two captures as well
12 as the distribution of the subsequent, the other
13 Flock cameras in the area.
14     Q  Do you describe or depict the location of
15 the other Flock cameras in the area in this
16 portion of your report?
17     A  The Figure 9 shows the captures which
18 obviously a camera's at a location where there was
19 a capture on, and it does show an additional
20 camera.  That's only within the view for, of the
21 image though.
22     Q  I see.  There's the green dot?

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Andrew P. Wheeler, Ph.D.
Conducted on September 4, 2025

51 (201 to 204)

---

**201**

1      A  The green dot, yes.

2      Q  I see.  Do you believe there are any other

3   Flock cameras in this location?  Do you think this

4   is a comprehensive overview of them?

5      A  You'll have to be more specific.

6      Q  Okay.  Let me try it again.  So when you

7   say that she was -- so you spent some time in this

8   local area.  What do you mean by "local area"?

9      A  Again, I didn't do a specific analysis to

10  box it in in this scenario.  I did do that in,

11  like, some of the other scenarios, but, so I would

12  have to go — I just didn't do it for that

13  specific example here.

14     Q  Okay.  So you don't offer an opinion in

15  this report about how large that area was, do you?

16     A  Not in this specific area — not in this

17  specific example, no.

18     Q  And you write: "One can infer some time

19  spent in the local area."

20        What do you mean by "some time spent"?

21     A  Oh, it's just the time between the two

22  captures.  So we know that she was in the car at

---

**202**

1   9:47 and 11:37.

2      Q  Do you know what else she was doing in

3   between those two captures?

4      A  No.  I didn't do analysis for that here.

5      Q  Okay.  Take a look at Figure 12.  It's on

6   page 19, and we're going to do the same thing

7   again.  I'm so sorry.  We're going back to page 16

8   right afterwards.

9   ██████████████████████████████

10  ██████████████████████████████

11  ██████████████████████████████

12  ██████████████████████████████

13  ██████████████████████████████

14  ██████████████████████████████

15  ██████████████████████████████

16  ████████████

17     Q  And just to make sure that I understand

18  what you're saying in this report, are you

19  inferring from the Flock data that Miss Arrington

20  visited her father on this date?

21     A  I'm inferring that she was just in this

22  general area.

---

**203**

1      Q  Okay.  How large is this general area that

2   you've identified?

3      A  I didn't — I didn't provide an exact

4   geographic area.  Yeah.  I didn't provide an exact

5   geographic area for this.

6      Q  Do you know how many people live in this

7   general area?

8      A  No, I don't.

9      Q  Do you know if there are any other

10  locations of interest in this general area?

11     A  Locations of interest for — for what?

12  Can you be more specific?

13     Q  Stores, churches, anything of the like?

14     A  There was likely — I'm trying to

15  remember.  Let me see my, my streets.  I forget —

16  so it's residential neighborhoods north and south

17  of Lafayette, but there could have been commercial

18  establishments on Lafayette.

19     Q  So it's your view that -- your inference

20  is that Miss Arrington could have been visiting a

21  residential neighborhood to the north or the south

22  of Lafayette Boulevard?

---

**204**

1      A  I think it was more, much more likely to

2   be south based on her subsequent capture at — and

3   I'll refer to — I see you have the same one up —

4   so Figure R1 in the revision.  So you have the

5   captures number one, number two, number three,

6   going up, is it Ballentine, and then Lafayette,

7   and then you have number four later in an hour at

8   Tidewater.  So based on the totality of that

9   information I think it — like, I make that

10  inference that she was in this particular area.

11     Q  Got it.  And if you take a look at page 6,

12  the top paragraph, you say, and this is page 6 of

13  your rebuttal report because we're flipping back

14  and forth.  "I can make the inference that Crystal

15  likely stayed in the approximate area south of

16  Lafayette in Figure R1 as that would imply a

17  typical driving pattern to result from captures

18  listed"; is that right?

19     A  Sorry.  Where was that again?

20     Q  The top paragraph of page 6 of your

21  rebuttal report, the last sentence.

22     A  Yes.

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Andrew P. Wheeler, Ph.D.
Conducted on September 4, 2025

52 (205 to 208)

---

205

1    Q  Okay.  What is the basis for your
2  understanding of what a typical driving pattern
3  is?
4    **A  A Typical driving pattern here, I just mean**
5  **not taking a – like, taking direct routes in**
6  **between locations.**
7    Q  What's your basis for the claim that that
8  is how Miss Arrington likely traveled on this
9  particular day?
10   **A  It's – it's not specific to Miss**
11 **Arrington at all.  It's just – it as a general**
12 **inference about individuals.  So most individuals**
13 **don't go out of their way.  They'll take the most**
14 **direct route in between places.**
15   Q  What is that general inference about
16 individuals based on?
17   **A  It's – it's based on general utility.  So**
18 **most people do the thing that's easiest, and here**
19 **easiest or fastest driving between two locations**
20 **they'll take the shortest route, shortest and most**
21 **direct route.**
22   Q  Is that just based on your personal

---

206

1  experience as a person in the world?
2    **A  It's – yeah, I mean I could describe,**
3  **like, economic utility theory that people do the**
4  **thing that costs them the less money, but sure.**
5  **It's based on my experience that most people drive**
6  **directly in between, take the most direct route.**
7    Q  And that experience is just your
8  experience as a person driving yourself?
9        MR. FROMMER:  Objection.  Mischaracterizes
10 prior testimony.
11   **A  It's – I think – I'm totally comfortable**
12 **saying I think the majority of time people take**
13 **the most direct route in between two locations.**
14   Q  And what is the basis for that statement?
15   **A  The basis for that statement is based on**
16 **my understanding of utility theory as well as the**
17 **way that's sufficient.**
18   Q  What is your understanding of utility
19 theory from?
20   **A  So economic utility theory, which comes up**
21 **in criminal justice as well, like, people weighing**
22 **costs and benefits and whether they should take a**

---

207

1    **particular action or not.  It's a very general —**
2    **like, it — I'm pretty sure it comes up in, like,**
3    **Intro Econ 101 classes, so...**
4    Q  Have we discussed all of the inferences
5    that you drew regarding Miss Arrington's --
6    regarding Miss Arrington and the Flock data that
7    you reviewed that are contained in your reports?
8    **A  What's in my report are the inferences**
9    **that I drew.**
10   Q  Okay.  In preparing your reports did you
11 analyze whether it was possible to infer that Miss
12 Arrington visited any other destinations in the
13 City of Norfolk that you did not ultimately
14 discuss in your reports?
15   **A  Can you repeat that question?**
16   Q  In preparing your reports did you analyze
17 whether it was possible to infer that Miss
18 Arrington visited any other places in the City of
19 Norfolk that you did not ultimately discuss in
20 your reports?
21   **A  No.**
22   Q  Am I correct that you identified only one

---

208

1  location in the City of Norfolk that Miss
2  Arrington may have visited in a two-month period?
3    **A  I only — let me look at my, my reports.**
4  **I only discuss this one example in my report.**
5    Q  Okay.  So I am correct that you identified
6  only one location in the City of Norfolk that Miss
7  Arrington may have visited in a two-month period?
8        MR. FROMMER:  Objection.  Mischaracterizes
9  prior testimony.
10   **A  Yeah, the analysis that I did wasn't to**
11 **make an exhaustive list of all the places she**
12 **did — she visited.  It was just to — I picked**
13 **out an example day.**
14   Q  Okay.  Am I correct that in your reports
15 you identified only one location in the City of
16 Norfolk that Miss Arrington may have visited in a
17 two-month period?
18   **A  The analysis I provided only focused on a**
19 **singular location for just that one day.**
20   Q  Am I correct that you analyzed only one
21 day of travel in the City of Norfolk for Miss
22 Arrington in your reports?

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Andrew P. Wheeler, Ph.D.
Conducted on September 4, 2025

54 (213 to 216)

213

1    A  Yes.
2    Q  And all of these captures occurred on a
3  single day; correct?
4    A  From the information conveyed to me later,
5  yes.
6    Q  Why did you decide to analyze these
7  particular captures in your report?
8    A  I don't have — I don't recall, like, a
9  systematic process via which I picked the
10 particular days and locations.  Yeah.  So I don't
11 have a specific methodology why I picked a
12 particular day.
13   Q  Did you reference the interrogatory
14 responses that Mr. Schmidt provided in this case
15 when deciding whether or not to discuss this
16 location in your report?
17   A  I can't specifically recall.  I can't
18 recall specifically why I picked that, that
19 location, whether it was based on the
20 interrogatory information or not.
21   Q  Okay.  So your testimony under oath is
22 that you don't know why you decided to analyze the

214

1  Norfolk Naval Station Commissary in your report;
2  is that correct?
3    A  It's — so if the — if the question is —
4  I didn't really have information related to
5  Mr. Schmidt and those, those key locations.  I
6  didn't systematically pick a particular day or
7  route.  So I just kind of — kind of at random I
8  picked a day and a route to sort of just show as
9  exemplars here.
10   Q  Right.  So I'm now referring to your
11 analysis of your -- your inference that
12 Mr. Schmidt visited the area around the Norfolk
13 Naval Station Commissary, do you recall that
14 analysis?
15   A  Yes.
16   Q  Okay.  And I'm asking you why you decided
17 to analyze or why you decided to infer in your
18 report that Mr. Schmidt may have traveled to the
19 location around the Norfolk Naval Station
20 Commissary?
21   A  Like I said, the times and examples I gave
22 were ad hoc.  There wasn't a systematic

215

1  methodology to it, and so it was — it was one of
2  the examples that I drew on and just showed the
3  regular travel pattern.
4    Q  So your testimony under oath is you did
5  not include the Norfolk Naval Station Commissary
6  in your report because you knew that Mr. Schmidt
7  traveled to that location from the interrogatory
8  responses?
9    A  Yeah.  I honest — I honestly can't say —
10 I definitely did have knowledge of that, but I
11 don't remember my specific reasoning to pick that
12 location over others.
13   Q  We can move on to Figure 4 on page 11.  So
14 this shows the four captures spread out across two
15 Flock cameras that are depicted in Figure 2; is
16 that right?
17   A  I presume that's the case, yes.
18   Q  Okay.  And flipping back to page 9.
19 Sorry, we're back in — going back and forth.  You
20 write: "Figure 4 shows repeated captures around
21 the Norfolk Naval Station Commissary"; right?
22   A  Yes.

216

1    Q  And you write:  "If they are familiar with
2  the area, defendants' employees can probably
3  figure out where Lee went, particularly if they
4  can determine the registered owner of the car and
5  consult other sources of information like license
6  and address information generally available with
7  law enforcement or public open source
8  intelligence"; is that right?
9    A  Yes.
10   Q  So --
11   A  Oh, can I amend — can I amend actually?
12 I do remember now why I picked this particular
13 location, and it was because I wanted to show an
14 example around a potentially sensitive location,
15 like a government facility.  So that's the reason
16 that I do remember picking this particular
17 example.
18   Q  So that's why you select, you decided to
19 include it in your report.  Is that your
20 testimony?
21   A  Yes, it is.
22   Q  Okay.  When you decided to include it in

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Andrew P. Wheeler, Ph.D.
Conducted on September 4, 2025

55 (217 to 220)

217

1 your report, did you know that Mr. Schmidt visited
2 this particular location?
3    A  I don't -- it's -- I'm pretty sure I did.
4 I can't say with a hundred percent certainty
5 though.
6    Q  Okay.  Are you offering an opinion that
7 based exclusively on Mr. Schmidt's Flock data the
8 NPD could determine that he visited the Norfolk
9 Naval Station Commissary?
10    A  No.
11    Q  Are you offering an opinion that if the
12 NPD only knew the name of the registered owner of
13 Mr. Schmidt's vehicle and had access to Flock data
14 they could determine where Mr. Schmidt went in
15 this area?
16    A  Can you repeat that, the information that
17 they had?
18    Q  If they only knew the name of the owner of
19 Mr. Schmidt's vehicle and had access to Flock
20 data, is it your testimony they could determine
21 where Mr. Schmidt went in this area?
22    A  Only based on that information, no.

218

1 There's likely other open source or information
2 that you could figure out that Mr. Schmidt was
3 part of the Navy.
4    Q  Okay.  Are you offering the opinion that
5 if you only knew Mr. Schmidt's name, home address
6 and had access to the Flock data, you could
7 determine when Mr. Schmidt went in this area?
8    A  In this particular example, no.
9    Q  Okay.  You reference here public open
10 source intelligence as a source of potential
11 information about where Mr. Schmidt went in this
12 area.  Do you see that?
13    A  I just said it, but did I reference it in
14 my document -- in my report?
15    Q  Yes.  It's the -- if you take a look at
16 the last paragraph on page 9.
17    A  Yes.
18    Q  And so you think that if you had access to
19 Mr. Schmidt's Flock data and also his name and
20 also public open source intelligence, you might be
21 able to figure out where Mr. Schmidt went in this
22 area?  Is that your testimony?

219

1    A  Yes.  I think that's reasonable.
2    Q  What is public open source intelligence?
3    A  A lot of it's -- imagine you Google and
4 just find out information, and so it may be
5 Facebook or LinkedIn.  Like, I use, say here,
6 Facebook is probably a more common source of
7 information.
8    Q  Okay.  Did you review Mr. Schmidt's public
9 open source information?
10    A  No, I did not.
11    Q  Okay.  So you don't know if based on
12 Mr. Schmidt's public open source information you
13 could determine where he went in this area; is
14 that correct?
15    A  Can you say that again?
16    Q  You don't know based on Mr. Schmidt's
17 public open source intelligence whether or not you
18 can infer where Mr. Schmidt went in this area; is
19 that right?
20       MR. FROMMER:  Objection.  Mischaracterizes
21 prior testimony.
22    A  So I didn't do the analysis of his public

220

1 data.
2    Q  Did you consider other potential locations
3 that Mr. Schmidt could have visited in this area?
4    A  Can you -- other potential locations that
5 he could visit in this area?
6    Q  Yeah.  And I apologize.  Can we take two
7 minutes off the record?  I've left something in a
8 different room.  I'll be right back.  It's just
9 the two demonstratives on the table in there, in
10 the conference room.
11       THE VIDEOGRAPHER:  Do you still want to go
12 off the record, Counsel?
13       MS. ROSS:  Just for a minute.  I'm sorry,
14 everyone.  I apologize.
15       THE VIDEOGRAPHER:  We're going off the
16 record.  The time is 2:55.
17       (A discussion was held off the record.)
18       THE VIDEOGRAPHER:  We are back on the
19 record.  The time is 14:56.
20 BY MS. ROSS:
21    Q  I'm going to mark as Exhibit 51 a
22 demonstrative we made of the area surrounding the

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Andrew P. Wheeler, Ph.D.
Conducted on September 4, 2025

64 (253 to 256)

253

1 approximately an hour; is that right?

2   **A Yes.**

3   Q  Okay.  Did you consider the possibility

4 that Mr. Schmidt traveled to multiple locations in

5 this area during that hour?

6   **A  Again, I would have to look at the**

7 **location of the Flock cameras that you could**

8 **basically box in where they could have been.  I**

9 **definitely knew that there was these multiple**

10 **locations there.  Like I said, that there's a —**

11 **I'm pretty sure that there's a post office around**

12 **here.**

13      **Again, it's based on all — like, this**

14 **repeated pattern to me is most consistent about**

15 **going grocery shopping.**



254

255

6      Q  Take a look at page 20 of your report.  So

7 you -- this is -- I'm looking at the top

8 paragraph.  You claim "Defendants have the

9 capability with their current technology to simply

10 monitor everyone who visits particular locations.

11 They can determine the times of visits and further

12 people who actually stopped at a given location

13 based on patterns of capture and noncapture, and

14 even consult other sources of information to

15 figure out what was going on in a given location

16 at a given time"; is that right?

17   **A  Yes.**

18   Q  How are you defining particular locations

19 here?

20   **A  Here it would just mean locations that**

21 **have a Flock camera nearby.**

22   Q  Do you mean that you can infer using Flock

256

1 camera data that someone is visiting a particular

2 building?

3   **A  It's — it's possible, yes.  Yeah.**

4   Q  What have you seen, or what is the basis

5 for your claim that it's possible that the NPD has

6 the ability to monitor everyone who visits a

7 particular location?

8   **A  It's based on the — for this particular**

9 **example you have a camera right outside of a**

10 **particular place of worship, and so it's based on**

11 **that scenario where you have a camera right**

12 **outside of a facility that you can determine the**

13 **people who have visited that particular location.**

14   Q  Okay.  So it's based on this example,

15 these two examples you provide in your report?

16   **A  These are two — the — I'm — can you**

17 **repeat the question?  Sorry.**

18   Q  So your claim that the NPD has the ability

19 to monitor everyone who visits a particular

20 location, is that based on the two examples you

21 provide in this report?

22   **A  It's — it's not only based on the**

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Andrew P. Wheeler, Ph.D.
Conducted on September 4, 2025

67 (265 to 268)

---

265

1  would provide about this document with counsel?
2     A  My understanding is it's -- that's
3  privileged.
4        MR. FROMMER:  Yeah.  Instruction not to
5  answer on work product grounds.
6        MS. ROSS:  Okay.  So we think we're
7  entitled to know the, whether or not the
8  conversation occurred and the general subject
9  matter of the conversation just as if it was a
10  privilege log.
11        MR. FROMMER:  Well, he acknowledged that
12  we spoke about it, and it was concerning this
13  e-mail.
14     Q  Okay.  Dr. Wheeler, when were you retained
15  in this case?
16     A  I don't know the exact date.
17     Q  Was it in May of 2025?
18     A  I'm sorry.  I don't have the -- I don't
19  have any materials to know the exact date.
20     Q  Was it shortly before you received this
21  e-mail from Mr. Soyfer?
22     A  I can't remember if the retention -- when

266

1  I signed the contract for retention was before or
2  after this date.
3     Q  And so Exhibit 54 is an e-mail from
4  Michael Soyfer to you on May 9th, 2025, entitled
5  Norfolk Flock ALPR Litigation - Documents; is that
6  correct?
7     A  That's correct.
8     Q  Who is Mr. Soyfer?
9     A  He is counsel for the Institute for
10  Justice.
11     Q  And Mr. Soyfer writes in his e-mail to
12  you: "I wanted to pass along the addresses we
13  know our clients visit frequently."
14        Do you see that?
15     A  Yes.
16     Q  You know, "It's eventually these will be
17  in an interrogatory response so you will be able
18  to reference that in your report."
19        Do you see that?
20     A  Yes.
21     Q  Is this the only e-mail you received from
22  Mr. Soyfer containing location information for the

267

1  plaintiffs in this case?
2     A  I believe so.
3     Q  What do you mean when you say you believe
4  so?
5     A  I -- we've had many e-mails, and so I
6  can't recall them with a hundred percent accuracy.
7     Q  Okay.  And if you take a look at this
8  e-mail, it contains a number of locations for
9  Mr. Schmidt and Miss Arrington; is that correct?
10     A  Correct.
11     Q  And those locations are full addresses for
12  certain buildings in the City of Norfolk and
13  Portsmouth, Virginia; is that correct?
14     A  That's correct.
15     Q  Okay.  What did you do with this
16  information when you received it?
17     A  This particular information I -- I don't
18  know the exact timing of events.  As you can see
19  in the e-mail, that eventually these will be in
20  the interrogatory response, so I cannot remember
21  if I did anything with this particular e-mail or
22  if I waited till the interrogatory response came.

268

1     Q  Your testimony under oath today is that
2  you received this e-mail with locations for
3  plaintiffs and you waited until you received
4  interrogatory responses to analyze these
5  addresses?
6     A  I -- it could have just -- I don't know.
7  I'm -- I don't know the exact time period, so,
8  when, between this e-mail, the interrogatory
9  responses and then incorporating it into my data
10  analysis.  I don't know the exact timing of
11  events.
12  [redacted]
13  [redacted]
14  [redacted]
15  [redacted]
16  [redacted]
17     A  Sorry.  Can you repeat the question?
18     Q  After receiving this e-mail from
19  Mr. Soyfer identifying Mr. Schmidt's home address,
20  did you do anything to analyze the Flock captures
21  around that address?
22     A  To just reiterate the analysis that I did,

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Andrew P. Wheeler, Ph.D.

Conducted on September 4, 2025

68 (269 to 272)

269

1  I basically plotted the entire, the entire Flock
2  locations and then superimposed the key locations
3  on those, on that particular map.
4      Q  So is your testimony today that you never
5  did any analysis of whether or not it was possible
6  to infer that Mr. Schmidt lived or visited his
7  home address?
8      A  Can you repeat that question?
9      Q  Is it your testimony today that you never
10 did any analysis after receiving this e-mail of
11 whether or not it was possible to infer that
12 Mr. Schmidt lived at the home address provided to
13 you by Mr. Soyfer?
14     A  The -- the analysis that I did in my
15 report is, is the analysis that I conducted.  So
16 there wasn't, like, additional analyses I did that
17 didn't make it into the report.
18 ████████████████████████████████
19 ████████████████████████████████
20 ████████████████████████████████
21     A  I did the analysis that's in the -- that's
22 in the report.  I don't know off the top of my

270

1  head where this particular location is.
2      Q  I understand that you did the analysis
3  that's in your report.  I'm asking if you did any
4  other analyses not contained in your report based
5  on this information that you received from
6  plaintiffs' counsel?
7      A  No, I did not.  There's not, like, other
8  analyses that aren't in the report.
9      Q  So when you received this list of
10 addresses from plaintiffs' counsel, you decided to
11 ignore these addresses?
12     A  I did the analysis sort of in the opposite
13 way that you're suggesting.  Like, I looked at the
14 ALPR captures and then superimposed these key
15 locations on the map.  I didn't start from these
16 key locations and then look at the captures.  It
17 was the opposite way.  I looked at the ALPR and
18 then superimposed on some of those maps when they
19 were key.
20     Q  I see.  So is it your testimony that you
21 created a map of the Flock captures like the maps
22 we've been discussing today and then

271

1  superimposed onto that map markers for these
2  different key locations?
3      A  Yes.
4      Q  Okay.  And the markers for those key
5  locations, did they include all of the locations
6  listed on this e-mail from Mr. Soyfer?
7      A  They did not.  So there was a few
8  locations that were subsequently removed:  The
9  Sentara Hospital and the Doumar's Cones &
10 Barbecue.
11     Q  When you say "subsequently removed," what
12 do you mean?
13     A  I don't -- I don't remember the exact, the
14 exact scenario where we discussed it, but
15 essentially I removed those addresses when they
16 weren't in the interrogatory response.
17     Q  Okay.  So they were on the map that you
18 had created with the Flock data, and then you
19 removed these addresses, the Sentara Norfolk
20 General Hospital and Doumar's Cones & Barbecue.
21 Is that your testimony?
22         MR. FROMMER:  Objection.  Mischaracterizes

272

1  prior testimony.
2      A  The -- the locations that I considered in
3  terms of my -- my -- my opinion in this report are
4  not based on -- are not based on Sentara and
5  Doumar's.
6      Q  I understand.  What I am asking is, if you
7  originally had a map that contained Flock captures
8  and also all of the key locations contained in
9  this e-mail from Mr. Soyfer and then subsequently
10 removed some of these locations?  Is that what
11 happened?
12     A  I don't know the exact -- I don't know a
13 hundred percent for sure.
14     Q  Why don't you know?
15     A  I would have to go reference my materials.
16 I would have to go reference those maps that I
17 made.
18     Q  Why would you remove some of the locations
19 from your map?
20     A  It would have been because based on
21 subsequent discussion we had.
22     Q  Okay.  What was that discussion?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Andrew P. Wheeler, Ph.D.

69 (273 to 276)

Conducted on September 4, 2025

---

273

1    A  So it would have just been in meetings
2  that I had with folks at IJ discussing the reports
3  I produced and then subsequent edits to those.
4    Q  Would you have proposed removing Sentara
5  Norfolk General Hospital and Doumar's Cones &
6  Barbecue from the map that you generated with the
7  Flock data?
8    A  They — again, the analysis I —
9       MR. FROMMER: I'm sorry.  Objection.
10  Mischaracterizes prior testimony.  You're assuming
11  that a map that he says he can't remember is in --
12  existed.
13    Q  You can answer.
14    A  Can you repeat the question again?
15    Q  Would you have proposed removing Sentara
16  Norfolk General Hospital and Doumar's Cones &
17  Barbecue from the map you created containing Flock
18  data?
19       MR. FROMMER:  Again, same objection.
20  Mischaracterizes prior testimony.
21    A  The analysis that I did, again, it was —
22  it was basically in the opposite direction.  Like,

---

274

1  I plotted the points and then superimposed some of
2  these key locations.
3       So the key locations didn't drive the
4  analysis.  It was where the Flock camera hits
5  were.  So, like, these — these didn't determine,
6  like, where I focused my analysis on.
7    Q  I'm asking a different question.  Did you
8  generate a map containing all the Flock captures
9  that you were reviewing and then superimpose all
10  of the key locations that Mr. Soyfer identified in
11  this e-mail onto that map?
12    A  I would have to go and review my
13  materials.  I'm not — I'm not a hundred percent
14  sure.
15    Q  Did you create maps that were not produced
16  in this case?
17    A  Yes.  So I have, like, interactive maps
18  that you can't share in, like, a physical
19  document.
20    Q  If you -- if these are interactive maps,
21  how would you go back and consult them to
22  determine whether or not you originally had all of

---

275

1  these key locations plotted onto a map containing
2  the Flock captures in this case?
3    A  I could look at the — like, it would be
4  imbedded in the — imbedded in the document —
5  imbedded in the, like, the interactive map I could
6  go see.
7    Q  Okay.  Do you have an understanding of
8  whether or not all of these locations were
9  identified to defendants in this case in
10  plaintiffs' discovery responses?
11    A  Can you say that again?
12    Q  Do you have an understanding of whether or
13  not all of the key locations contained in
14  Mr. Soyfer's e-mail were identified to defendants
15  in this case?
16    A  Oh, I don't — I don't have any other
17  additional information besides those interrogatory
18  responses.
19    Q  Did you ever receive any other e-mails
20  like this?
21       MR. FROMMER: Objection.  Vague.  "Like
22  this."  It's ambiguous and asked and answered.

---

276

1    A  I don't — I don't recall seeing any
2  additional e-mails that look like this as of,
3  like, a list of key locations.



9    Q  Did you subsequently decide to focus your
10  analysis on those two license plates?
11    A  Yes.
12    Q  Why did you do so?
13    A  I knew that those were the two plaintiffs
14  in this case, so that's why I focused on those.
15    Q  Okay.  So, Dr. Wheeler, your sworn
16  testimony today is that you have done no analysis
17  and no review of the locations contained in this
18  e-mail from Mr. Soyfer that do not otherwise
19  appear in your report; is that correct?
20    A  My — my response is I do not know.  I'm
21  — I would have to go and review those particular
22  maps.  In terms of — let me — let me say this.

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Andrew P. Wheeler, Ph.D.
Conducted on September 4, 2025

70 (277 to 280)

277

1  So I don't know if the additional locations I ever
2  plotted on a map.  I would have to go look at my
3  maps.
4        Now, additional analysis I know is not the
5  case.  So I a hundred percent know I didn't like,
6  go in and try to do travel patterns around the
7  Norfolk General Hospital, and I know I didn't go
8  and do additional analysis around Doumar Cones &
9  Barbecue.  Like, I know that for certain.
10    Q  Why?  Why did you not do that analysis?
11    A  Because, like I said, it was the -- it
12 went in the opposite direction.  So I chose
13 particular locations based on the distribution of
14 the Flock camera captures and then just used those
15 as exemplars and then -- and then when those were
16 amongst this group of key locations, I
17 superimposed those on the map.
18    Q  So when you say that you chose particular
19 locations to analyze based on the distribution the
20 Flock camera captures, does that mean that there
21 were not Flock camera captures around all of the
22 locations in this e-mail from Mr. Soyfer?

278

1        A  No.  Again, it was the opposite.  I drew
2  the locations of where the captures were and then
3  went and did a more detailed analysis of where
4  those were.
5     Q  I just want to understand.  So I
6  understand this to be a two-step process.  You
7  superimposed the Flock capture on a map, and then
8  you add the key locations identified in this
9  e-mail.
10       Had you drawn any inferences about the
11 locations to analyze before superimposing the key
12 locations onto the map that you were reviewing?
13       MR. FROMMER:  Objection.  Mischaracterizes
14 prior testimony.  He's repeatedly said --
15       MS. ROSS:  Counsel, I'd prefer you refrain
16 from speaking objections.
17       A  The -- so the inferences that I make in
18 the final report are based on all of the
19 information that I had available to me.  So it
20 wasn't just -- it was all of the Flock locations
21 as well as these key locations that I had.  So it
22 was -- I considered everything.  I didn't con -- I

279

1  didn't like hypothetically think, like, well, how
2  would I -- would I have made this inference with
3  information that I already had access to.
4     Q  Okay.  If we could turn back to your
5  report, to page 20 of your report.  And so we were
6  discussing earlier your assertion that defendants
7  have the capability to monitor everyone who visits
8  particular locations.
9        Do you recall that discussion?
10    A  Yes.
11    Q  Okay.  You provide two examples of
12 locations in the City of Norfolk in this section
13 of your report; is that right?
14    A  Yes.
15    Q  What are you trying to show in Figure 13
16 on page 20?
17    A  That there's cameras -- that there's a
18 camera located just outside of the Jehovah
19 Witness.
20    Q  Okay.  It's your assertion that it would
21 be possible based on the location of the single
22 Flock camera to make inference -- to identify all

280

1  vehicles that pass by before or after regular
2  services of this church; is that right?
3        MR. FROMMER:  Objection.  Mischaracterizes
4  prior testimony.
5     A  Yeah, I don't -- I don't make the claim
6  that it's not possible to go to this particular
7  location and not be -- not be captured by the
8  cameras.  I think it's unlikely but not
9  impossible.
10    Q  Okay.  So your claim is that it's possible
11 that the Flock camera located outside the Kingdom
12 Hall Jehovah's Witnesses captures people attending
13 services there?
14       MR. FROMMER:  Again, objection.
15 Mischaracterizes prior testimony.
16    A  It captures people traveling by the
17 location which using other information I believe
18 you could infer, like, who goes, who attends that
19 particular church.
20    Q  What other information do you have in
21 mind?
22    A  The same types of open intelligence as

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Andrew P. Wheeler, Ph.D.
Conducted on September 4, 2025

301

1    A  Yes, it is possible.
2    Q  Okay.  That's all the questions I have.
3  Thank you very much for your time today.
4    A  Thank you.
5        MR. FROMMER:  We'll reserve until trial.
6        THE VIDEOGRAPHER:  If there's nothing
7  further, please stand by.  This marks the end of
8  the deposition of Andrew Wheeler.  We are going
9  off the record at 17:18.
10       THE REPORTER:  Did you want a copy of the
11 transcript?
12       MR. FROMMER:  Yeah, rough and when --
13 today's Thursday?
14       MS. ROSS:  Yeah.
15       MR. FROMMER:  What yeah a rough and then
16 whenever, when can you do a rush by?
17       MS. ROSS:  We'll take it as fast as you
18 can.
19       (Off the record at 5:19 p.m.)
20
21
22

302

1      CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC
2      I, Janet A. Hamilton, Registered Diplomate
3   Reporter and Notary Public before whom the
4   foregoing deposition was taken, do hereby certify
5   that the foregoing transcript is a true and
6   correct record of the testimony given; that said
7   testimony was taken by me stenographically and
8   thereafter reduced to typewriting under my
9   direction; that review was not requested; and that
10  I am neither counsel for, related to, nor employed
11  by any of the parties to this case and have no
12  interest, financial or otherwise, in its outcome.
13     IN WITNESS WHEREOF, I have hereunto set my hand
14  this 7th day of September, 2025.
15
16
17
18
19
20  Registered Diplomate Reporter
21  My commission expires
22  March 31, 2028