# EXHIBIT 14

## Unredacted Exhibit Filed Under Seal Per Protective Order



# Transcript of Lee Schmidt

**Date:** August 26, 2025
**Case:** Schmidt and Arrington -v- City of Norfolk, et al.

**Planet Depos**
**Phone:** 888.433.3767 **| Email:** transcripts@planetdepos.com
**www.planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF VIRGINIA
 3     - - - - - - - - - - - - - - - - - - -x
 4  LEE SCHMIDT and CRYSTAL          :
 5  ARRINGTON,                       :
 6              Plaintiffs,          :
 7      vs.                   : Civil Action No.
 8  CITY OF NORFOLK and MARK TALBOT, : 2:24-CV-00621
 9  in his official capacity as Norfolk : MSD-LRL
10  Chief of Police,
11              Defendants.          :
12     - - - - - - - - - - - - - - - - - - x
13
14       VIDEOTAPED DEPOSITION OF LEE SCHMIDT
15             Norfolk, Virginia
16          Tuesday, August 26th, 2025
17               12:35 p.m.
18
19
20  Job No.: 596868
21  Pages: 1 - 280
22  Reported by:  Amy A. Brauser, RPR, RMR, CRR
```

**Page 2**

```
 1      Videotaped Deposition of LEE SCHMIDT, held at the
 2  office of:
 3
 4
 5
 6          Kaufman & Canoles, P.C.
 7          150 West Main Street, 21st Floor
 8          Norfolk, Virginia 23510
 9          (757) 624-3000
10
11
12
13      Pursuant to agreement, before Amy A. Brauser, RPR
14  RMR CRR, Notary Public in and for the Commonwealth of
15  Virginia.
16
17
18
19
20
21
22
```

**Page 3**

```
 1          A P P E A R A N C E S
 2
 3  ON BEHALF OF THE PLAINTIFFS:
 4      ROBERT FROMMER, Esquire
 5      TAHMINEH DEHBOZORGI, Esquire
 6      MICHAEL SOYER, Esquire (via Zoom)
 7      The Institute for Justice
 8      901 N. Glebe Road, Suite 900
 9      Arlington, Virginia 22203
10      (703) 682-9320
11      rfrommer@ij.org
12      tdehbozorgi@ij.org
13
14
15
16
17
18
19
20
21
22
```

**Page 4**

```
 1        A P P E A R A N C E S  (con't)
 2
 3  ON BEHALF OF THE DEFENDANTS:
 4      E. MARTIN ESTRADA, Esquire
 5      LIAM GENNARI, Esquire
 6      Munger, Tolles & Olson, LLP
 7      350 South Grand Avenue
 8      Los Angeles, California 90071
 9      (213) 683-9253
10      martin.estrada@mto.com
11      lgennari@mto.com
12       (and)
13      JONATHAN KRAVIS, Esquire
14      Munger, Tolles & Olson LLP
15      601 Massachusetts Avenue NW
16      Suite 500 East
17      Washington, D.C. 20001
18      (202) 220-1130
19      jonathan.kravis@mto.com
20
21
22
```



**Page 5**

A P P E A R A N C E S  (con't)

ON BEHALF OF THE CITY OF NORFOLK:

    KARLA J. SOLORIA, Esquire

    Norfolk City Attorney

    900 City Hall Building

    810 Union Street

    Norfolk, Virginia 23510

    (757) 664-4529


ALSO PRESENT:

    Alex Dickerson-Watson, Video Specialist

    Briana Sample, Video Specialist


**Page 7**

INDEX OF EXHIBITS  (con't)

Exhibit 10   Flock camera photograph of Mr.        201
             Schmidt's Jeep Cherokee on
             03/06/2025

Exhibit 11   Plaintiff Lee Schmidt's              204
             Supplemental Response to
             Defendants' Interrogatory 7

Exhibit 12   Spreadsheet of Flock data on         226
             Mr. Schmidt's Jeep Cherokee

Exhibit 13   Flock Camera Captures for Plate      232
             9254XL, 04/01/2025 to 04/08/2025

Exhibit 14   Email string, Bates NORF017455       248
             to 461

Exhibit 15   Joint Notice of New Authority        261

Exhibit 16   Declaration of Plaintiff Lee         272
             Schmidt

**Page 6**

INDEX OF EXAMINATIONS

By Mr. Estrada . . . . . . . . . . . . . . Page 9


INDEX OF EXHIBITS

NUMBER       DESCRIPTION          MARKED/IDENTIFIED

Exhibit 1    Plaintiff Lee Schmidt's Responses    30
             to Defendants' First Set of
             Interrogatories

Exhibit 1    Plaintiff Lee Schmidt's Responses    31
             to Defendants' First Set of
             Interrogatories

Exhibit 2    Complaint for Declaratory and        93
             Injunctive Relief

**Page 8**

P R O C E E D I N G S

1

2     THE VIDEOGRAPHER:  Here begins Media

3  Number 1 of the videotaped deposition of

4  Lee Schmidt in the matter of Schmidt and

5  Arrington versus the City of Norfolk in the

6  United States District Court of the Eastern

7  District of Virginia, Case

8  Number 2:24-cv-00621-MSD-LRL.  Today's date

9  is 08/26/2025.  The time on the video monitor

10 is 12:35.

11     The videographer today is Alex

12 Dickerson-Watson representing Planet Depos.

13 This video deposition is taking place at

14 Kaufman & Canoles, PC, Norfolk.

15     Would counsel, please, identify

16 themselves and state who they represent?

17     MR. ESTRADA:  Good morning, or good

18 afternoon.  Martin Estrada on behalf of the

19 City of Norfolk.

20     MR. GENNARI:  Liam Gennari on behalf of

21 the City of Norfolk.

22     MR. KRAVIS:  Jonathan Kravis on behalf

Transcript of Lee Schmidt
Conducted on August 26, 2025

---

**29**

1  Q.  So she went to college now?
2  **A.  Yes.**
3  Q.  Where do you live?
4  **A.  Norfolk.**
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22



---

**30**

1  Q.  Okay.  Let me show you an exhibit now.
2  This will be my Tab 3A.  This will be Exhibit 1.
3  (Exhibit Number 1 was marked for identification.)
4  BY MR. ESTRADA:
5  Q.  Okay.  Do you have Exhibit 1 in front
6  of you?
7  **A.  I do.**
8  Q.  Exhibit 1 is a document titled,
9  "Plaintiff Lee Schmidt's Responses to Defendants'
10  First Set of Interrogatories."
11  Do you see that?
12  **A.  Yes, sir.**
13  Q.  Now, if you look at page 4 of that
14  document.
15  Before I ask that, have you seen this
16  document before?
17  **A.  I have.**
18  Q.  Have you reviewed it?
19  **A.  I did.**
20  Q.  Is it accurate?
21  MR. FROMMER:  I instruct the witness to
22  take time to review the document.

---

**31**

1  (Witness reviews document.)
2  THE WITNESS:  It looks like the
3  document I signed previously.  It was
4  accurate when I signed it.
5  BY MR. ESTRADA:
6  Q.  Okay.  Let's look at page 4.  It says
7  Interrogatory Number 1, which reads as follows:
8  (Reading)
9  Identify all vehicles that you
10  have driven --
11  MR. FROMMER:  But we have a bad copy of
12  the exhibit.
13  MR. ESTRADA:  Page 4?
14  MR. FROMMER:  Yeah.
15  MR. ESTRADA:  Oh.  Let me take a look.
16  It's the first set of interrogatories.  Do
17  you guys have second set or first set?
18  MR. FROMMER:  I have first set.
19  MS. DEHBOZORGI:  Yeah.
20  MR. ESTRADA:  So they've got the right
21  ones.
22  (Exhibit Number 1 was re-marked for identification.)

---

**32**

1  BY MR. ESTRADA:
2  Q.  Okay.  So we'll start over.  You have
3  in front of you Exhibit Number 1, which is titled,
4  "Plaintiff Lee Schmidt's Responses to Defendants'
5  First Set of Interrogatories."
6  If you look at page 17, there's a
7  verification which has your signature.  Do you
8  recall reviewing this document and verifying its
9  accuracy?
10  **A.  I do recall that.**
11  Q.  Excuse me.  Okay.  Now look at page 4.
12  And you'll see Interrogatory Number 1 at the top.
13  Do you see that?
14  **A.  I do.**
15  Q.  Interrogatory Number 1 reads as
16  follows:  (Reading)
17  Identify all vehicles that you
18  have driven since May 1st, 2022,
19  including the make, model, year, color
20  and license plate number of each
21  vehicle.
22  Do you see that?

---

Transcript of Lee Schmidt
Conducted on August 26, 2025

33

1    A.    I do.

2    Q.    In the response, there are four
3 vehicles listed:  A brown 2021 Jeep Grand Cherokee,
4 a green 2018 Subaru Outback, a black 2014
5 Volkswagen Passat and a Gray 2004 Saab 9-3 Arrow.
6         Do you see that?

7    A.    I do.

8    Q.    Which of those four vehicles remain at
9 your home?

10   A.    All three except the Saab.

11   Q.    So you're -- Madelyn Cooper did not
12 take the black Volkswagen Passat?

13   A.    No.

14   Q.    Okay.  Of these three vehicles that
15 remain in your home, the brown Jeep Cherokee, the
16 green Subaru Outback, the black Volkswagen Passat,
17 which is your primary vehicle?

18   A.    The Grand Cherokee.

19   Q.    Which is Laura Schmidt's primary
20 vehicle?

21   A.    The green Subaru.

22   Q.    Who drives the black Volkswagen Passat?

34

1    A.    Madelyn.

2    Q.    Okay.  Starting with the brown Jeep
3 Cherokee -- brown Jeep Cherokee, excuse me.  Does
4 anyone apart from yourself in your household drive
5 that car?

6    A.    Not typically.

7    Q.    Does anyone apart from yourself and
8 your household drive that car, whether typically or
9 atypically?

10   A.    Yes.

11   Q.    Who else drives that car?

12   A.    My wife might very, very rarely.

13   Q.    Is there anyone else that might drive
14 your Jeep Cherokee?

15   A.    No.

16   Q.    When did you get the Jeep Cherokee?

17   A.    In 2020.

18   Q.    How often do you drive the Jeep
19 Cherokee?

20   A.    Whenever I go out.  Maybe a couple
21 times a week.

22   Q.    So you drive it about twice a week?

35

1    A.    Maybe three or four.

2    Q.    Let me ask you this:  Do you drive your
3 car every day of the week?

4    A.    It depends on the week.

5    Q.    So on some weeks, you will drive every
6 day?

7    A.    Yeah.

8    Q.    On some weeks, you won't drive it every
9 day?

10   A.    That's correct.

11   Q.    On average, how many times per week do
12 you drive your car?  Sorry.  Let me withdraw the
13 question.

14         On average, how many days per week do
15 you drive your car?

16         MR. FROMMER:  Objection, calls for
17    speculation.

18         If you have an idea, you can answer.

19         THE WITNESS:  I really don't know.

20 BY MR. ESTRADA:

21   Q.    Okay.  Would you -- I want an
22 approximation from you.  Approximately how many

36

1 days a week would you say you drive your car?

2         MR. FROMMER:  Again, objection, calls
3    for speculation.

4         You can answer.

5         THE WITNESS:  Three to four.

6 BY MR. ESTRADA:



Transcript of Lee Schmidt
Conducted on August 26, 2025



**Page 40**

5  Q.   What car would you take?

6  **A.   Typically, my Jeep.**

7  Q.   Okay.  And then you mentioned the

8  grocery store on Saturday mornings?

9  **A.   Yeah.**

10  Q.   Did you drive to the grocery store?

11  **A.   Yes.**

12  Q.   What car would you take?

13  **A.   Typically, my Jeep.**

14  Q.   Would you do that -- withdraw that.

15       Would you go to the grocery store alone

16  or with someone else?

17  **A.   With my wife.**

18  Q.   And typically, you would drive your

19  wife on Saturday mornings?

20  **A.   Yes.**

21  Q.   In the Jeep Cherokee?

22  **A.   Yes.**

Transcript of Lee Schmidt
Conducted on August 26, 2025



Transcript of Lee Schmidt
Conducted on August 26, 2025



Transcript of Lee Schmidt
Conducted on August 26, 2025

14 (53 to 56)

53

1    Q.   Explain to me how it works, the
2 shopping lists.
3    **A.   It's on the side of fridge, and if**
4 **someone finishes something, they write it on there,**
5 **or if we want something, we write it on there.**
6    Q.   And so if you're going out, you'll pick
7 up whatever is on that list?
8    **A.   Yes.**



15    Q.   Do you recall that?
16       So are those the days you would stop by
17 the grocery store to pick something up?
18    **A.   I don't know what days I would stop at**
19 **the grocery store.  It varies.**
20    Q.   I guess what I'm trying to understand
21 is, would you leave the house just to pick up
22 something from the grocery list or would you do it

54

1 only if you were going out for some other reason?
2    **A.   It would vary.**
3    Q.   Depending on what?
4    **A.   If I needed something, then I would go**
5 **to the grocery store.  If I was out doing something**
6 **else and I was going to be by the grocery store,**
7 **then I would take the shopping list.**
8    Q.   Do you need water?
9
10
11    Q.   The green Subaru, do you ever drive
12 that vehicle?
13    **A.   I do.**
14    Q.   How often?
15    **A.   I don't have a number.**
16    Q.   Once a week?
17    **A.   Possibly.**
18    Q.   Twice a week?
19    **A.   Possibly.**
20    Q.   Four times a week?
21    **A.   Doubt.**
22    Q.   Three times a week?

55

1    **A.   Doubtful.**
2    Q.   So one to twice a week; is that right?
3    **A.   Possibly.**
4    Q.   What would depend on whether you drive
5 the green Subaru or not, whether it's blocked in
6 the driveway?
7    **A.   And where we're going.**
8    Q.   How would where you're going affect
9 whether you drive one car versus the other?
10    **A.   If I am going with my wife.**
11    Q.   If you're going with your wife, would
12 you drive the green Subaru?
13    **A.   I'd be more likely to drive it.**
14    Q.   Does she prefer the green Subaru?
15    **A.   She doesn't like driving my Jeep.**
16    Q.   Apart from you and your wife, does
17 anyone else drive the green Subaru?
18    **A.   No.**
19    Q.   And you and your wife are both insured
20 for the green Subaru, right?
21    **A.   Yes.**
22    Q.   You and your wife are both insured for

56

1 the brown Cherokee?
2    **A.   Yes.**
3    Q.   The Passat that's still at your home,
4 do you ever drive that during the week?
5    **A.   Occasionally.**
6    Q.   How often?
7    **A.   Maybe once.**
8    Q.   Once a week; is that right?
9    **A.   Probably more like once or twice a**
10 **month.**
11    Q.   What factors into whether or not you
12 drive the Passat once or twice a month?
13    **A.   Now it's just because it's left at the**
14 **house.  To keep it moving.**
15    Q.   During the -- withdraw the question.
16       When did your daughter stop driving the
17 black Passat?
18    **A.   August 23rd or 25th, whenever move-in**
19 **day was.**
20    Q.   Okay.  So during the time --
21    **A.   Or 18th, whatever.  Tuesday, like**
22 **two weeks ago.**

57

1    Q.    Okay.  So during the time from
2  January 1st of this year, 2025 --
3    A.    Okay.
4    Q.    -- to let's say June of this year,
5  2025, how often would you drive the black Passat?
6    A.    On occasion.  Maybe once or twice a
7  month.
8    Q.    Who else in your household would drive
9  the black Passat during the period of January of
10 2025 to June 2025?
11    A.    My daughter.
12    Q.    Anyone else?
13    A.    My wife might occasionally.
14    Q.    Are you insured for the black Passat?
15    A.    I am.
16    Q.    Is your wife insured for the black
17 Passat?
18    A.    She is.
19    Q.    And your daughter, Marilyn Cooper, is
20 she insured for the black Passat?
21    A.    Madelyn?
22    Q.    Yes.

58

1    A.    Yes.
2    Q.    All right.  Let's take a look at page 6
3  of Exhibit 1.  Exhibit 6 -- sorry, Exhibit 1,
4  page 6, states Interrogatory Number 4:  (Reading)
5        Identify the ten locations
6      within the City of Norfolk that you
7      have visited most frequently in the
8      reporting period, including the name
9      and address of each location, as well
10     as the dates on which you've visited
11     each location.
12    Q.    Do you see that?
13    A.    I do.
14    Q.    And the reporting period, as stated
15 here, is February 19, 2025 to the present.  And you
16 would have signed this May 22nd, 2025.
17    Q.    Do you have those time frames in mind?
18    A.    What was the time frame again?  May
19 to . . .
20    Q.    February 19th, 2025 to May 22nd, 2025.
21    A.    So about a month?
22    Q.    More than a month.

59

1    A.    You said February --
2    Q.    So let me -- I'll withdraw the
3  question.
4        The date range we're talking about --
5    A.    Yeah.
6    Q.    -- is February 19th, 2025 to May 22nd,
7  2025.  Do you have that time frame in mind?
8    A.    Okay.
9    Q.    Okay.  And for that time period, we
10 asked:  (Reading)
11        Identify the ten locations
12     within the city of Norfolk that you
13     have visited most frequently,
14     including the name and address of each
15     location, as well as the dates on
16     which you have visited each location.
17    Q.    Do you see that?
18    A.    Yes.
19    Q.    Response towards the bottom of page 6
20 lists seven locations, going on to page 7.
21    A.    Okay.
22    Q.    Why didn't you list ten locations?

60

1        MR. FROMMER:  Objection, calls for
2    speculation.
3        If you recall, you can answer.
4        THE WITNESS:  What was your question
5    again?
6  BY MR. ESTRADA:
7    Q.    You listed seven locations.  Why not
8  ten?
9    A.    I think the reason we listed seven in
10 our objection, I don't maintain records of
11 everywhere that I go.
12
13
14
15
16
17
18
19
20
21
22



Case 2:24-cv-00621-MSD-LRL    Document 114-14    Filed 09/15/25    Page 12 of 43
PageID# 2709
Transcript of Lee Schmidt
Conducted on August 26, 2025

16 (61 to 64)



Transcript of Lee Schmidt                                    24 (93 to 96)
Conducted on August 26, 2025

93

1    A.    Thank you.
2    Q.    But if you want to take a break.
3         MR. FROMMER:  Yeah, I think.
4         THE WITNESS:  If I can have a couple
5    minutes.  I need to go to the restroom as
6    well.
7         MR. ESTRADA:  Quick break.
8         THE VIDEOGRAPHER:  We're going off the
9    record.  The time is 2:06 p.m.
10        (Recess taken.)
11        THE VIDEOGRAPHER:  We are now back on
12   the record.  The time is 2:18 p.m.
13   BY MR. ESTRADA:
14   Q.    Okay.  Back on the record.
15   Mr. Schmidt, understand you're still under oath?
16   A.    Yes, sir.
17   Q.    So when we took the break, you were
18   talking about an intersection which, because there
19   was cameras there, you felt were problematic?
20   A.    Yeah.
21   Q.    So let's get into your Complaint now,
22   if we would.  We'll have that marked as Exhibit 2.

94

1    (Exhibit Number 2 was marked for identification.)
2    BY MR. ESTRADA:
3    Q.    You can set that aside for now,
4    Exhibit 1 to the side.  Put Exhibit 2 in front of
5    you.
6         Looking at the first page of Exhibit 2,
7    it's a document titled "Complaint for Declaratory
8    and Injunctive Relief."
9         Do you see that?
10   A.    Yes.
11   Q.    And this is a document, it's stamped
12   October 21st, 2024 at the top, right?
13   A.    Yes.
14   Q.    Do you recognize this document?
15   A.    Yes.
16   Q.    What is this document?
17   A.    It's the Complaint.
18   Q.    Did you review it before it was filed?
19   A.    I did.
20   Q.    Are you confident that everything in
21   the Complaint is accurate?
22   A.    Yes.

95

1    Q.    Did you take any steps to ensure that
2    everything in the Complaint would be accurate?
3    A.    I read it and I asked questions.
4    Q.    And in reading it and asking questions,
5    were you satisfied that the final product was
6    accurate?
7    A.    Yes.
8    Q.    Okay.  Looking at page 2 of the
9    Complaint.  You have that in front of you?
10   A.    I do.
11   Q.    The first paragraph reads:  (Reading)
12        The City of Norfolk, Virginia
13   the City, has installed a network of
14   cameras that make it functionally
15   impossible for people to drive
16   anywhere without having their
17   movements tracked, photographed, and
18   stored in an AI-assisted database that
19   enables the warrantless surveillance
20   of their every move.
21        Do you see that?
22   A.    Yes.

96

1    Q.    Do you believe that the Flock cameras
2    allow for surveillance of a person's every move in
3    the city of Norfolk?
4    A.    Yes.
5    Q.    What is that belief based on?
6    A.    I think the example I gave you.  If I
7    go through that intersection, make a turn and then
8    continue up the street, they're right there.  The
9    cameras continue throughout my travels.
10   Q.    Do the cameras tell you where your
11   journey started from?
12   A.    They don't tell me that, no.
13   Q.    Do you think they tell the Norfolk
14   Police Department where your journey started from?
15   A.    Say that again.
16   Q.    Do you believe that the Flock cameras
17   tell the Norfolk Police Department where your
18   journey started from in the example you gave?
19   A.    I think geographically, yes.
20   Q.    What do you mean by that?
21   A.    Neighborhood.
22   Q.    What neighborhood are you referring to?

Transcript of Lee Schmidt
Conducted on August 26, 2025

97



21    Q.    So you believe that a camera two miles
22 away from your home would be able to tell the

99

1    A.    I've driven by them.

10    Q.    So the closest camera is half a mile
11 away, correct?
12    A.    I believe so.
13    Q.    I should say, closest camera based on
14 your belief is half a mile away; is that right?
15    A.    Maybe, yeah.
16    Q.    But there is no camera directly outside
17 your home, right?
18    A.    Correct.
19    Q.    There's no camera within the
20 residential neighborhood, correct?
21    A.    Not that I'm aware.
22    Q.    Now, you mentioned these -- the Flock

98

1 Norfolk Police Department where your journey
2 started from?
3    A.    There's more cameras before that
4 intersection.
5    Q.    Outside -- is there a camera outside
6 your home?
7    A.    Not right outside my home, no.
8    Q.    So there's no camera that would be able
9 to tell the Norfolk Police Department what home
10 your journey started from, right?
11    A.    No camera.
12    Q.    So, again, there's no camera outside
13 your home.  So there's no camera that would be able
14 to tell the Norfolk Police Department what home
15 your journey started from, correct?
16    A.    Correct.
17    Q.    Now, the intersection you're referring
18 to is two miles away from your home.  Do you
19 believe that there are Flock cameras closer to your
20 home?
21    A.    Yes.
22    Q.    What's that belief based on?

100

1 camera at the intersection of Granby and Oak Creek;
2 is that right?
3    A.    Little Creek.
4    Q.    Sorry.
5         You mentioned a Flock camera at the
6 intersection of Granby and Little Creek, right?
7    A.    Yes.
8    Q.    And you mentioned that Flock camera
9 being problematic because it could help determine
10 where you go; is that right?
11        MR. FROMMER:  Objection, misstates
12    prior testimony.
13 BY MR. ESTRADA:
14    Q.    Okay.  Why don't you tell me why you
15 believe the Flock camera at the intersection of
16 Little Creek and Granby is problematic.
17    A.    It's not just those.  I think it's all
18 of them.  I'm saying "them" as a system.  I was
19 using that intersection as just an example to be
20 able to determine how your movement is.
21    Q.    So how do you believe the camera at
22 that intersection determines -- well, allows

Transcript of Lee Schmidt
Conducted on August 26, 2025

113

6    Q.   Okay.  So in both an official or
7 unofficial capacity, have you ever informed the
8 Norfolk Police Department of your daily habits,
9 routines, driving patterns?
10   A.   I don't believe so.
11    Q.   In an official or unofficial capacity,
12 have you ever told any employee or official of the
13 Norfolk Police Department where you typically drive
14 on weekdays and weekends?
15   A.   I don't believe so.
16    Q.   Okay.  If you look back at the
17 Complaint, still we're on Paragraph 8, the last
18 line.  It's -- the Complaint reads:  (Reading)
19          They -- meaning you and
20          Crystal Arrington -- worry about how
21          someone might use or misuse that
22          information, especially given the

114

1          minimal restrictions on access.
2       Do you see that?
3   A.   Yes.
4    Q.   What is your -- excuse me.  What is
5 your worry, specifically?
6   A.   I mean, I think the news has covered it
7 enough recently with some of the misuse of police
8 officials.  But I think that in particular, if
9 someone chose to abuse it, if -- then it could be
10 abused.
11    Q.   Do you have a specific concern about
12 the Norfolk Police Department abusing the Flock
13 system as it pertains to you or your family?
14   A.   Yes.
15    Q.   What is that concern?
16   A.   That it could be abused.
17    Q.   Well, I'm asking do you have a specific
18 concern as it pertains to the Norfolk Police
19 Department's use of the Flock system as it pertains
20 to you or your family?
21   A.   I guess maybe we have a different
22 understanding.  The fact that it can be abused, to

115

1 me is the -- is the -- that's the way I look at it.
2 It's the ability for it to be abused is the issue.
3    Q.   So the possibility of it being abused
4 is your concern; is that right?
5   A.   Yes.
6    Q.   You have nothing more specific than
7 that, correct?
8   A.   Correct.
9    Q.   Let's take a look now at page 12 of the
10 Complaint.  You have page 12 in front of you?
11   A.   I do.
12    Q.   Looking at page 12, Paragraph 53, it
13 reads: (Reading)
14         The specter of surveillance
15         looms large in Lee's life.
16       That refers to you?
17   A.   Uh-huh.
18    Q.   Well, let me go back because we talked
19 about "uh-huhs."  We need a "yes" or "no" for the
20 court reporter.
21   A.   I'm sorry.  Yes.
22    Q.   So let me ask it again.  (Reading)

116

1         The specter of surveillance
2         looms large in Lee's life.
3         "Lee" refers to you, correct?
4   A.   Yes.
5    Q.   (Reading)
6         Just outside his neighborhood,
7       there are four Flock cameras.
8       Do you see that?
9   A.   Yes.
10    Q.   (Reading)
11         Lee drives by these cameras
12       and others he sees around town nearly
13       every day.
14       Do you see that?
15   A.   Yes.
16    Q.   (Reading)
17         And the Norfolk Police
18       Department can use the information
19       they record to build a picture of his
20       daily habits and routines.
21       Do you see that?
22   A.   Yes.

Transcript of Lee Schmidt
Conducted on August 26, 2025

---

**117**

1    Q.    Now, when you refer to four Flock
2 cameras just outside your neighborhood, what are
3 you referring to?
4    **A.    Those are the ones we spoke about**
5 **earlier, the Wards Corner ones.**
6    Q.    The ones at the intersection of Granby
7 and Little --
8    **A.    Little Creek, yes.**
9    Q.    Outside Granby and Little Creek, right?
10    **A.    Yes.**
11    Q.    And those are two miles away from your
12 home, correct?
13    **A.    Yes.**
14    Q.    Do you consider two miles outside of
15 your home to be just outside your neighborhood?
16    **A.    Yes.**
17    Q.    When you refer to "a picture of his
18 daily habits and routines," what specifically are
19 you referring to?
20    **A.    The fact that the cameras can determine**
21 **where I go.**
22    Q.    But what are those daily habits and

**118**

1 routines you're referring to?
2    **A.    I do not understand what you're asking.**
3    Q.    When you say that the Norfolk Police
4 Department can use the information from the Flock
5 system to record a picture of your daily habits and
6 routines, what daily habits and routines are you
7 referring to?
8    **A.    We spoke about what my habits and**
9 **routines are.  Those — that is what I would be**
10 **concerned with at this point.**
11

12
13
14
15
16    Q.    When you say that -- withdraw the
17 question.
18        When the Complaint states you drive by
19 these cameras nearly every day, do you -- we talked
20 about this earlier -- in fact, you drive three to
21 four times a week, right?
22    **A.    Uh-huh.**

**119**

1    Q.    Correct?
2    **A.    Yes.**
3    Q.    It's not true that you're driving every
4 day, right?
5    **A.    Correct.**
6    Q.    Correct, that that's not true, right?
7    **A.    Currently.**
8    Q.    At the time this Complaint was filed,
9 were you driving every day?
10    **A.    Yes.**
11    Q.    That's not true anymore?
12    **A.    Correct.**
13    Q.    During the time frame from January 1st
14 to June of 2025, were you driving nearly every day?
15    **A.    It was about three to four at that**
16 **time.  And, actually, as of this week, I do drive**
17 **every day.**
18    Q.    Okay.  What changed in the time of the
19 filing of this Complaint to the period of January
20 to June 2025 when you stopped driving nearly every
21 day?
22    **A.    Sorry, say that again.**

**120**

1    Q.    So you said during January to June of
2 2025, you drove three to four times a week, right?
3    **A.    Uh-huh.**
4    Q.    Correct?
5    **A.    Correct.  Sorry.**
6    Q.    At the time the Complaint was filed,
7 your testimony is you drove nearly every day,
8 right?
9    **A.    Correct.**
10    Q.    So what changed in your driving
11 patterns to reduce your driving on a weekly basis?
12
13
14

15
16
17
18
19
20    Q.    So let's go back to filing the
21 Complaint.  At what point did you stop driving
22 nearly every day?



129

1  don't know the specifics of any of that stuff.  It
2  was just an online news article.  I think it was
3  404 Media or something like that.
4      Q.   Let me bring you back to this case.
5      A.   Correct.
6
7
8
9
10
11
12
13
14  BY MR. ESTRADA:
15      Q.   Do you have any information telling you
16  that they actually could?
17      A.   No, I don't — I don't have any
18  information on that, no.
19      Q.   Now, at Paragraph 54 of your Complaint,
20  you say:  (Reading)
21           If the cameras capturing him
22           turning right, the NPD can infer that

130

1           he's going to the shooting range.
2           Right?  That's what the Complaint says,
3  correct?
4      A.   Oh.  Which — sorry.  Which you said?
5      Q.   Paragraph 54 --
6      A.   54.  Yep.
7      Q.   -- of the Complaint.
8      A.   Yep, correct.
9      Q.   Okay.  So going back to the map that's
10  Exhibit 3, if you're driving southbound through --
11  along Granby to Little Creek Road and you make a
12  right onto Little Creek Road, you'd be driving west
13  on Little Creek Road, right?
14      A.   Correct.
15
16
17
18      Q.   There's no Flock camera outside the
19  Superior Gun Shop, right?
20           MR. FROMMER:  Objection, calls for
21      speculation.
22           THE WITNESS:  I don't know where all

131

1      the cameras are at.
2  BY MR. ESTRADA:
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

132

Transcript of Lee Schmidt
Conducted on August 26, 2025

34 (133 to 136)

133



7 BY MR. ESTRADA:
8    Q.   Do you believe the Flock cameras could
9 tell where you stopped along the road?
10        MR. FROMMER: Objection, calls for
11    speculation.
12        THE WITNESS: Like I said, I think they
13    can give you the general area you go to, at a
14    minimum.
15 BY MR. ESTRADA:
16    Q.   Okay.  Apart from the general area,
17 could they tell when you specifically stopped?
18    **A.   Like I said, I think they can give you**
19 **a general area of where you go.**
20    Q.   So is your answer that they can't tell
21 where you specifically stopped?
22    **A.   My answer is they can give, at a**

134

1 **minimum, the general area of where you went.**
2    Q.   Do you believe they can tell you where
3 you specifically stopped?
4    **A.   I don't know.  I haven't gotten a Flock**
5 **login to see what it can -- and I don't mean that**
6 **in a smart aleck way.  I haven't seen the system.**
7 **I think at a minimum, from what I've read and seen,**
8 **the cameras, I think, can, at a minimum, give you**
9 **an area of where you've went.**
10    Q.   And that area where you went, if you
11 turned right at the intersection and proceeded west
12 on Little Creek Road, is the whole Sussex, Virginia
13 Gardens, Algonquin Park area, right?
14    **A.   Okay.**
15    Q.   Correct?
16    **A.   Yeah.**
17
18
19
20
21    Q.   It's also possible you could stop at
22 the Starbucks along the way, right?

135

1    **A.   I think your map is wrong.  I don't**
2 **think there's a Starbucks there.  But yes.**
3    Q.   And there are various streets that turn
4 in to residences, right?
5    **A.   I believe so.**
6    Q.   So it's possible if you made a right at
7 the intersection, went westbound along Little Creek
8 Road, you could stop at a residence along the way,
9 right?
10    **A.   Possibly.**
11    Q.   There's a lot of possibilities, right?
12    **A.   There are possibilities.**
13
14
15
16
17        MR. ESTRADA: I need Tab 14.
18    (Exhibit Number 4 was marked for identification.)
19 BY MR. ESTRADA:
20    Q.   Okay.  I'm going to show you Exhibit 4.
21        Okay.  Do you have Exhibit 4 in front
22 of you?

136

1    **A.   I do.**
2    Q.   So I'll represent to you this is a more
3 zoomed-in version of the intersection at Granby and
4 Little Creek Road.
5        Do you have that map in front of you?
6    **A.   I do.**
7    Q.   And this map depicts four Flock cameras
8 at that intersection that are taking pictures of
9 vehicles traveling northbound, southbound,
10 westbound, and eastbound.
11        Do you see that depicted by the arrows?
12    **A.   Yes.**
13    Q.   Okay.  Going back to Paragraph 54 of
14 your Complaint.  The last line of Paragraph 54
15 states: (Reading)
16        If the cameras capture him
17    turning left, the NPD can infer that
18    he's going to the grocery store.
19        Do you see that?
20    **A.   Yes.**
21
22



**137**

1

2    Q.    So going back to the map at Exhibit 4,

3  if you traveled southbound towards the intersection

4  of Granby and Little Creek Road and turn left, you

5  would be going east, right?

6    A.    Yes.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

**138**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

**139**

1  BY MR. ESTRADA:

2    Q.    So my question is, how would the

3  Norfolk Police Department know if you went

4  eastbound at Little Creek, that you weren't

5  stopping at Starbucks, Great Clips.  Be surprised

6  at how many people get cuts, beard cuts.  Touche.

7  Harris Teeter, Wendy's, Chipotle, Old Virginia Ham

8  Shop, how would they know that?

9        MR. FROMMER:  Again, objection, calls

10       for speculation, incomplete hypothetical.

11       THE WITNESS:  Like I said, they'll have

12       the minimum area as to where I'm at.

13  BY MR. ESTRADA:

14    Q.    But they won't have the specific

15  location, correct?

16    A.    They'll have a minimum area.

17    Q.    But not the specific location, correct?

18    A.    I don't — I haven't seen it in the

19  system, but I think they will have a minimum area.

20  I don't know what they'll have in the system.

21    Q.    A minimum area, but not a specific

22  location, correct?

**140**

1    A.    I don't know what they'll have in the

2  system, I haven't seen it, but they'll have a

3  minimum.

4    Q.    When you refer to what they might have

5  in the system, what do you -- what do you mean?

6    A.    I haven't seen what Flock produces.

7  Like I haven't seen what the cameras do.  I assume

8  it's just snapshots.  So I don't want to say

9  "correct."

10    Q.    Well, do you believe the Flock system

11  captures businesses, houses, apartments that you

12  ultimately stop at?

13    A.    I don't know how wide the angle is.

14  It's — because if that one's pointing, I don't

15  know what it gets.  I mean, that camera is pretty

16  close.  I don't know how wide it is.  That's why

17  I'm saying it with this one.

18    Q.    I mean, if the camera is only focused

19  on the public street and the backs of vehicles

20  traveling on the public street, do you believe it

21  would capture a specific location you went to

22  within a mini mall?

Transcript of Lee Schmidt
Conducted on August 26, 2025

36 (141 to 144)

141

1        MR. FROMMER: Objection, incomplete
2   hypothetical.
3        THE WITNESS: I'm not sure.
4   BY MR. ESTRADA:
5        Q.   You don't know?
6        A.   I don't.
7        Q.   By turning left and going eastbound on
8   Little Creek Road, there are many other locations
9   you could stop at, correct?
10       A.   There are.
11       Q.   Now, another thing I wanted to show you
12  on this map, let's say you made a left and went
13  eastbound on Little Creek and you turned into the
14  mini mall, stopped at Harris Teeter, Starbucks or
15  Great Clips, you could exit through Louisiana
16  Drive, right?
17       A.   I could.
18       Q.   And then continue southbound on Granby
19  Street, right?
20       A.   Would depend where I was going.
21       Q.   Correct?
22       A.   I could.

142

1        Q.   So if you wanted to go to the school
2   and the Harris Teeter or the Starbucks or the Great
3   Clips or any of the other various locations, there
4   are other routes you could take, right?
5        A.   There are.
6        Q.   Turning back to Exhibit 3. If you were
7   to make a right on Little Creek Road going
8   westbound, there are various other locations you
9   could stop at apart from the Superior Gun & Shop,
10  right?
11       A.   What are you referring — we're
12  referring to?
13       Q.   Well, there's businesses, there's
14  residences. There's various locations you could
15  stop.
16       A.   The reason I say that is, the map's
17  wrong with those businesses. Like the O'Reilly
18  Parts is not there. The Dollar Tree is not there.
19  Starbucks isn't there. The Dollar Tree is not
20  here. The Wendy's isn't there. The map is
21  incorrect.
22       Q.   Okay.

143

1        A.   It's pretty — pretty drastically for
2   the businesses. At least the ones in the middle
3   are really off, I know that. I think the Dollar
4   Tree is actually over in this shopping center over
5   here (indicating). O'Reilly's, I don't know where
6   that is.
7        Q.   Okay. You travel westbound on West
8   Little Creek, there's a Miller gas station, right?
9        A.   I believe -- I don't know, but I think
10  there's a gas station over there.
11       Q.   There's an Enterprise Rent-A-Car,
12  right?
13       A.   Somewhere over there, yeah.
14       Q.   There's Mount Pleasant Baptist Church,
15  correct?
16       A.   There's a church, I believe, yeah.
17       Q.   There's Sewells Park Apartments, right?
18       A.   I'm having to go off memory at this
19  point. I can't remember where all the businesses
20  are off that street.
21       Q.   Well, there's various apartment
22  complexes, right?

144

1        A.   There's buildings. I can't remember
2   all of them.
3

4
5
6
7        Q.   Same thing going southbound on the way
8   to Granby High School. There's Norfolk Collegiate
9   School, there's Granby Elementary School, there's
10  the Greek Orthodox Church, Beth Messiah Synagogue.
11  Various other locations you could stop, right?
12       A.   There are.
13       Q.   And there's apartments, residences, all
14  of which you could stop at, right?
15       A.   There are.
16       Q.   Let's continue through the Complaint.
17  If you look at Paragraph 56, it says: (Reading)
18       Once he leaves his
19  neighborhood, he routinely passes some
20  of the many other cameras posted at
21  undisclosed locations throughout the
22  city. In fact, Lee has noticed

Transcript of Lee Schmidt
Conducted on August 26, 2025

153

1 BY MR. ESTRADA:
2     Q.    Well, that's not my question.  Do you
3 believe that the Norfolk Police Department is, in
4 fact, plotting out all of your movements on a map
5 using the Flock system?
6         MR. FROMMER:  Objection, calls for
7     speculation.
8         THE WITNESS:  I'm starting to think
9     maybe I'm not understanding your question or
10    maybe the question changed in between the --
11    can you ask it again?
12 BY MR. ESTRADA:
13    Q.    I will ask it again.
14    And do you believe that the Norfolk
15 Police Department is, in fact, using maps to plot
16 out every single movement of you, Lee Schmidt?
17        MR. FROMMER:  Objection, calls for
18    speculation, vague and misleading.
19        THE WITNESS:  I don't know what the
20    police department is doing.
21 BY MR. ESTRADA:
22    Q.    So you have no reason to believe that

154

1 one way or another; is that your testimony?
2         MR. FROMMER:  Objection, misstates
3     prior testimony.
4         THE WITNESS:  I don't know what the
5     police department is doing.
6 BY MR. ESTRADA:
7     Q.    You don't know what the police
8 department is doing vis a vis you, Lee Schmidt,
9 using the Flock system; is that your testimony?
10    **A.    I don't know what the police department**
11 **is doing.**
12    Q.    You don't know what the police
13 department is doing with regard to the Flock
14 system; is that your testimony?
15    **A.    I don't know what the police department**
16 **is doing.**
17    Q.    With regard to the Flock system?
18    **A.    Correct.**
19    Q.    And so I will represent to you that the
20 retention period was changed, by law, to 21 days.
21    Do you have that understanding in mind?
22    **A.    I do now.**

155

1     Q.    Is it your belief that the City of
2 Norfolk is using 21 days of data to plot out the
3 movements of all people within the city of Norfolk?
4         MR. FROMMER:  Objection, calls for
5     speculation.
6         THE WITNESS:  I don't know what the
7     police are doing with the Flock data or the
8     system.
9 BY MR. ESTRADA:
10    Q.    Do you have any reason to think that
11 the Norfolk Police Department is plotting out on
12 maps data pertaining to you, Lee Schmidt?
13        MR. FROMMER:  Objection, calls for
14    speculation.
15        THE WITNESS:  I don't know what the
16    police department is doing.
17 BY MR. ESTRADA:
18    Q.    Are you engaged in any criminal
19 activity?
20    **A.    No.**
21    Q.    To your knowledge, are you the subject
22 of any ongoing criminal investigation?

156

1     **A.    Not to my knowledge.**
2     Q.    During the time period since the
3 lawsuit was filed in October of 2024, to your
4 knowledge, have you been the subject of any
5 criminal investigation?
6     **A.    Not to my knowledge.**
7     Q.    To your knowledge, has your vehicle,
8 the brown Jeep Cherokee, been the subject of any
9 criminal investigation?
10        MR. FROMMER:  Objection.  This whole
11    line calls for speculation.
12        THE WITNESS:  Not to my knowledge.
13 BY MR. ESTRADA:
14    Q.    Do you have any information telling you
15 that your Jeep Cherokee or any of the vehicles in
16 your household, the green Subaru, black Passat and
17 the brown Cherokee, have been the subject of any
18 criminal investigation?
19    **A.    Not to my knowledge.**
20    Q.    Do you have any information that you've
21 been the subject of an investigation into human
22 trafficking?

Transcript of Lee Schmidt
Conducted on August 26, 2025

157

1    A.    Not to my knowledge.
2    Q.    Do you have any information that any of
3  the three vehicles we talked about, black Passat,
4  the green Subaru, the brown Cherokee, have been the
5  subject of any investigation into human trafficking
6  since the Complaint was filed in October of 2024?
7        MR. FROMMER:  Objection, calls for
8  speculation.
9        THE WITNESS:  Can you say the question
10  again?
11 BY MR. ESTRADA:
12    Q.    Sure.
13        Do you have any information that any of
14  the cars in your household, the brown Jeep
15  Cherokee, the green Subaru, the black Passat, have
16  been the subject of an investigation into human
17  trafficking since the filing of your lawsuit in
18  October 2024?
19    A.    I do not.
20          Give me two seconds.
21    Q.    Do you need a break?
22          (Brief pause.)

158

1        THE WITNESS:  Sorry.  It's way weird
2  when everybody stares at you doing this.
3  ████████████████████████████████████
4  ████████████████████████████████████
5  ████████████████████████████████
6  ████████████████████
7        MR. ESTRADA:  Let us know when you're
8  ready.
9        THE WITNESS:  Okay.  Thank you.
10        MR. ESTRADA:  You ready?
11        THE WITNESS:  Uh-huh.
12 BY MR. ESTRADA:
13    Q.    Do you have any information that you
14  are the subject of any investigation into a missing
15  person or endangered person?
16    A.    I do not.
17    Q.    Do you have any information that any of
18  the cars in your household, the black Passat, the
19  green Subaru, the brown Jeep Cherokee, have been
20  the subject of any investigation into a missing
21  person or endangered person?
22    A.    I do not.

159

1    Q.    Let's look at Paragraph 58 in the
2  Complaint.  It states:  (Reading)
3          Flock's Convoy Analysis
4          feature also lets users identify
5          vehicles that are often seen together,
6          so anyone with access to Flock's
7          record of Lee's movements can use it
8          to see who he meets, when and where.
9          They can figure out who Lee's closest
10          friends are, who he goes to church
11          with and who he meets at the shooting
12          range.
13        Do you see that?
14    A.    Uh-huh.
15    Q.    Are you aware that the city of Norfolk
16  does not currently have Convoy Analysis?
17    A.    I'm not aware of that.
18    Q.    If you were aware that the city of
19  Norfolk currently does not have Convoy Analysis,
20  does that change your view of the accuracy of
21  Paragraph 58?
22        MR. FROMMER:  Objection, calls for

160

1  speculation.
2        THE WITNESS:  I can't answer that
3  question.
4  BY MR. ESTRADA:
5    Q.    Why not?
6    A.    I don't have access to the system.
7    Q.    No.  I'm telling you.  If I represent
8  to you that the city of Norfolk does not have
9  Convoy Analysis, does that change your view of the
10  accuracy of this paragraph?
11        MR. FROMMER:  Objection, calls for
12  speculation.
13        THE WITNESS:  My previous statement
14  stands.  I can't answer that question.
15 BY MR. ESTRADA:
16    Q.    Why not?
17    A.    I don't have access to the system.  My
18  understanding is Flock records are shared with
19  other jurisdictions so I don't know who else has
20  access to my records.
21    Q.    Okay.
22    A.    Or the Flock data, in general, not just



Transcript of Lee Schmidt

43 (169 to 172)

Conducted on August 26, 2025



169

1  said they had a stalker, their stalker may go to
2  work at some point.  That person is not with them
3  all the time, but they're still being stalked.
4          The camera is not with me all the time,
5  but the camera is following me and seeing me at
6  times when I'm doing my travels.  It's persistently
7  watching.  I think — Chief Talbot, I think it was,
8  in the video even mentioned it's hard to go
9  anywhere in the city without one of these cameras
10 catching you.
11     Q.    Did you review the deposition testimony
12 of Chief Talbot?
13     A.    No.
14     Q.    Did you review his testimony where he
15 clarified those statements?
16     A.    No.
17     Q.    And you said something just there that
18 I want to make sure I understand.  You said the
19 Flock cameras are not -- you equated it to someone
20 stalking a movie star, and you said, Even if
21 they're not with you all the time, but it's still
22 following me and seeing me at times.

170

1          I want to understand.  Is it your
2  testimony the Flock cameras are not capturing you
3  at all time?
4     A.    No, I was using what you had said.
5  You — when I talked about this, you said the
6  cameras aren't at all those locations, where I
7  believe the cameras — you know, I've already made
8  my point on the cameras.  I was just referring to
9  how you said the cameras aren't everywhere.
10     Q.    And you agree they're not everywhere,
11 right?
12     A.    I mean, I agree that the cameras don't
13 line the streets, yes.
14     Q.    I'm going to show you another exhibit.
15 This will be Exhibit 5, Tab 17.
16  (Exhibit Number 5 was marked for identification.)
17          THE WITNESS:  Thank you, ma'am.
18 BY MR. ESTRADA:
19
20
21
22

171

(lines 1–22, redacted)

172

(lines 1–11, redacted)

12     Q.    Okay.  I'm going to show you another
13 map now.  This will be Exhibit 6, Tab 18.
14  (Exhibit Number 6 was marked for identification.)
15 BY MR. ESTRADA:
16     Q.    Do you have Exhibit 6 in front of you?
17     A.    I do.
18     Q.    I'll represent to you Exhibit 6 is the
19 same map we saw before only now with the Flock
20 cameras depicted by the black arrows surrounded by
21 yellow circles.
22          Do you see that?



Transcript of Lee Schmidt
Conducted on August 26, 2025

44 (173 to 176)



173
1    A.    I do.

14    Q.    If you went to either of those
15 locations, there would be no record in the Flock
16 system, right?
17    A.    Correct.
18    Q.    And both of those are locations you
19 listed as frequently traveled locations in your
20 interrogatories?
21    A.    Yes.
22    Q.    Okay.  Let me show you another map.

174
1 This will be Exhibit 7, Tab 20.
2    (Exhibit Number 7 was marked for identification.)
3         THE WITNESS:  Thank you.
4 BY MR. ESTRADA:
5    Q.    Okay.  Do you have Exhibit 7 in front
6 of you?
7    A.    I do.

Case 2:24-cv-00621-MSD-LRL    Document 114-14    Filed 09/15/25    Page 25 of 43
PageID# 2722
Transcript of Lee Schmidt
Conducted on August 26, 2025

45 (177 to 180)



Case 2:24-cv-00621-MSD-LRL    Document 114-14    Filed 09/15/25    Page 26 of 43
PageID# 2723
Transcript of Lee Schmidt
Conducted on August 26, 2025

46 (181 to 184)



Case 2:24-cv-00621-MSD-LRL    Document 114-14    Filed 09/15/25    Page 27 of 43
PageID# 2724
Transcript of Lee Schmidt
Conducted on August 26, 2025

47 (185 to 188)

185



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

186

1
2
3
4
5
6
7
8
9
10
11    Q.   You could go to other businesses in the
12 area without Flock cameras seeing that, right?
13    A.   Like I've said, they'd have a minimum
14 idea where I was at.
15    Q.   The Flock cameras would not depict the
16 specific location you stopped at, right?
17    A.   So they would have a minimum idea of
18 where I was at.
19    Q.   Okay.  But a minimum idea is not a
20 specific location, right?
21    A.   Correct.
22    Q.   I want to turn to another section.  Do

187

1 you need a break?
2    A.   If you don't mind.
3       THE VIDEOGRAPHER:  We are going off the
4 record.  The time is 3:58.
5       (Recess taken.)
6       THE VIDEOGRAPHER:  We are back on the
7 record.  The time is 4:10 p.m.
8 BY MR. ESTRADA:
9    Q.   Okay.  Back on the record.  You
10 understand you're still under oath, Mr. Schmidt?
11    A.   I do.
12    Q.   Great.
13       Okay.  Let's go back to your
14 understanding of the Flock cameras.  Do you have an
15 understanding of how many Flock cameras Norfolk
16 Police Department currently uses?
17    A.   I don't.
18    Q.   But you did talk -- you did -- withdraw
19 the question.
20       You testified earlier that you've seen
21 them at different locations throughout the city,
22 right?

188

1    A.   I do.  Yeah.
2    Q.   Do you understand that, generally
3 speaking, and as we saw on some of these maps, they
4 are clustered around intersections?
5    A.   Typically.
6    Q.   So in a major intersection, there may
7 be four cameras at that one location?
8    A.   Yeah.
9    Q.   In your view, is there a number of
10 cameras, Flock cameras, for the City to use that
11 would be acceptable?
12    A.   No.
13    Q.   What if the number was less than 100?
14       MR. FROMMER:  Objection, calls for
15 speculation.
16 BY MR. ESTRADA:
17    Q.   Would that be acceptable to you?
18    A.   No.
19    Q.   What if the number was less than 50,
20 would that be acceptable to you?
21       MR. FROMMER:  Same objection.  Also
22 vague and misleading.

Case 2:24-cv-00621-MSD-LRL    Document 114-14    Filed 09/15/25    Page 28 of 43
PageID# 2725
Transcript of Lee Schmidt
Conducted on August 26, 2025

48 (189 to 192)

189

1          THE WITNESS:  Say it again.
2   BY MR. ESTRADA:
3      Q.   If the number of Flock cameras in the
4   city of Norfolk were less than 50, would that be
5   acceptable to you, would the Flock system be
6   acceptable to you?
7      A.   No.
8      Q.   What if the number of Flock cameras
9   were less than 25, would they be acceptable to you?
10     A.   No.
11     Q.   Is there any other number of Flock
12  cameras that you think would be acceptable for the
13  City of Norfolk to use?
14     A.   None.
15     Q.   Do you have an understanding of what
16  percentage of the roads in Norfolk are capable of
17  being captured by Flock cameras?
18     A.   I do not.
19     Q.   Is there a particular percentage of
20  road to be captured by Flock cameras that you would
21  think would be reasonable?
22     A.   None.

190

1      Q.   What if the Flock cameras captured less
2   than 10 percent of roads, public roads in the city
3   of Norfolk, would that be acceptable to you?
4      A.   No.
5          MR. FROMMER:  Objection.
6          THE WITNESS:  Sorry.
7          MR. FROMMER:  Incomplete hypothetical.
8          Go ahead.
9          THE WITNESS:  No.
10  BY MR. ESTRADA:
11     Q.   That would not be acceptable to you?
12     A.   It would not, correct, no.
13     Q.   What about less than 1 percent of
14  public roads captured by Flock cameras, would that
15  be acceptable to you?
16         MR. FROMMER:  Same objections.  Also
17         calls for a legal conclusion.
18         THE WITNESS:  I don't think any Flock
19         cameras.
20  BY MR. ESTRADA:
21     Q.   Even if they covered less than
22  1 percent of public roads; is that right?

191

1      A.   Correct.
2      Q.   What about less than .1 percent, would
3   that be acceptable to you?
4      A.   No.
5      Q.   Are you aware that Virginia law
6   requires that license plates on vehicles be
7   displayed so they can be seen by police officers?
8      A.   I am.
9      Q.   So in order to be driving legally, the
10  plate on your brown Jeep Cherokee needs to be
11  visible, right?
12     A.   Yes.
13     Q.   Bless you.
14     A.   Thank you.
15     Q.   Do you find that requirement to be
16  reasonable?
17     A.   The license place being visible, do I
18  find that to be reasonable, is that what you're
19  asking?
20     Q.   The requirement that your license plate
21  be visible while you drive, do you find that to be
22  reasonable?

192

1      A.   Yes.
2      Q.   Why is that?
3      A.   The license plate itself is benign.
4      Q.   Excuse me?
5      A.   The license plate itself is benign.
6      Q.   What do you mean by that?
7      A.   It just sitting there doesn't hurt —
8   hurt.  It's anonymous.
9      Q.   It's also important for law enforcement
10  to identify vehicles by their license plate, right?
11     A.   Well, I think it does more than just
12  that, but yes.
13     Q.   You would agree that in order to
14  identify vehicles that are involved in criminal
15  activity, it helps law enforcement to have license
16  plates visibly displayed, right?
17         MR. FROMMER:  Objection, calls for
18         speculation.
19         THE WITNESS:  Can you say your question
20         again?
21  BY MR. ESTRADA:
22     Q.   Sure.

Transcript of Lee Schmidt
Conducted on August 26, 2025

49 (193 to 196)

---

193

1          You would agree that in order for law
2  enforcement to be able to investigate and address
3  criminal activity involving cars, it's important
4  for them to be able to see the license plate of
5  cars, right?
6          MR. FROMMER:  Again, same objection.
7          THE WITNESS:  I don't know what would
8      help the police officers in that case.
9  BY MR. ESTRADA:
10     Q.   Well, the license plate being visible
11 helps with law enforcement efforts to address crime
12 involving vehicles, right?
13         MR. FROMMER:  Objection, calls for
14     speculation.
15         THE WITNESS:  But I don't know -- I
16     don't know what the police do in that case.
17 BY MR. ESTRADA:
18     Q.   Do you understand that having license
19 plates visible promotes public safety?
20     A.   I would believe that.
21     Q.   Why do you believe that having license
22 plates visible promotes public safety?

---

194

1      A.   If there was a car accident or someone
2  needed — hit your car needed to find you.
3      Q.   What if there were a drive-by shooting,
4  would it be important to be able to identify the
5  car involved using the license plate?
6      A.   I think this becomes difficult for me
7  to answer because I've never had to investigate a
8  drive-by shooting.
9      Q.   You never had to investigate any
10 criminal activity involving vehicles, right?
11     A.   Correct.
12     Q.   So your testimony is you're not aware
13 of what would be helpful and not helpful to law
14 enforcement in investigating criminal activity
15 involving cars, right?
16     A.   Correct.
17     Q.   Now, you have a dash cam on your brown
18 Jeep Cherokee, right?
19     A.   I do.
20     Q.   And the other two vehicles in your
21 home, the green Subaru and the black Passat, those
22 also have dash cams, right?

---

195

1      A.   The Subaru does not.
2      Q.   The black Passat has a dash cam?
3      A.   It does.
4      Q.   And your car has a dash cam?
5      A.   It does.
6      Q.   When you're driving around with a dash
7  cam, you can record the license plates of vehicles
8  in front of you, right?
9      A.   I haven't looked to see if it catches
10 them.  I would assume it catches them.  I don't
11 know if it has the resolution to.
12     Q.   Have you looked at the footage on your
13 dash cam?
14     A.   Not of driving — cars that are driving
15 past.
16     Q.   Is your dash cam pointed out towards
17 the road?
18     A.   It is.  It is.
19     Q.   Have you reviewed footage of the dash
20 cam when it's pointed to the road?
21     A.   Yes, but not — I didn't pay attention
22 to see if it was actually clear enough to catch the

---

196

1  cars around me license plates.
2      Q.   Have you noticed that it's clear enough
3  to capture the vehicle --
4      A.   It is.
5      Q.   -- in front of you?
6      A.   It is.
7      Q.   Gives you a vehicle description, right?
8      A.   It does.
9      Q.   Do you find it reasonable or not that
10 cars such as yours and others in the city of
11 Norfolk have dash cams that are recording vehicles
12 when they drive?
13     A.   For the individuals to have dash cams?
14 Yes.
15     Q.   You find that reasonable?
16     A.   I do.
17     Q.   And it's okay for those dash cams to
18 record license plates; is that your testimony?
19         MR. FROMMER:  Objection, misstates
20     prior testimony.
21         THE WITNESS:  I don't know if they're
22     recording license plates.

---

Transcript of Lee Schmidt
Conducted on August 26, 2025

50 (197 to 200)

197

1  BY MR. ESTRADA:
2      Q.   If they are recording license plates,
3  is that reasonable, in your view?
4      **A.   If the individuals' dash cams are**
5  **recording license plates, that's their choice.**
6      Q.   If someone had a dash cam on their
7  vehicle and recorded, using a dash cam, your car
8  and your license plate, would you consider that to
9  be an invasion of privacy?
10     **A.   An individual?**
11     Q.   Yes.
12         MR. FROMMER: Objection, incomplete
13     hypothetical.
14         THE WITNESS: No.
15 BY MR. ESTRADA:
16     Q.   And if you, in driving your brown Jeep
17 Cherokee with your dash cam, record another vehicle
18 and its license plate, do you consider that to be
19 an invasion of privacy?
20         MR. FROMMER: Same objection.
21         THE WITNESS: No.
22

199

1          THE WITNESS: I don't understand your
2  question. Like I wouldn't be following
3  someone randomly through the city.
4  BY MR. ESTRADA:
5      Q.   Let's say it wasn't random. Let's say
6  you knew the person and were going to meet with
7  that person and recording their license plate,
8  would that be an invasion of privacy?
9          MR. FROMMER: Again, objection,
10     incomplete hypothetical.
11         THE WITNESS: No, I guess it wouldn't
12     be a violation of their privacy.
13 BY MR. ESTRADA:
14     Q.   Why not?
15     **A.   Because that would just be an**
16 **inadvertent to that case — in that case, yeah.**
17     Q.   Let's say you got in a fender bender
18 and the person responsible drove off and you
19 followed that person and recorded their license
20 plate using your dash cam, would that be an
21 invasion of privacy?
22     **A.   If I followed them?**

198

1  BY MR. ESTRADA:
2      Q.   So why is it that it isn't an invasion
3  of privacy for you to record the license plates of
4  others with your dash cam, but the Flock cameras
5  you do believe are an invasion of privacy?
6      **A.   I'm not following them through the**
7  **city.**
8      Q.   Is that the only reason?
9      **A.   Yes.**
10     Q.   If you followed a vehicle and recorded
11 its license plate, you believe that would be an
12 invasion of privacy?
13         MR. FROMMER: Objection, incomplete
14     hypothetical, calls for -- well.
15         THE WITNESS: If I were stalking
16     someone?
17 BY MR. ESTRADA:
18     Q.   No. If you were following a car and
19 your dash cam is recorded -- recording his license
20 plate, would that be an invasion of privacy?
21         MR. FROMMER: Again, objection,
22     incomplete hypothetical.

200

1      Q.   Yes.
2      **A.   No.**
3      Q.   Why not?
4      **A.   Because in that case, I'm not following**
5  **them just to follow them, I guess. I'm trying**
6  **to — I don't know. I really wouldn't follow**
7  **somebody after a fender better. I would just call**
8  **the police and let them deal with it.**
9      Q.   But if you did --
10     **A.   I wouldn't —**
11     Q.   -- it wouldn't be an invasion of
12 privacy; is that your testimony?
13     **A.   No. My — my testimony is I wouldn't**
14 **follow them in that case.**
15     Q.   Okay. If you did, would that be an
16 invasion of privacy?
17         MR. FROMMER: Objection, calls for
18     speculation, complete hypothetical.
19         THE WITNESS: I wouldn't follow the
20     person in a fender bender.
21 BY MR. ESTRADA:
22     Q.   If you did, would that be an invasion

Transcript of Lee Schmidt
Conducted on August 26, 2025

51 (201 to 204)

---

201

1 of privacy?
2         MR. FROMMER: Objection, asked and
3     answered.
4 BY MR. ESTRADA:
5     Q.   You can answer.
6     A.   I wouldn't follow them.
7     Q.   Looking at the outside of your car, do
8 you believe that someone can tell who's driving?
9     A.   I mean, they can see me.
10    Q.   Do you think from the back of your
11 vehicle, they can see you driving?
12    A.   No.
13    Q.   Why not?
14    A.   My seat.
15    Q.   Do you think photos taken using the
16 Flock system of the back of your car can determine
17 who's driving the vehicle?
18        MR. FROMMER: Objection, calls for
19    speculation.
20        THE WITNESS: I think they could infer
21    it from the license plate.
22

---

202

1 BY MR. ESTRADA:
2     Q.   Okay.  Let me show you an exhibit.
3 We'll call this Exhibit 10, Tab 7.
4     (Exhibit Number 10 was marked for identification.)
5 BY MR. ESTRADA:
6     Q.   Okay.  I've put Exhibit 10 in front of
7 you.  This is a document that's been produced in
8 discovery of a Flock capture of your vehicle.
9         Do you see that?
10    A.   I do.
11    Q.   Dated March 6th, 2025.
12        Looking at this photograph, do you
13 believe it's possible to tell who's driving the
14 vehicle?
15    A.   I know I was driving it.
16    Q.   Okay.  You know you were driving it?
17    A.   Yes.
18    Q.   Looking at the back of this, could
19 someone who doesn't know you, Lee Schmidt, tell
20 that you were driving the vehicle?
21    A.   I don't know what the other person
22 looking at this photo would know or not know.

---

203

1     Q.   So you don't know one way or the other;
2 is that your testimony?
3     A.   I don't know what they would be doing
4 with the information.  I don't know anything that
5 they would know.
6     Q.   But physically looking at the
7 photograph, you can't see the driver, right?
8     A.   You cannot physically see the driver,
9 correct.
10    Q.   Your back window is tinted, right?
11    A.   Yeah, it's however it came from the
12 factory.  So, yeah, I guess so.
13    Q.   Your side windows are tinted as well,
14 right?
15    A.   The back are, yeah.
16    Q.   So looking at the back of the car, you
17 can't see the driver at all, right?
18    A.   You can't see the driver, correct.
19    Q.   How many miles would you say you drive
20 a day?
21        MR. FROMMER: Objection, vague and
22    ambiguous.

---

204

1         THE WITNESS: I really don't have any
2     idea.
3 BY MR. ESTRADA:
4     Q.   Okay.  Let's look at another exhibit.
5 This will be Exhibit 11.
6     (Exhibit Number 11 was marked for identification.)
7         THE WITNESS: There's an extra one.
8 BY MR. ESTRADA:
9     Q.   Okay.  So you have in front of you
10 Exhibit 11, which is a document marked "Plaintiff
11 Lee Schmidt's Supplemental Response to Defendants'
12 Interrogatory 7."
13        Do you see that?
14    A.   I do.
15    Q.   Okay.  And looking at the second page.
16 The response to Interrogatory 7, it says that:
17 (Reading)
18        On April 29th, 2025,
19    Plaintiff, you, checked the following
20    odometer readings.
21        And it has 57,607 for the Jeep
22 Cherokee, right?

---

Case 2:24-cv-00621-MSD-LRL    Document 114-14    Filed 09/15/25    Page 32 of 43
PageID# 2729
Transcript of Lee Schmidt
Conducted on August 26, 2025

54 (213 to 216)

213

1           MR. FROMMER:  Objection, calls for
2    speculation.
3           THE WITNESS:  I don't know what the
4    Flock system contains.
5    BY MR. ESTRADA:
6        Q.   So you don't know whether or not it
7    contains that information, right?
8        A.   I do not.
9        Q.   Okay.  You understand that people that
10   register their license plates, they may not always
11   stay at that residence where their license plate is
12   registered, right?
13          MR. FROMMER:  Objection, calls for
14   speculation.
15          THE WITNESS:  I don't know what other
16   people do.
17   BY MR. ESTRADA:
18       Q.   Okay.  So you think everyone who
19   registers their license plate, they only sleep and
20   stay at that location; is that your testimony?
21          MR. FROMMER:  Objection, calls for
22   speculation and argumentative.

214

1           THE WITNESS:  I don't know what other
2    people do.
3    BY MR. ESTRADA:
4        Q.   Okay.
5           Would looking at this photograph, this
6    one photograph, tell you whether or not you stopped
7    at any particular locations during your trip?
8        A.   Not this one photograph.
9        Q.   Would it tell you where you ended your
10   trip?
11       A.   Not this one photograph.
12       Q.   Would it tell you where you started
13   your trip?
14       A.   Not this one photograph.
15       Q.   Are you familiar with the use of
16   speeding cameras?
17       A.   I am.
18       Q.   Do you believe that speeding cameras
19   violate your right to privacy?
20          MR. FROMMER:  Objection, calls for a
21   legal conclusion.
22          THE WITNESS:  Say that again.

215

1    BY MR. ESTRADA:
2        Q.   Do you believe that speeding cameras
3    violate your right to privacy?
4        A.   No.
5        Q.   Why not?
6        A.   Because they're only active when you
7    run a red light.  Or sorry.  Speed -- speeding
8    cameras.
9        Q.   Speeding cameras.
10       A.   I believe those are the same thing.  I
11   believe they're only active when you speed.
12       Q.   So you believe because they're only
13   active when you speed, they don't violate your
14   right to privacy; is that your testimony?
15       A.   Correct.
16       Q.   Same thing with red light cameras,
17   you're familiar with those?
18       A.   Correct.
19       Q.   Do you believe that red light cameras
20   violate your right to privacy?
21       A.   No.
22       Q.   Why not?

216

1        A.   Same -- same thing.  I believe they're
2    only active when you run a red light.
3        Q.   So if the Norfolk Police Department
4    were to put an officer and locate that officer at
5    major intersections to take photographs of the
6    backs of vehicles, do you believe that would
7    violate your right to privacy?
8           MR. FROMMER:  Objection, calls for
9    speculation and incomplete hypothetical.
10          THE WITNESS:  Say that again.
11   BY MR. ESTRADA:
12       Q.   If the Norfolk Police Department were
13   to place an officer at every major intersection
14   with a camera to take a photograph of the backs of
15   vehicles, would that violate your right to privacy?
16          MR. FROMMER:  Again, calls for --
17   objection, calls for speculation, incomplete
18   hypothetical.
19          THE WITNESS:  They're taking every car?
20   BY MR. ESTRADA:
21       Q.   Every car.  Every car that passes the
22   intersection, including yours, would that violate

Transcript of Lee Schmidt
Conducted on August 26, 2025

55 (217 to 220)

217

1  your expectation of privacy?
2      A.    What are they doing with the photos?
3      Q.    Just assume they take the photos.
4  Would that violate your expectation of privacy?
5          MR. FROMMER: Calls for speculation,
6  incomplete hypothetical.
7          THE WITNESS: I don't think I can
8  answer that question without knowing, because
9  to me, it would sound similar to the Flock
10  system.
11  BY MR. ESTRADA:
12      Q.    So is it your testimony it depends on
13  what they do with the photos?
14      A.    No.  My testimony is I can't answer
15  that question.
16      Q.    Well, just to be clear.  You've got
17  police officers at every major intersection taking
18  the photograph of the back of every vehicle that
19  passes, including yours, we don't know what they're
20  doing with those images, would that violate your
21  expectation of privacy?
22      A.    As I said, I can't answer that question

218

1  without knowing what they're doing with those
2  photos.
3      Q.    It would depend on what they do with
4  the photos; is that your testimony?
5      A.    I can't answer that question without
6  knowing what they're doing with those photos.
7      Q.    Okay.
8          Do you have a doorbell camera?
9      A.    I do.
10      Q.    Is it a Ring camera?
11      A.    No.
12      Q.    Do you believe your doorbell camera
13  violates others' expectation of privacy?
14      A.    No.
15      Q.    Why not?
16      A.    Because they've come to my house.
17      Q.    Does your doorbell camera capture the
18  street in front of your home?
19      A.    It does.
20      Q.    Do you believe that violates the
21  expectation of privacy of cars that drive on the
22  street?

219

1      A.    No.
2      Q.    Why not?
3      A.    I just don't believe it does.
4      Q.    Why not?
5      A.    I just don't believe it does.
6      Q.    Well, let's say you drive past your
7  neighbor's doorbell camera, captures you on a
8  public street, does that violate your expectation
9  of privacy?
10          MR. FROMMER: Objection, incomplete
11  hypothetical, calls for speculation and calls
12  for a legal opinion.
13          THE WITNESS: My neighbor's?
14  BY MR. ESTRADA:
15      Q.    Yeah.
16      A.    No.
17      Q.    It doesn't violate your expectation of
18  privacy?
19      A.    No.
20      Q.    Why not?
21      A.    Because it's his camera.
22      Q.    Even though you're on a public street?

220

1      A.    Yes.
2      Q.    Why the difference between the Flock
3  camera and your neighbor's doorbell camera?
4      A.    Because he doesn't have doorbell
5  cameras all around the city that follow me.
6      Q.    So it's the number of cameras that he
7  has; is that right?
8      A.    No.  It's the location of them all
9  around the city that follow me.
10      Q.    If your neighbor had 50 cameras pointed
11  at the street, would that violate your expectation
12  of privacy?
13          MR. FROMMER: Objection, calls for
14  speculation, incomplete hypothetical, legal
15  conclusion.
16  BY MR. ESTRADA:
17      Q.    You can answer.
18      A.    No.
19      Q.    It would not violate your expectation
20  of privacy?
21      A.    No.
22      Q.    Why not?

Case 2:24-cv-00621-MSD-LRL    Document 114-14    Filed 09/15/25    Page 34 of 43
PageID# 2731
Transcript of Lee Schmidt
Conducted on August 26, 2025                    57 (225 to 228)

225

1  need them any other time.
2      Q.   Why is that your preference?
3      **A.   I don't think they need it any other**
4  **time.**
5      Q.   Does your -- any of your family members
6  have Find My iPhone on Apple?
7      **A.   I believe they do.**
8      Q.   And so they can find your location
9  using your iPhone, right?
10     **A.   Oh, you're asking do they have my**
11 **location?**
12     Q.   Yeah.
13     **A.   Only my wife.**
14     Q.   But she has your location at all times,
15 right?
16     **A.   Yes.**
17     Q.   How about Apple Maps, is that location
18 services turned on all the time?
19     **A.   That's only when in use. I believe**
20 **Find My is the only one you can't actually make**
21 **when in use only.**
22     Q.   How about Waze?

226

1      **A.   That's only when be being used.**
2      Q.   Do you have any location services
3  enabled for any other application on your phone?
4      **A.   Not that I'm aware of.**
5      Q.   Okay. So we've talked about the Flock
6  system. Flock system captures data. Have you ever
7  reviewed any data produced from the Flock system?
8      **A.   I don't think so.**
9      Q.   You never seen any spreadsheets
10 containing Flock data?
11         MR. FROMMER: I'll instruct you not to
12     answer to the extent it would include any
13     attorney-client or work product privileges.
14         THE WITNESS: I don't think so.
15 BY MR. ESTRADA:
16     Q.   Okay. Apart from anything your
17 attorneys might have shown you, have you seen any
18 spreadsheets containing Flock data for your
19 vehicle, the brown Jeep Cherokee?
20     **A.   No.**
21     Q.   Take a look at Exhibit 12.
22     (Exhibit Number 12 was marked for identification.)

227

1  BY MR. ESTRADA:
2      Q.   It's a little hard to read. We had to
3  get it on one page.
4

5
6
7
8      Q.   And this contains Flock data from the
9  dates of March 21, 2025 to April 10, 2025.
10         Do you see that?
11     **A.   March 21, yes.**
12     Q.   Okay. So looking at this data, the top
13 contains -- top of the chart contains a plate,
14 capture time, capture network, capture camera,
15 capture location latitude, capture location
16 longitude and image file name.
17         Do you see that?
18     **A.   I do.**
19     Q.   Nowhere there does it say where your
20 trip commenced or ended, right?
21     **A.   It does not.**
22     Q.   If we look down the page through the

228

1  dates, there's some places where there are no
2  dates, right?
3      **A.   What do you mean?**
4      Q.   Well, if we go down through the dates,
5  there's no entry for April 1st, 2025, right?
6      **A.   Oh, correct.**
7      Q.   Do you recall whether you drove your
8  vehicle on Tuesday, April 1st, 2025?
9      **A.   I don't keep a record of what days I**
10 **drive.**
11     Q.   You don't know one way or the other?
12     **A.   I don't.**
13     Q.   If there's no data listed here in the
14 Flock system for April 1st, 2025, do you believe
15 that means you didn't drive that day?
16         MR. FROMMER: Objection, form.
17 BY MR. ESTRADA:
18     Q.   You can answer.
19     **A.   So it's a good inference that I didn't**
20 **drive that day.**
21     Q.   But you wouldn't know one way or the
22 other, right?

Transcript of Lee Schmidt
Conducted on August 26, 2025

58 (229 to 232)



229
1    A.    What day of the week was it?
2    Q.    Tuesday.
3    A.    I wouldn't know.
16    Q.    But there's no capture there for your
17 vehicle, right?
18    A.    For my vehicle, correct.
19    Q.    There's no capture for March 27 either,
20 right?
21    A.    That's correct.
22    Q.    March 27th was a Thursday.  Do you see

230
1 that?
2    A.    Correct.
3    Q.    Do you know whether you drove your
4 vehicle or not on Thursday, March 27th?
5    A.    I do not know.
6    Q.    If we look further down, April 5th,
7 there's no entry there either, right?
8    A.    Correct.
17    Q.    Yet there's no entry for that Saturday,
18 April 5th, right?
19    A.    For that car, correct.
20    Q.    Do you know whether you drove or not on
21 April 5th, 2025?
22    A.    I don't know that.

231
1    Q.    There's also no entry for April 8th,
2 which is again a Tuesday.  Do you see that?
3    A.    You said April 8th?
4    Q.    Yes.
5    A.    I see that.
9    Q.    But no record of your car in the Flock
10 system, right?
11    A.    For my car, correct.  For the Jeep.
12    Q.    Do you have any reason that you drove a
13 different car that day?
14    A.    Sometimes I take my wife's car.
15    Q.    Would you have taken her car four --
16 five days during this 20-day period of time?
17    A.    Possibly.
18    Q.    We don't know one way or another,
19 right?
20    A.    Correct.
21    Q.    Okay.  Let's look at another exhibit.
22 So bear with us as we put the exhibits together.

232
1 We'll try to simplify this into one exhibit.
2        Okay.  Handing you what will be
3 Exhibit 13.
4    (Exhibit Number 13 was marked for identification.)
5        MR. ESTRADA:  We have all the pages
6    together.  Don't worry, we can put them
7    together.
8        MS. DEHBOZORGI:  Do you want this
9    (indicating)?
10        THE WITNESS:  No, I'm good.  Everything
11    else is stapled.
12 BY MR. ESTRADA:
13    Q.    Okay.  So I will represent to you that
14 this captures a week from April 1st to April 8th of
15 2025, the areas of Norfolk where there are captures
16 of your Jeep brown Cherokee based on the data we
17 see in Exhibit 12.
18        Do you have that representation in
19 mind?
20    A.    April 1st, yes.
21    Q.    Through April 8th, if you look at the
22 last one.  We'll go through them one by one.

233

1    A.    Okay.  Yep, it looks like I got them
2  all.
3  ██████████████████████████
4  ██████████████████████████████
5  ██████████████████
6        We went over this before.  There are no
7  captures on this date, Tuesday, April 1st, 2025.
8  Do you know one way or the other whether you drove
9  this day?
10    A.    I do not know one way or the other.
11    Q.    Okay.  We'll go to page 2.
12        These are captures for April 2nd, 2025.
13 This day shows five captures in the city of Norfolk
14 and I believe two just outside the city of Norfolk
15 for a total of seven captures.  They're labeled 1
16 through 7.  The first starts at 10:12 a.m., then
17 10:13, then 10:14, 10:15, 10:17, 10:18 and 10:18.
18        Do you see that?
19    A.    I do.
20    Q.    Do these captures show where your trip
21 started?
22    A.    No.

234

1    Q.    Do these captures show where your trip
2  ended?
3    A.    You said there was other captures that
4  aren't on this map?
5    Q.    No.  There's two that are outside the
6  city of Norfolk.  Those are 6 and 7.  Oh, they are
7  in the city of Norfolk.
8        Okay.  So we have basically seven
9  captures between 10:12 and 10:18.  Do you know
10 where you ended your trip this day?
11    A.    What day of week was that?
12    Q.    This would be a Wednesday, April 2nd.
13    A.    I do not remember.
14    Q.    Do you recall telling anyone with the
15 Norfolk Police Department, whether an employee or
16 an official, where you started or ended your trip
17 that day?
18    A.    I do not.
19    Q.    Okay.  Looking at page 3.
20        Page 3 is Thursday, April 3rd, 2025.
21 We have four captures that day, 3:53 p.m.,
22 3:59 p.m., 4:15 p.m. and 4:16 p.m.

235

1        Do you recall where you started your
2  trip that day?
3    A.    You said that was a Thursday?
4    Q.    Yes.
5    A.    Yes, I do.
6  ████████████████████████████████
7  ████████████████████████
8  ██████████████████████████████████
9  ██
10    Q.    Do you recall where you ended your trip
11 that day?
12    A.    Home.
13    Q.    Did you tell anyone with the Norfolk
14 Police Department, an official or employee, where
15 you started your trip that day?
16    A.    No.
17    Q.    Did you tell them where you ended your
18 trip that day?
19    A.    No.
20    Q.    And do you recall what you were doing
21 in the hours before 3:53?
22    A.    I was waiting for my daughter at

236

1  school.  I was picking my daughter up and taking
2  her home.
3    Q.    What time did you start waiting for
4  her?
5    A.    It's a long drive out there.  She gets
6  out at 3:20, I think.
7    Q.    Okay.  What did you do in the morning
8  before 3:20?
9    A.    I don't remember what I did that
10 morning.
11    Q.    Do you remember anything you did until
12 3:20 that day?
13    A.    Not the duration of the day.
14    Q.    Did you tell anyone with the Norfolk
15 Police Department, an employee or an official, what
16 you were doing that morning before 3:20 p.m.?
17    A.    No.
18    Q.    Let's look at page 4.
19        Page 4, we are now on Friday,
20 April 4th, Friday, 2025.  It shows one capture at
21 11:56 a.m. on a Friday.  Do you recall where you
22 started your trip that day?

Case 2:24-cv-00621-MSD-LRL     Document 114-14     Filed 09/15/25     Page 37 of 43
PageID# 2734
Transcript of Lee Schmidt
Conducted on August 26, 2025

60 (237 to 240)

237

1     A.     Probably my house.
2     Q.     Do you recall where you ended your trip
3  that day?
4     A.     I do not.
5     Q.     Do you recall what you were going out
6  to do that day?
7     A.     I do not.
8     Q.     Do you recall any of your stops that
9  day during this trip?
10    A.     I do not.
11    Q.     Do you recall telling anyone at the
12 Norfolk Police Department, whether employee or
13 official, what you went out to do this day with
14 this one capture at 11:56 a.m.?
15    A.     I do not.
16    Q.     Let's look at the next page.  We're on
17 Saturday, April 5th, page 5 of the exhibit.
18           No captures this day.  Do you see that?
19    A.     I do.
20
21
22



238

1
2     Q.     Okay.  Let's go to the next page,
3  page 6.
4           We are now on Sunday, April 6, 2025.
5  Do you see that?
6     A.     I do.
7     Q.     We have one entry at 1:19 p.m.  Do you
8  recall where you started your trip that day?
9     A.     I do not.
10    Q.     Do you recall when you ended your trip
11 that day?
12    A.     I do not.
13    Q.     Do you recall what stops you made, if
14 any?
15    A.     No.
16    Q.     Did you tell anyone at the Norfolk
17 Police Department, whether an official or an
18 employee, what you were doing this day, on
19 April 6th, 2025?
20    A.     No.
21    Q.     Let's look at the next day.  We are now
22 on Monday, April 8th, page 7 of the exhibit.

239

1           April 7th, 2025, we have three entries,
2  first one at 10:13 a.m., second one at 11:49 a.m.
3  and last one at 12:03 p.m.
4           Do you recall where you started your
5  trip that day?
6     A.     I do not.
7     Q.     Do you recall where you ended your trip
8  that day?
9     A.     Do not.
10    Q.     Do you recall what stops you made, if
11 any, along the way?
12    A.     I do not.
13    Q.     Do you recall telling any employee or
14 official of the Norfolk Police Department what you
15 did that day?
16    A.     I do not.
17    Q.     And then page 8.
18
19                                                    
20
21
22    Q.     Can you tell whether or not you drove

240

1  your vehicle that day?
2     A.     Not the Jeep.  I can't tell.
3     Q.     What's that?
4     A.     I can't tell if the Jeep was driven.
5     Q.     You can't tell one way or the other,
6  right?
7     A.     Correct.
8     Q.     Have you been the victim of any crime
9  in the city of Norfolk?
10    A.     I think I had my car broken into once
11 or twice.
12    Q.     Did you report it?
13    A.     I did.
14    Q.     What happened?
15    A.     One time, I caught the kids, and
16 another time, nothing.
17    Q.     Were the kids driving a vehicle?
18    A.     No.
19    Q.     Are you concerned, generally, about
20 crime in the city of Norfolk?
21    A.     I think most people are concerned about
22 crimes, yes.

Transcript of Lee Schmidt
Conducted on August 26, 2025

---

241

1    Q.    And you have six security cameras at
2  your home, so clearly, you're concerned about
3  crime, right?
4        MR. FROMMER:  Objection, misstates
5        prior testimony, vague and misleading.
6        THE WITNESS:  That's why I had asked
7        earlier if you wanted to know which was for
8        security.  Not all of them are for security.
9        The ones in the back are to watch the dogs
10       and one's for garden.
11 BY MR. ESTRADA:
12   Q.    You have a doorbell camera and you have
13 a camera in the -- you have security cameras in
14 your home, right?
15   A.    Yes.
16   Q.    And that's because you're concerned
17 about crime, right?
18       MR. FROMMER:  Objection, misstates
19       prior testimony.
20 BY MR. ESTRADA:
21   Q.    You can answer.
22   A.    I'm concerned about crime.

---

242

1    Q.    That's a "yes," right?
2    A.    Yes.
3    Q.    Do you agree that human trafficking is
4  a problem?
5    A.    Human trafficking is a problem, yes.
6    Q.    And that's something we should try to
7  prevent as a society?
8    A.    I would agree.
9    Q.    Do you think the Norfolk Police
10 Department should be assisting in identifying and
11 apprehending people involved in human trafficking?
12   A.    I do.
13   Q.    Do you agree that child abductions are
14 something bad that we should try to prevent?
15   A.    I do.
16   Q.    Do you think the Norfolk Police
17 Department should be involved in trying to identify
18 and apprehend those involved in child abductions?
19   A.    I do.
20   Q.    With regard to the Flock system in
21 particular, are you aware that it can provide
22 alerts to the Norfolk Police Department where it

---

243

1  detects a license plate that has been associated
2  with a child abduction?
3    A.    I'm not aware of how the system works.
4    Q.    Okay.  I'll represent to you that the
5  system contains information of things such as Amber
6  alerts to detect whether a license plate associated
7  with a child abduction has passed in the City of
8  Norfolk.
9        Do you believe that's a good use of the
10 Flock system or no?
11       MR. FROMMER:  Objection, vague and
12       ambiguous.
13       You can answer.
14       THE WITNESS:  Do I think Amber alerts
15       are good?  Yes.
16 BY MR. ESTRADA:
17   Q.    No.  I'm asking using the Flock system
18 to notify Norfolk Police Department officers if a
19 license plate associated with an Amber alert passes
20 through the city, do you think that is a useful
21 thing or not a useful thing?
22       MR. FROMMER:  Same objections.

---

244

1        THE WITNESS:  I mean, I do think
2        finding people that are -- have Amber alerts
3        attached to the car is good, yes.
4  BY MR. ESTRADA:
5    Q.    So do you think it's a problem to use
6  the Flock system in helping to apprehend people who
7  abduct children is a good thing or a bad thing?
8    A.    Say that again, please.
9    Q.    Sure.
10       Do you believe that using the Flock
11 system to help apprehend people involved in child
12 abductions is a good thing or a bad thing?
13   A.    I don't think it's a bad thing.
14   Q.    It's a good thing, right?
15       MR. FROMMER:  Objection,
16       mischaracterizes prior --
17 BY MR. ESTRADA:
18   Q.    Is that a "yes" or "no"?
19   A.    I don't think it's a bad thing.
20   Q.    It's a good thing, right?
21   A.    I don't think it's a bad thing.
22   Q.    All right.  Are you aware that criminal

---

Transcript of Lee Schmidt
Conducted on August 26, 2025

62 (245 to 248)

---

**245**

1 databases to identify stolen vehicles do flow into
2 the Flock system?
3     **A.   I'm not aware of how the system works.**
4     Q.   Do you believe it's an appropriate use
5 of the Flock system for Norfolk Police Department
6 to receive alerts when license plates associated
7 with stolen vehicles pass through the city?
8         MR. FROMMER:  Objection, calls for a
9     legal conclusion and calls for speculation.
10        THE WITNESS:  I don't think I'm
11    understanding your question.
12 BY MR. ESTRADA:
13    Q.   Okay.  Do you think it is a good thing
14 or a bad thing for the Flock system to be used in
15 helping to apprehend those involved in vehicle
16 thefts?
17    **A.   I don't think it's a bad thing to**
18 **apprehend the people for vehicle thefts.**
19    Q.   It's a good thing, right?
20    **A.   It's not a bad thing.**
21    Q.   Do you have any issue with the Flock
22 system being used in that way?

**246**

1     **A.   I mean, I disapprove of the Flock**
2 **system.**
3     Q.   Okay.  But if the Flock system is used
4 to apprehend child abductors, do you have an issue
5 with that?
6     **A.   I have an issue with the child**
7 **abductors.**
8     Q.   Do you have an issue with the Flock
9 system being used to apprehend child abductors?
10    **A.   I don't know how the police use all**
11 **these systems.  I can't control how they use them.**
12 **I don't know how they use them.  I think trying to**
13 **get into the weeds of how it's all used, I can't**
14 **speak for all those different uses.**
15    Q.   It's not something --
16    **A.   I can -- I can agree that the child**
17 **abductions are horrible.  They're abhorrent.  And I**
18 **can agree that car theft is bad.  But I can't get**
19 **in -- I'm not sure how to answer what you're asking**
20 **me.**
21    Q.   What I'm asking you is do you have any
22 issue with using the Flock system to apprehend

---

**247**

1 child abductors and people who steal cars?
2     **A.   I don't have an issue with people being**
3 **apprehended.  I just -- I have an issue with the**
4 **Flock system because I disagree with the Flock**
5 **system.**
6     Q.   Now, you were involved and voiced
7 concerns with regard to the new Virginia statute
8 implemented this July regarding the use of the
9 Flock system, right?
10    **A.   I did.**
11    Q.   In fact, you voiced your -- your
12 concerns to the governor?
13    **A.   I did.**
14    Q.   You voiced concerns to State
15 legislators, right?
16    **A.   I did.**
17    Q.   Did you look at the final law that was
18 passed?
19    **A.   I did.**
20    Q.   Are you aware that it provides that the
21 system can be used to identify those involved in
22 human trafficking?

**248**

1     **A.   I believe I read that.**
2     Q.   Are you aware that it allows the system
3 to be used to recover missing or endangered
4 persons?
5     **A.   I think I need to read the legislation,**
6 **if you have it.**
7     Q.   Well, with regard to the human
8 trafficking portion, which you are familiar with,
9 do you believe it's a problem for the Flock system
10 to be used in apprehending those involved in human
11 trafficking?
12    **A.   My recollection of the final**
13 **legislation is pretty vague, so if you have it, I'd**
14 **like to read it if we're going to speak on to it --**
15 **on it.**
16    Q.   Okay.  Well, we can get that.
17        Okay.  In the meantime, let's look at
18 some exhibits.  Let's look at Exhibit 14, Tab 25.
19    (Exhibit Number 14 was marked for identification.)
20        THE WITNESS:  Thank you, ma'am.
21 BY MR. ESTRADA:
22    Q.   Okay.  So Tab -- sorry.  Exhibit 14 is

261

1  BY MR. ESTRADA:
2      Q.    Let me repeat the question.  Would it
3  change your view if you're aware that it was a
4  spike in crime that led to the City of Norfolk
5  implementing the Flock system?
6      A.    **Which view are you asking?**
7      Q.    Your view as to whether the City should
8  have a Flock system or not.
9      A.    **No.**
10     Q.    Why not?
11     A.    **Because I don't -- I still don't think**
12 **they were should be here.  I think the cameras are**
13 **creepy, and I don't think that they're appropriate.**
14     Q.    You don't think they're appropriate
15 even if they're used to address a spike in violent
16 crime?
17         MR. FROMMER:  Objection, argumentative.
18         THE WITNESS:  Correct.
19 BY MR. ESTRADA:
20     Q.    Okay.  So we talked about the Virginia
21 statute.  Now I'm going to -- and you asked to look
22 at it.  I'm going to show you Exhibit 15.

262

1  (Exhibit Number 15 was marked for identification.)
2         MR. ESTRADA:  I don't have an extra
3  copy.
4         MS. DEHBOZORGI:  Do you have one?
5         MR. ESTRADA:  I don't have an extra
6  copy.
7         MS. DEHBOZORGI:  That's fine.
8         MR. FROMMER:  We're good.
9  BY MR. ESTRADA:
10     Q.    Okay.  This is a document, Exhibit 15,
11 titled "Joint Notice of New Authority."  And if we
12 look at the attachment at Exhibit A, it is
13 Chapter 720, the New Authority to go into effect
14 July 1st, 2025.
15         Do you see that in front of you?
16     A.    **Yes.**
17     Q.    Had you reviewed this proposed
18 legislation before it went into effect and when you
19 voiced your opposition to the governor?
20     A.    **I did.**
21     Q.    So you're familiar with this statute?
22     A.    **I've read through it, yes.**

263

1      Q.    Let's look at page 2 of Exhibit A.
2         If you look at Section D towards the
3  middle.  Let me know when you have that in front of
4  you.
5      A.    **I have it in front of me.**
6      Q.    It says:  (Reading)
7            A law enforcement agency may
8      use a system only, i, as part of a
9      criminal investigation into an alleged
10     violation of the Code of Virginia or
11     any ordinance of any county, city or
12     town where there is a reasonable
13     suspicion that a crime was committed;
14     ii, as part of an active investigation
15     relating to a missing or endangered
16     person, including whether to issue an
17     alert for such person or person
18     associated with human trafficking; or
19     iii, to receive notifications related
20     to a missing or endangered person, a
21     person with an outstanding warrant, a
22     person associated with human

264

1      trafficking, a stolen vehicle or a
2      stolen license plate.
3         Do you see that?
4      A.    **I do.**
5      Q.    Now, we are talking about the part in
6  portion 3 or iii, however you want to refer to it,
7  about receiving notifications or alerts regarding a
8  missing or endangered person.
9         Do you have a problem with the Flock
10 system being used to provide police officers in
11 Norfolk notifications related to a missing or
12 endangered person?
13         (Witness reviews document.)
14     A.    **Just for 3, receive notifications**
15 **related to a missing, endangered person, that's the**
16 **part we're talking about?**
17     Q.    Yes.
18     A.    **I mean, I disagree with the Flock**
19 **system, but I don't have a problem with criminals**
20 **being captured.**
21     Q.    What about criminals being captured
22 using the Flock system, do you have a problem with

Transcript of Lee Schmidt
Conducted on August 26, 2025

265

1  that?

2      **A.    I disagree with the Flock system.**

3      Q.    So is it your testimony that any use of

4  the Flock system you believe should not be allowed?

5      **A.    Any use?  Talking about misuses as**

6  **well?**

7      Q.    No.  I'm asking you, is it your

8  testimony that any use of the Flock system,

9  including to receive notifications related to a

10  missing or endangered person, should not be

11  allowed?

12          MR. FROMMER:  Objection, vague and --

13      vague and ambiguous and calls for

14      speculation.

15          You can . . .

16          THE WITNESS:  Can you ask your question

17      again?

18  BY MR. ESTRADA:

19      Q.    I knew you're going to go do that.

20      **A.    I'm not doing it to — my memory, I**

21  **want to make sure I understand your question**

22  **correctly.**

266

1      Q.    That's all right.  I have to test my

2  memory.

3          So is it your testimony that any use of

4  the Flock system, including what we see in 3, to

5  provide Norfolk Police Department officers with

6  notifications related to a missing or endangered

7  person, is a problem?

8      **A.    Like I said, I have a problem with the**

9  **Flock system.  What you may be advocating for a**

10  **positive use, there's also lots of misuses too.**

11      Q.    Are these sorts of positive uses okay,

12  in your view?

13      **A.    I have a hard — that's not an easy**

14  **question to answer, and it's not one that can be**

15  **answered necessarily.  How many good uses are —**

16  **outweigh bad uses?**

17      Q.    Are you aware that this legislation

18  that we're looking at provides for requirements of

19  audits on the use of the Flock system?

20      **A.    Which — which portion is that?**

21      Q.    If you look below 3:  (Reading)

22          All information necessary for

267

1          the creation of an audit trail should

2          be entered in order to query system

3          data.

4          Do you see that?

5          (Witness reviews document.)

6      Q.    Separate from the statute, if there's a

7  requirement that police departments audit its

8  officers' use of the Flock system, does that allay

9  your concerns?

10      **A.    No.**

11      Q.    Why not?

12          (Witness reviews document.)

13      Q.    I'm not asking about the specific law

14  now.  I'm just asking about whether audits, in

15  general, of the system to ensure that officers use

16  it properly, whether that allays your concern?

17      **A.    So, obviously, I've voiced my issue**

18  **with the — this system, but there's no**

19  **transparency for know if they've caught the**

20  **people or if there is misuse going on.**

21          **The reason I was looking back at this**

22  **(indicating), if I remember correctly, the data is**

268

1  **not foible.**

2      Q.    Are you aware of any examples where the

3  Norfolk Police Department have used the Flock data

4  inappropriately?

5          MR. FROMMER:  Objection, calls for

6      speculation.

7          THE WITNESS:  I'm not aware of any.

8          MR. ESTRADA:  Okay.  Short break.

9          THE VIDEOGRAPHER:  Going off the

10      record.  The time is 4:47 -- or 5:47 p.m.

11          (Recess taken.)

12          THE VIDEOGRAPHER:  We are back on the

13      record.  The time is 6:02 p.m.

14  BY MR. ESTRADA:

15      Q.    Okay.  Back on the record.  You

16  understand you're still under oath, Mr. Schmidt?

17      **A.    Yes, sir.**

18      Q.    We talked a little bit earlier about

19  some of the places you visit within the city of

20  Norfolk, where you go on certain days.

21          Since the filing of this lawsuit, have

22  you been in the practice of visiting any crime

Case 2:24-cv-00621-MSD-LRL    Document 114-14    Filed 09/15/25    Page 42 of 43
PageID# 2739
Transcript of Lee Schmidt
Conducted on August 26, 2025

68 (269 to 272)

269

1 scenes within the city of Norfolk?
2     **A.   I don't believe so.**
3     Q.   Is it your regular practice to visit
4 crime scenes?
5     **A.   No.**
6     Q.   Do you anticipate in the future
7 visiting crime scenes on an ongoing basis?
8     **A.   No.**
9     Q.   I want to go back to Exhibit 12.  It's
10 the datasheet.  So I mentioned we had various dates
11 captured here from March 21st through April 10th.
12          So if you look at March 21st, 2025,
13 which I'll represent to you is a Friday, there's
14 six entries for your brown Jeep Cherokee listed
15 there.
16          Do you see that?
17     **A.   For March 21st?**
18     Q.   Correct.
19     **A.   Okay.**
20     Q.   Do you recall what you did that day, on
21 Friday, March 21st, 2025.
22     **A.   Friday, March 21st, I'm not sure.**

270

1     Q.   You're not sure where you drove that
2 day?
3     **A.   I mean, if I saw it on a map, I may be**
4 **able to tell you.  It's hard to tell just based on**
5 **some lat. and long. and shorthand of a capture**
6 **address.**
7     Q.   But sitting here today, you don't know
8 where you drove that day?
9     **A.   No, I don't.**
10     Q.   If we look further down on the 28th,
11 there are one, two, seven entries starting at
12 9:32 a.m. to 5:31 p.m.
13          Do you recall what you did that day?
14 And I'll represent to you that's another Friday.
15     **A.   Same thing.  I don't recall.**
16 ████████████████████████████
17 ███████
18 █████████████████████████████
19 ████████████████████
20     Q.   Do you know if you did that this day?
21     **A.   I don't have my calendar with me.  So**
22 **if I had a calendar, I would be able to tell you.**

271

1     Q.   By the way, did you provide that
2 calendar to your attorneys?
3     **A.   No.**
4     Q.   Do you know if it was produced in this
5 litigation?
6     **A.   I don't believe so.  Sorry.**
7     Q.   Let's try another Friday,
8 February 28th.  I don't have the data in front of
9 me, but do you recall what you were doing that day?
10     **A.   Friday, February 28th?**
11     Q.   Yeah.
12     **A.   I do not recall.**
13     Q.   How about Friday, February 21st?  It's
14 another Friday.
15     **A.   I don't recall.**
16     Q.   How about Thursday, March 6th, do you
17 recall what you did that day?
18     **A.   I don't recall.**
19     Q.   How about Monday, March 10th, do you
20 recall what you did that day?
21     **A.   Monday?**
22     Q.   Monday, March 10th.

272

1     **A.   I do not recall.**
2     Q.   And that's because you don't catalog
3 everything you do on every day, right?
4     **A.   Not typically.**
5     Q.   Let's look back at your declaration.
6          MR. ESTRADA:  Have we entered it as an
7     exhibit yet?  This will be Exhibit 15 -- 16.
8     (Exhibit Number 16 was marked for identification.)
9 BY MR. ESTRADA:
10     Q.   Do you have Exhibit 30 in front of you?
11 Sorry.  Exhibit 16 in front of you?
12     **A.   I do have Exhibit 16 in front of me.**
13     Q.   So we look at the second page, it's a
14 document titled "Declaration of Plaintiff
15 Lee Schmidt."
16          Do you see that?
17     **A.   I do.**
18     Q.   If you look at page 3, Paragraph 17,
19 you see your signature at the bottom?
20     **A.   I do.**
21     Q.   Did you review this document before you
22 signed it?

277

1    lawsuit in which I was not party. I
2    would certainly be very upset at such
3    a member.
4        Do you see that?
5    **A.   I do.**
6    Q.   Are you intending, either in summary
7 judgment or through trial, to disclose the names of
8 any people in your anonymous treatment program?
9    **A.   Not at this time.  Not that I can think**
10 **of.**
11    Q.   Are you intending to use the identities
12 of any people in your anonymous treatment program
13 in this litigation in any way?
14    **A.   Not at this time that I can think of.**
15    Q.   By the way, we talked about various
16 dates, Friday, March 28; Friday, March 21st.  On
17 Friday, March 7th, do you recall whether you drove
18 and where you drove to in the city of Norfolk?
19    **A.   I don't keep detailed logs.**
20    Q.   Sitting here today, you have no
21 knowledge of where you would have driven on that
22 day?

278

1    **A.   Sitting here, I don't, no.**
2    Q.   Same question for March 11th, are you
3 aware of whether you drove that day?
4    **A.   Sitting here, I'm not aware.**
5    Q.   Are you aware of where you would have
6 driven that day?
7    **A.   No.**
8    Q.   And for March 11th, March 7th,
9 March 21st, March 28th, did you provide any
10 information to the Norfolk Police Department, its
11 employees or officials, about where you drove that
12 day, if you did drive?
13    **A.   No.**
14    MR. ESTRADA:  Okay.  I've got no
15 further questions.
16    MR. FROMMER:  Okay.  All right.  And
17 we're all done.  Thank you very much.
18    THE WITNESS:  Thank you.
19    THE VIDEOGRAPHER:  This marks the end
20 of the deposition.  We're going off the
21 record at 6:15 p.m.
22    THE CERTIFIED STENOGRAPHER: As far as

279

1    turnaround time, how soon would you like the
2    final?
3        MR. ESTRADA:  Soon, we have summary
4    judgment coming up.  How fast can you turn
5    around the final around?
6        THE CERTIFIED STENOGRAPHER:  By the end
7    of the week.
8        MR. ESTRADA:  That would be great.
9        THE CERTIFIED STENOGRAPHER:  As far as
10    the transcript, do you want yours Friday or
11    Monday?
12        MR. FROMMER:  I'm going to make a call
13    just given how close we are to the thing,
14    yeah, let's do the -- I can go with a much
15    more leisurely Monday schedule.
16 (Signature not requested before close of the record.)
17    (Deposition concluded at 6:15 p.m.)
18        - - -
19
20
21
22

280

1        CERTIFICATE OF NOTARY PUBLIC
2    I, Amy A. Brauser, RPR RMR CRR, the officer
3 before whom the foregoing deposition was taken, do
4 hereby certify that the witness was duly sworn by me
5 prior to the taking of the foregoing deposition; that
6 the testimony of said witness was taken by me to the
7 best of my ability and thereafter reduced to
8 typewriting under my direction; that I am neither
9 counsel for, related to, nor employed by any of the
10 parties to the action in which this deposition was
11 taken, and further that I am not a relative or employee
12 of any attorney or counsel employed by the parties
13 thereto, nor financially or otherwise interested in the
14 outcome of the action.
15    This is the 28th day of August, 2025.
16
17
18    Amy A. Brauser, RPR RMR CRR
     Notary Public
19
20
21 Notary Registration No.: 7675529
22 My Commission Expires:  January 31, 2028