# EXHIBIT 15

## Unredacted Exhibit Filed Under Seal Per Protective Order



# Transcript of Crystal Arrington

**Date:** August 27, 2025
**Case:** Schmidt and Arrington -v- City of Norfolk, et al.

**Planet Depos**
**Phone:** 888.433.3767 **| Email:** transcripts@planetdepos.com
**www.planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

**Page 1**

```
1            IN THE UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF VIRGINIA

3   - - - - - - - - - - - - - - - - - -x

4   LEE SCHMIDT and CRYSTAL         :

5   ARRINGTON,                      :

6             Plaintiffs,           :

7     vs.                           : Civil Action No.

8   CITY OF NORFOLK and MARK TALBOT,  : 2:24-CV-00621

9   in his official capacity as Norfolk   : MSD-LRL

10  Chief of Police,                :

11            Defendants.           :

12  - - - - - - - - - - - - - - - - - - x

13

14      VIDEOTAPED DEPOSITION OF CRYSTAL ARRINGTON

15                  Norfolk, Virginia

16          Wednesday, August 27th, 2025

17                    9:28 a.m.

18

19

20  Job No.: 596869

21  Pages: 1 - 154

22  Reported by:  Amy A. Brauser, RPR, RMR, CRR
```

**Page 2**

```
1      Videotaped Deposition of CRYSTAL ARRINGTON, held at

2   the office of:

3

4

5

6              Kaufman & Canoles, P.C.

7            150 West Main Street, 21st Floor

8              Norfolk, Virginia 23510

9                (757) 624-3000

10

11

12

13      Pursuant to agreement, before Amy A. Brauser, RPR

14  RMR CRR, Notary Public in and for the Commonwealth of

15  Virginia.

16

17

18

19

20

21

22
```

**Page 3**

```
1            A P P E A R A N C E S

2

3   ON BEHALF OF THE PLAINTIFFS:

4      ROBERT FROMMER, Esquire

5      TAHMINEH DEHBOZORGI, Esquire

6      JESSICA BIGBIE, Esquire (via Zoom)

7      The Institute for Justice

8      901 N. Glebe Road, Suite 900

9      Arlington, Virginia 22203

10     (703) 682-9320

11     rfrommer@ij.org

12     tdehbozorgi@ij.org

13

14

15

16

17

18

19

20

21

22
```

**Page 4**

```
1          A P P E A R A N C E S  (con't)

2

3   ON BEHALF OF THE DEFENDANTS:

4      JONATHAN KRAVIS, Esquire

5      Munger, Tolles & Olson LLP

6      601 Massachusetts Avenue NW

7      Suite 500 East

8      Washington, D.C. 20001

9      (202) 220-1130

10     jonathan.kravis@mto.com

11       (and)

12     E. MARTIN ESTRADA, Esquire

13     LIAM GENNARI, Esquire

14     Munger, Tolles & Olson, LLP

15     350 South Grand Avenue

16     Los Angeles, California 90071

17     (213) 683-9253

18     martin.estrada@mto.com

19     lgennari@mto.com

20

21

22
```



Page 5

```
1        A P P E A R A N C E S  (con't)
2
3   ON BEHALF OF THE CITY OF NORFOLK:
4        KARLA J. SOLORIA, Esquire
5        Norfolk City Attorney
6        900 City Hall Building
7        810 Union Street
8        Norfolk, Virginia 23510
9        (757) 664-4529
10
11
12   ALSO PRESENT:
13        Alex Dickerson-Watson, Video Specialist
14        Briana Sample, Video Specialist
15
16
17
18
19
20
21
22
```

Page 6

```
1              INDEX OF EXAMINATIONS
2   By Mr. Kravis . . . . . . . . . . . . . . . Page 8
3
4              INDEX OF EXHIBITS
5   NUMBER      DESCRIPTION      MARKED/IDENTIFIED
6   Exhibit 17  Plaintiff Crystal Arrington's        18
7               Responses to Defendants' First
                Set of Interrogatories
8   Exhibit 2   Complaint for Declaratory and        50
                Injunctive Relief
9
10  Exhibit 18  Plaintiff Crystal Arrington's        79
                Supplemental Response to
11              Defendants' Interrogatory 7
12  Exhibit 19  Plaintiff Crystal Arrington's       103
                Responses to Defendants' First
13              Set of Interrogatories
14  Exhibit 20  Virginia Motor Vehicle             103
                Registration, Bates Arrington
15              000001
16  Exhibit 21  Flock camera photograph of Ms.     129
                Arrington's Ford Focus on
                04/18/2025
17
18
19
20
21
22
```

Page 7

```
1                P R O C E E D I N G S
2        THE VIDEOGRAPHER:  Here begins Media
3   Number 1 in the videotaped deposition of
4   Crystal Arrington in the matter of Schmidt
5   and Arrington versus the City of Norfolk, in
6   the City District of Virginia, Case
7   Number 2:24-cv-00621-MSD-LRL.  Today's date
8   is August 27th, 2025.  Time on the video
9   monitor is 9:28 a.m.
10       Today's videographer is Alexander
11  Dickerson-Watson representing Planet Depos.
12  This video deposition is taking place at
13  Kaufman & Canoles PC, Norfolk.
14       Would counsel, please, voice identify
15  themselves and state whom they represent?
16       MR. KRAVIS:  Good morning.  My name is
17  Jonathan Kravis from the law firm of Munger,
18  Tolles & Olson representing the City of
19  Norfolk.
20       MR. ESTRADA:  Martin Estrada, also on
21  behalf of the City of Norfolk.
22       MR. GENNARI:  Liam Gennari, also on
```

Page 8

```
1   behalf of the City of Norfolk.
2        MR. FROMMER:  I'm Robert Frommer from
3   the Institute for Justice representing
4   Plaintiffs.
5        MS. DEHBOZORGI:  I'm
6   Tahmineh Dehbozorgi on behalf of the
7   Plaintiff from Institute for Justice.
8        THE VIDEOGRAPHER:  All right.  The
9   court reporter today is Amy Brauser
10  representing Planet Depos.  The witness will
11  now be sworn.
12            CRYSTAL ARRINGTON,
13  after having been first duly sworn by the certified
14  stenographer, was examined and testified as follows:
15            EXAMINATION
16  BY MR. KRAVIS:
17       Q.   Good morning, Ms. Arrington.
18       A.   Good morning.
19       Q.   My name is Jonathan Kravis.  I'm one of
20  the lawyers representing the City of Norfolk in
21  this case, and I'm going to be asking you some
22  questions today.
```

Transcript of Crystal Arrington
Conducted on August 27, 2025

---

**21**

1    A.    Yes.

2    Q.    And in your response, you listed three

3 cars, a Black 2010 Ford Focus, a white 2020 Ford

4 Explorer and a silver 2020 Ford Fusion.

5         Do you see that?

6    A.    Yes, I do.

7    Q.    All right. I want to ask you some

8 questions about each of those cars.

9         First, starting with the black 2010

10 Ford Focus, who is the driver of the car on a

11 day-to-day basis?

12    A.    Me.

13    Q.    And does anyone else in your household

14 ever drive that car or is it just you?

15    A.    Just me.

16    Q.    How about outside your household, is

17 there anybody outside your household, like your

18 family in the area, that drives that car or just

19 you?

20    A.    Just me.

21    Q.    All right. How often would you say you

22 drive that car?

---

**22**

1    A.    Every day.

2    Q.    And about how many miles a day on

3 average would you say you drive the car?

4    A.    I don't know.

5    Q.    Is this the car that you would use when

6 you travel to Norfolk for your home health care

7 business?

8    A.    Yes.

9    Q.    And is this the car you would use when

10 you travel to visit your family in Norfolk?

11    A.    Yes.

12    ████████████████████████

13    ████████████████████████████

14    █████████████████████

15    ███████████████████████████████

16    ██████████████████████████

17    ██████████

18    Q.    I was just asking about the --- the

19 tunnels or bridges that you would take to get over

20 the river.

21    A.    Okay.

22    Q.    So you said sometimes the midtown

---

**23**

1 tunnel and sometimes the downtown tunnel?

2    A.    Correct.

3    Q.    What does it depend on why you choose

4 one over the other? Is it traffic? time of day?

5 What is it?

6    A.    All of the above.

7    Q.    When you take the midtown tunnel to get

8 from Portsmouth to Norfolk, do you have to pass

9 through a toll?

10    A.    Yes.

11    Q.    And how about the downtown tunnel, do

12 you pass through a toll?

13    A.    Yes.

14    Q.    Okay. The second car on the list here

15 is a white 2020 Ford Explorer. Do you see that?

16    A.    I do.

17    Q.    And then next to the entry it says,

18 "Until September 2024."

19         Did I read that right?

20    A.    Correct.

21    Q.    So am I reading this right that you are

22 no longer in possession of this car?

---

**24**

1    A.    Correct.

2    Q.    And you have not been in possession of

3 the car since September of 2024?

4    A.    Correct.

5    Q.    Prior to September of 2024, who was the

6 primary driver of this vehicle?

7    A.    It was me.

8    Q.    So prior to September 2024 -- well, let

9 me see if -- strike that. Let me ask it a better

10 way.

11         When did you acquire the black 2010

12 Ford Focus?

13    A.    After September 2024.

14    Q.    All right. So you had the white 2020

15 Ford Explorer and then you got the black 2010 Ford

16 Focus. Do I have that right?

17    A.    Correct.

18    Q.    Same questions as last time. During

19 the time period when you had the white 2020 Ford

20 Explorer, was there anybody else in the household

21 who was driving that car besides you?

22    A.    No.

---

25

1    Q.    The third car that's listed on here is
2  a silver 2020 Ford Fusion.  Do you see that?
3    **A.    Yes.**
4    Q.    Are you still in possession of that
5  car?
6    **A.    That's my husband's car.**
7    Q.    All right.  So I think you've
8  anticipated my next question here.  It sounds like
9  the primary driver of the silver 2020 Ford Fusion
10 is your husband.  Do I have that right?
11   **A.    Correct.**
12   Q.    Do you ever drive that car?
13   **A.    Not too often.**
14   Q.    How -- would you say once a week? once
15 a month? twice a year?
16   **A.    Once a month maybe.**
17   Q.    And what are the circumstances under
18 which once a month or so you drive your husband's
19 car?
20   **A.    Maybe just going out to shop.**
21   Q.    Where do you typically shop, by the
22 way?

26



1    **A.    All over.**

27



21   Q.    Other than the cars -- well, actually
22 strike that.

28

1         I think you told me a moment ago that
2  your husband just recently purchased a new vehicle.
3  Do I have that right?
4    **A.    Correct.**
5    Q.    What is the -- what type of car did
6  your husband purchase?
7    **A.    A BMW.**
8    Q.    And do you know the year of the BMW?
9    **A.    2020.**
10   Q.    And the color?
11   **A.    White.**
12   Q.    Now, did your husband get rid of the
13 2020 Ford Fusion when he got the BMW or do you now
14 have both cars?
15   **A.    Have both.**
16   Q.    Do you remember approximately when your
17 husband purchased the BMW?
18   **A.    Not even a month ago.**
19   Q.    And is that a -- is that a car -- do
20 you drive the BMW ever?
21   **A.    No.**
22   Q.    Other than -- I know we've been talking

Transcript of Crystal Arrington
Conducted on August 27, 2025

---

29

1 a bunch about driving here.  Other than driving,
2 are there other ways that you typically get around
3 Portsmouth?
4 **A.   Just through the tunnel.**
5 Q.    I guess I'm wondering, other than in
6 your car, for example, do you ever use public
7 transportation?
8 **A.   I'll get an Uber from time to time, but**
9 **not often.**
10 Q.    Approximately how often would you say
11 you get an Uber?
12 **A.   I can't remember.  I don't know.**
13 Q.    Just give me a ballpark.  Like once a
14 week? once a month? twice a year?
15 MR. FROMMER: Objection, call for
16 speculation.
17 THE WITNESS:  I don't -- I don't know.
18 BY MR. KRAVIS:
19 Q.    And then other than driving, do you
20 ever take public transportation in Portsmouth, like
21 a bus or train or anything like that?
22 **A.   No.**

---

30

1 Q.    Is there any other way that you get
2 from Portsmouth to Norfolk?  Do you ever take a
3 ferry or bus or train or anything like that?
4 **A.   No.**
5 Q.    Let me ask you while you have the
6 document -- that document in front of you to take a
7 look at your response to Interrogatory 4.  And
8 that's going to appear on page 6 of the -- page 6
9 of the document.  Okay.  Let me know when you're
10 there.
11 **A.   I will.**
12 **I'm here.**
13 MR. FROMMER:  Why don't you take time
14 to review the interrogatory.
15 BY MR. KRAVIS:
16 Q.    I'm going to ask you some questions
17 about the response to Interrogatory Number 4.
18 The -- the interrogatory itself appears at the top
19 of page 6, then there's like a bunch of legal mumbo
20 jumbo, and then your answer appears on page 7.
21 Take a minute to look at it and then
22 let me know when you've had a chance to review it.

---

31

1 I'm going to ask you some questions about it.
2 (Witness reviews document.)
3 **A.   Okay.**
4 Q.    Okay.  So for Interrogatory 6, we asked
5 you, at the top of page 6: (Reading)
6 Identify the ten locations
7 within the city of Norfolk that you
8 have visited most frequently in the
9 reporting period, including the name
10 and address of each location, as well
11 as the dates on which you visited each
12 location.
13 Do you see that?
14 **A.   Uh-huh.**
15 Q.    And then if you turn to the next page,
16 your response, you listed three locations.  One is
17 the home of your father, one is the home of your
18 son and one is the home of your aunt.
19 Do you see that?
20 **A.   I do.**
21 Q.    So I guess my first question here is,
22 we asked you for ten locations.  Why did you list

---

32

1 only three?
2 **A.   I only listed three because I have a**
3 **home health care business and I take my clients out**
4 **to different places that they need to go to, so --**
5 **and that's kind of private for me to be listing,**
6 **you know, their addresses and stuff like that.  So**
7 **I only listed three for that reason.**
8 Q.    And since you brought that up, just to
9 get it out of the way, you see in the paragraph
10 above your response, it says: (Reading)
11 Nevertheless, Plaintiff will
12 respond generally with the locations
13 in the city of Norfolk that she
14 recalls visiting often from
15 February 19th, 2025 to the present,
16 excluding addresses associated with
17 her clients or their appointments.
18 Did I read that right?
19 **A.   Yes.**
20 Q.    Okay.  So I'm not going to ask you any
21 questions about the identities of your clients or
22 where you take them today.  My understanding is

---



**Page 33**

1  that you're not introducing any evidence in this
2  case about who your clients are or where you take
3  them.  Do I have that right?
4      **A.   Correct.**
5      Q.   All right.  Great.
6          So setting aside the clients, which as
7  I said, I'm not asking you about, you have these
8  three locations here.  And am I right that those
9  were the only other locations that you could recall
10 visiting often in the city of Norfolk from
11 February 19th, 2025 to present?
12         MR. FROMMER:  Objection,
13     mischaracterizes prior testimony.
14         THE WITNESS:  Correct.
15 BY MR. KRAVIS:
16     Q.   I'm going to ask you about those
17 locations a little bit later today, but for right
18 now, I want to move to the next interrogatory,
19 which appears in the middle of the page.  It says:
20 (Reading)
21         Identify the ten individuals
22     that you have interacted with most

**Page 34**

1      frequently in the city of Norfolk in
2      the reporting period and the date on
3      which you interacted with those
4      individuals.
5          Do you see that?
6          MR. FROMMER:  Take your time.
7          (Witness reviews document.)
8          THE WITNESS:  I do.
9  BY MR. KRAVIS:
10     Q.   Okay.  And then there's a paragraph
11 that begins "Objection."  There's a bunch more
12 legal mumbo jumbo.  And then your answer appears
13 towards the bottom of page 8 and the top of page 9.
14         Do you see that?
15         (Witness reviews document.)
16     **A.   I do.**
17     Q.   And you listed, again excluding
18 clients, you listed seven people, all family
19 members, correct?
20     **A.   Correct.**
21     Q.   So same question as last time.  We
22 asked for ten people and you gave us seven.  Why is

**Page 35**

1      that?
2      **A.   These are the people that I visit the**
3  **most, so that's why I gave you that.**
4      Q.   And so am I right that other than the
5  seven people who are listed here, there -- and
6  again, excluding the clients, there are no other
7  people that you recalled interacting with most
8  frequently from February 19th, 2025 to present?
9          Am I reading this right?
10     **A.   I would say pretty much.**

**Page 36**

Transcript of Crystal Arrington
Conducted on August 27, 2025



Transcript of Crystal Arrington
Conducted on August 27, 2025



---

57

1    Q.    I think you told me a moment ago that
2  you've seen some Flock cameras around the city of
3  Norfolk before.  Do I have that right?
4    A.    I seen a couple.
5    Q.    The ones that you saw, did you see
6  whether there were like multiple cameras at the
7  same intersection?
8    A.    I don't remember.
9    Q.    Okay.  Do you know whether there are
10 some places in Norfolk that have like multiple
11 cameras at the same intersection?
12   A.    Again I don't recall.
13   Q.    If I asked you like how many different
14 locations, different intersections or parts of the
15 street in Norfolk actually had Flock cameras on
16 them, would you know the answer to that?
17   A.    No.
18   Q.    If I asked you just to take a guess at
19 how many, what would you say?
20   A.    I can't guess.
21   Q.    Is there any number of Flock cameras
22 that the City might have that you would not object

---

58

1  to?
2    A.    Ask that question again.
3    Q.    Yeah.  I was just wondering if there's
4  any number of cameras that the City of Norfolk
5  might have that you would not find objectionable,
6  like that would be okay from your perspective?
7    A.    I can't answer that.
8    Q.    So if there were like 50 cameras, 50
9  Flock cameras in Norfolk?
10   A.    I can't — I can't answer that
11 question.
12   Q.    Why can't you answer the question?
13   A.    I just — I just can't answer the
14 question.
15   Q.    Do you know what percentage of the
16 roads in the city of Norfolk are covered by Flock
17 cameras?
18   A.    I don't.
19   Q.    Would it surprise you if I told you it
20 was less than 1 percent?
21   A.    Okay.
22   Q.    I'm just wondering if that would

---

59

1  surprise you.
2    A.    I mean, I don't think about that here
3  or there, but I do care about the cameras being
4  there, period.  So I don't like the cameras.
5    Q.    And am I hearing you right that you
6  don't like the cameras no matter how many or how
7  few of them there are?
8    A.    I don't like the cameras at all.
9    Q.    Okay.  If there were like ten cameras,
10 ten Flock cameras in the city of Norfolk?
11   A.    I still disagree.
12   Q.    One camera?
13   A.    I still disagree.
14   Q.    Do you -- sorry, strike that.  Let me
15 ask -- let me ask a different way.
16       Let me direct you to a different
17 paragraph of the Complaint.  I'm going to ask you
18 to take a look at Paragraph 87, which appears in
19 the bottom of page 18.
20       Are you with me?
21   A.    I'm with you.
22   Q.    Paragraph 87 reads:  (Reading)

---

60

1        Lee and Crystal, like most
2    people, try to maintain a degree of
3    privacy in their lives, but
4    Defendants' installation and operation
5    of the Flock cameras have invaded
6    their privacy by exposing a record of
7    their movements throughout the city to
8    every person the NPD allows to access
9    its data.
10       Do you see that?
11   A.    I do.
12   Q.    Do you believe that the Flock cameras
13 expose a record of your movements throughout the
14 city?
15   A.    I do.
16   Q.    How do the cameras do that?
17   A.    By capturing me, my license plate.
18 They know where I am.
19   Q.    So what is your understanding of what
20 the Flock camera captures when you drive by it?
21   A.    It captures my movement.
22   Q.    What do you mean when you say it

---

Transcript of Crystal Arrington
Conducted on August 27, 2025

---

61

1 captures your movement?

2    **A.   My license plate.  It knows where I am.**

3    Q.   You said it -- it captures your license

4 plate?

5    **A.   Yes.**

6    Q.   Do you think that the camera capturing

7 your license plate invades your privacy?

8    **A.   Yes, absolutely.**

9    Q.   Do you believe you have a right to

10 privacy in your license plate?

11        MR. FROMMER:  Objection, calls for a

12    legal conclusion.

13        THE WITNESS:  I should have some

14    privacy so that's why I'm totally disagreeing

15    with the Flock cameras.

16 BY MR. KRAVIS:

17    Q.   And the privacy that you think you

18 should have extends to your license plate?

19        MR. FROMMER:  Objection.  Same

20    objection.

21        THE WITNESS:  My license plate.  I mean

22    just tracking my moving around.  So that's my

---

62

1    license plate.  That's the only way they're

2    going to know.

3 BY MR. KRAVIS:

4    Q.   When the Flock camera takes a picture

5 of your car as it drives past, how does that create

6 a record of your movements?

7    **A.   Because it captures me every time.**

8    Q.   When the Flock camera takes a picture

9 of your car as it drives past, does it show where

10 you stop?

11    **A.   I'm not sure.**

12    Q.   You're not sure?

13    **A.   I'm not.**

14    Q.   If I told you that the Flock camera

15 does not record where your journey ends, would that

16 change your view of the cameras?

17    **A.   No, it would not.**

18    Q.   The first sentence reads here that:

19 (Reading)

20        Lee and Crystal, like most

21        people, try to maintain a degree of

22        privacy in their lives.

---

63

1        Do you see that?

2    **A.   I do.**

3    Q.   How do you try to maintain a degree of

4 privacy in your life?

5    **A.   Pretty much just not being captured on**

6    **where I'm moving to.  So I like to kind of be**

7    **private on where I'm moving about.**

8    Q.   What do you mean when you say you like

9 to be private on where you're moving about?

10    **A.   I wouldn't like the government to know**

11    **where I am, like when I'm driving and going to my**

12    **family's house or visiting a friend, whatever the**

13    **case may be.**

14    Q.   And do you believe that the Flock

15 cameras tell the government when you're going to a

16 friend's house?

17    **A.   I'm not sure.  I don't like it at all,**

18    **so . . .**

19    Q.   I'm just focusing on the first part of

20 that.  You're not sure whether the cameras tell the

21 government when you're going to a friend's house?

22    **A.   They probably do.  I don't know.**

---

64

1    Q.   When you say "they probably do," how

2 would they do that?

3        MR. FROMMER:  Objection, calls for

4    speculation.

5 BY MR. KRAVIS:

6    Q.   If you know.  If you don't know, you

7 can say you don't know.

8    **A.   I don't.**

9    Q.   Was that something that you thought it

10 might be important to investigate before you signed

11 off on the Complaint?

12    **A.   I just know I totally disagree with the**

13    **Flock cameras and I would like them to go away.  So**

14    **this is a part of me right here, being here.**

15    Q.   When you say you would like them to go

16 away, what exactly do you mean?

17    **A.   Take them off the streets.**

18    Q.   So was your goal in filing this lawsuit

19 to have all of the Flock cameras removed from the

20 city of Norfolk?

21    **A.   Yes, absolutely.**

22    Q.   How about Portsmouth?  Why not

---

Transcript of Crystal Arrington
Conducted on August 27, 2025

---

65

1 Portsmouth?

2 **A. Yes, Portsmouth too. All of them.**

3 Q. All right. Do you know -- I mean, do

4 you have any plans to file a lawsuit against

5 Portsmouth?

6 **A. I will.**

7 Q. Is that --

8 **A. Yeah, I will.**

9 Q. Just let me finish the -- I promise --

10 **A. Oh, okay.**

11 Q. -- I'm going to give you as much time

12 as you want to answer all the questions. It's just

13 for the court reporter's benefit.

14 **A. Okay.**

15 Q. I just ask you to make sure I get the

16 question out and then you go ahead and answer.

17 **A. Okay.**

18 Q. Do you currently have plans to file a

19 lawsuit against the City of Portsmouth?

20 **A. I'm going to look into it.**

21 Q. I'll tell you what, would this be a

22 good time to take a break?

---

66

1 **A. Yes. Okay. Yeah, uh-huh.**

2 Q. Okay.

3 THE VIDEOGRAPHER: All right. The time

4 on the monitor is 10:27 p.m. We are going

5 off record.

6 (Recess taken.)

7 THE VIDEOGRAPHER: We are now back on

8 the record. The time on the monitor is

9 10:42 a.m.

10 BY MR. KRAVIS:

11 Q. Welcome back, Ms. Arrington. You're

12 still under oath. You understand that, right?

13 **A. Yes.**

14 Q. Okay. So when we took our break this

15 morning, I was asking you some questions about the

16 allegations in the Complaint about the Flock

17 cameras.

18 Do you remember that?

19 **A. Yes.**

20 Q. And in the answers you're giving to the

21 questions, you seem kind of angry. Do the Flock

22 cameras make you angry?

---

67

1 **A. Yes.**

2 Q. Why do the Flock cameras make you

3 angry?

4 **A. I just don't like the whole system of**

5 **the Flock cameras.**

6 Q. What do you mean when you say you don't

7 like the whole system of the Flock cameras?

8 **A. I don't like being tracked. I don't**

9 **like being captured. I don't like the government**

10 **knowing my movements. I don't like it.**

11 Q. What do you mean when you say you don't

12 like being tracked?

13 **A. Pretty much when I drive past the**

14 **cameras, the government knows where I am. So I**

15 **totally disagree with it.**

16 Q. And is that what you mean by -- well,

17 let me -- sorry, strike that. Let me ask a

18 different question.

19 To your understanding, how do the Flock

20 cameras track you?

21 **A. Not track, I wouldn't say. I would say**

22 **they know my movements. They know where I am.**

---

68

1 Q. I see. So you would say it's not that

2 they track you, it's that they know where you are?

3 **A. Yes.**

4 Q. You mentioned a couple of times the

5 issue of the government not knowing your movements.

6 I just wanted to follow up on that.

7 Have you had any interactions with the

8 government of the City of Norfolk that you would

9 describe as negative interactions?

10 **A. No.**

11 Q. Do you have any negative feelings

12 towards the City of Norfolk's government?

13 **A. No.**

14 Q. How about the police, have you ever had

15 any negative interactions with the police in the

16 city?

17 **A. No.**

18 Q. Any negative feelings towards the

19 police?

20 **A. No.**

21 Q. Okay. Earlier I was asking you some

22 questions about how you came to be connected with

---

---

69

1  the Institute for Justice and you described to me,
2  I think -- or I think you told me that you had a
3  conversation with a person who was your friend but
4  is no longer your friend?
5      A.   Yes.
6      Q.   Did I hear that right?
7      A.   Correct.
8      Q.   Can you tell me about that
9  conversation?
10     A.   We were just discussing the cameras and
11 how it works and -- because I noticed the cameras
12 when I drove past one.  And we got into a
13 conversation about it.  It was like, you know, just
14 a conversation.  I wouldn't say what that is, but
15 we just don't agree with them.
16     Q.   And you said you noticed the cameras
17 when you drove past one?
18     A.   A certain location I noticed.
19     Q.   What's that location?
20     A.   I don't remember where it was, but that
21 was our conversation.
22     Q.   Do you remember if it was in the city

70

1  of Norfolk or --
2      A.   It was in Norfolk.
3      Q.   And in this conversation, you and your
4  friend were discussing how you do not like the
5  cameras?
6      A.   Yes.
7      Q.   And in that conversation, did -- your
8  friend brought up the Institute for Justice?
9      A.   No.
10     Q.   Did you bring up the Institute for
11 Justice?
12     A.   I did, yeah.
13     Q.   When did you first learn about the
14 Institute for Justice?
15     A.   I know them for a while.
16     Q.   How?
17     A.   A conversation between me and her.
18     Q.   I'm not -- I'm sorry.  I'm not -- I'm
19 not understanding.  When did you first learn about
20 the Institute for Justice?
21     A.   Probably a little bit before this suit
22 started.

71

1      Q.   And how did you first learn about the
2  Institute for Justice?
3      A.   A friend of mine.  Her.
4      Q.   So she told you about the Institute for
5  Justice?
6      A.   Yeah, uh-huh.
7      Q.   So sorry.  This is what I was asking
8  earlier.
9      A.   Oh, I'm sorry.
10     Q.   Did she bring up the Institute for
11 Justice in the conversation?
12     A.   Yes.
13     Q.   What did she tell you about the
14 Institute for Justice in that conversation?
15     A.   How the system works, and if I wanted
16 some justice towards the cameras, they would be
17 able to help me.
18     Q.   And when you say "justice towards the
19 cameras," you mean like taking the cameras down?
20     A.   Yes, correct.
21     Q.   Do you feel the same way about other
22 cameras in the city of Norfolk?

72

1      A.   I feel the way about a lot of things.
2      Q.   Like what?
3      A.   Just -- just a lot of things.
4      Q.   Well, like what other things?
5      A.   E-ZPass, Elizabeth River.  I don't like
6  the way that's set up.
7      Q.   What don't you like about the E-ZPass?
8      A.   They charge me every time I go through
9  there and they know my whereabouts as well.  If I
10 could do something about that, I would too.
11     Q.   The -- am I right that -- are you
12 talking now about the toll that you pay --
13     A.   Tolls, yes.
14     Q.   -- to go from Portsmouth into Norfolk?
15     A.   Correct.
16     Q.   So it sounds like you're aware that
17 there are cameras at those toll plazas?
18     A.   That's how they charge me.  I'm aware
19 of that.
20     Q.   And your view is that --
21     A.   I don't like it.
22     Q.   And when you say you don't like it,

73

1  what do you mean?
2      A.   I wish it could go away.
3      Q.   And the "it" there is the cameras at
4  the toll plazas?
5      A.   I wish I could get rid of all of it.
6      Q.   Are there other things you wish you
7  could get rid of?
8      A.   I have a long list.  I don't want to go
9  there.
10     Q.   Well, I'm sorry.  I don't mean like all
11 the things in the world you would like to get rid
12 of.  I mean other things --
13     A.   Just — just — I'm staying focused.
14     Q.   Sorry.  Let me just -- let me just
15 finish the question.  This is just for the benefit
16 of the court reporter.  I promise, you will have as
17 much time to answer as you want.
18          What other things do you wish would go
19 away because you believe they invade your right to
20 privacy?
21     A.   Just the Flock cameras right now.
22     Q.   And you also mentioned the toll

74

1  cameras, right?
2      A.   Yes.
3      Q.   Anything else you put on that list?
4      A.   That's it for right now.
5      Q.   How about red light cameras?
6      A.   Yeah, get rid of those too.
7      Q.   And speeding cameras?
8      A.   Get rid of those too.
9      Q.   How about Ring cameras that people have
10 on their doors?
11     A.   I don't like those neither.  No form of
12 camera.
13     Q.   How about cameras that businesses put
14 out, like surveillance cameras that a private
15 business has?
16     A.   That's what they do.  I have no control
17 over that.
18     Q.   What did you do to prepare for the
19 deposition today?
20     A.   I talked to my lawyers.
21     Q.   Don't tell me the content, what you
22 said.  But how many times did you meet with your

75

1  lawyers to prepare for the deposition?
2      A.   Well, a few times.  I don't recall
3  exactly how many.
4      Q.   Like three times?
5      A.   I don't recall.
6      Q.   Okay.  Do you remember how many total
7  hours you spent preparing for the deposition?
8      A.   I don't recall.
9      Q.   Would you say it was like more than
10 ten?
11     A.   I don't recall.
12     Q.   Would you say it was less than five?
13     A.   I don't recall.
14     Q.   You just have no idea how many hours
15 you spent --
16     A.   I don't recall.
17     Q.   Without telling me the -- the contents,
18 did you -- when you were meeting with the lawyers,
19 did you review any documents?
20     A.   I don't recall.
21     Q.   You don't recall if you reviewed the
22 documents?

76

1      A.   I don't recall.
2      Q.   Do you recall if you reviewed any
3  document that refreshed your recollection about
4  anything related to this case?
5      A.   I don't recall.
6      Q.   You just --
7      A.   I don't recall what documents, if I
8  reviewed anything.
9      Q.   Let's see.  Ms. Arrington, since the
10 time that this lawsuit was filed in October of
11 2024, do you have any reason to believe that you've
12 been the subject of a criminal investigation?
13     A.   No.
14     Q.   Do you have any reason to believe that
15 your car has been connected to any criminal
16 investigation in that time?
17     A.   No.
18     Q.   Are you currently engaged in any
19 criminal activity?
20     A.   No.
21     Q.   To your knowledge, are there any active
22 warrants out for you?

Transcript of Crystal Arrington
Conducted on August 27, 2025

20 (77 to 80)

77

1    A.   No.

2    Q.   Since you -- since the lawsuit was

3 filed in October of 2024, do you have any reason to

4 believe that you've been involved in any

5 investigation related to a missing or endangered

6 person?

7        MR. FROMMER:  Objection, calls for

8    speculation.

9        THE WITNESS:  No.

10 BY MR. KRAVIS:

11   Q.   Do you have any reason to believe that

12 your car has been involved in any investigation of

13 a missing or endangered person?

14       MR. FROMMER:  Same objection.

15       THE WITNESS:  No.

16 BY MR. KRAVIS:

17   Q.   Since the lawsuit was filed -- well, I

18 take it you're not engaged in any -- strike that.

19       Going forward in time, do you have any

20 reason to believe that any cars in your household

21 will be involved in any incident related to a

22 missing or endangered person?

78

1    A.   No.

2    Q.   Since the time the lawsuit was filed in

3 2024, do you have any reason to believe that you've

4 been involved in any investigation related to human

5 trafficking?

6        MR. FROMMER:  Objection.

7        THE WITNESS:  No.

8        MR. FROMMER:  Let me --

9        THE WITNESS:  Sorry.

10       MR. FROMMER:  It's okay.

11 BY MR. KRAVIS:

12   Q.   Since the time the lawsuit was filed in

13 October of 2024, do you have any reason to believe

14 that your car was involved in any human trafficking

15 investigation?

16       MR. FROMMER:  Objection, calls for

17   speculation.

18       THE WITNESS:  No.

19 BY MR. KRAVIS:

20   Q.   Going forward, do you anticipate that

21 you or your cars will be involved in any human

22 trafficking?

79

1        MR. FROMMER:  Objection, calls for

2    speculation.

3        THE WITNESS:  No.

4 BY MR. KRAVIS:

5    Q.   Do you ever visit crime scenes?

6    A.   No.

7    Q.   Let me show you another exhibit.

8        MR. KRAVIS:  Could we have the

9    supplemental responses, Tab 7, please.

10 BY MR. KRAVIS:

11   Q.   Ms. Arrington, I'm going to ask the

12 court reporter to mark this document as Exhibit

13 Number 18, I think is what we're up to.

14   (Exhibit Number 18 was marked for identification.)

15 BY MR. KRAVIS:

16   Q.   Ms. Arrington, do you recognize Exhibit

17 Number 18?

18       MR. FROMMER:  Take your time to review

19   it.

20       (Witness reviews document.)

21       THE WITNESS:  Yes.

22

80

1 BY MR. KRAVIS:

2    Q.   Do you recognize Exhibit 18?

3    A.   I do.

4    Q.   What is it?

5    A.   It's part of the case.

6    Q.   And did you have a chance to review

7 this document before it was -- before it was

8 produced to the Defendants?

9    A.   Yes.

10   Q.   Let me ask you to take a look at page 4

11 of the document.  There's a section there that's

12 labeled "Verification."

13       Do you see that?

14   A.   Yes.

15   Q.   Is that your signature in the

16 verification section?

17   A.   Yes.

18   Q.   To the best of your knowledge, the

19 information in here is all true and accurate,

20 right?

21   A.   Correct.

22   Q.   All right.  Let me direct your

Transcript of Crystal Arrington
Conducted on August 27, 2025

---

81

1 attention to Interrogatory Number 7, which starts
2 on the first page.
3          Interrogatory 7 reads:  (Reading)
4          For each day, starting on
5     May 1st, 2025 and ending on July 15th,
6     2025, provide the odometer reading as
7     of 7 a.m. of any vehicles you drive.
8          Do you see that?
9     A.   I do.
10    Q.   And then there's a paragraph that
11 starts "objection" with some legal mumbo jumbo.
12 And then on the next page, there's the response.
13         Do you see that?
14    A.   I do.
15    Q.   And the response says:  (Reading)
16         Consistent with the
17    Plaintiff's objections, on or around
18    May 21st, 2025, Plaintiff recorded the
19    following odometer reading:  2010 Ford
20    Focus, 189,917.  On July 16th, 2025,
21    Plaintiff recorded the following
22    odometer reading:  2010 Ford Focus,

---

82

1     191,670.
2          Did I read that right?
3     A.   That's correct.
4     Q.   And I think you told me this
5  information, to the best of your knowledge, is
6  accurate, right?
7     A.   To the best of my knowledge.
8     Q.   Right.  You took these odometer
9  readings, right?
10    A.   Yes, yes.
11    Q.   Okay.  So by my calculation, that's a
12 total of 1,753 miles over the course of 56 days,
13 which averages out to 31 miles a day.
14         Would you say that you drive an average
15 of 31 miles a day, or are there some days where you
16 drive a lot more and some days where you drive a
17 lot less?
18    A.   I'm not sure.
19    Q.   Are there any days of the week, based
20 on your schedule, where you always use your car?
21    A.   Pretty much, yes.
22    Q.   And what days are those?

---

83

1     A.   Monday through Sunday.
2     Q.   So you're driving in your car basically
3  every day?
4     A.   Yes.
5     Q.   And would you say that you're driving
6  about 31 miles a day every day?
7     A.   I don't know.  I'm not sure.
8     Q.   Do you tend to drive more during the
9  week and less on the weekends?
10    A.   I'm not sure.
11    Q.   The time period that we're talking
12 about here was -- the odometer readings we got were
13 May 21st, 2025 and July 16th, 2025.
14         Do you see that?
15    A.   I do.
16    Q.   Now, during that time period, May 21st
17 to July 16th, did you take any road trips?
18    A.   I'm not sure.  I don't recall.
19    Q.   Were there any days where you were
20 driving your car like outside the state of
21 Virginia?
22    A.   No, not that I can recall.

---

84

1     Q.   Were there any days in that time
2  period, May 21st to July 16th, when you, you know,
3  like got on a plane and went on vacation so you
4  weren't driving the car at all?
5     A.   I can't recall.
6     Q.   You can't recall whether you got on a
7  plane?
8     A.   I don't know.  I don't remember.
9     Q.   Let me make sure I understand that
10 question -- let me make sure I understand that
11 answer.
12         July 16th, 2025 was like a little over
13 a month ago, right?
14    A.   Have I got on a plane since then?
15    Q.   No.  My question is, between May 21st
16 and July 16th, did you get on a plane to go
17 somewhere?
18    A.   I would say I can't recall.
19    Q.   Just to make sure I understand your
20 testimony.  You may have gotten on a plane and you
21 don't -- in the last three months and you just
22 don't remember?

---

Transcript of Crystal Arrington
Conducted on August 27, 2025

22 (85 to 88)

---

85

1    A.    I don't remember.

2    Q.    How often do you fly?

3    A.    Not often.

4    Q.    So if you flew, you would probably

5 remember, right?

6    A.    I can't recall.

7    Q.    That wasn't my question.  My question

8 is, since you don't fly very often, you would

9 probably recall if you had flown, right?

10    A.    I don't remember.

11    Q.    Do you remember if you bought a plane

12 ticket?

13    A.    I can't recall.

14    Q.    You're telling me you cannot recall if

15 you bought a plane ticket in the last three months?

16    A.    I think me and my family took a

17 vacation.

18    Q.    Where did you take the vacation?

19    A.    We went to Georgia.

20    Q.    Okay.  When did you go to Georgia?

21    A.    I can't remember the date.  I can't

22 give you a date.

---

86

1    Q.    What month of the year was it?

2    A.    It was last month sometime.

3    Q.    So that would have been in July, right?

4    A.    Yes, yes, correct.

5    Q.    Was it before July 16th?

6    A.    I can't recall.

7    Q.    You took the odometer reading on

8 July 16th, right?

9    A.    Correct.

10    Q.    That's what it says in the

11 interrogatory response, right?

12    A.    That's right.

13    Q.    Did you go to Georgia -- did you get on

14 the plane to go to Georgia before or after the day

15 when you took the odometer reading?

16    A.    I would save after.

17    Q.    Okay.  Other than the trip to Georgia,

18 any other planes you think you got on between

19 May -- any planes you think you got on between

20 May 21st and July 16th?

21    MR. FROMMER:  Objection,

22    mischaracterizes --

---

87

1    THE WITNESS:  I can't recall.

2    MR. FROMMER:  -- prior testimony.

3    Let me --

4    THE WITNESS:  Sorry.

5    MR. FROMMER:  Mischaracterizes prior

6 testimony.

7    You can answer.

8    THE WITNESS:  I can't recall.

9 BY MR. KRAVIS:

10    Q.    Are you aware that Flock camera data

11 from the city of Norfolk was produced in this

12 litigation at your attorney's request for the

13 period of February 15th to July 3rd.

14    Do you know about that?

15    A.    I'm aware.

16    Q.    Have you looked at any of that data?

17    A.    I can't recall.

18    Q.    Do you know how many times per day the

19 Flock cameras in Norfolk photographed your car on

20 average in that period?

21    MR. FROMMER:  Objection, calls for

22    speculation.

---

88

1 BY MR. KRAVIS:

2    Q.    I'm just asking if you know.

3    A.    I can't recall.

4    Q.    Well, wait.  I'm not asking you to

5 recall something.  I'm asking you if you know or

6 you don't know.  Do you know?

7    A.    No.

8    Q.    If I asked you, based on your

9 understanding of the Flock cameras and what you've

10 seen of them and how the system works, how many

11 times on average you believe that the Flock cameras

12 in Norfolk photograph your car, what would you say?

13    MR. FROMMER:  Objection, calls for

14    speculation.

15    THE WITNESS:  A lot.

16 BY MR. KRAVIS:

17    Q.    Like how many?

18    A.    I don't know.

19    Q.    Well, you just said a lot, so I'm just

20 wondering what that means.

21    A.    I don't know.  What is a lot?

22    Q.    Okay.  So like more than ten?

---

Transcript of Crystal Arrington
Conducted on August 27, 2025

---

89

1    A.    I don't know.

2         MR. FROMMER: Objection, calls for

3    speculation.

4 BY MR. KRAVIS:

5    Q.    I'm not asking you to speculate.  I'm

6 asking about what you meant when you said the word

7 "a lot."  When you say the word "a lot," do you

8 mean more than ten?

9    A.    I don't know.

10   Q.    Does it mean more than 20?

11   A.    I don't know.

12   Q.    You told me earlier, I think, that --

13 when I asked you what your concern was, that you

14 would not like the government to know "when I'm

15 driving and going to a family member's house or

16 visiting a friend."

17        Did I hear that right?

18   A.    Correct.

19   Q.    So about how often do you think the

20 Flock cameras capture you going to a family

21 member's house?

22        MR. FROMMER: Objection, calls for

---

90

1    speculation.

2         THE WITNESS: Every time I pass one.

3 BY MR. KRAVIS:

4    Q.    How often do you think that is?

5    A.    I don't know.

6         MR. FROMMER: Objection, calls for

7    speculation.

8 BY MR. KRAVIS:

9    Q.    If I told you that on average, during

10 the period for which the data was produced,

11 February 15th to July 3rd, 2025, if I told you on

12 average in that time period, your car was

13 photographed by Flock cameras in the city of

14 Norfolk like twice a day, would that surprise you?

15   A.    I'm not sure.

16   Q.    Does that change your view of the Flock

17 cameras?

18   A.    Absolutely not.

19   Q.    Is it your view that on a day when the

20 Flock cameras in Norfolk capture your car twice,

21 that your right to privacy is being violated?

22   A.    Yes.

---

91

1    Q.    Is it your view that two photographs of

2 a -- your car in a single day by the Flock cameras

3 in Norfolk provides an intimate window into your

4 life?

5         MR. FROMMER: Objection, calls for a

6    legal conclusion.

7         THE WITNESS: I'm not sure.

8 BY MR. KRAVIS:

9    Q.    Okay.  Why are you not sure?

10   A.    I'm just not sure.

11        MR. FROMMER: Same objection.

12 BY MR. KRAVIS:

13   Q.    So it sounds like you're telling me

14 that on days when your car is captured,

15 photographed twice, you're just not sure whether

16 that reveals intimate details of your life.  Am I

17 hearing --

18        MR. FROMMER: Objection,

19    mischaracterizes prior testimony and calls

20    for a legal conclusion.

21        THE WITNESS: I don't like the

22    cameras --

---

92

1 BY MR. KRAVIS:

2    Q.    Right.

3    A.    -- and I wish they'd go away.

4    Q.    I got that, but I'm asking you

5 something a little bit different.  I'm asking you

6 about on the days when your car is photographed two

7 times by Flock cameras in the city of Norfolk, is

8 it your view that on those days, the cameras are

9 providing the City with intimate details about your

10 life?

11        MR. FROMMER: Objection, calls for

12    speculation, calls for a legal conclusion,

13    asked and answered.

14        THE WITNESS: I'm not sure.

15 BY MR. KRAVIS:

16   Q.    Why are you not sure?

17   A.    Because I don't know how the government

18 works.  It makes me feel really creepy about the

19 whole situation.

20   Q.    How about days when your car is

21 photographed once?

22   A.    It's still --

---

Transcript of Crystal Arrington
Conducted on August 27, 2025

---

93

1    MR. FROMMER: Same objections.
2    THE WITNESS: It still make me feel
3  creepy. I don't want to be at all.
4  BY MR. KRAVIS:
5    Q.   How about these -- why does it make you
6  feel creepy when your car is photographed once?
7    **A.   It should be zero.**
8    Q.   What about the days when your car is
9  photographed zero times?
10   **A.   Well, if you get rid of them, then it**
11 **will be zero times.**
12   Q.   On average, in the data that was
13 produced in this litigation, February 15th through
14 July 3rd, 2025, do you know how many days your
15 camera -- your -- excuse me, do you know how many
16 days your car was not captured at all by the --
17   MR. FROMMER: Objection.
18   MR. KRAVIS: Wait. Let me finish the
19 question.
20   MR. FROMMER: Sorry. I thought you
21 were finished.
22

---

94

1  BY MR. KRAVIS:
2    Q.   On average, in the data that was
3  produced in this litigation, in the period
4  February 15th to July 3rd, 2025, do you know how
5  many days your camera -- how many days your car was
6  not captured at all by Flock cameras in the city of
7  Norfolk?
8    MR. FROMMER: Objection, calls for
9    speculation.
10   THE WITNESS: I don't know.
11 BY MR. KRAVIS:
12   Q.   Do you think that the -- the Flock
13 cameras are providing intimate details about your
14 life on days when your car is not photographed at
15 all by the cameras?
16   MR. FROMMER: Objection, calls for a
17   legal conclusion.
18   THE WITNESS: I don't know how it
19   works, but I just would like if the cameras
20   could go away.
21 BY MR. KRAVIS:
22   Q.   I think you told me earlier that you

---

95

1  try to maintain a degree of privacy in your life
2  about where you go. Do I have that right?
3    MR. FROMMER: Objection,
4    mischaracterizes prior testimony.
5    MR. KRAVIS: Okay. Let me withdraw and
6    ask it again.
7  BY MR. KRAVIS:
8    Q.   Do you try to maintain a degree of
9  privacy in your life about where you go?
10   **A.   Not really privacy, but I just go where**
11 **I want to go.**
12   Q.   Right. I understand that. But I guess
13 my question is, do you view the places where you
14 want to go as private?
15   **A.   Yes.**
16   Q.   Do you do anything to maintain privacy
17 over the places where you go?
18   **A.   I try.**
19   Q.   What do you do?
20   **A.   I just try to be cautious of where I**
21 **am. I don't go into any dangerous places. Try to**
22 **say safe. Pretty much that's it.**

---

96

1    Q.   Do you know whether any of the apps on
2  your phone have location services turned on?
3    **A.   Repeat that question.**
4    Q.   Yeah. Do you know whether there are
5  any -- well, let me -- let me back up.
6    Do you have a cell phone?
7    **A.   I do.**
8    Q.   You carry the cell phone with you when
9  you go out and about?
10   **A.   I do.**
11   Q.   Do you have any -- do you know if you
12 have any apps on your cell phone that have location
13 tracking turned on?
14   **A.   No, none of them.**
15   Q.   None of them have the location tracking
16 on or you don't know?
17   **A.   None of them are on.**
18   Q.   Let me go back to the First Set of
19 Interrogatory Responses. That would be what we had
20 marked as Exhibit 17.
21   And I'm going to direct your attention
22 to Interrogatory Number 12, which appears starting

---

Transcript of Crystal Arrington
Conducted on August 27, 2025

---

97

1 on page 14 of the document.
2        Are you with me?
3    **A.    I'm with you.**
4    Q.    Okay.  Interrogatory 12 reads:
5 (Reading)
6            Identify which, if any,
7        location services you use, including
8        Google Maps, Maps, Find My iPhone and
9        other smartphone app location
10       services, comma, vehicle location
11       services, e.g. OnStar.  This response
12       should cover all of your mobile
13       devices, including all of those for
14       which documents are produced in
15       response to Request for Production
16       Number 14.
17       Do you see that?
18   **A.    I do.**
19   Q.    And then there's a paragraph that
20 begins "objection" that's got some legal language.
21 And then there's a paragraph that says:  (Reading)
22           Response:  Consistent with

---

98

1            Plaintiff's objections, Google Maps,
2        Apple Find My.
3        Do you see that?
4    **A.    I do.**
5    Q.    So -- and I think you told me earlier
6 that these interrogatory responses are accurate,
7 right?
8    **A.    Yes.**
9    Q.    And you reviewed them before you signed
10 them, right?
11   **A.    Yes.**
12   Q.    And the interrogatory response says
13 that you had, at the time you submitted the
14 responses, location services turned on for Google
15 Maps and Apple Find My.
16       Do I have that right?
17   **A.    Repeat that.**
18   Q.    The interrogatory response says that
19 you had location services turned on for Google Maps
20 and Apple Find My.
21       Do I have that right?
22   **A.    I had it turned on?**

---

99

1    Q.    The interrogatory response says that
2 the location services you use for apps on your
3 phone are Google Maps and Apple Find My, right?
4    **A.    Correct.**
5    Q.    Okay.  So was there a time between when
6 this interrogatory response was submitted and today
7 when you turned off the location services for
8 Google Maps?
9    **A.    I don't recall when.  From my**
10 **acknowledgment, I always had it turned off, but I**
11 **have it -- the app is there, but it's off.**
12   Q.    What do you mean when you say "the app
13 is there, but it's off"?
14   **A.    Yeah.  I don't have -- you can't --**
15 **they can't track me on my phone.  My location is**
16 **off.**
17   Q.    So are you saying that the answer to
18 Interrogatory 12 is wrong?
19   **A.    Maybe I'm not understanding exactly the**
20 **way you're wording it.  Can you repeat that one**
21 **more time?**
22   Q.    Yes.  I'm just asking you if your

---

100

1 testimony is that the answer that you gave to
2 Interrogatory Number 12 --
3    **A.    Okay.**
4    Q.    -- is true or false?
5    **A.    I do have Google.  Yeah, I do, I have**
6 **it, for sure.**
7    Q.    So you have location services --
8    **A.    Yeah.**
9    Q.    You use location services for Google
10 Maps; is that right?
11   **A.    I do, yeah.**
12   Q.    And you use location services for Apple
13 Find My?
14   **A.    Yes, that's true.**
15   Q.    And you do not have location services
16 you use for any other applications on your phone,
17 to your knowledge; is that right?
18   **A.    No.**
19   Q.    Do you know how the location services
20 for these apps works?
21   **A.    I'm not a hundred percent sure, no.**
22   Q.    Do you know if these apps can track the

---

Transcript of Crystal Arrington
Conducted on August 27, 2025

---

**101**

1  location of your phone as you're walking around
2  with it?
3      A.  I'm not sure.
4      Q.  Have you taken -- ever taken any steps
5  to try to figure that out, like what your phone --
6  what these apps are doing in terms of tracking your
7  location?
8      A.  No, I haven't.
9      Q.  How come?  Why not?
10     A.  I just haven't.
11     Q.  You -- you told me several times this
12 morning that the Flock cameras -- the Flock cameras
13 bother you.  Do the location services on these apps
14 bother you?
15     A.  I can't answer that question.
16     Q.  Why can't you answer the question?
17     A.  I just totally disagree with Flock, and
18 I don't want it there.
19     Q.  Right.  No, I get that.  I get that.
20 I'm just asking you about the apps, and I'm asking
21 you whether the apps bother you in the same way the
22 Flock cameras bother you?

---

**102**

1      A.  You know what, they do.
2      Q.  Why?
3      A.  Because at some point, they can track
4  me.  So they do bother me.
5      Q.  If they bother you, why have you not
6  taken any steps to turn off -- to turn them off?
7      A.  They're going to be turned off.
8      Q.  Did you tell me earlier that part of
9  what -- well, let me ask the question -- actually,
10 let me ask you about something else.
11          Did you tell me earlier that your
12 address is -- your home address is 4403 Pelican
13 Point in Portsmouth?
14     A.  Correct.
15     Q.  And did you tell me you've lived there
16 for like three years?
17     A.  Correct.
18     Q.  All right.  Let me direct you back to
19 the First Set of Interrogatories.  Oh, no, I'm
20 sorry.  I'm going to show you a new exhibit.  We're
21 going to ask the court reporter to mark this,
22 Tab 24.  Ask the court reporter to mark this as

---

**103**

1  Exhibit 19.
2          MR. KRAVIS:  Just give me one second.
3      And can I have the accompanying exhibit?  Do
4      you know what I'm talking about?
5  BY MR. KRAVIS:
6      Q.  While he's working on that, we can talk
7  about some things.
8          I'm going to direct you back -- I'm
9  going to take you back to the Complaint.  Now he
10 made it back faster than I thought.  All right.
11         I'm going to ask the court reporter to
12 mark the next two exhibits as -- we're up to 19 and
13 20.
14         MR. KRAVIS:  Make that one 19 and that
15     one 20, please.
16 (Exhibit Number 19 was marked for identification.)
17 (Exhibit Number 20 was marked for identification.)
18 BY MR. KRAVIS:
19     Q.  Okay.  Let me start with Exhibit 19.
20         Ms. Arrington, do you recognize
21 Exhibit 19?  No, no, I'm sorry.  Start with the
22 other one.

---

**104**

1      A.  Sorry.
2      Q.  That's okay.  You can look at both of
3  them, but I'm going to -- I want to ask you first
4  about 19.
5      A.  Okay.
6      Q.  Have you seen this before?
7          (Witness reviews document.)
8      A.  Okay.
9      Q.  Okay.  Have you ever -- let's start
10 with 19.  Have you ever seen 19 before?
11     A.  Yes.
12     Q.  Okay.  What is 19?
13     A.  A part of my case.
14     Q.  Yeah.  This is a response to a
15 discovery request that was provided to Defendants
16 in this case, right?
17     A.  Yes.
18     Q.  All right.  I'm going to ask you to
19 turn to RFP 7.  And that appears on page 9 of the
20 document.
21         By the way, do you remember if you
22 reviewed this document before it was served on the

---



**105**

1  Defendants?
2      A.   Yes.
3      Q.   You did?
4      A.   I think, yeah.
5      Q.   Can tell me when you're at RFP 7 on
6  page 9?
7      A.   Page 9?  I am at 9.
8      Q.   So Request for Production 7 reads:
9  (Reading)
10          Documents sufficient to show
11     every address at which you have
12     resided since May 1st, 2022.
13         Do you see that?
14     A.   Yes.
15     Q.   Okay.  Then there's an objection,
16 right?
17     A.   Okay.
18     Q.   There's a paragraph that says
19 "objection," right?
20     A.   Uh-huh.
21     Q.   And then there's a paragraph that says:
22 (Reading)

**106**

1          Response:  Consistent with
2      Plaintiff's objections, see Arrington
3      000001.
4          Do you see that?
5      A.   Yes.
6      Q.   I'm going to ask you to set that aside
7  for a second and then take a look at the next one,
8  which is Exhibit 20.  And do you see how in the
9  bottom right corner, it says Arrington 000001?
10         Do you see that?
11     A.   Uh-huh.
12     Q.   "Yes"?
13     A.   I do.
14     Q.   Okay.  This is a Virginia motor vehicle
15 registration, right?
16     A.   Uh-huh.
17     Q.   "Yes"?
18     A.   Yes, correct.
19     Q.   And you can see here, it lists your
20 address, right?
21     A.   Yes.
22

**107**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

**108**

1
2
3
4
5
6
7
8
9
10
11
12     Q.   Okay.  Thank you for the clarification.
13 That's helpful.
14         I'm going to direct you back to the
15 Complaint, which is the Exhibit Number 2 from
16 yesterday.  I think you still have it in front of
17 you.  If you need a copy, let me know.
18     A.   I have it.
19     Q.   I'm going to ask you to turn to
20 Paragraph 66 of the -- excuse me, of the Complaint,
21 which appears on page 14 of the document.
22     A.   Okay.  Okay.

Transcript of Crystal Arrington
Conducted on August 27, 2025

28 (109 to 112)

109

1    Q.    All right.  So Paragraph 66 reads:
2    (Reading)
3              On information and belief, the
4         Flock cameras have photographed
5         Crystal's car as she drove into and
6         around Norfolk to visit her friends
7         and family who live there.  Anyone
8         with access to Flock's database can
9         use this information to figure out
10        which places Crystal frequently visits
11        in Norfolk and deduce who her
12        relatives and closest friends are.
13             Did I read that correctly?
14   A.    Yes.
15   Q.    Do you believe that the City can use
16 the Flock cameras to deduce who your relatives and
17 closest friends are?
18        MR. FROMMER:  Objection, calls for
19   speculation.
20        You can answer.
21        THE WITNESS:  I'm not sure what they
22   can do.

110

1 BY MR. KRAVIS:
2    Q.    Okay.  So you told me that you reviewed
3 this document --
4    A.    I have.
5    Q.    -- the Complaint, before it was filed,
6 right?
7    A.    Yeah.
8    Q.    And you told me that everything in it
9 was accurate, right?
10   A.    Yes, yes.
11   Q.    Are you telling me you're not sure
12 whether the Flock cameras can be used to deduce who
13 your relatives and closest friends are?
14   A.    They probably can.
15   Q.    How?
16   A.    Yeah.
17   Q.    How can they do that?
18   A.    I don't know how the government can do
19 what they do.  But I just -- I totally disagree
20 with it.
21   Q.    Okay.  So I just want to make sure I
22 have your answer correctly -- I understand your

111

1 answer correctly.  You're telling me you do believe
2 that the Flock cameras can be used by the City to
3 deduce who your relatives and closest friends are,
4 but you're not sure how?
5    A.    Yeah.
6    Q.    Is that right?
7    A.    Correct.
8    Q.    The relatives and closest friends here,
9 are those the people that you identified in the
10 interrogatory response we were looking at earlier?
11   A.    Yes.
12   Q.    Ms. Arrington, do you have a Facebook
13 account?
14   A.    I do.
15   Q.    And is the Facebook account set to
16 "public"?
17   A.    I would say, yes.
18   Q.    So in other words, any member of the
19 public who is -- has a Facebook account can view
20 your Facebook page; is that right?
21   A.    Yes.
22   Q.    And the individuals that you listed,

112

1 the family members you listed in the interrogatory
2 response, they're on your Facebook page, right?
3    A.    Yeah.
4    Q.    There are photographs of your father,
5 for example, right?
6    A.    Yeah.
7    Q.    And there's photographs of your sister,
8 right?
9    A.    Uh-huh, uh-huh.
10   Q.    So any member of the public with a
11 Facebook account could look at your Facebook
12 account and identify who those relatives are,
13 right?
14   A.    Yeah.
15   Q.    What about -- let me ask you about when
16 you're traveling on the streets in Norfolk.
17   A.    Uh-huh.
18   Q.    What is your expectation of privacy?
19        MR. FROMMER:  Objection, calls for a
20   legal conclusion.
21        THE WITNESS:  Not my license plate
22   being captured when I move around.

Transcript of Crystal Arrington
Conducted on August 27, 2025

---

113

1 BY MR. KRAVIS:
2    Q.   What about the outside of your car, do
3 you view the outside of your car as private?
4    **A.   I'm not sure.**
5    Q.   Do you have any bumper stickers on your
6 car?
7    **A.   Not that I can recall.**
8    Q.   What about your home address, do you
9 consider your home address to be private from the
10 government?
11   **A.   Yes.**
12   Q.   You have a driver's license?
13   **A.   I do.**
14   Q.   And you got the driver's license by
15 going to the DMV?
16   **A.   Yes, correct.**
17   Q.   When you go to the DMV to get your
18 driver's license, you've got to tell them your
19 address, right?
20   **A.   Yes.**
21   Q.   And your address appears on your
22 driver's license, right?

---

114

1    **A.   Yes.**
2    Q.   And as we saw a moment ago, when you
3 registered your car, you have to give, again, your
4 home address to get the car registered, right?
5    **A.   Correct.**
6    Q.   And I know you got to update yours, but
7 your home address appears on your car registration,
8 right?
9    **A.   Yes.**
10   Q.   Do you believe that your license plate
11 itself is private?
12       MR. FROMMER: Objection, calls for --
13       Well, you can answer.
14       THE WITNESS: Is it private?
15 BY MR. KRAVIS:
16   Q.   Yeah.
17   **A.   Could you reword that for me, please?**
18   Q.   Yeah.  Let me try to ask the question a
19 little bit better.
20   **A.   Thank you.**
21   Q.   You've told me, I think, at various
22 points today that you consider your -- the

---

115

1 identities of your relatives and closest friends to
2 be private, right?
3       MR. FROMMER: Objection,
4 mischaracterizes prior testimony.
5       THE WITNESS: Yes.
6 BY MR. KRAVIS:
7    Q.   Well, do you consider the identities of
8 your friends and close relatives to be private, or
9 no?
10   **A.   I'm not sure.**
11   Q.   Okay.
12       And I think you told me a moment ago
13 that you considered your home address to be
14 private, right?
15   **A.   Yeah, I would like my home address to**
16 **be private.**
17   Q.   So I'm wondering, do you put your
18 license plate into the same category?
19   **A.   I'm not sure.**
20   Q.   Okay.  Let me ask you to turn back to
21 the Complaint, and I'm going to ask you -- how are
22 you doing, by the way?

---

116

1    **A.   I'm good.**
2    Q.   Do you want a break or do you want
3 to --
4    **A.   I would like a break, please.**
5    Q.   Let's do it.
6    **A.   Thank you.**
7       THE VIDEOGRAPHER: All right.  The time
8 on the monitor is 11:24.  We're going off the
9 record.
10       (Recess taken.)
11       THE VIDEOGRAPHER: We are now back on
12 the record.  The time is 12:35 p.m.
13 BY MR. KRAVIS:
14   Q.   Good afternoon, Ms. Arrington.  Welcome
15 back.  You're still under oath.  You understand
16 that, right?
17   **A.   Yes.**
18   Q.   I think when we started this morning,
19 you told me that you were in a car accident a few
20 weeks ago.
21   **A.   I was.**
22   Q.   Which car were you driving?

---

Case 2:24-cv-00621-MSD-LRL    Document 114-15    Filed 09/15/25    Page 26 of 32
PageID# 2766
Transcript of Crystal Arrington
Conducted on August 27, 2025

33 (129 to 132)

129

1  when I'm driving.
2      Q.   Right.  I understand that point.  I'm
3  just asking about what you understand the Flock
4  cameras to do.  And so I'm just -- I'd ask you to
5  focus in on that part of my question.
6          Do you have an understanding as to
7  whether the Flock cameras, when they photograph
8  your car, whether they take a picture of the driver
9  of the car?
10     A.   I'm not sure what it does.  I don't
11 trust it.
12     Q.   Let's mark this Exhibit 21.
13  (Exhibit Number 21 was marked for identification.)
14 BY MR. KRAVIS:
15     Q.   Ms. Arrington, I'm handing you what the
16 court reporter has marked as Exhibit 21.  And I'll
17 represent to you that this is a photograph of your
18 vehicle that was taken on April 18th, 2025 by a
19 Flock camera on Tidewater.
20         Do you see that photograph?
21     A.   Yes.  It's scary.
22     Q.   You would agree with me, would you not,

130

1  that it is not -- you cannot identify the driver of
2  the car, right?
3      A.   No, you can't.
4      Q.   You can't see the driver of the car in
5  the photo?
6      A.   I know I'm in it.
7      Q.   Right, right, right.  But my question
8  is a little -- how do you know you're in it?
9      A.   I know I'm -- I'm the only one that
10 drives this car.
11     Q.   Right.  Have you ever told the Norfolk
12 Police Department that you're the only person that
13 drives this car?
14     A.   What reason would I have to do that?
15     Q.   Right, exactly.  So they don't know
16 that, do they?
17     A.   If they ask me, I'll tell them.
18     Q.   Right.  But they haven't asked you,
19 right?
20     A.   But if they ask me, I'll tell them.
21     Q.   Okay.  But they don't -- you don't have
22 any reason to believe that the Norfolk Police

131

1  Department knows that you are the only driver of
2  this car?
3      A.   I don't know what they know.
4          MR. FROMMER:  Objection, calls for
5          speculation.
6  BY MR. KRAVIS:
7      Q.   Okay.  And if you were just looking at
8  this photograph, you could not see that you're the
9  one driving the car, agree?
10     A.   I don't know what they know.
11     Q.   I'm not asking you what they know,
12 Ms. Arrington.  I'm asking you to look at the
13 photograph and tell me whether you agree that you
14 cannot see the identity of the driver of the car.
15     A.   But I can't agree with you.  You're
16 asking me to agree, and I can't agree with you.  I
17 don't know what the government has said.  I don't
18 know.
19     Q.   Ms. Arrington, I just want you to focus
20 on my question.  I'm not asking you about what the
21 government has said.  My question is just about
22 this photograph.

132

1          If you look at the photograph, can you
2  see the identity of the person who is driving the
3  car?
4      A.   No.
5      Q.   Okay.  I'd like to change topics now
6  and ask you a little bit about those locations that
7  we were discussing a few minutes ago.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22





**Page 136**

```
12    Q.    Do you remember where you were between
13 1:07 p.m. and 2:15 p.m. on March 20th?
14    A.    I don't.
15    Q.    Okay.  You would agree with me that the
16 Flock data itself does not show where you were,
17 does it?
18          MR. FROMMER:  Objection,
19 mischaracterizes prior testimony.
20          THE WITNESS:  I don't know what it
21 knows.
22
```

Case 2:24-cv-00621-MSD-LRL    Document 114-15    Filed 09/15/25    Page 28 of 32
PageID# 2768
Transcript of Crystal Arrington
Conducted on August 27, 2025

35 (137 to 140)

137

1  BY MR. KRAVIS:
2      Q.   Right.  I'm just asking you about if
3  the data that's on the page doesn't show where you
4  went in that hour and eight minutes, does it?
5      **A.   I don't know what it knows.  I don't**
6  **know if it's a puzzle they can put together.  I**
7  **just don't trust it, and I don't like it.**
8      Q.   What do you mean by "a puzzle they can
9  put together"?
10     **A.   If you can see that I'm here at this**
11 **time and you can see I'm here at this time**
12 **(indicating) --**
13     Q.   Yeah.
14     **A.   -- who's to say in between wherever I'm**
15 **at the government don't know?**
16     Q.   Right.  I'm glad you brought that up.
17          So take a look at the second page of
18 the exhibit I just handed you.  This is -- I'll
19 represent to you this is the same map with some
20 locations filled in in that general neighborhood.
21 For example, you can see -- do you see there's a
22 red X that is labeled "Fairmont Park United

138

1  Methodist Church"?
2      **A.   I do.**
3      Q.   Do you see there's another red X
4  labeled "Mount Herman Baptist Church"?
5      **A.   Yes.**
6      Q.   Do you see there's another X -- red X
7  labeled "Freedom Church of God in Christ"?
8      **A.   I see.**
9      Q.   And you see there's a green X on
10 Lafayette labeled "Manny's Burger."  Do you see
11 that?
12     **A.   I do.**
13     Q.   And the park that I think we were
14 talking about is also in the photo, that green
15 square in the bottom center, right?
16     **A.   Yes.**
17     Q.   And just looking at the Flock data, you
18 could have gone to any of those locations between
19 1:07 and 2:15 on March 20th, right?
20     **A.   I'm not sure.**
21     Q.   Right.  That's my point.  Looking at
22 the data, you're not sure, right?

139

1      **A.   Uh-huh.**
2      Q.   Is that a "yes"?
3      **A.   Repeat that.**
4      Q.   Looking at the data that I've shown you
5  here, the Flock data, you're not sure where you
6  were, right?
7          MR. FROMMER:  Objection,
8  mischaracterizes prior testimony.
9          If you can . . .
10         THE WITNESS:  I don't know what the
11 government knows.
12 BY MR. KRAVIS:
13     Q.   I'm not asking you what the government
14 knows.  I'm asking you what you can tell from the
15 data on the page.
16     **A.   Well, I don't know from looking at this**
17 **paper, but I don't know what the government knows.**
18     Q.   Right.  From looking -- just from
19 looking at the data on this paper, you do not know
20 where you were between 1:07 and 2:15, correct?
21     **A.   I don't know, but do the government**
22 **know?**

140

1      Q.   Could I ask you to turn back to the
2  first page of the exhibit.
3      **A.   Uh-huh.**
4      Q.   In the bottom right-hand corner, there
5  is a silhouette of a woman, I guess, that is
6  intended to mark the location of your aunt's house.
7          Do you see that?
8      **A.   I see it.**
9
10
11
12
13
14
15
16
17
18
19     **A.   I don't recall.**
20     Q.   You don't recall?
21     **A.   I don't.**
22     Q.   Ms. Arrington, do you remember



141

1 testifying this morning that you visit your aunt
2 every day?
3    **A.   I do.**
4    Q.   And your testimony under oath is that
5 you do not recall how to get to her house?
6    **A.   I can't — I can't recall exactly which**
7 **way I go.  I can't say, oh, I go such and such and**
8 **such, because I don't know the streets.  And I**
9 **don't — I just — I can't recall how to get there.**
10    Q.   If I gave you a pen, could you draw it
11 on the map not knowing the streets?
12    **A.   No, I can't.  No, I can't draw it.**
13    Q.   I just want to make sure we're
14 perfectly clear.  I want to give you every chance
15 to be clear about this.  Your sworn testimony under
16 oath is that you cannot tell me how to get to the
17 house of your aunt that you visit every day?
18       MR. FROMMER:  Objection,
19    mischaracterizes prior testimony.
20 BY MR. KRAVIS:
21    Q.   Well, am I mischaracterizing it or not?
22 Can you tell me?

142

1    **A.   You are.  You absolutely are because I**
2 **can —**
3    Q.   Okay.  How do you get to your aunt's
4 house?
5    **A.   I can get in a car to drive there, but**
6 **I cannot tell you how I drive there.  How about**
7 **that.**
8    Q.   I'm having difficulty understanding
9 what you mean.
10    **A.   I'm sorry.**
11
12
13
14
15
16
17
18
19
20
21
22



143

1    Q.   How did you get there?
2    **A.   I can't recall.**
3    Q.   Would the -- do you go the same way
4 every time or you go different ways?
5    **A.   I go different ways sometimes.**
6    Q.   Why do you go different ways?
7    **A.   It just depends on the traffic.**
8    Q.   So it sounds like you're telling me you
9 don't always take the shortest geographic distance
10 between your house and your aunt's house, sometimes
11 you go a different way.
12    **A.   It just depends.  I don't — I don't**
13 **recall how I get there.**
14    Q.   The street that the park is on, below
15 Pope is Shoop Street, right?
16    **A.   I think that's Shoop.**
17    Q.   It looks to me from looking at the map,
18 like you could travel north on Tidewater, across
19 the Lafayette River, and then turn right on Shoop.
20       Can you do that?  Can you make that
21 right onto Shoop from Tidewater?
22    **A.   I can't hundred percent recall, but I**

144

1 think you can.
2    Q.   And then from there, where Shoop dead
3 ends, you could make a left on 267, right?  247,
4 sorry.
5    **A.   I can't recall.**
6    Q.   So just to make sure I'm clear on this
7 because, well, you listed your aunt's house as one
8 of the locations that you can recall visiting
9 frequently in the city of Norfolk during the time
10 period that we asked about, right?
11    **A.   Yes, it's one of the houses.**
12    Q.   But you can't remember the route you
13 take to get there?
14    **A.   I can't.**
15    Q.   Let's look at the --
16       MR. KRAVIS:  Can I have the next
17    exhibit?
18 BY MR. KRAVIS:
19    Q.   Ms. Arrington, I want to ask you about
20 a few other days that same week that the expert,
21 Dr. Wheeler, did not take a look at.  And I'm going
22 to start by showing you what I am asking the court

Case 2:24-cv-00621-MSD-LRL    Document 114-15    Filed 09/15/25    Page 30 of 32
PageID# 2770
Transcript of Crystal Arrington
Conducted on August 27, 2025

37 (145 to 148)

145

1 reporter to mark as Exhibit 23.
2    (Exhibit Number 23 was marked for identification.)
3 BY MR. KRAVIS:
4    Q.   Ms. Arrington, I'll represent to you
5 that this exhibit shows the three times that your
6 car was photographed by Flock cameras in the city
7 of Norfolk on March 22nd, 2025.  And you can see
8 that the second photograph was taken at 10:09 a.m.
9 very close to the Rap Rip Brewing Company and then
10 the next photograph was taken at 12:34 p.m. close
11 to the Norfolk Smokehouse & Seafood Company.
12        Do you see that?
13    A.   I do.
14    Q.   Do you recall where you were between
15 10:09 a.m. and 12:34 p.m. on March 22nd, 2025?
16    A.   I don't.
17    Q.   I'd like you to turn to the second page
18 of the exhibit.  And you can see that this is the
19 same map with some additional locations filled in.
20 So, for example, you can see that there is a -- I
21 think it's a restaurant or a bar called the Annex
22 on Church Street.

146

1        Do you see that?
2    A.   I see that.
3    Q.   The Mount Olive Baptist Church is,
4 looks like on Rugby Street, a couple blocks over
5 from 168.
6        Do you see that?
7    A.   I see it, I do.
8    Q.   I think that's -- is the green box to
9 the north, is that the zoo?
10    A.   I'm not sure.
11    Q.   And then over to the right, there's
12 another green patch that I believe is a park along
13 the Lafayette River.
14        Do you see that?
15    A.   I do.
16    Q.   And then a little bit further over to
17 the right is the Calvary Cemetery.  Do you see
18 that?
19    A.   I do.
20    Q.   And you would agree with me that
21 looking at the -- looking at the data, just looking
22 at the data on the page, you cannot tell where you

147

1 were between 10:09 a.m. and 12:34 p.m. on
2 March 22nd, can you?
3        MR. FROMMER:  Objection, calls for
4    speculation, misstates prior testimony.
5        THE WITNESS:  I can't tell, but do
6    the -- the government knows.
7 BY MR. KRAVIS:
8    Q.   The government knows?
9    A.   Yeah.
10    Q.   How does the government know?
11    A.   They get -- I don't trust this Flock
12 system, and I don't agree with it.
13    Q.   How does the government know where you
14 were between 10:09 and 12:34?
15    A.   I'm trying to be very nice about this,
16 but I don't agree with the Flock system, sir.
17    Q.   Right.  I get that you don't agree with
18 the Flock system.  You've mentioned that a bunch of
19 times.
20        My question is a little different.  My
21 question is, how would the government know where
22 you were between 10:09 a.m. and 12:34 p.m. on

148

1 March 22, 2025?
2    A.   I don't know what they know.  I don't
3 trust it at all.
4    Q.   Let me show you one more exhibit.  I'm
5 going to ask the court reporter to mark this as
6 Defense Exhibit 24.
7    (Exhibit Number 24 was marked for identification.)
8 BY MR. KRAVIS:
9    Q.   This is -- Ms. Arrington, the court
10 reporter has handed you what's been marked for
11 identification as Exhibit 24.  This is another set
12 of Flock data from the same week that we were
13 looking at.  It's another one that the Plaintiffs'
14 expert, Dr. Wheeler, did not mention in his report.
15        The first page of the exhibit shows all
16 of the photographs taken of your car by the Flock
17 cameras in Norfolk that day.  The second page of
18 the exhibit shows the three -- the first three of
19 those photographs, and that's kind of what I wanted
20 to focus in on here.
21        So you can see that the first
22 photograph was taken at 11:31 a.m. and the second

Transcript of Crystal Arrington
Conducted on August 27, 2025

149

1  photograph was taken -- I'm sorry, yeah, 11:31 a.m.
2  And the second photograph was taken about -- I
3  think that's two and a half hours later at
4  1:58 p.m.
5          Do you see that?
6  **A.  I do.**
7      Q.   Okay.  I'm sure you can guess.  I'm
8  going to ask you here, do you know where you were
9  on March 26, 2025 between 11:31 a.m. and 1:58 p.m.?
10 **A.  I don't know.**
11     Q.   Okay.  So if you turn and look at the
12 next page of the exhibit.  We have again identified
13 some locations here.  You can see that there is a
14 red X marking the Mount Olive Baptist Church.
15         Do you see that?  If you look at the
16 last page of the exhibit.  Sorry.
17 **A.  The last.  Oh, okay.**
18     Q.   Do you see the Mount Olive Baptist
19 Church?
20 **A.  I do.**
21     Q.   There's a red X marking the Church of
22 Restoration, right?

150

1  **A.  I see that.**
2      Q.   There's an orange X marking the
3  Lindenwood Elementary School.  Do you see that?
4  **A.  I do.**
5      Q.   There's a green blotch there that is
6  Barraud Park.  Do you see that?
7  **A.  Barraud Park, yes, I do.**
8      Q.   Barraud Park.
9  **A.  Yes.**
10     Q.   And you would agree with me that the
11 data on this page does not show when you went to
12 any of those locations or all of them between 11:31
13 and 1:58 on March 26th, right?
14         MR. FROMMER:  Objection, argumentative.
15         THE WITNESS:  I still feel the same
16 way.
17 BY MR. KRAVIS:
18     Q.   What do you mean when you say you feel
19 the same way?
20 **A.  I don't know what the government knows**
21 **about my location.  You're showing me dots on this**
22 **paper.**

151

1      Q.   Right.
2  **A.  I still don't feel safe.**
3      Q.   And what do you mean when you say you
4  still don't feel safe?
5  **A.  I don't.  I don't like the Flock**
6  **cameras.**
7      Q.   Right.  You've mentioned that a bunch.
8  I guess --
9  **A.  And I want them to go away.**
10     Q.   Right.
11 **A.  And I'm just -- that's the way I feel.**
12     Q.   Right.  And so I guess what I'm just
13 wondering is, looking at this data, is it your
14 belief that the government, the City of Norfolk,
15 knew where you were between 11:30 and 1:58?
16         MR. FROMMER:  Objection, speculation
17 and argumentative.
18         THE WITNESS:  I don't know what they
19 know.
20         MR. KRAVIS:  Why don't we go off the
21 record.
22         THE VIDEOGRAPHER:  We are going off the

152

1  record.  The time is 1:06 p.m.
2          (Recess taken.)
3      THE VIDEOGRAPHER:  We are now back on
4  the record.  The time is 1:20 p.m.
5      MR. KRAVIS:  Ms. Arrington, those are
6  all the questions I had for you.  I
7  appreciate your time today.
8      THE WITNESS:  Thank you.
9      MR. FROMMER:  We're done as well.
10 Thank you.
11     MS. DEHBOZORGI:  All right.
12     THE VIDEOGRAPHER:  This marks the end
13 of the deposition.  The time is 1:21 p.m.
14         THE CERTIFIED STENOGRAPHER:  As far as
15 the turnaround, do you need a rough draft
16 today?
17     MR. KRAVIS:  Yes.  Actually a rough
18 draft today would be great.
19         THE CERTIFIED STENOGRAPHER:  As far as
20 the turnaround on the final, what are you
21 thinking?
22     MR. KRAVIS:  Whatever your fastest is.

Transcript of Crystal Arrington
Conducted on August 27, 2025

153

1  (Signature not requested before close of the record.)
2       (Deposition concluded at 1:21 p.m.)
3          - - -
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

154

1       CERTIFICATE OF NOTARY PUBLIC
2       I, Amy A. Brauser, RPR RMR CRR, the officer
3  before whom the foregoing deposition was taken, do
4  hereby certify that the witness was duly sworn by me
5  prior to the taking of the foregoing deposition; that
6  the testimony of said witness was taken by me to the
7  best of my ability and thereafter reduced to typewriting
8  under my direction; that I am neither counsel for,
9  related to, nor employed by any of the parties to the
10 action in which this deposition was taken, and further
11 that I am not a relative or employee of any attorney or
12 counsel employed by the parties thereto, nor financially
13 or otherwise interested in the outcome of the action.
14     This is the 28th day of August, 2025.
15
16
17     Amy A. Brauser, RPR RMR CRR
       Notary Public
18
19
20 Notary Registration No.: 7675529
21 My Commission Expires:  January 31, 2028
22