# EXHIBIT 19

Unredacted Exhibit Filed Under
Seal Per Protective Order



**CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**

# Transcript of Chad Higdon-Topaz, Ph.D.

**Date:** September 3, 2025
**Case:** Schmidt and Arrington -v- City of Norfolk, et al.

**Planet Depos**
**Phone:** 888.433.3767 **| Email:** transcripts@planetdepos.com
**www.planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Chad Higdon-Topaz, Ph.D.
Conducted on September 3, 2025

1 (1 to 4)

---

**Page 1**

```
1           IN THE UNITED STATES DISTRICT COURT
2         FOR THE EASTERN DISTRICT OF VIRGINIA
3                   NORFOLK DIVISION
4
5     - - - - - - - - - - - - x
6  LEE SCHMIDT, et al.,    :
7         Plaintiffs,      :
8     v.                   :   Case No.
9  CITY OF NORFOLK, et     :   2:24-CV-00621-MSD-LRL
10 al.,                    :
11        Defendants.      :
12    - - - - - - - - - - - - x
13       CONFIDENTIAL - ATTORNEYS' EYES ONLY
14    Videotaped Deposition of CHAD HIGDON-TOPAZ, PhD
15             Williamstown, Massachusetts
16            Wednesday, September 3, 2025
17                  9:09 a.m. EST
18
19
20  Job No.:  597261
21  Pages: 1 - 284
22  Reported By: Karen Klerekoper, CSR-4250, RPR
```

---

**Page 2**

```
1     Videotaped Deposition of CHAD HIGDON-TOPAZ,
2  PhD, conducted at:
3
4               The Williams Inn
5              101 Spring Street
6       Williamstown, Massachusetts  01267
7                 413.458.9371
8
9
10
11
12
13
14
15    Pursuant to Notice, before Karen Klerekoper,
16 Notary Public in and for the State of
17 Massachusetts.
18
19
20
21
22
```

---

**Page 3**

```
1                A P P E A R A N C E S
2
3    ON BEHALF OF THE PLAINTIFF:
4        JESSICA BIGBIE, ESQUIRE
5        INSTITUTE FOR JUSTICE
6        901 North Glebe Road
7        Suite 900
8        Arlington, Virginia  22203
9        703.682.9320
10
11   ON BEHALF OF THE DEFENDANT:
12       JUSTIN P. RAPHAEL, ESQUIRE
13       MUNGER, TOLLES & OLSON, LLP
14       560 Mission Street, Suite 27
15       San Francisco, California  94105
16       415.512.4000
17
18
19  (APPEARANCES CONTINUED ON FOLLOWING PAGE.)
20
21
22
```

---

**Page 4**

```
1  (APPEARANCES CONTINUED.)
2
3    FOR THE DEFENDANT CITY OF NORFOLK:
4        ADAM MELITA, ESQUIRE (VIA ZOOM)
5        NORFOLK CITY ATTORNEY'S OFFICE
6        810 Union Street, Suite 900
7        Norfolk, Virginia  23510
8        757.664.4529
9
10 ALSO PRESENT:
11 VIDEOGRAPHER DIMAS BARDALES, PLANET DEPOS
12
13
14
15
16
17
18
19
20
21
22
```

Transcript of Chad Higdon-Topaz, Ph.D.
Conducted on September 3, 2025

---

Page 5

INDEX

WITNESS:                                    PAGE:

CHAD HIGDON-TOPAZ, PhD

        EXAMINATION BY MR. RAPHAEL:           8

                    *****

EXHIBIT:                                    PAGE:

(Exhibits attached to transcript.)

Exhibit 25, data for justice course, spring of 2026    30

Exhibit 26, abstract preprint/discriminatory federal    49

judges

Exhibit 27, later version of Exhibit 26    59

Exhibit 28, Journal of Humanities & Social Sciences    64

Communications

Exhibit 29, selection of data obtained from JUSTFAIR    68

(Exhibits continued on following page.)

---

Page 6

(Exhibits continued.)

Exhibit 30, Cost of Discretion report    72

Exhibit 31, open letter signed by a number of    74

judicial associations

Exhibit 32, Bluesky post    78

Exhibit 33, Bluesky post/spellcheck    79

Exhibit 34, 5/25 Bluesky post    84

Exhibit 35, Dr. Higdon-Topaz's report    96

Exhibit 36, Bates NORF000191, materials considered    179

Exhibit 37, Tang and Levinson paper    193

Exhibit 38, plotted captures of Ms. Arrington's    253

vehicle

                    *****

---

Page 7

P R O C E E D I N G S

THE VIDEOGRAPHER:  Here begins media number 1 in the videotaped deposition of Chad Higdon-Topaz in the matter of Schmidt and Arrington versus City of Norfolk, et al., in the United States District Court for the Eastern District of Virginia, Norfolk Division, Case Number 2:24-CV-00621-MSD-LRL.

Today's date is September 3rd, 2025.  The time on the video monitor is 9:09.  The Videographer today is Dimas Bardales representing Planet Depos.  This video -- this video deposition is taking place at Williams Inn at 101 Spring Street, Williamstown, Massachusetts.

Would counsel please voice-identify themselves and state whom they represent?

MR. RAPHAEL:  Justin Raphael, Munger, Tolles and Olson, for the defendants.

MS. BIGBIE:  Jessica Bigbie, for the Institute for Justice, representing the plaintiffs.

MR MELITA:  Adam Melita, City of Norfolk,

---

Page 8

counsel for the defendants.

THE VIDEOGRAPHER:  The court reporter today is Karen Klerekoper representing Planet Depos.  The witness will now be sworn in.

CHAD HIGDON-TOPAS, PhD, having been duly sworn testified as follows:

EXAMINATION

BY MR. RAPHAEL:

Q  All right.  Good morning.  Will you please state and spell your name for the record?

A  Yes.  It's Chad Higdon-Topaz.  That's C-H-A-D, H-I-G-D-O-N, dash, T-O-P-A-Z.

Q  And you understand that you are under oath, and that means your testimony here is the same as if it were in court, correct?

A  I do.

Q  Have you ever served as an expert in litigation?

A  No, I have not.

Q  Have you ever been a party to a lawsuit?

A  I have not.

Q  Have you ever had your deposition taken

3 (9 to 12)

**9**

1 before?
2 **A I have not.**
3 Q All right. Just a few ground rules to
4 make sure we get a clean record, our purpose here
5 today. The first is that we can't talk over one
6 another, and that we need -- the court reporter
7 needs a verbal yes or no answer.
8 Do you understand that?
9 **A Yes.**
10 Q And I will presume that you understand my
11 question unless you ask for a clarification, which
12 I'm happy to provide if you ask for it.
13 Do you understand?
14 **A I do.**
15 Q Is there any reason why you can't provide
16 your best testimony today?
17 **A There is no reason.**
18 Q Have you offered the opinion that Flock
19 cameras enable the Norfolk Police Department to
20 identify the whole of plaintiffs' movements?
21 **A I have most certainly not offered that**
22 **opinion.**

**10**

1 Q Have you offered the opinion that Flock
2 cameras enable the Norfolk Police Department to
3 learn intimate details about the plaintiffs'
4 private lives?
5 **A I have not offered that opinion. I feel**
6 **that requires me to know the Norfolk Police**
7 **Department's intent; but, no, that is not an**
8 **opinion I have offered.**
9 Q Well, have you offered the opinion that
10 Flock cameras would enable any police department
11 to learn intimate details about the plaintiffs'
12 private lives?
13 **A I don't know what "intimate details" means**
14 **but that question was outside the scope of the**
15 **assignment I was asked to do.**
16 Q Have you offered the opinion that Flock
17 cameras enable the Norfolk Police Department to
18 learn anything private about the plaintiffs' lives
19 at all?
20 **A So, to clarify again, what my analysis**
21 **does is evaluating system capability, so what you**
22 **are asking is outside of the scope of what I was**

**11**

1 **asked to do.**
2 Q Have you offered the opinion that the
3 Flock cameras enable the Norfolk Police Department
4 to learn anything about plaintiffs' political
5 activities?
6 **A I have not offered that opinion.**
7 Q Have you offered the opinion that the
8 Flock cameras enabled the Norfolk Police
9 Department to learn about plaintiffs' religious
10 activities?
11 **A Again, I have not specifically offered**
12 **that opinion.**
13 **What I have done is demonstrate the**
14 **surveillance capabilities of the network.**
15 Q Have you offered the opinion that the
16 Flock cameras enable the Norfolk Police Department
17 to learn about plaintiffs' sexual associations?
18 **A I have not specifically offered that**
19 **opinion, no.**
20 Q You said that what you have done is
21 demonstrated the surveillance capabilities of the
22 network.

**12**

1 Could you explain what you mean by that?
2 **A Well, the primary part of my assignment**
3 **was to conduct a systems-level evaluation of,**
4 **essentially, to what degree, how often it's**
5 **possible to reconstruct the routes of vehicles**
6 **within Norfolk.**
7 Q So you have not offered the opinion that
8 the surveillance capabilities of the Flock camera
9 network in Norfolk enable the police department to
10 learn anything about plaintiffs' intimate
11 activities?
12 **A I don't know anything about what the**
13 **Norfolk Police Department does. That was not part**
14 **of my assignment.**
15 Q Well, let me ask you this: Do the
16 surveillance capabilities of the Flock camera
17 network enable someone using that network to learn
18 anything about plaintiffs' private or intimate
19 activities?
20 **A Again, nothing in my analysis was**
21 **specifically about private or intimate activities.**
22 **My primary analysis was to evaluate the**

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Chad Higdon-Topaz, Ph.D.
Conducted on September 3, 2025

25 (97 to 100)

97

1    Q  Yes.  So you wrote:  The purpose of this
2  analysis is to quantify the potential surveillance
3  capabilities of Norfolk Police Department's
4  network of Flock automated Automated License Plate
5  Reader, ALPR cameras.
6      Do you see that?
7    A  Yep.
8    Q  Why did you use the word "potential"?
9    A  Because I don't know how the network is
10 actually being used.
11   Q  So, you have no knowledge of how the
12 Norfolk Police Department is actually using the
13 Flock system?
14   A  No.
15   Q  In carrying out your assignment, did you
16 try to put yourself in the shoes of the Norfolk
17 Police Department in determining what they could
18 deduce or infer from Flock data?
19   A  I put myself in the shoes of my own
20 expertise analyzing these kinds of systems.  I
21 don't -- I don't know Norfolk police.
22   Q  So, in carrying out your assignment, you

98

1  didn't try to put yourselves in the shoes of a
2  Norfolk police officer in determining what they
3  could deduce or infer from looking at Flock data?
4    A  No, because that wasn't relevant to the
5  question I was asked.
6    Q  In carrying out your assignment -- well,
7  strike that.
8      Your opinions in this case are about the
9  mathematical capabilities of the Flock cameras?
10   A  Yes, I have findings about the
11 capabilities of the camera network based on the
12 data and my analysis, yes.
13   Q  And those findings are a function of
14 applied mathematics, correct?
15   A  And computation and data science, and all
16 those things, yes.
17   Q  Would someone without your training in
18 computation and data science and applied
19 mathematics be able to conduct the analysis that
20 you did in your report?
21   A  I don't -- I didn't use every piece of
22 expertise I have on this project, because it's not

99

1  all related to this project.
2      If someone had a tool they could certainly
3  do the type of analysis I did.
4    Q  Your opinions are not about what the
5  Norfolk Police Department could actually do with
6  the Flock camera data, right?
7    A  My opinions are what could be done --
8  about what could be done, not about what is being
9  done, because I don't know.
10   Q  Are your opinions about what a Norfolk
11 police officer could do with the Flock camera
12 data?
13   A  No.  My opinions are about what someone
14 with access to the information and a tool could
15 do.
16   Q  What tool?
17   A  Or anyone with enough computational
18 knowledge.
19   Q  What do you mean by enough computational
20 knowledge?
21   A  I don't quite understand -- could you
22 clarify the question for me?

100

1    Q  Well, you said that your opinions are
2  about what someone with access to the information
3  and a tool, or enough computational knowledge,
4  could do.
5      What do you mean by "enough computational
6  knowledge"?
7    A  All I'm saying is, I am not the only
8  person in the world who could come to the same
9  conclusions based on this data.
10   Q  But in order to come to the same
11 conclusions based on data, you would need some
12 computational training?
13   A  Someone needs some amount of quantitative
14 training, yes.
15   Q  And what -- just in general terms, what do
16 you mean by enough quantitative training?
17   A  It's -- it's really impossible to say.  A
18 person would have to have enough -- they would
19 have to know to program a computer a little bit
20 and think quantitatively.  I mean, there is many
21 ways to get there.
22   Q  So, in order to draw the conclusions that

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Chad Higdon-Topaz, Ph.D.
Conducted on September 3, 2025

27 (105 to 108)

105

1   other than the plaintiffs identified?
2       A  That's correct.
3       Q  Why did you not do that?
4       A  It was not directly pertinent to my
5   question, which was to evaluate the systems level
6   capability of the surveillance network.
7       Q  Why was the Flock data regarding captures
8   of vehicles other than the plaintiffs' vehicles
9   not relevant?
10      A  I think the Flock data is relevant to
11  studying individual trips, but for evaluating
12  systems capability, you need a known ground truth
13  to compare capture data to.
14      Q  What do you mean by a "known ground
15  truth"?
16      A  I think a useful analogy is a microscope.
17  So when you want to understand the capabilities of
18  a microscope, you don't put a scientific specimen
19  that you have just collected under it.  You put a
20  known quantity under it where you've validated
21  some other way, like, what it is and what it looks
22  like.  And then that lets you assess the job that

106

1   your microscope is doing.
2       Q  I think your analysis was to evaluate the
3   systems level capability of the surveillance
4   network?
5       A  That was the main task.
6       Q  And you contrast that task from conducting
7   an analysis of individual trips?
8       A  My analysis does involve individual trips,
9   but they are not trips of people in the Flock
10  data.
11      Q  You reviewed one example of two captures
12  from the Flock data that was produced by the
13  Norfolk Police Department, right?
14      A  This was my slack time analysis.
15      Q  Right.  And your slack time analysis
16  consists of an example of two captures of one
17  license plate, right?
18      A  That's correct.
19      Q  And that is the only data captured by
20  Flock cameras that you reviewed in connection with
21  this case, right?
22      A  Yes, that was for my supplementary

107

1   analysis showing how that data can be used, so it
2   was a demonstrative example.
3       Q  The two captures of one license plate was
4   the only data from the Flock cameras that you
5   reviewed in connection with this case?
6       A  That depends what you mean by Flock
7   cameras.  Certainly the locations of the Flock
8   cameras play a key role in all of my analysis.
9       Q  You reviewed only two examples of where a
10  Flock camera captured a vehicle in the City of
11  Norfolk, correct?
12      A  I don't think "review" is the right word
13  for me.  I chose an example to demonstrate the
14  capability of slack time analysis.
15      Q  Right.  The analyses you conducted in your
16  report use only two examples of where a Flock
17  camera captured a vehicle in the City of Norfolk?
18      A  My supplementary analysis, which was not
19  the systems level analysis, uses two example
20  camera captures, yes, to demonstrate.
21      Q  And those were the only two camera
22  captures that any of your analyses in your reports

108

1   use?
2       A  Those are the only camera captures in
3   Flock or police department capture data, yes.
4       Q  And the example of the two captures you
5   used were of the license plate ███████?
6       A  Yes, probably.
7       Q  Do you know who the primary driver of the
8   car with that license plate?
9       A  I do not remember which individual it is.
10      Q  Do you know whether that license plate
11  was -- belongs to a vehicle that was primarily
12  driven by either of the plaintiffs?
13      A  I haven't -- I have an assumption about
14  that but I -- I don't honestly remember.  I think
15  it was.
16      Q  Could data from the Flock cameras
17  currently operating in Norfolk have been used to
18  validate the opinions you provide in your report?
19          MS. BIGBIE:  Objection, calls for
20  speculation.
21      A  Yeah, I -- because of my assignment, I did
22  not analyze the full quantity.  I didn't analyze

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Chad Higdon-Topaz, Ph.D.
Conducted on September 3, 2025

29 (113 to 116)

---

113

1  work?
2      A  I have abso — I have no idea.
3      Q  You have not reached any opinions about
4  the capabilities of Flock cameras for modeling the
5  movement of people who are using a mode of
6  transport other than a car?
7      A  My primary analysis is based on vehicle
8  movement.  My slack time analysis is not only
9  based on vehicle movement.
10     Q  Your slack time analysis makes certain
11  assumptions about the amount of time people can
12  spend walking?
13     A  No, it doesn't make assumptions.  It
14  has — it enables a user to make assumptions.
15     Q  Flock cameras don't collect any
16  information about anyone who is moving other than
17  in a vehicle, right?
18     A  I don't know, because I haven't seen every
19  Flock capture photo.
20        What I assume is that they take photos,
21  and if there are other things in the photo, then
22  those things appear in the photo.

---

114

1      Q  Do you know if something other than a
2  vehicle appears in a photo, whether that data is
3  searchable in the Flock system?
4      A  I would have no way of knowing that.
5      Q  You have not reached any opinions about
6  the capabilities of Flock cameras to determine
7  when a person is sitting at home, right?
8      A  I can't definitively say that.
9      Q  What opinions have you reached about the
10  capabilities of Flock cameras to determine when
11  someone is sitting at home?
12     A  I can imagine situations where capture
13  data would suggest that.
14     Q  What suggestions would those be?
15        (Brief interruption off the record.)
16        THE VIDEOGRAPHER:  We are going off the
17  record, the time is 11:26.
18        (Off the record.)
19        THE VIDEOGRAPHER:  We are going back on
20  the record, the time is 11:26.
21  BY MR. RAPHAEL:
22     Q  We were discussing situations where you

---

115

1  could imagine that Flock cameras could suggest
2  that somebody was sitting at home.  What
3  situations might those be?
4      A  There are — I mean, I'm conjecturing
5  here, and I want to be clear that I'm
6  conjecturing.
7        But if you showed me successive captures,
8  and I conducted a slack time feasible movement
9  analysis, and the feasible area was relatively
10  small, and included the person's home, I might
11  well assume that they were at home.
12     Q  And you have not actually found any
13  example of that in the Flock camera data, right?
14     A  So, to be clear, I did not try.  I chose
15  one example to conduct my slack time analysis.
16     Q  Right.  So, in your report, you don't have
17  any examples where you are actually able to see
18  subjective -- successive captures and conduct a
19  slack time analysis that put the feasible area
20  near somebody's home?
21     A  That was not part of my assignment.
22     Q  So, you are offering the opinion that that

---

116

1  is something that the Flock camera data could
2  actually do?  That's just a conjecture?
3      A  I'm offering the opinion that I can
4  imagine scenarios where you could do it.
5      Q  But you haven't tested whether any of
6  those scenarios you can imagine actually happen in
7  the real world?
8      A  No.
9      Q  You have not reached any opinions about
10  the capabilities of Flock cameras with respect to
11  when a person is using a mode of transport other
12  than a car, like a bus or a bike, or anything like
13  that?
14     A  I have not.
15     Q  You have not reached any opinions about
16  the capabilities of the Flock cameras to enable
17  anyone to deduce where a car began a particular
18  trip?
19     A  That — that was not part of the analysis
20  that I performed.
21     Q  And you have not -- no part of your
22  analysis involved determining whether the

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Chad Higdon-Topaz, Ph.D.
Conducted on September 3, 2025

30 (117 to 120)

117

1 capabilities of the Flock cameras include deducing
2 where a car ended its trip?
3    **A  Similarly, that was not part of my**
4 **assignment, similar to your last question.**
5 **It's -- I would conjecture but it's not outside**
6 **the realm of possibility that I could do that.  It**
7 **simply isn't what I was asked to do.**
8    Q  So, in your reports you haven't tested
9 whether the Flock cameras are capable of enabling
10 anyone to figure out where someone began or ended
11 a particular trip?
12   **A  No, that is not what my assignment was.**
13   Q  Your opinion does not address anything
14 about any person's location or activities in the
15 time period before their vehicle was first
16 captured on a particular day?
17   **A  So, my primary analysis is based on model**
18 **trips.**
19   Q  Well, even your slack time analysis, let's
20 say, your slack time analysis, that's the only
21 analysis involving particular trips, right?
22   **A  Yes.  It depends on what you mean by**

118

1 **particular trips.  I'm sorry.**
2    Q  Well, let me give you a more concrete
3 example to try to get at what I'm saying.
4    **A  Sure.**
5    Q  If the Flock data show that a vehicle was
6 captured for the first time in a day at 11:45 in
7 the morning, and then captured again at noon, and
8 then not for the rest of the day.
9    **A  Um-hmm.**
10   Q  Are you with me with that example?
11   **A  Sure.**
12   Q  You are not offering any opinion about the
13 capabilities of the Flock cameras before 11:45 or
14 after noon in that example, right?
15   **A  That's not what my analysis was about.**
16   Q  And because of that, you are not offering
17 any -- any opinions about the capabilities of the
18 Flock cameras before 11:45 or after noon in my
19 example?
20   **A  Again, it's -- this requires me to**
21 **conjecture, but this was not my assignment, but if**
22 **you asked me, I can't rule out the possibility**

119

1 that I could figure it out.
2    Q  Could you go to page 22 of your report?
3    **A  Maybe.  22, opinions and conclusions.**
4    Q  I'm grateful for you using your own table
5 of contents.  All right.
6       The third paragraph from the bottom you
7 talk about how the Norfolk Police Department
8 operates 175 automated license plate recognition
9 cameras distributed strategically across the
10 city's road network.
11   **A  Um-hmm.**
12   Q  Did you review any evidence regarding how
13 the Norfolk Police Department distributed the 175
14 ALPRs across the city?
15   **A  I didn't review information other than the**
16 **locations of the cameras and the results of my**
17 **analysis.**
18   Q  So you didn't see any information about
19 how the cameras got to the locations where you saw
20 them in the data?
21   **A  No.**
22   Q  In the next paragraph down you say

120

1 that -- you refer to dense coverage in central
2 Norfolk, and along major corridors, with broader
3 coverage throughout residential areas and
4 commercial zones.
5       Do you see that?
6    **A  Um-hmm.**
7    Q  What analysis did you do to determine the
8 extent of coverage of the Flock cameras in
9 residential areas?
10   **A  This is -- let me take a moment, please.**
11   Q  Sure.
12   **A  Right.  So, this statement is based on**
13 **what I observe in figure 1, and, you know, what we**
14 **know about zoning in Norfolk.**
15   Q  Okay.  So you referred to coverage
16 throughout residential areas, right?
17   **A  Um-hmm.**
18   Q  Yes.
19   **A  That's seems to be what it says.**
20   Q  Did you calculate any percentage of the
21 residential areas that are covered by Flock
22 cameras in Norfolk?

Transcript of Chad Higdon-Topaz, Ph.D.
Conducted on September 3, 2025

32 (125 to 128)

125

1      A  I'm happy to give an example that is a
2  conjecture.
3      Q  Sure.
4      A  If I had multiple slack time analyses for
5  a certain plate, and their feasible areas
6  overlapped, I -- to me it raises the probability
7  of the person visiting whatever is in the
8  intersection of those feasible areas.
9      Q  And you describe that as a conjecture
10  because you have not actually seen any Flock data
11  that meet the description that you just gave,
12  right?
13      A  Again, that is not the analysis I
14  performed.
15      Q  Okay.  So, you are not actually offering
16  the opinion that you have seen data suggesting
17  that the Flock camera analysis can be used to
18  determine patterns of movements?
19      A  Sorry, can you say the question again?
20      Q  Sure.  You are saying that you can
21  conjecture a situation that if the Flock data
22  showed some particular set of feasible areas, that

126

1  you might be able to deduce from there something
2  about a pattern of movement, right?
3      A  Sure.  And again, I gave an example.  I
4  think there are many other examples as well, but
5  that is one.
6      Q  And you have not seen any example in Flock
7  data that would support an inference from your
8  slack time model about patterns of movements,
9  right?
10      A  I did not look at all of the many Flock
11  captures, but I can, again -- it is not out of the
12  realm of possibility to me that there are many
13  things in the Flock data that I could use to
14  deduce individual's patterns of movements.
15      Again, that was not my assignment, but it
16  is not out of the realm of possibility.
17      Q  And because it wasn't your assignment, you
18  didn't analyze it as a conjecture at this point?
19      A  Yes, it's a conjecture based on my
20  expertise, yes.
21      Q  Let's talk about your reconstruction
22  model.

127

1      A  Sure.
2      Q  Your reconstruction model focuses on
3  situation where a car is captured by two Flock
4  cameras, right?
5      A  No.
6      Q  Well --
7      A  I guess I don't know what you mean -- can
8  you be more specific about what you mean?
9      Q  Sure.  When you talk about
10  reconstruction -- reconstructibility, you define
11  that as a trip that would be captured by at least
12  two Flock cameras.
13      A  That's correct.
14      Q  And that analysis of reconstructibility
15  assumes that a car drives continuously between the
16  two captures using the fastest route, right?
17      A  As supported by numerous peer-reviewed
18  research and standard assumptions, it uses
19  time-minimizing driving behavior.
20      Q  Right.  That's an assumption that you have
21  made based on your read...
22      A  It's not an assumption I'm making.  It's

128

1  an empirically validated fact about drive
2  behavior.
3      Q  So, your reconstructibility analysis, what
4  it shows, sort of, the bottom line, is that if a
5  car is driving using time-minimizing behavior
6  between two Flock cameras, then navigation
7  software like Google Maps can tell us what the
8  fastest route is?
9      A  Can you restate that, please?
10      Q  Sure.  So, in your reconstruction
11  analysis, you are looking at trips that would pass
12  two different Flock cameras, right?
13      A  To be reconstructible, they need to pass
14  two cameras.
15      Q  And in terms of the information that could
16  be determined from the fact that a trip passes two
17  cameras, what you're saying is that one can use
18  navigation software to identify the
19  time-minimizing route between those two captures?
20      A  Correct.
21      Q  And is your definition of
22  reconstructibility saying anything more than that?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Chad Higdon-Topaz, Ph.D.
Conducted on September 3, 2025

34 (133 to 136)

---

133

1  can't tell you exactly.
2     Q  The data from the Hampton Roads'
3  transportation organization was from 2015, right?
4     A  Yes, I believe that's correct.
5     Q  And so it predated the COVID pandemic?
6     A  Yes.
7     Q  Would it be your expectation that the
8  COVID pandemic changed the routes that people take
9  each day?
10    A  I mean, that's a conjecture.  My
11 conjecture would be I don't know if it would have
12 changed the routes.  I know people drove less
13 during -- during the pandemic.
14    Q  So, the COVID pandemic might change the
15 volume at which the routes were taken?
16    A  During the peak of the pandemic, I assume.
17    Q  Well, would it be your expectation that
18 even beyond the peak of the pandemic that the
19 COVID pandemic has changed people's daily habits
20 in terms of how often they are driving in to work,
21 and things like that?
22    A  Did it -- can you make your question more

---

134

1  specific?
2     Q  Sure.  Do you think that the COVID
3  pandemic has changed how people drive in Norfolk,
4  today in 2025, compared to how they did in 2015?
5     A  I don't have enough information to answer
6  that question.
7     Q  So you didn't test whether there were any
8  material differences between the transportation
9  planning data from 2015, that you used in your
10 report, and the way that people in Norfolk move
11 through the city today?
12    A  I used the 2015 data consistent with the
13 standards that I understand to be used by the
14 Hampton Roads' transportation planning
15 organization itself.  In my understanding, the
16 next data won't come for a while.  And that is the
17 data that they themselves are using.
18    Q  My question was whether you tested whether
19 there are any material differences between the
20 transportation planning data from 2015 and the way
21 people in Norfolk move through the city today?
22    A  No.

---

135

1     Q  You generated 15,000 simulated routes,
2  right?
3     A  Um-hmm.
4     Q  You have not done any analysis of whether
5  anyone in Norfolk has ever taken any of those
6  routes, correct?
7     A  I have not done analysis of whether they
8  have taken those routes, that's correct, and they
9  are -- they represent realistic routes that people
10 could be taking.
11    Q  Your simulated routes are routes that
12 people could be taking?
13    A  Yes.
14    Q  But you have not analyzed whether people
15 are actually taking those routes?
16    A  No, because this is a systems-level
17 assessment of the network surveillance capability
18 at a macroscopic level.
19    Q  You have not done any analysis of whether
20 either plaintiff has ever taken any of your
21 simulated routes, correct?
22    A  I have not.

---

136

1     Q  And you have not done any analysis as to
2  how often anyone in Norfolk takes any of your
3  simulated routes versus another?
4     A  So, this is all outside of the scope of
5  what I was asked to do.
6     Q  And so you did not analyze how often
7  anyone in Norfolk has ever taken any particular
8  simulated route versus another?
9     A  As I said, this is outside the scope of
10 what I was asked to do, so, no.
11    Q  To your knowledge, does the Norfolk Police
12 Department have access to your simulated routes in
13 its normal course of operations?
14    A  No, not to my knowledge.  I have no idea.
15    Q  And in order to have access to your
16 simulated routes, they would have to replicate
17 your analysis, right?
18    A  In order to have access to my simulated
19 routes, they would have to -- or obtain them from
20 someone, I guess.  I don't quite understand.
21    Q  Well, you created the simulated routes,
22 right?

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Chad Higdon-Topaz, Ph.D.

Conducted on September 3, 2025

35 (137 to 140)

137

1    A  Yes.

2    Q  Using a lot of coding and data analysis?

3    A  Yes.

4    Q  And so, in order to -- when the Norfolk

5  Police Department is conducting its normal

6  operations, they haven't done all of the work that

7  you did to create the simulated routes, right?

8    A  I have no idea what the police department

9  has done or not done.

10    Q  Can you go to page 14 of your report.

11  This is 5.2.

12    A  Let's see.  Um-hmm.

13    Q  So, you write:  To evaluate the

14  surveillance capabilities of the Norfolk Police

15  Department's Flock ALPR --

16    A  Sorry, can you tell me where I'm looking?

17    Q  I'm sorry, this is at the very top.

18       You wrote in section 5.2 of your report:

19  To evaluate the surveillance capabilities of the

20  Norfolk Police Department's Flock ALPR camera

21  network, I first need to construct a realistic

22  model of how people travel by car within the city.

138

1       Do you see that?

2    A  Um-hmm.

3    Q  Could you have used the Flock camera data

4  to construct a realistic model of how people

5  travel by car within Norfolk?

6    A  Quite possibly, but that's not what I did.

7    Q  Why not?

8    A  As I mentioned, the point of this analysis

9  is to measure the systems-level macroscopic

10  capabilities of the system, and the most

11  straightforward way to do that is to compare to a

12  ground truth.

13    Q  Well, the first step, though, in modeling

14  the systems-level macroscopic capabilities was to

15  reconstruct a realistic model of how people travel

16  by car?

17    A  Yeah, absolutely.

18    Q  So, could you have used the Flock camera

19  data to construct a realistic model of how people

20  travel by car within the city?

21    A  As I said, I mean, probably but I followed

22  approaches used by scholars and in peer-reviewed

139

1  research.

2    Q  Do you have an opinion one way or the

3  other was to whether the Flock camera data could

4  be used to construct a realistic model of how

5  people travel by car within Norfolk?  Is that

6  something you analyzed?

7    A  No, my analysis was -- so, I adopted two

8  complementary approaches in this work.

9       The first was to model realistic trips

10  within Norfolk, to evaluate the capability of the

11  surveillance system.  And then I conducted a slack

12  time analysis.  Those were my two analyses.

13    Q  You have not presented any opinion in your

14  reports in this case that Flock camera data be

15  used to construct a realistic model of how people

16  travel by car within Norfolk, right?

17    A  That's correct.  I can't rule out that one

18  could do it, but that was not the subject of my

19  report.

20    Q  All right.  Let's talk about your

21  assumptions, so if you can go to page 9, which is

22  section 4.2.

140

1    A  Um-hmm.

2    Q  And you write there that your analysis

3  relies on three categories of assumptions.  This

4  is below 4.2, right?

5    A  Yes.

6    Q  You made three categories of assumptions

7  about how your factual data sources represent

8  real-world travel behavior and surveillance

9  potential within Norfolk, right?

10    A  Yes, yes.

11    Q  If those assumptions turned out to not be

12  correct, would you still have confidence in the

13  reliability of your analysis?

14       MS. BIGBIE:  Objection, calls for

15  speculation.

16    A  These -- what I did was use standard and

17  widely adopted tools, and actually have no reason

18  to expect that some changes in those assumptions

19  would drastically change my results.  Moreover, if

20  didn't change the results at all, it's not clear

21  if they would result in more or less surveillance

22  capability.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Chad Higdon-Topaz, Ph.D.
Conducted on September 3, 2025

36 (141 to 144)

---

**141**

1    Q  You did not test whether changing any of
2  your assumptions would affect your results, right?
3    **A  Yes, I -- as I said, I'm using standard**
4  **widely used data sources that people use to -- to**
5  **model geography and transportation.**
6    Q  Well, beyond using standard data sources,
7  you did not do anything to test whether changing
8  any of your assumptions would affect your results,
9  right?
10   **A  Yeah, that's correct.  That's correct.**
11 **I -- yes, correct.**
12   Q  So, the first assumption that you made had
13 to do with data representativeness?
14   **A  Yes.**
15   Q  How well do your data sources reflect
16 Norfolk's travel reality?
17   **A  Yes.**
18   Q  Did you do anything to test whether your
19 simulated routes reflected Norfolk's travel
20 reality?
21   **A  As I said, the purpose of this analysis is**
22 **to be able to compare to a ground truth, and**

---

**142**

1  **that's what my model provides.**
2    Q  So, you did not do anything to test
3  whether your simulated routes reflected Norfolk's
4  travel reality?
5    **A  They reflect -- they do reflect Norfolk's**
6  **travel reality in the sense of they are highly,**
7  **like, validated and -- and widely used data**
8  **sources that specifically pertain to**
9  **transportation and to Norfolk.**
10   Q  You didn't do anything to compare the
11 simulated routes that you generated to the routes
12 that people actually take, right?
13   **A  That's correct.  They are based on the**
14 **same underlying data.**
15   Q  If you turn the page under the header
16 National Travel Pattern Applicability.
17   **A  Um-hmm.**
18   Q  You talk about how you use the national
19 household travel survey?
20   **A  Um-hmm.**
21   Q  And assumed that it appropriately
22 represents travel behavior patterns in Norfolk?

---

**143**

1    **A  Um-hmm.**
2    Q  You write that:  While local variation is
3  possible, there is no evidence suggesting that
4  Norfolk systematically departs from national
5  norms.
6        Do you see that?
7    **A  Um-hmm.**
8    Q  Is it the national norm to have the
9  world's largest Naval base within the city limits?
10   **A  I assume there is only one of those.**
11   Q  And did you know that's in Norfolk?
12   **A  I did know.**
13   Q  And there is lot of people in Norfolk who
14 are living and working at the Naval station?
15   **A  I have no idea how many people live or**
16 **work at the Naval station.**
17   Q  Did you do anything to determine whether
18 you needed to adjust your model based on national
19 patterns to account for the Naval station at
20 Norfolk?
21   **A  I do adjust for the Naval station in my**
22 **model, yes.**

---

**144**

1    Q  Well, you adjust for the Naval station by
2  taking out any trips that occur only within the
3  Naval station, right?
4    **A  That's correct.**
5    Q  Other than that, did you do anything to
6  adjust the -- your model to account for patterns
7  traveling to and from the Naval station that could
8  be different than the patterns in the national
9  norm?
10   **A  Yes.**
11   Q  How?
12   **A  Through the gravity model.**
13   Q  So, your gravity model does not account
14 for the likelihood that people could do a lot more
15 trips between places in the city and the Naval
16 station than between other places, does it?
17   **A  I would have to go back and check the**
18 **numbers, but what the gravity model precisely does**
19 **is tell us how many trips to expect between**
20 **different parts of the city depending on the**
21 **employment available there and on the population**
22 **there.**

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Chad Higdon-Topaz, Ph.D.
Conducted on September 3, 2025

41 (161 to 164)

161

1  home, right?
2      A  If her home is outside of the city then,
3  again, that analysis was not part of my
4  assignment, but I believe that there may well be
5  ways to analyze that.
6      Q  But you haven't analyzed that, right?
7      A  That was not my assignment.
8          But what I can say is that any part of the
9  trip that's within the city, and passes through
10 two cameras is -- is reconstructible.
11     Q  You calculated routes using the Open
12 Source Routing Machine, right?
13     A  Yes.
14     Q  And that uses the data that powers
15 commercial navigation applications?
16     A  That's correct.
17     Q  And is that like Google Maps?
18     A  I mean, off the top of my head, yes, that
19 sort of thing, yes.
20     Q  And so, would it be fair to say that
21 implying the routes -- the time-minimizing routes
22 between two camera captures, you are essentially

162

1  using a program like Google Maps?
2      A  I think that's a fair comparison.
3      Q  And the algorithms used by these
4  navigation applications, they prioritize path that
5  minimize travel time under normal conditions?
6      A  That's correct.
7      Q  And what are normal conditions in that
8  context?
9      A  There's a technical statement about this
10 in the documentation, but I can't tell you off the
11 top of my head.
12     Q  You need the documentation for the Open
13 Source --
14     A  Yes.
15     Q  -- Routing Machine?
16     A  Yes.
17     Q  Did you study how how often actual
18 conditions driving in Norfolk deviate from the
19 normal conditions as they are set out in those
20 technical documentation?
21     A  No, because I didn't need to.
22     Q  Well, if conditions deviate from normal

163

1  conditions, then that could result in people
2  taking different routes than the routes you
3  plotted using the navigation software based on
4  normal conditions, right?
5      A  That's possible, yes.
6      Q  And you didn't study how often people take
7  different routes between two cameras than the ones
8  that are the time-minimizing routes you used in
9  your analysis, right?
10     A  Again, I did not, because I didn't need
11 to.
12     Q  Why didn't you need to?
13     A  Because it's part of the power of a large
14 simulation, is that small amounts of variability
15 shouldn't change results; moreover, if they did, I
16 have no reason/bias to believe they would change
17 the results in any specific direction or another.
18 They might change them not at all.
19     Q  Well, someone looking at the fact that a
20 car was captured by two cameras --
21     A  Um-hmm.
22     Q  -- didn't know whether there were normal

164

1  conditions or not, they wouldn't necessarily know
2  which route between the cameras was taken, right?
3          MS. BIGBIE:  Objection, calls for
4  speculation.
5      A  So the -- the point of my analysis was to
6  evaluate the macroscopic capabilities of the
7  system.  You're asking me a question about an
8  individual route.
9      Q  My question is:  If you're looking at two
10 captures of a car, without knowing whether the
11 normal driving conditions at the time the car was
12 driving, you wouldn't know, looking at the Flock
13 camera data, what route was taken between them,
14 right?
15         MS. BIGBIE:  Objection, calls for
16 speculation.
17     A  I think I need to make sure I understand
18 this question.
19         (Indiscernible crosstalk.)
20     Q  I can ask it a different way to try to
21 clarify?
22     A  Please.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Chad Higdon-Topaz, Ph.D.
Conducted on September 3, 2025

42 (165 to 168)

165

1    Q  Are you offering any opinion that
2  the -- looking at two camera captures that someone
3  can actually determine the route that a car
4  actually took between the two?
5    **A  Yes.**
6    Q  So your opinion is that by looking at two
7  Flock camera captures, you can determine not only
8  what the time-minimizing route between them under
9  normal conditions would be but the route that the
10 car actually took?
11   **A  My statement is a statement about the**
12 **macroscopic capabilities of the system, which is**
13 **that a large number of routes are reconstructible.**
14   Q  I understand that.  I'm talking about a
15 particular set of camera captures on a particular
16 trip.
17     Do you have that in mind?
18   **A  So, a very specific individual at a**
19 **specific time, they pass through two camera**
20 **captures, and you have already told me that they**
21 **didn't take the time-minimizing route.**
22   Q  No.  Let me ask you this: Someone

166

1  analyzing Flock data sees two camera captures of
2  the same vehicle.
3     Do you have that in mind?
4    **A  Okay.**
5    Q  Can the person looking at those two camera
6  captures know the route that the person actually
7  took between those two captures?
8     MS. BIGBIE:  Objection, calls for
9  speculation.
10   **A  Yeah.  I think — I think they could**
11 **probably infer it, is my speculation.**
12   Q  So, your opinion that you could infer the
13 route between two camera captures by looking at
14 those captures is speculation?
15   **A  Yeah, it's speculation.**
16   Q  And it's speculation because looking at
17 the two camera captures, you don't know which of
18 the multiple routes between them somebody actually
19 took?
20   **A  It's speculation, because that's not what**
21 **my analysis was about, but if you told me captures**
22 **and gave me Google Maps, I could use all of the**

167

1  **rich information in there and probably give you a**
2  **really good guess about how they actually drove.**
3  **It's just not what I did.**
4    Q  I'm want to understand what you did and
5  then what you're speculating about now.
6     You did not do any analysis of whether the
7  Flock camera data would tell anyone whether the
8  exact route that a car took between two captures,
9  right?
10   **A  I'm — the — the only way I know how to**
11 **answer this question is just, that's not what I**
12 **was asked to do.**
13   Q  Right.  Because you were not asked to
14 analyze whether the Flock camera data could tell
15 someone the exact route that a car took between
16 two captures, right?
17   **A  Yeah, that wasn't the question posed to**
18 **me.**
19   Q  Because that wasn't the question posed to
20 you, you are not offering any opinions to answer
21 that question?
22   **A  Well, I have an opinion, I mean, but the**

168

1  **opinion is conjecture.**
2    Q  You haven't formed that opinion, you're
3  conjecturing now, right?
4    **A  Yes.**
5    Q  And...  Your conjecture is that if someone
6  knows what the -- that there is two camera
7  captures of the same vehicle, that they could use
8  Google Maps to guess the route that somebody took
9  between them?
10   **A  Yes.**
11   Q  But Google Maps often provides multiple
12 routes between the same two places?
13   **A  It sometimes does if you don't specify**
14 **certain parameters.**
15   Q  Right.  And so if this was -- if there was
16 a situation where there is multiple routes between
17 the two camera captures, there wouldn't be a way
18 to know whether guessing one route or the other
19 was the route that the person actually took?
20   **A  I am conjecturing again, because this is**
21 **not the analysis I did, but my conjecture is that**
22 **there is a way.**

173

1 analysis, my answer is it depends.
2    Q  You have not analyzed what could be
3 deduced from a situation where a vehicle is
4 captured only once by a Flock camera on a
5 particular day?
6    **A  I did not.  I don't believe I studied**
7 **that, no.**
8    Q  In the next sentence, after we went just
9 looking at you, you say:  This threshold, the two
10 or more camera captures reflects the practical
11 requirement that meaningful vehicle tracking
12 requires observing the same vehicle at multiple
13 locations, rather than a single-detection event.
14    **A  Yes, in this analysis.**
15    Q  And what did you mean by a
16 "single-detection event"?
17    **A  I meant a route in my model that only**
18 **passes through one camera.**
19    Q  Okay.  And so a single-detection event
20 would be a route that passes only one camera?
21    **A  Yes.**
22    Q  And you have not opined that a route that

174

1 passes only one camera can be reconstructed to any
2 extent?
3    **A  Not as part of this analysis, no, but I**
4 **can't rule out the possibility that it could.**
5    Q  And we talked a little bit about this
6 earlier, but lets just make sure we are clear on
7 it.
8       What you mean by "binary reconstructible"
9 is that you can use navigation software to
10 identify the time-minimizing route between two
11 camera captures?
12    **A  That's correct.**
13    Q  You are not using "binary reconstructible"
14 to mean reconstructing the actual route that any
15 person in Norfolk took on any particular trip?
16    **A  Yeah.  In my work, the definition of a**
17 **route being binary reconstructible is that route**
18 **has two, or more, camera detections.**
19    Q  Right.  But you're not using the term
20 "binary reconstructible" to mean that you can
21 reconstruct any actual route that any person in
22 Norfolk took between two cameras?

175

1    **A  That question was outside of the scope of**
2 **my analysis.**
3    Q  You have not done any analysis to measure
4 whether the portion of any route that you say can
5 be reconstructed is the actual route that any
6 person took between two cameras, right?
7    **A  Could you say the question again, please?**
8    Q  You have not done the analysis to measure
9 whether the portion of any route that you say
10 could be reconstructed is an actual route that a
11 car traversed in Norfolk in the real world?
12    **A  My analysis was based on simulated routes,**
13 **yes, and on the peer-reviewed published research**
14 **about the degree to which people follow**
15 **time-minimizing routes.**
16    Q  But what I'm asking you is:  You have not
17 offered the opinion that if we took two camera
18 captures on one of your simulated routes, that the
19 reconstructible portion of that route is the route
20 that person A took on day C in the real world?
21       You are not offering any opinion like
22 that, are you?

176

1    **A  No, it's a simulation.**
2    Q  Your reconstruction analysis does not
3 include any findings about whether Flock camera
4 data could be used to reconstruct the portion of a
5 route before a vehicle passes a Flock camera for
6 the first time in a day?
7    **A  Say that again.  I'm sorry, say it again,**
8 **please.**
9    Q  So, in order to be reconstructible, you
10 need to have two camera captures?
11    **A  Yes.**
12    Q  And what you say is reconstructible is the
13 route -- the time-minimizing route between the two
14 captures, right?
15    **A  My definition is that a route is binary**
16 **reconstructible if it has at least two captures,**
17 **and then we also talk about percentage**
18 **reconstructibility.**
19    Q  But you are not opining that any portion
20 of a route is reconstructible using Flock camera
21 data before the two camera captures that make it
22 binary reconstructible?

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Chad Higdon-Topaz, Ph.D.
Conducted on September 3, 2025

45 (177 to 180)

177

1     A  I feel the question touches on percentage
2  reconstructibility, where what we are doing is
3  measuring how much of trips are reconstructible.
4     Q  So maybe we will use a time example.
5        So, the car begins driving at noon.  It
6  passes the first camera at 12:15, the second one
7  at 12:30, and it finishes driving at 1:00.  Okay?
8     A  Um-hmm.
9     Q  So, your definition of "reconstructible"
10  would only refer to the time between the first
11  capture at 12:15 and the second capture at 12:30,
12  correct?
13     A  Which definition of "reconstructible,"
14  binary or percentage?
15     Q  I see.  Let me ask a more specific
16  question.
17     A  Sure.
18     Q  In my example where the car starts driving
19  at noon, first capture at 12:15, the second at
20  12:30 and a -- the car stops driving at 1:00, you
21  are not opining that the time between 12:00 and
22  12:15 is reconstructible?

178

1     A  Oh, as part of this simulation study, no.
2     Q  And as part of your simulation study, you
3  are not opining that the time between 12:30 and
4  1:00 is reconstructible?
5     A  Again, not as part of this simulation
6  study, that's correct.
7     Q  Have you done any study that would enable
8  you to reconstruct the time between 12:00 and
9  12:15 and 12:30 and 1:00 in my example?
10     A  So, my assignment was to again look at the
11  macroscopic surveillance capability of the camera
12  network, so it's not the question that I was asked
13  to look into.
14     Q  Because you weren't asked to look into it,
15  you didn't analyze it, correct?
16     A  Because I just want to make sure I answer
17  accurately, can you say what the "it" is?
18     Q  You were not asked to do any analysis that
19  would tell you, in my example, whether you could
20  reconstruct the time between 12:00 and 12:15 and
21  12:30 and 1:00?
22     A  Yeah, I was not asked that, no.

179

1     Q  And because you weren't asked to do that
2  analysis, you didn't do that analysis?
3     A  No, I didn't do that analysis.
4     Q  Let me show you another document.  This
5  will be Exhibit 36.
6        (Marked for identification Exhibit 36,
7  Bates NORF000191, materials considered.)
8     Q  Is it --
9     A  This is very small.  Could I use a
10  magnifier to look.
11     Q  If you have one, sure, absolutely.
12        MS. BIGBIE:  You gave two copies.  Two
13  copies or just one?
14     Q  I will represent to you that this is data
15  Bates numbered NORF000191, which was listed on
16  your materials considered in your report.
17     A  Okay.
18     Q  Have you seen this data before?
19     A  I mean, I suspect I must have.
20     Q  What does it look like to you?
21     A  It looks like a record of Flock camera
22  captures.

180

1     Q  All right.  Do you know if these are Flock
2  camera captures for Mr. Schmidt or Ms. Arrington?
3     A  I don't, only because I don't memorize the
4  license plates.
5     Q  So just looking from the Flock data, you
6  couldn't tell whose car is being captured in this
7  data, right?
8     A  No.  I can tell the license plate of the
9  car being captured.
10     Q  Okay.  And I will represent to you that
11  this this list captures a vehicle that Mr. Schmidt
12  has said is one that he drives.
13     A  Okay.
14     Q  And if we can look just at the top of the
15  captures on February 19th through February 21st;
16  do you see that?
17     A  Yes.
18     Q  Is it your opinion that you could use this
19  data to track where Mister -- everywhere that
20  Mr. Schmidt went between February 19th and
21  February 21st of 2025?
22     A  What does "everywhere" mean?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Chad Higdon-Topaz, Ph.D.
Conducted on September 3, 2025

46 (181 to 184)

181

1    Q  All of -- every place that he visited in
2  the City of Norfolk on those days.  Could the data
3  that's in Exhibit 36 be used to identify that?
4        MS. BIGBIE:  Objection, calls for
5  speculation.
6    **A  Yeah.  I was asked to think about vehicle**
7  **license plate captures, so that's what I'm**
8  **thinking of.**
9    Q  And the vehicle license plate captures of
10 Mr. Schmidt's vehicle would not enable you to
11 determine everywhere he went in the City of
12 Norfolk without speculation; is that right?
13       MS. BIGBIE:  Objection, calls for
14 speculation.
15   **A  Yeah, I have no idea.**
16   Q  Could you tell from any of the captures in
17 Mr. Schmidt's vehicle in this Exhibit 36 what he
18 was doing before or after any capture on the list?
19   **A  That -- I feel confident in saying I can't**
20 **answer that off the cuff.  That requires some**
21 **analysis.  So I believe I could possibly do**
22 **analysis of Flock captures that would let me**

182

1  **figure that out, but, again, that was not my**
2  **assignment.**
3    Q  It was not part of your assignment to
4  determine whether looking at Flock data, like
5  what's in Exhibit 36, that you could figure out
6  where the routes that Mr. Schmidt's vehicle
7  traveled?
8    **A  My assignment was to evaluate the**
9  **macroscopic surveillance capability of the entire**
10 **network.**
11   Q  So the answer to my question is no, that
12 was not your assignment?
13   **A  My assignment was not to figure out where**
14 **Mr. Schmidt went.**
15   Q  And your assignment was not to analyze
16 whether you could figure out where Mr. Schmidt
17 went looking at the data on where his vehicle was
18 captured, like what we're looking at in Exhibit
19 36, right?
20   **A  As my slack time analysis demonstrates, I**
21 **don't recall if it was for this plate or another,**
22 **as that demonstrates successive captures can be**

183

1  used to figure some things out.
2    Q  Your slack time analysis determines that
3  slack time can be used to narrow down where a
4  person might have been, right?
5    **A  That's correct.**
6    Q  Does your slack time analysis show that a
7  person of location can be identified any more
8  specifically than to narrow down where they could
9  have been?
10   **A  That depends on everything.  That depends**
11 **on how big the feasible area turns out to be.**
12   Q  All right.  Let's look at -- well, let me
13 just ask you:  Do you recall looking at data
14 similar to what's in Exhibit 36 for
15 Ms. Arrington's vehicle?
16   **A  I mean, it seems reasonable that I would**
17 **have.**
18   Q  And just like we talked about with
19 Mr. Schmidt, the vehicle license plate captures of
20 Ms. Arrington's vehicle would not enable you to
21 determine everywhere she went in the City of
22 Norfolk without speculating, right?

184

1    **A  Without speculating, yes.**
2    Q  Your reconstruction analysis is based on
3  the assumption that drivers take the fastest
4  routes in ideal conditions, right?
5    **A  No.**
6    Q  Maybe I'm not describing that correctly.
7        Reconstructibility, as you have defined
8  it, is based on the time-minimizing route between
9  two points, right?
10   **A  Yes.**
11   Q  You have not done any version of your
12 reconstruction analysis that is not based on a
13 definition of reconstructibility that has drivers
14 taking the fastest route?
15   **A  I'm sorry, say that again.**
16   Q  Have you done any analysis of
17 reconstructibility that is not based on a
18 definition that has drivers taking the
19 time-minimizing route?
20   **A  My analysis only uses that assumption, and**
21 **I believe that if that assumption is deviated**
22 **from, there's no reason to believe it would bias**

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Chad Higdon-Topaz, Ph.D.
Conducted on September 3, 2025

48 (189 to 192)

189

1  statements -- conjecture, I would be able to make
2  statements about what likelihood.
3      Q  Using like mathematical probability
4  theory?
5      A  And related tools, but I'm conjecturing.
6  It's not an analysis that I have done.  It is
7  outside the scope of my assignment.
8      Q  So, fair to say you do not know precisely
9  how to figure out where a vehicle was on a
10 particular trip based on camera captures if you
11 relax this definition of "binary reconstructible"
12 as taking a time-minimizing route?
13     A  I absolutely have ideas, but it was not
14 part of my analysis.
15     Q  Thank you.  You would agree that people
16 sometimes don't take the time-minimizing route,
17 right?
18     A  What I know is that from peer-reviewed
19 empirical research, the best majority of time
20 people take the time-minimizing route.
21     Q  Sometimes they don't, right?
22     A  I mean, vast majority.

190

1      Q  Sometimes people don't take the
2  time-minimizing route?
3      A  Yes, vast majority leaves a tiny minority.
4      Q  Some people try to stay off freeways or
5  busy roads because they just don't like driving
6  on.
7      A  Okay.
8      Q  Would you agree with that?
9      A  I have no idea.  I only know how I drive.
10     Q  So you -- you have not done yourself an
11 independent study of whether people in Norfolk
12 take the time-minimizing route?
13     A  I rely on the published, peer-reviewed
14 research about whether they do.
15     Q  Right.  You, yourself, have not done an
16 independent study of whether people in Norfolk
17 take the time-minimizing route?
18     A  No, because I'm using the peer-reviewed
19 research.
20     Q  And some people like to avoid tolls, would
21 you agree with that?
22         MS. BIGBIE:  Objection, calls for

191

1  speculation.
2      A  Yeah, I don't know.  I can imagine.
3      Q  You could imagine some people might prefer
4  the more scenic route or a route that goes through
5  some neighborhood that they like?
6         MS. BIGBIE:  Objection, calls for
7  speculation.
8      A  I think people can take scenic drives that
9  are the most direct route if that's their plan.
10     Q  Some people take more scenic routes that
11 are not the most direct, right?
12         MS. BIGBIE:  Objection, calls for
13 speculation.
14     A  They might.
15     Q  Your assumption -- I think you mentioned
16 the peer-reviewed literature.  Your assumption
17 that people generally take the fastest route is
18 based on a paper by Wardrop and a paper by Tang
19 and Levinson?
20     A  I need to look in my report to see.
21     Q  Sure.  I can let you do that.  I'll try to
22 direct you just to help you out.

192

1         This is just after 4.2.  This would be --
2  yeah, it's the page after 4.2 begins, so it's page
3  10 of your report, and you have a paragraph with
4  the bold phrase Routing Behavior.
5      A  Um-hmm.
6      Q  And does that describe the basis for your
7  definition of drivers minimizing travel time?
8      A  Yeah.
9      Q  And you cite two papers there.  One by
10 Wardrop from 1952, right?
11     A  It looks like it.
12     Q  And another paper from Tang and Levinson
13 in 2018 --
14     A  Yeah.
15     Q  -- right?
16     A  Yeah.
17     Q  And the assumption that drivers generally
18 take the time-minimizing route is called the
19 shortest-path principle?
20     A  I -- called by who?
21     Q  Well, in the literature is it known as the
22 shortest-path principle?

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Chad Higdon-Topaz, Ph.D.
Conducted on September 3, 2025

51 (201 to 204)

---

201

1    Q  And have you ever read the Zhu and
2  Levinson paper from 2015 cited in Tang and
3  Levinson?
4    A  I probably looked at.  Again, I read
5  hundreds of papers a year, but, again, I'm sure I
6  did at some point.
7    Q  Let's go to figure 4 of Tang and Levinson.
8    A  Okay.
9    Q  So figure 4 --
10   A  Um-hmm.
11   Q  -- is an example of where they have the
12 plotted the shortest distance, the shortest travel
13 time and the actual paths that somebody took based
14 on GPS --
15   A  Um-hmm.
16   Q  -- right?
17   A  Yep.
18   Q  And the shortest travel time path is
19 in -- is the dotted line, right?
20   A  Um-hmm.
21   Q  And the blue line is the actual path that
22 the person took?

---

202

1    A  Um-hmm.
2    Q  And let's assume for a moment that the
3  green triangle and the pink dot, the beginning and
4  end of the travel year, were Flock camera
5  captures.  Okay?
6    A  Okay.
7    Q  In that situation, the assumption that a
8  driver would have taken the shortest travel time
9  path would give someone incorrect information
10 about where the person actually went, right?
11     MS. BIGBIE:  Objection, calls for
12 speculation.
13   A  Yeah.  All I can tell you is that what the
14 figure shows is the different things that you
15 articulated, yes.
16   Q  And that could be true for any two
17 captures of vehicles by Flock cameras in Norfolk,
18 right?
19     MS. BIGBIE:  Objection, calls for
20 speculation.
21   A  Yes.  I provided a macroscopic — how do I
22 want to say it — assessment of the systems

---

203

1  capture capability that should be robust to
2  variations in assumptions.
3    Q  What I'm asking is whether there could be
4  a deviation between the shortest travel time path
5  between two places and the actual path somebody
6  took, as we see in Tang and Levinson figure 4, for
7  any two Flock captures in Norfolk?
8      MS. BIGBIE:  Objection, calls for
9  speculation.
10   A  As stated, most people follow
11 time-minimizing paths most of the time.  That is
12 not all people all of the time.
13   Q  But that's not what Tang and Levinson
14 found, right?
15   A  Well, I don't think I have agreed to what
16 they found, because I would need to reread this
17 paper from start to finish and make sure I'm
18 eliminating the information about other
19 modalities, and whatnot.
20   Q  Didn't Tang and Levinson eliminate all
21 trips besides auto trips?
22   A  I don't recall.  That's why I would need

---

204

1  to reread this paper in detail.
2    Q  Let's go to page 22 of your report.
3      MS. BIGBIE:  Justin, a copy of this.
4    Q  That's section 6.1.
5    A  Okay.
6    Q  Are you looking at your red bar chart?
7    A  No.
8    Q  That's what I want you to look at.
9    A  Okay.
10   Q  All right.  So this is figure 2 of your
11 report, right?
12   A  Yes.
13   Q  And you found that only 54.9 percentage of
14 trips are binary reconstructibility, right?
15   A  In my simulation, that is correct.
16   Q  So, more than 45 percent of what you say
17 are realistic trips are not reconstructible,
18 correct?
19   A  Not using the methodology of this study,
20 that is correct.
21   Q  And you haven't shown that the 45 percent
22 of trips that you say are not reconstructible with

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Chad Higdon-Topaz, Ph.D.
Conducted on September 3, 2025

52 (205 to 208)

---

**205**

1 the methodology of your study, that they are
2 reconstructible through some other study?
3    **A I have not shown that they are.**
4    Q  Okay.  You did no analysis of which of
5 your 15,000 routes are taken more than others,
6 right?
7    **A Can you clarify the question?**
8    Q  I think we talked about this earlier, but
9 you did no analysis to determine whether in the
10 real world people in Norfolk take some of their
11 15,000 routes much more often than others?
12    **A This is absolutely accounted for in the**
13 **model through the gravity model, which describes**
14 **travel demand in the city.**
15    Q  Well, your figure 2, though, when you have
16 the 54.9 percent --
17    **A Um-hmm.**
18    Q  -- that's 54.9 percent of the 15,000
19 routes?
20    **A Yes.**
21    Q  15,000 different routes?
22    **A Yes.**

---

**206**

1    Q  Okay.  The 54.9 percent is not the
2 percentage of trips that are reconstructible
3 accounting for how often each of those 15,000
4 routes is taken?
5    **A I have to think about this.**
6    Q  Maybe we will do it with some math and
7 that will help.
8    **A Sure.**
9    Q  Although, I'm a little intimidated to do
10 that with a math professor.
11       Let's say there are five different routes.
12    **A Um-hmm.**
13    Q  Four are not binary reconstructible and
14 one is.
15    **A Um-hmm.**
16    Q  The four routes that are not binary
17 reconstructible are taken for 1,000 trips.
18    **A Um-hmm.**
19    Q  And the one route that is binary
20 reconstructible is taken for ten trips.
21    **A I'm sorry.**
22       (Indiscernible crosstalk.)

---

**207**

1    Q  I'm assigning how often people are
2 taking --
3    **A Can you define what routes you are talking**
4 **about.  This would help me answer this question.**
5    Q  I'm just imagining five -- I select five
6 routes at random from your -- from your study.
7    **A From my study.**
8    Q  Five of your 15,000 simulated routes.
9    **A Okay.**
10    Q  And it turns out that four of them are not
11 binary reconstructible and one is.  Okay?
12    **A Um-hmm.**
13    Q  The four routes that are binary
14 reconstructible are taken by people in Norfolk a
15 total of 1,000 times a week.  Okay?
16    **A Um-hmm.**
17    Q  The one route that is not -- that is
18 binary reconstructible is taken for a total of ten
19 trips a week.
20    **A Um-hmm.**
21    Q  The percentage of trips in that set that
22 are binary reconstructible is much lower than the

---

**208**

1 percentage of routes that is binary
2 reconstructible, correct?
3    **A The best answer I can give to this**
4 **question is that if the gravity model creates a**
5 **set of trips that a representative of what people**
6 **actually do based on travel demand, so if there**
7 **was a route that only one person was taking**
8 **because it was -- there just wasn't a lot of**
9 **demand between those locations, it has a much**
10 **lower probability of showing up in the model.**
11       **So, what the model is representing is**
12 **real, actual travel demand in -- in Norfolk.**
13    Q  I want to understand that.  Because the
14 54.9 percent of reconstructible routes, that
15 is -- like, if I laid out all of the routes one by
16 one.
17    **A Um-hmm.**
18    Q  And I counted them.
19    **A Um-hmm.**
20    Q  I would get 54.9 percent reconstructible,
21 right?
22    **A This is true, but they are not any set of**

---

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Chad Higdon-Topaz, Ph.D.
Conducted on September 3, 2025

54 (213 to 216)

213

1 more often than nonreconstructible trips.
2    Q  How do you know that?
3    A  That's the 54.9 percent --
4    Q  I'm sorry, I guess what I'm asking is:  If
5 we had data on how often each one of your 15,000
6 trips is taken in a week --
7    A  Um-hmm.
8    Q  -- and so we multiplied the 15,000 by not
9 the number of routes but number of trips.
10    A  Um-hmm.
11    Q  Are you with me?
12    A  Yes.
13    Q  Then the 54.9 percent may not be the
14 correct number of trips that are reconstructible
15 because it could be that the reconstructible trips
16 were taken more commonly than the
17 nonreconstructible trips.
18    A  Yes, and in --
19      MS. BIGBIE:  Calls for speculation.
20    A  Yes, and in that case, the
21 reconstructibility percentage would be higher
22 under your scenario.

214

1    Q  And if the frequency of reconstructible
2 versus nonreconstructible trips were reversed,
3 then the percentage would be lower?
4      MS. BIGBIE:  Objection, calls for
5 speculation.
6    A  Yes, it could be lower, and what I would
7 emphasize again is the -- what we get from
8 simulating 15,000 trips and using a gravity model,
9 but based on that is a travel demand model, that
10 my expert opinion is that this should be
11 representative of what is happening.
12    Q  All right.  Now, you found that 70 percent
13 of reconstructible trips, the binary
14 reconstructible trips, are at least 25 percent
15 reconstructible?
16    A  Let me find the appropriate...
17      Sorry.  I see the graph now.  Can you make
18 your question again, please?
19    Q  Sure.  You found that approximately 70
20 percent of binary reconstructible trips are at
21 least 25 percent reconstructible, right?
22    A  I think I found that 75 percent of trips

215

1 are at least 25 -- approximately, 75 percent of
2 trips are approximately at least 25 percent
3 reconstructible.
4    Q  And so 25 percent of the 54.9 percent of
5 trips that are binary reconstructible can't even
6 be reconstructed a quarter of the way; is that
7 right?
8    A  Make the statement again, please.
9    Q  Sure.  25 percent of the binary
10 reconstructible trips can't be reconstructed even
11 a quarter of the way?
12    A  According to this analysis, yes.
13    Q  So, 25 percent of 54.9 percent is roughly
14 what?
15    A  A quarter of 55 percent?
16    Q  Yeah.
17    A  About half of that would be 27 1/2
18 percent, and half of that would be 13.75 percent,
19 I think.
20    Q  All right.  So if you add 13.75 percent to
21 the, roughly, 46 percent of trips that are not
22 binary reconstructible at all, you get roughly

216

1 just shy of 60 percent of trips that
2 aren't -- that can't be reconstructed even by a
3 quarter, right?
4    A  That's what the math says.
5    Q  And then you find that about 50 percent of
6 trips are at least 50 percent reconstructible,
7 correct?
8    A  Correct.
9    Q  And 50 percent of the, roughly, 55 percent
10 of trips that are binary reconstructible is 27 1/2
11 percent?
12    A  Correct.
13    Q  And so, 27 1/2 percent of all trips, even
14 if they are binary reconstructible, can't be
15 reconstructed even half of the way?
16    A  I'm sorry.
17      (Indiscernible crosstalk.)
18    Q  So 50 percent of the trips are at least 50
19 percent reconstructible, 50 percent --
20    A  Of the reconstructible trips, yes.
21    Q  And that means that 50 percent can't be
22 reconstructed up to 50 percent, right?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Chad Higdon-Topaz, Ph.D.
Conducted on September 3, 2025

55 (217 to 220)

217

1    A   No.  It means they can't be reconstructed
2  more than 50 percent.
3    Q   So, 50 percent of binary reconstructible
4  trips can be reconstructed only 50 percent, or
5  less?
6    A   Yes.
7    Q   And we said that that's about 27 1/2
8  percent of all trips?
9    A   Um-hmm.
10    Q   Right?  Correct?
11    A   Um-hmm.
12    Q   And if you add that to the 46 percent of
13 trips that aren't binary reconstructible --
14    A   Um-hmm.
15    Q   -- at all you get about 73 percent --
16    A   Yes.
17    Q   -- of trips in total that cannot be
18 reconstructed anymore than 50 percent?
19    A   That's correct.
20    Q   Let's go to page 22 of the report.  I
21 think that was -- was there earlier.
22    A   Which one?  I'm sorry.

218

1    Q   It's page 22 --
2    A   22.
3    Q   -- trying to help you locate.  It's 6.1.
4    A   -- opinions.  Okay.
5    Q   You say in the second sentence that the
6  analysis demonstrates that the Norfolk Police
7  Department's camera network provides extensive
8  detection coverage for routine travel throughout
9  the city.
10    Do you see that?
11    A   Um-hmm.
12    Q   What did you mean by "extensive"?
13    A   Well, a majority a trips in my simulation
14 are detected at least two times.
15    Q   And so by "extensive," you -- by
16 "extensive" you were just describing that
17 percentage finding in your analysis?
18    A   That's what detection coverage means, yes.
19    Q   And where you were using "extensive"
20 there, was that some term of art in your field?
21    A   It's more than -- it's a majority.
22    Q   And were you comparing "extensive"

219

1  to -- "extensive detection coverage" to something
2  that would not be extensive detection coverage?
3    A   No, it was a majority.
4    Q   And you go -- you say:  There is also
5  significant route reconstruction potential --
6    A   Um-hmm.
7    Q   -- for trips that enter the surveillance
8  system.
9    Do you see that?
10    A   Um-hmm.
11    Q   What did you mean by "significant"?
12    A   If you would give me a moment on that.
13    A   I'm looking at figure 6.
14    Q   Okay.
15    A   Based on that.
16    Q   Did you mean anything else by significant
17 in -- when you were referring to "significant
18 reconstruction potential"?
19    A   I mean the results of figures 5 and 6.
20    Q   Okay.  If we go back to page 22, section
21 6.1.
22    In section 6.1 of your report you refer to

220

1  sophisticated capabilities to infer detailed
2  activities and location visits during periods
3  between camera detections.
4    Do you see that?
5    A   I would like -- yes.  I would like to read
6  the whole sentence.
7    Q   Sure.
8    (Witness reviewing document.)
9    A   Yes.
10    Q   And what analysis have you done to show
11 that the surveillance records from Flock cameras
12 can be used to infer details, activities and
13 location visits?
14    A   Oh, that's the slack time analysis that
15 shows possibilities for...
16    Q   And that's the slack time analysis that I
17 think you testified shows that you can maybe, in
18 some circumstances, narrow down where a person
19 might have been?
20    A   Yes.
21    Q   And so that's what you many by inferring
22 detailed activities and location visits?

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Chad Higdon-Topaz, Ph.D.
Conducted on September 3, 2025

63 (249 to 252)

249

1    Q  Are you offering an opinion that what a
2  person does during slack time can be reconstructed
3  using Flock data?
4    **A  What I'm offering is an opinion that**
5  **successive camera captures, along with the**
6  **available amount of time, slack time, along with**
7  **the requirement that no other cameras were passed,**
8  **because they are successive camera heads, allows**
9  **me, in this analysis, to narrow down feasible**
10  **movements.**
11    Q  Okay.  But you are not offering an opinion
12  that what a person does during slack time is
13  reconstructible in the way that you say routes are
14  reconstructible in your simulation analysis?
15    **A  Oh, it's answering a different question.**
16  **Yeah, it's, sort of, answering a different**
17  **question.  It's a separate analysis.**
18    Q  I understand.  But you're not offering an
19  opinion that Flock data can be used to reconstruct
20  exactly where a person goes to during slack time?
21    **A  No.  I'm offering an opinion that it can**
22  **be used to narrow down to a feasible region.**

250

1    Q  And that's because parts of slack time
2  are, sort of, hidden or uncertain as to the Flock
3  cameras, right?
4    **A  I'm — slack time is just an amount of**
5  **time.**
6    Q  What a person does during slack time is
7  hidden from the Flock cameras?
8    **A  I don't actually know that, but it's an**
9  **assumption I've made, but I don't actually know**
10  **that to be true.**
11    Q  Are you offering an opinion that Flock
12  data can be used to determine that anyone visited
13  a particular place if they stop between two
14  captures by Flock cameras?
15    **A  I'm offering an opinion that depending on**
16  **the specifics of what the data says, that it would**
17  **be possible to narrow down to potentially a very**
18  **small region.**
19    Q  What you are saying as to slack time, the
20  Flock cameras can be used to rule out that people
21  visited certain places but not necessarily
22  identify where they went?

251

1    **A  It can restrict the choices of where they**
2  **went, yes.**
3    Q  And you have not done an analysis as to
4  how long the list of places somebody could have
5  gone after being narrowed down using the Flock
6  camera is -- is, on average, during slack time?
7    **A  My —**
8    Q  Let me ask a clearer question.
9    **A  Please.**
10    Q  You have not done any calculation of the
11  average, like square mileage, of the area in which
12  the Flock cameras can be used to narrow down where
13  somebody went?
14    **A  Again, this was not my main analysis.**
15  **This was a supplementary analysis to demonstrate**
16  **capability.**
17    Q  Right.  But you have not done any
18  calculation of the average square mileage of the
19  area that the Flock cameras can be used to narrow
20  down where somebody between between captures?
21    **A  Yeah.  No, that particular calculation was**
22  **not part of the assignment.**

252

1    Q  And you have not done any analysis of the
2  average number of establishments that a person
3  could have visited during slack time, right?
4    **A  So, I should really be clear, the slack**
5  **time was one example analysis, so definitionally I**
6  **did not do that.**
7    Q  Your entire slack time analysis consisted
8  of one example, right?
9    **A  Yes.  As I stated, it was an example to**
10  **demonstrate how the data can be used.**
11    Q  Did you make any attempt to test or show
12  that the one example of slack time that you looked
13  at could be extrapolated to other examples?
14    **A  Can you define "extrapolate," please?**
15    Q  Well, did you make any attempt to test or
16  show that the one example of slack time that you
17  looked at was representative of other slack time
18  intervals?
19    **A  I'm sorry, can you repeat it?  Did I**
20  **make —**
21    Q  Did you try to test or show that the one
22  example of slack time was representative of the

257

1    A  I mean, I don't have it in front of me.
2  It's like hundreds of lines of --
3    Q  So, you actually had to write a program
4  that would tell you the -- I think you called it
5  the feasible area --
6    A  Yes.
7    Q  -- between two captures that someone could
8  visit during slack time?
9    A  Yes.
10    Q  You had to write hundreds of lines of
11  computer code to do that?
12    A  Yes.
13    Q  And are you aware of anyone at Flock or at
14  the Norfolk Police Department that has written
15  that code?
16    A  I don't have visibility into their
17  internal capabilities, but I can conjecture that
18  there probably is, but I don't know.
19    Q  Okay.  Would you agree that the longer the
20  slack time, the more difficult it would be to
21  narrow down where anyone went between the two
22  captures?

258

1    A  No.
2    Q  All things being equal, would you agree
3  that the longer the slack time, the more difficult
4  it would be to narrow down where anyone went?
5    A  I would need you to define what "all
6  things being equal" means.
7    Q  Where what would be a situation where it
8  wouldn't be more difficult to narrow down where
9  somebody went during slack time if there was
10  longer slack time?
11    A  That requires analysis that I have not
12  done.  It depends on the specifics of where
13  cameras are located and how they are arranged.
14    Q  So, your example of slack time that you
15  covered with the two captures, you're not offering
16  any opinion about what specific location the
17  driver of the vehicle with that license plate
18  visited during slack time?
19    A  The slack time analysis presents a
20  narrowing of the feasible area for places they
21  could have visited.
22    Q  But you're not offering an opinion as to

259

1  any place they actually visited, correct?
2    A  I have not because that was not my
3  assignment.
4    Q  And you are not offering an opinion as to
5  how much of the slack time that you calculated for
6  that one example was spent by the driver walking,
7  driving or just sitting in their car?
8    A  Sorry, say that question?  I am not?
9    Q  You are not offering an opinion as to how
10  much of the slack time that you calculated for the
11  one example you used in your slack time analysis
12  was spent by the driver walking, driving or just
13  sitting in their car?
14    A  My analytical tool allows anyone to make
15  choices about those things.  I'm not offering an
16  opinion.
17    Q  And your model that you have used for
18  slack time allows for widely different assumptions
19  about how much of that time has been spent walking
20  or driving or sitting in your car?
21    A  Yes.
22    Q  And depending on the assumptions that you

260

1  put in for how long somebody has spent walking or
2  driving or sitting in their car during slack time,
3  you could get different feasible areas that the
4  person could have visited?
5    A  That's correct.
6    Q  And have you -- you have not studied the
7  range of feasible areas that would be created for
8  any particular assumptions about how somebody
9  spent slack time for any particular trip?
10    A  No.  I assume that doing that would --
11  yeah, that just wasn't part of my assignment.  I
12  didn't have access to anything else.
13    Q  And nothing in any of the analyses you
14  have done, or your computer code, would actually
15  tell you whether somebody spent time walking,
16  driving or sitting in their car, right?
17    Those are assumptions you would have to
18  make?
19    A  Those are inputs to the model.
20    Q  You would need another source of
21  information, other than the Flock camera captures,
22  to know whether somebody was walking, driving or

CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Chad Higdon-Topaz, Ph.D.
Conducted on September 3, 2025

71 (281 to 284)

---

281

1    A  That's my recollection.  And then at some
2  point, we decided to supplement it with a slack
3  time analysis.
4    Q  Just give me one moment.
5    A  Sure.
6        MR. RAPHAEL:  I think that is all the
7  questions I have for you today.  I'm grateful for
8  your time and for your willingness to do it here
9  at the hotel.  I'm will pass the witness.
10       MS. BIGBIE:  We will reserve.
11       MR. RAPHAEL:  All right.  I think that's
12 all.
13       THE VIDEOGRAPHER:  Are you ordering the
14 video?
15       MS. BIGBIE:  That's a great question.  Do
16 we have an order on file, does anyone know?
17       THE VIDEOGRAPHER:  It doesn't say here.
18       MR. RAPHAEL:  We will be ordering video.
19       MS. BIGBIE:  Let me check with... the lead
20 on this.
21       MR. RAPHAEL:  We should go off the record.
22       THE VIDEOGRAPHER:  Stand by.  This marks

---

282

1  the end of the deposition of Chad Higdon-Topaz.
2  We are going off the record at 16:02.
3
4        (Deposition concluded at 4:02 p.m. EST.
5        Signature of the witness was requested.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

---

283

1
2
3
4             VERIFICATION OF DEPONENT
5
6    I, Chad Higdon-Topaz, PhD, having read the
7  foregoing deposition consisting of my testimony at
8  the aforementioned time and place, do hereby
9  attest to the correctness and truthfulness of the
10 transcript.
11
12       _____
13       NAME:  Chad Higdon-Topaz, PhD
14       DATED:
15
16
17
18
19
20
21
22

---

284

1  CERTIFICAT OF SHORTHAND REPORTER NOTARY PUBLIC
2    I, Karen Klerekoper, the officer before whom
3  the foregoing proceedings were taken, do hereby
4  certify that the foregoing transcript is a true
5  and correct record of the proceedings; that said
6  proceedings were taken by me stenographically and
7  thereafter reduced to typewriting under my
8  supervision; that review was requested; and that I
9  am neither counsel for, related to, nor employed
10 by any of the parties to this case and have no
11 interest, financial or otherwise, in its outcome.
12   IN WITNESS WHEREOF, I have hereunto set my hand
13 and affixed my notarial seal this 4th day of
14 September 2025.
15
16 MY COMMISSION EXPIRES:
17 DECEMBER 4, 2031
18
19
20 NOTARY PUBLIC IN AND FOR THE STATE OF
21 MASSACHUSETTS
22

---