**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | |
|---|---|
| **LEE SCHMIDT and CRYSTAL ARRINGTON,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**CITY OF NORFOLK and MARK TALBOT, in his official capacity as the Norfolk Chief of Police,**<br><br>**Defendants.** | **Civil Action No. 2:24-cv-621** |

**DEFENDANTS' OPPOSITION TO**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**


INTRODUCTION ....... 1

STATEMENT OF MATERIAL FACTS IN DISPUTE ....... 3

ARGUMENT ....... 12

I. THE LEGAL STANDARD IS WHETHER NPD CAN USE FLOCK DATA TO TRACK THE WHOLE OF PLAINTIFFS' MOVEMENTS TO LEARN INTIMATE INFORMATION ABOUT THEM ....... 12

II. PLAINTIFFS CANNOT MEET THAT LEGAL STANDARD ....... 15

A. Plaintiffs Have No Evidence That NPD's Flock Cameras Track the Whole of Their Movements or Reveal Private Information About Them ....... 15

B. Plaintiffs' Experts Do Not Support Their Position ....... 20

III. PLAINTIFFS CANNOT DISTINGUISH NEARLY TWO DOZEN FEDERAL CASES THAT UNIFORMLY REJECT CLAIMS LIKE THEIRS ....... 24

IV. PLAINTIFFS' EFFORT TO CHANGE THE LEGAL STANDARD FAILS ....... 26

V. PLAINTIFFS CANNOT PROVE THAT USING LPRS IS A SEARCH BY CHALLENGING NPD'S OVERSIGHT OF HOW LPRS ARE USED ....... 29

CONCLUSION ....... 30

# TABLE OF AUTHORITIES

**Page(s)**

*Carlson v. Boston Sci. Corp.*,
856 F.3d 320 (4th Cir. 2017) ....................4

*Carpenter v. United States*,
585 U.S. 296 (2018).................... *passim*

*Katz v. United States*,
389 U.S. 347 (1967)....................12

*Kyllo v. United States*,
533 U.S. 27 (2001)....................23

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
2 F.4th 330 (4th Cir. 2021) (en banc) .................... *passim*

*Mexican Gulf Fishing Co. v. United States Dep't of Com.*,
60 F.4th 956 (5th Cir. 2023) ....................18

*Scholl v. Ill. State Police*,
776 F. Supp. 3d 701 (N.D. Ill. 2025) ....................16, 22, 26

*United States v. Bowers*,
2021 WL 4775977 (W.D. Pa. Oct. 11, 2021) ....................25

*United States v. Jackson*,
2025 WL 1530574 (D. Kan. May 29, 2025)....................2, 16, 25, 26

*United States v. Jones*,
565 U.S. 400 (2012).................... *passim*

*United States v. Jones*,
No. 10-1259, 2011 WL 7113271 (U.S. Aug. 11, 2011) ....................19

*United States v. Knotts*,
460 U.S. 276 (1983)....................2, 12, 22

*United States v. Martin*,
753 F. Supp. 3d 454 (E.D. Va. 2024) ....................3, 24, 25, 30

*United States v. Maynard*,
615 F.3d 544 (D.C. Cir. 2010)....................15

*United States v. Slaybaugh*,
2025 WL 2123781 (M.D. Ala. July 29, 2025)....................17

*United States v. Sturdivant*,
2025 WL 1633754 (N.D. Ohio June 9, 2025)....................16

*United States v. Toombs*,
671 F. Supp. 3d 1329 (N.D. Ala. 2023)....................25

*United States v. Vankesteren*,
553 F.3d 286 (4th Cir. 2009) ....................13

*Warth v. Seldin*,
422 U.S. 490 (1975)....................26

*Zambrano v. Sylvester*,
2025 WL 2682691 (S.D.N.Y. Sept. 19, 2025)....................24

## INTRODUCTION

Stripped of rhetoric, speculation, and hyperbole, Plaintiffs' motion for summary judgment shows why judgment should be entered in Defendants' favor. The undisputed facts show that the Norfolk Police Department's ("NPD") Flock cameras do not track or follow Plaintiffs *at all*. NPD's Flock cameras take photographs of the backs of vehicles at 75 specific locations covering less than 1% of Norfolk's public roads. The cameras do not show where the vehicle's journey begins or ends. And Plaintiffs themselves were photographed by NPD's Flock cameras on average a few times a day over a 21-day retention period—nowhere close to the comprehensive tracking available through cell site or GPS or aerial surveillance.

In the face of these undisputed facts, Plaintiffs do not even attempt to present evidence that NPD's cameras track the "whole" of their movements, *Carpenter v. United States*, 585 U.S. 296, 310 (2018), so as to reveal "intimate" details about their "associations and activities," *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 342 (4th Cir. 2021) (en banc) (citation modified). Plaintiffs do not show that NPD could track a single trip they took or learn that they visited any location without first asking Plaintiffs themselves. Plaintiffs' experts do not opine that NPD's cameras have that capability. Plaintiffs' principal expert, Dr. Chad Higdon-Topaz, did not analyze the Flock data at all, but instead relied on "simulated" routes. He has not opined that "Flock camera data can be used to construct a realistic model of how people travel by car within Norfolk." Defs.' Ex. 19 [Higdon-Topaz Dep.] at 139:13–19.[1]

Plaintiffs also have not offered any evidence that NPD's Flock cameras have the same tracking capabilities as GPS, cellular data, or Baltimore's aerial surveillance, which federal courts have unanimously held are fundamentally different from license plate readers ("LPRs"). The

[1] As explained in the Declaration of Lauren E. Ross, for the Court's convenience, Defendants have used the same exhibit numbers as used in their Motion for Summary Judgment, ECF No. 113.

courts have recognized that, "[e]ven in the aggregate, the [LPR] cameras['] capability to capture multiple shots of a single vehicle and/or store historical data does not approach the near-constant surveillance of cell-phone users' public and private moves that so concerned the Court in *Carpenter*." *United States v. Jackson*, 2025 WL 1530574, at *8 (D. Kan. May 29, 2025) (citation modified). Plaintiffs fail to distinguish their case from the uniform line of federal decisions holding that the use of LPR cameras does not violate the Fourth Amendment.

Instead, Plaintiffs' motion makes a series of legally flawed arguments:

*First*, Plaintiffs are wrong that the standard for a Fourth Amendment search is whether an investigative tool can "enable deductions and insights." Mot. at 16. The Fourth Circuit in *Beautiful Struggle* held that Baltimore's aerial surveillance program was a search not merely because it enabled deductions, but rather because the program "enable[d] police to deduce *from the whole of individuals' movements*." 2 F.4th at 346 (emphasis added). The Fourth Circuit emphasized deductions from the whole of a person's movements because only those deductions "reveal[] more about a person than does any individual trip viewed in isolation" and "go to the privacies of life." *Id.* at 342. "A person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another," *United States v. Knotts*, 460 U.S. 276, 281 (1983), but "[a] person who knows *all* of another's travels can deduce whether he is a weekly church goer, a heavy drinker, a regular at the gym, an unfaithful husband, an outpatient receiving medical treatment, an associate of particular individuals or political groups," *Beautiful Struggle*, 2 F.4th at 342 n.8 (emphasis added, citation modified). Plaintiffs do not argue, let alone cite evidence, that NPD could use Flock data to get anything like that kind of "intimate window into a person's associations and activities." *Id.* at 342 (citation modified).

*Second*, Plaintiffs object that NPD officers "have virtually unfettered access" to the Flock

data "with minimal oversight." Mot. at 11. As an initial matter, this is simply not true. The Virginia General Assembly recently enacted a statute that strictly regulates the use of LPRs by NPD and other Virginia law enforcement agencies. The statute imposes limits, backed by criminal sanctions, on when LPR data can be used in law enforcement investigations and requires recordkeeping and regular audits. In any event, while Plaintiffs may disagree with the Virginia legislature's judgments regarding LPR regulation—Plaintiffs' counsel unsuccessfully opposed the legislation—whether "Flock's system could be abused in the future . . . is not the constitutional standard." *United States v. Martin*, 753 F. Supp. 3d 454, 473 n.16 (E.D. Va. 2024).

*Third*, Plaintiffs propose a new rule that they admit is "foreclosed" by the Supreme Court's Fourth Amendment precedent. Mot. at 29. According to Plaintiffs, any "effort to find or discern something" or any "purposeful, investigative act" should be considered a search and require a warrant if it was inconsistent with "the common law search rules of 1791." Mot. at 30; *see also id.* at 25 (harkening to a bygone era of part-time police). Upending the law in that manner would not only jeopardize public safety by bringing policing to a halt, but it would also contravene decades of settled legal principles.

Plaintiffs ask the Court to change the law because the undisputed facts show that Plaintiffs cannot meet the standard for a Fourth Amendment search that applies today. That is why federal courts—*every* court in the Nation to consider the issue—have held that the use of LPRs is not a Fourth Amendment search. The undisputed facts of this case confirm the soundness of those rulings. The Court should deny Plaintiffs' motion and grant summary judgment to Defendants.

## <u>STATEMENT OF MATERIAL FACTS IN DISPUTE</u>

Plaintiffs' statement of undisputed material facts included multiple facts within each paragraph, requiring Defendants' consolidated responses below. To the extent that Defendants do not address certain facts in Plaintiffs' statement, Defendants disagree that any of those facts is

material to their own motion for summary judgment.

1. Undisputed but immaterial.

2. Undisputed as to all but the last two sentences. Disputed but immaterial that Flock "initially denied" anything; the context of the initial testimony was in regards to what customers can see and do, not what Flock collects. *See* Pls.' Ex. 2 [Lukens Dep.] at 64:21–65:5. NPD cannot query for a person or for features or characteristics of a person. *Id.* at 152:7–153:7. NPD does not have, nor is there evidence that it will enable, video access on its LPR cameras. *Id.* at 55:18–56:4.

3. Undisputed but immaterial because NPD has not purchased Convoy Analysis or Real-Time Routing and has no plans to purchase either feature.[2] Defs.' Ex. 1 [Thomas Dec.] ¶ 9. While a Flock witness did say, in the abstract, that officers are theoretically capable of conducting this manual analysis, Plaintiffs offer no evidence that any NPD officer has tried to "manually analyz[e] Flock data" to recreate either feature, or that any officer knows how to do so.

4. Undisputed that Flock allows customers to share data. Pursuant to Virginia's LPR Law, NPD does not share data with federal agencies or outside the Commonwealth of Virginia. Defs.' Ex. 17 [LPR Law] at pp. 2–3, § 2.2-5517(F); Defs.' Ex. 18 [General Order] at p. 8 § VI. NPD's data is never and has never been shared with Flock's private customers. Pls.' Ex. 10 [Josh Thomas Dep.] at 116:2–117:4.

5. Undisputed but immaterial.[3]

---

[2] Plaintiffs also describe the technologies incorrectly. [redacted] Pls.' Ex. 2 [Lukens Dep.] at 80:13–21. [redacted] *Id.* at 91:4–92:7, 94:16–95:4, 97:3–14. [redacted]

[3] Defendants object to the Trademark Application because the website contains 72 links and Plaintiffs do not specify on which advertisements they rely. *See Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017).

6. Undisputed but incomplete. NPD also selected Flock for its ability to help locate missing people. Defs.' Ex. 1 [Thomas Decl.] ¶ 5; Defs.' Ex. 28 [Sole Source Request].

7. Undisputed.

8. Undisputed as to the first two and final two sentences. Disputed but immaterial as to the third sentence. The cited deposition passage discusses options to lower costs, but says nothing about funding constraints. Pls.' Ex. 7 [Capt. Thomas Dep.] at 87:11–88:12.

9. Undisputed as to all but the final sentence, which is disputed but immaterial. Defendants' motion for summary judgment publicly filed maps depicting the location of NPD's Flock cameras. *E.g.*, Defs.' Ex. 9 [Estevez Report] App'x C, Ex. 1. Whether the public has access to the locations of LPR cameras does not bear on whether they violate the Fourth Amendment.

10. Undisputed but immaterial because unsuccessful requests that NPD purchase additional cameras are not material to the Fourth Amendment questions in this case. In any event, NPD has no plans to purchase additional Flock cameras. Defs.' Ex. 1 [Capt. Thomas Dec.] ¶ 8. Contrary to Plaintiffs' representations, this fact indicates that several stakeholders consider NPD's Flock cameras, which are placed at 75 locations, to have substantial gaps in coverage. *See* Defs.' Ex. 9 [Estevez Report] ¶ 21. That is true. *See id.* ¶ 26.

11. Undisputed but incomplete. Virginia's LPR Law and NPD's General Order now prohibit NPD from sharing data outside of Virginia or with federal agencies. *See* Defs.' Ex. 17 [LPR Law] at pp. 2–3, § 2.2-5517(F); Defs.' Ex. 18 [General Order] at p. 8 § VI.

12. Undisputed as to the first four sentences, disputed but immaterial as to the rest. The cited testimony states that the cameras are in "roughly" the same location because both are situated at crime hot spots, not due to any effort to use video cameras to "complement" Flock cameras. Pls.' Ex. 7 [Capt. Thomas Dep.] at 304:6–305:14.

13. Undisputed that Chief Talbot made the comments attributed to him, but incomplete and misleading as to the implied conclusions. Many trips, including many trips taken by Plaintiffs, do not result in even a single Flock photograph. For example, Mr. Schmidt testified [redacted]. Defs.' Ex. 14 [Schmidt Dep.] at 36:10–46:5, 118:3–15, 170:19–173:21, 184:14–186:21. Ms. Arrington testified that [redacted]. Defs.' Ex. 15 [Arrington Dep.] at 35:11–37:15; Defs.' Ex. 9 [Estevez Report] ¶ 36. Chief Talbot's comments are immaterial because even if every route driven in Norfolk resulted in at least one Flock photograph, the cameras would not reveal the whole of one's movements or any private information. Chief Talbot further testified that it would not be possible to create a traceable path of a car moving through the City because Flock cameras gather no data for movement outside of the camera range. Pls.' Ex. 23 [Talbot Dep.] at 147:12–148:5, 151:22–152:12, 152:22–153:8.

14. Undisputed that Plaintiffs' expert did these calculations, but immaterial for three reasons. ***First***, Plaintiffs' expert is not asserting that NPD can use Flock camera data to track the whole of Plaintiffs (or anyone's) movements, where they start or end their trip, patterns of driving, or to deduce or infer private facts about Plaintiffs (or anyone). Defs.' Ex. 19 [Higdon-Topaz Dep.] at 9:18–12:21, 117:8–12, 124:15–20, 126:6–20, 237:6–244:21. ***Second***, his analysis is based on 15,000 "simulated routes" he generated with the aid of a computer model, not routes actually traveled by either Plaintiff. *Id.* at 135:1–136:10, 142:10–14. The analysis referenced here relies on none of the Flock data produced in this case. *Id.* at 104:15–105:13. ***Third***, "reconstructible" means only that when a vehicle following one of the synthetic routes passes two Flock cameras, the portion of the trip that took place between those two cameras can be predicted by navigation

software. *Id.* at 128:3–20. His reconstructibility analysis thus simply shows that it is possible to use a software like Google Maps to determine a potential route between the location of two Flock camera photographs. *Id.* ***Fourth***, even taking his calculations at face value, nearly half of simulated routes cannot be reconstructed. *Id.* at 204:16–205:3, 173:22–174:4. He further admitted that nearly 60% of all routes could not be reconstructed even one quarter of the way and more than 70% of simulated routes could not be reconstructed half of the way. *Id.* at 214:19–217:19. Disputed that Flock cameras "often" capture cars from the front; the cited testimony notes only that this "sometimes" occurs. Pls.' Ex. 2 [Lukens Dep.] at 123:4–11.

15. Undisputed that Plaintiffs' expert used "assumptions and inferences" and Plaintiffs therefore offer no evidence that anyone can use NPD's Flock camera data to "reconstruct[]" Plaintiffs movements or deduce any private facts regarding their lives. Undisputed that Flock data provides locations and timestamps associated with photographs. The third sentence is disputed as unsupported because the evidence does not support that an officer can accurately infer likely routes from time and location information. In the cited evidence, Dr. Wheeler, another Plaintiffs' expert, attempted to make such inferences, Pls.' Ex. 25 [Wheeler Report] at 15–19, but admitted that these inferences could be incorrect, Defs.' Ex. 13 [Wheeler Dep.] at 147:16–148:6. He testified that he could not discern what the driver did in between Flock cameras when more than 30 minutes elapsed between photographs—[redacted]. *Id.* at 195:12–203:8; *see* Defs.' Ex. 9 [Estevez Report] ¶¶ 43–46 & App'x C, Exs. 8a–8d. Plaintiffs' Exhibit 2 is a Flock witness hypothesizing about what police might be able to do, not evidence of what NPD officers actually do. Regardless, the ability to infer portions of routes between two locations on public streets does not reveal private information from the whole of one's movements. Undisputed that Flock has a feature called Vehicle Journey Map. Disputed as unsupported by the

evidence that where vehicles are not captured is "equally telling." Dr. Wheeler could not identify where the trip discussed in the cited evidence began or ended. [redacted] Defs.' Ex. 13 [Wheeler Dep.] at 232:4–233:16. Dr. Higdon-Topaz's "slack time analysis" in Exhibit 24 could be used only to narrow an individual's travel "down to a feasible region." Defs.' Ex. 19 [Higdon-Topaz Dep.] at 249:17–22, *see also id.* at 251:17–22. Regardless, Flock cameras do not show points of origin, destinations, or other private information. Disputed as unsupported by the evidence that police can "use other information to infer where a person went during gaps." Dr. Wheeler was not able to show this. Defs.' Ex. 13 [Wheeler Dep.] at 216:1–220:1. Moreover, he could determine only that individuals were "not driving" during such gaps. *Id.* at 197:17–198:11, 201:6–17, 202:17–203:8. Disputed but immaterial that Plaintiffs' expert alleges that he can infer how far a person could have traveled without being captured by a Flock camera. Exhibit 24 provides a single example of Dr. Higdon-Topaz's "slack time analysis," which attempts to calculate the range of locations an individual could visit between Flock camera captures. An undefined area in which an individual may have traveled or stopped between Flock camera captures does not shed light on any individual locations visited, much less the whole of their movements. Defs.' Ex. 19 [Higdon-Topaz Dep.] at 251:17–252:10.

16. Undisputed but immaterial as to the first five sentences. Whether a tool used by police provides a "clue" that someone might be in a "certain part of the city" is immaterial to the relevant Fourth Amendment standard. Disputed as unsupported by any evidence and immaterial as to Plaintiffs' claim in the final sentence that an NPD officer testified that he "reconstructed a suspect's route." The cited testimony discusses falsifying a suspect's described route by confronting him with a lack of Flock images from cameras along that route, not inferences of the

privacies of life based on the whole of his movements.

17. Disputed but immaterial. Plaintiffs' figure is based on an incorrect assumption that all vehicles whose drivers "are suspected of any wrongdoing" have been added to a hotlist.[4] That is incorrect, as is the 2% figure they offer. Defs.' Ex. 29 [Capt. Thomas Supp. Decl.] ¶¶ 9–10. Plaintiffs also mischaracterize Chief Talbot's testimony; the quoted passage is discussing Real Time Crime Centers generally, not NPD's specifically. *See* Pls.' Ex. 23 [Talbot Dep.] at 103:7–104:17. To the extent he discussed NPD's Real Time Crime Center, he did so as a cost-benefit analysis. *Id.* at 108:4–19, 110:12–115:20.

18. Undisputed.

19. Undisputed but incomplete. The General Order contains several provisions that regulate LPRs beyond what the LPR Law requires, like requiring supervisory approval to create a hotlist alert, Defs.' Ex. 18 [General Order] at p. 4 § III(E)(2), and requiring that cameras be placed to only capture vehicles "exposed to public view," *id.* at p. 3 § III(B).

20. Undisputed as to the first, fourth, and fifth sentences. Disputed as unsupported by any evidence and immaterial as to the second and third sentences. NPD's General Order forbids improperly retaining data for more than 21 days. *Id*. at p. 6, § IV.B (providing that NPD personnel may not "download system data unless such data is related to at least one of the [Flock System's permitted uses]").[5] Defendants are aware of no evidence that NPD officers have ever improperly downloaded Flock data, nor have Plaintiffs offered any.

---

[4] Plaintiffs do not explain their math, but dividing "Hotlist Hits in the Last 30 Days" by "Vehicles Detected in the Last 30 Days" on the linked website is approximately 2%.

[5] The General Order further provides that if system data is "part of an ongoing investigation, prosecution or civil action, such data will be retained by [NPD] until . . . the investigation concludes without any criminal charges, or the final disposition of any criminal or civil matter related to the data." *Id.* at p. 7, § IV.D.3. Retaining evidence on which police have relied to investigate a crime is an essential protection for criminal defendants.

21. Undisputed as to the first two sentences. Disputed as unsupported by any evidence and immaterial as to the third sentence. The General Order sets out the criteria that must be met for an officer to query a license plate. *Id.* at p. 3, § III.A. Plaintiffs do not explain how the level of detail in the General Order could possibly violate the Fourth Amendment. The fourth, fifth, and sixth sentences are undisputed but immaterial. The fact that two NPD officers had different views about applying a policy to hypothetical situations is irrelevant to the Fourth Amendment inquiry.

22. Undisputed.

23. Undisputed but immaterial.

24. Undisputed but immaterial. Audits are not relevant to Plaintiffs' claims that NPD has violated their Fourth Amendment rights. Additionally, audits were not required under Virginia law or NPD policy until July 1, 2025. *See* Defs.' Ex. 16 [Special Order]. An officer's query for "protestor identification" sought to identify a vehicle connected to an individual suspected of committing an assault at a protest. Defs.' Ex. 29 [Capt. Thomas Supp. Decl.] ¶¶ 6–7.

25. The second sentence is disputed but immaterial. The officer would have been disciplined, but retired beforehand. Pls.' Ex. 4 [Vernon Dep.] at 128:12–21; Pls.' Ex. 23 [Talbot Dep.] at 224:16–225:12. The first, third, and fourth sentences are undisputed but immaterial. Disagreement of officials has nothing to do with this Fourth Amendment claim.

26. Undisputed as to the first three and final sentences. Disputed as unsupported by the evidence as to the fourth and fifth sentences. [redacted] Defs.' Ex. 14 [Schmidt Dep.] at 116:6–117:16. As to the fifth sentence, [redacted]. *Id.* at 36:10–37:8, 118:3–15. [redacted].

*See id.* at 170:19–173:21, 184:14–186:21. It is therefore not true that Mr. Schmidt would need to change "virtually every trip" to avoid Flock cameras.

27. Disputed but immaterial. Based on Plaintiffs' calculations, Mr. Schmidt was photographed an average of 3.5 times per day by an NPD-operated camera, and 3.9 times by all cameras to which NPD has access, during an average 21-day retention period. These figures differ from Defendants' calculations. *See* Defs.' Ex. 9 [Estevez Report] App'x C, tabl. 4. Plaintiffs' calculations are inflated because they do not exclude duplicative photographs—i.e., photographs taken by the same camera mere seconds apart—which do not provide additional information regarding Plaintiffs' movements. *See id.* ¶ 17; Defs.' Ex. 13 [Wheeler Dep.] at 119:2–121:8. The difference is immaterial because this data cannot be used to reconstruct Mr. Schmidt's movements or infer private facts. Disputed as unsupported by any evidence that 526 photographs across all Hampton Roads cameras over a four-and-a-half month period equates to 82 records per day. Disputed as unsupported by the evidence as to footnote 5. It is undisputed that Vehicle Fingerprint can log specific aspects of a vehicle for filtered queries, but Plaintiffs have not offered any evidence of their vehicles appearing with only Vehicle Fingerprint information but no license plate despite access to data from every Flock photograph taken in Norfolk over a multi-month period.

28. Undisputed as to the first five and final sentences. The sixth sentence is disputed as unsupported by the evidence; [redacted].

29. Disputed but immaterial. Plaintiffs' calculations suggest that Ms. Arrington was photographed an average of 2.3 times per day by an NPD-operated camera, and 6.3 times per day by all cameras whose data is available to NPD, during an average 21-day time period. These figures differ from Defendants'; calculations, *see* Defs.' Ex. 9 [Estevez Report] App'x C, tabl. 4,

and do not exclude duplicative captures, which Plaintiffs' expert agreed do not provide additional information regarding Plaintiffs' movements, *see id.* ¶ 17, Defs.' Ex. 13 [Wheeler Dep.] at 119:2–121:8. The difference is immaterial because Plaintiffs could not use any of this data to reconstruct Ms. Arrington's movements or infer private facts.

## ARGUMENT

Plaintiffs agree that the Supreme Court has "recognized a reasonable expectation of privacy in the whole of one's movements," Mot. at 20, but Plaintiffs do not cite any evidence that NPD's cameras track the whole of their movements, or anywhere near that standard. Accordingly, Plaintiffs' claims fail for the same reasons why federal courts have uniformly concluded that the use of LPRs is not a search. Plaintiffs cannot distinguish those cases or show why they are wrong.[6]

### I. THE LEGAL STANDARD IS WHETHER NPD CAN USE FLOCK DATA TO TRACK THE WHOLE OF PLAINTIFFS' MOVEMENTS TO LEARN INTIMATE INFORMATION ABOUT THEM

In general, there is no reasonable expectation of privacy in public activity. "What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351 (1967). For example, "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *Knotts*, 460 U.S. at 281. Thus, in *United States v. Knotts*, the Supreme Court held that installing a "beeper" device in a drum destined for a car to "monitor[] the progress of a car" was not a search even when that beeper device intermittently transmitted information about the car's route over the course of many miles. *Id.* at 277. The Court explained that a person who "travel[s] over the public streets" "voluntarily convey[s]" "that he was travelling over particular roads in a particular direction," and even "whatever stops he made" and "his final destination," to

[6] For the reasons set forth in Defendants' motion for summary judgment, Plaintiffs also lack Article III standing. *See* Defs.' Mot. at 14–17. Defendants do not repeat those arguments here.

"anyone who wanted to look." *Id*. at 281–82.

Similarly, "[p]eople understand that they may be filmed by security cameras on city streets, or a police officer could stake out their house and tail them for a time." *Beautiful Struggle*, 2 F.4th at 345. Thus, the Fourth Circuit has held that law enforcement agents were free "to use" a motion-activated camera for "video surveillance" that would "capture what any passerby would have been able to observe." *United States v. Vankesteren*, 553 F.3d 286, 291 (4th Cir. 2009).

In recognizing that "individuals have a reasonable expectation of privacy in the *whole* of their physical movements," *Carpenter*, 585 U.S. at 310 (emphasis added), the Supreme Court was careful not to disturb the general principle that it is unreasonable to expect public activities will remain private. *Carpenter* was a "narrow" decision that did not "call into question conventional surveillance techniques and tools, such as security cameras." *Id.* at 316. The Supreme Court distinguished tools that provide information about "a person's movement at a particular time" from technology that creates "a detailed chronicle of a person's physical presence compiled every day, every moment, over several years." *Id.* at 315.

The Supreme Court in *Carpenter* followed concurring opinions in *United States v. Jones*, 565 U.S. 400 (2012), that recognized that government tracking of *everything* that a person does in public can reveal their private, intimate information. As Justice Sotomayor opined in *Jones*, "GPS monitoring generates a precise, comprehensive record of a person's public movements *that reflects a wealth of detail* about her familial, political, professional, religious, and sexual associations." *Id.* at 415 (Sotomayor, J., concurring) (emphasis added).

In *Carpenter*, citing this concurrence, the Supreme Court held that CSLI was similar to extended GPS monitoring: "Mapping a cell phone's location over the course of 127 days provides an all-encompassing record of the holder's whereabouts. As with GPS information, the time-

stamped data *provides an intimate window into a person's life*, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'" 585 U.S. at 311 (emphasis added) (quoting *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring)). In fact, the Supreme Court determined that "historical cell-site records present even greater privacy concerns than the GPS monitoring of a vehicle" because a "cell phone—almost a feature of human anatomy—tracks nearly exactly the movements of its owner" and "follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales." *Id.* Thus, using CSLI gave the government the same information "as if it had attached an ankle monitor to the phone's user." *Id.* at 312.

In *Beautiful Struggle*, the Fourth Circuit applied *Carpenter* to Baltimore's aerial surveillance ("AIR") program. The Fourth Circuit held that the program violated a reasonable expectation of privacy because it, too, was "like 'attach[ing] an ankle monitor' to every person in the city." 2 F.4th at 341 (quoting *Carpenter*, 585 U.S. 296 at 312). The Court noted that "like the CSLI in *Carpenter* and GPS-data in *Jones*," Baltimore's program "tracks every movement of every person outside in Baltimore" and generates "a detailed, encyclopedic, record of where everyone came and went within the city during daylight hours over the prior month-and-a-half." *Id.* The Fourth Circuit determined that this tracking was "enough to yield a wealth of detail, *greater than the sum of the individual trips*," and "enables deductions" that "reveal[] *more about a person than does any individual trip* viewed in isolation" that "go to the privacies of life." *Id.* (emphasis added). The Fourth Circuit explained that logic by quoting the D.C. Circuit decision that was affirmed in *Jones*: "A person who knows all of another's travels can deduce whether he is a weekly church goer, a heavy drinker, a regular at the gym, an unfaithful husband, an outpatient receiving medical treatment, an associate of particular individuals or political groups—*and not just one such*

*fact about a person, but all such facts*." *Id.* at 342 n.8 (emphasis added) (quoting *United States v. Maynard*, 615 F.3d 544, 562–63 (D.C. Cir. 2010)).

It was "because the AIR program opens 'an intimate window' into a person's associations and activities" that the program "violate[d] the reasonable expectation of privacy individuals have in the whole of their movements." *Id.* at 342. Thus, even if *Carpenter* does not require tracking "the literal 'whole' of someone's movements," Mot. at 18, Plaintiffs must prove that NPD's Flock cameras "provide[] an all-encompassing," *Carpenter*, 585 U.S. at 311, and "encyclopedic" record of their movements that "reveal intimate details" about them, *Beautiful Struggle*, 2 F.4th at 341.

## II. PLAINTIFFS CANNOT MEET THAT LEGAL STANDARD

After months of discovery, Plaintiffs have not offered a shred of evidence that NPD's Flock cameras track the whole of their movements revealing private information. Nor could they. The undisputed factual record shows the opposite: NPD's Flock cameras ***do not*** enable NPD to track the whole of Plaintiffs' movements. The Flock cameras do not come close. In their motion, Plaintiffs *assert* that the NPD's Flock cameras provide "an intimate window into activities and associations," Mot. at 16, but they have no evidence that is true—because it is not.

### A. Plaintiffs Have No Evidence That NPD's Flock Cameras Track the Whole of Their Movements or Reveal Private Information About Them

Plaintiffs' motion does not include even one example of how NPD could use Flock data to identify any specific destination that Plaintiffs visited. Plaintiffs do not identify one private fact about themselves that NPD could use the Flock data to uncover. Contrary to their Complaint's allegations, Compl. ¶¶ 25–26, Plaintiffs do not argue that NPD could use Flock data to learn where Plaintiffs work, where they pray, or what their political associations are. Plaintiffs do not even argue that NPD could use the Flock cameras to figure out their favorite ice cream shop, pizzeria, or other retailer. Indeed, Ms. Arrington acknowledged at her deposition that she was not sure

whether Flock LPRs "create a running record of the whole of [her] movements throughout Norfolk." Defs.' Ex. 15 [Arrington Dep.] at 53:17–54:1.

The undisputed facts establish that Flock cameras are nothing close to an "ankle monitor" that "tracks nearly exactly the movements of its owner." *Carpenter*, 585 U.S. at 311–12. The Flock cameras do not collect *any* information about where anyone is outside of a car and do not follow individuals beyond public roadways "into private residences, doctor's offices, political headquarters, and other potentially revealing locales." *Id.* at 311. Plaintiffs repeatedly assert that there are 176 cameras in the City, but courts have rejected Fourth Amendment claims in jurisdictions with more cameras than Norfolk. *See, e.g.*, *United States v. Sturdivant*, 2025 WL 1633754, at *2–3 (N.D. Ohio June 9, 2025) ("1,636 Flock cameras across Cuyahoga County, 667 of which are associated with law enforcement agencies," and 1,119 other LPR cameras in metropolitan area); *Jackson*, 2025 WL 1530574, at *3 (190 Flock cameras in Wichita, Kansas); *Scholl v. Ill. State Police*, 776 F. Supp. 3d 701, 707 (N.D. Ill. 2025) (344 cameras in Cook County, Illinois).

More importantly, Plaintiffs do not mention that the vast majority of NPD's 176 cameras are placed at the same intersections to cover traffic moving in different directions. Accordingly, NPD's Flock cameras are located at only 75 discrete locations in Norfolk. Defs.' Ex. 9 [Estevez Report] ¶ 21. Plaintiffs present no evidence suggesting that LPR cameras at 75 locations in Norfolk provide anywhere close to the level of detail about the whole of an individual's movements that law enforcement can obtain from a GPS tracker or cell site data or aerial surveillance. NPD's cameras cover just 0.1138% of roadway and only 0.0069% of square mileage in Norfolk. *See id.* ¶ 26 & nn.26–27; ECF 113 [Defs.' Mot.] at 9 & n.3. That is light years away from CSLI and Baltimore's AIR program, which effectively covered an entire city. *See Beautiful*

*Struggle*, 2 F.4th at 334 (drones surveilled "90% of the city").

Sparse coverage makes for sporadic photographs. Defendants' expert found that NPD's cameras in Norfolk photographed Mr. Schmidt's vehicle an average of only about three times per day, and Ms. Arrington's vehicle an average of about two times per day. Defs.' Ex. 9 [Estevez Report] ¶¶ 35–36. Unlike Defendants, who provided the Court with expert analysis of the Flock data in this case, Plaintiffs relied entirely on a declaration from a paralegal counting the number of rows in the spreadsheets. These numbers improperly include duplicate photographs of the same vehicle taken by the same camera within a few seconds—for example when a car is photographed multiple times while stopped at a traffic light.

But Plaintiffs' inflated method does not change the bottom line: NPD's Flock cameras photographed Mr. Schmidt's vehicle about three times per day (Pls.' SUF ¶ 27) and Ms. Arrington's vehicle about twice a day *(id.* ¶ 29)—far fewer than the 100-plus daily data points from CSLI at issue in *Carpenter*. 585 U.S. at 311. This is not "a detailed, encyclopedic, record of where everyone came and went within the city." *Beautiful Struggle*, 2 F.4th at 341. Indeed, courts have held that using LPRs is not a search where individuals' vehicles were photographed at rates virtually *identical* to those that Plaintiffs have calculated in this case. *Compare* Pls.' SUF ¶ 27 (74 NPD Flock images per 21 days), *and id.* ¶ 27 (50 NPD Flock images per 21 days), *with United States v. Slaybaugh*, 2025 WL 2123781, at *2 (M.D. Ala. July 29, 2025) ("[U]se of seventy-two images of Slaybaugh's truck . . . over a three-week period does not implicate a reasonable expectation of privacy in 'the whole of [Slaybaugh's] physical movements.'" (citation modified)).[7]

[7] Even NPD's cameras *in the wider Hampton Roads area* only photograph Ms. Arrington's vehicle about 6 times per day, not 100 times per day as in *Carpenter* or even "once per hour, 24 hours a day, every day of the year" like the GPS device required for boats in *Mexican Gulf Fishing Co. v. United States Dep't of Com.*, 60 F.4th 956, 962 (5th Cir. 2023).

Plaintiffs themselves could not use the Flock data to determine their movements. After reviewing several days of Flock data on her vehicle, Ms. Arrington could not identify a single location she visited on those days. Defs.' Ex. 15 [Arrington Dep.] at 135:8–136:14, 145:4–16, 148:9–149:10. After reviewing a week's worth of data on his vehicle, Mr. Schmidt could identify only one location that he had visited that week. Defs.' Ex. 14 [Schmidt Dep.] at 233:6–240:7.

Plaintiffs quote *Beautiful Struggle* to make blanket assertions about what NPD can learn from Flock data, but they have no evidence to support these assertions. Plaintiffs *argue* that "[e]ven 'just a few random points of an individual's movements' can be incredibly revealing.'" Mot. at 27 (quoting *Beautiful Struggle*, 2 F.4th at 343). But Plaintiffs do not identify anything private that a few random photographs from the Flock System could reveal to NPD. Plaintiffs *claim* that NPD can use Flock data to "reconstruct or infer [their] routes and 'reveal intimate details through habits and patterns.'" Mot. at 24 (quoting *Beautiful Struggle*, 2 F.4th at 341). But Plaintiffs do not actually identify any particular habit or pattern that is visible in Flock data, let alone what intimate details such a pattern would reveal. Plaintiffs *say* that Flock cameras "reveal[] more about a person than does any individual trip viewed in isolation." Mot. at 23 (quoting *Beautiful Struggle*, 2 F.4th at 342). But Plaintiffs do not identify any fact about them that Flock data could reveal other than their "movement at a particular time." *Carpenter*, 585 U.S. at 315.

Plaintiffs cannot support these blanket assertions because, unlike the AIR data in *Beautiful Struggle*, NPD's Flock cameras do not enable NPD to "track a person's movements from a crime scene to, eventually, a residential location where the person remains." 2 F.4th at 343. Plaintiffs have no evidence that NPD can use Flock cameras to determine where they began or ended any trip, which Plaintiffs and their experts conceded Flock data cannot do. Defs.' Ex. 14 [Schmidt Dep.] at 96:10–12, 209:12–18; Defs.' Ex. 19 [Higdon-Topaz Dep.] at 116:9–117:12; Defs.' Ex. 13

[Wheeler Dep.] at 217:18–218:3. Thus, it is demonstrably false that Norfolk is "accomplishing from the ground what Baltimore did from the air." *Contra* Mot. at 22.

Plaintiffs assert that "when people leave their cars, someone examining the Flock data can map out—at least roughly—where the person could have gone." Mot. at 27. But they do not explain what "roughly" means, nor do they show that Flock data is anywhere close to as precise as GPS or cell site data. The Supreme Court's opinion in *Jones* states that the GPS device "established the vehicle's location within 50 to 100 feet," 565 U.S. at 403, not merely "in a 'neighborhood'" as Plaintiffs contend. *Contra* Mot. at 28.[8] In *Carpenter*, the Supreme Court emphasized that "wireless carriers already have the capability to pinpoint a phone's location within 50 meters." 585 U.S. at 313. In *Beautiful Struggle*, the Fourth Circuit described the AIR program as "surpassing the precision even of GPS data and CSLI." 2 F.4th at 343. But Plaintiffs did not calculate "the average square mileage of the area that the Flock cameras can be used to narrow down where somebody" might have been. Defs.' Ex. 19 [Higdon-Topaz Dep.] at 251:17–22. That is problematic because, even assuming a vehicle may have stopped near a Flock camera, there are often many establishments in the immediate vicinity. *E.g.*, Defs.' Ex. 9 [Estevez Report] ¶ 58.

Faced with this dearth of evidence, Plaintiffs quote Chief Talbot's statement that "[i]t would be difficult to drive anywhere of any distance without running into a camera." Mot. at 22. But Plaintiffs ignore the data, which cannot be disputed. The data show that Plaintiffs routinely drive in and around Norfolk without being photographed by a single Flock camera. [redacted]

[8] *See* Joint App'x, *United States v. Jones*, No. 10-1259, 2011 WL 7113271, at *80 (U.S. Aug. 11, 2011) (Q. Was this piece of equipment perfectly accurate? That is, can you it tell you exactly where you are? A. Yes, it could. Minus fifty to a hundred feet.").

[redacted] Defs.' Ex. 14 [Schmidt Dep.] at 36:10–46:5, 118:3–15. [redacted] *See id.* at 170:19–173:21, 184:14–186:21. [redacted] Defs.' Ex. 15 [Arrington Dep.] at 35:11–37:15. [redacted] Defs.' Ex. 9 [Estevez Report] ¶ 36.

Regardless, even if a Flock camera did photograph a car at some point on a journey through Norfolk, Plaintiffs' experts did not offer the opinion that simply passing one Flock camera enables any tracking. Defs.' Ex. 19 [Higdon-Topaz Dep.] at 173:22–174:4. As Chief Talbot explained at his deposition, NPD is still "not able to see anything other than which Flock cameras picked up your registration plate" at a particular location on a public road. Pls.' Ex. 23 [Talbot Dep.] at 147:12–148:5. Unlike aerial surveillance in *Beautiful Struggle*, "[w]hat [the driver] did between Flock cameras would not be apparent to [NPD]." *Id.*

**B. Plaintiffs' Experts Do Not Support Their Position**

Plaintiffs' experts have not provided opinions that address the *Carpenter* standard. Both experts testified that they had not been able to reach any opinion as to whether Flock data would permit NPD to determine either of Plaintiffs' associates or their "familial, political, professional, religious, and sexual associations," *Carpenter*, 585 U.S. at 311 (citation modified). Defs.' Ex. 13 [Wheeler Dep.] at 142:21–143:21; Defs.' Ex. 19 [Higdon-Topaz Dep.] at 9:18–11:19. Neither of Plaintiffs' experts opines that NPD can use Flock data to track the whole of Plaintiffs' movements. Defs.' Ex. 19 [Higdon-Topaz Dep.] at 9:18–11:1; Defs.' Ex. 13 [Wheeler Dep.] at 145:19–146:7.

Instead, Plaintiffs rely on the report of Dr. Chad Higdon-Topaz to support a very different assertion that NPD's Flock cameras "capture the vast majority of individual routes and enable reconstruction of large portions of most routes." Mot. at 22. But Dr. Higdon-Topaz's analysis does not help Plaintiffs for several reasons.

*First,* as an initial matter, Dr. Higdon-Topaz's report is irrelevant because he did not do any analysis whatsoever of routes that Plaintiffs' vehicles—or anyone's vehicles—actually took in Norfolk. *See* Defs.' Ex. 19 [Higdon-Topaz Dep.] at 104:21–105:2, 135:1–22. Dr. Higdon-Topaz admittedly made no attempt to opine on where Plaintiffs went in the real world. *See id.* at 10:16–11:19, 139:13–19. Instead, Dr. Higdon-Topaz created a "simulated" set of routes that he hypothesized drivers in Norfolk could take. *Id.* at 135:4–136:10, 142:10–14. This reliance on a simulated route experiment shows that Plaintiffs are wrong about what Flock data enable NPD to do. Dr. Higdon-Topaz's first step was to "construct a realistic model of how people travel by car" in Norfolk. Pls.' Ex. 24 [Higdon-Topaz Report] at 14. If Flock camera data were capable of tracking how people travel by car in Norfolk, then Dr. Higdon-Topaz would have used Flock data to build his model. But he didn't:

> Q: You have not presented any opinion in your reports in this case that Flock camera data can be used to construct a realistic model of how people travel by car within Norfolk, right?
>
> A: That's correct. I can't rule out that one could do it, but that was not the subject of my report.

Defs.' Ex. 19 [Higdon-Topaz Dep.] at 139:13–19. This testimony is Plaintiffs' failure of proof in a nutshell.

*Second,* Dr. Higdon-Topaz's hypothetical analysis disproves Plaintiffs' position because it shows that NPD's Flock cameras *cannot* track the whole of any vehicle's movements. Dr. Higdon-Topaz found that NPD would not be able to use Flock cameras to "track" or "reconstruct" *nearly half* of his "simulated routes" at all. *Id.* at 204:16–205:3, 173:22–174:4. He further admitted that almost 60% of simulated routes could not be reconstructed even one quarter of the way and more than 70% of simulated routes could not be reconstructed half of the way. *Id.* at 214:19–217:19. Put simply, Dr. Higdon-Topaz could only reconstruct limited segments of a limited number of

hypothetical routes. That is hardly "'attach[ing] an ankle monitor' to every person in the city." *Beautiful Struggle*, 2 F.4th at 341 (quoting *Carpenter*, 585 U.S. at 312).

*Third*, while Dr. Higdon-Topaz's "reconstruction" analysis only measures the most direct route between two cameras under ideal conditions, Plaintiffs concede that there are "gaps between captures where it appears someone stopped or did not take a direct route." Mot. at 10. Plaintiffs do not assert that NPD could use Flock data to determine that they went to any particular place, and Dr. Higdon-Topaz is "not offering an opinion that Flock data can be used to reconstruct exactly where a person goes" during those gaps. Defs.' Ex. 19 [Higdon-Topaz Dep.] at 249:18–22.

*Fourth,* Dr. Higdon-Topaz's analysis does not show that Flock data reveals any private information. Citing Dr. Higdon-Topaz, Plaintiffs argue that Flock data "provide[s] 'variable location points from which movements can be reconstructed'" because "[m]ost drivers choose time-minimizing routes." Mot. at 27 (quoting *Beautiful Struggle*, 2 F.4th at 343). But Dr. Higdon-Topaz has not tried to reconstruct the actual route that Plaintiffs or anyone else took. Defs.' Ex. 19 [Higdon-Topaz Dep.] at 175:16–176:1. By "reconstructing" a route, Dr. Higdon-Topaz simply means that navigation software like Google Maps can find the fastest route between two Flock cameras under ideal conditions. *Id.* at 128:15–20, 161:20–162:2. That is not private information about anyone. *See Knotts*, 460 U.S. at 281–82 (an "automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another"); *cf. Scholl*, 776 F. Supp. 3d at 720 ("Knowing what portions of an expressway someone passes tells the government far less about the privacies of life, than data that tracks nearly exactly the movements of [a cell phone's] owner[.]" (citation modified)).

Plaintiffs are wrong that "inferring a driver's route between captures is no more speculative than inferring when 'the lady of the house takes her daily sauna and bath' from thermal readings."

Mot. at 28 (quoting *Kyllo v. United States*, 533 U.S. 27, 38 (2001)). [redacted], Defs.' Ex. 14 [Schmidt Dep.] at 174:17–176:8; Defs.' Ex. 15 [Arrington Dep.] at 22:12–23:6, which is why Dr. Higdon-Topaz testified that predicting the route a vehicle actually took between Flock cameras would be "speculation," Defs.' Ex. 19 [Higdon-Topaz Dep.] at 165:22–168:10, 189:8–14. More importantly, the theoretically fastest route between two points on public streets is qualitatively different from what goes on inside the home, where "all details are intimate details, because the entire area is held safe from prying government eyes." *Kyllo*, 533 U.S. at 37.

*Finally*, Plaintiffs have no evidence to support their assertion that "police can use other information to infer where a person went during the gaps." Mot. at 10. Plaintiffs cite in passing their other expert, Dr. Andrew Wheeler. But Dr. Wheeler could not show how such information would enable him to draw inferences about Plaintiffs' movements from the Flock data. Defs.' Ex. 13 [Wheeler Dep.] at 216:1–220:1. Even after Plaintiffs' counsel provided him with a cheat sheet of places that Plaintiffs supposedly frequent, *see id.* at 130:14–131:5, 133:3–17, 254:20–255:5, Dr. Wheeler was willing to offer an opinion that Plaintiffs visited only one place: [redacted]. As to Ms. Arrington, the most detailed "inference" Dr. Wheeler could draw was that she lived in and visited areas of an undefined size, only one of them in Norfolk. *Id.* at 176:8–177:11, 197:17–198:11, 201:6–17, 202:17–203:8.[9] Dr. Wheeler did not use Flock data to infer any visit to any other location that Plaintiffs disclosed in discovery or highlighted in their Complaint—not Mr. Schmidt's home, his daughters' school, his gun range, his church, [redacted], Ms. Arrington's home, her clients' medical

[9] Dr. Wheeler also testified that the information gleaned from LPRs often was already "available from other sources." Defs.' Ex. 13 [Wheeler Dep.] at 103:17–104:9.

appointments, [redacted]. *Id.* at 164:4–174:11, 202:5–203:8.

Plaintiffs' experts simply could not make good on the allegations contained in the Complaint that NPD's Flock cameras create a "record of the whole of [Plaintiffs'] movements," Compl. ¶ 74, because NPD's Flock cameras do not do that.

## III. PLAINTIFFS CANNOT DISTINGUISH NEARLY TWO DOZEN FEDERAL CASES THAT UNIFORMLY REJECT CLAIMS LIKE THEIRS

Every federal court that has considered the question has reached that same conclusion: using LPRs is not a search because LPRs do not track "the whole" of people's movements or reveal private information. *See* ECF 113 [Defs.' Mot.] at 21–23 (collecting cases). That consensus grows by the week. Just days after the parties filed their motions for summary judgment, yet another court rejected a civil claim that using LPRs is a search because the Plaintiff's allegations failed to establish that LPRs are "capable of "near perfect surveillance that could create an all-encompassing record of [the plaintiff's] whereabouts or provide an intimate window into her life." *Zambrano v. Sylvester*, 2025 WL 2682691, at *18 (S.D.N.Y. Sept. 19, 2025).

Plaintiffs devote just a single paragraph in their summary judgment brief to this uniform line of decisions. Mot. at 25. This drive-by treatment contains no sound basis for finding the other cases "distinguishable," *id.*, never mind why this Court should make new law.

Plaintiffs try to distinguish Judge Payne's decision in *United States v. Martin*, 753 F. Supp. 3d 454 (E.D. Va. 2024), by noting that *Martin* involved "a network of just 66 Flock cameras within Richmond, compared to 176 Flock cameras involved in this case." Mot. at 25. As discussed above, the number of cameras is misleading because Norfolk chose to cluster its Flock cameras at just 75 discrete locations in the City. Thus, it was logical at the motion to dismiss stage for this Court to express interest in "the Flock camera *distribution*" in Norfolk and Richmond. ECF 29 at

19 n.9 (emphasis added). While Plaintiffs ignore that question, Defendants have addressed it: NPD's LPRs cover just 0.1138% of the street mileage in Norfolk and 0.0069% of the area in the city limits, while at the time of the decision in *Martin*, Flock cameras covered just 0.06% of street mileage and less than 0.00413% of area in Richmond. Defs.' Ex. 9 [Estevez Report] ¶ 28.

More fundamentally, however, focusing solely on the number of LPR cameras detaches the inquiry from the reasonable expectation of privacy that is the touchstone of a Fourth Amendment search. Judge Payne and an ever-growing number of other federal judges have rejected the argument that using LPRs is a search because of "fundamental differences" between LPRs and other technologies that make LPRs unable to engage in "the pervasive and continuous gathering of information with which the Supreme Court was concerned in *Carpenter* and *Jones*." *Jackson*, 2025 WL 1530574, at *8.

Courts have noted that LPRs do not "'track' or 'monitor' the entirety of an individual's movements during a particular car trip, much less through the activities of their daily life." *Martin*, 753 F. Supp. at 472–73. Rather, LPRs "are strategically placed to capture images of *locations*, not *individuals*, that are known as historically high-traffic or high-crime areas." *Id.* at 473 (citation modified). LPRs thus only "provide a snapshot" of a car's "location at a discrete time while traveling in an automobile on a public road." *United States v. Toombs*, 671 F. Supp. 3d 1329, 1340–41 (N.D. Ala. 2023). Those facts have led courts to find LPRs to be "more akin to the beeper in *Knotts*, which amounted principally to the following of an automobile on public streets and highways," than to GPS or CSLI. *Id.* (citation modified); *accord Jackson*, 2025 WL 1530574, at *8; *United States v. Bowers*, 2021 WL 4775977, at *5 (W.D. Pa. Oct. 11, 2021).

Unlike *Carpenter*'s cell phones or *Beautiful Struggle*'s aerial surveillance, no LPR "follows" the driver "beyond public thoroughfares and into private residences, doctor's offices,

political headquarters, and other potentially revealing locales." *Carpenter*, 585 U.S. at 311 (citation modified). LPR data "is incomplete and does not track the totality of an individual's movements." *Jackson*, 2025 WL 1530574, at *8. Courts therefore conclude that LPR data is "less comprehensive" and "lacks the same 'deeply revealing nature' as the information recorded by the surveillance technologies discussed in *Carpenter*, *Jones*, and *Leaders of a Beautiful Struggle*." *Scholl*, 776 F. Supp. 3d at 720 (quoting *Carpenter*, 585 U.S. at 320).

It does not matter, as Plaintiffs suggest (*see* Mot. at 25), that most of these other cases involved arguments by criminal defendants who generally have less access to discovery than civil litigants do. For one thing, the federal courts in the criminal actions did have evidence of the LPRs' capabilities. More importantly, Plaintiffs' access to discovery cuts against them. Plaintiffs have had data regarding every photograph taken of their vehicles by a Flock camera that NPD can access in Hampton Roads for months. But Plaintiffs still lack evidence that LPRs can track the whole of anyone's physical movements and reveal intimate information about them. Plaintiffs have not discovered evidence of that fact because it is not true.[10]

## IV. <u>PLAINTIFFS' EFFORT TO CHANGE THE LEGAL STANDARD FAILS</u>

Lacking evidence that LPRs reveal the "whole of an individual's movements" as *Carpenter* requires, Plaintiffs try to dilute the legal standard based on incomplete and misleading quotations from the Fourth Circuit's decision in *Beautiful Struggle*. Plaintiffs' position is not and cannot be the law. Indeed, their position closely resembles an interpretation of the Fourth Amendment that Plaintiffs concede is "foreclosed" by Supreme Court precedent. Mot. at 29.

---

[10] If other litigants "framed their challenges around what the ALPRs cameras captured about *their own* vehicles," Mot. at 25, then that would hardly distinguish any of their cases from this one. Plaintiffs' experts did not analyze *any* Flock data about vehicles other than Plaintiffs' own vehicles. Nor could photos of others' vehicles provide a basis for relief here. A plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

*First*, Plaintiffs misstate the law in arguing that "surveillance need not capture the literal 'whole' of people's movements, just enough to enable deductions and insights." Mot. at 16. As *Beautiful Struggle* makes clear, not all data that enables police to make deductions or draw insights is a search. The Fourth Circuit repeatedly explained that the AIR program was a search not merely because it enabled deductions, but "because the AIR program enables police to deduce *from the whole of individuals' movements*," 2 F.4th at 333 (emphasis added); *see also id.* at 344 ("these abilities enable police to glean insights from the whole of individuals' movements"); *id.* at 345 ("AIR data is what enables deductions from the whole of individuals' movements"); *id.* at 346 ("Because the AIR program enables police to deduce from the whole of individuals' movements, we hold that accessing its data is a search. . . ."). Plaintiffs therefore cannot meet their burden simply by saying that Flock cameras enable "deductions." Plaintiffs must show that NPD's set of Flock cameras "enable[] deductions from the whole of individuals' movements." *Id.* at 345.

*Second*, for similar reasons, it is misleading for Plaintiffs to suggest that "even 'snippets' of data" can reveal enough information to meet the *Carpenter* standard. Mot. at 2, 18, 24. Plaintiffs do not say what they mean by "snippets." But the "snippets" in *Beautiful Struggle* were "multi-hour blocks" in which planes tracked "every movement of every person outside in Baltimore." 2 F.4th at 341. Flock data does not enable NPD to do that because NPD's Flock cameras photograph Plaintiffs' vehicles two to three times per day. Plaintiffs cite no case finding that such sporadic data points meet the *Carpenter* standard.

*Third*, it is not the law that all "[l]ocation data [is] inherently revealing because people 'follow[] a relatively habitual pattern.'" Mot. at 19 (citation modified). If all location data revealed private information, then it would have made no sense for the Supreme Court to emphasize that *Carpenter* was not a case about "a person's movement at a particular time." 585 U.S. at 315. The

Fourth Circuit in *Beautiful Struggle* explained that where Baltimore police had a comprehensive record of location data "surpassing the precision even of GPS data and CSLI," the fact that people "follow[] a relatively habitual pattern" could help "law enforcement to deduce the people behind the pixels." 2 F.4th at 343. In other words, people's tendency to follow patterns could facilitate "deductions from the whole of individuals' movements." *Id.* at 345. But NPD's Flock cameras do not create anywhere close to a comprehensive record of Plaintiffs' movements, so they do not enable "deductions from the whole of" Plaintiffs' movements. *Id.*

Plaintiffs also misconstrue the correct legal standard by noting that NPD can use Flock data "to apprehend fugitives, reconstruct routes and catch suspects lying about their routes." Mot. at 23–24. Many "conventional surveillance techniques and tools, such as security cameras," *Carpenter*, 585 U.S. at 298, help police solve crimes by triangulating other evidence or evaluating alibis. Yet *Carpenter* did not "call into question" those tools. *Id.* Whether an investigative technique is a Fourth Amendment search cannot turn on how effective it is, otherwise police would need a warrant to do anything that helps them solve a crime.

That rule is not the law, as Plaintiffs acknowledge when they argue that "the Supreme Court should adopt" a very similar standard. Mot. at 29. According to Plaintiffs, any "effort to find or discern something" or any "purposeful, investigative act" should be a search for purposes of the Fourth Amendment. Mot. at 30. Indeed, Plaintiffs testified that even a single photograph of their car invades their privacy. Pls.' Ex. 15 [Arrington Dep.] at 57:13–59:13; Pls.' Ex. 14 [Schmidt Dep.] at 187:13–189:14. But Plaintiffs concede that this interpretation of the Fourth Amendment is "foreclosed" by Supreme Court precedent. Mot. at 30. The legal standard under existing precedent is whether Flock data enable NPD to track the whole of Plaintiffs' movements to reveal intimate details about them. Plaintiffs have no evidence that Flock data enable NPD to do that.

## V. <u>PLAINTIFFS CANNOT PROVE THAT USING LPRS IS A SEARCH BY CHALLENGING NPD'S OVERSIGHT OF HOW LPRS ARE USED</u>

Plaintiffs cannot remedy their failure of proof by arguing that NPD "officers have virtually unfettered access" to the Flock camera data "with minimal oversight." Mot. at 11. This is plainly untrue. In any event, "the threshold question of whether a 'search' has occurred" is not about whether the procedures used by the police are "reasonable." *Carpenter*, 585 U.S. at 307 n.2.

In 2025, the Virginia legislature passed a statute governing the use of LPRs. The statute includes strict limitations on the circumstances in which law enforcement officers can access LPR data, limitations on data sharing by Virginia law enforcement agencies, and audit and training requirements. Violating those provisions is a Class 1 misdemeanor. Defs.' Ex. 17 [LPR Law] at p. 4, § 2.2-5517(N). These LPR regulations are some of the strictest in the nation. *See* Defs.' Mot at 11–12 & n.6. Plaintiffs' counsel, the Institute of Justice, advocated for different policies, but they did not prevail in the democratic process. *Id.* at 12 n.7. Plaintiffs have not cited any evidence that they have suffered any harm from any supposed lack of oversight. But if they believe otherwise, then they can bring those concerns to the attention of their elected representatives and NPD or try to pursue any other remedies that the law might provide.

What Plaintiffs cannot do is pursue a constitutional claim that *everyone* at NPD needs a warrant to use LPRs because one officer used the Flock System to locate a missing pet, Pls.' SUF ¶ 25, or other officers could use the system improperly in the future. Whether there is sufficient oversight over NPD's use of the Flock System is not the standard for a Fourth Amendment search. In *Carpenter*, the Supreme Court explained that the "process set forth in the Stored Communications Act" for obtaining authorization to use CSLI "does not determine a target's expectation of privacy." 585 U.S. at 307 n.2. Here, too, the process for NPD personnel to obtain authorization or ability to query the Flock System does not determine whether using Flock cameras

invades Plaintiffs' privacy. As Judge Payne explained in *Martin*, whether "Flock's system could be abused in the future . . . . is not the constitutional standard." 753 F. Supp. 3d at 473 n.16.

Nevertheless, because it is important to NPD that the Court has confidence in the integrity of NPD's use of LPRs, NPD seeks to correct the record on this issue in several respects.

*First*, Plaintiffs cite one instance in which an NPD officer was found to have misused the Flock System in locating a missing pet. Pls.' SUF ¶ 25. It is misleading for Plaintiffs to assert that NPD "never disciplined" that officer, *id.*, because their own record evidence shows that the officer retired before the disciplinary process could be completed. Pls.' Ex. 4 [Vernon Dep.] at 128:20–21. Chief Talbot testified that the officer "would have been disciplined, had he not left the organization." Pls.' Ex. 23 [Talbot Dep.] at 224:16–225:8.

*Second*, while Plaintiffs raise concerns about the volume and content of some searches that occurred before the LPR Law and NPD's new General Order went into effect, they do not point to any evidence suggesting that NPD officers will violate either regulation. Plaintiffs suggest that some NPD personnel "could not agree" on how the LPR Law or General Order would apply to particular hypothetical fact patterns, Pls.' SUF ¶¶ 21, 25, but a difference of opinion about how to apply a law is hardly a basis for concern that the law will not be followed or enforced.

Ultimately, Plaintiffs have no evidence that the NPD's Flock cameras can be used to track the whole of their physical movements so as to reveal intimate details about their lives. Plaintiffs cannot circumvent their lack of proof by turning this lawsuit into a redo of the policy debate that took place in the General Assembly.

**CONCLUSION**

Plaintiffs motion for partial summary judgment should be denied.

THE CITY OF NORFOLK and
MARK TALBOT

/s/
Karla J. Soloria (VSB 82674)
Assistant City Attorney
Adam D. Melita (VSB 41716)
Chief Deputy City Attorney
karla.soloria@norfolk.gov
adam.melita@norfolk.gov
City of Norfolk Department of Law
810 Union Street, Suite 900
Norfolk, VA 23510
Telephone: (757) 664-4529
Facsimile: (757) 664-4201

*Attorneys for Defendants the City of Norfolk and Mark Talbot*

E. Martin Estrada (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
(213) 683-9100
Martin.Estrada@mto.com

Jonathan I. Kravis (*pro hac vice*)
Lauren E. Ross (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue, NW, Suite 500E
Washington, D.C. 20001
(202) 220-1100
Jonathan.Kravis@mto.com
Lauren.Ross@mto.com

Justin P. Raphael (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105
(415) 512-4000
Justin.Raphael@mto.com

*Attorneys for Defendant the City of Norfolk*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of September, 2025, I will electronically file the foregoing Opposition to Plaintiffs' Motion for Summary Judgment with the Clerk of Court using the CM/ECF system, which will send a copy of the foregoing to the following:

Michael B. Soyfer, Esq. (NY Bar # 5488580; DC Bar # 230366)
Robert Frommer, Esq. (VA Bar #70086)
Joshua Windham, Esq. (NC Bar #51071)
Tahmineh Dehbozorgi, Esq. (DC Bar #90030252)
Jessica Bigbie, Esq. (TX Bar #24134429)
James T. Knight, II (DC Bar #1671382)
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203-1854
703-682-9320 phone
703-682-9321 fax
rfrommer@ij.org
jwindham@ij.org
msoyfer@ij.org
tdehbozorgi@ij.org
jbigbie@ij.org
jknight@ij.org

*Counsel for Plaintiffs*

/s/ ______________________________
Karla J. Soloria (VSB 82674)
Assistant City Attorney
karla.soloria@norfolk.gov
City of Norfolk Department of Law
810 Union Street, Suite 900
Norfolk, VA 23510
Telephone: (757) 664-4529
Facsimile: (757) 664-4201

*Attorney for Defendants the City of Norfolk and Mark Talbot*