IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| LEE SCHMIDT and CRYSTAL ARRINGTON, | |
| Plaintiffs, | |
| v. | Civil Action No. 2:24-cv-621 |
| CITY OF NORFOLK and MARK TALBOT, in his official capacity as the Norfolk Chief of Police, | |
| Defendants. | |

DEFENDANTS' REPLY IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

INTRODUCTION ............................................................................................................1

ARGUMENT ..................................................................................................................3

    I.      PLAINTIFFS LACK ARTICLE III STANDING ...................................................3

    II.    PLAINTIFFS MISCHARACTERIZE THE GOVERNING LEGAL STANDARD ..........................................................................................................6

           A.    Plaintiffs' Argument About the "Literal Whole" Ignores Binding Precedent and Fails to Supply a Standard for the Court to Apply ...............6

           B.    *Beautiful Struggle* Does Not Support Plaintiffs' Attempt to Alter the Legal Standard ........................................................................................8

    III.   PLAINTIFFS CANNOT DISTINGUISH THE UNIFORM LINE OF FEDERAL CASES HOLDING THAT USING LPRS IS NOT A SEARCH ...............................................................................................................10

           A.    The Undisputed Facts Confirm That Courts Have Correctly Held That LPRs Are Vastly Different from Cell Site Data and Aerial Surveillance ......................................................................................................11

           B.    Plaintiffs Cannot Distinguish the Federal Decisions that Have Uniformly Rejected Their Theory ...........................................................14

    IV.   PLAINTIFFS' EXPERTS DO NOT CREATE A GENUINE FACTUAL DISPUTE ...................................................................................................16

           A.    Plaintiffs' Experts Ignore Flock Data ......................................................16

           B.    Dr. Higdon Topaz Does Not Create a Genuine Issue of Material Fact ..........................................................................................................17

           C.    Dr. Wheeler Does Not Create a Genuine Issue of Material Fact ...............19

CONCLUSION ..............................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Carpenter v. United States*,
585 U.S. 296 (2018) .................................................................................................. *passim*

*Dow Chemical Co. v. United States*,
476 U.S. 227 (1986) ........................................................................................................5

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ........................................................................................................5

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
2 F.4th 330 (4th Cir. 2021) (en banc) ............................................................... *passim*

*New York v. Class*,
475 U.S. 106 (1986) ........................................................................................................5

*Scholl v. Illinois State Police*,
776 F. Supp. 3d 701 (N.D. Ill. 2025) ........................................................................4, 5, 12

*United States v. Cooper*,
2025 WL 35035 (E.D. La. Jan. 6, 2025) ....................................................................14

*United States v. Curry*,
965 F.3d 313 (4th Cir. 2020) ......................................................................................10

*United States v. George*,
971 F.2d 1113 (4th Cir. 1992) ......................................................................................5

*United States v. Jackson*,
2025 WL 1530574 (D. Kan. May 29, 2025) ..............................................................14

*United States v. Jones*,
565 U.S. 400 (2012) ............................................................................................. *passim*

*United States v. Knotts*,
460 U.S. 276 (1983) ....................................................................................................1, 14

*United States v. Martin*,
753 F. Supp. 3d 454 (2024) ..............................................................................11, 14, 15

*United States v. Maynard*,
615 F.3d 544 (D.C. Cir. 2010) ......................................................................................9

*United States v. Slaybaugh*,
2025 WL 2123781 (M.D. Ala. July 29, 2025) ..........................................................15

i

*United States v. Toombs,*
    671 F. Supp. 3d 1329 (N.D. Ala. 2023).............................................................................11

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990)...........................................................................................................4

*Wikimedia Foundation v. National Security Agency,*
    857 F.3d 193 (4th Cir. 2017).............................................................................................5

**STATE CASES**

*Commonwealth v. Robinson,*
    113 Va. Cir. 494, 2024 WL 5454692 (2024)....................................................................11

## <u>INTRODUCTION</u>

Plaintiffs do not dispute the key facts that undermine their Fourth Amendment claim: Flock cameras photograph passing vehicles at fixed locations on public streets; they collect no information on the beginning or end of any trip, or any of the stops in between; and they provide no information about an individual's location beyond public roadways or outside of vehicles. Based on these undisputed facts, the federal courts have uniformly concluded that LPRs are fundamentally different from the cell site, GPS, and aerial surveillance that were capable of revealing private facts and held to be a search in *Jones*, *Carpenter*, and *Beautiful Struggle*. Plaintiffs had the opportunity to take discovery and prove that Flock cameras violate Plaintiffs' privacy rights—but the record lacks any such showing.  Instead, Plaintiffs offer a skewed presentation of the law and their own experts' opinions.  Plaintiffs' arguments should be rejected, and summary judgment should be granted in favor of Defendants.

In *Carpenter*, the Supreme Court recognized that "individuals have a reasonable expectation of privacy in the whole of their physical movements." *Carpenter v. United States,* 585 U.S. 296, 310 (2018).  Plaintiffs argue that they do not have to prove that LPRs can track "the literal 'whole' of [their] movements."  Opp. at 13, ECF 144.  This argument—which Defendants have not raised—misses the mark.  "A person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another."  *United States v. Knotts*, 460 U.S. 276, 281–82 (1983).  In *Carpenter*, the Supreme Court held that using cell site data was a search because it did more than record "a person's movement at a particular time," but instead generated "a detailed chronicle of a person's physical presence compiled every day, every moment, over several years."  585 U.S. at 315.  Following *Carpenter*, the Fourth Circuit held in *Beautiful Struggle* that aerial surveillance that created "a 'detailed, encyclopedic,' record of where everyone came and went" in Baltimore was a search.  *Leaders of a Beautiful Struggle v.*

1

*Baltimore Police Dep't*, 2 F.4th 330, 341 (4th Cir. 2021) (en banc) (quoting *Carpenter*, 585 U.S. at 309). Under these precedents, to constitute a Fourth Amendment search, a tool that records public location information must "provide[] an all-encompassing," *Carpenter*, 585 U.S. at 311, and "encyclopedic" record of people's movements that "reveal[s] intimate details" about them. *Beautiful Struggle*, 2 F.4th at 341.

Plaintiffs subvert that standard when they suggest that a search occurs when a tool records "snippets" that provide "just enough" information to enable "deductions." *See, e.g.*, Opp. at 13, 15, 24. While the Fourth Circuit did use the words "snippets" and "deductions" in *Beautiful Struggle*, it followed *Carpenter* and concluded that hours of aerial surveillance footage (described as "snippets") "enable[d] deductions from the whole of individuals' movements," *id.* at 345, and "open[ed] 'an intimate window' into a person's associations and activities," *id.* at 342.

The undisputed facts show that NPD's Flock cameras cannot do either of those things. Plaintiffs repeatedly state that the Fourth Amendment inquiry depends on the Flock cameras' capabilities, but they cannot dispute those capabilities (or lack thereof): the cameras do not collect information about a person's location beyond a public street or where a person began or ended a trip; they cover only a tiny fraction of Norfolk; and they photographed Plaintiffs' vehicles on average two to three times a day. Federal courts have relied upon those kinds of facts in uniformly holding that LPRs are not a search. Plaintiffs have more information than litigants in any of those cases had, but they still cannot show use of the cameras constitutes a Fourth Amendment search.

Plaintiffs' experts don't supply the necessary facts. Plaintiffs argued to this Court in discovery that the "full dataset" of Flock data "will show the overall capabilities of Defendants' surveillance—rather than how it happened to track just two people at a given time." ECF 50 at 3. Yet, neither of Plaintiffs' experts has analyzed the full dataset. Neither opines that NPD can use

Flock data to track the whole of Plaintiffs' movements or reveal intimate information about their lives. To the contrary, Plaintiffs' main expert, Dr. Higdon-Topaz, admitted that he has no opinion "that Flock camera data can be used to construct a realistic model of how people travel by car within Norfolk." Defs.' Ex. 19 [Higdon-Topaz Dep.] at 139:13–19. That says it all. Plaintiffs insist that Dr. Higdon-Topaz can "reconstruct" routes from "simulated" data, but he admits that "reconstruction" just means using Google Maps to find the fastest route between two cameras. That is not a privacy invasion.

Plaintiffs' other expert, Dr. Wheeler, fares no better. Unlike Dr. Higdon-Topaz, Dr. Wheeler did actually look at the Flock data, but only *after* Plaintiffs' counsel provided him with a list of the locations that they frequently visit in Norfolk. Even with access to that information, Dr. Wheeler could not opine that Flock data reveals any intimate details about Plaintiffs. Dr. Wheeler only tried to use Flock data to "infer" one of the locations provided to him. But he provided no explanation for why he believed Flock data was capable of supporting that inference, so his testimony says nothing about the Flock cameras' capabilities.

The federal case law is unanimous: using LPRs is not a search for Fourth Amendment purposes. After discovery, the undisputed facts of this case confirm that the courts got it right. LPRs that photograph vehicles on public streets in Norfolk do not invade any reasonable expectation of privacy because they do not track the whole of individuals' movements, nor do they reveal private information about individuals' lives. Thus, NPD's use of LPRs is not a search and Plaintiffs' claim fails.

## ARGUMENT

## I.    PLAINTIFFS LACK ARTICLE III STANDING

Plaintiffs' opposition does not provide any evidence that they have Article III standing. Plaintiffs' claim is that "[a]ggregated" data "enable[s] NPD to deduce people's routine, habitual

movements across the city." Opp. at 2. It is undisputed that NPD could not make such "deduc[tions]" about Plaintiffs' "routine, habitual movements" from "aggregate[d]" data unless NPD queried Plaintiffs' license plates—something NPD has never done and is not likely to do in the future. *Id.* at 11–13. Thus, while Plaintiffs claim injury from the invasion of their privacy, there is no dispute that NPD has never taken, and is not likely to take, the actions that Plaintiffs contend would reveal private information about them. Accordingly, it is undisputed that Plaintiffs' privacy injury is entirely hypothetical. As such, Plaintiffs lack Article III standing because "[a]llegations of possible future injury do not satisfy the requirements of Art. III." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).

Plaintiffs' argument that they have standing merely because their vehicles were photographed by NPD's Flock cameras, Opp. at 13, ignores *Scholl v. Illinois State Police*, 776 F. Supp. 3d 701 (N.D. Ill. 2025). *Scholl* explains why Plaintiffs are wrong that they have Article III standing under *Beautiful Struggle*. Defendants cited *Scholl* in their motion, but Plaintiffs do not even try to distinguish that case. In *Scholl*, the plaintiffs filed civil claims alleging that Illinois's system of LPRs was a search. Like Plaintiffs in this case, the plaintiffs in *Scholl* analogized LPRs to the cell-site data in *Carpenter* and the aerial surveillance in *Beautiful Struggle*. *See id.* at 718. The *Scholl* court concluded that the plaintiffs lacked standing to bring this claim. The court reasoned that in both *Carpenter* and *Beautiful Struggle*, the search at issue was the government's access of the records, not the collection of the data. *Id. See Beautiful Struggle*, 2 F.4th at 333 ("[W]e hold that accessing its data is a search, and its warrantless operation violates the Fourth Amendment."); *id.* at 346 (same). The court concluded that the "government's accessing the data in *Carpenter* and *Leaders of a Beautiful Struggle* is analogous to Illinois's querying of the [LPR] database, not to its collection of ALPR photos." *Scholl*, 776 F. Supp. 3d at 719. The court held

that the plaintiffs "lack[ed] standing to challenge" queries of the LPR database, *id.*, because they did "not allege any facts indicating a 'substantial risk' that police will soon retrieve plaintiffs' license plate information from the database." *Id.* at 710. Just so here, where Plaintiffs have no evidence that NPD will query their vehicles' license plates.

Plaintiffs do not even try to distinguish *Scholl* on this point. Plaintiffs cite the *Scholl* Court's holding that *if* the plaintiffs were challenging the collection of data to put into the LPR system, then they would have had standing to pursue that particular claim. *Id.* at 709. But that ruling does not support Plaintiffs' standing in this case because merely taking photographs of their vehicles on public streets cannot invade their privacy. *See United States v. George*, 971 F.2d 1113, 1120 (4th Cir. 1992); *New York v. Class*, 475 U.S. 106, 112–13 (1986). Accordingly, this case is different from *Wikimedia Foundation v. National Security Agency*, 857 F.3d 193 (4th Cir. 2017), where the plaintiffs had a privacy interest in not having their private emails seized by the government.

Enforcing Article III's standing requirement will ensure that these two individual Plaintiffs cannot decide for the entire City of Norfolk how "to balance privacy and public safety in a comprehensive way." *United States v. Jones*, 565 U.S. 400, 429–30 (2012) (Alito, J. concurring). Plaintiffs' counsel failed to persuade the General Assembly about how to strike that balance, Mem. at 12 n.7, ECF 113. The "federal courts" are not another "open forum" to repeat the same "general complaints about the way in which government goes about its business." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024). And "Fourth Amendment cases must be decided on the facts of each case, not by extravagant generalizations." *Dow Chemical Co. v. United States*, 476 U.S. 227, 238 n.5 (1986). Plaintiffs lack standing to invoke this Court's jurisdiction to decide the constitutionality of a tool that helps "deterring criminal conduct and unlocking difficult

investigations." U.S. Statement of Interest, ECF 139 at 2; *see also* Va. Ass'n of Chiefs of Police Amicus Br., ECF 132-1 at 4 (explaining the "significant value of LPR camera technology and how law enforcement uses the tool to protect the safety of Virginians").

## II.     PLAINTIFFS MISCHARACTERIZE THE GOVERNING LEGAL STANDARD

Even if Plaintiffs had standing, to show that using LPRs is a search, Plaintiffs would have to prove that NPD's cameras track the "whole" of their movements, *Carpenter*, 585 U.S. at 310, so as to reveal "intimate" details about their private "associations and activities," *Beautiful Struggle*, 2 F.4th at 342. Plaintiffs' opposition improperly tries to dilute this standard, mischaracterizes Defendants' position, and misconstrues both *Carpenter* and *Beautiful Struggle*.

### A.     Plaintiffs' Argument About the "Literal Whole" Ignores Binding Precedent and Fails to Supply a Standard for the Court to Apply

Contrary to Plaintiffs' repeated assertions, Defendants have never argued that "the Flock Cameras cannot invade a reasonable expectation of privacy unless they capture the literal 'whole' of Plaintiffs' movements." Opp. at 13. The words "literal whole" appear nowhere in Defendants' summary judgment motion. The extent of information regarding otherwise public movements *does* matter: to constitute a search for purposes of the Fourth Amendment, a law enforcement tool that records public location must "provide[] an all-encompassing," *Carpenter*, 585 U.S. at 311, and "encyclopedic" record of people's movements that are capable of "reveal[ing] intimate details" about them, *Beautiful Struggle*, 2 F.4th at 341. That is why both the Supreme Court and the Fourth Circuit characterized the tools at issue as "like 'attach[ing] an ankle monitor[.]'" *Id.* (quoting *Carpenter*, 585 U.S. 296 at 312).

In *Carpenter*, the Supreme Court explained that "[m]apping a cell phone's location over the course of 127 days provides an all-encompassing record of the holder's whereabouts," which "*provides an intimate window into a person's life*, revealing not only his particular movements,

but through them his 'familial, political, professional, religious, and sexual associations.'" 585 U.S. 296 at 311 (emphasis added) (quoting *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring)). The Court noted that a "cell phone—almost a feature of human anatomy—tracks nearly exactly the movements of its owner" and "follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales." *Id.* Thus, using CSLI gave the government the same information "as if it had attached an ankle monitor to the phone's user." *Id.* at 312.

In *Beautiful Struggle*, the Fourth Circuit held that Baltimore's aerial surveillance program violated a reasonable expectation of privacy because it, too, was "like 'attach[ing] an ankle monitor' to every person in the city." 2 F.4th at 341 (quoting *Carpenter*, 585 U.S. at 312). The Fourth Circuit noted that "like the CSLI in *Carpenter* and GPS-data in *Jones*," Baltimore's program "tracks every movement of every person outside in Baltimore" and generates "a detailed, encyclopedic, record of where everyone came and went within the city during daylight hours over the prior month-and-a-half." *Id.* The Fourth Circuit determined that the extent of this tracking "enables deductions" that "reveal[] more about a person than does any individual trip viewed in isolation" that "go to the privacies of life." *Id.* at 342. It was "because the AIR program opens 'an intimate window' into a person's associations and activities" that it was a search. *Id.*

According to Plaintiffs, "what really matters" is "the capabilities of the technology." Opp. at 18. *Carpenter* and *Beautiful Struggle* establish the standard for what the Flock cameras must be capable of in order for using them to be considered a search: they must "provide[] an all-encompassing," *Carpenter*, 585 U.S. at 311, and "encyclopedic" record of Plaintiffs' movements that "reveal intimate details" about them, *Beautiful Struggle*, 2 F.4th at 341. As explained below (*see* Part III *infra*), far from trying to "ignore the *capabilities* of NPD's system of Flock cameras,"

Opp. at 18, Defendants have shown beyond genuine dispute that Flock cameras are not capable of generating an all-encompassing or encyclopedic record of anyone's movements.

**B.    *Beautiful Struggle* Does Not Support Plaintiffs' Attempt to Alter the Legal Standard**

Plaintiffs pluck phrases from the Fourth Circuit's decision in *Beautiful Struggle* to try to dilute the legal standard.  Plaintiffs' arguments are misleading and incorrect.

*First*, the standard for a search is not whether an investigative tool collects "just enough" data "'to enable[] deductions' that reveal[] more about a person than does any individual trip in isolation."  Opp. at 15 (quoting *Beautiful Struggle*, 2 F.4th at 342).  In *Beautiful Struggle*, the Fourth Circuit repeatedly explained that the AIR program was a search not merely because it enabled deductions, but "because the AIR program enables police to deduce *from the whole of individuals' movements*."  2 F.4th at 333 (emphasis added); *see also id.* at 344 ("these abilities enable police to glean insights from the whole of individuals' movements"); *id.* at 345 ("AIR data is what enables deductions from the whole of individuals' movements"); *id.* at 346 ("Because the AIR program enables police to deduce from the whole of individuals' movements, we hold that accessing its data is a search. . . .").

Plaintiffs cannot meet their burden through the tautology that Flock cameras enable "deductions."  Plaintiffs must show that NPD's Flock cameras "enable[] deductions from the whole of individuals' movements," *id.* at 345, because such a dataset reveals *private* facts.  NPD's Flock cameras do not track anywhere close to the whole of Plaintiffs' (or anyone's) movements in the first place.  And "supplement[ing]" Flock data with officers' knowledge, video cameras, and "myriad resources routinely used in investigations," Opp. at 25, does not amount to a dataset that reflects the whole of individuals' movements.  Plaintiffs' evidence does not show—alone, or in combination with other information—a dataset from which NPD can deduce actual private

8

information.  Defs.' Ex. 13 [Wheeler Dep.] at 134:13–19; 218:9–220:1.

The Fourth Circuit explained why a "detailed, encyclopedic, record of where everyone came and went within the city during daylight hours over the prior month-and-a-half," 2 F.4th at 341, "reveal[s] more about a person than does any individual trip viewed in isolation," *id.* at 342. The Court stated:  "A person who knows all of another's travels can deduce whether he is a weekly church goer, a heavy drinker, a regular at the gym, an unfaithful husband, an outpatient receiving medical treatment, an associate of particular individuals or political groups—*and not just one such fact about a person, but all such facts*."  *Id.* at 342 n.8 (emphasis added) (quoting *United States v. Maynard*, 615 F.3d 544, 562–63 (D.C. Cir. 2010)).  For example, the Fourth Circuit explained that "a single trip to a gynecologist's office tells little about a woman, but that trip followed a few weeks later by a visit to a baby supply store tells a different story."  *Id.*  But Plaintiffs do not and cannot show that NPD's Flock cameras could reveal that a person made either kind of visit because the cameras do not show where any particular trip began or ended.

*Second*, it is misleading for Plaintiffs to suggest that "[e]ven 'snippets' of location data collected over weeks or longer are inherently sensitive."  Opp. at 24.  The word "snippets," cited six times in Plaintiffs' summary judgment filings to date, appears exactly once in *Beautiful Struggle*, to describe "multi-hour blocks" in which planes tracked "every movement of every person outside in Baltimore."  2 F.4th at 341.  Flock data does not enable NPD to do that because NPD's Flock cameras photograph Plaintiffs' vehicles on public roadways two to three times per day on average.  Opp., SUF ¶ 31.  Plaintiffs cite no case finding that such sporadic data points meet the standard set forth in *Carpenter* and *Beautiful Struggle*.

*Third*, it is not the law that all "[l]ocation data [is] inherently revealing because people 'follow[] a relatively habitual pattern.'"  Opp. at 17 (citation modified).  If all location data

revealed private information, then it would have made no sense for the Supreme Court to emphasize that *Carpenter* was not a case about "a person's movement at a particular time." 585 U.S. at 315. The Fourth Circuit in *Beautiful Struggle* explained that Baltimore police had far more than that. The fact that people "follow[] a relatively habitual pattern" could help "law enforcement to deduce the people behind the pixels" where Baltimore police had a comprehensive record of location data "surpassing the precision even of GPS data and CSLI." 2 F.4th at 343. In other words, people's tendency to follow patterns could facilitate "deductions from the whole of individuals' movements." *Id.* at 345. But NPD's Flock cameras do not create anywhere close to a comprehensive record of Plaintiffs' movements, so they do not enable "deductions from the whole of" Plaintiffs' movements." *Id.*

*Finally*, the Fourth Circuit did not hold that "[a]s a matter of law, 'the insight provided by locational data into individuals' private lives is profound.'" Opp. at 26 (quoting *Beautiful Struggle*, 2 F.4th at 344 n.11). The language Plaintiffs quote is from a 2017 law review article that the Fourth Circuit cited in a footnote. That citation did not establish a legal rule that all tools that generate location data are a search. Again, that would contradict *Carpenter*, where the Supreme Court explicitly distinguished tools that identify "a person's movement at a particular time." 585 U.S. at 315. Further, *Beautiful Struggle* did not overrule precedent that Fourth Amendment challenges "must be grounded on an accurate understanding of the facts." *United States v. Curry*, 965 F.3d 313, 316 (4th Cir. 2020). As explained below, Flock data does not give NPD *any* "insight . . . into individuals' private lives," let alone "profound" insight.

## III.    PLAINTIFFS CANNOT DISTINGUISH THE UNIFORM LINE OF FEDERAL CASES HOLDING THAT USING LPRS IS NOT A SEARCH

Every federal court to have considered the question has held that using LPRs is not a search. Plaintiffs do not argue those decisions are wrong, and they cannot dispute or distinguish the facts

that the courts in those cases relied upon.

### A.    The Undisputed Facts Confirm That Courts Have Correctly Held That LPRs Are Vastly Different from Cell Site Data and Aerial Surveillance

Plaintiffs' opposition confirms that they do not dispute the key facts underlying the unbroken line of federal court decisions holding that LPRs are fundamentally different from the surveillance techniques at issue in *Carpenter* and *Beautiful Struggle*.

*First,* Plaintiffs do not dispute the relevant characteristics of NPD's Flock cameras:

- Flock cameras are placed at fixed locations and take photographs of passing vehicles, and collect no information on the start or stop point of any trip taken in a vehicle. Opp., SUF ¶¶ 3, 9.

- Flock cameras provide no information about any individual's location "beyond public roadways or outside of vehicles." *Id.* SUF ¶ 5.

- Flock cameras collect no data "regarding who is driving or riding in any car at any given time." *Id.* SUF ¶ 7.

These undisputed facts show that Flock cameras are not like an "ankle monitor" that "tracks nearly exactly the movements of its owner." *Carpenter*, 585 U.S. at 311–12. They simply "provide a snapshot of the [vehicle's] location at a discrete time while traveling in an automobile on a public road." *United States v. Toombs*, 671 F. Supp. 3d 1329, 1340–41 (N.D. Ala. 2023). Based on these characteristics, Judge Payne found that the Flock System "is not meant to 'track' or 'monitor' the entirety of an individual's movements during a particular car trip, much less through the activities of their daily life." *United States v. Martin*, 753 F. Supp. 3d 454, 472–73 (2024).

*Second*, courts have found it significant that LPR networks "capture only a very tiny fraction of the city's roadways," *Commonwealth v. Robinson*, 113 Va. Cir. 494, 2024 WL 5454692, at *7 (2024); *see also Martin*, 753 F. Supp. 3d at 473 n.16; Opp., SUF ¶ 19. LPRs "are 'strategically' placed to capture images of *locations*, not *individuals*, that are known as historically

high-traffic or high-crime areas." *Martin*, 753 F. Supp. 3d at 473.  Plaintiffs do not dispute that the same is true here:  NPD's 176 Flock cameras are clustered in 75 locations and cover far less than one percent of roads and square milage in Norfolk.  Opp., SUF ¶ 28.  That is far different from planes surveilling "90% of the city" in the AIR program, *Beautiful Struggle*, 2 F.4th at 334, and cellular towers covering an entire city.  Plaintiffs argue that Defendants' statistics "say nothing" because "[c]ars can only drive on roads," Opp. at 20–21, but that is why LPR cameras taking photographs of cars on roads cannot track the whole of Plaintiffs' movements.

*Third*, courts have observed that LPR data is "significantly less comprehensive'" than the data generated by CSLI, GPS, or Baltimore's aerial surveillance program.  *Scholl*, 776 F. Supp. 3d at 720.  That, too, is undisputed here.  Plaintiffs criticize Dr. Estevez's methods, but they do not disagree with his math:  NPD's Flock cameras photographed Plaintiffs' primary vehicles only two to three times per day on average.  Opp., SUF ¶ 31.  That is far fewer than the 100-plus daily data points in *Carpenter*, 585 U.S. at 31, and nothing like the "detailed, encyclopedic, record of where everyone came and went within the city" in *Beautiful Struggle*, 2 F.4th at 341.  ██████████  ██████ was not photographed by any NPD Flock camera on nearly two-thirds of days, and ███ ████████████ was not photographed by any NPD Flock camera on nearly three in ten days.  Opp., SUF ¶ 32.  Plaintiffs argue that they "do not spend all their time driving," Mot. at 22, but that is another reason why LPRs cannot create "an all-encompassing record" of anyone's whereabouts.  *Carpenter*, 585 U.S. at 311.

*Finally*, courts have concluded that LPR data "lacks the same 'deeply revealing nature' as the information recorded by the surveillance technologies discussed in *Carpenter*, *Jones*, and *Leaders of a Beautiful Struggle*."  *Scholl*, 776 F. Supp. 3d at 720 (quoting *Carpenter*, 585 U.S. at 320).  Plaintiffs' opposition does not identify any intimate fact about their lives that NPD could

learn from Flock camera data.  In their Complaint, Plaintiffs alleged that NPD could use the Flock

System "to figure out which places [Plaintiffs] frequently visit[] in Norfolk and deduce who [their]

relatives and closest friends are," including "who [Mr. Schmidt] goes to church with, and who he

meets at the shooting range," and "who [Ms. Arrington's] clients are and where she usually takes

them."  *Id.* ¶¶ 58, 66, 73.  Plaintiffs' opposition says nothing about this information.

Plaintiffs say NPD "██████████████████████████████████████

██████" Opp. at 26, but their only evidence comes from their expert, Dr. Wheeler, █████████

███████████████████████  Defs.' Ex. 13 [Wheeler Dep.] at 254:20–255:5.  The

undisputed evidence shows that NPD *could not* use LPRs to track ███████████████

██████████████████████████  █████████████████████████████

█████████████████████████████████████████████████

███████████████  ████████████████████████████████

████████████████████████████████████████████.  SUF ¶ 35(b).

Plaintiffs similarly misrepresent the record when they argue that NPD could "f████████

███████████████████████████."  Opp. at 26–27.  When asked whether he had

offered an opinion that Ms. Arrington "███████████████████," Dr. Wheeler—█████████

█████████████████████—replied that he was "inferring that she was just in . . . [a]

general area" of undefined size.  Defs.' Ex. 13 [Wheeler Dep.] at 202:17–203:5.  ███████

█████████████████████████████████████████████

██████████████████████████  Defs.' Ex. 15 [Arrington Dep.] at 134:5–139:22.

Defendants' expert has not "conceded that consecutive captures can show that a car

'basically went from A to B.'"  Opp. at 21 (quoting Pls.' Ex. 34 [Estevez Dep.] at 140:13–22).  It

is undisputed that, on average, photographs of Plaintiffs' vehicles in Norfolk were taken almost an

hour apart, longer than it would take to drive between the two cameras that took the pictures.  *Id.* SUF ¶ 33.  Dr. Estevez was asked about a very different, hypothetical situation where "two cameras . . . are a five-minute drive apart, and five minutes elapses between captures on those cameras."  Pls.' Ex. 34 [Estevez Dep.] at 140:13–17.  He testified that, in that scenario, "the only thing that you can tell is that [the car] basically went from A to B."  *Id.* at 140:18–19.  That would reveal nothing private because an "automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another."  *Knotts*, 460 U.S. at 281–82.

For all of these reasons, the undisputed facts in this case show what courts in other cases have found:  using Flock cameras "does not infringe upon an individual's reasonable expectation of privacy because it does not reveal intimate details of an individual's daily life[.]"  *United States v. Cooper*, 2025 WL 35035, at *6 (E.D. La. Jan. 6, 2025).

### B. Plaintiffs Cannot Distinguish the Federal Decisions that Have Uniformly Rejected Their Theory

Plaintiffs cannot distinguish the unbroken line of decisions holding that using LPRs is not a Fourth Amendment search.  *First*, other courts' decisions were not based on "limited past captures" of the defendants' "*own* cars."  Opp. at 29.  The federal courts in the criminal actions had evidence of the LPRs' capabilities.  For example, in *Martin*, a criminal case, Judge Payne concluded after an evidentiary hearing that it was "part of the system's design" that the Flock System "is not meant to 'track' or 'monitor' the entirety of an individual's movements during a particular car trip, much less through the activities of their daily life."  *Martin*, 753 F. Supp. 3d at 472–73.  Other courts examining an evidentiary record have identified "fundamental differences" between the nature of LPR technology and other technologies.  *United States v. Jackson*, 2025 WL 1530574, at *9 (D. Kan. May 29, 2025).

It does not matter that many of the other cases "were criminal cases, where discovery is

extremely limited." Opp. at 29. Plaintiffs have more information about the operation of LPRs than any litigant who has ever challenged the use of that technology in a civil or criminal case, including Flock data of their vehicles across the entire Hampton Roads region for months. Now that they have seen that data, Plaintiffs have abandoned the allegations in their Complaint that NPD's Flock cameras could track *their* movements and identify *their* associates and intimate details about *their* lives. Instead, Plaintiffs now say all that matters is "what the technology is *capable of*, not what it turned up about a specific person." Opp. at 2 (emphasis in original). But the best evidence of what a technology is "capable of" is what the data in a particular case can be used to show. Unlike the litigants in every other civil and criminal case challenging LPRs, Plaintiffs had the opportunity to make that showing using actual LPR data. They could not do it because it cannot be done.

*Second*, Plaintiffs are wrong that their vehicles were photographed at rates "many orders of magnitude beyond" litigants in other cases. *Contra* Opp. at 29. Plaintiffs' opposition (*see id.* at 29 n.21) cites *United States v. Slaybaugh*, 2025 WL 2123781 (M.D. Ala. July 29, 2025), where the court held that the "use of seventy-two images of Slaybaugh's truck . . . over a three-week period does not implicate a reasonable expectation of privacy in 'the whole of [Slaybaugh's] physical movements.'" *Id* at *1. Here, according to Plaintiffs' own calculations, NPD's Flock cameras photographed Mr. Schmidt's vehicle at almost exactly the same rate—74 times per 21 days, Pls.' Ex. 29 at 2—and photographed Ms. Arrington's vehicle even less often on average— 50 times per 21 days, *id*. Plaintiffs' statistics that their vehicles were photographed "at least 475 times and 324 times, respectively," Opp. at 29, are not limited to the 21-day retention period under Virginia law. They are the total number of photographs taken by NPD's cameras over four months.

*Third*, Plaintiffs miss the point in arguing that NPD's Flock cameras "have about 83% more

15

coverage than the Flock cameras in Richmond" that were at issue in the *Martin* case.  Opp. at 30. Plaintiffs do not dispute that the cameras in both jurisdictions cover far less than 1% of roadways— a far cry from the virtually complete coverage of cellular towers in *Carpenter* and the aerial surveillance in *Beautiful Struggle*.

In short, Plaintiffs cite no federal case agreeing with their position that the use of LPRs is a search.  More than 20 federal courts have held the opposite.  Plaintiffs do not cite any fact that those courts relied upon that they dispute or any evidence in this case that undermines the soundness of those courts' conclusion that using LPRs is not a search.

## IV.    PLAINTIFFS' EXPERTS DO NOT CREATE A GENUINE FACTUAL DISPUTE

Plaintiffs' expert testimony does not warrant departing from the federal courts' consensus that using LPRs is not a search.  Plaintiffs *assert* that Flock cameras "enable extensive surveillance across Norfolk."  Opp. at 19.  They *assert* that "the Flock cameras have the *capacity* to reveal routine, habitual routes across the entire city."  *Id.* at 23.  And they *assert* that "NPD officers could use Flock data to make inferences about Plaintiffs' private routines."  *Id.* at 26.  But Plaintiffs lack any *evidence* to support these assertions.  Plaintiffs' experts indisputably have not shown that Flock cameras can track individuals or reveal private information about them.

### A.    Plaintiffs' Experts Ignore Flock Data

As an initial matter, it is telling that Plaintiffs' experts have ignored Flock data.  Plaintiffs say that what "actually matters" is "the Flock Cameras' capabilities."  *Id.* at 19.  Plaintiffs previously argued in this Court that data from the Flock cameras was needed to show those capabilities.  Plaintiffs moved to compel production of voluminous Flock camera data because "*the full dataset* will show the overall capabilities of Defendants' surveillance—*rather than how it happened to track just two people at a given time*—which is the key Fourth Amendment inquiry."  ECF 50 at 3 (emphasis added).  Plaintiffs ultimately received from Flock approximately four

months of data regarding every vehicle photographed by Flock cameras in Norfolk.  *See* Defs.'

Ex. 9 [Estevez Report] ¶ 14.

Yet, *neither* of Plaintiffs' experts relies on that "full dataset."  *Id.*  One expert, Dr. Chad

Higdon-Topaz, simply ignored the Flock data.  Pls.' Ex. 24 [Higdon-Topaz Report] at 39

(materials considered do not include any Flock-produced data).  Plaintiffs do not explain how one

could analyze what Flock cameras enable NPD to do without analyzing the data that the cameras

collect.  Plaintiffs' other expert, Dr. Andrew Wheeler, only examined data regarding Plaintiffs'

vehicles on a handful of cherry-picked days.  In other words, he analyzed data about "just two

people at a given time," which Plaintiffs previously told the Court would be insufficient to "show

the overall capabilities" of NPD's Flock cameras.  ECF 50 at 3.  Plaintiffs now dismiss the data as

"a series of irrelevant statistics that dilute and obscure" the Flock cameras' capabilities.  Opp. at

20.  That is not how Plaintiffs characterized the data before they knew what it showed.

### B.    Dr. Higdon Topaz Does Not Create a Genuine Issue of Material Fact

Dr. Higdon-Topaz was asked directly whether he has an opinion about the capabilities of

the Flock cameras data.  He testified as follows:

> Q:  You have not presented any opinion in your reports in this case
> that Flock camera data can be used to construct a realistic model of
> how people travel by car within Norfolk, right?
>
> A:  That's correct.  I can't rule out that one could do it, but that was
> not the subject of my report.

Defs.' Ex. 19 [Higdon-Topaz Dep.] at 139:13–19.  Because Dr. Higdon-Topaz has no opinion that

Flock camera data can be used to model how people travel by car within Norfolk, his testimony

cannot establish that NPD's Flock cameras "provide[] an all-encompassing," *Carpenter*, 585 U.S.

at 311, and "encyclopedic" record of people's movements that "reveal intimate details" about

them, *Beautiful Struggle*, 2 F.4th at 341.  Dr. Higdon-Topaz admitted that he has no "opinion that

Flock cameras enable NPD to identify the whole of plaintiffs' movements" or "learn intimate details about the plaintiffs' private lives." Defs.' Ex. 19 [Higdon-Topaz Dep.] at 9:18–11:19.

Plaintiffs cannot resuscitate Dr. Higdon-Topaz's opinions from these concessions. Plaintiffs argue that Dr. Higdon-Topaz found that some routes can be reconstructed. Opp. at 19. But it is critical to understand what Dr. Higdon-Topaz means by "reconstructed"—and what he does not mean. Dr. Higdon-Topaz did not try to use Flock data to reconstruct the actual route that Plaintiffs or anyone else took. Defs.' Ex. 19 [Higdon-Topaz Dep.] at 175:16–176:1. Nor did he show that Flock data could be used to reconstruct where any trip began or ended. *Id.* at 116:15–117:12. When Dr. Higdon-Topaz opines that a percentage of a hypothetical route can be "reconstructed," he means that the route would pass two Flock cameras and navigation software like Google Maps can find the fastest route between the two cameras under ideal conditions. *Id.* at 128:15–20, 161:20–162:2. If 25% of a hypothetical route is between two Flock cameras, then he labels that route 25% "reconstructible."

Plaintiffs do not argue that this routing information is private information about anyone. Thus, their suggestion that "different routing assumptions would" not "meaningfully change" how many routes he claims to be able to reconstruct, Opp. at 20, is irrelevant. The problem is not merely with Dr. Higdon-Topaz's assumption that all drivers always take the fastest route. The problem is that there is nothing private about a hypothetical route between two cameras.

Regardless, Plaintiffs do not dispute that nearly half of Dr. Higdon-Topaz's simulated routes cannot be "reconstructed" at all and nearly two-thirds cannot be "reconstructed" even one quarter of the distance. Defs.' Ex. 19 [Higdon-Topaz Dep.] at 204:16–205:3, 173:22–174:4, 214:19–217:19. Even granting that Dr. Higdon-Topaz's simulated routes say something about the actual world (which it does not), Dr. Higdon-Topaz cannot create a genuine dispute about whether

NPD can use Flock data to track the whole of anyone's movements when he admits that most routes cannot be reconstructed using Flock data.

Plaintiffs cite Dr. Higdon-Topaz for the proposition that "when people leave their cars, someone examining the Flock data can map out—at least roughly—where the person could have gone between captures," Opp. at 25, but this, too, supports summary judgment. The Supreme Court's opinion in *Jones* states that the GPS device "established the vehicle's location within 50 to 100 feet," 565 U.S. at 403, not merely "in a 'neighborhood'" as Plaintiffs contend. *Contra* Mot. at 28.[1] In *Carpenter*, the Supreme Court emphasized that "wireless carriers already have the capability to pinpoint a phone's location within 50 meters." 585 U.S. at 313. In *Beautiful Struggle*, the Fourth Circuit described the AIR program as "surpassing the precision even of GPS data and CSLI." 2 F.4th at 343. But Dr. Higdon-Topaz did not calculate "the average square mileage of the area that the Flock cameras can be used to narrow down where somebody" might have been. Defs.' Ex. 19 [Higdon-Topaz Dep.] at 251:17–22.

In sum, Dr. Higdon-Topaz did not try to put himself in the shoes of NPD to determine what they could learn from actual Flock data. *Id.* at 97:22–98:5, 99:10–15. He did an abstract math exercise based on a simulation. As Plaintiffs concede, "law enforcement inferences are not [weighed] in terms of library analysis by scholars." Opp. at 28.

## C.    Dr. Wheeler Does Not Create a Genuine Issue of Material Fact

Plaintiffs retained Dr. Wheeler to opine on "the ways in which Defendants . . . can use data from [LPRs] to draw inferences about people's locations, movements, and lives." Pls.' Ex. 25 [Wheeler Report] at 3. The logical way to perform this analysis would have been to provide Dr.

---

[1] *See* Joint App'x, *United States v. Jones*, No. 10-1259, 2011 WL 7113271, at *80 (U.S. Aug. 11, 2011) (Q. Was this piece of equipment perfectly accurate? That is, can you it tell you exactly where you are? A. Yes, it could. Minus fifty to a hundred feet.").

Wheeler with the Flock data produced in discovery and then ask him to draw inferences about Plaintiffs' "locations, movements, and lives" from that data. Instead, Plaintiffs' counsel gave Dr. Wheeler the answers before he took the test—they provided him with the locations that Plaintiffs frequently visit in Norfolk *before he performed his analysis*. Defs.' Ex. 13 [Wheeler Dep.] at 130:14–131:5, 133:3–17, 254:20–255:5, 278:5–279:3. Even with the answers in front of him, Dr. Wheeler *still* could not show that NPD could use Flock data and other information about Plaintiffs to learn anything private about them. He offered no opinion about who Plaintiffs associate with or what their political or religious affiliations are. At his deposition, Mr. Schmidt identified three routine trips that he makes during the week. *See* Defs.' Ex. 14 [Schmidt Dep.] at 36:10–46:5, 118:3–15. Dr. Wheeler did not use the Flock data to discern any of these routines. Pls.' Ex. 25 [Wheeler Report] at 8–14. Nor could he have. *See* Opp., SUF ¶ 35(b).

With one exception, Dr. Wheeler did not try to analyze whether Flock data would enable NPD to infer anything about whether Plaintiffs visited any location in Norfolk that Plaintiffs' counsel shared with him. ██████████████████████████████████

████████████████████████████████████████████████

Defs.' Ex. 13 [Wheeler Dep.] at 254:20–255:5. In his report. Dr. Wheeler did not explain *why or how* he was capable of drawing this inference. Pls.' Ex. 25 [Wheeler Report] at 9–11. Accordingly, that inference says nothing about the capabilities of the Flock cameras, which Plaintiffs says is the key issue. Nor did Plaintiffs or Dr. Wheeler try to test whether his inference was correct. ███████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

## **CONCLUSION**

Defendants' motion for summary judgment should be granted.

THE CITY OF NORFOLK and
MARK TALBOT

/s/ _____
Karla J. Soloria (VSB 82674)
Assistant City Attorney
Adam D. Melita (VSB 41716)
Chief Deputy City Attorney
karla.soloria@norfolk.gov
adam.melita@norfolk.gov
City of Norfolk Department of Law
810 Union Street, Suite 900
Norfolk, VA 23510
Telephone:  (757) 664-4529
Facsimile:  (757) 664-4201

*Attorneys for Defendants the City of Norfolk
and Mark Talbot*

E. Martin Estrada (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
(213) 683-9100
Martin.Estrada@mto.com

Jonathan I. Kravis (*pro hac vice*)
Lauren E. Ross (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue, NW, Suite 500E
Washington, D.C. 20001
(202) 220-1100
Jonathan.Kravis@mto.com
Lauren.Ross@mto.com

Justin P. Raphael (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105
(415) 512-4000
Justin.Raphael@mto.com

*Attorneys for Defendant the City of Norfolk*

21

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of October, 2025, I will electronically file the

foregoing Defendants' Reply in Support of their Motion for Summary Judgment with the Clerk

of Court using the CM/ECF system, which will send a copy of the foregoing to the following:

> Michael B. Soyfer, Esq. (NY Bar # 5488580; DC Bar # 230366)
> Robert Frommer, Esq. (VA Bar #70086)
> Joshua Windham, Esq. (NC Bar #51071)
> Tahmineh Dehbozorgi, Esq. (DC Bar #90030252)
> Jessica Bigbie, Esq. (TX Bar #24134429)
> James T. Knight, II (DC Bar #1671382)
> INSTITUTE FOR JUSTICE
> 901 N. Glebe Road, Suite 900
> Arlington, VA 22203-1854
> 703-682-9320 phone
> 703-682-9321 fax
> rfrommer@ij.org
> jwindham@ij.org
> msoyfer@ij.org
> tdehbozorgi@ij.org
> jbigbie@ij.org
> jknight@ij.org
>
> *Counsel for Plaintiffs*

/s/
_____
Karla J. Soloria (VSB 82674)
Assistant City Attorney
karla.soloria@norfolk.gov
City of Norfolk Department of Law
810 Union Street, Suite 900
Norfolk, VA 23510
Telephone:  (757) 664-4529
Facsimile:  (757) 664-4201

*Attorney for Defendants the City of Norfolk and Mark Talbot*