# EXHIBIT 2

*ECF # 111-2*

*under seal*



## Planet Depos
### We Make It *Happen*™

**CONTAINS CONFIDENTIAL AND ATTORNEYS' EYES ONLY INFORMATION SUBJECT TO PROTECTIVE ORDER**

# Transcript of Davis Lukens, Corporate Designee

**Date:** July 29, 2025
**Case:** Schmidt and Arrington -v- City of Norfolk, et al.

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
**www.planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

# Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

- - - - - - - - - - - - x

LEE SCHMIDT and CRYSTAL ARRINGTON,

Plaintiffs,

v.                          Civil Action No.

CITY OF NORFOLK and MARK   : 2:24-cv-00621-MSD-LRL

TALBOT, in his official capacity as Norfolk Chief of Police,

Defendants.

- - - - - - - - - - - - X

CONTAINS CONFIDENTIAL AND

ATTORNEYS' EYES ONLY INFORMATION

SUBJECT TO PROTECTIVE ORDER

Videotaped Deposition of FLOCK GROUP INC. d/b/a

FLOCK SAFETY, by and through its Designated

Representative DAVID LUKENS

Conducted Virtually

Tuesday, July 29, 2025, 9:05 a.m. EDT

Job No.: 589834

Pages 1 - 158

Reported by: Debra A. Whitehead

# Page 2

Videotaped Deposition of DAVID LUKENS, conducted virtually.

Pursuant to notice, before Debra Ann Whitehead, E-Notary Public in and for the Commonwealth of Virginia.

# Page 3

APPEARANCES

ON BEHALF OF PLAINTIFFS:

MICHAEL SOYFER, ESQUIRE

JOSHUA WINDHAM, ESQUIRE

ROBERT FROMMER, ESQUIRE

TAMINEH DEHBOZORGI, ESQUIRE

JESSICA BIGBIE, ESQUIRE

THE INSTITUTE FOR JUSTICE

901 North Glebe Road, Suite 900

Arlington, Virginia 22203

(703) 682-9320

ON BEHALF OF DEFENDANTS:

KARLA J. SOLORIA, ESQUIRE

ADAM D. MELITA, ESQUIRE

NORFOLK CITY ATTORNEY

900 City Hall Building

810 Union Street

Norfolk, Virginia 23510

(757) 664-4529

# Page 4

APPEARANCES CONTINUED

ON BEHALF OF FLOCK SAFETY AND THE WITNESS:

E. MARTIN ESTRADA, ESQUIRE

JOSEPH MANTEGANI, ESQUIRE

MUNGER TOLLES & OLSON

350 South Grand Avenue

50th Floor

Los Angeles, California 90071

(213) 683-9100

ALSO PRESENT:

JACK DUNN, Video Specialist

MICHAEL GOLDSTICKER, ESQUIRE

Inhouse Counsel, Flock Safety

CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION
Transcript of Davis Lukens, Corporate Designee
Conducted on July 29, 2025

2 (5 to 8)

**5**

C O N T E N T S

EXAMINATION OF DAVID LUKENS                      PAGE

By Mr. Soyfer                8

By Mr. Estrada               151

E X H I B I T S

(Attached to the Transcript)

PLAINTIFFS' DEPOSITION EXHIBIT              PAGE

Exhibit 54   Subpoena to Testify at a          12
             Deposition in a Civil Action

Exhibit 55   Printout from Flock Safety        54
             Website, Why Video Is the Missing
             Link in Your LPR Program

Exhibit 56   Printout from Flock Safety        72
             Website, How to Search in the
             Mobile App, Bates
             FLOCK 0000057 - 0000062

Exhibit 57   Printout from Flock Safety       102
             Website, Working with Search
             Results, Bates
             FLOCK 0000063 - 0000075

**6**

E X H I B I T S   C O N T I N U E D

PLAINTIFFS DEPOSITION EXHIBIT                   PAGE

Exhibit 58   SFTP Server Access and Content    114
             Guide

Exhibit 59   Excel Spreadsheet                 126

Exhibit 60   Flock Safety, End-to-End Data     142
             Architecture Summary for Flock
             Safety, Bates
             FLOCK 0000177 - 0000178

Confidential - Subject to Protective Order

23:22-26:15; 32:5-32:13; 33:3-35:7; 36:12-37:18;
39:6-44:22; 46:3-47:17; 47:21-48:18; 50:2-50:20;
52:11-53:20; 55:20-58:20; 59:13-60:12; 63:6-63:12;
63:21-71:20; 74:12-74:18; 75:4-76:1; 79:11-86:3;
88:2-99:21; 100:12-100:21; 101:6-102:4; 111:17-112:6;
112:20-114:6; 130:8-142:15; 142:18-144:4; 144:15-149:10

Attorneys' Eyes Only - Subject to Protective Order

114:10-124:17; 126:4-130:5; 151:16-154:8

**7**

P R O C E E D I N G S

VIDEO SPECIALIST:  Here begins Media Number 1 in the videotaped deposition of David Lukens in the matter of Lee Schmidt and Crystal Arrington V City of Norfolk and Mark Talbot, in his official capacity as Norfolk Chief of Police; in the United States District Court for the Eastern District of Virginia; Case Number 2:24-cv-00621-MSD-LRL.

Today's date is July 29, 2025.  The time on the video monitor is 9:05 eastern time.  The videographer today is Jack Dunn, representing Planet Depos.  All parties of this video deposition are attending remotely.

Would counsel please voice-identify themselves and state whom they represent.

MR. SOYFER:  My name is Michael Soyfer. I'm from the Institute For Justice.  I represent the plaintiffs in this case.  I am joined today by my colleagues Robert Frommer, Joshua Windham, Jessica Bigbie, and Tahmineh Dehbozorgi.

MR. ESTRADA:  Good morning.  My name is

**8**

Martin Estrada.  I am here representing the witness.  I'm joined by my colleagues Joseph Mantegani, from Munger, Tolles & Olson.  I'm also joined by Michael Goldsticker, in-house counsel for Flock.  And I am from the law firm of Munger, Tolles & Olson.

MS. SOLORIA:  Good morning.  My name is Karla Soloria.  I am with the Norfolk City Attorneys' Office, and I am appearing on behalf of the defendants.

VIDEO SPECIALIST:  The court reporter today is Debbie Whitehead, representing Planet Depos.

The witness will now be sworn.

DAVID LUKENS, having been duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS

BY MR. SOYFER:

Q   Okay.  Good morning.

We'll start with the most difficult question first.  Could you please state your name, for the record.

A   My name is Davis Lukens.

Q   And Mr. Lukens, before today you and I have never met.  Correct?

A   Correct.

Q   And where are you joining us from today?

A   Atlanta, Georgia.

Q   And is your counsel in the room with you during this deposition today?

A   Yes.

Q   Are you employed, Mr. Lukens?

A   I am.

Q   Where are you employed?

A   Flock Safety.

Q   What do you do at Flock Safety?

A   I'm the chief technology officer.

Q   Have you been deposed before?

A   I have not.

Q   Have you ever given testimony at trial or in court, anything like that?

A   I have not.

Q   So I'm going to go through some ground rules since this is your first deposition.  And just some basics to kind of make sure that today goes smoothly and we get a clean record and we don't, you know, light our court reporter's arms on fire.

So the first thing is, just always remember, verbal responses.  If you shake your head, it's difficult for our court reporter to get down.  The same thing with saying uh-huh or unh-unh.  So just always yes, no, a verbal response.

Sound good?

A   Yes, sir.

Q   The next thing is, I'll always try to let you finish your answer before I ask my next question, and I just ask that you let me finish my questions before you give an answer.

Is that fair?

A   Yes.

Q   If -- sometimes I ask questions that are confusing to witnesses, and I just ask that if I do so, you let me know and ask for a clarification.  I'm always happy to clarify or try to rephrase my question so that we're on the same page.

By that same token, if you answer my question I'll assume that you understood it.

Is that fair?

A   Yes.

Q   Is there any reason today that you can't give truthful and accurate testimony?

A   No.

Q   And I'll just say, this is a very standard question that's asked in every deposition.  Sometimes people take it the wrong way, but I'm going to ask it today.

Are you on any drugs or other substances that would interfere with your ability to testify truthfully and accurately today?

A   I am not.

Q   Are you receiving any compensation in exchange for your testimony today?

A   Not beyond my normal salary at Flock.

Q   Got it.  You just don't have to take a sick day or a vacation day or whatever in that sense?

A   No.

Q   Has anyone made you any promises in exchange for giving certain testimony today?

A   No.

Q   Is your continued employment at Flock in any way contingent on the testimony that you give today?

A   No.

Q   Do you understand that you're here today as a representative to testify on behalf of Flock as a company?

A   I am.

Q   And do you understand you've been designated to testify on certain topics?

A   I am.

Q   Do you have an understanding what those topics are?

A   I do.

Q   In just a moment you should see in the chat Plaintiff's Exhibit 54.

(Plaintiffs' Deposition Exhibit 54 marked

13

for identification and is attached to the transcript.)

MR. SOYFER: And I'll state for the record this is our deposition subpoena to Flock Group, Inc., doing business as Flock Safety.

MR. ESTRADA: Michael, give us a chance to put that up on the screen here.

MR. SOYFER: Okay.

MR. ESTRADA: Okay. We have it.

Q And if I refer to Flock today, obviously you'll understand that that's the company identified here as Flock Group, Inc., doing business as Flock Safety. Correct?

A Yes.

Q Great. And I'd like for you to turn to Page 4 of this PDF. And you'll see that there's a section entitled Deposition Topics.

Let me know if you're there.

A I'm there.

Q Okay. And if you look at the topics, they span Pages 4 to 6.

A Yes.

14

Q Is it your understanding that you're designated to testify on Topics 2 to 5 and 10 to 12?

A Yes.

Q Okay.

MR. ESTRADA: And I can confirm that is what Flock Safety has designated Davis Lukens for.

MR. SOYFER: Great. Thank you, Martin.

Q And in preparing for your deposition today, did you review this document?

A I did.

Q What did you do, just generally, to prepare for your testimony today? And I'll just say up front I'm not asking for specific conversations or the details of conversations with your attorneys, just a general description of the process of preparing to testify today.

A I met with my attorneys.

Q How many times?

A Five total times.

Q And for how long roughly each time?

A Between one and five hours, eight hours

15

one time.

Q One time was for eight hours?

A Yes.

Q Am I --

A Yes. Yeah.

Q And the other times were between one and five hours.

Is that right?

A That is correct.

Q Did you review documents during that time?

MR. ESTRADA: So I'll just interject here.

I will instruct the witness not to answer with regard to any communications you had with your counsel. And I will instruct the witness not to identify specific documents you would have viewed during the preparation sessions.

With those caveats, you can answer if you understand the question.

A I did review documents, yes.

Q Did any of those documents refresh your

16

recollection of any matters or events?

A Yes.

Q And what were the documents that refreshed your recollection?

A We reviewed a lot -- a lot of documents.

Q None specifically stand out to you?

A No.

Q Did you talk to any other Flock employees?

A I did my prep along with Josh Thomas, who you will be speaking with later.

Q Anyone else you spoke to at Flock, current employee, former employee, anyone?

A No, not for preparation for this. No.

Q Okay.

A Beyond my normal day-to-day of doing my job with all of them, just to be clear.

Q Understood. Okay.

A Yeah. Yeah.

Q Where did you attend college?

A Denison University.

Q And what did you study there?

17

A   Economics and computer science.
Q   When did you graduate?
A   2012.
Q   Did you go to grad school?
A   I did.
Q   Where did you go to grad school?
A   Georgia Tech.
Q   What did you study at Georgia Tech?
A   I have an M.B.A.
Q   Any other graduate degrees, anything like that?
A   I took a year of master's in computer science during the pandemic, but I did not finish.
Q   Where was that?
A   At Georgia Tech.
Q   Any certifications, courses, outside of university?
A   Not -- not really, no.
Q   How long have you worked at Flock?
A   Just over six years.
Q   So beginning roughly in 2019?
A   Yes.

18

Q   What were you doing before Flock?
A   I worked at Home Depot for a period of time in the technology department there, and then before that a number of other technology companies.
Q   Let me just ask you generally what did you do at Home Depot in the technology department?
A   We designed the system for last mile delivery to customers, so the system that decided whether or not a hammer could go on a -- in a car or it could go on a box trail -- box truck.
Q   Got it.  What was your first job at Flock in 2019?
A   I was the -- my title was product.
Q   And what did you do in that job, just kind of generally?
A   I spent time with customers to help determine what we should build from a technology perspective.
Q   So kind of understanding customers' needs and then deciding which products to build based on those?

19

A   That is correct.
Q   What types of customers at that point in time?
A   Mostly HOAs and homeowners' associations, and then shortly after, law enforcement.
Q   What sort of products did you determine should be built based on your experience there, if anything?
A   May I ask what time frame you were referring to, focused on?
Q   Yeah.  Let me ask you, when you were in this product role, how long were you in that product role?
A   My title changed multiple times as the team grew.  However, I was mostly in that role until the beginning of last year.
Q   Okay.
A   And still in many ways am part of that role.
Q   Got it.  So can you just tell me how your job responsibilities changed over time in that role?

20

A   Yes.  When I joined, I joined mostly on the product-management side.  However, as we grew I took on engineering as well, and today focus on engineering, and the product side is under a different colleague.
Q   When you say "engineering," what do you mean?
A   All of the people responsible for actually developing the product itself; writing software, building hardware, all of those pieces.
Q   And how is that distinct from product; can you just explain that to me a little bit?
A   Product management from a job function is usually one that is customer-facing, spends time understanding the problem statements that a customer might have, developing specifications for what we might want to build, and working with engineering to actually decide how -- how we build it and how long it will take.  Versus engineering being those that have more technical degrees and are writing software, you know, building hardware, all those types of things.

CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee

Conducted on July 29, 2025

**Page 21**

Q   Got it.  And so just to go back in my question, during your time in product management, were there any new products that you determined should be built based on customer feedback?

A   Yes.

Q   What were those products, just generally?

**A   We built -- decided to build a video camera, gunshot detection or audio detection solution, and a number of different software products.**

Q   What were the software products?

**A   It's what we call Flock OS.**

Q   So I guess just trying to understand. During your time in product management, based on customer feedback, Flock decided to build Flock OS.

Is that right?

**A   That is correct.**

Q   Were there specific kind of components or features, anything like that, that you determined to build based on customer feedback during that time?

**Page 22**

**A   Yes.**

Q   And what were those?

**A   We built a number of, you know, different iterations, like software does, of our search interface to ensure that it was as easy to use as possible, you know; mobile application; map-based interface for real-time crime centers.  Other -- other tools that are necessary for managing the day-to-day use of the Flock system, et cetera.**

Q   Can you clarify what do you mean by "map-based interface"?

**A   If you were to go into most all real-time crime centers, they will have a map kind of in the middle, and it kind of represents, so that the city, so they can respond appropriately to a 911 situation.**

Q   Got it.  So you became the chief technology officer in 2024.

Is that right?

**A   That is correct.**

Q   And what are your responsibilities as the chief technology officer?

**Page 23**

**A   I'm responsible for all of the engineering organization, as well as security.**

Q   When you say "security, what" do you mean?

**A   I -- information security, physical security, compliance.**

Q   Okay.  Let me break that down.

So information security, is that guarding Flock Systems from, like, outside actors like hackers, that sort of thing?

**A   That is correct.**

Q   Does it include ensuring employees don't exceed their authorized access as well?

**A   Yes.**

Q   Got it.  What about monitoring customers' access to the system; does that fall within information security at all?

**A   No.**

Q   So you say physical security.  Is that just like the security of Flock's buildings?

**A   That is correct.**

**Page 24**

CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee

Conducted on July 29, 2025



Page 25 and Page 26 are redacted.

**Page 27**

Do you see that?

A   I do.

Q   What did you do to prepare to testify on this topic, just generally?

A   As part of my job I am aware of the answers to most of these topics.

Q   Got it.  And so you supervise I guess the engineering of Flock cameras.

Is that fair to say?

A   That is correct.

Q   Do you understand what types of Flock cameras -- well, strike that.  Let me just ask you, when we refer to "defendants" here, do you understand that that means the City of Norfolk and its police chief in his official capacity?

A   That is my understanding.

Q   And so I'll just throughout today refer to them as "defendants" to save us a little bit of time.

Is that fair?

A   Yes.

Q   What types of Flock cameras do you

**Page 26**

Q   So I want to turn to the topics on which you've been designated.  And we're going to start with Topic 2, which is "The technical capabilities of the Flock cameras owned, rented, or otherwise acquired by defendants; including," and then there's a list of certain -- certain details of the camera's capabilities.

**Page 28**

understand defendants to have?

A   They have the Flock Safety LPR camera.

Q   Is there a specific type of -- well, let me ask you this: Does Flock Safety sell multiple types of LPR cameras?

A   Yes.

Q   Can you just tell me what those are?

A   We have the standard Flock camera, we have the Flock LPR long-range camera, and then we have the falcon -- the Flock flex LPR camera.

Q   Let me ask you, also again just generally, what is a LPR camera?

A   License plate reading camera.

Q   And which of the three cameras you just identified do defendants have?

A   The standard camera.

Q   They don't have the long-range camera?

A   No.

Q   What does the standard Flock LPR camera do?

A   Generally or just specifically?

Q   I guess give me a general overview.

**A** Flock license plate reading camera is a stationary LPR camera affixed to a pole. It captures vehicles driving in the -- in the direction that the camera is facing and is focused on capturing license plates of those vehicles.

**Q** Does it capture more than license plates?

**A** It takes a picture of the vehicle.

**Q** Does the picture include only a vehicle? Can it include more?

**A** It's a color image of the field of view of the camera, so there could be other things; trees, roadway, et cetera.

**Q** Got it. So it's a color image of the vehicle and the surrounding area that's within the field of view of the camera. Is that right?

**A** That is correct.

**Q** Do they -- so just tell me, like, are they kind of constantly taking pictures? Like, how do the cameras get triggered to take a picture?

**A** They're motion activated.

**Q** So when a vehicle drives past the camera, it's activated to take a picture. Is that right?

**A** That is correct.

**Q** Could it be activated by the motion of things other than vehicles?

**A** It is technically possible, yes.

**Q** Are they in the real world activated by the motion of things other than vehicles?

**A** Yes.

**Q** What types of things could activate the cameras?

**A** Could be a tree branch, something like that.

**Q** Could a person walking past activate the camera?

**A** Yes; it would activate the motion of the camera.

**Q** And every time the camera is activated, it snaps a picture. Is that right?

**A** Yes.

**Q** So every passing car, a picture is taken. Correct?

**A** That is correct.

**Q** I want to ask, so if you look at the topic again, I kind of wanted to break down some of the details here. So we're going to start with their accuracy in capturing car details. Do you see that?

**A** I see that.

**Q** What details about cars do Flock -- the Flock cameras capture?

**A** They capture the license plate, which is two pieces: The state of the plate, as well as the OCR value, which is the optical character recognition value, industry term for the reading of the license plate number. And then additional attributes about the vehicle itself; make, type, color, roof rack, bike rack, bumper sticker, window sticker, and toolbox.

**Q** What do you mean by toolbox? If there's just, like a toolbox on the vehicle?

**A** Toolbox that you would see on a pickup truck for, like, a work truck.

**Q** Got it. How do they read the license plates?

**A** We use machine learning.

**Q** What does that -- explain to me what machine learning is, first of all.

**A** It's the providing of examples to a computer-trained -- telling it what those particular images are, in this case the license plate number is human transcribed of the image, and then the model is trained based off of that data in order to then identify in different images those -- those numbers or letters.

**Q** So let me go back and just -- sometimes I'll ask you really obvious questions, they're just so that we have things clear for the record, so bear with me on those. But today when I talk about the Flock cameras, you'll understand that I mean the type of Flock cameras that defendants have. Correct?

**A** Yes, the Flock LPR, license plate reading camera.

CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee

Conducted on July 29, 2025

**33**

Q    Great.

A    **Standard.  Standard camera, yes.**

Q    So let me just kind of drill down on that process a little bit.

What is the machine learning program using to decode the license plate?

A    **It's -- sorry, struggling with the word "decode."**

Q    I guess let me -- I'll rephrase that.

What is the machine learning program using to read the license plate?

A    **It is -- it is using the output of trained data, which would -- which is in this case is the data I mentioned earlier of human annotated data.**

**And it then uses that information that is trained into the model of the type of machine learning algorithm that we use to then predict license plates via when a new image is provided to it.**

Q    So, yeah, I guess I just want to be clear.  The machine learning program you have is

**34**

using the image of the car.  Right?  The image that is taken by the Flock cameras.

Is that right?

A    **That is the input to -- to the model, yes.**

Q    Okay.  Is machine learning a form of artificial intelligence?

MR. ESTRADA:  Objection.  Vague and ambiguous.

A    **They are used interchangeably by the general public, but artificial intelligence is a type of machine learning.**

**35**

Q    Does the decoding of license plates depend on the camera hardware?  I guess scratch that, because I think the word "decoding" is potentially what you said you don't like.

So let me ask you, does the reading -- does the accuracy of reading license plates depend on the camera hardware?

A    **It depends on the quality of the picture.**

Q    Does that, in turn, depend on the camera hardware?

A    **Yes.**

Q    Okay.

A    **But that is not the only piece that impacts it.**

Q    What are the other ones?

**36**

A    **Weather, time of day, deployment, location, other external factors that cannot be controlled by the camera.**

Q    How accurate are the cameras in reading license plates?

A    **It is very dependent on the location and deployment situation of the camera.**

Q    Does Flock advertise certain accuracy rates to its customers?

A    **We do testing and provide that as part of the information to our customers.**

Q    Based on your testing, how accurate are the cameras in reading license plates?

MR. ESTRADA:  And just to be clear, we're talking about defendants' cameras.  Correct?

MR. SOYFER:  Correct.

A    **The camera that the defendants have, given that it is deployed to the specifications provided by Flock Safety, is about 93 percent accurate.**

Q    And how effective are they at capturing passing cars?

CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee

Conducted on July 29, 2025



**Page 37**

A    They're about 97 percent accurate in capturing a car.

Q    How did Flock determine that?

A    Real-world testing.

Q    When you say "real-world testing," that would be putting the cameras on a real street and driving cars by them?

A    That is correct.

Q    And then observing the results. Correct?

A    That is correct.

Q    Can you tell me in the 3 percent of cases where a car isn't captured, why is that?

A    It's usually due to it being obfuscated by another vehicle.

Q    What about, so you mentioned a bunch of other car details, I think among them were make, color, model.

Do you recall that?

**Page 38**

A    I did not say "model."

Q    Oh. Can the -- can the cameras determine the model of a vehicle?

A    No.

Q    No. Okay.

Okay. I believe you said that the cameras can capture additional attributes about the vehicle itself, make, type, color, roof rack, bike rack, bumper sticker, window sticker, and toolbox.

Is that right?

A    That is correct.

Q    What do you mean by type?

A    SUV, car, truck, box truck, those types of things.

Q    And how do they -- how do the cameras determine that from the images they capture?

A    The same process that we use for reading the license plate.

Q    Machine learning. Correct?

A    That is correct.

Q    Have the details that the cameras can

**Page 39**

determine from the images changed over time?

A    Yes.

Q    How have they changed, just at a general level?

A    We have added new categories.

**Page 40**

PLANET DEPOS

CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee

Conducted on July 29, 2025

11
(41
to
44)



Transcript of Davis Lukens, Corporate Designee

Conducted on July 29, 2025



45

Q   So let's look at B, the horizontal -- sorry.  B is the horizontal and vertical fields of vision of the Flock cameras.

Do you see that?

A   I do.

Q   Have those changed at all over time?

A   Yes.

Q   How have they changed?

A   We provide different focal length, focal distance cameras.

Q   Got it.  So I'm talking about defendants' Flock cameras.

For defendants' Flock cameras has that changed over time?

A   Once installed, it can't change.

Q   So after the camera is installed, its vertical and horizontal field of visions are what they are --

A   Correct.

Q   -- is that right?

And so is it your understanding that after their initial acquisition of Flock cameras,

46

defendants acquired more Flock cameras?

A   That is my understanding, yeah.

47

Q   Understood.  Who chooses the focal length for each camera that's installed?

A   Flock Safety.

48

On a two-lane road with one lane in each direction, would that capture oncoming traffic as well?

A   It would if it was positioned to do so.  However, the camera is not designed to capture oncoming traffic.

Q   Okay.  I want to move on to C, the minimum and maximum speeds at which they can photograph cars.

Do you see that?

CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

13
(49
to
52)

Transcript of Davis Lukens, Corporate Designee

Conducted on July 29, 2025

---

**49**

A    I do.

Q    What are the minimum and maximum speeds at which the defendants' Flock cameras can photograph cars?

A    **For our customers we say that it can go anywhere between 0 and around 60 miles per hour.**

Q    0 and around 60.

I've seen -- so I've just seen Flock advertisements saying up to 100 or even over 100. Are those referring to a different type of camera?

A    No.

Q    So can you just explain to me that difference there?

MR. ESTRADA: Objection. Assumes facts.

You can answer, if you understand.

A    **It is possible that it can read a car, a camera -- the license plate of a car going that fast; however, the likelihood of doing so and accuracy of doing so is not as high.**

Q    Got it. So it's high up to 60.

Is that fair?

A    **That is the range that we provide to our**

**50**

**customers for optimal functionality of the camera.**



Q    Let's go to the next one. This is lower case D, the minimum and maximum distance at which

---

**51**

they can photograph cars.

Do you see that?

A    **I do.**

Q    What are the minimum and maximum distances at which the defendants' Flock cameras can photograph cars?

A    **The specification we give for optimal capture is between 40 and 70 feet.**

Q    Does Flock try to position the cameras so that they're within that optimal range?

MR. ESTRADA: Objection. Assumes facts.

A    **We will -- we will choose the right camera to get between 40 and 70 feet.**

Q    Sorry, you said "choose the right camera"?

A    **As I mentioned earlier, there's multiple focal distance cameras.**

Q    Okay. Gotcha.

And I guess I am asking, so Flock has some role in advising its customers on the precise placement of cameras to capture cars on roadways.

Is that fair to say?

**52**

A    **Once given the locations that the agency would like to, or customer would like to install -- install at, we provide, you know, information on whether or not that camera will work at that location or not.**

Q    Okay. And when Flock installs the cameras, does it do so to get the right kind of distance where the camera, given the focal length, will be able to capture cars on the roadways?

A    **Yes.**

---

PLANET DEPOS



**Page 53**

Q So they --

MR. SOYFER: Well, let me actually mark

**Page 54**

Plaintiffs' Exhibit 55.

(Plaintiffs' Deposition Exhibit 55 marked for identification and is attached to the transcript.)

Q Let me know when you have this open.

MR. ESTRADA: Give us one second here.

MR. SOYFER: No problem.

A I have it open.

Q And what is this document?

MR. ESTRADA: Do you want him to look at the entire document? It's 11 pages.

Q I mean, you can just tell me generally what it is. But if you need to look at all 11 pages to do that, feel free.

A It looks like it's a post from the blog section of the Flock Safety website.

Q Do you contribute at all to the Flock -- the blog section of the Flock Safety website?

A Not personally.

Q But these are written by Flock employees. Correct?

A Usually.

**Page 55**

Q So what I want to ask you about is, if you look at this document on Page 2 of the PDF, you'll see 2 out of 11 in the bottom right corner. There is a section entitled What's New From Flock.

Do you see that?

A Yes.

Q And then after that there's kind of a subsection there in bold text it states, "Live video on LPR cameras coming late 2025."

Do you see that?

A I do.

Q And then beneath that it states, "All existing Flock LPRs will soon stream live video and capture clips with a free optional software update."

Did I read that correctly?

A That's what it says.

Q Well, let me just ask you, is that true?

A Yes.

Q And is it true for defendants' Flock cameras?

A Only if they choose to upgrade.

**Page 56**

Q So it is true that defendants can choose to upgrade to stream live video and capture clips. Is that right?

A By the end of the year, that is our goal.

CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee

Conducted on July 29, 2025



Page 57 [text redacted]

Page 58 [text redacted]

Q   Could Flock also enable recording video on the cameras?

MR. ESTRADA: Objection. Calls for speculation.

A   **It is possible to enable recorded video.**

Q   Okay.

A   **Given we write the software to do so.**

Q   Are customers able to opt in to this new video capability now?

A   **No.**

Q   So moving to the next subtopic here, that would be lower case F, their ability to operate at

Page 59

night.

Do you see that?

A   **I do.**

Q   Are the Flock cameras the defendants have able to operate at night?

A   **Yes.**

Q   Are they able to capture pictures of cars at night?

A   **Yes.**

Q   Are they able to read the license plates of cars at night?

A   **Yes.**

Q   How accurate are they in doing that?

A   **Less accurate than during the day.**

Q   Do you have an estimate of, say, percentage, anything like that?

A   **Around 90 percent.**

Q   Around 90.

Was that tested in the real world, like the other numbers you've given us today?

A   **Yes.**

Q   Has that number improved over time?

Page 60

A   **Yes.**

Q   Is Flock continuing to work to improve that number?

A   **We would always like the product to work better for our customers for capturing at night.**

Q   My question was a little bit different.

Is Flock continuing to work to improve the camera's accuracy in reading license plates at night?

MR. ESTRADA: Objection. Asked and answered.

A   **Yes.**

Q   So let's move to the last topic here, which is whether the cameras operate continuously.

Do you see that?

A   **I do.**

Q   Do they operate continuously?

A   **Not for capturing license plates or vehicles, no.**

Q   Only when triggered by motion. Correct?

A   **That is correct.**

Q   Do they have, like, down time every day,

CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee

Conducted on July 29, 2025

---

61

anything like that?

A   No.

Q   So as long as they're up, they're, I guess, ready to be triggered by motion and capture images.

Is that fair to say?

A   Yes.

Q   Let me also ask you this: If cameras are down, does Flock know?

A   Yes.

Q   And how does Flock know?

A   The camera sends health-related telemetry to the cloud.

Q   What does Flock do when there are issues with a camera?

A   We try to fix it.

Q   So let's move on to Topic 3. And by the way, I know we've been going for about an hour.

MR. ESTRADA:  Is this a good time for a short break?

MR. SOYFER:  Yeah.  Let's go off the record.

---

62

MR. ESTRADA:  Five minutes, does that work?

MR. SOYFER:  Yeah.

VIDEO SPECIALIST:  Stand by.

We are going off the record.  The time is 10:04 eastern.

(A recess was taken.)

VIDEO SPECIALIST:  We are back on the record.  The time is 10:12.

BY MR. SOYFER:

Q   Mr. Lukens, we're back from a break.

You understand you are still under oath.

Correct?

A   I do.

Q   I want to move on to Topic 3, which is how, quote, Vehicle Fingerprint, end quote, works at a general level as well as its intended use and/or -- sorry, I messed that up.  Let me start that over.

Topic 3 is how, quote, Vehicle Fingerprint, end quote, works at a general level, as well as its purpose and/or intended use.

---

63

Correct?

A   I see that, yes.

Q   What is Vehicle Fingerprint?

A   It is the marketing name for the vehicle attributes that we discussed earlier.

Q   Got it.  So it kind of refers to the ability of the Flock cameras to determine the vehicle attributes that we discussed.

Is that right?

A   Yes.  It's the marketing name for the output of the machine learning model that we discussed earlier.

Q   And that includes all of the fields that you've listed for us.  Correct?

A   Make, type, color, bike rack, roof rack, bumper sticker, window sticker, toolbox.

Q   Does it include damage to the vehicle?

A   No.

Q   Has it ever?

A   No.

---

64

Q   Can it detect if a person is in the frame?

---

PLANET DEPOS

CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee

17
(65
to
68)

Conducted on July 29, 2025



65

A   The word "detect" is probably -- I mean, although we did just use it for the other cases, it can say in the output that there is a vehicle and it is a bicycle or a motorcycle.  It cannot do so for people.

Q   So -- strike that.

So the cameras cannot say if there is a person in the frame of an image.

Is that your testimony?

MR. ESTRADA:  Objection.  Vague and ambiguous.

A   That is correct.

Q   Have they ever been able to do so?

A   Yes.

Q   During what period of time?

A   The first year I was at Flock.

Q   So in 2019.

Is that right?

A   That is correct.

Q   Why aren't they able to do so now?

A   We removed that capability.

CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee

Conducted on July 29, 2025



Okay. So one way you could search for a car in Flock OS is you could type in the license plate and you could pull up all the images where the camera has read that license plate.

Is that right?

A    You can search by license plate, yes.

Q    You can also search for the vehicle features using these Vehicle Fingerprint features.

Correct?

A    You could filter search results by those filters, yes.

Q    And so in cases where the cameras didn't read the car correctly, you may still be able to pull up additional images of a car based on the Vehicle Fingerprint features. Right?

A    You would be able to get search results based off of those vehicle attributes if you did not enter a license plate.

Q    I guess what I'm asking is, a car passes Flock cameras multiple times. Right? And one of those times the camera doesn't read the license plate correctly.

Are you with me?

A    Yes.

Q    So if I just search the license plate that one time where the license plate wasn't read correctly won't come up in my search. Right?

MR. ESTRADA: Objection. Incomplete hypothetical.

A    If you type in a license plate with specific numbers, and that license plate number was not in a different image, then that image

would not come up.

Q    But vehicle fingerprinting could potentially let me find that image where the license plate was not read correctly if I know other feeders of the car that I can use to search.

Correct?

MR. ESTRADA: Objection. Incomplete hypothetical.

A    A car that matched the description, if captured by a Flock camera, it -- and other -- and other cars similar to that car based off those attributes filtered would return, yes.

Q    And so using Vehicle Fingerprint features, I could possibly pull up additional images of a car I'm searching for where the license plate wasn't read correctly for whatever reason by the Flock cameras. Correct?

A    It is possible to get images of a car that we did not read the license plate correctly using Vehicle Fingerprint searches.

MR. SOYFER: I'd like to pull up a document. This will be Plaintiffs' Exhibit 56.

(Plaintiffs' Deposition Exhibit 56 marked for identification and is attached to the transcript.)

A    Downloading.

Q    Let me know whenever you have that open.

A    I have it open.

MR. SOYFER: Okay. For the record, this is a document produced by Flock bearing Bates Stamp Flock 0000057.

Q    Mr. Lukens, what is this document?

A    Give me one second to look at it.

Q    Of course.

A    It's an article from a -- from the Flock FAQ about the Flock -- searching using the Flock mobile app.

Q    Are you familiar with the Flock mobile app?

A    I am.

Q    In your role as chief technology officer, do you oversee development of the Flock mobile app?

A    I do.

CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee

Conducted on July 29, 2025

19
(73
to
76)

**Page 73**

Q    What is the Flock mobile app?

**A    It's a mobile-friendly version of the features that we provide via a desktop.**

Q    Okay.  So it gives Flock customers the ability to access the same features available on the web in a mobile-friendly version.

Is that fair?

**A    Not all of them, but many of them, yes.**

Q    Understood.  So if you turn to the second page, you'll see that there's an image there.

Correct?

**A    I do.**

Q    And this is the Home tab of the Flock Safety mobile app.  Correct?

**A    At the time -- at the time of publishing this FAQ, yes.**

Q    It might look a little different now.

Is that your testimony?

**A    Yes.**

Q    So if you look underneath that image, there is text that states, Then -- sorry.  Okay. If you look underneath that image, we're there's a

**Page 74**

line of text and then some bullet points.

Correct?

**A    Yes.**

Q    If you look at the first bullet point, it states, "You can conduct a partial plate search when you don't have the full license plate.  If you don't have a license plate, you can also search using Flock's Vehicle Fingerprint selections."

Did I read that correctly?

**A    Yes.**

Q    And is one of the purposes of Flock's Vehicle Fingerprint selections to enable searches where officers don't have a license plate?

**A    It's to allow filtering images based off of those Vehicle Fingerprint characteristics, yes. And you do not have to have a license plate as part of that search.**

Q    I want to look at the last bullet point now.  You will see that states, "Just by searching plate and state, it will follow the 'lookup tool' rules to provide the vehicle's journey in the last

**Page 75**

30 days."

Do you see that?

**A    I do.**



Q    What does it mean when it says "This provides the vehicle's journey in the last 30 days"?

**A    It will give the results for that license plate of all the -- all the different cameras that read that license plate over the last 30 days.**

Q    So that is the vehicle's journey over the last 30 days that's referenced here?

MR. ESTRADA: Objection.  Vague and ambiguous.

**A    I would not use those words, although I see them on this page.**

Q    And this is something -- this is something Flock drafted.  Correct?

**A    It's a Flock-written FAQ, yes.**

Q    Who puts together the FAQs?

**A    A combination of the product team and marketing.**

Q    Is the product team under your purview?

**A    No.**

Q    Who heads the product team at Flock

PLANET DEPOS

CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee

Conducted on July 29, 2025

77

Safety?

A    His name is Bailey Quintrell.

Q    If you turn to the next page, you will see another image of the Flock Safety mobile app. Correct?

A    I do.

Q    And does this kind of provide the general search layout, at least as of the time of this FAQ?

A    It does.

Q    If you look in the top left corner, you'll see that there is a date and a time there. Correct?

A    You're referring to 4/9/25?

Q    Yes.

A    I see that.

Q    And so the Vehicle Fingerprint feature -- so I want to focus on the Vehicle Fingerprint Feature part of this section. You'll see it says, Make. Correct?

A    I do.

Q    And that's the car manufacturer. Right?

78

A    That's correct.

Q    Then there's a Color field. Right?

A    Yes.

Q    And then a Body field. Correct?

A    Correct.

Q    And is that where you would select I think what you referred to as type?

A    That is correct.

Q    So it would be like SUV, sedan, that sort of thing?

A    That's correct.

Q    And then Identifiers, that would include the bumper stickers, window stickers, toolbox, roof rack, that sort of thing. Right?

A    That is correct.

Q    Can you type in here -- so if you look just above where we were looking, there's a License Plate field. Correct?

A    Correct.

Q    And the license plate state. Right?

A    Correct.

Q    Could you type in both the license plate

79

and use the Vehicle Fingerprint features at the same time?

A    Yes.

Q    I think that's all I have on that document, so you can set that aside. So I want to move on to Topic 4, which is how Convoy Analysis works at a general level, as well as its purpose and/or intended use. Do you see that?

A    I do.

Q    What is Convoy Analysis?

A    It's a search feature that allows a user to enter a license plate and see vehicles that were traveling within a certain time frame through the same cameras that that license plate that was entered did multiple times.

Q    Okay. I guess I want to break that down a little bit. So it looks for vehicles that are captured by the same camera or cameras at around the same time, just as a starting step. Correct?

A    First step is it takes a license plate,

80

finds where that license plate was on a number of cameras, on all the cameras that were searched. Then it goes and finds other camera -- other vehicles that were seen on either side of a particular time frame. And then it goes and sees if those same cars were on other cameras at the similar time as the other license plate was seen as well.

Q    Gotcha. So essentially cars that are seen at the same places, around the same times, multiple times. Correct?

A    That is correct.

CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee

Conducted on July 29, 2025



**Page 81**

Q   Is that something someone could do manually?

A   Yes.

Q   So Flock just makes it easier to do the same thing that you could kind of do manually. Right?

A   That is correct.

Q   A detective, for instance, could go in, look at the vehicles that were captured on the camera 30 seconds before, 30 seconds after, and do that for all of the cameras where a vehicle they're interested in is captured.  Right?

MR. ESTRADA: Objection.  Lack of foundation.

A   That is a process that they could do manually.

Q   What's the purpose of Convoy Analysis?

**Page 82**

A   Just -- just to allow someone to do something in an automated way that they already do manually.

**Page 83**

Q   And so this was a way to help them automate the process of looking for multiple vehicles that were involved together in a crime. Correct?

A   I'd use the word "speed up."  It does not happen automatically without them starting the search.

**Page 84**

Transcript of Davis Lukens, Corporate Designee
Conducted on July 29, 2025



**Page 85**

[text redacted]

**Page 86**

[text redacted]

Q   Got it.

A   **And to be clear, Norfolk does not have access to this product.**

Q   And why is that?

A   **They chose not to buy it.**

Q   So it's like an add-on, I guess?

A   **That is correct.**

Q   Is it part of -- let me just ask you, do you sort of pay a la carte for that, if you understand what I mean, or is it part of, like, a different package that you have to purchase?

A   **It is a part of a package of a couple different features.**

Q   Could Norfolk buy that package?

MR. ESTRADA: Objection. Lack of foundation. Calls for speculation.

A   **I'm not aware of what the city council or community would approve of, whether they have the capability for them to buy that or not.**

**Page 87**

Q   On Flock then, is that available for Norfolk?

A   **They could reach out to their sales rep and ask to buy it, yes.**

Q   And Flock wouldn't say no, or that's impossible, or anything like that. Right?

MR. ESTRADA: Objection. Calls for speculation. Beyond the scope.

A   **Not -- not given that they had approval to buy it.**

Q   Not given that they have approval to buy it. What do you mean?

A   **It costs money, and therefore they would have to get the money from their city council to buy it.**

Q   So Flock would want to know that they have the money to pay for it, essentially.

Is that fair?

MR. ESTRADA: Objection. Misstates testimony.

A   **No; I'm just discussing what the process that would need to be done by the city in order to**

**Page 88**

**get access to it.**

[text redacted]

PLANET DEPOS

CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee

Conducted on July 29, 2025



CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION
Transcript of Davis Lukens, Corporate Designee
Conducted on July 29, 2025

24
(93
to
96)

CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee

Conducted on July 29, 2025

**97**



Q    So it just kind of outputs for the user a map now that this vehicle has passed this camera, based on historical data, vehicles passed these other cameras these percentages of the time.

Correct?

MR. ESTRADA:  Objection. Mischaracterizes testimony.

**A    Yes, it gives the percentage that the passed cars that passed the hot list camera that presented -- created the hot list alert, what other cameras past vehicles went past next, if any.**

Q    And the purpose of that is for the officer to be able to make a decision to go to whichever camera they think it's most likely for that vehicle of interest to pass next.  Correct?

**A    It is a piece of data they can use to -- one of many that they will use to make the best decision that they can as a law enforcement officer.**

**98**

Q    Got it.  So they can use that data point, along with other information available to them, to make a decision about how to pursue a vehicle.

Correct?

**A    What next action to take.**

Q    So they can use that data point along with other information available to them to decide what next action to take.

That's your testimony.  Right?

**A    Yes.**

Q    And the reason they're doing that is because they want to locate that vehicle of interest.  Correct?

MR. ESTRADA:  Objection.  Asked and answered.

**A    That may be one of the reasons that they're doing so.**



**99**



Q    So I guess counsel sort of explained this

**100**

earlier, but I'd rather hear it from you.

Is Real-Time Routing available to Norfolk?

**A    No.**

Q    Is it available for purchase to Norfolk?

**A    It is part of the same package as Convoy Analysis.**

Q    So Norfolk, if it had authorization, could come to Flock and buy Real-Time Routing along with Convoy Analysis.  Right?

**A    That is correct.**

Q    Is there anything about Real-Time Routing that an officer could do manually just looking at the data?

**A    They could manually recreate the percentages.  I guess I would --**

Q    Yeah -- oh, sorry.  Go ahead.

**A    I would assume an officer is knowing -- having worked in that particular community, would probably -- be better at knowing where vehicles would normally go than Real-Time Routing would.**

Q    So let's move on to Topic 10.  This is,

CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee

Conducted on July 29, 2025

26
(101
to
104)

101

"The specific data fields included in defendants' Flock data and what each of these data fields means or reflects."

Do you see that?

A   I do.



102

Q   So I had a few questions about how the data actually looks to defendants. And I'm going to use a document from Flock to ask you about this.

MR. SOYFER: So I just dropped Exhibit 57 into the chat.

(Plaintiffs' Deposition Exhibit 57 marked for identification and is attached to the transcript.)

A   Downloading it.

Q   You can let me know when you have that open.

MR. SOYFER: But for the record, this is a document produced by Flock bearing Bates Number FLOCK 0000063.

A   I see that.

MR. ESTRADA: This is 13 pages. Is that the right document?

103

MR. SOYFER: Yes.

Q   Just generally, what is this document?

A   I'm looking.

It's an FAQ document around how to work with the search results provided by Flock's user experience.

Q   Provided by Flock's user experience team.

Is that correct?

A   A Flock employee wrote this, yes.

Q   Yes, that's what I'm trying to understand.

A   Yeah. Yep.

Q   So I guess I just want to understand from this, when a user actually searches the database, so if you go to the next page, for instance, if they search for, you know, a license plate number, is this the sort of output that they'll see?

A   Yes.

Q   And so this includes an image. Right?

A   Yes.

Q   And the image shows the car and sort of some of the area around it. Correct?

104

A   Correct.

Q   And then there's a smaller image of the license plate number just beneath the image of the car, if you see that. Right?

A   I do.

Q   And to the right of that smaller image of the license plate, there's the state and the reading of the license plate. Correct?

A   Correct.

Q   And if we're just looking at this card again, it has a time stamp. Right?

A   Yes.

Q   Let me ask you, what does that time stamp represent?

A   The time the picture was taken.

Q   Is there a lag between when the picture is taken and when it's uploaded?

A   It takes time to process the image before it's uploaded.

Q   But this time stamp reflects when the image was actually taken, not when it was uploaded.

105

Is that your testimony?

A   Yes, when it was taken.

Q   And the date, again that's the date the image was taken.  Correct?

A   That is correct.

Q   And then there's a few more details.

Do you see that?

A   I do.

Q   If we turn to the next page.  And feel free to blow this up a little bit.

But these appear to be search results for the same license plate we were looking at.

Correct?

A   That's what it appears.

Q   And they have the same elements that we were just viewing.  Correct?

A   The search for result cars do, yes.

Q   But, obviously, the data elements are for different captures of the same vehicle.  Right?

A   Of the same license plate, yes.

Q   And this is what it looks like when a user searches for data within Flock's database.

106

Correct?

A   Yes.

Q   And so you'll see there's a tab that has some additional information about the vehicle open on the right.  Correct?

A   Yes.

Q   And that includes the body, make, and color.  Right?

A   Yes.

Q   And then identifiers, those would be the sort of features that we discussed earlier, like roof rack, toolbox, bumper sticker, that sort of thing.  Right?

A   Yes.

Q   And here for the specific vehicle, it states, Undetected.  Correct?

A   Yes.

Q   And then next you have the plate state.

Right?

A   Yes.

Q   And the Date Seen, what does that mean?

A   The number of -- number of days within

107

the last 30 days that that car has been seen.

Q   Is that specific to a single camera, to all cameras owned by this particular user, something else?

A   It's to the camera -- all the cameras in the network.

Q   And the network is --

A   Norfolk's cameras.

Q   Okay.

A   In their case.

Q   In the case of Norfolk, when they look up this -- when they perform this same type of search and they look at Date Seen, the result there will be for all of the cameras in the Norfolk network.

Is that right?

A   That is correct.

Q   And then kind of going down this list, you'll see there is a Device Location field?

A   Yes.

Q   And that gives the precise latitude and longitude for where the LPR camera is.  Correct?

A   Correct.  The physical location of the

108

camera itself.

Q   So for each capture, will it be tagged with the device location, or an estimated location of where the car was when it was photographed?

A   It's tagged with the latitude and longitude that you see here, and then we geolocate based off that latitude and longitude the closest address, which you see on the next line.

Q   Is that the address of -- so what I'm trying to understand is, is that the address of the car, or is that the address of the camera?

A   That's the address of the camera.

Q   And so the location information that's provided along with each of these captures is the location of the camera, not an estimated latitude and longitude of the car.

Is that right?

A   That is correct.

Q   And the camera, generally speaking, it's seeing cars that are about 40 to 70 feet away.

Right?

A   Correct.

CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee

Conducted on July 29, 2025

109

Q   And so then if you go -- so like looking at the tags beneath the image that we were just reviewing, you'll see there's a section entitled Overview, and then that has a bunch of bullet points underneath it.  Right?

MR. ESTRADA:  Where are we looking at?  Is that the left side or the right side?

MR. SOYFER:  We're are looking at the text beneath the image on this page.

MR. ESTRADA:  There's multiple images.

MR. SOYFER:  Oh, yeah.  Okay.  So there's -- I meant the screen shot of the search results, the text below the screen shot of the search results, if you're with me.

MR. ESTRADA:  Oh, okay.

A   Oh, I've got it.  Yes, I see it now.

Q   Great.  So there's a section entitled Overview.

Do you see that?

A   I see that.

Q   Okay.  And then if you look at the next section, that's entitled Vehicle Journey map.

110

Correct?

A   I see that.

Q   And this states, "This map will plot all the times your owned or shared devices have seen this vehicle in the time frame you searched."

Do you see that?

A   I see that.

Q   And then if you go to the next page, you'll see a screen shot on this page.  Correct?

A   Yes.

Q   And this is labeled Vehicle Journey.  Correct?

A   That is the header, yes.

Q   And so if a user uses this feature, it will pull up this Vehicle Journey map.  Correct?

A   If there's multiple reads of the car, yes.

Q   And on just this example that's given on Flock's website, we see four reads for this car.  Right?

A   Yes.

Q   And each of those have dates and times

111

associated with them.  Correct?

A   Yes.

Q   Where does the map data for this map come from?

MR. ESTRADA:  You're talking about this one specifically, or generally?

Q   Let's talk about this one, and then I'll ask generally.

A   When you say "map data," what do you mean?

Q   Yeah.  So I guess we have all of these streets.  Right?  And addresses and, you know, parks and some locations you can see on this map.  Right?  If you look at the lower left corner you can see the Peachtree Golf Club.  Correct?

A   I do see Peachtree Golf Club.

112

Q   I just have one more question about this document.  Okay.  If you go to Page 10 out of 13, you'll see there's -- actually, let me know when you're there.

A   I'm there.

Q   Okay.  You'll see there's a bullet point at the top of this page.  Correct?

A   I see Download CSV.  Yes.

Q   And it states, "Download CSV:  CSV sheet with the metadata associated with the images, not the images themselves."

Correct?

A   That is correct.

Q

CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee

Conducted on July 29, 2025



CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee



Conducted on July 29, 2025

117

CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee

Conducted on July 29, 2025



**Page 123**

Q    And that states, "The value of the vehicle pose (e.g. front, rear, side)."
Correct?

A    Yes.

Q    Is that reflecting that the cameras will sometimes capture vehicles from angles other than the rear?

A    Yes.

**Page 124**

Q    In states where vehicles are required to have license plates on the front of the vehicle, does the machine learning program look for license plates on the front of the vehicle?

A    **If there is a license plate in the field of view and it is captured, it will read the license plate.**

Q    Regardless of where it is exactly on the vehicle.  Correct?

A    **That is correct.**

Q    So I'd like to move on to Topic 11.  And we've covered this a little bit.

MR. ESTRADA:  Can we take a break, short break?

MR. SOYFER:  Of course.

CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee

Conducted on July 29, 2025

32
(125
to
128)

---

**125**

Let's go off the record.

VIDEO SPECIALIST:  Stand by.

We are going off the record at 11:25.

(A recess was taken.)

VIDEO SPECIALIST:  We are back on the record.  The time is 11:37.

MR. ESTRADA:  So one thing from me, now that we're back on the record.

There have been some pings and noises throughout.  I can ask if anyone new comes into the depo, if you could identify yourself, A.  And then B, we plan on designating the entire transcript Confidential, so it makes it more important to identify yourself if you come in and out.  Thank you.

BY MR. SOYFER:

Q    Mr. Lukens, we are back from a break, but you understand you're still under oath.  Correct?

A    Yes.

Q    Great.

MR. SOYFER:  I have just dropped Plaintiffs' Exhibit 59 into the chat.

---

**126**

(Plaintiffs' Deposition Exhibit 59 marked for identification and is attached to the transcript.)

---

**127**

Q    So this is an example of a subset of defendants' Flock data.  Correct?

A    I'm not sure if it's the defendants' data or not.

Q    Okay.

A    It is data from an export, though.

Q    From Flock.  Correct?

A    It is in the form -- it is in the table structure of Flock data.

Q    Okay.

A    But could have come from -- someone could have created it, yes.

---

**128**

Q    I'll represent to you that this is an extract from defendants' Flock data.  This is one of the Bates files, some of the fields of which we were just discussing.

And do you recall we talked about the Class field when we were looking at the previous document?

A    Yes.

Q    So I will actually share my screen with you because it might be a little bit easier this way.

But I assume you're generally familiar with the functions of Excel.

Is that fair?

A    Yes.

Q    So all I'm going to do is filter in this file, I'm going to filter certain of the columns.  And if I'm doing anything wrong, please tell me.  But I just wanted to filter the Class column and then ask you some questions.

So if I filter Class, you will see there is a bunch of different entries.  What I want to

---

CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee

Conducted on July 29, 2025



129

focus on is when the entry in the Class column is Person.

Do you see I filtered this down to entries that just have the word "person" in the Class column?

A  I do.

Q  What does that signify?

A  In this export that there were -- that there was a person.

Q  And so the cameras are able to recognize that there is a person in the frame for that ID. Correct?

A  They are showing in this particular export, yes.

Q  Is that a field that is typically collected?

A  It seems to be collected in this particular case.

130

Q  Okay.  I am going to stop sharing my screen.  I think you can set that document aside.

CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee

34
(133
to
136)

Conducted on July 29, 2025



CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee

Conducted on July 29, 2025



CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee

Conducted on July 29, 2025

36 (141 to 144)



MR. SOYFER: Sorry, do you mind if we go off the record? It will be one minute.

MR. ESTRADA: Okay. All right. That's fine.

VIDEO SPECIALIST: Stand by.

We are going off the record at 12:02.

(A recess was taken.)

VIDEO SPECIALIST: We are back on the record. The time is 12:03.

BY MR. SOYFER:

Q   I want to ask some questions about a document.

CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee

Conducted on July 29, 2025



145

CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee

Conducted on July 29, 2025

38 (149 to 152)



149

Can you explain that to me?

[REDACTED]

Q   We talked a little bit earlier about the -- so we -- strike that.

MR. ESTRADA:  Are we done with this document, Michael?

MR. SOYFER:  Yes, we are done with this document.  You can set that aside.

Q   So we looked at some documents earlier that referenced a Vehicle Journey Map.

Do you recall that?

A   I do.

Q   Is that a feature that's available to Norfolk?

150

A   Is this still covering Topic 12, just for my --

Q   No.  I'm just going back to our discussion earlier.  We're off Topic 12.  I'm just asking, is the vehicle Journey Map a feature that is available to Norfolk?

A   Yes.

Q   And, you know, we discussed how that sort of plots out -- actually, strike that.  If you'll give me just one moment.

You mentioned a map-based interface for real-time crime centers.  What -- what is that?  What is it used for?

MR. ESTRADA:  Objection.  Misstates testimony.  And also beyond the scope.  I don't even know what topic we're on at this point.

Q   Okay.  You can go ahead and answer.

A   As part of Flock OS, there's a map that shows the location of the different Flock cameras.  And when a hot list alert hits on one of those cameras, it pops up on -- next to that bubble.

Q   And is that all that map interface does?

151

A   Yes, it's meant for showing alerts.

MR. SOYFER:  I think subject to redirect, those are all of my questions.

MR. ESTRADA:  Okay.  Why don't you give us a couple of minutes.

MR. SOYFER:  Okay.

VIDEO SPECIALIST:  Stand by.

We are going off the record.  The time is 12:13.

(A recess was taken.)

VIDEO SPECIALIST:  We are back on the record.  The time is 12:33.

EXAMINATION BY COUNSEL FOR FLOCK SAFETY AND THE WITNESS

BY MR. ESTRADA:

Q   Great.  Thank you.  This is Mr. Estrada.

[REDACTED]

152

[REDACTED]

PLANET DEPOS

CONTAINS CONFIDENTIAL & ATTORNEYS' EYES ONLY INFORMATION

Transcript of Davis Lukens, Corporate Designee

39 (153 to 156)

Conducted on July 29, 2025

153



154

Q   You were also asked about a feature of the Flock system called Vehicle Journey.

Do you recall that?

A   Yes.

Q   I want to be clear with you, does this feature, Vehicle Journey, give the actual journey that a vehicle takes within a jurisdiction?

MR. SOYFER: Objection.  Form. Foundation.

A   No.

Q   Does it show the full path that a vehicle takes within a jurisdiction that is a customer of Flock?

MR. SOYFER: Objection.  Form.

155

Foundation.

A   No.

Q   Does it reflect the actual route that a vehicle would have taken within a particular jurisdiction?

MR. SOYFER: Objection.  Form. Foundation.

A   No.

Q   Does the Vehicle Journey feature show if a vehicle stopped between different points where a Flock camera was located?

MR. SOYFER: Objection.  Form. Foundation.

A   No.

Q   Does the Vehicle Journey feature show who's in a vehicle?

MR. SOYFER: Objection.  Form. Foundation.

A   No.

Q   Does the Vehicle Journey feature show who's driving a vehicle?

MR. SOYFER: Objection.  Form.

156

Foundation.

A   No.

Q   Does the Vehicle Journey feature show what a person was doing within a vehicle?

MR. SOYFER: Objection.  Form. Foundation.

A   No.

Q   Does a -- withdraw the question.

Does the Vehicle Journey feature show where a vehicle started?

MR. SOYFER: Objection.  Form. Foundation.

A   No.

Q   Does a -- withdraw the question.

Does the Vehicle Journey feature show where a vehicle eventually parked?

MR. SOYFER: Objection.  Form. Foundation.

A   No.

Q   Does the Vehicle Journey feature show anything about intimate associations of a person driving a vehicle?

157

MR. SOYFER: Objection. Form. Foundation.

A No.

MR. ESTRADA: No further questions.

MR. SOYFER: I don't have anything further.

MR. ESTRADA: Anything from the City of Norfolk?

MS. SOLORIA: Nothing further.

VIDEO SPECIALIST: Okay. I will read us off the record.

This marks the end of the deposition of Davis Lukens. We are going off the record at 12:38.

(Off the record at 12:38 p.m. EDT.)

158

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Debra Ann Whitehead, E-Notary Public in and for the Commonwealth of Virginia, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; that reading and signing was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 8th day of August, 2025.

My commission expires:
October 31, 2027

----------------------------
E-NOTARY PUBLIC IN AND FOR THE
COMMONWEALTH OF VIRGINIA