# EXHIBIT 4

*ECF # 111-3*

*under seal*



# Transcript of Derrick Vernon

**Date:** July 18, 2025
**Case:** Schmidt and Arrington -v- City of Norfolk, et al.

**Planet Depos**

**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
**www.planetdepos.com**
Michigan #8598 | Nevada #089F | New Mexico #566

**WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

NORFOLK DIVISION

------------------------X

LEE SCHMIDT and CRYSTAL          :

ARRINGTON,                       :

          Plaintiffs,            :   Case No.

     v.                          :   2:24-cv-00621-MSD-LRL

CITY OF NORFOLK and              :

MARK TALBOT, in his official capacity :

as the Norfolk Chief of Police,      :

          Defendants.            :

------------------------X

REMOTE VIDEOTAPED STENOGRAPHIC DEPOSITION OF

DERRICK VERNON

Friday, July 18, 2025

9:33 a.m. Eastern Time

Job No.:  589829

Pages:  1 - 191

STENOGRAPHICALLY REPORTED BY:

GISELLE MITCHELL-MARGERUM, RPR, CRI, CCR, LCR, ACCR, CSR

CALIFORNIA CSR 14424

---

Deposition of DERRICK VERNON, held remotely, via videoconference at:

VIA VIDEOCONFERENCE

Pursuant to agreement, before Giselle Mitchell-Margerum, Registered Professional Reporter, Certified Reporting Instructor, Licensed Court Reporter (TN), Certified Court Reporter (GA), Certified Court Reporter (NJ), Certified Court Reporter (WA), Certified Shorthand Reporter (OR), Certified Shorthand Reporter No. 14424 (CA), Alabama Certified Court Reporter (ACCR), Certified Court Reporter (NM).

---

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS:

JESSICA BIGBIE, ESQ.

INSTITUTE FOR JUSTICE

816 Congress Ave, Suite 970

Austin, TX 78701

(512) 480-5936

ON BEHALF OF DEFENDANTS:

KARLA SOLORIA, ESQ.

NORFOLK CITY ATTORNEY'S OFFICE

810 Union Street, Suite 900

Norfolk, VA 23510

757-664-4529

---

APPEARANCES (cont'd):

ON BEHALF OF DEFENDANTS:

ADAM MELITA

JONATHAN KRAVIS

LIAM GENNARI

MUNGER TOLLES & OLSON LLP

601 Massachusetts Avenue NW

Suite 500 E

Washington, D.C. 20001

(202) 220-1100

ALSO PRESENT:

ROBERT FROMMER

JOSHUA WINDHAM

MICHAEL SOYFER

TAHMINEH DEHBOZORGI

MATTHEW SIMPSON, Videographer

WITNESS INDEX

Witness                                    Page

DERRICK VERNON (sworn) ........................8

    Examination by JESSICA BIGBIE ............8

    Examination by KARLA SOLORIA ...........182

    Re-Examination by JESSICA BIGBIE .......186

EXHIBIT INDEX

No.          Description          Page

Exhibit 5    NORF019294 - Email ..............67
             5/17/2024

Exhibit 6    NORF008996 - Email ..............71
             01/26/2023

Exhibit 7    NORF018635 - City ..............102
             of Norfolk Operational Special Order -
             23:002

Exhibit 8    NORF021152 - City ..............106
             of Norfolk Memorandum

Exhibit 9    ATTORNEYS EYES .................111
             ONLY NORF000029

Exhibit 10   NORF-RERUN000204 ...............141
             - RTCC Training Document

Exhibit 11   NORF019435 - ...................171
             Email 11/11/2022

PROCEEDINGS

THE VIDEOGRAPHER: Here begins media number one in the videotaped deposition of Sergeant Derrick Vernon, in the matter of Lee Schmidt and Crystal Arrington vs. City of Norfolk and Mark Talbot, in his official capacity as the Norfolk Chief of Police.

In the United States District Court for the Eastern District of Virginia, Norfolk Division. Case No. 2:24-cv-00621-MSD-LRL.

Today's date is July 18th 2025. The time on the video monitor is 9:33 a.m. Eastern Time. Remote videographer today is Matthew Simpson representing Planet Depos. All parties of this video deposition are attending remotely.

Would counsel please voice identify themselves and state whom they represent?

ATTORNEY BIGBIE: Jessica Bigbie, representing plaintiffs in this matter. Working with the Institute for Justice. We are also joined by my colleagues, Robert Frommer, Joshua Windham, Michael Soyfer, and Tahmineh Dehbozorgi.

ATTORNEY SOLORIA: This is Karla Soloria, with the Norfolk City Attorney's Office, on behalf of the defendants. In the room with me, I have co-counsel, Adam Melita and Jonathan Kravis, with Munger Tolles, and I believe Liam Gennari, also with Munger, has joined us online.

THE VIDEOGRAPHER: The court reporter today is Giselle Mitchell, representing Planet Depos. The witness will now be sworn.

COURT REPORTER: Please raise your right hand.

Do you swear to tell the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes.

COURT REPORTER: Okay. We can start.

ATTORNEY BIGBIE: Thank you.

DERRICK VERNON
Having been duly sworn testified as follows:

EXAMINATION BY ATTORNEY BIGBIE:

Q. Can you please state your name and rank for the record?

A. My name is Derrick Vernon. I'm a police

lieutenant in the City of Norfolk.

Q. And I'm sure you probably just heard me say my name is Jessica Bigbie. I represent the plaintiffs in this matter, along with my colleagues who are also here on the Zoom.

Do you understand who I am and who I represent?

A. Yes.

Q. All right. Before we start, I just kind of want to go over a couple logistics. Have you ever given a deposition before?

A. I have not.

Q. Okay. So I want to just go over a couple things to hopefully make this easy for both of us today.

Ms. Mitchell is here writing down everything that we are saying today. So a couple things that we need to do to make sure that she gets a really clean record. Okay?

The first is just that if we could not talk over each, that would be great. I know in everyday conversation, you could probably anticipate where my question is going and how it's going to end. But if you'll let me just get it all the way out and then answer, that would be really helpful. Okay?

A. Yes.

Q. And you are doing a great job so far, but also, there's verbal answers, yes or no, as opposed to a head nod, or an uh-huh or uh-uh.

Those are -- those are hard for Ms. Mitchell to write down and, you know, capture on the record. So if I ask you, is that a yes or is that a no, I'm not trying to be rude. I'm just trying to make sure we get a clean record. Okay?

A. Understand.

Q. Okay. Let's see. If you don't understand my question, I do ask that you ask for clarification. If you don't ask for clarification, I'm going to assume you understood my question.

Is that fair?

A. Yes.

Q. Okay.

And if you need to take a break today, for whatever reason, that's totally fine. Just let me know. I'm just going to ask that we finish the question we are on before we take that break. Okay?

A. Sure.

Q. And I know we are kind of in a -- it's a little bit informal with Zoom here, but do you understand that your testimony today holds the same weight as if we were in a courtroom, in front of a judge, in front of a jury?

A. Yes.

Q. And you understand that you have agreed and given an oath today to testify truthfully?

A. Yes.

Q. Any reason why you cannot give your full and best testimony today?

A. No.

Q. Did you do anything to prepare for today's deposition? And with that, I guess I should say I'm not asking for anything regarding privileged communications. I just want to know what you did, action-wise?

A. Nothing special to prepare for today. No.

Q. Okay.

Did you speak with anyone? Attorneys included. I just don't want to know what you maybe spoke with the attorneys about.

A. Today? No.

Q. Prior to this deposition. To prepare for the deposition.

A. Yes.

Q. Okay.

How many times did you speak with your attorneys to prepare for the deposition?

A. Three.

Q. And how long were each of those conversations?

A. An hour to two hours.

Q. Okay.

Aside from your attorneys, did you speak with anyone else to prepare for today's deposition?

A. No.

Q. No officers at the department?

A. No.

Q. Okay.

And did you review any documents to prepare for today's deposition?

A. Yes.

Q. What documents were those?

A. The general order concerning Flock.

Q. Do you recall the date of that general order?

A. June 29th this year.

Q. Did you review any other documents aside from that general order?

A. The special order.

Q. The special order?

A. Yes. From 2023.

Q. Okay.

So we have the special order from 2023. The general order from this year. Any other documents that you reviewed?

A. No.

Q. Did you bring any documents with you today?

A. No.

Q. What's your understanding of what this lawsuit is about, that we are here today for?

A. Someone doesn't like the fact that we used Flock cameras in the City of Norfolk.

Q. Okay.

How long have you been with the Norfolk Police Department?

A. Did you say how long?

Q. Yes, Sir.

A. Since January of 2000.

Q. So you just celebrated 25 years this year?

A. I did.

Q. I hope you got something nice for that.

A. I'm working on that part.

Q. And what's your current position with the Norfolk Police Department?

A. I'm a police lieutenant in the Strategic Intelligence Division.

Q. What's the Strategic Intelligence Division?

A. The Strategic Intelligence Division houses the Criminal Intelligence Unit, and the Realtime Crime Center, and the crime analysts that work for the City of Norfolk.

Q. Okay.

You said the Realtime Crime Center. The crime analysts. And what was the third one you mentioned?

A. The Criminal Intelligence Unit. CIU.

Q. Are those all housed, I guess, in the same physical location? Or are they kind of spread out between -- between the department?

A. All three offices are in different buildings.

Q. Okay.

So you are in charge of all of these people in those three units?

A. So I'm the -- what would be termed the "executive officer." So I have a commanding officer who works as the captain. And I'm the lieutenant who works under him. But they are all part of my responsibility. Yes.

Q. Okay.

So there is someone who is over you who also manages those folks, but you are in charge of them as well?

A. Correct.

Q. Okay.

And how long have you been in that specific position as the police lieutenant for the Strategic Intelligence Division?

A. Since August 2023.

Q. What position did you hold prior to that point?

A. Prior to that, I was the Sergeant in charge of the Public Housing Unit in the City of Norfolk.

Q. Tell me a little bit more about that, what that division was.

A. So there are currently five public housing communities in the City of Norfolk. I had one CRO -- Community Resource Officer -- assigned to each one of those communities.

And I was the sergeant in charge of those officers that worked in those communities, with the residents that lived there.

Q. And how long were you in that position?

A. Since 2019.

Q. I know this is -- we are going to go -- we are probably going to go all the way back, but what did you do prior to that position?

A. Prior to that, I was the sergeant in charge of the School Resource Officers, and the Community Resource Officers assigned to the First Patrol Division.

Q. What's the First Patrol Division?

A. One of the divisions of the Police Department of the City of Norfolk. So the city is separated into -- was separated into three parts at the time. Each patrol division managed a separate part of the city.

And the First Patrol Division was one of those sections of the city that my division managed.

Q. And you -- sorry.

Was it a certain geographical region? Like could you tell me if it's the north -- north side? East side? West side? Is it broken up that way?

A. Yes.

Q. So which of those was the First Patrol Division?

A. It would have been the southeast side of the city.

Q. Okay. And I guess, let me ask you this. Between being a sergeant in the School Resource Officer context; and then the Public Housing Unit context; and then -- I guess we'll start with that -- what was the reason for you moving from the School Resource Officer position to the Public Housing Unit?

A. I was selected by the lieutenant to move from one position to another.

Q. Would you consider it a promotion?

A. It was a lateral move.

Q. And then from the -- being the sergeant of the Public Housing Unit to your current position. What was the reason for that change?

A. That was a test and promotion.

Q. You had to take a test to become a lieutenant? Is that correct?

A. That's correct.

Q. All right. So prior to being a sergeant with the School Resource Officer context there, what did you do prior to that?

A. I was a sergeant of the tac squad in the First Patrol Division.

Q. When you say "tac squad," is that tactical?

A. Yes.

Q. Tell me a little bit about that. What that entailed.

A. We were responsible for deploying our resources to those places in the First Patrol Division. Where we had problems, we would kind of create strategies to stop some of the crime that was happening in those places.

Q. Was it more -- I think a preventive role? Like you are trying to go into the community and prevent crime before it happens? Or is it a response to crime?

A. Ours is more reactive. So it was after something happened, we would deploy resources there.

Q. Okay.

And what was your reason for leaving that position to move to the School Resource Officer position?

A. Much the same. Lieutenant moved me from one position to another.

Q. And how long were you in that tactical squad position?

A. Just about a year.

Q. All right. And then prior to that?

A. Prior to that, I was a sergeant in one of the patrol divisions with the platoon, where I just managed the platoon that worked in the patrol division.

Q. Was it a specific patrol division?

A. The Third Patrol Division at the time. Yes.

Q. Which section of the city did that cover?

A. The north -- probably the northeast section of the city, where our naval bases are. All the way up to right with the southeast part. Kind of met together. So it was a very large portion of the city.

Transcript of Derrick Vernon
Conducted on July 18, 2025

Q. Okay. So mainly the east side?

A. Yes.

Q. What did that position entail, just in terms of, like, what you did day-to-day? What was that role?

A. So, I managed officers going from call to call, for calls for service. I responded when I needed to, to those calls, when they wanted a supervisor to be there. Make sure the officers needed -- they had everything they needed when they were working.

Provided reports to lieutenants when I had issues. Maintain lead, and those types of things, for those officers that worked for me. Took care of the -- took care of that portion of the city. I was the sergeant responsible for those areas during my tour of duty.

Q. Sure. How many officers were under you in that position that you were -- that you were managing?

A. Maybe 12.

Q. And how long were you in that position?

A. A year and a half. Almost two years.

Q. What years would that have been?

A. So --

Q. Losing the math at this point.

A. So I was promoted in December 2012 to sergeant. So I was there until the middle of -- almost 2014. I can't remember exactly what the date -- the timeframe was.

Q. Okay.

And was that -- I think you maybe just alluded. Was that your first position as a sergeant?

A. Yes.

Q. Okay. All right. And then prior to that, what role were you in?

A. Prior to that, I was one of the officers assigned to the Public Housing Unit. So I was responsible for one of the communities that I actually supervised later. And that was from 2002 until 2012, when I got promoted.

Q. What was your -- I'm not -- what was your rank at that point? What would you have been

called?

A. Police officer.

Q. Just an officer?

A. Just an officer.

Q. Okay. Did you have to take a test to become a sergeant as well?

A. Yes.

Q. And did you take that test in 2012?

A. 2010, I think. The list lasted two years.

Q. Okay.

Which Public Housing Unit were you over in that -- in that position?

A. Oakleaf Forest.

Q. Which part of the city is that located in?

A. That's on the south side of the city. Yeah. Just on the south side of the city.

Q. Is that still around today?

A. It is.

Q. All right. And then from 2000 to 2002, what were you doing at NPD?

A. In the academy, and then assigned as a patrol officer when I finished the academy.

Q. Which patrol division did you initially work?

A. The First Patrol Division.

Q. How long was this -- did it take to get through the academy?

A. That's a long time. Twenty-nine weeks. It was 29 weeks long.

Q. A little over six months?

A. Yes. It was six months.

Q. All right. And at the academy, did you have to take any criminal procedure classes?

A. Yes.

Q. Tell me a little bit about those. I know it was a long time ago.

A. I'd have a hard time trying to explain those classes over those 29 weeks. It was about criminal procedure and how we -- criminal justice. I'd have a hard time trying to explain what those classes were, going that far back.

Q. What were some of, like, the subjects that you guys went through, if you can recall?

A. Investigations. Preliminary

investigations. Traffic stops. Specifics about domestic calls for service. Psychiatric calls for service. Developing probable cause. And making arrests.

Q. You touched on probable cause there. I guess based on your experience from the academy, and then also your experience as an officer, what's your understanding of probable cause?

A. Developing a reason to take criminal justice action -- police action.

Q. Is there anything more to that? You said a reason to take police action. Is that accurate, to your understanding?

A. Yes. A basic statement that kind of covers my understanding of what that means.

Q. Okay.

At the academy, did they -- did they teach anything about reasonable -- reasonable suspicion, that you recall?

A. Yes.

Q. Okay. What do you recall learning that reasonable suspicion is?

A. As I recall learning, again, it's been such a long time ago, but reasonable suspicion would again be the reason I would be in a place, starting investigation, to take any additional police action.

Q. How is that different than probable cause?

A. Probable cause, I can likely make an -- I can make an arrest. Reasonable suspicion, I have the reason to speak to someone. So there is not a whole lot of difference, I don't think. I think one kind of builds on the other.

Q. Did you, at the academy, have to do any classes specific to the Fourth Amendment?

A. I'm sure we did.

Q. But you don't recall, specifically?

A. No.

Q. Okay. What's your highest level of education?

A. I have a bachelor's degree. And I started master's courses when I finished my undergrad.

Q. Where did you received your bachelor's degree from?

A. From Norfolk State University.

Q. What was that degree in?

A. Sociology.

Q. And what were the classes for the master's degree that you were working toward? What were those in?

A. Those were actually additional sociology courses. I wanted to [Indiscernible].

Q. When did you last take a class towards that master's degree?

A. 1997.

Q. Why didn't you, I guess, decide to keep going with that?

A. I think it was time for me to find a job.

Q. And what did you do, I guess, in those three years between the classes and then starting with the Norfolk Police Department?

A. So, I was already employed when I was going to school full time. And I was employed by the United States Postal Service at the time.

Q. How long did you work for the U.S. Postal Service?

A. Twelve years on and off. It was a program where you had to be in college to work the position, and yet be on roll full-time. When I first started, then I stopped going to school and just worked there full-time.

Then I went back to school and started -- to finish my undergrad degree. So from 1995 to 1997, I completed my undergrad degree. And I was still working at the post office when I finished school.

Q. Okay. What positions did you hold at the U.S. Postal Service?

A. I was a mail handler. A clerk. And I worked in maintenance repair.

Q. What led to your decision to leave that job and go become a police officer?

A. I actually applied and I got hired.

Q. How come you didn't want to do USPS? Like how come you didn't want to keep doing that job?

A. The position was supposed to lead to a career position. And it did not turn out that way after I had been there for that long.

Q. Okay.

Aside from USPS, did you have any other -- other jobs prior to beginning your law enforcement career?

A. I worked for a cable company.

Q. When was that?

A. I couldn't tell you exactly when that was. It was a very short period of time. Probably six to seven months. It was actually between appointments at the post office.

Q. What did you do with the cable company?

A. Just an installer.

Q. Within your -- while you were working toward getting your sociology degree, were there any classes that you had to take, or that you just did take, related to technology?

A. So not while I was working on my sociology degree.

Q. Any other time that I guess you took classes related to technology?

A. So when I first started college, I was a computer science major. So it would have been the first two years that I was in college. Then I stopped going to school for an extended period of time, before I returned, and I switched my major.

Q. If you don't mind me asking, what led to that extended absence from school?

A. I actually had the job at the post office, and making money became more important to me than going to school at the time.

Q. I hear you. What type of classes did you take while you were initially working toward that computer science major?

A. So things were quite different then, computer-wise. So we were still using binary. So the O's and ones in computers. A lot of introduction classes. Some of the basic courses that were required to finish a degree, or to start a degree in college.

I couldn't tell you which one again. That was 30-plus years ago, Ma'am.

Q. Why did you decide to switch out of the computer science major into sociology?

A. Actually, talking to one of the advisors at school, and I found the program more fascinating than I did computer science.

Q. People, as opposed to computers?

A. Exactly. Understanding people and their actions.

Q. All right.

Beyond, I guess, your academic studies and then going to the police academy, have you done any, I guess like additional training or certifications throughout those 30-plus years that you have been in law enforcement?

A. So I'd actually been a volunteer with the police department as an intern, working on my undergrad degree. And I worked in the same place, the First Patrol Division, as part of my requirements for school.

And after my requirements were completed, I stayed with the police department for almost two years, almost up until I applied and became a police officer.

Q. Did you have to do any training to even volunteer with the department?

A. No.

Q. What did they have you doing when you were volunteering?

A. So I was actually assigned to ride with the Community Resource Officers that were assigned to the community at the time. So I literally did ride alongs almost every day when I came to work.

Q. Any of your positions, I guess within the Norfolk Police Department, have you ever received like any awards or recognitions?

A. So recognitions for being involved in some arrests that were made. Those things are not that important to me, so I don't -- I can't even think of all the things that I have received awards for. That's nothing I kind of pride myself in, getting awards for doing my job.

Q. Anything that you have like a plaque for in your office? Or anything like that, that's hanging up somewhere?

A. No.

Q. Have you ever received any write ups since you have been with the Norfolk Police Department?

A. No.

33

Q. Any disciplinary action taken against you?

A. I have no discipline actions in my 26 years in the police department.

Q. Have you ever received any verbal reprimands?

A. Yes.

Q. Okay. Tell me about that.

A. For being involved in car accidents.

Q. How many?

A. Two.

Q. And when were those?

A. 2005, and maybe 2009.

Q. And those were -- is it fair to say that was limited to a verbal reprimand? Nothing else was put in writing regarding those incidents against you, at least?

A. No. That was it.

Q. Have you ever been arrested?

A. No.

Q. Have you ever been convicted of a crime?

A. No.

Q. Have you ever been a plaintiff in a

34

lawsuit?

A. Yes.

Q. Tell me about that.

A. A lemon law lawsuit against the Ford Motor Company, for a vehicle I purchased.

Q. When was that lawsuit?

A. 2000 and -- 2003; 2004. I'm not exactly sure.

Q. Did that case go to trial?

A. No.

Q. Did it settle?

A. Yes.

Q. Any other lawsuits in which you have been a plaintiff?

A. Just Ford. That was it.

Q. Okay. Any lawsuits in which you have been a defendant?

A. No.

Q. All right. I guess going back to when you were on patrol, back in the day, did you guys ever conduct physical surveillance?

A. I was never a party to doing that. No.

35

Q. Okay. Were your colleagues?

A. So, physical surveillance? Explain to me what you mean by "physical surveillance?"

Q. Well, like I guess, tailing someone, is what comes to mind for me.

A. I didn't. So someone else may have. But I did not.

Q. Okay.
Did you ever do like a -- like a stakeout, where you are -- you know, I'm picturing like a movie. Like, you know, on the other side of the road, being incognito, watching someone?

A. No. I did not.

Q. Were you involved at all in like monitoring gang activity?

A. No.

Q. Did you conduct traffic stops as part of your job on patrol?

A. Yes.

Q. I guess, tell me a little bit about, say, the technology you had at that point when you would stop someone for a traffic stop.

36

A. So, up until several years ago, I was radar certified. So I would use the falcon radar that we had, to be able to determine speed of vehicles.

Q. Once you stopped a vehicle, how would you get more information about the vehicle and the person driving it?

A. I would approach the driver. Ask for their driver's license and registration for the vehicle, and go back to the car and use our CAD system in the car to run their driver's license information, as well as registration information for the vehicle.

Q. What's CAD?

A. Computer Aided Dispatch.

Q. Can you tell me a little bit about like what that system is?

A. Sure. They were like having a laptop in the car. And you query the system -- the VCIN system -- to check driver's license status and registration information.

Q. Is that a nationwide database? Or just

**Page 37**

specific to Virginia?

A. So the VCIN is specific to Virginia. The NCIC would be nationwide.

Q. Did you guys have NCIC at that point?

A. Yes.

Q. Okay.

Anything else you would scan, once you got back to the car with the license and registration?

A. No.

Q. Okay.

Did you guys ever have situations where you would be like, I guess -- I guess you would call it maybe like a BOLO? Like be on the lookout for a certain type of vehicle? Did you have that when you were on patrol?

A. Yes.

Q. Okay.

And when you would have that, how would you go about finding that specific vehicle?

A. A BOLO, by descriptors of the vehicle, and the license plate, if it was available. And you would not necessarily look for the vehicle,

**Page 38**

specifically. Sometimes it would just pop up, if that makes any sense to you.

Q. What do you mean "pop up?"

A. So if you are driving down the street and you just happen to see the vehicle and see the tag, of course, the type of vehicle might pique your interest initially, because of the BOLO.

And you confirm the license plate on the car if, in fact, there was one provided. And you compare that to what the BOLO was.

And if, in fact, they matched, then you confirm with the dispatcher on the radio, or with the CAD system, if that was a truly accurate information. And you take a police action at that point, if that was the case.

Q. Would -- when there was a BOLO, how would you learn about it?

A. It would be sent to you via your computer in the car, and over the radio by the dispatcher.

Q. Was there a way that officers could communicate with each other? Like I'm picturing, if you are in, you know, the southeast portion and

**Page 39**

someone else is in the northeast portion, if, you know, you are trying to find a vehicle, is there a way for you guys to communicate between each other if you are, you know, on the lookout?

A. Via radio. And on the computer. You could send messages back and forth on the computer.

Q. Were there certain, like, corridors or main roads that you guys would, I would say position yourself on to have a better opportunity to catch a vehicle that you are looking for?

A. I would imagine some officers might. That wasn't me. I didn't do that.

Q. Did you have any specific strategies or tactics that you would use?

A. I can't -- no. I don't think that I had any specific tactics that I used to look for cars like that. No.

Q. Was there any type of technology at that point that could assist you in looking for vehicles?

A. So I don't remember exactly when the first license plate readers came out, but they would be mounted on the back of two or three patrol cars in

**Page 40**

the city. I never drove one of those, but those cars would have the ability to read license plates as they pass the cars.

Q. Do you recall those being effective in helping with the BOLOs?

A. I imagine they would, but I can't give you a specific example. No.

Q. What else were they used for besides the BOLOs, if anything?

A. The license plate reader cameras?

Q. Correct.

A. So, to find stolen autos. I think in some instances, there might have been people that had a number of tickets on the cars. That's all I recall right now.

Q. And you said there were only -- only a handful of those when you were on patrol?

A. Yes.

Q. Do you remember if you guys ever received any training on those when they were implemented?

A. We probably did. I don't remember exactly what the training would have been. At the time, I

would have been assigned to the public housing communities, and I had no need to know. But I'm sure we all got the same training.

Q. Okay. But you don't have any independent recollection of going to a training on that?

A. No.

Q. Do you recall if there were any policies related to those vehicle-mounted license plate readers?

A. I'm sure there was.

Q. All right.

A. But I couldn't say. No.

Q. Do you know what -- I guess, how would you define location data?

A. The data says where you are. It was like a GPS coordinate. So the latitude; longitudes. Because we use those when we do car accidents.

Q. Yeah. How di --

A. We --

Q. Sorry. Go ahead.

A. Sorry. We try to pinpoint as close as possible, an exact location when we create those accident reports.

Q. Is there anything -- I guess how do you collect that location data? What sources do you -- would you get it from?

A. Right now, the best source I use is my cellphone.

Q. What about historically?

A. Historically, you would tell the dispatcher and they would tell you the latitude and longitude where your accident took place. And they would provide the data to you, either through CAD on the computer, or over the air.

Most times probably through CAD, though, so we can actually see it.

Q. And then, when you said "cellphone," how do you use a cellphone for location data?

A. So you would actually go to your cellphone. Open up the maps. It would provide your location as a blue dot on the phone. If you push that blue dot, it will give you your latitude and longitude as to where the phone is exactly located.

Q. Is there -- have you used that at all to find the location of others?

A. No.

Q. Have you used any type of location data to locate people, actually, in your job?

A. No.

ATTORNEY BIGBIE: All right. We've been going for about 50 minutes. Maybe let's take a break right now before we kind of transition, if that's okay with everyone. Maybe 10 minutes? Does that work?

THE WITNESS: Sure.

ATTORNEY BIGBIE: Okay. We can go off the record.

THE VIDEOGRAPHER: All right. We are going off the record, and the time is 10:18 a.m..

(Short break.)

THE VIDEOGRAPHER: We are back on the record and the time is 10:29 a.m..

ATTORNEY BIGBIE: Thank you.

BY ATTORNEY BIGBIE:

Q. All right. I think where we left off, I was asking you about location data. And I had just a couple more questions on that.

Have you ever obtained cell site location information on another person, in the course of an investigation?

A. I have not.

Q. Okay.

Do you know how cell site location information works, generally?

A. Probably much like what I just described to you with my location. I can press a button and it can tell you my location. Otherwise, I wouldn't know much more about that.

Q. Have you conducted investigations as part of your work with NPD over the last 25 years?

A. No.

Q. Have you ever applied for a search warrant?

A. I have not.

Q. All right.

So I want to switch gears a little bit. How did you first hear about Flock?

A. The supervisor for the Public Housing

45

Unit, NRHA, which is the Norfolk Redevelopment and Housing Authority, is who owns and manages those properties. And they purchased Flock cameras in the City of Norfolk. I think in 2022.

Q. And what did you -- I guess, what did you learn in 2022 about Flock cameras when you heard about it from the NRHA?

A. They were license plate readers that could be installed in communities, for them to install them in their communities on the streets. And they would read the license plates on the cars that passed by those -- the apparatus they had set up in the communities.

Q. How did you feel about them when you first heard about them in 2022?

A. I was indifferent. I didn't know a lot about them at all. It was just a new tool we had available to us in the Public Housing Unit.

Q. Okay.

And then, what did you think about them once they were kind of up and running in the Public Housing Unit?

46

A. Much the same. It allowed us to locate vehicles that were causing some of the issues in our communities, based upon the license plates or descriptors of the cars.

Q. I think you just said it helped you locate vehicles that you were having trouble locating in your community. What issues were you guys running into with actually finding vehicles before Flock?

A. Before Flock, you could -- you wouldn't have a very reliable source as to a license plate on vehicles, when those issues happened in the communities.

So where people might capture -- to tell you the kind of car, and maybe a possible license plate of a vehicle, the cameras take pictures of every vehicle that passes by.

Q. Is it fair to say that you were working off of somewhat subjective data, subject to human error, prior to Flock?

A. Absolutely.

Q. All right. And then, I guess, tell me a little bit about when you -- when you learned or

47

first heard about NPD actually maybe working to get Flock cameras.

A. It was over a year later. And the city had already made the purchase of the cameras and had them installed. And I realized only then, because my user name was my email address with that -- with public housing.

And then I was unable to access the public housing cameras, because my email address had been merged to the city's account, so I couldn't get into the cameras that we had in public housing anymore.

So that's actually when I learned that we had them in the city. I had not paid a whole lot of mind to those cameras being installed before.

Q. Okay.

So you weren't involved at all in the decision to purchase Flock cameras for NPD?

A. No.

Q. When would that have been that you had the email mix up and learned that NPD had installed them?

A. The summer of 2023.

48

Q. What type of Flock cameras does the NRHA have, if you know?

A. I don't know exactly what they are called, but they are the same cameras. They look the same.

Q. Same cameras as what?

A. That the City of Norfolk has.

Q. Okay.

Do you know, I guess -- tell me a little bit about the cameras that you know that Norfolk has.

A. So, they are powered -- they were solar powered -- they are solar powered. They are on poles about 12 to 16 foot high. The camera has the ability to take multiple pictures at a time, and they use the algorithm in the system to create those pictures that will be displayed.

Q. Do you know what the cameras capture? Like what's in the frame?

A. The cameras are set up to capture the rear of the car as it passes the camera. So the license plate and the rear picture of the vehicle.

Q. I think you mentioned the general

**49**

characteristics of the cameras. They are solar powered. They are kind of placed up high. Are those features useful, in your opinion?

A. Solar power. Definitely being up high, kind of hit or miss. Because we have had people who would take tall -- long sticks and hit the cameras and make them face away from the street.

Q. Okay. I guess, let's go -- let's go back. First, tell me why the solar powered is useful.

A. You don't have to worry about the power source, because the sun powers the cameras.

Q. Okay.

And then, going to the height section of it, tell me a little bit more about like people damaging these cameras.

A. So not so much to damage the cameras, but -- I couldn't tell you who did it. But over the course of my tenure in public housing, we had occasions where someone would walk by the cameras and they would use something to manipulate the direction the camera is facing.

So that where it was facing the street

**50**

before, it would be facing a house. So it would not capture the back of the cars when they came into the community.

Q. Do you have any ideas about why someone would want to move the camera's view like that?

A. I would only be guessing. So, I would suggest that they don't want you to see the car when it comes to the community.

Q. Based on what you know about Flock cameras, is there any time during the day or night that they don't work?

A. If the signal is bad, or the solar power -- the solar panel isn't working properly to charge the camera. That would be the only thing I can think of.

Q. Otherwise, they are always on?

A. Yes.

Q. Okay.

How many times have you encountered the signal failing, or the solar panel failing?

A. So only probably a couple of times in one community, as I recall. When I was assigned to

**51**

public housing.

Q. I think you mentioned to me when we were talking about the -- what the cameras are actually capturing, you mentioned the front and back of the vehicles.

Is that correct?

A. No. It captures the rear of the vehicle as it passes.

Q. Okay.

And then, I guess tell me about your understanding of the technological capabilities of the cameras to kind of synthesize that data.

A. So the camera will take between two and five pictures of every car that passes. And some algorithm in the system creates the pictures using the license plate or the descriptors that you enter for a vehicle.

Q. When you say "descriptors," what do you mean?

A. The bumper stickers. Stickers on the window. A roof rack on top of the vehicle. Color. Make. Those types of descriptors.

**52**

Q. Okay.

So the cameras, to your understanding, are able to kind of filter through that information to identify if you have the vehicle you are looking for?

A. Yes.

Q. Are those features useful, in your opinion?

A. I would imagine so. I've never actually searched for a vehicle.

Q. How come you haven't searched for a vehicle?

A. I've never had a reason to search for a vehicle. I've just seen the -- I know what the search parameters are.

Q. And those search parameters are the items you just listed? Make; model; bumper sticker; color; damage; things like that, to the vehicle descriptors?

A. Yes.

Q. Do you know how many cameras Norfolk has?

A. We have 176 cameras.

53

Q. And is that --

A. That's --

Q. Go ahead.

A. I'm sorry. One seventy-five right now.

Q. And why 175?

A. Because there is a camera that's missing.

Q. Do you know what happened to it?

A. So we had a construction crew working on one of the areas where the camera was installed. They took the camera down and laid the camera on the ground, as Flock was supposed to come to recover the camera.

When I went back out to that area to look to see where the camera was, the pole was there, but the camera and the solar panel are missing.

Q. Okay. All right.

What section of the city is that camera -- or was that camera in?

A. Little Creek Road and Tidewater Drive. That's where the interstate is.

Q. Are you guys working on getting a new camera put up there, though?

54

A. Not right now. They are still doing construction there. It's just the camera is not there anymore.

Q. Okay. So 175 cameras currently. Do you know how you got to that number?

A. So there were 172 cameras when I -- initially, that were installed. And last year, the auto quad unit for the patrol -- the police department, received a grant to purchase four additional cameras.

That brought our number to 176. Of course, minus the one that's missing now, makes it to 175.

Q. Were you involved at all in the acquisition of those four additional cameras?

A. So they purchased the cameras. They told me where they want the cameras to go. And I'm the person that communicated with Flock to have those cameras installed where they wanted them.

Q. Did you have any input in terms of the location of those cameras?

A. No.

55

Q. And then the initial 172 that were installed, do you know how -- how it was decided to start with 172 cameras?

A. So I wasn't involved with that -- that part of the acquisition, but I'm aware that they took an overlay of calls for service and violent crime. And those places where they intersected the violent crime and the high calls for service is where they placed those cameras.

Q. All right. I want to come back to that. How were you made aware of, I guess, the process by which they determined where to put the cameras and how many?

A. I'm not sure what the number -- the how many. But my -- I had a discussion with my captain as to how they determined where those cameras were going to be.

Q. Was that Captain Thomas?

A. Yes.

Q. And you said the cameras were generally placed where there's calls for service?

A. Calls for service and violent crime. So,

56

where those two kind of intersected.

Q. Okay.

And based on your experience, actually, like working patrol and, you know, being a sergeant over the folks in patrol, do those areas, like, have any commonalities? The calls for service and violent crime?

A. So I can only suggest that they placed those cameras at the places that we had the highest incident of violent crime. Because that was the focus for the police department. And stolen autos. I'm sorry.

So that was the thing that kind of drove some of that -- those decisions, I'm sure.

Q. Do those incidents tend to happen in like population centers, would you say?

A. What do you mean by population center? I'm sorry.

Q. Places where there is a lot of people.

A. I think all those places have a lot of people there, though.

Q. Okay. Tell me more about that.

57

A. I think it's the places where we had the issues with violent crime, and the stolen autos might have -- may have been located, I think is where they placed those cameras.

It's not necessarily where the more populous areas, but where maybe they found the cars, eventually.

Q. Do they overlap at all, in your experience, with some population centers?

A. Yes.

Q. Okay.

And do you know if there was any strategy in putting them on, like, major throughfares to capture people? Like a large number of people may be going to those areas where the calls for service happen?

A. I don't think that's accurate. No.

Q. Okay. Why not?

A. Because I can tell you for sure that between -- on the Virginia Beach Boulevard, which is one of our main thoroughfares, and Military Highway, again, one of our main thoroughfares, there are

58

miles of area where there are no cameras.

You can drive from Lincoln Street to Virginia Beach Boulevard, to the city line in Virginia Beach, and there will be one camera. And that's in the city of Virginia Beach.

Q. Do you think it would be helpful to put cameras there?

A. Yes.

Q. Okay. Why is that?

A. Because it's a big blank from the area, several miles that's covered, and there is no Flock camera there.

Q. What issues does that present when there is a blank area?

A. If a suspect who was in a stolen car, and we know the kind of car, from the time that person passed that camera, as I said, on Lincoln Street, until they get into the center of Virginia Beach, there are a number of any places that they could turn off and you would never know where the car went.

Q. Would you agree that it would be useful

59

for NPD to kind of fill in those blank spaces with Flock cameras?

A. Yes.

Q. Do you know if NPD has any plans to try to fill in those blank spaces to add cameras?

A. I do not.

Q. Do you know if there is any -- any constraints to adding cameras?

A. Not that I'm aware of. No.

Q. All right. Kind of backing up a little bit, the information that you told me that the cameras are capturing -- license plate and other characteristics of the vehicle -- do you know anything about how that data is stored?

A. No.

Q. Do you know if it's stored -- I guess, how long it's stored?

A. I do now. With the change in our law in Virginia, it's stored for 21 days.

Q. Prior to that change, did you know what the -- what the storage length was?

A. Yes. It was 30 days prior to that change.

60

Q. Okay.

And is there any way that the data can be, like, flagged and kept for longer, to your knowledge?

A. I imagine you can download the data.

Q. Have you ever done that?

A. No.

Q. Have you seen anyone download it?

A. So, downloads -- what do you mean in terms of download? And I know I said download the data. So, I've not seen anybody download the data. I guess I've done the audits. So I can -- I've done that before.

Q. Okay. And we'll talk about that a little bit later.

A. Okay.

Q. But in terms of just like saving a search, or the results of a search, do you know if there is a way to do that, to keep it longer than the 21 days?

A. So I imagine there might be a way, but I haven't done that and I haven't seen anyone do it.

61

Q. Okay. Do you know if there is any -- any requirements for saving a search? If there is any parameters around saving a search?

A. So those specifics might be listed on the general order, and I just don't remember exactly what that may say about saving a search.

Q. Okay.

Do you have any, I guess, in your day-to-day, though, outside of what the order might say, is there anything that you know of, that they have to do? Any procedures they have to go through? Any checks they have to kind of check off to save -- save a search?

A. Yeah. I don't recall anything to reply to you. No.

Q. Does it have to be, like, approved by a supervisor, to your knowledge?

A. So a supervisor is to approve you creating a hot list.

Q. Okay. But not to save a search?

A. Again, I can't provide an answer to that. I don't recall.

62

Q. Okay.

A. I know the requirement for creating a hot list requires the supervisor's authorization.

Q. Do you know if anyone's notified if someone saves a search?

A. I don't recall that. No.

Q. Okay.

Do you know if there is a process for purging the data after someone saved a search?

A. I don't recall that. No.

Q. Okay.

Do you know if Flock is notified if someone saves a search?

A. I don't know the answer -- I don't know the answer to that question. No.

Q. So you are not aware of any requirement to obtain supervisor approval to obtain a search. Is that correct?

ATTORNEY SOLORIA: Objection. Asked and answered.

THE WITNESS: So, in order to create a hot list, you have to get a supervisor's approval. And

63

that's done on the form that is being sent to the Realtime Crime Center, that's maintained by the sergeant that's there.

ATTORNEY BIGBIE: Okay.

BY ATTORNEY BIGBIE:

Q. Is -- a hot list is -- is a hot list different from a search, though, within the system?

A. So a search is a query of a license plate or a car. The hot list is actually created, and you establish how long that tag will be searched in the system as it passes the cameras.

Q. All right. So a hot list and a query are two different things. Is that accurate?

A. A query might be for me. A hot list might be for the department.

Q. What do you mean by that? Tell me more about that.

A. So, a query, I might be looking for a specific tag number that I will get the results -- that will come just to me, as I do the search. If I create a hot list, the hot list entries will be sent to anyone who was logged into our system, if that

64

tag passes on the cameras.

Q. Okay. I'm following. I'm following. Okay. That makes sense to me. I guess -- well, we'll come to that.

When you guys first got Flock cameras and you said there was the issue with your email, and you were trying to figure out how to make it the correct email to access the cameras, did you have to go through any training on the Flock cameras?

A. So the training I went through was with the Norfolk Development of Housing Authority. And the training was about an hour long. It was conducted by Brian McKenzie, who worked for Flock. And he did a training for all of the public housing officers and the staff for NRHA, via Zoom.

Q. And that was -- that predated, though, NPD getting Flock cameras. Is that correct?

A. That is correct.

Q. Once NPD actually got Flock cameras, did you have to undergo any additional training?

A. I did not.

Q. Did the NPD officers have to undergo any

training, to your knowledge, when the NPD implemented the Flock cameras?

A. Yes.

Q. What was that?

A. So I didn't see the training, but I understand they went through a training prior to being -- or as they were given access to the Flock cameras. They had 60 days, I believe, to do the training.

Q. Did you have any role in volunteering whether -- whether folks were completing that training?

A. NPD? No.

Q. Did you have any role in actually like getting the officers access to the Flock system?

A. Not for NPD. But for NRHA, yes.

Q. Did you have a role in getting the officers training for the NRHA cameras?

A. Yes.

Q. Okay. Tell me about that.

A. The video training that I attended via Zoom was saved as a video. And I could send the video out to officers who asked for access to the Flock cameras for NRHA.

I would send them the link. They would watch the video. And they would let me know when the video was completed. And then I would give them access to the NRHA cameras.

Q. Did you do anything to, I guess, make sure they had retained what the video showed?

A. No.

Q. And why not?

A. Most of what I've seen for the Flock cameras, you learn by using the system. So to be with -- to try to suggest that you learn everything while you are sitting there watching the video, I don't think it's reasonable.

I think people learn more as they use it or from the other officers in the cars that they were riding with. And there was no requirement to either do anything other than that.

Q. Did they have to take any type of test when they completed the video?

A. No.

Q. All right. So the real training was kind of on the job, if you will? Is that fair?

A. Yes.

Q. Was there any continued training that was required beyond just that on-the-job training?

A. No.

Q. Have you received any additional Flock training beyond that initial video?

A. No.

ATTORNEY BIGBIE: I'm just trying to find a document. There we go. All right. I'm going to share my screen. I'm going to put -- online exhibits are tough. I'll tell you that.

All right. I'm going to put this exhibit in the chat and I can share my screen with it as well.

(Exhibit 5 marked for identification)

ATTORNEY WINDHAM: Let me know if you can see my screen okay there.

THE WITNESS: Yes. I could see it.

ATTORNEY BIGBIE: Can you still see it okay? I think I just re-shared it.

THE WITNESS: Yes.

ATTORNEY BIGBIE: Okay. So I'll use this as Exhibit 1. It's Bates labeled NORF019294.

BY ATTORNEY BIGBIE:

Q. I'm going to scroll down, actually, to the bottom of the page. It looks like it's an email from derrick.vernon@norfolk.gov.

Is that your email address?

A. Yes.

Q. Okay. And it looks like it's dated May 17th 2024, to Rebecca McMicking? Do you know --

A. Yes.

Q. Do you know Rebecca?

A. Yes.

Q. Who is she.

A. She works in our fiscal management. So she is who I would ask for funds before I have to be going to trainings.

Q. Okay.

And I think we can see from the email here, you are mentioning that you and Officer Chafee

are going to be attending the Flock Forward Conference in Atlanta, on June 12th through 14th --

A. Yes.

Q. -- in 2024? Is that correct?

A. Yes.

Q. Did you guys attend that conference?

A. Officer Chafee did, but I did not.

Q. Okay. Why didn't you attend?

A. So, on June the 9th, my mother passed away. So when I was focused to go to conference, I was not going because I was planning a funeral.

Q. I'm sorry to hear that.

A. No worries.

Q. Did Officer Chafee tell you at all what he learned from the conference?

A. I was out of work almost three weeks, so I'm not exactly sure what -- I don't remember talking to him about that conference at all. No.

Q. Okay. What's Officer Chafee's role? What does he do within NPD?

A. Officer Chafee is one of the four officers who is assigned to the Realtime Crime Center.

Q. What's his -- what does he do within the Realtime Crime Center?

A. He is one of the four police officers. There are four officers there, and eight civilian analysts. And they are paired together to work shifts.

So it's one officer; two analysts. And they work to assist officers in investigations -- the investigators with investigations -- by locating video footage, most often reactive to what investigations they might be involved in.

Q. Okay. And we'll come back to the RTCC. But, yeah. I just want to know about Officer Chafee.

Were there any other opportunities to go to Flock conferences, that you know of?

A. That was the first.

Q. Okay. You haven't received any since then?

A. I'm sure there is one this year, but I don't know exactly when that is. There is something going on in September, but I don't, exactly.

Q. Do you plan to -- do you plan to attend?

A. I am not. No.

Q. Do you know if anyone from the department will?

A. So, Sergeant Gauthier would have been responsible for assigning two officers to go, or two persons to go. It might be an officer and an analyst. But I don't know exactly who is going, and I don't know when the conference is.

ATTORNEY BIGBIE: I'm going to show another exhibit here. Put it in the chat as well.

(Exhibit 6 marked for identification)

ATTORNEY BIGBIE: I put in the chat, and I'm sharing my screen as well, if you can see that, this will be Exhibit 2, Bates labeled NORF008996.

I can make that a little bit bigger too. It's pretty small. I'll actually scroll to the bottom of that page.

BY ATTORNEY BIGBIE:

Q. Again, it looks like at the top, it's an email from derrick.vernon@norfolk.gov. Is that your email address?

A. Yes.

Q. And it's dated December 31st 2022. Is that correct?

A. Yes.

Q. And it's to Jacob Collier. Who is Jacob Collier?

A. Jacob Collier would have been a police officer here.

Q. Okay. And in the email, you said:

"Please watch the attached video and let me know when you are done."

Do you remember what -- the context for this email?

A. So it looks like the Flock video that I watched, that was created by Brian McKenzie. And the link is the -- the hyperlink would have been the Norfolk Housing Authority trainings. So he would have watched the video that I sent to him.

Q. Okay. And I think you told me that they had to watch the video in order to get access to the NRHA cameras.

Is that correct?

A. Yes.

Q. Okay. So he was -- he would have been watching this video in order to access those cameras?

A. He would have been -- he would have -- the intention was for him to watch the video and then get access to the cameras. Yes.

Q. Okay. And then he responded, looks like almost a month later -- January 24th 2023 -- and he says, "Sir, I have watched the video provided."

Did I read that correctly?

A. Yes.

Q. Okay. Scrolling up here, like January 26th 2023, you responded that:

"The link for the training video is not active, so I am not sure which video you watched."

When did that link -- video link expire? Do you know?

A. So it would expire actually every 30 days. And you would have to upload the link again, or Flock would upload the link again, so they could watch it again.

Q. Okay. So --

A. And --

Q. Sorry. Go ahead.

A. It could be uploaded when I would call them. I would call Brian and he would upload it again.

Q. That was Brian McKenzie?

A. Yes.

Q. Do you remember how you -- how you would have learned that the link was not active?

A. So someone told me it wasn't active and I would click the link myself. And it would say -- it had some type of error, much like it was timed out. And I would make a phone call and have them reactivate the link again.

Q. Okay.

So is it fair to say in this situation, the link that you had sent Mr. Collier wasn't active, to your understanding?

A. So, I would like to believe that he watched the video. Though I suggested in my email, that that video wasn't active. I would hope that he wouldn't tell me something that was untrue.

Q. But --

A. So, what I made -- what I believed he may have done was watched the video with somebody else prior to him asking me for access. So him saying that he watched the video, I believed that he watched the video like he told me. He may not just watch the video in the link that I sent to him.

ATTORNEY BIGBIE: Objection. Non-responsive.

BY ATTORNEY BIGBIE:

Q. My question was, at that time, was it your understanding that the video link you had sent Mr. Collier was not active?

A. Yes.

Q. Okay.

And you, at that point, knowing the link was not active, went forward with setting up Mr. Collier's account so that he could access the NRHA cameras. Correct?

A. Yes.

Q. Why were you -- do you know why you were put in charge of, I guess, doling out access to the NRHA cameras?

A. Because I was supervisor for the unit assigned to working those properties.

Q. Now, I think you told me -- I know we talked a little bit about searches already, but I want to kind of go back to that.

When you log into the Flock system -- or I guess I should start with this. How does one log into a Flock system?

A. You go to the website. You click the sign in link. And you insert your user name and the password that you are designated.

Q. What computers can that -- can that site be accessed from?

A. I would say desktops and laptops in the police department, as well as the computers that are in the cars.

Q. Is someone able to use their personal laptop to access the website if they have their user name and password?

A. So, the policy now tells you that you should not do that. But are you able to? Yes.

Q. And you said the policy now. Would that be that January -- sorry -- June 29th 2025 policy you mentioned to me earlier?

A. Yes.

Q. Do you know if there was any policy regarding where you could log on to the Flock system prior to that order?

A. They should just have been city assets that you used. So much the same.

Q. Is there any way to -- that you know of, that NPD could see what computers their officers are logging in from?

A. Not that I'm aware of.

Q. All right.

And then when you log in to the Flock system, what do you see? Can you describe it for me?

A. When you first log in, I think it shows you the last results of any hot list -- any vehicle that were on the hot list that may have passed through a camera. So it might show you the rear picture of a vehicle. The date and time stamp. And the actual camera where the vehicle passed.

Q. Would that be a hot list that you put in? Or just any hot list that someone put in from the department?

A. Any hot list that someone created in the department.

Q. Okay.

And beyond that, is there like a home screen, or anything, that would have other options for where to go within the website?

A. So there are different panes and different tabs you can click at the top of the page, such as to do a search. An insight tab kind of tells you how many cars have passed through the cameras. Those type of things might be available to you.

Q. So there is a search tab; an insight tab. What other tabs?

A. I'd have to look at the screen to tell you exactly. Because I have more tabs on my screen than the officers do, as an administrator. And I'd have to look at the screen to tell you.

Q. Do you know what you have that's different than the officers?

A. I have the ability to look to see the last time someone logged in. I have the ability to add access. Restrict access. And deactivate accounts. And I know there are other items in the screen. But again, I have to look at the screen to tell you all of them.

Q. All right. Going back to that insight tab, tell me more about what that tab shows.

A. That tab might show how many cars have passed by the cameras. I think it does like the last 30 days, and it advances one day every day, obviously. So it goes back the last 20 to 30 days.

And to show you the number of cars that have passed by those -- by cameras in your city per day -- like an average per day -- I guess an average per day. Yes.

Q. Is that for individual cameras? Or all of the cameras as a whole?

A. All of the cameras.

Q. So there is no way to go in and see like this camera on X avenue has this many hits?

A. I think you can click on the camera to get that information, but the insights tab, it tells you the toll.

Q. Okay.

So where would you go to be able to see an individual camera? How would you navigate to that in the website?

A. You would have to go to the maps, and select -- as the map shows up and they will show you all the camera locations, you can click on the camera and it would provide some information for you.

Q. What information is that?

A. So, if there was a car that passed through that camera, that was on a hot list, it would show that -- the last time a vehicle passed through a hot list -- I mean, passed through that camera, and would list those -- those hits, if you want to call it that, in sequential order, from the newest to the oldest on that camera.

81

Q. Does it link other cameras? Like could it show you where -- what other cameras that vehicle hit next?

A. No.

Q. Can it tell you how many times a vehicle was spotted on that camera? That one camera?

A. So, I think each time, when you click the camera, it will show the picture, date, and time. The next picture would be another car that may have passed; date, and time, and location. The next picture would be the same thing.

So it would not tell you how many times any one car passed by a camera. No. I don't think it tells you that. No.

Q. Okay.

And that's from the -- sorry -- the maps tab, you can find that information now. Correct?

A. From the map. You click on the camera and it gives you the information.

Q. Okay.

But if we went over to -- let's pivot now to that search tab. Tell me what that looks like,

82

if we click into the search tab.

A. You can provide the license plate; the type of car; the color of the car. You are required to put in a search reason. And a case number. And you can search for vehicles that way.

Q. If you leave one of those items off -- I know you told me license plate; type of car; search reason; or case number. Say, if you don't have a type of car, will it still run the search? Or are all four of those required?

A. The only two tabs that are required are the search reason, and I think it's just the case number is required.

Q. And when you say they are required, is that something that's been the case since you started using the Flock system in 2022? Or is that a new development since the special order in 2025?

A. So there might be the -- something that's changed more recently, to have a -- the reason for search I think was always there. You always had to have a reason. But I think it requires a case number now.

83

But I could search a car with just a tag. I could search a car with just a color. I could search just makes of a car. You just get inundated with responses back.

Q. Okay. So it's more about narrowing the search? Is that --

A. Yes. The more you narrow the search, the more likely you are to get the result that you are looking for.

Q. Okay.

So, say you have type of car; license plate; case number. You put all of that in. What pulls up next? What's the next screen you would see?

A. So you need the reason --

Q. Or the reason, sorry.

A. And if the car has passed by one of the cameras, you should get a response back as to where that car may have been.

Q. What does the response look like? Does it spit out like an Excel sheet? Does it list different -- like what does it look like? I've

84

never seen it.

A. So it looks like what we kind of described before. It would be a highlight of the license plate number and a picture of the rear of the car as it passes by the camera.

You would have the date and timestamp. I believe it's the top right corner of the picture.

Q. Does it tell you which camera that picture was captured from?

A. Sorry. Yes. It also provides the camera that captured the picture.

Q. And does it, I guess -- if a vehicle -- say, if I'm driving from X street to Y street and both streets have a Flock camera, and I hit both of them, will both of those hits pull up? Or is it just the most recent one?

A. So, if you are suggesting you are going in one direction -- let's say you are going north and you turn right to go east, if there are cameras on the street that goes north, and the camera that goes east, then yes. It will show two different pictures.

Q. How many, I guess, would it -- would it just pull every camera that you have passed for the last now 21 days? Or is it a different time period than that, if you are just doing the search on the license plate?

A. It would give you the last 21 days.

Q. Okay.

And so that you can see in that instance like if, as you said, they went north, and then east, and both of those -- both of those roads had cameras. If it passed, you could see that from that one day. And then if you scroll back maybe the week prior, they drove that also?

You could see both of those instances. Is that your understanding?

A. Yes.

Q. Okay.

Can you export that data, do you know? Like that query?

A. I'm not sure.

Q. Do you know if it could -- I want to say, like, export that information from the hits to a map of the Flock cameras, to show you the route?

A. No. I'm not familiar with that.

Q. Okay.

All right. So then, going back to the actual, like, search page. That search reason that you mentioned. What justifies a reason for a search? What do you need to put in that category there?

A. It should be a criminal justice purpose. It could be a stolen car. Stolen license plate. Could be an amber alert. It could be a missing person, if they are to have been seen in that car, or be associated with that car.

Q. Sorry. What was that last one you said?

A. Or be associated with that car.

Q. What you associate with that car?

A. A missing person. I said it could be a missing person or a person associated with that car.

Q. What do you mean a person associated with that car?

A. So think about the missing person and the missing person having been in that car. And that would --

Q. And you also said -- sorry. Go ahead.

A. I'm sorry. That was just the reason.

Q. You also mentioned a criminal justice purpose. Tell me about that. What that means?

A. So I just used that as a topic to kind of lead into the stolen car or wanted person. Or stolen license plate.

Q. When you are inputting that reason in the search bar, how much specificity do you have to give for that?

A. So, it had to be enough for me to think that you have a reason to put that to search for the vehicle. You have got to give me enough so I know that you have a reason to be searching for that vehicle -- for that license plate.

You have got to give me enough to justify that.

Q. Is that enough to justify that? Is that -- I guess, has that been the policy since the implementation of the Flock camera? Or is that a new policy as of end of June of this year?

A. So it's definitely part of June of this year. But I think you are supposed to use a reason for searches, anyway, when you search for a vehicle.

Q. If you are looking in terms of like for a criminal justice purpose. Right? Does the vehicle have to be associated with the criminal suspect? Or are there other criminal justice purposes for which you might query the system, that you can think of?

A. That will be the reason for a query, in my opinion.

Q. What do you mean?

A. Criminal justice purpose. So it needs to be associated with the vehicle, if the vehicle is stolen. Or with the -- a person may be wanted, that may be in that vehicle.

Q. Any other criminal justice reason that would -- that comes to mind, that would be sufficient?

A. Again, a missing person, or like an amber alert, or something of that -- something of that type of search.

Q. Okay.

89

And then once you put in that reason for the search, does that have to be -- does it go through any approval?  Does anyone -- does anyone look at that in realtime to verify the purpose?

A.  No.

Q.  Who is able to run the search?  Who has access?

A.  Sworn personnel for the police department.  And there are some civilian staff that have the ability to run those queries.

Q.  Who would be included in the civilian staff members?

A.  The personnel that work in, like, our E911 dispatch center.

Q.  Law enforcement adjacent, though?

A.  Yes.  And, I'm sorry.  Of course, we have civilians that work in the Realtime Crime Center.

Q.  Is anyone outside of Norfolk able to run a search to see vehicle hits in Norfolk?

A.  So, people that we share access with?

Q.  Correct.

A.  Yes.

90

Q.  And who would those individuals be?

A.  Other law enforcement agents that we share with.

Q.  What's the -- what's the process to, like, verify those are, I guess other -- other officers, if any?

A.  So in the training with Flock, Flock encourages -- or encouraged sharing of the networks with other law enforcement agencies.  So a request from a law enforcement agency, we would share our access with them, and it would be reciprocal.

Q.  Okay.

So do you guys -- you don't do any independent, like, verification that this is the -- this is Officer Joe Shmoe from, I don't know, another -- another jurisdiction who is going to access our Flock data?

A.  No.

Q.  You may have alluded to this before, but how does -- how, if at all, did that rationale for a search that you had to input -- how did that change with the new policy, as of the end of June, 2025?

91

A.  I'd have to look at the policy to tell you directly.  Because I don't want to misquote anything from the policy.

Q.  Do you know if your officers do anything different?  Have you seen them do anything different as a result of the policy change?

A.  So, I have not.  Because I don't work with the Realtime Crime Center, and that's where the officers use the system the most.

Q.  What about with the NRHA cameras?  Have you seen any difference in how they have to go about accessing those, what they have to input?

A.  So, I don't work with them anymore.  So I can't give you an answer to that.

Q.  Okay.

Were you involved at all with the policy change at the end of June 2025?

A.  No.

Q.  Do you know if the new policy requires a warrant in order to justify a search?

A.  I'm pretty sure it does not require a warrant, but I have to look at the policy.  I'm

92

almost sure it does not require a warrant to do a search.

Q.  I think you told me a little bit before about these searches being audited.  Is that correct?

A.  Yes.

Q.  Can you tell me a little bit about that?  What that process is?

A.  So, I could do an organizational audit.  And in doing so, I can pull all the searches in specific date and time ranges, and it would show me every search for everyone in the city, during that time frame.

It would give me the date and time of the search.  The person who did the search.  The plate that they searched.  And the reason that they listed for doing the search.  And it's all created on a spreadsheet.

Q.  Okay.

And why -- like, why do you have access to that?  What about your position, I guess, enables you to see that or run that?

93

A. Any administrator in the city has the ability to run those organizational searches -- that organizational audit.

Q. What qualifies as an administrator?

A. So, the captain of the division will assign those administrative duties to people. The captain, of course, is administrator.

I'm one of the administrators. Sergeant Gauthier is an administrator. And I think there is one other administrator who works in our Technical Support Unit.

Q. Do you know why you were listed as an administrator? Why the captain made you an administrator?

A. Because I was an administrator for Flock for NRHA before I came over to the unit. And my duty just kind of fell in line to maintain the status that I had before.

Q. For what purpose would you run an audit?

A. Audits would be run to ensure compliance with the policy. To see why people were searching tags.

94

Q. How often are those audits run?

A. They are being done every 30 days now.

Q. Is that automatic? Or it's something you have to actually go in and run?

A. It's not automatic. It's something that takes input from a user to do.

Q. Okay.

And every 30 days -- I know you are not the only administrator. Who -- I guess, how do you guys work that between the 30 days of who is going to pull the audit?

A. Sergeant Gauthier pulls the audit.

Q. Has he always been the one to pull the audit?

A. He has been the one to pull them since we had the policy -- the last policy change dictating who would run those audits.

Q. End of June 2025 change?

A. Yes.

Q. Who -- how was it determined prior to that, who would run the audits?

A. Probably in the special order. So the

95

general order supersedes the last order. And that last order would be back in 2023.

Q. I guess from your -- from your own experience, between 2023, and then the new change just shy of a month ago, how often did you run audits?

A. It had not been something done on a regular basis at all. No.

Q. Was there any occasion that you can remember, that you ran an audit?

A. Yes.

Q. When was that?

A. It's been several months ago now. And it was for this lawsuit.

Q. Outside of running it for -- I guess I should ask you, for this lawsuit, was that like -- I guess, what do you mean for this lawsuit?

A. We ran an audit back to the beginning -- to the inception of the police department getting the Flock cameras.

Q. Okay.

A. And using it now.

96

Q. Outside of that audit that you ran to collect data responsive to what I presume were requests in this lawsuit, is there any other time you can recall running an audit?

A. No.

Q. Do you know of any other administrators running an audit outside of for the purposes of this lawsuit?

A. I'm not aware. No.

Q. Have you ever personally identified any misuse of the Flock system?

A. I did not personally identify the misuse. No.

Q. Okay. Do you know if someone else identified misuse of the system?

A. Yes.

Q. Okay. Tell me about that.

A. I was contacted by an executive in the department, who asked me to query, or to do an audit of an officer's use of the system, pursuant to a complaint. And it was found that the officer misused the system.

Q. How so?

A. He searched the system to -- to locate a vehicle in response to a stolen cat in another jurisdiction.

Q. What about that was identified as being a misuse of the system?

A. He was not working. He does not work in that jurisdiction. He used our -- our access to Flock to search for that vehicle.

Q. Do you know how that situation was uncovered? Like how that was -- how it was discovered?

A. It was discovered during the complaint that the person made against the officer.

Q. Okay.
Did he -- do you recall in that situation, if that individual put in a reason for the search?

A. I don't recall the reason he put in for the search. No.

Q. Was that something you looked for when you ran that audit of the search?

A. When I ran the search, I ran it because they wanted to know the date and time that the search was run. And that's the information that I provided. Again, that was all based on the complaint from the citizen.

Q. So is it fair to say that you weren't -- you weren't actually evaluating the information from the audit? You just ran it to hand it over to the person who was, I guess, investigating the claim?

A. That's correct.

Q. Okay.
If you were to be the one evaluating an audit when you -- well, I guess, there was nothing about that complaint that NPD actually found out? They looked into it because there was an outside complaint.
Is that correct?

A. That's correct.

Q. Okay.
So, going back, when you are running these audits, what are you looking for in the audit?

A. You want to make sure that all the boxes are checked, if that makes any sense. So I want to see if there is a reason specified in the "reason" category. If there is a case number assigned.

Those are the two biggest things. Because again, you could do searches for just the color of a car, or the license plate, or any of the identifying information on the car.

Q. Do you, I guess, look into the case number at all to verify that it's, in fact, a real case number, or an accurate case number?

A. So if you are looking for a specific case, I would say yes. But otherwise, you want to make sure those boxes were actually filled in the way they are supposed to be, to ensure the search is tabbing appropriately.

Q. What do you mean like the boxes are -- explain to me more what you mean about that.

A. So if I'm looking for Officer Jones, specifically, and I'm looking for the search that he conducted, and I want to see what he was searching for, and if he put in a reason code that says "stolen car." And if he put in an actual case number.
If I was looking for just that officer, I might go further and look to see if that case number actually existed. Or I would respond to Officer Jones and inquire, "What's your search? Why you were doing the search in the first place."

Q. Okay.

A. So --

Q. So that's looking at one specific officer. But if you run the audit, like you told me, where it pulls this big sheet of, you know, all this data of all the searches ever run, and there is a list of those case numbers, do you do anything to go in and verify that those case numbers are, in fact, legitimate?

A. So, I would not go through each one of those case numbers individually. No. Because there are thousands of searches done per week. So that would be impossible to try to maintain and keep up with.

Q. Okay.
ATTORNEY SOLORIA: Jessica, I want to give you a chance to finish up this topic, but we have

been going for coming up on an hour and a half.  So I just want to --

ATTORNEY BIGBIE:  Well, yeah.  Let's -- I have a good bit more of this.  So why don't we take a break now, and we can come back to it?  I am on Central Time, I'll tell you, so it's not quite lunch time for me, but I'm happy to take a lunch break if we need to, at this point.

ATTORNEY SOLORIA:  I think that makes sense.

ATTORNEY BIGBIE:  Okay.  Let's go off the record and we can talk logistics.

ATTORNEY SOLORIA:  Okay.

THE VIDEOGRAPHER:  We are going off the record, and the time is 11:54 a.m..

(Luncheon break.)

THE VIDEOGRAPHER:  We are back on the record, and the time is 1:00 p.m..

ATTORNEY BIGBIE:  Lieutenant Vernon, I think when we had left off, we were talking about audits of the queries in the system.

I want to maybe go back a little bit.  I'm going to send in the chat, and I can share my screen as well, two documents.  The first will be Bates labeled NORF018635.  That will be Exhibit 3.  So we'll start with that, and I can share my screen.

(Exhibit 7 marked for identification)

ATTORNEY BIGBIE:  Let me know if you can see my screen too.

THE WITNESS:  I see the screen.

ATTORNEY BIGBIE:  Okay.

BY ATTORNEY BIGBIE:

Q.   So it looks like -- I guess, let me ask you this.  Have you seen this document before?

A.   Yes.

Q.   Okay.  And I can scroll as necessary.  Just let me know.  Looks like this document is dated July 13th of 2023.

Do you see that at the top?

A.   Yes.

Q.   And it's labeled, "Operational Special Order 23-002: Flock Safety."  What's your understanding of what this document is?

A.   Providing guidance to using the Flock LPR system in the City of Norfolk.

Q.   Okay.

And I guess, what are the dates from which, to your knowledge, this specific policy -- these guidelines would have been controlling within Norfolk?

A.   So, from the date that it was issued, to the officers, or disseminated to the officers, until the general order was disseminated on the 29th of June.

Q.   That's the 29th of June of this year?

A.   Of this year, sorry.  Yes.

Q.   And you said when this order here that we are looking at -- the Operational Special Order 23-002 -- you said it would be the date that it was disseminated to officers.

Would you assume that would be close, at least, in time to this July 13th 2023 date?

A.   Yes.

Q.   Okay.

All right.  So looking at this document here -- and I will scroll -- I just want to -- I want to make sure we are on the same page in terms of looking at queries and the audit information you are looking at.

Under this policy, what is your understanding of the standard by which an officer must justify their search -- in putting the reason for their search in that query?

And take all the time you need.  I'm happy to scroll as well.

[Witness reviewed document.]

A.   Looking at the order, it looks like it gives more direction to investigators creating hot lists, and what's required for those hot lists, in term of permissions from a supervisor.

They are completing a document and forwarding that document to the special projects lieutenant, to ensure that they complete the document after they have done the -- to request the search, and they have the required permissions to do such searches.

And the reasons that they may be able to do a search, to include the BOLO; stolen vehicle;

105

amber alert; missing persons.

Q. Okay.

But to my question, that's for a hot list entry. Correct? And my question is for a general query of the Flock system, is there anything in this order that you see as guidance for what is a valid reason to input in that box?

A. The reasons to do the searches? Is that what you are asking?

Q. Correct.

A. So, I guess it lists what they -- the reasons why you could do searches. But it says there is no specific -- it says they are not limited to the search reasons, and gives reasons why you can do searches.

Q. Point me to where you are seeing that, if you don't mind?

A. So under "Procedures."

Q. Okay.

A. So, two. And down "H." Examples for scenarios for mail entry of a license plate.

Q. Okay.

106

And as you indicated, those are examples, but not limited to those options. Is that correct?

A. Correct.

Q. And this specifically again relates to hot lists. Not just specifically querying the system. Is that your understanding?

A. Yes.

Q. Okay.

But in terms of actually querying the system, generally, outside of the hot list context, there is no guidance that you can see for what is a reason to submit the query?

A. I don't see -- unless it would be under Section 3 for training. Letter C. And that guidance may be in the completion of the Flock Safety orientation video. But again, I didn't see this video, so I'm not sure.

Q. Okay.

ATTORNEY BIGBIE: Pivoting to what -- the other document I list in the chat, that's NORF021152, that will be Exhibit 4. And I can share my screen here so you can see.

107

(Exhibit 8 marked for identification)

BY ATTORNEY BIGBIE:

Q. Have you seen this document before?

A. Yes.

Q. Can you tell me what it is? What your understanding is?

A. So that will be the new general order that would supersede what was in the last document. Because this document was created to give additional guidance, and more specific guidance, to the use of the Flock Safety system.

Q. Okay.

Did you have any role in, I guess, creating this document that we are looking at?

A. No.

Q. How does this document, in your opinion, change or -- I guess, change the criteria by which officers are conducting queries?

A. So one of the first differences, I can assure, is with the change in the law in Virginia, about the [Indiscernible]. So it went from being 30 days in the special order to being 21 days in this

108

order. And there is a lot more detail given in terms of definitions and responsibilities of supervisors.

You know, of course, when the first order was disseminated, there was no Realtime Crime Center established yet. So this gives more direction as to what -- what's required in using Flock, and like the permitted uses, and the system accesses.

So it's more direction given here.

Q. Outside of just you, like, reading this document, was there any other, like, training or -- I want to say like department meetings that you all had, to teach you about these changes?

A. No.

Q. All right. So within this, how does this change, if at all, the -- what the officers are putting into those search boxes in the query?

A. Again, it provides direction as to what's required. So what parameters you are using for the searches. It asked for the case number and asked for the offense type. It asked for those things to be entered when doing the queries.

109

Q. And can you point me to where you are looking at in that document?

A. Three -- Section 3D. And the list of queries there.

Q. How does this -- this guidance -- you told me -- let me back up.

You are one of the administrators that can run an audit. Correct?

A. Yes.

Q. Okay.

How do these criteria inform what you are looking for in those audits?

A. So in the Excel sheet that will be generated, it will show the license plate and the vehicle characteristics that are listed. There is a column for case number. There is a column for offense type. And reasonable suspicion.

And those boxes -- each of those cells should have some information in those cells in the Excel sheet, besides the person's name; the date and time, that they run the query.

Q. What are you looking for -- I guess is

110

this -- let me ask this. This reasonable suspicion portion, is that what you would be looking for under that "Reason" category?

A. Yes. Offense type and reasonable suspicion. Yes.

Q. Okay.

Just, I guess, what in your opinion, when you are looking at these audit logs -- what's enough. Right? Like what are you looking to see that rises to what this standard is outlining here?

ATTORNEY SOLORIA: Objection. Lack of foundation.

THE WITNESS: So I will be looking for a stolen vehicle. For a wanted person. Stolen license plate. Something that rises to a -- requires some police action.

ATTORNEY BIGBIE: Okay.

BY ATTORNEY BIGBIE:

Q. And just quickly, I guess, going -- sorry.

Going back to Exhibit 3, it was dated July 13th of 2023. Are you aware of any policy predating this, that related to Flock cameras within

111

your --

A. So -- I'm sorry. So it probably didn't relate to Flock cameras. It probably related to license plate readers, which is what we had before there was a Flock camera.

And that was years and years before this, when we had those LPR cameras attached to the back of the police cars.

Q. Do you recall when that written guidance would have gone into effect regarding -- regarding those?

A. No.

ATTORNEY BIGBIE: I'm going to -- putting another document in the chat, and I'll share my screen of it as well.

(Exhibit 9 marked for identification)

ATTORNEY BIGBIE: This document is Bates label, Attorneys' Eyes Only NORF000029. And this will be Exhibit 5. I may have said an extra zero in that. NORF000029. Okay.

BY ATTORNEY BIGBIE:

Q. And I'll represent to you that you are

112

listed on this document as a -- as a custodian. Do you know why that is, that you would be listed as a custodian for this document?

A. I may have run this document. Maybe that's why.

Q. Okay. As an administrator, is that within your role?

A. Yes.

Q. Have you seen this document before?

A. So, I'm sure I have, but I couldn't tell you when, but --

Q. Okay.

A. -- yes.

Q. Can you tell me, I guess, what I'm looking at here? What this document is?

A. So it looks like an audit document. It shows the time frame. Some of this is jumbled together, so I can't really read --

Q. Yeah.

A. -- everything.

Q. When you go from an Excel document to a PDF, it's not clean.

**A.** Sure. But it lists the officer's name. The total networks. Again, time frame. License plate. Case number. So it looks like what will be a part of an audit -- audit document, to show what the officer ran.

**Q.** Okay.

So when you run an audit, like you told me before, is this consistent with the information that would, I guess, come up when you run that?

**A.** This looks consistent with what that document would be. Yes.

**Q.** Okay. If I want to go line-by-line here, so, it's a -- I mean, it's on my screen showing 320 pages, so happy to scroll as necessary. I don't know that we'll need to.

But just looking in this first column here, "Name," who are these people who are listed here?

**A.** Police officers.

**Q.** Okay. Are they only Norfolk police officers?

**A.** So I would be lying to you if I told you I know every police officer's name. I see a lot of names that I recognize, and some that I don't.

**Q.** Okay.

And I guess maybe a better question is this. When you are pulling this audit data, will it pull searches that officers from other jurisdictions have run within your Flock system?

**A.** I can't give you an answer to that question, because I don't know.

**Q.** Okay. Would there be a way to find that out?

**A.** I could inquire from Flock, but that would be the only way I would be able to find out for sure.

**Q.** Okay.

And when you are pulling these audit logs, is that something -- is that something you would do? Like look into who these people are?

**A.** Not so much. And I say that because I'm looking at the names, and on some of the pages, I recognize every name. On some of the pages, I can't tell -- I don't know the names of the persons, but I

know there are a lot of officers that I don't know that work here. And a lot of them probably don't know me because they have probably never seen me before.

So there are some -- close to five hundred officers here. At one point, I would know all of them. But right now, I don't know all of them. Newer people have come in.

**Q.** Sure. Did you run -- I'm sorry. Go ahead.

**A.** I'm sorry. I wouldn't know all of the officers that come in in the last, I don't know, maybe 10 years. I don't know all of those guys.

**Q.** And this is a long document. It's 320 pages. I guess, it would be almost impossible for you to look up every single one of these people.

Is that fair?

**A.** Yes.

**Q.** Okay.

And you don't -- you don't know who each and every one of these people are on this log, as a result of that?

**A.** Correct.

**Q.** Okay.

In practice, do you -- I guess, do you -- do you know of anyone going in and looking at these audit logs, and looking up every single person?

**A.** No.

**Q.** Is that just because it wouldn't be feasible with the sheer amount of information here?

**A.** That's correct.

**Q.** Okay.

Looking at that next column, "Total Networks," what is that?

**A.** I couldn't tell you.

**Q.** Okay. Fair enough.

**A.** I don't know.

**Q.** All right. I guess we could skip "Time Frame." "Case Number." Tell me about this column.

**A.** So, case numbers, I would believe would be something used more by the investigators. Because a police officer who would be using this -- using this system, may not have a case number. And it may or may not have a case number.

**117**

As I'm scrolling through, I see that this is blank almost all the way through. So...

Q. Is this something -- I think you had told me earlier that with the new policy, as of end of June 2025, the case number requirement has changed? Is that accurate?

A. It says it's a required field in the Flock system now. Yes.

Q. Okay.

But what happens now, like if you said, some searches, there is no case yet. Right? So how does that fit into this equation here?

A. It could be put in the CAD number, which is the number assigned to the car that they are assigned to.

Q. Okay.

So if I were to look at an audit log from post-June 30th 2025, would you expect that under "Case Number," this field should be filled in with a CAD number or a case number?

ATTORNEY SOLORIA: Objection. Calls for speculation.

**118**

THE WITNESS: So I suspect that's why it's empty. Because there was no case number assigned.

BY ATTORNEY BIGBIE:

Q. I guess I'm just asking now, with the policy change, how does this -- how does this column change, if at all?

A. Again, I think it would be a case number or the CAD number. CAD numbers are assigned to each individual call for service, and they are a unique set of numbers. For every call for service that you go to.

And I would suspect that the officer would use that as the case number.

Q. Okay.

Do you know if you would still be able, as of, I guess July 1st 2025 -- if you would still be able to run the search? The search would still populate something if you didn't have a case number or a CAD number?

A. I haven't run one, so I couldn't tell you. I just know what it says on the field. At the bottom of the field, it says "Required."

**119**

Q. Okay.

Moving over to "Filters," tell me about that -- that column.

A. So it looks like they add a little more. Something more specific to the search. Because I see they have a -- in some cases, the make of a car. Some say "Other." Again, "State." So it looks like any number of things that you could put in that field.

Q. How does the filter work, in practice? Like how does it narrow the data you are getting when you run that search?

A. So I think the officer's able to fill in that filter if they have something to put in that field. But it looks like it's not required. Because I see it blank in a lot of places. So it must be something that's not required.

Q. I guess I'm just wondering, like -- you know, it's hard to see because the data is crunched here. But if we have a license plate, I guess to filter it -- this license plate, I guess, would that pull license plates from all over the country with

**120**

Flock access, that you guys are sharing?

I'm just trying to, like -- are there duplicate license plates? Do you understand what I'm getting at?

A. Actually, there are duplicate license plates.

Q. Okay.

A. I've only seen that once, and it's been a lot of years ago. But if you don't put the state in, it might query the plate in different states. In NCIC -- we did the nationwide search through VCIN and NCIC.

Q. Okay.

But there is within Flock; right? So this would be Flock cameras throughout the country to which you have access?

A. Correct.

Q. Okay.

All right. Now, moving on to this other column, "Reason." Tell me about that column.

A. So there should always be a reason why you are conducting the search. I think that was a

121

required field. And officers sometimes use abbreviations, or they will actually type out what they are looking for.

I see reasons like "stolen." I see "INV," like for an investigation. "CJ" would be like criminal justice. I see a number down in the middle of the page that says "170." 170 is -- or would have been one of our preset codes for stolen vehicles. Fugitive.

So you list a reason why you are -- the reason for the search.

Q. I guess, tell me -- tell me a little bit, when you are pulling these audit logs, what are you evaluating in terms of the reason? Like what are you looking for to make sure that this is up to NPD standards?

ATTORNEY SOLORIA: Objection. Lack of foundation.

THE WITNESS: So I think I mentioned before, when I did the audit log, I did it for the lawsuit. That's why I pulled the log.

And I did the audit log from the -- back

122

in 2022, I ran it every 30 days -- every month, rather. I did month-long pulls of the searches for Flock, for the purposes of the lawsuit.

ATTORNEY BIGBIE: Okay.

BY ATTORNEY BIGBIE:

Q. So looking at, I guess, like this third one here, it says "CJ." I think you told me -- tell me again what "CJ" means.

A. Criminal justice.

Q. Okay. And tell me about how -- how that's a reason to search the Flock system.

A. So every search should be done for criminal justice purposes. So some police action can be taken, based upon the reason this car is being searched.

Q. In your opinion, is there -- if it has to be a criminal justice reason, just putting "criminal justice" doesn't actually state the reason. You understand what I'm saying?

Should there be something more to explain what the criminal justice reason is? Or is "criminal justice" enough, in your opinion?

123

A. I would like to --

ATTORNEY SOLORIA: Objection. Vague.

BY ATTORNEY BIGBIE:

Q. Go ahead.

A. I would like to know more, but "criminal justice" would satisfy the requirement for why they are searching for the vehicle. The reason for the search.

Q. You said you would like to know more?

A. I would.

Q. Okay.

And in your role as an administrator, someone who -- you are one of the people who runs these audits. Right?

A. Again, I ran the audit once. And I did it for the lawsuit.

Q. All right. Looking down -- still on the first page, looking right here, this reason. "LALALALA."

Do you know what that means?

A. Pretty inappropriate reason to run a search or to enter that as a reason. Because I

124

don't know what "LALALA" means. Officer Martison might know.

But that would not be enough for me to justify why he did a search, and I would inquire as to why.

Q. Okay. But you didn't -- outside of this lawsuit, you never ran this audit to look over these reasons and investigate if they were up to par.

Is that fair?

A. That is correct.

Q. Okay. If you had seen this, what -- what action should be taken --

ATTORNEY SOLORIA: Objection. Calls for --

ATTORNEY BIGBIE: -- in this situation?

ATTORNEY SOLORIA: Objection. Calls for speculation.

THE WITNESS: A reason for that entry would have to be explained to me. And I will go to his supervisor to inquire and have them ask that officer to explain why they have put that as the reason for the search.

125

BY ATTORNEY BIGBIE:

Q. And to be clear, that didn't happen in this situation. Correct?

ATTORNEY SOLORIA: Objection. Lack of foundation.

THE WITNESS: No. It did not. Again --

ATTORNEY BIGBIE: Are you --

THE WITNESS: I ran the search for the lawsuit.

BY ATTORNEY BIGBIE:

Q. Are you aware of any of the other administrators running an audit and following up with officers, as to the reasons input in the logs?

A. So I am aware that Sergeant Gauthier has run audits and has seen where there has been no expiration date entered for hot lists. And we have asked the supervisors to inquire with their officers or investigators about the fact that there is no expiration date.

Q. When was that, that you recall learning of Sergeant Gauthier looking into that?

A. It was probably not too long ago. So in

126

the last -- actually, in the last 30 days for sure. In the last 30 days.

Q. But to be clear, that was for a hot list, and not just a general query. Correct?

A. Correct. That was a hot list.

Q. Okay.

But you, yourself, have never followed up on an audit regarding the reason in this column here, given for a query?

A. Yeah.

Q. And I guess I should clarify. Audits happen after queries are run. Correct?

A. That is correct.

Q. So they are looking backward in this -- I guess in this instance, 30 days at a time, for the searches that have been run in the past. Correct?

A. That is correct.

Q. So there is nothing in realtime to verify the legitimacy of a query?

ATTORNEY SOLORIA: Objection. Vague.

THE WITNESS: That is correct.

BY ATTORNEY BIGBIE:

127

Q. There is nothing in realtime to verify the reason an officer is giving to conduct the query?

A. Outside of expecting the officer to follow the policy, that is correct.

Q. There is no supervisor who gets the search as it's being run, and has to check it off. Is that correct? Before it actually goes through.

A. That is correct.

Q. I guess just from a practical standpoint, we talked before about how -- how extensive these logs are. Right? Like there is a lot of searches being run every single day. Correct?

A. Yes.

Q. And you told me it would be pretty impossible to go through and verify every single person who runs a query. Right?

A. That is correct.

Q. Would you say that the same would also be true for the reasons given here for a query?

A. It will -- yes. That is correct.

Q. And outside of Sergeant Gauthier following up about the lack of an expiration date on a hot

128

list entry request, are you aware of any other administrator following up from an audit log, and what was contained in the audit log?

A. I am not.

Q. What's the procedure for removing an officer from access to the Flock system?

A. As an admin, you have the ability to deactivate the account or completely delete the account.

Q. Have you done that before?

A. I have.

Q. In what -- in what instances?

A. Deleting the accounts of people who are no longer employed, and deactivating, initially, with respect to the officer I told you that used the Flock system about the stolen cat. And I deleted his account when he left employ from the city.

Q. Was he terminated as a result of that incident?

A. He actually left prior to any discipline being completed.

Q. Do you know what discipline was given? Or

129

supposed to be given, I guess, before he left?

A. I do not.

Q. I know we have talked about hot lists kind of tangentially. I guess, maybe can you just walk me through briefly, what a hot list is?

A. So a hot list is a list of the license plate numbers that would be entered into the VCIN or NCIC, that will be flagged as a result of going through a Flock camera.

Those reasons would be most like what we discussed before. The stolen car. A person with warrants. Amber alert. Silver alert. Missing persons. BOLOs. Those types of reasons entered into VCIN and NCIC.

Q. Is it -- I guess how I am maybe conceptualizing this, and maybe you can tell me if this is accurate -- a hot list is something that is forward-looking for if a Flock camera gets a hit for that vehicle. Whereas a query is backward looking at whether the vehicle has, in the past, passed a Flock camera?

A. That seemed like a reasonable explanation.

130

Yes.

Q. Okay. Have you ever filled out a hot list form?

A. No.

Q. Are you involved in the approval of hot list forms at all?

A. No.

Q. Have you ever approved a hot list form?

A. I have not.

Q. I guess I should ask, have you ever denied a hot list form?

A. I have not.

Q. Are you involved at all in the department's, I guess decision, whether or not to allow other jurisdictions access to NPD's Flock system?

A. So those requests come to me through the Flock system. And I have the ability to approve those when they come through. Yes.

Q. Are you the sole approver?

A. Any administrator can approve them.

Q. Okay. Do you know of other administrators

131

who have approved them?

A. I can't say for sure. I know that I have approved them before. I know the ones that I have done. But if they are not in my system, somebody could have done it before I saw it.

Q. Have you ever denied another jurisdiction's request to share data -- Flock data?

A. No.

Q. What do you look at when you see a request come through from another jurisdiction to share data? What are you evaluating?

A. Those requests that come in from another law enforcement agency, which is what's been part of the course.

Q. Have you ever seen a request come through from a non-law enforcement agency?

A. I have.

Q. Tell me about that.

A. The requests I've seen come through those agencies are like Home Depot and Lowe's. Because they have Flock cameras on their properties.

Q. And were those requests -- I guess, tell

132

me what those requests were for, in those circumstances?

A. Those requests, they've shared their feeds with us.

Q. Was that a one-way request? In other words, they would share with you, but you wouldn't share with them?

A. So I had to inquire, and I found out that that was the case. They can share with us, but they don't have access to our system. We can see their cameras but they can't see ours.

Q. Okay.

Do you know about how many cameras that gave you access to with Home Depot and Lowe's?

A. It is over a hundred cameras, but I couldn't tell you the exact number. I know it is over a hundred cameras.

Q. Is that all within Norfolk?

A. No.

Q. Where are those cameras located, to your knowledge?

A. So the cameras give us the names

[Phonetic] and the store number, is what they list. So if I try to tell you if I knew where all of them were, I wouldn't be telling the truth. So I don't -- I can't give you every location that they are.

Q. Do you know if they are limited to Virginia?

A. I couldn't answer that question and give you an accurate statement.

Q. Sure. Are you able to estimate how many share requests you've approved from law enforcement agencies, I guess aside from the Lowe's and Home Depot request we just talked about?

A. I'd say hundreds. It could be a couple hundred, easily. Easily several hundred.

Q. When you share the data with other jurisdictions, are you able to see those other cameras in your, I guess, like the -- that map tab that you showed me before -- that you talked me through before?

Are you able to see those other cameras?

A. Yes.

Q. And does that include the Lowe's and Home Depot cameras as well?

A. Yes.

Q. If you run a query, will it give you the coordinates for those other cameras?

A. So, running the query won't give me the location of the camera -- the coordinates of the cameras. You know, unless the tag I'm searching passes that camera, and then it would tell me where that location is, and direction that the camera is facing.

Q. Okay.

So if you ran a query and a camera in another jurisdiction, with whom you share Flock data -- if they took a picture of that camera, it would pull up when you ran a query. Correct?

A. Yes.

Q. And it would tell you where that camera was that took the photo?

A. Yes.

Q. Okay.

Are you notified -- like, so in that situation we just talked about, where you run a query and it pulls up a capture from another jurisdiction, if someone else in another jurisdiction does that and it pulls up a capture in Norfolk, are you notified of that at all?

A. I think the person who initiates the query is notified. If they run a query, and the tag they are looking for passes by a camera in a jurisdiction, it would notify them of the camera's location, and again, the direction that the camera is facing when the vehicle passed that camera.

Q. But you are not sure if something like that would pull up in your audit logs if you were to pull it after the fact?

A. No. I'm not sure.

Q. Okay.

Are you involved in the, I guess, general day-to-day maintenance of the Flock cameras?

A. So, what do you mean by the maintenance of the Flock cameras?

Q. Well, you told me earlier there was an issue with a construction site and you were dealing with that. So I guess, are you involved in making sure the cameras are up and running?

A. So we don't have to do that. Flock does that automatically. And it happens every day. I only became involved in that situation because the construction company contacted the city to inquire who the cameras belonged to, or who is responsible for the cameras.

And when they reached out to us, I was put in contact with the construction supervisor, and he explained to me what they were trying to do and what they needed.

In that respect, I contacted Flock to see if they could remove the camera from the location so that the construction could take place, and they -- they did not do it in time. And the construction company actually moved the camera to the other side of the road so they could do their -- conduct the work they were doing there.

Q. Okay.

So fair to say, you are not -- on a daily basis, you are not involved in the maintenance of

137

the Flock cameras?

A. No.

Q. Since the Flock cameras have been roll out on Norfolk, are you aware of any new features or capabilities of the cameras?

A. No.

Q. All right. To pivot, you told me when we started this, as part of your current position, you are over the Realtime Crime Center.

Is that accurate?

A. Yes.

Q. Okay. What is the Realtime Crime Center?

A. The Realtime Crime Center uses cameras in the ability to contact officers. See officers working in realtime. We capture video in those places where cameras exist. We assist officers and investigators with investigations, in those places where we have cameras.

We are able to see criminal violations. We can actually contact the dispatcher and provide some direction to officers who are going on the calls, or create calls for service, where we see

138

criminal activity taking place.

We can assist officers after the fact, like with accidents and such, where we have traffic cameras in intersections.

We can record video from those traffic cameras and send those -- that documentation to officers, actually when they go into calls or when they have completed calls, for service, like for accidents.

Q. Were you involved in the creation of the Realtime Crime Center?

A. No.

Q. Do you know why you -- why the captain asked you to move over and help out with the Realtime Crime Center?

A. He did not. The chief assigned me to the Realtime Crime Center.

Q. Okay. Do you know why the chief asked you to cover the Realtime Crime Center?

A. I think it was just a -- again, I was promoted, and they were moving supervisors around; lieutenants around; captains around. And I happened

139

to be one of the persons who was moved to that division after its inception.

Q. How is the Realtime Crime Center staffed?

A. So I had one sergeant, four sworn officers, and eight civilian staff, and one admin person. And, of course, the captain, of course.

Q. And this may be a silly question. I don't know. But is the Realtime Crime Center like all one physical location?

A. Yes.

Q. Are all those personnel that you just listed, are they all -- when they go to work every day, do they go to that physical location?

A. All those people go to work in the same facility, yes, when they work.

Q. Okay.

And that facility, can you describe it to me, what it looks like when you walk in the door?

A. So there are eight workstations. There is a video wall that has 18 40-inch screens -- like 18 40-inch televisions on the wall that are all connected, that can all show one thing on all the

140

panes, or you can show different items on each screen, or break those screens down to -- I can make one 40-inch screen have 25 different pictures on that one screen.

Q. How is it determined what's going to be on each screen?

A. The officers that work in the office through the course of the day.

Q. Okay.

And I know you told me there is cameras and videos that feed into those screens. Is that correct?

A. Yes.

Q. Is there any other technology that the Realtime Crime Center is using to track everything you mentioned before?

A. So, track is not what we do, but we have the ability to see things that happen --

Q. Sure.

A. -- in realtime, and after the fact, what the cameras record.

ATTORNEY BIGBIE: So maybe this will be

helpful. Let me share, if I can share this.

(Exhibit 10 marked for identification)

ATTORNEY BIGBIE: This will be Exhibit 6. It's Bates labeled NORF-RERUN000204. I'll share that in the chat, and then I can also share my screen.

BY ATTORNEY BIGBIE:

Q. Let me know if you can see my screen there. If you are able to see what we are working with.

A. I see it.

Q. Okay. Have you seen this before?

A. Yes.

Q. Okay. What is it?

A. It is a list of the trainings that were provided to those personnel assigned to the Realtime Crime Center.

Q. Okay. I guess, can -- just maybe starting from the top, what's PowerDMS?

A. PowerDMS is a way that the city can -- the police department can actually send out training documents to the entire police department on one --

they can publish it in PowerDMS, and then each officer can log in to their account and view the training individually.

So it's something that they have the ability to watch at their convenience, when they are able to.

Q. Okay.

How is this used within the Realtime Crime Center? What's its relation to the RTCC here?

A. So all of the trainings that happen throughout the city, for both sworn and non-sworn, are all published in PowerDMS, and maintained in PowerDMS.

So like when the general order came out, the general order came out in PowerDMS, to ensure that everybody received the training, or received a copy of the new general order.

Would have been the same, when they came out in 2023.

Q. Okay.

Is there a way in PowerDMS for, I guess whoever runs it, or the administrators of PowerDMS,

to see if an officer has opened up a training document?

A. They can see that it has been completed. Yes.

Q. What does "completed" mean?

A. So if you are given a training and you are required to read a training, take a test during that same training, it will record those scores and document that you said you -- at least seen the training, and/or understood the basics of it.

And that's published -- being sent back to the training division. Because the training division runs the PowerDMS platform.

Q. So is it -- is it a completion that you opened it? Or is it something that the officer has to actually, like, sign their name or attest to, that "Yes, I've watched this?"

A. You have to sign your name and attest that you watched and understood what was there.

Q. Okay. All right.

All right. Moving on to this next one, VCIN. What is that?

A. The Virginia Criminal Information Network. So when you run a tag or a name in the CAD system -- the computer dispatch system -- that information will populate if you have warrants on file. Registration information for like a car.

It will tell you if I run your driver's license's number, if you have a concealed carry permit, or if you have a protective order against you. Those types of responses come back from this in VCIN.

Q. How is this used -- how is VCIN used in the Realtime Crime Center?

A. So if, in fact, you need to run a license plate to get a -- the registration information, or for persons that are wanted, that you may be running for an officer over the radio, because you hear them involved in a -- some police action, you could assist by running those names or tags.

Guns that might be stolen. You have the ability to get a return for the entries that you query.

Q. Could VCIN -- if I had a -- like a license

plate, if I put that into VCIN, could I see who the -- I guess the information for the registered owner?

A. Yes.

Q. Okay. All right.

LinX. Linux. I'm not sure how I'm supposed to say that. What's that one?

A. So that's LinX.

Q. LinX.

A. And that's the law enforcement network that allows -- agencies around the state can enter information into the LinX system, and it's kind of shared through law enforcement agency -- all law enforcement agencies that have LinX accounts.

And it allows you to -- if I ran a name here in Norfolk and they have got warrants in Annandale, Virginia, it will show me what kinds of things the person might have been involved in, in Annandale, or any other cities in the state of Virginia.

So it kind of links all of your involvements throughout the state if, in fact, the locality has accounts set up in LinX.

Q. How is this database used in the Realtime Crime Center?

A. Much the same. If you are running, looking -- you run a person's name and they have involvements in multiple places. Because this -- the investigators who also have the same access, but they may not have looked in LinX yet.

So it kind of checked for those type of involvements outside of Norfolk.

Q. All right. Moving on to CAD. What's "CAD" stand for?

A. CAD is the Computer Aided Dispatch. So that's actually the computer system in the police cars that we have access to, and dispatch have access to.

That's how our messages for events are created and sent to officers, and/or investigators, and how you could pull a message or clear a message that you may respond to.

Q. I guess explain that to me a little bit more when you say like, a message, and clearing a message. What does that mean?

A. So a message might not be a great term. If that were changed, from using "message" to "event." So, any call for service, police officers called them messages, but we now use the term, "event," and it's the same thing.

So a call for service, you get dispatched to a suspicious person. You get there. Nobody is there. You can clear on arrival that there is no person there now. Or if you go to a -- a domestic assault call, if you make an arrest, you can clear by arrest.

So that's what I mean in terms of clearing a message. So you give the final disposition of a case in the CAD system.

Q. Is it fair to say that the CAD system is an automated -- somewhat automated timeline of the case and the events that are taking place -- I guess during a call, rather?

A. So there is a timeline that's given. The date, time, everything is listed there in the message.

So if you talk about a -- the call for service has a number assigned to it. The CAD would generate that initial call for service. That initial assignment of a number.

And everything that happens through the course of that investigation or that call for service is listed there in chronological order, until it's completed or cleared by the officer or investigator.

Q. So when you are using this, I guess, in the RTCC, like when are people -- when are the folks who work there using CAD?

A. So CAD allows us to see the calls for service that are active on the street in the City of Norfolk. So they can actually monitor the calls for service in the city.

Q. All right.

A. As they are actually going on.

Q. Okay.

Is that something that would be broadcast up to one of the TVs?

A. It's up to the -- the people in the

149

office. Most of what the officers in the civilian staff work on, in the Realtime Crime Center, are set up on three screens they have in front of them.

But even if they have it on their screens, they can put it on the video wall.

Q. Okay. That makes sense.

So if they are working on it, and for some reason, they need to broadcast it to the rest of the folks in the RTCC, they can move it from their individual computer, up to the main big screen?

A. Correct.

Q. Netviewer. What is that?

A. I/Netviewer and CAD system are much the same. While CAD allows you to see the calls to service in the whole city, I/Netviewer will allow you to see those same calls through the city, but I can actually go to each individual call for service. They are stacked on the screen.

So not only can I see the calls for service. I can see who is assigned to the call. How long they have been there. You see the names of the officers there. The assets that are there in

150

terms of cars that are there.

They almost -- they almost -- they mirror each other, for the most part.

Q. So I/Netviewer gives you more information than the CAD system on the individual call?

A. Absolutely.

Q. OnCall. What is that?

A. OnCall is our records management system. The OnCall system allows you to search people, places, and things.

Again, this is also done -- they all can kind of do the same thing, but OnCall is specific just to Norfolk, and it shows exactly -- it can query names. It can query addresses. It can query items. Things that might be listed as stolen would be OnCall. Stolen car. OnCall.

Q. So would it be similar to LinX, but just limited to Norfolk?

A. Yes.

Q. Okay. CrimeView. What is that?

A. CrimeView allows an analyst, or an officer, or supervisor, to list there, to search

151

areas of the city. And I can draw boundaries or select by civic leagues, and determine the crimes that are going on in an area. Past crimes.

Everything is kind of retroactive within CrimeView. I can look back through the system and see where what type of crimes have happened in an area.

You can go back a couple years back and look and see, and it gives you like a very -- a very good description of what types of things are happening in those areas, to allow you to kind of deploy your resources to those places, based on what you find.

Q. How granular can you get with it? Like you said it shows trends in different areas. Can you, like, keep going down to the level to see like specific case numbers and people involved in those crimes, that lead to those trends?

A. So if you have a case number in CrimeView, you can't look at the case number, but you can see it's more broad than getting down to the actual case number. I can see what's kind of happening in an

152

area. Robberies; larcenies. Larceny from buildings.

Any number of things you can look at in terms of offenses. You can look at offense types in there, and then locations, to pull resource as required.

Q. Okay.

So it's more macro level. You can't actually get down to the personal level in CrimeView?

A. Correct.

Q. Okay. Evidence.com. Tell me about Evidence.com?

A. Evidence.com houses our body-worn cameras and the in-car cameras. The evidence is all encompassed in the Evidence.com website, so that you can view video that had been tagged by officers and in the cars.

Q. Are those -- so in terms of the Realtime Crime Center, the body-worn cameras and the in-car cameras, are those something that is only -- the Realtime Crime Center can only access once it's

153

uploaded? Or can they access it in realtime?

A. So, in order to answer that question, I'd have to go down to Axon Respond, which is the very next tab.

Axon Respond allows me to go into the body-worn camera when it's active. As long as it's recording, I can go in and see what the officer sees, and I can see where assets are in the city.

So I can see where every officer is located; who has a body-worn camera on. I could see every car that has -- that's been logged into by a police officer. I can see where they are on the map and I can actually see the calls they go to.

Q. Right. So they will give you a view into their actual body-worn camera, and what that body-worn camera or car camera are showing. And it will show you where on the map that camera and that person or car are located?

A. As long as the camera is activated. Yes. So if it's recording, I can see it. But I can't turn it on. But if it's recording, I can actually see what they see --

154

Q. Okay.

A. -- through the camera.

Q. That makes sense. All right. I'll skip Flock. We have talked about that one. Fusus. What is Fusus?

A. Fusus is the single pane that allows us to have our live view terminals. Our Ocularis cameras. Again, I'm jumping ahead of you, but those are the cameras that are owned by the city. We can see all of those in one single pane of window, was kind of how they described it.

So one pane is -- that video wall is Fusus. So we can see all those cameras on that one screen. So I can see the Axon cameras on the screen. I can see the live view terminals on the screen. I can see our cameras on that one screen.

Q. Okay.

So Fusus actually allows you to pull cameras from different -- I want to say origins, I guess the -- different -- different cameras that aren't necessarily connected, they will let you put it all into one screen?

155

A. Yes.

Q. Does Fusus allow for Flock cameras to be put on that screen?

A. So, they did. It changed. It's been -- it's been a while since it changed, but it doesn't do the same now that it did before. So you can see where the cameras are, and it will give you an alert if somebody -- if it passes through the camera. So, yes, it can be seen on that screen.

Q. I guess what changed, then, when you said it changed from before?

A. So, we talked before about how the Flock cameras, when you pass by the camera, it will show the license plate and the rare picture of the camera. It doesn't do that anymore.

Q. Okay.

I'm trying to -- explain it -- explain it to me again. So it used to put it up on Fusus if it captured the license plate, but -- okay, I'm not understanding what's different now. Sorry.

A. You have to open the Flock Safety website to see what I was explaining to you before about the

156

license plate and the picture of the -- the rear picture of the camera. Of the vehicle.

Q. So once you pull it up on the Flock website, then can you pull it into Fusus now?

A. No.

Q. When did that change, that you -- that it's not, like, automatically integrated with Fusus?

A. I'm not exactly sure. I don't work in that office every day.

Q. Would you say it was more than a year ago?

A. I couldn't tell you when exactly it happened.

Q. All right. LVT. What is that?

A. LVT are the Live View Terminals. You've probably seen those in parking lots. They have a big generator. A blue light flashing. A camera extended on top of a pole.

And we have access to those terminals in the city. Because the city is -- we run some of those cameras.

Q. So those are actually cameras in, like for example, you said in a parking lot, that would

157

capture the full area?

A. Yes.

Q. How many of those do you all have in Norfolk?

A. Nine.

Q. Nine?

A. Yes.

Q. Are those owned by the city?

A. No. These cameras are owned by the Live View Terminal. By LVT. They rent those to us.

Q. Okay.

And that -- that information from the Live View Terminals is also something that you can put in a single pane with Fusus?

A. We have to log in to a different network to pull that up.

Q. Now, it's similar to how Flock is, where you have to individually pull it up?

A. Yes.

Q. Okay. Ocularis. What is that?

A. The city-owned cameras. Those cameras that might be in the parking garages or other city

158

buildings, that we have access to.

Q. How many Ocularis cameras do you have?

A. There are several hundred of those cameras. I couldn't give you a good round number. I would say there are several hundred of them.

Q. Are they -- I guess, well, multiple questions. So are they in city buildings and outside of city buildings as well? Are they indoors and outdoors?

A. I think most of them are indoors. There are hundreds of cameras in parking garages here. That's primarily where they are in the city's parking garages. But they also are located in city buildings too.

Q. Okay.

A. But there is some outside and most of them are inside.

Q. And are those video cameras; the Ocularis cameras?

A. They are video cameras.

Q. Are they always running?

A. Yes.

159

Q. Do you know how long that video -- like how long the video is recorded? Right? Like until it -- historically how far back in those cameras you could go to see what happened?

A. I think it's three days.

Q. And I guess I should ask, same with the Live View Terminals. Are those -- those are video cameras?

A. They are video cameras.

Q. Are they always running?

A. They are always running.

Q. And what's the video retention period for those?

A. They might be two weeks.

Q. Okay.

And is Ocularis -- is that a camera that you can pull on the Fusus platform to see in multiple -- I guess multiple cameras on a single pane?

A. Another one you have to log in to separately.

Q. Okay.

160

So what -- I guess, what do you use Fusus for? Because it seems like all these cameras you have to log in individually, now. So how do you use Fusus?

A. So Fusus allows -- again, the basis of Fusus was to be able to put all of those into one pane and -- I guess things have changed now. So it's just a matter of working with Fusus to be able to get them all to the single pane now.

I think that's what we probably are working towards now. It's just that Fusus is getting pulled back together like it was before.

Q. Okay.

But even -- I mean, your analysts who are in there, they could pull up, say, a Live View Terminal on one of their computer screens and an Ocularis on another.

Is that -- is that correct?

A. Yes.

Q. And then they could even put both of those up on the big -- I think you said 18-panel screen as well. Right?

A. Yes.

Q. Okay.

ATTORNEY BIGBIE: Why don't we take a short break? I think this is maybe a good time. Because I know we have been going for a little while.

THE VIDEOGRAPHER: We are going off the record and the time is 2:23 p.m..

(Short break.)

THE VIDEOGRAPHER: We are back on the record and the time is 2:34 p.m..

ATTORNEY BIGBIE: Thanks.

Before we get into anything super substantive, procedurally, I want to clean up the exhibits a bit.

We conducted Sergeant Gauthier's deposition yesterday, and for purposes, I guess of all these depositions, we are going to consolidate exhibits so that they are all -- they are all -- sorry. Not yesterday. Wednesday. So that they are all together.

So we left off on Exhibit 4 for him. So the exhibits today would have started with Exhibit 5. So my Exhibit 5, formerly my Exhibit 1, would be Bates labeled NORF019294. My Exhibit 6 will be Bates labeled NORF008996.

Exhibit 7 will be NORF018635. Exhibit 8 will be NORF021152. Exhibit 9 will be Attorneys' Eyes Only NORF0000029. And Exhibit 10 will be NORF-RERUN000204.

All right. Now we've got that cleared up.

BY ATTORNEY BIGBIE:

Q. We had left off going through some of the technologies in cameras involved in the Realtime Crime Center. Other than those listed in that exhibit that we went through, are you aware of any other technologies that the Realtime Crime Center utilizes?

A. No.

Q. Okay. What about additional cameras?

A. So outside of the -- we have some live view cameras that we have installed.

Q. Okay. How many of those do you have?

A. Thirty-two that are active right now.

Q. And those are video cameras?

A. Yes.

Q. Are those always running?

A. Yes.

Q. Where are those located? Is there anything common between the placement of those?

A. So those cameras are placed in those places where we have the highest incidents of violence in neighborhoods.

Q. Would that overlap, to some extent, with the Flock cameras?

A. Yes.

Q. Does it largely overlap with where the Flock cameras are located?

A. No.

Q. So, I guess what -- of those 32, how many would you say are around the same area as the Flock camera?

A. One. I was just talking about it today, as a matter of fact.

Q. Where is that?

A. At Chesapeake Boulevard and Johnstons Road.

Q. When did you guys get these live view cameras?

A. So, we started installing them, maybe back in December last year. And it's just been a couple going up at a time. So we are up to 32 right now.

Q. Do you know why -- why you guys started installing them? What the reason was?

A. So I think the intent was always to have those live view cameras installed. It just took more time to get them in place, because of what it takes to get them installed.

Q. Are there plans to put even more up, that you know of?

A. So we had purchased 65 of those cameras. And 32 of those 65 are installed now.

Q. Do you know when the remaining cameras will -- are set to go up?

A. It is -- it's a waiting game for the vendors that we have. And the Dominion Power Company who works here.

Q. How do those cameras --

165

A. So it's --

Q. Sorry. I guess, what's so -- what's so tough about the installation of those cameras?

A. Coordinating with the power vendor that we have -- Dominion Power -- and them providing power to the poles so they can -- we can have the cameras connected.

Q. Okay. So they are actually pole cameras?

A. They are actually on poles. Yes.

Q. How tall are those poles?

A. So these poles are owned by Dominion Power, so they are attached to their, like wood power poles, where the lights would be on power poles. In our cases, they have wires running to those poles.

Q. Do you know if plans for the remaining cameras that aren't up yet -- are there plans to place any of those near Flock cameras?

A. So I don't think the locations coincide at all. It's just that one that I know of, that's -- they are in relatively close proximity.

Q. Okay.

166

And then, are there any other cameras that you guys use, aside from the live view and the other ones we listed in that RTCC list we just went through?

A. No.

Q. I guess, let me ask you this. Do you guys have any non-Flock license plate readers?

A. So I think we have license plate readers in patrol cars.

Q. Are those in every patrol car?

A. Every patrol car that has a camera in it has a license plate reader in the car.

Q. What percentage of patrol cars would you say have the license plate readers?

A. So I will say every patrol car that has -- that's assigned to a car district. I don't know if I could give you a good answer, but that's more than -- there's more than a hundred cars that have license plate readers in them.

Q. Okay.

A. They are marked police cars that have those in them.

167

Q. How do officers use those vehicle LPRs?

A. So I think the cameras were -- if they drive by a stolen car and the LPR is running, because it is, it will -- as you pass the car, much the same as a Flock camera.

So in this case, if you pass a car that is stolen and the LPR in the police car reads it, after you pass the car, it will alert you. It will give you a description of the car.

So you are not going to get a picture like you do with Flock, but you would get like a notification in the CAD system, or in the computer in the car, that there is a stolen car. It will give you the tag number and the description of the car.

Q. And that's an alert on -- is that on the officer's, like, computer that they have in the vehicle?

A. Yes.

Q. Does that data go anywhere else, to your knowledge, besides just that flash to the officer on their computer?

168

A. Just to the officer in that car.

Q. Is it logged anywhere?

A. I couldn't answer that. I don't know.

Q. Okay.

Like, is there any way to, like -- like how we looked at a list of -- I guess, even within the Flock system, right, you can go in and see hot list hits, or even search queries. Like is there any way to do that with these mobile LPRs, and the hits that come as a result of those?

A. I don't know. I couldn't give you an answer, because I'm not sure.

Q. Are the vehicle LPRs just running, looking for plates that are on hot lists? Or are they running every vehicle that comes by?

A. So in order to compare it to a hot list, it has to run every tag that it's exposed to. And it will get the alert if there is a hit with that tag.

Q. Okay.

So let me ask a better question. Is there any reason that the mobile LPRs would alert an

169

officer outside of a vehicle being on a hot list?

A. I would say no.

Q. Okay.

Does that information from the mobile LPRs -- does that get sent to the RTCC in some way?

A. No.

Q. Would it be logged in the CAD data?

A. I would think so, but I can't guarantee it.

Q. The cameras we talked about earlier, I think you were telling me when you were over the housing redevelopment project, there are some cameras in those -- in the housing unit as well. What type of cameras are those?

A. So they have Live View Terminals as well. They have live view cameras as well, that are attached to their buildings.

Q. Are those included in the 32 that are active that we talked about before? Or is that separate?

A. No. That's separate. Because those cameras are actually owned by the Housing Authority.

170

Q. Okay. And how --

A. They are not our cameras.

Q. How many live view cameras does the Housing Authority have, if you know?

A. Yeah. I don't know that answer.

Q. Do you know if it's more than 10?

A. I'm sure it's more than 10. A lot of their cameras are like inside, for their offices, inside -- inside of the buildings of those public housing areas.

Q. And those are video cameras?

A. Yes.

Q. Are they always running?

A. Yes.

Q. Do you know what the retention period is for the video?

A. Yeah. I'm not sure of that.

Q. Do you have access to the feeds from those cameras?

A. Yes.

Q. Does RTCC have access to the feeds from those cameras?

171

A. Yes.

Q. Were you involved, in any way, in the Housing Authority obtaining those cameras?

A. No.

ATTORNEY BIGBIE: Pull up, I guess this will be Exhibit 11.

(Exhibit 11 marked for identification)

ATTORNEY BIGBIE: Put this in the chat. There we go. I just sent that in the chat and I can pull it up on my end as well. Let me know if you can see my screen okay.

Can you see that?

THE WITNESS: Yes.

ATTORNEY BIGBIE: Okay. So this will be Exhibit, what did I say? Eleven? Exhibit 11. And this is Bates labeled NORF019435, I guess through 36. It's two pages.

BY ATTORNEY BIGBIE:

Q. We have here at the top, derrick.vernon@norfolk.gov. That's your email address. Correct?

A. Yes.

172

Q. Okay. And the email -- the email chain here is with karenrose@nrha.us. Do you know who Karen Rose is?

A. I do.

Q. Who is Karen Rose?

A. Karen Rose used to be a police officer for the City of Norfolk, and she went to work for NRHA. In fact, I replaced Karen Rose in Oakleaf Forest community. When she retired, I took her position in NRHA, working in that community.

Q. Okay. And what position was that?

A. So when we talked about me being the Community Resource Officer for the community of Oakleaf Forest, she was the Community Resource Officer there before I went there.

Q. Okay. Okay. That makes sense.

All right. So this email -- and I can scroll as necessary, but I guess -- yeah, it probably makes sense to -- the top of the second page says:

"Hello. Good morning.

I'm approving Chesapeake's request. I'm

considering adding Derrick as an administrator if he wants. Your thoughts? I think it's advantageous to have someone from NPD for communication among police departments.

Thanks."

That might be helpful. Looks like between Michelle Naughton-Epps and Karen Rose?

A. Yes.

Q. Do you know -- do you know what this email is about?

A. That's about me being added to the administrative function for the Flock cameras with NRHA.

Q. How many Flock cameras does NRHA have?

A. Twenty-four.

Q. And this is in 2022. Is that how many they had in 2022, to your knowledge?

A. Yes.

Q. What does it mean to be an administrator for those cameras?

A. So the exact same thing we have talked about so far. Having the ability to approve sharing of the cameras. Adding people to have access to the cameras. Restricting, deactivating the accounts, and deleting the accounts.

Q. Are you able to run audit logs on those cameras?

A. I'm sure I would have been able to. Yes.

Q. And when you -- when you moved out of that role -- I'm trying to remember what your next -- out of the Public Housing Unit -- that was into your current position at the Strategic Intelligence Division. Correct?

A. That's correct.

Q. Okay.

And when you moved into the new role as lieutenant, did you -- were you no longer an administrator? Or are you still an administrator to this day?

A. So as you recall, I told you how my email -- the email address is your user name. And I told you how the confusion happened.

Q. Right.

A. Because the city took my email address,

and when they used my email address, it dumped me out of NRHA's system. So I was no longer an admin for NRHA.

Q. Okay.

So when you became an admin for NPD, that's when you stopped being an admin for NRHA. Is that accurate?

A. That is correct.

Q. Okay.

Do you know what the Flock Transparency Portal is?

A. I do.

Q. What is that?

A. So, it allows citizens -- anyone -- to see -- to give a brief description of what Flock -- how we use Flock. It will tell you the amount of cameras that we have. It provides a lot of information related to what we do with the data.

Without looking directly, I can't tell you everything that it says, but it really gives you a basic description of what the relationship is between Flock and the police departments.

Q. How did you first learn about the Flock Transparency Portal?

A. One of the -- our customer service -- Customer Success Manager told me about the Transparency Portal.

Q. Would that have been Brian McKenzie? Or a different person?

A. Greg Sheehan.

Q. Greg Sheehan. Okay. Do you recall when you first learned about the Transparency Portal?

A. It was earlier this year. Couldn't tell you exactly when. Maybe four months -- three, four months ago.

Q. Okay.

Were you involved at all in getting Norfolk to have a Transparency Portal?

A. I was.

Q. Okay. Tell me a little bit about that.

A. It was literally an email to Greg Sheehan when he mentioned it to me. And I was able to look at some of the other -- some of the other agencies that had Transparency Portals, and looked like a

great chance to show the public being forward-facing, what our relationship was with Flock.

So, to be able to publish that document and show what we do with the data explains the sharing process and where the data is stored, and what the data is used for. So I thought it was a great opportunity to enhance the public's knowledge of what Flock cameras were all about.

Q. Why do you think -- why did you think it was important to educate the public in that way?

A. I thought it was a good opportunity. That's all. I thought that was a great opportunity to show them what the cameras could do, and what they were for.

Q. Had you received any negative feedback from the public regarding Flock cameras?

A. I have not. In fact, I have been to civic league -- a civic league meeting, for sure, and they said they want us to put up more Flock cameras.

Q. That was what type of meeting they said that?

A. A civic league meeting.

Q. A civic legal meeting?

A. Yes.

Q. What's the civic league?

A. Lochhaven is the name of the area.

Q. Is that like a -- what does the civic league do?

A. So it's like a neighborhood committee --

Q. Okay.

A. -- that suggests -- the people in this neighborhoods attend those meetings and share experiences. What they think is good and bad in the community, and/or the city. What they like. What they dislike.

Q. And they told you they want more Flock cameras?

A. They did. They are actually buying their own.

Q. Are those cameras that NPD would be able to access?

A. We would. If they share it, we will be able to access it.

Q. Do you know how many -- how many private cameras you guys have access to at NPD?

A. I don't know the exact number. But it would be like the Lowe's; Home Depot. Those are the only -- the only ones right now.

Q. And neighborhood organizations such as Lochhaven?

A. Nobody else -- no other neighborhood here has them. And Lochhaven hasn't purchased theirs yet. So they don't have any yet.

Q. Okay. Did you connect them with Flock to work on getting some for the neighborhood?

A. I did not. They actually came to us and told us that they have them, and they were trying to figure out how they could provide us access to those cameras.

Q. Okay. And are you guys in the process of working on that, to get access?

A. They don't have the cameras yet, so we can't go forward anymore at this point. Because they don't have them yet. But I'm sure that conversation would come up.

Q. Is there any type of, like, city approval that will be required when they -- when they get the cameras and potentially share them with you?

A. I'm sure it's a permitting process for sure, at first, to get them installed. And then a memorandum of understanding that will be between the city and that entity, to kind of dictate what happens; and who is responsible for what; and what our responsibilities are.

So they know what we expect of them. And we know what they expect of us.

Q. Are there any of those currently in place that you've seen?

A. So, I know there is one for NRHA right now. Because again, they are a separate entity from us.

Q. And that would be a memo of understanding between NPD and NRHA for the Flock cameras?

A. Yes. For any of their cameras. Anything that's on their property.

Q. Okay.

In terms of the -- in terms of the actual

**181**

Flock cameras, I know we talked about earlier, like when they are capturing a vehicle, they can capture characteristics outside of a license plate.

Is that your understanding?

A. Yes.

Q. And I guess I've -- through the documents I've seen, I've seen mention of "vehicle fingerprint."

Do you know what that is in the Flock context?

A. So that might be exactly what you are talking about. Those specifics about a vehicle.

Q. Okay.

A. Change the term to be a fingerprint.

Q. Okay.

A. Fingerprint and characteristics are the same thing.

Q. Sure. Do you know of any other, like, Flock terms that have to do with, like, their features and what the cameras can do, similar to having a vehicle fingerprint?

A. No.

**182**

Q. Are you familiar with convoy analysis?

A. I've heard of it, but I don't know exactly what that is. So I couldn't tell you what that exactly is.

Q. Okay.

ATTORNEY BIGBIE: Let me just look at my notes real quick.

BY ATTORNEY BIGBIE:

Q. Do you know the plaintiffs in this matter? Lee Schmidt, I guess I should say first?

A. I don't know.

Q. What about Crystal Arrington?

A. I don't know her either.

ATTORNEY BIGBIE: I think that's all the questions I have. I really appreciate your time.

I'll pass the witness. Thank you.

ATTORNEY SOLORIA: For the reporter, this is Karla Soloria. I'm not on the screen there.

I'm just going to ask you a couple of follow-up questions, if that's all right.

THE WITNESS: Okay.

**183**

EXAMINATION BY ATTORNEY SOLORIA:

Q. You recall counsel asking you about audits that are conducted of Flock? Do you recollect that?

A. Yes.

Q. And I heard you say that it's Sergeant Gauthier who performs those audits. Is that correct?

A. Yes.

Q. And when Sergeant Gauthier performs the audits -- well let's back up.

You had mentioned to counsel that you had performed -- you had pulled one audit for the purposes of this lawsuit. Is that correct?

A. Yes.

Q. And that lawsuit went back to the beginning of time, since Norfolk had acquired Flock cameras.

Is that right?

A. Correct. Yes.

Q. For the audits that Sergeant Gauthier would conduct, would those be for limited periods of time? In other words, it wouldn't be from the

**184**

beginning of time every time you did it.

Is that right?

A. That's right.

Q. And so, he would have a smaller document to be reviewing when he conducted that audit. Is that correct?

A. Yes.

ATTORNEY BIGBIE: Objection. Calls for speculation.

BY ATTORNEY SOLORIA:

Q. You recall counsel asking you some questions about the 2023 special order regarding Flock?

A. Yes.

Q. And do you recall counsel asking about whether that special order provided guidance on police officers providing a reason for their query?

Do you recall those questions?

A. Yes.

Q. And, first of all, the special order that she was referring to, that is not in effect today. Is that right?

A. That's correct. It is not.

Q. And there is a separate general order that's in effect as we sit here today. Correct?

A. Yes.

Q. I'm just going to turn back to that exhibit, which was the special order. NORF018635. And I'm going to direct your attention to Section Roman numeral two, capital letter C. And it states:

"Flock Safety is to be utilized by personnel for law enforcement purposes only."

Did I read that right?

A. Yes.

Q. So is it your understanding that that -- that provision of this policy means that a law enforcement officer would have to enter a law enforcement reason for a query?

ATTORNEY BIGBIE: Objection. Leading.

BY ATTORNEY SOLORIA:

Q. And did I hear you correctly earlier, when you were speaking with counsel, that on that topic of entering a reason for a query, that the current general order provides more detail on that? Or guidance on that, I should say?

A. Yes.

ATTORNEY BIGBIE: Objection. Leading.

ATTORNEY SOLORIA: I have nothing further. Thank you.

ATTORNEY BIGBIE: Just one follow-up question.

RE-EXAMINATION BY ATTORNEY BIGBIE:

Q. The audits that we were just talking about, Ms. Soloria mentioned, regarding Sergeant Gauthier performing, those audits are post the new order, as of July 1st 2025.

Is that correct?

A. No.

Q. Okay. Explain that to me.

A. The audits that Sergeant Gauthier ran are after the audits that I completed, for the purposes of the lawsuit. So he would have -- he started running the audits after the date that I stopped. I don't know exactly what that date was when I stopped, but he was performing the audits from that point forward, and I probably did them up until -- again, I don't know the exact date -- January or February of this year, or earlier this year. And he has done them since then.

Q. Why is it that he took over running the audits since earlier this year?

A. When we first started the lawsuit -- the lawsuit first started, we went back to the beginning of when Flock came to the police department, and it would be his responsibility to run those audits anyway, being the sergeant in the Realtime Crime Center.

I did them because I was initially asked to. But going forward, Sergeant Gauthier was assigned the task of running those audits.

Q. Who assigned him that task?

A. It would -- I told him to do those -- we went forward and I'm the one who told him to do those tasks going forward. Because he is the one who would actually be doing them anyway.

Q. Okay.

And just to clarify, any administrator has the ability to run an audit. Correct?

A. That is correct.

Q. Okay.

ATTORNEY BIGBIE: That's all my questions. Thank you.

THE VIDEOGRAPHER: All right. This concludes the end of the deposition. And we are going off the record at 3:07 p.m..

ATTORNEY BIGBIE: Thank you, guys.

Madam Court Reporter, did you need any spellings or anything?

COURT REPORTER: Can I get the orders for the transcript, please.

ATTORNEY BIGBIE: Michael, do you want an etran or a regular?

ATTORNEY SOYFER: I think we want a regular transcript, but I think we have an order on file with Planet Depos. If not, I can have our paralegal follow up.

COURT REPORTER: Okay. And Ms. Soloria?

ATTORNEY SOLORIA: I'll have to circle up and I'll let Planet know.

COURT REPORTER: Okay. Thank you.

189

ATTORNEY SOLORIA: Thank you.

THE VIDEOGRAPHER: Did anybody want a copy of the video?

ATTORNEY SOYFER: Yes. Plaintiffs do.

(Whereupon, the deposition adjourned at 3:08 p.m.)

190

REPORTER'S CERTIFICATE

I, GISELLE MITCHELL-MARGERUM, the undersigned, a Registered Professional Reporter, Certified Reporting Instructor, Licensed Court Reporter, and Certified Court Reporter, do hereby certify:

That the witness, DERRICK VERNON, before examination was remotely duly sworn to testify to the truth, the whole truth, and nothing but the truth.

That the foregoing deposition was taken remotely stenographically by me on Friday, July 18, 2025, and thereafter was transcribed by me, and that the deposition is a full, true, and complete transcript of the testimony, including questions and answers, and objections, motions and exceptions made by counsel.

That reading and signing was not requested; and that I am neither attorney nor counsel for, nor related to or employed by, any of the parties to the action in which this deposition was taken; and that I have no interest, financial or otherwise, in this case.

IN WITNESS WHEREOF, I have hereunto set my hand this 31st day of July, 2025.

GISELLE MITCHELL-MARGERUM, RPR, CRI, CCR, LCR, ACCR, CSR
CALIFORNIA CSR 14424

191

CERTIFICATE OF DEPONENT

I, DERRICK VERNON, hereby certify that I have read the foregoing pages, numbered 1 through 189, of my deposition of testimony taken in these proceedings on Friday, July 18, 2025 and, with the exception of the changes listed on the next page and/or corrections, if any, find them to be a true and accurate transcription thereof.

Signed: ........................
Name: DERRICK VERNON
Date: ........................