# EXHIBIT 6

*ECF # 111-4*

*under seal*



**Planet Depos**
We Make It *Happen*™

ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER

# Transcript of Assistant Chief Michele Maria Naughton

**Date:** July 25, 2025
**Case:** Schmidt and Arrington -v- City of Norfolk, et al.

**Planet Depos**

**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com

**www.planetdepos.com**

Michigan #8598 | Nevada #089F | New Mexico #566

**1**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

NORFOLK DIVISION

--------------------------------X

LEE SCHMIDT and CRYSTAL :

ARRINGTON, :

             Plaintiffs, : Civil Case No.:
2:24-cv-000621

  v. : -MSD-LRL

CITY OF NORFOLK and MARK TALBOT, :

in his official capacity as the :

Norfolk Chief of Police, :

           Defendants. :

--------------------------------X

ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER

Videotaped Deposition of

ASSISTANT CHIEF MICHELE MARIA NAUGHTON

Given Remotely

Friday, July 25th, 2025

Job: 589833

Pages: 1 - 268

Reported by: Karen Kidwell, RMR, CRR

**2**

Deposition of ASSISTANT CHIEF MICHELE
MARIA NAUGHTON, held at:

Remotely Given

Pursuant to Notice of Deposition, before
Karen Kidwell, Notary Public in and for the
Commonwealth of Virginia.

**3**

R E M O T E   A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS, LEE SCHMIDT and
CRYSTAL ARRINGTON:

  MICHAEL B. SOYFER, ESQUIRE

  ROBERT FROMMER, ESQUIRE

  TAHMINEH DEHBOZORGI, ESQUIRE

  JESSICA BIGBIE, ESQUIRE

  Institute for Justice

  901 North Glebe Road

  Suite 900

  Arlington, VA  22203

  703.682.9320

  msoyfer@ij.org

  rfrommer@ij.org

  tdehbozorgi@ij.org

  jbigbie@ij.org

**4**

R E M O T E   A P P E A R A N C E S (Continued)

ON BEHALF OF THE DEFENDANTS, CITY OF NORFOLK
AND MARK TALBOT, IN HIS OFFICIAL CAPACITY AS
THE NORFOLK CHIEF OF POLICE:

  KARLA J. SOLORIA, ESQUIRE

  Norfolk City Attorney's Office

  810 Union Street

  Suite 900

  Norfolk, VA  23510

  757.664.4529

  karla.soloria@norfolk.gov

  - and -

  JONATHAN KRAVIS, ESQUIRE

  LIAM GENNARI, ESQUIRE

  Munger, Tolles & Olson LLP

  601 Massachusetts Avenue NW

  Washington, DC  20001

  202.220.1130

  jonathan.kravis@mto.com

  liam.gennari@mto.com

Also Remotely Present:

  Matthew Simpson, Videographer

**5**

INDEX

WITNESS/EXAMINATION                Page
ASSISTANT CHIEF MICHELE MARIA NAUGHTON
  By Mr. Soyfer                10

EXHIBITS

  Number        Description        Page
Exhibit 38  E-mail chain, top e-mail ..........56
       Naughton-Epps to Karpovich,
       6/10/2022, Bates
       NORF001402-1406

Exhibit 39  6/16/2022 E-mail, Mento to ........67
       Naughton-Epps, with MOU
       attachment, Bates
       NORF001393-1400

Exhibit 40  E-mail chain, top e-mail ..........70
       6/21/2022, Mento to
       Naughton-Epps, Bates
       NORF013011-013

Exhibit 41  E-mail chain, top e-mail ..........81
       9/22/2022, Alex del Carmen to
       Naughton-Epps, Bates
       NORF009454-9455

**6**

EXHIBITS (Cont'd)

  Number        Description        Page
Exhibit 42  E-mail chain, top e-mail ..........88
       7/25/2022, Maslow to
       Naughton-Epps, Bates
       NORF007505-7509

Exhibit 43  1/13/2023 E-mail, Maslow to ......100
       Goldsmith and others, Bates
       NORF019598

Exhibit 44  E-mail chain, top e-mail .........110
       1/24/2023, Maslow to Goldsmith
       and others, Bates
       NORF014673-679

Exhibit 45  E-mail chain, top e-mail .........114
       9/4/2024, Purnell to Naughton
       and others, Bates
       NORF008164-8165

Exhibit 46  E-mail chain, top e-mail .........122
       10/18/2024, Naughton to Boone
       and others, Bates
       NORF015607-5610

Exhibit 47  E-mail chain, top e-mail .........141
       7/18/2022, Naughton-Epps to
       Vernon, Bates NORF012942-953

Exhibit 48  E-mail chain, top e-mail .........145
       8/5/2022, Naughton-Epps to
       Rose, Bates NORF008412-8413

Exhibit 49  E-mail chain, top e-mail .........153
       5/31/2024, Covington to
       Naughton, Bates
       NORF005746-5748

**7**

EXHIBITS (Cont'd)

  Number        Description        Page
Exhibit 50  E-mail chain, top e-mail .........162
       11/13/2024, Derrick to
       Naughton and others, Bates
       NORF014125-127

Exhibit 51  E-mail chain, top e-mail .........227
       5/24/2023, Maslow to Naughton,
       with attachments,
       Confidential, Bates
       NORF000369-371

Exhibit 52  6/13/2024 E-mail, Naughton to ....240
       Maslow with attachments, Bates
       NORF014765-4771

Exhibit 53  E-mail chain, top e-mail .........261
       11/13/2024 Thomas to Naughton,
       with attachment, Bates
       NORF020992-998

**8**

PREVIOUSLY MARKED EXHIBITS REFERENCED

  No.        Description          Page
Exhibit 8  6/30/2025 Memorandum, City of ....188
       Norfolk, Bates NORF021152-1163

Exhibit 11  E-mail chain, top e-mail .........150
       11/11/2022, Vernon to Rose,
       Bates NORF019435-436

Exhibit 22  E-mail chain, top e-mail .........158
       3/5/2024, Alvarez to Naughton
       and others, with attachments,
       Bates NORF006843-6846

Exhibit 25  10/22/2024 E-mail, Harvey to .....175
       Naughton, with attachments,
       Bates NORF017584-589

REPORTER'S NOTE: All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily indicate an exact quote from the document.

**9**

FRIDAY, JULY 25, 2025

P R O C E E D I N G S

- - -

VIDEOGRAPHER:  Here begins Media Number 1 in the videotaped deposition of Assistant Chief Michele Naughton, in the matter of Lee Schmidt and Crystal Arrington vs. City of Norfolk and Mark Talbot, in his official capacity as the Norfolk Chief of Police, in the United States District Court for the Eastern District of Virginia, Norfolk Division, Case Number 2:24-CV-00621-MSD-MRL.

Today's date is July 25th, 2025, and the time on the video monitor is 9:31 a.m. Eastern Time.  The remote videographer today is Matthew Simpson, representing Planet Depos.  All parties of this video deposition are attending remotely.

Would counsel please voice-identify themselves and state whom they represent.

MR. SOYFER:  Michael Soyfer, from the Institute for Justice, on behalf of Plaintiffs. I'm joined by my colleagues Robert Frommer,

**10**

Jessica Bigbie, and Tahmineh Dehbozorgi.

MS. SOLORIA:  I am Karla Soloria, with the Norfolk City Attorney's Office, on behalf of Defendant.  I'm joined here by my co-counsel Jonathan Kravis, with the firm Munger, Tolles. We are also joined by his colleague, Liam Gennari, via Zoom.

VIDEOGRAPHER:  The court reporter today is Karen Kidwell, representing Planet Depos.

The witness will now be sworn.

ASSITANT CHIEF MICHELE MARIA NAUGHTON having agreed to testify under penalties of perjury, testified as follows:

EXAMINATION

BY MR. SOYFER:

Q.  Okay.  Good morning.

We're going to start with the hardest question first:  Could you please state your full name for the record.

A.  Michele Maria Naughton.

Q.  And are you currently employed?

A.  Yes.

**11**

Q.  Where are you employed?

A.  City of Norfolk, Norfolk Police Department.

Q.  And what do you do at the Norfolk Police Department?  What's your title?

A.  Assistant Chief.

Q.  And just tell me a little bit about your job.  What are your -- your job duties as Assistant Chief?

A.  Currently I am responsible for the Investigative Services Unit, Division; I'm the Bureau Chief for that.  My responsibilities entail all of the detectives in the department; the gang squad; vice and narcotics; the special operations team, which is the SWAT team; the Real Time Crime Center of crime; the Criminal Intelligence Unit; and Crime Analysis all report to me.

Q.  How long have you been in that role?

A.  As the Investigative Chief since August of 2023.

Q.  Okay.  And before that, what were you -- what was your job?

**12**

A.  Upon being promoted to Assistant Chief in 2021, I was the Field Operations Chief.

Q.  And what were your job responsibilities there, just briefly?

A.  At that time, all of the patrol officers, the Special Enforcement Division all reported to me.

Q.  Okay.  I'll come back to that in a little bit.  But first, let me just ask you:  Have you given -- have you given a deposition before?

A.  Yes, I have, but it's been years.

Q.  Okay.  How long ago was that?

A.  This would have probably been when I was patrol officer, so prior to 2011ish.

Q.  Oh, okay.  So a very long time ago.  Okay. And what was -- what was that case about, just briefly?

A.  It was an accident.  I don't know the particulars; I don't recall the particulars at this time.

Q.  Okay.  Like a car accident?

A.  Yes.

Q.  Got it.  So since it's been a while, I'll

13

just go over some of the ground rules for today, ask you kind of a few basic questions about those.

The first thing is, you've been doing this well so far, but just always remember to give verbal responses. If you shake your head, or nod, that doesn't make it into our transcript. Is that fair?

A. Yes, sir.

Q. Okay. Also, with this being over Zoom and to make a clean record, we have to try our best not to speak over one another. So I'll always try to let you finish your answer, and I ask that you let me finish my question before you start answering. Is that fair?

A. Yes, sir.

Q. Sometimes I ask bad questions. It happens; hopefully rarely. But if you ever don't understand one of my questions, please just ask me for clarification, and I'll be happy to rephrase or clarify what I'm asking. Is that fair?

A. Yes, sir.

Q. Okay. And likewise, if you -- if you answer my questions, then I'll assume that you

14

understood them. Is that fair?

A. Yes, sir.

Q. Is there any reason you can't give truthful and accurate testimony today?

A. No, sir.

Q. Okay. And this is a standard question that's asked at almost every deposition, but sometimes it hits people the wrong way, so I just want to preface by saying this is a very standard question: Are you on any drugs or other substances that would interfere with your ability to testify truthfully and accurately today?

A. No, sir.

Q. Have you received any compensation in exchange for your testimony today?

A. No, sir.

Q. Has anyone made any promises to you in exchange for giving certain testimony today?

A. No, sir.

Q. Is your continued employment -- does your continued employment depend in any way on the testimony you give today?

15

A. No, sir.

Q. Okay. And I'm not asking for details of any conversations you may have had with lawyers, but just generally speaking, what did you do to prepare for your testimony today?

A. I met with the lawyers, I believe three times, for less than two hours the first two times and maybe a half an hour the third time.

Q. And when you say "the lawyers," who is that?

A. The City Attorney lawyers for Norfolk.

Q. Okay. So would that include Ms. Soloria, who's in the room with you today?

A. Yes, sir.

Q. Okay. And would it include the other two attorneys who are in the room with you today?

A. I'm not -- I don't remember everybody's name, but the one who's in the room with me today, yes. I'm not -- he could have been. I'm not sure of the names. I don't remember all the names.

Q. Okay. Did you speak to any other employees of the NPD or the City of Norfolk to try to

16

prepare for your testimony today?

A. No, sir.

Q. Okay. Did you speak to anyone outside of the City of Norfolk about this deposition?

A. No, sir.

Q. Okay. And during your preparation for this deposition, did you review any documents?

A. I didn't review documents. I looked at the general order after it was sent out, because I have to. So I don't know if that is considered preparing, because I wasn't preparing. I was complying with policy, to review the order as it came out.

Q. Understood. I appreciate that. Let me maybe ask a more precise question.

When you met with the lawyers, did you review any documents?

A. Yes.

Q. Okay. Did any of those documents refresh your recollection about, you know, things that happened in the past?

A. Yes.

17

Q.   And what -- what documents helped refresh your recollection?

A.   The special order, and e-mails that I -- e-mails that I sent.  E-mails that were in the folder.  There was some -- some documents.  This has been over, I think, a month or so.  But there were -- there were documents.

Q.   Are there any e-mails that really stood out to you during that process?

A.   Stood out?  I'm not sure -- "stood out to me."  I don't know what that means.

Q.   Yeah.  Are there any e-mails that like, sitting here today, you really remembered helped kind of refresh your memory of things that happened in the past?

A.   Yes.

Q.   And can you just tell me, generally, like what were those e-mails?

A.   E-mail that I sent to the Deputy Chief about an image that was sent out over e-mail.  And that one -- that one really refreshed my memory.

Q.   Okay.  I think we're thinking of the same

18

e-mail, so we'll -- we'll talk about that one a little bit later.

Let me just ask you generally, before we really get started:  What's your understanding of what this case is about?

A.   General understanding is that the Plaintiffs believe that the Flock system that we are using in Norfolk is a -- is technology used to track individuals throughout the city.

Q.   Okay.  And let me ask you now, just in your own words, generally, what is the Flock system that you just referred to?

A.   The Flock system is technology that we use in Norfolk to take images of -- photos -- photos of vehicles that pass through the camera system.  It gives us a general idea of where that car is at the particular time that it passes through the camera.

Q.   Okay.  And when you say "the camera," what -- what are those cameras?

A.   The Flock cameras.

Q.   Okay.  And the Flock cameras are license-plate-reader cameras, correct?

19

A.   Yes.

Q.   Okay.  So every time a vehicle passes a Flock camera, the Flock camera takes a photo of that vehicle; is that right?

A.   Yes.

Q.   Do you know what that photo includes?

A.   The vehicle, the license plate.

Q.   Does it include any of the surrounding area?

A.   I would say it includes the -- the traffic lanes, if there's -- that -- the lane that it's taking the picture.

Q.   Okay.  So the -- the Flock cameras are positioned to take pictures of certain lanes of traffic; is that a fair characterization?

A.   Yes.

Q.   Okay.  And so when it takes a picture, it will show that lane of traffic, correct?

A.   It will show the vehicle in that lane of traffic.

Q.   Oh, okay.  Thank you.

So what -- okay.  And so after that

20

picture is taken, realizing you -- you might not understand the technical details, but like what do the Flock cameras do with that picture after it's taken?

A.   You are correct.  I don't understand the technical dealings with Flock.  I don't utilize Flock.  I'm not inputting information.  I don't deal with it on a day-to-day basis.

Q.   Okay.  Have you ever logged in to Flock's website or app, anything like that?

A.   Yes.

Q.   Okay.  And how often have you logged in to Flock?

A.   My best guesstimate is once or twice.

Q.   Okay.  So it's -- it's just not something you use in your day-to-day job.  Is that fair?

A.   That is correct.

Q.   Okay.  But there are people working under you who do use it more in their day-to-day jobs right now; is that right?

A.   Yes, sir.

Q.   Okay.  Do you understand that after the

Flock cameras take a picture, they collect certain data from the pictures of cars that they've taken?

MS. SOLORIA: Objection. Vague.

You can answer.

THE WITNESS: Oh, I'm sorry.

I don't know what happens after or what data is collected, no, sir.

BY MR. SOYFER:

Q. Okay. Do you know when the -- the people working under you log in to Flock, what they can see there?

A. I'm not sure I understand the question. I don't know what they're seeing.

Q. Yeah.

A. I've only logged in once or twice, so I don't know exactly what they're seeing, no, sir.

Q. Okay. Let me ask you, the one or two times you logged in, what -- what was the purpose of that?

A. I say one or two times because I may have logged in when we initially got the system. The only other time I recall logging in is being on the scene of some type of violent crime, and looking for a vehicle, or putting either the vehicle or tag number in. Those are the only two times that I recall being inside the system.

Q. Okay. Let me ask you a bit about that second time. You said you were on the scene of a violent crime, correct?

A. Correct.

Q. And you searched the license plate number of a vehicle in Flock; is that right?

A. I don't recall what I searched.

Q. Okay.

A. I either put the vehicle description -- I'm not very familiar with the system. So sitting here, I can't even tell you whether I did it right or wrong. That was the only time that I was in the system, that I recall.

Q. Okay. That's fair.

So I'm just trying to understand, you know, when officers or detectives, the people working under you, log in to Flock, they look up a license plate number. Do you have an understanding of what data they'll -- that they'll see when they look up the license plate numbers?

A. I don't have a thorough information -- understanding of it. I know -- I believe that you can see color -- well, I don't know -- I guess they'll see the image of the -- of the car, is what I believe they'll see. But I think you can search by color, make, model, things like that. But I don't know what -- what they'll eventually see would be vehicles with the license plates, is what my understanding is, the images.

Q. Okay. Do you understand whether those images include the location where they were taken?

A. I believe they do. That's how we know where they're at.

Q. Okay.

A. So I'm going to say yes.

Q. Do they include time stamps?

A. I believe so.

Q. And if -- if an officer has a license plate, how do they figure out the registered driver?

A. They cannot utilize the Flock system to figure out the registered driver. All Flock does is give them the vehicle -- the image of the vehicle with the license plate.

Q. Okay. So understanding that that isn't inside Flock, how does an officer go about figuring out the registered owner of the vehicle they've just looked up?

A. They would have to utilize the DMV system.

Q. Okay. And the -- sometimes I'll ask you questions that seem really obvious, and they're just so that we have a clear record, so bear with me; but "the DMV" is the Department of Motor Vehicles. Correct?

A. That is correct.

Q. And that's something every officer has access to, that record of the registered owner of the license plate, right?

A. They -- I'm going to -- yes. You can also have the dispatcher run it for you. So yes.

Q. Okay. So one way or the other, they can look up that information; is that fair?

A. Yes, sir.

25

Q. Okay. If I say "vehicle fingerprint" in the context of Flock, does that ring a bell at all?

A. No, sir.

Q. Okay. Have you heard of convoy analysis in the context of Flock?

A. I have heard of it, but I don't understand what it is. I didn't know what it meant.

Q. Okay. What about real-time routing? Is that something you've heard of?

A. No, sir.

Q. Are you aware that Norfolk's Flock cameras have the ability to record video?

A. No, sir.

Q. Okay. I -- I wanted to go back to your -- your current job as Assistant Chief, where you oversee the Investigative Services Division. Is that correct?

A. Investigative Service Bureau, yes, sir.

Q. Oh, Investigative Service Bureau. Okay. And you mentioned that your responsibility entailed all the detectives in the department. So that's -- I guess -- what do the detectives do? Just

26

tell me, kind of generally, in the Norfolk Police Department.

A. They investigate crimes, depending on where they're assigned. Like you have homicide investigators who follow up on homicides, do the investigation, so that they can pull the information they gather -- prosecution with the Commonwealth's Attorney's Office.

Either they're -- they're following up on reports that come in for crime, so that they can investigate, identify suspects, identify screens, patterns. And they are instrumental in putting those cases together and securing charges.

Q. Do patrol officers have any role in investigating crimes in the Norfolk Police Department?

A. Yes. Not all crimes are investigated by the detectives.

Q. Understood. So what's the difference between how a -- well, when would a crime be investigated by a detective versus a patrol officer? Can you just explain that to me, at a general level?

27

A. Generally, felonies are investigated by the detectives. And then there are felonies that the law permits -- well, I don't know if it's the law, but policy permits that officers can do their own investigation.

For example, a third offense domestic assault can be investigated by patrol officers. Second offense concealed weapon, which is a felony, can be investigated by patrol officers.

Something like a homicide, robbery, embezzlement. Those are crimes that are investigated by the detectives.

Q. So generally --

A. Because they warrant --

Q. Sorry. Go ahead. I interrupted you.

A. I'm sorry. They warrant a little more in-depth investigative -- things that have to be done, like follow-ups with victims, search -- securing search warrants and things of that nature, which patrol doesn't have the true means or time to do because their primary function is to answer calls for service.

28

Q. Okay. So detectives will handle sort of more in-depth, time-consuming investigations; is that fair?

A. Yes.

Q. Okay. Are the detectives kind of broken into different subdivisions?

A. Yes.

Q. What are those, just generally?

A. Burglary. Stolen auto. Economic crimes. Homicide. Robbery. Malicious wounding.

I feel like I'm missing something, but that's pretty much -- special -- the special -- SCU, which is our Sexual Assault Unit, the Special Crimes Unit. So yes.

Q. Okay. And how do the detectives under your supervision use Flock, if at all?

A. Those are day-to-day operations that are truly under the -- the supervision and leadership of the commanding officer. I don't get involved in the day-to-day operations of it. I would say that they are currently utilizing as described in the general order.

29

Q. Okay. So you don't have -- other than that kind of like, even, say, 10,000-foot-level understanding of -- of how they're using it day to day?

A. I don't know what "10,000-foot level" means. I don't.

Q. Yeah. Just like a very general -- whatever your understanding is of how detectives in their day-to-day jobs are using Flock.

A. So my -- my general understanding would be that they -- the technology is available for them. I don't get into the weeds of all the technology that they're utilizing to make their cases because I'm not involved in the day-to-day or even the inner workings of it.

Q. Okay. Fair enough.

Are you aware of any kind of success stories of the detectives solving crimes using Flock?

A. Yes.

Q. And can you describe some of those to me, any that you remember?

A. So there are cases that -- a case that

30

comes to mind where there was a robbery. Vehicle description -- I'm sorry. They were at the hotel. This is -- this is a recent one.

I'm sorry. My mind is all jumbled.

Q. No worries.

A. There was a -- I want to say it was a robbery at the hotel. They were able to utilize Flock to get the description of the vehicle and the vehicle was located not -- not too far from where the Flock camera was. The image gave them a location. The officers went and patrolled around that area and were able to find the vehicle, and those suspects were subsequently arrested for that crime.

Q. Okay. So having the information from Flock, officers were able to figure out the area where those suspects were. Is that a fair characterization?

A. Yes.

Q. Okay. Any other kind of notable success stories that come to mind?

A. There's -- there's several success stories. I think those questions will -- probably

31

better for the Real Time Crime Center. They are keeping track of those success stories. I don't go in and read them all. I get case summaries of all of my violent -- all of my crimes. I'm added on those e-mails. So I'm reading several case stories, case summaries, every day. So I don't have them all lined up.

But there are several case summaries that indicate Flock as being beneficial to assisting with that information.

Q. Okay. Understood.

You also mentioned the gang squad. What's the gang squad?

A. So the Gang Suppression Unit is the unit that monitors and certifies gang members, monitors crimes involving them, malicious woundings, gang -- like gang participation, mob assaults using them. And that they assist our detectives when we have violent crimes involving those gang members so that we can look at social networkings to either prevent retaliatory crime or to enhance punishments because of gang participation.

32

Q. So you mentioned they certify gang members. What does it mean for them to certify gang members?

A. It means that they comply with the law, what it says. I don't know the inner workings, but my understanding is there's certain criteria to certify an individual as a gang member, as a part of a certain set. And they are the ones who get that information to ensure that we are in compliance, that those individuals are actually certified as -- as active gang members.

Q. Does the gang squad use Flock, to your knowledge?

A. Yes.

Q. And how, if you know, does the gang squad use Flock?

A. I've never sat down with them. I'm -- I'm going to yield to my same answer with the detectives.

Q. Okay. Yeah. Do you know for what purposes they use Flock?

A. Violent crimes. If they're looking for individuals who -- who meet the criteria. If they're

33

active investigations, criminal investigations, they -- they may also be using them for stolen autos. So as prescribed in the orders, yes.

Q. And what is vice and narcotics?

A. It's a unit within the Anticrime Division. And they do prostitution, narcotics arrests, prescription fraud, human trafficking, things of that nature.

Q. Okay.

A. Investigation.

Q. And to your knowledge, do they also use Flock?

A. Yes.

Q. And for what purposes do they use Flock, if you know?

A. It would be the same reason. They're also doing criminal investigations.

Q. Okay. And so they're -- they're looking up locations of cars to advance their criminal investigations; is that, generally speaking, right?

MS. SOLORIA: Objection. Mischaracterization.

34

THE WITNESS: I wouldn't say "locations of cars." They're using Flock to identify the vehicle -- get the images of the pictures of where those cars are passing through the Flock cameras.

BY MR. SOYFER:

Q. Okay. You also mentioned the Real Time Crime Center. We'll kind of come back to that a little bit later, but just at a general level, what is the Real Time Crime Center?

A. It's the center where we have sworn officers and civilian analysts who are monitoring -- they have access to technology that allows them to assist officers in real -- real-time crime.

For example, if a robbery goes out, and they are able to activate one of the cameras that are in that area, to kind of be the eyes out there with officers, either before they respond and to give them real-time information on the scene, either prior to the officer getting there or as they're arriving.

They also have the ability to tap into the officer's body-worn cameras, so if an officer is on

35

scene by themselves, there's another set of eyes remotely that's on scene with them as well. They're able to utilize the technology to follow up on crimes to assist the detectives as well as the patrol officers.

Q. Tell me a little bit about how they assist detectives.

A. They will follow up with the -- if there's information detectives need on video footage or information that the Real Time Crime Center is able to access, then they can pull that video footage for the detectives, kind of help them out, to kind of reduce some of their workload. They --

Q. Okay.

A. I'm sorry. They may do more. I'm just not into the day-to-day operations of the Real Time Crime Center. They fall under the leadership of Captain Thomas and Lieutenant Vernon.

Q. Understood. But to your knowledge, they play some role in the investigation of crime in coordination with detectives; is that fair to say?

A. Yes.

36

Q. You also mentioned the Criminal Intelligence Unit. What's that?

A. The Criminal Intelligence Unit is -- they do more in-depth investigations. They're like -- they attend city council meetings, provide security for the mayor and city council members. They work along with the JTTF -- and I apologize; I don't know what the acronym is for.

But for things like terrorism, domestic terrorism. They're -- they're those -- that unit that gets that information, kind of coordinates with the department and outside agencies for things of that nature.

Q. I think -- is JTTF joint terrorism task force? Could that be the acronym?

A. Yes.

Q. Okay. Got it.

Does that unit use Flock, to your knowledge?

A. I'm not sure. But they should have access to it. I -- I can't answer whether or not they are or not. I'm not sure.

Q. Okay. So you -- you think they have access to it, but you're just not sure whether anyone actually uses it day to day in that unit; is that fair?

A. That's correct.

Q. Okay. And you mentioned crime analysis, I think, was the last thing. Can you just explain what crime analysis is?

A. Crime analysis are civilians. There are no sworn members in crime analysis. And they pretty much do our statistical data. They compile it. They share it with us. They look at trends and patterns, and put out reports on what crimes have occurred. If they see any patterns of -- like rings of larcenies or stolen autos, they provide us intel on -- background on individuals from our systems.

Q. Does -- do the crime analysts use Flock?

A. I don't believe so.

Q. Okay. So you mentioned that starting -- so I believe from around 2021 to August 2023, you were Assistant Chief heading the field -- heading field operations; is that right?

A. Yes, sir.

Q. Okay. And you mentioned that the patrol officers and the Special Enforcement Division reported to you. Am I remembering that correctly?

A. Yes, sir.

Q. Okay. Let me ask you first what the Special Enforcement Division is.

A. Special Enforcement Division encompasses our K-9 officers, our Traffic Division, and our Harbor Patrol Unit.

Q. Okay. And just sort of -- can you explain to me a little bit more like what your role in overseeing the patrol officers involves?

A. So as the Assistant Chief, my role was to ensure that there's resource allocation, to monitor the manpower to ensure that my divisions were in compliance with policies, looking at modified duty, officer injuries, and things of that nature.

Q. So I think Flock was available to the NPD during only part of the time you were responsible for field operations. Is that right?

A. Yes, sir.

Q. Okay. Do you know when -- I guess, do you know when the Flock cameras went up in Norfolk?

A. I don't know the exact date. I want to say probably 2023ish. I think around the end of 2022ish, the Housing Authority got their Flock cameras first. And then the City -- the police department got theirs later.

I don't have the exact dates. I'm sorry.

Q. Okay. That's no problem. We'll -- we'll look at some documents that might -- might help you remember in a bit.

During your time over the -- over field operations, is it your understanding that patrol officers used Flock when it became available?

A. Yes.

Q. And what, if you know, did they use Flock for?

A. I don't know for certain. I believe stolen autos were probably the -- the main thing that they would -- patrol was using it for. A vehicle would pass through the Flock camera, image would be taken, and alert would be given to the officers if the vehicle was stolen.

Q. So patrol officers are primarily using Flock to get alerts when vehicles of interest pass through the system; is that fair to say?

MS. SOLORIA: Objection. Mischaracterization of prior testimony.

You can answer.

THE WITNESS: I think they're used -- they're using Flock to get alerts. I can't say if they're using it for -- the alerts are not -- probably not just for stolen autos. Detectives can put the alerts in, my understanding, for vehicles that are wanted in criminal offenses like homicides.

I believe primarily officers -- I don't know -- I can't say what they're primarily using them for. I'm sorry. I don't want to mischaracterize myself. I don't know -- they can use it for alerts.

BY MR. SOYFER:

Q. Okay. That's the thing that just -- for you personally -- primarily comes to mind; is that

fair to say?

A. No, because they also -- investigating criminal offenses as well. So they have the option to use it if they're investigating a criminal offense.

So I -- I don't know primarily which one they're using it more for, or which one takes precedence, because I'm not involved in their day to day or the Flock system to see what it's being used for.

Q. Okay. So patrol officers in the field can also go search for cars within Flock; is that right?

A. Yes.

Q. Okay. How many days of information, thinking back to 2023, could they pull up in Flock when doing a search?

A. My understanding, it was 30.

Q. And is it different now?

A. Yes.

Q. What is it now?

A. 21.

Q. Okay. Why is that?

A. Legislation changed. So the law allows for us to be able to pull it up for 21 days now.

Q. Okay. So there was a change in the legislation, and Norfolk PD now complies with that legislative change. Is that right?

A. We -- yes, we comply when the law went into effect.

Q. Okay. There wasn't an independent decision to decrease the retention period to 21 days in the Norfolk Police Department. Is that right?

A. I'm not aware if there was a decision or not.

Q. Okay. Would you have been part of that decision, if one had have -- had been made?

A. I am unable to answer that. That would be the Chief's decision, on who he includes in those decisions.

Q. Okay. You -- so we've talked about how some of the personnel who ultimately work under you use Flock, correct?

A. That is correct.

Q. And so if the Chief is making decisions about Flock, does he usually include you in those decisions?

A. So there's been two different chiefs under Flock's inception. I can't answer yes or no, because I don't know if the Chief is having conversations about Flock.

When Flock was first -- when we first had discussions about Flock, I was initially involved because I'm the one that set up the virtual meetings to see if it was technology that the department would be able to utilize.

Once the decisions were being made to acquire Flock, and -- and cameras, and all the things, I was not at the table. I was asked to be kept in the loop because I was the Field Operations Chief, and it would impact my patrol officers.

So no, I was not always involved in the decisions that were made with Flock. And I don't know all of the conversations that went on about Flock.

Q. Okay. Understood.

So you mentioned there were two different chiefs. Who was the first Chief?

A. Interim Chief Goldsmith, Michael Goldsmith.

Q. And from roughly when to when was he the Chief?

A. Around April -- so he was the interim Chief around April of 2022ish, April -- maybe May 2022 to May of 2023, when Chief Talbot came on May 1st.

Q. Okay. So obviously the second Chief is Chief Mark Talbot, from May 1st, 2023, to the present. Is that right?

A. That's correct. Now, I may be off by a couple weeks, because I believe the Deputy Chief may have been acting for the last two weeks of April, before Chief Talbot came.

Q. Okay. Understood.

Do you live in Norfolk, by the way?

A. No, sir.

Q. Okay. Do you live in the -- I assume you live in the Hampton Roads area, generally; is that right?

ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton
Conducted on July 25, 2025

12 (45 to 48)

---

A. That is correct.

Q. Okay. So moving to a slightly different subject, if I -- if I use the acronym "ALPRs," will you understand I'm referring to automatic license plate readers?

A. Yes.

Q. Okay. How long has the NPD used automatic license plate readers?

A. So I'm a little confused. I know you said ALPR is license plate readers. I can recall -- I know when I was a lieutenant, we had license plate readers affixed to marked police units, if that's what you're asking.

Q. Yeah, it is. Let me back up a little bit. How long have you been with the NPD?

A. Since November 13 of 2000.

Q. Okay. And you're referring to the period when you were a lieutenant. What time period is that?

A. I believe I got promoted in 2015 to 2019.

Q. Okay. And during that time period, you're saying you -- the NPD did have license plate readers on marked police units, correct?

A. Yes. Correct.

Q. During all of that time period?

A. So when I first got promoted, in I think July '15, I was the Blue Sector Lieutenant in the first precinct. I don't know exact -- I was there for two years. And I remember instructing my officers to make sure that the vehicles were utilized in districts where we had increases of stolen autos that were being recovered.

So I know -- that's the only reason why I can preface it. I -- I don't know if it came before then or after then. I just -- I'm sorry, I just don't remember.

Q. I understand. That's your earliest recollection of it; is that fair to say?

A. Yes, sir.

Q. Okay. Was it your understanding that every car had a vehicle-mounted license plate reader, or just some subset of the marked patrol units?

A. It was not every car.

Q. Okay. What's your understanding of what those license plate readers do?

A. My understanding then was it just read the license plate and put the image on the screen in the car, and it notifies you if they were stolen.

Q. Did the Norfolk Police Department download data from the vehicle-mounted ALPRs at any point in time?

A. I don't know.

Q. Okay. Do you know if they collected the -- scratch that.

Do you know if they recorded the location where they scanned stolen cars?

A. I don't know.

Q. Do you know if those vehicle-mounted ALPRs retained data on cars that did not trigger alerts?

MS. SOLORIA: Objection. Vague.

BY MR. SOYFER:

Q. That is, if they passed a car, scanned the license -- well, let me ask you this first, actually: To your knowledge, did the vehicle-mounted ALPRs scan the license plates of every car within their field of view?

A. I don't know. I -- I don't recall using the system.

Q. Okay.

A. So I don't know what it retained. I knew that we had them, and I know it was a resource. But I don't recall using the system. I don't recall what happened to the data, if it was stored. I -- I just don't have any of that information.

Q. Okay. Do you have any understanding, from then to today, whether information from vehicle-mounted ALPRs is used by detectives?

A. I -- I don't believe my detectives have ALPR vehicle-mounted.

Q. Okay.

A. But I'm not sure. I don't look at their vehicle. I'm a resource allocator, so -- I make sure they get cars, but I haven't given them any cars with any AL -- the license plate readers since I've been in the role as an Assistant Chief.

Q. Yeah, I guess I'm also asking kind of a more general kind of question: Does that -- do they use any information from vehicle-mounted ALPRs on,

---

say, patrol officers' vehicles in any way?

A. I don't know.

Q. Okay. So you mentioned earlier that you were the person in the Norfolk Police Department who first, you know, brought up the idea of buying Flock cameras. Is that right?

A. Yes, sir.

Q. How did that happen?

A. So at the time, I was the Field Operations Chief, and I was dealing with a lot of violent crime. As part of my responsibilities I monitor the crime and try to come up with strategies to reduce crime, to make the city safer for our citizens, residents, business owners, and visitors.

There was a lot of crime, for example, going on in one of my public housing communities that was involving vehicles. They were pretty much drive-by shootings, where I had people being shot and killed by vehicles that were driving by.

So one of the professional staff members had given me an article on Flock cameras that were being utilized in Fort Worth, Texas. I read the article, and then I reached out to Fort Worth, Texas, to get some additional information. That's when I was provided with the contact information for Flock.

I had three captains that worked directly for me. Two were in patrol; one was in my Special Enforcement Division. I was able to set up a Zoom meeting with Flock to get additional information about the technology, and had my captains present -- one might have been an acting lieutenant -- just to see if it was something that was worthy of presenting to the executive team.

After I set that meeting up and had a discussion with my -- my captains, we thought it was a good idea to present it to the executive team. I had a conversation with Interim Chief Goldsmith about the technology, and set up the Zoom meeting again, the presentation for Flock to -- to be held with the executive team.

Q. Let me follow up on just a few things you said. Do you recall who you reached out to in Fort Worth?

A. It was a sergeant. I'm not sure if it was Dalton. It was a sergeant. I don't recall his name off the top of my head.

Q. Okay. And you -- you mentioned one of the professional staff members had given you an article on Flock cameras. What do you mean by "professional staff member"?

A. That means that this member is not a sworn member of the department. They're not a police officer.

Q. Okay.

A. They're civilians. We call our civilians professional staff.

Q. Got it. Do you recall who that person was?

A. Yes.

Q. Who was it?

A. Amanda -- she might have been Deloatch at the time, but she's Amanda Harvey right now.

Q. Got it. What was her role?

A. She is the Chief's assistant.

Q. Okay. And you referred to -- you said there -- "There was a lot of crime, for example, going on in one of my public housing communities that was involving vehicles." What do you mean, my -- "one of my public housing communities"?

A. So let me clarify. It wasn't just the one community. I take true ownership of my community, so when I say "my," I feel as though I'm a part of my community. I just -- it's just a personal ownership I take, even though I'm a police officer.

Q. Okay.

A. But it wasn't just the one. I just used that particular one as an example.

Q. Is that a City of Norfolk public housing community, or -- I'm just -- what -- what kind of -- what entity oversees the public housing communities that you were referring to just now?

A. So for your first question, yes, it's in the City of Norfolk. And when I say "my communities," although I don't live in the City of Norfolk, I am a member -- I feel as a member of the community. So I -- I take on the crime as if it's my own. And the police department oversees all of the communities in the City of Norfolk.

53

Q. Understood. So the -- the public housing communities -- I guess what I'm asking is, are those public housing communities overseen by the government of the City of Norfolk, or by a different entity?

A. So the public housing communities are managed by the Norfolk Redevelopment Housing Authority --

Q. Okay.

A. -- with a memorandum of understanding of officers that are assigned to those communities.

For example, from 2007ish to 2011, I was assigned to the Calvert Square Community, which meant I was the community resource officer assigned to that community.

Q. So the -- the City of Norfolk has reached agreements with the Norfolk Redevelopment and Housing Authority to provide police to their communities; is that right?

A. Yes.

Q. Okay. Is the Norfolk Redevelopment and Housing Authority part of the City of Norfolk government?

54

A. That, I'm not sure. I don't -- I don't believe -- I don't know. I don't know how that -- that lines up.

Q. Got it. And in your day-to-day work -- well, let's go back to, you know, around when you were looking into the Flock cameras. You know, how did you deal with the NRHA in your day-to-day work?

A. As an Assistant Chief you're asking me?

Q. Yes.

A. Not really in my day to day. If their executive team wanted to meet, just to make sure we were collaborating, or I might go into a board meeting; I dealt with the director -- the security director.

Q. Who's the security director?

A. Karen Rose.

Q. Okay. So now, kind of going back to how the City first got the Flock cameras. What was sort of the -- the process for setting up the meeting with Flock?

A. I was in communication with -- I'm not sure if it was -- it was one or two people that Dan

55

Mento -- I can't think of the other individual's name -- where through those communications, either e-mail or telephone, we set up the Zoom presentation.

Q. Got it.

Did you look into any other companies that make ALPRs?

A. I did not.

Q. And why not?

A. I wasn't aware of any other companies. That was the article that I read, and that's what I looked into.

Q. Got it.

MR. SOYFER: Would you all mind if we took a short break, maybe five minutes, or more if you need it?

MS. SOLORIA: Sure.

Does five minutes sound good to you?

THE WITNESS: Yeah, that's fine.

MR. SOYFER: Okay. Let's go off the record.

VIDEOGRAPHER: We are going off the record, and the time is 10:27 a.m.

56

(A recess transpired from 10:27 a.m. until 10:36 a.m.)

VIDEOGRAPHER: We are back on the record, and the time is 10:36 a.m.

BY MR. SOYFER:

Q. Okay. We're back from break, Chief Naughton. You understand you're still under oath, correct?

A. Yes, sir.

Q. Okay. Great. So I just dropped into the chat what will be marked Plaintiffs' Exhibit 38. I'll give you a moment to open that.

MR. SOYFER: And in the meantime, for the record, I'll state that this is a document bearing Bates stamp NORF001402.

(Exhibit 38 was marked for identification.)

BY MR. SOYFER:

Q. And let me know when you have that open.

A. It's open.

Q. Great. So, Chief Naughton, you'll see that this is an e-mail from you to Albert Karpovich, with the subject "Flock Safety Meeting - LPR," dated

57

June 10th, 2022.  Correct?

A.  Yes, sir.

Q.  And just to make sure things are clear, your -- your last name in the "From" field here is Michele Naughton-Epps, but that is you, correct?

A.  That is me, correct.

Q.  So I'd like to go to the first-in-time e-mail, which is all the way at the bottom.  It actually starts on the second-to-last page, ending in 05.

A.  I'm not -- what does "05" mean?

Q.  Oh, okay.  Let me -- I'll just quickly explain this to you.  The -- the numbers in the lower right corner of the document, those are called Bates stamps, and those just number the pages.  So I am looking at the page with the Bates stamp that ends in 05 in the bottom right corner.

Are you with me?

A.  Yes, sir.

Q.  Okay.  Great.  I should have explained that to start, but . . .

You'll see that this is an e-mail from

58

Dan Mento to you, dated June 6th, 2022, correct?

A.  Yes, sir.

Q.  And he writes, "Good morning Assistant Chief Naughton.  I hope you had a great weekend.  I received your contact information from Dalton Webb regarding interest in our Flock Safety fixed LPR camera system."  Did I read that correctly?

A.  Yes, sir.

Q.  And is Dalton Webb the person at the Fort Worth, Texas, police department that you spoke to about Flock cameras?

A.  Yes, sir.  I believe that's the sergeant.

Q.  Okay.  Do you recall the date when you spoke to him?

A.  No, sir, not the exact date.

Q.  Okay.  It was sometime prior to this e-mail on June 6th, 2022; is that fair to say?

A.  Yes, sir.

Q.  And you may have already said this, so forgive me if -- if you have, but how did you speak to Officer Webb?

A.  I believe I might have sent an e-mail or

59

phone. I don't remember exactly. I might have did an e-mail reaching out to the department by Googling them. I may have talked to him on the phone.

It's been three years. I -- I don't recall exactly.

Q.  Got it.  And so from this e-mail, it looks like Dalton Webb relayed your information to Flock, and Flock then reached out to you; is that fair to say?

A.  Yes, sir.

Q.  Okay.  So Mr. Mento goes on and writes, "We work with a lot of police departments in your area including Chesapeake, Hampton, Newport News, Suffolk, and Williamsburg."  Did I read that correctly?

A.  Yes, sir.

Q.  Was his mentioning that kind of an attractive feature or selling point of Flock for you?

A.  No, sir. It didn't matter to me either way, because I initially reached out.

Q.  Okay.  And so it -- it didn't matter to you that other police departments in the area were

60

using Flock?

A.  No, sir. At that particular point in time, I don't think I had enough information on Flock, other than what was in the article.

Q.  Understood.

So you write back to him, on June 6th, 2022: "Thank you for your response.  I would love to meet with you."  Do you see that?

A.  Yes, sir.

Q.  And then you go on: "This week is not good for me either as we are in the final planning stages for this weekend's Harborfest."  Do you see that?

A.  Yes, sir.

Q.  Let me just ask you:  What is Harborfest?

A.  Harborfest is a signature event that's held in Norfolk. It's like a weekend where they have like a parade of sails, with the boats. It's -- I'm not a Norfolk native, but it's -- it's quite a big deal. It takes a lot of police resources to have this event. Pretty much the entire department works during that weekend.

Q. Understood.

Okay, so the next e-mail in this chain that I want to ask you about is on the first page; this is the page ending in 02. And you'll see the second e-mail down on this page is an e-mail from you to Dan Mento, dated June 10th, 2022. Correct?

A. Yes, sir.

Q. Okay. And you have cc'd Alan Johnson and Joe Branning. Do you see that?

A. Yes, sir.

Q. Who are they?

A. Alan Johnson I believe was my captain of the First Patrol Division. And Branning was the lieutenant who was acting as the commanding officer at my Second Patrol Division.

Q. Why did you CC them here?

A. Because they're the ones I'm asking to attend the virtual presentation with me.

Q. Okay. Why -- why did you want them specifically to attend the virtual presentation?

A. Because I wanted input from my team. I'm very team-oriented, and I wanted input from my team, and not just go off of maybe what I would be receiving as the information. I'm very inclusive.

Like I said, they're command staff. They were -- well, one was acting as a captain. Just so that others could get the information, so that we'd collaborate to see if this was worthy of bringing it to the executive team.

Q. So you write to Dan Mento: "My team and I are prepared to attend a virtual presentation on Thursday, June 16th, 2022, at 1000 hours." Do you see that?

A. Yes, sir.

Q. Okay. And so then, in the next e-mail up in this chain, you forward the whole chain to Albert Karpovich on June 10th, 2022. Do you see that?

A. Yes, sir.

Q. Who is Albert Karpovich?

A. He is currently a captain. He's actually the Captain of the Special Enforcement Division right now.

Q. Okay. And was he -- he was part of your team at this time; is that right?

A. I don't recall. In looking at this e-mail, it looks like maybe when I sent the e-mail to him, he probably was at that time. Just -- just looking at the e-mail, it looks like he wasn't at the time that I set the meeting.

But I want -- like I said, I'm very inclusive. So it looks like I'm including him in this meeting as well.

Q. Got it. So just starting with the second sentence of your e-mail to him, you write, "We are meeting with Flock just to see if their camera options will be more beneficial to the City than what we currently have." Did I read that correctly?

A. Yes.

Q. What did you mean -- what were you referring to when you said "what we currently have"?

A. So I believe I was referring to -- we were utilizing LVT cameras, which are -- are not license plate readers, but the LVT cameras were extremely expensive. They're the cameras that you see like at Target or Walmart, with the blue light on top, with the base that's there.

Like I said, I only had that article. I wanted to see what -- what Flock was and have input from my team. So this is all before meeting with the Flock representatives to get a -- a somewhat understanding on what Flock was.

Q. Okay. And then in the next sentence, you write, "Additionally Lieutenant Young is working with finance and budgeting to lease a camera for Community Beach." Did I read that correctly?

A. Yes, sir.

Q. First let me ask you, what is Community Beach?

A. So Community Beach is one of our -- it's a beach access in our Ocean View area where people go and enjoy the beach. It's a free public access to the beach.

Q. Okay. And when you say "lease a camera," did you mean a Flock camera, some other type of camera? Can you just explain that to me?

A. That was for the LVT cameras. So I -- I think, if I recall correctly, Captain Karpovich, when he was promoted, probably went to the Second, because

the Community Beach is in the Second. So I'm making sure that he has information on something that's in his area of responsibility.

Q. Understood. And was the NPD leasing a camera for Community Beach because it was a high-crime area?

A. I'm not sure of the exact numbers of crime. But there was concerns, because with the beach in the summertime, you have additional people coming to the beach, and there were some concerns about the -- about things going on at the beach during the summer. That's when that -- that area picks up, and that's where -- when crime would pick up, when you have more people coming out to the beach.

Q. Got it. So just -- it's generally a popular area of the city. Is that fair to say?

A. In the summertime, yes.

Q. Okay. And lots of people just go there to enjoy the beach and not commit crimes. Is that fair?

A. Yes.

Q. Okay. But because it attracts so many people, that also means that it's a concern for you that there might be crime happening there. Is that fair as well?

A. Somewhat. Not a concern just for me. If I recall correctly, there was complaints from the residents, or City -- coming in through city council, probably from that. We had -- already had acquired -- I'm not sure if it was six or seven LVT cameras. A majority of those cameras were placed in the downtown area.

So instead of moving -- we had some -- some violent crimes occur, to include a mass shooting in the downtown area, and we didn't want to move those cameras. So if I'm recalling correctly, we were going to get an additional one, to put this, so we would not have to remove what we already had in place.

Q. And to your recollection, that was because of complaints from residents or possibly the city council; am I understanding that correctly?

A. The complaints would have came in, if I recall correctly, through city council from the residents, from -- from the citizens of Norfolk.

Q. Okay. And did the NPD take that seriously, when complaints come in from residents through the city council?

A. We take all complaints seriously, regardless of how they come in.

Q. Okay. You can set that document aside, or close out of it.

I'm going to drop another document into the chat. Please let me know when you have that open.

MR. SOYFER: But for the record, this is a document bearing Bates stamp NORF001393. And this is Exhibit 39.

(Exhibit 39 was marked for identification.)

THE WITNESS: We have that open, sir.

BY MR. SOYFER:

Q. Great. You'll see this is an e-mail from Dan Mento to you, with the subject "Flock MOU," dated June 16th, 2022. Do you see that?

A. Yes, sir.

Q. Okay. And in the previous e-mail, June 16th is the date on which you were -- we saw you were going to meet with Flock, correct?

A. Correct.

Q. And so then if you turn to the next page, you'll see this is a -- an attachment to the e-mail, entitled "Memorandum of Understanding." Is that right?

A. Yes, sir.

Q. And the first sentence states, "This Data Sharing Memorandum of Understanding (hereinafter 'MOU') is entered into by and between Flock Group, Inc., with a place of business at 2588 Winslow Drive, Atlanta, Georgia 30305 ('Flock') and Norfolk VA Police Department with a place of business at 100 Brooke Avenue, Norfolk, Virginia 23510 ('Agency')."

And then just defines each of those as a "party," and together, "the parties." Do you see that?

A. Yes, sir.

Q. Okay. And if you look under Number 1, you'll see there's a section entitled "Purpose. To

allow the Agency to utilize the Flock services for the following purpose: To gain awareness with respect to the communities for which they serve to protect and facilitate investigations (the 'Purpose')." Do you see that?

A. Yes, sir.

Q. Okay. And then there's a Section 2, entitled "Access Rights to Flock Services." And the first sentence there just states "Subject to the terms and conditions contained in this MOU, Flock hereby grants to Agency a nonexclusive, nontransferable right to access the features and functions of the Flock services during the term (as defined below), solely for use by authorized users in accordance with the terms and conditions herein."

Did I read that correctly?

A. Yes, sir.

Q. Okay. Did you ever sign this memorandum of understanding?

A. No, sir.

Q. Okay. And do you have an understanding of why Mr. Mento sent this to you?

A. No, sir.

Q. Okay. Did you get access to Flock system at all as a result of him sending this?

A. On June 16th?

Q. Yes.

A. No, sir.

Q. Okay. You can set that aside.

MR. SOYFER: Okay. I'm going to drop in the next exhibit, which will be Plaintiffs' Exhibit 40.

(Exhibit 40 was marked for identification.)

MR. SOYFER: And for the record, this is a document bearing Bates stamp NORF013011.

BY MR. SOYFER:

Q. And let me know when you have that open.

A. We have it open. Thank you.

Q. Okay. Great.

So, Chief Naughton, you'll see this is an e-mail from Dan Mento to you, cc'ing Amanda Deloatch, with the subject "Meeting Follow up - Flock Safety," dated June 21st, 2022. Is that right?

A. Yes, sir.

Q. Okay. And Amanda Deloatch was -- we spoke about her earlier, but she is Chief Talbot's executive assistant, correct? Or I guess at this time was Chief Goldsmith's executive assistant. Is that right?

A. Yes, sir.

Q. Okay. And she was the person who I guess brought Flock to your attention originally, correct?

MS. SOLORIA: Michael, we lost audio on that last question, so you'll have to repeat it.

MR. SOYFER: Okay.

BY MR. SOYFER:

Q. And she was the person who brought Flock to your attention originally, correct?

A. Yes. She is the one that gave me the article.

Q. So if you go to the page ending in 12 -- this is the second page -- you'll see there's an e-mail from Dan Mento to you, copying -- I believe you said Lieutenant Johnson and Lieutenant Branning, if I got their titles correct; is that right?

A. Captain Johnson and Lieutenant Branning.

Q. Captain, okay. Thank you for that.

And Mr. Mento writes, "Good afternoon, Assistant Chief. I appreciate you and your team taking the time to meet with me today."

Did I read that correctly?

A. Yes.

Q. And you met with him on June 16th, 2022, correct?

A. Correct.

Q. He writes, "Below are links to a few of our success stories, including the video I played during the presentation today." Did I read that correctly?

A. Yes, sir.

Q. Okay. Do you have any recollection of reviewing these links?

A. I may have. I -- I don't have any recollection.

Q. Okay. My next question -- this is quite a long e-mail, but my next question is about something he says on the following page, which is the page ending in 13.

73

And if you see the first full paragraph on that page, he writes, "Attached are a few documents regarding our Community/Commercial Sales Division as requested. We are happy to meet with your local Housing Authority as well so just let me know if we need to set something up."

Did I read that correctly?

A. Yes, sir.

Q. And does his statement there reflect that you requested this information during the meeting on June 16th?

A. It could have been anyone in the meeting that requested it. I was just the point of contact. I'm not sure who may have requested it or how that conversation went at this point in time.

Q. Okay. But someone in the meeting requested this information, correct?

A. That's possible, yes.

Q. Okay. And that would have been you or someone on your team; is that right?

A. Yes, possibly, yes.

Q. And when he writes, "We are happy to meet

74

with your local Housing Authority as well," why is he writing that?

A. Best that I can recall, at the time, like I said, the LVT cameras -- so when I spoke about the violent crime in one of our public housing communities, would be one of these communities that's listed here.

I had previously met with the security director to try to see if they would -- if they wanted to purchase the LVT cameras or lease the LVT -- LVT cameras to put in their -- in their communities, because it -- we -- we had some down on Granby Street. I believe the cost was probably like 10,000 for a six-month period. It was -- it was a very costly price for those cameras.

The conversation I had, they couldn't afford them. So when we were doing our presentation, I would have probably thought that this was a great idea for them to utilize, because that violent crime was also occurring in their communities.

So I was going to set up a meeting with the Housing Authority, the security director, to see

75

if they would be interested in these cameras as well, because the violent crime was happening on -- like Young's Terrace, Calvert Square -- these are neighborhoods within the Housing Authority's responsibilities -- which they managed and owned.

Q. Okay. And so you were trying to make the NRHA security director aware of Flock cameras; is that fair?

A. Yes, sir.

Q. Okay. If you go up to the page ending in 11 -- this is the first page of the document -- at the bottom of this page, there's an e-mail from you on June 21st, 2022, where you write, "As promised, I have shared this information with the executive staff who have requested a presentation and we will be inviting someone from our IT and budgeting departments." Did I read that correctly?

A. Yes, sir.

Q. Did that presentation with Flock eventually occur?

A. Yes, sir.

Q. Okay. And who attended, to the best of

76

your recollection?

A. I don't recall exactly who was in a virtual meeting three years ago. It would have been -- the executive staff would have been invited. I'm not sure which ones would have attended. There's five of us. And according to the e-mail, IT and budgeting, I guess, to ensure that the infrastructure would support whatever -- or they -- you know, IT is more in-depth in the technological pieces of the puzzle.

But I don't recall who attended that meeting, who exactly was in that meeting.

Q. You said the -- "there were five of us." At this time, in June 2022, who was on the executive staff?

A. Interim Chief Goldsmith. Deputy Chief Michael Maslow. Assistant Chief Daryl Howard. Assistant Chief Todd Williams. And myself.

Q. And -- sorry; I think I forgot to ask you, but what did you discuss with Mr. Mento during the June 16th, 2022, presentation?

A. I don't recall the exact conversation. It

would have been a video presentation where -- and I'm just -- as best I can recall, where they were going over what -- what Flock does, I guess success stories, based on the -- the e-mails. It would have been a presentation of the technology.

I don't recall who asked what questions or what that questioning was, over three years ago.

Q. Great. Yes. I just want your best recollection.

So you obviously made a decision to move forward with presenting Flock to the executive staff, correct?

A. Yes, sir.

Q. And why did you make that decision?

A. I felt that the technology would considerably assist us with the violent crime that we were having. I had people being shot. I had people being killed with vehicles that were riding down Virginia Beach Boulevard shooting into the community, a community where there are children that live there, elderly folks that live there. And I wanted to do all that I could to protect life in any way that I could. The eyewitness descriptions weren't yielding us any results that were beneficial to us to -- to try to identify these individuals.

There was -- there's a -- another public housing community that is separated by one block from where this violence was occurring, and at the time, we believed that there was a group or gang violence that was going on between the two communities. So the violence was extremely rampant, and we were losing lives.

Q. And how -- so understanding that, how -- what -- what about Flock stood out to you as a potential way to solve that problem?

A. So Flock, because it captures the license plates and it also puts out alerts for stolen autos, some of those vehicles that were used in this violent crime were stolen autos. And being able to capture the license plate would give our officers the ability to prevent crimes, if those vehicles were in the area. Especially where we were having a lot of those violent crimes, it would give us the alerts for stolen autos that were passing through that camera, that image, knowing that the camera would be there, if we put a camera there, knowing that a -- that a vehicle that was stolen passed through image would alert our officers to potentially be in the area to ensure -- you know, visibility of a marked unit has the ability to deter crime, to deter somebody shooting at another individual so they're not caught.

So, you know, my -- my perspective was life preservation. I wanted to save lives. I wanted to utilize what -- and pull in any technology that would help me save lives.

Q. Did -- did you see any role for Flock in investigations at that point in time?

A. I don't recall. It's possible I did. I don't know exactly what my thought process was three years ago, in learning about the technology. I was the Field Operations Chief, so I'm not sure that I would have been immersed in what investigations was doing, because my area of responsibility was patrol and -- and the communities.

Q. Got it. And so it seems like from your answer today, your priority was preventing crime before it happened. Is that a fair characterization of your answer?

A. It's some of my -- I wanted to prevent crime before it happened. I wanted to ensure my officers were safe -- you know, knowing is half the battle -- and knowing what vehicles that they're possibly interacting with.

You know, if you pull a vehicle over and you have that information that they're a violent offender inside, you're going to do things differently. It's not going to be the, quote/unquote, routine traffic stop, where -- which is very dangerous for my officers. So not only was I at the mind-set of preserving life and preventing crime and preventing violent crime, but was also to keep my officers safe.

Q. Okay. Understood.

You can set that document aside.

MR. SOYFER: And I'm going to be dropping in the chat a document which we'll mark Plaintiffs' Exhibit 41.

//

81

(Exhibit 41 was marked for identification.)

MR. SOYFER: This is a document bearing Bates stamp NORF009454.

BY MR. SOYFER:

Q. And please let me know when you have that open.

A. We have that open.

Q. Okay. So you'll see, Chief Naughton, this is an e-mail from Alex del Carmen to you, with the subject -- all caps -- "NOBLE Conference," dated September 22nd, 2022. Is that correct?

A. Yes, sir.

Q. What is the NOBLE Conference?

A. So NOBLE is a national organization. It stands for the National Organization of Black Law Enforcement Executives, which I am a member. They usually have their conferences around August.

So it looks like, if I recall, Alex del Carmen would have been a presenter at that conference for 2022.

Q. Do you attend that conference every year?

A. Yes, sir.

82

Do I attend -- you said do I attend?

Q. Yes.

A. I now do, yes, sir.

Q. Okay. Since when have you started attending every year?

A. I'm not sure. Maybe '18, '19. I was the vice president. I'm currently the president of the Hampton Roads chapter.

Q. Okay. And you said Alex del Carmen was a presenter, right?

A. Yes, sir, if I recall correctly, yes, sir.

Q. Okay. Do you know what SBC Global is?

A. I don't recall.

Q. Okay. And you'll see, in the -- the first-in-time e-mail, which starts at the bottom of this page, ending in 54, you write, "Good morning. It was really nice speaking with you this morning. I would like to continue our discussion and receive the PowerPoint presentation." Do you see that?

A. Yes, sir.

Q. Okay. And that -- that e-mail is dated July 23rd, 2022, correct?

83

A. Yes, sir.

Q. You'll see later that day, Alex del Carmen writes back to you: "It was so great to chat with you Michele. Let me know when you have time for us to have a Zoom to follow up on our conversation." Did I read that correctly?

A. Yes, sir.

Q. Okay. And then you write back to her -- or I guess -- you write back to Alex; I don't know if that's a man or a woman.

You write back to Alex, on September 22nd, about two months after the e-mail we just read. Correct?

A. Correct.

Q. You write, "I apologize for the delay. I remember speaking with at NOBLE. Can you share the evaluation of the Flock cameras as my agency is working to obtain the technology. We want to incorporate these cameras into a Real-Time Crime Center." Did I read that correctly?

A. Yes.

Q. Do you recall what you spoke with

84

Alex del Carmen about at NOBLE?

A. Not in depth, no.

Q. Okay. Was it about Flock?

A. I'm going to say it had to have something to do with Flock, based on the e-mail. I don't remember the conversation.

Q. Okay. But you followed up, about two months later, to ask for the evaluation of Flock cameras. Do you see that?

A. Yes, sir.

Q. Did you ever receive that evaluation?

A. No, sir. I don't recall receiving it.

Q. And when you write "my agency is working to obtain the technology," does that reflect by this time the NPD had made a decision to move forward with Flock?

A. If I recall, it might have been a verbal conversation between me and Interim Chief Goldsmith. I don't know what actions were done on the back end to obtain it, but the conversation I had with -- with the interim chief is that he wanted us to leverage the technology.

85

Q. When did that happen? Roughly?

A. I don't recall when. It would have been in this time period of the presentations and what-not. If I recall correctly, Interim Chief Goldsmith was aware of what Flock was when I brought the idea to him that I wanted to do the presentation.

Q. Okay. Do you recall anything else about your conversations with Interim Chief Goldsmith about Flock?

A. The only thing I recall is he said it had a regional component to it, but that -- that's the only thing that sticks out about that conversation. But he was aware of what Flock was when I brought it -- the idea to him, before we had the presentation. Because I had to ask permission to even get it to Amanda, Ms. Deloatch, to have her put it on his calendar.

Q. What does that mean, "it had a regional component to it"?

A. "Regional," I guess, that it could -- so like if Portsmouth or Newport News had something entered into Flock, and we also have Flock, we can

86

see that as well. So not just specific to Norfolk, but to our -- the adjoining agencies within, I guess, our -- some areas that were in our region.

Q. And was that a consideration in deciding to move forward with Flock?

A. I'm not sure, because the decision wasn't mine to make. And Interim Chief Goldsmith did not tell me why he considered moving forward, or when he made that decision, or -- I don't know the back end on how all of that played out.

Q. Okay. So you kind of brought Flock to the attention of executive leadership; but after that point, you had -- well, I guess -- what was your role after that point?

A. So after that point, once the decision -- you're talking after the decision was made to be acquired?

Q. Yes.

A. It then fell on Lieutenant Thomas, who was the special projects lieutenant. I had asked just to be kept in the loop, because I knew it would be beneficial and that my patrol officers would be the

87

ones utilizing the technology.

But I was -- I may have attended a couple of meetings sporadically and may have been copied on e-mails. But as far as selecting cameras, looking at data to figure everything out, I was not intimately involved in that, no, sir.

Q. When you say "selecting cameras," you mean the specific products, or the number of cameras, or just -- all of that?

A. I'm sorry. I meant like the locations of where the Flock cameras would be in -- throughout the city.

Q. Okay. And that was something that, in your understanding, Captain Thomas was responsible for; is that right?

A. Yes, sir.

Q. Did you have any role in deciding the number of cameras?

A. No, sir.

Q. Okay. What about the specific types of Flock cameras -- well, let me ask you first: Do you understand that Flock offers several different types

88

of cameras?

A. I believe I saw that, maybe in the presentation.

Q. And did you have any role in deciding which of those specific products Norfolk would -- would get?

A. No, sir.

MR. SOYFER: I'm going to drop Plaintiffs' Exhibit 42 into the chat.

(Exhibit 42 was marked for identification.)

MR. SOYFER: For the record, this is a document bearing Bates stamp NORF007505.

MS. SOLORIA: Is it 007505? Is that what you said?

MR. SOYFER: 007505, yes.

BY MR. SOYFER:

Q. And do you have that open?

A. Yes, sir.

Q. Okay. You'll see that this is an e-mail from Michael Maslow to you, with the subject "VSP HEAT Program Offers Financial Aid for Auto Theft Enforcement/Prevention," dated July 25th, 2022. Is

that correct?

A. Yes, sir.

Q. First, just for the record, who is Michael Maslow?

A. Again, he is the Deputy Chief.

Q. Okay. And what is the Deputy Chief's role within the Norfolk Police Department?

A. He is the second in command. He acts in the absence of the Chief, and assists the Chief in whatever he needs.

Q. Okay. And is he essentially your direct supervisor?

A. So technically I report to the Chief, but he is the rank between Assistant Chief and Chief.

Q. Okay. Understood. Thank you.

If you go to the page ending in 06, which is the second page of the PDF, you'll see an e-mail from Dan Mento to you, dated July 5th, 2022. Correct?

A. Yes, sir.

Q. And he writes, "Good afternoon Assistant Chief, I hope you had a good weekend and 4th of July. I just wanted to share the below grant information with you that is available through the VA HEAT program and can be used to purchase our LPR cameras." Did I read that correctly?

A. Yes, sir.

Q. Okay. And then if you go to the following page, there is an e-mail from Erin Schrad to Brian Carlsen, who looks like he has a williamsburgva.gov e-mail address. Is that right?

A. Yes, sir.

Q. Okay. And then there's a letter on Commonwealth of Virginia, Department of State Police, letterhead. Do you see that?

A. Yes, sir.

Q. Okay. And if you go to the next page, you'll see that that's signed by Colonel Gary T. Settle, Superintendent. Do you see that?

A. Yes, sir.

Q. Do you know who Colonel Settle is?

A. No, sir.

Q. Okay. If you look at the second paragraph of the letter, Colonel Settle writes, "The Help Eliminate Auto Theft (HEAT) program is allocating funds to provide financial support for the auto theft investigation efforts of state and local law enforcement agencies. Financial support of up to $10,000 will be awarded to reimburse agencies for the purchase of equipment that will be used for investigating vehicle thefts or promoting the prevention of vehicle theft." Do you see that?

A. Yes, sir.

Q. Okay. And then if you go up -- back to the previous page, you'll see that after Mr. Mento sends you that e-mail, you forward it to Kimberly Boone, on July 17th, 2022. Correct?

A. Yes, sir.

Q. Who is Kimberly Boone?

A. Kimberly Boone was the Finance Bureau manager over public safety.

Q. Okay. So she was essentially like a -- a finance employee, I guess, is . . .

A. She -- yes. And in her role, she oversees all of our grant opportunities.

Q. Understood. And those are -- when you say "grant opportunities," you mean third-party grants to fund the operations of the police department; is that a fair characterization?

A. Yes, and her role, it would be for police and fire.

Q. Okay. Where do those grants come from, just generally speaking?

A. I'm not -- what grants?

Q. The -- I guess -- so, you know, we've talked about how she oversees third-party grants to fund the police department's operations. Where does the grant money come from?

Or maybe -- let me ask it like this: Does the police department receive grants from the federal government?

A. I'm going to say yes. I don't know -- so what they do is they'll ask us -- they'll look for grants, and they'll ask us, whatever the criteria is, to see if it's a need for us.

Q. Okay.

A. It could come from the Attorney General's Office. It could come from the federal government.

93

It could come from the HEAT. State. They could come from pretty much anywhere. It's like a normal grant process, where you apply for grants -- and it's not just for operations. It's for equipment, for a -- a breadth of things.

Q. Understood. Thank you for that.

And so you write to Ms. Boone, "Is this something we can apply for?" Correct?

A. Let me get to that.

Yes.

Q. Okay. And then you see Ms. Boone writes back to you, so the -- the header for this e-mail is on the previous page, ending in 05, but you'll see her e-mail is on the page ending in 06.

And she writes, "I have reached out to Ruby to see if this is the same funding that they apply for each year for reimbursement of training. It looks like we should do a joint application if funds can be used to help with other purchases outside of training. I'll get back to you soon. Thanks!" Do you see that?

A. Yes, sir.

94

Q. And then you forward her e-mail to Deputy Chief Maslow. Do you see that?

A. Yes, sir.

Q. On -- and that's on July 25th, 2022, correct?

A. Yes, sir.

Q. You write, "I think we should apply for this reimbursement grand" -- I think you meant "grant" -- "for the Flock cameras." Correct?

A. Yes, sir.

Q. Okay. And so I guess in this e-mail chain, what's happening is Mr. Mento is telling you about a way to obtain funding for some of the Flock cameras, at least. Correct?

A. I think he's giving -- giving us options where it can be used, where you can -- yes.

Q. Okay. And is it fair to say you hadn't previously been aware of that?

A. That is correct. I was not aware.

Q. Okay. Did you end up applying for a HEAT grant to fund purchasing Flock cameras?

A. I don't know.

95

Q. Okay. Do you have an understanding of where the funding came from to purchase Flock cameras?

A. Not really. I -- I don't know where the funding came from. That would fall on probably Lieutenant Thomas, who may have been working with the finance folks, like Kim Boone.

Q. Got it. Do you understand if it came from the City budget?

A. I don't know.

Q. Okay. So then Deputy Chief Maslow writes back, "Has the Chief mentioned to you how he would like to proceed? I know he likes the cameras, but I wasn't clear on what direction he wanted to go. He may have to talk to the City manager about securing funding."

Did I read that correctly?

A. Yes, sir.

Q. And do you know what Deputy Chief Maslow meant when he wrote, "I wasn't clear on what direction he wanted to go"?

MS. SOLORIA: Objection. Lack of

96

foundation.

THE WITNESS: I only can go by what's in the e-mail.

BY MR. SOYFER:

Q. Okay.

A. So I -- I don't know if that means yes, get them; no, get them -- which -- I don't know what that means.

Q. Okay. But he's asking you if -- if you know how the Chief wanted to proceed at this point. Is that right?

A. Yes, sir.

Q. Okay. And then you write back to him, "No, sir. I wasn't sure if you had that information in my absence." Do you see that?

A. Yes, sir.

Q. Do you know what you meant by "my absence" there?

A. I'm not sure if I was on vacation, at a conference. I don't know. Maybe I was out. Maybe I wasn't in the meeting. I'm not sure.

Q. Okay. This seems to be around the time of

the NOBLE Conference. Is it possible you were there?

A. It's possible.

Q. Okay. And does that reflect that at this time, you were talking to the Chief about, you know, how he wanted to proceed with the Flock cameras?

A. I'm not sure if I was talking to him or if we were having an executive discussion about it. I'm not sure. Because I don't have that information. It's obvious in my e-mail I wasn't sure.

Q. Got it. And then Deputy Chief Maslow writes, "No. I'll check with him and see how he wants to proceed." Do you see that?

A. Yes, sir.

Q. Did Deputy Chief Maslow inform you after this how the Chief wanted to proceed?

A. I don't remember.

Q. Okay. You can set that document aside.

So I understand earlier you weren't part of the decision in terms of the number of cameras, correct? You weren't -- you didn't decide on the number of cameras the department would buy; is that right?

A. That's correct.

Q. Do you know how -- strike that.

Let me ask you: Initially, how many cameras did the Norfolk Police Department acquire from Flock?

A. I don't recall.

Q. Okay. Does 172 ring a bell?

A. That -- that sounds about -- I know that number came up, but I don't know if that was the initial number.

Q. Okay. And so you don't know how that number was decided?

A. No, sir. I don't recall how that -- no.

Q. Do you know how many Flock cameras the City of Norfolk has today?

A. No, sir.

Q. Okay. Did the City of Norfolk buy additional cameras after summer 2023?

A. I don't. They may have. I don't know, and I don't know that we bought them. I think we lease them, if I'm -- if I remember correctly.

Q. Okay. Your understanding is the City leases the cameras from Flock, correct?

A. That's -- that's what I thought. I don't know that we bought them.

Q. Okay.

A. Yeah. Yeah, I'm not -- I don't think we bought them.

Q. Okay. Do you have an understanding of how much the City pays for each camera that it leases?

A. My best recollection, when I was initially -- I think they were $2500, and then either 14 or $1500 to convert a camera to the LPR camera. I don't know if, with inflation or whatever, if those prices have gone up. But I believe those were the -- the dollar amounts when I initially inquired about the cameras. I think it was 2500 and either 14 or 1500 to -- to switch out existing cameras, if I recall correctly.

Q. Yeah, I just want to follow up on that. When you say "convert a camera into an LPR camera," what do you mean?

A. I don't know how it works. I'm not the most technologically savvy. But it's -- you can have an existing camera, and I guess Flock will do something to make that an LPR camera, if I recall correctly, and it was -- it didn't cost the same amount as acquiring the new -- the actual camera.

Q. Is that something you looked into?

A. I didn't look into it any further. I know that -- I believe that -- if I recall correctly; I'm going three years back -- that that was what it was. I didn't do any further -- so I couldn't tell you if we even converted cameras. I don't even know that that was -- like I said, most likely fall on Lieutenant Thomas.

Q. Understood.

MR. SOYFER: Let me -- I'm going to drop Exhibit -- Plaintiffs' Exhibit 43 into the chat in just a moment.

(Exhibit 43 was marked for identification.)

MR. SOYFER: For the record, this is a document bearing Bates stamp NORF019598.

BY MR. SOYFER:

Q. Let me know when you have that open.

A. We have it up.

Case 2:24-cv-00621-MSD-RJK   Document 179-6   Filed 11/20/25   Page 28 of 69
PageID# 4636
ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton          26 (101 to 104)
Conducted on July 25, 2025

101

Q. Okay. So this is an e-mail from Deputy Chief Maslow to Interim Chief Goldsmith, Assistant Chief Howard, Assistant Chief Williams, and you, with the subject "Flock Camera Map," dated January 13th, 2023. Is that correct?

A. Yes, sir.

Q. Okay. And let me just ask, what was Assistant Chief Howard's role at this time?

A. He would have been the administrative assistant -- Administrative Services Bureau Chief.

Q. What does the Administrative Services Bureau do, just briefly?

A. They're over Central Records, Property and Evidence, the Training Division. I feel like I'm missing -- and Personnel and Accreditation.

Q. Okay. And Assistant Chief Williams, what was his role at this time?

A. He would have been, at the time, the Investigative Services Bureau Chief.

Q. Got it. So your current role?

A. Correct.

Q. Okay. And you'll see Deputy Chief Maslow

102

writes, "Below is the link that shows the locations for all of the Flock cameras that we have plotted." Do you see that?

A. Yes, sir.

Q. Okay. And you'll see there's a link in his e-mail that goes to a flocksafety.com address, correct?

A. Yes, sir.

Q. Did you click that link?

A. I may have. I -- I don't remember. I may have. It's possible I did.

Q. Did you review the camera locations at all?

A. It's possible I opened it up and looked at them. I mean . . .

Q. Okay. He writes, "The Red cameras are the NRHA Flock cameras which are already deployed." Do you see that?

A. Yes, sir.

Q. Okay. Do you have an understanding of why he would include those cameras on this map?

A. They are in the City of Norfolk.

103

Q. Okay.

A. And our officers had access to them.

Q. And so I think that's consistent with your testimony that the NRHA cameras went up toward the end of 2022, correct?

A. Yes, that was my best guess. They went up before ours went up, yes.

Q. And this e-mail is in January 2023, right?

A. Yes, sir.

Q. Okay. And is that your recollection, generally, of when you were deciding on the locations of the Flock cameras?

A. When you say -- I was deciding on them?

Q. I guess the executive leadership of the department.

A. I don't know that the entire executive leadership was deciding it. If the link came out from Deputy Chief Maslow, it looks like they were already selected. I don't believe like Chief Howard Chief had anything to do -- I believe it was Lieutenant Thomas working with the Deputy Chief and probably the analyst, because they're using hotspot

104

maps to select these locations.

Q. Okay. Got it. So the next sentence, he writes, "Please look at the locations and let me know if you see any adjustments that need to be made before we go to the installation phase." Did I read that correctly?

A. Yes, sir.

Q. Did you send him any adjustments that you believed need to be made?

A. I don't recall sending any adjustments. I would probably need to check in my e-mail. I -- I don't recall doing it, but I'm not sure.

Q. Okay. And so I guess, to your best recollection today, you didn't have an active role in mapping out where the cameras were. Is that fair?

A. Yes, sir. That's how I recall it.

Q. Okay. And yet -- but Deputy Chief Maslow is looping you in here as a member of the executive management team of the department; is that also fair?

A. Yes, sir.

Q. Okay. He writes, "The locations were chosen based on hotspot maps and Norfolk egress and

Case 2:24-cv-00621-MSD-RJK    Document 179-6    Filed 11/20/25    Page 29 of 69
PageID# 4637
ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton    27 (105 to 108)
Conducted on July 25, 2025

105

ingress routes." Do you see that?

A. Yes, sir.

Q. Do you understand what hotspot maps are?

A. Yes.

Q. What are they?

A. My understanding, it's the places that -- within the city where our violent crime is prevalent over periods of time.

Q. What, generally, are those places?

A. They're not -- they may change somewhat, depending on the time frame or how long you're looking at those hotspots. But off the top of my head, I think the top three spots are probably Huntersville, Calvert Square, and Young's Terrace, historically. But we've had -- we've had hotspots pop up in Berkley. We've had hotspots pop up other places in the city, but -- and that's why I referenced Calvert Square in my initial testimony, is because that is truly a hotspot.

Q. Okay. What about downtown Norfolk? Is that a hotspot?

A. Like I said, it's going to change,

106

depending on what time frame you're looking at. I can tell you we had a mass shooting on Granby Street; I think it was about the 3, 400 block. We've also had a homicide at the mall, the MacArthur Mall; and for that area, one violent crime, such as like a mass shooting, will increase the violence there.

It depends on what -- what time frame you're looking at and how far out they're going for the hotspot.

Q. Okay. And the mall, obviously, is a place where lots of people go for completely lawful purposes, right?

MS. SOLORIA: Objection. Vague.

THE WITNESS: I answer now?

MS. SOLORIA: Yes.

THE WITNESS: I'm sorry. I'm sorry.

Yes, people do attend -- go to the mall for lawful purposes. I can't say that all the people that go there are doing it lawfully, because you have larcenies; you have shoplifting. So -- yeah.

107

BY MR. SOYFER:

Q. Would you say the vast majority of people go there for lawful purposes?

A. I would say I believe they do. But not knowing what everyone's intent, you know, you have -- you have groups that target areas where there are going to be large amounts of people who may be vulnerable, not paying attention. They can target their vehicle, so . . .

I think the people who are going in, purchasing items, are there for lawful purposes, yes, lawful reasons.

Q. When Deputy Chief Maslow references "egress and ingress routes," what does he mean?

A. Entrances -- I believe he means entrances and exits to the city. So when you ask me where I live, I live in Virginia Beach. I pass through Flock cameras every time I come into the city.

Q. Okay.

A. Or when I go into Virginia Beach, I pass through their cameras as well.

Q. Got it. Those are just along your normal

108

commute to work?

A. Any time I -- every day that I come into the city. And it's pretty much daily. Even when I'm off, I'm in the city, I pass through Flock -- Flock cameras. And my vehicle image is also captured when I pass through, every day.

Q. Okay. On your way to work, do you pass by just one Flock camera?

A. I couldn't tell you. I know when I come in off of Northampton, or whether I come in off of Newtown Road, I'm passing through a Flock camera.

Q. Okay. And to your knowledge, you pass by multiple Flock cameras, generally, when you drive into Norfolk?

A. Yes.

Well, I don't know if I pass through multiple, because a lot of times when I come in the city, I ride through a lot of these hotspot areas. When -- when I come in on a Saturday -- I don't work weekends, but I come into the city on a Saturday. When I tell you I own my community as if it's my own, I come in on the weekends, and I'll go into these

Case 2:24-cv-00621-MSD-RJK    Document 179-6    Filed 11/20/25    Page 30 of 69
PageID# 4638

ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton    28 (109 to 112)
Conducted on July 25, 2025

109

areas that are hotspots. So I believe I am passing through these cameras as well.

Q. Have you seen the cameras yourself, like out and about, in driving?

A. Yes, sir.

Q. Okay. I guess I'm asking if you know you pass them just because you've seen the map, or do you actually see them on the side of the road as you pass them?

A. If I'm paying attention, on the side -- I see them on the side of the road. I don't have the map ingrained in my memory to know exactly --

Q. Okay.

A. -- to tell you exactly where every single Flock camera is. But I know I'm passing through them, and it's recording my image as well, when I'm at that particular location.

Q. Okay. Why, if you know, is it important to place Flock cameras at egress and ingress routes?

A. I don't know why they chose to do that. I wasn't privy to those conversations.

MR. SOYFER: Okay. I am going to drop

110

Plaintiffs' Exhibit 44 into the chat in just a moment.

(Exhibit 44 was marked for identification.)

MR. SOYFER: And for the record, this is a document bearing Bates stamp NORF014673.

THE WITNESS: We have it up.

BY MR. SOYFER:

Q. Okay. So you'll see this is an e-mail from Deputy Chief Maslow to Interim Chief Goldsmith, Assistant Chief Howard, Assistant Chief Williams, and you, with the subject "Maps," dated January 24th, 2023. Correct?

A. Yes, sir.

Q. Okay. So this is just a little bit after the e-mail we were looking at previously. And you'll see that Deputy Chief Maslow is e-mail -- is forwarding an e-mail that Captain Thomas sent to him. Correct?

A. Yes, sir.

Q. And he writes, "Attached are the CFS and shooting hotspot maps that are overlayed with the Flock cameras as well as the LiveView cameras." Do

111

you see that?

A. Yes, sir.

Q. What does "CFS" mean?

A. Calls for service.

Q. Okay. And those are -- are those calls to 911?

A. Yes, they could be 911 or nonemergency calls.

Q. Okay. Understood.

Do you know what he's referring to when he says "the LiveView cameras"?

A. I don't know. I could guess, the cameras that they were going to install, the LiveView cameras, but I'm not sure if that's what he actually means or -- or the LVT. I don't know.

Q. Okay. Did you advise Deputy Chief Maslow of any concerns or suggestions?

A. I don't recall advising of any concerns or suggestions.

Q. Okay. And if you just go to the page ending in 77, you'll see there's a map labeled "Citywide Camera Placement." Correct?

112

A. Yes, sir.

Q. And this is a map of the City of Norfolk, correct?

A. It does look like a map of the City of Norfolk.

Q. Did you review this map when you received it?

A. I may have opened it. But on the map, you just see -- it doesn't give you exact intersections of where. And with the information that they use, the statistical data, I probably wouldn't have challenged it. Because I don't have all of the data and how they pulled it out, I probably wouldn't have challenged. I may have opened it and looked at it, but I don't recall sending any concerns.

Q. Okay. You can set that aside.

Are there areas of Norfolk where it's impossible for the Norfolk Police Department to place Flock cameras?

A. I don't know the answer to that.

Q. Okay. Are there military bases in Norfolk?

113

A. Yes.

Q. Okay. Does the NPD police inside of military bases?

A. No, sir.

Q. Okay. Could it place a Flock camera inside of a military base?

A. I don't believe so. I don't think that we -- and I'm -- I'm just -- from what I believe, that all of our cameras are on the City's property. That's why NRHA has their own cameras on their -- their cameras are on their property.

Q. Got it. And I think you said before that you weren't sure if Norfolk had purchased additional cameras since -- or strike that.

I think you said before that you weren't sure if Norfolk had leased additional cameras since initially leasing cameras in 2023, correct?

A. Correct. I don't -- I don't recall or have any of that information in front of me to -- to know if we did or we didn't.

MR. SOYFER: Okay. I'm going to drop Plaintiffs' Exhibit 45 into the chat.

114

(Exhibit 45 was marked for identification.)

MS. SOLORIA: Michael, once we wrap up with this exhibit, could we consider a break?

MR. SOYFER: Of course.

MS. SOLORIA: Thanks.

MR. SOYFER: And if you really need one now, I'm happy to just take the break now.

MS. SOLORIA: Are you okay?

Okay, we'll proceed.

MR. SOYFER: Okay. This shouldn't take too long.

For the record, this is a document bearing Bates stamp NRF008164.

BY MR. SOYFER:

Q. And just let me know when you have that open.

A. We have it open.

Q. Okay. You'll see this is an e-mail from Kevin Purnell to you and Phillip Dixon, copying Kimberly Boone and Rita Chandler, with the subject "VSP HEAT Grant," dated September 4th, 2024. Is that right?

115

A. Yes, sir.

Q. Let me just ask you who these people are. Who is Kevin Purnell?

A. Kevin Purnell is the Lieutenant of Violent Crimes.

Q. And so does that mean that he is the leader of the Violent Crimes Unit within the Detective Division?

A. Underneath the captain.

Q. Okay. So he's kind of the second in command of that unit?

A. Yes.

Q. Does he report to you?

A. Yes. As the Investigative Chief, yes.

Q. Okay. Who is Phillip Dixon?

A. At the time of this e-mail, he would have been the commanding officer of the Detective Division.

Q. Okay. Who is Rita Chandler?

A. Rita Chandler works in the -- with the financial -- the PFSM, under Kimberly Boone.

Q. Okay. So you'll see -- you can actually

116

see who the bottom e-mail is sent to. It starts on this page, ending in 64, and goes to the next page, ending in 65. But you can see it's from Katie Ward. Correct?

A. Yes, sir.

Q. And she is a Flock Safety employee, correct?

A. I'm going to say yes, according to her e-mail.

Q. Okay. Other than the -- you know, seeing the Flock Safety domain and her signature, you're not familiar with who Katie Ward is; is that fair?

A. I don't recall who Katie Ward is.

Q. Okay. But you -- you can see that you forward her e-mail, correct?

A. Yes, sir.

Q. So you must have received this e-mail from her, right?

A. It's -- it's possible. I was getting e-mails from Flock personnel. So yes.

Q. Do you get general kind of marketing e-mails from Flock?

ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton                30 (117 to 120)
Conducted on July 25, 2025

117

A. I was getting all kinds of e-mails; Flock Safety -- things that I wasn't responding to. But it looks like this was sent to me, yes.

Q. Okay. She -- so Katie Ward writes, on August 29th, 2024, "Earlier this week, I attended the VACP conference and learned about a grant opportunity that I wanted to share with your agency." Did I read that correctly?

A. Yes, sir.

Q. What, if you know, is the VACP Conference?

A. Virginia Association of Chiefs of Police is what "VACP" stands for.

Q. Is that a conference you attend?

A. I may have attended in the past. I'm very familiar with them. They are the same organization that does PELS, Professional Executive Leadership School, of which I am a graduate, and I do assist with the selection committee. So I'm -- I'm familiar with the VACP, and I might have attended a conference or two in the past.

Q. Okay. She writes, "State police will provide $12,500 per year (equivalent to four Falcon

118

LPRs) in reimbursements for agencies to purchase equipment that aids in the investigation of motor vehicle thefts."

Did I read that correctly?

A. Yes, sir.

Q. Okay. And Falcon LPRs are Flock license plate reader cameras, correct?

A. I believe so. I -- yes.

Q. Okay. Do you know if the model of license plate reader camera that Norfolk has is called Falcon?

A. I don't recall.

Q. Okay.

A. I -- I don't know.

Q. Okay. And then you forward this e-mail to Phillip Dixon and Kevin Purnell, and you copy Kimberly Boone and Rita Chandler, on September 4th, 2024. Do you see that?

A. Yes, sir.

Q. Okay. And you write, "Is this something we can use for additional Flock cameras or continuing costs associated with Flock?" Correct?

119

A. Yes, sir.

Q. Okay. And this is an example of Flock, again, making you aware of funding to lease Flock cameras, right?

A. Yes, sir.

Q. Okay. And in response to your e-mail, Lieutenant Purnell writes back, on September 4th, 2024, "I don't see why not. Especially if other agencies have been successful in purchasing Flock with it. We are in desperate need of more cameras so I personally think it would be good to pursue."

Did I read that correctly?

A. Yes, sir.

Q. Did you discuss with him why the Norfolk Police Department was in desperate need of more cameras?

A. I don't know if the conversation was those particular words. With him being my Violent Crimes Lieutenant, and Flock not being successful in every single case -- there are several cases where Flock has not assisted with helping us solve any -- some of our violent crime. It's been beneficial in some, not

120

in all.

Maybe why his -- he's expressed this in -- in his e-mail. I don't know what the number was, what -- what the number was, what we started out with and where we went. I do believe that during my time in ISB, that there was conversation about purchasing three or four additional Flock cameras with money from this grant, because the HEAT grant -- the training that we're talking about in the previous e-mails are for the auto squad investigators, and they go to this HEAT conference and get their additional training.

I don't know if those additional cameras make the 172, because I don't know where the numbers started with and when they increased, so -- and I didn't know the total number as being 172. I've heard "172," but I don't know if that was initially what we started with, or is that after we added it -- the additional cameras, if we added them.

Q. Okay. And -- but here, Lieutenant Purnell is expressing to you that he believed the Norfolk Police Department was in desperate need of more

Case 2:24-cv-00621-MSD-RJK    Document 179-6    Filed 11/20/25    Page 33 of 69
PageID# 4641

ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton     31 (121 to 124)
Conducted on July 25, 2025

cameras, correct?

A. Yes, sir.

Q. Have others in the department ever expressed to you that the City of Norfolk needs more Flock cameras?

A. There may have been talk about it. I don't have particular names. You know, you may have an investigator who's frustrated because they can't solve their case, and they may say, "We need more cameras." You can have citizens saying, "You need more cameras."

But I don't -- I don't know names or dates or -- I don't know that I took any action because somebody had a conversation.

Q. Okay. Got it.

MR. SOYFER: We can take a break now, Karla.

MS. SOLORIA: Okay.

You want to go off the record?

VIDEOGRAPHER: We're going off the record, and the time is 11:56 a.m.

(A luncheon recess transpired from 11:56 a.m. until 12:32 p.m.)

VIDEOGRAPHER: We are back on the record, and the time is 12:32 p.m.

BY MR. SOYFER:

Q. Okay. We're back from a break. Chief Naughton, you understand you're still under oath, correct?

A. Yes, sir.

Q. Okay. Great.

MR. SOYFER: And I have just put a new document in the chat. This will be Plaintiffs' Exhibit 46.

(Exhibit 46 was marked for identification.)

MR. SOYFER: For the record, this is a document bearing Bates stamp NORF015607.

BY MR. SOYFER:

Q. And whenever you have that open, just let me know.

A. We have it open.

Q. Okay. Great.

You'll see that this is an e-mail from you to Kimberly Boone, copying Deputy Chief Maslow and

Derrick Vernon, with the subject "Fusus Contract & cameras inquiry," dated October 18th, 2024. Correct?

A. Yes, sir.

Q. Let me just ask you, generally, what is Fusus?

A. Fusus is a system that's used in the Real Time Crime Center that -- my understanding, it's kind of like the brains that holds the cameras together, keeps them all together -- not -- not the Flock cameras, but like the LiveView. I think it holds the body-worn camera. But it's one of the systems that they use in the Real Time Crime Center.

Q. Okay. And the LiveView cameras are the -- the City-owned video cameras that are positioned across the city. Is that right?

A. Yes, sir.

Q. Okay. And why is -- why does the City use Fusus? Like why is it useful, if at all?

A. I believe it holds -- it keeps everything together. I'm not sure exactly how it operates. It's utilizing the real time -- the Real Time Crime Center. So to really understand it, I don't think I'm the best person to answer, because I don't really understand. I know it's a component in the Real Time Crime Center, and it's supposed to be the brains; but other than that, I don't -- I don't operate it. I don't use it.

Q. Okay. Would Captain Thomas be the best person to answer that question?

A. Yes, sir.

Q. Okay. So I'd like to -- looking at the document -- I'm not going to go through every e-mail in here, but I'd like to start with the e-mail on the bottom on the page ending in 08, which is the second page of this PDF.

Do you know who Stephen Lucas is?

A. Yes, sir.

Q. Who is he?

A. I believe Stephen Lucas works in the Personnel and Accreditation Department for the -- for the City. He works for the police department, on the third floor. I believe his name is Stephen Lucas.

Q. What's do for the police department?

A. I think he's on the accreditation side of

ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER

Transcript of Assistant Chief Michele Maria Naughton

32 (125 to 128)

Conducted on July 25, 2025

---

the house.

Q. Okay.

A. I don't know what his direct day-to-day is. He works for Chief Williams now, under Captain Torian.

Q. Okay. You can see on this e-mail, and his signature, that his title at this time is "Budget and Policy Analyst," correct?

A. Yes, sir.

Q. Okay. If you just look at the second paragraph in his e-mail to Ms. Boone, you'll see he writes, "Also, Pete got an e-mail from Pat regarding the purchase, installation, and operation of a surveillance camera at Duffy's Lane bus stop and potentially Flock cameras in Ocean View." Do you see that?

A. Yes, sir.

Q. Okay. And then you'll see he immediately follows up on that e-mail with another e-mail that begins on 07 and goes on to 08. Do you see that?

If you're on the first page, at the very bottom, you'll see a line that says, "On October 18th, 2024, at 9:36 a.m., Stephen M. Lucas wrote" -- and then "Hey, Kim." Are you with me?

A. Yes, sir.

Q. Okay.

A. Yes.

Q. And then if you go on to the next page, you'll see that the -- the body of his e-mail is on this next page. Correct?

A. Yes, sir.

Q. Okay. And then in the second paragraph, he writes, "On the Flock cameras, do you have a price estimate per unit (purchase, installation, annual operating, et cetera)? Do you have a number of units in mind you were looking to purchase?"

Do you see that?

A. Yes, sir.

Q. Okay. And then you'll see that Ms. Boone responds to him. And then in the last sentence of her response to him, there's a question for Deputy Chief Maslow. Are you with me?

A. Are we on the October 8, 2024, 9:57, Kimberly Boone wrote e-mail?

---

Q. Yes, that's right.

A. Yes, sir.

Q. Okay. And then just above that, on the same day, at 11:06 a.m., there's a response from Deputy Chief Maslow to Ms. Boone's e-mail, correct?

A. Yes, sir.

Q. Okay. He writes, "I'm not sure about the additional Flock cameras mentioned. I have copied ACOP Naughton and Lieutenant Vernon for input if they have any."

Did I read that correctly?

A. Yes, sir.

Q. Okay. And you can't see who his e-mail is addressed to, but he does say he copied you, correct?

A. The e-mail says that, yes, sir.

Q. And you can see in the -- the top e-mail in this chain is from you, correct?

A. I'm still reading this one.

Q. Oh, okay.

A. Yes, sir.

Q. Okay. And so you -- you must have received this entire chain that we're looking at, correct?

A. Possibly, yes.

Q. Okay. So just going on in Deputy Chief Maslow's e-mail at 11:06, he next writes, "I know some additional Flock cameras and live video cameras have been requested by several people across the city, but I'm unaware of any plans for purchase and installation beyond the 50 live video cameras we currently have dedicated to locations based on crime and call for service data." Do you see that?

A. Yes, sir.

Q. Okay. And then Ms. Boone responds, "Thanks for the response. I'll wait to hear back from Chief Naughton or Lieutenant Vernon." Do you see that?

A. Yes, sir.

Q. Okay. And then you respond to her e-mail a few minutes later on October 18th, 2024. Correct?

A. Yes, sir.

Q. Okay. And you write, "It is my understanding that the additional Flock cameras for Military Highway and East Ocean View are being paid

---

PLANET DEPOS

888.433.3767 | WWW.PLANETDEPOS.COM

Case 2:24-cv-00621-MSD-RJK   Document 179-6   Filed 11/20/25   Page 35 of 69
PageID# 4643
ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton                33 (129 to 132)
Conducted on July 25, 2025

129

out of the HEAT grant." Do you see that?

A. Yes, sir.

Q. Does that refresh your recollection that after the initial lease of Flock cameras in summer 2023, the City of Norfolk Police Department leased additional Flock cameras?

A. Yes, sir. From the HEAT grant, yes, sir.

Q. Okay. And those were paid out of a HEAT grant, correct?

A. Yes, sir.

Q. That was the grant we've seen references to throughout today from the Virginia State Police, correct?

A. I'm not sure that was the same one, because it -- if I recall correctly, along with the e-mails, it was a grant that we were already acquiring for training or something. So I'm not sure if that was funding left over from the original grant we acquired, or if the grant folks got an additional grant under what was seen in the e-mails that was suggested by Flock, and then bought those cameras. Because if I recall correctly, there was

130

some additional funding. I just don't know what the basis of that grant -- where that grant came from. Was it the original HEAT grant that we've always applied for, and that was additional money, or if they applied for new grant. So I don't know.

Q. Okay. The HEAT grant is money from the State of Virginia, correct?

A. I believe so.

Q. Okay. What -- so is Military Highway and East Ocean View an intersection, a neighborhood, something else?

A. So Military Highway is a main thoroughfare that runs -- I want to say it runs north/south, and then East Ocean View is also a street in the Ocean View area that runs east/west.

Q. Okay. And why did the NPD decide to lease additional cameras for that intersection?

A. I don't know the exact reasoning why. I would have to go back and look at the -- the map that you showed, just to verify that there were probably no cameras along those routes.

Q. Okay. So it may have been to fill a gap

131

in the coverage; is that fair?

A. Yes, sir.

Q. You next write -- this is the next sentence in your e-mail. You write, "The price was discounted so all funding would come from the grant." Do you see that?

A. Yes, sir.

Q. Okay. How -- how many additional cameras did the NPD lease at this time?

A. I don't know. I don't know the exact answer to that. I don't know if they put two on each of those roads in each direction, or they -- I don't know, because Military Highway is a considerably long road that goes from Little Creek all the way until it meets the city lines in Virginia Beach, which is quite a distance. And then Ocean View runs -- Shore Drive turns into Ocean View until you get to the interstate -- what turns into West Ocean View. East Ocean View stops at around Community Beach, a little bit past Community Beach.

So I'm not -- I'm not sure how many cameras were -- that were ordered, and I don't know

132

the exact amount of the funding that was left, to even do the math just to kind of figure out how many cameras were purchased.

Q. Okay. You do write that the price was discounted. Does that reflect that Flock offered a discount to the NPD to lease additional cameras?

A. Yes. This e-mail -- I would not have spoken to Flock. I don't recall having conversations with Flock after acquiring. This would have been information I got from my Detective Division personnel, probably either the captain or the lieutenant or Lieutenant Barnes, who's directly over the auto squad investigators.

Q. Okay. And when you say "the lieutenant," do you mean Lieutenant Vernon?

A. No. Lieutenant Vernon is under Captain Thomas in the Real Time Crime Center under Strategic Intelligence Division. So it would have been Detective Division lieutenants, which would have been Barnes; at the time, Captain Dixon, or maybe Lieutenant Purnell, in conversation.

Q. Okay. So you go on, "There were supposed

Case 2:24-cv-00621-MSD-RJK    Document 179-6    Filed 11/20/25    Page 36 of 69
PageID# 4644

ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton    34 (133 to 136)
Conducted on July 25, 2025

133

to be an additional 15 cameras proposal."  Correct?

A.  Yes.

Q.  Are you referring to additional 15 Flock cameras there?

A.  I believe I'm talking about the LiveView.

Q.  Okay.  Got it.

MR. SOYFER:  Okay.  We can close out this document.

BY MR. SOYFER:

Q.  So we've spoken before about the Norfolk Redevelopment and Housing Authority, right?

A.  Yes, sir.

Q.  And we discussed that they in fact purchased -- strike that.

They acquired their own Flock cameras, correct?

A.  Yes, sir.

Q.  And those are within the City of Norfolk, right?

A.  Yes, sir.

Q.  Are there any other entities besides the NPD that have Flock cameras in the City of Norfolk?

134

A.  Yes, sir.

Q.  What are they?

A.  My understanding is Norfolk State University has cameras.  And I want to say Lowe's has their own Flock cameras.

Q.  Okay.  How do you know about Norfolk State University's Flock cameras?

A.  I had a conversation with their executive team at -- at Norfolk State.

Q.  Okay.  What -- what were those conversations, generally?

A.  That they have Flock cameras.

Q.  Okay.  Did you make them aware of Flock?

A.  I'm not sure what "aware" is.  I did not set up any meetings, as I did with the Norfolk Redevelopment Housing Authority.  I did not connect them with Flock personnel.  I did not do any of the things that I did with the Norfolk Redevelopment Housing Authority.

Q.  Okay.  So you had kind of -- a much more limited role with them in terms of -- well, actually, strike that.

135

Okay.  And how do you know about Lowe's?

A.  In conversations with Lieutenant Vernon.

Q.  He informed you that Lowe's has Flock cameras?

A.  Yes.

Q.  Okay.  How many Lowe's locations are there in the City of Norfolk?

A.  The only one I can think of is on North Military Highway.  I'm not sure, but I know that there's at least one on North Military Highway.

Q.  Does the NPD have access to information from those cameras?

A.  I believe we do, but I've not accessed it or seen it myself.  I believe we do.

Q.  Okay.  What about the NSU cameras, does the NPD have access to those?

A.  I believe we do, but I haven't seen it myself, so I'm not sure.

Q.  Okay.  I want to talk for a little bit about the NRHA cameras and the -- you know, your role in how the NRHA got those.  So -- but first I want to ask you, you testified earlier the NRHA manages

136

public housing in the City of Norfolk.  Is that right?

A.  Yes.  It's their property.

Q.  Okay.  And obviously those are places -- they're places where people live, correct?

A.  Yes, sir.

Q.  Okay.  How many cameras do they have?  If you know.

A.  I don't know how many they currently have.  I believe, when they were setting them up, it was 18 to 20, if I recall correctly.  I don't know what their numbers are now.

Q.  And the NPD has access to the information from those cameras, right?

A.  Yes, sir.

Q.  How, if you know, did it get access?

A.  Can you repeat that for me, please?

Q.  Sorry.  How, if you know, did it get access to those cameras?

A.  So when the Housing Authority had their cameras set up, Lieutenant Vernon at the time was the Sergeant of the Public Housing Unit, sworn police

officer over that unit, and I want to say he was the administrator for that.

He and I -- well, I was allowed by Karen Rose to be present on the Zooms when -- when she applied her cameras. So I attended a meeting where Flock and NRHA were looking at the cameras to make sure that the sunlight was adequate. They already had their cameras mapped out.

I had asked the security director, Karen Rose, if I could just be involved, because I knew at some point the City would get the cameras, and I just wanted to get ahead of the ball on what was going on so that we weren't learning everything new and I could have some additional information prior to our acquisition of the cameras.

Q. Yeah. Let me just clear a few things up from that answer that I want -- there are just a few things I want to confirm from your answer.

You said Lieutenant Vernon at the time was the Sergeant of the Public Housing Unit. Correct?

A. Yes, sir.

Q. And that's the Public Housing Unit of the Norfolk Police Department, correct?

A. Yes, sir.

Q. Okay. So he was working with the NRHA, but as a Norfolk Police Department employee, right?

A. Yes. The sergeant is the liaison with the Housing Authority.

Q. And when you say he was the administrator for that, what do you mean?

A. He was the administrator for Flock, which means he signed the officers -- I don't know if it's signing them up or gave them access. So he was responsible for all that. I don't know exactly everything that he did, but he was the administrator.

Q. He was the administrator for the NRHA's Flock cameras. Is that right?

A. Yes.

Q. Okay.

A. On our side of the house. I believe they also had a point of contact or administrator, but for the police department, it was -- at the time, Sergeant Vernon, who is Lieutenant Vernon now.

Q. Is it fair to say that the plan all along was for the NPD to have access to the NRHA's cameras?

MS. SOLORIA: Objection. Vague.

THE WITNESS: I don't know if it -- all along, because in the beginning phases, we didn't discuss -- again, the presentation, it wasn't discussed -- "Oh, you know, the police department is going to take over and have his access."

I think his -- as the -- as we went through the process, and I think when they identified that we needed to have an administrator, that's how. I don't know that there was ever any conversation that we would or we would not have access.

BY MR. SOYFER:

Q. Okay. Is it useful for the NPD to have access to the NRHA's Flock cameras?

A. Absolutely. As I described before, the violent crime -- which we, as the police department, are responsible for reducing and eliminating in the public housing communities -- those cameras are on the NRHA's property. So having access to those cameras would be beneficial in helping us try to prevent that violent crime that I was talking about, and save lives.

Q. Okay. It provides additional information for the Norfolk Police Department, correct?

A. I don't understand, "additional information." It would be information from those cameras. So I don't know if it's extra information, but ...

Q. Okay. But those cameras provide information beyond what the Norfolk Police Department's own cameras provide, right?

A. I'm confused. The -- my understanding is the Housing Authority does not have different cameras that provide extra or more in detail. I think they all provide the same information.

And yes, the department has access.

Q. Sorry, my question was a little confusing, so I'll try to clarify it.

Those cameras are at different locations than the NPD's cameras, right?

A. Yes, sir.

ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton
Conducted on July 25, 2025

Q. The NPD doesn't need to have a camera that covers the same locations covered by an NRHA camera; is that fair to say?

A. Yes, sir.

MR. SOYFER: Okay. I'm going to drop what will be Exhibit 47 into the chat.

(Exhibit 47 was marked for identification.)

MR. SOYFER: For the record, this is a document bearing Bates-stamped NORF012942.

BY MR. SOYFER:

Q. And just let me know whenever you have it open.

A. I have it open, sir.

Q. Okay. This is an e-mail from you to Derrick Vernon, with the subject "Meeting Follow Up - Flock Safety," dated July 18th, 2022. Correct?

A. Yes, sir.

Q. Okay. And if you look at the e-mail at the bottom here, you'll see it's from Dan Mento. Right?

A. Yes, sir.

Q. Okay. And if you recall -- so you can see this e-mail's on June 16th, 2022, correct? From Dan Mento?

A. Yes, sir.

Q. And he starts, "I appreciate you and your team taking the time to meet with me today." Correct?

A. Yes, sir.

Q. Okay. And then he provides a bunch of links to various news articles and pieces, right?

A. Yes, sir. This looks similar to one of the documents we already looked -- is this the same e-mail?

Q. Yeah, so that was my -- that was going to be my next question to you, is -- we've already looked at this bottom e-mail from him today, correct?

A. I believe so. It looks very familiar.

Q. Okay.

A. One I've already seen.

Q. And then you -- about five days later, June 21st, 2022 -- respond to his e-mail, and you'll see that you CC Karen Rose. Correct?

A. Yes, sir.

Q. We discussed earlier that she was the public safety director for the NRHA, correct?

A. I think she's the security manager.

Q. Okay. You write, "I am sharing your e-mail with Karen Rose the Security Programs Manager for NRHA." Correct?

A. Yes, sir.

Q. Okay. You write, "Our partners in Norfolk and share our need for security measures in our communities." Do you see that?

A. Yes, sir.

Q. What did you mean when you wrote "our partners in Norfolk"?

A. So anybody that we work with I call "our partners." We've -- we've partnered with NRHA in community engagement, security measures. It's just collaborative efforts to ensure the security, safety of residents, because they're in Norfolk.

Q. Okay. And you go on, "They have some existing cameras." Do you see that?

A. Yes, sir.

Q. Did you mean existing Flock cameras, or some other type of cameras?

A. Other type of cameras. In June of '22, I'm actually setting up the meeting -- in the process of setting up the meeting with Flock Safety and NRHA.

At that particular point in time, NRHA -- and I'm saying that for the Norfolk Redevelopment Housing Authority -- did not have Flock cameras. So I believe what that is about, when I talked about the pricing, where it was 2500 for -- for the cameras, or reduced price of either 14 or 1500 to -- I'm using existing camera. That's what I'm discussing -- what I believe I'm talking about there.

Q. Okay. So you made them aware of Flock cameras around this time; is that fair to say?

A. I made NRHA aware, yes, sir.

Q. Okay. And you were facilitating setting up a meeting between Flock and NRHA, correct?

A. Yes, sir.

Q. And you were doing that because you felt that it would further the NPD's own efforts to make the city of Norfolk safe. Is that fair to say?

A. Not entirely. At I said earlier, I had

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Case 2:24-cv-00621-MSD-RJK    Document 179-6    Filed 11/20/25    Page 39 of 69
PageID# 4647
ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton          37 (145 to 148)
Conducted on July 25, 2025

145

previously set down with NRHA, with Karen Rose, to suggest that they get the LiveView cameras, which were more costly. So I was trying to help them to find a more cost-efficient way that would really impact the violent crime that was occurring to their property. That was the responsibility of not just the Housing Authority, but as -- for the police officers as well.

Q. Okay. So you were working toward a common goal. Is that fair to say?

A. Yes, sir.

MR. SOYFER: Okay. You can set that document aside. I am going to put Exhibit 48 into the chat in just a moment.

(Exhibit 48 was marked for identification.)

MR. SOYFER: For the record, this is a document bearing Bates stamp NORF008412.

BY MR. SOYFER:

Q. Please let me know when you have that open.

A. We have that up.

Q. Okay. You can see this is an e-mail from

146

you to Karen Rose, with the subject "Flock LPR Cameras Inquiry," dated August 5th, 2022. Is that correct?

A. Yes, sir.

Q. If you go to the first-in-time e-mail, which is on the page ending in 83, the second page of the PDF, you'll see that this is an e-mail from you. Correct?

A. Yes.

Q. And we can't see exactly who the e-mail is addressed to, but I think that will become clear in just a moment.

Your first e-mail in this chain is dated August 2nd, 2022, right?

A. Yes, sir.

Q. You write, "I am working in conjunction with NRHA to get LPR cameras installed within their communities." Do you see that?

A. Yes, sir.

Q. And is it correct that on August 2nd, 2022, you were working in conjunction with NRHA to get LPR cameras installed within their communities?

147

A. I think I need to explain what "conjunction" means. I didn't acquire cameras. I didn't have the funding. I was just working alongside because of the partnership, so questions that -- that are being asked in this e-mail would be questions that maybe NRHA's asking me, and I'm just trying to facilitate those answers.

But I did not do anything -- depending on what you -- you think "conjunction" means, I didn't plot the cameras. I didn't pay for the cameras. I didn't decide how many cameras they would have in their -- around their communities.

Q. Okay. But you were helping them to get answers from the City to some of their questions about where they could install cameras. Is that fair to say?

A. Yes, sir.

Q. Okay. And you'll see that someone named Freda Burns responds to your e-mail, right?

A. Yes, sir.

Q. And what was her role?

A. So Freda Burns is the right-of-way and

148

development administrator for the City of Norfolk.

Q. Okay. And so she had some role in approving the camera locations; is that fair to say?

A. I don't think that's fair to say. I don't think she approved the locations. I think she gave permission if they wanted to put a camera at a certain location.

Q. Okay. Did the City have to give the NRHA permission to place some of its cameras in their ultimate locations?

A. I'd have to refer to this e-mail. Because I -- I don't -- I don't recall if they needed actual permission. But according to my e-mail, looks like the information I may have received was they need to send the request to the City manager's office for a license agreement to install equipment on the City's right-of-way.

Q. Okay. And that was information that you got from them -- strike that.

That was information you got to help them along in this process; is that right?

A. Yes, sir.

Case 2:24-cv-00621-MSD-RJK   Document 179-6   Filed 11/20/25   Page 40 of 69
PageID# 4648
ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton                38 (149 to 152)
Conducted on July 25, 2025

149

Q. Okay. Was there anything else you did to help them get the -- strike that.

Was there anything else you did to help them acquire or install the cameras?

A. I -- I don't know that I -- I helped them. I provided the information they needed, like I would have done with anybody else asking questions.

I pretty much was in the meetings, but I didn't -- I didn't make any decisions about their equipment, anything that they did. I may have been in the virtual -- the virtual meetings, to see how the process worked. But in the mapping meeting, I may have -- looking at the map on Google, because I had the perspective of actually being on the ground, where Flock representatives can only see the Google imaging, I may have given them some input on that, because I'd actually been in those locations. But I was not the one who put forth any -- any of the pertinent parts to get the cameras. I was just present and giving them the information that was asked of me.

Q. Okay. Thank you.

150

MR. SOYFER: You can set that document aside.

I'm going to put in the chat what has previously been marked as Plaintiffs' Exhibit 11.

(Exhibit 11 was previously marked for identification.)

MR. SOYFER: For the record, this is a document bearing Bates stamp NORF019435.

BY MR. SOYFER:

Q. Let me know when you have that open.

A. It is open.

Q. Okay. You'll see that the -- the top e-mail is from Derrick Vernon to Karen Rose. The subject is "Camera Access Request from Chesapeake VA PD," and it's dated November 11th, 2022. Correct?

A. Yes, sir.

Q. Okay. If you go down two e-mails in this chain, about the bottom third of the page, you'll see that there's an e-mail from you to Karen Rose. Right?

A. Yes, sir.

151

Q. Okay. And then I just want to go down to the next e-mail, right before that.

A. Yes.

Q. And you'll see Karen Rose writes, "Hello and good morning. I am approving Chesapeake's request. I am considering adding Derrick as an administrator if he wants. Your thoughts? I think it's advantageous to have someone from NPD for communication among police departments." Do you see that?

A. Yes, sir.

Q. Okay. Do you have an understanding of why she thought it was -- well, let me ask you: What did she mean when she says "communication among police departments"?

A. I'm not sure what she means. I don't -- I don't know what -- what she would mean.

Q. Okay.

A. Her thoughts.

Q. So you -- one e-mail up, you'll see that you respond. And you write, "Absolutely. I think that is a great idea." Did I read that correctly?

152

A. Yes, sir.

Q. Okay. Why did you think that was a great idea?

A. What I thought was a great idea was adding Derrick, who -- who at the time was Sergeant Vernon, as an administrator.

Q. And why?

A. Because then it gives us a -- like a liaison, or a person in between, so that you don't have officers just doing whatever. There should -- I feel there should always be a point of contact, especially when you're dealing with outside organizations, or you're dealing with two different organizations, or what have you.

MR. SOYFER: Okay. You can set that document aside.

BY MR. SOYFER:

Q. So we talked about Norfolk State University a little bit earlier, correct?

A. Yes, sir.

Q. As an entity in the City of Norfolk that has Flock cameras, right?

Case 2:24-cv-00621-MSD-RJK    Document 179-6    Filed 11/20/25    Page 41 of 69
PageID# 4649

ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton    39 (153 to 156)
Conducted on July 25, 2025

153

A. Yes, sir.

Q. Okay. And just to be clear, for the record, you can also refer to Norfolk State University by the acronym "NSU," right?

A. Yes, sir.

Q. Okay. Is that part of the City of Norfolk's city government?

A. I'm confused. Norfolk State has their own police department. We have shared jurisdiction.

Q. Okay. But they're an independent entity from the City of Norfolk. That's all I'm trying to clear up.

A. Yes, sir.

MR. SOYFER: Okay. I'm going to put another exhibit in the chat. This will be Plaintiffs' Exhibit 49.

(Exhibit 49 was marked for identification.)

MR. SOYFER: For the record, this is a document bearing Bates stamp NORF005746.

BY MR. SOYFER:

Q. Let me know whenever you have that open.

A. Yes, sir.

154

Q. So this is an e-mail from Brian Covington to you, with the subject "Flock Presentation," dated May 31st, 2024. Is that correct?

A. Yes, sir.

Q. Let me just ask you first: Who is Brian Covington?

A. He is the Chief of Police at Norfolk State University.

Q. And how, if at all, have you worked with him, just thinking over your past few years of your time as Assistant Chief of Police?

A. How -- I worked -- I mean, we have crimes that interlock. We assist with their homecoming parades. We have a very cohesive and -- and collaborative relationship, because we have shared jurisdiction. When there's certain violent crimes that happen on their campus, jurisdiction that we take the lead on it. For example, they had a homicide on their campus that we worked hand in hand with them so that they could also have the information and utilize like their technology to help solve those crimes.

155

So we have a very good working relationship with Norfolk State University.

Q. Okay. I want to start with the first-in-time e-mail in this chain, which begins at the bottom of page 2. This is the Bates stamp ending in 47, and goes on to page 3. Let me know when you're there.

A. I'm there.

Q. Okay. You can see this -- that's an e-mail from Katie Ward to you, dated May 29th, 2024. Right?

A. Yes, sir.

Q. Who is Katie Ward?

A. I thought we discussed earlier that she is an employee of Flock Safety.

Q. And -- okay. Sorry if I forgot that. Is she someone you -- you've worked with regularly?

A. I don't recall her -- her face or her imaging. We may have e-mails, exchanges through e-mail. I'm not sure if she was on those Flock presentations. It's been three years. I'm -- I'm

156

not sure.

But I see that she sent me at least two or three e-mails, though.

Q. Okay. And you'll see that she sends you a Google Docs link, if you turn to the next page, correct?

A. Yes, sir.

Q. Okay. And her -- the subject of her e-mail is "Flock Presentation," right?

A. Yes, sir.

Q. And there's -- there's no other text in the e-mail, correct?

A. That is correct.

Q. Okay. And then you forward that to Chief Covington, and you write, "The presentation link is attached. Please let me know if you cannot open and I will scan you a copy of the PowerPoint." Do you see that?

A. Yes, sir.

Q. Why did you forward this presentation to Chief Covington in May 2024?

A. I believe he may have asked about the

157

presentation, or asked about Flock.

Q. Okay. And you wanted to provide this information to him? Is that fair to say?

A. Absolutely. He's the Chief of Police. If he asks me for something, I'm going to provide it.

Q. Okay. And did they subsequently acquire or lease Flock cameras, the NSU police?

A. They have Flock cameras now. I don't know when they acquired it. I don't know who set it up or how that process went through. I didn't -- like I said, I didn't sit on any of their meetings like I did with NRHA.

Q. Okay. And so sitting here today, you think your role was pretty much limited to forwarding this presentation link to Chief Covington, correct?

A. As best as I can recall as I sit here, yes.

Q. Okay. Understood.

So, earlier you mentioned Lowe's has Flock cameras at at least one location in the City of Norfolk, right?

A. That is correct.

158

Q. Okay. And forgive me if I've just forgotten, but does the NPD have access to Lowe's cameras?

A. Yes.

Q. Okay. And how did that happen?

A. That would be a question for Lieutenant Vernon. I don't -- I don't -- I don't approve them, or give anyone access to the cameras, so I'm not sure how that went down.

Q. Okay. I can maybe help refresh your memory, I hope.

A. Okay.

MR. SOYFER: I'm going to put another exhibit into the chat. This will be Plaintiffs' Exhibit 50.

Or -- oh, I'm sorry about that. Strike that.

This has been previously marked as Plaintiffs' Exhibit 22.

(Exhibit 22 was previously marked for identification.)

159

BY MR. SOYFER:

Q. And that should pop up in a moment. And just let me know when you can see it.

A. I can see that.

Q. Okay. So this is an e-mail from Raoul Alvarez to you, copying Amanda Harvey, with the subject "Lowe's Now Sharing Their Cameras," dated March 5th, 2024. Do you see that?

A. Yes, sir.

Q. And if you just look at the first-in-time e-mail here, which is quite long, but -- it starts on the page ending in 43. It's an e-mail from Brian McKenzie at Flock Safety to Raoul Alvarez, with the subject "Lowe's Now Sharing Their Cameras." Correct?

A. Yes.

Q. Okay. And you'll see that he writes, "We are assisting in a process, in coordination with Lowe's, to provide agencies around the country with access to Lowe's camera for search capabilities as a part of their nationwide rollout." Do you see that?

A. Yes, sir.

Q. Okay. And then if you look at the -- the

160

rest of his e-mail -- I won't read the whole thing, but generally, he's describing a process for the NPD to get access to Lowe's cameras. Is that correct?

A. Yes, I was reading it. I'm sorry.

Q. Okay. Yeah, no problem.

You'll see that Captain Alvarez forwards that e-mail to you, right?

A. Yes, sir.

Q. Okay. And he writes, "Please see the below e-mail from Flock in reference to Lowe's. This is an agreement that they have worked out with Lowe's corporate to allow agencies around the country to access their cameras as donor sites." Did I read that correctly?

A. Yes, sir.

Q. What does he mean when he says "donor sites"?

A. So donor sites is a -- and I don't want to get it mixed up -- I don't know the true definition, because we can have our cameras and we can have donor sites where we're able to see the cameras. I believe that they control how much access we have, but I'm

Case 2:24-cv-00621-MSD-RJK   Document 179-6   Filed 11/20/25   Page 43 of 69
PageID# 4651
ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton         41 (161 to 164)
Conducted on July 25, 2025

not completely sure on everything with the donor sites.

Q. Okay. They're locations where the NPD has some level of access to cameras that are leased by third parties. Is that a fair description?

A. Yes.

Q. And he's calling them "donor sites" because the NPD doesn't pay for those cameras, despite having access; is that fair?

A. I believe that's the terminology from Flock, that they're donor sites. I'm not sure. I don't know why exactly they're donors. I don't recall. I know I've seen some paperwork on it, but I don't recall at this time why exactly they're considered donor sites. But they're --

Q. Why don't --

A. They're cameras that are owned by the City.

Q. Sorry for interrupting you.

Why did Captain Alvarez forward this e-mail to you?

A. So at the time, Captain Alvarez was the Captain of the Strategic Intelligence Division, which is what Captain Thomas is now. So he would have reported directly to me.

Q. Okay. And so was he sending this to you for approval, for some other reason? Just an FYI?

A. It looks like -- more like an FYI, because there's nothing that he's asking from me. Amanda -- you can see Amanda Harvey is cc'd. She's the Chief's assistant. So it doesn't look like there's any -- any actionable response he needs from me.

Q. Okay.

A. Unless I'm missing something.

Look down here . . .

MR. SOYFER: Okay. You can set that document aside. I'm going to put Plaintiffs' Exhibit 50 in the chat in just a moment.

(Exhibit 50 was marked for identification.)

MR. SOYFER: For the record, this is a document bearing Bates stamp NORF014125.

BY MR. SOYFER:

Q. Let me know when you have that open.

A. We have it open.

Q. Okay. So this is an e-mail from Derrick Vernon to you, copying Greg Sheehan and Raoul Alvarez, with the subject "The Home Depot Camera Share Program." And it's dated November 13th, 2024. Correct?

A. Yes, sir.

Q. Okay. If you look at the bottom e-mail here -- let me just ask you first: Do you know who Greg Sheehan is, independent of this e-mail?

A. No, sir, I -- I don't know if I know him. His name doesn't ring a bell. I see he works for Flock Safety, but . . .

Q. Okay. And then you'll see he writes, in the second paragraph of his e-mail, "I am now assisting in a process, in coordination with the Home Depot, to provide law enforcement agencies with access to the Home Depot's camera networks for both search and hotlist capabilities as a part of their Flock Safety rollout. Access will only be granted to camera networks located within your state." Did I read that correctly?

A. Yes, sir.

Q. How -- how many Home Depots are there in the City of Norfolk, to your knowledge?

A. I believe just one, also on North Military Highway, in close proximity to Lowe's.

Q. Okay.

A. It's the only one I can think of.

Q. Does seeing this e-mail refresh your recollection at all that the NPD has access to cameras at -- at least at Home Depot?

A. It's possible. I don't remember this e-mail, but I see that it was forwarded to me for information.

Q. Okay. If you go to the next page, you'll see that Mr. Sheehan lays out a process for getting access. And he writes, "Law enforcement agencies will be granted access to the Home Depot's camera networks located within their state by simply following these steps." Do you see that?

A. Yes, sir.

Q. Okay. And the first step is "Forward this e-mail to the head of your law enforcement agency (Chief, Sheriff, Commissioner, et cetera)." Correct?

**165**

A. Yes, sir.

Q. And then the second is "Include me, your agency's customer success manager, as a recipient in the forwarded e-mail, listed in either the 'To' or 'CC' caption." Do you see that?

A. Yes, sir.

Q. Okay. And next he writes, "Once I have received the forwarded e-mail your agency -- listing your agency head as a recipient I will confirm that the below details explaining the Home Depot camera share program's parameters were included." Do you see that?

A. Yes, sir.

Q. He writes, "No further action is required on your part." Do you see that?

A. Yes, sir.

Q. Okay. And then the -- the last step, he writes, "The process will then move forward and your agency will be granted access as soon as possible. Please be patient with this process as there are many law enforcement agencies participating and camera networks involved." Do you see that?

**166**

A. Yes, sir.

Q. Okay. And then his final note here is just not to change the contents of the e-mail or the "Subject" line. Correct?

A. Yes, sir.

Q. Okay. And if you go up to the top e-mail, from Lieutenant Vernon to you, you'll see that he writes, "ACOP Naughton, Please see the attached e-mail that will allow us access to Home Depot's Flock cameras." Did I read that correctly?

A. Yes, sir.

Q. Okay. And then he writes, "There is no additional action required according to the instructions provided." Correct?

A. Yes, sir.

Q. Okay. And so does that mean that your approval here or your receipt of -- well, strike that.

Having read the instructions that Flock provided, Derrick Vernon is signaling that forwarding this e-mail to you is sufficient to gain access; is that right?

**167**

A. I don't understand, because the instructions say, to the law -- the head of the law enforcement agency. I am not the head of the law enforcement agency.

Q. Okay. Got it.

Okay. You can set that document aside.

Are you aware of any homeowners' associations in Norfolk that have Flock cameras?

A. I'm only aware -- and I think it's Lochhaven -- wanted to acquire Flock cameras.

Q. Did they acquire a Flock camera?

A. I'm not sure.

Q. Okay. How were you aware of that?

A. I saw e-mails where they were, I think, trying to get approval or something from the City to acquire, I think, two cameras in their community. The Civic League was, I believe it was.

Q. Sorry, I think you -- you just froze for me. I'm not sure if I froze on your end.

MS. SOLORIA: Yeah. If you said something, please repeat it. I think we lost you for a second there.

**168**

MR. SOYFER: Okay.

BY MR. SOYFER:

Q. Yeah, I think you said it was the Civic League; is that right?

A. I believe it was the Lochhaven Civic League that was --

Q. Okay.

A. -- attempting to get Flock cameras.

Q. Any other community associations?

A. That's the only one that I recall. I'm not sure.

Q. Does Ghent Square ring a bell?

A. I don't remember Ghent Square. I -- I remember Lochhaven.

Q. Any property management companies, apartment complexes, anything like that?

A. To acquire Flock cameras? I'm not sure of that. Those requests would most likely have went through either Captain Thomas or Lieutenant Vernon. There may be instances where I was copied on it, but I don't recall off the top of my head exactly which entities wanted Flock camera, outside of Lochhaven,

ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER

Transcript of Assistant Chief Michele Maria Naughton          43 (169 to 172)

Conducted on July 25, 2025

because I remember reading those e-mails.

Q. Okay. Does the NPD have written policies for the use of Flock cameras?

A. Yes.

Q. How many written policies has the NPD had?

A. I recall a special order and a general order.

Q. Okay. Can you explain to me the difference between a special order and a general order?

A. The general order has to go through a process with approval outside of the organization; the special order does not. That's my understanding.

Q. Okay. Officers are expected to follow both a special order and a general order, correct?

A. Yes, sir.

Q. Okay. Is a special order something that's more temporary, or intended to be a stopgap, anything like that?

A. It can be, yes, sir.

Q. Okay. When was the Flock -- scratch that. When was the special order created?

A. I don't recall the date off the top of my head. I would have to look at it and look -- look at the document, and I could tell you the date on it.

Q. Okay. What about the general order?

A. The general order is more recent. I couldn't tell you the exact dates. It's either end of June, right before July 1, is I believe when it went into effect.

Q. Okay. What was your role in drafting the special order?

A. I did not draft the special order. It was -- I want to say drafted by -- I believe Lieutenant Thomas. I did have an opportunity to look at it, and I did send an e-mail back on some -- some things that I thought needed to either be included or changed, or some -- I did provide some feedback.

Q. Okay. And what were those things?

A. I don't recall them off the top of my head. I sent an e-mail. This would have been some time ago. I couldn't tell you exactly what I put in the e-mail.

Q. Okay. Did you have any meetings with Captain Thomas about the special order?

A. I may have sat in a couple of meetings, I want to say, during that time -- I believe it was all before August of 2023, where I was the Field Operations Chief. Like I said, because I felt like it would involve my officers, I asked to be included.

I wouldn't have sat in every single meeting. As I was notified or available, I probably would have sat in meetings, but I don't believe that I crafted the general -- the special order. Like I said, I might have provided feedback, but I did not create or craft the initial special order.

Q. Okay. What about the general order, what was your role in the creation of that?

A. I may have had some input. But when this -- when the order came out recently, I didn't do anything to the order when it -- when it recently came out, other than read it and acknowledge it.

Q. Okay. Did you attend meetings?

A. For the general order, I don't recall that I did. There may be -- there may be e-mail communications, because the general order would have started under Captain Alvarez, when the Strategic Intelligent Division was created. That's where the Real Time Crime Center falls underneath. So I may have been sending him e-mails to -- to give me progress updates on it, or where the general order -- initially the first -- initially, I probably would have seen a draft, but I did not do anything with the order that came out recently.

Q. When was the Strategic Intelligence Division created?

A. Sometime around, if I'm correct, August of 2023, when I took over as the Investigative Chief.

Q. Okay. And so your recollection is the general order was started around that time?

A. I don't believe it was started. I don't remember exactly when -- there might have been conversations about getting it up and running, but the special -- the special order in place for Flock would have given them some type of guidelines.

So I don't -- I don't recall exactly the -- the milestones or the -- the timetables, or where it was at and where it -- where it went or --

Case 2:24-cv-00621-MSD-RJK    Document 179-6    Filed 11/20/25    Page 46 of 69
PageID# 4654
ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton                44 (173 to 176)
Conducted on July 25, 2025

173

that.

Q. Okay. How long did it take to draft the general order?

A. I don't know.

Q. Okay. Did you review the special order after it went into effect?

A. Yes.

Q. Were you ultimately responsible for ensuring compliance with the special order, as Assistant Chief of Police?

A. No, that -- that responsibility, my responsibility is to make sure -- each officer has to review it and sign off on it, in a system called PowerDMS. Commanding officers are responsible for making sure their personnel do that. So I'm not responsible for the entire department reviewing those orders and signing off on them, no.

Q. Okay. Did you -- did you understand what the special order required, after you reviewed it?

A. When I read it? I did read it, and I had an understanding when I read it. I -- I don't memorize the special orders. There's -- there's

174

general orders; there's police officers' manual. It's accessible to all officers so that you don't have to remember it.

So if I have questions, or I have concerns, or I want to see if -- if somebody's in compliance, I can always pull the order up and look at it to ensure. So I don't have them memorized. There's a lot of orders.

Q. Yeah, I'm sure.

Did you -- did you reach out to anyone with questions about it after you reviewed it, anything like that?

A. After I sent the e-mail? Is that what you're asking me? Or before I sent the e-mail?

Q. No, after the policy was finalized and you reviewed the final policy, did you reach out to anyone about, you know, questions you might have had, clarifications you wanted, anything like that?

A. I don't recall. I don't know the dates of when it was -- when it was finalized. Like I said, I remember sending an e-mail to --

Q. Okay.

175

A. -- to the Deputy Chief, but I don't know the dates, to say whether it was before or after.

Q. Okay. And so I'm not asking if you memorized it, but just -- you felt you understood what the policy required. Is that fair to say?

A. Yes.

MR. SOYFER: Okay. I'm going to drop into the chat what's previously been marked as Plaintiffs' Exhibit 25.

(Exhibit 25 was previously marked for identification.)

BY MR. SOYFER:

Q. Please let me know when you have that up. But for the record, this is a document bearing Bates stamp NORF017584.

A. Oh, I'm sorry. We have it up.

Q. Okay. Great. So you can see this is an e-mail from Amanda Harvey to you, with the subject "Flock SO," dated October 22nd, 2024. Correct?

A. Yes, sir.

Q. And you'll see there's an attachment titled "SO_23-002_Flock_Safety_(7-25-23).pdf."

176

Correct?

A. Yes, sir.

Q. And then if you turn to the next page, you'll see that this is a signed copy of "Operational Special Order - 23-002: Flock Safety." Correct?

A. Yes, sir.

Q. This is the Flock Safety special order that we were just discussing, correct?

A. Yes, sir.

Q. It's signed by Mark Talbot, Chief of Police, correct?

A. Yes, sir.

Q. And the date is July 13th, 2023. Right?

A. Yes, sir.

Q. Do you know if July 13th, 2023, is before or after the Flock cameras had been installed and were in operation?

A. I don't know the exact date. I don't know.

Q. I want to turn back to the cover e-mail, because I have just one question for you about this.

So we saw that the special order is from

Case 2:24-cv-00621-MSD-RJK    Document 179-6    Filed 11/20/25    Page 47 of 69
PageID# 4655
ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton
Conducted on July 25, 2025
45 (177 to 180)

**177**

July 2023.  Right?

A.  Yes, sir.

Q.  Okay.  And Ms. Harvey is sending it to you on October 22nd, 2024, right?

A.  Yes, sir.

Q.  Why is she sending it to you on this date?

MS. SOLORIA:  I'm just going to -- I'm not sure; I'll let Chief respond.  But I want to advise you to the extent that there are communications between you and -- and an attorney, not to discuss the contents of those discussions.

THE WITNESS:  I don't -- I don't remember why she sent it to me.

BY MR. SOYFER:

Q.  Okay.  If I -- if I represent to you that that is the day after we filed this lawsuit, does that jog your memory at all?

A.  No.

Q.  Okay.  So turning back to the policy, I have a few questions about the policy for you.

A.  Yes, sir.

**178**

Q.  Okay.  So if you go down to Section II, you'll see the section is entitled "Procedures."  Correct?

A.  Yes, sir.

Q.  Okay.  And subsection B of Section II states, "Patrol officers are required to sign in to Flock safety and utilize the technology throughout their entire shift."  Do you see that?

A.  Yes, sir.

Q.  And that is in all bold.  Correct?

A.  Yes, sir.

Q.  And why were patrol officers required to sign into Flock Safety and utilize it throughout their entire shift?

A.  There was nothing given to us.  My -- my interpretation and understanding is because Flock does alert on stolen autos, officer safety.  If a vehicle passes through a Flock -- not just stolen autos, but violent crimes, the vehicles that are listed in Flock -- if a vehicle passes through the Flock camera and the image is captured and the officer knows that that vehicle is in the area and

**179**

they're not logged in to Flock, they would never know.

So it's also an officer safety component.  It falls right into ensuring that we are providing the services to our communities, to ensure that they have the information.  We want to have a -- very knowledgeable patrol officers out there, so that they're not blindly walking into any violent encounters or pulling over a vehicle that they may not have known was stolen.

If they're in the area, then it gives them more awareness of what they're looking for.  It's -- it's a tool for them.

Q.  Okay.  So let's look at subsection C.  This states, "Flock Safety is to be utilized by personnel for law enforcement purposes only."  Do you see that?

A.  Yes, sir.

Q.  What does "law enforcement purposes" mean here?

A.  My understanding, for your official capacity as a law enforcement officer,

**180**

investigations, criminal activity, reasonable suspicion, things that you would utilize -- VCIN, or NCIC -- or not for your personal knowledge, not to look up somebody that you want to -- you want to find out where they're at.  It's for law -- you have to have a legitimate reason -- for law enforcement purpose, criminal activity, criminal investigations -- to use it like we use any of our other databases, such as LInX.  You -- LInX, you have to use for law enforcement purposes, not for your own personal information or knowledge.

Q.  Got it.  And so is your expectation that all of the law enforcement officers under your purview would know what this provision means?

A.  I'm not sure what they would know.  But I believe law enforcement officers would know what a law enforcement purpose is.

Q.  Okay.  Does anything in the special order require officers to get a warrant before they search within the Flock system?

A.  If you don't mind, I'll quickly just double-check.  Like I said, I don't have it

Case 2:24-cv-00621-MSD-RJK   Document 179-6   Filed 11/20/25   Page 48 of 69
PageID# 4656
ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton       46 (181 to 184)
Conducted on July 25, 2025

181

memorized. I don't believe it's there, but I want to just double-check.

Q. Of course.

A. Too bad I can't search by words.

I don't see anything in this special order saying you need a warrant.

Q. Does anything in this special order require officers to have probable cause to search the system?

A. While the words "probable cause" is not in the -- the special order, probable cause does fall into law enforcement purposes.

Q. Okay. So is it your testimony that II(C) requires probable cause in order to perform a search?

A. No, that's not what I'm saying. I'm saying --

Q. Okay.

A. -- it's included. It's not a requirement. But "law enforcement purpose" would -- for me to do something law enforcement, I could have reasonable suspicion. I could have probable cause. So I'm saying because the words "probable cause" is not

182

listed in the actual wording, that probable cause falls into law enforcement purposes.

Q. Okay. So you can search the system if you have probable cause; but the special order does not require probable cause before searching the system. Is that fair to say?

A. I'm -- I think I'm confused. You have to comply with the order. But probable cause is not -- I'm not saying it's standing in and of its own. You still have to comply with the order. Probable cause is going to fall into -- stolen vehicles, for it to be stolen, there was probable cause to put it in there. Child abduction.

So I'm saying probable cause as a component, not as -- if it's standing and the only requirement for the special order.

Q. Okay. But it's not -- just to be clear, there is no requirement in the special order that an officer have probable cause before searching the system?

A. Correct. Only probable cause, correct.

Q. And there is no requirement in the special

183

order that an officer have reasonable suspicion before searching the system, correct?

A. I'm going to yield to what I said about probable cause. A be-on-the-lookout typically has reasonable suspicion.

Q. Okay. And if you look at the -- so are you looking at Section II(H) there?

A. Yes, I'm looking at that.

Q. Okay. And you can see that that section is about entering information into custom hotlists. Correct?

A. Yes, sir.

Q. Okay. That section is not about just searching for vehicles within the Flock system, right?

A. Correct.

Q. Okay. You -- well, keep that document open for a moment, in case you want to consult it. But do -- when the special order was in effect, so before the general order, during the time the special order was in place, did officers have to enter reason for each search of the Flock system?

184

A. I don't recall. Like I said, I've only used the system once. I can look at the order and see if it -- I don't think I saw it in here. I've only used the system once. I don't recall if that's what I put in, so I'm not sure.

Q. Okay. Are you aware of any audits of the reasons officers search the system being performed while the special order was in effect?

A. I was not.

Q. Okay. Are you aware of them being performed since the general order has been in effect?

A. The general order that came out on July 1?

Q. Yes.

A. I have not seen an audit in the 25 days the order has been in effect.

Q. Okay. Let me ask you --

A. I'm sorry. I'm not aware, I meant to say. I'm sorry.

Q. Okay. Let me just ask you this, to be clear: The general order superseded the special order, right?

A. Yes, sir.

**185**

Q. Okay. Do -- do patrol officers require any prior approval from anyone before they can search the Flock system?

A. I'm not sure I understand the training, because they have to have access first. So I'm not sure what -- what approval, and if it's something that's in the new general order. Like I said, I didn't -- it's ten pages. I did not remember it. So if I'm able to look at it, maybe I can answer that question better for you.

Q. Yeah, I'm asking about -- for right now, I -- I'm sorry; I was a bit unclear. For right now, I'm still on the time period when the special order was in effect.

During the time the special order was in effect, for a patrol officer in the field, let's say, to run a search within Flock, did they need prior approval from anyone?

A. I don't think I understand the question. If the order says they have to log in to it, I don't believe -- I've only used it once. I don't believe there's an approval to --

**186**

Q. Okay.

A. -- to use the system.

Q. So let me -- maybe if I can make it a little bit more concrete, it'll be easier to understand.

So an officer has a username, a login, they've been all set up, they've been approved to be in the system. They're in their police car. They're logged in. They see a license plate pass, and they want to look up where that vehicle has been for the last 30 days, in the Flock system, or where the vehicle has been seen for the last 30 days, in the Flock system. Are you with me so far?

A. I am, but you -- you haven't given me a reason other than they just want to look up somebody.

Q. Okay. Let's suppose -- let's suppose they think the person is a gang member, and they want to look them up. Can they go search for that person's license plate, and see every entry in Flock for the last 30 days, without someone else in the department approving that beforehand?

MS. SOLORIA: Objection. Incomplete

**187**

hypothetical. Calls for speculation.

You can answer.

THE WITNESS: Because they -- I would say being a gang member is not a criminal offense. If you're asking me if they have a law enforcement purpose to run that tag, do they need somebody else to say "You can run it"? No, they put the information in and run it, if they've been through the training, and they have the password, and all of those things.

MR. SOYFER: Okay. Let's -- you can close that out.

MS. SOLORIA: Michael, before you switch gears, can we get just a short break?

MR. SOYFER: Of course.

Let's go off the record.

VIDEOGRAPHER: We're going off the record, and the time is 1:52 p.m.

(A recess transpired from 1:52 p.m. until 1:58 p.m.)

VIDEOGRAPHER: We're back on the record, and the time is 1:58 p.m.

**188**

BY MR. SOYFER:

Q. Okay. Chief Naughton, you know the drill by this point, but -- we just came back from a break. You understand you're still under oath, correct?

A. Yes, sir.

Q. Okay. Great.

MR. SOYFER: I just put in the chat what has previously been marked as Plaintiffs' Exhibit 8.

(Exhibit 8 was previously marked for identification.)

MR. SOYFER: And for the record, this is a document bearing Bates stamp NORF021152.

BY MR. SOYFER:

Q. Let me know when you have that open and you've had a chance to take a look at it.

A. I have it open, and I've briefly looked at it.

Q. What is this document?

A. This is a departmental memo notifying the organization of the general order for Flock Safety ALPR system.

ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton    48 (189 to 192)
Conducted on July 25, 2025

189

Q. Okay. And you can see --

A. The general --

Q. Sorry.

A. The general order's attached. I'm sorry.

Q. Okay. No problem.

Okay. And so if you turn to the second page, this is the general order that we've referenced a few times today. Correct?

A. Yes, sir.

Q. Okay. You reviewed this to prepare for your deposition today, correct?

A. I read this when it initially came out. I reviewed it a couple of days ago. I've only looked at it twice.

Q. Okay. You read this when you came out in your capacity as Assistant Chief of Police, correct?

A. I read it in my capacity as an officer on the department, because we all have to read them when they come out.

Q. Okay. And you'll see this is signed by someone from the City Attorney's Office, correct?

A. Yes, sir.

190

Q. Okay. And that's Ms. Soloria, who's the attorney sitting to your right today, correct?

A. Yes, sir.

Q. It's also signed by the City Manager/Director of Public Safety, correct?

A. Yes, sir.

Q. And approved by the Chief of Police, right?

A. Yes, sir.

Q. You'll see it in the -- in that same sort of box, sort of in the middle, on the right side, there's a "Prescribed Date." Do you see that?

A. Yes, sir.

Q. And that -- what is the prescribed date?

A. I'm not exactly sure what that means.

Q. Is it the date when this went into effect?

A. I don't know what the prescribed date is. I generally look at the date of issue on the bottom of the pages in the order.

Q. Okay. Got it. And the date of issue is the same as the prescribed date, correct?

A. Yes, sir.

191

Q. And once this order is issued, the officers in the department have to follow it. Is that fair to say?

A. Yes, sir.

Q. Okay. So I have a few questions about this order. I don't have questions about every single part of it; I know earlier you referenced this order is ten pages long, correct?

A. Yes, sir.

Q. Okay. And so it's -- it's quite a bit longer than the special order, isn't it?

A. Yes, sir.

Q. Okay. I'd like to turn to the page ending in 55 at the bottom right.

A. Yes, sir.

Q. Section Roman numeral II, entitled "Responsibilities." Are you with me?

A. Yes, sir.

Q. Okay. And then I want you to turn one more page, to the page ending in 56.

You'll see that there's a subsection under Roman numeral II, capital E. Let me know if you're

192

with me.

A. Yes, sir.

Q. Okay. And this states, "NPD Flock Safety ALPR system administrators will be responsible for adding personnel as system users, reviewing data sharing requests with other jurisdictions for acceptance or approval, and conducting an audit of the Flock Safety ALPR system every 30 days." Do you see that?

A. Yes, sir.

Q. Who are the NPD Flock Safety ALPR system administrators?

A. I believe it might be Sergeant Gauthier and Lieutenant Vernon, if -- if I'm correct.

Q. Okay. And we covered this earlier, but just to make sure: What involvement, if any, do you have in that last part, conducting an audit of the Flock Safety ALPR system?

A. I don't have the involvement of conducting the audit. I don't do the audits. I'm not even in the system.

Q. Okay. Do you have any involvement

Case 2:24-cv-00621-MSD-RJK   Document 179-6   Filed 11/20/25   Page 51 of 69
PageID# 4659
ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton
49 (193 to 196)
Conducted on July 25, 2025

193

whatsoever in the audit process?

MS. SOLORIA: Objection. Asked and answered.

BY MR. SOYFER:

Q. Well, I -- you testified that you don't conduct the audits. And like beyond conducting, I'm just wondering, are you -- do you review the results? Do you have any other involvement in the audit process, other than conducting the audits yourself?

A. There's no requirement that I recall in the order that says I can, but because the Real Time Crime Center falls underneath me, I do have the ability to ask for the audits and to ensure that they're doing them.

Q. Okay. But that's not something you've done to date. Is that right?

A. That is correct, because it says 30 days. We are 25 days in.

Q. Okay.

A. We haven't met the threshold yet.

Q. Understood. Will you ask for that when you hit the threshold? Is that your plan?

194

A. Yes.

Q. Okay. So let's look under section Roman numeral III, "Permitted Uses" and "System Access." You'll see that there's a subsection, capital A, entitled "Permitted Purposes." Right?

A. Yes, sir.

Q. Okay. And then subsection numeral 1, underneath that, states, "The Flock Safety ALPR system, including downloads, queries, and hotlists, may be used only in the following circumstances per Virginia law."

And then that's followed by three further subsections. Do you see that?

A. Yes, sir.

Q. Okay. And that that provides three purposes for which the Flock Safety ALPR system may be used within the Norfolk Police Department, right?

A. Yes, sir.

Q. Okay. And "a" is "As part of a criminal investigation into an alleged violation of the Code of Virginia, or any ordinance of any county, city, or town where there is reasonable suspicion that a crime

195

was committed." Did I read that correctly?

A. Yes, sir.

Q. Okay. Could an officer, under that subsection, perform a search based on reasonable suspicion of a violation of federal law?

A. By the letter of the order, it does not say federal law.

Q. Okay. And is that your understanding, that it excludes federal law?

A. Yes.

Q. Okay. When it says "reasonable suspicion" -- well, let me ask you this: Just tell me your understanding of what reasonable suspicion is.

A. That there's some -- I don't know the -- I don't -- I can't regurgitate what reasonable suspicion's legal definition is. But it's less than probable cause, and I know probable cause is where the facts and circumstances within a person's knowledge or -- or of which he has probable cause to believe that a crime has occurred.

It's less than probable cause, but it's

196

more than nothing.

Q. Okay. And so when an officer has reasonable suspicion that a crime was committed -- I just want to understand how this would play out in the real world -- or your understanding of how this would play out in the real world.

So, you know, an officer has reasonable suspicion that the 7-Eleven was robbed, let's say. Can they go to the nearest camera and just look up the nearest license plate that was around that 7-Eleven at the time of this robbery?

MS. SOLORIA: Objection. Calls for speculation. Incomplete hypothetical.

You can answer.

THE WITNESS: I would say no. I would say that there needs to be more to your scenario. If the 7-Eleven was robbed and you have a witness that's giving you a -- that the suspect jumped into a blue vehicle, or the suspect was in a red truck, there going to be more than -- that's not going to put -- you have to put something in. You just -- you just don't put

197

"car."

BY MR. SOYFER:

Q. Okay.

A. My understanding, from the one time I used it, I didn't just put "car." There has to be some parameters that you're putting in.

But reasonable suspicion, you don't have probable cause that -- there may be three blue cars or three red trucks that go through that camera between the point of the time of the crime occurring and the officers responding, so that's where your reasonable suspicion comes in. You're not going to just look for every single car. You're going to have a little bit more to go off of.

Q. Okay. Thank you. That -- that was very interesting. And I want to follow up on your answer there.

So in that scenario, you know, a witness says the suspect was in a red truck. You can search the system for red trucks around that camera. Is that -- is that right? Is that a fair characterization of your testimony?

198

A. Yes, but most likely you have a time -- you have a time frame of when you're doing it. So you --

Q. Okay.

A. You're going to probably do it from the time either that the -- the victim or -- or witnesses said that the crime occurred to the time that you got in there.

Sometimes you can have cameras that are off, so they may give themselves a buffer time. I'm not sure exactly how they're searching it.

Q. Okay. So your understanding is, under this policy, you can't just search the whole city for red trucks, based on that?

A. I'm not sure. I've used the system once. I could not tell you exactly how it operates.

Q. Okay. I'm asking for what the policy allows. So assuming the system can do that, under this policy, the witness says a red truck was leaving the crime scene. Could an officer go in and just search the entire city for "red truck," for all of the data that's in there?

199

MS. SOLORIA: Objection. Incomplete hypothetical. Calls for speculation.

You can answer.

THE WITNESS: I'm not sure. But I don't know why -- what an officer would want to search in Ocean View if the 7-Eleven was robbed in Berkley. That's not going to yield you -- that -- I don't think that falls into reasonable suspicion, because it's not reasonable for the car, at the particular time the robbery occurred, to be in Ocean View, which is, on a good day, maybe a 20-minute ride.

BY MR. SOYFER:

Q. Okay.

A. And --

Q. Oh, sorry.

A. I'm sorry.

Now, if -- I don't know how the system works. Maybe it'll pop 20 minutes later when they're looking at it, if the car has passed through a secondary camera.

But that doesn't tell you which way they

200

went or how they got there. It just tells you that at one particular point, it passed through this camera. At another particular time in point, it passed through that camera.

Q. Okay. In the scenario you gave me -- so we're going with the hypothetical where the witness says they saw a red truck leaving the crime scene.

Is that right? Did I get that right?

A. Yes, sir.

Q. Okay. Would the officer have reasonable suspicion to go look up the witness's car?

A. No.

Q. Okay.

A. That scenario doesn't provide -- now, typically, in a -- in a utopia, 7-Eleven has really good camera footage, so our investigators are probably looking at that camera footage to see if they're -- if they can even get the license plate from the video, so that they can just search that particular car.

Unless the witness tells them that they were involved -- I mean, because we're doing

ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER

Transcript of Assistant Chief Michele Maria Naughton        51 (201 to 204)

Conducted on July 25, 2025

hypotheticals -- if they were involved in -- in some type of altercation somewhere on the road with this car, or whatever the case is, then yes, they would look at it.

But just to put the -- the witness -- or the victim's car in, just to put it in, that's not -- that doesn't fall into what our order is saying.

Q. Okay.

A. Because what -- what alleged violation did the -- the victim have?

Q. Okay. Got it. I think I understand.

So subsection "b" then states, "As part of an active investigation related to a missing or endangered person or a person associated with human trafficking." Do you see that?

A. Yes, sir.

Q. Okay. Does this subsection require reasonable suspicion?

A. So with -- I'm going to say yes. With the -- because they're in an active investigation. So what this means is that somebody has reached out to the police department and said, "This loved one, family member, is missing and/or in danger." And we're trying to locate them because they're missing. They may be in danger. They may be a person who may need medication and the family hasn't seen them in X amount of time.

So if the family has said that they typically drive this -- this is their vehicle; this is the car that they drive. Then to find that person, especially if they're missing or in danger, then yes, you're going to -- you're going to use the system. So that falls into that -- into the permitted purposes.

Q. Let me ask you: What is a person associated with human trafficking?

A. So human -- human -- we know human trafficking is the trafficking of people. You can have -- human trafficking can also be human sex trafficking, and those individuals who are trafficked are in danger. So I'm not sure, outside of that -- I don't know what you're asking me.

Q. So could it be someone who's committing human trafficking?

A. Yes, because they're associated. If the person committing it is using a vehicle to pick up — pick up the people they're trafficking, you want to find that vehicle so that you can save those people who are being trafficked before they're harmed.

Q. Okay. Could it be a victim?

A. I don't understand.

Q. Could a "person associated with human trafficking" mean a victim of human trafficking?

A. Absolutely. I mean, there's plenty of scenarios that can play out. The -- the traffickers can be using the victim's car to traffic people. So, yes.

Q. Okay. Could it be -- could a person associated with human trafficking be a witness to human trafficking?

A. Potentially, yes, but there's -- there's going to be other elements. I just need -- I just can't say, off the base, witnesses, victims; there's always more. That's why it says "an active investigation."

Q. Okay. And so subsection "c" here is -- lower case "c," that is -- is "To receive notifications related to a missing or endangered person, a person with an outstanding warrant, a person associated with human trafficking, a stolen vehicle, or a stolen license plate." Did I read that correctly?

A. Yes, sir.

Q. Okay. Outside of these three reasons, are there any other permitted purposes for using the Flock Safety ALPR system?

A. I'm going to say only what's listed under "Permitted Purposes" in the general order.

Q. Okay. So I'll skip ahead a bit to Section Roman numeral III, capital A, numeral 3. We're staying on the same page; it's just the last subsection under capital A, if you're with me.

A. I think I am.

Q. Okay. So this states, "The Flock safety ALPR system will not be used to interfere with individuals engaging in lawful activities or tracking individuals on the basis of the content of lawfully protected speech." Do you see that?

PLANET DEPOS

888.433.3767 | WWW.PLANETDEPOS.COM

Case 2:24-cv-00621-MSD-RJK    Document 179-6    Filed 11/20/25    Page 54 of 69
PageID# 4662
ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton    52 (205 to 208)
Conducted on July 25, 2025

205

A. Yes, sir.

Q. Okay. What does it mean -- well, how -- how could the system be used to interfere with individuals engaging in lawful activities?

MS. SOLORIA: Objection. Calls for speculation.

You can answer.

THE WITNESS: What I'm probably thinking is expressive activities. If -- if you're -- lawful activities means you're just doing -- you're -- you're lawful. You're driving in a lawful manner. You're not violating any of the city, county, or town -- state codes, Code of Virginia.

I think it's just saying that we're not using Flock just for those who are involved in lawful activities. It's just -- it's just a prohibition for officers to know that we're not tracking individuals; we're not violating lawful, protected speech. We do have quite a bit of expressive activities here in the city of Norfolk.

206

BY MR. SOYFER:

Q. There are protests in the city of Norfolk, for instance?

A. Sorry?

Q. There are sometimes protests in the city of Norfolk? Is that what you mean?

A. Those are -- we call them "expressive activities." I'm sorry.

Q. Okay. And so under this policy, it would be wrong to track protesters; is that right?

A. Yeah. Because we're not -- we're not tracking them with Flock.

Q. Okay. Does anything in this policy, to your knowledge, require an officer to obtain a warrant before searching the Flock Safety ALPR system?

A. I don't recall, but I have to skim through the entire ten-page policy to make sure.

Q. Of course. You're free to do that.

A. I don't see anything that says "a warrant."

Q. Okay. Does anything in this policy

207

require probable cause before searching the Flock Safety ALPR system?

A. I didn't see "probable" -- I think the only thing I saw -- and like I said, I'm -- I'm skimming through -- I saw was "reasonable suspicion." I don't see -- and I can't do the -- the finds to make sure I'm not missing it. I don't see "probable cause."

Q. Yeah. I guess, to your knowledge, did this ever require probable cause, to search the Flock Safety ALPR system?

MS. SOLORIA: Objection. Vague.

THE WITNESS: I don't see "probable cause." I would -- I would defer to the policy under "Permitted Purposes," where it gives the criteria for utilizing the system.

BY MR. SOYFER:

Q. Okay. Does an officer ever have to have prior approval from anyone to search the system?

A. I don't -- I don't see that in the order. Just like the last scenario, they -- they have access. They've been to the training. They have

208

their -- as long as they're in compliance with what the order says, they can search. They don't have to get approval from a supervisor, or anything of that nature.

Q. Okay. I want to turn to the next page. You'll see under Roman numeral III, there's a subsection, capital D, entitled "Queries." Correct?

A. Yes, sir.

Q. Okay. And I just have a few questions about the data that must be entered, or the -- the information that must be entered before initiating a search.

And if I say "search," would you understand that to mean the same thing as a query, as what's used in this policy?

A. Yes, sir.

Q. Okay. So under III, capital D, numeral 2, you'll see that there -- there's information that an officer has to enter into the system to conduct a search. Right?

A. Yes, sir.

Case 2:24-cv-00621-MSD-RJK    Document 179-6    Filed 11/20/25    Page 55 of 69
PageID# 4663
ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton    53 (209 to 212)
Conducted on July 25, 2025

**209**

Q. Okay. And the first is just the parameters of the search; the license plate, vehicle characteristics, other stuff like that. Correct?

A. Yes, sir.

Q. And then a case number, or a call for service number. Do you see that?

A. Yes, sir.

Q. What does an officer do if they want to conduct a search but they don't have a case number or a call for service number?

A. Looking at the order, you probably can put in the offense type and reasonable suspicion. But any time you have an offense, you're going to have a case number. And any time you're on a call for service, you're going to have a number associated, even if you're doing a traffic stop.

Every call for service, I believe that they're going to have it either way. If you're doing an active investigation, even if the officers in patrol are following up on an active investigation, there's a case number, an incident number that's assigned to it. So I believe they're going to have

**210**

it either way.

Q. Okay. So there's no scenario where they wouldn't have one of those. Is that correct?

A. I don't believe there's one.

Q. Okay. To your knowledge, does the system do anything to ensure that the case number or call for service number is a real case or call for service number?

A. I don't know. I don't -- I haven't used the system since it's been updated to this, so I don't know what it -- it does.

Q. Do you know if the audits confirm that the case number or call -- well, scratch that.

Do you know if the plan is for the audits to confirm that the case or call for service number is real?

MS. SOLORIA: Objection. Vague.

THE WITNESS: I don't know. But the auditor can research that information fairly quickly to see if it's a good case number.

BY MR. SOYFER:

Q. Okay. Do you have an understanding of how

**211**

many searches are performed in the average month by the NPD of the Flock Safety system?

A. I do not.

Q. Okay. Do you know if it's hundreds, thousands, more? Anything like that? Just ballpark.

A. I don't know. I don't use the system like that. I don't know.

Q. Okay. Understood.

And then this section -- so subsection, lower case "c," you'll see it requires the officer to input an offense type and reasonable suspicion. Correct?

A. Yes, sir.

Q. And then it gives several examples. Do you see that?

A. Yes, sir.

Q. Do you agree that these examples are sufficient?

A. Yes, sir.

Q. Okay. If you turn to the page ending in 59. Well, actually, I -- I'll go a little bit out of order, but let's -- let's go to the page ending

**212**

in 60.

A. Yes, sir.

Q. So you'll see there's a subsection there, capital D, entitled "Data Retention and Destruction." Correct?

A. Yes, sir.

Q. And then under that, subsection numeral 1: "The Flock Safety ALPR system will purge system data after twenty-one (21) days measured from the date of its capture." Did I read that correctly?

A. Yes, sir.

Q. Okay. Is that -- is it your understanding that the data within the Flock system are automatically deleted every 21 days?

A. Yes, sir. That's my understanding.

Q. Okay. Are they completely unrecoverable after they are deleted?

A. I don't know.

Q. Okay. Let's turn back to the previous page. I want to look at subsection capital B, which is entitled "Data Downloads."

You'll see the section -- so B1 states,

Case 2:24-cv-00621-MSD-RJK    Document 179-6    Filed 11/20/25    Page 56 of 69
PageID# 4664
ATTORNEYS EYES ONLY – SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton
Conducted on July 25, 2025
54 (213 to 216)

213

"Personnel will not download system data unless such data is related to at least one of the purposes described in Section III(A)." Do you see that?

A. Yes, sir.

Q. Okay. So then 2 states, "If personnel download system data as part of an investigation, it will be stored in accordance with applicable evidentiary records law and policy." Did I read that correctly?

A. Yes, sir.

Q. Okay. And so within this section, does anything limit data downloads to 21 days?

A. Outside of the fact that it's going to purge and not be there?

Q. Yes.

A. The -- the limit is it's not there, so the 22nd day, it's not going to be there for them to download.

Q. Okay. So let's say an officer downloads 21 days of data. And then on the 22nd day -- well, scratch that.

Let's say an officer downloads the past

214

21 days of data. They wait another 21 days, and they download 21 more days of data. Does anything in this policy forbid them from doing that?

MS. SOLORIA: Objection. Calls for speculation. Vague.

THE WITNESS: Other than the fact that they would have to have -- they would have to comply with the subsection to actually download a second 21 days. If they don't have -- if they're not in compliance with the policy, then they wouldn't be able to do it. They're not supposed to do it; let me say that.

BY MR. SOYFER:

Q. If they meet one of the permitted purposes, nothing forbids them from doing that, right?

A. According to the policy, correct.

Q. Okay. Let me -- I want to ask you just about -- generally. If you look at the page ending in 60, you'll see there's a section on training. Have you gone through the training required to use the Flock system?

215

A. I went through training initially, when we acquired Flock.

Q. That is -- sorry. That was back in summer 2023?

A. That was -- I don't know exactly when it was, but it was prior to us getting our -- probably when NRHA got their cameras is when I went through the training.

Q. What do you recall about that training?

A. I just remember it being a video, I think, from Flock.

Q. How long was the video?

A. I don't recall. Hour 30 minutes, two hours. I don't recall.

Q. Okay. Do you recall any of the subjects that it covered?

A. No, sir.

Q. I guess what I'm asking is, was it sort of just like how to use the system? Did it cover anything beyond that?

A. I do not remember. I --

Q. Okay. Will you have to go through any

216

additional training now that this general order is in effect?

A. Yes, sir. I would have to comply with the training that's in the order to utilize Flock.

Q. Okay. As of today, you haven't done that training; is that right?

A. That is correct.

Q. Okay. So I want to go back to the period when the special order was in effect. Do you have an understanding of how many other departments -- well, scratch that.

Going back to when the special order was in effect, how many other Flock customers, outside of the City of Norfolk, did the NPD share their data with?

A. I don't know.

Q. Okay. Did the NPD share its data -- its Flock data -- with other Hampton Roads jurisdictions?

A. Yes.

Q. Did it share data with any jurisdictions outside of Virginia?

A. Yes.

217

Q. Okay. Did it share its data with any private sector entities?

A. I don't believe so. But I'm not sure; I'm not sure. "Share" means they gave us access, but we didn't share ours. I don't -- I don't know the answers to that.

Q. Okay. And after -- now that this general order is in effect, how has the NPD's data sharing changed, if at all?

A. In compliance with the law, that we are only sharing, I believe, with Virginia law enforcement agencies. We are no longer sharing with outside of the state.

Q. Okay. I'd like to go -- my last questions about this document -- you'll be happy to know these are my last questions -- they're about the section Roman numeral X, on the page ending 63. And it's entitled "Violations."

A. Yes, sir.

Q. Okay. So this section states, "If any NPD personnel fail to comply with or equally enforce the terms of this general order, their authority to

218

access or use the Flock Safety ALPR system may be temporarily suspended or permanently revoked." Did I read that correctly?

A. Yes, sir.

Q. Okay. And does the use of the word "may" there mean that if personnel fail to comply or adequately enforce the general order, it is optional whether they're temporarily suspended or permanently revoked?

A. I -- I see it as may be either temporarily suspended or permanently revoked. So you can -- you may be suspended or you may be revoked, either/or.

Q. Okay. So your understanding is that this policy requires one of those two things to happen if personnel fail to comply or adequately enforce the order?

A. That's my understanding, yes, sir.

Q. Okay. The next sentence states, "Supervisors in the RTCC may take such other action necessary to ensure compliance, including referring such personnel for disciplinary measures permitted under NPD policy." Do you see that?

219

A. Yes, sir.

Q. And does the use of the word "may" there require them to take other action?

A. Does the use of the word "may" mean that they're going to take some other action?

Q. Does anything in this sentence require supervisors in the RTCC to take further action?

A. The way I understand this, "supervisor" may be the sergeant. So his action -- he may not be able to take action, because he's a sergeant; but forwarding it up will allow the command to take said action, to include sending it to the Office of Professional Standards to be -- for disciplinary action, which could also result in -- if under law it's a criminal offense to access it like it is with the VCIN system, the NCI system, and having those -- those measures taken into account.

Q. Okay. Do you know what -- you can set that document aside, by the way.

Do you know what the Flock Safety transparency portal is?

A. Yes. Somewhat. I know there's a portal

220

that allows the community to go look at the Flock numbers, I believe it is. The cameras, and -- just so that we're transparent in what we're doing.

Q. Okay. Has the NPD always had a Flock Safety transparency portal?

A. I don't believe we had it on the onset. I don't believe so.

Q. Do you know when the NPD created a Flock Safety transparency portal?

A. I don't know the exact date. That would probably best be answered by either Captain Thomas or Lieutenant Vernon. They are the ones who are working hand in hand with Flock.

Q. Okay.

A. I may have got notice, but I don't know off the top of my head.

Q. Do you know why the NPD created the Flock Safety transparency portal?

A. I'm not sure. I may have received information in my e-mail. They were keeping me advised. But I can't recall, off the top of my head, if -- if we were, or why we did it, or if it was

Case 2:24-cv-00621-MSD-RJK    Document 179-6    Filed 11/20/25    Page 58 of 69
PageID# 4666

ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton        56 (221 to 224)
Conducted on July 25, 2025

suggested that it was something we needed. So I'm not sure.

Q. Okay. Turning to a different subject, I want to talk about some of the permitted uses of the Flock system. And I guess I'll start with the period when the special order was in effect.

When the special order was in effect, could officers use the Flock system to enforce federal law?

A. It's possible they could -- I don't know their -- I don't know what the officers were using the system for. Typically, our officers operate under City and State codes. Any time we write charges, they are City or State codes. The only ones that operate under our federal law are our task force officers, who are deputized by the federal government and have the same privileges and responsibilities as a federal agent.

Q. Okay. Do -- so Norfolk PD officers work on federal task forces; is that right?

A. That is correct.

Q. Okay. When they do that, they effectively become federal law enforcement officers, correct?

MS. SOLORIA: Objection. Vague.

BY MR. SOYFER:

Q. Well, when they do that, they have the same duties and responsibilities as federal law enforcement officers; is that right?

A. Yes.

Q. Okay. During the time the special order was in effect, could Norfolk police officers use the Flock system for immigration enforcement?

A. Norfolk officers were not doing immigration enforcement.

Q. So that wouldn't be a permitted use, just because they weren't doing it?

A. That would be federal. And I don't know of any officers that are using the Flock system. The task force officers typically report to the federal partners and utilize their system, so there's no need for them to use Flock when they have access to federal systems.

Q. Okay. What about using Flock for traffic offenses?

A. I'm not sure if the special -- the orders are down. But I think I saw something -- we're sticking with the special order. I don't recall if I saw it in there. Because I know the general order says something to the effect of not just for traffic offenses alone.

Q. Okay.

A. But if you do a traffic stop, you have the car stopped. So I don't know if they're using it -- I don't know if they're using it for traffic offenses. I don't know what the officers were using Flock for. I can't answer that.

Q. Yeah, and we talked about how, under the general order, tracking protesters was not a permitted use of the Flock Safety system. Correct?

A. Correct, because Flock doesn't track.

Q. Okay. But using the system to look up the locations of people just because they attended a protest was not a permitted use. Is that right?

A. I recall that's what the general order said.

Q. Okay. Was that true under the special order as well?

A. I don't have the special -- I don't believe it was in the special order. But Flock doesn't track people, so I'm -- I think I'm confused.

Q. Okay. The Flock cameras: Are you aware the -- the Flock cameras sometimes incidentally photograph people?

A. I've seen one picture with people in it, so -- I've only seen one. I'm not sure what it does now. But in the -- earlier on, when we acquired Flock, I did see an image with people in it, yes.

Q. Okay. Is the NPD's intention that the Flock cameras capture images of people?

A. No. It was not the intention to capture images of people.

Q. How does the NPD prevent misuse of the Flock system?

A. Currently, we've updated our general orders to reflect that. And with the audits that are being put in place, will give us a better way to prevent -- and when there is misuse of a system, with any system, when there's misuse or -- or people

Case 2:24-cv-00621-MSD-RJK   Document 179-6   Filed 11/20/25   Page 59 of 69
PageID# 4667
ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton          57 (225 to 228)
Conducted on July 25, 2025

operating outside of the guidelines of how a system should be used, you have to hold them accountable. And once people are held accountable, that translates to other officers not to violate the -- the order, because you'll be held accountable. Nobody wants to be suspended or lose money or have a discipline record. So . . .

Q. Is another way of saying that that disciplinary action acts as a deterrent?

A. Yes, sir.

Q. How many total sworn officers today are in the NPD?

A. Over 500.

Q. Okay. Has that number been pretty consistent since the summer of 2023?

A. Around about that. We've had some fluctuations in manpower, so I would say around the 500 mark would probably be consistent.

Q. Okay. Are you aware of any misuse of the Flock system by an NPD officer?

A. Yes, sir.

Q. What is that?

A. I'm aware of a sergeant who utilized the Flock system doing his -- outside of law enforcement purposes, to locate an individual, her vehicle, looking for his cat.

Q. Why was that a misuse of the Flock system?

A. Because it wasn't for law enforcement purposes. He was doing it for his own personal reasons, looking for his own personal cat, outside of the confines of the City of Norfolk.

Q. Was that officer disciplined?

A. I'm not sure. I wasn't involved in the discipline process, because he is a field operations officer and I'm investigative services.

Q. Okay. So at the time that happened, you had transferred from field operations to investigative services; is that right?

A. So I'm not sure exactly when it happened. When it was -- so when discipline goes through its process, it typically lands with an assistant chief. When it got to my co-worker, I was in investigations, so I did not have access to the file, the folder, the discipline, or what happened with that, the outcome

of it.

Q. Okay. When did you learn about that?

A. I'm not sure of the time. It's definitely been since I've been in investigations, so sometime after August of '23, but prior to, I would say, in the last year. I don't think it was this year.
I don't know the exact date.

Q. Okay. And is that the only known instance of misuse of the Flock system by an NPD officer?

A. That is the only incident that I know that was misuse. The only other thing that I'm aware of is -- and you've talked about it -- the officer who shared an image of the Flock vehicle with people in the image. Those are the only two that I'm aware of.

Q. Okay. Why don't we -- let's talk about that one.

MR. SOYFER: What am I up to now? I believe this is Plaintiffs' Exhibit 51. I'm going to drop that in the chat.

(Exhibit 51 was marked for identification.)

MR. SOYFER: For the record, this is a document bearing Bates stamp

CONFIDENTIALNorf000369.

BY MR. SOYFER:

Q. Let me know whenever you have that open.

A. We have it up.

Q. Chief Naughton, you'll see this is an e-mail from Deputy Chief Maslow to you. Subject, "Officer Safety Forward: HOTLIST ALERT: NC - PHD6686 20 WB Bagnall at Tidewater." And the date is May 24th, 2023.
Correct?

A. Yes, sir.

Q. Okay. This predates the special order, correct?

A. Yes, sir.

Q. Okay. Does this refresh your recollection that officers were using the Flock system before the special order went into effect?

A. Yes. This -- this particular camera, Westbound, Bagnall at Tidewater, is an NRHA camera.

Q. Oh, okay. Who is -- and I might mispronounce his name, but who is ███████, or ███

**229**

A. ▮▮▮▮ is a -- at the time, was a gang squad -- Gang Suppression Unit investigator.

Q. Okay. And you'll see, if you go down to his e-mail, which spreads over two pages but starts on the page ending in 70, he writes, "Please help identify this unknown subject who appears to be armed with a rife and scope." Do you see that?

A. Yes, sir.

Q. I think he meant to write "rifle"; is that fair to say?

A. Yes, sir.

Q. Okay. He continues: "This photo was taken yesterday evening with a Flock camera at Bagnall Road at Tidewater." Do you see that?

A. Yes, sir.

Q. Okay. He sent that e-mail to an address, PD-SWORN@norfolk.gov. Do you see that?

A. Yes, sir.

Q. Is that -- does that go to all officers in the department?

A. All sworn officers, yes, sir.

Q. Are you on that Listserv?

**230**

A. Yes, sir.

Q. Okay. And you'll see that he lists a plate number and indicates that it's a stolen plate, correct?

A. Yes, sir.

Q. There's a time and date, correct?

A. Yes, sir.

Q. Okay. And the camera's identified there, right?

A. Yes, sir.

Q. And then he gives a network, which is VA - Norfolk Housing Authority. Do you see that?

A. Yes, sir.

Q. And that indicates that the camera belonged to the NRHA?

A. I believe that's what it is. I know that's one of their cameras, so I guess that's how they captured it.

Q. Okay. And if you turn to the next page, you'll see this an image. It contains a few vehicles, correct?

A. Yes, sir.

**231**

Q. Okay. And there are a few people in the image, right?

A. Yes, sir.

Q. Okay. And then it looks like Detective ▮▮ has put a text box and an arrow, and maybe a yellow circle on the image, right?

A. Yes, sir.

Q. And that's pointing to "Unknown subject appears to be armed with rifle with scope." Correct?

A. Yes, sir.

Q. Okay. And you can see that man's face, roughly, right?

A. Yes, sir.

Q. Okay. And then go up to the first page of this document, which is ending in 69. The first-in-time e-mail on this page, you'll see, is from you to Deputy Chief Maslow, correct?

A. Yes, sir.

Q. And it's about 28 minutes after Detective ▮▮ e-mail, correct?

A. Yes, sir.

Q. And you write, "Can we discuss this?" Do

**232**

you see that?

A. Yes, sir. Yes.

Q. And then Deputy Chief Maslow responds, "Sure. I bet it's about the same thing I was thinking when I saw this." Do you see that?

A. Yes, sir.

Q. Did you discuss this?

A. Yes, sir.

Q. And what did you discuss?

A. So I had concerns, because all the information that I had received about Flock was it was images of cars. And in my discussions with several community members -- because I'm very community-oriented -- if they ask questions about Flock, and they were concerned about this very thing, of identifying people or us using it as a tool of that nature, and I had, you know, been giving them the information that was given to me, that it's used for cars.

So when I saw this e-mail, I became concerned, because I felt like this is not what Flock's intended use was. And I wanted to have a

Case 2:24-cv-00621-MSD-RJK    Document 179-6    Filed 11/20/25    Page 61 of 69
PageID# 4669
ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton
59 (233 to 236)
Conducted on July 25, 2025

233

conversation with the Deputy Chief so that we can make sure that our officers are not using Flock in this manner.

This particular image, I talked a lot about the violent crime that we were having in Calvert Square. So this is Calvert Square. One block parallel to this is where the vehicles would come by and shoot at the individual -- I talked about groups and gangs.

So it became problematic that the cars would drive by and shoot at them, and they're arming themselves to protect themselves. But I didn't want to utilize the technology in a way that it wasn't prescribed, or the way that we had communicated with the community that we were not using it. So my intentions were to talk to the Deputy Chief about making sure that our officers are not utilizing Flock for this.

We had a conversation about it -- I don't remember the exact wording -- to ensure that they were aware that we were not going to use Flock like this.

234

At the time, I was the Field Operations Chief. So any follow-up that would have occurred with Investigator ▮▮▮ would not be under my purview, so I'm not able to tell you the conversation that may have went through his Chief to his captain to him, or to the division, and what not. I don't know why he would put that information there, other than he was tasked with the groups and gang -- and it was violence. I don't know if he had an ongoing investigation.

But I'm very true to what I say to my community, and being transparent. If we are not utilizing the technology for it, I'm going to ensure that that's what we're going to be doing. So that was the premise of the e-mail.

Q. Okay. I just want to unpack and follow up on some of your answer there. I appreciate the very thorough answer.

So when you say community members were concerned about Flock being used like this, what -- what do you mean there? Why were they concerned?

A. Well, a lot of times, when you see cameras

235

going up and -- you know, we want to be transparent as an organization, so that they're aware.

Like I said, NRHA had their cameras up first. So I was out in the community, and I -- I have conversations with community members all the time. So I'm asked, "Well, what's -- what's this camera? Why are they taking our pictures"?

I would explain to them that it's not a picture camera. It's capturing license plates and things of that nature. Any time technology is put up in areas -- especially areas that are maybe poverty-stricken, there's a concern. Community members are always concerned what's going on.

So I'm very transparent in my operations, in my movements, and community members constantly reach out to me and talk to me; I'm always in the community. So I would explain to them -- and I like to be true unto what I say. If I -- if I, me, the person I am, of telling you that we are using this technology for this intended purpose, then I'm going to do everything in my power to ensure that we're using that technology for that purpose.

236

So I just was having conversations with the community, as I do on a daily basis.

Q. Understood. And, you know, I understand the point that you wanted to make sure that what you were telling community members was correct; that was one of your priorities. Right?

A. Yes, sir.

Q. Okay. But what I'm trying to understand is a little bit different, which is, you know, why are community members concerned that these cameras were taking pictures of people?

A. Because they were cameras. You don't know what you don't know. And if they weren't tuned into the explanation -- because I believe NRHA did community notifications and worked with Flock to get the information out, but sometimes information does not reach everyone. And when it doesn't, then people create their own narratives.

Now, I'm not saying it was the entire community coming to me. It could have been less than a handful of conversations. But I did have conversations with -- with community members, which

Case 2:24-cv-00621-MSD-RJK   Document 179-6   Filed 11/20/25   Page 62 of 69
PageID# 4670

ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton
Conducted on July 25, 2025

60 (237 to 240)

**237**

is expected with any new technology.

With the Real-Time Crime Center, there was conversation. With -- with everything that we do in law enforcement when we're utilizing technology, or they see something online or on the news, there's going to be conversations with the community, and we -- we just have conversations.

Q. Did community members have privacy concerns?

A. Not that was expressed to me. I'm sure that there probably were, but none that were expressed to me, that they -- they felt that there were privacy concerns.

Q. Okay. And so after this, you and the Deputy Chief had a conversation, and you agreed that using the Flock cameras to identify people seen outside of cars was not a valid use. Is that fair?

A. Yes, because it was the intended purpose. Yes.

Q. Is that still true today?

A. Which part? Because when -- I haven't seen any evidence that we are using -- I haven't even

**238**

seen any Flock images with people in it, so I'm not sure which part of the question you're asking me.

Q. Yeah. So I guess if -- if Detective ███ sent this around, you know, yesterday, would you have the same reaction you did back in 2023?

A. So that's kind of twofold for me. If the same investigator sent this out again, I would think that we'd need to move to discipline action, because my understanding is somebody had a conversation with him, and if he's continuing to do it, then we need to progress in our discipline for it.

Q. Okay. Yeah. So I think -- I think you answered my question. But just to confirm, this would still be against policy today, correct?

A. Yes.

Q. Okay. Understood.

Is Detective ███ still with the NPD?

A. He is.

Q. Okay. Do you know what his role is now?

A. He works alongside the bomb investigators, doing UAS, the drone unit.

Q. Okay. Oh, tell me about the drone unit.

**239**

A. A unit that utilizes drones for search warrants. There's special reasons that we can use drones for. I'm not sure what -- I don't know what you want to know.

Q. Okay. Yeah, I guess just -- how are the drones used?

A. Drones are used for -- in compliance, I believe, that there's -- I'm not sure if it's state or federal law. We don't just throw drones up over people. There's rules and regulations. I'm not a drone instructor. I don't want to misspeak.

We can't put drones up over people. It has to be certain criteria whether drones are allowed to go up. And with FAA approval, and -- there's a lot of components to it.

Q. Got it. And so they're kind of used for limited times and limited purposes. Is that fair?

A. Correct.

Q. Okay.

A. Yes. Like missing person, in the water, they may put a drone up. Special operations, where there are search warrants, there may be a drone up.

**240**

But we don't just put drones up just to follow people, track people. We're not allowed to do that, compliance with law. And then in Norfolk, the air spaces is not as free rein as it is in other places.

Q. Understood.

MR. SOYFER: I'm going to drop our next exhibit into the chat. And this will be Plaintiffs' Exhibit 52.

(Exhibit 52 was marked for identification.)

BY MR. SOYFER:

Q. This is somewhat long. I have a few questions just about specific portions of it. Let me know when you -- you have it open.

For the record, I'll state that this is a document bearing Bates stamp NORF014765.

A. It's up.

Q. Okay. You'll see this is an e-mail from you to Deputy Chief Maslow, with the subject "Follow Up From Today's HRCOP," dated June 13th, 2024. Correct?

A. Yes, sir.

Q. Okay. And you can see the e-mail has a few attachments. Right?

A. Yes, sir.

Q. What is HRCOP?

A. The Hampton Roads Chief of Police. I think that's what it stands for.

Q. Okay. And just what -- what is that?

A. I think it's a monthly meeting with Chiefs of Police throughout Hampton Roads, and all of the jurisdictions. Probably extends a little farther than Hampton Roads, because in a co-send, I see "jamescitycounty."

Q. Okay. Does it include federal law enforcement?

A. It does.

Q. Okay. And you'll see the first e-mail in this chain is from Brian Dugan. Correct?

A. Yes, sir.

Q. And he has an fbi.gov e-mail, right?

A. Yes, sir.

Q. Do you know Brian Dugan? Do you work with him, beyond just receiving these e-mails?

A. I don't work with him, but I do know who he is. I attend the meetings at times. I -- I know who he is.

Q. Okay. And you can see he's -- he sent his e-mail to a lot of people. Correct?

A. Yes, sir.

Q. And actually it may be useful if I share my screen with you for this, just to help us get through this a bit more quickly, I hope.

So here -- this is the same document you're looking at on your end, correct?

A. Yes, sir.

Q. Okay. You'll see, on his June 12th e-mail, there are a bunch of recipients. Correct?

A. Yes, sir.

Q. And then if you go down, you'll see you received his e-mail. I'm highlighting it for you right now, if you're able to see that. Correct?

A. Yes, sir.

Q. Okay. And there are just lots of other recipients. You know, for instance, you can see one here who appears to be with Immigration and Custom

Enforcement. Correct?

A. Yes, sir.

Q. Okay. I will stop sharing.

Okay. So if you look at Mr. Dugan's e-mail, he writes, "Folks, as I promised, I wanted to provide the electronic copies of the documents I shared today. As my agent, Paul Dandrade" -- Dandrade -- "responsible for law enforcement partnerships mentioned, we are looking for help to spot and report diplomatic license plates seen by your officers. There is an e-mail listed on the handout to report any sightings. No need for department approval processes for us, an e-mail from an officer or sergeant with the Five Ws will suffice." Did I read that correctly?

A. Yes, sir.

Q. What -- what does he mean by "the Five Ws"?

A. I believe it's the who, what, where, when, and how. Those are Ws.

Q. Got it.

And what did he mean when he said, "No need for department approval processes for us"?

A. I don't know.

Q. Okay. If you look at the first attachment here, on the page ending 67, you'll see this is a document entitled "Diplomatic Travel." Correct?

A. Yes.

Q. And it has some examples of diplomatic license plates. Right?

A. Yes.

Q. Okay. And then there's a section entitled "What to look for (examples)." Do you see that?

A. Yes.

Q. And it gives examples of vehicles located at or around military bases/installations, critical infrastructure, government facilities, university/colleges. Correct?

A. Yes.

Q. And then examples of "Activity by vehicle and/or operator" to look out for, right?

A. Yes.

Q. And then it can include inconsistent travel patterns, taking pictures of sensitive

ATTORNEYS EYES ONLY -- SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton
Conducted on July 25, 2025

62 (245 to 248)

**245**

infrastructure/locations, attempts to access sensitive locations, stopping on the side of the road/frequent stopping while driving, and stationed and remaining in vehicles for hours. Do you see that?

A. Yes.

Q. And then there's a section about reporting to the FBI below that. Do you see that?

A. Yes.

Q. Okay. And so why -- I mean, why is this FBI agent sending around this document about monitoring diplomatic license plates?

A. I don't recall. I'm not sure if I attended that meeting. These are all members of that group; and their meetings, I believe, are on Wednesdays, when we have our other meetings. Chief Talbot is a stickler about us meeting, so I don't think we attended too many of them.

So I don't recall why he sent this out.

Q. Do you have an understanding why the FBI is interested in diplomatic license plates in the Hampton Roads area?

**246**

A. I don't know the exact information. I don't know if it was to ensure they're protected, for terrorism. I'm not sure.

Q. Do officers in the Hampton -- well, scratch that.

Do NPD officers look for diplomatic license plates?

A. No. Our officers are extremely busy with the -- I think 9,000 calls for service that we get a month.

Q. Okay. If you look, you'll see that you forwarded Mr. Dugan's e-mail to Deputy Chief Maslow on June 13th, 2024. Correct?

A. Yes, sir.

Q. Okay. And you write, "Crazy question? Would Flock be able to locate these diplomatic license plates? Seems like it could save a lot of time?" Did I read that correctly?

A. No, there's no word "license" in there. I just wrote, "Would Flock be able to locate these diplomatic plates?"

Q. Let me read this again.

**247**

"Crazy question? Would Flock be able to locate these diplomatic plates? Seems like it could save a lot of time?" Did I get it right that time?

A. Yes, sir.

Q. Okay. What did you mean?

A. As best as I can recall, I probably was talking about as it relates to terrorism, if they were -- I don't think I understood whether or not the diplomatic plates could be read. And if they were looking for them for terrorism, why wouldn't they just use Flock?

And that's probably why I said, "Crazy question? Would Flock be able" -- because it would save them time. Not that -- we don't have time for our officers to be running around doing the things that the federal government could do. I don't even recall officers sending any information. I'm not even sure if this e-mail went out to the entire department.

Q. Okay. And so I guess the idea you're throwing out here is that the FBI could use Flock to accomplish whatever it is they wanted to accomplish

**248**

in this handout attached to this e-mail. Is that correct?

MS. SOLORIA: Objection -- objection. Mischaracterizes testimony.

You can answer.

THE WITNESS: No, what I'm saying -- I'm not saying what FBI could use. I'm just simply -- I guess my thoughts on paper, you know, it's a crazy -- that's why I said it's a crazy question. But "Would Flock be able to" -- if what they're doing is preventing terrorism, then why would officers have to write down a hand -- if it's terrorism, because that's a crime. You can find some City, State code on it. It would save them a lot of time.

Like I said, I don't believe this e-mail went out to the department. I just was simply asking a question.

BY MR. SOYFER:

Q. Okay. Did Deputy Chief Maslow ever talk to you about that?

A. I don't believe we had -- I don't -- I

Case 2:24-cv-00621-MSD-RJK    Document 179-6    Filed 11/20/25    Page 65 of 69
PageID# 4673
ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton    63 (249 to 252)
Conducted on July 25, 2025

249

don't know. I don't recall. It's such a -- it's so minor, as it relates to our objective in Norfolk, that I don't even recall that he wasted any time going into detail about it.

Q. Okay. You don't know if this went anywhere?

A. I don't.

Q. Okay. You can close out that document.

MS. SOLORIA: Could we take a short break, Michael?

MR. SOYFER: Of course.

Let's go off the record.

VIDEOGRAPHER: We're going off the record, and the time is 3:10 p.m.

(A recess transpired from 3:10 p.m. until 3:20 p.m.)

VIDEOGRAPHER: We're back on the record. The time is 3:20 p.m.

BY MR. SOYFER:

Q. Chief Naughton, we're back from a break, and you understand you're still under oath. Correct?

A. Yes, sir.

250

Q. Great. What steps does the NPD take to ensure that no one without authorization gains access to its Flock system?

A. I don't know the answer to that. I think that would be best answered by either Captain Thomas or Lieutenant Vernon, who actually have access and oversight of those systems.

Q. Okay. Is it important to you, as Assistant Chief of Police, that the NPD protects the data in its Flock system?

A. Yes, sir.

Q. And why is it important to you?

A. As an organization that has access to that data, if I'm on the other end, I'd want my information to be protected as well. I think it's -- it's what we need to be doing. So absolutely, yes, sir.

Q. What do you mean when you say "if I'm on the other end"?

A. Well, I guess I shouldn't say "if I am," because I actually am, because I pass through Flock cameras as well. So yes.

251

Q. And so you wouldn't want the information on the Flock camera -- well, strike that.

As someone who drives by the Flock cameras, you wouldn't want that information to fall into the hands of someone who isn't authorized to see it. Is that fair?

A. I say that because I don't know what's captured on the back end, but anybody can see my license plate when I'm driving down the street, so I don't -- I don't really have an issue. I don't know what data's collected. If there's more that I'm aware of that -- I don't think there's anything that's going to personally identify me.

But my car on the city street, everybody sees my license plate. They can see me when I get out. They can associate me with my car. I'm going to -- I'm riding past Ring cameras that's capturing my data. I'm going to businesses that have cameras that's probably capturing my car and me, so -- I would think that they would want to protect their images and -- as with anybody else in that regard.

Q. Okay. To your knowledge, does anyone have

252

access to all of those other cameras that capture you along your drive?

A. I'm not sure what -- what other cameras. The -- the ones at like Target and Wawa? I'm not sure what you're asking.

Q. Yeah, does a single person or entity have access to, say, all of the Ring cameras that capture you around town?

A. I don't know. I know that each individual owner would have access to the Ring camera. But I don't know who they're sharing data with.

Q. And each of those cameras would only capture you when you're in front of them, correct?

A. I believe so, yes.

Q. And to your knowledge, each individual owner -- okay. To your knowledge, each individual owner is the only person who would necessarily have access to those cameras. Is that right?

MS. SOLORIA: Objection. Vague.

THE WITNESS: I don't know, because wouldn't Ring have access to it, any of their cameras? I don't know who has access to it.

ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton

64 (253 to 256)

Conducted on July 25, 2025

253

BY MR. SOYFER:

Q. Got it.

If the NPD publicly posted all of the information from its Flock system on the Internet, what do you think the reaction to that would be?

MS. SOLORIA: Objection. Calls for speculation.

THE WITNESS: Like my reaction? I don't know how everybody else would react.

BY MR. SOYFER:

Q. Okay. You don't have a sense for what the public reaction would be, based on your conversations with community members?

A. I did not have conversations with community members about how would you feel if we took all of your images and put it online.

Q. Okay. Do you think they would generally be fine with that?

MS. SOLORIA: Objection. Vague. Calls for speculation.

THE WITNESS: I don't know. Maybe those who like to be influencers would be -- I don't

254

know. Maybe some people would -- who were very private wouldn't want any of their information out. But when you're driving down the street in a car, anybody can take video. When you're in public, you're at risk of photos being taken of you, your car. You're on camera when you're at public businesses, so -- I think maybe some people may feel alarmed to see it online for everyone else to see, but it's still out there.

BY MR. SOYFER:

Q. Okay. So -- I get it. What you're saying is when you drive down the street, you know, people and businesses kind of here and there could capture you on camera or video. Is that what you're saying?

A. Yes. I'm saying anyone can capture you on video; that the rate of cell phones and video equipment that's out here, you're probably being captured more on -- on regular than you're being captured on Flock.

I don't know. It's just -- anybody can take a picture of your vehicle. As a police officer, if they take a picture of me in my police car when

255

I'm out in public, there's nothing I can do about it.

Q. Okay. So the Plaintiffs in this lawsuit are Lee Smith and Crystal Arrington. I just want to ask you, do you know Lee Schmidt?

A. Not that I'm aware of, no, sir.

Q. Have you ever heard of him before today? Or before this lawsuit, I should say.

A. No, sir. I don't recall that name before this lawsuit.

Q. To your knowledge, does the police department have any reason to suspect Lee Schmidt of any wrongdoing?

A. I don't -- I don't understand what you're asking me. I don't know of any investigations under my purview, that I've been made aware of, that that individual is involved in anything that the police department -- I don't know. It's possible he could be. I just don't know.

Q. Okay. All I'm asking is for your knowledge. So it sounds like, to your knowledge, the police department doesn't have any reason to suspect him of wrongdoing. Is that fair to say?

256

A. Yes, sir.

Q. Okay. Do you know Crystal --

MS. SOLORIA: Michael, you cut out, that last question.

MR. SOYFER: Oh. Sorry.

BY MR. SOYFER:

Q. Do you -- do you know Crystal Arrington?

A. I'm not familiar with -- with her either, that I recall.

Q. Prior to this lawsuit, had you ever heard of her?

A. Not that I recall, no, sir.

Q. To your knowledge, does the Norfolk Police Department have any reason to suspect Crystal Arrington of any wrongdoing?

A. I'll answer the same way for the first individual: No, sir.

Q. Okay. Let's switch subjects.

We talked about the RTCC a bit earlier. Do you recall that?

A. Yes, sir.

Q. And we talked about how it played some

Case 2:24-cv-00621-MSD-RJK   Document 179-6   Filed 11/20/25   Page 67 of 69
PageID# 4675
ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton
65 (257 to 260)
Conducted on July 25, 2025

257

role in investigations of crimes, correct?

A. Yes, sir.

Q. Okay. And that's -- by which I mean investigations beyond the immediate incident response. Is that clear?

A. I understand. Yes, sir.

Q. Okay. So what role -- just describe to me, like what role does the RTCC play in investigations beyond that immediate response?

A. So that's more to the day-to-day operations of the Real Time Crime Center. That responsibility is on the command over there, which would be Captain Thomas and Lieutenant Vernon. So I couldn't tell you exactly what they're -- exactly what they're doing to assist in those investigations.

Q. Can you tell me at a general level?

A. General level, they're probably looking for video to assist the detectives on their active investigations.

Q. Does the RTCC use the Flock system?

A. The RTCC has access to the Flock system. I'm not sure if they're inputting into the system or

258

if they're just -- when the alerts are coming through, seeing the alerts, so that in real time, if officers are responding, they can get the eye there. I couldn't tell you exactly what they're doing. I'm not stationed in the same building that they're in. So I couldn't tell you.

Q. To your knowledge, do they access Flock data to assist in investigations?

A. I'm not sure. They probably do, but I'm not sure.

Q. Okay. What -- so we talked about Fusus earlier, if you recall. And I -- I think what you said is Fusus kind of pulls together camera streams for the RTCC. Is that right?

A. Videos, camera screens, yes.

Q. Okay. What are those video camera streams? Are they all City-owned cameras, are they other things? Like can you just tell me generally what those are?

A. I don't know all of the cameras. I believe they're City-owned cameras, like in the parking garages, the LiveView cameras that they've

259

put up, body-worn cameras, those types of cameras.

Q. Okay. The LiveView camera    well, tell me about how the City-owned cameras that you reference, like in the parking garages, are different from the LiveView cameras.

A. I don't know the specs on the cameras. Like I said, I'm not the technological person. I know that the cameras that are in the garage were existing cameras that were already in place. The LiveView cameras are something that we acquired in places where -- like you had the map up where the data suggested those cameras go.

Q. Okay. How many of those LiveView cameras are there?

A. I don't know the exact numbers.

Q. And why -- why did the City acquire those in addition to the Flock cameras?

A. I would have to guess, if I knew -- I don't recall. I can't remember if I saw an e-mail or recalled the exact reasoning why. I think it might be in response to creating the Real Time Crime Center because those cameras would help with real-time

260

crime.

Q. Okay. You weren't involved with that decision; is that right?

A. Involved with acquiring the cameras?

Q. Yeah, the decision to acquire the LiveView cameras.

A. I don't believe I was. I may have been copied on e-mails because I'm at the executive level, but I want to say all of that took place under Captain Thomas, who was the lieutenant, and the special project -- for special projects at that time.

Q. Okay. Is the footage from the LiveView cameras saved or stored?

A. That, I'm not sure.

Q. Okay. Does the City of Norfolk have red-light cameras?

A. Yes, sir.

Q. Okay. Are those under the purview of the police department?

A. Yes, sir.

Q. Okay. And what's the difference between -- well, are the red-light cameras license

Case 2:24-cv-00621-MSD-RJK    Document 179-6    Filed 11/20/25    Page 68 of 69
PageID# 4676

ATTORNEYS EYES ONLY - SUBJECT TO PROTECTIVE ORDER
Transcript of Assistant Chief Michele Maria Naughton        66 (261 to 264)
Conducted on July 25, 2025

plate reader cameras?

A. I'm not sure. But a red-light camera -- I don't know how it all works, and the Real Time Crime Center does not monitor the red-light cameras. There's only three that I'm aware of in Norfolk. We use part-time officers who -- who do that, and I'm not sure if they're using DMV, or if that system is to gather that gives them that information. But that is not managed through the Real Time Crime Center.

Q. Just to make sure, there are only three red-light cameras in Norfolk that you're aware of?

A. Yes.

Q. Okay. I wasn't sure if you meant the number of officers or cameras, so I just wanted to clarify.

I want to show you one more document.

MR. SOYFER: I believe this will be my last document, and we're up to Exhibit 53.

(Exhibit 53 was marked for identification.)

MR. SOYFER: For the record, Plaintiffs' Exhibit 3 is a document bearing Bates stamp NORF020992.

THE WITNESS: We have it.

BY MR. SOYFER:

Q. And you'll see -- this is quite lengthy, but I only have questions about a few aspects of this.

This is an e-mail from Captain Thomas to you, copying assistant Chief Williams, with the subject "Flock Special Order," dated November 13th, 2024. Do you see that?

A. Yes, sir.

Q. And the first-in-time e-mail, which is the bottom of the first page, ending in 92, is from you to Captain Thomas. Do you see that?

A. Yes, sir.

Q. Okay. You write, "Can you send me the audit information for Flock Safety as I am updating the special order." Correct?

A. Yes.

Q. Okay. Does that refresh your recollection that in November 2024 -- well, let me ask you this: Is the special order referenced there the Flock special order that we looked at earlier today?

A. I don't think so, because that order was already signed by this particular date. I'm not sure if I meant the standard operating -- the standard operating or the general order. I probably meant the general order.

'23. Thomas would have come -- I'm trying to remember when Captain Alvarez, who was supposed to be working on it, was transferred out, and then Captain Thomas was transferred in. I just can't think of the exact date.

Q. Okay. You can see that the subject of this e-mail is "Flock Special Order." Correct?

A. Yes, sir.

Q. Okay. And so whatever you're referring to here concerned Flock, right?

A. Possibly. It concerns -- possibly, because in the -- what Thomas has sent me has Flock and Fusus, so I believe I may have -- it might be for the general order, and not Flock. I might have put the wrong title in there. Because at this particular point in time, the special order was already signed and in place.

Q. Okay. Why were you asking him to send you the audit information for Flock Safety?

A. I don't recall. Maybe to see what it said, to probably compare it to what was in the order.

I'm not sure. I -- I couldn't tell you why -- why I did one thing or another on a day. I probably got it for the general order. Probably meant the general order, but because it was for Flock, but "Flock Special Order," I don't know.

Q. Okay. And he writes, "Attached is the beginnings of the RTCC GO draft that I began before being transferred." Do you see that?

A. Yes, sir.

Q. And then he writes, "The last paragraph discusses running annual reports but is not specific to Flock or any other platform." Do you see that?

A. Yes, sir.

Q. And was that something you were concerned about at this point in time, auditing the use of Flock?

A. Probably, based on this e-mail. Like I

Page 265

said, I probably had it wrong, because the RTCC GO was general order draft. And like I said previously, I saw a draft of the general order. I may have said "Flock," but Flock would be a component in this general order, not the whole basis of it.

Q. Okay. And were you concerned at the time, generally, about audits of the use of information systems in the Real-Time Crime Center?

A. I'm not sure if that was my concern. Maybe my concern was just making sure we had a system in place. I don't think at that time I had any information that there was issues with auditing or anything. I don't believe I had seen any audit information or anything to that nature.

And I'm not as versed with Flock, or — or even Fusus, because that's more day-to-day. So I think — I may have been looking at it as the overall, from where I sat, but not actually the inner workings of it.

Q. Okay. Understood. You can set that document aside.

Have you spoken to community members about

Page 266

the Real Time Crime Center?

A. Yes.

Q. Okay. And just -- can you describe to me generally what those conversations are about?

A. So I think there was some release in that we were getting a Real Time Crime Center or maybe something at city council, and generally asking, like, "What is it like? What is it going to be? Where is it going to be located?"

Just general information and questions about what -- what exactly it is.

Q. Has anyone expressed concerns to you about the Real Time Crime Center Complaints, anything like that?

A. I have not received any complaints. Maybe increase, or just asking about what it is -- no.

MR. SOYFER: Okay. So, subject to any redirect, those are all of my questions for today.

MS. SOLORIA: I don't have any redirect. But before we get off the record, so I don't forget, pursuant to the protective order, the

Page 267

Defendants intend to designate those portions of the Chief's testimony where confidentially marked exhibits were discussed as confidential.

MR. SOYFER: Okay.

VIDEOGRAPHER: All right. This marks the end of the deposition. And we're going off the record at 3:41 p.m.

COURT REPORTER: Would you like the same orders you gave yesterday?

MR. SOYFER: Yes.

MS. SOLORIA: Yes.

(Time Noted: 3:41 p.m.)

Page 268

CERTIFICATE OF REPORTER

I, Karen K. Kidwell, RMR, CRR, the officer before whom the foregoing deposition was remotely taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial of otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this the 31st day of July, 2025.

_Karen K. Kidwell_
_____

Karen K. Kidwell
Registered Merit Reporter
Notary Public
Commonwealth of Virginia
Registration #7625774
My Commission expires: July 10, 2027