# EXHIBIT 7

*ECF # 111-5*

*under seal*



**HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER**

# Transcript of Captain Charles Thomas, Corporate Designee

**Date:** July 22, 2025
**Case:** Schmidt and Arrington -v- City of Norfolk, et al.

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
**www.planetdepos.com**
Michigan #8598 | Nevada #089F | New Mexico #566

**WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

NORFOLK DIVISION

-----------------------------------X

LEE SCHMIDT and CRYSTAL ARRINGTON    :

        Plaintiffs           :

      V                    : Civil Case No.

CITYOF NORFOLK and                   : 2:24-CV-00621-MSD-LRL

and MARK TALBOT, in his official     :

Capacity as the Norfolk Chief of     :

Police,                              :

        Defendants           :

-----------------------------------X

    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

    Videotaped 30(b)(6) deposition of the
           CITY OF NORFOLK
    By and through its Corporate Designee
        CAPTAIN CHARLES THOMAS
      And in his personal capacity
        Conducted virtually
       Tuesday, July 22, 2025
          9:34 a.m.

Job No.:  589830

Pages 1 - 333

Reported by:  Dianna C. Kilgalen
Videotaped by:  Isaac Weaver

    Videotaped deposition of CAPTAIN

CHARLES THOMAS, conducted virtually with all

parties attending remotely.

      Pursuant to Notice, before Dianna C.

Kilgalen, Notary Public for the State of

Maryland.

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:

    ROBERT FROMMER, ESQUIRE

    MICHAEL B. SOYFER, ESQUIRE

    TAHMINEH DEHBOZORGI, ESQUIRE

    INSTITUTE FOR JUSTICE

    901 North Glebe Road

    Suite 900

    Arlington, Virginia 22203

    703.682.9320

    JESSICA BIGBIE, ESQUIRE

    INSTITUTE FOR JUSTICE

    816 Congress Avenue

    Suite 970

    Austin, Texas 78701

    512.480.5936

A P P E A R A N C E S   C O N T I N U E D

ON BEHALF OF THE DEFENDANTS:

    JONATHAN KRAVIS, ESQUIRE

    MUNGER, TOLLES & OLSON, LLP

    601 Massachusetts Avenue, Northwest

    Washington, DC 20001

    202.220.1100

    E. MARTIN ESTRADA, ESQUIRE

    LIAM GENNARI, ESQUIRE

    MUNGER, TOLLES & OLSON, LLP

    350 South Grand Avenue

    50th floor

    Los Angeles, California 90071

    213.683.9100

    CARLA SOLORIA, ESQUIRE

    ADAM MELITA, ESQUIRE

    City of Norfolk

    City Attorney's Office

    810 Union Street, Suite 900

    Norfolk, Virginia 23510

CONTENTS

EXAMINATION OF CAPTAIN CHARLES THOMAS          PAGE

By MR. SOYFER:                                   8

MR. KRAVIS:                                     327

EXHIBITS

(Exhibits attached to the transcript.)

THOMAS DEPOSITION EXHIBIT                       PAGE

12    Amended Notice of Deposition         332

13    NORF004032-004035                    332

14    NORF014661-014670                    332

15    NORF007695-007702                    332

16    NORF009761-009767                    332

17    NORF004715-004723                    332

18    NORF014089-014091                    332

19    NORF018093 and NORF018094            332

20    NORF008166-008168                    332

21    NORF006895-06901                     332

22    NORF006843-006846                    332

23    NORF009843-009851                    332

24    NORF009665-009670                    332

25    NORF017584-017589                    332

EXHIBITS CONTINUED

THOMAS DEPOSITION EXHIBIT                       PAGE

26    NORF017593                           332

27    Excel spreadsheet                    332

28    Excel spreadsheet                    332

29    Excel spreadsheet                    332

THE VIDEOGRAPHER:  Here begins media Number 1 in the videotaped deposition of Captain Charles Thomas in the matter of Lee Schmidt and Crystal Arrington versus the City of Norfolk and Mark Talbot in his official capacity as the Norfolk chief of police, in the United States District Court for the Eastern District of Virginia, Norfolk Division.  Case number 2:24-CV-00621-MSD-LRL.

Today's date is July 22nd, 2025.  The time on the video monitor is 9:34.

The remote videographer today is Isaac Weaver representing Planet Depos.

All parties of this video deposition are attending remotely.

Would counsel please voice identify themselves and state whom they represent?

MR. SOYFER:  Michael Soyfer from the Institute for Justice on behalf of plaintiffs. I'm joined by my colleagues Robert Frommer, Jessica Bigbie and Tahmineh Dehbozorgi.

MR. KRAVIS:  Jonathan Kravis on behalf of the defendants and the witness.  I'm joined today by my colleagues from MTO, Martin Estrada and Liam Gennari.  I'm also joined by my co-counsel, the city attorneys from the City Attorney's Office, Adam Melita and Carla Soloria.

THE VIDEOGRAPHER:  All right.  The court reporter today is Dianna Kilgalen representing Planet Depos.  The witness will now be sworn.

PROCEEDINGS

CAPTAIN CHARLES THOMAS, having been duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

BY MR. SOYFER:

Q.  Good morning.  Would you please state your name for the record?

A.  Good morning.  Charles Michael Thomas.

Q.  Okay.  And as you just heard, my name is Michael Soyfer.  I represent the plaintiffs in this case.

We haven't met before today, correct?

A.  Correct.

Q.  Are you presently employed, Captain

Thomas?

A. I am currently employed, yes.

Q. Where are you employed?

A. The Norfolk Police Department, City of Norfolk, Virginia.

Q. What do you do there?

A. I'm currently the commanding officer for the Realtime Crime Center and the Criminal Intelligence Unit. I'm under the umbrella of the Strategic Intelligence Unit.

Q. Have you been deposed before?

A. I have, yes.

Q. What was that in connection with?

A. It was in my personal capacity.

Q. Okay. So just a personal lawsuit?

A. Yes.

Q. Were you the plaintiff or the defendant in that case?

A. The defendant in that case.

Q. Okay. And just very briefly what was that case about?

A. It was a vehicle accident where the plaintiffs suffered some injuries. A deposition was taken from myself, my wife, the plaintiff and the driver of the vehicle she was associated with. The case went to court and ultimately was ruled in my favor.

Q. Okay. And how long ago was that deposition?

A. It must have been five, five or six years ago.

Q. Okay. So I would like to just go over some of the ground rules. Obviously you have experience with this, but it sounds like it was a while ago.

So I know this deposition is taking place by Zoom and sometimes that seems maybe a bit informal. But you understand you are under oath today and it's as if you were testifying in a courtroom, correct?

A. Yes, I do understand that.

Q. I'd ask that throughout today, you have been doing a good job of this so far, but just make sure to give verbal responses. It's helpful for our court reporter and to have a good record. Is that fair?

A. It is fair. I understand. Thank you.

Q. I would ask that you not start answering my questions until I have finished. And likewise, I will not move on to the next question until I think you have finished answering.

Again, that is just important for our court reporter to keep a clean record. Is that fair?

A. Understood, yes.

Q. Sometimes throughout the day I will ask questions that are unclear to you or confusing. If I do that, please just let me know. I'm always happy to rephrase the question. But if you answer my question, then I will assume that you understood them. Is that fair?

A. Understood.

Q. Throughout the day, your attorneys might make objections. In general, unless they specifically instruct you not to answer, please just go ahead and answer the question. Sound good?

A. Yes.

Q. Is there any reason you can't give truthful and accurate testimony today?

A. There is no reason.

Q. I will preface this next question by saying that it's a standard deposition question but sometimes people take it the wrong way.

Are you on any drugs or other substances that would interfere with your ability to testify today?

A. No, I'm not.

Q. Are you receiving any compensation to appear here today?

A. No, I am not.

Q. Have you been made any promises in exchange for your testimony today?

A. No, I have not.

Q. Is your continued employment at all contingent on how you testify today?

A. No, it is not.

Q. Do you understand you are here today as

a representative of the City of Norfolk to testify on certain topics?

A. Yes, I do.

MR. SOYFER: Okay. I am going to, in the chat, introduce what will be marked Plaintiffs' Exhibit 12. Let me know when you are able to get that open.

THE WITNESS: It's open.

Q. Have you seen this document before?

A. Can you give me a moment to go through it?

MR. SOYFER: Yes.

A. Yes. I have seen this document before.

Q. Okay. And if you turn to page 3 of the pdf that I sent to you, you will see a section that begins or that's captioned deposition topics, right?

A. Yes.

Q. And you will see that that continues to page 5 of the document, correct?

A. Yes.

Q. And just generally speaking, we will go through each of them today, but are these the topics that you are prepared to testify on today?

A. Yes, I am.

Q. What did you do to prepare to testify today?

A. We held several meetings and deposition preparatory times with the attorneys. We reviewed multiple documents over that time frame to include things such as contracts, the new law that went into effect, general orders, communications between command staff and executive staff of the police department, communications between command and executive staff and city leadership, such as counsel, such as city management.

I have -- I have also reviewed multiple documents in reference to internal investigations. So multiple documents have been reviewed as well as meetings and deposition prep sessions.

Q. Okay. So there were a lot of things in there. So I just want to unpack that answer a little bit.

You said several meetings. Do you have an estimate of how many times you met with your attorneys?

A. Probably five or six would be an estimate.

Q. Okay. And about how long did each of those meetings last?

A. Approximately two to three hours per session.

Q. Who was there?

A. Ms. Soloria, Mr. Melita, Mr. Kravis. We have also had on multiple occasions Mr. Estrada, several other attorneys as well.

Q. Were any non-attorneys in attendance at those meetings?

A. Not that I recall, no.

Q. Okay. And you mentioned executive staff and command staff. So I just want to make sure I understand what those are.

What do you mean by command staff?

A. Command staff would include members of the police department such as captains and lieutenants.

Q. And what do you mean by executive staff?

A. Executive staff would include assistant chiefs, deputy chief, chief of police.

Q. Got it. At any point in time during your preparation did you meet with any current employees of the Norfolk Police Department?

A. I did not.

Q. Did you meet with any past employees of the Norfolk Police Department?

A. I did not.

Q. Outside of those preparation sessions, did you do any independent preparation for your deposition today?

A. If you include things such as reviewing the general orders, then yes.

Q. Okay. And so to prepare for your deposition today, you reviewed the general orders on your own without the attorneys? Is that -- am I understanding that correctly?

A. Yes.

17

Q.   Was there any -- were there any other documents you reviewed just independently without your attorneys to prepare?

A.   Not that I can specifically recall, no.

Q.   Did you speak to anyone else in the Norfolk Police Department about your deposition today?

A.   No.

Q.   Did you speak with anyone outside of the Norfolk Police Department about your deposition today?

A.   No.

Q.   So I would like to start with topic 1 on the deposition notice.  I will try today to tell you what topic specifically I'm talking about, but sometimes I will have questions that relate to multiple topics and -- but in -- but in general I will try to be clear about that.  Does that sound good?

A.   Understood.  Yes.

Q.   Okay.  So topic 1 is your reasons for renting, buying or otherwise acquiring Flock

18

cameras.
        When did Norfolk first start looking into getting Flock cameras?

A.   It was approximately 2022.  I was assigned to the chief's office as the lieutenant in charge of special projects.  Upon my assignment there, I was advised that a meeting had already been set up with Flock Safety and that the executive staff, which includes the deputy chief and chief of police, wanted me to attend.  So it was about that time frame when we started looking at it.

Q.   And what month was that in 2022?

A.   I don't know the month.

Q.   Okay.  Who was --

A.   Approximately, it was the wintertime moving into spring.  But the exact month, I don't know.

Q.   Okay.  The wintertime of 2022 moving into spring 2023 or --

A.   Sorry.  No.  It would have been -- my assignments began in '21, I believe, moving into

19

January of '22.  So it was in that time frame.

Q.   Understood.  Who was the chief of police at that time?

A.   At that time it was Larry (inaudible) --

        THE REPORTER:  What was the last name, Captain?

        THE WITNESS:  Boone, B-O-O-N-E.

Q.   And I guess I should just ask you generally what are the Flock -- what are Flock cameras?  Do you have an understanding what -- what I'm referring to?

A.   Yes.  Flock cameras are license plate readers that are positioned to take photographs, still photographs, of license plates as vehicles pass by them.

Q.   Okay.  Does the City of Norfolk have a particular model of Flock cameras?

A.   We have the Falcon.

Q.   Okay.  And who -- who in the City of Norfolk started looking into the Flock cameras initially?

A.   My understanding is that's Chief

20

Naughton was at a conference in Texas, that would be Assistant Chief Naughton, and spoke to somebody in Texas who had them down there.  And when she came back, she made the suggestion that we look into the Flock Safety system.

Q.   Who is Assistant Chief Naughton?

A.   I'm not sure I quite understand.

Q.   Yeah.  What is Assistant Chief Naughton's role?

A.   So currently her role is the assistant chief of Investigative Services Bureau.

Q.   And what was it around this time frame when the City started looking into acquiring Flock cameras?

A.   I believe her role at that time was as a the Field Operations Bureau assistant chief.

Q.   What is the Field Operations Bureau?

A.   The Field Operations Bureau includes divisions such as the patrol divisions, our K-9 division, traffic division.  It includes the boats and our harbor patrol division.

Q.   And I believe you said you were the

lieutenant in charge of special projects.

What is special projects?

A. Special projects was really unspecified for that particular reason.

I could tell you that when I was assigned there, Chief Boone's directive to me was I want you working on anything that you feel like is going to make the Norfolk Police Department better.

Q. Okay. And during what time frame were you in that role?

A. From -- I believe it was the fall of 2021 until August of '23. Yes.

Q. What role did you move into after that?

A. I moved into the role of Captain of the training division.

Q. Okay. Are you still in that role?

A. No, I'm not.

Q. Okay. What role did you move into after becoming Captain of the training division?

A. In April of this year I was transferred to the Strategic Intelligence Division.

Q. What is the Strategic Intelligence Division?

A. It is the division that houses the Real Time Crime Center as well as the criminal intelligence unit.

Q. Okay. And what is the criminal intelligence unit?

A. The criminal intelligence unit has investigators. They monitor things such as threats against dignitaries, providing safety and security during council meetings. It also houses crime analysts.

Q. What do you mean by threats against dignitaries?

A. So if there was a threat against say a city council member or a judge here in Norfolk or the mayor, they would monitor that, they would investigate that to determine the credibility of such threats.

Q. Well, what are some ways they might investigate that?

A. They would speak to the individuals who

make those threats, go interview them, determine if probable cause exists to effect an arrest.

If it's not a criminal threat, then they would -- you know, they would advise the chief of police as well as the dignitary involved. They might set up a security plan for them such as, you know, do they need -- do they need somebody with them for a given amount of time to provide safety and security.

Q. So going back to the Flock cameras, what made Assistant Chief Naughton interested in the Flock cameras?

A. So at the time, we had experienced a significant increase in stolen vehicles here in the City of Norfolk.

Also, with that, it was noticed that in stolen vehicles there were stolen guns that were being used for shootings here in the City of Norfolk, shootings into occupied dwellings, shootings into occupied vehicles, shootings of people.

So the police department was looking for a tool to help reduce those crimes in effect to reduce gun violence in the City of Norfolk.

Q. How did the Flock cameras help achieve that goal?

A. The Flock cameras at that time, it was our belief that would help us solve stolen autos by being able to arrest offenders more quickly, thus reducing their opportunity to commit shootings here in the City of Norfolk.

Q. How does it help you arrest offenders more quickly?

A. So if a stolen vehicle passes by a Flock camera, officers are alerted to that. Officers are then going to the location where it was last seen going through a camera and they search for that vehicle. If they are able to locate that vehicle, they will then verify that the vehicle is in fact stolen and then they would stop that vehicle and make an arrest, or further their investigation into that to determine if the person driving was a suspect and continue on in their investigation. If it required for an

25

arrest, that's what they would do.

Q. And could they continue on their investigation using information from the Flock cameras?

A. I'm not sure I understand the question.

Q. Yeah. I guess you said that, you know, if they didn't make an arrest at that moment, they could then continue on their investigation. How would they continue on their investigation?

A. I'm not sure that I said if they don't make an arrest they could continue.

MR. SOYFER: Okay.

A. So if -- if the person -- let me start over.

The Flock camera provides information that a stolen vehicle passed through a Flock camera at any -- at any given -- at any given time, at a time and location. So it tells an officer that a vehicle that has been reported stolen through the NCIC/VCIN system has -- was seen in that area.

Officers will respond to that area and

26

then search for the vehicle because the Flock camera is not going to tell them where it went after it passed through that location.

So if they were able to locate that vehicle, they would attempt a traffic stop. And if the investigation showed that that person was a suspect, they would make the arrest on that.

Q. Okay. And so would -- so I guess -- you mentioned alerts. If I call those hot list alerts, is that -- is that a reasonable terminology to use, or what would you call it?

A. No. They may be separate.

MR. SOYFER: Okay.

A. So the reason why they might be separate is a hot list alert requires an officer or investigator to enter the vehicle into the Flock system to create an alert.

A stolen auto automatically goes into the system through NCIC/VCIN and will alert officers when it passes through. So those are two separate ways.

They are alerts either way, but a hot

27

list alert specifically pertains to officers and investigators who have manually input a vehicle into the hot list.

Q. Okay. And other than receiving alerts, was there any other reason or purpose for which Norfolk was interested in acquiring the Flock cameras? And this is thinking back to 2022.

A. Well, I kind of want to clear that up.

We didn't get it for the purpose of getting alerts. We got it for the purpose of helping solve crime and diminish violent crime in Norfolk.

So the idea wasn't to just get alerts. I mean, the Flock system assists us in other ways as well. It can assist in finding missing people. It can assist us in locating vehicles who have been involved with Amber alerts.

So it wasn't just to get an alert. But what we used -- the plan was to use the system in that manner, was to assist us in those ways as well.

Q. Okay. One of the purposes for which you

28

wanted to use the Flock system back in 2022 was to investigate crime. Is that right?

A. Yes.

Q. How would you use the Flock cameras to assist in finding missing people?

A. So when a family member reports an individual as missing, one of the questions we would ask is are they driving a vehicle, are they associated with any vehicles.

If they are, we can put that vehicle license plate into a hot list, or it will come up as a missing person alert because of NCIC/VCIN.

So if the missing person is associated with a vehicle and that vehicle has a license plate, it would provide us an alert that that vehicle has passed through a particular location at a specific time.

Officers would then be able to go to that area, search for the vehicle. In the event that it was located, the hope is that they would be able to locate the missing person as well.

Q. Could you also look up where that

vehicle has been in -- has been seen in the past?

A. Yes, you could.

Q. Okay. Is that helpful?

A. It would be helpful, yes.

Q. Why is it helpful to look up where the vehicle has been seen in the past?

A. It would be helpful because if that person was traveling in a -- in an area multiple times a day and that person is either associated with a crime or is a missing person, it may give the officer a clue as to what area of the city that person might be staying for that particular moment, for that time frame.

Q. Okay. So the officer could look for patterns, right?

A. They could, yes.

Q. And that would provide a clue that might help the officer find where that person is. Is that your testimony?

A. It could assist with that, yes.

Q. Okay. So you mentioned Assistant Chief Naughton. Who else was involved in the decision to acquire Flock cameras?

A. Deputy Chief Maslow.

Q. And what are Deputy Chief Maslow's responsibilities?

A. His current responsibilities?

Q. Let's think back to 2022 when this decision was being made.

A. His -- his day-to-day job was to run the operations of the police department on a daily basis.

Q. Okay. So he kind of had overall responsibility --

A. Yes.

Q. -- for the police department?

Okay. Anyone else other than Deputy Chief Maslow?

A. I'm sure there are others, but at the time that's who I was interacting with on a regular basis.

Q. Okay. And so after Assistant Chief Naughton sort of expressed this interest following the conference she attended in Texas,

what steps did the City of Norfolk take to investigate the Flock cameras?

A. We invited Flock Safety in to provide us with a presentation on the capabilities of the Flock cameras.

Q. And when was that?

A. I don't know the exact date. If you -- if you had a document that showed that, I would -- it would refresh my memory.

MR. SOYFER: Okay.

A. But off the top of my head, I don't have a specific date.

Q. Did the City of Norfolk consider any other companies that make license plate reader cameras during that process?

A. No, not at that time.

Q. Why not?

A. Because Flock Safety was going to provide us with what we were trying to do. Additionally, Flock was already in our area. They were in Hampton. They were in Chesapeake and Suffolk. And so as a regionalization, it would be helpful to be able to share information regionally to help with the same problems that I have already -- I have already described.

So because of that, we thought it was in the best interest of the City of Norfolk and the citizens to purchase the Flock Safety product because it provided us with what we wanted and needed as well as the ability to work with and communicate with our neighboring cities.

Q. And why is that helpful?

A. Because people driving vehicles don't typically stay in one city. So they traverse to and from cities around here. The Hampton Roads area is pretty tightly connected. And so those who are either missing or stolen vehicles or those who commit crimes tend to pass through the neighboring cities on a regular basis. So that's why it would be helpful.

Q. So you can -- if someone commits a crime in Norfolk, you can continue to follow them into the neighboring jurisdictions. Is that right?

33

A. So --

MR. KRAVIS: Objection. Mischaracterizes prior testimony. Go ahead.

A. So I would say that you could follow them. The word follow would not be accurate.

Again, the system allows us to place somebody at a particular location at a particular time.

MR. SOYFER: Okay.

A. It simply tells us that they passed through that location. And if we deem necessary, we could send officers or investigators to that area to try to locate that person.

Q. Okay. But you can't send -- well, tell me, can you send officers or investigators into other jurisdictions to locate a person?

A. Yes, we can.

Q. Okay. So you can send them into, say, Chesapeake or Portsmouth?

A. Yes, we can.

Q. Okay. Does that require any coordination with those jurisdictions to be able

34

to do that?

A. Not typically, no. I mean, if -- if we need to, we can -- we can simply call over there and let them know we are in their city looking for a vehicle.

Q. Did you reach out to any other Hampton Roads jurisdictions during the process of deciding to buy the Flock cameras?

A. I did. I reached out to Newport News. I reached out to Chesapeake. And I believe I spoke with Suffolk as well.

Q. And why did you reach out to them?

A. I reached out to them to ask if they thought the Flock Safety system was a worthwhile system, to ask them if it had actually assisted in solving crimes that we were interested in solving, if it actually did assist them in locating stolen vehicles and then subsequently arresting individuals involved in stolen vehicles.

Q. Did you discuss sharing information with those jurisdictions?

35

A. We did at some point. I can't tell you if it was before we purchased the product or after, but we did eventually discuss sharing data, yes.

Q. Okay. When Norfolk made the decision to purchase the Flock cameras, was the assumption that data would be shared across these jurisdictions?

A. Yes.

Q. And so you mentioned that Flock presented to you about the capabilities of the Flock cameras during the -- during your decision-making process. Is that right?

A. Yes.

Q. Okay. Do you know who from Flock made that presentation?

A. It was Dan Mento.

Q. Okay. And who from the Norfolk Police Department attended?

A. I was there. The deputy chief was there. We had some IT folks there.

Anything technology related, we always

36

invite IT just to ensure we cover that -- that basis.

Q. Was Assistant Chief Naughton there?

A. I don't recall if she was there or not.

Q. Okay. And so you mentioned the presentation was about the capabilities of the Flock system. Is that right?

A. Yes.

Q. What capabilities of the Flock system stood out to you?

A. Its ability to send the alert when a stolen vehicle had passed through it. Its ability to send us an alert when a vehicle associated with a missing person had passed through it. Those were the -- those were the key aspects for us.

Q. Do you know what vehicle fingerprint is?

A. No. That's not a term that I recall hearing.

Q. Okay. Do any of the -- did the ability to search within the Flock system -- sorry. Scratch that.

Was the ability to search within the Flock system a feature that you thought would be useful during that presentation?

A. Yes.

Q. And why?

A. Because if we had an incident that occurred involving a vehicle, it would give us the ability to locate that vehicle. And with the hope of associating an individual with a vehicle who may have committed a crime, to get that person arrested and off the streets as quickly as possible.

Q. Why does it help you associate an individual with a vehicle?

A. I don't think I said it helps us associate a person.

If we can identify the vehicle, that identification would associate that person with a vehicle.

Q. Did the ability of the system to store data for up to 30 days at a time appeal to the City of Norfolk?

A. It did. I don't -- I don't think the amount of days itself specifically was an appeal. The fact that it could provide us with some historical data was -- was good in my opinion.

Q. Why is it good that the system could provide you with some historical data?

A. Because oftentimes people report late crimes that have occurred. They report multiple days after somebody has gone missing. And the ability to go back, at the time 30 days, was -- would be useful to us for that purpose.

Q. Is that the only reason it was useful?

A. I can't think of any other reason it would be useful other than trying to investigate a crime that occurred within that 30-day time frame.

Q. Did any -- have you heard the term machine learning in connection with Flock?

A. Yes.

Q. Are you aware of any machine learning features in the Flock system?

A. I couldn't speak specifically to the machine learning itself, but I have heard the phrase, yes.

Q. Was that something that appealed to the City of Norfolk when making the decision to acquire the Flock cameras?

A. It was not a deciding factor, no.

Q. How many cameras did the City of Norfolk decide to acquire from Flock?

A. Initially we acquired 172.

Q. Has that number changed since then?

A. Yes. We added four at some point in the last several months. So the total is 176.

Q. Okay. We will come back to that.

But just thinking about 2022, and over the course of making this decision to acquire Flock cameras, did the number of Flock cameras the City of Norfolk planned to acquire change over time?

A. During the purchase process?

MR. SOYFER: Yes.

A. Not in particular.

I mean, the initial idea from the deputy chief was let's see what 20 cameras looks like.

We had no idea what -- what the system was, what it looked like.

But that was not a directive that was given that we had to stay within or anything like that. It was let's just see what 20 looks like and let's go from there.

So yeah, to some degree, I mean, it changed, but we didn't go into it with a predetermined amount of cameras that we were going to get.

Q. What guided your decision on the number of cameras to buy?

A. So throughout the process of identifying the locations, we did not have a number of cameras in mind.

I met with Flock multiple times to go over locations in the City of Norfolk that had high propensity for violence. So we looked at heat maps that were created to show that and we went through those maps location by location to determine where we would put cameras that would

41

assist us in those investigations.

And at the end, they advised us that it would take 172 cameras to do that.

Q.   When you say they advised us, you meant Flock advised you that it would take 172 cameras?

A.   Yes.

Q.   And did they explain specifically why that would take 172 cameras?

A.   Yes.  I mean, that's -- we plotted 172 locations.

And when I say locations, one intersection itself takes four cameras to -- to get a visual on that intersection because of vehicles traveling in all four directions.  So that's -- that's why.

Q.   Okay.  And are the hot spots always right at intersections?

MR. KRAVIS: Objection.  Vague.

A.   So they're -- no, not necessarily.  They could be on a street.  They could be at an intersection.  They could be at a neighborhood.  So . . .

42

Q.   And so is the idea to place cameras at the intersections around hot spots?

A.   Yes.

Q.   And why -- why is that useful to place them at the intersections?

A.   So if a vehicle has been associated with somebody who committed a crime, if that vehicle passes through that intersection, there would be evidence of that that we could follow up on.

Q.   Okay.  And do you have to place cameras at multiple intersections around hot spots, in general?

MR. KRAVIS: Objection.  Vague.

A.   In order to -- yes, you would have to place cameras at multiple intersections.

Let's just say a neighborhood is a hot spot.  You would look to place cameras in the most likely intersection a vehicle would pass through to leave that neighborhood or to come into that neighborhood.

Q.   Was one of your goals in mapping out the Flock cameras to prevent people who committed

43

crimes from being able to find routes around the Flock cameras to get out of those hot spots?

A.   Yes.

Q.   How did Norfolk decide on the -- well, let me ask you.

The contract with Flock is a five-year contract.  Is that right?

A.   Yes.  That sounds right.  Yes.  Without seeing the contract in front of me, that sounds right.

Q.   How was the decision made to enter into a multi-year contract like that?

A.   I don't know that there was discussion about it.  That was just what they -- they presented with us, a five-year contract, to maintain the pricing for that five years.

So in order to maintain the pricing, that seemed like the best -- the best course of action for us.

Q.   Are you familiar with Falcon Flex cameras from Flock?

A.   I am, yes.

44

Q.   What are those?

A.   They are mobile Falcons that you could place at different locations.  So they are not affixed to the ground.

Q.   Has -- has the City of Norfolk ever looked into acquiring Falcon Flex cameras?

A.   We asked them if we could test one and they would not allow us to test one.  So the discussion ended with that.

Q.   Okay.  Are there any other Flock products that you are aware of other than the Falcon and Falcon Flex cameras?

A.   They have the Raven which is a gunshot detection camera.  The camera is not going to -- it has a gunshot detection device.  Also a camera system with it is my understanding.

They also have a Real Time Crime Center platform with live view type of cameras.

I'm not familiar with anything else other than those.

Q.   Have you ever heard that Flock has the ability to turn live view cameras into license

plate readers?

A. Yes.

Q. And how -- how did you learn about that?

A. It was part of the discussion during the presentation that you could turn things like your traffic intersection cameras into LPRs with software. I think they call it Wing.

Q. And did the City of Norfolk opt not to purchase Wing?

A. We did not. Correct.

Q. Okay. Do you have any current plans to do so?

A. No.

Q. Are you aware -- sorry. Did I interrupt you?

A. No.

Q. Okay. Are you aware that Flock is rolling out the ability to capture video with its license plate reader cameras?

A. I have not seen that, no.

Q. Okay. And so you are not aware that Flock is planning to allow customers to capture video using existing license plate readers for free beginning this year?

A. I have not heard that, no.

Q. Okay.

A. With currently existing cameras is what you are saying?

MR. SOYFER: Yes.

A. No, I have not heard that.

Q. Have you heard of Flock Condor cameras.

A. I have heard the term. I just don't recall what they do.

Q. Did you have a role in deciding where to put the Flock cameras that the City of Norfolk acquired?

A. I was involved.

Q. Anyone else?

A. The deputy chief and the assistant chiefs of police.

Q. And when you say the deputy chiefs, just for clarity, there is only one Deputy Chief Maslow, correct?

A. Correct.

Q. Okay. You had said the assistant chiefs of police. Who are the other assistant chiefs besides Assistant Chief Naughton?

A. Assistant Chief Williams and Assistant Chief Howard.

Q. Okay. And what, thinking back into when you were deciding where to put the cameras, what were Assistant Chief Williams' responsibilities?

A. So, collectively, after I sent them a map with the locations, it was sent out to them to ensure they -- to ask whether they had any objections to the locations. And to my understanding, they did not.

So all -- all of their roles were to examine the map of the locations to determine if there were any objections to -- to any of the locations.

Q. Did they have any objections to any of the locations?

A. Not that I'm aware of. Not that made it to me.

Q. And why would they have had objections to locations?

MR. KRAVIS: Objection. Calls for speculation.

A. Yeah. I don't know why they would. That would be up to them.

Q. Okay. So there wasn't something kind of specific in mind. It was just a matter of sending them the maps and making sure they didn't see any problems. Is that fair?

A. Yes. That's fair.

Q. Okay. Can you just tell me a little bit more about how you decided which specific areas you wanted to cover?

A. Sure. I asked our crime analyst to provide me with hot spot maps for violent crime. And I also asked them to provide me with calls for service maps.

And so what we did is those -- those two maps essentially create heat maps for violent crimes and calls for service.

So when we looked at those maps, we wanted to ensure that we could provide the most

amount of intelligence to investigators while they were investigating crimes in those areas as we could in order to reduce those violent crimes in those areas.

And so we looked at each one of those areas individually, we zoomed in, to locate the best intersections to put cameras at that would help provide the intelligence that we thought necessary to help solve these crimes and then prevent further violence.

Q. Can you just explain briefly what is a call for service?

A. When someone calls 911.

Q. Okay. And when you were mapping these out, did you limit the calls for service to calls for violent crimes or was it just every call for service?

A. I believe it was -- it was priority 1, 2 and 3 calls for service. So that would include violent crimes.

Q. Okay. So calls for service are assigned a priority. Is that right?

A. Yes.

Q. Okay. And so you testified we could provide the most amount of intelligence to investigators while they were investigating crimes in those areas. Is that right?

A. Yes.

Q. And how did you seek to maximize the intelligence that was available to investigators from the cameras?

A. By putting cameras in locations where suspects may travel to and from a location to commit a crime so that we could identify any vehicles associated with crimes that would assist investigators in providing clues as to who may be involved in those crimes, if they could track down the vehicle, or if the vehicle is stolen, you know, we could set up alerts that way. But that would be how.

Q. Okay. So that would -- you wanted to provide a way to give investigators clues as to how someone got to or away from a crime scene. Is that right?

MR. KRAVIS: Objection. Mischaracterizes prior testimony.

A. Yeah, no. That's -- it's not -- I guess I will clarify.

If a suspect has traveled to a location to commit a crime, or left a location after committing a crime, we wanted to be able to provide that information to investigators to follow up on.

Q. Okay. Did you consider locating the cameras in a way to prevent routes around them?

I guess did you -- so when you are thinking of placing cameras in these hot spots to try to capture people traveling to or from, you know, a criminal obviously could adapt and find a way around them. And so was that something you considered when you were deciding where to locate the cameras?

A. Yes.

Q. Okay. You wanted to reduce the possibility that someone could evade the cameras when going to commit a crime. Is that fair?

A. Yes.

Q. In your experience as a police officer, do criminals typically try to evade detection by the police?

A. Yes.

Q. Do non-criminals typically try to evade detection by the police?

MR. KRAVIS: Objection. Vague. Calls for speculation. I think at this point it's beyond the scope. But go ahead. You can answer.

A. I don't know what -- I don't have any idea.

Q. Okay. Have you repositioned any cameras since the initial placement?

A. There was -- there is one that we had to change locations because they were doing construction in the area.

There was one in the initial phase of installation that we realized we essentially put two cameras in the same spot we had to move.

But other than that, I don't -- I don't recall moving any at this point.

53

Q. Sorry. You realized you put two cameras in the same spot?

A. Essentially. They weren't at the same -- at the same spot, but they were about a block from each other which was not useful for us, so I decided to move one of them.

Q. Why wasn't that useful?

A. There was no need to have two cameras covering the same block. It was unnecessary.

Q. And why not?

A. We don't need redundant information.

Q. Okay. And so you relocated that camera. Is that right?

A. Yes.

Q. Do you recall where you relocated it?

A. I do not.

Q. Do you recall if it was a completely different area of the city, the same general area, anything like that?

A. I believe that was to a different area of the city.

Q. Has Flock provided you with any analyses

54

of generally how the cameras are doing or, you know, whether they could be repositioned, anything like that? This is since they went into operation just to clarify.

A. Can I ask you to clarify what kind of analysis do you mean?

Q. Just any sort of analysis of the effectiveness of individual cameras or the overall camera network.

A. Not that I'm aware of, no. They -- they run a health report to determine whether the camera itself is functioning, but that's -- to my knowledge, that's the extent of it. Yeah. So I have not seen anything from Flock that says this camera gives you more than that. I have not seen that.

Q. Okay. And just to be totally clear, nothing like this camera is capturing too few vehicles, you know, you should reposition it or anything like that?

A. Not that I'm aware of. I have not

55

seen -- has it been provided to somebody somewhere? But I have not seen that, no.

Q. Okay. I am going to -- this will be Exhibit 13. I'm going to drop this into the chat. And let me know when you are able to download that.

MR. KRAVIS: We see it.

Q. Okay. And so just looking at the top e-mail, you will see this is an e-mail from Dan Mento to Michael Maslow with the subject Flock systems in Hampton Roads dated August 15th, 2022, correct?

A. Yes.

Q. And I should say for the record this is a document bearing Bates stamp NORF 004032. And I would like to start with the bottom e-mail which is on page 4034. Let me know when you are there.

A. I'm there.

Q. Okay. And you can't see -- sorry. You can't see who this e-mail has been sent to, correct?

56

A. No, I don't think so. I don't think so.

Q. Okay. But if you go up to the next e-mail up in this chain on 4033, you will see the e-mail from Dan Mento, correct?

A. Yes.

Q. Okay. And it's to Deputy Chief Maslow. And you are cc'ed on this e-mail, correct?

A. Yes.

Q. Okay. So I would like to go to Deputy Chief Maslow's e-mail at the bottom. Do you see that?

A. Are we back down to 34?

MR. SOYFER: Yes, we are on 34.

A. Okay.

Q. And he writes: Dan, can you advise me what other Hampton Road cities currently use the Flock camera system?

Do you see that?

A. Yes.

Q. And then if you just skip two sentences forward, you will see that he writes: We are currently considering our best purchasing options

57

and may want to leverage an existing contact with one of our sister cities. Also, I want to confirm that the Flock systems set up in different jurisdictions can communicate with each other and information recorded in one jurisdiction is readily available in the other jurisdictions who have Flock cameras.

Did I read that correctly?

A. Yes.

Q. And so this is Deputy Chief Maslow reaching out to Flock to make sure that the cameras in each jurisdiction could communicate with each other, correct?

A. Yes.

Q. And we discussed previously, that was, you know, a key factor in making the decision to acquire the Flock cameras, right?

A. Yes.

Q. That ability to pull data together was important to Norfolk, correct?

A. Yes.

Q. Okay. If you go up to Dan Mento's

58

e-mail, this is the one beginning on 4033, you will see he writes back: Good morning, Deputy Chief. I hope you had a good weekend. Regarding using an existing contract, Chesapeake used the Hampton contract to piggyback off of and avoid going to an RFP. Another option is the Omnia National Cooperative Agreement that both Franklin and Suffolk used. This agreement enables any agency to purchase our cameras directly without having to go through an RFP process.

Did I read that correctly?

A. Yes.

Q. And why was Deputy Chief Maslow interested in potentially using another jurisdiction's contract to piggyback off of?

MR. KRAVIS: Objection. Calls for speculation.

A. Yeah. I mean, I'm not sure exactly what his answer would be.

The reason why we do that for any purchasing is in order to get the -- get the same pricing as another jurisdiction was able to

59

receive. It can speed up the process so we don't have to put it out for bid.

So, you know, as long as another -- another jurisdiction close by has contracted with the company, we -- we are legally able to piggyback off of that as long as they have cooperative language within that agreement.

So that's why he would do that, typically. I mean, for this specific e-mail, you would have to ask him.

Q. Okay. You sort of starting getting at this, but why is it desirable to avoid the RFP process?

A. Because it takes a long time.

Q. Why does it take a long time?

A. I don't -- I don't know why.

Q. Okay. He -- so Dan Mento also mentioned the Omnia National Cooperative Agreement. Do you see that?

A. Yes.

Q. Okay. Do you know what that is?

A. I do vaguely, yes.

60

Q. What is it?

A. Omnia is a company that allows governmental -- governments, city governments, municipalities, to work off of each other's contracts as long as there is cooperative language within those contracts.

Q. What are the advantage -- what are the advantages of that if any?

A. The advantage of that would be to avoid the request for a proposal process which again can take a long time.

MR. SOYFER: Okay.

A. It also allows you to take advantage of pricing that they may have provided to another agency. Those are two things that I can think of.

Q. When you go through the request for proposal process, that requires accepting bids from anyone who chooses a proposal. Is that correct generally?

A. Yes.

Q. And the City of Norfolk never considered

any vendor for automated license plate readers other than Flock during this process in 2022, correct?

A. Correct.

Q. Okay. So you will see, if you go up a page, this is on the first page of the document, Deputy Chief Maslow responds to Dan Mento, and then in the last sentence of his e-mail he writes: We are looking to start with 20 cameras.

Do you see that?

A. Yes.

Q. And that's consistent with your testimony that the City just generally decided to start with 20 cameras, right?

A. Yes.

Q. Okay. And that number wasn't chosen for any specific reason, was it?

A. It was not.

Q. Okay. Was there any like budgetary rationale behind choosing 20 cameras?

A. No. It's simply just a number honestly pulled out of nowhere. It was just to kind of see if -- see how they worked. That was the initial thought.

Q. Okay. And if you look at Dan Mento's response then to Deputy Chief Maslow, in the second paragraph of his e-mail, he writes: Next step would be for us to hop on a call and map out the 20 camera locations.

Do you see that?

A. Yes.

Q. Did you have an initial call to map out 20 camera locations?

A. So we had calls, but -- so what -- when Deputy Chief Maslow is handling this from his side of it, this was his conversation.

So as I am working on it from my side, I reach out to Dan to schedule a meeting, I went into it saying, Dan, I understand we are looking at 20 cameras, but let's go through the locations that we have identified and then go from there.

So I didn't say let's find 20 locations. I said let's find out what it's going to take to help reduce the gun violence in our city,

whatever that takes, let's find out, and then we will go from there. If we need to reduce the number to 20, that's fine, but we want to know what is it going to take to help keep the citizens of our city as safe as we possibly can.

And so that's -- that's the mission that I went into this project with and that's what I went into this initial call with.

Q. Okay. And so just to make sure I'm clear on the timeline, that was a conversation that you had during this initial call with Dan Mento following this e-mail, correct?

A. I couldn't tell you if it was following this e-mail. I can't tell you if it was independent of this e-mail. I couldn't tell you the dates exactly.

I know that my part of this in getting these locations plotted was to work with Dan and his team and then go from there.

I knew that Deputy Chief Maslow had the idea of starting with 20. But if we needed to plot every location that we thought would be most beneficial for the city and then reduce it to 20 based on the deputy chief's desire, then that's what we would have done. But I didn't go into the planning phase and plotting phase with just 20 on my mind. That just -- it wasn't -- that wasn't -- the end result was on my mind, not 20.

Q. Okay. Understood.

So if I'm understanding the process correctly, you identified certain hot spots that you wanted to cover. Is that right?

A. Yes.

Q. And then Flock advised you on where you would need to place cameras to cover those hot spots, correct?

A. I want to be clear about it because I don't want to insinuate that I turned it over to Flock and let them do it. That's not how it worked.

So what we did is we were on a Zoom call or Teams or whatever it was at the time. I shared my screen with the hot spot map with them. We zoomed into every hot spot location and I said

65

I want a camera here, I want a camera here and -- I said I want cameras here to cover this -- this area.

So after we put all that together, some time went by, I don't know if it was days or weeks, and they said here's a map of all the locations we plotted, here's how many it's going to take.

Q. Okay. So you told Flock the areas where you wanted cameras, correct?

A. Yes.

Q. Okay. And then Flock came back to you with the number of cameras required to cover those areas, right?

A. Correct.

Q. Okay. And do you have an understanding how Flock came up with the number of cameras required to cover those areas?

A. They counted them.

Q. Okay. So it's just every point you kind of, you know, pointed to on the map, Flock put a camera there?

66

A. We drop a pin on a map with whatever software they were using. They would drop a pin. And then when we were done, the pin count was 172.

Q. Okay. And when you -- when you drop a pin on the area, is that equal to one camera?

A. Yes. I believe that's how it was. It may be where I said I want this intersection covered, they drop a pin, after the meeting -- we had two meetings because this was -- this was -- it took a lot of time to do this.

I remember them saying, you know, it will take four cameras per intersection.

They may have dropped a pin at the area that I wanted and then they came back later and said here's what we think it's going to take to cover that area. We may not have dropped four pins exactly at that particular time. But we zoomed in, I said I want this location covered, and we'd move on to the next location.

Q. Okay. What is -- do you know what E Plus is?

67

A. E Plus?

Q. Yes.

A. No, I don't.

Q. Okay. Did anyone ever object to working with Flock to decide on the placement of the cameras?

A. I -- I don't know what you mean by anybody, anyone. Who is anyone?

I mean, internal, external from the police department? I'm not -- I'm not sure.

Q. Yeah. Did anyone within the City of Norfolk say it was a conflict of interest to have Flock help decide on the number of cameras needed?

A. So there was some misunderstanding -- I think I know where you are going with this, so I will meet you there.

MR. SOYFER: Okay.

A. Typically, when the City contracts a camera -- for any reason whatsoever they contract a camera company, there is a process in place that says we will contract somebody else to

68

identify the location.

And this is more for like a parking garage.

MR. SOYFER: Okay.

A. So they don't want -- they don't want the camera company identifying the locations in the parking garage because the camera company essentially has the ability to say, well, you know, we think you need 300 cameras in this area. Right?

So the City believes to some degree that that is a conflict of interest.

This project, like I said -- and I went back and forth with -- I can't remember whether it was purchasing or whomever, to help them understand -- we had a couple of meetings to help them understand what we were doing. And when they understood what our project was about, they said, clearly, you are right, this has nothing to do with us, this isn't a conflict of interest situation, it's a matter of public safety, the police department is the experts on public

safety, you guys are free to handle this.

So there were some e-mails exchanges back and forth about that. But once we explained to them this wasn't a parking garage, it wasn't like a fixed location that, you know, a camera company could come in and just sort of throw out a whole bunch of cameras that we don't need -- but that wasn't the situation here. So they turned that over to me/us, the police department, to handle.

MR. KRAVIS: And counsel, we have been going for about an hour and 15 minutes now. Whenever you get to a logical stopping point, maybe we could take a break then.

MR. SOYFER: We can go off the record.

THE VIDEOGRAPHER: All right. We are going off the record. The time on the monitor is 10:47.

(Thereupon, there was a recess taken at 10:47 a.m.)

(Thereupon, the proceedings were resumed at 10:58 a.m.)

THE VIDEOGRAPHER: We are back on the record. The time on the monitor is 10:58.

MR. KRAVIS: Counsel, before we move on to the next question, Captain Thomas just wanted to offer one elaboration on his answer to one of the earlier questions you asked about the preparation for 30(b)(6) -- for his 30(b)(6) testimony.

THE WITNESS: Yeah. I wanted to add that at some point we did have a discussion with our technical support unit as it pertains to vehicle-mounted license plate readers and how they work. That was a brief conversation we had with them just to get a better understanding of it.

You asked -- the question was did I meet with anybody else within the police department about my testimony. So that would be in addition to what I said.

MR. SOYFER: Okay. Great. Thank you. I appreciate the clarification.

I have dropped into the chat a document

that is going to be Plaintiffs' Exhibit 14. Just let me know when you are able to get that downloaded and open. But for the record, this was a document bearing Bates stamp NORF 014661.

THE WITNESS: Yes. We have it up.

BY MR. SOYFER:

Q. Great. And if you look at the first page, you will see that this is an e-mail from you to Dan Mento at Flock Safety.

The subject is Norfolk Flock camera locations and it's dated October 28th, 2022, correct?

A. Yes.

Q. Okay. Great.

I want to start with the first in time e-mail which is actually on the first page Bates labeled 14661. And this is an e-mail from you. Do you see that?

A. Yes.

Q. Okay. And you write: Attached is a document that has all of the locations we would like to have covered with Flock cameras.

Do you see that?

A. Yes.

Q. You go on: This document also contains the locations that are being purchased by NRHA and those locations are noted as such.

Did I read that correctly?

A. Yes.

Q. What is NRHA?

A. The Norfolk Redevelopment Housing Authority.

Q. What is that?

A. It is the quasi-governmental body that oversees housing -- housing, neighborhood subsidized government housing, government subsidized housing here in Norfolk.

Q. Okay. Is it part of the City of Norfolk government?

A. It's -- I guess it's technically not a part of the city government. It's -- they work with the city government. It's not technically an arm of the government. At least my understanding of it.

73

Q. When you say technically, why are you using that qualifier?

A. Because I believe that they are subsidized. They have -- there is some funding that comes from the city to them. But to my -- my understanding of NRHA is that they are a standalone body that works closely with the city in reference to subsidized housing.

Now, how specifically that happens, I don't know.

Q. Do they also work closely with the Norfolk Police Department on any issues?

MR. KRAVIS: Objection. Beyond the scope.

A. What do you mean by closely?

Q. Well, let me just get rid of that.

Do they work with the Norfolk Police Department on any issues?

MR. KRAVIS: Same objection.

A. We -- we do work with them. We have officers who are assigned to NRHA neighborhoods. So to that degree, yes.

74

Q. And why did you include the NRHA cameras in the document that you sent to Dan Mento?

A. Because NRHA prior to us getting Flock cameras purchased their own cameras. I believe the number was 22. And there is -- there would be no reason for us to duplicate efforts by placing a camera at the same locations they placed cameras because they were willing to share the data from their locations with us.

Q. So there was no need to place cameras at locations where the NRHA already had them, correct?

A. Correct.

Q. Because those cameras would provide data to you just like your own cameras, right?

A. Correct.

Q. And those are, just to -- just so I'm clear, those cameras are Flock cameras, right?

A. Yes.

Q. Okay. So you go on: Based on our last meeting, I put together a list of intersections with correlating latitude and longitude data.

75

Do you see that?

A. Yes.

Q. Okay. Then in the next sentence, you write: If I recall correctly, you advised that with that data your technical team would be able to determine exactly how many cameras it would take to cover all of the locations.

A. Right.

Q. Correct?

Okay. And then if you go to the first in time e-mail, this is again another e-mail from you about 16 days later from the e-mail we were just looking at. Do you see that?

A. Is that the one Friday October 28th?

MR. SOYFER: Yes.

A. Yes.

Q. Okay. And again you are writing to Dan Mento, correct?

A. Yes.

Q. You write: We have decided to move forward with having 100 cameras installed.

Do you see that?

76

A. Yes.

Q. And so between that first e-mail from Deputy Chief Maslow to now, Norfolk had gone from being interested in 20 cameras to now 100 cameras. Is that right?

A. Yes.

Q. And was the reason for that increase just to cover all of the hot spot locations that you had identified?

A. The reason for that was to provide better coverage to the hot spots that I had provided.

Q. Okay. And so 100 cameras provides better coverage than 20 cameras, correct?

A. Yes.

Q. Okay. Because more cameras provides more coverage, right?

A. Yes.

Q. Okay. And so then in the last sentence of this e-mail you write: Can you guys advise us how many cameras it would take to cover the highlighted locations?

77

Do you see that?

A. Yes.

Q. Is that signaling to Flock that you were willing to purchase more cameras if needed to cover the highlighted locations?

A. I believe so, yes.

Q. Okay. And so the City of Norfolk was willing to purchase more cameras to get more comprehensive coverage of those locations. Is that right?

A. Yes.

MR. SOYFER: Okay. You can set that document aside. I will -- I will be putting a new document in the chat in just a moment. This will be Plaintiffs' Exhibit 15.

Let me know when you have that opened.

Just for the record, this is a document bearing Bates stamp NORF 007695.

THE WITNESS: It's open.

Q. Okay. And you will see that this is an e-mail from Michael Maslow to you with the subject Flock camera system installation

78

information dated December 16th, 2022, right?

A. Right.

Q. Okay. And so this is about two months after the e-mails we were just looking at before, correct?

A. It is.

Q. Okay. And this is quite a lengthy e-mail chain, but I only have questions about a few of the e-mails.

You are obviously free to scroll through it, but my first question will be about Deputy Chief Maslow's e-mail to you which starts on the page ending in 95 and goes to the page ending in 96. Do you see that?

A. Yes.

Q. Okay. And my first question is -- you will see -- so the e-mail is from Michael T. Maslow and the e-mail address is Michael.Maslow@Norfolk.gov, correct?

A. Yes. What page are you on? 95?

Q. I'm on 95.

A. Okay. Yes.

79

Q. And then you will see someone is cc'ed with the name Michael Maslow, but the e-mail address is Mcmanuska@NNVA.gov. Do you see that?

A. I don't see that.

Q. Okay. If you look at the cc --

MR. KRAVIS: Right there.

MR. SOYFER: Thanks, Jonathan.

Q. Do you see it now?

A. I do.

Q. So is NNVA.gov to your knowledge a Newport News e-mail address?

A. I don't -- I don't know. I couldn't give you --

Q. Okay.

A. -- an answer there. I don't know.

Q. Do you have any understanding of what this e-mail address is or if it's an alternate e-mail address for Deputy Chief Maslow?

A. I -- I don't know.

Q. Okay.

A. I can tell you that Chief Maslow on a regular basis, when he sends e-mails, he ccs

80

himself on them. As such, you see his name, but then a different e-mail address corresponding to that -- just based on my history of getting e-mails from him, my guess here is that this MCMAN -- Manuska e-mail was inadvertent.

MR. SOYFER: Okay.

A. Because it is common practice. I mean, you have got the e-mails, I'm sure. He ccs himself on every e-mail that he sends out.

Q. Okay. Got you. I was just curious to know what that was.

So he writes: Mike, does Flock know we have moved from 107 cameras to 172?

Do you see that?

A. Yes.

Q. Okay. And then you respond to him on December 15th. Do you see that?

A. Yes.

Q. This is on 95.

You write: Chief, yes, sir. I reached out to him early this week and discussed it and Rebecca is requesting an updated quote from him

81

to reflect the 172.

Additionally, I have set a meeting with he and Brian, open paren, Flock technical guy, closed paren, to start talking about the placement of the additional cameras.

Did I read that correctly?

A. Yes.

Q. So the last e-mail we saw, you were up to 100 cameras?

A. Right.

Q. Do you remember that?

A. Yes.

Q. And Chief Maslow is now asking does Flock know we moved from 107 to 172, correct?

A. Yes.

Q. Okay. And based on your e-mail, I understand that 172 now reflects additional locations that are covered by the Flock cameras.

A. Yes.

Q. Is that right?

A. Correct.

Q. Who is Rebecca?

82

A. Rebecca McMicking is -- she works in our public safety finance group. So she processes payments.

Q. Okay. So she is kind of like a finance employee essentially? She has a finance role I guess is what I'm asking?

A. Yes.

Q. Okay. Did she have any role in deciding the number of cameras or where they would go?

A. Not at all.

Q. Okay. And why did you increase from 107 cameras to 172 cameras?

A. So if we go back to Exhibit 14 --

MR. SOYFER: Okay.

A. -- the way I did this initially was that -- and this may not be in order based on this particular e-mail, but I set priority locations based on -- based on the heat maps.

So as we move down those priority locations, you know, we had -- I got to -- and I don't know the exact location, but we got to one location where it was 100. So we were

83

comfortable with 100.

Then based on funding that was available, we could -- we could add the other locations. So we just added the other locations as -- you know, as I went down the priority list. And that's where the number 172 was finally settled on.

Q. So as you got additional finding, you decided to get more cameras. Is that fair?

A. At that time, yes, that was -- that was how it worked, correct.

Q. If you had had more funds available, would you have bought more cameras?

MR. KRAVIS: Objection. Calls for speculation.

A. Yeah, I don't know -- again, I set a priority list which included the hot spots. It included ingress/egress from the city.

You know, with those as parameters, once we met all of those needs, there was at the time no need to add more. So that's where the 172 came in from.

84

MR. SOYFER: Okay. So, actually, I will put a new document in the chat. And this will be Exhibit 16.

I will state for the record this is a document bearing Bates stamp NORF 009761.

Let me know when you have that open.

THE WITNESS: It's open.

Q. Okay. And you will see at the very top this is an e-mail from you to Mia Lorenz with the subject about the Virginia DCJF grant for 750K dated December 12th, 2022, correct?

A. Yes.

Q. Again, this is a pretty long e-mail chain. I just have questions about parts of it. You are free to flip through it. But I will kind of point you to what I have questions about.

A. Okay.

Q. So my first question, if you turn to the page ending in 64, you will see that there is an e-mail from Rita Chandler to Deputy Chief Maslow in the middle of the page. Do you see that?

A. Yes.

85

Q. Who is Rita Chandler?

A. **Rita Chandler at the time was our grants manager.**

Q. And what did her role entail?

A. **Managing grants.**

Q. Okay. Those are grants of money the police department receives for various spending purposes, I guess. Is that fair?

A. **Correct. Yes.**

Q. From what sources does the police department receive grants?

A. **It could be through DCJS. It could be anywhere. I mean, there's -- whoever is offering a grant, we could apply for it and get that.**

MR. SOYFER: Okay.

A. **It could be DCJS.**

Q. Could they come from the federal government?

A. **They could, yeah.**

Q. Could they come from the Virginia state government?

A. **They could, yeah.**

86

Q. Could they come from private entities?

A. **I guess they technically could, yes.**

Q. Okay. So I want to look -- well, let's start with Ms. Chandler's e-mail.

You will see she writes: Good afternoon, Chief Maslow. The grant requires that the items be listed as supplies/other items for the Flock cameras and Fusus subscriptions.

Do you see that?

A. **Yes.**

Q. She then goes on: I used the information received from Adria to start with those items, which is what you see in the supplies/other category, open paren, $690,000, close paren.

Who -- do you know who Adria is?

A. **Adria -- the only Adria I know is Adria Moore. She currently works as an admin assistant in the City Manager's office.**

Q. Okay. Do you know what she did as of November 28th, 2022, when this e-mail was sent?

A. **I do not.**

87

Q. Okay. So she writes: Here's what I got from Adria.

And I'm just going to skip the first sentence. But take a look at the second sentence: Based on the locations we have identified for camera installations, Flock has advised it will require 172 cameras to provide optimal coverage.

Do you see that?

A. **Yes.**

Q. And is that a true statement, that as of that time, it would require 172 cameras to provide optimal coverage?

A. **Yes. Seems to be.**

Q. Okay. So I would like to skip ahead in this paragraph to the very last sentence.

You will see she writes: We can lower this cost by reducing the number of cameras we have installed, but coverage likewise will be reduced.

Do you see that?

A. **Yes.**

88

Q. Okay. And so ultimately, the Norfolk Police Department did acquire 172 Flock cameras initially. Is that correct?

A. **Yes. That is correct.**

Q. And so the Norfolk Police Department obviously made the decision not to lower the cost by reducing the number of cameras, correct?

A. **Correct.**

Q. And by extension, likewise, made a decision not to reduce coverage by lowering the number of cameras, correct?

A. **Correct.**

Q. Okay. Okay. I just have one more question -- oh, actually, sorry. I have a few more questions on this document.

On page 62, which is the second page of the pdf, you will see towards the top the first full e-mail on this page is from Mia Lorenz to Rebecca McMicking, Rita Chandler and Kimberly Boone, and it's dated December 7th, 2022. Do you see that?

A. **Yes.**

89

Q. Who is Mia Lorenz?

A. **Mia is a procurement specialist for the City of Norfolk.**

Q. Okay. And what role did she have in the acquisition of the Flock cameras?

A. **So ultimately we used a sole source to procure the Flock cameras. She -- she essentially provided me with the sole source document that I had to fill out. And then once I submit it to her, she reviewed it and then submitted it to the chief financial officer for procurement. At least that is my understanding of the process. So -- so to some degree, she didn't really have much involvement with that, that process.**

Q. Okay. What is sole source?

A. **Sole source is a -- a request that we make through the city for purchasing. So going back to one of the other -- the Omnia question, there is -- you know, without going through an RFP, there are only a couple of**

90

**ways you can procure products or such as a public entity, one being through a cooperative agreement, which is what Omnia does, and another being through sole source, which makes the argument that you cannot purchase this type of service or product through anybody else. So that's -- that's the direction we went with this product, with Flock, because of its ability to communicate data between the other cities. That was the reason why we -- we elected to request a sole source procurement in this situation.**

Q. And is that the only feature of the Flock system that justified using the sole source process?

A. **I don't believe it is the only feature. I know there is a sole source document that discusses it. So if you -- if you have it that available, I would like to look at that --**

MR. SOYFER: Okay.

A. **-- before making any assertions.**

91

Q. Yep. Just asking for what you remember. But so I guess, if I'm understanding your testimony correctly, there are other reasons, and they are listed in the document. Is that right?

A. **Yes.**

Q. Okay. So I just want to ask one more question about Mia Lorenz's e-mail on the first page of this document ending in 61. You will see -- let me ask you first. What is Fusus?

A. **Fusus is a Real Time Crime Center platform.**

Q. What does it do?

A. **It -- it brings in video data to the -- to the platform itself for real time crime center analysts to view.**

Q. And you will see in the third paragraph of Ms. Lorenz's e-mail she writes: As for the Fusus cameras, there has been some push back from IT on moving forward. Do you see that?

92

A. **Yes.**

Q. By IT, she means information technology, right?

A. **Yes.**

Q. The City's IT department is who she means, correct?

A. **I would guess so, yes.**

Q. Okay. This appears to be politically motivated rather than security, from my limited knowledge. Do you see that?

A. **Yes.**

Q. And then you respond to her, writing: I think there may be some confusion about what I said and what exactly the Fusus, open paren, DMS, close paren, system actually does. Do you see that?

A. **Yes.**

Q. Do you know what she was talking about when she said that there was politically motivated push back?

A. **I don't. I don't recall what that was about.**

93

Q. Do you know what the confusion was that you identify here?

A. No. I don't remember the details of that.

Q. When Norfolk first -- when you mapped out the cameras, did you place any cameras at locations in other jurisdictions?

A. No. What do you mean? When you say other jurisdictions, do you mean cities?

Q. Correct. Like Virginia Beach, for instance?

A. Did I place them in other cities? Is that your question?

MR. SOYFER: Correct.

A. No. I wouldn't have the authority to do that.

MR. SOYFER: Okay. Let me put Exhibit 17 in the chat. And let me know when you have that open. But for the record, this is a document bearing Bates stamp NORF 004715.

And this is, again, quite a long e-mail chain, but I just have questions about a few

94

parts of it.

THE WITNESS: Okay. It's up.

Q. Okay. If you have that open, you will see this is an e-mail from Dan Mento to John Stevenson with the subject Flock camera system installation information, dated December 28th, 2022. Do you see that?

A. Yes.

Q. You will see in the very top e-mail you are cc'ed. You are about three lines down, correct?

A. Yes.

Q. Who is John Stevenson?

A. John Stevenson is the director of traffic operations if I understand his title correctly.

MR. SOYFER: Okay.

A. So not associated with the police department. That's a city department.

Q. Got it.

So if you go to the page ending in 16, the second page of the pdf, you will see there is

95

an e-mail from Dan Mento to Freda Burns and John Stevenson on that page, correct?

A. Yes.

Q. Okay. And you will see in Mr. Mento's e-mail, he writes: Good morning, Freda and John. I hope all is well with you. Circling back from our meeting just before Thanksgiving to see if you have had a chance to review the proposed camera locations so we could set up a follow-up meeting to go through each proposed location and nail down the details.

Did I read that correctly?

A. Yes.

Q. And so Mr. Stevenson had some role in approving the camera locations as the transit director. Is that fair?

A. So I'm going to say yes and no only in the sense that his division approves right of way entry requests and things like permit requests. So nothing to do with, you know, how or why we want them there or anything like that. It was to ensure that it wouldn't interfere with any

96

traffic operations and that they didn't have any objection to the physical spot in the ground where it was going.

And Freda Burns additionally approves right of way requests and permit requests.

So -- so the two of them we brought in at this point in the project to kind of get them involved to make sure that we were communicating.

Q. Understood. If you look at Mr. Stevenson's response on the page ending in 15, this is the first page of the pdf, you will see that he writes: Dan, transit has completed the review of the locations. Many speed limit designations are incorrect, not sure this makes a difference, and several sites are located within the City of Virginia Beach and would require their authorization.

Did I read that correctly?

A. Yes.

Q. Does this refresh your recollection at all that some of the sites chosen for cameras were within Virginia Beach?

A.   Yeah.  So what that would be, like I mentioned before, part of -- part of the planning for this was not just hot spots but ingress and egress from the city.  So on the map, when we plotted them, it's possible that, you know, one or -- he said some of these locations, several sites, were located within Virginia Beach.  But the pin on the map could have been located a couple of feet on the other side of the line unbeknownst to me or the folks that plot that were helping plot these.  So in that instance, we weren't going to Virginia Beach to get a permit.  We would just move it a couple of feet back to our side of the line.

Q.   Okay.  So to your knowledge none of the cameras were ultimately placed in Virginia Beach. Is that right?

A.   Correct.  To my knowledge, that is correct.

Q.   Okay.  You just mentioned something I wanted to follow up on.

You placed the cameras at areas of ingress and egress.  What does that mean?

A.   At the line.  So at the line of Virginia Beach and Norfolk.  At the line of Chesapeake and Norfolk.

Q.   Why did you place the cameras there?

A.   Because again, going back to my previous answer about why we wanted to data share, those who are committing crimes, such as stealing vehicles, committing shootings, they do travel around the Hampton Roads area.  So additionally, people who are missing or Amber alerts, they don't just stay in one city here in Hampton Roads.  They do travel around.  So we -- we wanted to get a better idea if stolen cars were being brought into our city or being taken out of our city.  Additionally, were people driving stolen cars or driving vehicles that were committing shootings, were they coming into our city to do so or were they leaving our city after doing so.

So that was the reason why we put Flock cameras at ingress and egress points for the city.

Q.   Okay.  So that you could see where people who had committed the crimes were entering or leaving the city.  Is that right?

A.   We wanted to see the vehicles that were coming and going from the city.  That way the investigation could be furthered by investigators to determine who was driving those vehicles at the time.

So, again, the -- you know, the cameras are only giving us a vehicle coming into and out of the city at any point in time at a specific location.  It is up to -- it is up to the investigators to still to follow up on those leads to determine who specifically.  But it does give us the lead of the vehicle.

Q.   Okay.  When the camera captures -- well, I guess let me just make sure the record is clear.

Ingress is a route that is going into the city, correct?

A.   Yes.

Q.   And egress is a route that is going out of the city, correct?

A.   Correct.

Q.   And so on a road that has lanes that go both directions, that is both a point of ingress and egress, correct?

A.   Correct.  Yes.

Q.   And so can a route that has both ingress and egress be covered by just one Flock camera?

A.   Typically, the answer would be no.  I don't want to say it's impossible.  But one camera would cover one direction.  Another camera would cover a second direction.  It's the same reason why four cameras are required for a four point intersection.  Because they cover one direction each.

Q.   Okay.  On a street that just has traffic moving in two directions, but has two cameras, one camera will tell you the traffic is going in the direction that that camera is pointed and the other camera will tell you traffic is going in the direction that that camera is pointed.  Is

101

that fair, roughly?

A. Yes.

Q. Whenever a vehicle passes a Flock camera, it takes a picture, correct?

A. Yes.

Q. And someone who goes in to look up pictures of the vehicle, they can -- scratch that.

Someone who goes in and looks up a license plate, they can see all the pictures that are associated with that license plate, correct?

A. They could, yes.

Q. And generally with the Flock cameras that will include some of the area around the car as well?

A. Possibly.

Q. Okay. It's not just a picture of the license plate when they go in, correct?

A. Correct.

Q. Okay. You can set that document aside. I'm finished with that one. And I will be putting Exhibit 18 into the chat in a moment.

102

For the record, this is a document bearing Bates stamp NORF 014089. Let me know when you have that open.

A. It's open.

Q. Okay. So you can see that this is an e-mail from you to Deputy Chief Maslow. The subject is FYI. It's dated June 5th, 2023. Do you see that?

A. Yes.

Q. If you scroll down to the first in time e-mail, which is on the page ending 90 and is actually the second page of the pdf, you will see that this is an e-mail from Christopher Jones to William Pickering, correct?

A. Yes.

Q. Who is Chris Jones?

A. Chris Jones was our -- our facilities manager.

Q. And who is William Pickering?

A. William Pickering at the time was the sergeant assigned to the Public Information Office.

103

Q. What's the Public Information Office?

A. So someone who would disseminate information to the public, do interviews for news stories and such.

Q. Okay. Like a communications department?

A. Yes.

Q. Okay. So Mr. Jones writes to Sergeant Pickering: Received a request -- received a records request for map of where the LPRs are installed.

Do you see that?

A. Yes.

Q. When he says a records request, what do you understand that to mean?

A. My guess is it's a FOIA request.

Q. Okay. He then writes: VP asks.

Do you know who VP is?

A. I do not.

Q. Okay. And you will see Mr. Pickering then -- sorry -- Sergeant Pickering, rather, responds to Mr. Jones.

And then one more e-mail up, it looks

104

like somehow Deputy Chief Maslow received that e-mail and he forwarded it to you, correct?

A. That's what it looks like, yep.

Q. And he writes -- I should -- I should ask this just for charity. But your first name is Charles, but you go by Mike. Is that right?

A. Correct. Yes.

Q. Okay. He writes: Mike, has Flock dealt with this type of request with other jurisdictions?

Do you see that?

A. Yes.

Q. Okay. Then you will see one further e-mail up in this thread on the first page ending in 89, starting with 1, you can't see who your e-mail is addressed to, but you can see that in the next e-mail up, Brian McKenzie of Flock responds, correct?

A. Yes.

Q. You write: Hey, Brian, have you guys experienced other agencies who have received FOIA requests for camera locations? If so, do you

HIGHLY CONFIDENTIAL
Transcript of Captain Charles Thomas, Corporate Designee          27 (105 to 108)
Conducted on July 22, 2025

---

know how they handle them, whether the locations fall under an exemption or not.

Did I read that correctly?

A.   Yes.

Q.   And Mr. Mackenzie responds: I have seen these requests before and the agency has denied the request citing that disclosing the locations of the cameras could jeopardize current and active investigations.

Do you see that?

A.   Yes.

Q.   And then you forward Mr. Mackenzie's e-mail to Deputy Chief Maslow, and you write: It looks like Flock's experience is that agencies denied FOIA requests for locations based on the possibility of jeopardizing current and active investigations.

Do you see that?

A.   Yes.

Q.   So I just want to ask why did you reach out to Flock to ask this question?

MR. KRAVIS: Objection.  Beyond the scope.

A.   Because the deputy chief asked me to do so.

Does the City of Norfolk consider the locations of its Flock cameras confidential?

MR. KRAVIS: Objection.  Beyond the scope.

A.   I'm not quite sure what you mean.  I mean, we have not released publicly the locations.

(Thereupon, there was overtalk.)

Q.   And why hasn't -- why hasn't the City of Norfolk done that?

MR. KRAVIS: Beyond the scope.  Lack of foundation.

A.   Because we do believe that it could jeopardize current and active investigations.

Q.   How would it jeopardize current and active investigations?

MR. KRAVIS: Objection.  Beyond the scope.

A.   It could jeopardize them in the sense

---

that, you know, those who know where those locations are, they could go try to damage them to prevent us from -- from gaining critical evidence of an incident that has already occurred.  That's just one example.

Q.   Are there other exams you can think of?

MR. KRAVIS: Objection.  Beyond the scope.

A.   Not off the top of my head necessarily, no.

Q.   Are you concerned people could evade the cameras if the locations were publicly known?

MR. KRAVIS: Objection.  Beyond the scope.  Calls for speculation.  Lack of foundation.  Vague.

A.   I guess that's a possibility.

Q.   That's not something you have been concerned about personally?

A.   Not necessarily.  I mean, you can -- you can see them when you drive past them.  So if you wanted to evade them, you just could.

Q.   Okay.  So then if you can see them when

you drive past them, what's the point in keeping all of the locations confidential?

MR. KRAVIS: Objection.  Beyond the scope.  Lack of foundation.

A.   For the same reasons I have -- I have explained, that it could jeopardize active investigations.

Q.   Does Norfolk also consider the locations of its live view cameras confidential?

MR. KRAVIS: So I have been sustaining the objection and letting him answer, but can I get some clarification here?

We are in the 30(b)(6) portion of the deposition.  Is that right?

MR. SOYFER: I'm just asking these questions in his personal capacity.  But I will let you know when I go back to a 30(b)(6) topic.

MR. KRAVIS: Okay.  So going -- I think what you are obligated to do here is I think you have to tell the witness when we are moving out of the 30(b)(6) portion of the deposition into the personal capacity portion of deposition so

Transcript of Captain Charles Thomas, Corporate Designee    28 (109 to 112)
Conducted on July 22, 2025

that he knows what sources of information he is supposed to be drawing on when he's answering the question.

So just to be clear, this last question, you are not requesting him as the 30(b)(6)? You are just asking him in his personal capacity?

MR. SOYFER: This one right now, yes, I am.

(Thereupon, there was overtalk.)

MR. SOYFER: I will ask the reporter to read back the question for a clear record.

(Thereupon, the question on page 107, line 22 was read back by the reporter.)

MR. SOYFER: I'm sorry. There was a question after that, but I will -- I will just reask it.

Q. Does Norfolk also consider the locations of its live view cameras confidential?

MR. KRAVIS: Objection. Lack of foundation. Vague.

A. To my knowledge we have not disclosed those locations publicly. So yes.

Q. Is there a reason the City of Norfolk hasn't disclosed those locations publicly?

A. So that it doesn't jeopardize active current investigations. Same, same reasons.

Q. Do you consider it important not to disclose those camera locations publicly?

MR. KRAVIS: Objection. Lack of foundation and vague. Go ahead.

A. I do.

Q. Okay. So moving on to topic 3. This topic is your plans, if any, to buy, rent or otherwise acquire additional Flock cameras and your reasons for doing or planning to do so.

Are you prepared to testify on that topic today?

A. Yes.

Q. Has -- okay. So I think you testified earlier since -- actually, let me just ask you for reference.

When were the 172 initial cameras installed?

A. It was May of '23, May into June of '23.

Q. Okay. And when did they become operational?

A. As soon as they are installed, they are operational.

Q. Okay. Since May/June of 2023 has Norfolk acquired additional Flock cameras?

A. We did.

Q. How many?

A. We acquired four additional ones.

Q. Are all four of those cameras operational today?

A. Yes.

Q. When did Norfolk acquire those four cameras?

A. Beginning of this year. I can't give you the exact date. I think it was January, February time frame.

Q. And why did it get those additional cameras?

A. To provide additional coverage in an area where investigators felt like stolen vehicles were traveling and we didn't have any understanding of how many or where or when that was occurring. It was to provide additional coverage in an area where there wasn't any.

Q. So essentially to fill a gap in the existing system. Is that right?

A. Yes.

Q. Okay. What was the source of funding for the purchase of those cameras?

A. My understanding it came from a HEAT grant. It's a -- it's a grant -- it's HEAT. HEAT is an acronym, Help Eliminate Auto Thefts grant. And I believe that is from the State of Virginia.

Q. And so did Norfolk -- well, let me ask it this way.

Did Norfolk decide to buy the cameras after the funding came in or was it that there was a decision made and then Norfolk went and found the funding?

A. I don't have the answer to that.

Q. Okay. Does that grant cover the cost of those cameras in future years?

113

A.   I'm not entirely sure.

Q.   Do you have any current plans to buy more cameras?

A.   We do not.

Q.   Why not?

A.   At this point, there is just no -- there is no plan to buy additional ones.

MR. SOYFER:  Okay.

A.   It hasn't -- it hasn't been brought to my attention that we need additional ones. Nobody has suggested additional ones.  So at this point, I don't have any plans to buy additional ones.

Q.   You haven't had any discussions of buying additional cameras beyond those four?

A.   No.

Q.   Okay?

A.   Not that I recall, no.

Q.   So we talked about Falcon Flex cameras earlier and I think -- and you can set me straight if I'm wrong about this.  But your testimony was that you asked for a test unit but

114

Flock wouldn't provide one.  Is that right?

A.   That's correct.

Q.   Okay.  And that plan has just been dropped essentially?  You have no plans to try out Falcon Flex cameras?

A.   Right.  Yeah.  It hasn't been discussed for two years.

Q.   Okay.  Why were you interested in Falcon Flex cameras?

A.   Because we were having a specific problem with burglaries occurring at storage units and a vehicle was being used every time a burglary was -- was occurring.  So we were trying to identify the vehicle that was being used for those burglaries.

Q.   And how would Falcon Flex cameras specifically do that?

A.   A Falcon Flex as a mobile camera could be stationed outside of a storage unit and we could identify the vehicle that was being used hopefully to -- that was being used in those incidents to provide us a lead as to who -- you

115

know, who might be committing those crimes.

Q.   Okay.  Have community members ever asked for cameras to be stationed at specific locations?

A.   I did have a couple of calls from some civic leagues and HOAs.  They didn't ask that we place them.  They asked how they could go about getting cameras placed in their communities.

Q.   What do you mean, how they could go about getting cameras placed in their communities?

A.   Who could they contact within Flock to get a Flock camera for their neighborhoods.

Q.   Okay.  So to buy their own Flock cameras essentially.  Is that right?

A.   Yes.

Q.   Okay.  Well, we will return to that subject a little bit later.

For now, I would like -- I'm going to put another exhibit in the chat.  This will be Exhibit 19.

And for the record, this is a document

116

bearing Bates stamp NORF 18093.  When you've got that open, let me know.

THE WITNESS:  It's open.

Q.   Okay.  You will see that this is an e-mail from Deputy Chief Maslow to Amanda Deloatch, copying Mark Talbot, and also self copying Deputy Chief Maslow, with the subject line no Flock cameras in OV dated June 12th, 2023.  Is that correct?

A.   Yes.

Q.   Who is Amanda Deloatch?

A.   She is the chief of police's administrative assistant.

Q.   Okay.  And the chief of police is Mark Talbot?

A.   Right.

Q.   Okay.  When did Chief Talbot become the chief of police?

A.   I believe it was May of '23.

Q.   Okay.  So right about when the Flock cameras were going up?

A.   That sounds right, yes.

**117**

Q. Okay. If you turn to the second page of this document which is ending in Bates stamp 94, you will see an e-mail from Thomas -- I'm going to mispronounce his name, but I think it's Smigiel?

A. Yes.

Q. Okay. Smigiel. To Chief Talbot and also Chip Filer or Feeler?

A. Filer.

Q. Filer. Great. Thank you for your help with the pronunciations.

So who is Thomas Smigiel?

A. **Thomas Smigiel is a council member for the City of Norfolk.**

Q. Okay. What -- let me ask you what role did the city council play in deciding on the locations of the 172 Flock cameras that initially went up?

A. **No role whatsoever.**

Q. Okay. Did the city council appropriate funding for those cameras?

A. **No, not initial -- not initially.**

**118**

Q. So the city council of Norfolk had no say in where those 172 cameras went. Is that fair?

A. **That's correct.**

Q. Okay. And so Councilman Smigiel writes: Chip and Chief, I was disappointed to see that there were no Flock cameras at any of the major intersections in Ocean View.

Do you see that?

A. **Yes.**

Q. What is Ocean View?

A. **It's an area of the city. Sort of a neighborhood.**

MR. SOYFER: Okay.

A. **It is just an area of the city.**

Q. Were any of your hot spots in that area when you initially mapped out the Flock cameras?

A. **No, I don't believe so.**

Q. Okay. Is it a high crime area at all?

A. **No.**

Q. Okay. So I'm going to skip to the fourth sentence in this paragraph starting with

**119**

one would think. Are you there?

A. **Yes.**

Q. Okay. He writes: One would think that when trying to follow a pattern of a car that gets picked up on Flock we would want to pick up the pattern in Ocean View. Granby Street and Ocean View Avenue seems like a good location to place these. Maybe there are plans to add them.

Do you see that?

A. **I do.**

Q. Is Granby -- well, let me just ask you. Is Ocean View Avenue a major thoroughfare within Norfolk?

A. **Not really.**

Q. Does anything stand out to you about Granby Street and Ocean View Avenue?

MR. KRAVIS: Objection. Vague.

A. **Granby Street is a -- is a major thoroughfare that runs north and south through the city. But at that intersection in particular, no.**

Q. Are there cameras -- are there Flock

**120**

cameras on Granby Avenue [sic]?

A. **On Granby Street?**

Q. Sorry. Yes, Granby Street.

A. **I think there are. Without having a map in front of me, I couldn't --**

Q. Okay. Given that it is a major thoroughfare, would it make sense to place cameras on Granby Street?

A. **So Granby Street runs the entire length of the city.**

MR. SOYFER: Okay.

A. **So parts of it, yes. Parts of it, no.**

Q. Okay. Were there plans to add cameras on Granby Street at Ocean View?

MR. KRAVIS: Objection. Vague as to when. Go ahead.

A. **No.**

Q. At this time?

A. **At this time, no.**

Q. Since then, have there been any plans?

A. **No.**

Q. Okay. Do you have an understanding of

HIGHLY CONFIDENTIAL

Transcript of Captain Charles Thomas, Corporate Designee        31 (121 to 124)

Conducted on July 22, 2025

---

what Councilman Smigiel means when he writes about trying to follow a pattern of a car that gets picked up on Flock?

MR. KRAVIS: Objection. Calls for speculation.

A. Yeah. I don't know. I think it's his misunderstanding of what the Flock system does.

Q. Okay. If you go up to the next e-mail, you will see there is an e-mail from Chief Talbot to Councilman Smigiel basically saying that he is going to ask his team to weigh in. Do you see that?

A. Yes.

Q. Okay. And then the very top e-mail, it's from Deputy Chief Maslow to Amanda Deloatch and cc'ing Chief Talbot. Do you see that?

A. Yes.

Q. And Deputy Maslow writes: Amanda, please send once you have reviewed. Thanks, MCM. So this is a message that he's written for Ms. Deloatch to send to the councilman, correct?

A. Correct.

Q. So I'm going to go -- skip from the beginning of this paragraph and go one, two, three, four sentences in to the sentence starting with as such. Let me know when you are there.

A. I'm there.

Q. So he writes: As such, while working with a limited number of cameras, we prioritized locations of the Flock Safety cameras by examining high priority calls for service, concentrated violent crime data and city ingress and egress routes. Did I read that correctly?

A. Yes.

Q. And is that a true and accurate description of how the cameras were placed?

A. It is.

Q. He then goes on: We believe the current placement of the cameras allows us to identify and arrest the most violent offenders within our community while also limiting unnecessary contact with law enforcement for most citizens.

---

Do you see that?

A. Yes.

Q. And does that truly and accurately capture the belief of the NPD about the current placement of the cameras?

A. Yes.

Q. What does he mean when he writes that it allows limiting unnecessary contact with law enforcement for most citizens?

A. I don't know what exactly he means by that.

Q. Okay. I mean, what would qualify as unnecessary contact with law enforcement?

MR. KRAVIS: Objection. Vague. Calls for speculation.

A. Yeah. I'm just not sure what exactly he meant by that. I don't -- I don't know.

Q. Okay. Is a car being captured by a Flock camera -- well, scratch that. Let me start that over. If a car is photographed by one of the Norfolk Police Department's Flock cameras, is that contact with law enforcement?

A. It is not.

Q. Okay. So he goes on: Working with a limited number of cameras, it was impossible to cover all the areas in the city that would benefit from coverage. Did I read that correctly?

A. Yes.

Q. And is he correct that with the number of cameras it was impossible to cover all the areas in the city that would benefit from coverage?

A. Yes.

Q. And so there are areas in the city that would benefit from coverage that as of this e-mail did not have cameras, correct?

A. Correct. Yeah.

Q. Is that also correct today?

A. It is.

Q. He writes: In some instances we installed cameras at the primary gateways leading into and out of some areas in an effort to

---

provide a wider net of coverage with fewer cameras.

Did I read that correctly?

A.  Yes.

Q.  And is that statement true and correct?

A.  I think it depends on what his assertion of net of coverage means.  I think he would have to clarify what -- what that means.

If I'm trying to understand it, I see it as a net has many openings in which something can get through.  And in this circumstance, it's completely accurate with our -- our Flock cameras that, yes, I mean, we -- you can absolutely traverse our city without going through one single Flock camera.

And I think what he's getting at is that we tried to place them in areas where, you know, the areas of the cameras itself were wide enough to catch people coming in and out of the major thoroughfare as best as possible before or after they commit a crime, or as they are driving a stolen vehicle.

And when I say -- I say vehicles traveling to and from areas of criminal activity -- and again, I will reiterate that the vehicle itself is a -- Flock is a tool that leads us to a vehicle that leads us to investigative measures to identify people driving those vehicles.

So what exactly he meant by that, he would have to clarify.  But as I look at it, net meaning a lot of wide holes, which is accurate.

Q.  Got it.  So the Flock cameras kind of function like a net where you want to capture things of interest but there are ways that things can fall out of it.  Is that kind of the analogy you are drawing?

A.  For sure, yes.

Q.  Okay.  So then in the last sentence he writes: As funding becomes available, we will consider installing cameras in areas that were not selected for the initial deployment.

Do you see that?

A.  I do.

Q.  And has the Norfolk Police Department considered installing additional cameras as funding became available?

MR. KRAVIS: Objection.  Asked and answered.

A.  Yeah.  We have not at this point.

MR. SOYFER: Okay.  You can set that document aside.  And I will be dropping in Exhibit 20 in just a moment.

For the record, this is a document Bates stamped NORF 008166.

Q.  Do you have that open?

A.  I do.

Q.  Okay.  So this is an e-mail from Fritz Trojahn to you with the subject Flock cameras, dated June 22nd, 2023, correct?

A.  Yes.

Q.  Who is Fritz Trojahn?

A.  He's a police officer.

Q.  Okay.  And other than in connection with this e-mail, how do you know him?

A.  He's a police officer here in the City of Norfolk.  That's it.

Q.  Okay.  Do you work with him on a day-to-day basis at all?

A.  No, not as of now and not as of the time of these e-mails.

Q.  Okay.  If you go to the last page, the first in time e-mail.

A.  Okay.

Q.  This is the page ending in 68.  You will see that Officer Trojahn e-mails you and asks: Can you advise me who is in charge of the Flock camera system roll-out.

A.  Yes.

Q.  Okay.  And then if you go up one e-mail, you respond to him, and you say: I am.  What can I help you with?

Do you see that?

A.  Yes.

Q.  And it's true that as of June 2023, you were in charge of the Flock camera system roll-out, correct?

A.  Correct.

HIGHLY CONFIDENTIAL

Transcript of Captain Charles Thomas, Corporate Designee                33 (129 to 132)
Conducted on July 22, 2025

Q. Okay. So then Officer Trojahn responds to you and writes: Lieutenant, I recall in the e-mail the chief sent out regarding the roll-out of the Flock cameras that they were placed in areas of high crime based on heat map data.

Do you see that?

A. Yes.

Q. He goes on: However, I have noticed several main roads and areas with no cameras that would benefit from having additional installed.

Did I read that correctly?

A. Yes.

Q. He then asks: If it is possible, I know of approximately six to eight locations that would improve our coverage.

Did I read that correctly?

A. Yes.

Q. Okay. And then go up one more e-mail. This is on the first page of the document ending in 66.

You respond to him and you write: There are actually a lot of locations that we would like to add cameras to, but at this point we purchased 172 of them, the most of any jurisdiction in Virginia --

Let me start that over. I read it incorrectly. Sorry about that.

You write: There are actually a lot of locations that we would like to add cameras to, but at this point we purchased 172 of them, the most any jurisdiction in Virginia has purchased, at a cost of $2500 each per year.

Did I read that correctly?

A. Yes.

Q. And was it true when you wrote this that there were actually a lot of locations that we would like to add cameras to?

A. Yes.

Q. And who is the we that you are referencing here?

A. The police department.

Q. Okay. And was it true when you wrote this that 172 cameras was the most any jurisdiction in Virginia has purchased?

A. That's my understanding, yes.

Q. Okay. Is it still true today that Norfolk has the most Flock cameras of any jurisdiction in Virginia to your understanding?

A. I don't know. I haven't asked that question probably since --

MR. SOYFER: Okay.

A. -- then.

Q. You then go on: If additional funds become available in the future, we will definitely look to add cameras. But at this point, we aren't adding any additional cameras.

Did I read that correctly?

A. Yes.

Q. And was that statement true when you wrote it?

A. Yes.

MR. SOYFER: Okay. You can set that document aside. Actually, is now a good time for a break?

MR. KRAVIS: Sure. That's fine with us.

MR. SOYFER: Okay.

THE VIDEOGRAPHER: All right. We are going off the record. The time on the monitor is 12:10.

(Thereupon, there was a recess taken at 12:10 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time on the monitor is 12:21.

MR. KRAVIS: Counsel, before you ask your next question, I think we have one clarification of a personnel matter in one of the earlier exhibits. Captain, if you want to explain.

THE WITNESS: Yeah. Exhibit 18, the question was in reference to Chris Jones who sent an e-mail.

So the police department has a Chris Jones who was the facilities manager.

The City communications department had at the time name was Chris Jones, which makes sense now why he was sending an e-mail to our public information officer.

So I didn't know that one was the other.

HIGHLY CONFIDENTIAL
Transcript of Captain Charles Thomas, Corporate Designee          34 (133 to 136)
Conducted on July 22, 2025

133

So anyway, this Chris Jones was the City communications director at the time.

BY MR. SOYFER:

Q. Okay. Great. Thank you for the clarification.

So we are moving on now to topics 4 and 5, which are the number of vehicle-mounted license plate readers you own or use as well as how you use them and whether and how your mobile or vehicle-mounted license plate readers contribute to or are otherwise integrated with your Flock data.

Are you prepared to testify on those topics?

A. Yes.

Q. Okay. The Norfolk Police Department uses mobile or vehicle-mounted license plate readers, correct?

A. Yes.

Q. And those are mounted somewhere on police cars, right?

A. Yes.

134

Q. Okay. And just tell me generally like what do those do? How are they used?

A. So they are used in car. So they are actually -- it's called the Axon Fleet 3. It's a camera that is a dash cam that has the ability to conduct license plate reads.

So as a vehicle is driving in front of a police vehicle or coming head on to a police vehicle it can read the license plate, and essentially provide the same data as a -- as Flock cameras do.

So those ones work within the vehicle. So they are not broadcasting the information out to anybody. There is a running log within the vehicle as they are logged into Axon there which is what the vehicles log into.

It can tell an officer who is driving that vehicle if a vehicle they just passed has been stolen.

Similar things that the Flock one does, whether that person is a missing person, it's a wanted person, if it's associated with that

135

particular vehicle.

Q. When the vehicle scans a license -- scratch that.

When the vehicle mounted to LPRs scans a license plate, do they store the license plate -- do they store a record that they scan the license plate?

A. It does.

Q. Okay. Is that true for all of the license plates that the mobile ALPR scans or just the ones with hits?

A. It would be for all scans.

Q. Okay. And how does the Norfolk Police Department use that stored data?

A. We really don't.

Q. Okay. Does anyone download it?

A. No, not to my knowledge. I have never seen one downloaded. I have never heard of any officer actually utilizing that particular program. So, in essence, we don't use that.

Q. Do you believe you have the capability to do it if you wanted?

136

A. The capability exists, yes.

Q. Okay. And when the license plates are scanned, what other data is stored along with the scan?

A. It would be the license plate information.

Q. The time?

A. Yeah, the date, time.

Q. What about the location?

A. Location.

Q. Okay. But at this time, you don't download those data. Is that right?

A. Correct.

Q. How long are -- well, okay.

Are those data ever deleted from the mobile ALPRs?

A. So that ALPR data is handled just like Flock. Flock is ALPR. So that data is handled the same. And that has a 21-day retention per the new Virginia law and general order that covers it.

Q. Okay. How does it get deleted?

HIGHLY CONFIDENTIAL

Transcript of Captain Charles Thomas, Corporate Designee    35 (137 to 140)

Conducted on July 22, 2025

A.   I don't know the mechanics of how technically it gets done.

Q.   Yeah.  I guess I'm just wondering, if no one ever actually downloads data from the mobile ALPRs, are they just programmed to automatically delete it?

A.   That is my understanding, yes.  It's an automatic falloff.

Q.   Okay.  I want to move on to topic 6 now.  And topic 6 is the persons and entities you have provided access to your Flock data as well as the reasons for your decision to provide such persons and entities with access.

Are you prepared to testify on that topic?

A.   Yes.

Q.   So first, I want to know -- I'm not asking you to identify specific people, but what personnel within the City of Norfolk have access to your Flock data?

A.   Norfolk police officers.

When requested, it could be -- it could be provided to a commonwealth attorney who is requesting it.

It could be provided to a defense attorney for discovery.

Q.   Yeah.  Let me ask you.  I will be more specific.

Who has direct access?  As in, who can log in and run queries or look up data?

A.   Police officers here at the City of Norfolk.

Q.   So that includes patrol officers?

A.   Yes.

Q.   Okay.  It would include investigators or detectives?

A.   Yes.

Q.   Let me just ask about terminology.

Would you be more comfortable if I used the word investigators or more comfortable if I used the word detectives?  Do -- are those different roles within the NPD?

A.   Same role.

Q.   Okay.  And so those words can just be used interchangeably?

A.   Yes.

Q.   Okay.  What about the department leadership?  Do department leadership have access?

A.   They have access.  Whether or not they use it, I don't know.

Q.   Okay.  What about 911 operators?

A.   They do, yes.

Q.   Crime analysts?

A.   I believe they do have access, yes.

Q.   Employees at the Real Time Crime Center?

A.   Yes.

Q.   Are there any restrictions on the amount or type of data any personnel can see?

A.   I'm not sure what you mean.

MR. SOYFER:  Yeah.

A.   We have admins in the system and we have users.

Q.   Okay.  So there are admins and users who have different levels of access, correct?

A.   Yes.

Q.   In terms of going up and looking up data, so like running a search, looking up where a license plate has been seen, are there any restrictions on any of those subsets of employees we've talked about?

A.   No.  Everyone with access has the ability to query the system.

Q.   Okay.  And they can look up right now 21 days of data if they want to, correct?

A.   Correct.

Q.   And before July 1st, I guess, that would have been 30 days of data, correct?

A.   Correct.

Q.   Okay.  How many administrators are there for the Flock system?

A.   I don't know the number.

Q.   Is it more than one?

A.   Yes.

Q.   Okay.  Do you think it's more than ten?

A.   I don't believe so.

Q.   Okay.  Do you know who any of the administrators are?

HIGHLY CONFIDENTIAL
Transcript of Captain Charles Thomas, Corporate Designee        36 (141 to 144)
Conducted on July 22, 2025

**141**

A.   I know that I'm an administrator. Lieutenant Vernon is an administrator. Sergeant Gauthier is an administrator.

Outside of that, I'm not -- I'm not aware of anybody else being an admin.

Q.   What abilities do you have as an administrator that other users of the system don't?

A.   I have the ability to add or delete or deactivate users.

MR. SOYFER: Okay.

A.   I can run -- I can run an audit, audit trail, of the system.

Q.   When you say an audit trail of the system, do you mean an audit of queries of the system?

A.   Yes.

Q.   Okay. And I guess I have been referring to queries and searches of the system.

Do you understand what I mean when I use those terms?

A.   Yes. I understand them as

**142**

interchangeable terms to mean that you are searching for a vehicle and/or license plate.

Q.   Okay. Good. On the same page.

So what do you -- what do NPD personnel need to do to get access to the Flock system?

A.   With the -- with the new law that has come out, they are required to do training. There is online training involved. So they -- they are required to perform some form of training that Flock has produced and then request it of us to do that, to gain access.

Q.   Okay. Let's stick to the kind of current state of affairs for these next few questions.

Is the only training that they do, that training provided by Flock?

A.   Yes. Also new -- new officers coming out of the academy I believe are -- are having a session on Flock itself on how to use the system.

But yes, primarily, it's the Flock training that they provide.

Q.   What's the form of that training? Are

**143**

they videos, written materials, something else?

A.   Yeah. They are videos. They are webinars that they provide.

Q.   Okay. How long does that training take?

A.   Probably about an hour.

Q.   Okay. Do they have to take any sort of test, quiz, any assessment after the training?

A.   No, not that I'm aware of.

Q.   Okay. And so thinking of today, to get access, they just do the training, they write to you, you grant them access. Is that right?

A.   Correct.

Q.   Okay. How do you verify they have completed the training?

A.   We can check through Flock whether they have logged in.

And also considering the new general order that just went into effect July 1st, we will be producing training documents through PowerDMS that they have to sign off on, and it will show that they have completed the training.

Q.   You said you will be producing. So do

**144**

those documents not currently exist?

A.   It has not gone out to the entire department yet. But the general order requires that it does so in I believe it was 60 days, in a matter of 60 days from July 1st.

Q.   What is PowerDMS?

A.   PowerDMS is a -- is a document system that tracks whether or not you have viewed certain documents or attended certain trainings.

It allows the organization to know that you have read and signed general orders, that your -- you know, that you understand them, things of that nature.

Q.   Okay. And so when you talk about this training through PowerDMS, there are documents where officers have to go in, I guess review the document, or sign off that they have reviewed the document. Is that right?

A.   Correct.

Q.   Okay. So -- okay. So that isn't in place as of today, correct, like that process?

A.   Correct.

145

Q.   Okay.  When you get requests for access from officers, do you verify that they have viewed the videos from Flock?

A.   We will be verifying through that, yes.

We haven't had any new officers since July 1st, so we haven't had to do that as of yet.  But we will have that ability because you have to log in -- well, you have to log in -- you have to be given an access first so you can log in and do the training.  So we will have to verify that, that they have done it.

Q.   Okay.  And before July 1st of this year, what sort of training did officers go through?

A.   Flock did provide some training through video, and those coming out of the academy did -- they were provided with some training, as well.  And then senior officers who had been using the system had provided training to -- to those who were new to the system.

Q.   And was that training required before you would sign off on access?

A.   I would say it was supposed to have been

146

done.  But I wasn't here the entire time.  I was -- I was gone for, you know, almost two years.  So I don't know what was being done in that time frame.

MR. SOYFER:  Okay.

A.   It was required per the special order, yes.

Q.   Okay.  How did the Flock training differ before July 1st?

A.   I'm not -- I'm not sure that it did differ.  They produced some training videos, and I'm not sure that it differs from the webinars that they are providing now.

Q.   Okay.  So moving off the officers, I want to talk about before July 1st of this year.

Did people not employed by the Norfolk Police Department have access to the Norfolk Police Department's Flock data?

A.   Through -- through sharing, yeah, and other law enforcement agencies, yes.

Q.   Okay.  And that includes law enforcement agencies outside of Virginia?

147

A.   Prior to July 1st, yes, it did.

Q.   Okay.  Yes.  All of my questions for right now -- I will let you know when I want to talk about after July 1st.  But just for right now, to be clear, all of my questions are before July 1st.

Are there any government agencies that weren't law enforcement that had access to Norfolk's data?

A.   Not to my knowledge.

Q.   Any federal agencies?

A.   No.

Q.   You are not aware of, for instance, the U.S. Postal Inspection Service requesting access?

A.   Not that I recall, no.

Q.   Okay.  What about private, non-government entities?

A.   They don't have access, no.

Q.   Okay.  How do you know that?

A.   Well, it was -- access was not to be granted to anybody outside of law enforcement agencies.

148

MR. SOYFER:  Okay.

(Thereupon, there was overtalk.)

A.   So in a situation where a private entity would want to share with us, we would -- we would be able to see their data, but they wouldn't be able to see ours.

Q.   I'm just asking how do you know that?

A.   I don't have a list in front of me.  If you have a list, I could verify it.

MR. SOYFER:  Okay.

A.   But without having a list, you know, I can't tell you.

Q.   So Flock has private sector customers, correct?  You are aware of that?

A.   Yes.

Q.   And your understanding is that those private sector customers did not have access to the City of Norfolk's Flock data, correct?

A.   Correct.

Q.   Could the City of Norfolk have granted access to those private sector customers?

A.   Do you mean within the system or -- or

149

some other way?

Q.   Yes, within the system.

A.   I think it was possible.  I -- I don't -- I would have to go look into the system itself, the sharing module, to see.

I think it was possible that Flock had it set up that you could share with others.  I just don't specifically remember myself.  It's -- yeah.

Q.   Okay.  Why did you grant access to other law enforcement agencies?

A.   Because, most specifically, if we had a vehicle we were looking for associated with something like a missing person or a wanted person, we would be able to know if they left our jurisdiction.

If we should continue our -- or expand our search efforts to another location, the Flock cameras would help us with that.

For missing folks, for missing people, it would be very beneficial to know that we should not spend our efforts looking here, that

150

we could -- we could look somewhere else if they were associated with a vehicle that we were aware of.  So that was why.

Q.   Did Norfolk opt in to Flock's national network?

A.   I'm not familiar with the term national network.

Q.   Or national lookup database?

A.   Again, that's not -- that's not something I'm familiar with.

Q.   How were -- I mean, how were the sharing decisions handled?  Who made those decisions?

A.   In the very beginning stages of it, I handled it.

If there was a law enforcement agency that was requesting a share, then I approved that, and then requested it back to them.

Q.   Did those come in one by one?

A.   Yes.

Q.   Okay.  And your process was that if it was a real law enforcement agency, you would approve it, right?

151

A.   Yes.

Q.   Did it matter where the law enforcement agency was?

A.   No.

MR. SOYFER:  Okay.

A.   Not prior to July 1st.

Q.   And you would request reciprocal access each time those came in, correct?

A.   Yes.

Q.   Are there instances where you reached out to other agencies to request access?

A.   I'm sure there were.

Q.   Did Flock ever encourage you to share with other law enforcement agencies?

A.   No, I don't ever recall that.

Q.   Okay.  Do you know -- prior to July 1st, do you know how many law enforcement agencies had access to Norfolk's data?

A.   I do not know the number.

Q.   Was it over a hundred?

A.   Likely.

Q.   Was it in the hundreds essentially?

152

A.   Sounds right.

MR. SOYFER:  I'm going to introduce Exhibit 21 in a moment.

For the record, this is a document bearing Bates stamp NORF 006895.

Q.   And Captain Thomas, you will see this is an e-mail from you to Amanda Winter and Jonathan Mills with the subject SNJB Flock camera Norfolk access, dated May 8th, 2023.

Do you see that?

A.   Yes.

Q.   What is SNJB?

A.   The South Norfolk Jordan Bridge.

Q.   And just what is that -- that entity?

A.   I mean, the bridge is just a bridge.  I don't --

MR. SOYFER:  Okay.

A.   I don't know what you mean by entity.  I'm not familiar with any entity that is.

Q.   It's a bridge into Norfolk, I guess?

A.   It's actually not.  It's a bridge that crosses from Chesapeake into Portsmouth, I

HIGHLY CONFIDENTIAL

Transcript of Captain Charles Thomas, Corporate Designee    39 (153 to 156)
Conducted on July 22, 2025

153

believe.

Q.    If you go to the bottom e-mail, which is actually on the page ending 900 and page 6 of the pdf, you will see this is an e-mail from Ken Cater whose title appears to be facilities manager, South Norfolk Jordan Bridge.  Do you see that?

A.    Yes.

Q.    Okay.  And he is e-mailing to Flock employees Hannah Valerio and Christopher Clayton.  Do you see that?

A.    Yes.

Q.    And he writes:  SNJB gives permission for the City of Chesapeake police department to have access to the newly installed device at SNJB.  We would also like to extend this capability to the City of Portsmouth Police Department as well.

Do you see that?

A.    Yes.

Q.    Okay.  If you go up a few e-mails, I'm on the page ending in 96.  This is page 2 of the

154

pdf.

You will see on May 8th, Jonathan Mills sends an e-mail, although we can't see the recipients, but he writes:  I'm looping in Norfolk's police coordinator, Lieutenant Thomas, with the suggestion that they also be granted access to SNJB's camera/hot list tool.

Do you see that?

A.    Yes.

Q.    Is Sergeant Mills someone you have worked with?

A.    I'm not familiar with Sergeant Mills, no.

Q.    Okay.  Do you know why he would loop you in here?

A.    I don't.

Q.    Okay.  And if you go up one e-mail, this is on the first page of the document ending in 95, you will see there is an e-mail from Amanda Winter to Jonathan Mills, and you are cc'ed on this e-mail, correct?

A.    Yes.

155

Q.    Okay.  And she writes:  Hi, Sergeant.  Thank you.  Flock is able to enable sharing once approval is received from an admin on SNJB's account.  Team, please let me know if you would like to allow sharing and I can get this enabled for you.

Do you see that?

A.    Yes.

Q.    And then you respond to Ms. Winter, and you write:  Norfolk is happy to allow sharing to anyone who would like it.

Did I read that correctly?

A.    Yes.

Q.    Was that statement true when you made it?

A.    Yes.

MR. SOYFER:  You can set that document aside.

Q.    So I promised you when I wanted to talk about the post-July versus pre-July world I would be clear.  So now I want to talk about sharing after July 1st of this year.

156

So your understanding now is that sharing is limited to law enforcement agencies in Virginia, correct?

A.    Correct.  Yes.

Q.    Okay.  Have you confirmed that with Flock?

A.    Yes, we have.

Q.    Okay.  How did you verify that?

A.    How did I verify -- I'm not sure I understand the question.

Q.    Well, did you verify that?

A.    We --

MR. KRAVIS: Objection.  Vague.  Go ahead.

Q.    Did you verify that sharing is restricted to law enforcement agencies within Virginia?

A.    I had verified that through Lieutenant Vernon who has been our main contact with Flock representatives.

He has indicated to me that that was done as well as the restriction of 21 days has

157

been completed in the Flock system.

Q. Okay. So you are relying on Lieutenant Vernon having confirmed that. Is that fair?

A. Yes.

Q. Okay. In terms of the restriction on sharing with law enforcement agencies outside of Virginia, that happened because of the change in state law, correct?

A. Yes.

Q. Norfolk didn't make an independent decision to do that, correct?

A. Correct.

Q. And the same is true of the decrease in the retention period from 30 days to 21 days, right?

A. Correct.

Q. Okay. I am going to move on to topic 7 now which is your access to and use of Flock cameras or Flock data belonging to third parties. Are you prepared to testify about that today?

A. Yes.

Q. So obviously Norfolk Police Department

158

had access to Flock data from cameras other than its own, correct?

A. Yes.

Q. And I think you testified earlier that is one of the reasons the Norfolk Police Department decided to contract with Flock, correct?

A. Yes.

Q. Okay. And there is no restriction within Norfolk among the Norfolk Police Department personnel in terms of the data sources they can access. Is that correct?

A. What do you mean by data sources they can access?

Q. Yes. So all officers within the department can access all of the data from all of the cameras to which the Norfolk PD has access, right?

A. Yes.

Q. Okay. And I think you testified earlier one of the key selling points on Flock was the ability to share data among the Hampton Roads

159

jurisdictions, correct?

A. Yes.

Q. And that would include Chesapeake, right?

A. Yes.

Q. Portsmouth?

A. Yes.

Q. Hampton?

A. Yes.

Q. Virginia Beach?

A. Yes.

Q. Newport News?

A. Yes.

Q. Are there any others you would kind of consider within that Hampton Roads area?

A. Probably not. We would generally refer to Hampton Roads as the seven cities. So . . .

Q. How did you decide to share your cameras among all of the Hampton Roads jurisdictions?

A. I mean, I'm not really sure how to answer that other than we wanted to share data with them and they wanted to share with us so we

160

just – we did it.

Q. Did you like reach out in advance of the Flock cameras being installed to ask about access?

A. No, other than, as we discussed earlier, I did reach out to a couple of jurisdictions to get their – their thoughts and opinions on the use of the system, whether it was useful, whether it has helped them.

Other than that, if – are you asking me did I contact them to see if they would data share if we were to purchase the product?

MR. SOYFER: Yes.

A. Yeah, I don't recall having that kind of conversation.

Q. Okay. Did you notify your contacts in any of those jurisdictions when you made the decision to contract with Flock?

A. When we purchased the product and I had access to it, I remember sending data sharing requests to those who had it around – around us, yes.

161

Q.   Okay.  And those were all approved, correct?

A.   To my -- to the best of my knowledge, yes.

Q.   Okay.  You are not aware of any Hampton Roads area city that didn't approve one of those requests?

A.   I am not.

MR. SOYFER:  Okay.  I am going to introduce Exhibit 22 now.

For the record, this is a document bearing Bates stamp NORF 006843.

This is an e-mail from Raoul Alvarez to Michelle Naughton cc'ing Amanda Harvey with the subject:  Lowe's now sharing their cameras dated March 5th, 2024, correct?

A.   Yes.

Q.   Who is Raoul Alvarez?

A.   He was -- once I was promoted in August of '23, he was the captain assigned to the Real Time Crime Center.

Q.   Okay.  And so did he assume some of your

162

responsibilities, you know, concerning the Flock cameras at that time?

A.   He assumed all my responsibilities at that time, yes.

Q.   Okay.  So if you look at the first sentence of his e-mail, he writes:  Chief --

And I just want to make sure I understand this, he is addressing Assistant Chief Naughton, correct?

A.   Correct.

Q.   He writes:  Chief, please see the below e-mail from Flock in reference to Lowe's.  This is an agreement that they have worked out with Lowe's corporate to allow agencies around the country to access their cameras as donor sites.

Do you see that?

A.   Yes.

Q.   Is it your understanding that the City of Norfolk has access to information from Flock cameras at some Lowe's locations?

A.   Yes.

Q.   Okay.  And this is a silly question, but

163

just so the record is clear, Lowe's is a private organization, correct?

A.   Correct.

Q.   Do you have an understanding of how many Lowe's stores there are in Norfolk?

A.   There is one Lowe's in Norfolk.

Q.   Okay.  And so if you go down -- I just want to ask a few questions about the next e-mail in the chain, which is from Brian McKenzie to Raoul Alvarez, dated March 5th, 2024.  Do you see that?

A.   Yes.

Q.   It starts on the first page ending in 43, but most of the text is on the next page ending in 44.  Do you see that?

A.   Yes.

Q.   He writes:  We are assisting in the process in coordination with Lowe's to provide agencies around the country to access to Lowe's camera for search capabilities as a part of their nationwide roll-out.

Do you see that?

164

A.   Yes.

Q.   Is it your understanding that Flock assisted Lowe's to provide the Norfolk Police Department with access to Lowe's cameras?

A.   That's what it appears, yes.

Q.   Why did the Norfolk Police Department want access to Lowe's cameras?

A.   To assist us in investigating larcenies that are occurring at Lowe's properties.

Q.   Okay.  And it provides additional cameras to collect data that the Norfolk Police Department can use, correct?

A.   Yeah.

Q.   Okay.  The Norfolk -- well, let me ask you this question.

If you go back to Raoul Alvarez' e-mail, the sentence that we were just looking at, he says:  This is an agreement that they have worked out with Lowe's corporate to allow agencies around the country to access their cameras as donor sites.

What does he mean by donor sites?

HIGHLY CONFIDENTIAL

Transcript of Captain Charles Thomas, Corporate Designee       42 (165 to 168)

Conducted on July 22, 2025

165

A.   A private entity that is sharing their Flock data with law enforcement agencies.

Q.   Okay.  And there was no cost associated with the Norfolk Police Department getting access to those cameras, right?

A.   Note to my knowledge, no.

MR. SOYFER: Okay.  You can set that document aside and I will introduce Exhibit 23.

For the record, this is a document bearing Bates stamp NORF 009843.

THE WITNESS: Yes, I have it available.

Q.   And this chain has a lot of redactions, but I just want to kind of briefly ask you if you can turn to page -- the page ending in 50.

You will see the first in time e-mail here is from Michael Maslow to Bernard Pishko.

You were copied in the cc line.  The subject is Real Time Crime Center MOU legal review, and it's dated March 23rd, 2023, correct?

A.   Yes.

Q.   Who is Bernard Pishko?

A.   He is the City attorney.

166

Q.   Okay.  So just kind of -- if you scroll up -- well, so you will see on this page there are several redactions that say attorney-client privilege, correct?

A.   Yes.

Q.   Okay.  If you scroll up another page, you will see again all the e-mails here are redacted and they say attorney-client privilege, correct?

A.   Yes.

Q.   Do you know who Shelley Baker is?

A.   She works here in the City attorney's office if I'm not mistaken.

Q.   Okay.  What about Andrew Fox?

A.   He works in the City attorney's office.

Q.   Okay.  And so if you scroll up another page, you will see the page ending in 48.  Again, these two e-mails are redacted.

Scroll up one more page to 47.  There is a redacted e-mail at the bottom here.  But then you forward that e-mail to Karen Rose on April 3rd, 2023.  Do you see that?

167

A.   Yes.

Q.   Okay.  You can see that her e-mail address is Krose@NHRA.us, correct?

A.   Yes.

Q.   Who is Karen Rose?

A.   Karen Rose is -- I think her title is security director with Norfolk Redevelopment Housing Authority.

Q.   Okay.  So she is employed by the Norfolk Redevelopment and Housing Authority.  Is that right?

A.   Yes.

Q.   And I think you said this earlier, but the Norfolk Redevelopment and Housing Authority is not part of the city government of Norfolk, right?

A.   Correct.

Q.   Okay.  And Karen Rose is not -- well, Karen Rose at this time is not employed by the City of Norfolk, correct?

A.   Correct.

Q.   Okay.  You write to her: Good

168

afternoon, Karen.  Attached is an MOU for the Fusus platform that will be used in the Real Time Crime Center.

Do you see that?

A.   Yes.

Q.   Do you know what the MOU referenced is?

A.   Yes.  It was in reference to them allowing us to have access to their cameras on their HA property.

Q.   Okay.  Does that include Flock cameras?

A.   No.

Q.   Okay.  So this agreement doesn't cover Flock cameras.  Is that your testimony?

A.   Correct, it does not.

Q.   Okay.  I would like to -- we will skip all the way up to the first page, which is the page ending in 43.  You will see the second e-mail from the top is from Karen Rose to you, Renato Aponte, and Derrick Vernon dated May 27th, 2023, correct?

A.   What date did you say?  I'm sorry.

Q.   May 27th, 2023.

Transcript of Captain Charles Thomas, Corporate Designee    43 (169 to 172)
Conducted on July 22, 2025

169

A.  Correct.  Yes.

Q.  Okay.  Who is Renato Aponte?

A.  He is a captain with the police department.

Q.  Okay.  What is his role?

A.  Currently his role is the commanding officer of the anti-crime division.

Q.  Okay.  And at this time, what was his role?

A.  He was assigned to the chief's office.  He was to a very small degree assisting me with -- with these -- implementing this project.

Q.  When you say implementing this project, what is this project?

A.  The Real Time Center project, Flock Safety cameras.

Q.  Okay.  So you will see Karen Rose writes:  Hello.  Just FYI, I have submitted financial documents to add Flock Safety cameras at Hunter Square and Sykes midrises, four cameras total.  They will cover parking lot access, two at each location.  Please advise if you need

170

additional information.

Do you see that?

A.  Yes.

Q.  Do you know what Hunter Square and Sykes midrises are?

A.  They are apartment complexes.

Q.  Okay.  And when she says they will cover parking lot access, that means access to the parking lots at those apartment complexes, right?

A.  Yes.

Q.  That would be where residents park, for instance?

A.  Yes.

Q.  And so the idea here is to have Flock cameras covering the parking lots at those locations, right?

A.  Yes.  That is what they were -- they were purchasing those cameras, yes, for that, for coverage in those parking lots.

Q.  Okay.  And they, the NRHA, granted the Norfolk Police Department access to all of their cameras, correct?

171

A.  Yes.

Q.  So that would include those four additional cameras, right?

A.  Yes.

Q.  Okay.  I'm -- you can set that document aside.  I'm going to move on to the next topic, which is your encouragement, assistance, facilitation or approval of third parties' purchases rentals or acquisitions of Flock cameras that are located within your territorial limits.  Are you prepared to testify today on that topic?

A.  What number is that?

MR. SOYFER:  8.

A.  Okay.  Yes.

Q.  We touched on this earlier a little bit, but Flock also sells cameras to private sector customers, correct?

A.  Yes.

Q.  Okay.  And the City of Norfolk is aware of that, correct?

A.  Yes.

172

Q.  Can you just give me some examples of private sector entities in Norfolk that have Flock cameras?

A.  Lowe's is an example.

Q.  Any others?

A.  I'm not sure that there are any others.  There may be.  I just may not be aware of it.

So we had -- at this time, I had a couple of HOAs reach out to me to ask what they had to do to get some cameras.  And I told them that I would put them in contact with the Flock representative that could help them work through all that.

But whether they -- I don't think any of the HOAs actually ended up getting them.

Q.  When you say an HOA, you mean a homeowners association, correct?

A.  Yes.

Q.  Okay.  And so is the idea that some homeowners association would sort of place Flock cameras in the neighborhood?

A.  Yes.

HIGHLY CONFIDENTIAL

Transcript of Captain Charles Thomas, Corporate Designee                44 (173 to 176)
Conducted on July 22, 2025

173

MR. SOYFER: Okay.

A.   Or wherever they wanted them on their property. That's -- that would be up to them.

Q.   Okay. So they just reached out to you to express interest?

A.   They reached out to us to ask who they would have to contact, yeah, you know, who could they speak to in reference to that.

Q.   And you provided that information to them?

A.   Yes.

Q.   Okay. But you don't know what ultimately came of that. Is that right?

A.   Yeah. I don't believe any of them actually purchased any ultimately.

Q.   Okay. Did you want them to purchase cameras?

A.   I didn't have a feeling one way or the other. I did advise -- so one was Ocean View. It was actually East Ocean View. I advised her that -- you know, because she asked questions about, you know, were we planning on putting any

174

there. I said no, based on the same conversation we have been having all day, that the violent crime data didn't support it. And so they were interested in purchasing their own.

So I really didn't have an interest in them getting them or not getting them. It was up to them. And that's why I told them that.

I had another -- another location in the city was Ghent. It might have been called Ghent Square, somewhere in a portion of the city that again the data did not support us putting any there. And I told the representative that.

So they were interested in it. So they talked about it and ultimately decided not to get any.

So whether they did or didn't was really of no concern to me. I didn't try to convince them one way or the other.

I did advise them that if they decided to purchase it and wanted to share with us, that would be fine, but I didn't have a feeling one way or the other about it.

175

Q.   Have you ever contacted, you know, a property management company or a neighborhood association or a homeowners association, anything like that, just to tell them about Flock cameras?

A.   I don't recall specifically me reaching out to somebody as a cold call to say, hey, would you guys be interested in this. I did field some calls and I did call people back after I was told there was some interest, but I don't remember ever cold calling or just reaching out to somebody randomly to try to get them involved.

MR. SOYFER: I think now might be a good time for a lunch break if we want to go off the record.

MR. KRAVIS: Sounds good.

THE VIDEOGRAPHER: All right. We are going off the record. The time on the monitor is 1312.

(Thereupon, there was a recess taken at 1:12 p.m.)

(Thereupon, the proceedings were resumed at 1:59 p.m.)

176

THE VIDEOGRAPHER: We are back on the record. The time on the monitor is 1359.

BY MR. SOYFER:

Q.   Welcome back, Captain Thomas. We just took a break, but you understand you are still under oath, correct?

A.   Yes.

Q.   Okay. So I'm moving on to topic 9 now and that is the purposes for which you use Flock data and the Flock system. Are you prepared to testify on that topic?

A.   Yes.

Q.   Okay. So we touched on this a little bit earlier, so I will try to streamline here a little. But you said one of the purposes for which Norfolk uses Flock data is receiving alerts, for officers to receive alerts. Is that correct?

A.   That is one of purpose, yes.

Q.   Okay. And those could be for stolen cars, right?

A.   Could be.

Q.   Okay.  Could they be for missing people?

A.   Could be, yes.

Q.   Okay.  What about for people who have open warrants?

A.   Yes.

Q.   Okay.  And help me understand how that works.

So if someone has an open warrant and they are the registered owner of a car, does that license plate get added and there are alerts generated based on that license plate?

A.   Yes.  So also it would really be, if that person is associated with a vehicle that we know of, then it would go on the hot list as a person who is wanted as associated with this vehicle.  And if the vehicle passes by, we are alerted of the vehicle, of its location at that given time.  So officers can respond to that area and search for the vehicle.

Q.   Okay.  Let me just unpack that a little bit.

So one way you could know that they are associated with a vehicle is if the person is a registered owner of the vehicle, right?  That's one way?

A.   Correct.

Q.   How else could you know that a person with an open warrant is associated a vehicle?

A.   If a family member says I lent him this vehicle and he's been driving it for the past three weeks, here's the vehicle's information, that's another way.

Q.   Okay.  So you can consider other sources of information that you have to determine that a person is associated with a vehicle, right?

A.   Yes.

Q.   Okay.  So we've talked about stolen cars, open warrants, missing people.

Are there any other types of alerts that Norfolk generates through the Flock system?

A.   Stolen license plates is one.  But generally speaking, officers turn off that alert, because there are so many of them, you just get constant alerts.  So most people -- plus, our

pursuit policy is such that we can't chase a vehicle with stolen license plates.

So trying to track -- you know, spending your time tracking down stolen license plates and, if they run from you, you can't chase them anyways, along with a few other limitations.

Like if I stop you with a stolen license plate, I may or may not even be able to put that stolen license plate on you.  Right?  There are a whole lot of factors that go into it.

But most -- most officers turn that alert off.  But that is another alert type.

Q.   Okay.  I just want to pause and follow up on the pursuit policy.

Is that pursuit policy you are mentioning specific to stolen license plates?

A.   No.  It gives you when you can pursue.

MR. SOYFER:  Okay.

A.   And you can pursue in the event of a violent crime or a stolen vehicle or a driving under the influence situation.

Q.   Okay.  And so under this general policy, a stolen license plate is just one of those situations where you can't pursue a vehicle solely because the license plate is stolen?

A.   Correct.

Q.   Okay.  Are your Flock data used in investigations of past crimes?

A.   Can you be more specific?

Q.   Yeah.  I mean, do Flock data play any role in investigations of crimes?

A.   Yes.

Q.   And what -- just tell me about that.  What role do they play?

A.   They play a role in providing investigators with investigative leads to help them identify people who may have been in a vehicle after an incident has occurred.

Q.   And why -- why is it that they provide leads?

Like how -- how are they valuable for providing leads?

A.   So if an incident occurs and the vehicle description, their license plate was given to an

Transcript of Captain Charles Thomas, Corporate Designee    46 (181 to 184)
Conducted on July 22, 2025

181

officer and they search the -- the Flock database, you know, they may see a direction of travel from where they -- where they went. They may be able to go to that location and search the area to find a possible occupant or driver, put together who may have been driving it, along with witness information, and then make an arrest based on that information.

Q. So let's say a crime happens somewhere near a Flock camera. Can an officer go in and pull every license plate that was captured at that Flock camera around the time that crime occurred?

A. Yes.

Q. And they -- I should ask this: They -- they can also pull pictures of vehicles that don't have a license plate, correct?

A. Yes.

Q. Okay. For each of those license plates, could they look up, you know, where else that car was seen for whatever period data exists?

A. They could, yes.

182

Q. Okay. Could they look for repeat visitors to an area?

MR. KRAVIS: Objection, vague.

A. So if they -- if they search a date and time frame and got a search result of multiple vehicles and found one that matches the description of the vehicle they were provided, then they could search that vehicle specifically and see what Flock cameras it has passed in the previous 21 days, yes.

Q. Okay. And if that vehicle was repeatedly seen in the area where the crime was committed, they can figure that out, right?

A. Yes.

Q. Okay. So if the vehicle later was seen at another Flock camera, they can see that as well, correct, after the crime occurred?

A. Yes.

Q. And if they pull say all of the data for that vehicle for a period of time, those data include time stamps, right?

A. Yes.

183

Q. And they include the latitude and longitude of the camera that took the picture, right?

A. I believe so, yes.

Q. Have Norfolk PD officers or investigators ever relied on Flock data to seek a warrant?

A. Not that I am aware of. Additionally, that would violate the general order and special order on the use of Flock.

MR. SOYFER: Okay.

A. If it was solely used -- if that was the sole information used. Could it be a piece of the information used, yes, as it pertains to -- are you still there?

MR. SOYFER: Yes, I am still here.

A. Okay. It's just -- okay.

You know, some magistrates here want to see the bread crumbs of how you got from one place to another. So it could be a piece of it.

They could identify an investigative lead within a search warrant, and a Flock data

184

point could be a part of that, but it cannot be the only -- only piece of evidence to allow you to get a search warrant.

Q. Okay. I definitely want to ask you more about that, but we will come back to it later when we go through the special order and the general order. So I will kind of put a pin in that for now.

Have officers ever relied on Flock data while testifying in courtrooms?

A. I'm sure they have. I don't -- I'm not there for every piece of testimony, so I couldn't tell you with a hundred percent surety. But it has provided officers with investigative leads and I am certain it has come up in court cases.

Q. Are there any you are aware of?

A. I haven't been to court in probably 20 years, so I -- I don't know. So . . .

Q. Okay. And you just haven't been made aware of them through other means, I guess?

A. No, I have not been made aware of them.

Q. Okay. You -- are you aware sitting here

Transcript of Captain Charles Thomas, Corporate Designee          47 (185 to 188)
Conducted on July 22, 2025

today of any success stories of getting convictions using Flock data?

A. I mean, I can't say convictions. I don't — I don't follow convictions, conviction rates.

As such, I can tell you that Flock data has led to a numerous amount of arrests of violent crimes and stolen autos.

Q. Okay. Are there any other purposes for which the Norfolk Police Department uses Flock cameras that we haven't covered so far?

A. None that I can think of.

Q. Okay. What about for traffic enforcement?

A. No.

Q. Okay. And why not?

A. There's — it's — the system doesn't even allow you to do that. There is no traffic enforced based on a still picture. So it wouldn't catch you running a red light. It wouldn't catch you speeding. There is nothing you can do with a still picture when it comes to traffic enforcement that I'm aware of.

Q. Could it catch a car crash?

A. It's hypothetically possible.

Q. Okay. Could it catch, let's say, like an illegal U-turn?

A. I guess it's hypothetically possible. But I'm trying to think of locations where we have no U-turn signs and even if there is even a Flock camera in those locations, even if it would catch that. I don't know.

Q. Okay. So it's hypothetically possible, but you are not aware of that happening in the real world, though, correct?

A. No.

Q. Okay. And is traffic enforcement not a permitted use?

A. It's not — it's not mentioned as a permitted use in the general order, so no.

Q. Is it prohibited?

A. No, I don't — no, not that I'm aware of.

Q. Okay. What about to serve subpoenas?

I'm thinking, for that question, I would like to know before July 1st of this year, was serving subpoenas a permitted purpose for the Flock system?

A. I have never heard of anybody trying to serve a subpoena using Flock. I'm not even sure how — how they would do that.

Q. Okay. So topic 10 is how and for what purposes your patrol officers access and use the Flock cameras, Flock data and Flock system.

Are you prepared to testify about that?

A. Yes.

Q. Okay. And I guess I should ask you so we are on the same page.

When I say patrol officer, do you have an understanding what I mean by that?

A. Yes.

Q. And what's your understanding?

A. An officer who drives in a police vehicle and is assigned to patrol neighbors here in the City of Norfolk.

Q. And provided they sort of checked the boxes and did the training, patrol officers can get access to the Flock system, right?

A. Yes.

Q. And they have the same level of access that anyone else in the police department has other than the admins, correct?

A. Yes.

Q. So they can go in and they can right now look up 21 days of data, correct?

A. Yes.

Q. Okay. And prior to July 1st, that would be 30 days of data, correct?

A. Yes.

Q. How do patrol officers access Flock?

A. They log into the Flock system on their MDT, the computer in their vehicle.

Q. You said that's MDT?

A. Yes, mobile data terminal. I believe that's what it's called. Yeah.

Q. And that is an NPD-owned computer that's issued to police officers?

A. Yes.

Q.  Is that the only device they are permitted to log onto Flock with?

A.  No.  You are talking about patrol officers?

MR. SOYFER:  Yes.

A.  No.  They could use City issued computers that are in the precincts.  It's any City issued device.

Q.  Are you aware if Flock has a mobile app?

A.  Yes.

Q.  Are patrol officers allowed to use the mobile app?

A.  Yes, as far as I know.

Q.  Okay.  Would that be on a City owned phone?

A.  Yes, per the — per the general order, yes, it has to be on a City -- City device.

Q.  Okay.  And are police -- are patrol officers issued NPD-owned mobile phones?

A.  Some are.

Q.  Okay.  So if an officer does not have an NPD-owned mobile phone, then they can't use the Flock app, correct?

A.  Correct, not per the general order.

Q.  Okay.  Just thinking day to day, generally how do patrol officers use the Flock system?

A.  So they are required to log on via the MDT at the beginning of their shift.  So it will run in the background as they are patrolling throughout their shift.  An alert will come through that is audible.  So they would hear it.  They would pull the Flock system up from out of the background, see where that alert is coming from, the location.  Given its a location that they are close by, they can go to that location and begin a search of that vehicle.

If they locate that vehicle -- let's just say it's a stolen auto.  If they locate it, they would get behind it.  They would wait for an additional vehicle to — a police vehicle to catch up to them where they would initiate their lights and sirens to attempt a vehicle stop.

Q.  Are there any other purposes for which patrol officers use the system?

A.  I mean, if they have an incident that has occurred that they are investigating and they are given a vehicle description or a vehicle tag, they can query that to the system to see which direction, maybe a left, if it crossed a camera, so that they might be able to try to locate that vehicle.

Q.  Okay.  And so they would query the data while searching for a vehicle of interest.  Is that right?

A.  Yes.

Q.  Okay.  That facilitates their search for that vehicle, correct?

A.  Yes.

Q.  Okay.  I would like to move on to topic 11 which is how and for what purposes your investigators and/or detectives access and use the Flock cameras, Flock data and Flock system.  Are you prepared to testify about that today?

A.  Yes.

Q.  Just tell me how do your investigators or detectives use the Flock system?

A.  They could use it in a similar fashion to patrol officers.  They could use it while investigating crimes from their desk at their City computer.

So if they have a report that has been assigned to them and it contains a vehicle of interest or a license plate of the vehicle, they could -- they could query the system that way to see if they can identify where that, you know, vehicle might be or where it was last seen so they could try to locate it.

If they are investigating anything, for that matter, that is how they would do it.

Q.  Could they query the past -- strike that.

Thinking of right now, could they query the past 21 days of data?

A.  Yes.

Q.  What are some reasons they might do that?

A.  If a vehicle of interest frequents a

Transcript of Captain Charles Thomas, Corporate Designee

Conducted on July 22, 2025

certain part of the city on a regular basis, then they -- it may provide them with an investigative lead as to where to locate the operator of that vehicle. That would be why.

Q. Okay. That provides them with clues about where the vehicle operator is. Is that fair?

A. Yes.

Q. Okay. Could they look for repeat visits?

MR. KRAVIS: Objection. Vague.

Q. If they have a vehicle of interest, could they look for repeat visits around a certain area?

A. I mean, it's essentially the same answer, I mean, I gave. Yeah, if they frequent an area, then they might know where they could find that vehicle.

I mean, maybe I will answer your question -- the Flock cameras don't tell us -- don't give us any locations that they stop at or, you know, repeat go to. It doesn't tell us that.

It tells us that they were at a specific place at a specific point in time passing that camera. That's it. And they all -- they all point towards public roadways where vehicles are driving. So it's not going to tell us if someone goes to a house. It's not going to tell us if someone goes to a business whatsoever.

Q. And I appreciate that. I'm just asking specific questions. I'm going to move to strike the answer as non-responsive. But I can just move on to the next question.

Have you heard of any success stories using the Flock cameras for investigations?

A. Yes.

Q. And just tell me some of those.



Case 2:24-cv-00621-MSD-RJK    Document 179-7    Filed 11/20/25    Page 52 of 86
PageID# 4729

HIGHLY CONFIDENTIAL

Transcript of Captain Charles Thomas, Corporate Designee

Conducted on July 22, 2025

50 (197 to 200)



Q.   Okay.  Do you think it's a fair assumption that the driver of the vehicle is usually the registered owner?

MR. KRAVIS: Objection.  Calls for speculation.

A.   No, I would not.  That is not a fair assumption.

Q.   Okay.  So moving on to topic 12 now. Topic 12 is your policies for access to and use of the Flock cameras, Flock data and Flock system.  Are you prepared to testify on that topic today?

A.   Yes.

Q.   Who sets Norfolk policies for the Flock system?

A.   The police department does.

Q.   Who within the police department?

A.   It's not necessarily a person involved.

Transcript of Captain Charles Thomas, Corporate Designee    51 (201 to 204)
Conducted on July 22, 2025

201

There's -- it's usually multiple people involved to include subject matter experts.

The personnel division, the assistant chiefs, the chief of police, the City attorneys are all involved in setting policies.

Q.   Okay.  So -- okay.  So I understand the City of Norfolk has had at this point two written policies for the use of the Flock cameras.  Is that correct?

A.   We had a special order and now a general order.

Q.   Okay.  Who was -- just tell me who was primarily involved in creating the special order?

A.   I was.

Q.   Anyone else?

A.   I mean, I would say that deputy chief and chief of police.  They had to approve of it.

Q.   Okay.  So that would be Deputy Chief Maslow?

A.   Yes.

Q.   And the chief of police at that time would have been Chief Talbot, correct?

202

A.   The dates are pretty close.  I don't know if it was Goldsmith or Talbot.  It was --

Q.   That's fair.  We will look at the document in a minute and maybe that will refresh your recollection.

What about Assistant Chief Naughton, was she involved?

A.   Not that I'm aware of.

Q.   Okay.  And let's think about the general order now.  Who was involved in preparing the general order?  Who was primarily involved?

A.   There probably was not a primarily involved person.  That was a -- a collaboration between the police department and the City attorney's office.

Q.   Okay.  Who was involved on the side of the police department?

A.   I was, Sergeant Gauthier was, our personnel division was.  So it was -- it was a number of people.

Q.   And who was involved on the side of the City attorney's department?

203

I'm just asking for names of any people, not any communications you had with them.

MR. KRAVIS:  I'm just going to underscore that.  I think the question is just asking for names.  If you can just give the names and that's it, that would be great.

A.   Ms. Soloria was involved.

Q.   Okay.  And she is one of the attorneys sitting in the room with you today, correct?

A.   Yes.

Q.   Okay.  Was the City attorney's office involved in preparing the special order back in 2023?

A.   Not that I'm aware of.

Q.   Do you know why not?

MR. KRAVIS:  Objection.  Vague.  Go ahead.

A.   Yeah, I don't -- I don't know why not.  Special orders are different than general orders.

Special orders are orders by the chief of police when we need to generate a -- a -- it

204

ended up being a temporary policy in a very near term situation.

The Flock system coming online was something that we needed to generate some formal policy around as soon as we could.  And we didn't necessarily have the time to have it reviewed through the state attorney's office.  We needed to get something out quicker rather than not.  So that would be why.

Q.   Got it.  So the idea is the special order is sort of temporary.  Is that fair?

A.   Yes.

Q.   Just until a general order can be developed.  Is that right?

A.   Correct, or if it's superseded by a different general order, yes.

So in this situation, a Flock special order could have been superseded by an LPR general order.  It just happened to be superseded by another Flock general order.  So it's in place until superseded by a general order of some sort, yes, that covers the same information.

HIGHLY CONFIDENTIAL

Transcript of Captain Charles Thomas, Corporate Designee    52 (205 to 208)

Conducted on July 22, 2025

205

Q.    When was the Flock special order issued?

A.    If you want to -- if you want to show me that order, I will be happy to answer that.

Q.    Yeah, sure.  Let me just ask you a few questions first.

Was the special order issued after the cameras went up?

A.    Again, I don't know -- I don't know the date.  So if we bring it up, I could tell you.

MR. SOYFER:  Yeah.  Let's start looking at some documents here.  We are on 24 now.

Okay.  I just dropped that in the chat.

For the record, this is a document bearing Bates stamp NORF 009665.

And feel free to look through it.  I won't have too many super substantive questions on the policy itself, but you are certainly free to flip through there.

THE WITNESS:  Okay.

Q.    You will see that this is an e-mail from Deputy Chief Maslow to Catheryn Whitesell, copying you, among others, with the subject

206

privacy policy for RTCC dated July 21st, 2023.  Do you see that?

A.    Yes.

Q.    Who is Catheryn Whitesell?

A.    She is a deputy city manager.

Q.    And what does a deputy city manager do?

A.    I have no idea.

MR. SOYFER:  Okay.

A.    They are in charge -- they have a portfolio of multiple city departments.

What hers are exactly at this time, I don't know.

MR. SOYFER:  Okay.

A.    It wasn't the police department.

Q.    Got you.

Okay.  So you will see this is dated July 21st, 2023, correct?

A.    This e-mail is, correct.

Q.    Yes.  And is that subsequent to when the Flock cameras went up?

A.    This e-mail is generated, yes, after the Flock cameras went up at the end of May, early

207

June of '23.

Q.    Were officers already using the Flock system by that time?

A.    Yes.

Q.    And you will see that Deputy Chief Maslow writes:  Attached is a draft of the special order regarding the use of the Flock LPR cameras and data.

Do you see that?

A.    Yes.

Q.    So at this time, the special order was still in draft form, correct?

A.    It sounds like it based on this e-mail, yes.

Q.    Okay.  And if the special order was in draft form, that means it wouldn't have been issued to the officers.  Is that fair?

A.    Yes.

Q.    If you go to the next page, you will see that the draft special order starts there, correct?

A.    Yes.

208

Q.    Okay.  And did you -- I think you said earlier you played a part in drafting the special order.  Is that correct?

A.    Yes.

Q.    I think you said you were primarily responsible, but correct me if I am wrong.

A.    I did take a primary role in drafting this special order, yes.

Q.    How did you go about putting this together?

A.    It was kind of putting together different -- different documents that we already had, plus adding in things that we felt were pertinent.

We already had an older version of an LPR general order.  It was -- it was out of date, but there were still some what I thought were important things on there.

I also looked at other policies from other jurisdictions and pulled out what I thought pertained to us as an organization.

Q.    How did you get those policies from

HIGHLY CONFIDENTIAL

Transcript of Captain Charles Thomas, Corporate Designee

53 (209 to 212)

Conducted on July 22, 2025

other jurisdictions?

A.   You can locate them online, some of them.  You can request them from jurisdictions, I mean.

Q.   Did Flock provide you with any?

A.   I think they did.  It might have been one or two, but I don't recall where they were from.

MR. SOYFER:  Okay.

A.   If you have the e-mail pulled up that shows that they provided it to me and show it to me, I could be more precise on that.

Q.   Okay.  Do you recall any of the other departments or organizations whose policies you looked at?

A.   I can't remember the names.  No, I don't.  I don't recall.

Q.   Okay.  You can set that document aside.  And I will be dropping Exhibit 25 into the chat.

For the record, this is a document bearing Bates stamp NORF 017585.

And Captain Thomas, when you get that open, you will see that this is an e-mail with attachment from Amanda Harvey to Michelle Naughton with the subject Flock SO, dated October 22nd, 2024.  Is that right?

A.   That is the date of this e-mail, correct.

Q.   Okay.  And then if you go on to the next page, what is this document?

A.   This is the signed special order signed by the chief of police.

Q.   Okay.  And what -- what is the date?

A.   The date is July 13th, 2023.

Q.   Okay.  Can you tell which chief's signature that is?

A.   No.

Q.   So I would like to go to the second page of this policy.  And if you look, there is a section 1 entitled Responsibilities.

And just to be clear, this is the page ending in 86.

There's a section I, entitled Responsibilities.  And then if you look at B

underneath responsibilities, you will see the first sentence states:  Until the establishment of the Real Time Crime Center, open paren, RTCC, close paren, the special projects lieutenant will act as the point of contact and liaison with Flock Safety.

Did I read that correctly?

A.   Yes.

Q.   So as of the time of this policy, you were the special project lieutenant, correct?

A.   Correct.

Q.   So the next sentence states:  The special projects lieutenant will be responsible for overseeing the development and administration of the training process for ensuring for efficiency of operators.

Do you see that?

A.   Yes.

Q.   And then this will include but is not limited to -- and then skip to number II, below letter capital B, the states maintaining training records.  Do you see that?

A.   Yes.

Q.   Did you maintain training records in your role as a special projects lieutenant?

A.   I was transferred out from this position very shortly after this.  So I did not have any training records as of the time that I left.

Q.   Okay.  Did subsequent special lieutenants -- special project lieutenants maintain such records?

A.   I'm not aware of whether they did or not.

Q.   Okay.  Are you aware today as the City of Norfolk's 30(b)(6) witness whether -- actually, scratch that.

Moving on, if you look under I C, this States:  Supervisors will ensure that personnel who operate the Flock Safety platform will follow the established guidelines and procedures.

Do you see that?

A.   Yes.

Q.   Who are the supervisors being referenced here?

213

A.   Any police supervisor.  So any patrol supervisor, they have to ensure that their officers are operating the system, per established guidelines and procedures.

MR. SOYFER: Okay.

A.   Any police supervisor could fall under that.

Q.   And how do they ensure that the people they supervise follow the established guidelines and procedures?

A.   They need to first have conversations with them to let them know that, you know -- make sure they understand what the special order says.

They can follow up with them and ask them how they are using it, things of that nature.

Most -- the supervisors in this case weren't admins, so they can't run queries.

But as the police department operates, it is the supervisor's responsibility to ensure that their officers follow all Norfolk Police Department guidelines and general orders.

214

So it's sort of -- I don't want to say a catch-all, but it's there to make sure that supervisors are doing what they can within their purview to ensure that officers are following the guidelines of general orders and special orders.

Q.   When you say the supervisors in this case weren't admins, so they can't run queries, do you mean that they can't run audits to see the reasons all of the people they supervise are searching the system?

A.   My apologies.  If I said queries, I meant, yes, queries of audits.  They can't run an audit.

Q.   Okay.  I just wanted to clear that up.

A.   Yes.  Sorry abut that.

Q.   They don't -- they don't run audits to ensure that past use has been appropriate.  Is that right?

A.   Correct.

Q.   Okay.  So let's keep going.  You will see there is a section II entitled Procedures. Do you see that?

215

A.   Yes.

Q.   And then B in that section, capital B, states:  Patrol officers are required to sign into Flock Safety and utilize the technology throughout their entire shift.

Do you see that?

A.   Yes.

Q.   And that sentence is in all bold text, correct?

A.   Yes.

Q.   Was it important to the police department that patrol officers sign in and use the technology through their entire shift?

A.   Yes.

Q.   Why?

A.   Because we thought that the, and we still believe, that the system is critical to public safety.  It provides us with critical investigative leads that will help us reduce gun violence in the City of Norfolk and increase the safety and save lives of the citizens that live here.

216

Q.   You wanted to maximize the number of officers who were actually using the system.  Is that fair?

A.   Yes.

Q.   So then capital C states:  Flock Safety is to be utilized by personnel for law enforcement purposes only.

Do you see that?

A.   Yes.

Q.   What does law enforcement purposes mean in this context?

A.   It means to further investigation, so -- and to anything -- anything -- anything in the law enforcement department.  Generally it would refer to an incident they are investigating, an incident they are en route to, anything that they are working on in the capacity, their official capacity, as a police officer.

Q.   Okay.  So law enforcement purpose is anything they are working on in their official capacity as a police officer.  Is that a fair description?

217

A.   Yes.

Q.   Okay.  Could that include work on say like a joint federal task force?

MR. KRAVIS:  Just objection.  Vague as to when.  You are asking now about at the time of the special order --

MR. SOYFER:  I am asking for the time period in which this policy applied.

Q.   Could law enforcement have included working on a joint federal task force?

A.   Yes.

Q.   Okay.  Nothing in this policy requires an officer to seek their supervisor's approval to run a search, correct?

A.   Correct.

Q.   Nothing in this policy requires an officer to have a warrant to run a search, correct?

A.   Correct.

Q.   Nothing in this policy requires an officer to have probable cause to run a search, correct?

218

A.   Correct.

Q.   Nothing in this policy requires an officer to have reasonable suspicion to run a search, correct?

A.   Correct.

Q.   So under II G, you will see it states: Flock Safety will automatically delete data after a 30-day period.

Correct?

A.   Yes.

Q.   How was the 30-day period chosen?

A.   That was an automatic period that came with the Flock system.  It wasn't necessarily chosen by us.  That's just what they had.  So that is what we utilized.

Q.   Did you ever express interest in a longer time period?

A.   Not that I recall.

Q.   So section -- subsection H here states: Personnel who are assigned to the investigative services bureau will have rights to search as well as input information into the system.  Do

219

you see that?

A.   Yes.

Q.   So is it the case that outside the investigative services bureau, personnel like patrol officers don't have the ability to input information into the system?

A.   They -- they do.  They do now.  So yeah, they do now.

Q.   Why was it important to have this restriction at the time this policy applied?

A.   Because we didn't want officers to put people on a hot list where it wouldn't be appropriate.  So we wanted to make sure that there was at least another set of eyes on that, like a supervisor, so when we go down farther in H, the reason for having a detective or a supervisor review the request was to make sure that a second -- a second opinion, and specifically a supervisor, was weighing in on whether or not someone qualified to be entered into a custom hot list, a vehicle.

Q.   What's an example of where it wouldn't

220

be appropriate to put someone on a hot list?

A.   It wouldn't be appropriate if an officer suspected somebody of selling drugs and using a vehicle to do that and then putting them in a hot list to see where they were going and coming to and from with that vehicle, because it would be inappropriate to try to -- to try to do that without probable cause or, you know, reasonable suspicion at the very least.  That would be inappropriate.  So we didn't want that happening.

Q.   It would be inappropriate to put someone on a hot list to generate alerts just based on a hunch?  Is that potentially what you are saying?

A.   Yes.

Q.   Okay.  Why is that inappropriate?

A.   Because it -- you know, it's just -- we just felt like it's not an appropriate way to try to locate where people are coming to, going to and leaving from at any particular points in time in their vehicles without having probable cause to do so.  So we didn't want people trying to -- trying to use the system for that purpose when

Case 2:24-cv-00621-MSD-RJK    Document 179-7    Filed 11/20/25    Page 58 of 86
PageID# 4735
HIGHLY CONFIDENTIAL
Transcript of Captain Charles Thomas, Corporate Designee          56 (221 to 224)
Conducted on July 22, 2025

that's not what it's designed for. So the policy was put in place to — to prevent that kind of usage.

MR. KRAVIS: And I just want to make sure the record is clear. These questions now are all about the time period when the special order was in effect? Because I think there are parts of the general order that address this question.

MR. SOYFER: Yes. All of my questions are about the special order for the period when it was in effect.

We are moving on to the next exhibit which is 26. Let me know when you have received that. This is a document bearing Bates stamp NORF 017593.

Q.   And I will just start with the first in time e-mail. There are only two e-mails in this thread.

Captain Thomas, you can see this is an e-mail from Todd Williams to Keith Torian and Brian Atwood, cc'ing you, with the subject to dos, dated February 24th, 2025, correct?

A.   Yes.

Q.   Forgive me if I asked you already. But who is Todd Williams?

A.   **He is assistant chief of police in charge of administrative services.**

Q.   Okay. And who is Keith Torian?

A.   **He is the captain in charge of the personnel and accreditation division.**

Q.   And who is Brian Atwood?

A.   **At the time, Brian Atwood was the captain of our central records division.**

Q.   Okay. So Assistant Chief Williams writes: Keith, we need to generate a GO of the use of Flock.

Do you see that?

A.   Yes.

Q.   And so that reflects that as of February 24th, 2025, there was no general order in place on the use of Flock, correct?

A.   Correct.

Q.   He writes: I know we put out a SO, but with all the news surrounding the use of these cameras, we need to get our started.

Do you see that?

A.   Yes.

Q.   I think he meant to write we need to get our GO started. Does that seem right?

A.   Yes.

Q.   Okay. And so that reflects that as of February 24th, 2025, the NPD had not started a GO for the use of the Flock cameras. Is that correct?

A.   Yes.

Q.   What does he mean when he writes all the news surrounding the use of these cameras?

MR. KRAVIS: Objection. Calls for speculation.

A.   **Yeah. I don't — I don't know.**

Q.   Okay. Was there news surrounding the use of these cameras in February 2025?

A.   **Not that I remember.**

Q.   Why did the NPD decide to get started on drafting a general order in February 2025?

A.   **I don't know if I understand the question. Are you asking about the dates or the general order?**

Q.   I'm asking why at the time did the NPD decide to start drafting the general order?

A.   **I don't know. Again, I don't know what he's talking about as far as the news surrounding these cameras.**

Q.   Okay. Just putting that to the side, do you have any recollection independent of this e-mail about when the NPD started drafting a general order on the use of Flock?

A.   **I don't. Again, I got reassigned to the Real Time Crime Center in April of this year. So it was already sort of in the works when I got here. But then when there was word of, you know, a new law that had been put forth, we decided to wait until that law was passed so that we could make sure our general order was up to date and coincided with that, that law.**

**So to some degree at the end of the year, when I say year, leading up to July 1st, we**

HIGHLY CONFIDENTIAL
Transcript of Captain Charles Thomas, Corporate Designee
Conducted on July 22, 2025

57 (225 to 228)

225

were waiting. We were waiting to put out what we had to make sure that it matched what the law was.

Q. So the special order was in effect for nearly two years. Is that right?

A. Yes.

Q. And there was no general order during those roughly two years, correct?

A. Correct, just a special order.

Q. Okay. So then below -- below is Assistant Chief Williams' message to Keith.

He writes: Brian, the chief believes there is a single e-mail that is sent when an employee separates from the city which triggers the removal of system uses by the employee.

Do you see that?

A. Yes.

Q. And he essentially asks to follow up on that.

Is that generally the gist of what he's asking?

A. Yeah. He's asking to check with Terri

226

Doane, who is the chief information officer, so the head of IT.

Q. Okay. Is that related to Flock?

A. I don't know.

Q. Okay. Are you familiar with the single e-mail that is sent when an employee separates from the city that triggers the removal of system uses?

A. I am not, no.

Q. Okay. How are departing police officers removed from access to Flock? How is their access to Flock revoked?

A. So we do get an e-mail internally that is a memo indicating that a person has either resigned, retired or been terminated.

Once that occurs, we would go into the system and deactivate their account.

MR. SOYFER: You can set that document aside. I'm going to introduce another document. And this has previously been marked plaintiff's Exhibit 8.

It's a document, for the record, bearing

227

Bates stamp NORF 021152.

Let me know when you have that open.

THE WITNESS: I have it open.

Q. Okay. And what is this document?

A. This is the new general order regarding Flock Safety LPR systems signed as of June 30th of this year.

Q. And this is a general order, right? So it's intended to be semi-permanent is my understanding from your testimony. Is that fair?

A. It's designed to be permanent until superseded by a future --

MR. SOYFER: Okay.

A. -- order, yes.

Q. Got it.

And so at the top it has a legal review date, and you can see that, correct?

And then it has a prescribed date. What is the prescribed date?

A. 6/30/2025.

Q. I guess I'm asking a slightly different question. Just what does prescribed date mean?

228

A. I -- I don't know.

Q. Okay. Is that the date on which officers are expected to start following this order?

A. Yes.

Q. Okay. Do you have any understanding of why the time stamp for the prescribed date is Pacific Daylight Time?

A. No.

Q. Okay. I would like to -- I won't ask you about every single thing in this policy, but I would like to skip down to section II. This is on the fourth page of the pdf.

A. Okay.

Q. You will see the section is entitled Responsibilities.

If you look at capital B, it states: Supervisors in the Real Time Crime Center, open paren, RTCC --

Actually, sorry. Scratch that.

I actually want to take you to E, under section II, which is on the following page.

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

229

A.   Okay.

Q.   And if you are there, it states:  NPD Flock Safety ALPR system administrators will be responsible for adding personnel as system users, reviewing data sharing requests with other jurisdictions for acceptance or approval in conducting an audit of the Flock Safety ALPR system every 30 days.

Do you see that?

A.   Yes.

Q.   And I believe you identified two of the system administrators earlier as Sergeant Gauthier and Lieutenant Vernon.  Is that right?

A.   Yes.

Q.   And there may be some others that you -- you can't recall.  Is that correct?

A.   Possible.

Q.   Okay.  Do you know who conducts -- well, let me ask you this:  Have any audits of the Flock Safety ALPR system been conducted pursuant to II E in this policy?

A.   Yes.

230

Q.   When did that happen?

A.   What is today's date?  We are doing them on the 1st and 15th.  So I believe we just did one on the 15th.

Q.   Okay.  So you do them more than every 30 days.  You do them every 14-ish days.  Is that right?

A.   Yes.

Q.   Is there any reason you decided to do the more frequent audits as opposed to once a month?

A.   It's easier to -- to look at the data in smaller chunks.  So that is the best answer.  I mean, it's --

Q.   Okay.  It's harder, just because of the size of the files, to look at an entire month's worth of data.  Is that right?

A.   Yes.

Q.   Who performs those audits?

A.   Sergeant Gauthier.

Q.   Okay.  Just him?  No one else?

A.   At the moment, yes.

231

Q.   Prior to July 1st, when were audits performed?

A.   So I was assigned to the Real Time Crime Center April 12th.  I had Sergeant Gauthier starting to perform audits that I was aware of by May 1st.

Q.   That's May 1st of this year?

A.   Yes.

Q.   And you are not aware today of audits occurring prior to that date?

A.   I am not aware of any, no.

Q.   And when you asked Sergeant Gauthier to do that, was that a new process that you were in stating I guess when you had been reassigned to the RTCC?

A.   Yes.  It seemed like it, yes.

Q.   Okay.  I would like to look at section III.  And you will see the section is entitled Permitted Uses and System Access.  Do you see that?

A.   Yes.

Q.   And then under section III A, this

232

section is entitled Permitted Uses, correct?

A.   Yes.

Q.   And then section III A 1 lists out three permitted uses of the Flock system, correct?

A.   Yes.

Q.   And this is different from the previous policy, correct?

A.   Maybe in minor parts, but I would have to really look at them side by side.  They seem similar.

Q.   The previous policy says that the system use must be for a law enforcement purpose, correct?

A.   Yes.

Q.   And this has three specific uses that don't just say law enforcement purpose, correct?

A.   Right.

Q.   Okay.  So III A 1 a states:  As part of a criminal investigation into an alleged violation of the Code of Virginia, or any ordinance of any county, city or town where there is reasonable suspicion that a crime was

HIGHLY CONFIDENTIAL

Transcript of Captain Charles Thomas, Corporate Designee          59 (233 to 236)

Conducted on July 22, 2025

---

233

committed, correct?

A.   Yes.

Q.   Do you have an understanding of what a reasonable suspicion is?

A.   Yes.

Q.   And what is it?

A.   Reasonably if somebody has -- has committed a crime or, you know -- I mean, I don't know the legal definition of it --

MR. SOYFER:  Okay.

A.   -- to spit it off the top of my head, but --

Q.   I'm just asking for your understanding.

A.   Yeah.  It's a reasonable belief that somebody has committed a crime, less than probable case, but facts and circumstances lead someone -- a reasonable person to believe that a person has committed or is about to commit a crime, which is probably closer to the definition of probable cause itself.  But anyhow, that is what I have got off the top of my head.

Q.   Okay.  Fair enough.

---

234

So does this III A 1 a say what connection there has to be between the license plate and the crime that was committed?

A.   No.

Q.   So if there is reasonable suspicion, say that there is a robbery at a certain location, and there is a Flock camera a block away, can an officer go in and just look at all of the vehicles that were seen in that vicinity at around the time the robbery occurred based on this policy?

MR. KRAVIS:  Objection.  Incomplete hypothetical.

A.   Yeah, they could do that.

Q.   Okay.  And does this definition exclude violations of federal law?

A.   It appears to.

Q.   Okay.  Let me maybe ask the question a little bit differently.

Under this policy, can an officer search the Flock system based on their reasonable suspicion that a federal crime has occurred?

---

235

MR. KRAVIS:  Objection.  Vague. Incomplete hypothetical.  It also calls for speculation.

A.   Yeah, I'm not really sure under any circumstances a Norfolk police officer would be investigating a federal crime.  So I don't know.

Q.   Could it be as part of a joint federal state task force or a federal local task force?

MR. KRAVIS:  I have the same objections. Go ahead.

A.   Yeah, I mean, that would be possible if we had a -- a -- somebody who is assigned as a TFO to a federal agency, if they are -- if they are investigating a crime that has occurred in Norfolk, then, sure, they could search our system for that.

Q.   So now moving on to III A 1 b, you will see that this subsection allows searches of the system as part of an active investigation related to a missing or endangered person or a person associated with human trafficking.

Did I read that correctly?

---

236

A.   Yes.

Q.   Does this subsection require reasonable suspicion?

A.   Well, a missing person and an endangered person is not a crime itself, which would not require reasonable suspicion.

MR. SOYFER:  Okay.

A.   But it is a law enforcement purpose.

Q.   Okay.  What is a person associated with human trafficking?

A.   It could be the victim of human trafficking.  It could be a suspect of human trafficking.

Q.   Okay.  Could it be a witness to human trafficking?

A.   Per the general order and the Code of Virginia, that is what it appears to be, yes, any person.  It says or a person associated with human trafficking, which could include a witness in this situation.

Q.   Okay.  And then the third permitted use here, section III A 1 c, states:  To receive

---

Transcript of Captain Charles Thomas, Corporate Designee    60 (237 to 240)
Conducted on July 22, 2025

notifications related to a missing or endangered person, a person with an outstanding warrant, a person associated with human trafficking, a stolen vehicle or a stolen license plate.

Do you see that?

A.   Yes.

Q.   And that's consistent with some of the uses we discussed earlier today, right?

A.   Yes.

Q.   Does anything in this general order require the prior approval of a supervisor to use the Flock system?

MR. KRAVIS: Objection.  Vague.

Are you asking about the entire general order or just the pieces we were looking at?

MR. SOYFER:  The entire general order.

MR. KRAVIS:  Go ahead.

A.   So the use of the hot list or input into the hot list requires a detective division supervisor's approval.

Q.   Okay.  To search the Flock system, does that require prior approval?

A.   No.

Q.   So a patrol officer in the field can still search the Flock system without prior approval, correct?

A.   Yes.

Q.   Okay.  And under this policy, it has to be for one of these three permitted purposes, correct?

A.   So the section II, subsection A, 1, 2 or 3 is what you are referring to?

MR. SOYFER: I'm actually referring to I A through C.

A.   Then no, I would not agree with that assertion.

Q.   There are other purposes for which they can use the Flock system besides those listed in III A 1?

A.   So in III A 2, it says a Flock ALPR system may be used for official and legitimate use in connection with law enforcement purposes set forth in this general order and applicable law.

So there could be other things, not specifically stated in here, that are legitimate law enforcement purposes that they can use it for.

Q.   Okay.  And so you think this general order does not capture all of the permitted uses of the system.  Is that your testimony?

A.   Yes.

Q.   Okay.  Who makes a decision prior to a search happening whether the search is for a permitted use?

A.   So when you complete a search, you have to put two fields in there.  One has to be a reason.  The other one has to be an associated report number to go along with it.

A report number could be a police report number or a CAD number which is a number associated to a call for service.

So if you are able to produce those two things and the reason listed that you write on there is a legitimate law enforcement purpose -- I have not seen the circumstances yet where that did not fall within these parameters.

Q.   I'm just asking when the patrol officers access the system, no one else is supervising their decision that it's a permitted use and a valid use of the system, correct, in real time?

A.   Correct.

Q.   Does anything in this policy require an officer to have probable cause before searching the system?

A.   No.

Q.   Does anything in this policy require an officer to obtain a warrant prior to searching the system?

A.   No.

Q.   Okay.  So I would like to look at III A 3, which states:  The Flock Safety ALPR system will not be used to interfere with individuals engaging in lawful activities or tracking individuals on the basis of the content of lawfully protected speech.

Do you see that?

A.   Yes.

241

Q. Why is this here?

A. I don't know why that is there.

MR. SOYFER: Okay.

A. I believe it is part of the law that requires us to comply with it.

Q. How could the Flock Safety ALPR system be used to interfere with individuals engaging in lawful activities?

MR. KRAVIS: Objection. Calls for speculation. Vague. Go ahead.

A. Hypothetically, if you have a protest planned and somebody could identify who is going to take part in that protest, again, hypothetically, a law enforcement officer somewhere could stop those people on a traffic stop to prevent them from engaging in these lawful activities of free speech. That's my guess. But I don't know.

Q. Got it. So this policy prohibits using the system to identify protesters in that manner. Is that correct?

A. That's what it appears, yes.

242

Q. Did the special order prohibit that?

A. No.

Q. Okay. So under the special order an officer could go in and use the system to identify protesters to stop them from engaging in lawful free speech?

MR. KRAVIS: Objection. Misstates the prior testimony. Vague. Calls for speculation.

Q. I'm trying to understand the testimony. I'm trying to understand if what you are saying is that under the special order the scenario that you just described would be fine.

MR. KRAVIS: Objection. Vague as defined. Go ahead.

A. I would not agree with that assertion because I don't think that stopping an individual to prevent them from lawfully engaging in protected speech activities is a law — is a legitimate law enforcement activity.

MR. SOYFER: Okay.

A. So I would say no, that does not qualify as operating within the special order.

243

Q. Got it. So your understanding is the special order prohibited that?

A. In a broad sense, yes. I mean, it was not specific, as it is in this, but it does not fall within the parameters of the special order. Therefore, it would be outside of the guidelines.

Q. Okay. Under III C, you will see this is a section entitled System Access.

Move on, under C, it states: Officers are required to sign into the Flock Safety ALPR system at the beginning of each shift such that the technology is available for use throughout their shift based on operational needs.

Do you see that?

A. Yes.

Q. And this is consistent with the prior policy requiring officers to be signed in for their entire shift, correct?

A. Yes.

Q. Okay. Let's go down to section III D which is entitled Queries. Let me know when you are there.

244

A. You said III E?

MR. SOYFER: D, D as in David.

A. Okay. I'm there.

Q. So if you look under subsection 2, this is III D 2, it states: The user must enter the following information in the corresponding data fields of the Flock Safety ALPR system to initiate a query.

Correct?

A. Yes.

Q. And A is parameters; e.g., license plate, vehicle characteristics, time and/or location, correct?

A. Yes.

Q. And B is case number or call for service number. Do you see that?

A. Yes.

Q. Requiring a case number or call for service number is a change from the special order, correct?

A. I don't know if it's a change as much as it is an addition.

**245**

Q. Okay. Under the special order a case number or call for service number were not required, correct?

A. Correct.

Q. What does an officer do if they don't have a case number or a call for service number?

A. There is no time where an officer would be acting as a law enforcement officer and not have the ability to generate a case number or call for service number.

Q. Okay. I mean -- okay. I guess what I'm trying to understand is let's say an officer is standing outside 7-Eleven, they hear gunshots, they see what seems to be a robbery, suspect runs out of the store, dashes into a car, drives away and they don't get a license plate number.

Under those circumstances, how would an officer get a case number or call for service number?

A. So they call on the radio and they say -- let's say my number is 120. I say, 120, put me on a shots fired call, shots in progress.

**246**

Immediately a number is generated. That number would be the case number. Even lunch. The lunch is a case number.

So any action we take that's verbalized on -- on the radio is assigned a number.

Q. Okay. And so then under D 2 c, it states offense type and reasonable suspicion.

And what this is saying is that officers are required to state the offense type and describe the basis for reasonable suspicion. Is that a fair summary of that?

A. Yes.

Q. Okay. And then it gives three examples. Do you see those?

A. Yes.

Q. And these are all sufficient examples to enter into the system, right?

A. Yes.

Q. And they are all basically just a few words, pretty brief, correct?

A. Correct.

Q. Okay. I would like to look at -- go

**247**

ahead to section -- you will see there is a section IV entitled Procedures.

And if you go down to B, subsection B, you will see this is a subsection entitled Data Downloads, correct?

A. Yes.

Q. And B 1 states: Personnel will not download system data unless such data is related to at least one of the purposes described in section III A.

Do you see that?

A. Yes.

Q. Section B 2 states: If personnel downloads system data as part of an investigation, it will be stored in accordance with applicable evidentiary records, law and policy.

Do you see that?

A. Yes.

Q. And then III, personnel may download audit trail data for purposes of generating audit reports.

**248**

Do you see that?

A. Yes.

Q. And so if I understand correctly, under this general order, the data -- the actual Flock data must be deleted every 21 days. Is that right?

A. Yes.

Q. Does that 21-day retention period also apply to downloads of data from the Flock system?

A. No.

Q. Okay. So an officer can download data from the Flock system for a permitted purpose for more than 21 days?

A. Yes.

MR. SOYFER: Okay.

MR. KRAVIS: Michael, I'm sorry. I didn't want to interrupt you while you were going through the document, but it has been like an hour and 25 minutes. Are we close to take a break here?

MR. SOYFER: I have a few more questions on this document, but we can just take a break

249

right now.

MR. KRAVIS: Okay. Thank you.

THE VIDEOGRAPHER: All right. We are going off the record. The time on the monitor is 1523.

(Thereupon, there was a recess taken at 3:23 p.m.)

(Thereupon, the proceedings were resumed at 3:28 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time on the monitor is 1528.

BY MR. SOYFER:

Q. We just took a short break, but you understand you are still under oath, correct?

A. Yes, I do.

Q. Okay. So I would like now to turn to subsection C in the general order. This is section IV capital C entitled Internal Audits. Do you see that?

A. Yes.

Q. So number 1 states: All Flock Safety ALPR records documenting the use of an ALPR or

250

access to or use of ALPR data will be subject to review and audit by the Flock Safety ALPR system administrators.

The purpose of these audits include to ensure compliance with the terms of this general order and Virginia law.

Do you see that?

A. Yes.

Q. And even though this says system administrators, in practice these audits are performed by Sergeant Gauthier. Is that correct?

A. Yes.

Q. Then subsection II states: The Flock Safety ALPR system administrators must conduct an audit of the ALPR system at least every 30 days.

Correct?

A. Yep.

Q. And then going down to III, III states: Audits will include a review of audit logs to ensure that queries are conducted for permitted purposes and that each user has input all required information.

251

Do you see that?

A. Yes.

Q. How does Sergeant Gauthier, when he conducts these audits, ensure that queries are conducted for permitted purposes?

A. So he does the audit in the system, runs the audit. He downloads it as a csv file and then goes through it to ensure that all the reasons put down are law enforcement purposes.

Q. Okay. So it just involves him looking at the reasons that are recorded. Is that correct?

A. Yeah. When we are talking about queries, yes.

Q. What about the call for service or case number, does he review to ensure that those are filled in?

A. Yeah, it has to be. It's a required field.

Q. Okay. Does he check that those are actual call for service or case numbers?

A. He could. I don't know if he did on the

252

most recent one, but he could. You could do that.

Q. Would it be feasible for him to do so for every entry?

A. No.

Q. And why is that?

A. It would be entirely too time consuming to do every single one.

Q. Okay. Just because of the number of entries that are in the audit files?

A. Yes.

Q. Okay. For instance, if there is an entry that says case number 123 and then the reason is robbery, saw suspect fleeing, no one is checking that case number 123 isn't a completely unrelated investigation. Is that right?

A. It's possible that it's being checked, but it's not guaranteed to be checked.

Q. Okay. So Sergeant Gauthier could decide to check it. It's just not kind part of the standard process. Is that fair?

A. Right. Yes.

**253**

Q.   I would like to look at section -- sorry.  I would like to look at section VII.  This is on the 10th page of the pdf.  And this is a section entitled System Data Security.  Do you see that?

A.   Yes.

Q.   So subsection A states:  System data will be encrypted in transit and at rest.
     Do you see that?

A.   Yes.

Q.   How is that implemented?

A.   **It's implemented per the contract we have with Flock.  So they have it in the contract that they will ensure that data is secure.**
     **How they do that from an IT perspective, I don't know, but it is within the contract to do so.**

Q.   Okay.  And so thinking in section VII A, B and D, is it your understanding that those are things that Flock handles?

A.   Yes.

     MR. SOYFER: Okay.

**254**

A.   **And probably also D if you didn't say D.**

Q.   I said A, B and D.

A.   **Okay.  And also E.**

Q.   Got it.  So does the Norfolk Police Department determine whether Flock is certified with -- certified by the FBI's criminal justice information services in compliance with all these standards?

A.   **No.  The law requires that, and so that is up to them to --**

     MR. SOYFER: Okay.

A.   **To, you know, uphold.**

Q.   Got it.
     And then my final questions about this document are on the last page in section X which is entitled Violations.
     Let me know when you are there.

A.   **I'm there.**

Q.   So you will see this only has one subsection, capital A, stating:  If any NPD personnel fail to comply with or adequately enforce the terms of this general order, their

**255**

authority to access or use the Flock Safety ALPR system may be temporarily suspended or permanently revoked.
     Do you see that?

A.   **Yes.**

Q.   And so the temporary suspension or permanent revocation isn't automatic here.  Is that right?

A.   **Automatic based on --**

Q.   So if personnel fail to comply with or adequately enforce this order, this just provides that their authority to access or use the Flock system may be temporarily suspended or permanently revoked, right?

A.   **Right.**

Q.   It doesn't require an immediate suspension or permanent revocation, right?

A.   **Correct.**

Q.   Who makes the decision about whether to suspend or revoke access?

A.   **Ultimately, I would consult the chief of police.**

**256**

Q.   Okay.  And so you have the option here about whether to do one of those two things if there is a failure to comply with or adequately enforce the general order.  Is that right?

A.   **Well, I have the option as an administrator to activate and deactivate users.**
     **If I'm going to deactivate a user based on a violation of policy, I would do so under the direction of the chief of police.**

Q.   Okay.  So ultimately it's his decision, correct?

A.   **Yes.**

Q.   Okay.  Have you ever, for a policy violation, revoked or temporarily suspended access?

A.   **I have not.**

Q.   Okay.  The next sentence states: Supervisors in the RTCC may take such other action necessary to ensure compliance including referring such personnel for disciplinary measures permitted under NPD policy.
     Do you see that?

Case 2:24-cv-00621-MSD-RJK   Document 179-7   Filed 11/20/25   Page 67 of 86
PageID# 4744
HIGHLY CONFIDENTIAL
Transcript of Captain Charles Thomas, Corporate Designee          65 (257 to 260)
Conducted on July 22, 2025

257

A.   Yes.

Q.   And would you say the same thing, that ultimately this is the chief of police's decision?

A.   Yes.

Q.   Okay.  It's not a decision for supervisors to make?

A.   **So are we separating the decision to suspend?**

Q.   I'm just focused on the second sentence right now about --

A.   **Discipline?**

Q.   Yeah, other actions.

A.   **Okay.  So in this particular scenario, when we are talking about discipline itself, that could be under the direction of the officer's commanding officer or the chief of police, depending on the circumstances.**

Q.   Okay.  And again, this uses the word may, correct?

A.   Yes.

Q.   Okay.  It doesn't require other action,

258

correct?

A.   **Correct.**

Q.   Okay.  You can set that document aside.
We are going to move on to topic 13, your efforts, if any, to prevent unauthorized access to or misuse of your Flock cameras and Flock data as well as the reasons why you undertake such efforts.
Are you prepared to testify on that topic today?

A.   Yes.

Q.   What does Norfolk do to prevent unauthorized access to its Flock data?

A.   **Can you clarify what you mean by unauthorized access?**

Q.   Yeah.  Someone who is not authorized to see the data getting accessed, like an outside party or a Norfolk employee who doesn't have authorization.

A.   **So we create within the policy that you can't share log-in information.**

Q.   Do you require strong passwords?

259

A.   **That would be a question for Flock Safety.  I'm not sure what their password requirements are.**

Q.   Does Norfolk -- has Norfolk implemented two-factor authentication in its Flock system?

A.   **We require it to log into computers, but the Flock system itself does not require two-factor authentication.**

Q.   Okay.  When police officers leave the apartment -- the department, does someone immediately revoke their access to Flock?

A.   **Yes.  As soon as we are notified that they have resigned, retired or been terminated, we deactivate their accounts.**

Q.   Officers are not allowed to share Flock data publicly, correct?

A.   **Correct.**

Q.   Do you understand how Flock prevents unauthorized access to the Norfolk data?

MR. KRAVIS:  Objection.  Vague.

A.   **I don't.  It's within the contract that they are required to do so.  So that's their**

260

responsibility.

Q.   Got it.  But you don't know what specific steps they take.  Is that fair?

A.   **That is fair.**

Q.   Has the Norfolk Police Department ever asked for Flock's data security policies?

A.   **Not to my knowledge.**

Q.   Has it ever asked to see audits of Flock's data security practices?

MR. KRAVIS:  Objection.  Vague.

A.   **Not -- not to my knowledge.**

Q.   Okay.  I would like to move on to topic 14 now.  And this topic is your awareness of and response to any instances of unauthorized access to or misuse of the Flock cameras or Flock data.
Are you prepared to testify about this topic?

A.   **Yes.**

Q.   So when I say unauthorized access, you know, I'm asking about parties who don't have permission to access Norfolk's Flock data gaining access to it.  Is that reasonable?

Transcript of Captain Charles Thomas, Corporate Designee

66 (261 to 264)

Conducted on July 22, 2025

---

261

A.   So -- so like a hacker or like sharing -- sharing a log-in with somebody else that shouldn't have it?

Q.   So it could be either of those things, but I guess my understanding -- so let me ask you this question.

You specifically authorize people to be able to access the Flock system, correct?

A.   I -- I assign people a user name or whatever.  I put them in the system that sends them an e-mail to create a user name and password.  So yes.

Q.   There are administrators who create user profiles in the system.  Is that right?

A.   Yes.

Q.   Okay.  And so I'm asking about access to the system outside of that set of authorized users.  Does that make sense?

A.   I believe so.

Q.   Okay.  Are you aware of anyone accessing the system outside of that set of authorized users?

---

262

A.   No, I'm not.

Q.   Okay.  Is the Norfolk Police Department aware of any instances of that?

A.   Not that I've heard, no.

Q.   How about now considering going back to this body of authorized users.  Are you aware of any misuse of the system within that set of authorized users?

A.   I have been made aware of an allegation of a misuse of the system.

Q.   What is that allegation?

A.   The allegation was that a sworn officer utilized the Flock Safety system to further an investigation in his personal capacity.  Someone allegedly stole his cat and he used the system to locate the suspect in that particular situation.

Q.   Why is that a misuse of the system?

A.   I don't know that I would assert that it is necessarily a misuse.  It was for law enforcement purposes at the time.  The -- the individual ultimately retired.

So the commanding officer found that

---

263

because the instance actually happened prior to them signing the special order, recognizing the policies and procedures surrounding Flock data, found that they were not in violation of the policy itself.

Q.   Okay.  So is it the case that if he had signed those then he would have violated the policy?

A.   I don't know what the recommendation of the commanding officer would have been at that time.  That was just an argument made in the letter written by the commanding officer.

Q.   Okay.  And the officer had retired at that point anyway, correct?

A.   Yes.

Q.   So no disciplinary action was taken against that officer?

A.   Correct.

Q.   What does Norfolk do to discover misuse of the Flock system?

A.   We complete audits and examine reasons why the system is being used, identify whether or

---

264

not people are utilizing the correct authorization form to put cars into the hot list.  That's what we are doing.

Q.   Do you take any steps to proactively prevent misuse?

A.   We have created the special order to -- to have some policy surrounding it.  We have the general order to create policies around use of Flock Safety.

Q.   Okay.  And you expect all Flock Safety users to just follow those policies.  Is that correct?

A.   That is the expectation, yes.

Q.   Have you ever -- have you discovered any other misuse of the system?

A.   There was conversation around another instance as to whether or not it could be considered a misuse.  There was an instance where a shooting occurred and officers investigating that shooting went into Flock Safety data to locate a vehicle that was in the area at the time.

---

265

On one of the pictures taken of a vehicle, in the background you can see an individual holding a gun. That picture was disseminated to try to identify that particular person. So the conversation surrounded should we use this system for that purpose?

Ultimately, it was decided that using the system for its intended purposes could on occasion find something in the background of those pictures useful to further investigation.

Just because information is found or information is seen in the background during an unintended use of it doesn't mean we can't use that information to further investigations. So it was determined that that particular use was not a violation of the policy or a misuse of the system itself. And it is the only situation I can think of where something like that occurred, where there was pertinent information in the background of a picture taken to solve a crime.

Q.    Yeah. And I guess just help me understand why you had to debate whether that was

266

a misuse. Is it because the Flock cameras aren't supposed to be used to capture people?

A.    Correct, yeah. The intended purpose of the Flock camera is to capture vehicles and license plates. It just so happened that in the background we saw this person holding a gun. And because that is not the intended purpose, it was just a discussion around should we allow -- should this -- should this action have been done by sending that picture out to try to identify that person. Should -- should we allow that?

So that is why the conversation was had.

That is correct. That was not the intended purpose. However, it existed. So --

Q.    And in that case, you determined that that was okay because the person was suspected of a crime?

MR. KRAVIS: Objection. Mischaracterizes prior testimony. Go ahead.

A.    No. It was that -- simply because we captured evidence in a way that was not intended, with the use of technology, doesn't mean that we

267

can't use it.

Q.    Okay. And when did those discussions take place?

A.    I don't have the dates. It was probably the same date that the e-mail was sent out.

So if you have that e-mail and you want to throw it up here, I would be happy to confirm that.

Q.    Got you. I think we will just move on.

Topic 15 is your audits or other assessments, if any, of the reasons your employees have provided for searching or accessing the Flock data or Flock system.

Are you prepared to testify about that topic today?

A.    Yes.

Q.    Okay. So we have discussed the audits a little bit previously, I know, but I believe your testimony before was that to your knowledge those really started happening in May of this year. Is that fair?

A.    The audits? That's correct. Yes.

268

Q.    Okay. Has the City of Norfolk ever taken any disciplinary action based on an audit of its Flock system?

A.    No. No official disciplinary action. We have sent e-mails to officers and their supervisors asking them to submit a request to enter a vehicle into a hot list form. And we have removed vehicles from the hot list as a result of it not being there.

So that is not necessarily discipline. It was rectifying that issue.

If they wanted it to be reentered, they would have to do -- to do the correct form.

Q.    And those actions that you mentioned just now, those relate to hot lists, not queries in the system, correct?

A.    Correct.

Q.    Okay. Have you -- have -- has the City of Norfolk ever changed its policies based on something discovered in an audit?

A.    Not that I'm aware of.

MR. SOYFER: Okay. We are up to Exhibit

Transcript of Captain Charles Thomas, Corporate Designee    68 (269 to 272)

Conducted on July 22, 2025

269

27 I believe. And I'm going to drop into the chat an Excel file.

This was produced as a document bearing Bates stamp attorneys eyes only NORF 000019.

And let me know when you are able to get that open.

THE WITNESS: We have it open.

Q. What is this file?

A. It appears to be an audit of queries.

Q. And if you look -- let's just go -- scratch that.

Let me ask you. Is this something you reviewed to prepare for your deposition today?

A. We discussed it, yes.

Q. Have you reviewed audit files before?

A. Yes.

Q. Okay. And does this generally look like the audit files that you produced during your audit process?

A. Yes.

Q. Okay. Going across the top, I just want to ask you what these data fields are.

270

What is -- so looking at column A to start, what is name?

A. The officer.

Q. That's the officer who searched the system?

A. Yes.

Q. What -- what is total network searched?

A. My understanding of that is networks being the Norfolk Police Department network of Flock Safety cameras. That's my understanding of that.

Q. Okay. Do you have an understanding of like just looking at the first two rows why these numbers could range from 1 to 61?

A. Generally. But then you have, you know, on row 32, 3749. So that seems like an outlier number. I --

Q. Okay. So you are not entirely sure what this -- this field means. Is that fair?

A. Not entirely, no.

Q. Okay. Do you know what the time frame column C refers to?

271

A. Yes. So it would be a start time to an end time for the search.

MR. SOYFER: Okay.

A. So that is why I have a comma there. It looks like it is missing data.

Yeah, it would be from one date to another date.

Q. That's the time period that the officer queried?

A. Yes.

Q. Okay. And then license plate?

A. License plate, yes.

Q. The license plate the officer entered.

Okay. Case number would be the Norfolk PD case number, correct?

A. Right.

Q. Do you have an understanding what the filters column is?

A. Yes. Filters could be -- Flock Safety has a few filters that you can ask it to query, such as make, model of the vehicle, you know, SUV, sedan, color.

272

Those are some of the filters that you can -- you can search.

Q. Are those filters helpful?

A. They can be, yes.

Q. Why is that?

A. Because if you don't have a license plate number, but you have a color, make, model of the vehicle, you can search -- you can query the system based on that.

Q. And then the reason column, is this just the reason that the officer provided for the search?

A. Yes.

Q. Okay. What is the search time column?

A. That's the date and time the search was completed.

Q. Okay. And you can see these are all in November 2023, correct?

A. Yes.

Q. At this time was anyone in the Norfolk Police Department regularly auditing these data?

A. I don't believe so.

Transcript of Captain Charles Thomas, Corporate Designee
Conducted on July 22, 2025

69 (273 to 276)

273

Q.   Okay.  Okay.  So I will -- let me just ask you this, too.

Do you use Excel, Microsoft Excel, in your day-to-day work?

A.   I would not say that I am super proficient.  I mean, I can control finds.  I can do some things, but don't ask me to create pivot tables.  That ain't happening today.

Q.   We won't be doing anything too fancy.  But why don't I just share my screen with you and you can tell me if I am messing anything up here.  Does that sound fair?

A.   Yes.

Q.   Okay.  Are you able to see my screen?

A.   Yes.

Q.   Great.  So I am going to just highlight this entire table.  And if I go to the bottom row, you can see that it ends at row 7,245, correct?

A.   Yes.

Q.   And so that is reflecting for the month that these data represent that there were 7,244

274

queries of the system not including this header row at the top, correct?

A.   Yes.

Q.   Okay.  So I'm going to just select filter so that I can filter the data here.

And again, if I'm doing anything wrong, please feel free to tell me.

To your understanding do these data include officers outside the Norfolk Police Department who searched the Norfolk Police Department's data?

A.   My understanding is that it does include that.

Q.   Okay.  Do you know an officer named ████  ████?

A.   I do.

Q.   And who is ████  ████?

A.   He is an investigator here at the Norfolk Police Department.

Q.   Okay.  Okay.  So I am going to actually filter, if you can see what I'm going, the search reason column, I'm just clicking the arrow here.

275

Okay.  I filtered, if you can see that, to seven entries where the searching officer's name is ████  ████.  Do you see that?

A.   I do.

Q.   Okay.  And if you look, you can see these searches all took place kind of around the same time on November 14th, 2023.

A.   Yes.

Q.   Do you see that?

And he's -- let me expand this field so that you are able to see this.

Okay.  He is searching various time frames on October 28th to 29th, correct?

A.   Yes.

Q.   Okay.  And if you look at the reason that he's provided for all of these searches, you can see that it's protester identification, correct?

A.   Yes.

Q.   Okay.  Do you know why Officer ████ was -- or Detective ████ was trying to identify protesters?

276

A.   I do not.

Q.   Okay.  And just identifying protesters without a valid law enforcement purpose isn't a permitted use of the system, correct?

A.   Correct.

Q.   To your knowledge, has anyone ever asked Detective ████ about why in November 2023 he was trying to identify a protester?

A.   To my knowledge, no.

Q.   Okay.  Do you intend -- do you intend to investigate that now that you know?

A.   It is something that I would like to look into, yes.

Q.   Okay.  So I'm going to remove that filter.  We are going to stay on this data file, still looking at the reason column, and I'm going to filter to some other searches in here.

So I'm filtering down to entries that include the word traffic violation or traffic.  Do you see that?

A.   Yes.

Q.   And if you look at the bottom left

corner of the screen, you can see that that returns 110 records, correct?

A.   Yes.

Q.   Okay.  And you will see three officers performed these searches, ████ ████  Do you know who he is?

A.   I do.

Q.   Is he an NPD officer?

A.   He is.

Q.   ████ ████  Do you know who that is?

A.   That name is not familiar to me, no.

Q.   Okay.  ████ ████████  Do you know who that is?

A.   That name is also not familiar to me.

Q.   Okay.  And based on what is written here, can you say whether these were appropriate searches?

A.   I can't because I don't know what they were investigating.  I mean, a traffic violation could be all kinds of things.

I don't know where these guys worked. So if they were working traffic and they were investigating a crash, could they be trying to find out where that person came from, the direction of travel they were coming from?  It could be.

So without additional details and information or more facts and circumstances surrounding these searches, it is really, really hard to say whether that would be a violation.

Q.   Okay.  So sitting here today, you can't say whether this is a violation of the policy or not?

A.   I cannot.

Q.   Okay.  And no one noticed these in November of 2023 when these searches were performed, correct?

A.   Not to my knowledge, that's correct.

Q.   Do you intend to look into this further?

A.   These ones, no.  No.

Q.   Okay.  So I am going to stop sharing that one.  We can set that aside.

If you will give me just a moment, we are up to Exhibit 28.  And this will be another

Excel file.  And just let me know when you are able to open that.

THE WITNESS:  All right.

Q.   Okay.  I will again share my screen just to kind of make things a little bit easier here. But pretty much similar to what we were just looking at, correct?

A.   Yes.

Q.   Okay.  And if you look in the search time field, you will see these were all May 2024, right?

A.   Yes.

Q.   Okay.  So I am going to go through the same process.  But here I will just ask you, remember that there is a header row, you can see that the total number of rows in this file is 9,857, correct?

A.   Yes.

Q.   And so that means in this month, the month for -- from which this data comes from, officers performed 9,856 searches in the City of Norfolk's data, correct?

A.   Yes.

Q.   Okay.  And this would again include everyone who searched the data, not just Norfolk PD officers, right?

A.   Correct.

Q.   Okay.  So, again, I'm going to filter these for you and talk about some specific ones here.

If you are having trouble seeing any of the information here, just let me know and I will expand these.  And of course speak up if I'm doing anything wrong.

Okay.  So, again, we can see that there are 12 searches from Officer ████ or Detective ████  correct?

A.   Yes.

Q.   Okay.  And these searches basically all happened on May 6th, 2024, correct?

A.   Yes.

Q.   Okay.  And I will just expand this out to make it easier to see.

But the reason for all of these searches

Transcript of Captain Charles Thomas, Corporate Designee
Conducted on July 22, 2025

281

is protester identification, right?

A.   Yes.

Q.   Okay.  I guess in the first instance here, he left off the N at the end of identification, but we can tell what that is, right?

A.   Yep.

Q.   Okay.  And so this is similar to what we saw in the last file, that some months later Officer ▮ searching the system and putting the reason as protester identification, correct?

A.   Yes.

Q.   Sitting here today, you can't say that these are appropriate searches, correct?

A.   I can't say they are appropriate or inappropriate.  I would have to ask him.

Q.   Either way, right?

A.   Right.

Q.   Okay.  And do you -- do you intend to ask him about these searches as well?

A.   Yes, these one pique my interest.  I would like to know what the purpose is of these.

282

Q.   Okay.  And again, to your knowledge, no one noticed this at the time, correct?

A.   Correct.

Q.   I have one more question about these searches.  So I'm going to make this a little bit easier to see.

If you look at the first set of searches, it looks like he was searching a time frame on May 6th, 2024, correct?

A.   That's what it looks like, yes.

Q.   Okay.  And that is the same day that these searches were performed, correct?

A.   Correct.

Q.   And then you have four additional searches after that also performed on May 6th, 2024, correct?

A.   So why did you separate those four?

Q.   Well, let's just confirm that the search time for these was May 6th, 2024, correct?

A.   For this entire data field that you are showing me, they were all May 6th of '24.

Q.   Okay.  Yeah, every one of these searches

283

is May 6th, 2024, correct?

A.   Yes.

Q.   Okay.  And so these last four searches, if you look at the time frame when the searches were performed, they are all in December of 2023, correct?

A.   Yes.

Q.   And December 2023 was more than 30 days prior to May 6th, 2024, right?

A.   Yes.

Q.   So how is it that Officer ▮ was searching data from December of 2023 in May of 2024?

MR. KRAVIS:  Objection.  Calls for speculation.  Go ahead.

A.   Yeah, my -- my guess would be that -- you can put whatever you want in there.  If you hit the search button, after you have inputted that information, it's not going to return anything outside of 30 days.

MR. SOYFER:  Okay.

A.   So it's still going to show that you

284

attempted a search for that, but it's not going to provide you with any information.

Q.   And so each -- for each of these four searches that he did, your testimony is that zero data should have come up if the system were functioning properly.  Is that fair?

A.   Yes.

MR. SOYFER:  Okay.  I do want to say for the record that the Bates number on this document is attorneys eyes only NORF 000025.

I'm done with this document and we are going to be moving on to Exhibit 29, which is yet another Excel file.

I will state for the record this is a document produced bearing Bates stamp attorneys eyes only NORF 000028.

Q.   And Captain Thomas, just to confirm, this is another audit file for the City of Norfolk's Flock data, correct?

A.   Yes.

Q.   If you look at the search time field, you will see that all of these searches take

285

place basically in August 2024, right?

A. Yes.

Q. Okay. I'm just going to do the same thing here, highlight all of these data.

If I go down to the bottom, you will see that this file has 12,399 rows, correct?

A. Yes.

Q. And so subtracting the header row, for this month there were 12,398 searches of the Norfolk PD's Flock data, correct?

A. Yes.

Q. And so I just again have chosen the filter function and I'm going to go over to reason. There we go.

Do you know who ███████████ is?

A. No.

Q. You don't know if he is a Norfolk police department officer?

A. I don't know. That name doesn't sound familiar.

Q. If you look at the search time column, you will see that all of the searches returned

286

here were performed on August 13th, August 21st or August 30th, correct?

A. Yes.

Q. Okay. And the reason for -- given for all of these searches is la la la la, correct?

A. That's what it looks like, yes.

Q. Is that a valid reason for a search?

A. Well, without having additional facts and circumstances surrounding what la la la la means in this situation --

MR. SOYFER: Okay.

A. -- it would be very difficult to say.

Q. Yeah. You have no way to know whether this was an appropriate search or not sitting here today?

A. Correct.

Q. Okay. And to your knowledge, in August of 2024, or around then, no one noticed this, correct?

A. Correct.

Q. And no one followed up with ███████ ████████ about it, correct?

287

A. Correct.

Q. Okay. Who is -- do you know who ███████ ██████ is?

A. The name is familiar. I know he is a police officer in Norfolk, but I don't know him personally.

Q. Okay. So all you know is he is a police officer in Norfolk, correct?

A. Correct.

Q. Okay. And when we were looking at the search earlier -- sorry, when we were looking at the spreadsheet earlier, we saw that there were about 12,000 searches, give or take, total for this month, correct?

A. Yes.

Q. Okay. I'm going to narrow this to just the searches where ████ ████████ appears in the first column. And tell me if I do anything wrong here.

Do you see this?

A. Yes.

Q. Okay. If you look in the bottom left

288

corner, you will see that this states that -- sorry, if you look in the bottom left corner of the file, you will see that Excel states that this returned 1,221 of 12,398 records, correct?

A. Yes.

Q. And so of the total searches for this month, almost 10 percent of them are just Officer ███████ correct?

A. Yes.

Q. Okay. Would it surprise you if I told you that Officer ██████ is the top searcher in the data that we have?

A. Not based on what you are showing me.

Q. Okay. Would it surprise you to learn that he searched, again, based on the data that we have, the Flock system more than 10,000 times?

A. No, not based on the data you are showing me. It doesn't surprise me.

Q. And other than he's a Norfolk police officer, you don't know who he is, correct?

A. Correct.

Q. And you don't know why he would be

289

searching 12 -- over 1200 times in one month?

A. No.

Q. Okay. I would like to look --

A. It looks like – I will say the reason for there – for – he has put as 123. 123 is a warrant. So you asked me the reason. That is the reason.

So what he's – what he's doing is he is searching for wanted individuals who are associated with vehicles.

Q. Okay. And so he's just performing over a thousand searches that -- in a month?

A. Yep. That's what it looks like.

So to me – that doesn't surprise me at all.

MR. SOYFER: Okay.

A. He is using his proactive time to try to search for those who are wanted and associated with particular vehicles.

Q. Okay. And is 123, does that indicate that the person has an open warrant?

A. Yes.

290

Q. Okay. What about 1?

A. Yeah, 1, I don't have anything for.

MR. SOYFER: Okay.

A. Not that I'm – not that I'm aware of.

Q. Okay. I'm going to take that document down and you can set it aside.

So I would like to go to topic 17. And this topic is how and for what purposes you use any search data analysis machine learning and artificial intelligence features or capabilities of the Flock system.

Are you prepared to testify about that topic today?

A. Yes.

Q. Okay. And so you are aware that Flock also offers software, right, just generally speaking?

A. I don't -- I don't know if I understand what you mean by software.

Q. Yeah. Maybe I'm being -- maybe the question is bad.

So Flock manufactures cameras, right?

291

A. Yes.

Q. Okay. And those are, you know, physical things that it puts up on poles out in the world, right?

A. Right.

Q. Okay. And -- so I guess I would refer to that as maybe hardware in kind of tech speak. Does that sound reasonable?

A. Yes.

Q. And there is also software that Flock develops to work alongside those cameras. Is that a fair description?

A. Yes.

Q. Okay. And it offers kind like an operating system to, you know, go in and use information from those cameras?

A. Correct, yes.

Q. Okay. Would you call that Flock OS or something else?

A. No, that is something different. Flock OS is a Real Time Crime Center platform.

Q. Okay. What would you call -- well, how

292

do you access Flock?

A. It's a web-based product that you go to Flock Safety, go to the website, log in, put in your credentials and you are logged in.

Q. Okay. So like if I call that the Flock web app or the Flock website, does one of those work?

A. Yes. Yes.

Q. Okay. So when you log into the Flock web app, you can search data, correct?

A. Yes.

Q. Okay. And can you pick like which camera networks you are searching?

Let me scratch that. Let me ask a better question.

Can you decide to search specific cameras?

A. Yes.

Q. Okay. And can you narrow your search by, you know, like who the camera network belongs to?

A. I believe so, yes.

**293**

Q. Okay. So you could search, say, just the Norfolk Police Department's cameras, right?

A. Yes.

Q. Or you could search just Portsmouth PD's cameras, correct?

A. Correct.

Q. Can you choose the time period that you search?

A. Yes.

Q. Okay. Like what do you have to enter to do a search, what information?

A. Our required fields are reason for the search, a case number or a call for service number, I believe a time frame. So a date time frame. That may be it.

Q. Do you have any way to access the Flock database offline if you don't have an Internet connection?

A. Not that I'm aware of, no.

Q. Okay. And when you search vehicle features, I guess like help me out here. Is it like a Google search bar where you are just --

**294**

you can just type in, you know, Dodge Caravan, red, and maybe a partial license plate? Are there specific fields you have to fill in?

A. Yeah. There are fields that you can fill in. It asks you like color, make, model, that kind of thing.

There is also a -- there is a field for particular characteristics, and it's very narrow. It's only a few of them. But it's like top rack, bumper sticker. There may be one or two others. But yeah.

Q. Why are those fields useful if at all?

A. Why are they useful?

MR. SOYFER: Yeah.

A. Because if a victim or a witness provides us with a description of a vehicle, but not a license plate, we can use those characteristics to identify the vehicle through the search query and then subsequently the license plate.

Q. Can you also use those to identify captures of a vehicle where the license plate

**295**

wasn't captured or decoded?

A. Yeah. That's -- that's also true.

Q. Okay. And is the ability to search those features what Flock calls a vehicle fingerprint?

A. I don't -- I don't know if that's what they call it.

Q. Okay. Are you aware of whether Flock has the ability to search for images that include a person?

A. They do not.

Q. Okay. How do you know that they do not?

A. I have -- I have never seen one. I have never -- I have never -- I have never seen it in a search query that I -- that I have conducted. I have never seen anybody produce one.

Q. Okay. Are there any other features you use within the Flock system other than search?

A. A custom hot list.

Q. What about the insights tab?

A. Yeah, I think insights is for admins.

Q. And what does that do?

**296**

A. It's been a while since I have used insights. I don't -- I could not give you a good road map as to what that does within the system. I don't -- I don't remember.

Q. Have you heard of convoy analysis?

A. I have.

Q. And what is your understanding of what it is?

A. If a vehicle tends to travel along with another vehicle or vehicles, it would show you that.

Q. Is that useful information to know?

A. I don't know. We've never -- we don't have it, so we've never used it.

Q. Okay. You've never used it. How did you learn about it? How did the Norfolk Police Department learn about it?

A. Flock said that it was an available product within the system.

Q. Did anyone look into it?

A. I did. Yeah, I asked them at one point. I said, well, how do you use that? He said,

297

well, it's an additional cost. And at that point, I didn't really care what the cost was, I didn't see the value in it. So I didn't even inquire as to what the cost was. Not that I can remember at least.

Q.   Okay. Have you heard of real time routing?

A.   No.

Q.   Okay. I think you just touched on this, but Flock has different kind of software packages that have different prices. Is that right?

A.   I don't know if that's how it works or if it's they have — they have additional capabilities that can be turned on if you pay for them.

MR. SOYFER: Okay.

A.   Maybe — maybe we are saying the same thing. I don't know.

But it's — if you pay for convoy, you can get the button for convoy.

Q.   Okay. So I guess your understanding, just so we are on the same page, is that there

298

are additional features in the Flock system that are pay walled that the Norfolk Police Department doesn't currently have access to. Is that right?

A.   Right.

Q.   Okay. And you are not aware that Flock plans to offer video recording on its license plate reader cameras, correct?

A.   I'm not.

MR. KRAVIS: Objection. Asked and answered.

Q.   Okay. I would like to move on to topic 19 now, which is the purpose of your Real Time Crime Center.

Are you prepared to testify about that today?

A.   Yes.

Q.   Okay. And Norfolk has a Real Time Crime Center, correct?

A.   Yes.

Q.   When -- when did the Real Time Crime Center kind of start operations?

A.   May of '24.

299

Q.   And is it still in operation today?

A.   It is.

Q.   And for the foreseeable future will remain in operation?

A.   Yes.

Q.   Okay. What is the purpose of Norfolk's Real Time Crime Center?

A.   The purpose of the Real Time Crime Center is to provide real time information to officers who are responding to calls for service and to provide evidence of crimes that have occurred to investigators investigating crimes that have occurred.

Q.   How does it provide evidence of crimes that have occurred to investigators?

A.   So if we have an incident that has occurred on video, we can download the video and share that with investigators who are investigating that particular crime.

Q.   Can you also share Flock data?

A.   Do we share Flock --

Q.   With investigators?

300

A.   Yes.

Q.   Okay. Okay. I would actually like to talk about -- I'm going to skip ahead a bit to topic 21, which is the surveillance or other monitoring technologies you use in your Real Time Crime Center.

Are you prepared to testify about that topic today?

A.   Yes.

Q.   So just other than Flock -- well, let me ask you, do you use Flock data in your Real Time Crime Center?

A.   We do.

Q.   What other technologies do you use in your Real Time Crime Center other than Flock?

A.   We use video feeds. So live view video feeds.

We use a records management system that the police department has.

We utilize cameras that are owned by the City.

We have cameras that are — that feeds

Transcript of Captain Charles Thomas, Corporate Designee        76 (301 to 304)
Conducted on July 22, 2025

301

the Real Time Crime Center from donor sites.

We use the dispatch system. So it provides us information about calls for service.

Q. Anything else?

A. That's -- that's the ones I can think of off the top of my head right now.

Q. Okay. What about traffic cameras?

A. That would be a live view feed that --

MR. SOYFER: Okay.

A. -- the City owns, yes.

Q. Okay. So let me ask you first of all, what is the police department's record management system?

A. OnCall Records.

Q. And what -- what information does that provide to the RTCC?

A. It's -- it's where we keep our like police reports. All police reports come through OnCall Records.

So if an individual has been involved in any incidents where a police report was taken, it's in OnCall.

302

So if officers were responding to a call for service, let's say a domestic call, an RTCC analyst can look up that address, determine if, you know, there have been calls for service at that location before, if reports were taken, whether weapons were involved, whether, you know, there are alerts for that location, like, you know, violence has occurred there, things of that nature, to prepare an officer.

So information such as -- such as that.

Q. So I want to focus on the City-owned live view cameras for a moment.

How many of those are there?

A. So approximately maybe 1100, a thousand to 1100 total.

Q. Okay. And just where -- just generally can you break down for me where those cameras are located?

A. A lot -- most of them are located in City buildings, so the City Hall building, the Scope arena, Chrysler Hall. They are at the cruise ship terminal, things of that nature.

303

Most of them are there.

Some of them are on public roadways. Some of them are traffic cameras.

So, generally, that's -- that's where they are.

Q. Okay. Are the cameras on City properties referred to as Ocularis cameras?

A. Yeah. Ocularis is the video maintenance system --

MR. SOYFER: Okay.

A. -- that the City uses. Those are all on City properties.

Q. Okay. And what are -- what are the -- if I refer to the AXIS cameras, what is that?

A. An AXIS camera is a police department-owned camera that is operating at a violent crime hot spot in the city.

Q. Okay. How many of those are there in the city?

A. Currently there's 34.

Q. Okay. Are there plans to add more of them?

304

A. Yeah. Currently we have 65 in progress. The rest, they are in some state of installation.

Q. Okay. Are there plans to add more beyond the 65?

A. Not at this point, no.

Q. You said that those are located at crime hot spots in the city. Is that correct?

A. Yes.

Q. Okay. And the Flock cameras are also located at crime hot spots, right?

A. Yes.

MR. SOYFER: Okay.

A. That is one criteria, yes.

Q. Okay. Are there other criteria for the placement of the AXIS cameras?

A. It could be in an area with high volume of calls for service. So if the purpose of the Real Time Crime Center is to provide real time information to officers arriving to calls for service, then that would be an item or a criteria metric that we looked at.

Q. And that is also a criteria used to

Case 2:24-cv-00621-MSD-RJK    Document 179-7    Filed 11/20/25    Page 79 of 86
PageID# 4756

HIGHLY CONFIDENTIAL

Transcript of Captain Charles Thomas, Corporate Designee
Conducted on July 22, 2025

77 (305 to 308)

decide where to place the Flock cameras, correct?

**A.    Yes.  Other -- other criteria for the live view cameras are for public safety, so major gatherings.**

**So downtown, we have major gatherings throughout the year where, you know, providing that bit of public safety there is critical.  So there are some -- some live view cameras in downtown Norfolk as well.**

Q.    So are those cameras kind of generally speaking located in roughly the same areas the Flock cameras are located?

**A.    Some -- roughly, yeah, just -- yes, roughly.**

Q.    Okay.  Why is it useful to have those cameras in addition to the Flock cameras, if at all?

**A.    So the purpose of the live view cameras is really to provide officers and investigators with real time, in the moment information about what's going on at a particular location so that they are prepared to deal with it once they get there or the evidence is given to them once they are investigating.**

**So what we are trying to do is create a safer environment for officers to respond to calls for service and also provide evidence to investigators so that they can investigate crimes, apprehend suspects quicker than they could have previously.**

Q.    How do those cameras provide evidence to investigators that lets them apprehend suspects quicker?



Q.    So in that example, the live view camera and the Flock camera complimented each other.  Is that fair?

**A.    Yes.**

Q.    How long is the video from the AXIS camera saved?

**A.    Approximately three days.**

Q.    Okay.  And then it's deleted forever?

**A.    Yes.**

Q.    Okay.  What about the Ocularis cameras, is there a single policy for how long those are retained?

**A.    No.  The ones that we have access to are generally three to four days.  But through Ocularis, they might -- I believe those might be 30 days.**

Q.    Okay.  What about the traffic cameras?

**A.    The traffic cameras are three-ish days.**

Q.    Are there red light cameras in the City of Norfolk?

**A.    There are.**

Q.    And just describe for me, what do those cameras do?

**A.    They take pictures.  My understanding of them is they take pictures and video of vehicles that run red lights.  Those are not associated whatsoever with the Real Time Crime Center.**

Q.    Okay.  Can the NPD get records from the red light cameras?

MR. KRAVIS: Objection.  Beyond the scope.  Lack of foundation.

**A.    Yeah.  The NPD has a unit that handles red light cameras.  It's not at all associated with the Real Time Crime Center or the Strategic Intelligence Division at all.**

Q.    Are the red light cameras license plate readers?

HIGHLY CONFIDENTIAL

Transcript of Captain Charles Thomas, Corporate Designee     78 (309 to 312)

Conducted on July 22, 2025

MR. KRAVIS: Objection. Beyond the scope. Lack of foundation.

A.   I don't know if they do at all. I'm not sure.

MR. SOYFER: Okay.

A.   It's not something that I have dealt with at all.

Q.   Okay. You haven't looked into integrating those into the Flock system, for instance?

A.   I don't even think that's possible.

Q.   Okay. And you haven't looked into integrating those into the Real Time Crime Center in any way?

A.   No, I haven't.

MR. SOYFER: Could we take a quick five-minute break?

MR. KRAVIS: Sure.

THE VIDEOGRAPHER: We are going off the record. The time on the monitor is 1637.

(Thereupon, there was a recess taken at 4:37 p.m.)

(Thereupon, the proceedings were resumed at 4:50 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time on the monitor is 1650.

BY MR. SOYFER:

Q.   Okay. We just took a break, Captain Thomas, but you understand you are still under oath, correct?

A.   Yes.

Q.   Okay. How do Real Time Crime Center employees access Flock?

A.   They have to log into the system through the web-based version.

Q.   So they just -- they open a browser tab or whatever and they log into the website. Is that fair?

A.   Yes.

Q.   Okay. How do they access the live view cameras?

A.   They access them through Fusus.

Q.   You might have said this earlier but just remind me what is Fusus?

A.   Fusus is a Real Time Crime Center platform that brings in video feeds to one central location for RTCC analysts to view.

Q.   And are all of the live view video feeds that we discussed earlier available in Fusus?

A.   No.

Q.   Okay. Which of them are?

A.   So some of the Ocularis ones are. The traffic cameras that we have access to are in there. The AXIS cameras are in there. Some -- like the donor sites that we have are in there as well.

Q.   And thinking of today, are Flock data available within Fusus?

MR. KRAVIS: Objection. Vague.

A.   At a very, very small level, it is.

So the only data available in Fusus that is Flock related is the alerts.

An alert will pop up in Fusus that a stolen car, or any of the alerts that we have discussed already, will show in Fusus.

But Fusus does not allow you to search the Flock platform at all whatsoever.

So very, very little information comes through Fusus.

Q.   Has that changed over time the amount of information from Flock that is available in Fusus?

A.   Not that I'm aware of.

Q.   Okay. You also mentioned some privately owned cameras feed into the Real Time Crime Center. Is that correct?

A.   Yes.

Q.   Okay. How does the city gain access to those cameras?

A.   A business or person, they can request to -- to integrate their cameras with the Real Time Crime Center. And then they sign an MOU with the city. Once they do that, we install what is called a Fusus core. It's just a device that uploads their video feed to our Fusus platform.

Q.   And does it save video?

A.   It does for about three days.

313

Q.   Okay.  So the same retention policy that applies to the city cameras.  Is that correct?

A.   Yes.

Q.   Okay.  Does the NPD use any form of facial recognition for its live view cameras?

A.   Sorry.  I didn't mean to cut you off.

No, we do not.

Q.   Okay.  And why not?

A.   It's not available to us.  We don't have it.  We just don't, no.

Q.   Would you use it if it were available?

MR. KRAVIS: Objection.  Calls for speculation.  Incomplete hypothetical.

A.   Yeah, I don't know.  That would be a decision up to the chief of police.

Q.   Do you -- just asking in your personal capacity for this question.

Do you personally think facial recognition software would be useful?

MR. KRAVIS: Objection.  Vague.  Lack of foundation.  Calls for speculation.

A.   I do think there are certain situations

314

where it would be beneficial, yes.

Q.   Okay.  So again, I just want to ask you some questions about -- scratch that.

Okay.  So moving off of your -- the 30(b)(6) portion of the deposition, I just want to ask you some questions about your background.

When did you start working for the NPD?

A.   September of 2003.

Q.   Was that your first full-time job?

A.   No.

Q.   Okay.  What was your first full-time job?

A.   Let's see.  I graduated high school in 2000.  I went to college for a couple of years.  I came out of college and went into retail.

I started retail in February of 2001, I believe it was.  No, 2002.  And moved from retail -- I did other things like pizza delivery and such.

And then from there, I went to -- came to the police department.

Q.   And why did you decide to start working

315

in the Norfolk Police Department?

A.   Why did I start?

MR. SOYFER: Yes.

A.   I needed a job with benefits.  And it was also helpful that my dad was a police sergeant here, so I was familiar with the work itself.

Q.   Okay.  Family tradition sort of?

A.   I -- I guess.  Plus my wife saying get a job or find somewhere else to live.

Q.   I won't ask more questions about that.

And so what was your first job in the department?

A.   Well, everyone starts off as a police recruit.  So we have six months of that.

Then I graduated from the police academy.  And I was in patrol from March of 2004 until January of 2006, where I transferred to the detective division.

I stayed in the detective division until 2014?  Sounds right.  Yeah, 2014.  I was promoted to sergeant in 2014.  Then promoted to lieutenant

316

in 2016.  No, that's not right.  2018 I was promoted to lieutenant.  And then 2023 promoted to captain.

Q.   So I think you said the tech division.  Is that T-E-C-H?

A.   Sorry.  Detective division.

Q.   Oh, detective division.  Okay.

So from 2006 to 2014 was when you were in the detective division.  Is that right?

A.   Yes.

Q.   Okay.  And just tell me a little bit what your job responsibilities there were.

A.   As a detective, I started off in the what we called general assignment, or call general assignment.  You handle larcenies, vandalisms, you know, sort of minor property crimes at that time.

I was there for six months.  And then I moved to the special crimes unit which is our version of special victims unit.

So I was there until 2008, where I moved to the homicide unit.

I was in the homicide unit for about eight months. And then I transferred back to the special crimes unit. I was there until about 2014.

So a majority of my time was spent investigating child abuse, child neglect, sexual assaults, things of that nature.

Q. Did you ever use automated license plate reader data in your investigations, thinking of that time range, 2006 to 2014?

A. No.

Q. Okay. Did you ever obtain any location data associated with cell phones during that time range?

A. It was just starting to kind of come into play where if you had an exigent circumstance you could ping phones through an exigent request to the mobile carrier.

Q. Okay. So that was to get real time data about where a phone was, right?

A. Yes. Yes.

Q. Did you ever obtain historical cell phone location data at that time?

A. I had not, no.

Q. Did you ever conduct, you know, physical surveillance?

A. On occasions, very rare.

Q. Okay. Ever tail a suspect?

A. No.

Q. Okay. What types of physical surveillance would you have done on those rare occasions?

A. I can think of one occasion where I had warrants for a guy who had beat his son with a machete and so we were trying to locate him.

So we did surveillance outside of his house to see if he was -- if he was there, coming or going, trying to locate him that way.

Q. Okay. So I guess I used the word tail. So I just want to be clear.

You didn't have any occasions where you just followed a suspect for any period of time to see what they did?

A. I did not. That's correct.

Q. Are you aware of other detectives doing that?

A. Yes.

Q. Okay. Is there any reason in particular why you didn't personally do that in your investigations?

A. No. It's the investigations that I handled, which again were the special victim type investigations, they just didn't lend themselves to that kind of tactic. It wasn't -- it just wasn't necessary.

Q. In that role, 2006 to 2014, as a detective, did you apply for warrants?

A. Yes.

Q. Just rough ballpark, how many warrants do you think you applied for?

A. Warrants for arrests or all warrants to include --

Q. Let me be clear.

Roughly how many search warrants do you think you applied for, if any?

A. Yeah, I don't know. Several hundred.

Q. Several hundred?

A. Probably, yeah.

Q. Okay. Were any of those denied?

A. Not that I recall, no.

Q. How long on average would it -- strike that.

How long on average did it take you during that time frame to prepare warrants?

A. Usually in the -- in a range of hours, an hour to two hours.

Q. Okay. Were there ever times when you needed a warrant quickly and weren't able to obtain one?

A. I don't recall a time where I needed one that -- that quickly, no.

Q. Okay. And so in 2016, I think you said you were promoted to lieutenant, right?

A. 2018.

Q. Sorry. Let me start that over. I think I messed up the timeline.

So 2006 to 2014, you are a detective, correct?

321

A.   Yes.

Q.   Okay.  Then in 2014 you are promoted to sergeant, right?

A.   Right.

Q.   And did you move out of the detective division at that point in time?

A.   I did.

Q.   What did you do then?

A.   I went to the First Patrol Division for a year.  Then I transferred to Internal Affairs where I was there for another two and a half-ish years.  Then transferred back out to patrol division for about six months before being promoted to lieutenant.

Q.   What did you do in Internal Affairs?

A.   Investigate police officers for policy violations.

Q.   Did it all -- did that also include recommending discipline against those police officers?

A.   No.

Q.   Okay.  So then 2018, when you were

322

promoted to lieutenant, what was your job role then?

A.   I was lieutenant in charge of property crimes.  I was there for -- from 2018 until -- I was there about approximately a year.  And then I transferred back to the special crimes unit where I was there for another almost two years or so, yeah.

Q.   And just briefly, being lieutenant in charge of property crimes, what did that involve?

A.   Well, it involved overseeing investigations into larcenies, stolen autos, burglaries.  Again, those low level, you know, forgery -- low level property crime.

Q.   Was that again in the detective division?

A.   Yes.

Q.   And then back to the special crimes unit again in kind of a detective role, or I guess a managerial role within the detective division?

A.   Yeah, command staff level of the detective division, yes, sir.

323

Q.   Okay.  Is it after that that you became the lieutenant in charge of special projects?

A.   Yes.

Q.   Okay.  And what prompted that change?

A.   The chief wanted me to be in charge of -- so we -- the role of special projects was a created role for a police officer at -- I don't know what year it was.

And once he retired, he recommended to the chief that they place me in that role.  So that's what the chief did.

Q.   Do you have an understanding of why you were recommended for that role?

A.   Yeah.  So the guy who initially had that role was a Ph.D., so he did sort of side projects, like research-type projects for the chief.

When he retired, I was the only person left in the police department with a Ph.D.  So he recommended I take that role to assist the chief of police in those types of matters.

Q.   When did you get your Ph.D.?

324

A.   2021.

Q.   And what's your Ph.D. in?

A.   Organizational leadership and human resource development.

Q.   And where is it from?

A.   Regent University.

Q.   Okay.  So now, after being lieutenant of special projects, what was your next job?

A.   I was promoted to captain in August of '23 and transferred to the training division.

Q.   Okay.  What did you do in the training division just briefly?

A.   Yeah, I was a training director.  I oversaw the police academy, the recruiting unit, the pistol range, background investigators.  So I oversaw all of that.

Q.   In that role in the training division, did you develop any training related to Flock?

A.   I did not, no.

Q.   And then after that, is that your current position?

A.   Correct.

HIGHLY CONFIDENTIAL

Transcript of Captain Charles Thomas, Corporate Designee          82 (325 to 328)

Conducted on July 22, 2025

---

**325**

Q.   Okay.  Just personally day to day, how do you use Flock in your day-to-day job at if at all?

A.   I do not.

Q.   Okay.  You don't personally access the system to go search anything like that?

A.   I don't.

Q.   Okay.  Do you still -- I should ask today, do you still approve and remove users from the system, or is that primarily Sergeant Gauthier and Lieutenant Vernon?

A.   Yes, it's primary -- it's primarily the sergeant and lieutenant, yes.

Q.   Okay.  Do you still meet with Flock on occasion, thinking -- let's mostly say this year?

A.   No, I have not.

Q.   Okay.  Have you ever attended any Flock conferences?

A.   No, I haven't.

Q.   Okay.  Have you attended any webinars with Flock?

A.   Not that I can think of.

---

**326**

Q.   Have you ever been employed by Flock?

A.   So when they did the installation of the cameras, they wanted police officers there with the installer.  So I, along with several other police officers, worked for them as, I guess you would say, a private contractor just to provide, you know, security for them to close a lane of traffic or something like that.

Q.   Okay.  And that was something Flock paid for?

A.   Yes.

Q.   Did you have to get that approved by a supervisor or someone else in the city?

A.   Yes.

Q.   Okay.  And what -- just briefly what is that process?

A.   Yeah, I submitted a form to my supervisor who at the time was Deputy Chief Maslow indicating what kind of work it was.

Once he approves it, then I'm able to work it.

Q.   Do you recall how much Flock paid you

---

**327**

for that?

A.   I don't.

MR. SOYFER:  Okay.  So subject to any redirect, those are all of my questions.

MR. KRAVIS:  Great.  Captain, I just want to follow up on a couple of topics real quick.

Madam Court Reporter, you can hear me okay?

THE REPORTER:  Yes, sir.

MR. KRAVIS:  Great.  Just making sure because of where I am sitting.

EXAMINATION BY COUNSEL FOR THE DEFENDANTS

BY MR. KRAVIS:

Q.   First, you testified a little bit earlier about an incident that involved a photo taken by a Flock camera that happened to show in the background an individual that was holding a gun.  Do you remember that?

A.   Yes.

Q.   I just want to clarify one thing about this.

---

**328**

I think I heard you testify that that photograph was disseminated.

Do you remember that?

A.   Yes.

Q.   Just to be clear, the photo was disseminated within the Norfolk Police Department, right?

A.   Correct.

MR. SOYFER:  Object to form.

Q.   Okay.  So when you said disseminated, you meant disseminated within the police department, not disseminated to like the general public.  Do I have that right?

MR. SOYFER:  Object to form.

A.   Yes.

Q.   One other thing, a little bit earlier today, my colleague was asking you about uses of the Flock system and you gave an answer in which you were talking about how the Flock cameras do not tell you where the car stopped.  Do you remember that?

A.   Yes.

---

Q.    And I think my colleague at that point objected and moved to strike the response.

So I'm just going to ask you now to get on the record here, what did you mean when you were saying, you know, in the context of how the police department uses the Flock cameras, that the Flock cameras do not show you where the vehicle stops? What exactly do you mean by that?

MR. SOYFER: Object to form.

A.    So what I mean by that is if a vehicle is traveling to and from a business or a house or anywhere, for that matter, it's not going to tell us that. I don't know where they came from and I don't know where they are going.

The Flock camera only tells us that a person passed a camera at a particular location at a particular time and that's it.

So I don't know if they have gone to a house or a residence or a business or anywhere else for that matter.

So I don't know when or where they stopped at all. So that's it.

Q.    And so just as a general matter, in light of that limitation that you've described, that the Flock camera doesn't tell you where the person is going, it just tells you whether the vehicle has passed a particular camera at a particular time, in light of that limitation, how does the police department use Flock cameras?

MR. SOYFER: Object to form.

A.    It utilizes it by giving us an investigative tool to send officers to the location to complete an additional search.

So if a vehicle passes by and that vehicle is of interest, I will just use that as a blanket term, because it applies to one of those things we talked about all day long, an officer will go to the location where it last passed and search for that vehicle.

If they find that vehicle, they will use, you know, investigative means to identify the occupants or driver or what have you, depending on the situation, to try to identify those who are in the vehicle to help further the

investigation they are working on, whatever that may be.

So they use that information to send them to an area of the city to continue a search.

MR. KRAVIS: Thank you. That was all I had.

MR. SOYFER: I have no further questions.

THE VIDEOGRAPHER: All right. I will take us off.

This concludes today's deposition. The time on the monitor is 1714.

(Thereupon, there was a discussion off the record.)

THE REPORTER: Counsel, can I get transcript orders, please?

MR. SOYFER: I think we have a standing order. Ours is normal turnaround time and we order the video same normal turnaround time.

MR. KRAVIS: Yeah, I think for MTO we have a standing order as well.

(Thereupon, there was a discussion off the record.)

THE VIDEOGRAPHER: We are back on the record. The time on the monitor is 1716.

MR. KRAVIS: Sorry. Just one last thing.

Noting for the record that the City is designating as highly confidential under the protective order the portions of the testimony that concern the attorney's eyes only documents. And we will follow up with specific page and line numbers for those designations.

THE REPORTER: Thank you.

THE VIDEOGRAPHER: This concludes today's deposition. We are going off the record. The time on the monitor is 1716.

(Off the record at 4:16 p.m.)

(Whereupon, Thomas Deposition Exhibits 7, 8, 12-29 were marked for identification and attached to the transcript.)

HIGHLY CONFIDENTIAL

Transcript of Captain Charles Thomas, Corporate Designee

84 (333 to 336)

Conducted on July 22, 2025

CERTIFICATE OF SHORTHAND REPORTER

NOTARY PUBLIC

I, Dianna C. Kilgalen, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 31st day of July, 2025.

My commission expires June 28th, 2029.

_Dianna C. Kilgalen_

NOTARY PUBLIC

IN AND FOR THE STATE OF MARYLAND

COUNTY OF HARFORD