# EXHIBIT 10
*ECF # 111-6*
*under seal*



**CONTAINS CONFIDENTIAL INFORMATION
SUBJECT TO PROTECTIVE ORDER**

# Transcript of Josh Thomas, Corporate Designee

**Date:** July 29, 2025
**Case:** Schmidt and Arrington -v- City of Norfolk, et al.

**Planet Depos**

**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
**www.planetdepos.com**
Michigan #8598 | Nevada #089F | New Mexico #566

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

- - - - - - - - - - - - x

LEE SCHMIDT and CRYSTAL :

ARRINGTON, :

      Plaintiffs, :

  v. : Civil Action No.

CITY OF NORFOLK and MARK : 2:24-cv-00621-MSD-LRL

TALBOT, in his official :

capacity as Norfolk :

Chief of Police, :

      Defendants. :

- - - - - - - - - - - - X

CONTAINS CONFIDENTIAL INFORMATION

SUBJECT TO PROTECTIVE ORDER

Videotaped Deposition of FLOCK GROUP INC. d/b/a

FLOCK SAFETY, by and through its Designated

Representative JOSH THOMAS

Conducted Virtually

Tuesday, July 29, 2025, 1:18 p.m. EDT

Job No.: 589834

Pages 1 - 119

Reported by: Debra A. Whitehead

---

Videotaped Deposition of JOSH THOMAS, conducted virtually.

Pursuant to notice, before Debra Ann Whitehead, E-Notary Public in and for the Commonwealth of Virginia.

---

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS:

MICHAEL SOYFER, ESQUIRE

JOSHUA WINDHAM, ESQUIRE

ROBERT FROMMER, ESQUIRE

TAMINEH DEHBOZORGI, ESQUIRE

JESSICA BIGBIE, ESQUIRE

THE INSTITUTE FOR JUSTICE

901 North Glebe Road, Suite 900

Arlington, Virginia 22203

(703) 682-9320

ON BEHALF OF DEFENDANTS:

KARLA J. SOLORIA, ESQUIRE

ADAM D. MELITA, ESQUIRE

NORFOLK CITY ATTORNEY

900 City Hall Building

810 Union Street

Norfolk, Virginia 23510

(757) 664-4529

---

A P P E A R A N C E S  C O N T I N U E D

ON BEHALF OF FLOCK SAFETY AND THE WITNESS:

E. MARTIN ESTRADA, ESQUIRE

JOSEPH MANTEGANI, ESQUIRE

MUNGER TOLLES & OLSON

350 South Grand Avenue

50th Floor

Los Angeles, California 90071

(213) 683-9100

ALSO PRESENT:

JACK DUNN, Video Specialist

MICHAEL GOLDSTICKER, ESQUIRE

Inhouse Counsel, Flock Safety

C O N T E N T S
EXAMINATION OF JOSH THOMAS                PAGE
By Mr. Soyfer                7
By Mr. Estrada                115

EXHIBITS MARKED IN TODAY'S SESSION
(Attached to the Transcript)
PLAINTIFFS' DEPOSITION EXHIBIT                PAGE
Exhibit 61   Agreement By and Between the City  38
of Norfolk and Flock Safety, Inc.,
Bates FLOCK 0000007 - 00000031
Exhibit 62   Printout from Flock Safety        50
Website, Data at the Curb:  How
Traffic Analytics is Transforming
Safety and Success for Commercial
Businesses

EXHIBITS MARKED IN PRIOR SESSIONS
(Not attached)
PLAINTIFFS' DEPOSITION EXHIBIT                PAGE
Exhibit 54   Subpoena to Testify at a        10
Deposition in a Civil Action

Confidential - Subject to Protective Order: 16:13-18:17; 19:14-20:18; 21:1-21:4; 36:4-36:11; 38:7-49:19; 54:6-57:18; 58:20-63:19; 65:7-67:2; 68:8-86:10; 88:2-88:10; 88:17-89:16; 104:1-106:4; 109:9-113:16

P R O C E E D I N G S

VIDEO SPECIALIST:  Here begins Media Number 1 in the videotaped deposition of Josh Thomas in the matter of Lee Schmidt and Crystal Arrington V City of Norfolk, and Mark Talbot, in his official capacity as Norfolk chief of staff -- chief of police, excuse me; in the United States District Court for the Eastern District of Virginia; Case Number 2:24-CV-00621-MSD-LRL.

Today's date is July 29, 2025.  The time on the video monitor is 13:18 eastern time.  The videographer today is Jack Dunn, representing Planet Depos.  All parties of this video deposition are attending remotely.

Would counsel please voice-identify themselves and state whom they represent.

MR. SOYFER:  Michael Soyfer from the Institute For Justice, on behalf of plaintiffs in this case.  I am joined today by my colleagues Robert Frommer, Joshua Windham, Jessica Bigbie, and Tahmineh Dehbozorgi.

MR. ESTRADA:  Good afternoon.  Martin Estrada.  I'm joined by Joe Mantegani, on behalf of Flock Safety, from the law firm of Munger, Tolles & Olson.  Also with us is Michael Goldsticker, in-house counsel for Flock Safety.  We are here representing the witness, Josh Thomas.

MS. SOLORIA:  Good afternoon.  I'm Karla Soloria, with the Norfolk City Attorney's Office, representing the defendants.  And I'm joined by my colleague Adam Melita.

VIDEO SPECIALIST:  The court reporter today is Debbie Whitehead, representing Planet Depos.

The witness will now be sworn.

JOSH THOMAS, having been duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS

BY MR. SOYFER:

Q    Could you please state your name, for the record.

A    **My name is Josh Thomas.**

Q    And, Mr. Thomas, you and I have never met before today.  Correct?

A    **Correct.**

Q    Are you employed?

A    **Yes.**

Q    Where are you employed?

A    **Flock Safety.**

Q    What do you do at Flock Safety?

A    **Communications.**

Q    What is your title?

A    **Chief communications officer.**

Q    Great.  And have you been deposed before?

A    **No.**

Q    Have you ever given testimony at trial or in a court?

A    **No.**

Q    So I just want to run through some of the ground rules for today.  This is to make sure things go smoothly and we get a clean record.

The first thing -- which you've been doing a great job of so far -- is always remember to give verbal responses, not shaking your head or saying uh-huh or unh-unh.  That just makes sure that our record is clear.

**9**

Is that fair?

A   Yes.

Q   The other thing is not to speak over one another. I will always try to let you finish your answer before I ask my next question. And I ask that you let me finish my questions before you start to answer.

Is that fair?

A   Yes.

Q   If at any time you don't understand my questions for any reason, please just let me know. I'm happy to clarify or try to rephrase. By extension, if you answer my questions I'll assume that you understood them.

Is that fair?

A   Yes.

Q   Is there any reason you can't give truthful and accurate testimony today?

A   No.

Q   I'll preface this by saying sometimes witnesses have a bad reaction to this question, but it's asked in virtually every deposition.

**10**

Are you on any drugs or other substances that would interfere with your ability to testify truthfully and accurately today?

A   No.

Q   Are you receiving any compensation to testify today?

A   No.

Q   Has anyone made any promises to you in exchange for giving certain testimony today?

A   No.

Q   Is your continued employment contingent on your testimony today?

A   No.

Q   Do you understand you're here today to testify as a representative of Flock?

A   Yes.

Q   And this was previously introduced in Mr. Lukens' deposition.

MR. SOYFER: But hopefully, Martin, if you still have it handy, you can pull it up. I'd like to go to Plaintiff's Exhibit 54.

(Plaintiffs' Exhibit 54, previously

**11**

marked, not attached.)

MR. ESTRADA: So we do have Exhibit 54 up on the side screen.

MR. SOYFER: Great.

Q   And again for the record, this is the subpoena to Flock for today's deposition.

When I refer to "Flock," you'll understand that that's the entity identified here as Flock Group, Inc., doing business as Flock Safety. Correct?

A   Yes.

Q   Sometimes today I'll ask you some obvious questions just to make sure things are clear for the record, like that one. So just bear with me for those.

So just looking back, if you go a few pages in to Page 4 of this exhibit, of Exhibit 54, you'll see a section entitled Deposition Topics.

Correct?

A   Yes.

Q   And feel free to look through those, but do you understand you have been designated to

**12**

testify on behalf of Flock on Topic 1, Topics 6 to 9, and Topics 13 to 15?

A   Yes.

Q   Okay. Great.

What did you do to prepare for your testimony today?

A   Reviewed the documentation here and talked with our counsel.

Q   And when you say "our counsel," can you just tell me which specific people you mean?

A   I mean Martin Estrada, Joe, and Michael.

Q   How many times did you speak to them?

A   Three times.

Q   And for roughly how long each time?

A   Roughly four hours each time.

Q   Did you review -- and I'm just looking for a yes or no for right now. Did you review any documents during the times that you met with them?

A   Yes.

Q   Roughly how many documents would you say you reviewed?

A   Four.

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Josh Thomas, Corporate Designee

Conducted on July 29, 2025

4 (13 to 16)



**Page 13**

Q    Did any of those documents refresh your recollection of certain matters or events?

MR. ESTRADA:  And I would just instruct the witness not to provide any specific documents unless they refreshed your recollection.

A    No.

Q    Did you speak to any other Flock employees, current or past, to prepare for your deposition today?

A    No.

Q    I just want to ask a few background questions about you.

Where did you attend college?

A    UC Santa Barbara.

Q    What did you study?

A    English literature.

Q    And have you gone to grad school?

A    No.

Q    How long have you worked at Flock?

A    Seven years.

Q    So starting around 2018?

A    Yes.

**Page 14**

Q    What was your first job at Flock?

A    Marketing.

Q    And were you employed before you started working at Flock?

A    Yes.

Q    What were you doing before Flock?

A    Would you like immediately preceding or my whole --

Q    Yeah, let's start with immediately preceding.

A    I worked for a company called Experience.

Q    And what did Experience do?

A    Sports and live entertainment ticketing, and upgrades for live events.

Q    Got it.  And what was your role there, just briefly?

A    Marketing.

Q    And so then you came into Flock and started in marketing, correct --

A    That's correct.

Q    -- in 2018?

Sorry, that was a yes?

**Page 15**

A    Yes.

Q    What was your -- I guess what was your actual title at that point?

A    It was the literal single word "marketing."

Q    Okay.  Got it.  Thank you for that.

Just tell me again briefly what your day-to-day role in marketing entailed.

A    At the very beginning when I first started?

Q    Yes.

A    It entailed communications and PR, setting up digital marketing channels like Google and Facebook, building a website.  Kind of your traditional getting a company started in early marketing activities.

Q    Got it.  So that was very early in Flock's existence, if I understand correctly.

Right?

A    Yes.

Q    Flock was founded in 2017, I believe?

A    Yes.

**Page 16**

Q    And so you started marketing.  Did your job responsibilities change at some point in time after that?

A    Yes.

Q    And when was that?

A    Well, they changed all the time.  Every three to six months my responsibilities would change pretty dramatically until eventually my focus got pretty narrowed into just doing communications.  And that was in roughly 2020.

Q    Okay.

A    2021, something like that.

Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025



17

18

Q   Okay.  Understood.

And so what was your title when you shifted to that communications role in 2020 or 2021?

A   I believe I was the VP of external

19

affairs.

Q   Has that -- that title obviously changed at some point between then and now.  Right?

A   Yes.

Q   And now can you just kind of go through what your titles were from that point until the present?

MR. ESTRADA:  You're talking about 2020 or 2021 to the present?

MR. SOYFER:  Yes.

A   At some point in time I was the SVP of policy and communications, and then I have my current title.

20

Q   Do you -- okay.  Got it.

And do you still supervise that team today?

A   No.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025

6 (21 to 24)

**21**

[black redaction]

Q   Okay.  If you turn to the deposition notice for today, you'll see that Topic 1 is the intended purpose and use of Flock cameras.

Correct?

A   Yes.

Q   Great.

What types of -- just like as background, can you tell us what types of cameras Flock offers to its customers?

A   Yeah.  Flock offers LPR devices, video cameras, and drones and trailers.

Q   Got it.  What are trailers?  Just cameras mounted on trailers?

A   Yeah, a trailer can be mounted with a camera, it could be mounted with a speaker to provide a talk-down kind of a voice-over coming out of the -- it can have flashing lights on it as well.  But it does contain a camera.

**22**

Q   Got it.  When I talk about Flock cameras today, just so we have a clean record, I'm mostly, unless I say otherwise, going to be talking about Flock license plate reader cameras.

Does that track?

A   Yes.

Q   Okay.  Great.  Does Flock offer, again just as background, multiple different types of LPR cameras?

A   So Flock has different models of LPRs, yes.

Q   Okay.

A   They all perform generally the same function, just a kind of different -- different angles and different focal lengths.

Q   Can you tell me what those models are?

A   So it's the Flock LPR device is just our standard LPR.  There's a long-range version, a short-range version, and a flex version are kind of the primary models.

Q   Let me ask you about those.  I guess the difference between the long-range version and the

**23**

short-range version is how far it could see, essentially.  Right?

A   Has to do with, yeah, the focal distance.  That's right.

Q   Got it.  And what about flex, tell me a bit about what that does.

A   I don't know all the technical specs of the flex.  But the idea of the flex is that it's -- as opposed to a fixed location that's installed in the ground in one point in time, it is a temporary solution that can be used mounted and taken down and the battery stays charged for a limited amount of time, but it is not meant to be a permanent installation.

Q   Got it.  Can it be mounted on a car?

A   No.

MR. ESTRADA:  I missed the question.  Can it be mounted on what?

MR. SOYFER:  A car.

MR. ESTRADA:  Oh, okay.

A   No.

Q   Does Flock manufacture any

**24**

vehicle-mounted license plate readers?

A   No.

Q   And I should ask you, does Flock itself manufacture all of those cameras?

A   Yes.

Q   So I want to focus today -- or scratch that.  Let me ask you, are you aware of which Flock cameras the defendants in this case, the City of Norfolk and the chief of police, have acquired?

A   My understanding is it's all the standard LPR.

Q   Okay.  What's the intended use of those standard LPR cameras?

A   To provide objective evidence, to increase public safety in a transparent and accountable way.

Q   Is one intended use to investigate crime?

A   Yes.

Q   How are the Flock LPR cameras used to investigate crime?

A   A Flock LPR device can take a picture of

the back of a car and provide the objective, you know, sort of plain-view information that may be helpful to give another clue to an investigator as she's developing her case.

Q So they take pictures of the backs of cars. Right? That's one thing that they do?

A Yes.

Q Can they take pictures of the fronts of cars as well?

A A Flock LPR device can inadvertently take a picture of the front of the car, but it's designed to take the picture of the back of a car.

Q And those pictures, they include a time stamp. Right?

A Yes.

Q They include a location. Correct?

A It includes the location of the device, yes.

Q And so that information provides a clue to investigators as they develop their cases.

Is that fair?

A Yes.

Q Do they store any other information about cars, other than what we've just gone through?

A It can essentially, in the picture of the back of the car, it can read the license plate characters, ABC123, the state of the license plate, as well as the color of the vehicle, the type of vehicle, often the make of the vehicle, and a few other sort, of like, distinguishing characteristics about the vehicle itself.

Q And how is that information used?

A Could you be more specific in what you mean by that?

Q I guess I'm just asking why would that information be useful to Flock's customers?

A Well, an investigator might be given an eyewitness statement about a vehicle saying it was a blue car, and so they could go into the Flock system and filter on blue cars in the time frame and the designated location, might give them a license plate, which could give that investigator another clue in their investigation.

Q So you mentioned the time frame. Is part

of the purpose of the Flock cameras to store information that investigators can look up later?

A That's one of the benefits of using Flock, yes.

Q You have this record, you can go in, search for a vehicle, and pull up images for what -- whatever time frame you're searching for within the retention period.

Is that right?

MR. ESTRADA: Objection. Asked and answered.

A An investigator can go into the Flock system and narrow the time frame to see if a particular vehicle or license plate drove by a Flock device to further an investigation in the event of a crime.

Q And Flock cameras don't just take pictures of cars that are suspected of involvement in crime. Correct?

A Correct.

Q Flock cameras take pictures of every car that passes them. Correct?

MR. ESTRADA: Objection. Misstates the prior testimony.

A A Flock camera can take a picture of a car that drives past that particular camera.

Q Yeah. So I guess I'm trying to understand the answer.

You're saying they don't take pictures of every car that passes them?

MR. ESTRADA: Let me just object. This is a witness designated on Topic Number 1. You already had a witness who testified extensively on technical capabilities of the Flock cameras. It seems like we're covering the same territory here.

MR. SOYFER: Okay.

MR. ESTRADA: And that information you could have talked about with Mr. Lukens.

MR. SOYFER: It falls within the intended use. I mean, thanks for the speaking objection, but we disagree.

Q If you know, you can answer, Mr. Thomas.

MR. ESTRADA: Objection. Beyond the scope.

**29**

A    Do you mind restating what you asked?

Q    Yes.  Sure.  You're saying they don't take pictures of every car that passes them.

MR. ESTRADA: Objection.  Beyond the scope.

A    I did not say that, no.

Q    Okay.  Do the Flock cameras take pictures of every car that passes them?

MR. ESTRADA: Objection.  Beyond scope.

A    They're intended to do that, yes.

Q    They are intended to take pictures of every car that passes them.  Correct?

A    Yes.

Q    So if I understand correctly, Flock has -- well, let me ask you this: Who are Flock's customers, just kind of in broad strokes?

MR. ESTRADA: Objection.  Beyond scope.

You can answer.

A    Really anybody that cares about public safety.  So law enforcement, businesses, private

**30**

individuals, HOAs, churches.  Really anybody that has a desire to increase their public safety in a transparent and accountable way.

Q    Got it.  I asked you that because I want to ask about some of those private-sector customers that you just listed.

What -- how do Flock's private-sector customers use Flock cameras?

MR. ESTRADA: I'm going to object.  Beyond the scope.  Unless you can give me a representation on how this touches upon the noticed topics that you gave, I'm going to instruct him not to answer.

MR. SOYFER: You're going to instruct him not to answer? I mean, the intended use and purpose of Flock cameras is the topic.  It doesn't say for the specific type of customer.  I mean, I don't have three hours of questions on this, but I do have some questions on this, and it's well within the scope of the topic.

MR. ESTRADA: Okay.

You can answer that question.

**31**

We'll see how far it goes.

A    Do you mind restating the question?

Q    Yes.  How do Flock's private-sector customers use Flock cameras?

A    In the event of a crime, they can provide objective vehicular evidence to their local law enforcement.

Q    So kind of similar to public sector customers, to assist in investigations.

Is that fair?

A    It's pretty different in the way that a private-sector customer uses Flock versus a public-sector customer.

Q    Tell me a little bit about that.

MR. ESTRADA: Object.  Beyond the scope.

You can answer.

A    Well, a private-sector customer isn't law enforcement, and so they don't have to follow very similar rules as law enforcement with having public-usage policies.  They can't act on this information as law enforcement can with developing reasonable suspicion.  They're merely providing a

**32**

piece of evidence to law enforcement to let law enforcement go continue their investigation, and therefore severely limited, what private-sector customer can actually view or do within Flock.

Q    I think I understand.  So their intended use is to assist law enforcement in investigations.

Is that a fair characterization of your answer there?

A    Yes.

Q    And a private-sector customer can share information with law enforcement.  Correct?

MR. ESTRADA: Objection.  Assumes facts.  Lack of foundation.

You can answer if you understand.

A    Will you clarify what you mean by "information"?

Q    They can share images or data from their Flock cameras with law enforcement.  Correct?

A    Yes.

MR. ESTRADA: Objection.  Beyond the scope.

Case 2:24-cv-00621-MSD-RJK   Document 179-8   Filed 11/20/25   Page 11 of 32
PageID# 4774

CONTAINS CONFIDENTIAL INFORMATION

9 (33 to 36)

Transcript of Josh Thomas, Corporate Designee

Conducted on July 29, 2025

33

Q   Okay.  Let's move on to Topic 6.

So this topic is your ability and authority to make defendants' Flock cameras or Flock data available to third parties.

Correct?

**A   Yes.**

Q   What ability, if any, does Flock have to make the defendants' Flock cameras or data available to third parties?

**A   So we build a system and tools that allows the customer who owns the data to decide with whom they share and lets their system administrator of that information share that information at their will, as long as it's within the confines of the law.**

Q   So the customer makes the choice of who to share their data with.

Is that right?

MR. ESTRADA: Objection.  Misstates testimony.

**A   The system administrator of the -- like who is -- of the customer is the one who can**

34

**decide with whom they share their data.  Flock does not decide who they share their data with.**

Q   Let me ask you, does Flock have a national database of all customers?

MR. ESTRADA: Objection.  Vague and ambiguous.

**A   Can you clarify what you mean by "a database"?**

Q   Yeah.  So does Flock have a database that its customers -- strike that.

Let me ask you this a little bit differently.  Does every customer have to decide -- strike that.

Does each customer have to choose individually each other customer that they want to share their data with?

**A   If a customer wants to share data with another customer, they must explicitly choose to do so.**

Q   And do they have to do that on a customer-by-customer basis?

**A   They must share individually with another**

35

customer on a customer-by-customer basis.

Q   So are you saying they can't choose to just, say, share with every other customer in the state?

MR. ESTRADA: Objection.  Lack of foundation.  Calls for legal conclusion.

**A   The customer can additionally decide if they want to share with anybody within the state, or they can decide to share with people nationally if they choose.**

Q   And how do they do that?  Like, is there a button they can click within Flock, essentially, to do that?

**A   The system administrator sets the parameters for sharing, and they decide if they want to share one-to-one with another agency within the state or with anybody else who would choose to reciprocate within the nation.**

Q   Got it.  And so that latter option, is that an opt-in option; that is to say, if they want to share nationally, do they have to opt into that?

36

**A   The system administrator must choose, yes, to explicitly opt in to share nationally if they want to do so.**



Q   Can Flock share defendants' data with private-sector customers?

**A   Sharing never goes from a law enforcement agency to a private-sector customer.**

Q   In any form?

**A   Correct.**

Q   If Flock receives a subpoena for Norfolk's data, what happens?  What's your understanding of what happens?

**A   What happens is we send it to our legal team, and they work with city and state attorneys**

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025

10 (37 to 40)



**37**

or whoever is important, and they figure out what to do next. I'm not a lawyer. I don't actually know the exact process.

But we send it to our legal team, and they make an interpretation on how to proceed.

Q    Is it your understanding that Flock has the ability or authority to make defendants' Flock data available to third parties if it receives a subpoena?

A    My understanding is that we would follow the legal process.

Q    And would you give the same answer if I asked you about a warrant?

A    We would follow the legal process.

Q    So your answers, just to be clear, would be the same if I asked you about warrants?

A    I think you would need to be more specific about what you're asking about warrants.

Q    Yeah. If you received a warrant from a court signed by a judge for defendants' Flock data, what would be the process then?

MR. ESTRADA: Objection. Calls for legal

**38**

conclusion.

A    My understanding is we would send it to our legal team, and they would go interpret what is the legal responsibility of Flock, and it would work with the court or the judge, the attorneys at play, and follow the legal process.

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Josh Thomas, Corporate Designee

Conducted on July 29, 2025



41

42

Q    And so just continuing with the text here, you'll see the next sentence states, "For clarity, Flock may access, use, preserve, and/or disclose the footage to law enforcement authorities, government officials, and/or third

43

parties if legally required to do so or if Flock has a good-faith belief that such access, use, preservation, or disclosure is reasonably necessary to, A, comply with a legal process or request; B, enforce this agreement, including investigation of any potential violation thereof; C, detect, prevent, or otherwise address security, fraud, or technical issues; or D, protect the rights, property, or safety of Flock, its users, a third party, or the public as required or permitted by law, including to respond to an emergency situation."

Did I read that correctly?

A    I believe so.

Q    So is it Flock's understanding that if Flock has a good-faith belief that access, use, preservation, or disclose is reasonably necessary to fulfill one of these four identified purposes, it can disclose defendants' Flock data to third parties?

A    Yes.

Q    And you'll see that Section -- so the B

44

on this list is, "enforce this agreement, including investigation of any potential violation thereof."

Correct?

A    Yes.

Q    Can you explain when Flock would have the ability or authority to make defendants' Flock data available to a third party to enforce this agreement or investigate a potential violation of it?

MR. ESTRADA:  Objection.  Lack of foundation.  Calls for speculation.

A    I don't know.

Q    Okay.  Let me ask you about -- I'll ask you the same question with respect to D on this list.

Can you explain when Flock would have the ability or authority to make defendants' Flock data available to a third party to protect the rights, property, or safety of Flock, its users, a third party, or the public?

MR. ESTRADA:  Objection.  Lack of



foundation. Calls for speculation.

A    I don't know.

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Josh Thomas, Corporate Designee

Conducted on July 29, 2025

13 (49 to 52)



Q    You can set that aside for the moment. I have a few questions on that last issue, and I'm going to put another exhibit in the chat to try to ask some of those.

(Plaintiffs' Deposition Exhibit 62 marked for identification and is attached to the transcript.)

MR. ESTRADA:  Okay, we have Exhibit 62 on the screen.

MR. SOYFER:  Okay.  Great.

Q    What is this document?

A    It looks like a blog post from our website.

Q    Does the Flock Safety blog fall under your purview as chief communications officer?

A    No, but on an interim basis I'm helping to oversee some of these people.

Q    Got it.  How long have you been overseeing them on an interim basis?

A    A couple of months.

Q    And if you'll look at the blog post, you can see it's dated July 2nd, 2025.  Correct?

A    Yes.

Q    Great.  And the title of the blog post is Data At the Curb:  How Traffic Analytics is

Transforming Safety and Success For Commercial Businesses.

Do you see that?

A    Yes.

Q    Do you know who wrote this blog post?

A    I don't.

Q    I just want to ask you about a specific part of this.  So could you go to Page 3 of the PDF.  You'll see it's Page 3 out of 7 in the bottom right corner.

A    Yes.

Q    Okay.  So you can see that the section is talking about Flock's traffic analytics for businesses.  Right?

MR. ESTRADA:  So we have Benefit, Safety, and Wealth of Consumer Intelligence, and then no bullet.  Then this says, Visitor Origin, Repeat Visit Patterns.

Which one are you talking about?

MR. SOYFER:  Okay.  Why don't we go back to the previous page.  I'll take this piece by piece.

Q    You'll see at the very bottom of the page there's a section entitled Beyond Safety:  A Wealth of Consumer Intelligence.  Correct?

A    Yes.

Q    And on the first sentence of this section states, "Where traffic analytics really shines for businesses is in what it reveals about the noncriminal visitors, the everyday customers who drive in, park, and make purchases."

Did I read that correctly?

A    I believe so.

Q    Are you generally familiar with Flock's Traffic Analytics for businesses?

A    At a high level, yes.

Q    Got it.  And Flock does, in fact, offer traffic analytics to businesses?

A    Yes.

Q    Okay.  So the next sentence states, With Flock's platform, commercial operators can identify patterns that inform operational decisions and strategic growth, followed by a colon, and then four bullet points.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025



Do you see that?

A   I do.

Q   And the first bullet point, it has a label in bold text, Visitor Origin, colon, By seeing where vehicles are coming from, open paren, based on anonymized vehicle movement data, close paren, businesses can understand geographic draw zones.  Are customers coming from local neighborhoods or across town.  Are campaigns working to attract out-of-area customers.

Do you see that?

A   I do.

Q   And what is the anonymized vehicle movement data that's referenced here, if you know?

MR. ESTRADA:  Objection.

Let me just object.

Beyond the scope of the notice topics.

You can answer, if you understand.

A   This is the first time I've seen this.

I'm not sure.

Q   So let me just ask you, for private business customers like, say, a store, they're going to have cameras around their business or on their parking lot.  Right?

A   A private business customer, yeah, would deploy Flock devices around their parking lot or around their store.



Q    Okay.  You can close that document out. We will move on to Topic 8 now.  If you have the deposition notice handy, Topic 8 is, "Whether and how Flock monitors defendants' use of Flock's products and services."

Correct?

A    Yes.

Q    Does Flock monitor defendants' use of Flock's products and services in any way?

A    No.  We created tools so that the City of Norfolk can monitor their own use of the products and services.

Q    What are those tools?

A    We call them our, like, auditing tools.

Q    And just explain to me what those tools do?

A    Sure.  They essentially record the keystrokes of the users of the Flock Safety system when they're performing a search, so it understands what the officer typed into the Flock Safety system, their search reason, and then some of the filters by which they search for a specific vehicle.

A    I would say that we very recently, our product team has released some new functionality that doesn't allow an officer to search for impermissible search terms in certain states where there might be a law that doesn't allow them to search for those certain search terms.

Q    Okay.  Is that functionality available in Virginia?

A    Not to my knowledge.

Q    To your knowledge, have the -- have defendants implemented that functionality?

A    Not to my knowledge.



CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025

Q   Does Flock collect success stories from the City of Norfolk?

A   We would love to.

Q   Okay.  Does Flock monitor legal cases where the City of Norfolk relies on Flock data?

A   Could you clarify what you mean by "monitors"?

Q   Yeah.  Does Flock, you know, keep tabs on them, watch them, you know, try to get updates on cases where the City of Norfolk is relying on Flock data in court?

MR. ESTRADA: Objection.  Vague and ambiguous.

A   I don't know if there's anybody who's directly checking the status of court cases in the City of Norfolk.

Q   Okay.  Is there anyone at Flock who looks for success stories in the City of Norfolk use Flock data?

MR. ESTRADA: Objection.  Asked and answered.

A   We have a team of people at Flock who are -- would love to have success stories from any of our customers.

Q   Do they actively reach out to the City of

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Josh Thomas, Corporate Designee          17 (65 to 68)

Conducted on July 29, 2025

Norfolk to try to get them, or are they sort of just passively hoping customers will contact Flock?

A   I don't know if anyone has ever reached out to somebody at Norfolk or not asking for success stories.

Q   You mentioned earlier that recently Flock implemented a functionality to prevent searches based on certain impermissible terms.

Do you recall that?

A   Yes.

Q   And you mentioned that that functionality isn't available, to your knowledge, in the State of Virginia.  Correct?

A   Yes.

Q   Why isn't it available in the State of Virginia?

A   To develop a tool like that takes a lot of engineering effort, and our product and engineering team did it in response to something that we had been made aware of in a different state and implemented it for a different state, but not for all customers or particularly any customers in Virginia.  It was in response to a desire for that in a particular state.

Q   And which state was that?

A   Illinois.



Q   Okay.  So to your knowledge, can defendants download data from their Flock system?

A   Yes.

Q   Does Flock create records of when police officers in Norfolk download data?

A   I'm not sure of that.  I would refer you to my colleague, Mr. Lukens.

Q   So to your knowledge, it doesn't monitor data downloads in that way?

MR. ESTRADA:  Objection.  Mischaracterizes testimony.  Asked and answered.

A   I'm not sure.

Q   Let's move on to Topic 9.

MR. ESTRADA:  Okay.  Let's take a break then.

MR. SOYFER:  Oh, gotcha.  Yeah, happy to take a break.

VIDEO SPECIALIST:  Stand by.

We are going off the record at 14:29.

(A recess was taken.)

VIDEO SPECIALIST:  And we're back on the record.  The time is 14:41.

BY MR. SOYFER:

Q   Mr. Thomas, we're just back from a break, but you understand you're still under oath.

Correct?

A   Yes.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee

18 (69 to 72)

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee



CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee

20 (77 to 80)



CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Josh Thomas, Corporate Designee

Conducted on July 29, 2025

22 (85 to 88)



**Page 85** — [content redacted]

**Page 86**

Q    Okay.  Let me go back.  I actually wanted to ask a question that relates more to Topic 8, which is whether and how Flock monitors defendants' use of Flock's products and services.

Just as background, let me ask, when an officer goes in to search within Flock's OS, they have to enter a reason for the search.  Correct?

**A    When somebody performs a search for Flock's -- when they're using the Flock system, they need to input a reason.  Yes, that's correct.**

Q    They can't -- they can't do the search without putting in a reason.  Right?

**Page 87**

**A    Correct.**

Q    And for the Norfolk Police Department as of July 1st, 2025, officers also have to provide a case or call-for-service number.

Is that correct?

**A    As well as some other things, yes, that's correct.**

Q    What are the other things?

**A    Well, the new statute requires a lot of new things, including a shorter date of retention period, some auditing requirements.  They have to put in like, you mentioned a case number, call-for-service number.  I think there's also like -- I forget the exact words, but it's like an offence type, maybe is what it's called.  So there's a -- there's a few things that are new requirements under the law that an officer has to do.**

Q    Got it.  Let me break that down.

So the offense type, does that go in The Reason field?

**A    I believe it's an either/or offense type**

**Page 88**

**or the search reason.**

Q    So I want to ask about the case or call-for-service number.

So is it your understanding that that field has to be completed before a search is performed?

**A    Yes.**

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Josh Thomas, Corporate Designee

Conducted on July 29, 2025

89



Q   So I want to move on to Topic 13, if you have the notice handy.  You'll see the Topic 13 is the retention period for defendants' Flock data, as well as how and why that retention period was chosen or applies to defendants' Flock data.

Correct?

90

A   Yes.

Q   And so here's where I'll try to be very specific about the time periods I'm talking about.

So from the time defendants first acquired their Flock cameras to June 30th, 2025, the retention period was 30 days.  Correct?

A   Yes.

Q   And from July 1st, 2025, to the present and going into the future, the retention period is 21 days.  Correct?

A   Yes.

Q   Okay.  So I wanted to talk first about the 30-day retention period.

Why was the retention period initially 30 days?

A   Because we wanted to ensure that the public information that was collected by Flock devices was actually useful for law enforcement as they're looking to solve and investigate crime.

And given the volume of crime that takes place in America, and given what we heard from a lot of our customers early on, they wouldn't even

91

be assigned cases sometimes for several weeks.  And so having access to data that would help them potentially solve crime for around 30 days was an area where our customers would tell us they would want to have that much data.

But we also spoke to professors, privacy advocates, the public around what we were doing in building these tools.  And a lot of people, like the NYU Policing Project, for example, said a shorter retention period would better allay concerns of privacy advocates.  And so our perspective was, Look, let's try to find the right balance between providing enough evidence for law enforcement to solve crime, while at the same time addressing concerns of privacy advocates.  So 30 days felt like a really reasonable compromise to give law enforcement enough time to do what they needed to do to ensure they had the evidence for their ability to solve crime.

Q   Got it.  I appreciate the thorough answer.  I want to unpack it a little bit.  But the first question I want to ask is just, was 30

92

days Flock's default retention period?

A   It still is to this day.

Q   So let me ask for background.  How long has that been Flock's default retention period?

A   Since we were founded.

Q   Got it.  Back in 2017?

A   Yes.

Q   And is that when the conversations with, you know, professors, privacy advocates, and the public, happened?

A   That's when they began.

Q   Do you recall any specific professors that Flock has consulted?

A   Yeah.

Q   And who are they?

A   There is one professor named Farhang Heydari.  He's I believe at University of Tennessee now, but he used to be the executive director of the NYU Policing Project.

Q   Okay.

A   Barry Friedman was involved, he's at NYU.  These are all folks that we had -- another guy

named Max Issacs. These are all people that we have spoken to at the NYU Policing Project.

Q And when did those conversations with the NYU Policing Project happen?

A I don't remember the exact dates, but I would guess they were probably between 2019 and 2021 was the bulk of those conversations.

Q At any point in time during discussions with Norfolk prior to passage of the new Virginia legislation requiring the 21-day retention period, did Norfolk ever request a different retention period?

A Not to my knowledge.

Q Do Flock customers ever depart from the 30-day default?

A Yes.

Q Do some customers have lower -- strike that.

Do some customers have shorter retention periods?

MR. ESTRADA: Objection. Beyond the scope.

You can answer.

A Some customers have a longer retention period, and some customers have a shorter retention period.

Q And in those cases Flock defers to whatever the customer wants?

A Our general policy is that we defer to whatever the law is in that jurisdiction or that locality, or ordinance or whatever it may be.

So if a -- there's a legal standing in some capacity that says it needs to be longer or shorter, we defer to the law.

Q Got it. So why did Flock decide upon 30 days specifically for its default?

MR. ESTRADA: Objection. Asked and answered.

Q I guess my question is, why not ten days, why not 20 days, something like that?

MR. ESTRADA: Objection. Asked and answered.

A We try to strike the right balance between what law enforcement told us that they

needed for the opportunity to even have the clues for their investigations, and oftentimes a city may not even be -- like an officer, a detective, may not even be assigned a case for several weeks. And so we wanted to ensure that the data was there and useful for law enforcement to be able to solve crime.

But storing and maintaining data for significantly longer periods of time creates the opportunity for more noise than signal. And therefore we want to ensure that the data is actually useful for law enforcement to investigate and solve crime.

And then we also wanted to ensure that as we were talking to more -- you know, people in the public, that we were allaying their concerns that the data is only going to be used for those purposes, and not -- not for anything else.

So 30 days felt like a really great compromise.

Q Yeah. How does a 30-day retention period allay those concerns?

MR. ESTRADA: Objection. Lack of foundation.

A It provides the opportunity for law enforcement to do their job and investigate crime. And if it's not used for those purposes, it's permanently and irrevocably deleted.

And so what we've heard from privacy advocates is that's a helpful -- a helpful feature of the Flock system, is that the data is only collected for a temporary time period for law enforcement to do their job and nothing more.

Q In that answer you referenced privacy advocates a lot. I'm wondering, does Flock have any position on whether the 30-day retention period protects personal privacy?

A Flock's position is that 30 days is a helpful in allaying the concerns of privacy advocates by ensuring that the data is around for a long enough time period for law enforcement to do their job and nothing more. And therefore, it is permanently and irrevocably deleted every 30 days on a rolling basis.

97

Q   Got it.  So Flock's position is just, we want to do what we need to do to allay the concerns of privacy advocates.

Is that fair?

MR. ESTRADA:  Objection. Mischaracterizes testimony.

**A   No.  I would say that what Flock is trying to do is ensure that we provide the evidence necessary for law enforcement to do their jobs, and nothing more.  And therefore, we instituted a limited data retention so that we could tell the public that that is exactly what this is being used for.  It's for law enforcement to do their job and nothing more.  And therefore at some period in the future we are going to permanently and irrevocably delete this data.  And 30 days felt like a really great compromise for our default position.**

Q   So what I'm trying to understand is, does Flock have its own position on why data should not be kept more than 30 days, or is that just an effort to kind of compromise with privacy

98

advocates and reassure the public?

MR. ESTRADA:  Objection.  Asked and answered.  Beyond the scope.

**A   I mean, our position is what I stated, which is, we want to ensure that law enforcement have the opportunity to leverage the objective plain-view evidence necessary to do their jobs, and help stop and solve crime, and nothing more. And therefore, we instituted a limited data retention period for the purposes of ensuring that it can be used, it can be helpful, and then it's not used for anything else.**

Q   Okay.  Would it cost Flock more money to store more than 30 days of data?

MR. ESTRADA:  Objection.  Lack of foundation.

**A   The longer you store data, the more it costs.**

Q   And the current retention period since July 1st of this year is now 21 days.  Correct?

**A   Correct.**

Q   Does Flock have any position on that?

99

Is it too short, in Flock's view?

MR. ESTRADA:  Objection.  Beyond the scope.

**A   I think it depends on every circumstance. So it's hard to say if 21 days is too short in every circumstance.**

Q   Why is it 21 days now?

MR. ESTRADA:  Objection.  Calls for legal conclusion.

**A   Legislators in the State of Virginia voted on that and followed the democratic process, followed the law, and instituted that new law.**

Q   That wasn't Flock's choice.  Correct?

**A   Legislators passed a law.  Yeah, Flock did not pass a law.**

Q   And Flock implemented that for all of its customers in Virginia.  Correct?

**A   Yeah, Flock did that.  We follow the law.**

Q   Outside of Virginia, does Flock still apply a 30-day default?

MR. ESTRADA:  Objection.  Vague and ambiguous.

100

**A   That's our default position.  But if there's a law that is in existence that supercedes that longer or shorter, we will follow the law that's shorter or longer on data retention.**

Q   And when defendants go in to search data, if they search the data of out-of-state agencies, can they see data that are older than 21 days, depending on the out-of-state agency's retention periods?

MR. ESTRADA:  Objection.  Assumes facts.

**A   You're saying if the City of Norfolk has a sharing relationship with somebody outside of Norfolk, outside of the State of Virginia?**

Q   Yes.

**A   Can they see data that's longer than the 21 days?**

Q   That's right.

**A   My understanding is they can have access to whatever the data-retention period is on the locality in which they're searching.**

Q   Got it.  And so if they're searching a locality that has a 30-day retention period, for

101

that locality they can see 30 days of data when they go in and search. Right?

MR. ESTRADA: Objection. Lack of foundation. Calls for legal conclusion.

A   I'm not certain, but I believe that that is right. I think that that's more of a question I would actually have you defer to Davis Lukens on. But I think that -- I think what you described is accurate.

Q   Okay. Flock doesn't prevent defendants from downloading and storing data for longer than 21 days. Right?

MR. ESTRADA: Objection. Vague and ambiguous.

A   You -- would you rephrase that? Sorry. That sounded like a couple of negatives. I got confused.

Q   Okay. Sure. Flock does not prevent defendants from downloading and storing data for longer than 21 days. Correct?

A   Correct. Yeah. If a customer downloads

102

the footage, they would store it as part of their evidence-management system. So yeah, they can store it as long as their internal policies allow them to store it.

Q   Flock doesn't interfere with that. Correct?

A   Flock does not interfere.

Q   Okay. Let's move on to Topic 14. And this topic is Flock's ability to use, access, or retrieve defendants' Flock data that have been deleted.

Do you see that?

A   Yes.

Q   So again, as we've been discussing, the retention period before July 1st used to be 30 days, now it's 21 days. Right?

A   Yes.

Q   Okay. And whenever that deadline hits, Flock automatically deletes data.

Is that right?

A   Yes.

Q   And that process is automatic. Correct?

103

A   Correct.

Q   Once the data are deleted, are they just permanently unavailable in any form?

A   Correct.

Q   There is absolutely no way to recover any portion of the data?

A   Once data has been deleted, there is no opportunity to recover data.

Q   How is the -- let me just ask you, to follow up on that. How is the data deletion handled? Does Flock accomplish it, or is it something Amazon Web Services accomplishes for Flock?

A   My understanding is it is a setting in Amazon Web Services that is where the data is actually purged.

Q   And to your understanding, Amazon Web Services has zero ability to recover any deleted data. Correct?

MR. ESTRADA: Objection. Beyond the scope.

A   That's my understanding.

104



Q   I'm actually in Section 4.1, but I'm in the portion of it that's on the page ending in 22.

A   Yes, we see that.

Q   I just want to ask you to clarify me -- clarify for me this last -- these last two sentences here. Or, actually, this last sentence. Sorry about that. The last sentence of this paragraph states, "Flock may store deleted footage in order to comply with certain legal obligations, but such retained footage will not be retrievable without a valid court order."

Do you see that?

A   I see that.

Q   How does Flock store deleted footage?

A   Well, I think that it's saying, like, for

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025

27 (105 to 108)

this Norfolk case where you'll ask us to store, like preserve data in a separate system, it's been deleted from the City of Norfolk and they no longer have access to it in the Flock system, but it has been stored separately for the purposes -- purposes of evidence preservation so that, you know, plaintiffs, like in your case, can have access to this. It's referring to that sort of like system of being able to make a copy of that and store it while the files have been deleted.



Q   Got it. I'd like to move on now to our last topic, which is Topic 15. "Flock's role in determining the placement, location, and/or positioning of defendants' Flock cameras, as well as, at a general level, the methodology for deciding where to place, locate, and/or position defendants' Flock cameras."

Do you see that?

A   I do.

Q   What role, if any, did Flock have in determining the placement, location, or positioning of defendants' Flock cameras?

A   Really just the final call to ensure that the locations would actually work where the city wanted them. The police department told us where they wanted to put these devices based on historical crime patterns is my understanding. And then Flock would determine the final location

to ensure that, you know, these are solar-powered devices, there actually was enough sun in those locations. Maybe there was a tree in the way and the canopy might block it.

And so Flock's role is just to ensure that the location that's picked actually works to achieve the outcomes of the police department.

Q   And so your understanding is that the specific locations were all decided upon by the Norfolk Police Department.

Is that right?

A   Yes.

Q   And what's Flock's understanding of how -- of what methodology was used to decide where to place those?

A   My understanding was that the City of Norfolk used historical crime data that they had access to, and therefore wanted to put devices near those historical crime areas to ensure that if there was a crime committed in the future, they had the evidence necessary to go, you know, further their investigation.

Q   Did Norfolk have a set number of cameras it wanted to buy at the outset -- or strike that.

Did Norfolk have a set number of cameras it wanted to acquire at the outset of this process?

MR. ESTRADA: Objection. Beyond the scope. Lack of foundation.

You can answer, if you understand.

A   I'm not sure if they had a specific number in mind.

Q   Okay. When Norfolk identified the cameras, did Flock provide any assistance with identifying where to locate those cameras within the areas that Norfolk wanted them?

MR. ESTRADA: Did you say identify the cameras? Shouldn't it be identify the locations?

MR. SOYFER: Right. Let me reask that.

Q   When Norfolk identified the locations where it wanted cameras, did Flock provide any assistance with identifying where to locate those cameras within the areas that Norfolk wanted them?

A   I'm sure we helped decide some of those

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025

28 (109 to 112)



109

locations based on what we talked about earlier.
Is there enough sunlight.  You know, Flock calls
811 to ensure that there's no underground sewage
or wires.  So I'm sure that we helped find the
precise location in those areas.

Q    Does Flock provide any general guidelines
for customers on how to location Flock cameras?

A    Yes.

CONTAINS CONFIDENTIAL INFORMATION
Transcript of Josh Thomas, Corporate Designee
Conducted on July 29, 2025

113

[redacted]

Q   So do you have an understanding of how many Flock cameras Norfolk has?

A   Yes.

Q   And how many do they have?

A   My understanding is 172.

Q   Has that number stayed the same since

114

they initially acquired cameras, as far as you know?

A   I think they wanted to get 176. I'm not sure if those last four were ever installed.

Q   How do you know they wanted to get 176?

A   I saw a document, I think that you provided maybe, going back and forth between somebody at the City of Norfolk and one of our sales reps, inquiring about four more cameras.

Q   To your knowledge, did Flock have any involvement in deciding where to place those cameras?

MR. ESTRADA: Objection. Vague and ambiguous. Asked and answered.

A   From what I saw, the City of Norfolk sent over specific, like, coordinates of where they wanted those devices. So I believe the City of Norfolk chose those locations, like they did with all the rest of their devices.

MR. SOYFER: Could we take a ten-minute break.

MR. ESTRADA: Sure.

115

MR. SOYFER: Great.

VIDEO SPECIALIST: We are going off the record. The time is 15:34.

(A recess was taken.)

VIDEO SPECIALIST: We are back on the record. The time is 15:51.

MR. SOYFER: Okay. I have good news, which is that subject to any questions I might have after redirect, those are all of my questions for you today, Mr. Thomas.

THE WITNESS: Thank you.

EXAMINATION BY COUNSEL FOR FLOCK SAFETY AND THE WITNESS:

BY MR. ESTRADA:

Q   So I have a few questions.

Good afternoon, Mr. Thomas.

A   Hello.

Q   I just have one clarification.

You were shown a document which discussed Flock's work with private entities and their data. I believe it's Exhibit 62.

Do you recall that?

116

A   Yes.

Q   I want to be very clear. Does Flock share any of defendants' data, Norfolk Police Department Flock data, with any private entities?

A   No.

MR. SOYFER: Object to form. Foundation.

Q   Are you aware of Flock ever sharing any of defendants' data with any private entities?

MR. SOYFER: Objection. Form. Foundation.

A   No.

Q   Are you aware of Flock sharing any of defendants' data with any private businesses within the City of Norfolk?

MR. SOYFER: Form. Foundation.

A   No.

Q   Does Flock share defendants' data, whether in any form, anonymized data, with any private entities?

MR. SOYFER: Form. Foundation.

A   No.

Q   Does Flock share Norfolk data,

CONTAINS CONFIDENTIAL INFORMATION

Transcript of Josh Thomas, Corporate Designee

Conducted on July 29, 2025

30 (117 to 120)

---

117

defendants' data, in any form, including aggregated data, with any private entities?

MR. SOYFER: Form. Foundation.

A    No.

MR. ESTRADA: No further questions.

MR. SOYFER: And just to clarify, those questions were in your capacity as counsel for Flock. Correct?

MR. ESTRADA: You're talking to me, Michael?

MR. SOYFER: Yes, I am.

MR. ESTRADA: Yes.

MR. SOYFER: Okay.

VIDEO SPECIALIST: Any other questions from counsel?

MS. SOLORIA: The city has nothing further.

VIDEO SPECIALIST: Okay. Then if no one objects, I'll read us off the record.

This ends the deposition of Josh Thomas. We are going off the record at 15:53.

MR. ESTRADA: We are designating the

---

118

transcript as confidential.

MR. SOYFER: I will just say we are fine treating the transcript as confidential until we receive more specific designations. But the Protective Order requires that a specific portion or portions be designated confidential on the record.

So I'm not sure if you want to go on the record and say what those portions are, or if you're just fine with our agreement that until we get a letter from you with specific designations, we'll treat it as confidential.

MR. ESTRADA: The agreement would be we'll keep the whole thing confidential until we send you a letter designating specific portions.

MR. SOYFER: That's right.

MR. ESTRADA: That's fine with us.

MR. SOYFER: Okay.

(Off the record at 3:54 p.m. EDT.)

---

119

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Debra Ann Whitehead, E-Notary Public in and for the Commonwealth of Virginia, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; that reading and signing was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 8th day of August, 2025.

My commission expires:
October 31, 2027

----------------------------

E-NOTARY PUBLIC IN AND FOR THE
COMMONWEALTH OF VIRGINIA

---