# EXHIBIT 23

*ECF # 111-8*

*under seal*



**Planet Depos**
We Make It *Happen*™

<span style="color:darkred">**CONFIDENTIAL**</span>

# Transcript of Chief Mark Talbot

**Date:** July 23, 2025
**Case:** Schmidt and Arrington -v- City of Norfolk, et al.

**Planet Depos**

**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com

**www.planetdepos.com**

Michigan #8598 | Nevada #089F | New Mexico #566

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

**1**

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA, NORFOLK DIVISION

- - - - - - - - - - - - - -x

LEE SCHMIDT AND          :
CRYSTAL ARRINGTON,       :
                         :  No:
Plaintiffs               :  2:24-cv-00621-MSD-LRL
                         :
     v.                  :

CITY OF NORFOLK and
MARK TALBOT, in his
official capacity as
the Norfolk City
Chief of Police,

Defendants.

x

TRANSCRIPT MARKED CONFIDENTIAL

Remote Videotaped Deposition of CHIEF MARK TALBOT
Wednesday, June 25, 2025
9:32 a.m. EST

Job No.: 589831
Pages:  228
By: Alyssa A. Repsik
    Court Reporter

**2**

Videotaped Deposition of CHIEF MARK
TALBOT, held remotely via Zoom videoconference,
pursuant to Notice, before Alyssa A. Repsik, Court
Reporter and Notary Public in and for the
Commonwealth of Pennsylvania.

**3**

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:

INSTITUTE FOR JUSTICE
Robert Frommer, Esq.
James Knight, Esq.
Michael B. Soyfer, Esq.
Tamineh Dehbozorgi, Esq.
901 North Glebe Road, Suite 900
Arlington, VA 22203
Rfrommer@ij.org
Jknight@ij.org
Msoyfer@ij.org
Tdehbozorgi@ij.org

Jessica Bigbie, Esq.
816 Congress Avenue, Suite 970
Austin, TX 78701
Jbigbie@ij.org

ON BEHALF OF THE DEFENDANTS:

MUNGER, TOLLES & OLSON, LLP
Jonathan Kravis, Esq.
Lauren Ross, Esq.
601 Massachusetts Avenue NW
Suite 500 E
Washington, D.C 20001
Jonathan.kravis@mto.com

Also Present:  Carla Soloria, Esq.

**4**

I N D E X

CHIEF MARK TALBOT                          PAGE

BY ATTORNEY FROMMER                          6

           - - -

        E X H I B I T S

  NUMBER        DESCRIPTION           MARKED
Exhibit 30    5/23/23 E-mail            99
Exhibit 31    Video                    117

        (Exhibit 31 retained by counsel.)

P R O C E E D I N G S

THE VIDEOGRAPHER: Here begins Media No. 1 in the videotaped deposition of Chief Mark Talbot in the matter of Lee Schmidt and Crystal Arrington versus the City of Norfolk and Mark Talbot in his official capacity as the Chief of Norfolk police.

In the United States District Court for the Eastern District of Virginia, Norfolk Division. Case No. 2:24-CV-00621-MSD-LRL.

Today's date is July 23rd, 2025. The time on the video monitor is 9:32.

The remote videographer today is Isaac Weaver, representing Planet Depos. All parties of this video deposition are attending remotely.

Will counsel please voice identify themselves and state whom they represent.

ATTORNEY FROMMER: Robert Frommer, counsel for Plaintiffs. With me today is Jessica Bigbie, James Knight, Michael Soyfer and Tamineh Dehborzorgi, all representing Plaintiffs.

ATTORNEY KRAVIS: Jonathan Kravis on behalf of the Defendants. With me today are Lauren Ross and Carla Soloria.

THE VIDEOGRAPHER: The court reporter today is Alyssa Repsik, representing planet Depos. The witness will now be sworn.

CHIEF MARK TALBOT, a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY ATTORNEY FROMMER:

Q. Good morning, Chief Talbot. I hope today is going well for you so far.

Could you please state your name and rank for the record, please?

A. Yes, sir. Good morning. My name is Mark Talbot. I'm the chief of police.

Q. And my name is Robert Frommer. You probably heard me just a second ago. I'm an attorney for the Plaintiffs in this matter.

And before we start any questions, I just want to go through a few logistics, make sure we're all on the same page.

My first question is: Have you ever been deposed before?

A. I have.

Q. Okay. How many times have you been deposed?

A. I don't know, precisely. Probably a -- a dozen.

Q. Okay. So a decent number.

And have you ever testified at trial?

A. Many times.

Q. Okay. So you're likely familiar with the things I want to go through, then. But I'm still going to go through them just so we're on the same page and everything goes smoothly.

Do you understand that you've given an oath to testify truthfully here today?

A. I do.

Q. Okay. And I know we're on Zoom, so you can see I'm a little informal. But do you understand that you should treat your testimony today with the same seriousness that you would if you were in front of a judge in court?

A. Yes, sir.

Q. Okay. Now, it's important for us to have a clear record -- that's because the court reporter is writing down everything we say -- and that really requires us to do a few things.

One is I'm going to do my very best, and I will admit I'm often bad at it, to avoid talking over you. So if you're giving an answer, I'll try to avoid speaking until the answer is complete.

And, likewise, if I'm asking a question, even if you think you know where I'm going, if you can just wait until I'm finished with the question before answering.

Does that sound fair?

A. Yes, sir.

Q. Another big thing for the court reporter is having verbal answers, so no "uh-huhs" or head nods or things like that.

So if I ask you, is that a yes, I'm not trying to be rude. I'm just making sure that we have a clear record. Okay?

A. Yes.

Q. If you don't understand the question, it's

understandable. I sometimes ask bad questions. So if you don't understand it, just ask me for clarification, and I'll be happy to try to clarify or rephrase it.

But if you don't ask for a clarification, I'll assume that you understood my question.

Is that fair?

**A. Yes, it is.**

Q. Okay. Now, if you need a break, you know, that's fine. Just ask for one. I don't want to cause anybody any uncomfort.

I just say that if you ask for a break, I just ask that we finish the question we're on and then we can go take that break; okay?

**A. Yes.**

Q. Okay. Is there any reason that you would not be able to give your full and best testimony today?

**A. No.**

Q. Okay. And I always -- I always hate asking this, but, like, are you on any drugs or other medication that might affect your ability to provide clear and accurate testimony today?

**A. I am not.**

Q. Okay. Did you do anything to prepare for your deposition today?

**A. No.**

Q. Did you speak with your attorneys prior to this deposition?

**A. Yes.**

Q. How many times did you speak with them?

**A. Over what time period?**

Q. In your preparation for this deposition, I'm asking how many times did you speak to them?

**A. Three.**

Q. Three. Okay. And how long were those -- I'm not trying to inquire about the substance of those conversations, but I'm just asking how long were each of those conversations?

**A. I don't know, precisely.**

Q. Were they all just a matter of a few minutes or were there some that lasted more than an hour?

**A. They all lasted more than an hour.**

Q. Okay. So approximately when you -- it sounds like you met with attorneys three times.

How long did you meet with them in each of those three times?

**A. Between one hour and two and a half.**

Q. Okay.

**A. If I'm not mistaken.**

Q. Okay. Did you speak with anyone about this deposition aside from defendants' attorneys?

**A. I would have spoken to my assistant chiefs --**

Q. Okay.

**A. -- about it.**

Q. And what would you have talked to them about this deposition? What would those conversations have been?

**A. Well, the most recent once was I won't be in the office all day because I will be giving my deposition.**

Q. Did you talk to your assistant chiefs about any substantive matters related to the deposition?

**A. No, I did not.**

Q. Okay. Did you speak for -- with any other NPD officials, aside from your assistant chiefs, about this deposition?

**A. No.**

Q. Okay. Did you speak with anyone from Flock Safety in preparation for this deposition?

**A. Are you including attorneys from Flock Safety?**

Q. No. I meant anyone from Flock, the company, Flock Safety?

**A. No.**

Q. Did you speak to any attorneys -- well, now that I ask, did you speak to any attorneys from Flock Safety?

**A. Yes.**

Q. Who -- who did you speak to?

**A. I don't know. It -- it was part of the dep -- deposition prep that I have already alluded to.**

Q. Okay. So you were having a deposition preparation session with defendants' attorneys, and

13

then Flock attorneys came to that meeting, as well.
Is that correct?

A. Yes.

Q. Okay. Did you review any documents in preparation for this deposition?

A. Yes, I did.

Q. What documents did you review?

ATTORNEY KRAVIS: Are you asking him which documents he reviewed in sessions with attorneys or documents he reviewed outside of those sessions?

ATTORNEY FROMMER: Outside of those sessions. I don't want to infringe on any work product issues.

ATTORNEY KRAVIS: So just in answering the question, you should refer only to documents that you reviewed outside of meetings with the attorneys and not any documents you reviewed in the meetings with the attorneys.

THE WITNESS: Very good. Got it.
Could you please repeat your question?

BY ATTORNEY FROMMER:

Q. Sure. Outside of those meetings that we

14

talked about, those three meetings with the defendants' attorneys and the Flock's attorneys, did you happen to review any documents outside of those meetings that are pertinent to this deposition?

A. No, I did not.

Q. Okay. Did you, outside the context of those meetings, watch any videos in order to prepare for today's deposition?

A. No, I did not.

Q. And did you happen to bring any documents with you today?

A. No, sir.

Q. Okay. Now, just at the very high level I just want to ask what is your understanding of what this lawsuit is about?

A. The lawsuit is about the -- whether or not the use of our Flock system is constitutional.

Q. Okay. That's a very good summary of it.
All right. Thanks. So that's just sort of the background.
I want to get to actually know -- before we get into the substance of things, I want to

15

actually understand who you are a little bit better and your background.
So can you tell me? Where were you born?

A. I was born in a small town called Oxford, Pennsylvania.

Q. Okay. Where -- where is Oxford at?

A. It's in Southeastern Pennsylvania.

Q. Okay. And did -- did you grow up your whole life there?

A. I spent my childhood there.

Q. Okay.

A. I moved out as a young adult.

Q. Okay. And was that to go to school or get a job?

A. Both. Yes.

Q. Okay. Well, why don't you tell me, after you left home, what was the -- what was -- what was the next thing you did?

A. Moved out when I was 19 years old. Became a corrections officer -- that was in 1990 -- for the Chester County Prison.
I spent four years there and became a

16

police officer for the City of Reading in Pennsylvania in 1994.

Q. Okay. So you were a -- a prison official for four years and then you made a jump -- came over and became a police officer?

A. Correct. Yes, sir.

Q. Those two jobs, I mean, they must be quite different, aren't they?

A. They are quite different, yes.

Q. Which one -- I assume that you prefer the police officer one, since that's where you went to?

A. Yes, I do prefer it.

Q. And so what is -- in '94 you said you -- you became a police officer. What was the name of the -- the department?

A. Reading Police Department.

Q. Reading. Okay. And how long were you at -- with the Reading PD?

A. 18 years.

Q. Okay. When you started at Reading, what was your rank?

A. I was a patrol officer.

Q. Okay. And so you said -- so you started as a patrol officer in 1994, and then you said you were there 18 years?

A. Yes, sir.

Q. By the end of the 18 years, what was your rank then?

A. Deputy chief of police.

Q. Okay. All right. So that takes us up to, what? About 2012?

A. Approximately, yes.

Q. And as deputy chief of police in Reading, did you have to -- was that more of a managerial role, where you're overseeing the functions of the department?

A. I was the second highest-ranking officer in the organization. I was the chief operating officer.

Q. Okay. And so that's sort of, like, the day-to-day operations would fall under the purview of the COO; is that correct?

A. Yes.

Q. Okay. All right. So '94 to 2012 you climb from patrol officer all the way up to deputy chief. And then what happens in 2012?

A. I retired from the Reading Police Department and I take over a state agency in Pennsylvania.

Q. So what -- what agency was that?

A. It's called the Bureau of Enforcement and Investigation.

Q. Okay. I don't think I've heard of that. Can you tell me what that is?

A. Sure. It's the agency in Pennsylvania that oversees licensed professionals.

Q. Okay. So is -- okay. So -- if -- if an -- if there's an occupational license, this is the agency that sort of oversees that the licensees are abiding by the rules?

A. Correct.

Q. Okay. I understand. How long were you at the Bureau of Enforcement and Investigation?

A. A little more than two years.

Q. Okay. And then so bureau -- PA bureau for two years. And then -- and then what happened? And then what -- it sounds like you made a -- another move, then?

A. I did. I became the chief of police in Norristown, Pennsylvania.

Q. Oh. Okay. So 2014 you became chief of police for Norristown?

A. Yes.

Q. Where is Norristown -- what was that?

A. Norristown is outside of Philadelphia.

Q. Okay. Is this near your old -- your old home, your -- your -- you said Southeast Pennsylvania, so I'm just --

A. Yeah, it -- it is -- geographically it's not too far away, but it -- I wouldn't say it's close to the area, no.

Q. Okay.

A. They're nothing alike.

Q. Okay. And so you're the chief now at -- in Norristown, and the chief is -- can you describe to me, since you were a deputy chief in Reading, what's the difference between being a chief and a deputy chief?

A. As a deputy chief, you still have another police officer who outranks you and as chief, you are the highest-ranking officer in the organization.

Q. Right. I definitely get that. I understand -- I think that's implicit in the name "deputy."

But I was wondering, like -- and maybe it's different at every organization, but I was wondering if there's functionally a difference between the types of tasks or responsibilities a chief has versus a deputy chief of police?

A. Not -- not really.

Q. Oh, okay. All right. It can really just be either, just depending?

A. Yeah.

Q. All right. So you were at the Norris -- you became chief of police at Norristown, and what's the size of Norristown, roughly?

A. 40,000 people. Approximately, 40,000.

Q. 40,000. Okay. Sorry. I realized halfway through my question that I was not clear about, like, the size of the city and the population, so

thank you for accurately predicting what I was going to ask.

So you were chief at Norristown starting in 2014. And how long were you chief there?

A. About seven years.

Q. Okay. So about until 2021?

A. Yes.

Q. All right. And then what caused you to leave Norristown?

A. I became chief in Hampton, Virginia.

Q. Chief in Hampton. And that's part of the -- that's one of the cities in the Hampton Roads area; correct?

A. Correct.

Q. And what's the size of -- and population of Hampton?

A. 140,000.

Q. 140,000, okay. And you did -- okay. So you were there from 20 -- 2021, and then when did you come over to the Norfolk Police Department?

A. April 24th, 2023.

Q. 2023. And what was the -- what was the impetus for the move?

A. City manager asked me to become the police chief.

Q. Well, why did you want to -- I mean, it's not a far commute, it's not a far -- Hampton to Norfolk isn't that big of a -- geographically, but why were you interested in making the leap from Hampton to Norfolk?

A. The issues that I -- I could see that the city was dealing with at the time were issues that I -- I felt like I could positively impact.

Q. Okay. All right. And I know we went through your career. When you first became a police officer, did you have to undergo training to become a police officer?

A. I did.

Q. And is that -- can you describe that training for me?

A. I can describe it for you. It's -- at that time, it was probably five months. Now it's longer. But at that time, five months covering all of the things that you would need to know to be a police officer:

The law, the constitution, use-of-force, patrolling, patrol tactics.

Q. Okay. And I want to get into that a little bit. But it also made me realize that while we've talked a lot about your professional career, we haven't really talked about your educational experience.

So what's the highest level of education you've completed?

A. I have a bachelor's degree.

Q. Okay. And where did you get the bachelor's from?

A. Penn State University.

Q. Okay. And what was the bachelors in?

A. Organizational leadership.

Q. Okay. Organizational leadership. And why did you decide -- well, let me ask this: When did you get that degree from Penn State?

A. I finished my degree somewhere in 2018, as an adult. Somewhere around that age.

Q. Okay. So you've been in your career -- by the time you got your degree, you've been in your career close to 25 years?

A. Yes.

Q. All right. And what was the -- so why did you get -- why did you decide to do a degree in organization -- I take it you said, "organizational leadership"?

A. Yes.

Q. Yeah. What was the -- why -- why did you pick that major to pursue?

A. Well, very candidly, I knew that if I was going to take over a larger police department, I wouldn't be able to be a competitive candidate without some sort of degree that made sense to the city in question.

Q. Okay. And as -- I don't know police departments very well, but I -- it sounds, then, that a degree like organizational leadership is an attractive degree or credential for a police department; is that right?

A. I can say I'm an attractive candidate. I've got all the jobs I tried to get, so I guess so.

Case 2:24-cv-00621-MSD-RJK    Document 179-10    Filed 11/20/25    Page 9 of 59
PageID# 4813
Confidential

Transcript of Chief Mark Talbot
Conducted on July 23, 2025

7 (25 to 28)

Q. Very good. So when you were getting that degree, did you take any classes on technology?

A. **Not that I recall.**

Q. Okay. I -- I have a small aside. So I don't really understand what organizational leadership is.

I mean, I understand, like, the concept, broadly, right, but I don't -- so like, what are the -- what kind of, like, courses or particular skills are you picking up in an organizational leadership degree?

A. **Yeah. I -- I asked myself that question for a good part of my -- my educational life.**

**The courses are -- are generally related to some aspect of leadership management and administration.**

Q. Okay. All right. And is it designed to be -- it's designed so that you can run organizations; correct?

A. **Yes.**

Q. Okay. Now, I know -- whether -- and here I'm just -- I'm not to talking necessarily about the BA or your time at the police -- training to be a police officer, but I just want to -- I have a few questions.

Did you take any classes on, like, criminal procedure?

A. **I don't believe so. I'm sorry. I need to clarify.**

**You're saying outside of the police department's --**

Q. No, no, no. And thank you for -- thank you for asking that clarifying question.

No, I meant like whether during the time you were training to be a police officer or the time you were over at Penn State, did you happen to take any classes or any courses -- did you have any exposure to the subject matter of criminal -- criminal procedure?

A. **Yes.**

Q. Okay. And I think you mentioned this, but did you take any courses or were exposed to any material on the Fourth Amendment?

A. **Yes.**

Q. Okay. And obviously, you've been a chief -- a chief, deputy chief, for years now, so just let me ask, what's your understanding of what probable cause is?

ATTORNEY KRAVIS: Objection. Calls for a legal conclusion.

BY ATTORNEY FROMMER:

Q. Please go ahead and answer.

A. **Probable cause would be facts and circumstances that would lead a reasonable person to believe that a crime has been committed.**

Q. That's almost -- that's a pitch-perfect definition of probable cause, like -- all right. And -- so thank you for that.

I have a question. Can you explain to me what your understanding of what reasonable suspicion is?

ATTORNEY KRAVIS: Objection. Calls for a legal conclusion.

Go ahead.

THE WITNESS: Reasonable suspicion is a reasonable belief that criminal activity is afoot.

BY ATTORNEY FROMMER:

Q. And just as a general matter, how do those two standards compare to one another? Is probable cause a higher standard or a lower standard than reasonable suspicion?

ATTORNEY KRAVIS: Objection. Calls for a legal conclusion. Also vague.

Go ahead.

THE WITNESS: Probable cause is a higher standard than reasonable suspicion.

BY ATTORNEY FROMMER:

Q. Okay. And so I understand you had all this -- all this in your courses. I want to talk a little bit about your actual work as a police officer.

And the first thing is, did -- as a police officer, have you ever applied for a warrant?

A. **Yes.**

Q. Does -- have you ever applied for a search warrant, specifically?

A. **Yes.**

Q. And have you ever applied for an arrest

warrant?

A. Yes.

Q. How many times would you say you've applied for -- let's take them separately -- an arrest warrant?

A. 100 times.

Q. Okay. Yeah. And I'm not asking you for a precise number. I know that would be almost impossible at this point, so I'm just trying to get a range.

And how many times do you believe you -- you believe you have applied for a search warrant?

A. Maybe 25 times.

Q. Okay. And how did you learn how to apply for those warrants? Was it at the police academy or somewhere else?

A. There's some training at the police academy and then there's training with your field training officer. And then as a -- as an incumbent police officer, you would receive training from senior officers or supervisors or detectives.

Q. Okay. So it sounds like there's some training that happens at the schooling -- at the school -- at the academy level, but then there's more training that happens at -- or on-the-job training.

Is that a fair way to describe it?

A. That is fair.

Q. And you noted that -- it sounded like there are also just within the -- even the -- with on-the-job training, there were a couple -- couple of different levels of training involved.

Am I wrong -- am I incorrect about that?

A. You are correct.

Q. Okay. Can you break those out for me just a little bit more, because I really don't understand the difference?

A. I don't know that the distinctions are -- make much of a difference. It -- it would simply be who is the individual doing the training.

Q. Okay.

A. The content of the training would be essentially the same.

Q. Okay. So it's the same substantive

material, it's just who is delivering the -- the -- the instruction?

A. Yes.

Q. Okay. I got you.

So we've talked about you getting warrants in your long career as a police officer, but let's talk about something a little bit different.

When you were a police officer, during those -- during those years, did you ever physically survey somebody -- surveil somebody?

A. Many times.

Q. And how -- would that be, like, a stakeout?

A. I've never heard a police officer call it a stakeout, but --

Q. Okay.

A. But I believe -- I believe that we're talking about the same thing.

Q. Well, we'll just use the terms that you all actually use instead of the layman's terms. So could you describe to me, you said you've physically surveiled people, I think you said "a number of times."

Can you describe to me, generally, what that would entail?

A. It generally would entail being at a particular location that is concealed from your point of observation, and you are either watching a particular location for some sort of action to occur, or you could be watching an individual or evidence that an individual was -- was at some discreet location.

Q. Okay. And it sounded like you -- you did that a number of times over your career. Is that fair to say?

A. Many times.

Q. What's the longest -- what's the longest amount of time that you spent on a -- I won't call it a "stakeout" -- on a clandestine physical surveilment of someone else?

A. Probably 12 hours or so.

Q. 12 hours? Okay. Have you ever had any that went over multiple days?

A. Well, I've never done it over multiple

days, but I've -- I've certainly oversaw teams of people that are doing surveillance over multiple days.

Q. That -- okay. I -- yes, I didn't think you would be sitting there for an entire week by yourself, but I was wondering, like, have you ever -- and thank you for that.

Are there situations where you oversaw teams that did physical surveilment -- surveying that lasted multiple days?

A. Yes.

Q. Okay. And the -- is that a resource-intense operation?

A. Very much so.

Q. Can you describe to me why?

A. So if -- if you're willing to put the resources into surveilling someone over multiple days, typically, you are watching more than one point that the physical limitations of seeing around objects means that you have to have multiple sworn officers viewing the location or the subject or what have you from multiple vantage points.

Which means that you have to have the logistical capability of getting those folks in and out without being seen.

Depending on the level of risk that is in the environment, you might need a more heavily-armed backup team. So it's -- there's -- there's a lot of moving parts to it.

Q. So is it -- would a multiday stakeout like the one you just described -- sorry -- clandestine surveilment operation --

A. Got it.

Q. Would a multiday operation, like the one you described, be a common occurrence?

A. I'm not -- I don't know what level of precision you're attaching to -- to common.

It wouldn't be uncommon. It would happen a few times a year depending on which organization, you know, the size of the organization and the scope of criminal activity in that particular municipality.

Q. So is it fair to say that a multiday operation, like the one we described, would tend to be reserved for larger criminal organizations or large -- or larger, more serious criminal activity?

A. It would be much more likely to occur with serious criminal activity.

Q. Okay. And is that because of sort of the resource allocation -- that this type requires a lot more resources to do a multiday operation like the one we're describing?

A. Yes.

Q. Okay. Okay. We talked about the clandestine surveilment. But let's get you on the move.

Have you ever tailed someone?

A. Yes.

Q. Okay. Can you -- can you explain that? Like, how -- I just don't know how that works. Can you explain to me, like, give me an example of when you tailed someone?

A. So I've had -- I spent a number of years working in vice and narcotics as -- as a commander, and so we would have, typically, drug organizations and we need to find out where the stash house is.

A stash house would be the location where they're hiding their drugs. Finding out where the stash house is would often involve following a member of the drug organization in some fashion that they're unaware that we're following them.

And you would stay close enough that you could see exactly where they went, but not so close that they knew a police officer or somebody in law enforcement was following them.

And you would do so until either you were no longer able to see their movements or they ultimately ended their journey.

Q. They got to their destination?

A. Yes. Or got to a destination.

Q. That sounds very challenging, what you're describing. Was it difficult to tail someone so that you could be able to keep track of their whereabouts, but at the same time evade detection on your own?

A. I mean, I think challenge -- challenging is -- is relative to skill. So, no, it's not -- it's not really challenging. Most people are

thoroughly oblivious of their surroundings, you know, so you -- you don't have to do too much.

Q. I see. You're saying most of the drug -- people you are tailing weren't exactly the most observant of individuals?

A. Usually, they were not the most observant of individuals.

Q. What -- what is like the longest period of time -- single time -- that you tailed someone?

A. Maybe a few hours, three, four hours.

Q. Okay. And do they usually -- does tailing someone usually take that long or is that one an outlier?

A. That was an outlier and it was following somebody from one city at another.

Q. Oh, okay. All right. And -- but most of the time -- on average, your run-of-the-mill tailing, how long would that usually take in terms of time?

A. It's really hard to say "run of the mill," but maybe around 30 minutes to an hour.

Q. Okay. All right. Did you ever have a situation where you were tailing someone in conjunction with other vehicles? I've watched too much TV. I remember all the things where car one will be -- will pull off so that car two can continue the lead.

And I'm just wondering. Is that something that's ever -- that you've ever done?

A. Many times.

Q. Okay. So the police will sometimes coordinate patrol vehicles to maintain a tail for longer than a single vehicle could?

A. Yes, that -- that happens.

Q. Okay. And so that would require coordination between the officers and dispatch, I would assume?

A. Not necessarily dispatch.

Q. Okay. But between officers?

A. And I would say dispatch rarely would dispatch be involved in -- when you're tailing someone.

Q. Okay. I think I understand why. Now -- and we'll talk about -- we'll talk about Flock later

in this.

But I just want to find out -- we talked about, you know, surveying, we talked about tailing.

Have you ever used or accessed location data in your career, as part of an investigation?

ATTORNEY KRAVIS: Objection. Vague. Go ahead.

THE WITNESS: Yes, I have.

BY ATTORNEY FROMMER:

Q. Okay. What kinds of location information have you accessed in your career?

A. Cell phone.

Q. By that, you mean cell site location information?

A. Yes.

Q. Okay. Have you ever -- and I want to ask a couple questions about that.

Have you ever, like, affixed a GPS monitor to a vehicle or anything like that?

A. I have.

Q. Okay. Is there other than in the --any other source of --

THE REPORTER: I'm sorry, Mr. Frommer. You were breaking up pretty severely. We couldn't make out your question.

BY ATTORNEY FROMMER:

Q. Okay. Oh. I said other than the CSLI, is there any other location data that you've accessed in your career?

A. Not that I recall.

Q. Okay. Let me ask you some questions about CSLI. How many times do you think you've acquired or accessed CSLI as part of an investigation?

A. Just as a point of clarification, if you would, I've been a police officer for 31 years and I've been the number one or number two person in the organization more than half of that time.

Q. Okay.

A. So when I say I've done it --

Q. Yeah.

A. It's -- it's not precisely true. It's not precisely true. I've been in the chain of command with many of the things that I'm that -- I'm referring to.

Q. Okay. All right. So like -- well, let me go back just to clean up to make sure we have a common understanding.

So when we were talking about the things that are not stakeouts, the physical surveillance, have -- did you physically survey people yourself?

**A. Yes, so the surveillance, the tailing, I've done those things in my career.**

Q. Okay.

**A. I've never accessed anybody's location information, directly.**

Q. I see. Was it an officer or an investigator who was working underneath you who wanted to get that location information and then you were part of the process?

**A. Yes, sir.**

Q. Okay. And when was that, approximately?

Actually, strike that because a better question to start with is: How many times did that happen?

**A. Dozens of times. I would imagine 100 times.**

Q. Okay. And not holding you to this precisely, but can you give me, like, a date range or what years from this year to this year these CSLI acquisitions were happening?

**A. So approximately, I'd say late iPhone era 2009, 2010, up until now.**

Q. Okay. All right. So you've been involved in a good number of them over many, many years?

**A. Yes, sir.**

Q. And are these usually being done for the purpose of criminal investigation?

**A. Yes.**

Q. Okay. Did you find that the CSLI data your -- your investigators acquired, was it useful in those investigations?

ATTORNEY KRAVIS: Objection. Vague.

Go ahead.

THE WITNESS: It was useful, for the most part.

BY ATTORNEY FROMMER:

Q. Okay. And did you ever, like, actually review the CSLI data that came -- that your

investigators got yourself, did you ever look at it?

**A. Yes.**

Q. Okay. What did -- what did that data show?

ATTORNEY KRAVIS: Objection. Vague.

Go ahead.

THE WITNESS: The data shows, to some degree of accuracy, the location of a cell phone.

BY ATTORNEY FROMMER:

Q. Okay. And you said "a degree of accuracy"?

**A. Yes.**

Q. So it's not a precise? It's not saying it's here to this very inch? It's more of, like, it gives a range?

**A. Not only does it give a range, it also might give information that is completely inaccurate.**

Q. Oh. Okay. All right.

And after -- with the CSLI, has -- have your -- I understand it's probably not you, personally, but have your people -- investigators

applied for search warrants for CSLI?

**A. Yes.**

Q. Did the -- now, before the Carpenter decision -- do you know what I'm talking about when I say "the Carpenter decision," by the way?

**A. I do not.**

Q. Okay. It was a Supreme Court decision that said that you need to get a warrant for CSLI, and that happened about 2018.

And I'm wondering before that -- before 2017, did your investigators ever go apply for a warrant for CSLI?

**A. I don't remember.**

Q. Okay. You just don't remember one way or another?

**A. I don't.**

Q. Okay. That's totally fine.

Now, I know you said that you've been, basically, in a supervisory role for over half of your career, so I'm guessing the answer to some of these questions is going to be no, but I'm going to ask them, anyway.

Throughout your career, did you ever use license plate readers in your day-to-day job?

A. No.

Q. Okay. Is that just because you were already in sort of a supervisory role by the time that technology came out?

A. Yes, sir. I've been in a supervisory role since 2001.

Q. Yeah. That would -- have you -- have your departments that you've either been the deputy chief or the chief for have -- and I'm not talking about Norfolk right now. I'm leaving all that to the side.

Have they used license plate readers in their day-to-day job?

A. Yes.

Q. Okay. And did you -- at those -- in those departments, did you develop policies and procedures for how those license plate readers were supposed to be used?

A. Yes.

Q. Okay. And what kind of -- if I can ask, what kind of license plate readers are we talking about here?

Are they the fixed kind or the ones that are mounted on cars?

A. Both.

Q. Oh, both. Okay. So let me just go back real quick.

So in -- what did I have -- so with the -- okay. So in Norris -- so Norristown -- before you were at Norristown, you were at Reading; is that correct?

A. Yes, sir.

Q. All right. So at Reading did you use license plate readers?

A. I don't believe so.

Q. Okay. Either fixed or mounted -- or fixed or vehicle mounted?

A. I don't believe so. I don't recall when the technology first came about, but I don't recall using it at that point in my career.

Q. Okay. How about when you jump -- went over to Norristown to become the P -- the PD there?

A. Yes.

Q. Okay. And what were those kinds of -- what were those kinds of LPRs?

A. They were mounted on vehicles.

Q. Okay.

A. And then there were a couple of stationary LPRs in -- in the community.

Q. Okay. And when you were at Norristown, did you develop policies and procedures for how the -- how the department was supposed to use these LPRs?

A. Yes.

Q. Okay. And actually, let me jump -- talk a little bit about Hampton.

Okay. So in 2021, you said that you had come to Hampton. Did they have -- did you have any issues with license plate readers there?

A. Did I have any --

Q. Sorry. That was a -- that was a bad question. I apologize. Let me ask:

When you moved to Hampton, did you -- does -- did the Hampton PD, when you became chief, was it using license plate readers?

A. Yes, sir.

Q. What kind of license plate readers was it using?

A. Both Flock and a few vehicles had license plate readers attached to them.

Q. Okay. So both mobile and fixed LPRs; correct?

A. Yes, sir.

Q. Okay. Did you develop any policies or procedures when you were in -- you were chief of the Hampton PD governing how your officers should use those technologies?

A. I did not.

Q. Did anyone in your department do -- create those or administer policies and procedures regarding the use of LPRs?

A. Yes, sir.

Q. Who -- who did that?

A. I don't know. That was in place when I got there.

Q. Do you remember? Like, was it -- was it a

49

captain that was in charge of that?

A. I don't -- I don't know who developed the policy.

Q. Do you -- who -- were there people who were responsible for administering the policy on a day-to-day basis to make sure it was actually followed?

A. Yes.

Q. Okay. And who were those people?

A. Everybody in a supervisory capacity.

Q. Okay. But was there any identified, like, single person who you were responsible for ensuring that the department's use of LPR complies with policy?

A. No.

Q. Okay. All right.

ATTORNEY FROMMER: Okay. Well, we've been going about an hour. Why don't we take just a -- a short five-minute break, and we'll come on back.

ATTORNEY KRAVIS: Okay.

THE VIDEOGRAPHER: All right. We're going off the record. The time on the monitor is 10:25.

50

(A recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time on the monitor is 10:31.

BY ATTORNEY FROMMER:

Q. All right. Thank you, Chief, for bearing with me during that small break.

I had a very -- a quick question about -- well, just police work, generally.

And I'm wondering if -- if there's been in any way, either, like, you as a patrol officer or -- or maybe you supervised this person, are you aware of people who would -- police officials who would sort of keep tabs on people who were in gangs, running drugs, or other high-value targets?

ATTORNEY KRAVIS: Objection. Vague.

THE WITNESS: Could you please tell me how you're using the phrase, "keep tabs on"?

BY ATTORNEY FROMMER:

Q. Sure. I'm wondering if there are ever -- if there have ever -- if you've ever been aware of situations where you or your officers have identified a particularly high-value target,

51

high-value suspect, and you make a concert -- and you or the officers make a concerted effort to keep track of the location of that person?

ATTORNEY KRAVIS: Objection. Vague.

Go ahead.

THE WITNESS: So given how you asked the question, it's hard for me to respond. I don't -- I don't speak in terms of high-value targets. There certainly are offenders that I've have had in various cities that have frequently engaged in criminal behavior.

And as part of policing those cities, somebody would be responsible to find ways to reduce that person's offending.

Reducing their offending might involve being conscious of where they live, where they -- where their girlfriend lives, where they drink.

So I -- I don't know if that is responsive to your question.

BY ATTORNEY FROMMER:

Q. I think it is. And I'm wondering, like, yeah, where you keep track of their locations --

52

well, how does keeping -- keeping track of those locations, like you mentioned, where the girlfriend is, where they drink, et cetera.

How does that help reduce their reoffending?

A. So the -- the way that I talk about it is thinking back from the result that we're trying to produce. If we have a particular high-rate offender, we want to -- the actual full version of what we're trying to do is -- is keep that person from killing someone, getting killed. We want to do that with them.

And since many of violent crimes involve social networks, that's true for their friends, as well.

Q. Okay.

A. So it's -- it's developing the path back from reducing their offending and victimization to a set of action steps or a strategy.

Q. Okay. That makes sense. I think I understand.

So it -- by knowing, like, the places

they're likely to frequently visit, places they're likely to go, it helps you sort of -- helps make sure that -- or it helps minimize the chances of additional criminality or them being victims of crime.

Is that fair?

A. No. It's -- no -- no -- no, I don't -- I don't -- yeah, it's certainly fair. There are lots of things that we're trying to do, including understanding who they are and what vulnerabilities they are bringing into their life that can either be used to change their behavior or to incapacitate them in some way so that they no longer stand to victimize others.

Q. Okay. And knowing, you know, the places they visit, the places they go, that is part of helping to accomplish that; correct?

Is that correct?

A. Sure.

Q. Okay. Yeah. Because obviously, you need to know -- if you know where they're going, you know who they're meeting with and that can give you

information about either potential crimes they might be undertaking or they -- how they might be a potential victim of a crime?

A. Correct.

Q. Okay. All right. Thank you for that.

Let me -- so now we've talked about your past. We've talked about your past career all the way up to Hampton. And now you've come over to the city of Norfolk. And I believe you said that was in April -- I think you said April 24th, 2023.

Is that accurate?

A. Yes, it is.

Q. Okay. And before we start getting into, like, sort of the nitty-gritty of things, can you just sort of explain to me at high level, and I know this is going to sound vague, but can you explain, what are your primary responsibilities as a chief for the Norfolk Police Department?

A. I'm responsible for achieving the mission of the Norfolk Police Department, which involves leading, managing, administering the organization. It involves strategy, tactics, adherence

to policies and procedures, making sure that the organization is disciplined and functioning. Morale and motivation. I can talk a long time --

Q. Yeah.

A. -- about that.

Q. I'm sure. You have to be the leader of an organization. Basically, you have a degree in that.

It does sound like there's -- now, how many -- now, the Norfolk PD, is it larger than the previous police departments you've been a chief for?

A. It is.

Q. How many -- how many -- let me go back. I think in Hampton you said there are about 140,000 citizens.

Do you know what the population of Norfolk is, by chance?

A. 244,000, give or take --

Q. Okay.

A. -- 1,000 or so.

Q. And how does the size of the Norfolk Police Department compare to, let's say, the Hampton Police Department?

A. It's approximately double the size.

Q. Okay. And how about as compared to Norristown?

A. It's -- it's about ten times the size.

Q. Okay. So much bigger. Much bigger?

A. Much bigger, yes.

Q. And so you said that -- you gave me a number of different areas of responsibility and one of the things you mentioned is you have to make sure the -- the department adheres to policies and procedures.

So that's -- did I hear that correctly?

A. That's correct.

Q. Okay. So as chief, do you have the final authority over, like, department-wide policies?

A. Yes, I do.

Q. Okay. So if you think a policy isn't working correctly, you can change that policy; is that correct?

A. Yes, sir.

Q. And, similarly, if you think you have a good policy but it's not being enforced

57

sufficiently, you can take action to make sure that's happening, as well; correct?

A. Yes, I can.

Q. Okay. And I had -- I -- how many -- how many different policies does -- do you have to -- does the Norfolk Police Department have?

I mean, I understand it's a difficult question, but I'm trying to get a sense of how many of these things you have to actually keep your hands on, or at least oversight over?

A. I don't know. I don't know the number. There are a lot, a couple hundred, probably.

Q. A couple hundred. Yeah. I was going to say, is it in the dozens, but a couple hundred sounds --

So are you -- so as chief, you would do -- would you also have final authority over, like, what technology the Norfolk Police Department acquires and uses?

A. Yes.

Q. Okay. And obviously, as the chief, you are the manager -- well, not the manager. You're

58

the chief of the entire organization.

So can you tell me how you interface with the different units within the department?

A. Can you -- I mean, how are you using the term "interface"?

Q. Sure. What I'm wondering is, so how -- when -- I know there's a number of different departments or units within the Norfolk Police Department.

And I'm wondering. Do you communicate directly with those units, or does it go through your assistant chiefs of police?

That's what I'm trying to understand.

A. Yes, sir. So I have a -- as I said, I've been an executive a long time, so I have a pretty elaborate management process.

Mondays I have executive briefings with my deputy chief and assistant chiefs. They're -- they are the chiefs of different -- of the different bureaus in the organization. So I meet with those folks Monday, Tuesday, and Wednesday mornings.

On Thursdays I meet with every ranking

59

officer in the organization for a longer CompStat meeting.

Every other Wednesday, including my senior executive team, I meet with all of the executives, so those of the rank of captain and above.

There's some other things that go on, but that's -- those are the routine leadership and management conversations I have.

Q. Okay. So, for instance, like, with -- like, The Realtime Crime Center, would -- if -- would you communicate -- I'm trying to figure out how communication would flow between you and, I don't know, let's say, Captain Thomas in -- in the RTCC?

Like, would you just reach out to him directly or would that go through an assistant or deputy chief of police?

A. Both would happen.

Q. Oh. Both would happen?

A. Yes.

Q. Which one is more common, would you say?

A. Neither is more common. They are -- they

60

are equally likely to happen.

Q. Okay. So there have been times where you've just called up Captain Thomas and said, "I want to talk to you about something"?

A. Yes, sir.

Q. Okay. All right. And then there are other times, maybe, where you direct either a deputy or assistant chief to have that conversation; is that correct?

A. Correct.

Q. Okay. I think I got it.

And I was talking about, like, information going down from you to the units. I'm wondering, how often are you briefed, and maybe it's at these same meetings that you were just describing -- how often are you briefed about what's happening in each of the particular bureaus?

A. Briefing -- excuse me. Briefing occurs in those meetings that I described. That would be the most frequent instance of that. And then other times, I'm speaking to Captain Thomas, directly.

Q. Okay. All right. All right. And how

**61**

often would you say you're briefed on the operations of The Realtime Crime Center, for instance?

A. Anywhere from weekly to once a month. A lot -- I'm sorry.

Q. No, sorry. I interrupted you. I apologize.

Does that depend -- does the frequency of those -- of that briefing turn on what's happening in The Realtime Crime Center?

A. It turns on either what's happening in The Realtime Crime Center or where my focus lies at any point in time.

Q. Okay. All right. Now, I meant -- and so you said you have these briefings. Are these briefings usually with, like, deputy chiefs and assistant chiefs?

A. As I described, they -- Monday, Tuesdays, Wednesdays are the deputies and assistants, and then every other week the captains turn in on Wednesdays, and then Thursdays, everybody.

Q. Okay. All right.

A. I give them Friday off.

**62**

Q. That's very nice of you.

A. Yes, it is.

Q. So the meetings you have with the deputies and assistants happen on certain days and then, like, if you have a meeting with Captain Thomas, for instance, that would happen on Wednesday, it sounds like?

A. Wednesday or Thursday.

Q. Wednesday or Thursday. Okay.

All right. Jumping just a little bit, here, but not to anywhere we -- because we already talked about this.

You mentioned when you were chief in Hampton that the Hampton PD had some Flock LPRs; is that correct?

A. Yes.

Q. Do you know, approximately, how many LPRs Hampton had?

A. I don't remember.

Q. Okay. That's fine.

All right. So you were already -- by the time you became chief of police for Norfolk, you

**63**

were already familiar with Flock license plate readers; is that correct?

A. Yes, sir.

Q. Okay. Do you know when, approximately, Hampton acquired its Flock LPRs?

A. No, I do not.

Q. Okay. Were you involved in them -- in Hampton getting the LPRs?

A. No, I wasn't.

Q. Oh, okay.

All right. So I understand you're familiar with what -- with the Flock Safety ALPR system.

Could you just provide -- and just in your own words -- what are Flock LPR cameras?

A. They are stationary license plate readers designed to capture registration information from vehicles that travel within their field of view.

Q. Okay. And so your understanding is that it takes an image of a car that's passing by so as to capture its license plate and other identifying information; is that accurate?

**64**

A. That's not how I described it.

Q. Okay. What's the -- then what -- maybe I'm -- I'm not fully understanding.

So can you explain to me what's the difference between what you said and what I said?

A. You used different words than I used. My definition is it's a stationary license plate reader that will capture registration information from vehicles that drive within its purview.

Q. Okay. And by "registration information," do you mean the license plate or something else?

A. Also known as the license plate.

Q. Okay. All right. There we go. I think I found the -- the root of our -- of my confusion.

And then once that camera takes that picture, what does it do with it?

ATTORNEY KRAVIS: Objection. Vague. Go ahead.

THE WITNESS: I -- I have no idea what the camera does with it.

BY ATTORNEY FROMMER:

Q. Okay. So does the camera -- do you know

65

if the camera just stores that image locally just on the camera and -- is that -- is that how it operates?

A. I don't know what the camera does beyond what I described. I -- I feel like I might be having a hard time understanding your question.

Q. Well, I am trying to figure out, like, okay, you said the camera takes a picture, takes a picture of the registration information of the vehicle that passes within its purview.

And then I'm wondering what happens to that image subsequent to the -- to the taking of the picture.

A. The limits of my understanding of the technology stop there. I can tell you that the registration information then becomes available to us.

I don't know how -- I don't know the magic that -- that happens between device and information on a computer screen or printed out on a piece of paper.

Q. Okay.

66

A. But it becomes available somehow.

Q. Okay. So let me make sure we're on the same page just so that -- so -- and I understand not understanding the techno mechanics of all the -- all the stuff in the middle.

But your understanding is the LPR takes an image of the registration information and then through whatever technological means, the Norfolk Police Department then have a record stating that this particular -- a vehicle with this registration information was seen at this particular place at this particular time.

Is it -- is that your understanding, as well?

A. No.

Q. What was that?

A. I said no.

Q. Okay. Then what is your understanding?

A. So if you substitute "has a record" for "has access to a record," I would agree with you.

Q. Okay. So if the camera takes an image and then, through whatever techno wizardry, it ends up

67

being that the information contained in that image becomes information -- a record that's accessible to the Norfolk Police Department.

Is that -- are we on the same page now?

A. Yes, sir. I believe so.

Q. Okay. And do you agree that that information would contain the time the image was taken?

A. I don't know for sure.

Q. Okay. Would it include the -- the location where the picture was taken, maybe in terms of longitude and latitude?

A. It would include the location information.

Q. Okay. Do you know what other information, if any, would be included in that record you could access?

A. I do not know.

Q. Okay. Do you know if the record would contain any other descriptions or features about the vehicle, perhaps its color or any identifying marks on the vehicle?

A. I do not know.

68

Q. Okay. Do you know the particular model of Flock camera that is used by the Norfolk Police Department?

A. No, sir.

Q. Okay. And so, like, when you -- you said you became chief in April of 2023. Then -- the police department had already contracted with Flock prior to you becoming chief; is that correct?

A. Yes, sir.

Q. Okay. And can you explain to me, and I understand it wasn't your decision, but why do you understand the Norfolk Police Department to have decided to start using Flock cameras?

ATTORNEY KRAVIS: Objection. Lack of foundation.

Go ahead.

THE WITNESS: I've never asked why they decided to acquire the technology.

BY ATTORNEY FROMMER:

Q. Let me step back and ask you it slightly differently because you noted that you -- that there were Flock cameras in Hampton when you were there.

Did you get -- as chief in Hampton, did you gather -- what were your views about the efficacy or usefulness of the Flock cameras that the Hampton PD employed?

ATTORNEY KRAVIS: Objection. Vague. Go ahead.

THE WITNESS: Where are they now? What are my views now? Is that your question, sir?

BY ATTORNEY FROMMER:

Q. No, no. I'm saying when you were chief of police for Hampton before you came over, you know, and you had these Flock cameras as part of the police department's technology, what I'm really asking is what did you think of them?

Specifically, did you think that they were effective?

ATTORNEY KRAVIS: Objection. Vague. Go ahead.

THE WITNESS: I didn't know whether they were effective or not.

BY ATTORNEY FROMMER:

Q. Well, why -- well, why not?

A. **Effective -- the term "effective," as it relates to my responsibilities, are about whether or not the device contributed to crime reduction and/or quality-of-life improvements.**

**It is difficult, if not impossible, to separate a particular piece of technology and determine what is that piece of technology's contribution to your crime reduction efforts, if it's contributing, how much of a contribution is it.**

**Are you accurate in your assessment that that particular piece of technology is what's driving behavior in a particular way, or is there some other factor that you're not thinking of.**

**So to assess with any degree of precision, does a particular intervention or piece of technology work, the person who says that it works is almost certainly wrong in terms of their actual understanding or they -- it might be worse than wrong.**

Q. Okay. And I -- I appreciate that. It sounds -- and it seems to me that you're saying, and I'm -- you don't have to agree with me -- that,

essentially, when you have multiple variables, an incredible number of variables, it's almost impossible to identify one single variable and say, yes, this is making the difference?

A. **Yes, sir.**

Q. Okay. In your view -- was that your general view when you were the chief of Hampton?

A. **I do my business very thoughtfully. It's how I look at the world.**

Q. Okay. That makes sense.

I'm just trying to determine if what we just discussed here, the back-and-forth, the multivariable thing, was that your view back then when you were in Hampton or is that your view now or -- or both?

A. **I've -- it's been my view about crime and crime reduction for 20 years.**

Q. Okay. So you're saying that -- that given all your training and experience as a -- as a law enforcement officer, it's very difficult, if not impossible, to pick out one piece and say, "This is making the difference"?

A. **Correct.**

Q. Okay. I appreciate that.

Would -- would you say that -- that the Flock cameras, the Flock LPRs, can act as some kind of force multiplier?

ATTORNEY KRAVIS: Objection. Vague.

THE WITNESS: Can you please restate your question? I'm not sure on it.

BY ATTORNEY FROMMER:

Q. Sure. I'm just wondering. We were talking about the efficacy and whether it's more effective, but I'm asking a slightly different question, which is:

Do you think that the Flock cameras -- the Flock LPRs can act as a force multiplier, in the sense of being able to have more presence in more locations than you could otherwise?

ATTORNEY KRAVIS: Objection. Vague. Go ahead.

THE WITNESS: No.

BY ATTORNEY FROMMER:

Q. Okay. So have you heard other people ever

describe these Flock cameras, these LPRs, as a force multiplier even if you wouldn't use the term yourself?

A. No. I don't think I've -- not that I recall.

Q. Okay. And I think you said at the beginning of our conversation here about you being chief, that you are sort of in charge of the policies and procedures at the Norfolk Police Department; is that right?

A. Yes, sir.

Q. Okay. And so ultimately, the written policies that would govern the use of the Falcon LPR system, those policies -- you would have final authority on those policies; is that right?

A. Yes, it is.

Q. Okay. And, likewise, you would have final authority on making sure that those policies are being observed and enforced; correct?

A. Yes.

Q. Now, are you -- were you personally involved in approving policies regarding how technology is used, particularly the Flock cameras?

A. Can you explain what you mean by "personally involved," please?

Q. Yes. Yes. It was -- what I'm trying to figure out is -- okay. So there's a policy about Flock LPRs.

Are you personally involved in the adoption of that policy?

ATTORNEY KRAVIS: Objection. Vague.

THE WITNESS: In my professional role as chief of police, the policy requires my signature before it becomes valid.

BY ATTORNEY FROMMER:

Q. Okay. So you have final approval on the policy, and it cannot become an active policy until you give it your blessing; is that correct?

A. If the end of the process results in my signature.

Q. Okay. Let me -- well, let's -- let's step back. I get that. I get that at the end of the day it's your signature that makes the thing become the policy?

A. Correct.

Q. Do you draft the policies?

A. No.

Q. Have there ever been any policies at Norfolk Police Department that you personally drafted?

A. No.

Q. Okay. Do you edit the policies?

A. Sometimes.

Q. Okay. And you have done that at -- in your capacity as chief of Norfolk police? You've edited policies that have come to you?

A. I have.

Q. Can you give me an example of one of a situation like that?

A. I can't recall, specifically, which policy.

Q. Okay. When you're editing them, is it just -- are you just marking it up and saying "change this, change that, I don't like this," or is it like line edits where you're actually changing the language of the policy, yourself?

A. It can be either of those things.

Q. Okay. And before you sign the policy, or before you sign a proposed policy and make it come alive, do you read through those policies to make sure they're what you expect?

A. Yes, I do.

Q. Okay. So I understand that you are -- you don't have primary drafting duties for all the policies of the Norfolk PD.

Who are -- in general, are the people that are drafting these proposed policies for your review?

A. It -- there are a number of people usually -- well, I'll say it depends on which policy you're referring to.

But it's a combination of the personnel that are in our personnel division, which is headed by a captain.

We would also use subject matter experts. Might be internal or external to the organization.

Q. So a wide variety of people, might be within the department, might not be. Okay.

And as chief -- as chief, are you aware of who within the -- who, within the Norfolk Police Department, has access to the Flock system?

**A. Are you referring to who has access to receive information from the Flock system?**

Q. Yeah -- well, let me -- let me step back, actually, because we -- and make sure we're -- all of our terms are -- we're agreeing about our terms.

So when I'm talking about the Flock system, I'm not just talking about the cameras that are mounted.

I'm talking about the software and -- on the -- and, you know, the web app, the back-end software that allows officials to get the location -- the -- those images -- that registration information we were talking about earlier.

So that's what I mean by the Flock system, the whole hardware and software suite.

Does that make sense?

**A. Yes.**

Q. Okay. So now that we have that clear, as chief, are you aware of who, within the Norfolk Police Department, has access to that Flock system?

**A. I don't know all of the people who may have access. I know who is ultimately responsible for that part of our organization, which would be Captain Thomas.**

Q. Okay. So Captain Thomas would be the person who would know who has access to the Flock system?

**A. Yes.**

Q. Okay. But sitting here right now, you don't -- you don't know that for certain?

**A. No, sir.**

Q. All right. I have to ask. Have you ever used the Flock system in your day -- yourself?

**A. No, I haven't.**

Q. Have you ever logged on?

**A. No, I have not.**

Q. Not even to take a peek?

**A. I have -- I got way too much to do. No.**

Q. Okay. So you -- you leave, you know, the -- the -- the interface and all that stuff to Captain Thomas and everyone else?

**A. They -- it's all theirs.**

Q. I totally understand that. Delegate, delegate, delegate.

All right. Now, I know that we -- we've talked about your timeline a bit. So I know that you -- well, let me just ask this:

Were you personally involved in the Norfolk PD's decision to make Flock a component of The Realtime Crime Center?

ATTORNEY KRAVIS: Objection. Vague. Assumes facts.

Go ahead.

THE WITNESS: No, I was not.

BY ATTORNEY FROMMER:

Q. Do you happen to know who was involved in that initial decision to acquire Flock?

**A. No. I -- I do not know.**

Q. Okay. And do you know anything about, like, when the NPD started -- first started looking into getting the Flock cameras?

**A. I know that it occurred before my arrival, but that's the extent of what I know about them.**

Q. Okay. Do you know? What are the reasons -- well, I want to talk about -- like, just your understanding as chief, what are, like, some of the primary reasons for using the Flock LPRs in the Flock system?

ATTORNEY KRAVIS: Objection. Vague.

Go ahead.

THE WITNESS: As a component of our efforts to reduce crime and -- and increase quality of life.

BY ATTORNEY FROMMER:

Q. Okay. And how do -- how do -- how do the Flock cameras and the Flock system help that?

**A. So Flock -- the Flock cameras are like the other technologies that we use. They are potential assets that can be positioned and operationalized in a way that accelerates our strategy.**

**So in our high-crime neighborhoods when we have a crime that occurs and we believe that a vehicle could have been used or was used in the -- in that particular crime, having a Flock camera close by will allow us to potentially identify a**

suspect vehicle and ideally apprehend a suspect.

Q.   Okay.  So is it fair to say that the Flock help -- cameras would help -- help in investigating a crime that's already occurred?

A.   They could.

Q.   Okay.  And in the situation you're describing here, if there's a Flock camera that captured the vehicle, that would give you information about the registration information of the vehicle; correct?

A.   I'm sorry.  I lost focus for a second. Can you restate it?

Q.   Totally fine.  It was a basic question. If the Flock camera captures a vehicle, then you have an image of the vehicle and hope -- and likely the registration information; correct?

A.   No.

Q.   No?

A.   The -- it works as I've described.  You would have the registration information that would give you additional detail to ultimately help apprehend a suspect.

Q.   But the -- but their registration information is coming from an image taken by the camera; correct?

A.   Yes, that's correct.

Q.   And then it's some sort of AI that reads the image and pulls out the registration information/license plate number?

ATTORNEY KRAVIS: Objection. Vague. Lack of foundation.

Go ahead.

THE WITNESS: I don't know where you drew AI.  I have no -- none of us really know, unless we are computer scientists.  I don't think any of us know what magic occurs inside those boxes.

But the process of using technology in our efforts to reduce crime is -- is like I described.

BY ATTORNEY FROMMER:

Q.   Okay.  So it takes an image -- and that's fair.  That's fair.  We talked previously about not getting into those techno middle steps, but we know the LPR takes an image.

Now you have registration information for

the vehicle that passed by, and is that an investigative lead at that point?

A.   I mean, I made up the whole scenario. So -- so with the hypothetical that is in question, if it was a suspect vehicle and we captured registration information, it may lead to an apprehension.

Q.   Okay.  And once you have that registration information, would you -- I understand you're not using the system, but would an NPD officer then be able to query the system to find other places where that -- a vehicle with that same registration information was identified?

ATTORNEY KRAVIS: Objection.  Vague. Incomplete hypothetical.  Calls for speculation.

Go ahead.

THE WITNESS:  So within the context of the hypothetical that I could answer your question, yes.

BY ATTORNEY FROMMER:

Q.   Okay.  And so an officer could set up an alert, for instance, if that car happened to drive past another Flock LPR; is that right?

A.   Again, I would say within the context of this hypothetical, yes, that -- that would be permissible.

Q.   Okay.  And they could -- that officer could also query the system to see retrospectively where that vehicle may have passed a Flock camera in the -- in the past, as well; is that correct?

A.   Yes.

Q.   And do you understand -- have you ever heard the term, "vehicle fingerprint"?

A.   No, I have not.

Q.   Okay.  And I'm -- well, we talked about AI.  You chided me for the AI a second ago.  I was about to ask you about machine learning.

A.   No.

Q.   Have you ever heard that phrase?

A.   I have.

Q.   One thing about the Flock system is that it allows you to share your Flock data with other jurisdictions; correct?

A.   That would be correct under certain circumstances.

Q. I think at Hampton Roads, right, had -- there's -- what? About six or seven cities down there.

So if Port Smith or Chesapeake had used Flock cameras, as well, is it your understanding that you'd be able to share data with one another?

A. **Within the confines of the law and our -- and our policy, yes, we would be able to do so.**

Q. Okay. All right. And do you find that sharing ability, do you think that's a useful feature of the system?

ATTORNEY KRAVIS: Objection. Vague.

Go ahead.

THE WITNESS: I don't think in terms of generally useful. I know we do it when it's permissible to do so.

BY ATTORNEY FROMMER:

Q. But there must be a reason you do it; right? Just because it's permitted -- I mean, there's lots of things that you might be permitted to do, but you wouldn't do them because they're a bad idea.

So if you are doing it, I'm wondering why does NPD think it's a good idea to do this?

A. **Well, I would say we would do this precisely because it's permitted. And it would be up to the Port Smith police chief to say why it's useful for -- for them.**

Q. Okay. But to your understanding, has the Norfolk PD entered into sharing agreements with other jurisdictions?

A. **Yes.**

Q. Okay. Do you know how many jurisdictions?

A. **No, sir.**

Q. Is it most of the -- in not all of the jurisdictions in the Hampton Roads area?

A. **I don't know.**

Q. Okay. All right. Okay.

ATTORNEY FROMMER: Let's just take a five-minute break, if that's okay. And thank you very much.

THE WITNESS: No problem.

THE VIDEOGRAPHER: We're going off the record. The time on the monitor is 11:21.

(A recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time on the monitor is 11:27.

BY ATTORNEY FROMMER:

Q. Thank you for the short break, Chief.

I just have -- I have a few questions about -- a little bit more about the NPD's Flock cameras.

And I'm wondering, do you know why the Norfolk Police Department decided on 172 cameras?

A. **No, I don't.**

Q. Do you know if the number of cameras that the police department was going to acquire changed over time?

A. **No, I don't know, sir.**

Q. Okay. Do you know why the Flock LPR cameras were placed in the particular locations they were placed?

A. **Yes, I do.**

Q. Okay. Can you explain to me? What's your understanding about what criteria were used in deciding where to place the cameras?

A. **My understanding is that the camera placement was based on crime conditions in the city and avenues of ingress and egress.**

Q. You mentioned avenues of ingress and egress. Why would those be important to cover with the Flock cameras?

A. **Those are the reasons that drove the decisions for camera placement. I don't know the why beneath that. I never inquired with either of those reasons.**

Q. Okay. So you said, I believe, and correct me if I'm wrong, that you had mentioned that some of the criteria, like, where there was violent crime, where the crime data supported placing cameras; is that accurate?

A. **Yes, it is.**

Q. Okay. And did traffic -- do you know if traffic volume, like, how many cars went past played any role in deciding where to sight the Flock cameras?

A. **I don't know.**

Q. Well, for instance, are you aware if they

89

-- if NPD tried to focus on major thoroughfares that would capture a lot of passing traffic?

A. I don't know if that's the case. That's not something that was ever relayed to me.

Q. Okay. So from your understanding, NPD sited these cameras based on crime data, I believe you said, and also for places of ingress and egress.

Is that accurate?

A. Yes, it is.

Q. All right. Are there any other criteria of which you're aware that sort of drove the sighting decision other than crime data and ingress, egress?

A. I'm not aware of any other.

Q. Okay. Do you know if the Norfolk PD, when they're deciding where to sight Norfolk's Flock cameras, did it take into account Flock cameras that were owned by other entities?

A. Can you --

Q. Yeah.

A. I don't understand what you mean, "take into account."

90

Q. Let me be a little more specific. Like, you know what the NRHA is; correct?

A. I do.

Q. Okay. Yeah, that's the Norfolk Redevelopment and Housing Authority; is that -- did I get that right?

A. Yes, sir.

Q. And are you aware that they had purchased a number of Flock cameras?

A. Yes, I'm aware.

Q. Okay. And I'm just wondering now -- hopefully I put a little more meat on the bones.

Now, do you know if NPD's decision about where to put NPD's cameras at all turned on the fact that NRHA had bought and placed their own 20 cameras?

A. I don't know if that's the case or not.

Q. Okay. You don't know if what I'm saying is accurate or you don't know whether NPD made -- whether NRHA purchasing those cameras affected NPD's decision?

A. I don't know if what you said is accurate

91

in terms of the number of cameras --

Q. Okay.

A. -- purchased by NRHA. And I also don't know if that was a part of the original factors that were considered when Norfolk decided to purchase Flock and where to place them.

Q. All right. Well, taking my -- my precision -- precise number of cameras aside, you don't have any understanding that NPD adjusted where it's cameras would be located based on NRHA or other entities buying their own cameras; is that correct?

A. That's correct.

Q. Okay. All right. Now, I want to shift gears just a little bit and talk -- we talked about this for just a few minutes before, about The Realtime Crime Center.

And can you describe to me, to the best of your understanding, what was the initial motivation by the Norfolk Police Department to establish The Realtime Crime Center?

A. I don't know.

Q. Okay. Well, let's say -- okay. How about

92

this? Rather than having you play mind reader for people in the past, why don't you tell me what function or what value does The Realtime Crime Center contribute to the mission of the Norfolk Police Department?

A. The Realtime Crime Center generally, like -- like other aspects of the organization, is meant to help us achieve our mission, given its resources, capability and technology.

And so The Realtime Crime Center has several civilian analysts. It has some sworn police officers. Their responsibility involves using the technology at their disposal in their quest to support the mission of the organization.

So they're going to be looking at cameras and accessing information in support of the operational arm of the organization.

They're going to support the Field Operations Bureau, we call it, patrol officers. They're going to support Investigative Services Bureau, or you would -- you would know them as detectives.

Q. Mm-hmm.

A. And they would support our traffic unit with this technology.

Q. Okay. That makes sense.

So you named a few different groups there of people that the RTCC assists or helps further their mission.

So with the -- with the field patrol officers, is that -- it sounds like that is often about providing them realtime information about the situation they're going into so that they can take proper action.

I know that's at a high level, but am I generally understanding that correctly?

A. Generally.

Q. Okay. And then you also mentioned investigators. And is it that the RTCC uses the tools that they have there to help investigators, well, investigate past crimes?

A. Well, future crimes aren't actually a thing other than in our imagination.

So primarily, if -- if they're working with detectives, it would be about some crime that has already occurred.

Q. Okay. So when they're working with those investigators, they're bringing the tools to the RTCC to bear to help those investigators solve those already committed crimes; is that correct?

A. Yes.

Q. And is the idea the RTCC center -- this idea of, like, Intelligence-Led Policing that you want to have policing that is leveraging information and data in a way to further your mission?

ATTORNEY KRAVIS: Objection. Vague.

Go ahead.

THE WITNESS: I try to stay away from the term "intelligence led" because, you know, what is the opposite? Idiot led?

BY ATTORNEY FROMMER:

Q. Fair point.

A. You know, so the -- in my capacity as chief, one of the things that I talk about frequently is the appropriate role of support units and how their behaviors need to fit within the strategy and talk very precisely about what that means on a day-to-day basis.

So in The Realtime Crime Center, those discussions sound like being available to do exactly what you describe, to assist in investigations and to do so in ways that help us to arrest the right people with the minimum footprint that we can bring to the community in any particular investigation.

Q. I see. Actually, I want to keep asking stuff about things about the RTCC, but I want to jump back just very briefly and -- because we were talking -- back to the placement decision about the cameras, about the Flock cameras.

And we had a couple of questions back and forth about ingress and egress. And I was just wondering, based on your experience as a police officer for, you know, almost three decades -- over three decades -- just right around three decades.

Based on your experience as a police officer, why do you think placing cameras at locations of ingress and egress, why would that matter? Why would --

ATTORNEY KRAVIS: Objection. Vague. Calls for speculation. Incomplete hypothetical.

Go ahead.

THE WITNESS: It -- it doesn't matter until the potential that it represents gets realized. The same with placing the -- the cameras in violent crime hot spots.

All of it is essentially a hypothesis about what's going to work in keeping the city safe.

So having the cameras at points of ingress and egress, like having them in hot spots is this sort of police officer's guess that that's going to matter at some point.

BY ATTORNEY FROMMER:

Q. Okay. All right. So you view it the same way as placing the cameras in the high crime -- high-crime areas in the sense that this is your officials and -- the people -- the people making the same decisions, they are taking a guess as to, like, these are -- these camera locations are going to be the most effective at letting us further our mission of preventing and solving crime; is that --

A. I think it's -- we're probably being generous in the sense that it -- it may or it may not have been that thoughtful of a process. I don't know. I wasn't part of those decisions.

If I were making those decisions, that's how it would have been done.

Q. Okay. I got it.

And you mentioned something just a second ago, not with regard to the ingress/egress, but with regard to the RTCC and how it allowed the Norfolk Police Department to sort of minimize its footprint while -- while pursuing its mission.

And I was just wondering what you meant by that exactly.

A. It's not that the RTCC allows us to minimize our footprint, it's -- minimizing our footprint is the aspiration in our quest to reduce crime in the city, meaning if we can reduce crime by using our coercive capacity at a lesser degree than we've done at other times, we're more successful.

We want to achieve the same level of crime reduction while minimizing force, threat of force, coercion, and presence as much as we possibly can.

Q. Okay. I think I get it.

And the tools in the RTCC help achieve that, in your opinion?

A. No. No. I'm saying it is the aspiration. That is part of how the tools and the people should be positioned.

Q. Okay.

A. Right? We should be thinking about doing our job in ways that minimize. I capture all that by the term "footprint."

Q. I see. So being able to solve crime while having a sort of a lighter -- less of an imposing police presence, less coercion, as you were saying?

A. Yes.

Q. Okay. And why is it beneficial to be able to do that, to be able to reduce crime with a lower police presence than you otherwise might have to have?

A. It speaks to a certain theory of value. It values freedom and the autonomy of our residents.

So we don't want to maximize the interruptions in their life or the -- that the number of times that we are putting our hands on them or we are commanding their behavior. It speaks to a certain respect for the constitution and a certain version of -- of humanism.

Q. Okay. I can appreciate that. Thank you for that explanation.

A. You're welcome.

Q. And so through using things like the Flock cameras, you might be able to reduce that footprint, reduce the police presence while still being able to solve -- further your mission; is that accurate?

A. Yes.

Q. All right. Let's turn to a document. This is going to -- my colleague is going to post it in a moment here in the chat, and it will be, I believe, Exhibit 30.

(Deposition Exhibit No. 30 was marked for identification.)

BY ATTORNEY FROMMER:

Q. And there it is.

All right. Let me know when you have that available.

A. I have it here.

Q. Okay. This is Exhibit 30. This is an E-mail with the Bates number beginning NORF009727.

And it is an E-mail from Mark Talbot to "PD-Email."

Do you see that there, Chief Talbot?

A. I do.

Q. Okay. Is this an E-mail you sent out to the police department?

A. It looks that way.

Q. Okay.

A. But that's one day before I became the police chief. But...

Q. Okay. You said you began in April '24?

A. I'm sorry. Yeah. Yes. That's correct.

Q. Yeah. The timing of all this I've been -- okay.

And feel free to take a moment, review the E-mail, go through it.

A. Okay.

Q. I have only a few questions about it, so

it'll probably make sense.

Just let me know when you're ready. I'm also going to share a copy of it, share screen a copy of it just so we can go through it together.

A. Okay.

Q. Okay. Let me hit share here. And hopefully, you should be seeing a copy of that E-mail?

A. Yes.

Q. Okay. Great. All right. And we previously said this is an E-mail from you and it's dated May 23rd, 2023; is that correct?

A. That's correct.

Q. And I don't know. Can you see highlighting that I'm doing here?

A. It's small, but I can pull it up on my page.

Q. Okay. It's the second full paragraph. It says, "In the spring of 2022, we began evaluating the possibility of developing an RTCC. This evaluation process indicated that five critical components make up a state of the art RTCC.

"The components include existing city-owned cameras, Flock Safety license plate reader cameras, private business cameras, city-wide cameras placed in high-crime areas, and Fusus, which is a video management system that feeds these components into the RTCC."

Did I read that correctly?

A. Yes, sir.

Q. Okay. And so was this statement true when you made it?

A. It is. It is.

Q. Okay.

A. It is true, yes.

Q. That these five critical -- that these five critical components make up a state-of-the-art realtime crime center?

A. Well, the full sentences says, "This evaluation process indicated that five critical components make up a state of the art RTCC."

Q. Let me ask this: Do you agree with that evaluation process?

A. Not at all.

Q. Really? Why not?

A. No. Well, I mean, to state the obvious, I got hired to bring new ideas to the police department, and the thinking that is represented in that paragraph doesn't align with how I think about crime and crime reduction.

Q. Well, you are the chief of police. I'm very interested in hearing your thoughts.

Can you tell me where you differ from this paragraph?

A. The -- the notion that -- that there's such a thing as -- so here's -- here's how I honestly think that the notion that there is a state-of-the-art realtime crime center is -- is -- it feels like a throwaway phrase in the sense that what -- what state, and what art are we referring to?

There -- there hasn't been any real evidence that I've seen that cities have been successful in reducing crime. And there's been some objective verification. It's about The Realtime Crime Center. So that's -- that's one problem with the paragraph.

Another problem with the paragraph is where do those five components come from, and why are they critical? The only way that you could assess something as critical would be you have a clear understanding of the value that entity is going to contribute to your operation.

So it's going to depend on your strategy, it's going to depend on the skill of the people driving your strategy, and it's going to depend on exactly how that technology is either accelerating the strategy or not.

So I would take issues with that.

So it's -- it's true for -- for any historical sense, but it's not how I see things or my understanding of how we need to maximize the use of our resources.

Q. So the RTCC is up and running with these five components; correct?

A. Well, I'm not -- no. Yes, it's up and running with these five components. I acknowledge that they are there. I'm simply doing what you

105

asked and -- and letting you know I don't agree with the implicit assumptions that -- that went into creating it.

Q. So in our -- I just want to make sure I understand. So how does it differ what's here -- well, let me ask this -- a more plain question. Strike the previous one.

Do you believe that The Realtime Crime Center is useful?

ATTORNEY KRAVIS: Objection. Vague.

THE WITNESS: I hope so.

BY ATTORNEY FROMMER:

Q. But that's not exactly my question. My question is do you believe the RTCC -- RTCC is useful?

A. I don't -- I don't run the police department with notions of belief. I -- I will check and see, as I run the organization, whether or not we've been able to use the capacity there to make the city safer.

Q. Okay. And that --

A. I -- I inherited it. I didn't create it.

106

Q. I understand. Fully understand. And you've been chief -- do you -- do you recall when the RTCC became operational?

A. No, I don't.

Q. Okay. But you've been chief now for over two years; correct?

A. Correct.

Q. Have you undertaken any action to evaluate the effectiveness of the RTCC?

A. Yes.

Q. What steps have you taken?

A. Those Thursday meetings that -- that I mentioned is -- those meetings involve extensive discussions about how we're operating the process that we're using to train the personnel there, what -- what they're focusing on, what kind of guidance that they've been given.

We look at all of those things in terms of what, you know, this sort of classic management speak of the inputs, the outputs, and outcomes from the work that we're doing.

So that's -- that's an ongoing endeavor.

107

Q. Okay. And you mentioned the Thursday meetings. And I know we've talked about on Mondays and Tuesdays you'd have this, and who are the Thursday meetings with?

A. There's typically about 50 or 60 people in the room from all over the organization.

Q. Is this like patrol -- the patrol Officers or is it people who -- like -- is it, like, ranked officers?

A. It's anybody who is in the organization is -- is eligible. The main conversation being had would be between me and the various division commanders.

Q. Okay. So stepping back just to the RTCC, you had mentioned that you had taken some actions to evaluate its effectiveness.

Am I saying -- am I correct in that?

A. Yes.

Q. Okay. And examples evaluating its effectiveness, as well as whether it's cost effective?

A. That would be part of the evaluation.

108

Q. Okay. And when did you start making -- taking actions to evaluate the RTCC?

A. That's just part of my work, so every day.

Q. Okay. Have -- have you reached any conclusions about the RTCC's effectiveness?

A. Yes.

Q. Oh. Please tell me. What are they?

A. It's underperforming.

Q. How so?

A. The -- so I gave you the -- the -- believe it or not, the brief version of our strategy. The way that The Realtime Crime Center is functioning now is as if every instance of assistance to patrol or detectives represents success.

But that is way too simplistic of an evaluation. As you said, it is a -- a rather expensive prospect. And so the value that we're bringing to -- to the city needs to exceed that expense.

Q. I see.

A. So I'm -- I haven't gotten myself to a place where I believe that it's been worth the

money, frankly. Now, I'm a pretty -- I get paid to be very critical about these things, but that's where I stand right now.

Q. Okay. Are there -- are there any -- is it just -- is there any particular aspect of the RTCC that you believe is underperforming or do you just believe that the RTCC, as a whole, is not providing enough value in terms of furthering your mission, given what it costs the NPD?

A. Both things that you said are part -- I believe are true.

Q. Okay. Well, let's break out -- well, the second one is a wholistic thing, so we'll just put that to the side.

Are there specific aspects of the RTCC that you believe are underperforming?

A. Well, when you talk about performance, you're talking about people. So it's not aspects.

Q. Okay.

A. I -- it's a people problem.

Q. Well, what is -- what is the nature of the people problem that you have with -- at the RTCC?

A. So -- well, I mean, I run the organization, so ultimately, it's my own performance that is most annoying to me.

But everybody in the chain of command. It's led by an assistant chief of police. There's work that needs to be done there. Under her is a captain, some work to be done there, and a lieutenant and a sergeant.

So the whole chain has got to -- we've got to get ourselves together and do some things differently than -- than we've been.

Q. What's -- so you identified the assistant chief, and then the captain, lieutenant, and then you said -- I forget your precise word. I think you said it's not working or they're not working.

But what about the current way they're undertaking their responsibilities is not working for you?

ATTORNEY KRAVIS: Objection. Mischaracterizes prior testimony.

Go ahead.

THE WITNESS: Yeah. So I -- the term I used was "underperforming."

BY ATTORNEY FROMMER:

Q. My apologies.

A. So the enterprise itself is not where I would like it to be, and we're working to get it there.

Q. Okay. Can you explain to me with a little more -- specifically, why it's a -- in what ways, specifically, is it underperforming?

A. I can't point to -- now, I'll just say this. I can't point to a success or a series of successes in my tenure that justifies this expense.

I don't know which particular aspect of the enterprise is the primary source of frustration. It could be a lot of things. It's my job, as we move forward, to figure it all out. I'm not there yet.

Q. Is it that -- it's -- and we've been talking about that.

Is it that you think that the RTCC could perform at that level you think is appropriate if you just fix the underperforming issues with some personnel, or do you have more fundamental concerns about the viability of the RTCC, period?

ATTORNEY KRAVIS: Objection. Vague.

Go ahead.

THE WITNESS: Last year our homicide clearance rate was somewhere around 85 percent. This year it's about 50 percent.

I would like a substantial investment in technology to push -- to help us push clearance rates and things like homicide clearance rates in a more positive direction.

And we just hit our 17th homicide for the year. And the last time I looked at the numbers, you know, maybe two hours ago, or no, I've been here. So, like, four hours ago, we are almost precisely at the same level of nonfatal shootings that we had last year.

So nothing, as far as I'm concerned in the organization, is successful. If I was sitting here now and I was able to say, yeah, we banged down nonfatal shootings 50 percent and we're locking a bunch of people up and homicide clearance rates are

113

through the roof, I might have a different assessment.

BY ATTORNEY FROMMER:

Q. I see.

A. But that's where I sit now.

Q. I got it. Yeah. And before you mentioned, I think, some investments in technology that you wanted to see -- that you were hopeful that there might be some investments in technology that could help increase the clearance rate for homicides.

What investments -- this is not my area of expertise, so what kind of investments would be able to accomplish that?

A. Training. Supervision. Management. Better administering the organization. Better use of technology. More coordination. Lower absenteeism.

You know, more people come to work, raising the staffing in the organization. That there are -- there are dozens and dozens of variables that we have to ultimately get right.

114

And so within that mix of factors is The Realtime Crime Center and the technology associated with it.

Q. Okay. And is it that you think that there needs to be a better use of the technology -- not trying to ask you either/or questions.

But do you believe that there is technology that's not currently used by the NPD that would help you achieve your goals?

A. I don't -- I don't know. I mean, it -- if there's something out there that I think will help and I become aware of it, I'm going to be asking for it. That's my job.

Q. Yeah. Let me ask you sort of the -- the flip side of that, which is that you have a number of pieces of technology in the RTCC.

Is it that you feel they need to be better deployed or utilized to gain -- to get those benefits that you're looking for at the higher clearance rate?

A. I don't have a clear sentence that fills that gap of "I'm unhappy with performance at X

115

level, and I will be happy at Y."

It's -- it's really not that simple as I alluded to, given all the -- the variables involved. It's -- it's more of an -- an experiential problem, if you will.

I had to cancel one of my prep sessions for this deposition because I was out looking at a dead 17-year-old. And in the process of investigating that homicide, we have no vehicle information. We -- we have no real suspect information.

Success is when you have dead teenagers, you're able to quickly figure out what happened and -- and put handcuffs on somebody. We're not able to do that, at least half of the time this year.

So I don't know what it is about The Realtime Crime Center. I do know that the technology is not helping us in any way that I can see overcome that challenge is what I'm saying.

Q. I see. I see.

Okay. Okay. Sorry.

116

ATTORNEY FROMMER: It's 12:13 now. It seems like if you guys -- this might be a good time for -- for lunch?

ATTORNEY KRAVIS: Sure. That's fine with us.

ATTORNEY FROMMER: Okay. Why don't we plan -- is 45 minutes -- it's basically 1:00, okay by you -- oh. Let's go off the record.

THE VIDEOGRAPHER: Okay. All right. We're going off the record. The time on the monitor is 12:13.

(A lunch recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time on the monitor is 1316.

BY ATTORNEY FROMMER:

Q. Thank you for -- I hope the break went well for you, Chief Talbot. Just -- you understand that despite the fact we took a lunch break, you're still under oath.

Do you understand that?

A. I do.

Q. All right. Okay. Well, then let's --

117

let's dive in. I wanted to -- as you can see on the screen here, I wanted to introduce another exhibit.

This is Exhibit 31. It's a video of a city council meeting.

(Deposition Exhibit No. 31 was marked for identification.)

BY ATTORNEY FROMMER:

Q. Do you recall talking to the city council in May of 2023?

A. Yes.

Q. Okay. And do you recall talking about the RT -- The Realtime Crime Center and Flock and other technologies at that meeting?

A. Yes, I do.

Q. Okay. All right. Great.

So I just want to go through a few parts of the video, and just talk through them.

ATTORNEY FROMMER: If -- Tamineh, if you can move us up to 13 minutes, please.

(Exhibit 31 plays.)

ATTORNEY FROMMER: Okay.

BY ATTORNEY FROMMER:

118

Q. And so, Chief Talbot, I understand before, earlier this morning, you and I had some conversations about the concept of Intelligence-Led Policing and things like that.

But I just wanted to just see if you agree with the statement that you're making here, that policing -- effective policing is about having the best intelligence you can have?

A. Correct.

Q. Okay. All right.

ATTORNEY FROMMER: Let's move up to -- let's move up to 1710.

(Exhibit 31 plays.)

ATTORNEY FROMMER: Okay. If we can pause. Thank you.

BY ATTORNEY FROMMER:

Q. Chief Talbot, I had a couple of questions about the statements you made just then.

At the beginning, at 17 minutes and 16 seconds I believe you said, "172 cameras have been purchased and are already paying dividends for the work that we're doing."

119

And my question is specifically about that phrase, "paying dividends." I was wondering what you meant by that?

A. It's a metaphorical phrase that tends to indicate some value being produced out of the entity in question.

Q. Okay. Was there any specific value that you were contemplating when you made that statement?

A. Yeah. I'm -- I'm sure I had a number of ideas in my mind.

Q. Can you recall any of them at this moment?

A. This happens to be my first council meeting.

Q. Okay.

A. So to some degree, all of the details are not clear, but I was in a position where I was advocating for the work that we were doing at that time.

And you know, branding myself as the new police chief that's worth the money that he's making.

Q. I got it.

120

ATTORNEY FROMMER: Tamineh, can you replay the clip starting at 1732, please.

(Exhibit 31 plays.)

ATTORNEY FROMMER: Okay. Thank you.

BY ATTORNEY FROMMER:

Q. And I wanted to ask about that phrase. And we had discussed at the beginning -- this morning a bit about how the Flock Safety cameras work.

And here, you said that one of the things that's important about Flock Safety cameras is that it grabs a snapshot of registration plates of cars as they're driving by.

And you agree that that's what they do; correct?

A. Can you restate your question, please?

Q. Oh. I'm just asking you if the statement you made in the video that one of the things that are important about Flock Safety cameras is that it grabs a snapshot of registration plates of cars as they're driving by.

I'm just wondering if you agree with that

121

statement?

A. I agree with myself on the video.

Q. Okay.

A. Yes.

Q. And then you go on to say, it just gives us -- "It gives us the opportunity to do work without checking for stolen cars and missing people just willy-nilly."

And what I'm wondering is are the Flock cameras a more comprehensive way of being able to locate stolen cars than the previous ways that the NPD and others would have employed?

ATTORNEY KRAVIS: Objection. Vague. Compound.

Go ahead.

THE WITNESS: They -- what was in my mind is not that they are more comprehensive, but that it is a more precise way. And hence the term, "willy-nilly."

BY ATTORNEY FROMMER:

Q. Okay. And let me explore that -- that, precise.

122

So if you don't have the cameras, it seems like you're thinking about a situation in which you won't have cameras and you would have to enforce the law in some other way.

Could you describe to me, like, that alternative method of enforcement and why you say that's, as you put it here, "willy-nilly"?

ATTORNEY KRAVIS: Objection. Vague. Calls for speculation.

Go ahead.

THE WITNESS: It doesn't sound like you mean enforcement because the enforcement part stays the same. But there's an investigative component that changes with the technology.

BY ATTORNEY FROMMER:

Q. Okay. That's fair. I guess -- I guess, then, to be more precise, what I'm saying is can you tell me how this technology acts as an investigative aid to make identifying stolen cars easier?

A. The contrast here would be if -- if we're looking for a stolen car, an officer may run numerous registration plates or they may engage in

123

traffic stops, depending on what evidence presented itself and the particular officer's preferred strategy or tactic, if you will.

Having technology in a particular area that will fairly reliably let us know if a registration plate is associated with a stolen car, it reduces the need to potentially indiscriminately run registration plate information as a police officer on the street.

Q. I see. Would there be a way of -- could you -- another way of -- of identifying stolen cars, could you have officers stationed at intersections throughout the city and writing down the license plates of cars and then determining whether they're stolen or not?

Would that be a viable way to -- to identify stolen vehicles?

ATTORNEY KRAVIS: Objection. Vague. Incomplete hypothetical. Calls for speculation.

Go ahead.

THE WITNESS: It would be a ridiculous way, but it's a way.

124

BY ATTORNEY FROMMER:

Q. Would that be a feasible way of -- of checking for stolen vehicles?

ATTORNEY KRAVIS: Same objections.

THE WITNESS: If by "feasible," do you mean could we do it? Is it within the realm of possibility? It is within the realm of possibility.

BY ATTORNEY FROMMER:

Q. Okay. And I get that. And we talked a little bit earlier when we were discussing about the RTCC not just about effectiveness, but about effectiveness, you know, given -- why, you know, versus the cost involved of the enterprise.

And so I'm asking in this situation -- and I understand it's a hypothetical -- let's say you replaced the 172 Flock cameras with 172 officers and you had them out there recording, writing down license plates and looking up information.

I understand you're saying that that could potentially be a way to do this work -- to identify stolen vehicles.

Am I right in that?

A. Yeah, that -- that would be a way.

Q. Would that be a cost-effective way -- would that be -- or scratch -- strike that.

Would -- would that be feasible in terms of, like, the department's man hours and budget?

ATTORNEY KRAVIS: Objection. Vague. Calls for speculation. Incomplete hypothetical.

Go ahead.

THE WITNESS: I've lost track of the parameters of your hypothesis here.

BY ATTORNEY FROMMER:

Q. Yeah. I'm sorry about that. What I'm just wondering is, like, I understand you could put 172 officers out there, but would that be feasible from a budgetary perspective?

Could you do something like that?

ATTORNEY KRAVIS: Same objections.

THE WITNESS: Well, they're already out there. It is -- it is never their sole job to look for stolen cars. They're doing a number of things out there, including writing down registration plate information as a part of our work.

So, what you're describing actually happens all the time.

BY ATTORNEY FROMMER:

Q. Do you just have officers sit at intersections just to write down address -- or license -- or registration plate numbers?

A. When you say "just," meaning is that the exclusive behavior --

Q. Yeah.

A. -- that they're engaging in?

Q. Just -- I'm sorry.

ATTORNEY FROMMER: And I'm sorry, Madam Court Reporter, for talking over the chief.

BY ATTORNEY FROMMER:

Q. What I mean here is let's say we take those 172 cameras down and we just replace them with 172 people, or let's say, it's just a subsection.

Let's say we just want to -- at the four highest crime intersections, we want to put officers to record the registration information of all the vehicles passing by.

All I'm asking is that's not something the NPD does, is it, first off?

A. No.

Q. Okay. And it's something that NPD would have the physical capacity to do; correct?

A. Yes, we would have the capacity to do that.

Q. What the -- what if it were, instead of the four intersections I identified, let's say it's 25 intersections.

Would that be physically feasible for the NPD to accomplish?

A. In your hypothetical, are you erasing all other activities that police officers have to engage in --

Q. No, no.

A. -- or is that included?

Q. The world continues. It's just --

A. Okay. So in that world it -- it would be feasible as long as you allow them to do other things while they're recording registration information down.

Q. I understand. In my hypothetical, though, they have to focus all their time to write down that registration information.

Let me ask this a little bit differently.

Let's say you found out that there were some officers who were just sitting at an intersection and they just sit there for hours and the only thing they did was just write down the registration plates, numbers, of all the vehicles they saw.

Is that something that you've ever contemplated having officers do?

ATTORNEY KRAVIS: Objection. Vague. Incomplete hypothetical. Calls for speculation.

Go ahead.

THE WITNESS: I've never -- or I don't recall ever asking for that.

BY ATTORNEY FROMMER:

Q. Do you think that would be a good -- scratch that -- strike that.

Why haven't you ever asked for that?

A. I never had a goal that aligns with a police officer sitting at an intersection writing

**129**

down all the registration plates of vehicles that are going by.

Q. Okay. So in the hypothetical I was putting forward where you replace the LPRs with stationary officers, is that -- would that be a -- would that be -- strike that. Strike that.

Would it be possible for NPD to staff 172 locations, stationary locations, 24 hours a day, just to write down with NPD officers where the -- the sole job of the NPD officer is to stay at that location and write down the registration information -- plate number of every car that passed by?

A. Certainly it would be possible. I have 550 police officers. I can certainly do that.

Q. Why don't you do that, then?

A. I don't have a goal that -- that aligns with stationing that many police officers at a location writing down registration plates.

Q. And would such a program, the kind I'm describing, would it detract from the NPD's other efforts to fight crime?

A. Well , I don't know how you can add crime

**130**

to your hypothetical, because if you have other crime there, why would they be sitting there?

Q. No, I'm saying in my situation, the city of Norfolk is just like the city of Norfolk now. I'm just taking a third -- sounds like about a third of your officers and stick -- and placing them at the 172 locations that the LPRs are currently at.

And I'm just asking, if you did something like that and you're manning this 24 hours a day, so that's three shifts, would that effort or would that placement of officers detract from your other efforts to fight crime in the city?

ATTORNEY KRAVIS: Objection. Vague. Incomplete hypothetical. Calls for speculation. Also at this point, I think asked and answered.

Go ahead.

THE WITNESS: Your hypothetical prevented me from having them do anything else while they're at these intersections, so it's constructed in a way where it -- it wouldn't make any sense whatsoever.

BY ATTORNEY FROMMER:

Q. What wouldn't make any sense?

**131**

A. So it would be feasible, but -- but a bad idea.

Q. Okay. It'd be feasible, but a bad idea.

And do you believe if you went down that road and actually engaged in that idea, that it would be detrimental to NPD's public safety goals?

A. I believe that the hypothetical doesn't allow me to do my job. So I'm -- I'm sort of stuck and confused.

Q. All right. I was wondering -- okay. How much does -- how much does the average police officer -- how much is the average police officers' salary for the NPD?

A. Patrol officer?

Q. Yeah, patrol officer. Let's say patrol officer.

A. $70,000 a year.

Q. Okay. And do you know how much the -- the Flock cameras cost per year?

A. I don't. I do not know.

Q. Does $2,500 per year sound -- does that ring a bell for you?

**132**

A. It doesn't ring a bell.

Q. Okay. And would -- going back to the hypothetical, and I understand it's a hypothetical.

And, you know -- so we have our 172 officers, or it might -- well, if you have three shifts, it might be over a 500 officers standing at these locations recording car registration information that they see with their eyes as it passed by.

Would that be an effective use of resources?

ATTORNEY KRAVIS: Objection. Vague. Incomplete hypothetical. Calls for speculation.

Go ahead.

THE WITNESS: Effective use of resources toward what end?

BY ATTORNEY FROMMER:

Q. An effective use of resources towards furthering NPD's overall public safety goals. I mean --

ATTORNEY KRAVIS: Same objections. Same objections.

---

133

THE WITNESS: No.

BY ATTORNEY FROMMER:

Q. Okay. All right. Thank you. All right. Thank you for that.

ATTORNEY FROMMER: Tamineh, can you go to 1845, please?

(Exhibit 31 plays.)

ATTORNEY FROMMER: Can you pause? Thank you.

BY ATTORNEY FROMMER:

Q. So we were talking a bit earlier, remember, about the NRHA cameras?

A. Yes.

Q. Do you recall that?

And I think at that time you weren't quite -- you couldn't remember the precise number that they had. Here, in the video, you agree that you -- well, it's right on the screen -- that the NRHA had purchased 20 Flock cameras.

Do you agree with that?

A. Yes.

Q. Okay. Do you know? Why was that

---

134

important for you to mention at the city council meeting?

A. So, these city council meetings are a part of my responsibilities. I speak to them quarterly and give a public safety update. So the information contained in the PowerPoint presentation is about providing that -- that update.

This happened to be my first -- as I alluded to earlier, happened to be my first city council meeting. Nearly all of the PowerPoint content was created by others.

So I'm just sort of doing my best to relay the information.

Q. Perfectly understandable. So sitting here today, is it fair to say you don't recall why that was included here or was it -- strike that.

I understand what you mean. I understand what you mean.

But let me ask this: Do you know if the cameras that NRHA purchased, do they share data with the city?

A. I don't know for sure.

---

135

Q. Okay. You don't know if -- if the NPD has access to the NRHA cameras?

A. I would -- I believe we do. I don't know for sure.

Q. Okay. If -- if you do have access to those cameras, would that further extend the coverage of your Flock system?

A. Well, it would extend the geography that's covered by Flock, not necessarily our Flock system.

Q. Okay. All right. If you share -- then you agree that if you have a sharing arrangement with them, that you would be able to get data generated from their cameras, and potentially, vice versa?

A. Yes. As to the definition of "share," that sounds correct.

Q. Okay. All right.

ATTORNEY FROMMER: Let's hit play, Tamineh.

(Exhibit 31 plays.)

ATTORNEY FROMMER: Okay. Can you pause, please?

---

136

BY ATTORNEY FROMMER:

Q. Do you know if these jurisdictions share data with you?

A. No, I do not know.

Q. Okay. Did you review the PowerPoint -- so let me -- let me back up for a second because it seems like your presentation to the city council is really two things:

One, there's a PowerPoint, and I believe you said that that was prepared for you by others, and then there's your own words, your own statements?

Who prepared your statements that you're -- that we're seeing you give here?

A. I prepared those.

Q. Oh, okay. All right.

ATTORNEY FROMMER: Tamineh, can you rewind about five or ten seconds so we can just go through that again?

(Exhibit 31 plays.)

ATTORNEY FROMMER: Okay. If you can pause. Thank you.

137

BY ATTORNEY FROMMER:

Q. Did you review the PowerPoint that -- that's in this presentation beforehand?

Let me --

A. Before I --

Q. Let me rephrase because I realize I -- that was vague.

Before giving this presentation to the city council, had you reviewed the PowerPoint?

A. Yes, sir.

Q. Okay. Had you asked whoever helped prepare the PowerPoint any questions about it?

A. I'm not sure if I did or not.

Q. Okay. But did you expect that the PowerPoint would be accurate?

A. No. No, that's not my expectation.

Q. Oh. Well, that's a kettle of fish. Why didn't you expect it to be accurate?

A. I've been a chief for just about half of my career. So expecting something handed to you by somebody else to be accurate is -- is -- that's mostly a bad idea.

138

Q. Okay. Did you do any independent work to verify the statements in the PowerPoint?

A. I'm not sure if I did or not. I imagine that I would have done some fact checking, but that's my normal habit.

But to what extent, I'm not sure.

Q. Okay. Well, I want to focus a little more specifically on your quote right at the end there, which is -- you say, "It creates a nice curtain of technology, which we all can use to support each as we're keeping the city safe."

And I guess my first question is, was that statement true when you made it?

A. Well, it's true as far as a metaphorical statement can be true.

Q. Well, did you believe that the multiple jurisdictions all sharing data with one another created a nice curtain of technology?

A. That's what I'm saying. It's true as far as a metaphorical statement can be true. There's no curtain anywhere as it relates to my comments.

If you look out into the environment, you

139

won't see a curtain.

Q. Okay. I see what you're saying.

ATTORNEY KRAVIS: I'm not sure -- were you finish answering?

THE WITNESS: No, I wasn't finished.

BY ATTORNEY FROMMER:

Q. I apologize.

A. So there is no truth to anything as it relates to a curtain. My intention was to communicate that we all have this technology in place. We are all tasked with keeping our city safe.

One of the ways that we are trying to keep our city safe involves technology, such as Flock here. And in our respective jurisdictions, doing that helps the whole be safer than -- than it would be otherwise.

It would be the long statement that I would make that would remove the -- the metaphor from my comments.

Q. Okay. Thank you. And, again, I apologize for interrupting you. I didn't mean to.

140

ATTORNEY FROMMER: Can you go to 19 -- 1922, please?

(Exhibit 31 plays.)

ATTORNEY FROMMER: Okay. Let's pause.

BY ATTORNEY FROMMER:

Q. And, Chief, I just wanted to ask you -- just -- just get your thoughts about those statements.

Is it your understanding that the placement of the Flock cameras was based on, I think as you said here, "Where most of the crimes are occurring"?

ATTORNEY KRAVIS: Objection. Asked and answered.

Go ahead.

THE WITNESS: Yes.

ATTORNEY FROMMER: Okay. Tamineh, if you can, hit play again.

(Exhibit 31 plays.)

ATTORNEY FROMMER: Okay. If you can pause.

BY ATTORNEY FROMMER:

141

Q. And you know, earlier today, we talked about points of ingress and egress. And here, can you explain to me why, just as a police officer who has experience with this, why points of ingress and egress are important to capture?

ATTORNEY KRAVIS: Objection. Asked and answered.

THE WITNESS: In my statements there, I talked about it being important when we're looking for somebody coming into the city or going out of the city.

When that's the case, we would be able to access that information, potentially, from our Flock cameras.

So it would help us in the investigative process under those circumstances.

BY ATTORNEY FROMMER:

Q. Okay. It's helpful to know if a suspect entered or exited the jurisdiction; is -- is that fair?

A. Yes.

Q. Okay. All right. Let's go to 2016,

142

please.

(Exhibit 31 plays.)

ATTORNEY FROMMER: All right. Let's hit pause.

BY ATTORNEY FROMMER:

Q. All right. So I wanted to just go through those statements just very quickly.

A councilman -- Council Member Smigel asked you about the ability to track the movement of his vehicle. And I believe you responded, "very quickly."

Am I correct about that?

ATTORNEY KRAVIS: Objection. Mischaracterizes the exhibit.

Go ahead.

THE WITNESS: He asked a compound question, and the compound question consisted of how quickly we could find his car.

And he kept talking, and he added a couple of statements about tracking the car from one place to the next. And my response was "very," which was a pretty slick way of not giving an actual time that

143

it would take.

BY ATTORNEY FROMMER:

Q. And I --

ATTORNEY KRAVIS: Hold on. Are you done?

THE WITNESS: No. The council member -- what didn't get said out loud is -- well, of course, we could enter it into the system quickly and we would be on it quickly because you're a council member. And that's how the world works.

So that's what was going on in that particular interaction.

BY ATTORNEY FROMMER:

Q. So you're saying, if I'm just an ordinary Joe citizen of Norfolk, I can't expect that kind of quick service?

ATTORNEY KRAVIS: Objection. Mischaracterizes prior testimony.

Go ahead.

THE WITNESS: I would never say that.

BY ATTORNEY FROMMER:

Q. Let me ask about -- you make another statement in that same clip that we just heard. I

144

believe you said "you wouldn't even need to know your license plate."

And I was wondering if you could explain to me why that's the case?

A. Because we could use his -- his name or whoever the person is -- is who is the registered owner of that vehicle. If we had the name, we could then find out the registration information from there.

Q. Oh. What -- does the system -- is the system -- is -- do the Flock LPRs, are they able to identify vehicles by features other than just the registration plate?

A. The way that you can identify a particular vehicle tends to hinge upon, does it have the same registration plate. You -- you can't narrow down the field enough if you -- if you don't know that.

So that -- that wouldn't be viable.

Q. I'm sorry. I -- I don't quite follow.

So let's say I know Council Member Smigel has, I don't know, a red Toyota with a bumper sticker on the back, but he can't -- neither I

145

can -- he can't remember his license plate.

You know, would -- if you go into the Flock LPR and ask it to find a red Toyota with a bumper sticker, would it be able to do that?

A. I don't know.

Q. Okay. So you don't know if -- if Flock can -- can identify vehicles on bases other than the registration plate number?

A. I do not know --

Q. Okay.

A. -- the answer.

ATTORNEY FROMMER: Okay. Let's hit play again.

(Exhibit 31 plays.)

ATTORNEY FROMMER: Hit pause. Too much technology. Thank you.

BY ATTORNEY FROMMER:

Q. So there Council Member Smigel said a traceable car -- "A traceable path of the car moving through the city as long as it's being picked up by the Flock cameras."

And you responded, "I believe, that's

146

correct."

Was that statement true when you made it?

A. Was the council member's statement true?

Q. Your affirmative response to the council member's statement, was that true?

A. Can you -- I'm not clear on what my response was or what I'm precisely responding to. If you can let me hear it again.

ATTORNEY FROMMER: Okay. Let's replay that clip, then, and we can go through it a second time. So back to 2128, I think.

(Exhibit 31 plays.)

BY ATTORNEY FROMMER:

Q. And it was -- so going through it a second time, did you understand council member Smigel to say that the Flock cameras -- if the car drives past multiple Flock cameras, it could create a traceable path of the car moving through the city?

A. Again, he packs a lot into his question. He says, "As long as the image is captured, as long as the car goes past, a Flock camera, as long as we know it's his registration plate." He says -- he

147

says a number of things.

And I'm not quibbling with premise or premises of his question, which, as you can see, I could have easily done that. I simply responded, "correct" and then understood that what he was asking is would we be able to find his stolen car under a certain set of conditions.

He reports it right away. We know what the registration plate is. We enter it into the system. Under those conditions would we find it quickly? Probably.

Q. Okay. But that's not really what I'm asking. He's talking about here if -- let me ask you this: Let's say I have driven down to the city before and I've driven past, like, within one drive, four to five cameras.

If somebody goes back and puts in my registration plate, would they be able to create -- see the path I took?

ATTORNEY KRAVIS: Objection. Vague. Calls for speculation.

Go ahead.

148

THE WITNESS: They would not be able to see anything other than which Flock cameras picked up your registration plate.

What you did between Flock cameras would not be apparent to us.

BY ATTORNEY FROMMER:

Q. I am not sure I understand your answer.

Let's -- let's play the clip -- let's play the clip again. Because I -- I -- respectfully, Chief, I think he's asking a really specific question here of like, if you -- would -- if the car passed through multiple things, would it create a traceable path?

But let's listen to him.

(Exhibit 31 plays.)

ATTORNEY FROMMER: Let's hit pause.

BY ATTORNEY FROMMER:

Q. Okay. So there he says, "A traceable path of the car moving through the city as long as it's being picked up by Flock cameras?" And you respond, "correct."

And all I'm asking is, if a car goes past

multiple Flock cameras, would that give -- would that create a path that could be traceable by NPD?

ATTORNEY KRAVIS: Objection. Mischaracterizes the exhibit and vague.

Go ahead.

THE WITNESS: So I don't see his question as -- as nearly as straightforward as -- as you're seeing it. He packs many conditions into his question.

Some of what he described is technically inaccurate, but it wasn't my job to educate him on exactly and precisely how this whole thing plays out.

So what I'm saying is my understanding of his question then and now is what are the conditions that would need to be in place for us to both find his -- his vehicle and do so in a relatively short period of time.

Some of the conditions he -- he packed into his -- his question, some he didn't. But there -- there is a misunderstanding about -- it seems to be a misunderstanding about how the technology works.

So what it will allow us to do is know precisely, as long as we didn't fall into that error rate that this type of technology often has, we would know the -- the approximate time it went through one Flock camera and then another, and then potentially another, and that would present investigative leads.

So we would send a police officer out as quickly as possible to the most recent known location. And ideally, we would spot the car and verify that that, in fact, is the vehicle that we believe to be stolen.

Do a traffic stop, and in this whole hypothetical, we would eventually arrest somebody.

He's saying -- he's saying something -- he's saying something, or at least my ears -- being an expert in policing, my ears are hearing a whole number of conditions that -- that he's putting in place and then trying to work through that as I respond to his question.

BY ATTORNEY FROMMER:

Q. Okay. I think you said at one point in your answer just now that his understanding that he was technically inaccurate. And I'm wondering what exactly -- or what is -- what is he being technically inaccurate about?

A. Well, the -- as you know, the shortest distance between two points is a straight line. In -- in his question, he seems to think that a vehicle that travels from one point to the next, you could trace that -- that straight line and that straight line would be the -- the precise path of the -- of the vehicle.

But -- well, that's not -- that happens to be inaccurate. If -- if there were avenues where you could go elsewhere, there's a side street or there's a garage that you went into, there's another path that you could have gone, we could not know that based on Flock-fed data.

So it gives us precisely what it gives us. Anything beyond that is an extrapolation.

Q. I understand that.

But what I'm trying to understand is, you know, if -- if there are, like, five hits from Flock cameras within ten minutes, say in a car, ten minutes, and they're at different locations, couldn't one make a -- couldn't one trace out a path of which cameras that car passed by at which time to figure out how they were traveling?

ATTORNEY KRAVIS: Objection. Vague. Calls for speculation. Incomplete hypothetical.

Go ahead.

THE WITNESS: Certainly you could trace it out. You just would have a -- a significant chance of being wrong.

BY ATTORNEY FROMMER:

Q. About where they went -- let me make sure I understand.

You're saying I might have a chance of being wrong about where they subsequent -- went, subsequently, after the last camera hit?

ATTORNEY KRAVIS: Objection. Mischaracterizes prior testimony.

Go ahead.

THE WITNESS: No. I'm saying that you

could trace the path. It's within the realm of possibility to trace it with a pencil or a pen, as you seem to be -- be referring to.

But that is not information that you're getting from Flock. You're imagining something that you would not know is the case.

So if you did that, the chances that you are wrong would be ever present.

BY ATTORNEY FROMMER:

Q. Okay. So you would have to make some sort of -- I understand what you're saying. So you're saying that in order to trace that path, you have to make some inferences.

You would have to make some inferences in order to trace that path; is that correct?

ATTORNEY KRAVIS: Objection. Mischaracterizes prior testimony. Also vague.

Go ahead.

THE WITNESS: You would be assuming or inferring -- I'll accept that -- or inferring information that you do not have.

BY ATTORNEY FROMMER:

Q. Yes. But if -- if I do make that -- take that inference, then you agree, you could -- you could trace out the path.

You're just saying -- you agree that that is true; correct?

ATTORNEY KRAVIS: Objection. Vague.

THE WITNESS: I -- I don't agree with what you're describing because it seems -- it seems that you're accepting the misunderstanding that council member Smigel put on the table. You're accepting him as being accurate. I -- I am not.

BY ATTORNEY FROMMER:

Q. Well, isn't an additional piece of information not just the time -- not just the locations of those -- of the Flock hits, but also the timing of it?

Let's say I drove -- a car went past five cameras that had the span of, I don't know, three miles in ten minutes and it's a 35-mile-per-hour road.

Would that additional information allow me -- help me to infer the likely route -- and I

understand that the route isn't 100 percent going to be accurate, but would it allow me or an investigator to infer the likely route?

ATTORNEY KRAVIS: Objection. Vague. Calls for speculation. Incomplete hypothetical.

Go ahead.

THE WITNESS: It would not necessarily help with the inference. It would increase the chances that the inference is correct.

BY ATTORNEY FROMMER:

Q. Okay. And I think we talked -- we talked earlier about -- I think I asked if you recalled whether the Flock LPRs captured the time of capture.

Do you recall me asking you that?

A. I believe you did ask that.

Q. Okay. I think your answer was you weren't sure whether they did or not?

A. Yes.

Q. Okay. But you would agree that if they did capture the time, that that would make that inference, as imperfect as it may be, a little bit more -- no, I don't want -- I'm trying to figure out

how to describe this.

That the presence of that time information allows someone to make a more accurate inference than they would otherwise; is that correct?

A. Correct.

Q. Okay. All right. And, of course, if I wanted to take the -- if I took those Flock kits, I could put them into something like Google Maps and try to figure out the potential routes that they took to trigger all those hits; right?

ATTORNEY KRAVIS: Objection. Calls for speculation. Incomplete hypothetical. Lack of foundation.

Go ahead.

THE WITNESS: Could you please restate your question?

BY ATTORNEY FROMMER:

Q. I'm just saying let's say we have the five hits again, and I know where they are and I know when they happened, and so I just plot them out on a map like Google Maps and could I then generate potential routes that they had taken that meant they

157

went by all five of those Flock cameras?

ATTORNEY KRAVIS: Same objections.

THE WITNESS: You could certainly create potential routes and you would have to create a number of options.

BY ATTORNEY FROMMER:

Q. Okay.

A. May I take a break?

Q. Yeah. Absolutely. That's fine. How long would you like, sir?

A. Just five minutes.

Q. Okay.

THE VIDEOGRAPHER: We're going off the record. The time on the monitor is 1312.

(A recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time on the monitor is 1317.

BY ATTORNEY FROMMER:

Q. Thank you, Chief Talbot. I just wanted to run through another couple of things in this.

ATTORNEY FROMMER: Tamineh, can you run the clip at 2136?

158

(Exhibit 31 plays.)

ATTORNEY FROMMER: Okay. Hit pause, please.

BY ATTORNEY FROMMER:

Q. Was that statement true when you made it to the city council?

A. Yes.

Q. Okay. Thank you.

ATTORNEY FROMMER: Let's go on to -- let's go up to 2150, please.

(Exhibit 31 plays.)

ATTORNEY FROMMER: Okay. Thank you.

BY ATTORNEY FROMMER:

Q. Chief, you just heard that. I was wondering how has the use of Flock Safety cameras facilitated the investigation of crime since Norfolk adopted it in 2023?

A. It is a part of the investigative process in -- in various ways I alluded to on the video in my response to the city manager in talking about the success stories, the number of -- at that point, the instances of making stolen car arrests than making

159

arrests of some violent offenders.

So it has aided us in that investigative chain of events.

Q. Well, I -- in the beginning of your answer you mentioned it's just one of a suite of -- or I forget the precise word you used, a combination of technologies. It's part of the technologies.

And I'm asking you specifically about the Flock cameras, the Flock Safety cameras. And I'm just asking, here you responded to the city council saying there have been success stories from the use of Flock cameras.

And I am asking, specifically, how have the use of Flock cameras facilitated the investigation of crime since 2023?

ATTORNEY KRAVIS: Objection. The preamble there mischaracterizes the prior testimony.

But go ahead.

THE WITNESS: The Flock cameras provide information that aids in the investigative process.

BY ATTORNEY FROMMER:

Q. It provides -- is it fair to say it

160

provides leads to investigators?

A. No. It's not fair to say it provides leads, because calling them -- the information leads would -- would indicate that the information is -- is what we need and that's not always the case.

It provides information and there are times we can use that information in furtherance of an investigation.

Q. Okay. And in those situations, it would be your investigators using that information to make inferences in the course of their investigation?

ATTORNEY KRAVIS: Objection. Vague.

THE WITNESS: I don't understand the question.

BY ATTORNEY FROMMER:

Q. I'm just trying to understand. You say it's information. I'm trying to understand, how is it -- how is that information useful to your investigators? That -- that's what I'm trying to get -- understand?

A. See, there's where it -- it's important to understand how the investigation plays out because

161

it may or it may not be useful.  The usefulness depends on whether or not it happens to be the information that is germane to this particular investigation.

So in the event that Flock, on the occasion that we're referring to here, provides a discrete piece of information that's related to a criminal investigation and that piece of information is -- is -- is part of the chain of -- of evidence that you need to further your efforts, then it's useful or -- or it's valuable.

Q.   Okay.

A.   So it works in a contextual way, and it -- it works that way in the event that it's with Flock cameras.

It works in the way in the event that it's, in fact, registration information that you're looking for.

Q.   Okay.  So the Flock cameras provide information to investigators; is that fair to say?

A.   In its most general sense, yes. Information of a particular type, which here would

162

be registration information.

Q.   And then the investigators could potentially take that information and use it as part of their investigations in furtherance of their investigations; is that correct?

A.   That is a potential contained in the context and in the information that -- the registration information that is obtained.

Q.   Yeah.  Obviously, some information will not be useful to investigators; correct?

A.   Correct.

Q.   And then -- okay.  But then -- yes.  We're done with this Exhibit 31.

ATTORNEY FROMMER:  So, Tamineh, if you can stop sharing the screen, please.

BY ATTORNEY FROMMER:

Q.   All right.  And thank you for bearing with me going through the video.  I knew it was going to be a little bit -- it was new technology, as well, so thank you for bearing with us.

I wanted to sort of -- I want to shift gears a little bit and talk about the capabilities

163

of the Flock ALPRs and the Flock system more generally.

And we've already talked about this a little bit, so I just want to make sure we're on the same grounds.

So what do you know -- I thought I asked you before.  Had you heard the term "vehicle fingerprint" before?

A.   Not before you mentioned it earlier.

Q.   Okay.  Have you ever heard the term "convoy analysis" before?

A.   No, I have not.

Q.   Okay.  Are you -- so I understand from our previous discussions that you understand the Flock cameras to capture the registration plate numbers; is that correct?

A.   Yes, sir.

Q.   Okay.  Do you have any understanding of any other information about a vehicle that the Flock cameras capture?

A.   No.  I'm not sure exactly what the parameters are.

164

Q.   Okay.  Do the Flock cameras capture -- will they capture cars without license plates that lack any registration plate number?

A.   I don't know.

Q.   Well, if I take a -- so if I take off my plate of my car and drive around Norfolk, you're not sure whether the Flock cameras will -- will take images of my car or not?

ATTORNEY KRAVIS:  Objection.  Asked and answered.

Go ahead.

THE WITNESS:  I don't -- I don't know --

BY ATTORNEY FROMMER:

Q.   Okay.

A.   -- what happens in that case.

Q.   Okay.  Do you happen to know if the Flock cameras -- do they capture images of people?

A.   I have seen images of people that I believe were captured from Flock.

Q.   Okay.  Does that -- what is -- so is that an incident where -- okay.

So you believe you have seen pictures or

images where Flock captured an image of a person?

A. I believe so.

Q. Do you know if the -- the Flock cameras, are you aware if they have video capabilities?

A. I don't know.

Q. Okay. I want to talk a little bit about how the city uses the system.

So does Norfolk use the Flock cameras and the system to get alerts from NCIC Veeson?

ATTORNEY KRAVIS: Objection. Vague.

THE WITNESS: What system are you referring to, sir?

BY ATTORNEY FROMMER:

Q. NCIC in the -- the Veeson databases?

A. Yes, sir. So what is your question, please?

Q. Oh. I was -- does Norfolk use its Flock cameras and its Flock system so that it can generate alerts based on vehicles that rely on the NCIC or Veeson databases driving past a Flock camera?

A. So our policy describes the appropriate use. I can't tell in your question if -- the way it's phrased if it aligns with our policy.

We're able to use Flock for legitimate law enforcement purposes and the policy lays out the conditions.

Q. Okay. And we'll talk about the policy in a little bit.

I was just wondering if there's a -- you know, a vehicle that's on Veeson that's been marked as -- and it passes by a Flock camera, would Norfolk police get an alert saying that vehicle passed by?

ATTORNEY KRAVIS: Objection. Asked and answered.

THE WITNESS: Is the car that you're referring to on Veeson? Is it -- is it stolen or what?

ATTORNEY FROMMER:

Q. Let's put a little more meat on the bones. I think talking in terms of abstract acronyms is not helping either of us.

So let's say there's a stolen car and it got put onto a hot list. Either a custom hot -- either a custom hot list or the hot list we're

talking about.

Does the NPD use its Flock cameras to trigger when a stolen car goes past a Flock camera?

ATTORNEY KRAVIS: Objection. Vague. Incomplete hypothetical.

Go ahead.

THE WITNESS: Yes.

BY ATTORNEY FROMMER:

Q. Okay. Let's say there's someone who is associated with a vehicle who has an open warrant, open arrest warrant.

Does Norfolk use its Flock cameras and system to look for that associated vehicle, so as to effectuate the arrest?

A. I would have to look at the policy to -- to precisely answer that question.

Q. Okay. Does -- that's fair.

How about from missing people? Does Norfolk use the Flock system to help identify missing people?

A. Our policy would permit us to use it --

Q. Okay.

A. -- to help find missing people.

Q. And I think we've talked about this previously, but the NPD, it uses its -- the Flock cameras and the system and the data it generates as part of investigations; correct?

A. I'm sorry. Can you repeat that?

Q. That the NPD uses Flock data from its Flock system in the course of investigations; is that correct?

A. Yes.

Q. Okay. And would it -- for example, would NPD use that data to see where a vehicle was at a particular point in time in the past, perhaps?

ATTORNEY KRAVIS: Objection. Vague. Incomplete hypothetical.

THE WITNESS: I would have to look at the policy to see, precisely, the answer to that question.

BY ATTORNEY FROMMER:

Q. Okay. What would you need -- what do you need -- we will look at the policy in a little bit, so we'll -- we can ask those questions in that

169

context.

Do you know if the city and -- city or NPD uses the Flock cameras for traffic enforcement?

A. If you're saying to enforce traffic laws, the answer is no.

Q. Do you know how patrol officers get access to the Flock system? I mean, how they physically get access to the Flock system?

A. No, sir.

Q. Okay. Do you know if they pull it up on their car computers?

A. I don't know.

Q. Okay. Do patrol officers get issued phones by the city?

A. Some do.

Q. Okay. Would a patrol officer be able to pull that up on their city phone, city-owned phone?

A. I don't know if they can or not.

Q. Okay. All right. Is it -- so they just -- you don't really have knowledge about precisely how patrol officers get access to the Flock system?

A. That's correct.

170

Q. Okay. And I think you mentioned before that you would never -- you never logged into Flock -- into Flock; right?

A. That's correct.

Q. You never played around with it trying to do some queries just to see what the bells and whistles were?

A. Never -- I've never done that.

Q. Okay. All right.

Well, then -- and I think we've talked about -- I think you said before that you were unsure about -- or you didn't know if Flock could capture information about a vehicle separate from its registration plate number; is that correct?

ATTORNEY KRAVIS: Asked and answered.

THE WITNESS: Okay. Correct.

BY ATTORNEY FROMMER:

Q. Okay. Is it -- okay.

ATTORNEY FROMMER: Actually, let's take, like, a five-minute break, if that's okay?

ATTORNEY KRAVIS: Okay. That's fine.

THE VIDEOGRAPHER: All right. We are

171

going off the record. The time on the monitor is 1437.

(A recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time on the monitor is 1446.

BY ATTORNEY FROMMER:

Q. Thank you, Chief Talbot. I want to move onto something a little bit different that -- the policies and procedures regarding the use and sharing of Flock data.

And I think we talked a little bit earlier this morning that as the head of chief of police, you're the person who has final decision-making about departmental policies; is that correct?

A. Yes, sir.

Q. All right. And does Norfolk have a written policy for the use of the Flock system?

A. Yes, it does.

Q. Okay. And just one, or does it have any others?

A. There is a policy for the use of the Flock system.

172

Q. Okay. Who wrote that policy?

A. I don't know who drafted the policy.

Q. Okay. Do you know who was involved in drafting the policy?

A. I know some of -- I know that Captain Thomas was involved and I know that I read it and signed it.

Q. Okay. And you got to my next question, which was, like, do you know who approved it?

A. Yes.

Q. And who did approve it?

A. I did.

Q. Okay. Thank you.

And do you know if the -- if -- NPD's policy on the use of Flock cameras, has it gone through any iteration or changes over time?

A. Yes, it has.

Q. Okay. All right. Are you aware of any unwritten policies that NPD officials follow when using the Flock system?

A. I'm not.

Q. Okay. So it'd be fair to look just at the

173

written policies for the rules regarding how NPD officials are supposed to use Flock -- the Flock system; is that fair?

A. Well, it's fair to say that the policy is the -- the policy and it governs all of the terms that are enumerated in -- in the document.

Q. Okay. Moving on just a little bit. What, if anything, do you know about what officers need to do if -- NPD officials need to do in terms of training in order to use the -- the Flock system?

A. I don't know the content of the training.

Q. Do you know if they need to take any -- if NPD officials need to take any training before accessing the Flock system?

A. I would have to review the policy to -- to say for sure.

Q. Okay. Okay. So you -- okay. So without seeing the policy, you can't recall, one way or the other; is that fair?

A. I can't recall, exactly, what it -- what is in place.

Q. Okay. Well, let's -- let's actually look

174

at a couple of the policies rather than just talking in general terms about them.

ATTORNEY FROMMER: Tamineh, can you put up Exhibit 3, please? This has been previously marked as Exhibit 3.

And I'm actually not going -- I'm -- this is an E-mail. But my focus is actually on the document that begins on Page 2.

BY ATTORNEY FROMMER:

Q. Just for the record, this is a -- an E-mail and document bearing Bates label NORF018634, NORF001521 and NORF018655.

An April 9, 2025 E-mail from Captain Thomas to Vernon and Gauthier.

So, do you recognize the document that's here on the screen in front of you?

A. Yes, I do.

Q. Can you tell me what it is?

A. It's the Flock Safety special order.

Q. Okay. And what date does it say?

A. It has a handwritten signature and the date is July 13th of 2023.

175

Q. Is that your signature?

A. It is, yes.

Q. Okay. Okay. Can you explain -- before we go any further, there's one thing I'm really confused by. And it's, like -- there's a thing called a "special order" and then there's this other thing called a "general order."

And I do not understand how the two of those relate to one another. Can you explain that to me?

A. No, I can't explain how they relate to each other. They -- they both serve the same function. They represent the policy and the requirements that officers must abide by, but the special versus general doesn't have -- there's no distinction that -- that makes any difference.

Q. Do you know? Is it whether different people review a special order versus a general order?

Is that the difference?

A. No. I'm -- well, I don't know. I actually don't know the answer to that question.

176

Q. Okay. All right. So you're not -- you're not clear what the difference is between the two of them; is that fair?

A. That's fair.

Q. Makes two of us.

Okay. In 2023 -- so let's scroll down, please. All right. All right. That's a good spot.

If you could look at 2B here, it's about two thirds of the way down the screen, and it says, "Patrol officers are required to sign into Flock Safety and utilize the technology throughout their entire shift."

Did I read that correctly?

A. Yes, you did.

Q. What -- what does that mean?

A. I don't know how to answer other than to read it again, like you just did.

Q. So does it mean that they're supposed to be using -- that patrol officers are supposed to be using Flock throughout their entire shift?

ATTORNEY KRAVIS: I'm sorry. I just want to make clear. You're asking now not about what

177

rules are today, but about what the rules were at the time that the special order was in effect?

Is that the time frame we're talking about.

ATTORNEY FROMMER: Yes. I am walking through each of the orders.

BY ATTORNEY FROMMER:

Q. And, Chief Talbot, the special order, I understand, went into effect on July 13th, as you mentioned, and then was later superceded.

So I'm just talking about this special order and NPD officials' obligations under it during the time -- during the time frame it was operative.

Do you understand?

A. Yes, sir.

Q. Okay. All right. So what I'm trying to understand is that in the special order it says that the patrol officers are required to sign into Flock Safety and utilize the technology throughout their entire shift.

And I -- I mean, I take -- I just want to get your understanding of what that is. And I think

178

it might well be that it's just what it says.

But if you can tell me, in your own words, what does this mean?

A. I don't have alternative words. It appears to be straightforward. Is there a particular word that is challenging for you?

Q. No. No. That's -- it's fine.

ATTORNEY FROMMER: All right. If we can go down to the next one, the next line, C.

BY ATTORNEY FROMMER:

Q. It says, "Flock Safety is to be utilized by personnel for law enforcement purposes only."

Did I read that correctly?

A. Yes, sir.

Q. And what I'm trying to figure out is what exactly is a "law enforcement purpose"?

A. It would be a purpose that is related to enforcing the law.

Q. Okay. I agree with you, although that is a bit circular.

Do you know if this is defined -- if "law enforcement purpose" is defined in any other

179

document?

A. I do not know.

Q. Okay. Do you know if NPD officials get any training on -- or -- strike that.

When this policy was operative, do you know if NPD officials got any training on what constituted a law enforcement purpose?

A. I do not know.

Q. Okay.

ATTORNEY FROMMER: And if we could go to G very quickly. Thank you.

BY ATTORNEY FROMMER:

Q. And this says, "Flock Safety will automatically delete data after a 30-day period."

Did I read that correctly?

A. Yes, sir.

Q. Okay. And I'm trying to figure out was that 30-day period Flock's own retention policy?

A. I don't know.

Q. Okay. You don't know. Do you know whether that was Flock's retention policy or whether that was NPD's retention policy?

180

A. Since it's listed this way in the special order, it would make it our retention policy. I don't know if it was also Flock's policy.

Q. Okay.

ATTORNEY FROMMER: And then if we can go down to the next page, please? Actually, can we go up?

BY ATTORNEY FROMMER:

Q. We were talking a little bit before about entering into -- entering alerts into the system.

And I just wanted to show you this part. It's part H.

A. Yes.

Q. And so you agree that -- well, take a moment to just take a look at that. Just let me know when you're ready.

A. Okay.

Q. I just -- I have a -- so this is the criteria for when something can be entered into the custom hot list; correct?

A. It says a lot there, including entering information into a custom hot list.

181

Q. Okay. The one thing I -- I was confused by is that in H -- do you see the bolded language that says, "entering a vehicle" -- "entering a vehicle into the custom hot list will require a documented criminal predicate"?

A. Yes, I see it.

Q. Okay. And I'm trying to square that with the fact that a number of -- or at least a couple of the reasons listed below, like, missing persons -- like a missing person doesn't have a criminal predicate.

You know, there's no crime, someone is just missing; correct?

A. Well, there certainly could be a crime involved in someone who is missing.

Q. Okay. But at the -- but that would require additional information to know, correct, to know that a person missing is correct -- connected to some -- for some illegal reason?

A. All of the parameters would require additional information, including missing persons.

Q. That's -- I'm just wondering how I could

182

enter a missing person into the custom hot list unless I know that that person is missing as a result of some sort of violation of law?

A. There are -- there are certainly ways.

Q. Okay. All right.

ATTORNEY FROMMER: Let's go down to J here. And I just want to talk about J and then we'll talk about K.

BY ATTORNEY FROMMER:

Q. Section J of the special order says, "Personnel are prohibited from releasing any specific information obtained by Flock Safety to any non-law enforcement entity."

Did I read that correctly?

A. Yes, sir.

Q. And why is that prohibition in place?

A. Well, we want to make sure that we're not allowing non-law enforcement personnel to have Flock information.

Q. I understand that. But that's just simply restating J. I'm asking why. Why are -- why does NPD prohibit its officials from releasing Flock

183

Safety data to non -- to people who aren't law enforcement?

A. That's how we share information. We share information with other law enforcement organizations. We tend to be sensitive about sharing outside of law enforcement, so that seems to be consistent with that.

Q. Well, I -- but why are you -- so I understand you share it with other law enforcement entities, but that you might be -- but you do not share with non-law enforcement entities.

But I'm trying to understand why, why is that restriction in place?

A. It goes back to some of the values that -- that we bring to the work and -- and making sure that we're minimizing the potential harm that we could bring to the community by, in this case, needlessly exposing the information that we are able to obtain by virtue of the jobs that we do.

Q. Okay. And what would be some of those harms that you're talking about that could occur from disseminating Flock Safety data to non-law

184

enforcement personnel?

A. Well, the closest thing I can think of is if you've ever encountered one of those morons who put on social media precisely when they're going to be away from their home for a week or so and then they come back and all their stuff is stolen, we want to make sure that we don't facilitate anybody suffering as a result of what we're doing.

Information of all kinds needs to be handled in particular ways. So we try to make sure that there's as narrow a distribution pipeline as we can bring to all of the information that we get.

And if we are sharing it, we want it to be for precise and appropriate reasons.

Q. Is -- so you mention one harm that can befall people, a situation where, in essence, they could get robbed or burgled.

Is -- is the concern with sharing -- spreading information outside law -- to non-law enforcement personnel, that doing so could violate the personal privacy of the person's -- whose information it is?

185

ATTORNEY KRAVIS: Objection. Mischaracterizes prior testimony. Also vague and incomplete hypothetical.

Go ahead.

THE WITNESS: No. I used the social media example as simply a way to compare inappropriate broadcasting of information without thought. So that is -- I try to use that to give you a sense of the values that we're bringing to our work.

BY ATTORNEY FROMMER:

Q. Well, let's talk about a situation -- let's say I'm a NPD officer. I'm not saying -- this is a hypothetical. I'm not saying any of your officers have done this.

And they have a friend whose girlfriend broke up with them and the friend -- the civilian friend is mad and so the NPD officer gives the civilian friend some Flock data to show where his -- all the various locations his ex-girlfriend's vehicle has appeared at over the past week.

Would that be an appropriate action by the NPD official?

186

A. No, it wouldn't be.

Q. And what kind of -- why -- why not?

A. The appropriate goals involved in that transaction wouldn't fall within our purview. We're not in the business of either facilitating or ending relationships or providing evidence to anybody to make decisions either way.

So that would be none of our business.

Q. Well, what I'm wondering, in that example, could that unauthorized dissemination, could that harm the ex-girlfriend?

ATTORNEY KRAVIS: Objection. Incomplete hypothetical. Calls for speculation.

Go ahead.

THE WITNESS: I imagine it could if -- if -- if the hypothetical boyfriend was unhappy with the hypothetical girlfriend in her travels, I can say it'd be detrimental, you know, unless he saw the information and was totally fine with it.

BY ATTORNEY FROMMER:

Q. And how -- I mean, I understand that it could harm her, but how would -- how would it harm

187

her to have that information out there?

What, if anything, is getting -- is the harm that she's facing from having her -- her location information out there?

ATTORNEY KRAVIS: Same objections.

THE WITNESS: It's your hypothetical. It wouldn't actually happen in my business. We wouldn't do it. And we wouldn't do it because we don't do things like that.

We don't share information to our friends who are not police officers involved in a particular investigation. And also for what sounds, to my ears, like frivolous purposes.

So the harm -- I don't know what the harm would be. I would have to, you know, think more precisely, I guess, about the hypothetical relationship between those two and see if anybody is violent or -- or what have you.

But we wouldn't do anything like that.

BY ATTORNEY FROMMER:

Q. Let's say a -- let's say we have the Flock cameras running and, you know, instead of going to a

188

proprietary, you know, database, it just gets posted onto a public website for all the world to see. A live running sheet of all the Flock hits in Norfolk.

Could that harm members of the public?

ATTORNEY KRAVIS: Objection. Vague. Calls for speculation. Incomplete hypothetical.

Go ahead.

THE WITNESS: Could it -- I -- I guess it could be somewhere in the causal chain, that -- that could lead to harm. You know, it's -- it's tough. You create tough hypotheticals because they're so far outside of my experience, I can't attach logic or anything that I've ever experienced to -- to an answer.

I wouldn't like it. If it were me, I wouldn't like it. I can tell you that. I don't know that I would be harmed, but I'd probably be unhappy.

BY ATTORNEY FROMMER:

Q. Well, why wouldn't you like it? I was about to ask. Like, let's say I took -- I know I -- I don't know if you drive a civilian car or a

police-issued car as part of your duties.

But let's say in either event, I take all -- I take all of your Flock data and just post it out to the world. In that situation, is that something that you'd be fine with or not?

A.   As I'm sure, posting everybody's Flock data out, I would be angry with you if you picked me out, but if this was going to be something in -- in our hypothetical scenario, we're just going to make the world a place in which everybody's registration information was somehow easily available to the public, I guess we would all adapt like we do when we work and we realize that all of our E-mail is somebody else's property, and we move on.

Q.   Well, my situation is just your -- it's just your location information. Nobody else's. I just -- I have -- I have powers. I decide that I want the world to know everywhere that Chief Talbot has gone and so I just released it to our website. Everyone can see it.

And now I'm just wondering, in that situation, it sounds like if -- you're saying that if everybody's was shared, you'd be okay with it, but if it was yours, you wouldn't. And I'm trying to understand why.

A.   I -- I want to be treated like everybody else.

Q.   So it's just an equity -- an equity -- you're offended just from an equity position?

A.   Yeah. Well, why -- why did you pick me and why am I subject to something that other people aren't? I don't --

Q.   But when you --

A.   -- appreciate that, in your hypothesis.

Q.   But why do you care? I mean, why do you care that your data is exposed, and why is it only fine with you if everyone else's is exposed, as well?

ATTORNEY KRAVIS: Objection. Asked and answered.

Go ahead.

THE WITNESS: I like to be treated the same way that others are treated. I'm -- I'm willing to be exposed to the same level of

transparency as anybody else. I don't opt out of anything because I'm chief of police or -- or anything else.

I tend to want people to be treated fairly as part of the values that -- that I hold. So singling me out makes me think somebody else could get singled out. So it's -- I'm sensitive about it.

BY ATTORNEY FROMMER:

Q.   And the sole basis -- and I'll just ask this plainly.

The sole basis of your offense would be not that this somehow exposed your private travels to the world, but just that it -- it didn't happen to everybody?

A.   I go to work. I go home. And I go to the grocery store. You know, so it would -- it would be incredibly predictable and boring.

The annoying part would be the part where for some reason, I'm being treated differently than -- than others. I think all of us are sensitive to feeling as if there's some sort of special condition or requirement that we're subject to that nobody else is subject to.

That's truly aggravating. I actually haven't experienced it, but in my imagination right now, it's truly aggravating.

Q.   Okay. Irrespective of how you personally see it, do you understand that -- do you -- I'm trying to figure out the right way to say this, so --

Do you understand that other people -- sorry. Strike that.

Even if you, you know, would only have a problem with this, the dissemination of your location data from an equity perspective, do you understand that others that -- strike that.

Do you think -- yeah, so imagine most -- just imagine most people, a situation -- do you think most people would be okay with or not be okay with NPD posting all the data from its Flock system about their movements onto a public website?

ATTORNEY KRAVIS: Objection. Vague. Calls for speculation. Incomplete hypothetical. Lack of foundation.

193

Go ahead.

THE WITNESS: I'm -- I'm of the opinion that many of the people that I encounter post much of their lives online in some form or -- or fashion, and you can see all manner of what I would consider private facts about human beings on the internet.

I don't think one's registration information even approaches what you can find spending 17 seconds on Snapchat.

So I don't have any experience or any awareness that this would be troublesome to a -- to others.

BY ATTORNEY FROMMER:

Q. Okay. So you don't really -- is it your testimony, you don't really think that members of the public would be concerned about their Flock data being posted to the internet?

ATTORNEY KRAVIS: All the same objections plus asked and answered.

THE WITNESS: I guess I'm really saying I don't know. I don't know either way.

BY ATTORNEY FROMMER:

194

Q. What do you think the city council would say if tomorrow you just decided to post all the Flock data onto a public website?

Do you think the city council would call you in and say, "good job" or do you think they'd have some questions?

ATTORNEY KRAVIS: Objection. Calls for speculation. Incomplete hypothetical.

THE WITNESS: I think that they would wonder if I got kidnapped and somebody was impersonating me because they know I'd never do something like that.

BY ATTORNEY FROMMER:

Q. Okay. All right. I think we've talked plenty about the release of information to non-law enforcement personnel, so let's -- let's move on about that.

Give me just -- give me one second. This will only be one second.

Okay. All right. Let's put this exhibit away. And let's turn to another exhibit. This is Exhibit 8. It's been previously marked as Exhibit

195

8.

ATTORNEY FROMMER: Tamineh, I'm actually going to share screen just so I have a little more control. All right.

BY ATTORNEY FROMMER:

Q. You should be seeing -- do you see that there?

A. I do.

Q. Okay. This is Exhibit 8. Do you recognize this document?

A. Yes, I do.

Q. Okay. Can you tell me what it is, please?

A. It is the memorandum announcing the Flock general order.

Q. Okay. And when was this dated?

A. It's dated June 30th, 2025.

Q. All right.

ATTORNEY FROMMER: If we can jump down to the Bates page NORF021155. Oh. Wait. Sorry. I forgot that I'm sharing screen and you can see that automatically.

BY ATTORNEY FROMMER:

196

Q. And I wanted to talk about here. This language. Do you see that?

A. I do. I do. Yes.

Q. Okay. And I'll just read it. "NPD Flock Safety ALPR system administrators will be responsible for adding personnel system users reviewing data sharing requests with other jurisdictions for acceptance or approval and conducting an audit of the Flock Safety ALPR system every 30 days."

Did I read that correct?

A. Yes, sir.

Q. All right. Thank you.

And I was just wondering, who are the administrators? Do you know?

A. No, I don't.

Q. Okay. You don't know who the system administrators are.

Do you know how the audits are performed?

A. Not precisely, no.

Q. What do you mean by "not precisely"? Can you -- why don't you explain to me to the extent you

have an understanding of the audit policy -- process, if you can just walk me through it.

A. Well, I have an understanding of audits. And I have an understanding of the policy, so those two understandings give me a sense of what is probably happening in an audit.

Q. Let me make sure I -- need to unpack that a bit.

So when you're saying, "I understand what an audit is," you're just talking about, like, the general definition of the word "audit"?

A. Right. Yes, sir.

Q. Okay. And you're saying -- but do you have any -- do you have any actual knowledge, not about audits, generally, but how the Flock -- how NPD does an audit of the Flock Safety system?

A. No. Not in terms of what happens when human beings sit down at a computer terminal. I don't know what occurs from there.

Q. Okay. So you don't know -- is it fair to say that you don't know what an administrator might be looking for in the course of, like -- of an audit?

A. That's -- that's not fair to say.

Q. Okay. Well then, what -- what did they look for?

A. They would be looking for evidence that users have complied with our policy.

Q. Okay. And if they found -- if administrators found a violation of policy, what actions, if any, are they required to take?

A. Policy violations should be dealt with in a number of ways or could be dealt with in a number of ways.

It could be coaching. It could be discipline. It could be some counseling. It could be training.

So some determination would need to be made about how to appropriately address the problem.

BY ATTORNEY FROMMER:

Q. I -- I understand that. I'm asking, like, let's say there is a violation or let's say a system administrator does discover a violation.

What actions, if any, do they -- are they required to take that are required, not what they could do, but what are they required to do?

A. The question can't be answered in the absence of a -- a specific violation.

They -- they could see something that is indicative of a typo, and it -- if that was the case and it was one off, I would say nothing. That the response would be to do nothing, to move on to the next thing.

If it was some sort of -- whatever they uncovered was egregious in their minds or could be egregious, then they should be following the process as it relates to addressing any inappropriate behavior that constitutes a policy violation.

Q. Well, and that's what I'm asking, is that if they come -- and I agree with you. I'm not talking about a typo or anything like that. I'm talking about a clear violation of the policy.

And all I'm asking is that if they run across that, are there actions that system administrators must take, pursuant to policy?

A. I -- I -- I'm trying to answer your question. The -- the requirement would be the same requirement that all of us have when we see a violation of our rules and regulations, so it would depend on the severity of the infraction.

And the range of solutions would go from, you know, a conversation all the way up until termination depending on exactly what happened. So they would be doing their job.

I guess Flock doesn't occupy some special ground independent from the rest of my police department. Violations of Flock are like violating use-of-force policy or violating our policy as it relates to using sick leave.

Any violation should be dealt with the same way you would deal with any infraction. That would apply to administrators as well as everybody else.

Q. Okay. Sorry. I accidentally interrupted you a tiny bit there, so I apologize.

So like with the use-of-force -- use-of-force policy. Let's say you're aware that someone has violated the use-of-force policy.

201

Does the use-of-force policy require you to take some sort of action, corrective action, with regard to the person who violated the policy?

A. The -- the requirement is in the oath as opposed to the policy.

Q. I'm not sure I -- sorry.

A. The -- the requirement to act is contained within the oath of office for your position.

Q. Okay. I'm just -- all I was wondering is if -- if there's a violation of the use-of-force policy, is there anything that -- in that policy that says that NPD has to take action, has to take some kind of action in response to the violation?

A. If -- if it were contained within the policy, I'm saying it would be redundant because the requirement to address it is contained within the oath of office.

Q. Okay.

A. It supercedes the policy. It supercedes whether or not it's in Flock or The Realtime Crime Center, any aspect of the organization. It's the oath. It's the fact that you're a police officer

202

that creates the obligation to do something about it.

Q. Okay. All right.
All right. I'm going to move on a little bit. And can you see me scrolling up to Section 3 here?

A. Yes.

Q. All right. And I was just -- and you should have a copy of the special order, so feel free to look at the two of them.
And I was wondering here under "Permitted Purposes," I was wondering if this differs from the previous policy?

A. I'm certain that they're not identical.

Q. Okay. Do you know how they're different?

A. I don't know, specifically. I can put them side by side and I'm happy to point it out for you.

Q. Okay. Well, let's just talk about this document since it's -- it's the actual live document that is operative and binding on -- on the department right now.

203

A. Yes, sir.

Q. In -- I wanted to understand. Could an NPD official use the Flock system to assist in a -- into a -- as part of a joint federal state task force looking into violations of federal law?

ATTORNEY KRAVIS: Objection. Incomplete hypothetical.

THE WITNESS: No.

BY ATTORNEY FROMMER:

Q. And why do you say that?

A. Section 3, permitted uses and system access. Subsection A, permitted uses. A1 says, "The Flock Safety ALPR system, including downloads, queries and hot lists may be used only in the following circumstances per Virginia law."
And then it talks about in subsection small A, "As part of a criminal investigation into an alleged violation of the code of Virginia or any ordinance of any county, city, or town where there is reasonable suspicion that a crime was committed."
And -- and it doesn't give any space there or any permission for federal offenses.

204

Q. Okay. All right.
Actually, you mentioned a couple words there I found interesting. You mentioned there, "reasonable suspicion."
Do you see that in sub -- sub A in the last line of that right here?

A. Yes, sir.

Q. I was wondering if you could look at the next section. What I'm trying to figure out is -- it's a couple of things.
One is, do you know what a person associated with human trafficking -- what -- who could that be? Who would fit that description?

A. A person being trafficked, a person trafficking, a person attempting to exploit an individual who was being trafficked would all fit that definition.

Q. Okay. So you -- both victims and suspects could fit under that definition; is that fair to say?

A. I tend to use more words than you, but, yes.

205

Q. One thing that I noticed here, in part A it requires that you have reasonable suspicion to conduct a query; correct?

A. I'm sorry. Can you say that again?

Q. In the section immediately above, right, it says, "Where there is reasonable suspicion"; correct?

A. Correct.

Q. And then look at part B. Does it require any sort of quantum of suspicion?

A. So I -- part -- subsection A seems to be an onramp to a criminal investigation and -- and B is during a criminal investigation.

Q. I'm not sure I follow. But if the investigation is into an alleged violation -- alleged human trafficking, then why wouldn't B, itself, allow someone to query Flock data regardless of whether they have reasonable suspicion or not?

A. A refers to reasonable suspicion that there's no requirement for reasonable suspicion, and B, if you are involved in an active investigation, you have already passed that threshold of

206

reasonable -- reasonable suspicion.

You said, "alleged human trafficking," but it doesn't actually say that in the policy. It says "associated with human trafficking," which indicates that we've already determined that is the case.

Q. Okay. I -- so you're -- I think I understand what you're saying.

Are you saying that B would only kick in if there was already an investigation under way in that -- let's say I thought someone -- there is no investigation.

I just see someone going down the street, you know, and it appears that they have somebody -- they're human trafficking somebody, right. There's no investigation up to that point.

Can I -- can I go onto -- I got their license plate, though, and I -- I -- I don't have -- can I -- can I pull the Flock data for that vehicle?

ATTORNEY KRAVIS: Objection. Incomplete hypothetical. I think at this point, it actually calls for a legal conclusion.

You can answer.

207

THE WITNESS: It sounded like your -- your hypothetical was one in which reasonable suspicion would have had to have been overcome in your assessment of whether or not you're seeing what you think you're seeing.

So if it was the case that you had reasonable suspicion, then you would be at subsection A, in which case -- in which case you -- you would be fulfilling the requirement for subsection A.

BY ATTORNEY FROMMER:

Q. Okay. But if I just saw a car drive down the street and I had a hunch that that was some human trafficking that went by, it's just a hunch, I don't have any real articulable facts to go to, could I pull the Flock data in that situation?

ATTORNEY KRAVIS: Same objections.

Go ahead.

THE WITNESS: If you're using the term "hunch" as something below the level of reasonable suspicion, some level of evidence below the -- the level of reason -- reasonable suspicion, the answer

208

is no.

BY ATTORNEY FROMMER:

Q. Okay. Okay. And so these purposes that are listed in A1, A through C, do any of those uses require a warrant?

A. No.

Q. Okay. Do any of those uses, permitted purposes, require that the official have probable cause?

A. No. There's no mention of probable cause there.

Q. Okay.

A. If you had an outstanding warrant?

Q. Mm-hmm.

A. At some point in that chain of events, probable cause would have been developed.

Q. Sure. But I don't -- I'm sorry if you were continuing?

A. Well, I was -- so I don't know if that's responsive to your question, but -- so that would be an instance of where it would be the case, but I don't -- but that requirement is not in the

permitted purposes.

Q. Okay. Are -- are -- looking at this, are there any uses of the Flock system that you know are permitted that are not identified in 3A?

A. These are the permitted purposes as per our policy.

Q. Okay. So you don't think there are any others. Okay.

A. Well, there can't be any others because our -- our policy dictates what the purposes are. So that would be it.

Q. Got it. I want to focus your attention on this. It says "The Flock Safety" -- this is -- do you see where I'm at? I'm at 3A3.

A. Yeah.

Q. It says, "The Flock Safety ALPR system will not be used to interfere with individuals engaging in lawful activities or tracking individuals on the basis of the content of lawfully-protected speech."

And I'm wondering would it -- well, a couple of things.

One, why is speech broken out here separately from other lawful activities?

A. I would say in an -- in an abundance of caution.

Q. Okay. So wouldn't it be appropriate -- in your position as chief, would it be appropriate if Norfolk officials used the Flock system to try to identify people who were at protests?

A. Only if --

Q. Speech and fully lawful activities. I'll add that caveat to clarify the question.

A. No.

Q. Okay.

ATTORNEY FROMMER: And let's move down to C.

BY ATTORNEY FROMMER:

Q. And in C1 it says, "Officers are required to sign into the Flock" -- do you see where I am?

A. Yes, sir.

Q. "Into the Flock Safety ALPR system at the beginning of each shift, such that the technology is available for use throughout their shift based on operational needs. The Flock Safety ALPR system can be minimized or otherwise remain in the background."

And you -- how many -- how many Norfolk personnel, police department personnel, have access to Flock?

A. I don't know the precise number.

Q. Okay. Well, how many sworn officers did you say NPD has?

A. Approximately 550.

Q. Okay. And so all of -- do you agree with me? All those people would have access?

A. I'm one of the a 550, so, no. I mean, I could have access if I wanted to. I'm sure nobody is going to tell me no, but...

Q. All right. So you -- sorry. You don't have access to the system?

A. I don't have a log-in or whatever is required, no.

Q. You never got one of those created?

A. Well, I've never asked for one -- for one to be created. There might be one for me out there somewhere, but I'm not aware of it.

Q. Okay. But how many officers do you have on the NPD?

A. Patrol officers?

Q. Yeah.

A. Somewhere around 250.

Q. Okay. And so they would all be required to sign into the Flock system at the beginning of their shifts; correct?

A. Correct.

Q. Okay. Okay.

ATTORNEY FROMMER: Let's go down to D.

BY ATTORNEY FROMMER:

Q. This is entitled "Queries." Do you see where I am?

A. I do.

Q. Okay. And so it says a number of things. It says, "Queries may be used only in connection with the permitted purpose listed under Section 3A. The query made in connection with a crime also requires reasonable suspicion.

The user must enter the following information to the corresponding data fields of the

213

Flock Safety ALPR system to initiate a query."

It includes, it looks like, the three different rows here: parameters, a case number, and an offense type.

And I was wondering. Can you explain to me what a case number is?

A. So, calls for service and investigations are assigned a unique identifier, so the case number is referring to that unique identifier that is attached to a discreet series of events that relates to some sort of criminal behavior.

Q. So is a call for service like -- explain to me the difference between a case number and a call for service number because I'm slight -- it sounds like they're a little bit different, but I don't understand how.

A. A call for service is related to an officer being dispatched to a particular location to do a preliminary investigation.

When they get there, they may find that a crime was committed or evidence that a crime was committed or they might find nothing. Nothing

214

useful or nothing police related.

If they do find evidence of a crime or a crime, a case number is developed.

Q. Okay. Okay. That actually -- that's very helpful. Thank you. Because I didn't understand.

A. You're welcome.

Q. Is there any time a case number could get generated without there being a call for service number first?

A. Yes.

Q. What would that -- just give me a -- sort of an example when that would occur.

A. Police chief calls the captain and says, "Hey, I just saw this thing. Have somebody go check it out." And they go check it out and it turns out, yep, you saw, you know, a crime. And we're on it.

Q. Okay. I see. So a call for service is, like, hey, let's send somebody out. There might be something there.

And then a case number is, oh, there is something either there, there's some criminality afoot?

215

A. Correct.

Q. Okay. I got it now. Thank you.

A. You're welcome.

Q. So an officer would need to put in a number -- either a case number or a call for service number and they then would also have to put in an offense type; is that correct?

A. Correct.

Q. All right. And here it says -- it seems like there are descriptions for what constitutes reasonable suspicion is just a few words. Is -- are those sufficient?

A. Are they sufficient for what purposes?

Q. No. To -- for -- to be able to evaluate post hoc whether the query was legitimate, whether it comported with policy. And that's what I'm asking.

Is the information that is provided here sufficient to know -- to be able to determine after the fact if the officer actually had reasonable suspicion to conduct the query?

A. Yes.

216

Q. Okay. Why do you say that?

A. Because it's -- it's not a single data point that would be indicative of whether or not the officers are in compliance.

Here we have several parameters. We have licenses -- we have the license plate or vehicle characteristics and -- and what's listed there.

We either have a case number -- if there is a case number, there would be extensive information connected with a case.

Or we have a call for service number. There would also be additional information connected with a call for service.

In addition to those two pieces of -- of information, we would have subsection C, which is both a specific offense type and some language that's indicative of reasonable suspicion was obtained.

So I think if -- if you have all that data, there's a substantial amount of evidence that the officer has reasonable suspicion.

Q. Okay. All right. And we'll talk about

217

that in a little bit -- in a little bit.

I had a question. I'm in section 4 of the general order procedures, and going to page NORF021159. And I had -- it's a question about this section called, "Data Downloads."

I'll give you a second -- second. Please take a look at it.

A.   Okay.

Q.   Okay. And what I'm wondering is if -- is it your understanding that Virginia law limits the data -- the retention of Flock data for 21 days?

A.   Yes, that's my understanding.

Q.   Okay. And what I'm trying to understand here is that B1 seems to indicate that personnel can download system data as long as it's related to one of the purposes we discussed previously.

Do you agree with that?

A.   Yes, I do.

Q.   Okay. And what I'm wondering is if -- if they download the system data, how does the NPD ensure that the 21-day limitation in Virginia law is honored?

218

ATTORNEY KRAVIS: Objection. Vague. And also assumes facts.

THE WITNESS: The -- the permitted download that's described here -- the implication is that the data would be still in the Flock system. This is independent of -- of that requirement.

For this to be permissible, we would have to fit within the parameters of Section 3A that -- that we just went over extensively. So we're either investigating a crime or we have reasonable suspicion that there is a crime.

So -- so the data that is downloaded would be falling under the umbrella of this investigation process.

If the investigation didn't bear out, then the report and the information in those reports fall under our internal policies as it relates to retaining information.

BY ATTORNEY FROMMER:

Q.   All right. Okay. And then let's just move down just a little bit here to C. And it -- the general order says it imposes internal audits;

219

correct?

A.   Yes, sir.

Q.   Okay. And how often are those audits supposed to occur?

A.   At least every 30 days.

Q.   Okay. And do you know who conducts those audits?

A.   No. I don't know, precisely, who is conducting the audits.

Q.   Do you know what they do as part of conducting an audit?

ATTORNEY KRAVIS: Objection. Asked and answered.

THE WITNESS: They check for compliance to the law and to our policy.

BY ATTORNEY FROMMER:

Q.   And that would mean evaluating whether a query provided the parameters a case number or a call service number and an offense type along with adequate, reasonable suspicion; is that correct?

A.   Yes, that is -- that would be fair game in an audit, yes.

220

Q.   Okay. And if a query didn't satisfy the parameters, case or a call service number or offense type and reasonable suspicion, that would be a query that violated policy; correct?

A.   Correct.

Q.   Okay.

ATTORNEY KRAVIS: And, Counsel, I don't know if you're almost finished with this document or moving onto another topic or how much you have left of the deposition, but I think we've been going maybe an hour and 15 minutes.

So whenever it makes sense to you to take a break, unless you were close to the end.

ATTORNEY FROMMER: Yeah. Why don't we -- why don't we take a five-minute break. I'll -- let me turn off sharing here.

Why don't we take a five-minute break. We don't have that much left, but let me go talk with folks. So let's be back in five, if that's okay?

THE WITNESS: Thank you.

ATTORNEY KRAVIS: Sounds good.

THE VIDEOGRAPHER: We're going off the

221

record. The time on the monitor is 1601.

(A recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time on monitor is 1610.

BY ATTORNEY FROMMER:

Q. Thanks, Chief Talbot.

A. You're welcome.

Q. I have just a few questions about -- a few questions.

When, approximately, did the Flock system become operative? When did it go live?

A. I'm not sure when it went live.

Q. Was it -- well, I recall we discussed your special order, right, that you signed on July 13th, 2023.

Do you know if this is -- if the Flock system was up and running by that date or around that date?

A. I believe it was up and running by that date.

Q. Okay. All right. So we know in the summer of 2023 is when Flock got -- the Norfolk

222

Flock system came up.

When was the first time anyone at the Norfolk Police Department conducted an audit of the Flock data?

A. I do not know.

Q. Do you know if any occurred in 2023?

A. I would not receive that -- that information. I'm unaware of what -- what's happening there.

Q. Well, do you know if there's ever been an audit of the Flock data that's been run by NPD?

A. I do not know.

Q. So you don't know -- I just want to make sure I understand.

So you're currently unaware about whether the Norfolk Police Department has ever run an audit of -- of the Flock data?

A. I don't -- I don't know.

Q. Are you aware of -- have you ever been made aware of any violations of -- of the -- either the special order or the general order regarding Flock policy?

223

A. Yes, sir.

Q. Can you describe those situations -- those violations -- how many violations were you made aware of?

A. The most vivid recollection that I have is of an officer who has since retired using the Flock system to locate his stolen pet.

Q. Are there any others that you've been made aware of?

A. I have been made aware of inappropriate entries into the system.

Q. Like what?

A. Like, incomplete -- incomplete characters, if you will, into one of the boxes that have to be filled out.

Q. Okay. And so is that a situation where somebody just failed to fill out one -- one or more of the fields in -- in the required fields?

A. Yes, sir.

Q. When were you made aware of that?

ATTORNEY KRAVIS: And I'm not -- I'm not sure if this applies here, but I'm just going to

224

offer the instruction anyway.

Chief Talbot, in answering the question, I'm going to instruct you not to divulge the substance of any communications that you had with the lawyers in preparation for your deposition.

So if there's another conversation that is not those conversations that's responsive to the question, you can answer that.

Otherwise, I'd instruct you not to answer.

THE WITNESS: Very good.

I have no response.

BY ATTORNEY FROMMER:

Q. Okay. By implication, this is the first time that you heard this is when you consulted with the lawyers. Okay.

Are you aware of any officer ever being disciplined for violating the Flock policy, either the special order or the general order?

A. The officer that I alluded to regarding the stolen pet would have been disciplined, had he not left the organization.

Q. Had -- do you know if that officer

225

actually signed the paperwork saying he would agree to abide by the policy?

A. I don't know for sure.

Q. And if he hadn't, would that mean that -- would he still be eligible for discipline?

A. He would have been disciplined. I reviewed the investigative file that was presented to me and he would have received discipline.

Q. And -- but since he's retired, do you have -- you have no ability to discipline a retired officer?

A. No, I don't.

Q. Okay. All right.

ATTORNEY FROMMER: With that, I will pass the witness.

ATTORNEY KRAVIS: I don't have any questions. Thank you.

ATTORNEY FROMMER: Okay. All right. Well, thank you very much, Chief Talbot. I know today has been a little bit long, but thank you for going back and forth with me and it's been a fascinating conversation.

226

THE WITNESS: Thank you.

THE VIDEOGRAPHER: All right. We are going off the record. The time on the monitor is 1617.

THE REPORTER: Attorney Kravis, do you need a copy of the deposition transcript?

ATTORNEY KRAVIS: Yes, we do. Somebody from my office will follow up with you on that.

THE REPORTER: Thank you. Do you need a rough draft?

ATTORNEY KRAVIS: Yes. A rough would be great.

(A recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time on the monitor is 1618.

ATTORNEY KRAVIS: Thanks, everybody. Sorry. I always forget to do this at the end.

On behalf of the city, I'm going to designate the deposition transcript as confidential under the protective order.

THE VIDEOGRAPHER: All right. This conclude's today's deposition. The time on the

227

monitor is 1618.

- - -

(Thereupon, the deposition was concluded at 4:18 p.m. Signature was waived.)

- - -

228

COMMONWEALTH OF PENNSYLVANIA )
                                                    ) SS
COUNTY OF BERKS                          )

CERTIFICATE

I, Alyssa A. Repsik, a notary public in and for the Commonwealth of Pennsylvania, do hereby certify that the witness, CHIEF MARK TALBOT, was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth; that the foregoing deposition was taken at the time and place stated herein; and that the said deposition was recorded stenographically by me and then reduced to typewriting under my direction and constitutes a true record of the testimony given by said witness.

I further certify that I am not a relative, employee, or attorney of any of the parties or a relative or employee of either counsel and that I am in no way interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 3rd day of August 2025.

_____
Alyssa A. Repsik, Notary Public
Court Reporter
Notary Public
Berks County
My Commission Expires March 12, 2028
Commission Number 1296614