# EXHIBIT 30

*ECF # 111-12*

*under seal*

# REBUTTAL EXPERT REPORT ON BEHALF OF PLAINTIFFS

*Schmidt v. City of Norfolk*, No. 2:24-cv-621 (E.D. Va.)

**Andrew P. Wheeler, PhD**

*2025-08-23*

**CONTAINS AND REFERENCES INFORMATION SUBJECT TO PROTECTIVE ORDER**



# Table of contents

Response to Expert reports by Horan & Estevez ...............................................3

   Response to Horan.......................................................................................3

   Response to Estevez ...................................................................................7

   Materials Used............................................................................................9

# Response to Expert reports by Horan & Estevez

This is a response to the critiques presented by the defendants' experts in this case:

- Kevin R. Horan, Expert Witness Report: Comparative Intrusiveness of Location-Based Technologies
- Valentin Estevez, Expert Report

## Response to Horan

Horan states "In my professional experience, when law enforcement seeks to determine where a person was at a particular time, or to track (i.e., follow the path of), their movement across multiple locations, they rely on CSLI or GPS data." Although it is true that law enforcement sometimes uses these other technologies to surveil individuals, that does not in any way invalidate the analysis I provided. The existence of other technology does not hinder the current capabilities of automated license plate readers to accomplish similar objectives. And, as I explain further below, my experience is that police and investigators typically rely on multiple sources of information and intelligence to determine the locations of individuals of interest in investigations.

Because law enforcement can currently access ALPR tracking data without a warrant, it is often the first and preferred source of location data, and reviewing it can yield valuable insights. For instance, I am aware of a Norfolk police officer who testified in state court that he was able to reconstruct a suspect's route and catch the suspect lying about where he was using multiple Flock hits.[1] Norfolk's witnesses have similarly testified in this case that officers were able to use Flock data to track down and arrest suspects in areas near Flock cameras, including intercepting a suspect at his home after he committed a crime.[2] And Flock has advertised in a podcast that "for $5,000" its clients can identify "every single car that passes the roadway on this street in this high crime area."[3]

What makes these scenarios relevant to this particular case is they all involve instances of retroactively examining data to glean insights, as opposed to actively identifying plates against a specific list (such as when a stolen vehicle is placed on a hotlist). These examples show how Flock data can be used in the real world to reconstruct an individual's route based on multiple Flock hits in a given time period, track down an individual of interest at a specific location (including their home address), and query multiple records surrounding specific locations to generate

---

[1] Motion to Suppress Hearing Transcript at 6-10, 28–29 in *Virginia v. Church*, Case No. CR24000304-00, -01, -02 (Va. Cir. Ct., Norfolk Apr. 24, 2025).

[2] Charles Thomas Deposition Transcript at 194-99, 306-07.

[3] https://www.youtube.com/watch?v=Rn9i7CD6aqI&ab_channel=FlockSafety (at minute 20).



investigative leads without having a suspect in mind in advance. This information is extremely valuable to police departments. Unlike CSLI, it does not currently require a warrant and relies on a police department's own records, as opposed to records that must be obtained from a third-party company. And unlike GPS, it does not require knowing and targeting a suspect in advance.

Horan goes on to state that ALPRs "do not provide information on a vehicle's origin, destination, location between captures, whether a vehicle stopped at a location between captures, nor, if so, how long a vehicle stopped at a particular location." This is an overstatement that ignores context and investigative skill. The information Horan claims ALPRs "do not provide" can often be directly inferred by captures, as stated in my initial report. I give one example of how an investigator could infer ██████████ route based on the locations and timestamps of captures:

> One can additionally infer approximate travel paths, given that the captured instances also have associated time stamps with them. For one example, shown in Figure 6 below, ████████████ on ALPR on March 6th at 7:45 AM, and then subsequently captured on the camera outside of Harbour View East Shopping center at 7:47 AM.

> While such information can seem innocuous, in my experience as a crime analyst, similar information is used to surveil individuals in police investigations. For example, it is somewhat common in my experience to compile locations where individuals frequent, such as friends' houses or public places where individuals commonly spend time. Such information is used to geoprofile individuals and identify if they are likely associated with particular criminal activity nearby in space. Of course, this is most helpful where the surveilled individual's identity is already known, as it typically is when police have a license plate number, they can use to look up the registered owner of the car.

> While these two datapoints alone do not necessarily distinguish between whether ████████████ stopped at the shopping center (or the Department of Defense Suffolk complex), there was a subsequent capture much further south on the Nansemond Parkway at 7:56. That provides additional context that can be used to narrow down the possibilities. Given the multiple captures on ALPRs and the timing and order of capture, the only reasonable inference is that ██████ traveling westbound on the Hampton Roads Parkway, turned North onto College Drive, then took the exchange to the Hampton Roads Beltway South, and then took the exit onto Portsmouth Boulevard West and continued onto Nansemond Parkway. The combination of multiple cameras and time stamps allows one to create a web of travel patterns that one can use to subsequently reconstruct the whereabouts of an individual.

One can make reasonable inferences when individuals have stopped at locations and the general area they likely visited, as well. I discussed one such scenario in my original report, where ████████ vehicle was captured on ALPR in the network of cameras depicted in Figure R1 below.



*Figure R1: Area of Flock cameras (green circles) in Norfolk. The A cluster was the first capture of ▮▮▮▮▮▮▮▮▮▮▮, and then the B cluster was a capture at ▮▮▮▮▮.*

▮▮▮▮▮ was captured traveling northbound on Ballentine and then westbound on Lafayette in the cluster of cameras (labelled as #1, #2, & #3) slightly after ▮▮▮▮ ▮▮▮▮▮▮ Then at ▮▮▮▮▮▮▮▮▮ was captured on the camera (labelled #4) traveling southbound on Tidewater. While it is technically possible to drive out of this area without being captured on cameras, it requires a very circuitous route through various residential streets to avoid detection on the cameras. It seems



unlikely that the average person would take such a circuitous route. A person would likely do that only if they had committed a crime and were trying to evade detection. Given the subsequent capture at the camera labelled #4, I can make the inference ▬▬▬▬▬ likely stayed in the approximate area south of Lafayette in Figure R1, as that would imply a typical driving pattern to result in captures listed.

Of course, this analysis and my other analyses do not necessarily identify the specific location or address a person visited based on ALPR captures alone. But evidence never exists in a vacuum. In my experience as an analyst and consultant, police commonly rely on multiple sources of information to fill in gaps, including regular criminal intelligence known to investigators, public records, public open-source intelligence, and police camera networks.

Indeed, CSLI provides a similar level of geographic detail, and it is misleading for Horan to suggest that it is necessarily more precise or comprehensive than ALPR data. CSLI does not provide the exact location of an individual, only the person's general vicinity, which is just an approximation based on the density of the cellular tower network in a given location.

Horan's suggestion that the "644 cellular towers across all major wireless carriers" in Norfolk "will record data about the timing and location of a person's origin and ultimate destination as well as the places that they pass and the stops that they make along the way" is deeply misleading and lacks important context. To start, a given person's phone will only connect to the subset of towers their carrier uses.

The location records these towers generate will also not pinpoint people's locations in the manner Horan suggests. Instead, they will, at best place a person within the approximated coverage area of the cell tower and sector to which the person's phone connected at a given time. Coverage areas can range widely and are typically much larger (and less precise) in residential areas than in dense, urban areas. The approximated coverage areas are themselves imprecise and sometimes wrong. Horan has himself said that relying on these approximated coverage areas is "highly problematic and misleading" and that the only way to correctly determine a cell tower's precise coverage area is by doing a real-world "drive test," where he uses equipment to generate the precise coverage area.[4]

To demonstrate this point in concrete terms, Figure R2 below shows the approximated coverage areas of Verizon's[5] cell towers in Norfolk and layers those approximated coverage areas on top of a map of the defendants' Flock cameras. As I explained above, the coverage areas are just approximations based on the assumption that a cell phone will connect to the nearest tower, as in practice that should be the strongest tower. On average, the approximated coverage areas of

---

[4] https://www.nbcnews.com/news/us-news/university-idaho-murder-suspects-alibi-defense-puts-spotlight-cellphon-rcna148405.

[5] Other major cell providers (like AT&T) look similar in Norfolk.



Verizon's towers are around 0.4 square miles. This ranges widely throughout Norfolk, however, and coverage areas tend to be much larger in residential areas than along urban corridors. As is obvious from Figure R2, defendants' Flock cameras follow a similar pattern.

*Figure R2: Approximate coverage areas of Verizon Cell Towers in Norfolk.*

Again, this map shows approximated coverage areas. As Horan has himself stated, it would be inaccurate to assume that CSLI could pinpoint a person's location or even place them with certainty within one of these areas. Horan's assertions to the contrary in his report are demonstrably wrong and inconsistent with his own public statements.

## Response to Estevez

Estevez states that "there are 1,839,974,400 square feet in the City of Norfolk. Assuming that every Flock camera the NPD has access to within the City of Norfolk



captures data at the optimal range of 30 feet, a conservative estimate is that Flock cameras cover 0.0083% of the City area." A total estimate of the area covered by the cameras dramatically understates the capabilities of such a system to monitor individuals' movements.

For a simple example, imagine you have a corridor with two doors one can enter and exit out of, and one has a system to monitor each door. When an individual enters one of the doors, you know they are within corridor until they exit. The doors themselves only cover a trivial percentage of the area of the corridor (effectively 0%), but you know with perfect certainty where an individual is.

This is similar to current state with fixed ALPRs. While it is technically possible to travel in a vehicle around Norfolk without being captured on the cameras, doing so often requires taking a circuitous or inefficient route. Figure 1 in my original report and Figure R1 of this report both show the density of cameras along primary thoroughfares, which most individuals would take to get from one area to another efficiently within the city. Police and investigators can typically make inferences about which route or routes an individual may have taken between captures based on timestamps and general knowledge of the geography of the city.[6]

Estevez also critiques various inferences I made in analyzing ▮▮▮▮▮▮ travel patterns. His critiques largely miss the forest for the trees, and seemingly dismiss the inferences I make as "speculative" as long as other inferences are possible. And many of his contrary assertions simply ignore key context that I identify based on my examination of the data and my education and experience as a crime analyst, data science consultant for police departments, and criminal justice researcher.

I stand by my initial analysis and detail below why Estevez's critiques overall are incorrect, without responding to every one of his points.

First, when initially examining the entirety ▮▮▮▮▮ captures, I could clearly identify several clusters of points. One of those was repeated captures around ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮. The repeated captures were not the only pieces of context that supported this inference, though. Instead, I inferred ▮▮ likely ▮▮▮▮▮▮▮▮▮ due to the travel patterns, in particular, time gaps between captures indicating ▮▮▮▮▮ for some time. I also identified multiple specific dates when I inferred ▮▮▮▮▮▮▮▮▮ based on such patterns (i.e., not just on ▮▮▮▮▮, but also ▮▮▮▮▮▮▮▮▮ ▮▮▮▮). Critically ▮▮▮▮▮ captured on the same cameras on other dates, but I could infer ▮▮▮▮ did not go ▮▮▮▮▮▮▮ due to captures at other locations

---

that were inconsistent with the inference ███████ in that vicinity. While there are multiple ████████████████ in that same location (such as a ████████████ ████████████ ), these other locations would be unlikely to generate similar travel patterns, particularly given the density and locations of cameras in this area. Not impossible, but unlikely.

This is exactly how a crime analyst would use such information in support of surveillance of an individual. While inferring when and where one goes to the grocery store is innocuous, I have been involved in scenarios examining similar ALPR data to infer where individuals are buying or selling contraband. Such hits do not establish the exact location one is potentially engaging in illegal behavior, but they are still quite useful (the same way CSLI is useful) to generate overall geographic profiles of suspects' movements. This information enables useful inferences that can then be confirmed or refined through further investigation. Making useful inferences about individuals' locations and travel patterns in this manner does not require ALPR data to be impossibly precise, as Estevez seems to demand.

Based on my experience as a crime analyst, despite not having perfect coverage all of the time, ALPR provides a large amount of travel information that can be used to retrospectively identify the travel patterns of individuals. At best, Estevez's critiques simply show that my inferences are not 100% certain or that alternative inferences are possible. But, in my experience, that is almost always true in investigations, and even extremely useful information sources may not support inferences with the level of certainty that Estevez seems to demand.

## Materials Considered

In addition to any materials cited in this report and my opening report, I considered the following materials in forming the opinions expressed in this report:

- NORF000191.csv [license plate reader hits]
- NORF000192.csv
- NORF000193.csv
- NORF000194.csv
- NORF000195.csv
- NORF002253.csv
- NORF002254.csv
- NORF002255.csv
- NORF002256.csv
- Flock0000001.XLSX [Locations of flock cameras]
- Horan Expert Report Final 08.08.2025.pdf
- Schmidt v. City of Norfolk - Expert Report of Valentin Estevez, PhD.pdf
- https://opencellid.org/, locations of cell phone towers
- https://mcc-mnc.net/, mapping of MCC & MNC codes to Verizon and AT&T cell towers



- Davis Lukens Deposition transcript
- Motion to Suppress Hearing Transcript at 6-10, 28–29 in *Virginia v. Church*, Case No. CR24000304-00, -01, -02 (Va. Cir. Ct., Norfolk Apr. 24, 2025).
- Charles Thomas Deposition Transcript at 194-99, 306-07.
- Youtube Video, <https://www.youtube.com/watch?v=Rn9i7CD6aqI&ab_channel=FlockSafety>, What is the best way to deploy license plate readers?