# EXHIBIT 34

Deposition of VALENTIN ESTEVEZ, PH.D., held at the offices of:

ARLINGTON GATEWAY

901 North Glebe Road

Arlington, Virginia 22203

(703) 682-9320

Pursuant to notice, before Karen Young, Notary Public in and for the Commonwealth of Virginia.

behalf of the plaintiff, also from Institute for

Justice.

MS. ROSS:  Lauren Ross from Ross Munger

Tolles Olson on behalf of the City of Norfolk.

I'm joined by my colleague, Jonathan Kravis, also

from Munger Tolles Olson, and Karla Soloria from

the city attorney's office from the City of

Norfolk.

THE VIDEOGRAPHER:  The court reporter

today is Karen Young, representing Planet Depos.

The witness will now be sworn.

VALENTIN ESTEVEZ, PH.D.,

having been duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR

LEE SCHMIDT and CRYSTAL ARRINGTON

BY MR. SOYFER:

Q  Could you please state your name for the

record?

A  Valentin Estevez.

Q  And you and I have never met before today,

correct?

A  Not that I can recall.

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025

of the individual. My others of specialization is

econometrics, which is the application of

statistical principles to the analysis of economic

questions.

Q And those are both pretty broad areas.
Are there any kind of subfields that you've
specialized in over the course of your career?

A I do a lot of work in labor economics,
which is the application of microeconomics and
econometrics. It's the study of the decisions
that individuals make in the labor market, as it
pertains to the labor market. So that's an area I
work a lot, but in general, my training is about
studying human behavior using both theory and
data.

Q Did you -- did you write a dissertation in
your Ph.D. program?

A Yes, I did.

Q And what was that -- what was the subject
of that dissertation?

A The subject of the -- my dissertation was
an empirical analysis of the behavior of the IRS

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                    15

depending on the party controlling the presidency

and the Congress.

Q   Okay.  Was that published anywhere?

A   No, I did not publish it.  I guess it's

published at the University of Chicago.  They

maintain a copy, but I didn't publish it.

Q   Okay.  Have you published papers in any

peer-reviewed journals?

A   No.

Q   What did you do after your Ph.D.?

A   I started working as a labor economics

consultant at Welch Consulting.

Q   You said as a labor economics consultant?

A   Yeah, like that -- that's what I do.

Q   Okay, and what did your work there

involve?

A   Involved analyzing data that reflects the

decision of individuals and, you know, and

companies, so it's basically data analysis.

Q   Okay.

A   Large complex databases intertwined with

the decisions and the behavior of individuals.

10:07:25
10:07:30
10:07:31
10:07:37
10:07:40
10:07:42
10:07:45
10:07:49
10:07:50
10:07:51
10:07:53
10:07:56
10:08:00
10:08:06
10:08:09
10:08:12
10:08:13
10:08:17
10:08:19
10:08:22
10:08:23
10:08:26

Transcript of Valentin Estevez, Ph. D.

Conducted on September 3, 2025                    25

There were several databases that documented -- or were intended to document individuals' movements, and I was asked to organize all of them, summarize them and offer some opinions about the issues in the matter.

Q   Okay, so there were I guess certain points where workers maybe for lack of a better word checked into work and checked out from work, and you analyzed what conclusions you could draw from that information.

A   That was the issue in the case, that there was the allegation, and my assignment was to take the available data and try to see where that data could be used to analyze that question.

Q   And did you use the data to analyze that question?

A   I offered opinions about what could be used -- what the data could be used for and what it couldn't be used for.

Q   Have you ever worked as a police officer?

A   No.

Q   Have you ever worked as a detective?

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                    26

A   Not as a -- as a data detective.  That's what I do every day, but I guess if you think of a sworn officer, no.

Q   You haven't worked as a detective in a police department.

A   No.

Q   Have you worked as a crime analyst?

A   Crime analyst, no.

Q   Have you ever held any job in law enforcement?

A   No.  As I said, my engagement here was not based on that expertise, but on my expertise of analyzing data and deciding or determining whether a conclusion could be drawn from data.

Q   Okay.  Not asking what your engagement was based on.  Just have you ever held any job in law enforcement.  The answer was no, correct?

A   Yes, I have not worked as a law enforcement officer.

Q   Have you ever testified as an -- well, I guess we've gone through all of your expert engagements.  You've never testified as an expert

10:19:37
10:19:42
10:19:45
10:19:46
10:19:48
10:19:49
10:19:50
10:19:54
10:19:56
10:19:59
10:20:00
10:20:05
10:20:09
10:20:12
10:20:14
10:20:17
10:20:20
10:20:22
10:20:24
10:20:25
10:20:29
10:20:31

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                    36

Q  Okay, and you didn't try to look at any other data sources to see how you could supplement the Flock camera data.  Is that fair?

A  That's fair.  My understanding of the allegations in this case is that the Flock camera data by itself, whether it could be used to -- to make some inferences, that's kind of what I did in this case, looked at the Flock camera data and see what could or could not be done with that data.

Q  What's that understanding based on?

A  My reading of the complaint in this matter.

Q  Okay.  That's how you interpret the complaint.

A  That's correct.

Q  Okay, and so all of your opinions are based on what the flock data alone can show.  Is that fair?

A  What the flock data says, that's what I'm doing in that matter.  Basically I reviewed the data, review what's available, summarize it and offer opinions about what can be gleaned or

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                         37

learned from the Flock camera data.  That's my

assignment here.

     Q   From the Flock camera data alone, correct?

     A   That's correct.

     Q   And you didn't consider any other sources

of information that might be available to the

Norfolk Police Department, correct?

     A   That's correct.

     Q   Okay.  So if you go to paragraph 9, you'll

see you write, "Flock only shows customers'

information regarding vehicles."  And then you go

on in the next sentence to note that according to

the American Community Survey, in 2023, 5.2

percent of 16 and older workers in Norfolk do not

have access to a car, correct?

     A   Yes, that's what I wrote.

     Q   And do you have an understanding of what

percentage -- like what portion of the 5.2 percent

are between 16 and 18?

     A   Not on top of my head.  Something that you

can work off the data.

     Q   Okay, but you didn't put that in the

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                    39

movements?

A  I don't know if any of them drove somebody's car, and that's the whole point, like you cannot tell in the Flock camera data who's driving the car.  The only thing that you see is that there's an image.  From that image, a license plate will be extracted, and that's the extent of the information that you see in the data about it.

Q  Okay, so from the Flock camera data alone, you can't identify the driver of a car is your testimony, correct?

A  That's something that is -- yeah, that's what you see in the data.

Q  Okay, you can't identify that with certainty, right?

A  You cannot identify with certainty.

Q  But the reason you use the qualifier "likely" here is because some of these individuals at times could drive other people's cars, and those would be captured in images, but the images wouldn't necessarily tell you that individual was driving the car with certainty.  Is that fair?

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                      43

Q  So for instance, the make of a car?                    10:36:15

A  Yes, I understand --                                   10:36:20

Q  The color of a car?                                    10:36:22

A  -- it attempts to do that, yeah.                       10:36:23

Q  The type of car?                                       10:36:25

A  I understand that it tries to, yes.                    10:36:29

Q  You understand that it tries to.  What do              10:36:31
you mean by that?                                         10:36:35

A  Well, it's -- uses OCR technology, so it's             10:36:35
an image.  You seen an image, and then you try to         10:36:40
get information out of that image.                        10:36:44

Q  Do you have any understanding of how                   10:36:46
accurate the Flock cameras are in reading license         10:36:48
plates?                                                   10:36:51

A  What do you mean by accurate?                          10:36:53

Q  I mean -- well, let me break that up.  Do              10:36:55
you understand what percentage of the time the            10:36:58
Flock cameras are unable to read a license plate?         10:37:00

A  Not on top of my head, but in many cases,              10:37:03
of the records I reviewed, especially Flock raw           10:37:09
data that I analyzed, in many, like a large               10:37:12
fraction of the cases, there was no license plate         10:37:16

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                44

information, and as I say elsewhere in my report,

sometimes even the license plate information was

suspect.  My understanding, that the in U.S.,

license plate need to be between six and seven

digits.  In some cases, the license plate

information was under four digits.

So again, even if there is a license plate

extracted from the image, again, you see only two

characters, those are -- that's not the real

license plate, but again, that's something --

again, that's one of the limitations of these

data.

Q  Okay.

A  It only -- doesn't tell you anything about

individuals.

Q  Okay, so for each of those instances where

the license plate wasn't read or wasn't read

correctly, there would still be an image

associated with that capture, correct?

A  My understanding, that there should be an

image, yes.

Q  Okay.  When you say a very large fraction

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025          45

of cases did not contain a license plate, what

fraction was that?

        MS. ROSS:  Objection, mischaracterizes his

testimony.

    A   Again, I don't remember on top of my head.

It was -- I think it was maybe about half, but

what I did hear in this case was to look at the

records, when a license plate was in the database,

assuming that anything with four or more

characters was in fact a license plate.  As you

can see, there is a lot of -- you know, we don't

know if it's a real license plate, so that's one

of the limitations of the Flock camera, there is a

lack of information.

        There are just certain things that you can

query, and that's it.  There's nothing about

individuals.  It's just something that may or may

not be a license plate that was extracted from the

image.

    Q   Okay, so in the 50 percent of cases where

you said there was no license plate, what

percentage of those cases -- of those instances

10:38:12
10:38:17
10:38:18
10:38:20
10:38:20
10:38:24
10:38:27
10:38:30
10:38:33
10:38:36
10:38:41
10:38:44
10:38:47
10:38:49
10:38:50
10:38:53
10:38:55
10:38:57
10:38:59
10:39:00
10:39:04
10:39:09

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                    48

A   So if they have the additional
information, not the Flock data, for example,
they're looking for a car, that could be
potentially useful.

Q   Okay.  If they had additional information,
that could potentially be useful.  That's your
testimony?

A   Yeah, if they knew what they were looking
for, my understanding that that's what this data
is for.  There are captures static at a point in
time about cars or at least vehicles that appeared
to have crossed that intersection.

Q   Okay.  If you go to page 10 of your
report, in section 5, Flock camera placement
coverage, in the second sentence of paragraph 19,
you write, "A single Flock camera covers two lanes
in a single direction, and cannot pan, tilt or
zoom."  Do you see that?

A   I see that.

Q   Do you have an understanding of whether
Flock cameras can take pictures of the front of
vehicles?

10:41:02
10:41:05
10:41:07
10:41:10
10:41:11
10:41:15
10:41:18
10:41:18
10:41:20
10:41:23
10:41:27
10:41:31
10:41:32
10:41:46
10:41:50
10:41:55
10:41:58
10:42:03
10:42:03
10:42:04
10:42:08
10:42:12

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                49

A  My understanding, that they are supposed
to take pictures of whatever triggers the camera.
You know, since they are facing one direction,
most of the captures should be the back of the
vehicle, but it's possible that an incoming
vehicle may trigger a capture.

Q  So I'd like to ask you about how the Flock
data -- how you worked with the Flock data that
you received in this case.  How were those -- how
was the raw data made available to you?

A  So the -- what source of data are you
thinking about?  The data for Ms. -- Ms. Arrington
and Mr. Schmidt or the entire data?

Q  So not the Norfolk production --

A  Okay.

Q  -- for Ms. Arrington and Mr. Schmidt, but
the Flock data production.

A  The Flock data, what I call the Flock raw
data.  I was given credentials to access a secure
site with those credentials.  I guess this was
what we call now the cloud, and the data was there
in folders tabled by day -- by date, so you'll

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                    57

intersection, three cameras.  So it's something                  10:51:14

that just stands out at you when you look at the                 10:51:16

data.                                                            10:51:19

Q  So a cluster of camera will cover, for                    10:51:19

instance, each road each way into an intersection,               10:51:22

correct?                                                        10:51:27

A  It depends on the intersection.  It's not                 10:51:27

like every time it was like that, but it's                      10:51:30

something that is obvious from the data that some               10:51:32

of these four-corner intersection have four                     10:51:34

cameras, one for each flow of traffic.                          10:51:36

Q  Okay, and that can indicate the direction                 10:51:39

the car moves through each intersection, correct?               10:51:41

A  That's the intent.                                        10:51:44

Q  Okay, and so you identified 75 clusters of                10:51:46

cameras operated by the Norfolk Police Department,              10:52:04

correct?                                                        10:52:07

A  That's correct.                                           10:52:07

Q  And 97 Flock camera clusters total within                 10:52:07

the city, correct?                                              10:52:15

A  Clusters of cameras the Norfolk Police has                10:52:15

access to in Norfolk, yeah.                                     10:52:19

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                    59

look at their location, they might have been 505                 10:53:17

feet, so technically doesn't meet the definition I               10:53:21

use of a cluster, but they were also close by.  So               10:53:25

the whole point of these two paragraph is to say                 10:53:28

that the cameras seem to be put together, like                   10:53:30

most of them seem to be paired with at least one                 10:53:35

other camera, many cases, most cases with at least               10:53:37

three or four other cameras.                                     10:53:39

     So that's kind of what I'm saying here,                     10:53:41

cameras seem to be close together, and even some                 10:53:43

of the ones that appear to be alone, it's because                10:53:46

they barely miss the 500 feet rule I use, and                    10:53:50

again, it's something that if you look at the                    10:53:53

exhibit in -- that show the clusters, it's very                  10:53:54

obvious that those cameras seem to be close to                   10:53:57

each other.                                                      10:54:00

   Q  Okay, and there's a reason for clustering                  10:54:00

the cameras that we discussed earlier, correct?                  10:54:03

       MS. ROSS:  Objection, vague.                              10:54:06

   A  As I said, like the idea here is like                      10:54:07

cameras are put in certain places to capture a                   10:54:10

vehicle that's crossing that intersection, and                   10:54:14

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                    60

some places there are four lanes -- four flows of

traffic, and that's why they have four cameras.

Q  Okay, and so that would capture more data

than a single camera there would, correct?

A  Again, the idea of placing this camera was

to, you know, put them in areas with a lot of

traffic or a lot of, you know, calls for service.

So it's consistent with that.  It's something I

also speak about in the report.

Q  Do you have an understanding of why it's

useful to place the cameras in areas with a lot of

traffic?

A  Well, again, the idea was to like -- they

were trying to figure out like entering and

exiting the city, so that was one of the reasons

that they were placing the cameras in certain

locations, at least from documents I reviewed.

Q  Okay, so I'd like to look -- and this is

where separately clipping the appendices --

MS. ROSS:  Sorry, Counsel, before you move

on to your next line of questioning, we've been

going for around an hour, so --

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                          88

or at least a calculation showcasing kind of what                11:33:16

I discuss later, the Flock camera data contains                  11:33:19

very little information about vehicle movements.                 11:33:22

Q  You'd agree that if there were a Flock                     11:33:26

camera, that would still cover a small fraction of               11:33:34

feet of road, correct?                                           11:33:37

MS. ROSS:  Objection, incomplete                          11:33:38

hypothetical.                                                    11:33:40

A  I will have to see the calculations or the                11:33:40

actual data points.  I'm working here with what I                11:33:43

have.                                                            11:33:46

Q  Okay.                                                      11:33:46

A  And this is kind of what is -- what is                    11:33:47

true right now.                                                  11:33:48

Q  Okay, and so you didn't try to recalculate                11:33:50

this metric assuming there were cameras at every                 11:34:04

single intersection, correct?                                    11:34:08

A  No, again, I calculated what is true, like                11:34:09

right now, this is what's true at least as of the                11:34:13

day I got the data.  So this is what's reflected                 11:34:16

right now in terms of camera positioning and                     11:34:20

capabilities.                                                    11:34:23

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                    89

Q  And the percent coverage, say were at

every intersection.  That still wouldn't be a

hundred percent.  Is that fair to say?

A  I will have to see the numbers.

Q  Okay.  You also write there are

1,839,974,400 square feet in the City of Norfolk.

Do you see that?

A  I see that.

Q  And then you calculate the percentage of

total square feet in the City of Norfolk that the

cameras' optimal capture ranges cover.

A  That's correct.

Q  And why is that a meaningful metric?

A  As I mentioned a second ago, I'm trying to

just, you know, explain what type of data these

cameras can collect.  So I started by saying they

cover a very small fraction of all the roads, they

cover a very small fraction of the entire area of

the City of Norfolk, and then I proceed to

document the lack of information in the Flock

camera data, so basically setting the stage for

what comes next about the lack of information in

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                    90

the Flock camera data.                                         11:35:40

Q   Yeah, so I'm guessing why do you use --                   11:35:42
you would agree that the total surface area                    11:35:48
includes areas that aren't roads, correct?                     11:35:50

A   Yeah, that's correct.                                     11:35:53

Q   Okay.  It includes areas where cars can't                 11:35:53
drive, right?                                                  11:35:56

A   Potentially, yes.                                         11:35:57

Q   Okay, it would include, you know, for                     11:35:58
instance, buildings where cars typically don't                 11:36:00
drive.                                                         11:36:03

A   That's correct.                                           11:36:03

Q   Okay.  What statistical formulas do these                 11:36:04
calculations rely on?                                          11:36:08

A   It's a ratio.  It's described in the                      11:36:10
footnote.  In the footnotes, I describe the                    11:36:19
calculation.  It's a numerator, a denominator.                 11:36:20
Again, the allegations in the complaint are that               11:36:25
the Flock camera data can be used to make                      11:36:27
inferences about individuals' movements.                       11:36:30
Basically I'm explaining what I see in the data.               11:36:32
These cameras cover very little of the surface                 11:36:35

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                    93

information about the driver of the vehicle, the                    11:39:22

origin, destination, or length of a particular                    11:39:25

trip or any of the stops or activities an                    11:39:29

individual undertook, including any trips an                    11:39:33

individual took by a different vehicle between                    11:39:36

camera captures."  Did I read that correctly?                    11:39:39

    A  Yes, you did.                    11:39:41

    Q  And when you say the Flock data does not                    11:39:42

contain this information, do you mean the Flock                    11:39:46

data alone does not contain the information?                    11:39:49

    A  Yeah, that's what I describe in the                    11:39:51

report.  The Flock data is the Flock camera data                    11:39:54

that according to my reading of the complaint can                    11:39:57

be used, at least that's the allegation, that's                    11:40:00

the allegation of the complaint, that using the                    11:40:03

Flock camera data can you make inferences about                    11:40:06

the individual's movements.  What I'm saying here                    11:40:07

is that my review of the data shows that that's                    11:40:10

not possible, given the lack of information in                    11:40:14

that data.                    11:40:16

    Q  Okay, and so if you, say, have a Flock                    11:40:16

camera stationed 40 feet down the road from                    11:40:21

Transcript of Valentin Estevez, Ph. D.

Conducted on September 3, 2025                        94

someone's driveway, do you agree that that could

capture the origin of a trip?

    A  I don't know because the only way to know

the driveway, you need to have information from

outside the Flock camera data.  The only thing the

camera data is going to tell you, the vehicle

passed a given camera.  It doesn't tell you where

the vehicle originated or started the trip or was

headed or who was even driving the vehicle.

    Q  Okay, and so the Flock camera wouldn't

tell you the origin even in that scenario because

you would need to know who lives at that house,

correct?

    A  Well, you need to know more than just

that.  The Flock camera data only tells you an

image was taken this date, this time, this license

plate appeared to have been extracted from that

image, and that's it.  That's the --

    Q  Okay.

    A  -- the extent of information about that

capture.

    Q  So you would need information that, say,

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                    95

the trip started at the driveway of a residence,                    11:41:19

right?                    11:41:22

    A    I mean, that's information that we don't                    11:41:23

have.                    11:41:26

    Q    In the Flock data itself.                    11:41:26

    A    In the Flock -- yeah.                    11:41:27

    Q    Okay.                    11:41:28

    A    As I said, my reading of the complaint is                    11:41:29

that the allegation is that the Flock data could                    11:41:31

be used to make those inferences, and I don't see                    11:41:33

that type of information in the Flock data.                    11:41:36

    Q    Okay.  And so your testimony is, say,                    11:41:39

someone is captured on a Flock camera a half mile                    11:42:01

from their home at the beginning of the day.  The                    11:42:04

Flock camera itself, the Flock camera data itself                    11:42:07

wouldn't tell you that that person was coming from                    11:42:11

home, right?                    11:42:13

    A    Yeah, because I don't know where the                    11:42:15

person's home is or where the trip started or                    11:42:17

anything.  That's -- that's the limitation.  You                    11:42:20

only know that an image from which a license plate                    11:42:22

that appeared to match a given license plate occur                    11:42:26

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                      98

Department.  Is that fair?                                      11:44:24

    A   That's -- I don't know if it's -- can you            11:44:26

rephrase the question?                                          11:44:29

    Q   Yeah, let me -- okay, so we've -- we've              11:44:30

talked today about how Flock captures pictures of               11:44:35

passing cars, correct?                                          11:44:39

    A   Yes, that's correct.                                 11:44:39

    Q   Have you seen any pictures captured by               11:44:40

Flock cameras?                                                  11:44:42

    A   Yeah, I've seen pictures.                            11:44:43

    Q   Okay.                                                11:44:45

    A   And again, the point here, like the                 11:44:45

cameras are pointing at a road, so if they capture              11:44:47

something, it's a vehicle on the road.  That's --              11:44:51

and again, if you look at the Flock camera data,                11:44:54

the only thing that you can query is like have                  11:44:57

there been a hit on a given date and time.  It                 11:44:59

doesn't tell you where the vehicle was coming                   11:45:02

from, where it was headed, who was even in the                  11:45:06

vehicle, driving the vehicle.                                   11:45:07

        So again, this is very little information            11:45:09

in this Flock camera data, at least for purposes                11:45:11

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                              99

of the allegations that I read in the complaint.

Q  Do you agree that the images provide additional information beyond what's reflected in the data alone?

MS. ROSS:  Objection, vague.

A  You will have to show me examples because again, you cannot query images.  You cannot query an image.  The -- my understanding of the complaint is that you can take the Flock camera data and make inferences about people's whereabouts, and if I look at the Flock camera data, I cannot query images.  I can only see like is there a hit at a given time on a given day, and that's it, like -- and that hit will -- if there is one, will show just the vehicle passing by.

Q  Okay.  Your -- your testimony is that you can't query images in the Flock system?

A  You cannot search the contents of the image, okay?  As far as I can tell, you cannot do that.

Q  Okay.  Can you search for all cars that passed a given camera within a given time period

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025

116

spend all day in their cars?

A  I guess it depends on the person.

Q  Okay.  Do you have any ideas on average
how much time people spend in their cars?

A  Not on top of my head.  Really varies a
lot person to person.

Q  Did you consider any research on that
subject?

A  No, again, here my assignment was to look
at the Flock camera data and summarize information
I saw there about vehicle captures.

Q  And so you didn't consider any research on
the average amount of time that people spend in
their cars on daily basis?

A  No, again, my assignment here was to
summarize the information that I could see in the
Flock camera data, and I have said I don't see
much information in it.

Q  And so the numbers that we were just
looking at, you excluded consecutive captures
within one minute, correct?

A  If I saw consecutive captures in the same

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                              117

camera within one minute, I consider it to be that

-- part of the same capture.  As I explain in my

report, those captures appear to be the same

event, not multiple events.

     Q   Okay, and you didn't apply that rule --

well, scratch that.  Your testimony is you applied

that rule by camera and not by camera cluster,

correct?

     A   It is by camera, by camera and time.  So

it has to be consecutive capture for the same

camera within one minute.

     Q   Okay, and how did you arrive at that?

     A   By examining the data.  That's what I do

in these cases, I go to data, for example, the

query of license plate for plaintiff and the Flock

raw data.  I look at the data, and that's one of

the things I noted from plaintiff.  I put an

example of that in my report, that on occasions, I

guess -- I guess we can speculate what happened.

Potentially the car was at a stop sign -- I mean

stoplight and would capture multiple times as the

intersection cycled through the lights, so it was

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025

118

obvious that the same car was just moving slowly

in the same position and was captured multiple

times.

It wasn't multiple captures.  It's just a

single event, and that goes to my point of the

lack of information.  Even having captures may not

tell you much if it happens just the car waiting

for the red to -- the light to turn green.

Q  Okay, but those -- those multiple captures

within one minute could indicate that the car is

stopped.  Is that fair?

A  At the road, you know, the example I put

in the report, for example, is one of the major

intersections of Norfolk, so it appears that the

car was just waiting for the light to turn green.

It went through several cycles.

Q  And could you look at Flock images to

determine whether that was the case?

A  I guess it is possible.  Here was just

examining the data itself, and again, that's part

of the examination of the data that needs to

happen when you work with data to understand what

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                    119

-- what's there, what can and cannot be done with

available data.

Q   And so if I understand your testimony

correctly, you selected one minute based on your

examination of the plaintiffs' Flock data,

correct?

A   I started with the plaintiff Flock data,

and there was a clear demarcation between one

minute and the -- and the other instances of -- of

captures for the same camera one after the other,

so I adopted that rule more generally -- before

adopting that rule more generally, but again, this

is just from examining the data.

Q   And did you examine the broader data set

as well before you decided to apply that rule?

A   Did appear generally consistent because

again, you saw the same -- the same type of

situation by looking at the data, that there were

consecutive captures close to one another, and

again, the statistics whether you, you know, do it

one way or the other are about the same.  Here

it's just to try to emphasize the importance of

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025

121

data, which for me is an important step before

trying to use any data for making inferences.

Q  Did you record how many lines of data you

discarded or consolidated by applying that rule?

A  No, I don't have any on top of my head,

but we provided these scripts, the -- process the

data and prepare calculations.

Q  Okay, and so I think we discussed this

earlier, but when you looked at the plaintiffs'

data that was produced by the City of Norfolk,

that only included entries with license plates,

correct?

A  Yes, that's correct.

Q  And so any images of plaintiffs' car that

were captured but where a full license plate

wasn't captured wouldn't be within the data that

you were provided, correct?

A  Yeah, that's my understanding.

Q  Did you ever look in the broader data set

for any kind of near matches to plaintiffs' cars?

MS. ROSS:  Objection, vague.  Counsel, can

you just clarify broader data set just for the

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                    122

record?

BY MR. SOYFER:

    Q   Okay, yes, let me reask the question.  Did you look within the broader Flock data for any potential additional near matches to plaintiffs' cars?

    A   What do you mean by near matches?

    Q   Yes, so let's go back to the example I gave earlier just to save me reading their license plate into the record.  Say you have the license plate ABC 123.  The cameras could read that as BC 123.  They could read it as ABC 12, right?  They could miss a letter, correct?

    A   It could be.  I guess you will have to show me an example.

    Q   Okay.  Do you agree that's possible?

    A   I don't know how possible -- again, I just analyzed the data that I had in front of me.

    Q   Okay.

    A   So there were license plates associated with plaintiff, and I looked for records for those license plates both in the data provided by the

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025

123

City of Norfolk and then the -- what I call the

Flock raw data as I describe it in my report.

Q Okay. I'll try to use Flock raw data since you seem to be more comfortable with that one, but here's my question. So assuming, you know, plaintiffs' license plate were ABC 123, and the cameras consistently read their cars as a red Ford, for instance, I just wanted to ask, did you go into the Flock raw data and look for entries that maybe were ABC 12 red Ford?

A No, because again, here is what you could do with the data, and the same way, for example, you are -- the hypothetical here, what if they read it incorrectly, incompletely, even if the record matches, it could also be a false match. So again, here it's just about summarizing the data. The allegation is that using the Flock data CDs, you can track individual's movement. That's what their -- plaintiff are alleging, and I look at the data and summarize what I see for that, and -- and again, the answer, like I see very few captures for plaintiffs.

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                     124

Q   Okay, and so you only matched full license

plates and not near matches.  Is that fair?

A   Because I don't know what you mean by a

near match.  What do you mean by a near match?

Q   Okay, so like if you, for instance, had a

license plate like in the example I gave where

just one character was missing but the other

vehicle attributes were the same, you wouldn't

count that as the same vehicle.

A   Again, you will have to make assumptions

about what is the same vehicle, and that's the

part that this data doesn't help you.  Like

somebody has to make those determinations, and if

I look, for example, at what plaintiff experts

did, they didn't even attempt that either.  So

that tells you how little information are in these

data.

Q   Okay, so someone would have to make that

assumption to, you know, take that additional

step, but that's not something you felt that you

could do.

A   Well, it's not -- again, the allegation

12:11:47
12:11:50
12:11:53
12:11:54
12:11:58
12:12:01
12:12:04
12:12:07
12:12:09
12:12:11
12:12:14
12:12:17
12:12:19
12:12:22
12:12:24
12:12:27
12:12:30
12:12:31
12:12:33
12:12:37
12:12:38
12:12:39

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                    125

here as I understand it and my assignment was to                12:12:43

summarize the camera hits on plaintiffs' vehicles,              12:12:45

and that's what I did, and we have the license                  12:12:48

plates, and we summarized what we could see about               12:12:50

those license plates in the data.  What I found is              12:12:53

that there were very few hits and very little                   12:12:56

information even when you have those hits.                       12:12:59

    Q  Yeah, camera hits based on full license                  12:13:01

plate matches, correct?                                         12:13:05

    A  That's what we -- that's what we could do                 12:13:06

because --                                                      12:13:06

    Q  Okay.                                                     12:13:06

    A  -- again, that's what you can search for.                 12:13:09

        MR. SOYFER:  Okay, we can take a break                   12:13:12

now.                                                            12:13:14

        MS. ROSS:  Thank you.                                    12:13:14

        THE VIDEOGRAPHER:  We are now going off                  12:13:15

the record.  The time is 12:13 p.m.                             12:13:17

            (Recessed at 12:13 p.m.)                             12:13:17

            (Reconvened at 1:06 p.m.)                            13:06:37

        THE VIDEOGRAPHER:  We are now back on the                13:06:37

record.  The time is 1:06 p.m.                                  13:06:43

BY MR. SOYFER:

Q  Dr. Estevez, we just returned from a lunch break, but you understand you're still under oath, correct?

A  Yes.

Q  Okay, and I think your -- your testimony earlier and what you write in your report is that the Flock data alone doesn't tell you the identity of the driver, correct?

A  Yeah, the Flock camera data only identifies vehicles.  It doesn't identify who was driving the vehicle.

Q  Do you agree that identity is easy to deduce from just a few random points of location data?

A  Sorry, you --

MS. ROSS:  Objection, vague.

BY MR. SOYFER:

Q  I'll repeat the question.  Do you agree that identity is easy to deduce from just a few random points of location data?

MS. ROSS:  Objection, vague.

13:06:47
13:06:47
13:06:49
13:06:52
13:06:52
13:06:53
13:06:57
13:07:00
13:07:03
13:07:05
13:07:09
13:07:12
13:07:14
13:07:17
13:07:20
13:07:21
13:07:22
13:07:23
13:07:23
13:07:25
13:07:29
13:07:31

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                    127

A   You will have to give me more information, but as a general proposition, I'll say no.

Q   Okay.

A   At least based on what I see in the Flock camera data.

Q   Do you consider yourself a privacy expert?

A   Privacy.  Can you give me more context on the question?

Q   Data privacy.

A   In my practice, what I do, privacy's very important, so I take it very seriously.  I don't know whether that qualifies myself as a privacy expert, but I'm supposed to maintain all the data entrusted to me in confidence and secure.

Q   Other than securing the data that has been entrusted to you as a consultant or a witness, have you ever testified or done any analysis about data privacy?

A   Again, you will have to be more specific. For example, sometimes I'm asked to anonymize data or use data that has been anonymized, so again, that's part of my experience.

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025          129

case the parties agree to exchange anonymize data,          13:09:45

so --          13:09:49

    Q   Okay.  So I want to -- if you have your          13:09:49

report handy --          13:09:56

    A   I do.          13:09:58

    Q   We will go to paragraph 39 on page 15, and          13:09:58

you write in the first sentence of this paragraph,          13:10:14

"The Flock system data for NPD-operated cameras          13:10:16

produced in this matter includes 8,154,653 unique          13:10:20

license plates."  Do you see that?          13:10:29

    A   I see it.          13:10:30

    Q   Okay, and those are license plates with          13:10:31

four or more characters, correct?          13:10:35

    A   Yeah.          13:10:37

    Q   Or -- scratch that.  Let me ask you a          13:10:39

different -- or -- sorry, no, I was right the          13:10:42

first time.  Those are license plates with four or          13:10:48

more characters, correct?          13:10:50

    A   Well, remember, like these are -- this is          13:10:51

information extracted from the image, so the          13:10:54

extraction in that field has four or more          13:10:57

characters, so we assume that if it's four or more          13:10:59

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                    135

A  Well, we have to be careful there because we got the production from the City, from the NPD, but some of those captures were also in the Flock raw data --

Q  Okay.

A  -- because it came from both sources.  So what I'm saying is like those Flock captures that came from the NPD, we don't know the origin or destinations of those captures, so they might have originated outside of Norfolk or even outside of Virginia for all we know.

Q  Yeah, so that's -- that's all I'm asking you, is the data -- the Flock raw data could include captures that were long trips that originated outside of the city, correct?

A  Yeah, but again, it's not just the Flock raw data.  Even the data for plaintiffs that the NPD produced separately.

Q  Okay, and like --

A  That's the -- that's the same thing, like we don't know origins or destinations.

Q  Understood.  My questions right now are

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                    136

just for the Flock data, and so those --

        MS. ROSS:  I'm sorry, Counsel, I know that

this is frustrating.  The Flock raw data?

        MR. SOYFER:  Yes.

        MS. ROSS:  Okay.

        MR. SOYFER:  Did I --

        MS. ROSS:  The Flock data.  I'm just

trying to keep the record --

        MR. SOYFER:  Got it.  Okay.

        MS. ROSS:  -- clear.  I know it's -- yeah.

BY MR. SOYFER:

    Q  Yes, I'll try to stick with the Flock raw

data because that was your preferred terminology.

My questions right now are just for the Flock raw

data.  So the Flock raw data could also include

trips, captures during trips that ended outside of

Norfolk, correct?

    A  Yeah, that's possible.

    Q  Okay.  They could include captures on

trips that both originated and ended outside of

Norfolk, correct?

    A  Yes, that's the point of my report, the

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025

140

A   That is correct.

Q   And not, say, a series of captures by Flock cameras, correct?

A   Well, as I've been saying, in general, the Flock data doesn't -- doesn't show where the vehicle was coming from or where it was headed or who was operating the vehicle, so it's true about a particular capture, and it's also true about a series of captures.  Like even if you see two consecutive captures, we don't know where the car was coming from, and we don't know what the car did after the second capture.

Q   Okay.  If two cameras, for instance, are a five-minute drive apart, and five minutes elapses between captures on those cameras, that does provide you some information about where the vehicle was between those captures, correct?

A   Yeah, the only thing that you can tell is that basically went from A to B, but we don't know why, where the vehicle came from and where the vehicle was headed or who was operating the vehicle.

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                        146

you write, "Dr. Wheeler does not provide a

methodological approach for drawing inferences

from Flock data," correct?

    A  That's correct.

    Q  Why is that important?

    A  Well, my understanding is that Dr. Wheeler

was supposed to do that, provide a method for

using the Flock camera data to make inferences.  I

reviewed his report and his supplemental report,

and I haven't seen that methodology.

    Q  Do crime analysts have a particular

methodological approach they generally use for

drawing inferences from location data?

    A  That's my point.  He didn't describe any

methodology.  He makes assertions about

conclusion, but he doesn't explain, or didn't

explain as far as I can tell how he arrived to

those conclusions, whether following data

analytical techniques or other techniques.  He

just stated a conclusion but never explained how

or why he arrived to that conclusion.

    Q  Apart from what he describes, your

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                    147

independent knowledge, do crime analysts in the

real world use a particular methodological

approach for drawing inferences from location

data?

    A   Again, that's what I tried to glean from

his report, and I couldn't see any methodological

approach or method or steps.  It's just a series

of conclusions that appeared to start with the

answer and then work backwards to the question

without really explaining how he went from point A

to point B in a sense.

    Q   So you would have had to learn from his

report what methodological approaches crime

analysts in the real world use to draw inferences

from location data.  Is that fair?

    A   Well, my expectation, given what he did,

was that he would explain whatever approach he

followed to go from the data available to him to

the conclusions, and from what I could tell, he

provided some conclusions but never explained how

he arrived to those conclusions.  He just stated

them as fact while it involves some amount of, you

Transcript of Valentin Estevez, Ph. D.

Conducted on September 3, 2025                    148

know, analysis, and I couldn't see how he went

from what was available to him to those

conclusions.

    Q   And without an explanation from

Dr. Wheeler, you don't have any independent

knowledge of what methodological approaches crime

analysts use to draw inferences from location

data.

    A   As I said, you know, I reviewed his report

trying to understand how he arrived to those

conclusions, and I didn't see a method.  He just

stated conclusions without really explaining how

he went from the information available to those

conclusions, and I'm a data analyst, so I tried to

make sense of what he did, and I couldn't find a

way to do it.

    Q   Thinking back to the time before you

reviewed his report, did you have an understanding

of what methodological approaches crime analysts

use to draw inferences from location data?

    A   Again, I'm here as a data analyst, an

economist who has experience analyzing human

behavior, and again, I've analyzed data in many contexts, and what I was expecting here is to see whatever approach consideration he followed, and I didn't see any discussion of that.

Q  And so you don't have experience as a crime analyst analyzing location data, correct?

A  No, as I said, I'm here as an economist and data analyst.

Q  Do you have any understanding of whether detectives in police departments have a particular methodological approach for drawing inferences from location data?

A  Again, you will have to give me an example.  I can only speak about what Dr. Wheeler did in his two reports, and as I mentioned, I didn't see any description or explanation of how he arrived to the conclusion that he stated.

Q  Okay, so your only answer to that question could have come from reviewing Dr. Wheeler's report, correct?

A  That was my assignment, to --

Q  Okay.

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                    156

you analyze data.  You analyze data, you have to                    13:39:09

set up the question and see if you can answer it.                   13:39:12

    Q   That's not how you analyze data, correct?                   13:39:15

    A   That's how data is supposed to be                           13:39:17

analyzed.  Otherwise, again, you're starting with                   13:39:20

the answer.  Basically you have the answer key,                     13:39:22

and then try to take the exam and then claim that                   13:39:24

you got all the answers correct.                                    13:39:36

    Q   And so in this section, and I'm just                        13:39:38

thinking, the section that deals with ███████                       13:39:46

███████   runs from about page 19 to page 22.  What                 13:39:48

economic concepts are you applying in this                          13:40:01

section?                                                            13:40:03

    A   So basically here's data analysis, so I'm                   13:40:04

just looking at what I see in the data and what                     13:40:07

can be inferred from the data.  There's part of my                  13:40:11

training as an economist and econometrician, so                     13:40:14

you --                                                              13:40:17

    Q   Are there any formulas you applied in that                  13:40:17

analysis?                                                           13:40:20

    A   No, at this point, this is what we call,                    13:40:20

you know, working with the data.  Economic                          13:40:22

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                                    157

analysis involves getting your hands in the data
and looking at it and determining what can be said
or not said from a given set of data points.  My
point in this section is that nowhere in
Dr. Wheeler's report he explains how he goes from
those data points that he chose to analyze --
again, remember, it's only a subset of data
points, from those data points, how he arrived to
this very strong conclusion that he did.

Q  So I'd like to look at -- and if you'll
keep your report open, we might be flipping back
and forth between the two, I'd like to look at
Exhibit 12 in Appendix C, and you'll see the title
of this exhibit is Exhibit 12, "Establishments
Near Flock Cameras Closest to █████████,"
correct?

A  Yes, that's correct.

Q  And ████████ is mapped on this
exhibit, correct?

A  Yes, there's some icons showing where the
████████ that Dr. Wheeler identified is.

Q  Okay, and the stars indicate Flock cameras

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                    160

A    It is possible, and again, these are only establishments.  The point of this exhibit is to show that there's more than ▆▆▆▆▆▆▆ to this area.  This is just thinking about visiting establishments.  There could be personal reasons or other reason why ▆▆▆▆▆ was in this area, and that's the only point I'm making here. They're concluding, as Mr. Wheeler did, that it must be ▆▆▆▆▆ is something I don't -- I don't see how you can draw that conclusion just from seeing captures of the data.

Q    Okay.  You can see that the intersection around the ▆▆▆▆▆ the intersection closest to the ▆▆▆▆ appears to have a cluster of four cameras, correct?

A    That's correct.

Q    Do you recall we looked at that intersection earlier today?

A    I believe we did, yeah, earlier exhibits I think.

Q    And so the intent of the cameras there is to capture traffic in each direction from that

intersection, right?

A   That's my understanding.

Q   Okay.  And so for instance, if you can capture a car going left in the direction of ██████████████ from ████████████, that would suggest that the car is not going to, for instance, ████████████████ which you have mapped out on the west end of this map, correct?

A   That would --

MS. ROSS:  Objection, incomplete hypothetical.

A   Again, you only see is that the car turned left.

Q   Okay.

A   That's the -- assuming that ██ took -- ██ got captured by that camera, so again, that's the point, you only see the capture.

Q   Okay.

A   You don't know where the vehicle was headed, where it stopped or didn't stop or why the vehicle was in the area.

Q   If you'll go back to your report, you'll

Transcript of Valentin Estevez, Ph. D.

Conducted on September 3, 2025                    181

inferences from the data.  Again, this is not something that you can query.

Q  Okay, and if you were a Norfolk police officer looking at these two and you wanted to figure that out, you could pull up the images, correct?

A  I'm assuming that they can do that.

Q  Okay.  That's not something that you did, correct?

A  Again, because here it is what you can do with the Flock camera data as it sits in front of me in terms of making some general statements about inferences, and again, just seeing these two captures, I cannot make inferences about where Ms. Arrington was coming from or where she was headed, just that she was captured these particular cameras these time stamps.

MR. SOYFER:  Now's probably a good time for a break.

THE VIDEOGRAPHER:  We are now going off the record.  The time is 2:06 p.m.

(Recessed at 2:06 p.m.)

Transcript of Valentin Estevez, Ph. D.

Conducted on September 3, 2025

184

A   That's what we know.  We don't know where it started, where it ended, whether other captures are part of the same, you know, trip.  That's the information that is not detailed in the Flock camera data.

Q   Okay.  It's not detailed in the Flock camera data alone, correct?

A   That's correct.

Q   In paragraph 98, you go -- well, it's the fourth from the last sentence of that paragraph, it begins with the word "But."  "But law enforcement using the Flock camera data do not know the routes taken by vehicles captured in the Flock data."  Do you see that?

A   I see that.

Q   And what's the basis for that statement?

A   My examination of the Flock camera data. As I've been saying, the Flock camera data only shows captures.  Nothing in the Flock camera data links together captures, it tells you where the vehicle started the trip or ended the trip.  The only thing that we know, that there was a capture.

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                              199

A  -- in this case.

Q  The answer is no, that's fine.  We can
move on.  In paragraph 102, or scratch that.
Never mind.  Paragraph 103 on page 34, you write
in the second sentence, "In the real world, most
sets of two or more captures by Flock cameras are
not part of a single unified trip, but instead,
likely reflect multiple different trips.  So what
is the basis for that opinion?

A  The number that we were discussing a
second ago when I discussed elapsed time between
captures, the distance between captures.  So
again, you see that difference in time.  You went
through some examples earlier in this deposition
showing that there was a capture at 9:00 in the
morning, then one in 3:00 in the afternoon with
nothing in between.  So you look at this data, and
that's -- that's why the first step is just to
look at data and realize this data is not about
trips.  It's about snapshots, a capture at a point
in time, and that's the extent of what you can get
out of this data.

Transcript of Valentin Estevez, Ph. D.
Conducted on September 3, 2025                                    200

This image was taken in this corner or this intersection, from that image, a license plate that appeared to match a vehicle was struck. That's what we can get out of it.

Q   And so you're saying that most sets of two or more captures are not part of a single unified trip, but instead likely reflect multiple different trips because of that average time between captures?

A   I'm just looking at the data, looking at the plaintiff data.  We have looked at many record from the plaintiff in this deposition.  This is something that you learn from examining the data. That's why I've been saying that first step is to look at the data, been saying that nothing is much there, and that's why my criticism of Dr. Wheeler and Dr. Higdon-Topaz for apparently ignoring the Flock camera data and going around it and making conclusions because the Flock camera data doesn't look like the data that they've been using for their calculations.

Q   And so when you see large gaps between

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

          I, Karen Young, the officer before whom

the foregoing deposition was taken, do hereby

certify that the foregoing transcript is a true

and correct record of the testimony given; that

said testimony was taken by me stenographically

and thereafter reduced to typewriting under my

supervision; that reading and signing was not

requested, and that I am neither counsel for or

related to, nor employed by any of the parties to

this case and have no interest, financial or

otherwise, in its outcome.

          IN WITNESS WHEREOF, I have hereunto set my

hand and affixed my notarial seal this 7th day of

September, 2025.

_____

NOTARY PUBLIC IN AND FOR

THE COMMONWEALTH OF VIRGINIA

My commission expires:

June 20, 2026

Registration No. 704852

**CERTIFICATE OF SERVICE**

I hereby certify that on September 29, 2025, I caused a copy of the foregoing document

to be served on all counsel of record for Defendants.

*/s/ Robert Frommer*
Robert Frommer