UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**

| | |
|---|---|
| LEE SCHMIDT and CRYSTAL ARRINGTON, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF NORFOLK, et al., <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 2:24-cv-621 <br> ) <br> ) <br> ) <br> ) <br> ) |

**BRIEF OF SAFE HOUSE PROJECT LLC AS *AMICUS CURIAE* SUPPORTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Amicus Safe House Project, Inc. ("Safe House Project"), by counsel, submits this brief in support of Defendants' Motion for Summary Judgment.

**INTRODUCTION AND INTERESTS OF AMICUS CURIAE**

Safe House Project is a national non-profit founded in Virginia that seeks to eradicate child trafficking. Human trafficking is one of the most common crimes in the world today. It is also one of the hardest to detect. Law enforcement relies on modern technology to monitor and investigate patterns of potential trafficking in public spaces. That includes the license plate readers at issue in this case. Plaintiffs, claiming an expansive privacy interest on public roads, would have this Court disable this important investigatory tool. Safe House Project submits this amicus brief to respectfully urge the Court to affirm law enforcement's ability to monitor and investigate public roads to protect the public, and particularly its most vulnerable members.

1

An estimated 40 million people across the world are currently victims of trafficking.[1] A disproportionate number of these victims are women and children.[2] Safe House Project is a nonprofit that aims to eradicate child trafficking by providing safe housing, survivor support, and community education across the country. Since 2017, Safe House Project has trained over 400,000 people on how to identify, report, and prevent trafficking. Safe House Project and its partners have also established a national network of care, including over 600 beds across the United States providing approximately 227,760 safe nights each year to survivors. And over 10,000 corporations in Safe House Project's network assist in identifying and aiding survivors.[3] Through these and other programs, Safe House Project assists trafficking victims to escape their trafficking situations and recover from the trauma they have endured.

Keeping up with advancing technology is crucial to combatting trafficking. Trafficking is a particularly challenging crime to detect and to prosecute. Although prevalent, it is underreported and easy to miss. Given this reality, modern technology is often the only way to detect trafficking situations, rescue trafficked individuals, and bring perpetrators to justice. Safe House Project knows this from personal experience: It recently launched an innovative app, Simply Report, which uses artificial-intelligence technology to gather observations from the public, vet the

---

[1] Deanna Longjohn, *Four Dimensions of Human Trafficking Prevention*, 8 J. GLOB. JUST. & PUB. POL'Y 123, 123 (2022).

[2] Kathleen A. McKee, *A Primer on Human Trafficking*, 10 J. GLOB. JUST. & PUB. POL'Y 1, 10 (2024).

[3] *See* Safe House Project, https://www.safehouseproject.org (last visited Sep. 22, 2025); *see also* EIN Presswire, *Safe House Project Expands Safe Homes Nationwide, Providing a Path to Freedom for Child Trafficking Survivors* (Oct. 23, 2024), https://www.einpresswire.com/article/754181012/safe-house-project-expands-safe-homes-nationwide-providing-a-path-to-freedom-for-child-trafficking-survivors.

information provided, and provide tips to appropriate authorities.[4] These tips can include license plate information, allowing law enforcement to better locate both perpetrators and victims. Both North Carolina and Mississippi have adopted the Simply Report app as their primary human trafficking reporting system, and more states are expected to follow suit.[5] Flock's license-plate-reader (LPR) technology is another tool that is crucial to efforts to combat trafficking. LPR technology collects temporary data regarding the exteriors of vehicles on public roads and in public places. It is one of the few tools available today for effectively investigating human trafficking.

The Fourth Amendment provides essential protections to individuals from unreasonable searches and seizures. At bottom, those protections require balancing an individual's expectation of privacy with the public's interest in safety. Here, the public has an overwhelming interest in ensuring that law enforcement authorities have access to the technology needed to monitor and investigate potential criminal activities in public spaces. The Virginia legislature has recognized this reality. It recently enacted a law that explicitly allows the use of license plate readers, subject to rules to ensure that they are used properly. This Court should not disregard this careful balancing of interests. If it were to do so and forbid law enforcement from using license plate readers in public spaces without a warrant as Plaintiffs urge, many human trafficking investigations would all but grind to a halt. And untold numbers of trafficking victims would never be identified, much less rescued. Safe House Project urges this Court to consider these real-world harms and hold that license plate readers do not violate the Fourth Amendment.

---

[4] Rebeka Zeljko, *Exclusive: Safe House Project ramps up fight against human trafficking, launches first-of-its-kind app*, BLAZEMEDIA (May 6, 2025) https://www.theblaze.com/news/exclusive-safe-house-project-ramps-up-fight-against-human-trafficking-launches-first-of-its-kind-app.

[5] Zeljko, *supra* n.4; *Magnolia Mornings: July 1, 2025*, MAGNOLIA TRIBUNE (July 1, 2025), https://magnoliatribune.com/2025/07/01/magnolia-mornings-july-1-1-2025/.

# ARGUMENT

I.  **The Fourth Amendment Reasonableness Test Requires Giving Appropriate Regard to the Public Interest in Community Safety.**

Plaintiffs' unfounded extension of the Fourth Amendment should be rejected. The Fourth Amendment demands "assessing, on the one hand, the degree to which [a search] intrudes upon an individual's privacy and, on the other, the degree to which [the search] is needed for the promotion of legitimate government interests." *Wyoming v. Hougton*, 526 U.S. 295, 299-300 (1999). Plaintiffs claim that they have an expectation of privacy on Norfolk's public roads, and that the license plate readers in Norfolk unconstitutionally invade that privacy. But expectations of privacy are significantly reduced in public spaces, including "on public streets and highways." *United States v. Knotts*, 460 U.S. 276, 281 (1983); *see, e.g., Cardwell v. Lewis*, 417 U.S. 583, 590 (1974) (plurality) ("A car has little capacity for escaping public scrutiny. It travels public thoroughfares where its occupants and its contents are in plain view."). And the public has a strong, even overwhelming interest in ensuring that law enforcement can review a person's public movements to effectively keep the streets safe.

Although license plate readers only capture information about vehicles' movements at intermittent times and at discrete roadside locations, law enforcement can effectively use this data to improve public safety, including for the most vulnerable among us. Human trafficking is a serious problem, and one that is notoriously difficult to stop and detect. License plate readers are promising tools that law enforcement can use to combat trafficking, without unduly infringing the privacy of those driving on Norfolk's public roads. The political branches have recognized that this balance can be struck: Just this year, the Virginia legislature passed, and the Virginia governor signed, regulations that permit law enforcement to use license plate readers, but that also impose certain safeguards to protect the privacy of law-abiding citizens.

The Fourth Amendment necessarily involves balancing interests. On one side is the individual privacy that Americans hold so dear. On the other is the public's need for law enforcement to have adequate and effective tools for the investigation, prevention, and prosecution of crimes. "The balance, ever so delicate, swings from law enforcement and public safety to liberty and privacy interests." *United States v. Chatrie*, 136 F.4th 100, 105 (4th Cir. 2025) (Diaz, J., concurring). But in evaluating this balance, courts must take care to give appropriate regard to "the weighty interest" in "the community's interest in basic public safety." *United States v. Bumpers*, 705 F.3d 168, 171 (4th Cir. 2013). Here, that balance is firmly on the side of public safety—especially considering that Virginia's legislature has already regulated license plate readers to prevent potential abuses. Plaintiffs now ask this Court to disrupt that legislative solution and categorically bar law enforcement from using a key investigative tool. Safe House Project urges this Court to decline this invitation. As another court in this district explained in holding that Flock's license plate readers did not constitute an unlawful search, courts must be "cautious to not hinder law enforcement's use of modernizing surveillance capabilities." *United States v. Martin*, 753 F. Supp. 3d 454, 476 (E.D. Va. 2024); *see also Bumpers*, 705 F.3d at 176 (rejecting an outcome that "would impose a significant barrier to efforts to investigate trespassing violations . . . where security is critical").

## II. Human Trafficking Is a Pervasive Public Safety Problem.

Human trafficking is a prevalent and persistent problem—in Norfolk, in Virginia, and across the world. Trafficking encompasses a wide range of harms, including "the recruitment, abduction, transport, harboring, transfer, sale or receipt of persons . . . through force, coercion, fraud or deception; to place persons in situations of slavery or slavery-like conditions, forced labor or services, such as forced prostitution or sexual services, domestic servitude, bonded sweatshop

labor, or other debt bondage."[6]  The scale of this problem is immense:  Across the world, an estimated 21 million individuals are actively being trafficked, over a quarter of whom are children.[7]  Virginia is no exception.[8]  Indeed, the Eastern District of Virginia has tragically been home to some of the highest profile and most graphic sex trafficking cases in the country.[9]

Despite its prevalence, fewer than 1% of trafficking situations are identified, and even fewer are prosecuted.[10]  In the two decades after 2000, when the United States enacted the groundbreaking Trafficking Victims Protection Act, only 4,824 trafficking cases were brought at the federal level.[11]  State level enforcement has been even more abysmal.  For many years, most states, including Virginia, did not even precisely identify human trafficking as a crime.[12]  And even after such statutes were put in place, Virginia has still struggled to make progress.[13]

---

[6] McKee, *supra* n.2, at 6.

[7] Longjohn, *supra* n.1, at 128 (Data is from 2022).

[8] Nicole Tutrani, *Open for the Wrong Kind of Business: An Analysis of Virginia's Legislative Approach to Combating Commercial Sexual Exploitation*, 26 REGENT U.L. REV. 487 (2014); Va. Dep't of Criminal Justice Servs., *The State of Human Trafficking in Va.* (2019).

[9] *See, e.g.*, Affidavit in Support of a Criminal Complaint and Arrest Warrants at 2, *United States v. Strom*, 2013 WL 6271932 (E.D. Va. Dec. 4, 2013) (No. 1:12-cr-159); *Doe v. Wyndham Hotels & Resorts, Inc.,* 2025 WL 725268 (E.D. Va. Mar. 6, 2025) (No. 2:24-cv-204); *Doe v. Fairfax Police Officer No. 1*, 2022 WL 22949011 (E.D. Va. May 11, 2022) (No. 1:21-cv-1150).

[10] EIN Presswire, *supra* n.3.

[11] McKee, *supra* n.2, at 10.

[12] *See, e.g.*, Taryn Offenbacher, *Virginia: Last State In Nation to Establish a Human Trafficking Law, Shared Hope International* (April 1, 2015), https://sharedhope.org/2015/04/01/virginia-last-state-in-nation-establishes-first-standalone-sex-trafficking-law/; Tutrani, *supra* n.8; Todd Shockley, *These Old Familiar Chains: Virginia's Attempts to Draft & Ratify Anti-Human Trafficking Legislation*, 2011 LIBERTY UNIV. L. J. 18 (2011).

[13] Virginia State Crime Commission, *Sex Trafficking—Vacatur of Convictions and Data Collection* (2021).

Much of this breakdown occurs at the detection and investigation stages. Traffickers are an unusually diverse group—ranging from individual defendants (of all ages and genders) to organized gangs.[14] And the way they operate is "constantly changing and adapting to current cultural trends and technological improvements."[15] Traffickers intentionally target and take advantage of those who are already vulnerable to exploitation and least likely to be able to ask for help. Many trafficking victims have substance-abuse problems, deficiencies in their legal status, unmanageable debts, or limited language or intellectual abilities.[16] Victims "often do not see themselves as victims or realize that they are being sex trafficked."[17] They also "face various challenges in leaving the commercial sex industry, such as a lack of a support structure, limited basic life skills, lack of an education, a criminal record, difficulty securing housing or employment, mental health conditions, and health issues."[18] Compounding all this, victims tend to be wary of the "traditional criminal justice response," which has historically treated them (rather than their traffickers) as criminals.[19]

In sum, the hidden nature of human trafficking contributes to its prevalence. It is "highly profitable," but "entails relatively minimal risk of detection by the police."[20]

---

[14] McKee, *supra* n.2, at 7-10; Michael J. Frank & G. Zachary Terwilliger, *Gang-Controlled Sex Trafficking*, 3 VA. J. CRIM. L. 342, 344-47 (2015).

[15] Longjohn, *supra* n.1 at 31.

[16] McKee, *supra* n.2, at 12.

[17] VSCC Sex Trafficking Vacatur, *supra* n.13, at 158.

[18] *Id.*

[19] *Id.*

[20] Frank & Terwilliger, *supra* n.14, at 344.

**III.     License Plate Readers Are an Important Tool for Combatting Trafficking.**

Human trafficking is a crime that exploits the most vulnerable and then uses those vulnerabilities to avoid consequences. License plate readers help give law enforcement the information they need to compete with the criminals they are investigating.

Nearly all the force, coercion, deception, and abuse in trafficking occurs in private spaces, such as a trafficker's home, a place of business, or a hotel room. Only limited aspects of trafficking occur in public, usually involving transporting victims from one location to another for labor, sex, or services. Motor vehicles are one of the most prevalent transportation methods for sex traffickers. From 2019 to 2023, private vehicles accounted for 38% incidents of human trafficking; rideshares, such as Uber and Lyft accounted for 7%; rental cars for 3%; commercial vehicles for 3%; and buses for 2%.[21] Vehicles thus often provide one of the only public clues in a trafficking investigation. This limited public conduct—law enforcement's main chance to identify and stop traffickers—can look ordinary to the naked eye. That is where modern technologies like license plate readers come in.

License plate readers like Flock's can collect the data needed to help investigating officers identify a suspect's vehicle. Take a common scenario. A minor is reported missing in a suspected kidnapping. Through an investigation, an officer can ascertain the identity of the suspected kidnapper's vehicle. The investigating officer can then check a license plate reader to access information about where the vehicle was recently spotted, supporting the officer in locating the suspect and the victim. In such cases of child abduction, time is of the essence.[22] Flock's license

---

[21] Human Trafficking Institute, *2023 Human Trafficking Report*, https://traffickinginstitute.org/wp-content/uploads/2024/06/2023-Federal-Human-Trafficking-Report-WEB-Spreads-LR.pdf (2024).

[22] Federal Bureau of Investigation, *What We Investigate*, https://www.fbi.gov/investigate/violent-crime/vcac (last visited Sep. 22, 2025).

plate readers have helped law enforcement across the country to intercept many kidnappers and their victims in exactly this way, including in situations where the kidnapper engaged or intended to engage in unlawful sexual activity.[23]

License plate readers have also shown great promise for assisting victims in exigent circumstances. For example, the Amber/Silver Alert system uses a nationwide text message and media banner to send out notices of missing children or elderly people, including children being trafficked or kidnapped by perpetrators. Amber Alert is embedded into Flock's systems, ensuring an automatic ping to law enforcement any time a vehicle in an Amber alert is detected by a Flock LPR camera. Since integrating with the Amber Alert system, Flock cameras have been used to reunite more than 1,000 missing people.[24] In one recent example, Flock's technology helped reunite a mother with her infant child after the child was taken by a relative at knifepoint. After an Amber alert was issued following the infant's disappearance, a Flock camera detected the vehicle matching the alert, allowing officers to locate and recover the child.[25] In another instance, a missing man with dementia drove nearly 200 miles undetected before a Flock camera spotted his

---

[23] *See, e.g.*, Kaitlyn Snook, *Fort Myers man arrested for transporting minor across state lines with intent of unlawful sexual activity*, Fox 4 Southwest Florida (Feb. 3, 2023), https://www.fox4now.com/news/local-news/fort-myers-man-arrested-for-transporting-minor-across-state-lines-with-intent-of-unlawful-sexual-activity; Camberyn Kelley, *Iowa County official documents reveal suspect communication weeks before alleged kidnapping*, 15 WMTV (Jan. 3, 2024), https://www.wmtv15news.com/2024/01/04/iowa-county-official-documents-reveal-suspect-communication-weeks-before-alleged-kidnapping/; Chris Gothner, *Kidnapped 13-year-old found with Wisconsin fugitive in Key Largo, deputies say*, Local 10.com (Feb. 13, 2024), https://www.local10.com/news/local/2024/02/13/kidnapped-13-year-old-found-with-wisconsin-fugitive-in-key-largo-deputies-say/.

[24] Flock Safety, *1,000 Missing Persons Reunited: How Flock Safety is Transforming Recovery Operations* (May 1, 2025), https://www.flocksafety.com/blog/1000-missing-persons-reunited.

[25] Flagscanner, *UPDATE: 1-Year-Old Kidnapped in Los Angeles Found Safe Near Flagstaff; Three Arrested* (Sep. 7, 2025), https://flagscanner.com/breaking-kidnapping-suspect-tracked-by-flock-cameras-to-flagstaff-area-infant-found-safe/.

vehicle and notified nearby officers.[26] The responding officer noted that if it had not been for Flock's technology, "the vehicle would have passed right by me and I would've had no idea."[27]

If prevented from using license plate readers and other modern technologies in real time, law enforcement will be denied a vital asset in their efforts to combat trafficking and many other crimes. The Fourth Amendment does not require this harmful result to public safety. After all, "[n]othing in the Fourth Amendment prohibit[s] the police from augmenting the sensory facilities bestowed upon them at birth with . . . enhancement[s from] science and technology." *Knotts*, 460 U.S. at 282-83 (holding that officers could rely on tracking device in defendant's car to monitor its movements).

In sum, Norfolk's investment in license plate readers helps keep the most vulnerable members of society safe. In trafficking investigations, data and analysis from license plate readers can make all the difference. The significant public interest in using license plate readers to monitor and investigate serious crimes like human trafficking should weigh strongly in the Fourth Amendment balance struck by this Court. *See id.* at 284 (rejecting the idea that technology that "enable[s] the police to be more effective in detecting crime" runs afoul of the Fourth Amendment).

### IV. Virginia's Political Branches Have Recognized the Importance of License Plate Readers and Ensured the Technology Is Used Responsibly.

Virginia's political branches have recognized that license plate readers have immense potential for detecting and stopping human trafficking and other hidden crimes, and so the public

---

[26] Beau Bowman, *Missing Kansas City man with dementia found in Indianola by new cameras that read license plates*, KCCI DES MOINES (May 15, 2024), https://www.kcci.com/article/flock-license-plate-cameras-help-indianola-police-find-missing-kansas-city-man-with-dementia/60780224.

[27] *Id.*

interest favors using such technology on public streets. Specifically, the General Assembly recently enacted, and the Governor signed into law, regulations permitting the use of license plate readers and affirming its importance for law enforcement. In doing so, the legislature also established detailed requirements to ensure that the technology is used responsibly and lawfully. This Court should not lightly disturb the carefully negotiated balance struck by Virginia's democratically elected representatives. *See United States v. Jones*, 565 U.S. 400, 429 (2012) (Alito, J., concurring in the judgment) (explaining how "Congress did not leave it to the court to develop a body of Fourth Amendment case law governing" wiretapping, but instead "promptly enacted a comprehensive statute").

During the 2025 session, the Virginia General Assembly enacted, and the Governor signed into law, House Bill 2724.[28] Codified as Chapter 720, this robust law regulates any license plate recognition system used in the Commonwealth. First, it establishes certain quality requirements for vendors of such systems (like Flock). Each vendor must "certif[y] that it will not sell or share any system data" and "will only access system data" at the request of the agency for maintenance purposes. *See* Va. Code § 2.2-5517(B)(1). The vendor must have in place "audit trail data" to check for law enforcement abuses. *Id.* at (B)(3). The vendor must certify that the system will purge data 21 days after the data is captured. *Id.* at (B)(2); *Id.* at (E). And the vendor must meet "information security standards as established by the Virginia Information Technologies Agency." *Id.* at (B)(5).

The statute also restricts how law enforcement may use the system. First and foremost, it limits the technology to only certain circumstances, with a particular focus on using the technology

---

[28] H.B. 2724, Gen. Assemb., Reg. Sess. Reconvened (Va. 2025).

to combat human trafficking. Specifically, the law allows access to license plate reader information for:

- Criminal investigations for state or local laws where there is reasonable suspicion that a crime has been committed;
- Active investigations into missing or endangered persons or persons associated with *human trafficking*; and
- Notifications for missing persons, persons associated with *human trafficking*, persons with outstanding warrants, and stolen vehicles or license plates.

*Id.* at (D). The statute also limits how data may be shared between law enforcement agencies or other parties. *Id.* at (F). And any law enforcement agency that adopts an LPR system "shall establish a policy governing such use . . . that includes," among other things, training requirements, procedures and limitations on use, procedures for auditing use, and data security and management procedures." *Id.* at (H).

The statute further provides protections for individuals targeted by the license plate readers. "A notification by a [LPR] system . . . does not, by itself, constitute reasonable suspicion as grounds for law enforcement to stop a vehicle." *Id.* at (M). Rather, officers must develop independent reasonable suspicion or independently verify the grounds for the suspected vehicle. *Id.* Evidence acquired in violation of the statute cannot be used in any proceeding. *Id.* at (O). And it is a misdemeanor for any law enforcement officer to misuse the data. *Id.* at (N).

Chapter 720 thus establishes restrictions to avoid the very abuses about which Plaintiffs hypothesize here. And in doing so, the General Assembly made clear that not only does the public have a strong interest in improving public safety through license plate readers, but that law enforcement's responsible use of such technology has broad public and community support, including from organizations like Safe House Project.

12

Virginia's recent law is a perfect example of the political process effectively balancing the competing demands of the Fourth Amendment. After all, "[a] legislative body is well situated to gauge changing public attitudes, to draw detailed lines, and to balance privacy and public safety in a comprehensive way." *Jones*, 565 U.S. at 429-30 (Alito, J., concurring in the judgment). And any potential abuses in particular cases can be addressed as they arise. This Court should not disrupt Virginia's careful and measured legislative process. *See Carpenter*, 585 U.S. at 316 (when considering the application of the Fourth Amendment to new technological "innovations," a "[c]ourt must tread carefully … to ensure that [it does] not embarrass the future"); *Application of U.S.*, 563 F.2d 637, 645 (4th Cir. 1977) (reversing a lower court decision that "would permit the judiciary to substitute its judgment for that of the legislature as to the nature and significance of the public interest which justifies electronic surveillance").

## CONCLUSION

Just as courts are "obligated … to ensure that the progress of science does not erode Fourth Amendment protections," so too must courts ensure that law enforcement is not deprived of technological advancements key to improving public safety. *Carpenter*, 585 U.S. at 320. Safe House Project respectfully requests that Norfolk's Motion for Summary Judgment be granted.

Dated: September 22, 2025                    Respectfully submitted,

*/s/ Juliet B. Clark*
Juliet B. Clark (VSB No. 96918)
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
Tel.: (804) 775-1000
Fax: (804) 775-1061
jbclark@mcguirewoods.com

Ryan Y. Park (*pro hac vice* forthcoming)
MCGUIREWOODS LLP
501 Fayetteville Street, Suite 500

13

Raleigh, NC 27601
Tel.: (919) 755-6566
Fax: (919) 525-4321
rpark@mcguirewoods.com

*Counsel for Amicus Safe House Project LLC*